United States District Court
For the District of Columbia

| | | |
|---|---|---|
| **Jay W. Cooper** <br> 2431 Pinebrook Circle <br> Medford, Oregon 97504, <br><br> Plaintiff <br><br><br> v. <br><br> **Counterpart International** <br> 1200 Eighteenth St., N.W. <br> Suite 1100 <br> Washington, D.C. 20036. <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civ. No. 05-1598 (RMC/JMF) |

**FIRST AMENDED COMPLAINT FOR DAMAGES**
**(BREACH OF CONTRACT and FALSE LIGHT INVASION OF PRIVACY)**

Plaintiff Jay W. Cooper alleges as follows:

**Nature of the Action**

1. Plaintiff Jay W. Cooper ("Cooper") seeks redress and money damages from his former employer for breach of contract and for false light invasion of privacy.

**The Parties**

2. Cooper is a 57-year-old resident of the State of Oregon, temporarily residing in Arlington, Virginia. Cooper has been employed by Defendant Counterpart International since January of 1995 in various capacities on various projects in Central Asia.

1

3. Defendant Counterpart International ("Counterpart") is a corporation organized and operating under the laws of a state other than Oregon, with its principal place of business in Washington, D.C.

## Jurisdiction and Venue

4. The amount in controversy, exclusive of interest and costs, exceeds the sum of $ 75,000.

5. This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

6. Venue lies in this Court under 28 U.S.C. § 1391(a), as a substantial part of the events giving rise to the claim occurred in the District of Columbia.

## Count I

### (Breach of Contract)

7. On or about December 18, 2003, Cooper and Counterpart entered into a letter agreement under which Counterpart renewed an existing contractual relationship with Cooper, and confirmed Cooper's position as Chief of Party for several Counterpart programs. A copy of this agreement endorsed by Counterpart is attached to this Complaint as Exhibit A, and is incorporated herein by reference. Cooper endorsed a copy of Exhibit A and transmitted it to Counterpart on or about December 18, 2003. Hereinafter that agreement is referred to as "the letter agreement."

8. Under the letter agreement, Counterpart was obliged to continue Cooper's employment until June 30, 2006, absent certain circumstances enumerated in paragraph 7 of that letter agreement.

9. The letter agreement provides that Cooper was to comply with the procedures outlined in Counterpart's Manual for Overseas Employees ("the Counterpart Manual"), and to receive the benefits outlined therein.

10. Counterpart never prepared or presented to Cooper the "job description for the Position" as it was obliged to do under the letter agreement. The only description of Cooper's job responsibilities ever developed was one that Counterpart requested Cooper to prepare in the summer of 2004.

11. Counterpart failed to provide Cooper with the annual performance evaluations to which he was entitled under the Counterpart Manual. Counterpart only provided one such evaluation in the years of Cooper's employment. That evaluation was delivered in 2002.

12. Under an oral agreement with Counterpart, Cooper was scheduled to receive a five percent raise in salary effective July 1, 2004. That oral agreement was reflected in at least one of the budgets of the projects Cooper managed. Cooper's salary was not raised in July of 2004 from its previous level, in violation of that agreement.

13. On November 12, 2004, Counterpart unilaterally terminated Cooper's employment. That action breached the letter agreement in that (a) funding for Cooper's position or for the programs he administered had not been lost, (b) Counterpart did not give Cooper thirty days' notice of its action, and (c) Cooper did not agree to that action.

14. At all times prior to November 12, 2004, Cooper had fulfilled his obligations under the letter agreement and performed his job duties to Counterpart's satisfaction.

15. To the extent that Counterpart purports to have relied on a determination that the foregoing paragraph 14 is untrue, Counterpart was obligated to make any such determination in good faith and in a reasonable, non-arbitrary manner. Since Counterpart's purported review of Cooper's job performance in the final months of his employment was arbitrary, capricious and conducted in bad faith, Counterpart has violated the implied covenant of good faith and fair dealing imposed by the letter agreement.

16. Prior to November 12, 2004, Cooper had complained to his superiors and others at Counterpart about certain financial irregularities in programs Counterpart was performing under contract to agencies of the United States.

17. Cooper's action in so reporting those irregularities was in accord with his responsibilities under Counterpart's Manual.

18. Upon information and belief, Counterpart terminated Cooper in violation of the letter agreement in part to avoid the questions Cooper had raised, as described in the preceding two paragraphs.

19. The Counterpart Manual provides that an employee may avail himself of an established grievance procedure if he encounters any circumstances of concern or any actions he feels to be discriminatory.

20. By terminating Cooper without the thirty days notice required by the letter agreement, upon information and belief Counterpart intended to prevent Cooper

from commencing a grievance proceeding under which he could have (and would have) challenged the motive described in paragraphs 16-18, above.

21. Following Cooper's termination, Counterpart refused to remit to Cooper reimbursement for expenses he had incurred on Counterpart's behalf, despite Cooper's submission of appropriate documentation and repeated requests from counsel. Such refusal violated the letter agreement and Counterpart's Manual and the covenant of good faith and fair dealing.

22. Furthermore, Counterpart failed to provide Cooper with reimbursement for the expenses of his relocation from his duty site in Kazakhstan to his home of record, in violation of the Counterpart Manual and the covenant of good faith and fair dealing.

23. In addition, by disseminating false information about Cooper's supposed "performance" problems and "mismanagement" (as described in paragraph 28 *infra*), Counterpart further violated the prohibitions of the Counterpart Manual and the covenant of good faith and fair dealing.

WHEREFORE, Cooper demands judgment against Counterpart for the following:

    a. His full salary from the date of termination through June 30, 2006, including the five per cent raise that should have been effective as of July 1, 2004;

    b. The value of all benefits due him under the letter agreement and the Counterpart Manual from the date of termination through June 30, 2006;

    c. Reimbursement of all business expenses for which Cooper has submitted documentation;

    d. Sums deducted from Cooper's paychecks as cash advances, which sums were, on information and belief, not tendered to Cooper;

    e. Such other amounts as shall be proven at trial; and

    f. Such other and further relief as the Court deems just and proper.

## Count II

### (False Light Invasion of Privacy)

24. Plaintiff realleges and incorporates herein paragraphs 1-23 set out above.

25. After terminating Cooper on Friday, November 12, 2004, Counterpart took steps knowingly designed publicly to send out the message to Cooper's professional colleagues in and outside the Counterpart organization that Cooper had been guilty of serious misfeasance or dishonesty and was not to be trusted. Counterpart took those steps despite the fact that Cooper had never demonstrated any such traits during his ten years of employment and, to the contrary, was well known to Counterpart as a highly trusted and esteemed employee.

26. Among the steps referenced in the preceding paragraph are the following:

    a. On Friday November 12, 2004, Counterpart knew that Cooper would be on a business mission to Counterpart's office in Bishkek, Kyrgyzstan. Counterpart notified Cooper of his termination in a telephone conference call and told him he could not return to his office in Almaty, Kazakhstan.

    b. Counterpart immediately changed the locks on Cooper's office in Almaty in the presence of the staff of that office and kept it locked.

  c.  Counterpart informed its Country Directors in Kazakhstan, Kyrgyzstan and Turkmenistan that Cooper was no longer with Counterpart and that he was not allowed in any offices in those countries

  d.  Counterpart promptly shut down all internet access for its staff in Almaty, on an obvious false pretense of remodeling, thereby making it impossible for Cooper to communicate electronically with anyone at his office.

  e.  Counterpart instructed all staff in Almaty to stay away from Counterpart's Almaty office on the weekend of November 13-14, 2004.

  f.  During that weekend, Counterpart employees sorted through everything in Cooper's office; during this process they broke into locked drawers and files and confiscated materials relevant to the events described in paragraph 15, above.

  g.  A Counterpart executive named Michael Kunz instructed the staff at Cooper's office not to forward emails or telephone messages or other correspondence to Cooper.

  h.  On Monday, November 15, 2005, a Counterpart employee told Cooper's professional colleague at USAID, the federal agency which had funded the projects on which Cooper had been working for ten years, that Cooper had left Counterpart "not by his own choice."

27. The steps enumerated in the preceding paragraph starkly differ from those usually followed in the case of a departing Counterpart executive; such a person is usually afforded the courtesy of cleaning out his office, saying goodbye to staff and USAID contacts, participating in the orderly transition of projects to new

management, and receiving communications which are personal or to which it is appropriate that he personally respond. Moreover, in Central Asia it is customary for Counterpart (and other companies) to participate in a party for a departing employee, to which the employee invites friends and business colleagues. Many of Cooper's professional colleagues throughout Central Asia and Europe took note of how differently Cooper's termination was handled.

28. Moreover, agents of Counterpart have, at various times since Cooper's termination, made the following untrue statements to Cooper's professional colleagues purposely to damage Cooper's professional and personal reputation and credibility, or, at best, with reckless disregard thereto:

    a. That it was Cooper's decision to leave the employ of Counterpart.

    b. That Counterpart offered Cooper choices other than being terminated that he rejected.

    c. That Cooper did not cooperate with Counterpart.

    d. That Cooper was terminated for performance reasons.

    e. That Cooper mismanaged his projects.

    f. That Cooper's ex-wife, rather than Cooper, deserved custody of the couple's minor child because Cooper was too "controlling."

29. Counterpart's public actions and knowing and/or reckless dissemination of these matters placed Cooper in a false light that would be highly offensive to a reasonable person and which reasonably caused his professional and personal colleagues to doubt his credibility, ethics and professional competence.

WHEREAS, Cooper demands judgment against Counterpart for damage to his professional reputation, as well as for emotional distress and personal humiliation resulting from being held up to a false light in violation of his personal privacy, in amounts to be proven at trial, and such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,

_____
Patricia D. Douglass
D.C. Bar No. 214916
98 Interpromontory Rd.
Great Falls, VA 22066-3219
(703) 759-3586

COUNSEL FOR PLAINTIFF.

July 11, 2006