UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAY W. COOPER ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 1:05-cv-01598-RMC |
| ) | |
| COUNTERPART INTERNATIONAL ) | |
| ) | |
| Defendant. ) | |
| ) | |

**STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Counterpart International ("Counterpart"), by its attorneys, submits this statement of material undisputed facts in support of its motion for summary judgment pursuant to Rule 7(h) of the Local Civil Rules of the U.S. District Court for the District of Columbia.

**A.  Counterpart Employs Cooper Pursuant To A Contract That
     Permits Termination For Unsatisfactory Performance**

1.  Counterpart is a nonprofit development organization that manages a variety of development projects around the world. Counterpart is organized into several program divisions, including the Civil Society Division which has developed and overseen all civil society support projects in the Central Asian Republics since 1994. (Lear Decl. ¶ 3, Exhibit L.)

2.  In January 1995, Counterpart hired Jay Cooper ("Cooper") to work on its projects in Central Asia. (Amended Complaint, ¶ 2.) Throughout his tenure with Counterpart, the terms of Cooper's employment were governed by various employment contracts. (Exhibit A.)

3. On December 21, 2003, Cooper and Counterpart entered into an employment agreement to continue Cooper's employment with Counterpart as Chief of Party for the Civil Society Support Initiative, the Healthy Communities Program, and similar projects. (Exhibit B.) Cooper's position was based in Counterpart's Almaty, Kazakhstan office. (Cooper Dep. at 50, Exhibit I; Lear Decl. ¶ 7.) The contract specified the term of Cooper's employment "shall be thirty-six (36) months, and shall begin on July 1, 2003 and end June 30, 2006, unless terminated earlier as provided below." (Exhibit A.)

4. The provision specifying early termination was stated in paragraph 7 of the employment agreement as follows:

> This Agreement may be terminated without liability to either party in the following circumstances: 1) by Counterpart, upon fourteen (14) days notice, if funding for the Position or Program is lost, 2) *by Counterpart, immediately upon notice, if you fail to fulfill your obligations under this Agreement or fail to perform your job duties to Counterpart's satisfaction*, 3) by either party upon thirty (30) days written notice, for any lawful reason; or 4) by mutual agreement of the parties at any time.

*Id*. (Emphasis added.)

5. In the past, Cooper had negotiated various terms and conditions of his employment prior to execution of his employment contracts with Counterpart. (Cooper Dep. at 37-44.)

6. Cooper had the opportunity to discuss and negotiate its terms and conditions of his December 21, 2003 contract prior to execution. (Cooper Dep. at 47-50, *see also* Exhibit C.) Cooper admits he agreed to sign the contract without discussing or negotiating the terms relating to the termination of his employment. (Cooper Dep. at 56:15-22; 57:1-4.)

7.  The contract executed on December 21, 2003 was in effect at the time of Cooper's termination in November 2004. (Exhibit B.)

8.  Cooper's primary responsibility as Chief of Party in Counterpart's Almaty office was the effective implementation of the program goals, objectives, and related results indicators for the Civil Society Support Initiative and Healthy Communities Program. (Lear Decl. ¶ 6.)

9.  Counterpart's Senior Vice President, Arlene Lear ("Lear") was the Counterpart executive with oversight responsibility for all civil society support programs, including the Civil Society Support Initiative and Healthy Communities Program. (Lear Decl. ¶¶ 2, 4.)

10. Lear had final authority over Counterpart personnel in her division, including hiring and firing of employees, negotiating employee contracts, and reviewing employee job performance. (Lear Decl. ¶5.)

**B.  In 2004, Counterpart Becomes Dissatisfied With Cooper's Performance**

11. In 2004, Cooper served under Lear's supervision. (Lear Decl. ¶ 6.) Lear had final authority to decide if Cooper was performing to the satisfaction of Counterpart. (Lear Dep. at 265, Exhibit J.) That year, several expatriate employees working with Cooper in Almaty reported to Lear that Cooper was ineffective as a leader. (Lear Dep. at 115:16-19; 216-218.)

12. Lear previously had discussed with Cooper his need to improve as a leader and to reduce his defensiveness regarding other employees. (Lear Decl. ¶ 8.)

13. When Lear visited Cooper in the Spring of 2004, she perceived that Cooper was not adequately transmitting to key project staff the overall vision of the program. (Lear Decl. ¶ 9.)

14. Lear also perceived the general tone of the Almaty office was flat and local staff seemed withdrawn, with little interaction with Cooper other than to be responsive to questions. (Lear Decl. ¶ 10.)

15. In discussions with field staff, Lear came to believe that Cooper was inaccessible to his employees and that he often stayed behind closed doors. (Lear Decl. ¶ 11.) This was corroborated by later reports from other Counterpart employees, including staff member Erkin Kasybekov, who told Lear that Cooper did not answer his e-mails for extended periods of time. (Lear Dep. at 213-214.)

16. Lear further observed that Cooper had inefficiently structured Counterpart programs so that all administrative functions had been placed under his direct authority and supervision. She felt that Cooper was distracted and unfocused, and believed he was too engrossed in minor administrative tasks. (Lear Decl. ¶ 13, Lear Dep. at 105-106; 113:9-11.)

17. Lear believed Cooper's consolidation of administrative functions under his direct supervision diverted him from his primary responsibilities as a leader, and that his management approach compromised Counterpart's ability to achieve program goals. (Lear Decl. ¶ 14.) Lear believed that program beneficiaries, including local associations, were not receiving the capacity they needed to serve their communities. (Lear Dep. at 117:15-18.)

18. Lear also observed the native citizen staff members in the Almaty office seemed afraid and intimidated by Cooper. (Lear Dep. at 214-219.) In prior visits, Lear personally witnessed Cooper being controlling and intimidating toward Counterpart employees. (Lear Decl. ¶ , Lear Dep. at 214-215.) Other Counterpart employees, among them Yana Ina and Kazakstan Country Director Marat Kazibeko, confirmed with Lear that Cooper was controlling and intimidating his staff. Marat Kazibeko told Lear that Cooper's staff had expressed fear of Cooper and feelings of disempowerment. (Lear Dep. at 215-219.)

19. Lear also held discussions with Counterpart employees Beth Kamoli and Ara Nazinyan, as well as USAID regional director George Deikun, all of whom reported that Cooper had difficulty fulfilling his leadership responsibilities. (Lear Dep. at 216-217.)

20. Lear was concerned that, because the vision of the programs managed by Cooper was not well understood by his staff, Counterpart's ability to implement the objectives of the programs was undermined. (Lear Dep. at 115:7-10.)

21. Cooper's managerial style and need for tight control over his staff also concerned Lear because, in her view, this was counterproductive to Counterpart's broad mission of empowering the local individuals, institutions and communities where Counterpart focused its work. (Lear Decl. ¶10 , Lear Dep. at 214-215.)

22. Lear concluded that Cooper was failing to effectively implement the Counterpart programs under his purview and she felt compelled to revisit his management structure and job responsibilities. (Lear Decl. ¶15 , Lear Dep. at 106-107; 113-114.)

23. Lear decided it would be beneficial to place Cooper under the direct supervision of Regional Director Michael Kunz ("Kunz"), who was assigned to oversee all of Counterpart's expatriate employees working in Central Asia. (Lear Decl. ¶ 16.)

**C.   In August 2004, Counterpart Gives Cooper Notice
That His Performance Is Unsatisfactory**

24. On August 18, 2004, Lear met with Cooper in Washington D.C. to discuss the new management structure. (Lear Decl. ¶17, Cooper Dep. at 95, Lear Dep. at 99.) Present at the meeting were Lear, Cooper, Kunz, and Barbara Sloan, an independent management consultant retained by Counterpart to facilitate discussions. (Lear Dep. at 99-105.)

25. During the meeting, Lear informed Cooper that he would no longer be reporting directly to her but reporting instead to Kunz. (Lear Dep. at 100.)

26. Lear also informed Cooper that she was shifting some of Cooper's administrative duties to Bob Abma ("Abma"), Counterpart's Director of Finance and at one time Director of Finance and Administration under Cooper. (Lear Decl. ¶ 17.)

27. Lear testified that she made these changes because she wanted to create a leadership structure that would enable Counterpart to move forward and to meet the objectives of the program. (Lear Dep. at 123:17-21.)

28. Cooper admits he cannot recall why Counterpart was making a change in his management structure. However, Cooper admits that he told Lear during the meeting that he did not welcome the changes and would consider leaving Counterpart because he was uncomfortable with Kunz as his supervisor:

Q.   Were you told any other reasons why that change was being made?

> A. Not that I recall. Michael Kunz did mention that if this change wouldn't take place that he would leave Counterpart.
>
> Q. Did you make a similar statement?
>
> A. I think I mentioned that I was – would consider leaving Counterpart, that this was uncomfortable for me.

(Cooper Dep. at 101-103.)

29. Cooper also told Lear he was uncomfortable with her decision to shift some of his administrative duties to Abma. (Cooper Dep. at 102, Lear Dep. at 104-105.)

30. In order to give Cooper an opportunity to voice his concerns, Lear continued the meeting. (Cooper Dep. at 95-96 in part, Lear Decl. ¶ 18.) Lear hoped to seek a resolution that would be acceptable to all persons involved while also serving the needs of the organization. (Lear Decl. ¶ 18.) She agreed to give Cooper some time to think about the new management structure and to determine whether he wanted to continue his position at Counterpart. (Lear Decl. ¶ 18, Lear Dep. at 99-140, Cooper Dep. at 95-96.)

31. Cooper admits he had an opportunity to discuss some positives about himself and discuss some of the issues he had with the new management structure. (Cooper Dep. at 95-96.)

32. Lear encouraged Cooper to remain in the hope that Cooper could work cooperatively under the new management structure but offered him a liberal separation agreement should he decide to separate from Counterpart. (Cooper Dep. at 104:15-17, Lear Decl. ¶ 19.)

33. In an email dated August 24, 2004, Sloan summarized the outcome of the August 18th meeting. (Exhibit D.)

7

34. In the email summary, Sloan recounted that Cooper agreed to a subsequent conference call during which Cooper, after having some time to think about the new management structure, would inform Counterpart "what he wants to do going forward." (*Id.*)

35. Cooper agrees the email summary drafted by Sloan is accurate. (Cooper Dep. at 108-109.)

36. On or around August 25, 2004, Lear conducted the aforementioned conference call. Present on the call were Sloan, Cooper, and Kunz. (Cooper Dep. at 115.)

37. In an email dated August 25, 2004, Sloan summarized the outcome of the conference call. (Exhibit D.)

38. In the email summary, Sloan wrote under the subject header "Key Decisions" the following statement:

> At the latest, make a go-no go decision in 4 months (January 1?). If either Jay [Cooper] or Michael [Kunz] feel strongly that it will not work before that date, they will make say so and plans will begin for a thoughtfully managed separation, designed to meet both the organizations need for a smooth transition and Jay's need to find new employment. Arlene [Lear's] commitment to Jay is for 6 months of income. Should it become evidence that this effort is not working, she [Lear] will consider, together with Jay and Michael, how best to use this time.

(*Id.*)

39. Cooper admits there was nothing said at the August 18th meeting or at any time thereafter which altered the basis under which Counterpart had the right to terminate his employment contract. (Cooper Dep. at 107:12-16.)

8

D.  **Cooper's Performance Continues To Be Unsatisfactory**

40. Cooper admits that, on October 4, 2004, he emailed then-Human Resources Manager Kelli Boyer ("Boyer") to discuss a possible departure from Counterpart and inquired of Boyer about his options. (Cooper Dep. at 47:13-15; 118-119, *see also* Exhibit E.)

41. Lear was aware through Boyer that Cooper had emailed Boyer inquiring about separating from Counterpart. (Lear Decl. ¶ 20.) Lear agreed that Boyer would address Cooper's inquiry on a trip she was planning to take to Almaty in late-October, early-November. (Lear Decl. ¶20.)

42. Lear believed Boyer did a good job handling personnel issues and trusted Boyer's ability to investigate employee performance issues and report accurately to her. (Lear Decl. ¶ 21.)

43. Boyer reported to Lear that Cooper said he could not work within the current organizational structure, and that he felt it was time to move on. (Lear Decl. ¶ 23.)

44. Lear also learned from Boyer that Cooper had expressed work-related problems with Abma, but that he refused to participate in mediation because it was scheduled to take place in Kunz's office. (Lear Decl. ¶ 22.) Boyer told Lear that Cooper had screamed at her, "I will not meet with Michael." (Lear Dep. at 149:10-18, Lear Decl. ¶ 22, Boyer Dep. at 112, Exhibit K.)

45. Cooper admits he refused to meet in Kunz's office because he did not think it was "appropriate" to use Kunz's office as a meeting place. (Cooper Dep. at 162:16-18).

9

46. Lear began to perceive that Cooper was behaving erratically. (See notes of Arlene Lear, Exhibit F.) In her own conversations with Cooper, he waivered between expressing admiration for Kunz and resentment for Kunz's management and communication style. (Lear Decl. ¶ 32.)

47. Lear also learned from Boyer that Cooper repeatedly indicated his desire to leave the organization, only to change his mind shortly thereafter. (Lear Decl. ¶ 17.) Boyer reported that Cooper refused the option of working as a consultant so long as Kunz was his supervisor. (Boyer Dep. at 128.)

48. Lear then learned from Boyer that Cooper had indicated his intention to perform only the bare minimum of his job responsibilities until the expiration of his contract in 2006. (Lear Decl. ¶ 19, Lear Dep. at 168.)

49. Boyer recalled Cooper's statements as follows:

Q. Did he tell you that he had decided that he wanted to move on?

A. Yes.

Q. And he was asking what his rights were or what his compensation would be?

A. He was asking clarification on the 6 months. Apparently from the noted here they had talked about 6 months of salary. And he needed clarification on when did that start. And I told him I would check with Arlene [Lear]. But from reading the noted that he handed me, it started back in August …

Q. Did you check with Arlene?

A. Yes, I did.
   …

Q. Was there anything else in that conversation you haven't told me about?

A. Yes.

> Q. What?
>
> A. After I talked with Arlene and got the clarification on the 6 months, Jay was telling me that wasn't his understanding. And if the 6 months didn't start from the time he decided to leave, then he would just sit and do the basic minimum through the end of his contract and just not do anything because he had a contract and he would stay there to the end of his contract.
> …
>
> Q. What did you say in response to that?
>
> A. I let him know that he couldn't just sit and do nothing. And he said, yes, I can. I have a contract.

(Boyer Dep. at 127-131.)

50. Boyer recalled that, when she asked Cooper if he was serious about performing only the basic minimum, Cooper responded that if Counterpart had a problem with it they could fire him. (Boyer Dep. at 146-148.)

51. Cooper admits the statements he made to Boyer could have been taken as "minimal effort or something like that." (Cooper Dep. at 157:18-158:1-3.)

**E.  Counterpart Terminates Cooper For Unsatisfactory Performance**

52. Lear felt that Cooper's performing only minimal effort regarding his job responsibilities was unacceptable, and especially unacceptable when, in her opinion, Cooper had been failing to fulfill his leadership responsibilities for some time. (Lear Decl. ¶ 25.)

53. Cooper's behavior towards Boyer and his refusal to meet with Counterpart staff also led Lear to believe he was no longer a good fit at Counterpart. (Lear Decl. ¶ 26.)

54. Because of Cooper's on-going performance deficiencies, Lear felt she had no choice but to terminate his employment. (Lear Decl. ¶ 27.)

55. On November 12, 2004, Lear terminated Cooper's employment out of dissatisfaction with his job performance:

> Q. At the time you terminated Jay Cooper, had you concluded, on behalf of Counterpart, that Jay Cooper was not performing to your satisfaction, being Counterpart's satisfaction?
>
> A. Yes.

(Lear Decl. ¶ 28, Lear Dep. at 265-266. *See also* Cooper termination letter, Exhibit H.)

56. Lear communicated her decision to Cooper by telephone from her Washington D.C. office.[1] (Lear Decl. ¶ 2, Amended Compl. ¶ 26.) Cooper was on a business mission to Counterpart's office in Bishkek, Kyrgystan at the time. (Amended Compl. ¶ 26.)

57. Cooper admits that Lear explained in the conversation she was disappointed in Cooper's performance, that local staff at all levels were disturbed by his intimidating and controlling behavior, and that staff had expressed fear of him and feelings of disempowerment. (Cooper Dep. at 158, 160.)

58. Cooper also admits Lear explained that minimal effort on the job was not acceptable, nor was Cooper's inability or unwillingness to function under the new management structure. (Cooper Dep. 160-161.)

59. Cooper admits he does not know who made the ultimate decision to terminate his employment. (Cooper Dep. at 129:4-6.)

60. Cooper admits that, at the time of his discharge, he had no reason to believe Lear bore him ill will. (Cooper Dep. at 210:18-20.)

---

[1] Written notes by Lear recount some of her perceptions regarding Cooper's performance which led to his termination. (Exhibit ____ **[Coop Dep Ex 15**.)

### F. Counterpart's Termination Procedures

61. At the time of Cooper's termination, it was standard Counterpart practice to request that the terminated employee leave his or her office. (Lear Decl. ¶ 30.)

62. It also was standard practice to retrieve the employee's office keys and lock up the employee's computer. (Lear Decl. ¶ 30.)

63. It was an additional practice not to allow the terminated employee to return to Counterpart offices except in the presence of designated personnel. (Lear Decl. ¶ 30.)

64. As with many organizations, Counterpart informs other Counterpart staff of an employee's departure. (Lear Decl. ¶ 30.)

65. Lear testified that these established precedents were followed by Counterpart quite consistently at the time of Cooper's termination. (Lear Dep. at 172.)

66. Cooper admits he did not take part in discussions of, and is not aware of, Counterpart protocol regarding terminations. (Cooper Dep. at 185.)

### G. Cooper Never Reported Concerns About Financial Irregularities To Anyone Involved In The Termination Decision

67. Cooper admits he never told anyone at Counterpart that he was going to report financial irregularities to the federal government:

> Q. Did you ever tell anyone in Counterpart management that if these irregularities in your view were not corrected or addressed, that you were going to complain to somebody in the U.S. government?
>
> A. No.
>
> Q. Did you ever give any kind of a, you know, or else statement of any kind, saying do this or else I'll do something?
>
> A. No.

(Cooper Dep. at 240:21-241:8.)

68.     Cooper admits he did not report financial irregularities following his discharge and that he did not believe there were financial irregularities that warranted investigation:

> Q.  Following your discharge, did you report any financial irregularities?
>
> A.  No. No, I did not. And in fact, I was asked by the contracting officer, n Almaty, if I suspected there were some financial irregularities, and I told him not that would warrant investigation.

(Cooper Dep. at 245.)

69.     When Cooper contacted Chief Financial Officer Harry Dorcus and Counterpart President Lelei Lelaulu to complain about his termination after the fact, he never mentioned his concerns about financial improprieties. (Exhibit G.)

70.     Cooper testified the reason he believes his discharge is related to his concerns about financial irregularities is his conversation with Michael Kunz about Kunz's management style:

> Q.  Do you have any reason to believe that your discussions about the financial irregularities that you have identified have anything to do with you discharge?
>
> A.  Yes.
>
> Q.  What makes you think that?
>
> A.  When I was – in July of 2004, I came back from Turkmenistan, and I told – I saw Michael Kunz, and he was –at this point, he wasn't my supervisor. And I said, you know – he said, well, we should sit down and talk about what happened in Turkmenistan. And I said, well, okay.
>
>     And eventually, that day or the next day, I was in his office, and describing what went on. And there were some changes in the work plans that were made. He became very irate because he had done some work on the work plans, I had invited him to, and ranted for at least 30 minutes,

>which this discussion came up in the meeting with Barbara Sloan and Arlene Lear.
>
>And I said to him, I said, you know now, I know why I have some files about you. And I was referring to letters of complaint I had received. And he went on.
>
>Finally, I had a conversation with Arlene Lear after this incident, on the phone. And she said to me, she said, you know, why are you keeping files on Michael? I said, I don't – I'm not keeping files on Michael. I have the documents that – letters of complaint that I have sent to you, I have sent to Harry, those are the documents that I have. I'm not keeping files.
>
>And my feeling is that there was the idea that I was keeping some files on financial irregularities in my office.

(Cooper Dep. at 241:8-243:5.)

71.     Cooper admits his conversation with Kunz had nothing to do with financial irregularities and that the subject of financial irregularities was not raised by Lear:

>Q.     Your conversation with Michael Kunz, which he ranted for 30 minutes or so, did that have anything to do with financial irregularities?
>
>A.     No.
>
>Q.     Okay. When you had your discussion with Arlene Lear and she asked you if you kept any files, did she say anything about files about financial irregularities?
>
>A.     No.

(Cooper Dep. at 243:10-14.)

72.     Cooper further admits he did not have any intention of filing a grievance relating to Counterpart's alleged financial improprieties at the time he was terminated:

>Q.     Is there anything that you intended to do in the grievance procedure that you didn't do? In other words, in the grievance procedure, I'm assuming you would have said, hey, this is wrong and here is why. Did you do that?

      A.      Is there anything that I intended to do in the grievance that I didn't do?

      Q.      Yeah.

      A.      Well, looking back, I should have filed a grievance against Michael Kunz for the tirade. And in the interest of trying to keep things working, you know, filing a grievance isn't going to help relationships. Later – yeah, in fact, not having the opportunity to file a grievance and being, you know fired immediately, you know, I can't say that – I mean, I – my intention was to keep working. So I can't say that I was planning to do this or going to do that. My intention was to continue.

(Cooper Dep. at 248-249.)

      73.     In Lear's conversations with Cooper about Kunz, he mentioned letters of complaint he had gathered from Kunz's staff on more than one occasion. (Lear Decl. ¶ 32.)

      74.     Lear did not ask Cooper about financial irregularities, nor did the subject of financial irregularities ever arise. (Lear Decl. ¶ 33.)

      75.     Lear did not believe Cooper possessed information about financial irregularities nor did she believe Cooper ever intended to report financial irregularities. (Lear Decl. ¶ 34.)

      76.     Lear attests she had no conversation with Cooper where he expressed an intention to report financial irregularities to Counterpart management or government authorities. (Lear Decl. ¶ 35.)

      77.     Lear attests that she is not aware of any financial irregularities at Counterpart. (Lear Decl. ¶ 36.)

**H.    Cooper Has No Evidence Counterpart Issued Any Publicity About Him Which Placed Him in a False Light**

      78.     Cooper admits Counterpart did not publish the reasons for his termination. (Cooper Dep. at 198, 200.)

79. Cooper admits he does not know whether any Counterpart staff members actually witnessed the locks being changed on his office. (Cooper Dep. at 180-181.)

80. Cooper admits that he does not know whether there was remodeling going on at the time Counterpart shut down its internet. (Cooper Dep. at 188-190.) Cooper further admits he has no evidence shutting down the internet connection had anything to do with his termination. (Cooper Dep. at 190-192.)

81. Cooper admits he has no facts supporting his assumption that Counterpart closed the Almaty office because of his termination. (Cooper Dep. at 192:15-22.)

82. Cooper admits he does not know the reason why the Almaty office was closed. (Cooper Dep. at 192-194.)

83. Cooper testified that he is not aware of anyone other than three Counterpart Country Directors and one professional colleague being told Cooper was terminated and no longer allowed in Counterpart's Central Asia offices. (Cooper Dep. at 185-187.)

84. Cooper admits two Counterpart employees, Abma and Boyer, sorted through his office after his termination while in the presence of one office security guard. (Cooper Dep. at 195-196.)

85. Cooper admits he does not know whether Counterpart told anyone about sorting through his office. (Cooper Dep. at 196.)

86. Cooper admits he was the one who shared the incident about Counterpart sorting through his office with others. *Id.*

87. Cooper claims Counterpart's IT director was informed not to forward email or other correspondence to Cooper. (Cooper Dep. at 196-197.) Cooper admits he

does not know of any written or oral communication reflecting this instruction. (Cooper Dep. at 197:7-17.)

88. Cooper admits he does not know whether anyone perceived him as dishonest or guilty of misfeasance as a result of Counterpart's instruction not to forward email or other correspondence to Cooper. (Cooper Dep. at 197-198.)

89. Cooper admits that two colleagues at most, Igor Tupitsyn and possibly Susan Fritz, were told Cooper left Counterpart "not by his own choice." (Cooper Dep. at 200-202.)

90. Cooper admits the fact that he did not leave Counterpart by his own choice is true. (Cooper Dep. at 202:16-19.)

91. Cooper claims that he had a conversation with Ruth Pojman, a USAID employee, who told him an employee of Counterpart, Altinay Kucheekekyuva, said Cooper deserved what he got. (Cooper Dep. at 173:4-19.) Cooper admits that when he followed up with Ms. Pojman regarding clarification on what was said, she retracted her statement and said she did not really think that was what was said. (Cooper Dep. at 175:7-11.)

92. Cooper claims Lear told one of his professional colleagues, Ara Nazinyan, that Cooper was terminated for performance reasons. (Cooper Dep. at 218-219, Amended Complaint, ¶28.) Cooper admits Nazinyan gave no indication that he thought any less of Cooper, reputationally, for having been told that. (Cooper Dep. at 219-220.)

93. Cooper claims Lear told one of his professional colleagues, Asiya Sasykbaeva, that it was Cooper's decision to leave Counterpart, that Counterpart offered Cooper other choices beside termination which he rejected, and that Cooper did not

cooperate with Counterpart. (Cooper Dep. at 214:19-215:10; 218:6-10, Amended Complaint, ¶28.) Cooper admits that Ms. Sasykbaeva gave no indication that she thought any less of Cooper because of what she had heard, and that she remains a friend of Cooper's to this day. (Cooper Dep. at 217.)

94. Cooper admits that Lear intended to put a positive spin on his leaving Counterpart when she made her statements to Ms. Sasykbaeva. (Cooper Dep. 217:17-218:5.)

95. Cooper claims that Mark Hannafin, a USAID employee, also heard that Cooper had made the decision to leave Counterpart (Cooper Dep. at 203, Amended Complaint, ¶28.) Cooper admits that such a statement was never communicated to a large group of persons:

> Q. Other than Mr. Hannafin, have you had any conversations with anyone who has said to you, hey, wait a minute, I heard that you left of your own accord, and I also heard that you left not by your own choice?
>
> A. Well, again, it comes back – no, I haven't specifically, that on one hand I left on my own terms.

(Cooper Dep. at 209.)

96. Cooper claims Counterpart told one of his professional colleagues, Stephen Larabee, that Cooper mismanaged projects. (Cooper Dep. at 220:15-20, Amended Complaint, ¶ 28.) Cooper admits he is unable to confirm whether Mr. Larabee believed the statement or thought less of Cooper because of the statement. (Cooper Dep. at 223.)

97. Cooper claims Lear told Igor Storozhenko that Cooper's ex-wife, rather than Cooper deserved custody of the couple's minor child because Cooper was too controlling. (Cooper Dep. at 224: 4-10, Amended Complaint, ¶ 28). Cooper admits he

has no facts that show Mr. Storozhenko ever believed the statement or thought less of Cooper because of the statement. Cooper admits that Mr. Storozhenko remains a friend. (Cooper Dep. at 225.)

Respectfully submitted,

**JACKSON LEWIS LLP**

January 12, 2007

By:_____/s/_____
Tyler A. Brown (D.C. Bar No. 480693)
8614 Westwood Center Drive, Suite 950
Vienna, VA 22182
(703) 821-2189

**Attorneys for Defendant Counterpart International**