# EXHIBIT I

# PART 2

Jay Cooper                                January 4, 2006

Vienna, VA

158

1    interested in my projects and I'm not going

2    to -- you know, that's my main interest, and

3    that could have been taken as minimal effort or

4    something like that.

5        Q.    Were you told about Kelli's interviews

6    with local staff at all levels, that they were

7    disturbed because they expressed fear of you and

8    feels of disempowerment?

9        A.    No.

10       Q.    Were you told that?

11       A.    In this?

12       Q.    In the call --

13       A.    Yes.

14       Q.    -- were you told that?

15       A.    Yes, I was.

16       Q.    Do you have any reason to believe that

17   that is an untrue statement?

18       A.    Yes.

19       Q.    What's that?

20       A.    After she was there for several days,

21   I was observing the fact that she wasn't meeting

22   with anyone.

Jay Cooper

January 4, 2006

Vienna, VA

160

1      A.    Do I know if she had?

2      Q.    Any discussions with staff when she

3   got back?

4      A.    You know, I didn't -- I didn't have

5   any access to any further activities after she

6   return to Almaty because I was in Kyrgyzstan.

7      Q.    Was it said, during the call, that

8   there are few words to express my

9   disappointments, et cetera --

10     A.    Yes.

11     Q.    -- or words to that effect?

12     A.    Yes, yes.

13     Q.    Was it said that we are still hopeful

14  that we can come up with a win, win best

15  outcome?

16     A.    I -- it's possible.

17            I just don't -- that one, I don't

18  recall.

19     Q.    Was it said that what is clear is that

20  we need to take action because minimal effort on

21  your part is not acceptable, nor is the

22  inability or unwillingness to function under the

Jay Cooper

January 4, 2006

Vienna, VA

161

1    new management structure, or words to that

2    effect?

3         A.    Word to that effect, yes.

4         Q.    Going back towards the beginning, you

5    said Ms. Lear did say that, He won't even meet

6    with Michael.

7              Was that a true statement?

8         A.    No.

9         Q.    Do you know what she was referring to?

10        A.    Yes.

11        Q.    What is she referring to?

12        A.    On Thursday, the first -- that would

13   be about December.

14        Q.    November.

15        A.    Oh, November 6, I think.

16             No, that's not right.

17             It's the fourth, or somewhere in

18   there.

19             Anyway, Thursday, the first week Kelli

20   Boyer was in Almaty.

21             We went to lunch, and she asked -- she

22   said, you know, I know there are some issues

Jay Cooper                                          January 4, 2006
                          Vienna, VA

                                                              173

1    were with the complaint.

2          A.    I'm very familiar with it.

3          Q.    Okay.

4          A.    I had a conversation with Ruth Pojman,

5    P-O-J-M-A-N, at which time she told me that an

6    employee of Counterpart told her that I deserved

7    what I got.

8                I don't think that's in the complaint.

9          Q.    Okay.  Who is that employee of

10   Counterpart?

11         A.    Altinay Kuchukeena.

12               K-U-C-H-E-E-K-E-K-Y-U-V-A, something

13   like that.

14         Q.    And when did you have this

15   conversation with Ruth Pojman?

16         A.    In -- last summer, July -- July, I

17   think, of 2005.

18         Q.    And who is Ruth Pojman?

19         A.    She works for USAID.

20         Q.    And who is --

21         A.    Altinay Kuchukeena?

22         Q.    Altinay -- okay.

Jay Cooper

January 4, 2006

Vienna, VA

175

1         A.    Not really.

2               She just told me no.

3               I do want to say that I followed up

4    with her, and I said that --

5         Q.    Her being?

6         A.    Ruth Pojman.

7               I followed up with Ruth Pojman, and I

8    asked her, I said, what did that mean.

9               It was on the next day.

10              And she said, Oh, you know, I don't

11   really think that's what she said.

12              So I -- I don't know what was said,

13   but there was obviously some conversation.

14              I was told first, I got what I

15   deserved, then she retracted her statement when

16   I asked for further clarification, which I found

17   interesting.

18              I don't know why.

19        Q.    Do you have any reason to believe that

20   Ms. Pojman talked with Ms. Kuchukeena in between

21   the two conversations?

22        A.    I don't have any reason to believe

Jay Cooper                                      January 4, 2006

Vienna, VA

178

1    trusted?

2        A.    I wasn't told directly that I can

3    recall that -- other than, you know, comments

4    like, you know, we really wondered what you did,

5    what's going on, we don't know, where -- this

6    is, you know, so strange.

7            We never heard of anybody else ever

8    having this situation, this -- being locked out

9    of their office, lots and lots of comments like

10   that, you know.

11           And even though they -- I mean, you

12   know, I don't think -- there aren't very many

13   people that would come to me and say what did

14   you do, you know, it's -- well, it's ...

15       Q.    Who are the people you just identified

16   who questioned why it was handled -- why you

17   were not allowed back in your office?

18       A.    I think most of the people that are

19   listed in the, I would say in the

20   interrogatories, yeah.

21           And we have an attached list of people

22   who I have had communications with.

Jay Cooper                                      January 4, 2006
                          Vienna, VA

1    presence of the staff in the office, and kept it

2    locked."

3              Now, how do you know that those locks

4    were changed in the presence of staff?

5        A.    Because my office is right in front of

6    a whole array of desks.

7        Q.    Has anybody told you they watched the

8    locks be changed?

9        A.    Yes.  There were people who have told

10   me that.

11       Q.    Who?

12       A.    Several staff persons.

13       Q.    Give me their names, please?

14       A.    Igor Storozhenko.

15             S-T-O-R-E-Z-H-E-N-K-O.

16       Q.    Anyone else?

17       A.    That's all I can think of right now,

18   that -- specifically that I remember.

19       Q.    So Igor told you, I saw them change

20   the locks?

21       A.    I don't think he said I saw them

22   change the locks.

Jay Cooper                                    January 4, 2006
                    Vienna, VA

                                                    181

1            He told me that they, you know, that

2    he knew that they changed the locks on Friday.

3       Q.    Okay.  There's a difference.

4            Because what's alleged here is that

5    they changed the locks in the presence of the

6    staff in that office and kept it locked.

7            One is a public event, doing things

8    out in front of people.  One is a private event.

9            I want to know if you have any

10   testimony, any evidence to show that it was done

11   in a public manner.

12       A.    Well, the only way it could be done is

13   in a public manner, unless they closed the

14   office.

15       Q.    Right.  Okay.

16            Other than your own supposition as to

17   what must have happened, do you have any -- has

18   anybody told you they saw the locks be changed?

19       A.    I can't say that someone specifically

20   told me that they saw the locks being changed.

21       Q.    Okay.  Referring to paragraph C, do

22   you have any facts which would lead you to

Jay Cooper

Vienna, VA

185

1      A.    No.

2      Q.    And Ms. Vasquez, were you involved in

3  her termination?

4      A.    Yes.

5      Q.    And was she barred from the

6  Turkmenistan office?

7      A.    No.

8      Q.    When was she terminated?

9      A.    In October or November -- November

10  2001.

11      Q.    Did you ever take part in any

12  discussions with Counterpart management where

13  the protocol for terminating a chief of party

14  was discussed?

15      A.    No.

16      Q.    Are you aware of any document which

17  spell out what the protocol should be?

18      A.    No.

19      Q.    Other than informing the country

20  directors in Kazakhstan, Kyrgyzstan and

21  Turkmenistan that you were not allowed in any

22  offices of those countries, did you know if

Jay Cooper

Vienna, VA

January 4, 2006

186

1    Counterpart informed anyone else of that ban, if

2    you will?

3        A.    I know that there was a meeting on a

4    Friday morning in the office in Almaty, before I

5    had the conference call, that announced that I

6    was no longer working with Counterpart.

7        Q.    Okay.

8        A.    And I'm not sure the specifics of that

9    meeting, but that meeting took place announcing

10   that I was no longer with Counterpart, even

11   before I knew I was no longer working with

12   Counterpart.

13       Q.    And how do you know that the timing

14   was such that that took place prior to your

15   finding out?

16       A.    Well, because the meeting took place

17   at 9:15 in the morning, and there's an hour

18   difference in time between Kazakhstan and

19   Kyrgyzstan.

20            And the conference call was at 10

21   o'clock, so it would have been 11 o'clock in

22   Almaty when I received the conference call.

Jay Cooper                                        January 4, 2006
                        Vienna, VA

                                                              187

1          Q.. And how do you know the meeting take

2     place at 9:15?

3          A.   I was informed.

4          Q.   By whom?

5          A.   By staff members in Kazakhstan.

6          Q.   Can you give me their names, please?

7          A.   Again, Igor Storozhenko.

8          Q.   Anyone else?

9          A.   No, not that I can recall.

10         Q.   Who did Igor tell you conducted the

11    meeting?

12         A.   Michael Kunz and Bob Abma.

13         Q.   And did Igor or has anyone else told

14    you what was said in that meeting?

15         A.   It was an announcement of that I was

16    no longer working.

17              That's all I recall.

18         Q.   And other than that, are you aware of

19    any publication of the fact that you were not

20    allowed in any of the offices of the three

21    countries?

22         A.   I'm not aware of any.

Jay Cooper                                                      January 4, 2006

Vienna, VA

188

1      Q.    Paragraph D, 25D, refers to shutting

2    down internet access for staff in Almaty on an

3    obvious false pretense of remodeling, thereby

4    making it impossible for Cooper to communicate

5    electronically with anyone at his office.

6            What facts do you have which lead you

7    to state that the remodeling was an obvious

8    false pretense?

9      A.    I discussed the shutdown with the IT

10   manager, the person responsible.

11           He told me that he was told by Michael

12   Kunz to shut down the server and not allow any

13   email traffic.

14           I talked to the director of ICNL,

15   International Center for Not for Profit Law,

16   Steve Larabee, who told me that he was told that

17   email was being shut down because of remodeling.

18           And the IT manager told me that it

19   was -- he was told to shut it down.

20     Q.    Somehow that's contradictory if he was

21   told to shut it down, couldn't it have been he

22   was told to shut it down because of remodeling?

Jay Cooper                                                    January 4, 2006

Vienna, VA

189

1        A.    No.

2        Q.    Why not?

3              I'm sorry.  I don't understand the

4    disconnect.

5        A.    The system had been -- is totally in

6    place, there wasn't any remodeling going on on

7    the system.

8              The IT manager would know if there was

9    any work being done on the system.

10       Q.    Maybe the work wasn't being done on

11   the system -- let me finish, but the work was

12   being done on the physical plant, something

13   having to do with the office, which would

14   require --

15       A.    Like what, for example?

16       Q.    Oh, I think this highlights the fact

17   that you don't know.

18       A.    Well, I do know.

19       Q.    You were told that the IT director

20   said to you that Mr. Kunz told him to shut down

21   the system; right?

22       A.    Yes.

Jay Cooper                                    January 4, 2006
                        Vienna, VA

                                                    190

1        Q.   Okay.  Did the IT director tell you
2   there was no remodeling going on in the office?
3        A.   But you don't shut a system down --
4        Q.   Answer my question, please, sir.
5             Did he tell you there was no
6   remodeling going on in the office?
7        A.   He did not tell me there was no
8   remodeling going on in the office.
9        Q.   Do you know for a fact that there was
10  no remodeling going on in the office?
11       A.   I don't know that for a fact.
12       Q.   Okay.
13       A.   But I would like to add.
14       Q.   Sure, go ahead.
15       A.   That if you understand anything about
16  computers and systems, that you don't have to
17  shut the system down for remodeling.
18            When there was no remodeling going on
19  in the server's office, in the IT managers
20  office.
21       Q.   Well, that's your supposition, you're
22  entitled to it, sir.

Jay Cooper                                    January 4, 2006

Vienna, VA

191

1          And as the former head of the firm's

2     technology committee, I do understand a thing or

3     two about technology.  So I would take exception

4     with your statement, but we're not here to

5     debate that.

6          You're entitled to your opinion.

7          We will move on.

8     A.    And I also would like to add to that,

9     if I could.

10    Q.    Yeah.

11    A.    That the director of ICNL was really

12    quite upset that his communications were shut

13    down under false pretenses.

14          That this is not an office just for

15    Counterpart, but there were other organizations

16    that were working and renting space and

17    cooperating with Counterpart, that worked in

18    other projects and had their email, internet

19    access disconnected.

20    Q.    And what connection was made, speaking

21    of connections, by Counterpart to this shutdown

22    and your lack of employment with Counterpart

Jay Cooper                                            January 4, 2006

Vienna, VA

192

1    anymore?

2              What was said in that regard?

3        A.    Please repeat that question.

4        Q.    Sure.  It was pretty awkward.

5              Who said anything to connect the fact

6    that internet access was being shut down with

7    the fact that you were being terminated?

8        A.    No one said that that had anything to

9    do with it, but there's obvious conclusions

10   drawn here, that ...

11       Q.    Did anybody tell you that they

12   connected the shutdown of the internet access

13   with your termination?

14       A.    No.

15       Q.    Who informed you that Counterpart

16   instructed all staff at Almaty to stay away from

17   the office on the weekend of November 13 and 14?

18       A.    Steve Larabee.

19       Q.    Did Mr. Larabee tell you that he was

20   told that the reason that people were told to

21   stay away was because of your termination?

22       A.    No.

Jay Cooper                                    January 4, 2006

Vienna, VA

193

1       Q.   Other than the fact that you were

2    terminated and the fact that he was told that,

3    is there any connection between those two

4    events?

5       A.   The fact that everyone in the office

6    was told not to -- that the office was

7    unaccessible, that no one should come to the

8    office on Saturday or Sunday --

9       Q.   Uh-huh.

10      A.   -- I'm trying to rephrase your

11   question.

12           The fact that everyone was told to

13   stay away from the office.

14      Q.   Right.

15      A.   Does it have any relationship to the

16   fact that I was fired?

17      Q.   Yes.

18      A.   Well, the reason that they had told

19   people to stay away was they were -- from what I

20   understand, were packing my bags, my goods.

21      Q.   Was anybody told that, that that was

22   the reason that the office was closing?

Jay Cooper                                    January 4, 2006

Vienna, VA

194

1        A.    No.  I -- not that I know of.

2        Q.    And how is it you know -- what leads

3    you to believe that the reason that the office

4    was closed was so that someone could pack your

5    office?

6        A.    Well, I know that my office was packed

7    on the weekend.

8        Q.    That's a different question.

9              How do you know that the reason that

10   the office was closed was so that your office

11   could be packed?

12       A.    I don't know that.

13       Q.    Okay.  Paragraph F says that during

14   that weekend, Counterpart employees sorted

15   through everything in your office, and you can

16   read the rest of it.

17       A.    Uh-huh.

18       Q.    First of all, who sorted through your

19   office?

20       A.    Bob Abma and Kelli Boyer.

21       Q.    How do you know that?

22       A.    I was told.

Jay Cooper                                          January 4, 2006

Vienna, VA

195

1       Q.    By whom?

2       A.    By the guard who was working that

3    weekend.

4       Q.    Whose name is?

5       A.    Vitaly Shertov.

6       Q.    Did Mr. Shertov tell you that he

7    observed Mr. Abma and Ms. Boyer sort through

8    things in your office?

9       A.    Yes.

10      Q.    And how do you know they broke into

11   locked drawers?

12      A.    Because Mr. Shertov told me.

13            In fact, he told me that he actually

14   broke for -- the drawer open for Bob Abma.

15            Bob Abma asked him -- and Bob Abma

16   told him that if anybody asked, it was Kelli who

17   told him to do it.

18      Q.    When did you have this conversation

19   with Mr. Shertov?

20      A.    In the -- sometime in the, you know,

21   month or so after.

22      Q.    And so it's your understanding that

Jay Cooper                                      January 4, 2006

Vienna, VA

196

1    while this search was going through, or sorting

2    through your office was going through, the only

3    people present were Mr. Abma, Ms. Boyer and

4    Mr. Shertov?

5         A.    As far as I know.

6         Q.    And do you know of anyone who was told

7    subsequently about this search?

8         A.    No.

9         Q.    Paragraph G talks about --

10        A.    Yes, actually -- well, no, I can't

11   recall.

12              I don't know who may have known.

13              I know I knew about it, and I told --

14        Q.    Because Mr. Shertov told you?

15        A.    Yeah.

16        Q.    Yes.  All right.

17              And then you decided to share it with

18   people?

19        A.    Yeah, I told a few people.

20        Q.    Okay.  Paragraph G talks about

21   Mr. Kunz instructing the staff not to forward

22   emails or telephone messages or other

Jay Cooper                                        January 4, 2006
                        Vienna, VA

                                                              197

1      correspondence to you.

2              How is it you know that?

3              I'm referring to 25G.

4      A.     Uh-huh.

5              From the -- from -- again, from the IT

6      manager.

7      Q.     Do you know if he did that, if

8      Mr. Kunz did that orally, in writing, do you

9      know?

10     A.     I don't know.

11     Q.     Have you ever seen any correspondence

12     or --

13     A.     No.

14     Q.     You have got to wait until I finish.

15             Have you seen any correspondence that

16     reflects this instruction?

17     A.     No.

18     Q.     And has anybody told you that they

19     concluded because emails were not to be

20     forwarded to you or telephone messages or

21     correspondence, that you were guilty of

22     misfeasance or dishonesty, or that you were not

Jay Cooper                                      January 4, 2006
                        Vienna, VA

                                                            200

1        Q.   Do you know of any communication from

2    anybody in Counterpart management that said, we

3    terminated Jay Cooper's employment because, and

4    then gave some reasons or a reason?

5        A.   No.

6        Q.   So people coming up to you not having

7    that type of communication, expressed their

8    curiosity, I think was the term you used, as to

9    why this happened because they weren't being

10   told by Counterpart, so they were left to their

11   own devices as to what might have happened.

12            Is that fair to say?

13       A.   It's fair to say there was a lot of

14   gossip going on, a lot of rumors.

15       Q.   Okay.

16       A.   Especially in a network of, you know,

17   hundreds and hundreds of NGOs, and just, you

18   know, in a culture that people talk.

19       Q.   Paragraph 25H says that a Counterpart

20   employee told your professional colleague at

21   USAID that you had left Counterpart, "Not by his

22   own choice."

Jay Cooper                                          January 4, 2006
Vienna, VA

201

```
 1        A.    Yeah.

 2        Q.    Let's first find out who said what to

 3    whom?

 4              Who is the Counterpart employee?

 5        A.    Michael Kunz.

 6        Q.    And he was talking to whom?

 7        A.    He was address a meeting at USAID.

 8              And I know that Igor Tupitsyn was

 9    present, who is our cognizant test technical

10    officer on the project.

11              I think that Susan Fritz was also

12    there.

13              I'm not sure if anybody else was

14    there.

15        Q.    Well, the way the complaint reads.   It

16    says a -- told Cooper's professional colleague,

17    singular.

18              Are you saying that, in fact, it was

19    made --

20        A.    It was --

21        Q.    You have got to let me --

22        A.    It was --
```

Jay Cooper

Vienna, VA

January 4, 2006

202

1    Q.    -- got to let me finish my question.

2    A.    Oh, I'm sorry.

3    Q.    Are you saying that he made this

4    comment to both Mr. Tupitsyn and Ms. Fritz?

5    A.    That's -- that was my understanding,

6    but I may not be exactly clear.

7          If I recall right, it was Igor

8    Tupitsyn who told me that's what the statement

9    was.

10    Q.    Now, the statement that you had left

11    Counterpart not by his own -- not by your own

12    choice, that is a true statement; correct?

13    A.    Yes.  Well, wait a minute.

14          That I -- I did not leave by my

15    choice, no.

16    Q.    So it's -- if in fact, Mr. Kunz said,

17    Jay Cooper left Counterpart not by his on

18    choice, that would be a true statement; right?

19    A.    Yes.

20    Q.    Now, let's talk about paragraph 27.

21          Paragraph 27 lists six statements

22    which are alleged to be untrue statements to

Jay Cooper                                    January 4, 2006

Vienna, VA

203

1    your professional colleagues, purposely to

2    damage your professional and personal reputation

3    and credibility, or at best, with reckless

4    disregard thereto.

5              So paragraph or statement A says that

6    it was Cooper's decision to leave the employ of

7    Counterpart, and according to your answers to

8    interrogatories, that was made by Ms. Lear to

9    Asiya --

10         A.    Sasykbaeva.

11         Q.    -- like you said, on or about June 25,

12   and to Mark Hannafin.

13              How is it you know that Ms. Lear made

14   these statements?

15         A.    I was told by Ms. Sasykbaeva.

16         Q.    Okay.  When did Ms. Sasykbaeva tell

17   you that?

18         A.    I think it was in June of 2005.

19         Q.    And so at or about the time the

20   statement was made by Ms. Lear.

21         A.    Yes.

22         Q.    And who is Ms. Sasykbaeva?

Jay Cooper                                    January 4, 2006
                        Vienna, VA

                                                      209

1        A.    No.

2        Q.    Other than Mr. Hannafin, have you had

3    any conversations with anyone who has said to

4    you, hey, wait a minute, I heard that you left

5    of your own accord, and I also heard that you

6    left not by your own choice?

7        A.    Well, again, it comes back -- no, I

8    haven't specifically, that on one hand I left on

9    my own terms.

10            But a lot of questions of what

11   happened are getting, you know, confusing, so --

12       Q.    You worked with Ms. Lear as your

13   supervisor for a number of years.

14       A.    Yes.

15       Q.    Okay.  How was your relationship?

16       A.    I thought our relationship was really

17   good.

18       Q.    Do you have any reason to believe that

19   Mr. Lear bore you any ill will?

20       A.    No.

21       Q.    As you sit here today, do you have any

22   reason to believe that she bears you any ill

Jay Cooper                                              January 4, 2006

Vienna, VA

210

1    will?

2         A.    Well, I'm sure my feeling is that she

3    feels that I, you know, questions why I'm here.

4         Q.    Well, I don't think anybody likes to

5    have their company be sued.

6              I have yet to meet the client that

7    thanked me for having to defend them.

8              Other than that, do you have any --

9         A.    Have you ever met anyone who worked

10   for ten years for a company and was fired on the

11   spot for no apparent reason?

12        Q.    More than I can count, sir.

13             But I wouldn't say that it was for no

14   apparent reason.

15             But my question is, other than the

16   fact that I'm sure that Ms. Lear is not happy

17   about having her company sued and having to

18   spend the day in this particularly -- this

19   environment, any other reason to believe that

20   she might bear you any ill will, as you sit here

21   today?

22        A.    No.   In fact, I think she was very

Jay Cooper                                    January 4, 2006

Vienna, VA

214

1    absolutely not a professional.

2          She doesn't, you know, doesn't

3    function effectively or professionally in her

4    role as an HR manager.

5          Q.    Other than the statement concerning

6    whether you were or were not going to have a

7    meeting, in which you have testified that she is

8    flat out lying, have you ever known her to lie

9    about anything else?

10         A.    Not lies that are outright flat-out

11   lies.

12         I mean, there's the issues of, you

13   know, you're going to -- the issue of the job

14   description, and the issue of we're not going to

15   pay you until you sign this contract.

16         Those you know, are -- I mean, they're

17   not lies, but they're -- yeah, I haven't had

18   that much interaction with her, to be honest.

19         Q.    Paragraph 27B says that Counterpart

20   offered you choices other than being terminated,

21   that you rejected.

22         And then that's elaborated on in your

Jay Cooper                                    January 4, 2006

Vienna, VA

215

1    interrogatory response, which says that that was

2    a comment made by Arlene Lear to Ms. Sasykbaeva,

3    which I apologize for butchering her name.

4            Was that supposedly made in the same

5    conversation that the comment in paragraph 27A

6    was made?

7        A.   Yes.

8        Q.   And related to you at the same time

9    that the comment in 27A was?

10       A.   Yes.

11           Going back to that, when she -- when

12   Ms. Sasykbaeva told me this, she didn't say, oh,

13   this is what she said, she -- I mean, she said

14   it in a tone that was, you had choices, why

15   didn't you take them?

16           You had, you know, it wasn't -- it was

17   you who -- it was as if she really believed

18   this.

19       Q.   Uh-huh.  And how did that damage your

20   professional or personal reputation and

21   credibility?

22       A.   Well, when someone is accused and even

Jay Cooper                                    January 4, 2006
                          Vienna, VA

217

1    you know, as an unethical, unprofessional,

2    dishonest manipulator, or something like that,

3    you know.

4              There just -- it's -- it's -- it just

5    doesn't do anybody any good for their reputation

6    to, you know, to lie and to -- not to tell the

7    truth.

8         Q.   Did Ms. Sasykbaeva tell you that she

9    thought less of you because of what she had

10   heard?

11        A.   No.  She didn't tell me that.

12        Q.   Was she a friend of yours?

13        A.   Yes.

14        Q.   Does she remain a friend of yours

15   today?

16        A.   Yes.

17        Q.   Would you allow for the possibility

18   that assuming Ms. Lear made these statements to

19   Ms. Sasykbaeva --

20        A.   Good job.

21             That was really good.

22        Q.   Thank you.

Jay Cooper                                            January 4, 2006
                              Vienna, VA

218

1           That she was doing it to, in effect,

2     put a positive spin on your leaving the company,

3     as opposed to telling her, hey, he was fired

4     because we didn't like him?

5           A.    I think that was her intent.

6           Q.    27C says that the statement was made

7     that you did not cooperate with Counterpart --

8                 Oh, that's the same conversation with

9     Ms. Lear and Ms. Sasykbaeva.

10          A.    Uh-huh.

11          Q.    Okay.  Now, 27D, statement made that

12    you were terminated for performance reasons, was

13    supposedly made to Ara Nazinyan?

14          A.    Nazinyan.

15          Q.    And I have to assume that Mr. Nazinyan

16    told you that?

17          A.    Yes.

18          Q.    At or about the time that the

19    statement was supposedly made to him in March

20    2005?

21          A.    Well, you know, I'm really lost as far

22    as the date of that goes.

Jay Cooper

Vienna, VA

January 4, 2006

219

1          I think it was around that time, but I

2     really don't remember.

3          All I know is that I had a phone call

4     with him.  He said he had been in Washington DC,

5     my name came up, and all Arlene said were there

6     were some performance issues.

7          And he said there were no details, and

8     that was -- that was it.

9       Q.   And who is Mr. Nazinyan?

10      A.   He is the country director for Eurasia

11   foundation in Armenia.

12      Q.   I'm sorry.  The Eurasian Foundation?

13      A.   Eurasia Foundation in Armenia.

14      Q.   In Armenia.

15      A.   They were based in Washington DC.

16      Q.   The comment -- well, did Mr. Nazinyan

17   tell you that he believed that you were

18   terminated for performance reasons?

19      A.   No.

20      Q.   Did he give you any indication that he

21   thought any less of you for having been told

22   this?

Jay Cooper                                    January 4, 2006
                        Vienna, VA

                                                        220

1       A.    No.

2       Q.    Is he a friend of yours?

3       A.    Yes.

4       Q.    Does he remain --

5       A.    A colleague.

6       Q.    Colleague; okay.

7             Does he remain a colleague of yours?

8       A.    Yes.

9       Q.    When was the last time you talked to

10   him?

11      A.    I don't recall.

12            It's been a long time.

13            I would guess six months or something

14   like that.

15      Q.    In paragraph 27E, you allege that a

16   statement was made that you mismanaged your

17   projects, and that this was reportedly made,

18   referring to your answers to interrogatories,

19   from Mr. Kunz to Stephen Larabee, on or about

20   December or January 2004 or 5.

21            And how is it that you learned on this

22   comment?

January 4, 2006

Vienna, VA

223

1    wouldn't believe what Michael Kunz said, or was

2    it, you know, gosh, I'm really concerned, is

3    this true?

4              I mean, how was it brought up?

5         A.    I may have asked him how are things in

6    the office, and he said fine, oh, by the way,

7    Michael stopped by and said, you know, you

8    mismanaged your projects, something like that.

9              I'm just -- that's an example of how

10   it could have happened.

11        Q.    Well, I mean, was there incredulity in

12   his voice, or was there, you know --

13   characterize it for me.

14        A.    I really can't characterize it.

15             It was a telephone conversation.

16        Q.    Oh, okay.

17             Did you continue to talk to

18   Mr. Larabee after that?

19        A.    I have had some contact, but not for a

20   long time.

21        Q.    Is he still back in Central Asia?

22        A.    I'm assuming that he is.

Jay Cooper                                         January 4, 2006

Vienna, VA

224

1              Someone told me that he recently has a

2    new addition to his family, and that's all I

3    have heard.

4         Q.   Paragraph 27F statement is that your

5    ex-wife, rather than you, deserved custody of

6    your minor child because you were too

7    "controlling."

8              And this comment was supposedly made

9    by Ms. Lear in the presence of Igor Stor --

10        A.   Storozhenko.

11        Q.   Storozhenko.

12        A.   Yes.

13        Q.   And I assume Mr. Storozhenko told you

14   this?

15        A.   Yes.

16        Q.   Shortly after June 2005?

17        A.   Yes.

18        Q.   So basically, Mr. Storozhenko reported

19   to you that Ms. Lear had shared her opinion

20   about your --

21        A.   Yes.

22        Q.   -- child custody situation?

Jay Cooper                                    January 4, 2006

Vienna, VA

225

1          A.    Yes.

2          Q.    Did Mr. Storozhenko tell you what his

3    reaction to that was, to hearing that?

4          A.    No.

5          Q.    Is he a friend of yours?

6          A.    Yes.

7          Q.    Does he remain a friend of yours?

8          A.    Yes.

9                It's a little difficult to maintain

10   friendships half way around the would.

11         Q.    I would imagine so, although I'm sure

12   email helps.

13         A.    Well, it's also difficult with

14   language and other things too, but.

15         Q.    I'm sure that's true, too?

16               THE WITNESS:  Can we take two minutes?

17               MR. BROWN:  Yeah, sure.

18                    (A recess was taken.)

19   BY MR. BROWN:

20         Q.    Do you know of any statement in a

21   newspaper or magazine or handbill distributed to

22   any number of persons that said anything about

240

1      Q.   Unofficially?

2      A.   Well, I do a million things.

3      Q.   And your salary is 70,000 a year?

4      A.   Yes.

5      Q.   Do you get bonus?

6      A.   No.  Actually, I'm even going to make

7  less because I'm taking a leave of absence, now,

8  to be here, and unpaid, so.

9      Q.   You started in September?

10      A.   Yep.

11      Q.   You don't have vacation?

12      A.   Well, this company doesn't have much

13  policy for vacation.

14           It's the real world.

15      Q.   I want to talk to you a bit about

16  these financial irregularities that you have

17  alleged in the complaint.

18           There's about seven of them, it looks

19  like, referring to your answers to

20  interrogatories.

21           Did you ever tell anyone in

22  Counterpart management that if these

Jay Cooper                                    January 4, 2006

Vienna, VA

241

1    irregularities in your view were not corrected

2    or addressed, that you were going to complain to

3    somebody in the U.S. government?

4         A.    No.

5         Q.    Did you ever give any kind of a, you

6    know, or else statement of any kind, saying do

7    this or else I'll do something?

8         A.    No.

9         Q.    Do you have any reason to believe that

10   your discussions about the financial

11   irregularities that you have identified have

12   anything to do with your discharge?

13        A.    Yes.

14        Q.    What makes you think that?

15        A.    When I was -- in July of 2004, I came

16   back from Turkmenistan, and I told -- I saw

17   Michael Kunz, and he was -- at this point, he

18   wasn't my supervisor.

19             And I said, you know -- he said, well,

20   we should sit down and talk about what happened

21   in Turkmenistan.

22             And I said, well, okay.

Jay Cooper                                              January 4, 2006
                          Vienna, VA

242

1            And eventually, that day or the next

2    day, I was in his office, and describing what

3    went on.  And there were some changes in the

4    work plans that were made.

5            He became very irate because he had

6    done some work on the work plans, I had invited

7    him to, and ranted for at least 30 minutes,

8    which this discussion came up in the meeting

9    with Barbara Sloan and Arlene Lear.

10           And I said to him, I said, you known

11   now, I know why I have some files about you.

12           And I was referring to letters of

13   complaint I had received.

14           And he went on.

15           Finally, I had a conversation with

16   Arlene Lear after this incident, on the phone.

17   And she said to me, she said, you know, why are

18   you keeping files on Michael?

19           I said, I don't -- I'm not keeping

20   files on Michael.  I have the documents that --

21   letters of complaint that I have sent to you, I

22   have sent to Harry, those are the documents that

Jay Cooper                                          January 4, 2006

Vienna, VA

243

1    I have.

2              I'm not keeping files.

3              And my feeling is that there was the

4    idea that I was keeping some files on financial

5    irregularities in my office.

6              And the reason that they fired me so

7    quickly and closed my office was so they could

8    look through my files to see what kind of

9    information that I was saving.

10       Q.   Your conversation with Michael Kunz,

11   which he ranted for 30 minutes or so, did that

12   have anything to do with financial

13   irregularities?

14       A.   No.

15       Q.   Okay.  When you had your discussion

16   with Arlene Lear and she asked you if you kept

17   any files, did she say anything about files

18   about financial irregularities?

19       A.   No.

20       Q.   So you are --

21       A.   I did mention to Kelli Boyer that

22   that -- right -- the week -- the first week she

248

1    to discussion anything counsel might have

2    discussed.

3         A.   I was -- well, go ahead.

4         Q.   Is there anything that you intended to

5    do in the grievance procedure that you didn't

6    do?

7              In other words, in the grievance

8    procedure, I'm assuming you would have said,

9    hey, this is wrong and here is why.

10             Did you do that?

11        A.   Is there anything that I intended to

12   do in the grievance that I didn't do?

13        Q.   Yeah.

14        A.   Well, looking back, I should have

15   filed a grievance against Michael Kunz for the

16   tirade.

17             And in the interest of trying to keep

18   things working, you know, filing a grievance

19   isn't going to help relationships.

20             Later -- yeah, in fact, not having the

21   opportunity to file a grievance and being, you

22   know, fired immediately, you know, I can't say

249

1    that -- I mean, I -- my intention was to keep

2    working.

3            So I can't say I was planning to do

4    this or going to do that.

5            My intention was to continue.

6    Q.    Even if the grievances procedure had

7    been in effect at the time of your discharge,

8    you understood that it was not a procedure that

9    had to be followed in every case by the company;

10   correct?

11   A.    I don't really understand the

12   grievance procedure that well, to say that it

13   would have -- you have to follow it or you don't

14   have to follow it.

15           I ...

16   Q.    The conversation that you had with

17   Mr. Kunz, where you said that this hindsight you

18   should have filed a grievance against him.

19   A.    Yeah.

20   Q.    When did that conversation take place?

21   A.    In July of 2004.

22   Q.    So prior to your -- right, it was

Jay Cooper                                    January 4, 2006

Vienna, VA

326

1          been waived, the proceedings in the

2     above-captioned matter were concluded at 5:24

3                              p.m.)

4

5

6

7                              _____

8                              JAY COOPER

9

10

11          SUBSCRIBED AND SWORN before and to me

12     this day of _____, 20___.

13

14

15

16

17                              _____

18                              NOTARY PUBLIC

19

20

21

22     My Commission expires:

Jay Cooper                                          January 4, 2006

Vienna, VA

327

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2              I, Joseph A. Inabnet, the officer

 3    before whom the foregoing deposition was taken,

 4    do hereby certify that the witness whose

 5    testimony appears in the foregoing deposition

 6    was duly sworn by me; that the testimony of said

 7    witness was taken by me in Stenotype and

 8    thereafter reduced to typewriting under my

 9    supervision; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    thereto, nor financially or otherwise interested

17    in the outcome of the action.

18

19

20              Joseph A. Inabnet, Notary Public

21                   for the Commonwealth of Virginia

22    My Commission Expires:  July 31, 2007
```