**EXHIBIT J**

011306a1

0001

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   * * * * * * * * * * * * * * * *
 4   JAY W. COOPER,                    :
 5               Plaintiff,            :
 6      -vs-                           : CASE NO.:
 7   COUNTERPART INTERNATIONAL,        : 1:05cv1598(RMC)
 8               Defendant.            :
 9   * * * * * * * * * * * * * * * *
10   Corporate Deposition of Counterpart International
11                 by and through
12                   ARLENE LEAR
13                Vienna, Virginia
14            Friday, January 13, 2006
15                   9:36 a.m.
16
17
18
19
20   Job No.:  1 - 70575
21   Pages:  1 - 269
22   Reported by:  Paula M. Flint, Notary Public
```

0002

```
 1          Deposition of COUNTERPART INTERNATIONAL,
 2   by and through ARLENE LEAR, held at the law offices
 3   of:
 4
 5                JACKSON LEWIS, LLP.
 6            8614 Westwood Center Drive
 7                   Suite 950
 8            Vienna, Virginia  22182
 9                (703) 821-2189
10
11
12
13
14          Pursuant to agreement, before Paula M.
15   Flint, Notary Public of the Commonwealth of
16   Virginia.
17
18
19
20
21
22
```

0003

```
 1                A P P E A R A N C E S
 2
 3   On behalf of the Plaintiff:
 4          PATRICIA D. DOUGLASS, ESQUIRE
 5          Law Office of Patricia D. Douglass
 6          98 Interpromontory Road
 7          Great Falls, Virginia  22066-3219
 8          (703) 759-3674
 9
10   On behalf of the Defendant:
11      BY:  KARA M. ARIAIL, ESQUIRE
12          Jackson Lewis, LLP.
13          8614 Westwood Center Drive
14          Suite 950
15          Vienna, Virginia  22182
16          (703) 821-2189
```

011306al

20      Q.    Findings that needed to be addressed that
21  reflect badly on the management Jay Cooper applied
22  to the project.

0097

1       A.    Well, Jay Cooper had overall
2   responsibility for the project.  There were issues
3   identified, that was the point of this evaluation,
4   and to be addressed.
5       Q.    Like any evaluation?
6       A.    Uh-huh.
7       Q.    Correct?
8       A.    Correct.
9       Q.    So when you received Plaintiff's
10  Exhibit 28, you did not immediately conclude that
11  Jay Cooper had mismanaged the health NGO capacity
12  building initiative project, did you?
13      A.    I don't recall the details of this
14  evaluation.  So I'd have to review the evaluation
15  and then respond.
16      Q.    All right.  Did you receive Plaintiff's
17  Exhibit 28 soon after December 3, 2003?
18      A.    I received it before for review as a
19  draft.
20      Q.    So you received it and reviewed it before
21  you entered into the contract with Jay Cooper, which
22  is Plaintiff's Exhibit 8?

0098

1       A.    Yes.
2       Q.    Now, I want to go on to subject three.
3             You were -- am I correct in assuming that
4   you have found no additional documents reflecting
5   the events of August 18, 2004?
6       A.    Correct.
7       Q.    Is it your habit to take notes at
8   meetings?
9       A.    Sometimes.
10      Q.    Did you take any notes of a meeting
11  convened on August 18, 2004 concerning Jay Cooper
12  and Michael Kunz?
13      A.    No.
14      Q.    Did you notice anyone else taking notes of
15  that meeting?
16      A.    Yes.
17      Q.    Would that be Barbara Sloan?
18      A.    Yes.
19      Q.    Anyone else?
20      A.    Not that I'm aware of.  It's possible Jay
21  took some notes.  It's possible Michael took some.
22  But not that I'm aware of.

0099

1       Q.    Now, who called the meeting on August 18,
2   2004?
3       A.    I did.
4       Q.    And how, in what form did you call that
5   meeting?
6       A.    I spoke to Jay.  I spoke to Michael
7   individually.  We determined -- we set the date.
8   Jay was in the U.S., as I recall, doing renovations
9   on his house in Oregon.
10      Q.    Was Jay in Oregon a scheduled vacation
11  or -- why was he in Oregon?
12      A.    He said he had renovations to do on his
13  house.  As I recall, that was the time.

011306a1

14    Q.    And he wasn't absconding from his duties
15    by being in Oregon, was he?
16    A.    No.  He got permission to.  No.
17    Q.    Now, what did you tell Jay about the
18    purpose of the meeting on August 18, 2004?
19    A.    Barbara Sloan talked to Jay about the
20    purpose of the meeting.
21    Q.    Did you say anything to Jay about the
22    purpose of the meeting?

0100

1    A.    Well, I said, "We'll get together.
2    Michael's here.  You're here.  We'll talk about
3    issues."
4            I know that Jay was not happy about having
5    to report to Michael.  Michael -- yes.
6            And so there were some outstanding --
7    there were issues, management -- related to his
8    acceptance of the new management structure that I
9    had put into place.  He had his issues.  So it was
10   an opportunity for all parties to sit down in a safe
11   place with a third-party objective person,
12   professional facilitator and executive coach to help
13   us talk through those issues that Jay had, that
14   Michael had about the new management structure in
15   which Jay was reporting directly to Michael.
16           And when Barbara Sloan spoke to Jay, she
17   heard from Jay -- she said it was her habit to speak
18   to each individual separately that was going to
19   participate in such a meeting to get their views,
20   tell them about what she felt was the purpose of the
21   meeting or what she was told was the purpose of the
22   meeting, to get their views, their individual views.

0101

1    It was, again, an opportunity for them to speak
2    privately to the facilitator so that she would be
3    sure that all views came out.
4    Q.    Am I correct in assuming from your answer
5    to the last question that you had made a decision to
6    change the management structure so that Jay Cooper
7    would report to Michael Kunz before the meeting of
8    August 18, 2004?
9    A.    Yes.
10   Q.    And that you had announced that decision
11   to Jay Cooper and Michael Kunz before that meeting?
12   A.    Yes.
13   Q.    Now, how much before that meeting had you
14   announced that?
15   A.    I don't recall.
16   Q.    Do you remember in what form you announced
17   that change in management structure to Jay Cooper?
18   A.    On the telephone.
19   Q.    What do you remember --
20   A.    It was something I wanted to -- I didn't
21   want to be overly bureaucratic about it.  I wanted
22   to talk to him.

0102

1    Q.    So sometime before August 18, you had a
2    telephone call with Jay Cooper, correct?
3    A.    Uh-huh.
4    Q.    And you also had a similar call with
5    Michael Kunz, presumably?
6    A.    Yes.  More than -- I would say more than a
7    month.

Page 37

011306al

8    Q.    More than a month?
9    A.    That's my recall.  My recall.
10   Q.    With both of them?
11   A.    Uh-huh.
12   Q.    Had the change in management structure
13   been announced to other persons in Counterpart
14   before August 18?
15   A.    I don't know.  I don't recall.
16   Q.    Now, from your description of the role of
17   Barbara Sloan, am I correct in an assumption that
18   you knew before August 18, 2004 that there would be
19   some issues in making this management change?
20         MS. ARIAIL:  Objection to form.
21         MS. DOUGLASS:  Strike it.  I'll start
22   again.

0103

1    BY MS. DOUGLASS:
2    Q.    Am I correct that you knew before
3    August 18, 2004, that the management change which
4    you had made might result in some problems?
5    A.    Yes.
6    Q.    And is it Counterpart's policy to engage
7    professional facilitators and executive coaches when
8    management changes are made?
9    A.    It's our policy to use facilitators to
10   facilitate resolution of issues of whatever manner.
11   We've had facilitators to help us at the senior
12   management team level talk about allocation of
13   resources across divisions.  We've used facilitators
14   to facilitate meetings that could be potentially
15   contentious.
16   Q.    Did you have reason to think that the
17   change of management could be potentially
18   contentious in the case of Jay Cooper and Michael
19   Kunz?
20   A.    Yes.
21   Q.    What was that concern based on?
22   A.    Jay Cooper had indicated to me that he had

0104

1    issues with Michael Kunz.  Michael Kunz had
2    indicated to me that he had issues with the way Jay
3    Cooper was managing the project.
4    Q.    Was this information imparted to you
5    during these telephone calls you testified about?
6    A.    Prior, during, yeah.
7    Q.    So what was your intention of calling the
8    August 18 meeting?
9    A.    The intention was to look at the
10   management structure, get agreement on some changes,
11   which one of the big changes was to have Jay Cooper
12   report -- no.  One of the big changes was to have
13   Bob Abma take on the admin function.  He was already
14   director of finance.  And Michael felt that based on
15   his perception of how things were being managed,
16   that finance and admin needed to be pulled together.
17   Because Jay Cooper had taken -- previously taken Bob
18   off the admin function and took it upon himself the
19   admin function, which had him report -- more than
20   10 people, possibly 12 individuals reporting to him,
21   many of them performing admin functions.  And the
22   perception was that it was distracting him from

0105

1    focusing on the substance of the program.

Page 38

011306al

2    Q.    When you said the perception was, you mean
3  Mr. Kunz's perception was?
4    A.    And mine.
5    Q.    And yours?
6    A.    Yeah.  Remember, I had visited in the
7  spring of 2004.
8    Q.    In the spring of 2004, you drew the
9  conclusion you've just said, that the administrative
10  function was distracting Jay Cooper from his other
11  responsibilities?
12    A.    No.
13    Q.    When did you first come to the conclusion
14  that the administrative functions were distracting
15  Jay Cooper?
16    A.    I came to the conclusion that Jay Cooper
17  was distracted in the spring of 2004.  I came to the
18  conclusion that things were just not moving along in
19  the way that I had hoped.
20    Q.    In the spring of 2004?
21    A.    That's right.
22    Q.    Did you at any point in time come to the

0106

1  conclusion that the fact that Jay Cooper had some of
2  the administrative functions, which had previously
3  rested with Bob Abma, was contributing to what you
4  perceived as his distractions?
5    MS. ARIAIL:  Objection, asked and
6  answered.
7    MS. DOUGLASS:  I don't believe so,
8  actually.
9    A.    I came to the conclusions that it was
10  inappropriate for the chief of party to have the
11  receptionists, the drivers and other admin functions
12  reporting directly to the chief of party.  It didn't
13  make sense.  It was not the way we had structured
14  the program in the past.  And I did come to that
15  conclusion, yes.
16    Q.    When?
17    A.    I came to -- when did I come to the
18  conclusion?  I came to the conclusion that we needed
19  to revisit the structure and to have a conversation
20  with Jay Cooper about the pros and cons of having
21  him hold on to the administrative functions or
22  letting go the administrative functions and having

0107

1  them put back under Bob Abma.
2    So during the course of the August 18
3  meeting, that was part of the dialog.  So the actual
4  decision was made in the August 18 meeting.
5    Q.    So let me see if I've got this right.  The
6  decision to have Michael Kunz supervise Jay Cooper
7  was made before the August 18 meeting?
8    A.    That's right.
9    Q.    But the question of whether or not the
10  admin function should be given back to Bob Abma was
11  not made until the August 18 meeting?
12    A.    That's right.
13    Q.    And was Jay Cooper and Michael Kunz
14  informed that the division -- that the supervision
15  of the admin functions was going to be one of the
16  subjects discussed at the August 18 meeting before
17  the meeting happened?
18    A.    I think the broader topic of the

Page 39

011306a1

13      Q.      Did it appear to you to be an accurate
14  description of his job functions?
15      A.      At that time, yes.
16      Q.      This is before the change in management,
17  correct?
18      A.      This is before -- yes.
19      Q.      And did you have Mr. Kunz prepare a job
20  description also?
21      A.      I don't recall.
22      Q.      Now, I want you to turn your attention to
                                                        0111
1   the actual meeting itself.
2           MS. DOUGLASS:  And I'm going to have
3   marked as the next exhibit number, your -- I hope I
4   have enough copies -- second supplemental response
5   to plaintiff's first set of interrogatories.
6           (Document referred to marked Deposition
7   Exhibit Number 29 for identification and
8   subsequently attached to the deposition.)
9   BY MS. DOUGLASS:
10      Q.      I'm showing you what's been marked
11  Plaintiff's Exhibit 29.  Have you seen Plaintiff's
12  Exhibit 29 before?
13      A.      Yes.
14      Q.      And did you recently execute a
15  verification with respect to the answers set forth
16  in Plaintiff's Exhibit 29?
17      A.      Yes.
18      Q.      Would you please turn to the answer to
19  Interrogatory number two, paragraph one.
20      A.      Yes.
21      Q.      I want to ask you specific questions about
22  some of it.
                                                        0112
1       A.      Yes.
2       Q.      You say --
3           MS. ARIAIL:  I'm sorry.  I don't -- she's
4   not looking at the same document I'm looking at.
5           MS. DOUGLASS:  (Indicating.)
6           MS. ARIAIL:  She is not looking at that
7   document.  You gave her the responses to the request
8   for production.
9           MS. DOUGLASS:  Sorry about that.  Can we
10  substitute for Exhibit 29 -- thank you for saying
11  that -- a different document?
12          (Deposition Exhibit Number 29 was
13  remarked.)
14  BY MS. DOUGLASS:
15      Q.      I'm sorry about that, Ms. Lear.
16      A.      Okay.
17      Q.      Please look on page four of Plaintiff's
18  Exhibit 29, answer -- response to Interrogatory
19  number two, paragraph one.
20      A.      Uh-huh.
21      Q.      You say in the first sentence of response
22  to Interrogatory number two, paragraph one, that on
                                                        0113
1   August 18, 2004, you held a meeting with plaintiff,
2   Michael Kunz and Barbara Sloan, quote, "to discuss
3   Cooper's performance problems," close quote.
4           Was that one of the purposes of the
5   August 18 meeting?
6       A.      Yes.

Page 41

011306a1

```
 7        Q.     What performance problems of Cooper's were
 8   discussed at that meeting?
 9        A.     One of the issues was the -- the
10   distraction on admin functions taking him away from
11   more substantive areas of responsibility.  The other
12   was not accepting a revised management structure
13   which would allow for Bob Abma, rather than Jay
14   Cooper, to oversee the admin functions.
15        Q.     Anything else?
16        A.     The focus of that meeting.  That was --
17        Q.     Those two?
18        A.     -- the primary focus.  And then other
19   issues arose.
20        Q.     I'm going to ask you about the rest of the
21   sentence, but right now I'm just asking what
22   performance problems by Jay Cooper were discussed,
```
                                                            0114
```
 1   and you've identified two, correct? ·
 2        A.     Uh-huh.
 3        Q.     All right.
 4        A.     And in relationship to this, not meeting
 5   the objectives of the program.
 6        Q.     In relationship to what?
 7        A.     The focus on the admin functions.
 8        Q.     In other words, being distracted from the
 9   objectives by the admin functions?
10        A.     Right.
11        Q.     Now, during the August 18 meeting, did
12   Mr. Cooper admit that he had been distracted by the
13   administrative functions so that he could not focus
14   on the objectives of the program?
15        A.     No.
16        Q.     Did he deny that?
17        A.     Yes.
18        Q.     He did?
19        A.     Yes.  He felt that he was -- he could do
20   both.
21        Q.     What facts were brought to his attention
22   to convince him that he did have a problem in that
```
                                                            0115
```
 1   area?
 2        A.     As I recall, there was -- I don't know
 3   whether I'm recalling what happened at that meeting
 4   or prior to that meeting with Michael Kunz.
 5        Q.     Well, what do you recall, whichever place
 6   it happened?
 7        A.     That the vision of the program was not
 8   well understood by some key staff and, therefore,
 9   their ability to implement was undermined.
10        Q.     And you were told that by someone or you
11   concluded that from something?
12        A.     I concluded that from my visit in the
13   spring and it was corroborated by others.
14        Q.     I'd like to parse that through for a
15   minute, if I could.
16               Which members of the key staff did not
17   appreciate the vision of the program?
18        A.     Country directors.  In particular those in
19   Kazakhstan and Kyrgyzstan.
20        Q.     And how did you determine that they did
21   not appreciate the vision of the program?
22        A.     Conversations that Michael Kunz had had
```
                                                            0116

Page 42

011306al

```
 1  with those individuals.
 2       Q.    Did you have conversations with those
 3  individuals personally to verify or determine that
 4  fact?
 5       A.    At what point in time?
 6       Q.    At any time before August 18.
 7       A.    Yes.
 8       Q.    With whom and when?
 9       A.    Marat Kazibeko.
10       Q.    And his position is what?
11       A.    At that time he was country director.
12       Q.    Of Kazakhstan?
13       A.    Uh-huh.
14       Q.    And when did you speak to him about his
15  vision of the program?
16       A.    I didn't say his revision for the program.
17  I gathered from my conversations with him that he
18  didn't have a clear vision.
19       Q.    And in what respects did his vision appear
20  faulty to you, from your conversations with him?
21       A.    I don't think he -- he did not appear to
22  understand how the devolution of authority, how
```

0117

```
 1  authority was going to devolve from the Kazakhstan
 2  country office through the associations that we were
 3  principally targeting as our legacy in those two
 4  countries.
 5       Q.    Was there a work plan in place to permit
 6  that process to happen, in Kazakhstan?
 7       A.    Some of the work plan was not being
 8  executed.
 9       Q.    By Marat?
10       A.    By Marat.
11       Q.    And others?
12       A.    And his direct supervisor, Jay Cooper.
13       Q.    In what respect was Jay Cooper not
14  executing the work plan?
15       A.    Capacity was not being built, sufficient
16  capacity was not being transferred to the
17  associations to take on the role that they needed to
18  take on prior to the end of the program.
19       Q.    You got that impression from a direct
20  conversation with Marat.  You also had a direct
21  conversation --
22       A.    No.
```

0118

```
 1       Q.    Am I wrong?
 2       A.    (Indicating.)
 3       Q.    How am I wrong?
 4       A.    You asked -- that was not -- that did not
 5  relate to a direct conversation with Marat.
 6       Q.    It was your conclusion after a
 7  conversation with Marat.  Is that correct?
 8       A.    We did not discuss the work plan with
 9  Marat.
10       Q.    After your conversation with Marat, you
11  drew the conclusion that the work plan was not --
12  the vision of the program was not adequately
13  understood by him.  Is that correct?
14       A.    Yes.
15       Q.    Did you also have a conversation on that
16  subject with the country director from Kyrgyzstan?
17       A.    I don't recall.
```

011306a1

12    A.    NO.
13    Q.    Now, what you've called the vision part,
14  we're communicating about that, was that discussed
15  at the August 18 meeting as an aspect of Cooper's
16  performance problems?
17    A.    I don't recall.
18    Q.    Now, on answer to Interrogatory number
19  two, paragraph one, you also say that during the
20  meeting on October 18, you sought to, quote,
21  "identify and implement an effective management and
22  leadership structure."

0122

1         MS. ARIAIL:  Objection.  I think you meant
2  August.
3         MS. DOUGLASS:  What did I say?
4         MS. ARIAIL:  October.
5         MS. DOUGLASS:  Strike it, please.  Thank
6  you.
7  BY MS. DOUGLASS:
8    Q.    Was the meeting on August 18 also to
9  identify and implement an effective management and
10  leadership structure?
11    A.    Yes.
12    Q.    We've already talked about the fact that
13  before the meeting Mr. Kunz had already been brought
14  in to supervise Mr. Cooper, correct?
15    A.    Yes.
16    Q.    So what that refers to, in your answer to
17  Interrogatory number two, is the structure for
18  moving the administrative functions to Mr. Abma.  Is
19  that right?
20         MS. ARIAIL:  Objection.
21         MS. DOUGLASS:  What's the objection?
22         MS. ARIAIL:  The objection is that that's

0123

1  not what she's testified and that's not what this
2  states.  If you have a question, ask her; don't put
3  words in her mouth that you have no basis for coming
4  up with.
5  BY MS. DOUGLASS:
6    Q.    The management structure, to the extent
7  that it involved adding Mr. Michael Kunz as a
8  supervisor of Jay Cooper, was already in place
9  before the meeting, correct?
10    A.    Yes.
11    Q.    Given that, what did you mean in your
12  answer to Interrogatory number two, paragraph one,
13  when you said that you held a meeting on August 18
14  to, quote, "identify and implement an effective
15  management and leadership structure for the CSSI and
16  Healthy Communities project," close quote?
17    A.    Yeah.  We wanted to do just that, to
18  identify and create a leadership structure that we
19  felt would enable us to move forward to meeting the
20  objectives of the program -- or to better meet the
21  objectives of the program.
22    Q.    What did that encompass aside from --

0124

1    A.    It encompassed having --
2         MS. ARIAIL:  I was just going to say, let
3  her finish her question.
4  BY MS. DOUGLASS:
5    Q.    What did that encompass aside from moving

Page 45

011306a1

21    Q.    When did that happen?
22    A.    During the week that Kelli Boyer was in

0149

1    central Asia.
2    Q.    And what did Michael Kunz say to you on
3    that subject during that week?
4    A.    "Jay Cooper refuses to meet with me."
5    Q.    Did you question him about the
6    circumstances under which that happened?
7    A.    Yes.
8    Q.    And what did he say in response to your
9    questions?
10    A.    That there was one occasion where Kelli
11    had organized a meeting between Bob Abma and Jay
12    Cooper to discuss their issues.  And she organized
13    it to take place in Michael Kunz's office.  It was
14    her request as our HR director.  She felt she wanted
15    Jay's supervisor to be present.  Jay refused to meet
16    with Michael in Michael's office and refused to meet
17    with Michael.  And thereafter refused to meet with
18    Michael for any purpose.
19    Q.    Now, can I ask you some specifics about
20    that?  Did Michael say that Jay refused to meet in
21    Michael's office or that he refused to meet with
22    Michael, or both?

0150

1    A.    Refused to meet in his office for that
2    particular, but refused to meet with Michael.
3    Q.    For any purpose?
4    A.    Right.
5    Q.    And did that refusal happen in one
6    conversation or did it happen in multiple
7    conversations, if you know?
8    A.    As I recall, it was in one -- certainly in
9    one conversation, possibly in two.
10    Q.    And so did you interpret Michael's
11    reporting this to you as being his invocation of the
12    agreement that he could come forward and say this is
13    not working?
14    MS. ARIAIL:  Objection, beyond the scope
15    of the deposition.
16    BY MS. DOUGLASS:
17    Q.    It's not, so please answer the question.
18    A.    Can you --
19    MS. ARIAIL:  I'll instruct you not to
20    answer.  Counterpart can't interpret anything.
21    Ms. Lear's going to be deposed or has the option to
22    be deposed at a later time when she can be

0151

1    questioned about her individual interpretations,
2    feelings and opinions.  That's not the purpose of
3    today's deposition.
4    BY MS. DOUGLASS:
5    Q.    What did you do when Michael Kunz called
6    you and reported what you've just described?
7    A.    I discussed it with our COO.  I discussed
8    it with Kelli.
9    Q.    Did you take any action?
10    A.    No, not at that time, no.
11    Q.    Now, if you look back on Plaintiff's
12    Exhibit 12, page 743, bullet point six under key
13    decisions, did you take any steps to discuss with
14    Jay Cooper the fact that in Michael Kunz's view the

Page 55

011306a1

```
 3    get done.  So, sure, let's go.
 4              MS. ARIAIL:  I'll keep track of how long
 5    we are so you get your seven hours.
 6              (A recess was taken.)
 7    BY MS. DOUGLASS:
 8         Q.    We're still on communications, oral or
 9    written, following the August 25 phone call, which
10    is the subject of subject number five.  And I'm
11    going to ask you a number of subjects.  I'm going to
12    ask you whether or not you had any communication
13    with anyone on those subjects.  And the time frame
14    I'm pointing to is October 25 through your
15    decision -- the corporation's decision to terminate
16    Mr. Cooper.
17              Did you have any discussions, aside from
18    the ones you've talked about, about Mr. Cooper being
19    accessible to employees under his supervision?
20         A.    Yes.
21         Q.    With whom and when?
22              MS. ARIAIL:  Objection, compound.  You can
```

0158

```
 1    answer.
 2         A.    Kelli Boyer.
 3         Q.    Excuse me?  Kelli Boyer?
 4         A.    Uh-huh.
 5         Q.    What did Kelli Boyer tell you about that
 6    subject?
 7         A.    That -- repeat the question.  This is
 8    about accessibility?
 9         Q.    That Cooper was often inaccessible to
10    those employees under his supervision.
11         A.    Yes, he was behind closed doors a lot of
12    the time.
13         Q.    Kelli Boyer told you that?
14         A.    She perceived that.  Michael Kunz
15    perceived that.  Bob perceived that, but he didn't
16    talk to me directly about it.
17         Q.    Do you know whether Kelli Boyer
18    interviewed staff members at the Almaty office to
19    draw that conclusion?
20         A.    She interviewed staff.
21         Q.    Did you have any conversations about
22    whether or not Cooper was controlling and
```

0159

```
 1    intimidating?
 2         A.    I'm trying to remember.  Yes.
 3         Q.    Who told you that?
 4         A.    Kelli.
 5         Q.    Do you know what her basis for drawing
 6    that conclusion was?
 7         A.    Conversation with Marat.  The term was not
 8    empowered.
 9         Q.    Not empowering?
10         A.    Not empowering.  Not feeling empowered.
11    That was the term.
12         Q.    Did anyone have a conversation with you
13    about whether Jay Cooper neglected opportunities to
14    enhance the productivity and well-being of existing
15    staff?
16         A.    During that time frame?
17         Q.    Yes.
18         A.    Would you repeat that?
19         Q.    Did you have any conversations with anyone
```

011306a1

19       A.    The office was locked to secure his
20   possessions, to keep them safe.
21       Q.    And his being instructed not to come into
22   any Counterpart office was for what purpose?

0171

1        A.    Jay's parting words -- the conversation
2    that we had on November 12, he was going to get a
3    lawyer.  And so consequently there was a
4    self-protection motive.
5        Q.    I don't quite follow the reason.
6        A.    There was no reason for Jay to be going to
7    the other offices.  There was reason for Jay to come
8    to retrieve his belongings in the office.
9        Q.    So he was told to stay out of the other
10   offices because he had said he wanted to get a
11   lawyer.  Is that your testimony?
12       MS. ARIAIL:  Objection,
13   mischaracterization.
14       A.    No.  I'm not drawing that -- I'm just
15   saying that we made that request at our attorney's
16   recommendation or advice.
17       Q.    Is it --
18       A.    And you would maybe understand that better
19   than I.
20       Q.    Is there any written procedure at
21   Counterpart concerning what procedures are to be
22   followed with respect to offices and entry to

0172

1    offices and personal property, et cetera, upon the
2    involuntary termination of an employee?
3        A.    It's precedent.
4        Q.    By precedent, you mean a consistent
5    practice?
6        A.    Yes.
7        Q.    And what was the consistent practice?
8        A.    The precedent is -- or the consistent
9    practice is that upon termination the employee
10   leave, be asked to leave the office, return the
11   keys.  The computer is -- I don't know what the term
12   is, whatever you do with a computer, lock it up.
13   And that the employee may return to the office in
14   the presence of someone designated to accompany the
15   employee to pick up personal belongings and to do
16   whatever else is agreed upon, mutually agreed upon.
17       Q.    And has that practice been consistently
18   followed by Counterpart in termination of other
19   employees?
20       A.    Quite consistently.
21       Q.    Now, in your response to Interrogatory
22   number four, I asked you about people who had been

0173

1    locked out of their office and you have come up with
2    two individuals, Mr. Propp and Mr. Touma.  Is that
3    correct?
4        A.    Yes.  And there was -- and now I recall
5    there was another one, Brian Black.  I think that
6    was what his name was.
7        Q.    When was Mr. Black terminated?
8        A.    This was during Greg Touma's tenure, and I
9    don't remember the years.
10       Q.    Within the last five years?
11       A.    I think so.
12       Q.    What was his position?

Page 63

011306a1

21    in November and I got back about the third week of
22    November, and I got back into the office maybe
                                                              0212
1     around the 27th or 28th.  I think it was something
2     like that, yeah.  I mean, I don't know the exact
3     date, but I came back and I was told that by Kelli.
4     Or soon after.  Frankly, you know, it wasn't like --
5     yeah.
6          Q.     You, as a corporation, have no knowledge
7     that Kelli's change in circumstances had anything to
8     do with her handling of the Jay Cooper matter, do
9     you?
10         A.     Oh, not at all.  Not at all.  I think we
11    were very satisfied with her handling of the Jay
12    Cooper matter.
13         Q.     Let's move on to -- we've already touched
14    on the subject of subject 11.  Would you look at the
15    text of subject 11 there and see whether or not
16    subject 11 on -- whether you have any information to
17    add as to the source of any of those allegations in
18    your Interrogatory answer.
19         A.     If we could take the time frame away.
20    Last time you asked me within a specific time frame.
21    Do you want to take the time frame away?
22         Q.     Sure.  I mean, your question is whoever
                                                              0213
1     said this to you at any time.  Is that what you're
2     asking me?
3          A.     What is the question?
4          Q.     The question is, who told you at any time
5     that Cooper was inaccessible to the employees under
6     his supervision?
7          A.     Erkin Kasybekov indicated he wasn't
8     answering e-mails for extended periods of time.
9          Q.     Have you finished your answer?
10         A.     This is in addition to the other people
11    mentioned?
12         Q.     Yes.  Could you tell me when Erkin made
13    that comment to you?
14         A.     It might have been during a trip that I
15    made to central Asia.
16         Q.     In what year?
17         A.     It was either '04, '05.
18         Q.     And Erkin is the country director for
19    Kyrgyzstan, correct?
20         A.     Uh-huh.
21         Q.     Has anyone, other than Kelli Boyer who you
22    described previously, mentioned to you that
                                                              0214
1     Mr. Cooper remained in his office with the door
2     closed much of the time?
3          A.     Bob Abma had said it to me on many
4     occasions.  Michael.
5          Q.     What time frame were those comments made?
6          A.     Prior to the 18th and subsequent to the
7     25th.  I have witnessed Jay to be controlling and
8     intimidating.
9          Q.     I'm just doing one.  We're going to go bit
10    by bit.
11         A.     I'm really sorry.
12         Q.     Have you finished with everybody who said
13    anything about his door closed?
14         A.     This is just about the door closed.  I am
                            Page 78

011306a1

15  sorry.  About the door closing, the door closing,
16  Michael, Bob, Kelli.
17      Q.   Kelli as we've already described?
18      A.   That's right.  Three people, as I remember
19  about the door closing.
20      Q.   Who was the source of information coming
21  to you that Cooper was controlling and intimidating
22  to his staff?

0215

1       A.   Myself.  It was an observation of mine.
2  When I visited in the spring of 2004 -- Jay and I
3  have talked about this.  This has been an ongoing
4  issue.
5       Q.   Anything else?
6       A.   Subsequent -- strike that.  Are you able
7  to strike something?
8       Q.   Yeah.
9       A.   Strike "subsequent."  Jay is legendarily
10  controlling.
11      Q.   That's your own observation?
12      A.   It's been an issue for a long time, yes.
13      Q.   As far as you know, no one else has told
14  you that?
15      A.   Interviews with Kelli reveals or
16  corroborated it.
17      Q.   Go ahead.
18      A.   Bob.  I think I mentioned Bob.
19      Q.   You mentioned Bob in connection with
20  something else.  Bob also said he was controlling
21  and intimidating?
22      A.   Yes.  Yana has said that to me.

0216

1       Q.   Yana, Y-A-N-A?
2       A.   Yeah.  Ina, who was his M&E and reporting
3  person, indicated that he had the habit of going
4  around and looking at what people were doing at
5  their computer in their e-mail to determine whether
6  they were doing personal communications or whether
7  it was work related.  That to me is intimidating.
8       Q.   Not to say likely to uncover many games of
9  Solitaire.
10      A.   There's also a sign-in policy that
11  apparently at one point I think Jay may have ended
12  it, but it was ongoing for a long time, which is
13  signing -- not only signing in and signing out in
14  the morning and evening, but signing in and out
15  every time one left the office.  And I felt that
16  that was conveying a wrong -- a wrong message to the
17  local staff in a developing country we were trying
18  to assist.  So that's what I remember right now.
19      Q.   Did anyone ever relay to you that Cooper
20  had difficulty fulfilling his leadership
21  responsibilities?
22      A.   Yes.  Michael, in my own perceptions.

0217

1  Beth Kamoli.  Ara Nazinyan after he left Phase --
2  upon his departure from the program we had an exit
3  interview, and he was a person very loyal to Jay.
4       I'm thinking of who else.  Well, George
5  Deikun alluded to that fact, that aired in
6  conversation.  That's all I can recall at this time.
7  Do I have the option to amend later on, either
8  correct or amplify or whatever?  Are we given that
                        Page 79

011306a1

22    had a chance to formulate a subject or address them.
0264
1     And also subject to a resolution of some of your
2     objections that we have not resolved, specifically
3     about the documents involving Michael Kunz and
4     complaints about him.
5              MS. ARIAIL:  Of course.
6              MS. DOUGLASS:  But subject to those
7     reservations, I'm closing the deposition.  Thank you
8     very much.
9              THE WITNESS:  Thank you.
10             MS. ARIAIL:  I just have a few questions,
11    literally just a few questions.
12             EXAMINATION BY COUNSEL FOR DEFENDANT
13    BY MS. ARIAIL:
14        Q.    Arlene, could you please locate Exhibit 12
15    that you looked at today.
16             Can you please tell me, yes or no, if any
17    statement contained in Exhibit 12 is a contract?
18        A.    No.
19        Q.    I would like to direct you to Exhibit
20    Number 8.  Do you recognize this as the last
21    employment contract between Jay Cooper and
22    Counterpart?
0265
1         A.    As I remember, yes.
2         Q.    Is there any statement set forth anywhere
3     in Exhibit 12 that in any way supersedes the
4     provisions of the contract in Exhibit 8?
5              MS. DOUGLASS:  You're asking her for a
6     legal conclusion?
7              MS. ARIAIL:  I'm not asking her for a
8     legal conclusion.  I can restate that.
9     BY MS. ARIAIL:
10        Q.    Do any of the statements contained in
11    Exhibit 12 change the agreement set forth in
12    Exhibit 8?
13        A.    Not that I --
14             MS. DOUGLASS:  Same objection, but go
15    ahead and answer.
16        A.    No.
17        Q.    Do you have the authority to evaluate the
18    performance of Jay Cooper?
19        A.    Yes.
20        Q.    At the time you terminated Jay Cooper, had
21    you concluded, on behalf of Counterpart, that Jay
22    Cooper was not performing to your satisfaction,
0266
1     being Counterpart's satisfaction?
2         A.    Yes.
3              MS. ARIAIL:  That's all I have.
4              MS. DOUGLASS:  Well, that has prompted
5     something.
6              MS. ARIAIL:  Uh-huh.
7              EXAMINATION BY COUNSEL FOR PLAINTIFF
8     BY MS. DOUGLASS:
9         Q.    Would you please look at Plaintiff's
10    Exhibit 8.  No, I reserve -- I changed my mind.
11             MS. DOUGLASS:  Question withdrawn before
12    asked.
13             THE REPORTER:  Reading and signing?
14             MS. ARIAIL:  Oh, absolutely.  I'm sorry.
15             (Deposition concluded at 5:21 p.m.)
                        Page 97

011306a1

16
17
18
19
20
21
22

0267

ACKNOWLEDGMENT OF DEPONENT

1
2
3              I, ARLENE LEAR, do hereby acknowledge
4      that I have read and examined the foregoing
5      testimony, and the same is a true, correct and
6      complete transcription of the testimony given by me,
7      and any corrections appear on the attached errata
8      sheet signed by me.
9
10
11
12
13      _____        _____
14         (Date)                    (Signature)
15
16
17
18
19
20
21
22

0268

E R R A T A   S H E E T

1
2      IN RE:   JAY W. COOPER vs. COUNTERPART INTERNATIONAL
3      RETURN BY: _____
4      PAGE/LINE   REASON
5      _____  _____
6      _____  _____
7      _____  _____
8      _____  _____
9      _____  _____
10     _____  _____
11     _____  _____
12     _____  _____
13     _____  _____
14     _____  _____
15     _____  _____
16     _____  _____
17     _____  _____
18     _____  _____
19     _____  _____
20     _____  _____
21     _____  _____
22     DATE               SIGNATURE

0269

1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3          I, Paula Flint, Court Reporter, the officer
4      before whom the foregoing proceedings wee taken, do
5      hereby certify that the foregoing transcript is a
6      true and correct record of the proceedings; that
7      said proceedings were taken by me stenographically
8      and thereafter reduced to typewriting under my
9      supervision; and that I am neither counsel for,
                        Page 98