# EXHIBIT K

```
                 IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF COLUMBIA

    -------------------------------X

    JAY W. COOPER,                  )

              Plaintiff,            )

              -vs-                  )   No 1:05cv1598 (RMC)

    COUNTERPART INTERNATIONAL,      )

              Defendant.            )

    -------------------------------X

                   Deposition of Kelli Boyer

                       McLean, Virginia

                   Tuesday, March 28, 2006

                          9:57 a.m.


    Job No.:  1-74535

    Pages 1 - 216

    Reported by:  T. R. Hollister
```



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

92

1  Q  Okay. Anything else?
2  A  No, not that I recall.
3  Q  Did Abma say that Jay was inaccessible?
4  A  Yes.
5  Q  That he kept his door closed?
6  A  Yes.
7  Q  How many days were you actually in the Almaty
8  office?
9  A  Eight.
10 Q  Eight working days?
11 A  Eight working days.
12 Q  None of those days were weekends?
13 A  No.
14 Q  How many of those 8 working days was Jay
15 Cooper there?
16 A  Five.
17 Q  Did you see Jay Cooper with his door closed?
18 A  Yes.
19 Q  On how many occasions?
20 A  I don't recall.
21 Q  Was his door closed that you observed for
22 long periods of time?

DEPOSITION OF KELLI BOYER
CONDUCTED ON TUESDAY, MARCH 28, 2006

112

1   A   I'd say the first meeting I had with Jay out
2   there we were discussing the e-mails he had sent me prior
3   to my trip going out there about him separating from the
4   company and what was my role and he'd like to ask me some
5   questions. And I sent him my home and cell phone but he
6   never called me. So we were discussing him leaving the
7   company. And he exhibited erratic behavior. He would
8   get upset and then not.
9       But the meeting I'm specifically referencing
10  is when I offered to try to mediate with him and Bob Abma
11  because it was obvious they had issues. And I went to
12  his office to let him know that we would be meeting with
13  Michael. And he screamed at me that he would not meet
14  with Michael. He was not going to any meeting with
15  Michael. He refused to go to this meeting. It was just
16  like an instant personality change.
17  Q   Okay. Was anyone else present to witness
18  that exchange?
19  A   No.
20  Q   I want to ask you a number of questions about
21  this. Before you had the meeting with Jay about meeting
22  with Abma, you had already met with Abma and discussed

127

1   Q   So when you met with him on the 4th of
2   November, you discussed this subject?
3   A   Yes.
4   Q   Tell me what the discussion was.
5   A   We talked about him leaving the organization.
6   He let me know that Arlene had offered him 6 months of
7   salary. And he needed clarification on when that 6
8   months started, would it be from the day he left or the
9   day they discussed it. And I let him know I didn't know
10  they had discussed any type of package. That's when he
11  showed me the meeting minutes from August when he was in
12  D.C. with Arlene and Barbara Sloan and Michael Kunz.
13  Q   I'm going to show you that just so the record
14  is clear what we're talking about here. I'm showing you
15  what is in your pile what's marked Plaintiff's Exhibit 12
16  and you identified that as pages 743 and 744 of
17  Plaintiff's Exhibit 12.
18  A   Correct.
19  Q   He had this with him, this section of Exhibit
20  12?
21  A   It was in his e-mails. He pulled it up from
22  his e-mails.

128

1  Q   Okay. What did he say about it?

2  A   He talked about being torn leaving
3  Counterpart, but he felt it was time to move on and that
4  he could not work with the current organizational
5  structure that had been put in place.

6  Q   Did you understand that to be a reference to
7  Mr. Kunz and Mr. Abma?

8  A   Mr. Kunz.

9  Q   All right.

10 A   And I talked to him about staying on, working
11 as a consultant. He had been with us so many years. He
12 told me that as long as Michael would be his supervisor,
13 he would not consider becoming a consultant.

14 Q   Did he tell you that he had decided that he
15 wanted to move on?

16 A   Yes.

17 Q   And he was asking what his rights were or
18 what his compensation would be?

19 A   He was asking clarification on the 6 months.
20 Apparently from the notes here they had talked about 6
21 months of salary. And he needed clarification on when
22 did that start. And I told him I would check with

129

1  Arlene. But from reading the notes that he handed me, it
2  started back in August. And he said that was not his
3  understanding. So I would check with Arlene to see when
4  it did start. It was the first I'd heard about it, so --
5       Q    Did you check with Arlene?
6       A    Yes, I did.
7       Q    You see that reference on page 1457 of Boyer
8  Exhibit 4 that's circled and says, "No just salary,"
9  right there?
10      A    That's in reference to the allowances. That
11 would happen with severance, housing allowance and
12 education allowance.
13      Q    Is "No just salary," something you wrote
14 after talking to Arlene?
15      A    Yes.
16      Q    So you didn't know the answer to that at the
17 time?
18      A    No.
19      Q    Okay. Did you go and ask Arlene right away
20 right after having this conversation with Jay?
21      A    Yes.
22      Q    Was there anything else said in the meeting

130

1  of October 4th -- November 4th aside from what we've
2  talked about?
3      A    Prior to my conversation with Arlene with the
4  clarification?
5      Q    Before you went to talk to Arlene. You just
6  had a conversation. We've discussed what that was.
7      A    Right.
8      Q    Was there anything else in that conversation
9  you haven't told me about?
10     A    Yes.
11     Q    What?
12     A    After I talked with Arlene and got the
13 clarification on the 6 months, Jay was telling me that
14 wasn't his understanding. And if the 6 months didn't
15 start from the time he decided to leave, then he would
16 just sit and do the basic minimum through the end of his
17 contract and just not do anything because he had a
18 contract and he would stay there to the end of his
19 contract.
20     Q    I want you to be as precise as you can on the
21 words that he used, okay. Did the words "basic minimum"
22 come from Jay?

131

1    A    Yes.

2    Q    This whole thing was premised on if it didn't
3    start when he decided to leave?

4    A    Correct.

5    Q    That was the dependent clause at the
6    beginning of the statement?

7    A    Yes.

8    Q    If it didn't start -- if the 6 months didn't
9    start when he decided to leave, he was to -- and then
10   tell me exactly what the words were.

11   A    Sit here and do the basic minimum through the
12   end of my contract.  I have an agreement with Counterpart
13   and I'm just going to sit here.

14   Q    What did you say in response to that?

15   A    I let him know that he couldn't just sit and
16   do nothing.  And he said, yes, I can.  I have a contract.

17   Q    Okay.  Is that the end of the conversation?

18   A    Yes.

19   Q    What did you do next?  Here we are on Friday
20   the 4th of November, right?

21        MS. ARIAIL:  Objection.

22   BY MS. DOUGLASS:

147

1     A    No.

2     Q    Was anybody else present?

3     A    No.

4     Q    You said, I hope it doesn't come to that?

5     A    Yes.

6     Q    Then what happened?

7     A    He said he didn't care. He had put in a lot
8 of years with Counterpart and he wasn't going to be
9 pushed out. And he would again sit around and just do
10 the basic minimum until the end of his contract.

11     Q    He used the words "basic minimum" again?

12     A    Yes.

13     Q    How many times in all these conversations did
14 he use the words basic minimum?

15     A    Several.

16     Q    Several times?

17     A    Yes.

18     Q    The same phrase?

19     A    Yes.

20     Q    Okay. So then what happened next?

21     A    Went back to my hotel. Called Arlene. Let
22 her know about the conversation. She said let her talk

148

1  to Harry and she would give me a call back because she
2  asked me did I feel like the situation could be salvaged
3  and I told her I did not think so.
4      Q   What is the next thing that happened?
5      A   I think the next thing we were in the Bishkek
6  office about half a day. I met with Jay again.
7      Q   We're on the 10th of November?
8      A   We're on the 10th of November, yes.
9      Q   You met with Jay again on the 10th. What
10 happened in that meeting?
11     A   Again I was trying to get him to reconsider
12 his decision. And he said, no, he wasn't going to do
13 anything. Let Counterpart fire him. They're going to
14 have to fire me.
15     Q   Did he use the phrase "bare minimum" again?
16     A   No.
17     Q   Did anybody overhear that conversation?
18     A   No.
19     Q   What's the next thing that happened?
20     A   Irina and I went back to Almaty. I talked to
21 Arlene that night I believe. Also talked with Michael on
22 the way back. They were going --

213

ACKNOWLEDGMENT OF DEPONENT

I, Kelli Boyer, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

DATE                              SIGNATURE

CERTIFICATE OF NOTARY PUBLIC

I, T. R. Hollister, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

*T.R. Hollister*

Notary Public in and for
the Commonwealth of Virginia

My Commission Expires:
August 31, 2007