## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAY W. COOPER               )
                                 )
          Plaintiff         )
                                 )
v.                               )     Civil No. 1:05-cv-01598-RMC
                               )
COUNTERPART INTERNATIONAL  )
                               )
         Defendant.      )
                               )

## MEMORANDUM  IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Local Civil Rule 7, Defendant Counterpart International ("Counterpart"), through counsel, submits this memorandum of law in support of its motion for summary judgment.

## I.    INTRODUCTION

### A.    Cooper's Claim For Breach Of Contract

Plaintiff, Jay Cooper, claims Counterpart breached his employment contract when Counterpart terminated his employment for unsatisfactory performance.  However, the record evidence shows Counterpart lawfully exercised its option under the terms of Cooper's written contract which expressly provides for Cooper's termination in the event Counterpart determined Cooper was not performing his duties in a satisfactory manner. There is no genuine dispute that, in November 2004, Cooper's supervisor became dissatisfied with his performance and terminated the contract.

In reaching the termination decision, Counterpart fully complied with its duty of good faith and fair dealing. The extensive record developed in this case shows Counterpart took extraordinary steps to help Cooper improve his performance, but that Cooper refused and failed to work positively under Counterpart's management structure, instead indicating that he would perform only the "basic minimum" tasks required under his contract. Cooper's supervisor, faced with Cooper's defiance and deliberate restraint, made the difficult but considered decision that Cooper's performance was unacceptable and that his employment should be terminated.

Cooper argues that his termination was due to reporting his concerns about financial irregularities. There is no evidence that the relevant decision-maker regarding Cooper's termination ever knew or believed Cooper had concerns about financial irregularities, much less an intent to report them. Cooper's argument fails because the undisputed evidence reveals (1) Cooper has no substantive evidence of financial irregularities, (2) Cooper never expressed to the sole decision-maker in his termination, the Senior Vice President, any possession of or intention to report financial irregularities, and (3) Cooper himself never held a reasonable belief that financial irregularities ever existed. To the contrary, Cooper publicly told government authorities that there were no financial irregularities "worth investigating."

Thus, there is no evidence on the record showing that Counterpart acted unlawfully, in bad faith, or in contravention to the express and implied terms of Cooper's employment contract. Accordingly, summary judgment on Cooper's breach of contract claim should be granted.

### B.    Cooper's Claim For False Light Invasion Of Privacy

Cooper claims Counterpart engaged in false light invasion of privacy as a result of acts taken by Counterpart and by statements made about Cooper by Counterpart agents after Cooper's termination. However, Cooper cannot prove that Counterpart gave publicity to any matter which placed Cooper in a false light, or matter that would have been false or highly offensive to a reasonable person. The undisputed facts show the conduct in question, mainly Counterpart operating procedures relating to Cooper's termination, do not meet the exacting standard for establishing publication, nor does the conduct in question meet the seriously aggrieving conduct that the tort of false light requires to establish a claim.

Cooper's claim is also barred in that at least one of the statements he contends to be false—his involuntary termination—is by his own admission verifiably true, and because the statements about whether Cooper is a good parent or whether he deserved to be terminated are matters of opinion for which the law affords constitutional protection.

In addition, Cooper's claim for damage to personal and professional reputation cannot be remedied under the tort of false light invasion of privacy because the tort of false light protects only against mental distress. Cooper provides no significant evidence of mental distress other than his own conclusory allegations, nor, for that matter, does he provide any evidence of injury proximately caused by his termination. Because Cooper cannot establish he suffered injury as result of Counterpart's conduct, his claim for damages should be reduced or denied altogether.

For all these reasons, and those more fully described below, summary judgment in Counterpart's favor on all counts, including his false light claim, is appropriate.

II.    **ARGUMENT**

    A.    **Plaintiff's Breach Of Contract Claim Must Fail Because He Was Terminated In Accordance With The Express Terms Of His Contract[1]**

Cooper alleges Counterpart breached his employment contract when it terminated his employment in accordance with the express termination provision contained therein. However, the D.C. Circuit Court of Appeals has long admonished: "It is an elementary principle of contract interpretation that the plain and unambiguous meaning of a written agreement is controlling, in the absence of some clear evidence indicating a contrary intention." *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land*, 670 F.2d 289, 292 (D.C. Cir. 1981) (quoting *Vogel v. Tenneco Oil Company*, 465 F.2d 563, 565 (D.C.Cir.1972) (affirming summary judgment for defendant on breach of contract claim)).

Here, Cooper cannot avoid the plain and unambiguous language in his contract. The undisputed evidence shows Counterpart properly terminated Cooper's employment in accordance with express terms as set forth in paragraph 7, section 2 of Cooper's December 21, 2003 employment contract ("the termination provision"), which unequivocally and incontestably states:

> This Agreement may be terminated without liability to either party in the following circumstances … 2) by Counterpart, immediately upon notice, if you fail to fulfill your obligations under this Agreement or fail to perform your job duties to Counterpart's satisfaction.

(¶¶ 3-4).  See also, Exhibit A.

---

[1] Cooper claims that, under an oral agreement with Counterpart, Cooper was scheduled to receive a five percent raise in salary effective July 1, 2004.  However, paragraph 9 of Cooper's employment contract expressly prohibits any modification of the terms and conditions of Cooper's employment except by written agreement of the parties.  Because Cooper's claim is based on an alleged oral agreement, the salary raise is not binding upon Counterpart.

Cooper has not proffered any evidence, much less clear and convincing evidence, demonstrating that he intended or agreed upon a different result than that set forth in the termination provision. Cooper admits he had an opportunity to negotiate the terms of his contract in the past, in fact negotiated certain terms he wanted modified in the governing contract, and did not negotiate or modify the termination provision. (¶¶ 5-6). Cooper further admits he agreed to sign the contract without negotiating or discussing the terms relating to the termination of his employment. (¶ 6).

There is no dispute that Senior Vice President Arlene Lear ("Lear") was the Counterpart executive with authority to decide if Cooper was performing to the satisfaction of Counterpart. (¶¶ 9-10). The record in this case reveals that Lear had in fact determined that Cooper was not performing in a satisfactory manner. (¶¶ 11-56).

Thus, under section 2 of Cooper's contract, Lear exercised Counterpart's valid option to terminate Cooper's employment. (¶ 56). The express provision of Cooper's contract permitting such an action is clear and definite, and conclusively proves that Counterpart's action fell squarely within the boundaries of the law.[2]

## B.    Plaintiff's Termination Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing

Because Counterpart reached the decision to terminate Cooper's employment in a fair and honest manner, Cooper cannot seriously argue that Counterpart violated an

---

[2] Cooper claims that Counterpart's termination of Cooper's employment was unlawful in that (a) funding for Cooper's position or the program he administered had not been lost, (b) Counterpart did not give Cooper thirty days' notice, and (c) Cooper did not agree to that action. *See* Amended Complaint ¶13. However, none of these conditions are applicable in this case. Cooper is referring to other expressed circumstances in the contract where Cooper's employment could be terminated. Counterpart overlooks the appropriate provision at issue in this case, section 2, which expressly provides for immediate termination of employment upon unsatisfactory performance without reference to funding, advance notice, or mutual agreement.

implied covenant of good faith and fair dealing.  D.C. courts[3] read into every contract an

implied covenant of good faith and fair dealing:

> In every contract there is an implied covenant that neither party
> shall do anything which will have the effect of destroying or
> injuring the right of the other party to receive the fruits of the
> contract, which means that in every contract there exists an implied
> covenant of good faith and fair dealing.  This duty prevents a party
> from evading the spirit of the contract, willfully rendering
> imperfect performance or interfering with the other party's
> performance.

*Hais v. Smith*, 547 A.2d 986, 987-988 (D.C. 1988).  In this case, however, Cooper has

amassed no evidence that Counterpart violated this covenant by terminating his

employment contract.

### 1. Plaintiff Cannot Dispute The Evidence Supporting Defendant's Termination Decision

The D.C. Court of Appeals defined good faith and fair dealing in *Allworth v.*

*Howard University*, 890 A.2d 194 (D.C. App. 2006).  There, the Court stated:

> The Restatement sheds some light on the meaning of "good faith"
> in the context of a breach of the covenant of good faith and fair
> dealing claim: "The phrase 'good faith' is used in a variety of
> contexts, and its meaning varies somewhat with the context.  Good
> faith performance or enforcement of a contract emphasizes
> faithfulness to an agreed common purpose and consistency with
> the justified expectations of the other party; it excludes a variety of
> types of conduct characterized as involving 'bad faith' because
> they violate standards of decency, fairness or reasonableness.
> Subterfuges and evasions are not included in examples of good
> faith; bad faith may be overt or may consist of inaction, and fair
> dealing may require more than honesty.  Bad faith involves
> evasion of the spirit of the bargain, lack of diligence and slacking
> off, willful rendering of imperfect performance, abuse of a power
> to specify terms, and interference with or failure to cooperate in the
> other party's performance.  Bad faith means more than mere

---

[3] Under a choice of law provision, the parties agreed in the December 2003 contract that
any disputes arising under the contract would be governed by the law of the District of
Columbia.

negligence." We considered the fair dealing aspect of a breach of the covenant of good faith and fair dealing claim in *Adler v. Abramson*, 728 Ad. 2d 86, 90 (D.C. 1999). There we determined "fair dealing" involves reasonable rather than arbitrary or capricious action.

*Allworth*, 890 A.2d at 201-202.

Under this controlling definition applicable to the instant case, the undisputed evidence permits only one logical conclusion: Counterpart's termination of Cooper's employment was in full compliance with the doctrine of good faith and fair dealing. The testimony of relevant Counterpart personnel is unrefuted: Cooper's performance was unacceptable and unsatisfactory, and warranted termination. Lear, the sole decision-maker authorized to review Cooper's performance, believed there were problems with Cooper's management as early as Spring 2004. (¶¶ 13-23). Lear took extraordinary steps to address and correct Cooper's performance issues, and allowed Cooper a chance to work positively under a new management structure designed to improve his efforts. At the close of extensive discovery, the facts indisputably show:

- Lear believed Cooper was not adequately transmitting to key project staff the overall vision of the program. (¶ 13).

- Lear believed that Cooper was inaccessible to his employees and that he often stayed behind closed doors. (¶ 15).

- Lear perceived the general tone of the Almaty office as flat, that the local national staff seemed withdrawn, and staff exhibited little interaction with Cooper other than to be responsive to his questions. (¶ 14).

- Lear felt Cooper was distracted and unfocused on the projects he was managing. (¶ 16).

- Lear personally witnessed Cooper's intimidating and controlling behavior towards his employees and felt it was counterproductive to Counterpart's mission of empowering the local individuals, institutions and communities where Counterpart focused its work.  (¶ 18).

- Lear believed from discussions with Counterpart employees and a USAID regional director that Cooper had difficulty fulfilling his leadership responsibilities.  (¶ 19).

- Lear was concerned that, because the vision of the programs managed by Cooper was not well understood by his staff, Counterpart's ability to implement the objectives of the programs was undermined. (¶ 20).

- Lear also was concerned about Cooper's managerial style and need for tight control over his staff because it was counterproductive to Counterpart's broad mission of empowering the individuals, institutions and communities where Counterpart focused its work.  (¶ 21).

- Lear concluded that Cooper was failing to effectively implement the Counterpart programs and she felt compelled to revisit his management structure and job responsibilities.  (¶ 22).

Lear went to great lengths to address Cooper's performance deficiencies by restructuring Cooper's office administration, placing Cooper under the direct supervision of Regional Director Michael Kunz ("Kunz"), and shifting some of Cooper's administrative duties to the Director of Finance and Administration, Bob Abma ("Abma").  (¶ 23-24).  She also held a professionally facilitated meeting to allow Cooper

to air his grievances, discuss his concerns, and seek a mutually acceptable resolution. (¶ 30-31).

Cooper admits he had an opportunity to discuss positives about himself and to discuss some of the issues he had with the new management structure.  (¶ 31).  Although Cooper expressed his discomfort with the new management structure and a desire to leave Counterpart if the new approach were instituted, Lear encouraged him to stay and agreed to give Cooper some time to think about whether he wanted to leave Counterpart. (¶¶ 28-29, 30, 32).  She even offered Cooper a liberal separation agreement should he decide not to continue his employment.   (¶¶ 30-32).  Yet, despite Lear's efforts, this was not enough for Cooper:

- Despite making changes to the management structure, Lear received reports that Cooper was behaving erratically and refusing to cooperate with human resource's efforts to resolve his differences with Counterpart staff and colleagues.  (¶¶ 44, 46).

- Cooper told Lear he did not welcome the change in command, and was uncomfortable reporting to Kunz.  (¶ 28).  In her own conversations with Cooper, he waivered between expressing admiration for Kunz and resentment for Kunz's management and communication style.  (¶ 46).

- Cooper expressed equal discomfort with Lear's decision to shift some of his administrative duties to Abma and refused to participate in a mediation arranged by human resources to resolve his concerns.  (¶¶ 29, 44).

- Although Cooper contacted human resources to discuss his termination options, he refused to consider any options provided and instead indicated

to human resources that he intended to perform his duties with minimal effort until the expiration of his contract. (¶¶ 40, 48-49).

▪ When asked if Cooper really intended to apply only minimal effort, he replied that Counterpart could fire him if they did not like it.  (¶ 50).

Based on these undisputed facts, it is clear Counterpart gave Cooper every opportunity to improve and change his performance, or provide him alternatives to continuing in his position.  But Cooper simply would not, or could not, work within Counterpart's new management structure.   Cooper's lack of cooperation and his persistent refusal to perform his duties proved for Lear to be the final straw that warranted his termination.

At the close of discovery, Cooper has no evidence that Lear's termination decision, made months after first observing his ineffective leadership, was reached in an arbitrary or capricious manner, or effected in bad faith.  To the contrary, Cooper's own testimony shows he believed Lear bore him no ill will.  (¶ 60).

> ### 2.    Plaintiff Has No Evidence That His Termination Was Caused By His Current Allegations Of Financial Irregularities

Cooper nevertheless argues that Counterpart did not terminate him for performance reasons, but rather, "in part to avoid questions Cooper had raised in reporting financial irregularities."  *See* Amended Complaint ¶17-18.   However, ever knew or believed Cooper had concerns about financial irregularities, much less an intent to report them.  Cooper's argument fails because he cannot prove that (1) he has any substantive evidence of financial irregularities, (2) he ever expressed to the single relevant decision-maker, Lear, an intent to report alleged financial irregularities, or (3) that he or Lear ever held any belief there were financial irregularities to report.

During discovery, Cooper failed entirely to provide evidence of improper conduct by Counterpart.  Rather, Cooper speculated in deposition that a conversation he had with Kunz about "files" he was keeping on Kunz could have given Counterpart "the idea" he had information about financial irregularities.  (¶ 70).  In support of his assumption, Cooper relied on a discussion he had with Lear regarding Kunz's management style. (¶ 70).  Based on this discussion alone, Cooper draws the strained conclusion that Lear could, theoretically, have believed he had information on financial irregularities.  (¶ 70). Cooper reasons that Lear terminated him in order to ransack his office in search of the theoretical documents.  (¶ 70).

However, Cooper admits unequivocally that his conversation with Kunz had nothing to do with financial irregularities:

> Q.          Your conversation with Michael Kunz, which he ranted for 30 minutes or so, did that have anything to do with financial irregularities?
>
> A.          No.

 (¶ 71).

Cooper then admits that his discussion with Lear also did not have anything to do with financial irregularities, but regarded letters of complaint Cooper had gathered from staff about Kunz's demeanor:

> A.          (Cooper) … Finally, I had a conversation with Arlene Lear after this incident, on the phone.  And she said to me, she said, you know, why are you keeping files on Michael?  I said, I don't – I'm not keeping files on Michael.  I have the documents that – letters of complaint that I have sent to you, I have sent to Harry, those are the documents that I have.

(¶¶ 70, 71).

Cooper further confesses that he never expressed to Counterpart management any intention of reporting financial irregularities:

> Q.    … Did you ever tell anyone in Counterpart management that if these irregularities in your view were not corrected or addressed, that you were going to complain to somebody in the U.S. government?
>
> A.    No.
>
> Q.    Did you ever give any kind of a, you know, or else statement of any kind, saying do this or else I'll do something?
>
> A.    No.

(¶ 67).

Indeed, Cooper finally admits that he publicly stated to government authorities there were no financial irregularities worth investigating:

> A.    (Cooper) … And in fact, I was asked by the contracting officer, in Almaty, if I suspected there were some financial irregularities, and I told him not that would warrant investigation.

(¶ 68).

Given these undisputed facts, Cooper cannot seriously claim Lear terminated his employment to hide phantom information about unknown financial irregularities. Cooper's logic is flawed in that Lear never knew or could have known that Cooper possessed information about financial irregularities, much less an intent to report them. Lear's only understanding of Cooper's concerns from the aforementioned conversation was Kunz's managerial style and letters of complaint. (¶ 73). Lear could not possibly have drawn the conclusion asserted by Cooper that, in one conversation about letters of complaint, Lear then believed Cooper should be terminated for his concerns about financial irregularities. Put another way, it is simply impossible to draw the inference that letters of complaint are the equivalent to concerns about financial irregularities.

The undisputed facts clearly demonstrate Lear was not aware of any financial irregularities at Counterpart, and Cooper never led her to believe otherwise. (¶¶ 73-77). Cooper simply puts forth an unproven hypothesis that is contradicted by his own testimony. The extensive record in this case shows Cooper's theory of termination for reporting financial irregularities is fatally flawed, and that summary judgment on his breach of contract claim should be granted.

### C.    Plaintiff Cannot Prevail On His Claim For False Light Invasion Of Privacy

Cooper's claim for false light invasion of privacy is equally miscalculated and unavailing. The undisputed facts show that Cooper cannot prove the elements of a false light claim. To prevail on a false light claim, a plaintiff must show (a) material is published which places the plaintiff in a false light that would be highly offensive to a reasonable person, and (b) the actor who published the material had knowledge of or acted in reckless disregard as to the falsity of the publicized matter. *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) (quoting *Moldea v. New York Times Co.*, 15 F.3d 1137, 1150-51 (D.C. Cir. 1994). The undisputed evidence shows Cooper cannot satisfy the elements of this test.

### 1.    Plaintiff Has No Evidence Of Publicity

Cooper has no evidentiary basis for contending that statements or conduct by Counterpart were published within the meaning of the term as defined by D.C. courts. This Court in *Steinbuch v. Cutler*, 2006 U.S. Dist. LEXIS 78462 (U.S.D.C. 2006) defined the meaning of publicity as follows:

> Publicity in the sense that it is used regarding these claims for invasion of privacy differs from the term publication as used in connection with liability for defamation. Publication can mean

> communication to a single person. The Second Restatement of Torts differentiates publicity as follows: 'Publicity,' on the other hand, means the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of communication that reaches, or is sure to reach, the public.

*Id*. at *5-*6 (citations omitted).

The Second Restatement of Torts' standard on false light invasion of privacy, as adopted by the District of Columbia,[4] further explains:

> It is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

RESTATEMENT (SECOND) OF TORTS §652D cmt. a.

Each instance of conduct Cooper argues placed him in a false light was never published within the meaning of the term as defined in this Circuit. The undisputed evidence demonstrates that Counterpart's conduct was either 1) communicated to Cooper alone or 2) communicated to so few people that no broad publication could have occurred.

---

[4] See *Steinbuch v. Cutler*, 2006 U.S. Dist. LEXIS 78462 (U.S.D.C. 2006), *4-5 (stating the "District of Columbia adopts the Second Restatement of Torts' formulation of the law of false light invasion of privacy").

The extensive record developed in this case shows there can be no genuine issue as to the *de minimus* number of persons that were apparent recipients of Counterpart's alleged conduct:

- Cooper claims the locks on his Almaty office were changed in the presence of staff.  Cooper admits he has no evidence any staff actually witnessed the locks being changed.  (¶ 79).

- Cooper claims Counterpart employees sorted through everything in his office after his termination.  Cooper admits two Counterpart employees sorted through his office in the presence of one security guard.  Cooper admits that he, not Counterpart, shared this fact with others.  (¶¶ 84, 86).

- Cooper claims that in his teleconference with Lear, he was told not to return to the Counterpart office in Almaty.  *See* Amended Compl. ¶ 26.  However, Cooper offered no evidence that anyone else actually heard this request.

- Cooper admits that two individuals at most ever heard that he left Counterpart "not by his own choice."  (¶ 89).

- Cooper admits that only three Counterpart directors and one professional colleague heard Cooper was no longer with the organization and not allowed in Counterpart offices.  (¶ 83).  Cooper admits he does not know whether this information was communicated broadly to other individuals.  ( ¶ 83).

- Cooper admits that Counterpart did **not** publish the reasons for his termination.[5] (¶ 78).

- Cooper claims Counterpart staff in the Almaty office were told to shut down internet access, that the office was closing down for remodeling, and that correspondence to Cooper should be discontinued.  *See* Amended Compl. ¶ 26.  Cooper offered no evidence that these instructions were broadly communicated to the public.

- Cooper admits that every statement described in paragraph 28 of his Amended Complaint was made to one individual on each occasion, and of the six statements alleged, three were made to a single person.  (¶ 92-97).

There can be no dispute that Counterpart's alleged conduct never reached a large audience as required to sustain this cause of action.  There is no evidence, for example, that Counterpart announced any of the alleged statements before a general population, or that such statements were broadcast through newspapers, radio, periodicals, handbills, or similar means.  Quite the opposite, the extensive record shows that each instance of conduct alleged by Cooper was, if communicated at all, revealed to one individual only, or a small group of persons at the most.  These were mainly local Counterpart staff who worked with Cooper in the field or colleagues who worked with Cooper on Counterpart programs and projects.  This hardly evinces the sort of broad communication required to establish false light publicity.

---

[5] Paradoxically, Cooper admits he felt Counterpart's decision not to publish the reasons for his termination led him to conclude Counterpart committed false light invasion of privacy.

Without evidence of broad communication, Counterpart's actions never posed a substantial risk of becoming a matter of public knowledge.  Therefore, Cooper's claim that he was placed in a false light before the public cannot survive.  Cooper's claim for false light invasion of privacy is unsupported by the evidence and summary judgment on this count should be granted.

### 2.    The Publicity Alleged By Plaintiff Does Not Concern a Matter That Would Be Highly Offensive To A Reasonable Person

Cooper also cannot establish that his claim meets the "highly offensive" prong of the false light test.  The Second Restatement of Torts explains:

> The rule stated in this Section gives protection only against unreasonable publicity, of a kind highly offensive to the ordinary reasonable man.  The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.  Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part.  Thus he must expect the more or less casual observation of his neighbors as to what he does, and that his comings and goings and his ordinary daily activities, will be described in the press as a matter of casual interest to others … Even minor and moderate annoyance, as for example through public disclosure of the fact that the plaintiff has clumsily fallen downstairs and broken his ankle, is not sufficient to give him a cause of action under the rule stated in this Section.  It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it that the cause of action arises.

RESTATEMENT (SECOND) OF TORTS §652D cmt. c.

Whether an act or statement is highly offensive to a reasonable person is "an objective one, based upon the reaction that a reasonable person would have if he or she were the subject of the [publicity]."  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 149 (U.S.D.C. 1995).

Here, the conduct and statements allegedly made by Counterpart do not indicate the sort of repugnant conduct necessary to sustain a false light claim. All but one instance of conduct alleged by Cooper relates to his employment.[6] *See* Amended Compl. ¶ 28. Most of these instances, such as changing the locks on his office, sorting through his office, and discontinuing correspondence, reflect standard operating procedures followed by Counterpart as part of its established practice regarding terminations. (¶¶ 61-64). There is no evidence that Cooper was singled out for these acts disfavorably, or that Cooper even had knowledge of Counterpart protocol with respect to terminations. (¶ 66). Nor would a reasonable person feel seriously aggrieved by these benign policies, for it is quite common today for an employer to clear out a terminated employee's office and to commence the process of removing that employee's connection to the job. In that regard, it is reasonable for Counterpart carry out its own terminations in such a fashion, and to request of Cooper that he cooperate by refraining from entering Counterpart's offices.

Moreover, statements about Cooper being terminated, his decision to leave Counterpart, and his job performance in general, are not so highly offensive as to give rise to a claim for false light. *See* Amended Compl. ¶ 28. Terminating Cooper in a telephone conference, for example, is hardly an outrageous or abominable act, particularly when, at the time of the call, Cooper was in Central Asia while Lear, who initiated the call, was thousands of miles away in Washington D.C. (¶ 56).

---

[6] The exception is the one statement regarding the custody of his child alleged in paragraph 28 of Cooper's Amended Complaint which, as already established, was made only to a single individual.

Further, Cooper readily admits that many of these statements, notably that it was Cooper's decision to leave Counterpart and that he was offered choices besides termination which he rejected, were made with no desire to insult, but with the good intention of characterizing Cooper in a positive light.  (¶ 94).  Cooper also admits that for each of the above statements, as well as that about his termination for performance reasons, failure to cooperate, or mismanagement of projects, no one thought less of him upon hearing the statements or felt he was guilty of misfeasance, dishonest, or unprofessional.  (¶¶ 92, 93, 96).

Indeed, statements about Counterpart's dissatisfaction with Cooper's job performance are proportionately reasonable given the genuine sense of dissatisfaction Counterpart felt about Cooper's performance at the time.  (¶¶ 11-56).

Cooper also admits that he could find no correlation between obviously neutral conduct and the fact of his termination.  (¶¶ 80-82).  Acts such as shutting down internet service and closing the Almaty office bear no relevance to Cooper as a person or as a professional, and no evidence shows the acts were specifically directed at him, let alone aimed at him for malicious purposes.  Even if a correlation could be found, these events are so common in the working world that, to render them actionable, would remove all legal distinction between everyday inconvenience and highly offensive conduct.

### 3.     True Statements And Opinions Are Not Actionable On A Claim For False Light

Cooper's claim is barred for the additional reason that some statements he contends to be false are, by his own admission, verifiably true, or otherwise properly classified as opinion for which the law affords full constitutional protection.

Under District of Columbia law, a statement alleged to have placed a person in a false light is actionable only if the statement has "explicit or implicit factual foundation" and the statement is not a mere matter of opinion. *Lane*, 985 F. Supp. at 148-150, citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). A complete defense is afforded where a statement is verifiably true. *Id*. And "full constitutional protection exists for rhetoric that, due to its loose, figurative tone, cannot reasonably be interpreted as stating actual facts about an individual, and for imprecise statements that are not susceptible of being proved true or false." *Id.*, citing *Milkovich*, 497 U.S. at 20-21.

In this case, one of Counterpart's statements, namely that Cooper left Counterpart "not by his own choice," is verifiably true and therefore serves as a complete defense. (¶ 90). Other statements about whether Cooper's ex-wife deserved custody of the couple's minor child, or whether he deserved to be fired, are hardly matters of verifiable fact, but rather, properly classified as subjective opinion, and afforded full constitutional protection. *See* Amended Compl. ¶ 28. Thus, to the extent that Cooper relies on any of these statements in support of his claim, summary judgment must be granted.

**4.    Plaintiff's Damages Claim Cannot Be Remedied Under A False Light Tort Action**

Cooper's claim for damage to personal and professional reputation also cannot be remedied under a false light claim because the tort of false light protects only against mental distress. In *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990), the D.C. Court of Appeals held, "The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view."

Cooper alleges in his Amended Complaint that Counterpart made various "untrue statements … purposely to damage Cooper's professional and personal reputation and credibility, or, at best, with reckless disregard thereto."  *See* Amended Compl. ¶ 28. Cooper's alleged injuries, however, fall under the rubric of defamation and not false light. Even if Cooper could make such a claim, there is no evidence that any of the persons named by Cooper as recipients of Counterpart's alleged statements ever considered Cooper professionally unfit, doubted his credibility or professional competence, or viewed him as disreputable, untrustworthy, or incompetent.  (¶¶ 93, 96, 97).  Thus, to the extent that Cooper relies on damage to reputation as the basis for his damages claim, he cannot obtain relief.

Cooper's claim for emotional distress is equally flawed because he provides no evidence of actual distress other than his own bald allegations.  Even assuming otherwise, evidence of Cooper's distress is far from substantial, as he admits in deposition testimony that he had no physical manifestation of distress or ever sought medical attention.

Indeed, Cooper does not provide any evidence of injury proximately caused by his termination.  Cooper's sole claim that he could not find a job in Central Asia is belied by his own admission that he did not apply for any jobs in Central Asia or believe there were any job openings available.

Thus, to the extent that there is no factual basis or correlation between Cooper's damages and his termination, Cooper's prayer for relief should be reduced or denied in their entirety.

## III.    CONCLUSION

For the foregoing reasons, Counterpart asks the Court to grant its motion for summary judgment, enter judgment in Counterpart's favor on all counts, and dismiss this case with prejudice.

Respectfully submitted,

**JACKSON LEWIS LLP**

January 12, 2007                    By:/s/_____
                                    Tyler A. Brown (D.C. Bar No. 480693)
                                    8614 Westwood Center Drive, Suite 950
                                    Vienna, VA 22182
                                    (703) 821-2189

                                    **Attorneys   for   Defendant   Counterpart
                                    International**