**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JAY W. COOPER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1598 (RMC-JMF)** |
| | ) | |
| **COUNTERPART INTERNATIONAL,** | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In November of 2004, Plaintiff Jay Cooper had been employed for almost ten years in positions of increasing responsibility by Defendant Counterpart International ("Counterpart"), a firm running assistance and development projects under agreements funded by the United States Agency for International Development ("USAID") and other donors. He was stationed in Almaty, Kazakhstan and worked for the Civil Society Division of Counterpart, headed by a Vice President by the name of Arlene Lear to whom he reported. "Civil society" programs are those that encourage the development of democratic ideals and institutions abroad. Often such programs attempt to do so by encouraging and supporting the establishment and operations of local non-governmental organizations ("NGOs") to run specific programs on subjects such as literacy, women's rights, health, advocacy, agriculture, environment and the like for the local population. USAID funded Counterpart to run projects to establish, train and fund the NGOs to run such projects for specific periods of time under "Cooperative Agreements," with the goal of empowering the NGOs to continue the programs that Counterpart staff had initiated

1

after Counterpart's project came to an end. (Declaration of Jay Cooper ("Cooper decl.")[1] at ¶ 2)

Cooper's specialty was running civil society programs for the populations of five countries in Central Asia that had formerly been under the rule of the USSR.  By November of 2004, he was Regional Director and Chief of Party in charge of two major programs.[2]  The first was the Civil Society Support Initiative ("CSSI"), an $ 11 million, three year program operating in Kazakhstan, Kyrgyzstan and Uzbekistan, the current phase of which was scheduled to run from July of 2003 through June of 2006.  It was the largest program in Lear's Division and the largest program Counterpart had  at the time. (X-42 at CP1415-16)  The second was the Health NGO Capacity Building Initiative ("HNCBI"), a three-year, $ 3.5 million project which ran in those countries and two additional ones (Turkmenistan and Tajikistan) and was scheduled to come to an end in December of 2005. (Cooper decl.¶ 2)

Cooper was working under a letter agreement with Counterpart (CPX-B)[3] the term of which had been fashioned to coincide with the end of the CSSI program.  Under

---

[1] In this Opposition and in Plaintiff's Statement of Genuine Issues ("Genuine Issues"), attached Declarations are cited by the witness's last name, followed by " decl.".

[2] Cooper was also in charge of several minor programs and had administrative responsibility over Counterpart's Regional Office (based in Almaty, Kazakhstan) and Country Offices in each of the five Central Asia Region ("CAR") countries, each headed by Country Directors. (Declaration of Jay Cooper ("Cooper decl.") ¶ 2)

[3] In this Opposition and in Plaintiff's Statement of Genuine Issues, exhibits attached to Counterpart's motion papers are cited as "CPX-  ".  Plaintiff has submitted relevant pages of  exhibits marked at depositions in this case in Attachment A to the Declaration of Patricia D. Douglass ("Douglass decl."), in numerical order.  These are referred to as "X-  ".  Other documents identified and attached to the Douglass decl. are referred to as "PDX-   ".  Documents identified and attached to the Cooper decl. are referred to as "JCX-  ".

CPX-B, Cooper was to be retained until June 30, 2006 unless Counterpart found that he had failed to perform his job duties "to Counterpart's satisfaction" (CPX-B at CP0032).[4]

On November 12, 2004, Counterpart abruptly fired Cooper under circumstances to be described below.  Counterpart seeks in this Court to justify that act under the contractual language set out above, and asserts that it acted in good faith in exercising its contractual prerogative.  As we show below, Cooper was not terminated because of the reasons cited in Counterpart's Statement of Material Issues, which rest on the Declaration of Arlene Lear.  Cooper was terminated because he was complaining about financial irregularities in Counterpart's use of funds that USAID had provided for the CSSI and HNCBI programs, which funds Counterpart was diverting for other uses in violation of USAID regulations.  He was terminated because Counterpart was afraid that Cooper was keeping "secret files" on these activities and was planning to expose Counterpart's violations.  He was terminated under circumstances that give the lie to claims of good faith in a host of respects.  And he was terminated in a particularly gratuitous and ugly manner, designed to send a message that it was Cooper who was guilty of fraud or dishonesty of some kind, while permitting Counterpart to take steps to see that the much-feared "secret files" never saw the light of day.

Because Counterpart did not exercise its contractual power in good faith or respect Cooper's right not to be placed in a false light -- and because material factual disputes infect every aspect of a fair inquiry into those matters -- Counterpart's Motion for Summary Judgment should be denied.

---

[4]  There were other circumstances under which Counterpart could have terminated Cooper's contract under the terms of CPX- B, none of which are relevant to the present case.

**ARGUMENT**

Counterpart contends that Arlene Lear, Cooper's supervisor, personally observed various deficiencies in Cooper's job performance and thereafter, in good faith, exercised her lawful right unilaterally to terminate his employment agreement.  Ms. Lear has submitted a Declaration setting out in paragraphs 8-15 the various weaknesses she claims to have perceived.  That Declaration, Ms. Lear's deposition testimony and a few cites to the deposition of Counterpart's HR director Kelli Boyer are the only source for paragraphs 11-22 and 43-54 of Defendant's Statement of Material Facts Not in Dispute ("Defendant's Statement") concerning Counterpart's basis for terminating Cooper's contract and the only factual basis for the present motion as to that claim.  After a summary recital of relevant facts, we dispute in Part I  below:  1) that Lear in fact ever held such views, 2) that such views were the actual reasons for the termination decision, and 3) that Cooper performed poorly in any of the respects alleged by Lear.  (See generally Plaintiff's Statement of Genuine Issues ("Genuine Issues") Nos. 1-4, 18-19, 22)  In Part II, we demonstrate that the real reason why Lear terminated Cooper was to prevent him from disclosing accounting practices that were unlawfully diverting program funds to other sparsely funded or unfunded programs or program development efforts and that were funding Lear's considerable salary and the expenses of her operations at Counterpart Headquarters (see generally Genuine Issues Nos. 11-16).  In Part III we show why those and many other of Counterpart's actions violate the duty of good faith and fair dealing inherent in any contractual relationship.  Part IV discusses evidence supporting Cooper's tort claim.  We conclude by discussing why summary judgment is inappropriate on this record.

**Statement of Facts**

In August of 2004, Lear summoned Cooper to a meeting in Washington, D.C. to announce that Michael Kunz was to be added to the Almaty office as Regional Director for Eurasia, the Mid East and Southeast Asia, that Cooper would now report to Kunz rather than directly to Lear, and that Kunz would take over responsibility for the supervision of Bob Abma, Counterpart's Regional Finance Officer who had been reporting to Cooper on Regional finance issues.  (A more complete description of that meeting is found at Cooper decl. ¶ 9.)   At that meeting on August 18, 2004, Lear promised Cooper that if the new arrangement did not work out she would guarantee him six months of salary.  She also promised to hold monthly check-in sessions to facilitate the successful personal transition. (CDX-D at CP00743; Cooper dep. at  104)

Cooper had reasonable doubts about the changes Lear announced.  He had in the past received complaints about Kunz's temperament and confrontational management style from staff reporting to him on a program in Uzbekistan.  He had forwarded those complaints to Lear, who took no action. (X-33-35; Genuine Issue No. 6)   He had also personally been involved in a recent incident during which Kunz ranted angrily at him for thirty minutes.  In response to this tirade, Cooper had said to Kunz, "Now I know why I have a file on you," referring to the previous letters of complaint.  Within a few days Lear called Cooper to ask why he had a file on Michael Kunz.  (Cooper decl. ¶ 45d; Genuine Issue No. 6)  The significance of this exchange will become clear shortly.

Cooper also had reasonable concerns about losing supervisory control over Bob Abma. He had for some time questioned Abma's accounting practices in allocating expenses to the CSSI and HNCBI programs that were for the benefit of other programs or

of program development efforts.  He had complained about such matters to Abma directly, and taken some of his concerns to Counterpart's CFO and COO Harry Dorcus and to Lear.  (Genuine Issues No. 7; Cooper decl. ¶¶ 11-16)  He worried about the financial health of the two programs he was running in light of the loss of his ability to monitor Abma's activities under the new management structure. (Cooper decl. ¶ 11) Nonetheless, Cooper, who had for years been dedicated to the promotion of civil society in Central Asia, returned to Almaty determined to make the new arrangement work. (Cooper decl. ¶ 17)

Once Abma began to report to Kunz rather than Cooper, Abma became more open and aggressive about shifting funds from projects with excess funds available to projects in deficit and to his and Kunz's travel for the development of new projects for Counterpart.  Within weeks of his return he received an email from Abma overtly proposing that program funds from the HNCBI project be used to offset losses in other programs and to make up for deficits caused by excessive spending of program funds in Counterpart's Washington headquarters. (JCX-A)  The blatant mischarging that that email was proposing served to increase Cooper's anxiety that he would be helpless to protect the integrity of the funding for his projects. (Cooper decl. ¶¶ 20-22)

The next month Cooper was asked to concur with a budget proposed by Abma and endorsed by Kunz that would use monies granted by USAID for the CSSI and HNCBI programs to fund travel by Kunz and Abma to develop new Counterpart projects in Eurasia, a part of Kunz's portfolio that Abma was assisting with.[5] (X-46; Cooper decl.

---

[5] Kunz's job description makes it clear that he was tasked to develop new programs for Counterpart in countries outside the five countries of Central Asia where CSSI and HNBCI operated.  Those responsibilities required extensive travel by Kunz, with Abma often accompanying him.  (Cooper decl. ¶ 23; JCX-B)

¶¶ 27-28)  Cooper refused to go along with this diversion, and so notified Kunz and Abma; he also pointed out the need for a new staff person to monitor the appropriateness of spending from the funds for those two programs.  ( X-45)  Cooper sent a copy of his email stating those positions to Harry Dorcus, at the time Counterpart's Chief Financial Officer, hoping for support from Counterpart's management. (X-45)

Counterpart's management reacted by dispatching its Director of Human Resources Kelli Boyer to Almaty.[6]  Boyer stayed in Almaty for a few days, had extensive discussions with Kunz and Abma and a few discussions with Cooper and some staff members and reported a wildly fictitious description of events and statements by Almaty staff members to Lear in Washington. (See Genuine Issues Nos. 18-19)

**Lear referenced the matters reported by Boyer, not the matters referenced in ¶¶ 8-15 of her Declaration in this Court, when she called Cooper on November 12, 2004 to inform him of his termination**.  Those matters, and other accusations reported by Boyer, were incendiary and demonstrably false.  (Genuine Issues Nos. 18-19)  A simple comparison of the particulars reported by Boyer and the views of the many professional colleagues who have filed Declarations on his behalf in this Court should cause the Court to conclude that Boyer's assigned task was nothing more subtle than to invent evidence to support Cooper's termination.  There is no other rational explanation for how Boyer could have gotten so many things about Cooper's character and management style so wrong.[7]  And there is no good faith reason why Arlene Lear, who

---

[6]  There is a muddy and contradictory factual record as to precisely motivated Boyer's trip to Almaty.  (See Genuine Issue No. 17)  Cooper contends that the inference in text is supported by the record, as described in this Opposition.

[7]  Genuine Issue No. 20 pulls together evidence of Boyer's troubled work history at Counterpart.  While sufficient to cause a manager in Lear's position to question the accuracy of Boyer's reports, that information does not seem severe enough to have led to inadvertent flawed reporting of such magnitude.

had worked with Cooper for close to ten years and had consistently praised and promoted him (Genuine Issue No. 4), should have summarily credited Boyer's report.

Cooper was given no opportunity to refute the "facts" reported by Boyer, as Counterpart had abruptly announced the abolition of its Grievance Procedure some five weeks earlier.[8]  Cooper was summarily fired and locked out of his office so that Boyer and Abma could go searching for the "secret files" that they feared Cooper was collecting to report their wrongdoing. He was barred from all Counterpart offices in the Region, sending a message around the five countries of Central Asia that in that culture branded him a traitor and a disgraced man.  (Cooper decl. ¶¶ 50, 60-61, 63)

## I    COUNTERPART DID NOT TERMINATE COOPER'S EMPLOYMENT AGREEMENT BECAUSE OF POOR JOB PERFORMANCE.

Cooper disputes that he was fired for poor job performance, whether it be on the grounds espoused in Lear's Declaration, or on the "facts" reported by Kelli Boyer.

**Lear's present grounds:**  The matters cited in ¶¶ 8-15 of Lear's Declaration are wholly at odds with Lear's history of promoting Cooper to a series of increasingly responsible jobs, and with her statements and actions consistent with consistent profound respect for his talents and vision.  (See Genuine Issues Nos. 1-2, 4)  They are dramatically opposed to the only written Employee Performance Review Lear ever prepared on Cooper, a Review deemed "exceptionally favorable" by Boyer and "highly favorable" by Harry Dorcus, Counterpart's CFO and Chief Operating Officer.  (X-9; Genuine Issues No. 4)  Counterpart has not come up with a single document by Lear or

---

[8]   The record evidence surrounding the highly suspicious cancellation of Counterpart's Grievance Procedure is set out in Genuine Issue No. 9.  Cooper will ask the trier of fact to draw the inference that it was abolished to prevent Cooper and a Vice President named Brian Propp, who was also questioning Counterpart's use of funds, from challenging their terminations by raising troubling financial issues.

anyone else in the company that conflicts with the exceptional ratings Lear applied during that Review.   Cooper has denied that Lear has leveled any of the critical comments now asserted in her Declaration to him in person or by telephone, with one exception:  he admits that Lear advised him on more than one occasion that he should learn to "schmooze" more.  Moreover, Cooper has not only denied that such criticisms took place, he also denies the substance of those criticisms, as have the Declarants before this Court.  (Cooper decl. ¶¶ 3, 4, 6, 18, 33 and 54; Genuine Issue No. 3)   Lear has strained at deposition to come up with any instances of critical comments about Cooper by others,[9] and we have presented contrary evidence as to those she did.[10]

Cooper's management talents are best displayed in the success of the projects he supervised.  A mid-term evaluation of CSSI project was performed jointly by Counterpart and an outside consulting firm three-four months after Jay's termination.  The evaluation was highly positive (Genuine Issue No. 2a), as was the Final Report on the HNCBI project, (JCX-F).[11]   One can infer that Counterpart's management was pleased with the

---

[9] Evidence concerning Cooper's performance in the Fall of 2004 as he worked in Almaty under Kunz's supervision is devoid of any complaints about Cooper from his new supervisor, Kunz.  (Genuine Issue No. 8)

[10]  Lear claims to have heard critical comments about Cooper from a few persons.  But Ara Nazinyan has filed a Declaration in this Court describing his tremendous respect for Cooper's management strengths and vision.  (Declaration of Ara Nazinyan)  George Deikun's colleague has filed a Declaration in this Court swearing that she and the USAID staff with hands-on experience with Cooper disagree with whatever criticism Deikun may have of Cooper.  (Declaration of Susan Kosinski Fritz ¶ 10); see also Declaration of Lawrence J. Held ¶ 6., Marat Aitmamgetov, who was Country Director for Kazakhstan reporting directly to Cooper, has made statements contrary to what Lear reports about his views;  he and the other Country Directors all told Christopher Szecsey of their appreciation of Cooper's understanding and support, contrary to what Kunz told Lear (Szecsey dep. at 18-19).  Lear has sworn that she placed no reliance on anything on any subject said by Kim Alter (Lear dep. at 257-58).  We demonstrate at Genuine Issue No. 2b4 that the Comolli comment referenced by Lear preceded the exceptional performance review Lear gave Cooper in March of 2002.

[11] It seems that Counterpart may be trying to hide this sort of evidence as to Cooper's success as a manager.  Cooper was lucky to find Counterpart's Final Report on the HNCBI project on the internet (Cooper decl. ¶ 70).  Counterpart declined to prepare a final report on the CSSI project, although one was called for by the cooperative agreement with USAID that funded that program.  (Genuine Issues No. 4c)

results of the CSSI program even at its midpoint when Cooper had been its manager for 16.5 out of its 18 months of operation, for on December 30, 2004 – some six weeks after Cooper's termination -- Counterpart awarded Lear a bonus of $ 25,000 for FY 2004.  (X-56 at CP3374)

Lear is left with her personal observations to support her negative conclusions about Cooper's worth as a manager.  Cooper has described the nature of her trips to Central Asia and the very limited opportunities Lear had to make the observations and draw the conclusions she urges on the Court.  (Cooper decl. ¶ 5)  And if Lear's personal observations as set forth in her Declaration were Lear's reasons for discharging Cooper, why did she not mention them in the telephone call where she fired Cooper and cited a list of reasons for doing so?

**Lear's grounds on November 12, 2004.**  Lear's statements during the telephone call in which she fired Cooper are reflected in her script for that call, CPX-F.  Each relies on the matters reported to her by Kelli Boyer. (Genuine Issue No. 18)  Each of these reported "facts" and other information reported by Boyer is disputed by Cooper. (Cooper decl. ¶¶ 35-45)  Many specific Boyer "facts" are also roundly disputed in Declarations filed by persons who worked with Cooper in Central Asia.  These Declarants, none of whom has anything to gain by coming forward in Cooper's defense, collectively have decades of  experience working with Cooper on civil society development projects in Central Asia.  While many of these Declarations were sought to speak to the specific allegations raised by Kelli Boyer, they refute Lear's more recent rationale for the termination as well. Declaration of Ara Nazinyan ¶¶ 2-3; Declaration of Lawrence J. Held ¶¶ 3-6; Declaration of Asiya Sasykbaeva ¶¶ 3-7; Declaration of Stephen J. Larrabee

¶¶ 3-5; Declaration of Aman Nusupov; Declaration of Owen Goldfarb ¶ ¶ 3-6;

Declaration of Susan Kosinski Fritz ¶ 4.

The fact that Boyer's reported information is so at odds with Cooper's entire

professional history and with the views of so many of his peers and colleagues supports

an inference that Boyer was sent to Almaty not to observe, interview and report

accurately, but, rather, to develop negative information that would justify Cooper's

termination.  That fact also leads to the conclusion that Lear and others at Counterpart

involved in or endorsing the termination decision must have known that that information

was false, or at the very least the result of some set of exceptional circumstances that

Cooper had earned the right to explain.  In short, the very scenario embraced by

Counterpart gives the lie to any claim that Cooper was terminated in good faith.

The missing element in this equation is Counterpart's motive for engineering

Cooper's ouster, which we describe below.


II    COUNTERPART TERMINATED COOPER TO PREVENT HIM FROM
      REPORTING MISUSE OF PROGRAM FUNDS.

Counterpart states repeatedly in its Memorandum that Cooper had no evidence of

financial irregularities at Counterpart and that Lear had no reason to think that he did.  On

the contrary, Cooper had been for some time before August of 2004 raising with

appropriate persons at the company his concerns about a number of what he considered to

be questionable uses of project funds.  For example, he objected to Lear's excessive use

of project funds at Headquarters to be told that she had "100 % line item flexibility" and

could move funds as she liked.  (Cooper decl. ¶ 16) He objected to use of project funds to

support new project development and was supported by a letter from USAID warning

Counterpart against that practice.  The practice continued and worsened.  (Genuine Issue

No. 11; Cooper decl. ¶¶ 13, 20)  He tried to guide Abma to proper allocation of expenses

to the projects they benefited leading to a tense relationship, and he objected to having

the CSSI and HNCBI projects supporting all of Abma's expenses when he worked on

many other projects as well.  (Cooper decl. ¶¶ 12-13, 15)  Cooper's concern grew in the

Fall of 2004 when he saw travel and other expenses associated with Kunz's and Abma's

new project development efforts growing. (Cooper decl. ¶¶ 20, 23, 27-29; Genuine Issue

No. 11)  He felt the financial health of the two projects he was responsible for at risk, and

he felt he had lost any influence over Abma's accounting practices.

Cooper took his most aggressive step when he objected to a budget involving

Eurasian travel advanced by Abma and Kunz and sent an email to Harry Dorcus,

counterpart's CFO,  stating his objection and calling for a new staff person to monitor

spending from CSSI and HNCBI (X-45). (Genuine Issue No. 12)

For a listing of Cooper's complaints and evidence that Lear knew of them see

Genuine Issues Nos. 11, 12, 22.  In each case, his complaints were rejected or ignored.

We demonstrate below that Cooper had it right, and that Counterpart had much to

lose if, as they suspected, Cooper was collecting "secret files" on their accounting

practices and planned to take that information to USAID.

Under OMB Circular No. A-122, Cost Principles for Non-Profit Organizations

("the USAID Cost Standards"), applicable by virtue of 22 C.F.R.§ 226.27, a grantee may

not use funds granted for one program for another program or for the development of

new programs, and an expense (direct cost) that benefits more than one program must be

allocated between them in proportion to its benefit to each program.  (X-41, Attachment

A at 6-7, ¶A4; Genuine Issue No. 13; Dorcus dep. at 149-50)[12]

Exhibit JCX-A demonstrates beyond doubt that Bob Abma was proposing to

violate this fundamental principle by shifting project funds granted for use in well-funded

projects such as HNCBI to less well funded ones; it also shows that Headquarters was

siphoning off program funds in disregard of the project budgets that had been approved

by USAID at the time of the grant.[13]   Cooper's email objecting to Abma's budget (X-45)

demonstrates that less than a month before he was fired Cooper was objecting to use of

funds from his programs to fund travel by Kunz and Abma to develop new projects for

Counterpart in Eurasia.  (Genuine Issue No. 12)  Both are problems that Cooper had been

complaining about, in appropriate ways, for some time. (Genuine Issue No.11) Yet a

closer look at Counterpart's financial records reveals that these instances were merely the

tip of the iceberg in a company that apparently simply disregarded the USAID Cost

Standards when it was convenient to do so.  This evidence provides the motive for the

abrupt and unnecessarily harsh termination of Jay Cooper.  If what we describe below

were to be reported to USAID, Counterpart – and in particular the Division headed by

Arlene Lear --would face severe consequences.

1.  *Improper charging of direct costs*.  Harry Dorcus described in his deposition

that the proper way to allocate salary and fringe benefits in the case of employees who

worked on more than one project was to allocate these items among the projects on which

the employee worked in proportion to the hours the employee spent on each project. That

---

[12]   Mr. Dorcus has not consistently adhered to that position. (See Dorcus dep. at 374-76, 113, 118-20;
Genuine Issues No. 13)
[13]   Cooper decl. ¶ 16 describes that USAID- approved budgets provide specific spending levels for various
project costs.  See also Dorcus dep. at  130, for an admission that USAID approves a project and its budget.

allocation was accomplished at Counterpart, he testified, by reliance on timesheets the employee filled out and submitted for supervisor approval. (Dorcus dep. at 271-73, 279, 289, 291)

What really occurred is quite different, and is consistent with what Jay Cooper had been complaining about. We made summary charts of the timesheets of Lear, Kunz and Abma and determined what percentage of each's time was spent on the CSSI and HNCBI projects in 2004. (Douglass decl. ¶¶ 9-11& PDX-G, H & I) We then compared those percentages to the compensation paid to Lear, Kunz and Abma from those projects, as reflected on Counterpart's General Ledger. (Cooper decl. ¶ 52)[14]  The specifics of this analysis are laid out in Genuine Issue No. 14. In short, we found the following:

- Lear spent only 39% of her time in 2004 on the CSSI project, yet at least 55% of her compensation was charged as direct costs to that project as were 46 % of her holidays and vacation days. Lear spent 14% of her time working on the HNCBI project, yet at least 20% of her compensation and 21% of her holidays and vacation days were charged to that project. Yet the budget approved by USAID for the CSSI project provided that only 10 % of Lear's salary would be paid by that project in each project year (X-43 at 1055), and the budget approved by USAID for the HNCBI project provided that only 5 % of Lear's salary would be paid by that project in each project year (X-44 at 1070)[15]

---

[14]   The analysis is not perfect, as the timesheets we have are for calendar year 2004 and the General Ledger we have is for Fiscal Year 2004, which runs October 1, 2003 through September 30, 2004. We will subpoena the timesheets for the period October 1, 2003 through December 31, 2003 at trial to make a more perfect analysis. If that analysis would differ materially so as to negate the substance of the conclusions reached in text, Counterpart will undoubtedly point out that fact in its Reply Brief.

[15] Both budgets assumed that Lear's starting salary in project year one would be $ 120,000 or slightly higher. (X-43 at 1055; X-44 at 1070)

- Abma spent only 32% of his time in 2004 on the CSSI project, yet at least 60 % of his compensation and 58 % of his holidays, vacation days and sick leave were charged to that program.  In addition, in various months Abma charged between 60% and 75% of the rent for the apartment he lived in[16] to the CSSI project.  (Genuine Issue No. 14av & vi)  Abma spent only 22% of his time on HNCBI project, yet charged at least 30% of his compensation and between 25 and 40% of his housing costs to that project.

- Michael Kunz spent 49 % of his time on the CSSI project in 2004 and at least 65% of his compensation[17] and 63% of his holiday and vacation time and 66 % of the costs of his housing were charged to that project.

We also present evidence that travel expenses, training-related expenses and other miscellaneous expenses were improperly wholly charged as direct costs to CSSI and HNCBI simply because, as Dorcus testified, those projects had the budget to support the charges.  (Genuine Issues No. 14b, c, & d)   These mischarges were not merely inadvertent.  Counterpart well knew how to allocate expense items.  We direct the Court to a few pages of expense ledger's from the Almaty office carefully allocating insignificant charges for matters such as tea and sugar for the office.  (Genuine Issue No. 14e)

---

[16]   The rent was paid to Abma's romantic partner.  Cooper had questioned the legitimacy of Abma's housing arrangement to Dorcus, but Dorcus gave his approval on the understanding that Abma was buying the apartment and that he was using his housing allowance to pay a mortgage.  Dorcus testified that he only approved the mortgage use, and had heard nothing about the lease from the boyfriend. (Dorcus dep. at 323, 335; Genuine Issues Nos. 11v, 14av)

[17] The analysis as to Michael Kunz is necessarily an estimate, but it most probably misstates the disparity between his time and his compensation.  Since Plaintiff does not know Kunz' total compensation for 2004 we assume that he got a salary below that of the lowest of the highly compensated employees listed on Counterpart's IRS Form 990 for 2004.  (See Genuine Issue No.14biii(1))

**2.** ***Failure to properly allocate NICRA.*** Counterpart has a Negotiated Indirect Cost Reimbursement Agreement ("NICRA") with USAID under which USAID provides Counterpart with $ .28 for each dollar Counterpart spends on each of its programs. (Dorcus dep. at 110-12)  NICRA funds are supposed to be spent on indirect costs, defined by the Cost Standards as "those that have been incurred for common or joint objectives and cannot be readily identified with a particular final cost objective."  (X-41, Attachment A at 10, ¶ C1)  Mr. Dorcus testified that Counterpart uses the NICRA funds it receives for Headquarters expenses.  (Dorcus dep. at 112-14)  Dorcus testified that because it receives the same NICRA rate for each project, Counterpart is not required to allocate the funds it receives under NICRA to particular projects.  (Dorcus dep. at 127-28).

Dorcus is comparing apples to oranges.  The USAID Cost Standards describe a process to negotiate a NICRA rate.  (X-41, Attachment A at 20, ¶E)  Counterpart has apparently followed that process which has resulted in the rate of $.28 for each dollar spent.  But the Cost Standards also require that indirect costs, as well as direct costs, be allocated. (X-41, Attachment A at 11-13, ¶D)  Mr. Dorcus has testified that Counterpart uses the Simplified Allocation Method, one of the methods allowed, to do so. (Dorcus dep. at 108-09, 126)   The USAID Cost Standards require that under that method the indirect cost rate "is used to distribute indirect costs to individual awards" and that such distribution should be "equitable."  (X-41, Attachment A at 1-13, ¶ D2)

Counterpart's allocation of NICRA funds is accomplished in an annual meeting of its Vice Presidents when NICRA funds are distributed to various Divisions (not awards) based on which programs the company wants to support.  (Dorcus dep. at 116-18, 120-

24; Genuine Issue No. 15) In the spring of 2004, NICRA funds were allocated away from

Arlene Lear's Civil Society Division and given over to other corporate purposes. (Propp

dep. at 14-18) The relevance of this fact to Cooper's situation is that Lear had less by way

of NICRA funds to run her Headquarters operations in 2004.[18]

    3. ***Improper shifting of project funds to Headquarters.***  As noted, Lear lost

control of some portion of the NICRA funds she might have expected for her Division in

the Spring of 2004.  This event exacerbated the fact that Lear's Division normally

generated less NICRA funds than other divisions in proportion to the size of the projects

she ran because she bid for projects using grant pools that do not earn NICRA.  (Dorcus

dep. at 209-10, 412-14)  Dorcus conceded that this situation could provide a motive for

charging as many Headquarters expenses as possible as direct project costs.  (Dorcus dep.

at 414)

    That is precisely what Lear was doing in the Fall of 2004.[19]   Each Counterpart

cooperative agreement with USAID is entered into with a budget, approved by the

agency.  (Cooper decl. ¶ 16; Dorcus dep. at 130)  These budgets provide that some

percentage of program funds will be spent at Headquarters. (See, *e.g.,* X-43 at CP1050;

X-44 at CP 1070)   Lear charged far more of her own salary and that of her Headquarters

staff to the CSSI and HNCBI projects than those projects had budgeted for that purpose.

The budget approved by USAID for the CSSI project provided that 10% of Lear's salary

---

[18]   Arlene Lear  testified that the fact that Counterpart's accountants perform a yearly audit shows that
Counterpart must be compliant with the Cost Standards.  (Lear dep. at 189).  Yet the Counterpart Audit
Report for 2004 shows no allocation of NICRA funds "to the individual awards."  (Genuine Issues
No.15iv; X-42 at CP1403-04)

[19]   Dorcus also testified that it is up to Lear to decide how much of her time to charge to NICRA and how
much to charge to particular programs, and that the company's monitoring of her decision is simply to sign
her timesheets.  (Dorcus dep. at 119-22)

(budgeted at $ 120,000 in project year one) would be paid by that project each year (X-43 at CP1055), whereas Lear charged at least 55 % of her actual higher salary.[20]  The budget approved by USAID for the HNCBI project provided that 5 % of Lear's salary (budgeted at $ 120,300 in project year one) would be paid by that project in each project year (X-44 at 1070), whereas Lear charged at least 20% of her higher actual salary.[21]  Other Headquarters salaries were charged to these projects at well (see Cooper decl. ¶ 54). increasing the stress on the funds available in the field to operate the CSSI and HNCBI projects.  The situation just described caused Abma to write in JCX-A that Headquarters had a large projected deficit and suggest that project funds from the under-spent HNCBI program be used to make up the difference.

At her deposition Lear justified using project funds budgeted to run the program at Headquarters saying she had "100% line item flexibility" to transfer funds from Headquarters to the field or vice versa.  (Lear dep. at 188-90)  This is the same rationale she gave Jay Cooper each time he had complained to her about it.  (Cooper decl. ¶ 16)  Lear is wrong.  She has perhaps 10-15% line item flexibility in most cases, as Dorcus grudgingly admits.  (Dorcus dep. at 133-34; Propp dep. at 18-20)  She had to have known she was wrong and that Cooper was onto the problem.  Her salary depended on her access to these project funds.  Cooper was a threat.

Cooper was a threat on other issues as well.  For example Lear testified that in response to a letter from USAID warning Counterpart that it should not use staff working

---

[20]  As noted previously, Lear was paid $ 83,229.32 in salary as a direct cost to the CSSI program, and that was 55.8% of her total compensation of $ 149,001.

[21]  As stated previously, Lear was paid $ 30,674.12 in salary as a direct cost by the HNCBI project; this was 20.5 % of her total compensation of $ 149,001.

on funded projects to work on new project development, she instituted a new "program development council" at Headquarters paid with NICRA funds, and that this "substantially ameliorated" the problem.  (Lear dep. at 195-97)  She must have known it had not, for we have found only 13 hours charged to this task (code 955) on any of the timesheets of Lear, Kunz or Abma in 2004.  (Genuine Issue No. 11avi) Using project funds to pay Kunz and Abma to develop new projects is exactly the issue Cooper was complaining about when he sent X-45 to Harry Dorcus.

The evidence of Lear's and Abma's violations of the USAID Cost Standards and their knowledge that Cooper was onto them reasonably supports the inference that Lear dispatched Boyer to Almaty to neutralize the threat, and to do so in such a way as to prevent Cooper from leaving with any "secret files" on these issues that might prove troublesome for Counterpart.  Her resolve to remove Cooper as a threat undoubtedly hardened when Lear was informed by Boyer about Cooper's comments about hanky panky, and about his "possible" resort to the Inspector General.

## III    COUNTERPART'S ENTIRE CONTRACTUAL RELATIONSHIP WITH COOPER REEKS OF BAD FAITH.

Counterpart rightfully concedes that its contractual relationship with Cooper requires it to deal with him in accord with the implied covenant of good faith and fair dealing.  That duty is found in RESTATEMENT (SECOND) OF CONTRACTS § 205 ("RESTATEMENT § 205"), and has been applied in the context of an employer's duty to act in good faith in exercising a contractual right such as that at issue here. See RESTATEMENT § 205, cmt. e:  "Several courts have found that an express power to terminate a contract at will was modified by a duty of good faith."  The most common

articulation of the doctrine is that it prevents a party from evading the spirit of the contract or to act in such a way as to impede the other party from receiving his justifiable expectations from the contractual relationship. See, e.g., *Allworth v. Howard Univ.,* 890 A.2d 194 (D.C. 2006); *Hais v. Smith,* 547 A.2d 986, 987 (D.C. 1988).

Terminating an employee to prevent him from complaining to the authorities about corporate wrongdoing is squarely within this principle,[22] for Jay Cooper certainly had the justifiable expectation that he would be allowed to stay through the end of the CSSI project as long as he was performing his job well and, as stated above, Lear and Kunz had given him no warning that he was not. Cooper was also reasonable in expecting that Counterpart should and would abide by USAID's regulations governing the expenditure of funds granted for the projects he managed and that he would not be punished for attempting to insure that Counterpart was in compliance. Cooper also had a justifiable expectation that he was acting appropriately by abiding by the exhortations in Counterpart's Manual to complain of matters he found troubling to the appropriate Vice Presidents, as he did in his complaints to Lear and to Dorcus, and to Boyer, the Human Resources Director. It cannot be seriously argued that Counterpart acted in good faith if it terminated Cooper to prevent him from continuing to insist on compliance with USAID regulations and to prevent the possibility that he might decide to take matters to the authorities. A defendant's bad motive is a central element of proof of a claim of bad faith. *Wade v. Kessler Inst.,* 778 A.2d 580, 589 (N.J. 2001).

---

[22] Counterpart's position is that the provision at issue essentially made Cooper an employee at will. Even if it had, Cooper would have a wrongful termination claim under D.C. law by virtue of *MacIntosh v. Building Owners and Managers Ass'n,* 355 F.Supp.2d 223 (D.D.C. 2005) (employee at will can challenge a termination based on his refusal to inflate expenses under a government contract).

There are many other respects in which bad faith is evident in Counterpart's handling of Cooper's employment and in its termination. We list them below. The clearest cases are the ones where Counterpart deviated from its standard practices or Manual, as the courts view a defendant's adherence to it customary policies and procedures as evidence that establishes the lack of arbitrary action and defeats a claim of bad faith. See, e.g., *Allworth,* supra. We suggest that failure to act in accordance with Counterpart's published Manual are such arbitrary acts. (Those items marked with **** in the list below are those subject to conflicting testimony and thus are, at least in part, matters of disputed fact.)

- Counterpart never provided Cooper with a job description (stated to be an attachment to his employment agreement) that was to define the expectations Counterpart had for his performance, despite Cooper's repeated requests, although it was Counterpart policy to do so in the case of overseas employees so there would be no ambiguity about what they were hired to do. (Cooper dep. at 53-55; Boyer dep. at 37)

- Boyer admitted that she deliberately lied to Cooper to induce him to sign his employment agreement despite the fact that Counterpart had produced no job description, by telling him that he would not be paid until he signed the agreement under Counterpart policy. When Boyer told Cooper that, she knew, as she admitted, that there was no such Counterpart policy. (Boyer dep. at 37-38) Subterfuges and evasions are standard indicia of bad faith. RESTATEMENT § 205, cmt. d.

- Counterpart failed to provide Cooper with a performance review after March of 2002, despite the provision in its Manual that such a review should be performed annually or more frequently. (X-7 at CP0579; Cooper decl.¶ 4) Harry Dorcus, Counterpart's

Chief Operating Officer, conceded that each employee should be reviewed annually, that Cooper should have been given formal performance reviews and that the discussion at what he termed a "retreat" on August 18 was not a substitute for that review. (Dorcus dep. at 98-101)

- At the time of Cooper's termination, Counterpart had no policy to protect whistleblowers from retaliation and the Manual contains no such policy, although Counterpart belonged to an Organization (Interaction) that required its members to have such a policy and management recognized at the time the need to strengthen its whistleblower policy. (Lear dep. at 247-48, Dorcus dep. at 155-56, 232-33; CPADMISS ¶¶ 42-48)  Despite the lack of a whistleblower policy, the Manual requires an employee "who has reason to question the integrity of any transaction, or to believe misconduct and/or a prohibited act has occurred" to report it to his supervisor and the Vice President for Administration.  The Manual also has an Open Door Policy that encourages its employees to communicate openly and fairly with their supervisors or any other manager about any aspect of their work and to feel free to offer suggestions for improvement.  (X-7 at CP0598, CP0578)  The combination of these provisions and the lack of whistleblower protection puts an employee like Cooper who encounters questionable activity in a vulnerable position. (Genuine Issue No.    )  ******

- Counterpart did nothing in response to Cooper's proper reporting of staff complaints about Michael Kunz' actions and display of temperament in Uzbekistan (X-33-35; Genuine Issues No. 6), despite Dorcus's admission that those reports would give a manager pause about Michael Kunz and prompt some investigation "if 100 percent

true." (Dorcus dep. at 27-28)   Instead, Counterpart simply dismissed Cooper's reasonable reservations about bringing Kunz in to oversee the management of the CSSI and HNCBI programs, especially given that Lear gave no clear direction as to the division of responsibilities between him and Kunz. (Genuine Issues No. 6)

- Harry Dorcus did nothing in response to the email Cooper sent to Abma and to him complaining about Abma's plan to charge expenses for "Eurasia travel" to the CSSI project budget (Dorcus dep. at 167-68), although such a complaint was contemplated and encouraged by Counterpart's Manual  (Manual, X-7 at CP0598) and Mr. Dorcus admitted (1) that when such a report is made it is Counterpart's practice to take steps to look into the matter and correct the situation,"  and (2) that he, as Vice President for Administration, was the proper person to receive such a report.   (Dorcus dep. at 103-05)

- Kelli Boyer violated the provision in Counterpart's Manual that provides that employees are free to bring concerns to the Human Resources Department, who will treat such discussions as confidential.  (X-7 at CP0596-97).  Cooper sought to bring to Kelli various questions that he had about what his options would be if he left Counterpart.  (Cooper decl. ¶ 24)  Boyer promptly relayed those discussions to Arlene Lear, which was quickly followed by Boyer being sent to Almaty.  (See note 6, *supra*)  (Lear dep. at  163; Lear decl. ¶ 20)

- Counterpart eliminated its Grievance Procedure within five weeks of Cooper's termination, claiming that its Open Door policy was sufficient to protect employees, depriving Cooper of a mechanism to correct the "facts" that Boyer reported that were

used to justify his termination.[23] (Genuine Issue No. 9)  It took that step knowing that its "Open Door" policy was inadequate to protect employee rights.  It did so to prevent Cooper and Brian Propp from having a mechanism to challenge the good faith of the decision to terminate them.  (Genuine Issue No. 10) *****

- Arlene Lear never showed Dorcus the one "exceptionally favorable" performance review she had prepared on Cooper in the course of the many discussions he reported that she had with him about Cooper's performance failures, and Dorcus never sought to review it or other information about Cooper's past performance for Counterpart before concurring in Lear's decision to terminate Cooper.  (Dorcus dep. at 79-84, 102-03)

- Arlene Lear never asked Cooper about the truthfulness of Boyer's reporting of events in Almaty, or gave him an opportunity to state his version of these events before making and announcing Counterpart's decision to terminate him, despite his years of stellar service to Counterpart. (Cooper decl. ¶ 44; Genuine Issues Nos. 1-4; Cooper decl. ¶ 50; Lear dep. at 169-70)  She simply took the word of a Human Resources officer with a troubled work history (Genuine Issue No. 20) to make her termination decision. In fact she accepted Boyer's advice not to call Cooper, because it was Boyer's judgment that that was what Cooper wanted her to do so he could talk to Lear directly.  (Boyer dep. at 133-34)  Despite the fact that he consulted on the termination decision and participated in the termination telephone call, Harry Dorcus has admitted that it "could have been important" to verify with Jay information reported by Boyer, and that it was "absolutely" usual Counterpart policy to contact an employee who has

---

[23]   Arlene Lear testified for the corporation that the August 18 meeting constituted the beginning of a grievance procedure for Jay Cooper.  (Lear dep. at 235, 237)  Of course no one told Cooper that.  (Cooper decl. at ¶ 9)

been accused of misconduct to find out their point of view on it.  (Dorcus dep. at 69-70)

- Dorcus did not suggest that someone contact Cooper for his point of view on the "information" reported by Boyer before the termination because he assumed that Lear had been in telephone contact with Cooper and Kunz twice a week.  (Dorcus dep. at 70, 73-74)   He was "certain" that Arlene had been in communication with Michael and Jay because he paid for phone calls to Almaty for Arlene at least twice a week. (Dorcus dep. at 73-74) [24]   Yet Lear had had no such conversations with Cooper. (Cooper decl. at ¶ 4, 8, 18)  (Genuine Issues Nos, 4, 5 ) *****

- Arlene Lear led Harry Dorcus to accept her decision to terminate Cooper by falsely telling him that she had offered Cooper numerous alternatives and options but that he would not accept any of them and that she had had "months of warnings, months of discussions" with Cooper about his performance failures and the need for him to change.  (Dorcus dep. at 37, 44-45, 73-78, 100-03, 227-28, 237-38).  Yet Cooper has sworn no such alternatives, opportunities or discussions had ever been offered or held and that he never talked to Lear at all about anything after August 25, 2004. (Cooper decl. at ¶¶ 4, 7, 8, 18)   If Cooper and Dorcus are to be believed, Lear lied to Dorcus about these matters to receive his endorsement for the termination decision. (Genuine Issues No.   )  *****

- Counterpart publicly locked Cooper out of his office, barred him from all Counterpart offices in the Region and announced that it was doing so to its staff.  Counterpart also

---

[24] It is difficult to reconcile that testimony with the position that Counterpart has advanced in discovery that it does not have telephone records that will permit one to tell what extension a call has originated from. (Dorcus dep. at 367-69)   We presume that Ms. Lear will testify that there were such calls, leading to a dispute of material fact.

barred its Almaty staff from office access for a weekend while it searched through

everything in Cooper's office in the hunt for "secret files," an action inconsistent with

its usual policies as well as the customs of the Region, and an action it knew or

should have known would send out a message that Cooper was dishonest and could

not be trusted. Counterpart's attempts to compare what was done to Cooper to its

handling of other terminations have shifted over time, are riddled with contradictions

and met with contrary evidence. (Genuine Issue No. 21)  *****

- There is evidence that Counterpart financially rewarded those who engineered

   Cooper's termination, although we assume the motive will be contested.  In addition

   to Lear's $ 25,000 bonus (X-56 at CP3374), Counterpart's Form 990 for FY 2005

   indicates that Counterpart materially increased the compensation to Kunz and Abma

   after Cooper's termination, with Kunz making $ 107,838 (PDX-L at Schedule A), as

   opposed to some sum less than $ 92,083 in FY 2004, and Abma making $ 92,836

   (*id.*), as opposed to an estimated $ 78,000 in 2004.  (Genuine Issue No. 25) These

   raises are far in excess of the 5 % annual raise that Mr. Dorcus has described as

   standard at Counterpart. (Dorcus dep. at 18-19)[25]

## IV     PLAINTIFF'S TORT CLAIM ALSO REQUIRES THE RESOLUTION OF DISPUTED FACTS.

   The elements of a claim of invasion of privacy by false light are 1) giving

publicity, 2) to a false statement, representation or imputation, 3) understood to be about

the plaintiff, 4) which places the plaintiff in a false light that would be highly offensive to

---

[25]   Counterpart asserts that even if he prevails Cooper is not entitled to a 5 % raise in salary for each year because he is suing based on an oral contract. (Mem. at 4 ) Cooper's claim is based on the company-wide standard about which Mr. Dorcus testified, as well as on the fact that the budgets for both the CSSI and HNBCI contracts called for such a raise for the Chief of Party, which Cooper would have been through June 30, 2006, absent the unlawful breach of contract by Counterpart.

a reasonable person.   The defendant must have actual knowledge of or have been in reckless disregard of the falsity of the publicized matter and the false light in which the plaintiff would be placed.  *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C. 1999), referencing RESTATEMENT (SECOND) OF TORTS § 652E (1977) ("Section 652E").[26]

Section 652E defines the cause of action to require that a plaintiff be "given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." *Id.*, cmt. b.   Unimportant false statements are not actionable.  "It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy."  *Id.*, cmt. c.

Counterpart seeks summary judgment on the issues of publicity, falsity and offensiveness.  The facts as to all of these elements are at least partly in dispute

We first discuss public communication and falsity, by looking what Counterpart disseminated about Cooper and his termination and to whom.  Counterpart sent out several conflicting messages about Cooper's departure and did so in a variety of ways. False light publicity, like the claim for defamation, is not restricted to verbal publication. It can encompass any action or gesture conveying an imputation that would be highly offensive to a reasonable man.  For example, in *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 a. 2d 873,   & n. 5 (D.C. 1998) the court stated that inactivating a plaintiff's access key is an act capable of a defamatory meaning if such treatment was

---

[26]  See also, *Vassiliades v. Garfinckel's*, 492 A.2d 580, 587 (D.C. 1985); *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001)

ordinarily meted out only to attorneys who had engaged in criminal or unethical activity.
[27]  We show below that in a series of statements and acts Counterpart sent out the
message that Cooper had been terminated for conduct that was so unusual that it merited
the special treatments of locked doors and being banned from entering any company
offices.  It coupled that message with the contradictory message that Cooper had left of
his own accord, causing confusion and adding to speculation in the community in which
Cooper lived and worked. Counterpart did so knowing that its actions were so
unprecedented and unseemly in the case of someone so long held in such high esteem,
and that the events were certain to lead to speculation and doubt about Cooper's
character, especially in the culture of Central Asia.  Finally, Counterpart took these
actions knowing it had not armed Cooper with any rational explanation with which to try
to diffuse the cloud of suspicion it had created.

- First, if we believe Kelli Boyer's letter to Cooper that is CPX-H, on November
  12, 2004, someone sent out the word to all of Counterpart offices that Cooper was
  no longer with Counterpart and not allowed in any of the offices.  Counterpart has
  offices all over the world.  (Cooper decl. ¶ 72) Even if this "word" was sent only
  in Central Asia, the staff in five offices in five different countries got this
  message.

- On November 16, 2004, Arlene Lear sent out an email to "Worldwide CPI staff"
  stating that she "deeply regrets" that Cooper will no longer be Chief of Party on
  the CSSI and HNBCI projects. She went on to talk about the "immeasurable
  contribution" Cooper has made to the management of the company's civil society

---

[27] The court also referenced with approval examples of actionable conduct cited by
Prosser, such as hangings in effigy and erecting a gallows.  715 A.2d at  , n. 5)

support initiative over the last decade  and spoke of  "mutual trust and

commitment" and a sincere hope for future work together.  (X-24)  A fair reading

of that message is that it was Cooper who decided to leave Counterpart and

Counterpart regrets that he did so.[28]  Based on evidence that Counterpart submits

to this Court to support its good faith termination of Cooper's contract, those

statements are false and the speaker, Lear, knew they were false.  Based on

Cooper's evidence these statements (with the exception of Lear's statement of

regret) were true.  So we have a disputed fact as to falsity.

- Arlene Lear told Asiya Sasykbaeva, a civil society NGO professional based in

  Kyrgyzstan, that Counterpart had decided Jay couldn't work anymore in his

  position as Regional Director, that she had offered Jay choices to stay at

  Counterpart as a consultant to work on other projects and that he had refused, that

  Jay was not cooperating with Counterpart, that it was Jay's choice to leave and

  that she couldn't call him because he had a lawyer.  (Sasykbaeva decl. ¶ 9)

  Cooper has denied that any options were offered or even discussed, and the matter

  is again one of disputed fact. (Genuine Issue No. 5; Cooper decl. ¶ 5)

- Counterpart representatives made other comments designed to signal that Cooper

  was fired for mismanagement.  Lear told Ara Nazinyan that there were issues

  regarding Jay's performance. (Nazinyan decl. at ¶ 10)  Kunz or Abma told Steve

  Larrabee that Cooper had been relieved of his duties and they didn't want  anyone

  in the office over the weekend after his termination in case Cooper decided to

---

[28]   One might draw the inference that Lear publicized this email to everyone who worked for Counterpart
simply to be kind to Cooper.  But no, Lear testified at her deposition that she believed everything she said
in X-24 (Lear dep. at 72-73), a comment at hopeless odds with the Declaration she has filed in this Court
reciting all the dreadful flaws she perceived in Cooper's competence.

come to the office because "they thought that maybe there could be problems if Mr. Cooper did decide to come to the office."  (Larrabee decl.¶ 8)   We have already set out evidence that Cooper was not fired for mismanagement or for any other performance flaw; Counterpart takes the opposite position in this Court so the falsity of these comments is a matter of disputed fact.

Counterpart's public actions, as opposed to the verbal communications set out above, sent out an unambiguous message, however, especially in the culture in which they occurred.  Kunz and/or Abma announced that no one could come into the office over the following weekend.  They gave the staff false and conflicting stories as to why, which they must have known would fuel the fire of speculation.  They changed the locks on three outside door leading to the Almaty office, placed an obvious new lock on Cooper's door, forced open locked drawers and file cabinets and searched through everything in his office.  These are the actions of the KGB in that part of the world, not "benign policies."[29]  It is not credible that Counterpart would not forsee that its unprecedented and dramatic actions would be the subject of comment and speculation in the circles that Cooper lived and worked.  We have provided evidence, that Counterpart disputes, that these actions were unprecedented and that Cooper was indeed singled out for them.  Counterpart has given only shifting and self-contradictory rationales for their application.  All of this is a matter of disputed fact . (Genuine Issue No. 21)

The message conveyed – that Cooper had merited termination in some way that had made him a threat to the integrity of Counterpart's office and warranted immediate expulsion – was clear.  Cooper was branded as unworthy of trust and an all-around

---

[29]  The protection afforded by an action for invasion of privacy by false light is properly measures relative to the customs of time and place and to the occupation of the plaintiff.  Section 652D,cmt. e.

scoundrel, which was a "major misrepresentation of his character, history [and] activities," and an imputation that a reasonable Cooper understandably found outrageous. Review of his reaction should be for the jury.

Counterpart argues that these messages were not communicated broadly enough to support liability. Yet we have evidence, not just from Cooper, that rumors about why Cooper was no longer with Counterpart were rampant in Central Asia where he had lived for over ten years. For example, Ara Nazinyan, based in Armenia at the time, has reported that he "heard many different rumors from former colleagues in Central Asia. Although there were different interpretations, almost all of them were telling how upset they were with the process. For all of them, locking out the Regional Director, not allowing him to interact with the staff, and other "preventative" measures were outrageous and not justifiable. (Nazinyan decl. ¶¶ 1, 9) See also, the Declaration of Lawrence Held, who reports that word about the lockout situation made its way by word of mouth among the staffs of the other Democracy projects in the development community in Central Asia. (Held decl. ¶ 10) Aman Nusupov reports hearing about the incident from a driver and being questioned about it from NGO leaders. (Nusupov decl. at p. 2) Asiya Sasykbaeva heard about it from a colleague at an NGO in Kyrgyzstan (Sasykbaeva decl. ¶ 8). The mixed messages left Cooper's friends and professional contacts simply confused over what had happened between him and Counterpart. See, for example, Asiya Sasykbaeva, describing her suspicion that "something else was involved, and that Counterpart must somehow suspect Jay of being dishonest or a thief." (Sasykbaeva decl. ¶ 9-10) And the persons who had been on Cooper's staff in Almaty were left with "common confusion." (Kolmakova decl. ¶ 14; Akhmetov decl. ¶ 8))

Counterpart's conflicting messages left Cooper at a loss when asked why he had left Counterpart and what had happened between him and Counterpart, as he was repeatedly by friends and professional colleagues who knew of his passion for the work he had been doing. (See Sasybkbaeva decl. ¶¶ 10-12) Cooper has described statements made to him such as "we just don't know what happened," or "we're so curious," or "what could you have done." (Cooper dep. at 198) There were a lot of rumors in the "hundreds of NGOs . . . in a culture that people talk." (*Id*. at 200). The only reasons Cooper had been given, as Counterpart well knew, were those based on Boyer's reporting. We have described why these statements were false from Cooper's perspective (Genuine Issue    No. 18) and were so off the mark that Cooper was utterly perplexed as to how to describe what had happened. Counterpart, we say, knew that the Boyer reporting was fictitious (Genuine Issues No. 1-4, 10, 17-20, 22) and should have known that Cooper was sent out into the world with no coherent explanation for his abrupt change of circumstances.

Counterpart claims that Cooper has not suffered mental distress but, rather, merely reputational damage. Cooper has described the impression his attempt to explain his situation to his friends and professional colleagues produced: "The fact that Counterpart ordered my door locked sent a message of serious dishonesty or wrongdoing on my part to the staff in Almaty, especially coming from a US organization  . . . .No one actually said to me that they had concluded that I must have stolen money or defrauded Counterpart in some way to have received such harsh treatment, but there were many awkward pauses and uncomfortable conversations with people who had at one time acted as if they held me in the highest regard. And no jobs or even job openings were offered."

32

(Cooper decl. ¶ 63-64)  The emotional impact of these events on Jay Cooper was immense, and is described by many of our Declarants.  (*See,* Sasykbaeva decl. ¶ 12; Goldfarb decl. ¶ 12; Held decl.  Fritz decl. ¶ 6)  If Counterpart wishes to seriously challenge the basis for this proof, it is yet another contested fact.  (Genuine Issue No.23)

**V     PERVASIVE DISPUTES OF MATERIAL FACT AND SUBSTANTIAL ISSUES OF CREDIBILITY PRECLUDE ENTRY OF SUMMARY JUDGMENT.**

The proper standards for measuring the merits of a summary judgment motion are well known.  Under Rule 56, the Court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 247 (1986). In determining whether there exist genuine issues of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Liberty Lobby, Inc.*, 477 U.S. at 255. In addition, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,Inc.*, 530 U.S. 133, 150 (2000); *see also Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir 2006). If material facts remain at issue or are susceptible to different inferences, then summary judgment is not appropriate. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994.)

1. **Central Disputed Facts**.

Every aspect of this case is rife with disputes of fact.  A few central examples are the following.

***Why did Counterpart terminate Cooper?*** The alternatives seem to be as follows: 1) for poor job performance for the reasons set out in ¶¶ 8-15 of Lear's Declaration, or 2) for poor job performance based on Boyer's report as Lear stated in the termination telephone call, or 3) to prevent him from reporting illegal use of project funds. If Counterpart wants to claim the first alternative, they confront a factual dispute as to whether Lear actually held such views, based on evidence as to the success of his projects, Lear's long history of praise for and promotion of Cooper, no performance evaluation or other document demonstrating any concerns consistent with Lear's Declaration, the contrary observations of Cooper's staff and professionals who worked with him, and Cooper's own testimony as to Lear's lack of opportunity to observe what she recounts and his description of his management style. Presumably Lear will need to counter with claims that she criticized Cooper for those failings in telephone conversations, a fact that Cooper has denied. (Cooper decl. ¶¶ 4, 18) Counterpart will also need a credible explanation of why Lear did not raise any such issues in her November 12 telephone call where she listed a number of reasons for terminating Cooper. (CPX-F)

If Counterpart elects to embrace Boyer's findings as a rationale (or an additional rationale) for the termination, it will be faced with factual disputes on virtually every aspect of Boyer's report, supported with substantial contrary evidence from those who worked with Cooper in Central Asia. (Genuine Issues Nos. 18, 19)

As to the third explanation for the termination, Counterpart has already signaled its alternative positions in deposition testimony if not in its motion papers, each of which is rife with factual disputes. First, Counterpart can be expected to take the position that

USAID did not really care about its Cost Standards in the case of a cooperative agreement.  That position is contested by the language of the USAID Cost Standards as well as by the testimony of Brian Propp.  (Propp dep. at  18-20)  Counterpart will also undoubtedly adhere to the testimony of Harry Dorcus and Arlene Lear that Counterpart's accounting was wholly in conformity with applicable USAID Cost Standards and that it was perfectly proper to simply charge costs to projects that had the budgeted funds available at the time and to charge Lear's salary and other direct costs at Washington Headquarters despite risk of project shortfalls in the field.  The latter position will be disputed by Propp's testimony, by the fact that Dorcus cannot point to any provision in the Cost Standards so providing, and by the fact that he and Lear differ on the percentage of line item flexibility that Lear actually had.[30]

   ***Did Arlene Lear Know that Cooper was complaining about accounting practices at the time she fired him?***  She denies such knowledge in her Declaration. (Lear decl. ¶¶ 33-35)[31]  Evidence to the contrary includes both direct evidence and reasonable inferences from direct evidence. (Genuine Issue No. 22)  First, Cooper had complained to her directly about several matters, including about amounts spent at Headquarters.  (Genuine Issue No. 11)   Second, Cooper had complained to Dorcus about several matters and had sent him X-45, Cooper's refusal to approve the Eurasia travel expenses and the request for a new staff member to monitor spending from CSSI and HNCBI, and Dorcus was involved in many discussions with Lear about whether Cooper

---

[30]   Even if Lear were correct about 100% line item flexibility, line item flexibility only applies to movement of funds between Headquarters and the field, not to movement of funds to another project. (Dorcus dep. at 138-39)

[31] The wording of ¶ 34 of Lear's Declaration is interesting, stating that Cooper never expressed to her that he ever intended to report financial irregularities.  That statement leaves open the highly likely scenario that Kelli Boyer reported to Lear that Cooper had told her he had found "hanky panky" in the Almaty operation.

should be terminated.  (Dorcus dep. at 37, 44-45,73-78, 100-03, 237-38).  Third, Cooper

had complained to Abma repeatedly about diversion of project funds and was actively

objecting to the Eurasia travel budget being pushed by Abma and Kunz, and Lear was

talking to Kunz frequently in the weeks before the termination. (Cooper decl. ¶ 7)

Lear, Kunz and Abma all expressed concern about the "secret files" they

suspected Cooper was stashing away (Cooper decl. ¶ 45d; Boyer dep. at 93, 96-97), a

curious interest for those not concerned with what Cooper was looking into.  Cooper

complained to Boyer about "hanky panky" in the Almaty office, Boyer made the

comment that Jay could go to the USAID Inspector General and Cooper replied that that

was possible.  (Genuine Issue No. 21; Cooper dep. at 243-45)  Boyer reported everything

else she "found" in Almaty to Lear, and it defies logic that she would not have reported

this conversation.  Perhaps we are actually expected to believe Boyer when she admits

that Cooper complained to her about Headquarters taking too much of the field's project

funds and, when asked if she looked into it, she replied that she didn't, because "I don't

do budgets and accounts.  (Boyer dep. at 165)

Finally Lear unquestionably knew that she was charging her own salary to the

CSSI and HNCBI projects in disproportion to the hours she spent on those projects.

(Genuine Issues No. 14bi and ii)  And she knew, or at the least absolutely should have

known, that she did not in fact have "100% line item flexibility" to move project monies

from the field to cover Headquarters expenses, including a disproportionate percentage of

her salary, and that in doing so she was depriving the field staff of the funds necessary to

run the programs she claimed to love. (Genuine Issues No. 16)

> ***Was locking Cooper out of his office and banning him from all Counterpart***
>
> ***offices nothing more than Counterpart following a standard operating procedure?***

Another factual dispute relevant to both the contract claim and the tort claim is whether publicly locking Cooper out of his office and barring him from all Counterpart offices in the Region is in fact simply Counterpart following its standard operating procedures or, as Cooper contends, a self-protective, revenge-fueled attempt to brand Cooper as a person not to be trusted. Counterpart's testimony on the reasons for this "standard procedure" has wobbled. We are asked to believe that the procedure is to secure the office pending a decision on what to do with files and office equipment, or to protect the employee's personal possessions, or to prevent the employee from using Counterpart's computer, or to prevent theft by the employee, or for safety and control because you have no idea what the person is going to do. (Genuine Issue No. 21nii) But at bottom Counterpart is faced with two facts: 1) the only two employees it has identified in sworn testimony and interrogatory answers as having been treated in a similar fashion simply were not locked out (See Genuine Issue No. 23), and 2) the "standard operating procedures" that it describes (Lear decl. ¶ 30; Defendant's Statement ¶¶ 61-63, 65) were not what happened to Cooper. No one changed the locks on the doors of Counterpart Headquarters after Touma or Propp were fired. No memo went out barring them from all Counterpart offices.

## 2. **Credibility Issues.**

Credibility issues will dominate any resolution of this case. For example, the credibility of all three of Counterpart's leading witnesses becomes immediately suspect as Boyer, Lear and Dorcus each tries at deposition to paint Boyer's visit to Almaty not as

a trip designed to gather ammunition with which to justify Cooper's termination, but, rather, as part of a normal corporate program to expose their HR Director to Counterpart's various overseas offices and staff.  It turns out that Boyer had been with Counterpart since June of 2003 and of Counterpart's 20 foreign offices, Boyer had only been sent to one other, and that visit involved the scrutiny of an employee and resulted in the his termination. (Genuine Issues No. ¶ 17ai & b; Cooper decl. ¶ 70)

If one were inclined to believe anything reported by Kelli Boyer that instinct would be dashed by reading her testimony about the "secret files" she found in Cooper's office (see Boyer dep. at 93-103) and comparing that testimony to what was actually found in Cooper 's office.  (See Cooper decl. ¶ 45d; Genuine Issue No. 19e) Virtually every statement by Kelli Boyer at deposition is highly suspect.  Yet Boyer is the only source of Counterpart's evidence that Cooper acted "erratically" or stated that he would do the "bare minimum."  Cooper has denied virtually all of Boyer's testimony and to accept Boyer's version of events one would have to conclude that Cooper began to act in a manner diametrically opposed to the way he had led the rest of his life.

Arlene Lear's credibility is also at issue.  Her claim that she didn't know about Cooper's complaints about financial matters is one example.  The Court should also review her attempts to describe the August 18, 2004 meeting where she announced the reorganization of the Almaty office as the beginning of a grievance procedure because Cooper was permitted to express his views on the management change, despite the fact that he was in no position to dispute the reports of Kelli Boyer or discuss the financial issues to which he had been objecting.  (Lear dep. at 235, 237)   At another point she testified that the M&IE rate disparity that Cooper was complaining about was "out of my

control" because it had been set by Cooper's predecessor as Chief of Party, apparently momentarily forgetting that the Chief of Party reports to her.  (Lear dep. at 193-94) Finally there is her attempt to insist that Cooper had no responsibility for the positive mid-term evaluation of the CSSI program, a statement logically suspect on its face but also debunked by one of the evaluators.  (Lear dep. at 161-62; Genuine Issue No. 2aiv)

　　Lear and Dorcus contradict each other on some issues. While Lear testified for the corporation that the views of a woman named Kim Alter played no role in her decision to terminate Cooper (Lear dep. at 257-58), Dorcus testified that Lear brought up Alter by name and credited Alter's opinions about Cooper in a meeting concerning the termination decision.  (Dorcus dep. at 223-25)  Lear and Dorcus differ on whether a grievance filed against Lear by an Aaron Chassey (X-79) was investigated, although both agree that in the end it was determined to be "unfounded."  (Genuine Issues No. 9m-o)

　　There are other indications in the record that the credibility of  Harry Dorcus requires a careful look.  One should start with the at least eight occasions when, confronted with an expense charged to the CSSI or HNCBI project that was obviously wholly or partially for the benefit of another project, Dorcus gave the same answer:  that it is perfectly proper to simply charge the expense to the project that has money budgeted for the purpose.  (See Dorcus dep. at 302-07, 308, 311, 313-14, 319, 329-30, 332, 347) Mr. Dorcus at one point attempts to explain (dep. at 332-34) that it is quite proper to bill Kunz's rent to a larger project that had a rental budget in the grant for his particular position even though Kunz spent parts of his time working on other projects.[32]  He sees no problem in the fact that the programs actually paying the rent lose the benefit of the

---

[32] There is no budget item in the CSSI budget to support the rent for Mr. Kunz, as the Regional Director for Eurasia, the Mid East and Southeast Asia, to live in Almaty.  (X-43 at CP1054)

full-time attention of the employee they are supporting because "that's a conscious

decision made by all those that post the time, including Bob Abma – I mean Jay Cooper."

(*Id.* at 333)   In the next breath Dorcus denies any knowledge of Cooper's complaints that

a disproportionate share of the expenses of Kunz and Abma were being billed to his

programs.  (*Id.* at 334)  On other occasions he tried to blame mis-charges on "a

miscommunication between Abma and the accountant" or on a "Xerox copying error."

(Dorcus dep. at 299-301, 329-30) One should also review his contention that the USAID

Cost Standards do not really govern cooperative agreements because USAID is focused

on "the deliverables," despite conceding that the USAID Cost Standards do in fact apply

to those agreements.  (See Genuine Issue No. 13.)  And there is also the occasion when

Dorcus claimed that Aaron Chassey's grievance against Arlene Lear (X79) was not a

grievance.  (Dorcus dep. at 403-06) Finally, Dorcus tries to suggest that Counterpart's

Open Door policy was sufficient to protect employee rights because, although he does not

know if there was any way to address employee complaints at the time Cooper was fired,

and although he can't say for sure, if Cooper had come into his office in Washington with

his complaints about Abma's budget, he may have done something about it.  (Dorcus

dep. at 233-34)  Cooper was, of course, on the other side of the world in Almaty at the

time and had sent Dorcus an email stating his reasons for objecting to Abma's budget (X-

45).  Dorcus never responded to X-45 and concurred in Cooper's termination.

### Conclusion

We submit that Cooper has met his burden by submitting Declarations and record

evidence refuting the matters set out in Defendant's Statement and Lear's Declaration.

We have raised and supported with competent evidence factual disputes central to a

determination under both counts of the Amended Complaint.  In sum, we have shown that virtually every sentence of Counterpart's memorandum is a matter of contested fact, and reasonable jury could conclude that Counterpart exercised bad faith in its termination of Cooper held him up in a false light.  *Anderson, supra*, 477 U.S. at 248. Counterpart took no extraordinary steps to help Cooper improve his performance because his performance needed no improving.  Cooper was working positively under the management situation imposed by Lear on August 18, unless one considered his reluctance to approve Abma's budget as being negative.  Cooper never said he would do the bare minimum and never did the bare minimum.  Lear knew that Cooper had been complaining to her and others about financial issues for some time, knew she was in violation of the USAID Cost Standards in a host of respects, and knew Cooper had reported hanky panky to Boyer.  She thought he was keeping secret files, although he was not.

Counterpart claims that Cooper had no reasonable belief that financial irregularities existed.  Yet we've shown that virtually every matter he complained about (Genuine Issue No. 11) has been proven true.  Lear and her cohorts knew their piggy bank would be broken if an official investigation ensued.  They used Boyer to fire Cooper to protect themselves.  Good faith had nothing to do with it.

Because essential facts are in dispute, because rational inferences from those disputed facts would support a verdict in Cooper's favor and because credibility issues dominate any evaluation of the factual contentions of the parties, this is not a case for summary judgment.

Cooper requests an oral hearing on this motion so that he can respond to whatever matters Counterpart raises in it Reply Brief.


Respectfully submitted,


_____
Patricia D. Douglass
D.C. Bar No. 214916 [check]
98 Interpromontory Rd.
Great Falls, VA 22066-3219
703.759-3586

COUNSEL FOR PLAINTIFF JAY COOPER


February 12, 2007