# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAY W. COOPER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 05-1598 (RMC-JMF)** |
| | ) |
| **COUNTERPART INTERNATIONAL,** | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF PATRICIA D. DOUGLASS

Patricia D. Douglass, being duly sworn, declares as follows.

1.    I am counsel for Plaintiff in this action.  I submit this Declaration to place before the Court certain information and documents about which I have become aware in that capacity.

2.    Attachment A to this Declaration are the first page and relevant pages of documents marked as deposition exhibits in this case to which we refer in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, arranged in numerical order.  The first page of Attachment A is an index to those exhibits indicating where in the pdf file that is Attachment A each deposition exhibit begins.  When a deposition exhibit has already been submitted by Defendant we do not submit it again but simply indicate the exhibit number given it by Defendant, using the prefix "CPX-" signifying that it has been previously submitted by Defendant Counterpart International

1

3.      Attachment B to this Declaration is Defendant's Response to Plaintiff's Request for Admissions ("CPADMISS").

4.      Attached as Exhibit PDX-C to this Declaration is Counterpart's Mid-Term Evaluation Report on the CSSI project, prepared jointly with a consulting firm named Social Impact. This is the Report discussed in the deposition of Christopher Szecsey and discussed at Genuine Issue No. 1a.

5.      Attached as Exhibit PDX-D to this Declaration is the first page of the document concerning the Mahalla Initiative Project referred to in ¶ 2bvi2 of the accompanying Statement of Genuine Issues.  It was produced to me in discovery after the date of Ms. Lear's deposition.

6.      Attached as Exhibit PDX-E to this Declaration is are the relevant pages of Defendant's Response to Plaintiff's Second Request for Production of Documents, dated May 3, 2006.

7.      Attached to this Declaration as PDX-F is IRS Form 990 for fiscal year 2004 (October 1, 2004 through September 30, 2005) filed with the Internal Revenue Service by Counterpart International.  Counterpart has admitted the authenticity of this document.  (CPADMISS ¶ 61)

8.      The document that is X-78 was delivered to me on October 12, 2006, the last day before the discovery cut-off under the Court's Order of July 12, 2006.

9.      Attached at Exhibit PDX-G to this Declaration is a chart I made to summarize the number of hours Michael Kunz billed to each of the projects on which he worked in fiscal year 2004.  Exhibit PDX-G is wholly based on information contained in Plaintiff's deposition X-58, which was identified by Counterpart's Chief

Operating Officer and Chief Financial Officer Harry Dorcus as the timesheets of

Michael Kunz for fiscal year 2004. (See Deposition of Harry Dorcus ("Dorcus dep.")

at 290). That chart lists the code number and Counterpart's abbreviation for the name

of each project to which Mr. Kunz billed any time during FY 2004 along the top.

After several of the projects there is an additional column listing the same code

number and the initials HVS. The HVS column contains the hours he billed to that

program for holiday, for vacation or for sick leave. The vertical row along the left-

hand border of the chart lists the Bates Stamp number of each page of X-58 on which

the information about hours billed is to be found.

    10.    Attached to this Declaration as Exhibit PDX-H is a similar chart I

prepared to summarize the number of hours Bob Abma billed to each of the projects

on which he worked in fiscal year 2004. Exhibit PDX-H is based on deposition X-57,

which was identified by Harry Dorcus as the timesheets of Bobby Abma for fiscal

year 2004. (See Dorcus dep. at 285-86).

    **11.**    Attached to this Declaration as Exhibit PDX-I is a similar chart I prepared

to summarize the number of hours Arlene Lear billed to each of the projects on which

she worked in fiscal year 2004. Exhibit PDX-I is based on deposition X-55, which

was identified by Harry Dorcus as the timesheets of Arlene Lear for fiscal year 2004.

(Dorcus dep. at 262-63).

    12.    Defendant's first Response to Plaintiff's first set of interrogatories was

dated November 29, 2005. The answers given on that date are those above the

notation "Supplemental Response" as to each answer on X-29..

I declare under penalty of perjury that the foregoing is true and correct.

_____
Patricia D. Douglass

_____
February 12, 2007

**ATTACHMENT A**

| | |
|---|---|
| **From:** | Arlene Lear |
| **Sent:** | Sunday, November 16, 2003 1:45 PM |
| **To:** | Kelli Boyer |
| **Subject:** | RE: Performance Reviews; Jay Cooper contract |

**Importance:** High

Neither has contacted me for this purpose. However, I did have a conversation last week with Jay; he said he'd be sending us back comments on the contract; I said, please don't send back the same comments which were taken into consideration when developing the last draft. I asked about his concerns; and he again brought up the issue of per diem....I again reiterated our position and indicated that if he were to get full per diem, so should David Smith, Andrea, et als. Then I noted, that I couldn't imagine him using up $1200 on per diem for meetings staff meetings/representation. I concluded that it's not about per diem, but about acknowledgement and told him so; then asked him to think about this a bit.

Regarding acknowledgement: I'd like to give him a merit bonus for being the COP of two multi-million dollar multi-country initiatives. This is not related to revenue generation, but management performance. There are other issues which I'd like to discuss.

**ACTION:** Can we meet on Monday the 17th? If so, please let me know the best time in the afternoon.

Thanks,
al

### *Arlene Lear*

Senior Vice President
Counterpart International, Inc.
1200 18th Street, N.W.
Suite 1100
Washington, D.C. 20036

Tel.  (202) 721-1520
Fax.  (202) 296-9679
www  counterpart.org

-----Original Message-----

| | |
|---|---|
| **From:** | Kelli Boyer |
| **Sent:** | Thursday, November 13, 2003 10:03 AM |
| **To:** | Arlene Lear |
| **Subject:** | RE: Performance Reviews; Jay Cooper contract |

The last correspondence I had with Jay regarding his contract was 11/04/03. He emailed me to say he was on travel and could not find it in his email and could I please send it again so that he could review and discuss with you. I forwarded it to him again and have not yet received additional feedback.

Also, this is the same case with Meriel. She stated that she has not yet returned her contract because she needed to discuss some of the details in it with you. Has she contacted you regarding this?

Kelli

-----Original Message-----

| | |
|---|---|
| **From:** | Arlene Lear |
| **Sent:** | Wednesday, November 12, 2003 8:32 PM |
| **To:** | Kelli Boyer |
| **Subject:** | Performance Reviews; Jay Cooper contract |

Dear Kelli,

EXHIBIT
#6
Plaintiffs

CP 0850

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **A.  TEAM WORK** | | | | | | |
| 1.  Works effectively with and within the various operational systems of Counterpart International. | | x | | | | |
| 2.  Maintains effective professional relationships with Counterpart staff and external organizations.  Respects the value, diversity, knowledge, abilities & talents of other staff members. | | x | | | | |
| 3.  Focuses on the achievement of organizational goals through the work unit and other co-workers. | | x | | | | |
| 4.  Accepts and provides feedback effectively. | | x | | | | |

Comments:

It is my observation that Jay's ability at teambuilding and teamwork has substantially improved within this past year; partly because he has become quite adept at self awareness, partly because he is participating in a Gestalt management training course which emphasizes tearmbuilding, and partly because Jay always has his eye on performance – i.e., enhancing performance for himself and his sub-ordinates.  I respect Jay's willingness to grow and appreciate his ability to accept feedback from me, even if critical.  He's a true colleague and fully committed to achieving Counterpart's goals of local capacity building and program localization.

My only concern is that he sometimes provides impulsive negative feedback which undermines the mentoring and modeling role he needs to play as an expatriate leader; I've observed this with some local staff from time to time.  We've discussed this and I know that Jay is seeking to improve….I 've noticed the same tendency in myself and know how difficult it is to change a tendency towards expecting perfection in oneself and in others.

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **B.  RESPONSIVENESS and JOB KNOWLEDGE** | | | | | | |
| 5.  Reliable with attendance; is prompt for meetings and scheduled appointments. | | x | | | | |
| 6.  Sets realistic deadlines and completes work assignments on a timely basis.  Keeps co-workers informed of changes or delays. | | x | | | | |
| 7.  Accepts responsibility for own actions.  Acknowledges and | | | | | | |

3-01

Page 1

000033

EXHIBIT
#9
Plaintiff's

corrects errors in a timely manner minimizing disruption of work flow.

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| 8. Maintains knowledge and skills at the levels needed to be successful in all areas of responsibility; demonstrates willingness to learn new techniques and utilize new resources; requests training when needed to further develop technical competence. | | x | | | | |

**B.   RESPONSIVENESS and JOB KNOWLEDGE (continued)**

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| 9. Completes quality work that meets organizational standards (well organized; thorough, error free; attentive to detail; consistent with Counterpart's objectives; well conceived, clear, accurate, and useful. | | | x | | | |

Comments:

Jay has an exceptional work ethic and is always proactively seeking to learn more about either training, the non-profit field, management, human resources, team building and conflict resolution.....He is not error-free, no human being is; but his willingness to learn from mistakes is exceptional.

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **C.   PRODUCTIVITY and JUDGMENT** | | | | | | |
| 10. Completes a quantity of work that meets organizational and divisional standards and needs. | | x | | | | |
| 11. Plans and organizes work; applies the appropriate amount of time, effort and resources to each task. Anticipates future workload and adjusts priorities as needed. | | x | | | | |
| 12. Works effectively under pressure. | | x | | | | |
| 13. Effectively identifies problem; collects and analyzes information; able to reach sound conclusion, and implement corrective measures. | | | x | | | |
| 14. Effectively sets priorities and acts accordingly while considering the impact of decisions on other parts of the organization; includes appropriate staff in decision making. | | x | | | | |
| 15. Demonstrates initiative and capacity for program development and ability to generate revenue. | | x | | | | |

000034

Comments:  Jay is one of the most productive staff in Counterpart; doesn't avoid plunging into challenging work assignments and cares deeply about the outcomes, quality of the product and longer term impacts.  He has shown solid ability to identify a problem, but sometimes holds back from taking action to address the problem. This could be for several reasons: 1) avoidance of confrontation with the individual or individuals involved, 2) a hope that the problem will resolve itself, 3) simple procrastination.  The least likely reason is the latter, since in most cases Jay demonstrates an action-oriented and can-do work style.  However, when the problem is not addressed in a timely way, it can escalate to crisis proportions.  The best example, is that of Roselie and Scott in Turkmenistan.  There were signs of problems with their management style, and feedback from USAID, soon enough for an intervention by Jay to take place to possibly avoid their eventual dismissal from their positions or at least to avoid their feelings of victimization.

| | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **D.   COMMUNICATIONS/INTERPERSONAL SKILLS** | | | | | | |
| 16. Displays openness and willingness to share appropriate information with others. | | x | | | | |
| 17. Oral communications are appropriate for, time, place, audience; respectful, clear, concise. | | x | | | | |
| 18. Written communications are appropriate, well-organized, neat and readable, accurate, complete, and timely. | | | x | | | |
| 19. Treats others with dignity & respect. | | | | x | | |

Comments:  I suppose if there is one area in which Jay is less than outstanding; it is related to interpersonal skills and communication.  However, it must be said that he has demonstrated a much greater tolerance for those who disagree or dispute his opinions, including myself.  He most certainly is very sharing of information once he trusts the one making the request; however, his tendency is sometimes to hold back from fully expressing his full point of view....I think fearing that a confrontation will ensue....I hope that Jay can feel comfortable confronting people with issues/problems without thinking of such confrontation as aggression.  It's a question of how the person is approached, with what tone, and with what intent.

In addition, Jay has so much substance, yet sometimes hesitates to enter into a dialogue on the substance in a group setting....I think he finds it easier to do this one-on-one.

Jay is most effective at communicating through good, constructive deeds....what he needs to work on is finding a way to communicate his goodness and caring in verbal form...to let down his guard a bit....so that those working with him hear and see more of the special individual that he is.

000035

3-01 Page 3

|  | N/A | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **E.    MANAGEMENT and SUPERVISION (for Supervisors and Managers)** | | | | | | |
| 20.  Establishes clear and realistic goals (and budget, as applicable) for projects and directs them, on schedule, in a results-oriented manner. | | | x | | | |
| 21.  Develops realistic goals with staff, based on Counterpart and unit goals; clarifies work expectations and holds staff responsible for timely and accurate completion of assignments; provides regular staff feedback to sustain and improve job performance; documents performance. | | x | | | | |
| 22.  Meets regularly with staff for free and even exchange of ideas and unit concerns; includes staff in unit decision making when appropriate. | | | x | | | |
| 23.  Takes judicious and timely action to hire staff or to counsel staff with performance problems.  Recognizes personnel problems and, with appropriate staff, develops plans to resolve them in a timely and effective manner | | | | x | | |

Comments:  My comments related to items 22 and 23 have already been said under "D" above.

|  | | Exceptional (5 points) | Commendable (4 points) | Meets Min. Stds. (3 points) | Needs Improvement (2 points) | Unacceptable (1 point) |
|---|---|---|---|---|---|---|
| **K.    ADDITIONAL STANDARDS/DUTIES** | | | | | | |
| 24. Jay has an exceptional ability to understand the appropriate Applications of information technologies for the purpose of information Dissemination and M&E... as evidenced by CANGO.NET, the superb Database created to monitor program activities; and consistent _curiosity about IT applications to organizational learning.  We have yet to tap Jay's full range of talent for identifying IT applications for our work in the CAR and worldwide | | x | | | | |
| 25. Jay has a strong sense of loyalty to Counterpart and never flinches at going the extra mile to help out on tasks not directly related to his own areas of responsibility.  A perfect example is his hard work and efficiency in mobilizing staff support throughout the region for a recent proposal | | | | | | |

000036

submission in which we did not fully agree in the approach, but he steadfastly performed at peak as a team player because he could do no less as a member of the Counterpart family.

Comments:

Jay is one of those staff who is more like family than employee. He's been with Counterpart for 7 years in many positions. With each position he has taken on increasing responsibility and stress…..he has faltered from time to time, gotten up and become stronger and so has Counterpart. He deserves a great deal of the credit for multi-tasking in ways that few of our staff can. He is an exceptional member of the Counterpart global team….and hopefully will always be.

00000037

A.  **Total number of points:**                    _____

B.  **Total number of items scored:**           _____

C.  **Overall Score A + B:**                         _____

---

**Overall Evaluation Based on Points Awarded:**

5-4.7 _____Exceptional          4.6-3.7 _____Commendable          3.6-2.7 _____Meets Minimum Standards

2.6-1.7 _____Needs Improvement          1.6 & below _____Unacceptable

---

000038

3-01                                                    Page 6

# Counterpart International Employee Performance Review

## Employee Self-Appraisal

Name:                                              Position Title:

The employee's perspective on his/her performance and relevant goals is critical to thorough and accurate performance review. Your responses to the questions below will suggest areas for your supervisor to consider and discuss with you as the performance review process proceeds. Please return the completed self-appraisal form to your supervisor by _____.

1. Identify and describe what you consider to be your most significant accomplishment(s) this past year.

2. What do you consider your key contributions to the joint efforts of your division and/or department?

3. Identify any special circumstances that mitigated or enhanced your performance.

000039

Employee Self-Appraisal, page 2

Name:

4. In order to enhance your productivity and effectiveness on the job, identify, as applicable, a) ways in which your supervisor can help you achieve more or higher quality work; b) ways that s/he is currently contributing to your productivity and effectiveness; and c) what your supervisor should discontinue doing as it relates to your productivity and effectiveness.

5. In what areas do you believe you should focus attention for improvement?

6. What are your recommendations for goals/objectives for your position in the coming year?

_____        _____
Employee Signature                          Date

000040

3-01                                        **Page 8**

# COUNTERPART INTERNATIONAL, INC.

## MANUAL FOR
## EMPLOYEES in FOREIGN AREAS

Counterpart International, Inc.
Manual for Employees in Foreign Areas
March, 2001



EXHIBIT
#7
Plaintiff's

Counterpart expects its employees to communicate openly and fairly with the organization. Counterpart urges employees to talk freely with their supervisors or any other manager about any aspect of their work or any concern about employment. One is also free to offer suggestions for improvements.

## 2.5    Home of Record

The Home of Record, established at the time of initial hiring (as specified in an employment agreement or contract) will remain the same throughout employment with Counterpart. Generally, exceptions will only be granted if they will result in reduced costs to Counterpart for Home Leave and/or Relocation.

## 3.0    WAGES, HOURS, AND PAYROLL PRACTICES

## 3.1    Hours of Work

Counterpart expects its Employees in Foreign Areas to observe, at a minimum, regular business hours in accordance with local custom. Due to the nature of Counterpart=s business, Employees in Foreign Areas should expect to work extra and/or unusual hours, as necessary, to effectively complete their assigned job responsibilities.

## 3.2    Time Sheets

All Employees in Foreign Areas must record their hours of work on timesheets. Timesheets should be maintained on a daily basis, and submitted each month to their supervisors for review, approval, and signature. Time sheets must be submitted to the supervisor in time for the supervisor to review and submit them to headquarters Finance and Administration ("F&A") no later than the end of month dates established on the annual payroll schedule – usually the 20th day of each month. If for any reason Employees in Foreign Areas cannot comply with this requirement, they must notify their supervisor in advance to make alternative arrangements.

Each Employee in Foreign Areas is responsible for the accuracy of his/her own timesheet. An employee should not alter or complete the timesheet of another employee. Failure to adhere to this timesheet policy may result in discipline up to or including discharge.

## 3.3    Paydays

Counterpart pays it Employees in Foreign Areas twice a month (on the 15th and last day of each month). When a regular payday falls on Saturday or Sunday or a legal holiday, paychecks are issued on the preceding business day.

Counterpart ordinarily arranges to deposit paychecks for Employees in Foreign Areas directly to

their domestic bank account. Employees in Foreign Areas who wish Counterpart to issue their paycheck to anyone other than themselves, or to deliver their pay in any other manner, must provide Counterpart with a written request.

Paychecks are not issued between paydays except in extraordinary circumstances or in case of separation from employment.

Employees in Foreign Areas may take advances on salary only with the approval of the Vice President for Finance & Administration ("VP for F&A").

The following deductions are ordinarily made from payroll checks for Employees in Foreign Areas:

| Required | Voluntary |
|---|---|
| Social Security (FICA) | Dependent health insurance, if applicable |
| | Elective 403-B contribution, if applicable |
| | Flexible Spending Account contribution, if applicable |
| | Transportation Spending Account contribution, if applicable |

Changes in your family status (dependents) may affect the amount of your income tax liability. To assure that an appropriate amount of taxes is withheld, please advise the Human Resources Director of any status changes and complete a new withholding authorization (W-4) form, as needed.

Employees in Foreign Areas are generally exempt from federal and state income tax withholding requirements for the income earned in a foreign area up to a specified amount. Federal regulations establish the amount of the exemption each year. If an employee=s income exceeds the exemption amount, Counterpart will withhold federal and state income taxes from the pay.

Employees in Foreign Areas are paid in U.S. currency unless, at Counterpart's discretion, a different currency is more appropriate.

## 3.4    Annual Performance Evaluations

Counterpart maintains a performance review procedure for periodic assessment of each employee's performance. Performance review is conducted annually or more frequently, as appropriate. Employees and supervisors, both, prepare components of the written appraisals which are discussed with each employee and maintained by the Human Resources department in the employee's personnel file.

Performance review is intended to provide open, two-way communication of goals and work results, and we expect employees and supervisors to use the opportunity to communicate frankly.

Any and all raises are discretionary, and are based on merit and availability of Counterpart funds. A supervisor will make a relevant recommendation to the division Vice President concerning a salary increase, at the time of an employee's annual performance review. Salary increases resulting from the annual performance review will be effected at the beginning of the subsequent pay period.

# 4.0    RELOCATION ASSISTANCE, HOUSING ALLOWANCE, AND OTHER ALLOWANCES

## 4.1    Transportation to and from Overseas Posts

In most circumstances, Counterpart pays the reasonable costs of transporting Employees in Foreign Areas and their immediate family by economy airfare from their Home of Record to their post outside the United States and back to their Home of Record. *Immediate family means spouse and minor children under 18 years of age.*

If Employees in Foreign Areas change their immediate family situation while on assignment, Counterpart may, at its discretion, choose not to pay for the return of additional family members to the Home of Record.

To be paid for transportation to the Home of Record from an assigned post, Employees in Foreign Areas must travel, within sixty (60) days of their termination from employment  At the discretion of Counterpart, Employees in Foreign Areas may be asked to visit headquarters for debriefing following completion of an assignment.  This visit will not adversely affect an employee's eligibility for relocation benefits.

## 4.2    Shipment and Storage of Household and Personal Effects

For eligible Employees in Foreign Areas, Counterpart contributes to the cost of storage and/or shipment of household and personal effects from the employee's Home of Record to the employee's assigned post (final destination) and back to the Home of Record or, in the case of transfer,  from one assigned post to a new assigned post.

Counterpart's contribution is limited to the actual costs of storage and/or surface shipments or ocean freight or air cargo up to a maximum of $2500 each way for each relocation (from Home of Record to original assigned post, transfers, and from assigned post to Home of Record) for a single employee or married employee relocating alone.  Employees in Foreign Areas relocating with their spouse and/or dependents are allowed a maximum of $3500 each way for each relocation.  These reimbursement amounts are maximums subject to verification of actual expenses as documented by receipts.

Eligible Employees in Foreign Areas who were hired prior to April 1, 2001, and  who have not

already used their full allowance for shipment/storage of household goods, may be reimbursed, for the return portion of their relocation, up to the amount specified above consistent with the number in their household.

## 4.3     Temporary Lodging Allowance (ATLA@)

A Temporary Lodging Allowance (ATLA@) is available for Employees in Foreign Areas as they arrive at their assigned post, and again when they prepare for departure. The TLA is available for up to fifteen (15) days upon arrival at the post, and/or for up to fifteen (15) days prior to departure. The TLA is intended to cover the cost of temporary quarters only, and is not available to employees when permanent quarters are available. The TLA cannot be claimed simultaneously with a Housing Allowance. The amount of the TLA is limited to the actual cost of acquiring temporary housing, up to the maximum lodging *Per Diem* permitted by applicable US government regulations. See Section 8.6, Per Diem, below. Claims for reimbursement for temporary lodging must be accompanied by receipts from the place of lodging.

## 4.4     When Counterpart Will Not Pay for Your Return Relocation Expenses

Employees in Foreign Areas who leave employment for any reason, except a layoff or upon the normal expiration of a contract, may be required to reimburse Counterpart for costs incurred by Counterpart for transporting the employee and/or dependents to interviews and/or briefings in Washington, D.C., and to the assigned post. Further, the employee forfeits the right to payment/reimbursement for relocation back to the Home of Record.

## 4.5     Housing Allowance

Employees in Foreign Areas are provided a reasonable Housing Allowance unless the assigned post is within reasonable commuting distance from the employee's pre-existing residence. In other words, Counterpart does not pay for, or otherwise provide, housing or compensation for housing and utilities for personnel who are residents of the area of assignment, or who live within reasonable commuting distance of the Counterpart program. The amount of the Housing Allowance for each Employee in a Foreign Area is based on budgetary restrictions, applicable government regulations, and the location of the assignment. The specific amount of the Housing Allowance is stated in the employment agreement or contract.

The Housing Allowance is intended to cover the actual cost of housing and utilities up to the maximum amount of the allowance. Employees in Foreign Areas may choose to pay the housing expense and seek reimbursement (by submitting receipts for payment), or may request Counterpart to pay the housing costs directly. Counterpart does not pay for or otherwise subsidize housing owned by the employee or the employee's family.

## 4.6     Rest and Recuperation (R&R) Allowance

Employees in Foreign Areas, subject to budgetary constraints, may be eligible for up to one R&R Allowance each year, after completion of twelve (12) months on assignment in a country other

If you or your eligible dependents elect to continue as members of Counterpart's plan, you will be charged the applicable premium charged to us by our carriers, plus an additional two percent (2%). If you have been determined to be disabled under the Social Security Act, however, you will be charged an additional fifty percent (50%) of the applicable premium during the nineteenth (19th) through the twenty-ninth (29th) months of the *continuation period*. The premium is subject to change if the rates being charged Counterpart increase or decrease. If you elect to continue coverage, you have the right to convert this coverage to an individual policy with our insurance carriers at the end of the *continuation period*.

Continuation coverage may end, however, if any of the following events occur: (1) you fail to make timely payments of any premium; (2) another group health plan assumes coverage of you and does not exclude or limit coverage provided to you on account of a pre-existing medical condition; or (3) Counterpart terminates its group health plans. If you enroll for Medicare, you will no longer be eligible for continued coverage, but, as noted earlier in this statement, your spouse and dependent children may be entitled to extend their continuation coverage.

Our plan administrator will contact you concerning these options at the time of your termination or a reduction in your work hours. The plan administrator will contact your qualified beneficiaries in the event of your death or enrollment for Medicare benefits. However, in the event that you become divorced or legally separated, or one of your dependents ceases to be eligible for coverage under our group health insurance plans, you and/or your dependents are responsible for contacting the Human Resources department and/or the plan administrator to discuss continuation/conversion rights. You and your qualified beneficiaries are also responsible for notifying the Human Resources department and/or the plan administrator within sixty (60) days of qualifying for Social Security disability benefits.

# 7.0  PERSONAL CONDUCT AND ETHICS

## 7.1  Policy Relating to Ethics

Counterpart is a charitable organization with a hard-earned reputation for honesty, integrity and caring. That reputation can only be maintained if each of Counterpart's employees scrupulously acts with absolute honesty and extreme diligence, especially with regard to monetary transactions between Counterpart and its employees and between Counterpart and third parties. Any employee who has reason to question the integrity of any transaction, or to believe misconduct and/or a prohibited act has occurred, is obligated to report it to the appropriate department supervisor and the VP for F & A.

Counterpart's activities are highly visible and, accordingly, Counterpart expects it Employees in Foreign Areas to maintain the highest standards of ethical and professional conduct. The use of Counterpart assets for any unlawful or improper activity is prohibited. Counterpart forbids its staff to offer, solicit or accept cash or other payments such as goods-in-kind, rebates or special privileges in return for an advantageous position or the establishment of a beneficial situation, or to otherwise solve a problem, or for any other reason.

expenses directly related to business and authorized in advance by management or department heads are authorized.  Receipts evidencing all charges must be provided to the VP for F&A.

## 7.15    Losses Due to Damage, Theft, etc.

Keep in mind that Counterpart does not carry insurance for reimbursement if your personal property is stolen, damaged, destroyed or lost.  If you require such protection, appropriate insurance remains your responsibility.

## 7.16    Code of Conduct

It is the policy of Counterpart International that certain rules and regulations regarding employee behavior are necessary for the efficient operation of the organization and for the benefit and safety of all employees.  Conduct that interferes with operations, that discredits the organization, or that is offensive to visitors or coworkers will not be tolerated.

Employees are expected at all times to conduct themselves in a positive manner so as to promote the best interests of Counterpart.  Conduct which will not be tolerated includes:

♦   Angry or vulgar language, including swearing, name calling and shouting
♦   Physical contact with another person in any angry or threatening way
♦   Harassment or intimidation by words, gesture, body language or any other menacing behavior.
♦   Behavior which intends to or results in the theft or destruction of property

Employees are encouraged to be responsible for their own personal comfort and safety and to ask any person whose behavior threatens their personal comfort to refrain.

Counterpart will investigate all reported incidents of violation of the code of conduct. Termination of employment may result from any violation of the code of conduct.

## 7.17    Grievance Procedure

Counterpart has established procedures through which you may seek assistance or counseling for any problems, circumstances, or conditions of employment that are of concern to you or that are felt to be discriminatory. These procedures are designed to ensure that your problems or complaints are presented in the simplest and most direct way and to assure that they receive prompt and fair consideration.

### A.  Counseling

If you have a work-related problem, you should first discuss it with your immediate supervisor. You may choose to follow with a discussion with your next higher supervisor, if necessary. If, for any reason, you do not wish to consult supervisory personnel in your department or division, you may request assistance from the Human Resources Director. This may be done by scheduling an

appointment at a time most comfortable for you, before, during, or after work hours. You may also request a meeting with your supervisor and the Human Resources Director to discuss work-related problems. Such three-way discussions are often helpful in resolving problems.

All employee problems will be treated confidentially by Human Resources, meaning that only individuals with a legitimate business need to know will be informed as necessary.

## B. Counterpart's Procedure for Employee Grievances

The great majority of problems can be settled promptly and informally among the individuals involved. However, there are certain disputes, which, for a variety of reasons, cannot be resolved in such a manner. The purpose of the grievance procedure described in this section is to provide an orderly and systematic method for the equitable resolution of such disputes.

It is the intent of the grievance procedure to create a set of guidelines for the resolution of specific problems arising between and among employees of Counterpart, between an employee of Counterpart and his or her supervisor, or regarding the application of Counterpart's policy in specific instance. The grievance procedure is not designed to resolve disagreements between employees of Counterpart and Counterpart management regarding the substance of Counterpart's policies, goals, and mission. The remedies sought by an aggrieved employee are limited to actions, which may be taken to correct the factual situation, which forms the basis of the grievance.

The process provides opportunity, at the initiation of the employee:
♦   For a review and written reply by the immediate supervisor (*Step I*);
♦   For a review and written reply by the second level supervisor (*Step II*);
♦   For a review and recommendations by a three-member review panel, and final decision by the CEO (*Step III*).

In the presentation of grievances or by participation as a member of the review panel provided for in Step III, employees are assured of freedom from restraint, interference, discrimination, or reprisal.

The Human Resources Director is responsible for the equitable and proper administration of the resolution procedures. The Director has complete discretion in the administration of grievance proceedings. This responsibility encompasses at a minimum the following:

♦   Determining whether the grievance procedure is appropriate for use under the circumstances and terminating the proceedings if they are not.
♦   Monitoring the grievance procedure to ensure that the required timetables are

♦   Assisting and advising all involved parties on the procedures to be followed.
♦   Maintaining a complete file of all materials relative to each grievance.

## C. <u>Step-by-Step Grievance Process</u>

Employee grievances shall be addressed in the manner described below. However, because every situation is different, flexibility is essential to a workable process. Therefore, the Human Resources Director has the discretion to allow, change or modify the process described herein.

***Step I:***  The aggrieved employee must submit a written statement of the grievance to his or her immediate supervisor, with a copy to the Human Resources Director, within fifteen **(15) calendar days** of the date the employee became aware of the act or occurrence, or at any time in the case of a continuing practice or condition.

The grievance statement shall include a clear description of the events and circumstances which give rise to the grievance, names of individuals having first-hand knowledge of the grievance, any other facts and circumstances believed by the employee to be pertinent, and the remedies sought. This statement of grievance shall be used as the document of consideration in Step I and any subsequent steps.

The supervisor will then confer with the employee and others if necessary in order to resolve the grievance. The supervisor's resolution of the dispute shall be presented in writing to the employee within six **(6) working days** of the date the grievance was submitted. If a supervisor determines that he or she does not have the power to resolve the grievance, that supervisor's recommendations shall be forwarded to the next level of supervision.

In the event the employee's immediate supervisor is the CEO, the grievance will be filed with the Human Resources Director who will assist in forming the review panel as described in Step III.

***Step II:***  If the employee is not satisfied with the decision, the employee may appeal the matter to the second level of supervision (provided, however, that if such second level supervisor is the CEO the appeal shall instead go to the review panel as described in Step III). This appeal must be at the positive initiation of the employee, in writing, and made within six **(6) working days** of the receipt of the Step I decision. The second level supervisor's resolution of the dispute shall be presented in writing to the employee within six **(6) working days** of the receipt of the appeal.

***Step III:***  If the employee is not satisfied with the decision reached in Step II, the employee may appeal the matter to a review panel. This appeal must be at the

Director within six **(6) working days** of the receipt of the Step II decision. The panel shall consist of three (3) members. One shall be an employee selected by the CEO, one shall be an employee selected by the aggrieved employee, and the third member shall be a person selected by the Human Resources Director. The review panel shall meet to hear the grievance within ten **(10) working days** of the selection of all members of the review panel. The panel shall report to the CEO its findings and recommendations in writing within **six (6) working days** of the hearing. The report of the panel shall clearly reflect the majority opinion of the panel. A minority opinion, if any, may be prepared to accompany the majority opinion.

Within six **(6) working days** of receiving the recommendations of the review panel, the CEO shall issue a written decision in the matter; that decision shall be final.

If an extension to this time frame is necessary at any step of the process, a written request must be made, prior to the end of the time frame, to the CEO who may grant the additional time necessary.

## 8.0    TERMINATION

## 8.1    Notice of Termination/Resignation

To allow for smooth transitions, Counterpart requests that Employees who resign from employment provide at least two (2) weeks notice of their intent to resign.

## 8.2    Payment of Wages

If Counterpart terminates an employee's employment, Counterpart shall issue the employee a final paycheck by the next payday or within seven (7) business days, which occurs first, unless the employee is responsible for handling Counterpart cash or finances.

Upon departure, employees must forward immediately their final timesheet and field financial reports to the VP for F&A in order to receive their final paycheck in a timely manner.

All final paychecks are issued manually, and not direct deposited, so at the time of termination, employees must inform the Human Resources Director of the address to which they would like their final paycheck delivered.

## 8.3    Payment for Annual Leave Time

Upon separation from employment, employees receive pay for accrued unused *Annual Leave*, subject to ordinary payroll deductions.  The check is issued at the same time as the final

**From:** Michael Kunz [mailto:mkunz@counterpart.org]
**Sent:** Wednesday, October 06, 2004 9:25 PM
**To:** 'Jay Cooper'
**Cc:** 'Altinay Kuchukeeva'; Yazgylych Charyev
**Subject:** Congratulations to Counterpart Turkmenistan

Dear Jay and Yaz,

 Congratulations on the execution of a sucessful conference in Turkmenistan! Jay, as we discussed, we are looking forward to a summary write-up on the event that we can use to help our Civil Society TEam speak in one voice on the program, to help all of us articulate how the conference fits into our overall strategy in Turkmenistan. We'll use this as a starting point for marketing your teams good work in the country.

Thanks,

Michael



EXHIBIT
#23
Plaintiff's

000284

| | |
|---|---|
| **From:** | Arlene Lear |
| **Sent:** | Tuesday, November 16, 2004 8:22 PM |
| **To:** | Worldwide CPI Staff |
| **Cc:** | repoocyaj@yahoo.com |
| **Subject:** | Farewell and thanks to Jay Cooper |

Dear all,

I deeply regret that Jay Cooper will no longer be working as Counterpart's Chief of Party on our Civil Society Support Initiative in Central Asia and our Health NGO Capacity Building Initiative.

Jay has made an immeasurable contribution to the development and management of Counterpart's region-wide civil society support initiative over the past decade. His creativity, dedication and commitment to the realization of a vibrant and sustainable NGO sector has left a legacy of individuals and institutions with the capacity to continue building civil society and community-driven development well into the future. His evolution from Kyrgyzstan Country Director to Regional Training Director to Regional Deputy Director and to Chief of Party is a reflection of our mutual trust and commitment over the years.

So, this is a sad time for both of us, as we go our separate ways....remembering our shared experiences, shared joys and shared hopes.

On behalf of all of the Counterpart family, I wish Jay the best in his future endeavors, and sincerely hope that we will work together again in the future.

Best regards,

Arlene

*Arlene Lear*
*Senior Vice President*
*Counterpart International*
*1200 18th Street, NW Suite 1100*
*Washington, DC 20036*
*Tel: 202.296.9676*
*Fax: 202.296.9679*



EXHIBIT
#24
Plaintiffs

# Mid-term Evaluation
## of
## Counterpart's Health NGOs Capacity Building Initiative
## Phase 1 and Phase 2

Jane Yudelman

3 December 2003

*Phase 1: Cooperative Agreement #115-A-00-00-000034-00—1st Oct., 2000-31st Dec. 2002*
*Phase 2: Cooperative Agreement #176-A-00-03-00004—1st Jan., 2003-31st Dec., 2005*



EXHIBIT
#28
Plaintiff's

CP 0973

On October 1st 2000 Counterpart International was awarded a grant by USAID of $848,427 to implement a two-year program entitled "Health NGO Capacity Building Initiative" (HNCBI) in Kazakhstan, Kyrgyzstan and Uzbekistan. This program was designed to complement Abt Associates' ZdravPlus program by facilitating the organizational development of the health sector NGO community.

The program strategy consisted of identifying, together with Abt, six target health NGOs in each of the three countries, conducting organizational assessments of each of these target NGOs, providing training and consultations, and making available small Community Action Grants and opportunities to access Mentoring Partnership Grants.

The program ended in December 2002. USAID provided an "extension" to Counterpart so that it could continue, together with Abt, its work in the health sector. The extension program, known as Phase 2 of the HNCBI or the "Healthy Communities Grant Program" (HCGP), has been funded for $3.5 million for three years (1st Jan., 2003-31st Dec., 2005) with $1,070,000 available for grants. It is being implemented in Kazakhstan, Kyrgyzstan, Uzbekistan, Turkmenistan and Tajikistan. This program, while called an "extension", is *completely different* from Phase 1 or the HNCBI program. As its new name implies, it is a grant program rather than the capacity-building program that the HNCBI program was. The HCGP has as its purpose the empowerment of NGOs and communities to address priority health needs.

In order to meet the purpose of the program, Counterpart, working closely together with Abt, has established a competitive grant program that provides grants of up to $5,000 each to Community Initiative Groups and NGOs to implement health-related projects. Applicants can access limited training (in Participatory Community Appraisal and Project Design) to help them in the grant development process. Grantees receive additional training in Participatory Monitoring and Evaluation and can access technical assistance from Abt to help strengthen the technical (health) aspects of the projects. Unlike the previous HNCBI, the Counterpart's Civil Society Support Centers play a crucial role in this program. In particular, they promote the program, assist applicants in the design of the projects, arrange the training, and monitor and evaluate the projects. Also, unlike the previous program, the grant program is not targeted and has been open to all interested Community Initiative Groups and NGOs that meet the criteria.

A "mid-term" evaluation of these two programs was conducted from 21st September-24th October 2003 in Kazakhstan, Tajikistan, Kyrgyzstan, and Uzbekistan by an external consultant in conjunction with Counterpart staff. Since Phase 1 and Phase 2 of the program are completely different this assignment is better characterized as a very cursory final evaluation of the HNCBI (Phase 1) and an initial assessment of the HCGP to identify any areas in which it can be strengthened. By co-joining these two assignments under the banner of a "mid-term" evaluation, both assignments were greatly hampered by a lack of time.

CP 0976

This program has been complete for almost a year and by all accounts it has been successful. The target NGOs appeared to be very satisfied with the program and highlighted the effect that their participation had on their organizational development. Some of the key areas that were mentioned included: development of strategic plans, better structured organization, introduction of fee-for-service to support financial sustainability, increased membership and volunteers, and social partnerships that embodied improved and expanded relationships with local government and other NGOs. The benefits reaped as a result of participating in the program continue to accrue even after the program's completion. The visibility and credibility of the target NGOs have been greatly enhanced and continue to work in their favor, as is evidenced by their ability to access other donor funds and their continued links with the government. The NGOs still maintain relationships with their international partners from the Mentoring Partnership Grants and amongst themselves. Additionally, in two of the three countries the target NGOs have formed health networks that are beginning to undertake health-related activities.

While this program is successful, reflecting back on it a year after its completion, there are a number of lessons to be drawn: 1) future efforts might be more strategic when selecting the target NGOs; 2) the assessment tool could be reviewed and adapted with respect to the phraseology and scoring system; 3) a huge amount of organizational development data has been collected — analyzing the data would provide quantitative, program-wide impact data which could shed additional light on the program's accomplishments and areas for improvement; 4) being more strategic with the generic training could save resources, improve attendance and the dynamics during training and possibly the outcome of the training; 5) when applying Counterpart's generic training package to a new program, it needs to be reviewed and adapted to the specific needs of the trainees; 6) expanding types of the regional-level events beyond training could greatly enhance the regional-level networking; 7) introducing participatory community appraisal techniques to health sector NGOs encouraged them to have more contact with their members, branch offices and beneficiaries during the project design process; and 8) Mentoring Partnership Grants, while costly, are very effective and future efforts should try to build on the concept of mentoring and NGOs acting as resources to each other.

### The Healthy Communities Grant Program (HCGP)

At the time of this assessment the HCGP had been in operation for roughly 9-10 months. In this short time it has impressively managed to set up functioning systems and procedures for the HCGP in all five Central Asian countries. The program was well publicized and the response to it considerable. Two rounds of funding had taken place in most of the countries. Ninety-eight projects equaling a value of $354,057 had been funded with USAID money. Soros in Kyrgyzstan funded an additional 15 projects equaling a value of $49,592 through the program. Many of the health grant projects appeared to provide useful and well-appreciated services that build the knowledge and skills of select populations. Community action grant projects were also well underway and a number of these appeared to have the potential to provide health benefits at the community-level.

CP 0977

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAY W. COOPER )
                   )
        Plaintiff )
                   )
v. )     Civil No. 1:05-cv-01598-RMC
                   )
COUNTERPART INTERNATIONAL )
                   )
        Defendant. )
                   )

## SECOND SUPPLEMENTAL RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

    Defendant Counterpart International ("Counterpart") provides second supplemental responses to Plaintiff's first set of interrogatories as follows:

### General Objections and Responses

    1.    Counterpart has made good faith efforts to investigate the allegations in plaintiff's complaint and to provide accurate and complete responses to plaintiff's interrogatories.  However, Counterpart's investigation and discovery in this case is not yet complete.  Further investigation and discovery may lead to the discovery of additional facts or to new interpretations of facts already known.  Counterpart reserves the right to amend or supplement its responses to plaintiff's interrogatories as its investigation and discovery proceeds.

    2.    Counterpart objects to any interrogatory that requests information protected by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege.


EXHIBIT
# 29
Plaintiff's

3.    Counterpart objects to the instructions contained in plaintiff's interrogatories to the extent they impose obligations beyond those imposed Federal Rules of Civil Procedure and/or Local Rules of the District Court for the District of Columbia.

4.    Counterpart will provide identifying information, where available, only the first time an individual is mentioned and thereafter refer to that individual by name only.

## Specific Objections and Responses

**INTERROGATORY NO. 1:** Please identify each person who played any role in (or was consulted regarding) your decision to terminate Cooper's employment, and, as to each person so identified, identify any documents relevant to that person's role in or opinion of that decision.

**RESPONSE:**  Counterpart objects to providing the home address and telephone number for defense witnesses that can otherwise be reached through their place of employment. Notwithstanding Counterpart's objection, the following individuals played a role (or were consulted regarding) Counterpart's decision to terminate Cooper's employment:

1)    Kelli Boyer: Ms. Boyer, former HR Manager has recently transitioned to a consultant role for Counterpart.   Ms. Boyer may be contacted through counsel. Counterpart is reviewing its files to identify documents that are relevant to Ms. Boyer's role in or opinion of the termination decision and will supplement this response if and when any such documents are identified.

2)    Arlene Lear: Ms. Lear may be contacted only through Counterpart's counsel.  Documents produced in response to plaintiff's Request for Production No. 1,

2

the course of several days, he changed his mind back and forth as to whether he wanted to resign his employment. Cooper persuaded Boyer to stay an additional weekend so they could meet to discuss the matter further the following Monday. However, Cooper left the country prior to their meeting with no notice to Boyer. When Boyer finally located Cooper and confronted him regarding how he wished to proceed regarding his employment, Cooper informed her he intended to remain with Counterpart until the completion of his contract and do the "bare minimum" necessary to perform his duties. Counterpart is reviewing its files to identify responsive documents and will supplement this response if and when any such documents are identified. Documents produced in response to plaintiff's Request for Production No. 2, Bates Nos. 1452-1469 are relevant to Boyer's interactions with Cooper in Almaty in November 2004.

**INTERROGATORY NO. 4:** Please identify each Counterpart employee whose employment was involuntarily terminated within the past five years and who was locked out of his office at time [sic] of that termination, and as to each such identified employee, state the reasons for the termination.

**RESPONSE:** Consistent with Counterpart's standard operating procedure, a lock was placed on the office of former Vice President of Counterpart Humanitarian Assistance Programs ("CHAP"), Brian Propp, when he was terminated for the purpose of securing the office until a decision was made regarding what to do with any files, office equipmen and other Counterpart property located in the office. Mr. Propp's last known address is PO Box 21033, Denver, CO. 80221-0033. Counterpart terminated Mr. Propp's employment because: 1) the CHAP program was being restructured and re-budgeted; 2)

performance; and 3) he violated Counterpart's employee code of conduct.

**SUPPLEMENTAL RESPONSE (first disclosure):** Consistent with Counterpart's standard operating procedure, a lock was placed on the office of former Chief Operating Office, Gregory Touma, when he was terminated for the purpose of securing the office until a decision was made regarding what to do with any files, office equipment and other Counterpart property located in the office. Mr. Touma's last know address is: 5608 Fifth Rd. S, Arlington, Virginia 22204.

**INTERROGATORY NO. 5:** Please identify each written or oral communication relating to Cooper's termination, Cooper's job performance or Cooper's character made by any of your employees to any person (whether or not a Counterpart employee) from November 12, 2004 to the date of your Answers to these Interrogatories.

**RESPONSE:** Counterpart objects to Interrogatory No. 5 on the grounds that it is overly broad. Counterpart further objects to Interrogatory No. 5 on the grounds that it requests information protected by attorney-client privilege. Notwithstanding Counterpart's objections, Counterpart is aware of the following non-privileged communications responsive to Interrogatory No. 5:

1)     On November 16, 2004, Arlene Lear sent an e-mail to all Counterpart employees notifying them of Cooper's termination. The e-mail is being produced in response to plaintiff's Request for Production No. 1, Bates Nos. 571.

2)     On November 16, 2004, Michael Kunz sent Arlene Lear and e-mail complimenting her notification e-mail regarding Cooper's termination. The e-mail is being produced in response to plaintiff's Request for Production No. 1, Bates No. 735.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAY W. COOPER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1598 (RMC)** |
| | ) | |
| **COUNTERPART INTERNATIONAL,** | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Jay W. Cooper responds as follows to Defendant's First Set of Interrogatories to Plaintiff.

**General Objections and Qualification:**

1.  Plaintiff objects to Instruction No. 3, to the extent it enlarges upon Plaintiff's duty as set out in Rule 26(e) of the Federal Rules of Civil Procedure.

2.  Plaintiff objects to all interrogatories to the extent they call for information protected by the attorney-client privilege or the attorney work-product doctrine.  Information so protected has not been provided in these answers.  See General Objection No. 2 in Plaintiff's Responses to Defendant's First Set of Requests for Production of Documents to Plaintiff, incorporated herein.

3.  Plaintiff objects to these Interrogatories as more numerous than allowed under Rule 33(a) of the Federal Rules of Civil Procedure,

**Answer to Interrogatory No. 13:**  Michael Kunz, Bob Abma, Harry Dorcus, Kelli Boyer and Arlene Lear.  Identifying information as to these persons is included in Exhibit A to these Answers. I discussed the financial irregularities I was concerned about with these individuals with varying degrees of specificity.  I tried to communicate with Lelei Lelaulu prior to November 12, 2004.  On November 9, I sent an email asking Lelaulu to set up a time for a phone call.  He responded and told me to call anytime during the day Wednesday November 10th.  When I called I was told he was not available.

**Interrogatory No. 14:**  Identify the "financial irregularities" referred to in Paragraph 15 of the Complaint.

**Answer to Interrogatory No. 14:** The financial irregularities include the following:

1)  The purchase of an apartment by Bob Abma for himself and his companion in his companion's name or possibly his companion's mother's name was intended to defraud the United States Agency for International Development (USAID), a US Government agency. The fraud was that Bob Abma collected money from the project to be paid as rent.  I discussed this with Harry Dorcus, during a visit to Almaty in the summer of 2003.  I was told that Bob Abma revealed his intentions to Harry Dorcus and Arlene Lear.  I have been told that Bob Abma's companion's mother was paid to clean the apartment and collected money directly for this service from funds provided for our projects by USAID, thereby extending the

fraud.  (This process was particularly interesting to me since I purchased an apartment in Bishkek in 1994 which was in my future wife's name before we were married. I was told that Counterpart International had a strict policy against employees receiving any financial support for housing that they owned.)

2) The Washington DC office of Counterpart used project funds for purposes and in amounts that were not permitted by the agreements between Counterpart and USAID, in many cases by a significant amount of money. Monthly financial documents provided to me by Bob Abma revealed that the amounts charged to my projects by the DC office was well over what was budgeted for use by the DC office in budgets Counterpart provided to USAID. I discussed this with Bob Abma many times.

3) Miscellaneous and Incidental Expenses (M&IE) were paid out of project funds to the staff from Washington DC at the full rate, when we had an established rate which was significantly lower in the Central Asia Region. I discussed this with Ms. Lear, who would always take the full rate and demand that others from DC take this as well.

4) It was a Counterpart practice to use project staff, including me, in the development of project proposals while that staff was being paid out of funds earmarked for specific USAID-funded projects already underway.  I was aware that this sort of activity was improper.  As Chief of Party I received a serious letter of concern in 2001 from the former head of USAID in the region about developing projects with staff assigned to

16

implement awarded contracts. I discussed this matter with Arlene Lear, and other CI staff.  The concern they expressed was simply how to reduce the damage to the reputation of CI.

5)  Counterpart charged my projects for most of the expenses associated with the overseas status of Michael Kunz and Bob Abma (including housing, travel and other benefits available to Americans working for Counterpart overseas), even though they were only budgeted to spend, and in fact did spend, a percentage of their time on my projects.  For example, Michael Kunz's salary and expenses were being billed to my projects even though there were not line items for his expenses in the budget and he did very little to contribute to them. As a result, my project funds were depleted.  I discussed the issue on many occasions with Bob Abma, but it was not changed. The pipelines were presented to USAID in such a way as to disguise the details of this pattern of spending. This shifting of expenses onto my program(s) by Counterpart's managers in the District of Columbia was part of a wider pattern.  I have been told by a member of the office staff in Almaty that Ms. Lear would routinely tell her to charge expenses to "434" or "452"  -- the code for my projects, whether or not the expense was in fact used to further my programs' goals.  .

6)  Counterpart apparently pays settlements to fired employees out of program funds, which I believe is improper.  In recent years I know of at least two settlements that were apparently paid out of the funds designed

for my projects after a judgment was made that particular employees should be terminated for incompetence. I discussed this with Kelli Boyer.

7) Counterpart subsidized various activities by members of its Board of Directors when those members visited countries in which Counterpart had ongoing projects. I met one member and spouse during travels to Turkmenistan. In my subsequent trips to the country I realized that there was an ongoing relationship between the Board members and the staff in Turkmenistan to purchase and ship carpets to the Board member. I was told by the staff in Turkmenistan that they would have carpets brought to the office and then take digital photographs and send them by email to the Board member for review. When carpets were selected, the staff in Turkmenistan would arrange through the carpet seller payment and shipping. This was an obvious abuse of US Government funds which was supposed to be for the support of the staff and operations in Turkmenistan. I was also aware of Arlene Lear's use of her trips to the Central Asia region to stop in Paris. Ms. Lear always used airlines of her choice even though the USAID Contracting Officer required the use of US airline and official ticketing partners, in this case Northwest/KLM, because it was convenient for her stops in Paris and collection of frequent flyer miles. I pointed out several times the memo from the USAID Officer but she continued to use airlines of her choice. I would guess that the stops in Paris also increased the costs of tickets for her trips to Central Asia.



**COUNTERPART**

*COUNTERPART*
**Program of Civil Society and NGO Development in the
Central Asia Region**


International Center
for Not-for-Profit Law

11 A Donskaya Street, Mirzo Ulugbek District,
Tashkent 700077, Uzbekistan
Tel: (99871) 169-16-13/14/15/17; Fax: (99871) 1691641
E-mail: office@cpart.uz

EXHIBIT
#33
Plaintiff's

**To:** Jay Cooper, Regional Director, Counterpart CAR
**From:** Counterpart Uzbekistan staff
**Date:** Feb-25, 2003
**Subject:** Results of collaboration with CAIP project implemented by CHF International
and Counterpart International.

One of main problems that can be determined is that there was no and there is still no any written agreement between Counterpart Uzbekistan and CAIP program implemented by CHF International and Counterpart International. And this was a cause for our relations to be established in stressful conditions, because all tasks were formed mostly orally and not supported by written contracts or agreements. Changes in these tasks were also made in a quick and unpredictable manner from a side of Michael Kunz, Deputy Chief of Party, CAIP Uzbekistan.

We hoped that in the closest future our relations would be clarified and written agreement with a description of both sides' obligations signed. Nevertheless, situation didn't change even few months after the CAIP program started in July 2002. Tasks continued to be issued and delivered to Counterpart Uzbekistan chaotically and mainly had slight connection to a work plan that was developed by Shahnoza Muminova, Training Coordinator of CAIP program. Role of Counterpart Uzbekistan in CAIP program was not clearly defined.

At one of meetings in December 2002 of Counterpart HUB managers (Soroush, Azam, Dina, Khamid) with Michael Kunz there was a proposition made to Michael Kunz to organize our work based on task orders. He agreed to this. But, still not a single task order is received.

Out of experience of Lyudmila Tolpegina, Training Coordinator, Counterpart Uzbekistan following points can be mentioned here:

1) During one month Lyudmila was working on developing a cover sheet and dividers for 2 training modules under coordination of Michael Kunz. After a work was finished Michael said that CHF has different standards that differ from what she has been working on. And he recommended re-developing a coversheet. He accepted format of dividers, but in a month he came back and said that dividers also need to be changed.

2) Lyudmila mentioned several times that Michael doesn't give clear tasks. But all of them often appear to be urgent ones. He leaves those tasks right before his trips to Almaty or fields and is not available for consultations or clarifications. He visits Almaty very often.

3) Michael doesn't reply to requests from Shahnoza (CAIP training coordinator) about who is responsible for supervision of CAIP program while he is away. The only way for Shahnoza out of those situations is to take over responsibility and in order for the whole program not to fail she has to appoint trainers for different trainings going on throughout south of the Republic of Uzbekistan. And of course she waits for Michael for signing contracts with those trainers. But, when he is back he starts shouting on Shahnoza,

Counterpart Consortium's activities in Central Asia are supported by the
**U.S. Agency for International Development** and other donors


USAID

000049

Lyudmila, and HUB management's team that he is a supervisor of this program and why those trainers appointed and working with contracts signed by him.

4) Then, he makes decisions on firing well-educated trainers without proper reasons. For example, Shahzoda from Samarkand. For family reasons Shahzoda was forced to go back to Samarkand. And according to her contract Shahzoda (a trainer), informed Shahnoza (CAIP Training Coordinator), about this in advance. Shahnoza made a replacement of that trainer, but couldn't inform Michael because he switched off his mobile at 5.00 p.m. on Friday. Michael always switches off his mobile for the whole weekend and it is impossible to reach him while there is no break for weekend in training modules which are going on in the south of Uzbekistan (92 trainings within 3 months).

Out of experience of Dildora Amirkulova, Director of "Umid" NGO's affiliate in Kashkadarya Oblast, Counterpart Uzbekistan following points can be mentioned here:

1) Her organization served as a Resource Center in Kashkadarya Oblast for CAIP program from the very beginning. In December 2002 her organization was chosen as CHF's Resource Center in Kashkadarya Oblast. She was promised that a written agreement would be signed. But still there is no any agreement signed and her organization works for CAIP program on voluntary basis.

2) When she didn't agree to accept Michael's proposition on trainer fee level for her trainer services, Michael said to CHF representatives in a very rude manner: "Sack her!"

3) An enormous amount of trainings within a short time frame leads to reducing quality of those trainings. Trainers are not motivated by anything but money. Participation of trainings is very weak since participants are not interested and motivated. They are often taken out of cotton and potato fields. Michael several times promised to make an increase in payment levels, but never did. Most of trainers are on the edge and going to resign. Because of strict schedule, trainers have to cancel their participation in other events like conferences, seminars, etc. Their private lives suffer. Trainers keep silence in front of CHF representative, because they are afraid that CHF facilitators will be fired and will lose their only source of income. There was a precedent when CHF facilitator was fired only because Khokimiyat representative didn't come for a training.

4) Azerbaijani module of a training, which served as a basis for CAIP Module III, is not applicable for Uzbekistan environment. As an example, one of participants' opinions can be given: "Are you mocking at us?"

5) In January trainers proposed to make some amendments in CAIP program, but Michael didn't agree and moreover he shouted over those trainers.

While conducting OD consultancy in Kashkadarya Oblast for "Umid" NGO, Main Branch, in Samarkand Bobur Turdiev, CO Coordinator in Counterpart HUB Office, met with NGOs and trainers and found out that:

1)    Michael doesn't listen to trainers at all, doesn't take into account their opinions, and shows no respect for their rights.

2)    Michael replaces well-educated trainers with very weak ones.

Zoya Salieva, Manager of Boukhara CSSC, expressed a very solid opinion that long-term efforts of Counterpart's team to establish high standards for Counterpart's training program were brought to almost zero level due to CAIP training program. Quality of trainings provided by CAIP program falls from one training to a next one due to unreasonable strict schedule.

Out of Counterpart HUB management team's experience it is possible to add following:

1) Michael offers a Counterpart car for his private purposes with an explanation that those trips are business related. When Oxana, Office Manager of Counterpart, said that unfortunately there are no cars available in the evening time and recommended him to take a taxi, Michael started to shout on her claiming that he is Deputy Chief of Party and Counterpart is supposed to assist him. Oxana hung on a receiver. Later this evening when Valeriy, a driver of Counterpart HUB office, was at the airport he saw Michael meeting his girlfriend from Almaty.

2) Michael several times didn't come for appointed meetings with HUB managers.

3) Michael made Oxana buy airplane tickets to Thailand for his private vacation trip with a girlfriend. Oxana agreed to help, but said that there is no cash available in a safe because it is late Friday and a request was not made in advance. Next Monday prices for airplane tickets were gone up a little bit, Michael called Oxana and started shouting on her that now he loses his personal money because of her fault. Michael kept calling and writing her several times a day asking for tickets and remaining R&R funds allowed for his vacation. At the evening Oxana cried and almost was in hysteria.

Above-mentioned facts were gathered and put in writing within 4 hours. Should there be any additional information required, further investigation can be implemented.

To: Dina Muhamadieva, Program Director Counterpart/ Uzbekistan

From: Shakhnoza Muminova, Training Coordinator, Counterpart/ CAIP

Date: February 25, 2003

Subject: CAIP Fact sheet

During the trip in Termez city for preparation for visit of USA Ambassador, all the CAIP employees stayed in a hotel, where Ambassador and his family stayed too.

Very late night, M. Kunz, being very drunk, made a noisy scandal with administration of the hotel. All the employees and security of the Ambassador came because of the noise.

I had to give explanations, because M. Kunz was in a deranged state. When few days after this incident was discussed in the embassy and CAIP administration, M. Kunz accused me of creating negative atmosphere amongst collective.

II. When discussing Module III I have many times raised the issue of formalizing contracts with developers of the Module. I got clear and detailed answers (regarding procedure of signing contract, pricing for development of module, etc.) to all of my questions from Coordinator of Counterpart Consortium.

I submitted this data to M. Kunz for coordination on 16th of October 2002. During the following five working days, I several times raised the matter of signing contracts with Module developers again, but Mr. Kunz found no time to confirm the final version of the contract.

000052

After this, on 22nd of October, he left for a business trip to Almaty, having ordered me to begin module development in his absence. He promised to sign the contracts on his coming back (in two days). During his 7 days of absence (from 22nd till 29th of October) the work was done. But during next two months M.Kunz refused signing the contract, opposing to the pricing of work, daily allowance, etc. Contract was signed on New Year's Eve, whereby M. Kunz accused me of not keeping to the procedure of preliminary discussing and signing of the contracts.

III. On 15th October 2002 selection process of NGO partners for CAIP program began. A detailed plan with collaboration of Counterpart expert (who helped on voluntary basis) was made. According to the plan, one of the first steps was placing advertisements about the competition in the central newspapers. The plan was approved by the CAIP director and verbally confirmed to be executed. Control of its timely execution was delegated to me (21st of October 2002). After this, CAIP management left for a business trip (Please see para II), having left me a strict order to keep to deadlines of the plan. Neither was I delegated powers on making decisions nor was I given any contact details (telephones, addresses) to contact M. Kunz in Almaty,

As a result, a necessity of urgent payment for advertisements in the newspapers arose.

I did not have powers to give permission to pay, neither had I right to omit or postpone execution of this step. Having no possibility to contact M.Kunz, I had to give permission for the best of interests of the program for reaching the aim by the set deadlines.

000053

2

As a result, after his coming back, M. Kunz using insulting language accused me and employees of Counterpart in exceeding powers.

The whole NGO partners' selection process (mentioned in Para III), implied contract based participation of Counterpart Consortium. Due to different reasons, agreement between Counterpart and CHF was not reached, and my colleagues from Counterpart informed me accordingly. M.Kunz noted that judging to all appearances this process would be stopped.

At the same time I was not discharged of the responsibilities of execution of developed plan. When asked by the director of the program at which stage the process is, my response was that I did not know what to do next. As a result of this, M.Kunz accused me of being incapable to take decisions and (literally) in "having no brains in head" in presence of other program employees.

Furthermore, because time was lost, the plan had to be and was successfully fulfilled till the end due to tremendous efforts and intensive work of Counterpart employees.

V. In the beginning of October 2002, Training Coordinator of Counterpart and I were charged with a task to develop and issue CAIP training materials in the presentation format.

A plan for fulfilling this task was prepared by us. M.Kunz accepted a responsibility to write 3 sections of these publications.

The rest of the sections were prepared on time. Moreover, M.Kunz was given draft versions of those three sections.

000054

3

During the following four months M. Kunz constantly made new corrections in the design of the publication again and again, whist not submitting his three sections. All this time all employees of the Counterpart Consortium including me were accused of not having the final product ready, and being incapable of working.

VI. Keeping the situation, which is described in Para II, in mind I prepared the contracts for trainers before beginning the next series of the training. It had to begin in February 2003. During verbal discussion of contractual terms, M.Kunz said that the honorarium for beginning trainers must be lower than that for those more experienced. We agreed at the sum of 10 USD as honoraria of beginning trainers. Also two more points were made, that is:

1) The contracts have to be made only in English language;
2) The contracts will be signed during T.O.T, because it is the only possibility to meet all the trainers and speak with all of them individually.

For that matter M.Kunz came to T.O.T. in Termez city in the end of the third day of the seminar (three days long seminar).

On his arrival, I submitted the prepared contracts for all trainers to him, including those for new trainers.

M.Kunz would not sign the new contracts; his argument being that the honoraria for the new trainers was too high and had not been agreed with him.

In response to this, I submitted him blank headed papers where he himself wrote honoraria for the new trainers as

000055

4

said that Counterpart employees again did not keep up with the procedures of preliminary preparation of contracts and that the contracts must be made in Russian language. (Unfortunately, this letter was lost during car accident on 10th of February of 2003).

When I suggested to M.Kunz to discuss the contractual terms with new trainers individually, because they might not agree to the offered honoraria, and we might have difficulties in case we would have to replace the trainers and involve freshmen in the course of the program, he replied that he was not going to discuss anything with anybody and if somebody does not agree to work on our (his) conditions then he would not listen to any second offers. At this point the conversation stopped and M.Kunz left to Tashkent.

At the same time, work on provision of logistics during trainings (provision of transport, accommodation, etc) was undertaken.

There were regular warnings to save money on these items of the budget. Private car owners and taxi drivers would not agree to work for the offered payment. POC manager CHF and I were responsible for logistics. Seeing our difficulties, one of new trainers offered his help for saving purposes; he helped to find accommodation in Denau city, cars for minimal payment, including his own. Because we had no choice, funds, and time we had to agree to accept his assistance.

All the team of trainers left for trainers to Denau city.

000056

On the 8th of February 2003, it was discovered that for the next training (12-14 February) we would have to replace one of the trainers, who unexpectedly received news about urgent private business.

As this happened on Saturday, I could not contact M.Kunz and warn him about it, and that is why I took a responsibility of replacing of trainer, not to break the very intensive schedule.

Since Islamkulov Shavkat, who offered us his help, was on of the most able new trainers, I requested him do the training, as only in this case there would be no worries about the qualities of the training. He did not agree to the offered payment but in order not to let us all down he offered to do his first training without payment.

On 10th of February, in the morning, I contacted M.Kunz and described the situation I stressed that this trainer would be one of our strong prospective trainers, and that for the time being I could not trust anybody else, and that in this case it was worth to negotiate the contract with him individually. M. Kunz refused again.

On completion of the training we were on the way to the Termez city in Sh. Islamkulov's car.

On that day Islamkulov worked in the training and was tired. Besides, he was nervous about of the contract and M.Kunz's attitude to him after all that he (Shavkat) had done for us. Namely this tension brought to loss of his vigilance on the road and his death, and traumas of the rest of the passengers (two more trainers of CAIP and me).

000057

6

Shavkat Islamkulov died during car crash whilst fulfilling unpaid tasks of CAIP.

VII. After this tragedy, M.Kunz did not consider it necessary to postpone the training program and involved new people in the training work, who have not undergone necessary stages of preparation (again without discussing or asking their agreement to the offered terms).

The consequences:
1) All trainers after the tragedy worked on the edge of nervous breakdown, because they did not have even one day to recover from shock.
2) Trainers, who had contract with CAIP, did double workload, because the trainers, who were their partners, were not ready to do the most complicated module.
3) Trainers (new) worked several days in other towns and they cannot even get daily allowance for being out of home, because they have got no contracts.
4) New trainers, who never tried their powers before, got serious complexes as they could not manage the task, with which they were charged (in essence, it was unmanageable).
5) One of the of the most experienced trainers of CAIP and Counterpart Consortium was unjustfully dismissed, for "unauthorized absence without 5 days prior warning ". The fact that Saturday and Sunday were working days for trainers and me did not bear any importance for M.Kunz.

000058

Obviously, all these consequences influenced on the quality of trainings and were extremely detrimental to the moral climate and attitude of team of trainers to CAIP on the whole.

VIII. M.Kunz made a contract with me from 15th of July 2002 till 31st of December 2002. Beginning from mid-December I several times verbally reminded and wrote to him about running out of my contract and necessity of review (inclusion of new articles of responsibilities and powers, contents of work, and terms of payment, etc.)

I did not get any reply to my written requests. The response to my verbal requests was that he always agreed that it was necessary to formalize a contract, but never found time for it, although I several times brought him draft versions for correction.

Moreover, I still do not have description of my functional responsibilities, although draft versions were submitted by me in both electronic and hard formats.

To the question about my powers I got answer: " You have many duties and few powers". No answer was given to the question who my supervisor is when M.Kunz is absent. No answer was given to the question of who is empowered to take responsible decisions in unexpectedly arising problematic situations. A request to M.Kunz to put my tasks in written or electronic format (with a view of avoidance of misunderstanding) resulted in unequivocal refusal by him and a threat to dismiss me.

I confirm that all the information given above is true and objective.

000059

000060

9

**From:** Jay Cooper
**Sent:** Tuesday, April 08, 2003 6:14 PM
**To:** Arlene Lear
**Subject:** FW: CAIP Issues

Dear Arlene,

As I read through this string of messages I get angry, frustrated and sick.. The way Michael has treated our staff is beyond forgiveness. I really feel that we need to end any relationship between CAIP and Counterpart Uzbekistan.

I really hope that you open your eyes when you review this string of messages.

Best, Jay

-----Original Message-----
**From:** Soroush [mailto:soroush@cpart.uz]
**Sent:** Friday, February 28, 2003 6:54 PM
**To:** Jay Cooper
**Subject:** FW: CAIP Issues

Hi Jay,

As promised here is the email correspondence regarding Akmal's work on partner assessment. He only did the planning but you will notice Michael's tone of asking questions and criticizing Akmal for not providing 'proper' answers. Highlights (bold) have been added by me.

Best,

Soroush

*********************************

-----Original Message-----
**From:** Soroush [mailto:soroush@cpart.uz]
**Sent:** Tuesday, November 05, 2002 6:21 PM
**To:** Michael Kunz
**Cc:** Shakhnoza; Akmal Roustamov; Azam Babahodjaev; Dina Mukhamadieva
**Subject:** RE: CAIP Issues



EXHIBIT
#35
Plaintiff's

000255

I returned from Samarkand last night but was busy all day taking care of our Irish trainers to call you. Azam and I met with Akmal to discuss the planned OD work on CAIP – the main issue was the workload. Akmal is currently very busy with the new Civic Advocacy program and he also has to complete 4 full assessments in November. When he agreed to do the work plan it was on the understanding that this was part of the negotiation process and agreeing a contract. As you know has already worked on the selection criteria, RFA and announcement and as yet we have no contract. **I note that some of you queries below sound as if we have already agreed to implement the project and so we should know details of the activities suggested in the plan.** I hope we reach agreement as soon as possible because we can then identify and assign appropriate people to work on the project. Akmal has been only helping with planning and some start up work and he will not be able to continue working without the necessary support people.

Perhaps we could discuss this over the phone or meet sometime soon.

Best,

Soroush

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

-----Original Message-----
**From:** Akmal Roustamov [mailto:akmal@cpart.uz]
**Sent:** Tuesday, November 05, 2002 12:24 PM
**To:** Soroush Javadi; Azam Babakhodjaev
**Subject:** CAIP Issues
**Importance:** High

Dear Soroush and Azam,

I have several questions concerning CAIP to discuss with you before responding to Michael.

Can we meet today at 13:15? What time is suitable for you?

Thanks,

Akmal

----- Original Message -----

**From:** MICHAEL KUNZ

**To:** Shakhnoza ; Akmal Roustamov

**Cc:** Soroush Javadi ; Dina Mukhamadieva

**Sent:** Tuesday, November 05, 2002 11:21 AM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Let Counterpart Organize this. Let's have the review here. Ask Matt when he will be in town. Do people need to be physically present? Who does Counterpart want to replace Dina (Azam or Soroush would be fine)? **Who is in charge of this project from Counterpart????**

It appears so me that you are ...and I object strongly.

----- Original Message -----

**From:** Shakhnoza

**To:** MICHAEL KUNZ ; Akmal Roustamov

**Cc:** Soroush Javadi ; Dina Mukhamadieva

**Sent:** Tuesday, November 05, 2002 11:00 AM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Michael,

Our next step should be Initial Shortlisting of Partner Candidates by Documents, and we should begin this process next week. But we do not have much candidates applied (only 15 for both regions), and that is why we can move to the next step, it is Scoring of candidates by panel. List of participants is below:

1. Chris

2. Michael

3. Dina

4. Matt

5. Oybek

6. Izzet

7. Shakhnoza

8. Akmal

9. Nargiza

For now we have to begin preparation to this process, like copy all Letters of Interest and Scoring Cards for all participants of scoring, and sending these documents to everybody 2 or 3 days before panel. The place could be Counterpart or CHF office, doesn't matter. We just need to decide about the place, date, and who will replace Dina as she is in her vacation these days (maybe Soroush or Azam?). Let's discuss all these questions, and I will begin to prepare what necessary.

Thanks,

Shakhnoza

----- Original Message -----

**From:** MICHAEL KUNZ

**To:** Shakhnoza ; Akmal Roustamov

**Cc:** Soroush Javadi ; Dina Mukhamadieva

**Sent:** Tuesday, November 05, 2002 9:26 AM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

As counterpart is organizing this, I'd like to know times, dates places. If this is too much trouble, I strongly recommend we cancel this project immediately.

----- Original Message -----

**From:** Shakhnoza

**To:** MICHAEL KUNZ ; Akmal Roustamov

**Cc:** Soroush Javadi ; Dina Mukhamadieva

**Sent:** Monday, November 04, 2002 6:32 PM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Dear Michael,

We couldn't finish our discussion today, because I was busy with trainer, and that is why I didn't have a chance to explain next steps in selection process.it was in my list of questions need to be considered with you. Let's continue our conversation tomorrow (or when possible) and I will tell

you about all details in our plane (based on Counterpart policy&experience), because Akmal already explained me everything as I am responsible for coordination of this process.

Thanks,

Shakhnoza

----- Original Message -----

**From:** MICHAEL KUNZ

**To:** Akmal Roustamov

**Cc:** shakhnoza ; Soroush Javadi ; Dina Mukhamadieva

**Sent:** Monday, November 04, 2002 5:10 PM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

THat's the plan. **I'd like to know the reality. When where with whom??? Nobody is going to majically appear at an office and know what to do unless they get instructions. THe members of the panel don't read the work plan. The work plan doesn't say where the meeting will take place. Or how panelists should evaluate / participate.**

Michael

----- Original Message -----

**From:** Akmal Roustamov

**To:** MICHAEL KUNZ

**Cc:** shakhnoza ; Soroush Javadi ; Dina Mukhamadieva

**Sent:** Monday, November 04, 2002 4:46 PM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Dear Michael,

Please see the Action Plan I sent you on Octobe 18. There you can find tasks, dates and participants of selection panel.

Best,

Akmal

----- Original Message -----

**From:** MICHAEL KUNZ

**To:** Akmal Roustamov

**Cc:** shakhnoza ; Soroush Javadi ; Dina Mukhamadieva

**Sent:** Monday, November 04, 2002 3:45 PM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Akmal,

When will the panel meet? Who will participate? What should the panelist do to prepare for the meeting?

Michael


----- Original Message -----

**From:** Akmal Roustamov

**To:** MICHAEL KUNZ

**Cc:** shakhnoza ; Soroush Javadi ; Dina Mukhamadieva

**Sent:** Monday, November 04, 2002 3:17 PM

**Subject:** Re: Revised versions of CDC Partner Assessment Documents

Dear Michael,

Thank you for making changes in the documents.

Next steps will be in accordance with Action Plan I sent before. In other words, once you receive all the appications, there will be selection of NGOs by panel consisting of people from CAIP/CHF and Counterpart.

If you have any other questions, please let me know.

Best,

Akmal

----- Original Message -----

**From:** MICHAEL KUNZ

**Subject:** FW: Rescind Policy - Grievance Procedure
**From:** "Jay Cooper" <jay.cooper@yahoo.com>
**Date:** Sat, 3 Dec 2005 06:47:24 -0800
**To:** "Pat Douglass" <pdouglass@cox.net>

**From:** Kelli Boyer [mailto:kboyer@counterpart.org]
**Sent:** Wednesday, October 06, 2004 5:09 AM
**To:** Headquarters Staff
**Cc:** Ahmadou NDiade; Austin Bowden-Kerby; Dale Dunivan; David Smith; Henri Paul Bolap; Hugh Orozco; Jay Cooper; Meriel Rhodes; Phillip Fine; Ramine Bahrambegi; Tilly Reed; Victor Pinga; William Van De Berg
**Subject:** Rescind Policy - Grievance Procedure

Please remove the Grievance Procedure from your handbook. It is redundant because Counterpart has an Open Door Policy.

Thanks

Kelli


Kelli D Boyer, PHR
Manager, Human Resources
Counterpart International, Inc.
1200 18th Street NW, Suite 1100
Washington, DC 20036
202.296.9676
202.296.3188 FAX
kboyer@counterpart.org
www.counterpart.org



EXHIBIT
#37
Plaintiff's

000230

**From:** Kelli Boyer [kboyer@counterpart.org]

**Sent:** Wednesday, October 06, 2004 9:08 AM

**To:** David Smith; Headquarters Staff

**Cc:** Ahmadou NDiade; Austin Bowden-Kerby; Dale Dunivan; Henri Paul Bolap; Hugh Orozco; Jay Cooper; Meriel Rhodes; Phillip Fine; Ramine Bahrambegi; Tilly Reed; Victor Pinga; William Van De Berg

**Subject:** RE: Rescind Policy - Grievance Procedure

**All,**

**Below is the Open Door Policy as taken from our employee manual:**

1.4    Open Door Policy

Counterpart expects its employees to communicate openly and fairly with the organization. Counterpart urges employees to talk freely with their supervisors or any other manager about any aspect of their work or any concern about employment. One is also free to offer suggestions for improvements.

---

**From:** David Smith
**Sent:** Wednesday, October 06, 2004 9:00 AM
**To:** Kelli Boyer; Headquarters Staff
**Cc:** Ahmadou NDiade; 'Austin Bowden-Kerby'; Dale Dunivan; Henri Paul Bolap; Hugh Orozco; Jay Cooper; Meriel Rhodes; Phillip Fine; Ramine Bahrambegi; Tilly Reed; Victor Pinga; William Van De Berg
**Subject:** RE: Rescind Policy - Grievance Procedure

What IS an Open Door policy?

DAS

David A. Smith, Program Director
Civic Advocacy Support Program
Counterpart International
11A Donskaya Street
Tashkent, Uzbekistan 700000
Telephone:
 office: 998-71-1691613/4/5/7
 mobile: 998-90-1082061
 home: 998-71-1691911
 fax: 998-71-1691641
E-mail:
 david@cpart.uz
 dsmith3184@aol.com
www.uzbekadvocacy.org

-----Original Message-----
**From:** Kelli Boyer [mailto:kboyer@counterpart.org]

000231

10/11/2005

**Sent:** Wednesday, October 06, 2004 5:09 PM
**To:** Headquarters Staff
**Cc:** Ahmadou NDiade; Austin Bowden-Kerby; Dale Dunivan; David Smith; Henri Paul Bolap; Hugh Orozco; Jay Cooper; Meriel Rhodes; Phillip Fine; Ramine Bahrambegi; Tilly Reed; Victor Pinga; William Van De Berg
**Subject:** Rescind Policy - Grievance Procedure

Please remove the Grievance Procedure from your handbook.  It is redundant because Counterpart has an Open Door Policy.

Thanks

Kelli


Kelli D Boyer, PHR
Manager, Human Resources
Counterpart International, Inc.
1200 18th Street NW, Suite 1100
Washington, DC 20036
202.296.9676
202.296.3188 FAX
kboyer@counterpart.org
www.counterpart.org

000232

Original Message-----
From: Lelei LeLaulu [mailto:lelei@counterpart.org]
Sent: Saturday, October 23, 2004 8:53 PM
To: Worldwide CPI Staff
Cc: Board and IAC; FSPI
Subject: Draft SMT notes Oct 19, es

Senior Management Team
Weekly meeting
NOT AN OFFICIAL RECORD
 Draft Minutes
October 19, 2004


In Attendance: Lelei LeLaulu, Bryant George, Harry Dorcus, Dick Drolet,
Raymond Chavez, Elizabeth Moore, Andrea Ratzloff, Sam Jones, Grace
Jones,
Adrin Ngassi, Thoric Cederstrom, Rob Gustafson, Sergiy Zghilov, Arthur
Lovelace, Kelli Boyer

Sofia-Bulgaria
Currently, Arlene Lear, Don Feil, and Katherine Schad are in Bulgaria
for
the Grantmakers East Conference and a Counterpart Bulgaria meeting.
This is
an opportunity for Counterpart to interact with the branch of the
European
Foundations Centre which focuses on funding to Eastern Europe

Food Security
The Food Security and Sustainable Agriculture Division boasts two new
members.  Grace Jones, coming to us from the Forest Gardens Program in
Guatemala as a Mickey Leland Hunger Fellow, will be backstopping the
Guatemala program, developing training materials to increase the number
and
location of the programs, and develop an HIV/AIDS response component as
well.  Adrian Ngassi, a new Program Officer, will be backstopping the
Senegal Office and brings a wealth of Title II experience with
ACDI/VOCA and
a whole breadth of experiences in agriculture, microfinance, and GSI.


Thoric recently returned from a trip to Iowa, where he had the
opportunity
to both present Counterpart to students at Iowa State University as
well as
attend the World Food Prize Symposium in Des Moines.  Iowa State has a
strong sustainable agriculture program, including opportunities for
students
in Ghana and Uganda, so we have a number of opportunities to work with
them
in sustainable agriculture and HIV/AIDS programs.
The World Food Prize  Symposium, championed as the Nobel Prize of
Hunger
Issues and Agricultural Development, was a very prestigious affair,
with a
$250,000 prize.



Lelei LeLaulu and Thoric would like to see an event of similar prestige

Counterpart has a policy which covers the medical evacuation of both ex-pats
and traveling staff if medical emergencies arise.  In order to ensure that
everyone eligible for that assistance has appropriate access to the
information they need, program officers will send out the cards and
information to the appropriate field staff.  Furthermore, Kelli Boyer will
be sending out an email to all staff reminding them to get the information
before they leave on trips to the field.  Arthur Lovelace also stated that
the Medex customer service representatives will be glad to give a
presentation to the staff on the services provided at a time most convenient
to all.

Grievance Policy
A recent policy change which replaced the grievance policy with the open
door policy left PMT concerned with the potential oversight of stating
rights of employees.  This includes the issues of confidentiality, no
detailed guidance in how or where to go if immediate superior is not
approachable, no instructions in how to resolve disputes, and no option for
written grievances.  While Counterpart does actively pursue an environment
that allows the open door policy to work, both SMT and PMT agree that it is
important to draft necessary language to protect particular rights.  Lelei
encouraged PMT to draft the language, which will be incorporated into the
official Open Door Policy.

FSPI-AGM
The Foundation for the People's of the South Pacific International is having
their Annual General Meeting next week in Fiji, which Lelei will be
attending as the Chairman of FSPI.  He will also have the opportunity to
meet with a variety of donors in New Zealand on the trip.


Week's Issuances

        INTERNATIONAL CRISIS GROUP - NEW REPORT - Armenia: Internal
Instability Ahead
<http://www.counterpart.org/dnn/Default.aspx?tabid=49&metaid=EBIO1215-fd6>
October, 18 2004
Yerevan/Brussels, 18 October 2004: Armenia's stability is fragile. Its war
with Azerbaijan could easily reignite, and its departure from democratic
standards generates domestic unrest.

# Office of Management and Budget

Click to Print
this document

## CIRCULAR NO. A-122
**Revised**

TO THE HEADS OF EXECUTIVE DEPARTMENTS AND
ESTABLISHMENTS

SUBJECT: Cost Principles for Non-Profit Organizations

1. **Purpose.** This Circular establishes principles for determining costs of grants,
contracts and other agreements with non-profit organizations. It does not apply to
colleges and universities which are covered by Office of Management and Budget
(OMB) Circular A-21, "Cost Principles for Educational Institutions"; State, local,
and federally-recognized Indian tribal governments which are covered by OMB
Circular A-87, "Cost Principles for State, Local, and Indian Tribal Governments";
or hospitals. The principles are designed to provide that the Federal Government
bear its fair share of costs except where restricted or prohibited by law. The
principles do not attempt to prescribe the extent of cost sharing or matching on
grants, contracts, or other agreements. However, such cost sharing or matching
shall not be accomplished through arbitrary limitations on individual cost
elements by Federal agencies. Provision for profit or other increment above cost
is outside the scope of this Circular.

2. **Supersession**. This Circular supersedes cost principles issued by individual
agencies for non-profit organizations.

3. **Applicability.**

    a. These principles shall be used by all Federal agencies in determining the
costs of work performed by non-profit organizations under grants, cooperative
agreements, cost reimbursement contracts, and other contracts in which costs are



EXHIBIT
41
8/29/06

f. Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period.

g. Be adequately documented.

3. **Reasonable costs**. A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs. The question of the reasonableness of specific costs must be scrutinized with particular care in connection with organizations or separate divisions thereof which receive the preponderance of their support from awards made by Federal agencies. In determining the reasonableness of a given cost, consideration shall be given to:

a. Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award.

b. The restraints or requirements imposed by such factors as generally accepted sound business practices, arms length bargaining, Federal and State laws and regulations, and terms and conditions of the award.

c. Whether the individuals concerned acted with prudence in the circumstances, considering their responsibilities to the organization, its members, employees, and clients, the public at large, and the Federal Government.

d. Significant deviations from the established practices of the organization which may unjustifiably increase the award costs. >dd>

4. **Allocable costs**.

a. A cost is allocable to a particular cost objective, such as a grant, contract, project, service, or other activity, in accordance with the relative benefits received. A cost is allocable to a Federal award if it is treated consistently with other costs incurred for the same purpose in like circumstances and if it:

(1) Is incurred specifically for the award.

(2) Benefits both the award and other work and can be distributed in reasonable proportion to the benefits received, or

(3) Is necessary to the overall operation of the organization, although a direct relationship to any particular cost objective cannot be shown.

b. Any cost allocable to a particular award or other cost objective under these principles may not be shifted to other Federal awards to overcome funding deficiencies, or to avoid restrictions imposed by law or by the terms of the award.

## 5. Applicable credits.

a. The term applicable credits refers to those receipts, or reduction of expenditures which operate to offset or reduce expense items that are allocable to awards as direct or indirect costs. Typical examples of such transactions are: purchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds, and adjustments of overpayments or erroneous charges. To the extent that such credits accruing or received by the organization relate to allowable cost, they shall be credited to the Federal Government either as a cost reduction or cash refund, as appropriate.

b. In some instances, the amounts received from the Federal Government to finance organizational activities or service operations should be treated as applicable credits. Specifically, the concept of netting such credit items against related expenditures should be applied by the organization in determining the rates or amounts to be charged to Federal awards for services rendered whenever the facilities or other resources used in providing such services have been financed directly, in whole or in part, by Federal funds.

c. For rules covering program income (i.e., gross income earned from federally-supported activities) see Sec. __.24 of Office of Management and Budget (OMB) Circular A-110, "Uniform Administrative Requirements for

accumulation of such costs into separate cost groupings which then are allocated individually to benefiting functions by means of a base which best measures the relative degree of benefit. The indirect costs allocated to each function are then distributed to individual awards and other activities included in that function by means of an indirect cost rate(s).

c. The determination of what constitutes an organization's major functions will depend on its purpose in being; the types of services it renders to the public, its clients, and its members; and the amount of effort it devotes to such activities as fundraising, public information and membership activities.

d. Specific methods for allocating indirect costs and computing indirect cost rates along with the conditions under which each method should be used are described in **subparagraphs 2 through 5.**

e. The base period for the allocation of indirect costs is the period in which such costs are incurred and accumulated for allocation to work performed in that period. The base period normally should coincide with the organization's fiscal year but, in any event, shall be so selected as to avoid inequities in the allocation of the costs.

2. **Simplified allocation method.**

a. Where an organization's major functions benefit from its indirect costs to approximately the same degree, the allocation of indirect costs may be accomplished by (i) separating the organization's total costs for the base period as either direct or indirect, and (ii) dividing the total allowable indirect costs (net of applicable credits) by an equitable distribution base. The result of this process is an indirect cost rate which is used to distribute indirect costs to individual awards. The rate should be expressed as the percentage which the total amount of allowable indirect costs bears to the base selected. This method should also be used where an organization has only one major function encompassing a number of individual projects or activities, and may be used where the level of Federal awards to an organization is relatively small.

b. Both the direct costs and the indirect costs shall exclude capital expenditures and unallowable costs. However, unallowable costs which represent activities must be included in the direct costs under the conditions described in **subparagraph B.3**.

c. The distribution base may be total direct costs (excluding capital expenditures and other distorting items, such as major subcontracts or subgrants), direct salaries and wages, or other base which results in an equitable distribution. The distribution base shall generally exclude participant support costs as defined in **paragraph 34 of Attachment B**.

d. Except where a special rate(s) is required in accordance with **subparagraph 5**, the indirect cost rate developed under the above principles is applicable to all awards at the organization. If a special rate(s) is required, appropriate modifications shall be made in order to develop the special rate(s).

e. For an organization that receives more than $10 million in Federal funding of direct costs in a fiscal year, a breakout of the indirect cost component into two broad categories, Facilities and Administration as defined in **subparagraph C.3**, is required. The rate in each case shall be stated as the percentage which the amount of the particular indirect cost category (i.e., Facilities or Administration) is of the distribution base identified with that category.

## 3. Multiple allocation base method

a. General. Where an organization's indirect costs benefit its major functions in varying degrees, indirect costs shall be accumulated into separate cost groupings, as described in **subparagraph b**. Each grouping shall then be allocated individually to benefitting functions by means of a base which best measures the relative benefits. The default allocation bases by cost pool are described in **subparagraph c**.

b. Identification of indirect costs. Cost groupings shall be established so as to permit the allocation of each grouping on the basis of benefits provided to the

## COUNTERPART CSSI PROGRAM BUDGET

| **Full Program** | **LOP** |
|---|---|
| Program | 3,064,161 |
| Partners | 1,724,191 |
| SubAwards (Grants) | 3,904,047 |
| Indirect | 1,363,638 |
| **Total USAID** | **10,056,036** |
| Cost Sharing | 1,500,000 |
| **TOTAL PROGRAM** | **11,556,036** |

### By Country Allocation

| **Kazakhstan** | **LOP** |
|---|---|
| Program | 1,083,054 |
| Partners | 624,658 |
| SubAwards (Grants) | 1,397,191 |
| Indirect | 496,069 |
| Total USAID | 3,600,971 |
| Cost Sharing | 537,000 |
| **TOTAL PROGRAM** | **4,137,971** |

| **Kyrgyzstan** | **LOP** |
|---|---|
| Program | 1,016,244 |
| Partners | 786,218 |
| SubAwards (Grants) | 1,302,960 |
| Indirect | 470,114 |
| Total USAID | 3,575,536 |
| Cost Sharing | 534,000 |
| **TOTAL PROGRAM** | **4,109,536** |

| **Turkmenistan** | **LOP** |
|---|---|
| Program | 964,863 |
| Partners | 313,315 |
| SubAwards (Grants) | 1,203,896 |
| Indirect | 397,455 |
| Total USAID | 2,879,529 |
| Cost Sharing | 429,000 |
| **TOTAL PROGRAM** | **3,308,529** |



EXHIBIT

CP 1045

| Turkmenistan Hub | Year 1 | Year 2 | Year3 | LOP |
|---|---|---|---|---|
| A. SALARIES | 67,425 | 72,145 | 26,533 | 166,103 |
| B.FRINGE BENEFITS | 27,677 | 29,424 | 10,647 | 67,748 |
| C. TRAVEL | 4,000 | 4,500 | 3,000 | 11,500 |
| D. OTHER DIRECT COSTS | | | | |
| Consultants | 30,000 | 0 | 0 | 30,000 |
| Workshops | 9,730 | 11,930 | 2,030 | 23,690 |
| Operations | 65,588 | 65,842 | 39,977 | 171,406 |
| E. EQUIPMENT | 5,300 | 1,500 | 0 | 6,800 |
| **Subtotal Turkmenistan Hub Operations** | **209,720** | **185,340** | **82,187** | **477,247** |
| | | | | |
| **PARTNERS** | | | | |
| ICNL | 110,014 | 90,510 | 80,350 | 280,874 |
| Social Impact | 18,011 | 14,430 | 0 | 32,441 |
| **Subtotal Partners** | **128,025** | **104,940** | **80,350** | **313,315** |
| | | | | |
| **Subtotal Operations Turkmenistan** | **337,745** | **290,280** | **162,538** | **790,562** |
| | | | | |
| **Grants** | | | | |
| CI - Community Grants | 75,000 | 65,000 | 0 | 140,000 |
| CSSC Community Grants | 0 | 0 | 75,000 | 75,000 |
| Institutional Grants to Leading NGOs | 100,000 | 200,000 | 200,000 | 500,000 |
| Social Enterprise Recoverable Grants | 30,000 | | | 30,000 |
| **COMMUNITY GRANTS - Turkmenistan** | **205,000** | **265,000** | **275,000** | **745,000** |
| | | | | |
| CSSC Network Association (not including grants) | 0 | 0 | 178,896 | 178,896 |
| CI - Institutional Grants | 90,000 | 70,000 | 0 | 160,000 |
| CSSC - Institutional Grants | 0 | 0 | 120,000 | 120,000 |
| **INSTITUTIONAL GRANTS - Turkmenistan** | **90,000** | **70,000** | **298,896** | **458,896** |
| | | | | |
| **Turkmenistan Grants Subtotal** | **295,000** | **335,000** | **573,896** | **1,203,896** |
| | | | | |
| **TOTAL TURKMENISTAN** | **632,745** | **625,280** | **736,434** | **1,994,459** |
| All DC, Reg and Overhead | 283,399 | 349,588 | 252,084 | 885,071 |
| | | | | |
| **TOTAL Request COUNTERPART Turkmenistan** | **916,144** | **974,868** | **988,518** | **2,879,529** |

## Summary of COUNTERPART Regional and Headquarters Costs

| | Year 1 | Year 2 | Year3 | LOP |
|---|---|---|---|---|
| **REGIONAL ADMIN** | | | | |
| A. SALARIES | 193,930 | 219,275 | 84,952 | 498,157 |
| B.FRINGE BENEFITS | 135,030 | 150,365 | 62,574 | 347,969 |
| C. TRAVEL | 15,000 | 14,500 | 9,000 | 38,500 |
| D. OTHER DIRECT COSTS | | | | |
| Consultants | 11,000 | 0 | 0 | 11,000 |
| Workshops | 40,860 | 31,581 | 22,279 | 94,720 |
| Operations | 51,623 | 42,028 | 33,931 | 127,582 |
| E. EQUIPMENT | 15,787 | 1,289 | 798 | 17,874 |
| **Subtotal COUNTERPART Regional Admin** | **463,230** | **459,038** | **213,533** | **1,135,800** |
| | | | | |
| **Headquarters** | | | | |
| A. SALARIES | 89,250 | 95,498 | 102,182 | 286,930 |
| B.FRINGE BENEFITS | 29,453 | 31,514 | 33,720 | 94,687 |
| C. TRAVEL | 10,000 | 10,000 | 10,000 | 30,000 |
| D. OTHER DIRECT COSTS | | | | |
| Consultants - Short Term Tech Specialists | 15,000 | 0 | 8,500 | 23,500 |
| Operations | 32,000 | 32,000 | 32,000 | 96,000 |
| E. EQUIPMENT | 3,000 | 0 | 0 | 3,000 |
| **Subtotal COUNTERPART Headquarters** | **178,703** | **169,012** | **186,402** | **534,117** |

## IV. COUNTERPART REGIONAL COSTS

| A. SALARIES | | % Yr 1 | % Yr 2 | % Yr 3 | | | | |
|---|---|---|---|---|---|---|---|---|
| Chief of Party (Expat) | | 75% | 75% | 50% | 71,250 | 76,238 | 54,383 | 201,870 |
| Regional Financial Officer (Expat) | | 70% | 70% | 15% | 54,600 | 58,422 | 13,395 | 126,417 |
| Regional Senior Technical Advisor (Expat) | | 50% | 75% | 0% | 40,000 | 64,200 | 0 | 104,200 |
| Information & Comm/M&E Officer | | 90% | 90% | 50% | 9,180 | 9,823 | 5,839 | 24,842 |
| Deputy Regional Fin Officer | | 70% | 70% | 70% | 6,650 | 7,116 | 7,614 | 21,379 |
| Capacity Development/Training Coordinator | | 90% | 0% | 0% | 9,000 | 0 | 0 | 9,000 |
| Administrative Officer | | 50% | 50% | 50% | 3,250 | 3,478 | 3,721 | 10,448 |
| | | | | | | | | |
| **SUB-TOTAL SALARIES BUDGET** | | | | | **193,930** | **219,275** | **84,952** | **498,157** |
| | | | | | | | | |
| **B.FRINGE BENEFITS** | | | | | | | | |
| Housing (Almaty) | 1600/month Almay | | | | 37,440 | 42,240 | 12,480 | 92,160 |
| Personal Shipping | 2500 each way (to Almaty) | | | | 2,500 | 2,500 | 5,000 | 10,000 |
| R&R | 1750 per year | | | | 3,413 | 3,850 | 1,138 | 8,400 |
| Education Allowance | 10,000 per Expat/per year | | | | 19,500 | 22,000 | 6,500 | 48,000 |
| Relocation | 3500 per Expat/each way | | | | 3,500 | 3,500 | 7,000 | 14,000 |
| Medevac | 250 per Expat/per year | | | | 488 | 550 | 163 | 1,200 |
| Expat Fringe | 33% | | | | 54,731 | 65,624 | 22,367 | 142,721 |
| Health Insurance | $450 per HCN staff per year | | | | 2,228 | 1,935 | 1,058 | 5,220 |
| HCN Fringe | 40% | | | | 11,232 | 8,166 | 6,869 | 26,268 |
| **SUB-TOTAL FRINGE BENEFITS** | | | | | **135,030** | **150,365** | **62,574** | **347,969** |
| | | | | | | | | |
| **C. TRAVEL** | | | | | | | | |
| Inter/Intra-Country Travel | | | | | 15,000 | 14,500 | 9,000 | 38,500 |
| **SUBTOTAL TRAVEL** | | | | | **15,000** | **14,500** | **9,000** | **38,500** |
| | | | | | | | | |
| **D. OTHER DIRECT COSTS** | | | | | | | | |
| Consultants | | | | | | | | |
| Consultants Fees | | | | | 10,000 | | 0 | 10,000 |
| Consultants Travel | | | | | 1,000 | | 0 | 1,000 |
| **Subtotal Consultants** | | | | | **11,000** | **0** | **0** | **11,000** |
| | | | | | | | | |
| **Workshops** | | | | | | | | |
| Legal Workshops | | | | | 15,860 | 6,581 | 6,779 | 29,220 |
| Regional Staff Meetings | | | | | 10,000 | 10,000 | 8,000 | 28,000 |
| Regional Grant Meetings | | | | | 15,000 | 15,000 | 7,500 | 37,500 |
| **SUBTOTAL WORKSHOPS** | | | | | **40,860** | **31,581** | **22,279** | **94,720** |
| | | | | | | | | |
| **OFFICE OPERATION** | | | | | | | | |
| Bank Fee | | | | | 3,500 | 3,000 | 2,000 | 8,500 |
| Office Rent | | | | | 12,718 | 10,932 | 7,015 | 30,665 |
| Office Supplies | | | | | 8,220 | 6,000 | 5,000 | 19,220 |
| Telephone/Fax | | | | | 11,000 | 9,226 | 7,733 | 27,959 |
| Internet Access | | | | | 3,600 | 3,800 | 4,000 | 11,400 |
| Postage/Shipping/Fed EX | | | | | 1,800 | 1,800 | 1,800 | 5,400 |
| Publications | | | | | 5,660 | 4,770 | 4,883 | 15,313 |
| Vehicle Fuel | | | | | 3,000 | 2,500 | 1,500 | 7,000 |
| Office Furnishings | | | | | 2,125 | | | 2,125 |
| **SUBTOTAL OFFICE OPERATION** | | | | | **51,623** | **42,028** | **33,931** | **127,582** |
| | | | | | | | | |
| **E. EQUIPMENT** | | | | | | | | |
| Computer/Fax/Copier | | | | | 15,787 | 1,289 | 798 | 17,874 |
| **SUBTOTAL EQUIPMENT** | | | | | **15,787** | **1,289** | **798** | **17,874** |
| | | | | | | | | |
| **TOTAL REGIONAL ADMIN** | | | | | **463,230** | **459,038** | **213,533** | **1,135,800** |

CP 1054

Health NGO Capacity Building Initiative Extension

December 12, 2002

## TOTAL OF OPERATIONS BY CATEGORY

**Summary All Countries, Regional and Headquarters**

|  | Year 1 | Year 2 | Year 3 | LOP |
|---|---|---|---|---|
| A. SALARIES | 178,398 | 219,576 | 234,555 | 632,529 |
| B. FRINGE BENEFITS | 75,213 | 88,750 | 98,343 | 262,305 |
| C. TRAVEL | 21,750 | 18,000 | 21,950 | 61,700 |
| D. PROGRAM ACTIVITIES | 205,400 | 170,400 | 170,400 | 546,199 |
| E. OFFICE OPERATIONS | 63,660 | 63,720 | 62,840 | 190,220 |
| F. GRANTS | 500,000 | 500,000 | 300,000 | 1,300,000 |
| G. EQUIPMENT | 6,000 | 1,000 | 1,000 | 8,000 |
| **SUB-TOTAL** | **1,050,420** | **1,061,446** | **889,087** | **3,000,953** |
| **NICRA** 28.68% | 157,861 | 161,023 | 168,950 | 487,833 |
| **TOTAL REQUESTED FUNDS FROM USAID** | **1,208,281** | **1,222,468** | **1,058,038** | **3,488,787** |
| **COUNTERPART COST SHARE** 25% | 302,070 | 305,617 | 264,509 | 872,197 |
| **GRAND TOTAL PROGRAM** | **1,510,351** | **1,528,085** | **1,322,547** | **4,360,984** |



CP 1062

Health NGO Capacity Building Initiative Extension

III. KYRGYZSTAN

1.07

| | | | | | | Year 1 | Year 2 | Year 3 | LOP |
|---|---|---|---|---|---|---|---|---|---|
| **A. SALARIES** | | | | | | | | | |
| Kyrgyzstan CD | Erkin Kasybekov | | 10% | 10% | 10% | 2,160 | 2,311 | 2,473 | 6,944 |
| Kyrgyzstan Coordinator | Chinara Kamarli | | 100% | 100% | 100% | 8,500 | 9,095 | 9,732 | 27,327 |
| Country Grant Manager | Baktybek Orozaliev | | 80% | 100% | 100% | 5,280 | 7,062 | 7,556 | 19,898 |
| Country Financial Mger. | Aidai Saparalieva | | 40% | 50% | 50% | 3,000 | 4,013 | 4,293 | 11,306 |
| **SUB-TOTAL SALARIES** | | | | | | 18,940 | 22,481 | 24,054 | 65,475 |
| | | | | | | | | | |
| **B. FRINGE BENEFITS** | | | | | | | | | |
| Local Fringe | | 40% | | | | 7,576 | 8,992 | 9,622 | 26,190 |
| **SUB-TOTAL FRINGE BENEFITS** | | | | | | 7,576 | 8,992 | 9,622 | 26,190 |
| | | | | | | | | | |
| **C. TRAVEL** | | | | | | | | | |
| Local Travel | | | | | | 2,000 | 2,000 | 2,000 | 6,000 |
| **SUBTOTAL TRAVEL** | | | | | | 2,000 | 2,000 | 2,000 | 6,000 |
| | | | | | | | | | |
| **D. PROGRAM ACTIVITIES** | | | | | | | | | |
| _Sub-Contracts_ | | | | | | | | | |
| Trainings | 24 yr | | 500 @ | | | 12,000 | 12,000 | 12,000 | 36,000 |
| CAP Activities | | | | | | 6,000 | 6,000 | 6,000 | 18,000 |
| Pre-Grant Consulting | | | | | | 6,000 | 6,000 | 6,000 | 18,000 |
| Monitoring & Evaluation | | | | | | 8,000 | 8,000 | 8,000 | 24,000 |
| Subtotal Sub-Contracts | | | | | | 32,000 | 32,000 | 32,000 | 96,000 |
| | | | | | | | | | |
| _Grant Coordination Process_ | | | | | | | | | |
| Grant Mgment. Team Meetings (4 meetings/yr) | | | | | | 800 | 800 | 800 | 2,400 |
| Grant Review Committee Meetings (2 meetings/yr) | | | | | | 1,600 | 1,600 | 1,600 | 4,800 |
| Subtotal Grant Coordination Process | | | | | | 2,400 | 2,400 | 2,400 | 7,200 |
| | | | | | | | | | |
| **SUBTOTAL PROGRAM ACTIVITIES** | | | | | | 34,400 | 34,400 | 34,400 | 103,200 |
| | | | | | | | | | |
| **E. OFFICE OPERATIONS** | | | | | | | | | |
| Communications | | | | | | 900 | 900 | 900 | 2,700 |
| Bank Fees | | | | | | 200 | 200 | 200 | 600 |
| Supplies | | | | | | 600 | 600 | 600 | 1,800 |
| Postage/Shipping | | | | | | 100 | 100 | 100 | 300 |
| Vehicle Fuels/Maint. | | | | | | 600 | 600 | 600 | 1,800 |
| Rent | | | | | | 3,600 | 3,600 | 3,600 | 10,800 |
| Reference | | | | | | 500 | 500 | 500 | 1,500 |
| Staff Development | | | | | | 1,200 | 1,200 | 1,200 | 3,600 |
| **SUBTOTAL OFFICE OPERATION** | | | | | | 7,700 | 7,700 | 7,700 | 23,100 |
| | | | | | | | | | |
| **F. GRANTS** | | | | | | | | | |
| Health Activity Grants | | | | | | 110,000 | 110,000 | 60,000 | 280,000 |
| **SUBTOTAL GRANTS** | | | | | | 110,000 | 110,000 | 60,000 | 280,000 |
| | | | | | | | | | |
| **G. EQUIPMENT** | | | | | | | | | |
| Computers/ Phones | | | | one computer | | 1,000 | 0 | | 1,000 |
| **SUBTOTAL EQUIPMENT** | | | | | | 1,000 | 0 | 0 | 1,000 |
| | | | | | | | | | |
| **TOTAL KYRGYZSTAN** | | | | | | 181,616 | 185,573 | 137,776 | 504,965 |

CP 1066

| VII. HEADQUARTERS COSTS | | | | | Year 1 | Year 2 | Year 3 | LOP |
|---|---|---|---|---|---|---|---|---|
| **A. SALARIES** | | | | | | | | |
| Senior Vice President | Arlene Lear | 5% | 5% | 5% | 6,150 | 6,458 | 6,780 | 19,388 |
| Program Officer | Mark Granus | 20% | 20% | 20% | 10,000 | 10,500 | 11,025 | 31,525 |
| Field Accountant | Lance Brenner | 5% | 5% | 5% | 2,500 | 2,625 | 2,756 | 7,881 |
| SUBTOTAL Salaries | | | | | 18,650 | 19,583 | 20,562 | 58,794 |
| | | | | | | | | |
| **B. FRINGE BENEFITS** | | | | | | | | |
| U.S. Fringe | | 33% | | | 6,155 | 6,462 | 6,785 | 19,402 |
| SUBTOTAL FRINGE BENEFITS | | | | | 6,155 | 6,462 | 6,785 | 19,402 |
| | | | | | | | | |
| **C. TRAVEL** | | | | | | | | |
| One Round-Trip Airfare Per Year | | $2,000 | $0 | $2,200 | 2,000 | 0 | 2,200 | 4,200 |
| Per Diem 10 Days x $175 per day x 2 Trips | | $1,750 | $0 | $1,750 | 1,750 | 0 | 1,750 | 3,500 |
| SUBTOTAL TRAVEL | | | | | 3,750 | 0 | 3,950 | 7,700 |
| | | | | | | | | |
| **D. PROGRAM ACTIVITIES** | | | | | | | | |
| | | | | | | | | |
| **E. OFFICE OPERATIONS** | | | | | | | | |
| Postage/shipping/fedex | | | | | 540 | 540 | 540 | 1,620 |
| Bank Fees | | | | | 600 | 600 | 600 | 1,800 |
| Photocopying | | | | | 300 | 300 | 300 | 900 |
| Equipment leases | | | | | 480 | 480 | 480 | 1,440 |
| Audit | | | | | 1500 | 1500 | 1,500 | 4,500 |
| Communications | | | | | 1200 | 1200 | 1,200 | 3,600 |
| Office Supplies | | | | | 600 | 600 | 600 | 1,800 |
| SUBTOTAL OFFICE OPERATIONS | | | | | 5,220 | 5,220 | 5,220 | 15,660 |
| | | | | | | | | |
| **F. GRANTS** | | | | | | | | |
| | | | | | | | | |
| **G. EQUIPMENT** | | | | | | | | |
| Information and communications equipment | | | | | 1,000 | 1,000 | 1,000 | 3,000 |
| Subtotal Equipment | | | | | 1,000 | 1,000 | 1,000 | 3,000 |
| | | | | | | | | |
| TOTAL HEADQUARTERS COSTS | | | | | 33,775 | 31,265 | 36,517 | 101,556 |

CP 1070

**From:**      Jay Cooper [jayc@cpart.kz]
**Sent:**      Thursday, October 21, 2004 1:40 PM
**To:**        'Bob Abma'; 'Michael Kunz'
**Cc:**        Harry Dorcus (HDorcus@counterpart.org); Yana Dobronravova (yanad@cpart.kz)
**Subject:**   RE: CSSI/Health Budget Allocations

Bob, Michael,

I have given this proposal a lot of thought and I do not agree to approve funds from CSSI
or HNCBI to be used for anything other than those projects.  If there are costs to be
allocated for travel of staff from the CI Eurasia Regional Office I would like to know
ahead of time about the travel and its purpose for CSSI and HNCBI.  I am talking about
field budget charges.

As a result of this discussion I realize the need for a full time financial person to work
with CSSI and HNCBI to track closely all the costs for those projects.  Maybe that person
is Yana, although she seems to be extremely busy, or maybe we need to hire someone else.
The point is that Bob is now working with the CI Eurasia Regional Office.  Since Bob will
be spending a great deal of time away from the CSSI/HNCBI projects I will need someone who
I can work on a daily basis for these 2 projects.

With around 15 million dollars in the budgets for the 2 projects over a 3 year period I
need a full time person who is responsible and reports directly to those 2 projects.

Please keep in mind that I am trying to get additional funds for the small grant program
from USAID for the HNCBI project to extend it 6 months to coincide with the end of CSSI in
July 2006.  I discussed this with Arlene in August.  Of course we need to look at the
projected spending for HNCBI to make sure that we can keep staff for the additional 6
months.  Our most recent pipeline shows that we are well underspent in HNCBI allowing us
to extend if we get additional funds for the small grants program.

Best, Jay




-----Original Message-----
From: Bob Abma [mailto:babma@cpart.kz]
Sent: Friday, October 08, 2004 2:46 PM
To: Michael Kunz; Jay Cooper
Subject: CSSI/Health Budget Allocations

Michael, Jay
Attached is the Budget Allocation process with the draft numbers we agreed to today.  The
partial funding to the Eurasia Assistant position was removed as we discussed.

I will work next week to add to this the budget figures for consultants, and for
workshops.

Please give me your comments on other suggested changes.

Bob



000074

-----Original Message-----
From: Bob Abma [mailto:babma@cpart.kz]
Sent: Friday, October 08, 2004 12:46 AM
To: Michael Kunz; Jay Cooper
Subject: CSSI/Health Budget Allocations

Michael, Jay
Attached is the Budget Allocation process with the draft numbers we agreed
to today.  The partial funding to the Eurasia Assistant position was removed
as we discussed.

I will work next week to add to this the budget figures for consultants, and
for workshops.

Please give me your comments on other suggested changes.

Bob



000069

**August 1, 2004 through June 30, 2006**
**Allocations of Personnel and Travel Resources**
**CSSI & Healthy Communities**
**October 10 2004 Draft**

| | CSSI/Health Reg | Finance/Admin | Eurasia Regional | TO RENT see note | TOTAL |
|---|---|---|---|---|---|
| HCN Personnel | | | | | |
| Salaries | 73,862 | 74,915 | 0 | 16,236 | 165,013 |
| Fringes | 37,317 | 38,704 | 0 | 10,211 | 86,232 |
| **Subtotal HCN Personnel** | **111,180** | **113,619** | **0** | **26,447** | **251,245** |
| | | | | | |
| TRAVEL | 13,310 | 6,656 | 6,655 | 0 | 26,621 |
| | | | | | |
| **TOTAL Personnel & Travel** | **124,490** | **120,274** | **6,655** | **26,447** | **277,866** |

NOTE:    Cleaners and Guards are included in Personnel budget, but the service is provided by Landlord

070000

| IV. COUNTERPART REGIONAL Budget HCN Salaries - Total Available CSSI & HC | Jan - Jun 2003 | Jun - Dec 2003 | Jan - Jun 2004 | Jun - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Regional Health Coordinator | 5,100 | 5,100 | 5,457 | 5,457 | 5,839 | 5,839 | 0 | 0 | 32,792 | | |
| Information & Comm/M&E Officer | 2,730 | 7,320 | 8,763 | 9,752 | 10,044 | 8,086 | 3,620 | 0 | 50,315 | | |
| Deputy Regional Fin Officer | 3,570 | 6,895 | 8,782 | 9,935 | 10,317 | 10,344 | 4,505 | 0 | 54,348 | | |
| Capacity Development/Training Coordinator | 0 | 4,500 | 4,500 | 0 | 0 | 0 | 0 | 0 | 9,000 | | |
| Accountant | 0 | 0 | 0 | 150 | 150 | 0 | 0 | 0 | 300 | | |
| MIS Manager | 4,320 | 4,320 | 4,622 | 4,756 | 5,080 | 4,946 | 0 | 0 | 28,044 | | |
| Administrative Officer | 3,900 | 5,525 | 5,798 | 5,912 | 6,204 | 6,326 | 1,860 | 0 | 35,525 | | |
| Driver | 1,680 | 1,680 | 2,568 | 2,568 | 2,748 | 2,748 | 0 | 0 | 13,992 | | |
| Cleaner | 1,280 | 1,260 | 1,926 | 1,926 | 2,061 | 2,061 | 0 | 0 | 10,494 | | |
| Guard | 2,520 | 2,520 | 3,852 | 3,852 | 4,122 | 4,122 | 0 | 0 | 20,987 | | |
| Subtotal HCN | 25,080 | 39,120 | 46,268 | 44,307 | 46,563 | 44,471 | 9,986 | 0 | 255,796 | 90,783 | |
| | | | | 125,090 | | | | | | 73% | |
| | | | | | | | | | | 34,307 underspent as of 8/1/04 | |

| Allocations of HCN Salaries - based on budgeted amounts | Aug - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | TOTAL | Under Spent as of 8/1/04 | Allocation |
|---|---|---|---|---|---|---|---|---|
| CSSI/Health Reg | | | | | | | | |
| Regional Health Coordinator | 3,656 | 5,839 | 5,839 | 0 | 0 | 15,334 | | |
| Information & Comm/M&E Officer | 6,534 | 10,044 | 8,086 | 3,620 | 0 | 28,284 | | |
| Capacity Development/Training Coordinator | 0 | 0 | 0 | 0 | 0 | 0 | | |
| MIS Manager | 3,187 | 5,080 | 4,946 | 0 | 0 | 13,212 | | |
| Subtotal | 13,377 | 20,963 | 18,871 | 3,620 | 0 | 56,830 | 17,032 | 73,862 |
| Finance/Admin | | | | | | | | |
| Deputy Regional Fin Officer | 6,656 | 10,317 | 10,344 | 4,505 | 0 | 31,823 | | |
| Accountant | 101 | 150 | 0 | 0 | 0 | 251 | | |
| Administrative Officer | 3,961 | 6,204 | 6,326 | 1,860 | 0 | 18,351 | | |
| Driver | 1,721 | 2,748 | 2,748 | 0 | 0 | 7,216 | | |
| Subtotal | 12,438 | 19,418 | 19,418 | 6,366 | 0 | 57,640 | 17,275 | 74,915 |
| Eurasia Regional | | | | | | | | |
| Eurasia Assistant - no funding | | | | | | | 0 | |
| Subtotal | | | | | | | 0 | 0 |
| TO RENT - for services now provided by landlord | | | | | | | | |
| Cleaner | 1,290 | 2,061 | 2,061 | 0 | 0 | 5,412 | | |
| Guard | 2,581 | 4,122 | 4,122 | 0 | 0 | 10,824 | | |
| Subtotal | 3,871 | 6,182 | 6,182 | 0 | 0 | 16,236 | 0 | 16,236 |
| TOTAL SALARIES | 29,686 | 46,563 | 44,471 | 9,986 | 0 | 130,706 | 34,307 | 165,013 |

000071

**HCN Fringes - Total Available CSSI & HC**

| | | Jan - Jun 2003 | Jun - Dec 2003 | Jan - Jun 2004 | Jun - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | TOTAL | Spent to 7/31/04 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Health Insurance | 450 | 0 | 1,114 | 1,114 | 1,046 | 1,046 | 529 | 529 | 0 | 5,378 | 4,448 |
| HCN Fringe | 40% | 10,032 | 15,648 | 18,507 | 17,723 | 18,625 | 17,788 | 3,995 | 0 | 102,319 | 17,016 |
| Subtotal HCN | | 10,032 | 16,762 | 19,621 | 18,769 | 19,672 | 18,317 | 4,623 | 0 | 107,696 | 21,464 |
| | | | | | 52,609 | | | | | | 31,145 underspent as of 8/1/04 |

**Allocation of HCN Fringes**
based on alocated salaries

| Taxes | | Aug - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | on "unspent" salaries | ALLOCATION |
|---|---|---|---|---|---|---|---|---|
| CSSI/Health Reg | 40% | 5,351 | 8,385 | 7,548 | 1,448 | 0 | 6,813 | 29,545 |
| Finance/Admin | | 4,975 | 7,767 | 7,767 | 2,546 | 0 | 6,910 | 29,966 |
| Eurasia Regional | | | | | | | 0 | 0 |
| TO RENT - for services now provided by landlord | | 1,549 | 2,473 | 2,473 | 0 | 0 | | 6,494 |
| Subtotal | | 11,874 | 18,625 | 17,788 | 3,995 | 0 | 13,723 | 66,005 |

| Health Insurance | Aug - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | on "unspent" salaries | Underspent Fringes as of 8/1/04 | ALLOCATION |
|---|---|---|---|---|---|---|---|---|
| CSSI/Health Reg | 1,350 | | 450 | | | 1,350 | 4,623 | 7,773 |
| Finance/Admin | 1,350 | | 1,350 | | | 1,350 | 4,688 | 8,738 |
| Eurasia Regional | | | | | | 0 | 0 | 0 |
| TO RENT - for services now provided by landlord | 900 | | 900 | | | 900 | 1,016 | 3,716 |
| Subtotal | 3,600 | 0 | 2,700 | 0 | 0 | 3,600 | 10,327 | 20,227 |
| Taxes and Health Ins. | 15,474 | 18,625 | 20,488 | 3,995 | 0 | 17,323 | 10,327 | 86,232 |
| | | | | | | | | 0 |

| TOTAL PAYROLL ALLOCATIONS | Aug - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | on "unspent" salaries | TOTAL Allocation |
|---|---|---|---|---|---|---|---|
| CSSI/Health Reg | 20,077 | 29,348 | 26,869 | 5,069 | 0 | 29,817 | 111,180 |
| Finance/Admin | 18,764 | 27,186 | 28,535 | 8,912 | 0 | 30,223 | 113,619 |
| Eurasia Regional | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TO RENT - for services now provided by landlord | 6,320 | 8,655 | 9,555 | 0 | 0 | 1,916 | 26,447 |
| TOTAL PAYROLL | 45,160 | 65,189 | 64,959 | 13,981 | 0 | 61,956 | 251,245 |

000072

| TOTAL TRAVEL BUDGET AVAILABLE | | | Jan-Jun 2003 | Jun-Dec 2003 | Jan-Jun 2004 | Jun-Dec 2004 | Jan-Jun 2005 | Jun-Dec 2005 | Jan-Jun 2006 | Jun-Dec 2006 | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **C. TRAVEL** | | | | | | | | | | | | | |
| Inter/Intra-Country Travel | | | 3,500 | 11,000 | 11,000 | 13,900 | 13,900 | 11,650 | 8,150 | 0 | 73,100 | | 43,013 Budgeted left |
| **SUBTOTAL TRAVEL** | | | | | | 30,087 | | | | | | | 46,480 spent to date |
| | | | | | | | | | | | | | 26,620 actual left |
| | | | | | | | | | | | | | -16,393 overspent to d ate |

| ALLOCATED TRAVEL BUDGET | | | Aug - Dec 2004 | Jan - Jun 2005 | Jun - Dec 2005 | Jan - Jun 2006 | Jun - Dec 2006 | TOTAL | Overspent as of 8/1/04 | Available |
|---|---|---|---|---|---|---|---|---|---|---|
| CSSI/Health Reg | 50% CSSI | 50% HC | 4,657 | 6,950 | 5,825 | 4,075 | | 21,507 | -8,197 | **13,310** |
| Finance/Admin | 25% CSSI | 25% HC | 2,328 | 3,475 | 2,913 | 2,038 | | 10,754 | -4,098 | **6,656** |
| Eurasia Regional | 25% CSSI | 25% HC | 2,328 | 3,475 | 2,913 | 2,038 | | 10,753 | -4,098 | **6,655** |
| | **TOTAL** | | **9,313** | **13,900** | **11,651** | **8,150** | **0** | **43,014** | **-16,393** | **26,621** |

000079

OMB No. 1545-0047

Form **990**

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements.

Department of the Treasury
Internal Revenue Service

**2003**

Open to Public Inspection

**A** For the 2003 calendar year, or tax year beginning **OCT 1, 2003** and ending **SEP 30, 2004**

| B Check if applicable | | C Name of organization | D Employer identification number |
|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type See Specific Instructions | **COUNTERPART INTERNATIONAL, INC.** | **13-6183605** |
| ☐ Name change | | Number and street (or P.O. box if mail is not delivered to street address) Room/suite | E Telephone number |
| ☐ Initial return | | **1200 18TH STREET, N.W.**    **1100** | **202-296-9676** |
| ☐ Final return | | City or town, state or country, and ZIP + 4 | F Accounting method: ☐ Cash ☒ Accrual |
| ☐ Amended return | | **WASHINGTON, DC 20036** | ☐ Other (specify) ► |
| ☐ Application pending | | | |

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**G** Website: ► **WWW.COUNTERPART.ORG**

**J** Organization type (check only one) ► ☒ 501(c) ( **3** ) ◄ (insert no.) ☐ 4947(a)(1) or ☐ 527

**K** Check here ► ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return.

**H** and **I** are not applicable to section 527 organizations.

**H(a)** Is this a group return for affiliates?   ☐ Yes ☒ No

**H(b)** If "Yes," enter number of affiliates ►

**H(c)** Are all affiliates included?   **N/A**   ☐ Yes ☐ No (If "No," attach a list.)

**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**I** Group Exemption Number ►

**M** Check ► ☒ if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ► **106,501,742.**

### Part I   Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | | |
|---|---|---|---|---|---|
| **1** | Contributions, gifts, grants, and similar amounts received: | | | | |
| **a** | Direct public support | 1a | 83,429,125. | | |
| **b** | Indirect public support | 1b | | | |
| **c** | Government contributions (grants) | 1c | 22,585,358. | | |
| **d** | Total (add lines 1a through 1c) (cash $ **106,014,483.** noncash $ ) | | | 1d | 106,014,483. |
| **2** | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | |
| **3** | Membership dues and assessments | | | 3 | |
| **4** | Interest on savings and temporary cash investments | | | 4 | 22,469. |
| **5** | Dividends and interest from securities | | | 5 | 4,133. |
| **6 a** | Gross rents    **SEE STATEMENT 1** | 6a | 104,524. | | |
| **b** | Less: rental expenses | 6b | | | |
| **c** | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | 104,524. |
| **7** | Other investment income (describe ► ) | | | 7 | |
| **8 a** | Gross amount from sales of assets other than inventory | (A) Securities | (B) Other | | |
| | | 8a | | | |
| **b** | Less: cost or other basis and sales expenses | 8b | | | |
| **c** | Gain or (loss) (attach schedule) | 8c | | | |
| **d** | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | | 8d | |
| **9** | Special events and activities (attach schedule). If any amount is from gaming, check here ► ☐ | | | | |
| **a** | Gross revenue (not including $ of contributions reported on line 1a) | 9a | | | |
| **b** | Less: direct expenses other than fundraising expenses | 9b | | | |
| **c** | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| **10 a** | Gross sales of inventory, less returns and allowances | 10a | | | |
| **b** | Less: cost of goods sold | 10b | | | |
| **c** | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| **11** | Other revenue (from Part VII, line 103) | | | 11 | 356,133. |
| **12** | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 106,501,742. |
| **13** | Program services (from line 44, column (B)) | | | 13 | 102,682,360. |
| **14** | Management and general (from line 44, column (C)) | | | 14 | 3,420,091. |
| **15** | Fundraising (from line 44, column (D)) | | | 15 | 5,409. |
| **16** | Payments to affiliates (attach schedule) | | | 16 | |
| **17** | Total expenses (add lines 16 and 44, column (A)) | | | 17 | 106,107,860. |
| **18** | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | 393,882. |
| **19** | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19 | 146,155. |
| **20** | Other changes in net assets or fund balances (attach explanation)    **SEE STATEMENT 2** | | | 20 | 71,320. |
| **21** | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 611,357. |

323001
12-17-03   LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**

Form 990 (2003)

1

15030620 745960 08565      2003.09000 COUNTERPART INTERNATIONAL,   08565__1

RECEIVED 2005 IRSC CHARLOTTE NC



EXHIBIT 49

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Organization Exempt Under Section 501(c)(3)**

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or Section 4947(a)(1) Nonexempt Charitable Trust
**Supplementary Information-(See separate instructions.)**
▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

**2003**

| Name of the organization | Employer identification number |
|---|---|
| COUNTERPART INTERNATIONAL, INC. | 13 6183605 |

**Part I**  **Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees**
(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| JAY COOPER<br>ALL IN C/O OF ORGANIZATION | REGIONAL DIR.<br>40 | 105,824. | 22,020. | 0. |
| HUGH OROZCO | CHIEF PARTY<br>40 | 90,959. | 13,439. | 0. |
| RICHARD DROLET | DIR COMM ACQ<br>40 | 85,601. | 13,290. | 0. |
| OLIVER DAVIDSON | EMER MAN. DIR<br>40 | 90,000. | 10,357. | 0. |
| DAVID SMITH | CHIEF PARTY<br>40 | 92,083. | 17,851. | 0. |

Total number of other employees paid over $50,000 ▶ 22

**Part II**  **Compensation of the Five Highest Paid Independent Contractors for Professional Services**
(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| MARIST FATHERS OF BOSTON<br>27 ISABELLA ST, BOSTON, MA 02116 | CONSULTING | 66,000. |
| DAVID COHEN<br>2361 PLAYERS POND LN., RESTON, VA 20191 | CONSULTING | 77,000. |
| | | |
| | | |
| | | |

Total number of others receiving over $50,000 for professional services ▶ 0

323101/12-05-03   LHA   For Paperwork Reduction Act Notice, see the instructions for Form 990 and Form 990-EZ    Schedule A (Form 990 or 990-EZ) 2003

7

FORM 990                PART V - LIST OF OFFICERS, DIRECTORS,              STATEMENT    9
                          TRUSTEES AND KEY EMPLOYEES

| NAME AND ADDRESS | TITLE AND AVRG HRS/WK | COMPEN-SATION | EMPLOYEE BEN PLAN CONTRIB | EXPENSE ACCOUNT |
|---|---|---|---|---|
| LELEI LELAULU ALL BOARD MEMBERS CAN BE REACHED IN C/O OF ORGANIZATION'S ADDRESS | PRESIDENT/CEO 40 | 211,583. | 23,532. | 0. |
| ARLENE LEAR | SENIOR VICE PRESIDENT 40 | 149,001. | 13,300. | 0. |
| BRIAN PROPP | VICE PRESIDENT 40 | 122,851. | 16,832. | 0. |
| THORIC CEDERSTROM | VICE PRESIDENT 40 | 108,541. | 18,993. | 0. |
| DON FEIL | VICE PRESIDENT 40 | 112,135. | 19,992. | 0. |
| HARRY C DORCUS | VICE PRESIDENT/CFO 40 | 127,528. | 15,770. | 0. |
| RAYMOND CHAVEZ | VICE PRESIDENT 40 | 114,732. | 15,999. | 0. |
| ELIZABETH B. SILVERSTEIN | FOUNDER/HONORARY CHAIR 0. | 42,000. | 4,270. | 0. |
| STANLEY W HOSIE | CHAIRMAN 0. | 55,730. | 4,270. | 0. |
| BRYANT GEORGE | SECRETARY 0. | 0. | 0. | 0. |
| SALLY M BRUMBAUGH | DIRECTOR 0. | 0. | 0. | 0. |

# COUNTERPART INTERNATIONAL, INC.

## AUDIT REPORT

### FINANCIAL AND FEDERAL AWARD COMPLIANCE EXAMINATION

## FOR THE YEAR ENDED SEPTEMBER 30, 2004



EXHIBIT

42

8/29/06

PENGAD 800-631-6989

CP 1396

**COUNTERPART INTERNATIONAL, INC.**

## STATEMENT OF FUNCTIONAL EXPENSES
### FOR THE YEAR ENDED SEPTEMBER 30, 2004

|  | | | | Program Services | |
|---|---|---|---|---|---|
|  | Relief | Institution Building | Business Development | Natural Resources and Environment | Health and Nutrition |
| Personnel | $ 3,111,267 | $ 3,604,947 | $ 757,747 | $ 636,367 | $ 1,234,148 |
| Training | 208,452 | 456,949 | 22,894 | 66,213 | 86,974 |
| Travel | 541,744 | 298,866 | 134,110 | 219,472 | 171,181 |
| Equipment | 67,407,511 | 969,429 | 21,121 | 786,066 | 1,682,203 |
| Transportation and warehousing | 843,244 | - | 103 | 118 | 13,000 |
| Space and other | 1,003,110 | 1,214,795 | 62,888 | 208,305 | 1,388,042 |
| Pass through | 4,770,911 | 431,520 | 242,379 | 363,413 | 224,855 |
| Technical assistance | 204,081 | 20,000 | 10,391 | 54,216 | 519,307 |
| Non-allowable | (134) | - | - | - | - |
| Program loans | - | - | (2,398) | - | 98,806 |
| Small grants | 294,157 | 3,708,546 | 206,140 | 128,487 | - |
| Indirect costs (Note 6) | 1,344,750 | 1,525,572 | 281,805 | 164,804 | 834,963 |
| **TOTAL** | **$ 79,729,093** | **$12,230,624** | **$ 1,737,180** | **$ 2,627,461** | **$ 6,253,479** |

See accompanying notes to financial statements.

I-6

CP 1403

| Total Program Services | Management, General and Fundraising | Business Development and Public Education | Total Supporting Services | Total Expenses |
|---|---|---|---|---|
| | | Supporting Services | | |
| $    9,344,476 | $    2,215,351 | $      459,609 | $    2,674,960 | $  12,019,436 |
| 841,482 | 5,672 | 3,891 | 9,563 | 851,045 |
| 1,365,373 | 301,317 | 178,527 | 479,844 | 1,845,217 |
| 70,866,330 | 3,437,801 | 5,394 | 3,443,195 | 74,309,525 |
| 856,465 | 87 | - | 87 | 856,552 |
| 3,877,140 | 902,270 | 58,377 | 960,647 | 4,837,787 |
| 6,033,078 | - | - | - | 6,033,078 |
| 807,995 | - | 700 | 700 | 808,695 |
| (134) | 8,397 | - | 8,397 | 8,263 |
| 96,408 | - | - | - | 96,408 |
| 4,337,330 | - | - | - | 4,337,330 |
| 4,151,894 | (4,151,894) | - | (4,151,894) | - |
| $102,577,837 | $    2,719,001 | $      706,498 | $    3,425,499 | $106,003,336 |

See accompanying notes to financial statements.

I-7

CP 1404

COUNTERPART INTERNATIONAL, INC.

NOTES TO FINANCIAL STATEMENTS
SEPTEMBER 30, 2004 AND 2003

4.    FURNITURE, FIXTURES AND EQUIPMENT

Furniture, fixtures and equipment for the years ended September 30, 2004 and 2003 are summarized by major classification as follows:

|  | 2004 | 2003 |
|---|---|---|
| Furniture and fixtures | $   30,890 | $   30,890 |
| Equipment | 188,866 | 177,104 |
| Deferred leasing costs | 12,594 | 12,594 |
|  | 232,350 | 220,588 |
| Less: Accumulated depreciation | (215,871) | (209,586) |
|  | $   16,479 | $   11,002 |

5.    FOREIGN CURRENCY ACCOUNTS

Cash deposited in local currencies in foreign banks is translated into U.S. dollars at rates of exchange in effect at year end. For the years ending September 30, 2004 and 2003, Counterpart incurred a foreign currency translation gain of $102,439 and $29,874, respectively. These amounts are included in miscellaneous income in the Statements of Activities and Changes in Net Assets.

6.    ALLOCATION OF GENERAL AND ADMINISTRATIVE COSTS

A portion of total indirect costs is allocated to specific grants based on the allowed percentages included in the grant agreement. Total costs allocated for the years ended September 30, 2004 and 2003 were $4,151,894 and $2,830,662, respectively.

7.    PENSION PLAN

Counterpart maintains a defined contribution 403(b) retirement plan for its employees. This plan allows participants, subject to certain service requirements, to defer pre-tax income into a qualified plan. An eligible employee may defer pre-tax earnings annually, up to a limit of $11,000. Counterpart matches ten percent of the employee's salary. Counterpart's contribution vests immediately. Counterpart's matching contributions to this plan totaled $408,906 and $346,775 for fiscal years ended September 30, 2004 and 2003, respectively.

8.    COMMITMENTS AND CONTINGENCIES

Counterpart is substantially dependent on U.S. government grants and subcontracts that are subject to audit. The ultimate determination of amounts received under these programs generally is based upon allowable costs incurred required to be reported to and subject to audit by the government. Until such audits have been completed and final settlement reached, there exists a contingent liability to refund any amounts received in excess of allowable costs. Counterpart's management is of the opinion that no significant adjustment to these financial statements, if any, would result from audit findings.

I-15

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS
### FOR THE YEAR ENDED SEPTEMBER 30, 2004

| Federal Granting Agency and Program Title | CFDA or Grant Number | 2004 Expenditures |
|---|---|---|
| US Government programs | In-Kind Contribution | $ 66,067,498 |
| **United States Agency for International Development:** | | |
| CHAP WESTNIS | 110-G-00-4044-00000 | (2,000) |
| CENTRAL ASIA NGO SUPPORT | 110-A-00-94-00020 | 2 |
| FOREST GARDEN | FAO-A-00-97-00048-00 | (39,776) |
| DONETSK DISASTER RELIEF | 121-G-00-01-00011-00 | (2,003) |
| TITLE TWO | FAO-A-00-98-0056 | (2,876) |
| Child Survival India | FAO-A-00-00-00028 | 542,116 |
| Child Survival Uzbekistan | FAO-A-00-00-00027 | 288,476 |
| CHAP WESTNIS | 121-A-00-01-00019-00 | 2,088,381 |
| Moldova Liesap | 121-A-00-01-00014-00 | (70,864) |
| Bulgaria | 183-A-00-01-00106 | 797,054 |
| Moldova TB Prison Hospital | 121-A-00-02-00009-00 | 23,600 |
| Civic Advocacy Support Program | 122-A-00-02-00044-00 | 589,728 |
| Central Asia Health NGO Capacity Building Initiative | 176A-0003-00004-00 | 1,176,782 |
| Q'eqchi Maya Community Development and Sustainable Tourism Project | 520-A-00-03-00097-00 | 403,695 |
| Belarus - Civil Society Strengthening Project | 121-A-00-03-00003-00 | 1,723,896 |
| Central Asia Civil Society Support Initiative | 115-A-00-03-00020-00 | 3,717,486 |
| Institutional Capacity Building to Strengthening CPI's Capacity to Design, Manage, Monitor and Evaluate Effective Title II Programs | AFP-A-00-03-00028-00 | 460,205 |
| Inter-Institutional Environmental Considerations and Regulation 216 Training Initiative | FFP-G-00-03-0100-00 | 1,520 |
| CAPTA-Alliance for Trade Capacity Building | 520-A-00-03-0100-00 | 420,311 |
| Training, Monitoring, and Employment at Risk Youth in the Tourism Sector in Brazil | 512-A-00-03-00042-00 | 188,467 |
| Georgia: Assistance to Victims of Upper Svaneti Flood | 114-G-00-04-00085-00 | 50,000 |
| Armenia: Stoner Advocacy NGOs | 111-A-00-04-00056-00 | 652 |
| **United States Department of State:** | | |
| Operation Hope | S-OPRAQ-98-H-0065 | 220,912 |
| Community and Humanitarian Assistance Program (CHAP) | S-LMAQM-01-H-0272 | 285,772 |
| Community and Humanitarian Assistance Program (CHAP) Iraq | S-LMAQM-02-H-0304 | 894,290 |
| Community and Humanitarian Assistance Program (CHAP) | S-LMAQM-03-H-0119 | 1,954,896 |
| CHAP Transport - Operation Hope | S-LMAQM-04-GR-025 | 181,076 |
| **United States Department of Agriculture:** | | |
| GFEI Senegal | GFE-685-2001/681-00 | 1,519,384 |
| Food for Progress - Tajikistan | FFC-119-2003/215-00 | 365,223 |
| Bosnia | FGR-168-2003/022-00 | 427,856 |
| Food for Progress - Senegal | FGR-685-2004/020-00 | 94,722 |
| Food for Progress - Vietnam | FCC-440-2004/021-00 | 4,946 |
| Food for Progress - Tajikistan | FCC-119-2004/013-00 | 1,123 |
| Philippines | FCC-492-2002/1043-00 | 431,328 |
| Vietnam | FCC-440-2002/1025-00 | 523,130 |
| **Other Federal Programs:** | | |
| CAIP Uzbekistan | 122-A-00-02-00024-00 | 372,008 |
| EPA - Environmental Education Training and T/A | X-82731601 | 414,899 |

I-18

Timesheet

# Timesheet for ARLENE LEAR Employee # 030

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| pp.1/15 | 1/26/2004 | 77.00 | ARCHIVED |

**From** 1/1/2004 **To** 1/15/2004

## Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/1 2004 | Fri 1/2 2004 | Sat 1/3 2004 | Sun 1/4 2004 | Mon 1/5 2004 | Tue 1/6 2004 | W 1 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0625 | | 4.00 | | | 4.00 | 4.00 | 4.0 |
| ☐ | Regular | 449 | 0625 | | 2.00 | | | 2.00 | 2.00 | 2.0 |
| ☐ | Regular | 448 | 0625 | | 1.00 | | | 1.00 | 1.00 | 1.0 |
| ☐ | Holiday | 452 | 0625 | 4.00 | | | | | | |
| ☐ | Holiday | 449 | 0625 | 2.00 | | | | | | |
| ☐ | Holiday | 448 | 0625 | 1.00 | | | | | | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

## Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/8 2004 | Fri 1/9 2004 | Sat 1/10 2004 | Sun 1/11 2004 | Mon 1/12 2004 | Tue 1/13 2004 | W 1/ 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0625 | 5.00 | 5.00 | | | 5.00 | 5.00 | 5.0 |
| ☐ | Regular | 444 | 0625 | 2.00 | 2.00 | | | 2.00 | 2.00 | 2.0 |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

## Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/15 2004 | Fri 1/16 2004 | Sat 1/17 2004 | Sun 1/18 2004 | Mon 1/19 2004 | Tue 1/20 2004 | W 1/ 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0625 | 5.00 | | | | | | |
| ☐ | Regular | 444 | 0625 | 2.00 | | | | | | |
| | | | Totals | 7.00 | | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| MARIA C. STONEHAM | 1/26/2004 | * Timesheet was changed by administrator * |

CP3556

EXHIBIT
Duccus 55
1-27-06

# Timesheet for ARLENE LEAR Employee # 030

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 5/5/2004 | 77.00 | ARCHIVED |

From 5/16/2004 To 5/31/2004

## Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sun 5/16 2004 | Mon 5/17 2004 | Tue 5/18 2004 | Wed 5/19 2004 | Thu 5/20 2004 | Fri 5/21 2004 | S 5/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0625 | | 4.00 | 4.00 | 3.00 | 3.00 | 3.00 | |
| ☐ | Regular | 444 | 0625 | | 3.00 | 3.00 | 4.00 | 4.00 | 4.00 | |
| | | | Totals | | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | |

## Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sun 5/23 2004 | Mon 5/24 2004 | Tue 5/25 2004 | Wed 5/26 2004 | Thu 5/27 2004 | Fri 5/28 2004 | S 5/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 674 | 0625 | | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | |
| ☐ | Regular | 449 | 0625 | | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | |
| | | | Totals | | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | |

## Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sun 5/30 2004 | Mon 5/31 2004 | Tue 6/1 2004 | Wed 6/2 2004 | Thu 6/3 2004 | Fri 6/4 2004 | S 6 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Holiday | 452 | 0625 | | 4.00 | | | | | |
| ☐ | Holiday | 448 | 0625 | | 2.00 | | | | | |
| ☐ | Holiday | 444 | 0625 | | 1.00 | | | | | |
| | | | Totals | | 7.00 | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| MARIA C. STONEHAM | 6/8/2004 | * Timesheet was changed by administrator *<br>* Completed * |

Enter New Notes

**CP3570**

## Timesheet for ARLENE LEAR Employee # 030

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 6/22/2004 | 77.00 | ARCHIVED |

From 6/1/2004  To 6/15/2004

### Week 1  [ Add line ]  [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Tue 6/1 2004 | Wed 6/2 2004 | Thu 6/3 2004 | Fri 6/4 2004 | Sat 6/5 2004 | Sun 6/6 2004 | M 6 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0625 | 3.00 | 4.00 | 3.00 | 3.00 | | | 2.( |
| ☐ | Regular | 449 | 0625 | 3.00 | 3.00 | 3.00 | 3.00 | | | 4.( |
| ☐ | Regular | 448 | 0625 | 1.00 | | 1.00 | 1.00 | | | 1.( |
| | | | Totals | 7.00 | 7.00 | 7.00 | 7.00 | | | |

### Week 2  [ Add line ]  [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Tue 6/8 2004 | Wed 6/9 2004 | Thu 6/10 2004 | Fri 6/11 2004 | Sat 6/12 2004 | Sun 6/13 2004 | M 6/ 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 449 | 0625 | 4.00 | 3.00 | 3.00 | 2.00 | | | 2.( |
| ☐ | Regular | 452 | 0625 | 3.00 | 4.00 | 4.00 | 5.00 | | | 5.( |
| | | | Totals | 7.00 | 7.00 | 7.00 | 7.00 | | | |

### Week 3  [ Add line ]  [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Tue 6/15 2004 | Wed 6/16 2004 | Thu 6/17 2004 | Fri 6/18 2004 | Sat 6/19 2004 | Sun 6/20 2004 | M 6/ 2( |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 761 | 0619 | 3.00 | | | | | | |
| ☐ | Regular | 657 | 0625 | 4.00 | | | | | | |
| | | | Totals | 7.00 | | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| MARIA C. STONEHAM | 6/24/2004 | * Timesheet was changed by administrator *<br>* Completed * |
| MARIA C. STONEHAM | 6/24/2004 | * Timesheet was changed by administrator *<br>* Completed * |

**Enter New Notes**

CP3571

# COUNTERPART
## International

Member of the
Counterpart Global Network

1200 Eighteenth Street, NW Suite 1100 Washington, DC 20036 Tel: [1] 202.296.9676  Fax: [1] 202.296.9679

**BOARD OF DIRECTORS**
Elizabeth B. Silverstein
Founder and Honorary Chair
Stanley W. Hosie
Chairman
Lelei LeLaulu
President and CEO
Bryant George
Secretary
Sally M. Brumbaugh
Advisory Committee on
Voluntary Foreign Aid
Perry Eaton
Alyeska Pipeline Service Co.
Charles Eddy
President, CEI Resources
Eva Haller
USBC Foundation
John A. Hoyt
Commissioner, Earth Charter
Lekha Singh
i2 Foundation/AidMatrix
Paul G. Irwin
The Humane Society of the U.S.
David M. Sloan
Scowcroft Group
Eamon M. Kelly
Chairman
National Science Foundation
Barbara Pyle
Journalist and Filmmaker
Mark Silverstein
Skin Cancer Foundation

**INTERNATIONAL
ADVISORY COUNCIL**
Linda Brolly Hathaway
Photographer, Indigenous Tribes
Brenda Broz Eddy
Eddy Associates, Inc.
Alexandra Cousteau
Oceans Advocate
James G.P. Dehlsen
Elizabeth Dowdeswell
Nuclear Waste Management
Organization
Senator J. Kalani English
State of Hawaii
Cary Fields
President, We Media
Yoel Haller, M.D.
Hon. Jose Ramos-Horta
Nobel Laureate
Amb. James Joseph
Duke University
Craig Kielburger
Free the Children
Mary Lewis
Jane Goodall Institute
Raymond Liesegang
Standard Parking West
Idelisse Malave
Executive Director
Tides Foundation
Rose Marshall
Media Consultant
Hon. Cranwell Montgomery
Baker-Worthington
Victoria Stack
Environmentalist
Randal C. Teague
Vorys, Sater, Seymore, & Pease
Melanne Verveer
Chair of the Board
Vital Voice Global Partnership

**OFFICERS**
Elizabeth B. Silverstein
Honorary Chair for Life
Stanley W. Hosie
Chairman of the Board
Lelei LeLaulu
President and CEO
Harry Dorcus
Treasurer
Bryant George
Secretary
Arlene Lear
Senior Vice President
Raymond Chavez
Vice President
Don Feil
Vice President
Brian Propp
Vice President

October 17, 2003

Ms. Arlene Lear
2853 Ontario Road, NW
Washington, DC 20006

Dear Arlene:

I am pleased to confirm that you have been granted a salary bonus of $16,000. This is based on the excellent performance by both your division and CPI. The primary factors in determining the size of your bonus is specifically your contribution in the area of income generated (New Grants), customer satisfaction (Implementation success), seniority and overall salary level. I have authorized this as a one-time payment; it will not affect your base salary or anniversary date.

On behalf of senior management at Counterpart, I extend our appreciation for your fine work.

Best wishes,

*and thanks for everything!*

Lelei LeLaulu
President/CEO

Cc:     Harry Dorcus
        Human Resources

Tax exempt under Internal Revenue Tax Code Section 501 (c)(3)
**www.counterpart.org**

CP3373



EXHIBIT
Dorcus 56
11-27-06

Pag. 1    Employee Check Information    07/27/2006 11:01 a

ARLENE    LEAR

| CHECK DT | PAY END | CHECK NO | GROSS | EARNINGS | DEDUCT | DIR DEP | NET PAY | RUN DATE |
|----------|---------|----------|-------|----------|--------|---------|---------|----------|
| 12/30/2004 | 12/15/2004 | 00000366 | 25000.00 | 25000.00 | 10527.24 | 0.00 | 14472.76 | 12/23/2004 |

----- DETAILS -----

| | | | | | |
|---|---|---|---|---|---|
| Deduction 01 | FICA TAX | Hours: | 0.0000 | Dollars: | 362.50 |
| Deduction 02 | FED TAX | Hours: | 0.0000 | Dollars: | 7882.13 |
| Deduction 03 | STATE TX | Hours: | 0.0000 | Dollars: | 2282.61 |
| Earning 11 | BONUS $ | Hours: | 0.0000 | Dollars: | 25000.00 |

CP3374

## Timesheet for BOBBY D. ABMA Employee # 090

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 1/16/2004 | 77.00 | ARCHIVED |

**From** 1/1/2004 **To** 1/15/2004

### Week 1 [ Add line ] [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Thu 1/1 2004 | Fri 1/2 2004 | Sat 1/3 2004 | Sun 1/4 2004 | Mon 1/5 2004 | Tue 1/6 2004 | W 1 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Holiday | 452 | 0525 | 7.00 | 7.00 | | | | | |
| ☐ | Regular | 452 | 0525 | | | | | 4.00 | 4.00 | 7. |
| ☐ | Regular | 449 | 0525 | | | | | 3.00 | | |
| ☐ | Regular | 761 | 2719 | | | | | | 3.00 | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

### Week 2 [ Add line ] [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Thu 1/8 2004 | Fri 1/9 2004 | Sat 1/10 2004 | Sun 1/11 2004 | Mon 1/12 2004 | Tue 1/13 2004 | W 1/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0525 | 4.00 | 4.00 | | | 4.00 | | 4. |
| ☐ | Regular | 449 | 0525 | 3.00 | | | | 3.00 | 5.00 | 3. |
| ☐ | Regular | 761 | 2719 | | 3.00 | | | | 2.00 | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

### Week 3 [ Add line ] [ Delete line(s) ]

| | Time Type | Labor Class | Cost Center | Thu 1/15 2004 | Fri 1/16 2004 | Sat 1/17 2004 | Sun 1/18 2004 | Mon 1/19 2004 | Tue 1/20 2004 | W 1/ |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0525 | 4.00 | | | | | | |
| ☐ | Regular | 449 | 0525 | 3.00 | | | | | | |
| | | | Totals | 7.00 | | | | | | |

### Notes

| From | Date | Note |
|---|---|---|
| JAY COOPER | 1/16/2004 | *Completed-Mass Approval* |
| MARIA C. STONEHAM | 1/24/2004 | * Timesheet was changed by administrator * |
| | | * Completed * |

**Enter New Notes**



CP3286

## Timesheet for BOBBY D. ABMA Employee # 090

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 4/2/2004 | 84.00 | ARCHIVED |

**From** 3/16/2004 **To** 3/31/2004

### Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Tue 3/16 2004 | Wed 3/17 2004 | Thu 3/18 2004 | Fri 3/19 2004 | Sat 3/20 2004 | Sun 3/21 2004 | M 3/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 674 | 5225 | 7.00 | 7.00 | 7.00 | 7.00 | | | 7.0 |
| | | | Totals | 7.00 | 7.00 | 7.00 | 7.00 | | | |

### Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Tue 3/23 2004 | Wed 3/24 2004 | Thu 3/25 2004 | Fri 3/26 2004 | Sat 3/27 2004 | Sun 3/28 2004 | M 3/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 669 | 2727 | | | | | | | 5.0 |
| ☐ | Regular | 674 | 5225 | 7.00 | 7.00 | 7.00 | | | | |
| ☐ | Regular | 452 | 0525 | | | | 4.00 | | | 2. |
| ☐ | Regular | 449 | 0525 | | | | 3.00 | | | |
| | | | Totals | 7.00 | 7.00 | 7.00 | 7.00 | | | |

### Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Tue 3/30 2004 | Wed 3/31 2004 | Thu 4/1 2004 | Fri 4/2 2004 | Sat 4/3 2004 | Sun 4/4 2004 | M 4 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 669 | 2727 | 5.00 | 5.00 | | | | | |
| ☐ | Regular | 761 | 2719 | 2.00 | 1.00 | | | | | |
| ☐ | Regular | 449 | 0525 | | 1.00 | | | | | |
| | | | Totals | 7.00 | 7.00 | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| JAY COOPER | 4/3/2004 | *Completed-Mass Approval* |

Enter New Notes

CP3295

## Timesheet for BOBBY D. ABMA Employee # 090

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 4/19/2004 | 77.00 | ARCHIVED |

From  4/1/2004  To  4/15/2004

### Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 4/1 2004 | Fri 4/2 2004 | Sat 4/3 2004 | Sun 4/4 2004 | Mon 4/5 2004 | Tue 4/6 2004 | W 4 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 669 | 2727 | 5.00 | 5.00 | | | | | |
| ☐ | Regular | 449 | 0525 | 1.00 | | | | | 3.00 | 2.0 |
| ☐ | Regular | 452 | 0525 | | 1.00 | | | 6.00 | 4.00 | 5.0 |
| ☐ | Regular | 761 | 2719 | 1.00 | 1.00 | | | 1.00 | | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

### Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 4/8 2004 | Fri 4/9 2004 | Sat 4/10 2004 | Sun 4/11 2004 | Mon 4/12 2004 | Tue 4/13 2004 | W 4/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 449 | 0525 | 4.00 | 3.00 | | | 2.00 | 2.00 | 3.0 |
| ☐ | Regular | 452 | 0525 | 3.00 | 4.00 | | | 5.00 | 4.00 | 4.0 |
| ☐ | Regular | 761 | 2719 | | | | | | 1.00 | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

### Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 4/15 2004 | Fri 4/16 2004 | Sat 4/17 2004 | Sun 4/18 2004 | Mon 4/19 2004 | Tue 4/20 2004 | W 4/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 0525 | 6.00 | | | | | | |
| ☐ | Regular | 761 | 2719 | 1.00 | | | | | | |
| | | | Totals | 7.00 | | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| JAY COOPER | 4/20/2004 | * Completed * |

Enter New Notes

**CP3296**

Timesheet

# Timesheet for BOBBY D. ABMA Employee # 090

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 5/17/2004 | 70.00 | ARCHIVED |

From 5/1/2004  To 5/15/2004

### Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sat 5/1 2004 | Sun 5/2 2004 | Mon 5/3 2004 | Tue 5/4 2004 | Wed 5/5 2004 | Thu 5/6 2004 | F 5 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 449 | 0525 | | | 2.00 | 3.00 | 3.00 | 2.00 | 3. |
| ☐ | Regular | 452 | 0525 | | | 4.00 | 4.00 | 4.00 | 4.00 | 4. |
| ☐ | Regular | 761 | 2719 | | | 1.00 | | | 1.00 | |
| | | | Totals | | | 7.00 | 7.00 | 7.00 | 7.00 | |

### Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sat 5/8 2004 | Sun 5/9 2004 | Mon 5/10 2004 | Tue 5/11 2004 | Wed 5/12 2004 | Thu 5/13 2004 | F 5 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 449 | 0525 | | | 1.00 | | | 1.00 | |
| ☐ | Regular | 452 | 0525 | | | 2.00 | 3.00 | 2.00 | 2.00 | 1. |
| ☐ | Regular | 761 | 2719 | | | | | 3.00 | | 2. |
| ☐ | Regular | 955 | 0647 | | | 2.00 | 2.00 | 1.00 | | |
| ☐ | Regular | 955 | 0647 | | | 2.00 | 2.00 | 1.00 | | |
| ☐ | Regular | 674 | 5225 | | | | | | 4.00 | 4. |
| | | | Totals | | | 7.00 | 7.00 | 7.00 | 7.00 | |

### Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Sat 5/15 2004 | Sun 5/16 2004 | Mon 5/17 2004 | Tue 5/18 2004 | Wed 5/19 2004 | Thu 5/20 2004 | F 5 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | | 0525 | | | | | | | |
| | | | Totals | | | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| JAY COOPER | 5/19/2004 | * Completed * |

CP3300

Timesheet

# Timesheet for MICHAEL L. KUNZ Employee # 331

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| Jan - 1 | 1/22/2004 | 77.00 | ARCHIVED |

From 1/1/2004 To 1/15/2004

## Week 1  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/1 2004 | Fri 1/2 2004 | Sat 1/3 2004 | Sun 1/4 2004 | Mon 1/5 2004 | Tue 1/6 2004 | W 1 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 2325 | | 5.00 | | | 5.00 | 5.00 | 5. |
| ☐ | Regular | 657 | 2325 | | 2.00 | | | 2.00 | 2.00 | 2. |
| ☐ | Holiday | 452 | 2325 | 5.00 | | | | | | |
| ☐ | Holiday | 657 | 2325 | 2.00 | | | | | | |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

## Week 2  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/8 2004 | Fri 1/9 2004 | Sat 1/10 2004 | Sun 1/11 2004 | Mon 1/12 2004 | Tue 1/13 2004 | W 1/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 2325 | 5.00 | 5.00 | | | 5.00 | 5.00 | 5. |
| ☐ | Regular | 657 | 2325 | 2.00 | 2.00 | | | 2.00 | 2.00 | 2. |
| | | | Totals | 7.00 | 7.00 | | | 7.00 | 7.00 | |

## Week 3  [Add line]  [Delete line(s)]

| | Time Type | Labor Class | Cost Center | Thu 1/15 2004 | Fri 1/16 2004 | Sat 1/17 2004 | Sun 1/18 2004 | Mon 1/19 2004 | Tue 1/20 2004 | W 1/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | Regular | 452 | 2325 | 5.00 | | | | | | |
| ☐ | Regular | 657 | 2325 | 2.00 | | | | | | |
| | | | Totals | 7.00 | | | | | | |

## Notes

| From | Date | Note |
|---|---|---|
| ARLENE LEAR | 1/22/2004 | * Approved * |
| MARIA C. STONEHAM | 1/25/2004 | * Completed * |

Enter New Notes



CP3334

## Timesheet for MICHAEL L. KUNZ Employee # 331

| Timesheet Description | Date Submitted | Total Hours | Status |
|---|---|---|---|
| (Untitled) | 7/9/2004 | 77.00 | ARCHIVED |

From 6/16/2004 To 6/30/2004

### Week 1 [ Add line ] [ Delete line(s) ]

|  |  | Time Type | Labor Class | Cost Center | Wed 6/16 2004 | Thu 6/17 2004 | Fri 6/18 2004 | Sat 6/19 2004 | Sun 6/20 2004 | Mon 6/21 2004 | T 6/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ |  | Regular | 452 | 0625 | 2.00 | 2.00 | 2.00 |  |  | 2.00 | 2. |
| ☐ |  | Regular | 657 | 0625 | 2.00 | 2.00 | 2.00 |  |  | 3.00 | 3. |
| ☐ |  | Regular | 674 | 0625 | 3.00 | 3.00 | 3.00 |  |  | 2.00 | 2. |
|  |  |  |  | Totals | 7.00 | 7.00 | 7.00 |  |  | 7.00 |  |

### Week 2 [ Add line ] [ Delete line(s) ]

|  |  | Time Type | Labor Class | Cost Center | Wed 6/23 2004 | Thu 6/24 2004 | Fri 6/25 2004 | Sat 6/26 2004 | Sun 6/27 2004 | Mon 6/28 2004 | T 6/ 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ |  | Regular | 452 | 0625 | 3.00 | 3.00 | 4.00 |  |  | 3.00 | 4. |
| ☐ |  | Regular | 674 | 0625 | 4.00 | 4.00 | 3.00 |  |  | 4.00 | 3. |
|  |  |  |  | Totals | 7.00 | 7.00 | 7.00 |  |  | 7.00 |  |

### Week 3 [ Add line ] [ Delete line(s) ]

|  |  | Time Type | Labor Class | Cost Center | Wed 6/30 2004 | Thu 7/1 2004 | Fri 7/2 2004 | Sat 7/3 2004 | Sun 7/4 2004 | Mon 7/5 2004 | T 7 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ |  | Regular | 452 | 0625 | 3.00 |  |  |  |  |  |  |
| ☐ |  | Regular | 657 | 0625 | 4.00 |  |  |  |  |  |  |
|  |  |  |  | Totals | 7.00 |  |  |  |  |  |  |

### Notes

| From | Date | Note |
|---|---|---|
| MARIA C. STONEHAM | 7/9/2004 | * Completed * |

Enter New Notes

CP3352

COUNTERPART International, Inc.

| | DATE | TYPE JOURNAL | BATCH CONTROL NUMBER | | Posting Line Items | CLJI |
|---|---|---|---|---|---|---|
| | 04/30/04 | GJ | 04146 | | 13068 | |

Attach Documentation

Description:  Reason for Posting/Adjustment
CAR Dushanbe, Tajikistan – April 2004

Posting Trace No.

| FUND | LOC | PROJ | OBJECT | ORG | SUB OBJ | DEBITS | CREDITS | NOTES/COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 950 | 27 | 00 | 1001 | 4 | 204 | 197,960.46 | | |
| 950 | 27 | 00 | 1001 | 4 | 204 | | 68,289.75 | |
| 950 | 27 | 00 | 3335 | 6 | 449 | | 48,000.00 | Xfer Fr HQ |
| 669 | 27 | 27 | 3038 | 4 | 000 | | 140,244.98 | CARE Int (Monetization) |
| 765 | 01 | 00 | 1126 | 1 | 000 | | 9,586.36 | WB For CENA |
| 95 | 27 | 00 | 3011 | 4 | 000 | 1.10 | | Gain/Loss On Exch |
| | | | | | | | | |
| 449 | 05 | 25 | 4404 | 4 | 000 | 190.37 | | |
| | | | | | | | | |
| 449 | 27 | 25 | 4100 | 4 | 000 | 1,729.13 | | |
| 449 | 27 | 25 | 4104 | 4 | 000 | 2.52 | | |
| 449 | 27 | 25 | 4150 | 4 | 000 | 379.51 | | |
| 449 | 27 | 25 | 4231 | 4 | 000 | 200.00 | | |
| 449 | 27 | 25 | 4502 | 4 | 000 | 153.61 | | |
| 449 | 27 | 25 | 4403 | 4 | 000 | 332.88 | | |
| 449 | 27 | 25 | 4404 | 4 | 000 | 246.12 | | |
| 449 | 27 | 25 | 4700 | 4 | 000 | | 170.00 | |
| 449 | 27 | 25 | 5001 | 4 | 000 | 203.92 | | |
| 449 | 27 | 25 | 5000 | 4 | 000 | 88.04 | | |
| 449 | 27 | 25 | 5005 | 4 | 000 | 67.51 | | |
| 449 | 27 | 25 | 5014 | 4 | 000 | 123.90 | | |
| 449 | 27 | 25 | 5042 | 4 | 000 | 764.74 | | |
| 449 | 27 | 25 | 5039 | 4 | 000 | 210.91 | | |
| 449 | 27 | 25 | 5045 | 4 | 000 | 24.05 | | |
| 449 | 27 | 25 | 5506 | 4 | 000 | 3,197.45 | | |
| | | | | | | | | |
| 657 | 23 | 25 | 4100 | 4 | 000 | 83.00 | | |
| 657 | 23 | 25 | 4502 | 4 | 000 | 51.20 | | |
| 657 | 23 | 25 | 5000 | 4 | 000 | 56.85 | | |
| 657 | 23 | 25 | 5005 | 4 | 000 | 113.79 | | |
| 657 | 23 | 25 | 5042 | 4 | 000 | 764.74 | | |
| 657 | 23 | 25 | 5045 | 4 | 000 | 3.44 | | |
| | | | | | | | | |
| 669 | 27 | 27 | 4100 | 4 | 000 | 2,149.31 | | |
| 669 | 27 | 27 | 4104 | 4 | 000 | 2.37 | | |
| 669 | 27 | 27 | 4150 | 4 | 000 | 448.50 | | |
| 669 | 27 | 27 | 4100 | 4 | 000 | 40.00 | | |
| 669 | 27 | 27 | 4152 | 4 | 000 | 528.00 | | |
| 669 | 27 | 27 | 4100 | 4 | 000 | 300.00 | | |
| 669 | 27 | 27 | 4159 | 4 | 000 | 1,290.07 | | |
| 669 | 27 | 27 | 4403 | 4 | 000 | 1,518.80 | | |
| 669 | 27 | 27 | 4500 | 4 | 000 | 13,991.24 | | |
| 669 | 27 | 27 | 5014 | 4 | 000 | 143.37 | | |
| 669 | 27 | 27 | 4700 | 4 | 000 | 2,000.00 | | |
| 669 | 27 | 27 | 5000 | 4 | 000 | 252.45 | | |
| 669 | 27 | 27 | 5014 | 4 | 000 | 226.20 | | |
| 669 | 27 | 27 | 5042 | 4 | 000 | 764.74 | | |
| 669 | 27 | 27 | 5039 | 4 | 000 | 58.80 | | |
| 669 | 27 | 27 | 5045 | 4 | 000 | 25.67 | | |
| | | | | | | | | |
| 669 | 27 | 12 | 5005 | 4 | 000 | 135.63 | | |
| | | | | | | | | |
| 761 | 27 | 19 | 4100 | 4 | 000 | 1,938.50 | | |
| 761 | 27 | 19 | 4104 | 4 | 000 | 2.67 | | |
| 761 | 27 | 19 | 4150 | 4 | 000 | 432.44 | | |
| 761 | 27 | 19 | 4151 | 4 | 000 | 61.78 | | |
| 761 | 27 | 19 | 4152 | 4 | 000 | 1,000.00 | | |
| 761 | 27 | 19 | 4404 | 4 | 000 | 10.31 | | |
| 761 | 27 | 19 | 4502 | 4 | 000 | 163.85 | | |
| 761 | 27 | 19 | 4700 | 4 | 000 | | 170.00 | |
| 761 | 27 | 19 | 5000 | 4 | 000 | 205.79 | | |
| 761 | 27 | 19 | 5005 | 4 | 000 | 137.51 | | |
| 761 | 27 | 19 | 5042 | 4 | 000 | 764.73 | | |
| 761 | 27 | 19 | 5014 | 4 | 000 | 174.54 | | |
| 761 | 27 | 19 | 5039 | 4 | 000 | 324.31 | | |
| 761 | 27 | 19 | 5045 | 4 | 000 | 25.02 | | |
| 761 | 27 | 19 | 5501 | 4 | 000 | 30.00 | | |

EXHIBIT

Dobbs 59
11.27.06

CP4034

## COUNTERPART CONSORTIUM
### DUSHANBE OFFICE EXPENSE VOUCHER

VOUCHER NUMBER: _4/4_                          DATE: _April 5, 04_

PAID TO/DEPOSIT FROM: _Trip to Tajikistan_                    HC

| EXPLANATION OF PAYMENT/DEPOSIT/ADJUSTMENT: |
|---|
| _Some expenses during the trip_ |
| _to Tajikistan of Bob Abrνα_ |
| _on March 28, 04 April 4, 04_ |

| CHART OF ACCOUNTS NUMBER (Must Be Completed) | | | | | | NARRATIVE | DEBIT OR CREDIT AMOUNT |
|---|---|---|---|---|---|---|---|
| FUNDS | LOC | PROJ | CHART OF ACCT | ORG | SUB-ACCT | | |
| 449 434 | 27 | 25 | 4404 | 4 | 000 | _Inter Coountry Travel_ | 210.00 |
| 434 | 27 | 25 | | 4 | 000 | | |
| 434 | 27 | 25 | | 4 | 000 | | |
| 434 | 27 | 25 | | 4 | 000 | | |
| 434 | 27 | 25 | | 4 | 000 | | |
| 434 | 27 | 25 | | 4 | 000 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 950 | 00 | 00 | 3335 | 4 | 000 | | |

TOTAL AMOUNT: 210.00

| CERTIFICATION: |
|---|
| RECEIVED IN FULL AMOUNT OF: _____ |
| SIGNATURE: _____ |

PREPARED BY: _Nodira P._

APPROVED BY: _[signature]_

CP4037

## Расходный ордер Алматинского офиса
### ALMATY OFFICE EXPENSE VOUCHER

| | | |
|---|---|---|
| Номер ордера/Voucher number: | **04/05/45** | Дата/ Date: **05/13/04** |

Выдано кому      **Bob Abma**

Paid to:

**Назначение платежа/ Депозит/ Поправка:**      Per diem in Ashgabad May 1-8

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMENT:

| Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed) | | | | | | Описание NARRATIVE | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|
| Фонд № Fund # | Местоназ-с LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | | |
| 452 | 32 | 25 | 4404 | 4 | 000 | Inter-Country Travel    *FD* | 356,63 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | **Общая сумма** TOTAL AMOUNT | 356,63 |

Удостоверение:

Certification:
      **Получена сумма (прописью):** _____
         RECEIVED IN FULL THE AMOUNT OF:

         **Подпись** _____
         SIGNATURE:

**Подготовлено:**
PREPARED BY:

**Одобрено:**
APPROVED BY:

**EXHIBIT**
Dorcus 60
11·27·06

CP4055

452-32  4404    *Fin Over*

## Каунтерпарт Консорциум , Алматинский офис
### Counterpart Consortium, Almaty office
## Расходный кассовый ордер
### RECEIPT FOR CASH PAYMENT

Дата: *05/13/04*
Date:

Я, *Bob Abma*        от _____        получил(а) сумму *$356.63*
I,    (имя, фамилия)     of                      received
      (name of person)        (Название организации)
                              (name of organization/company)

(курс обмена *23 000 manat* на доллар США) от Каунтерпарт Консорциума для
(exchange rate        per USD) from the Counterpart Consortium for

*May 1 07:00  TO  May 8 08:00  2004*              *$50/Day*

*kss amount taken in Ashgabad (1st payment $5.87); 7½ d × $50 = $362.50*
                          описание товаров и/или услуг
                    (description of goods and / or services rendered)

на период от *May 1 - 07:00* до *May 8 - 08:00*
for the period of          to

                                    Получено : _____
                                    Received by : _____ подпись/signature

Фамилия и подпись представителя Консорциума, ответственного за оплату
Name and Signature of Consortium Representative Making Payment:

                        Прикрепить к оригиналу счета-фактуры
                        [Must attach original invoice]

CP4056

# Каунтерпарт Консорциум/Counterpart Consortium
## Расходный ордер Алматинского офиса
ALMATY OFFICE EXPENSE VOUCHER

| Номер ордера/Voucher number: | 04/06/15 | Дата/Date 06/07/04 |
|---|---|---|

| Выдано кому / Paid to: | Igor Storozhenko |
|---|---|

**Назначение платежа/ Депозит/ Поправка:** Petty Cash May 18 - June 3

Exchange rate 136,70 kzt/usd

Таблица кодов/Chart of accounts number
(Должно быть заполнено/Must be completed)

| Фонд №<br>Fund # | Местонах<br>LOC | №проек<br>#PROJ | Таблица счет<br>Chart of acc | Орг<br>ORG | Подсчё<br>SUB - ACC | Описание<br>NARRATIVE | | Сумма<br>дебита или кредит<br>Debit or credit amount |
|---|---|---|---|---|---|---|---|---|
| 750 | 21 | 30 | 5014 | 4 | 000 | Office Supplies | UM/Hepatitis | 60,34 |
| 750 | 21 | 30 | 5037 | 4 | 000 | Computer Supplies | UM/Hepatitis | 0,44 |
| 449 | 21 | 25 | 5005 | 4 | 000 | Telephone | Healthy-Kazakhstan | 10,97 |
| 449 | 21 | 25 | 5014 | 4 | 000 | Office Supplies | Healthy-Kazakhstan | 120,69 |
| 449 | 21 | 25 | 5037 | 4 | 000 | Computer Supplies | Healthy-Kazakhstan | 0,88 |
| 449 | 05 | 25 | 4231 | 4 | 000 | Subcontractor's Fee | Healthy-Regional | 307,00 |
| 449 | 05 | 25 | 5005 | 4 | 000 | Telephone | Healthy-Regional | 10,99 |
| 449 | 05 | 25 | 5014 | 4 | 000 | Office Supplies | Healthy-Regional | 150,86 |
| 449 | 05 | 25 | 5037 | 4 | 000 | Computer Supplies | Healthy-Regional | 1,10 |
| 449 | 06 | 25 | 4401 | 4 | 000 | Inter-Country Travel HQ staff | Healthy HQ-Washington | 737,71 |
| 449 | 06 | 25 | 5005 | 4 | 000 | Telephone | Healthy HQ-Washington | 108,63 |
| 452 | 21 | 25 | 4302 | 4 | 000 | Supplies & Services | Kazakhstan | 286,52 |
| 452 | 21 | 25 | 4403 | 4 | 000 | Intra-Country Travel | Kazakhstan | 298,30 |
| 452 | 21 | 25 | 5014 | 4 | 000 | Office Supplies | Kazakhstan | 126,72 |
| 452 | 21 | 25 | 5037 | 4 | 000 | Computer Supplies | Kazakhstan | 0,88 |
| 452 | 05 | 25 | 4231 | 4 | 000 | Consultants Fees | Regional | 160,00 |
| 452 | 05 | 25 | 5014 | 4 | 000 | Office Supplies | Regional | 150,86 |
| 452 | 05 | 25 | 5037 | 4 | 000 | Computer Supplies | Regional | 1,10 |
| 452 | 05 | 25 | 4152 | 4 | 000 | Housing-JC | Regional                    JC | 74,45 |
| 452 | 06 | 25 | 4401 | 4 | 000 | Inter-Country Travel HQ staff | Washington | 1367,28 |
| 452 | 06 | 25 | 5005 | 4 | 000 | Telephone | Washington | 111,92 |
| 452 | 06 | 25 | 4401 | 4 | 000 | Inter-Country Travel HQ st. | Washington | 422,00 |
| 674 | 52 | 25 | 4404 | 4 | 000 | Inter-Country Travel | IRAQ CAP | 280,10 |
| 674 | 52 | 25 | 5005 | 4 | 000 | Telephone | IRAQ CAP | 36,21 |
| 955 | 04 | 098 | 5005 | 4 | 000 | Telephone | Armeniya PD | 36,21 |
| 955 | 04 | 096 | 5005 | 4 | 000 | Telephone | Moldova PD | 36,21 |
| 452 | 06 | 25 | 5014 | 4 | 000 | Office Supplies | Washington | 139,49 |
| 449 | 06 | 25 | 5014 | 4 | 000 | Office Supplies | Healthy-Washington | 62,00 |
| 657 | 06 | 25 | 5014 | 4 | 000 | Office Supplies | CAIP-Washington | 46,50 |
| 448 | 06 | 25 | 5014 | 4 | 000 | Office Supplies | CASP-Washington | 31,00 |
| 444 | 06 | 25 | 5014 | 4 | 000 | Office Supplies | Bulgaria-Washington | 31,00 |
| | | | | | | TX from Advances to Cash on Hand | | -2055,53 |
| | | | | | | TX to Cash on Hand from Advance | | 2055,53 |

| | Общая сумма<br>TOTAL AMOUNT | 5208,36 |
|---|---|---|

**Удостоверение:**
Certification:

Получена сумма (прописью): _____
RECEIVED IN FULL THE AMOUNT OF:

Подпись _____
SIGNATURE

Подготовлено: _____
PREPARED BY:

Одобрено: _____
APPROVED BY:

EXHIBIT
Dorcus 61
11.27.06

CP4134

CASH ADVANCE LIQUIDATION / REIMBURSEMENT REQUEST

Subml :                    Storozhenko Igor                              Date : _____

Amount of Received:  Tenge                                              Grant Total :   $4 969,21
          Exchange Rate    136,70                                                            (date)

Attached please find receipts for the following expenses (except taxis less than $10) :

| ITEM # | DATE | DESCRIPTION | | | AMOUNT | | |
|---|---|---|---|---|---|---|---|
| | | | | | TENGE | Ex. Rate | DOLLARS |
| 1 | 18.май.04 | Organizer for Didars Setpulnik | REGIONAL | 5014 | 826,00T | 136,70 | $6,04 |
| 2 | 27.май.04 | Stationary for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 4 359,00T | 136,70 | $31,89 |
| 3 | 25.май.04 | Ticshenko for Altynai Kussainova | REGIONAL | 4231 | | 136,70 | $212,00 |
| 4 | 25.май.04 | Computer supplies CD disks for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5037 | 600,00T | 136,70 | $4,39 |
| 5 | 25.май.04 | Scotch tape for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 1 330,00T | 136,70 | $9,73 |
| 6 | 25.май.04 | Kcell for Michael Kunz | REGIONAL | 5005 | 45 000,00T | 136,70 | $329,19 |
| 7 | 25.май.04 | DVDR-disks for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 29 000,00T | 136,70 | $212,14 |
| 8 | 25.май.04 | Food for office (tea,sugar) | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 4 205,00T | 136,70 | $30,76 |
| 9 | 26.май.04 | Stationery for Training for Kim Alter | KAZAKHSTAN | 4302 | 13 891,00T | 136,70 | $101,62 |
| 10 | 27.май.04 | Taxi:   Kanzhigaline | KAZAKHSTAN | 4403 | 800,00T | 136,70 | $5,85 |
| 11 | 21.май.04 | Soft drinks, cookies coffee-breaks | KAZAKHSTAN | 4302 | 6 421,00T | 136,70 | $46,97 |
| 12 | 27.май.04 | Plastic packets for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10%/ | 5014 | 453,00T | 136,70 | $3,31 |
| 13 | 28.май.04 | Airtickets Almaty-Dushanbe for Arlene Lear | REGIONAL | 4404 | 39 208,00T | 136,70 | $286,82 |
| 14 | 28.май.04 | KCell for Vaslat Akhmetov | HEALTH-REGIONAL | 5005 | 1 502,00T | 136,70 | $10,99 |
| 15 | 28.май.04 | KCell for Yespenova | HEALTH-KAZAKHSTAN | 5005 | 1 500,00T | 136,70 | $10,97 |
| 16 | 28.май.04 | Water "Calipso" | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 16 200,00T | 136,70 | $118,51 |
| 17 | 28.май.04 | Rubber gloves for cleaning lady | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 315,00T | 136,70 | $2,30 |
| 18 | 28.май.04 | Translator Ticshenko for Kussainova | REGIONAL | 4231 | | 136,70 | $95,00 |
| 19 | 31.май.04 | Soft drinks, cookies, coffee-breaks | KAZAKHSTAN | 4302 | 10 972,00T | 136,70 | $80,26 |
| 20 | 31.май.04 | Payment fo lunch workshop participants Kim Alter | KAZAKHSTAN | 4302 | 6 568,00T | 136,70 | $48,05 |
| 21 | 31.май.04 | Translator Kaldubekova for Kim Alter | REGIONAL | 4231 | | 136,70 | $160,00 |
| 22 | 01.июн.04 | Visa for Tajikistan for Michael Kunz | REGIONAL-MK | 5010 | | 136,70 | $450,00 |
| 23 | 01.июн.04 | Taxi:   Amanova | KAZAKHSTAN | 4403 | 200,00T | 136,70 | $1,46 |
| 24 | 01.июн.04 | Cd disks for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 1 500,00T | 136,70 | $10,97 |
| 25 | 01.июн.04 | Airtickets Almaty-Astana-Almaty for Setpulnik Didara | KAZAKHSTAN | 4403 | 39 778,00T | 136,70 | $290,99 |
| 26 | 01.июн.04 | Cookies for Workshop for Kim Alter | KAZAKHSTAN | 4302 | 1 315,00T | 136,70 | $9,62 |
| 27 | 01.июн.04 | Tea sugar coffee for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 5 002,00T | 136,70 | $36,59 |
| 28 | 01.июн.04 | Airtickets Almaty-Frankfurt-Almaty for Michael Kunz | REGIONAL/MK | 4404 | 114 033,00T | 136,70 | $834,18 |
| 29 | 02.июн.04 | Xerox paper for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 42 375,00T | 136,70 | $309,99 |
| 30 | 02.июн.04 | Airticket Dushanbe-Almaty for Michael Kunz | REGIONAL/MK | 4404 | 19 558,00T | 136,70 | $143,07 |
| 31 | 02.июн.04 | Napkins, toilet paper liqued soap for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 7 820,00T | 136,70 | $57,21 |
| 32 | 02.июн.04 | Airtickets Almty-Moscow for Lola Asrokova | IRAC CAP | 4404 | 38 290,00T | 136,70 | $280,10 |
| 33 | 02.июн.04 | Turkmen visas for Arlene Lear, Kunz Michael | REGIONAL | 5030 | | 136,70 | -$422,00 |
| 34 | 03.июн.04 | Visa for Arlene Lear for Kazakhstan Iwo Registration | REGIONAL | 5010 | 33 666,00T | 136,70 | $246,28 |
| 35 | 03.июн.04 | Stationery for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 12 305,00T | 136,70 | $90,01 |
| 36 | 03.июн.04 | Airtickets Almaty-Tashkent for Michael Kunz | REGIONAL/MK | 4404 | 19 772,00T | 136,70 | $144,64 |
| 37 | 03.июн.04 | Housing for Jay Cooper for May | REGIONAL JC | 4152 | 10 177,00T | 136,70 | $74,45 |
| 48 | | | | | | 136,70 | $0,00 |

$5 208,36

gned : _____                         Less Advance Rec'd     $4 969,21

Supervisor's Approval / Date                        Amount due Counterpart or (due employee)     ($239,15)

_____ / _____

DCOP  Approval / Date

____ / _____

CP4135



**Накладная № Н-7576  от 1 июня 2004 г.**

Оформлена на основании счета № 0 от 1 июня 2004 г.

Форма оплаты: Наличный расчет

Покупатель: COUNTERPART ICNL

Дисконтная карта: 0000253

**IATA ACCREDITED AGENT**

**Агентство Эй Си Эс**
А В И А Б И Л Е Т Ы  И  Т У Р И З М

Республика Казахстан, 480100, г. Алматы, пр. Достык, 27
Телефон: +7 3272 912628
Телефон бухгалтерии: +7 3272 912505
Факс: +7 3272 913141

| № | Наименование (номер а/билета, маршрут, пассажир) | Количество | Стоимость | Скидка, (%) | Скидка, тн | Сумма |
|---|---|---|---|---|---|---|
| 1 | 220 4436403317 KUNZ/MICHAEL MR ALA-FRA-BER-FRA-ALA | 1 шт. | 115060.00 | 1.00 | 1027.00 | 114033.00 |
| | | | | | Итого: | 114 033.00 тенге |

Для получения авиабилетов иметь доверенность плательщика        С правилами тарифа ознакомлен

Внимание: Возврат авиабилетов производится при наличии фискального чека.

Получил _____        Отпустил(а): _____        Дрейлинг И.В.

АГЕН-ВО ЭЙ СИ ЭС
РЕГ-39883
01.06.04
ОП.0 К.N 1299364
ЧН 600900516986
*ВТОРНЫЙ ЧЕК*
10К ..114033.
% 0......0.00%
+<%>......0.
ИТОГ..114033.
14:46Ф ЧЕК34
СВ60305-0005318

CP4143

## Расходный ордер Алматинского офиса
### ALMATY OFFICE EXPENSE VOUCHER

VOUCHER NUMBER: **04/06/57**     Дата/ Date: **06/28/04**

PAID TO: **Bob Abma**

---

EXPLANATION OF PAYMENT

**Bob Abma - Salary Advance**     for June 2004

**Cash: $800**

**Bank Fee: 1%**

---

| Фонд № | Мествах-е | № проекта | Таблица счетов | Орг | Подсчет | Описание | Сумма |
|--------|-----------|-----------|----------------|-----|---------|----------|-------|
| Fund # | LOC | #PROJ | Chart of acct | ORG | SUB - ACCT | NARRATIVE | Debit or credit amount |
| 950 | 06 | 00 | 1206 | 6 | 090 | Bob Abma - Salary Advance | 808.00 |
| 452 | 21 | 25 | 5000 | 4 | 000 | Bank Fees | -8.00 |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |

Таблица кодов/Chart of accounts number
(Должно быть заполнено/Must be completed)

| | |
|---|---|
| Общая сумма | 800.00 |
| TOTAL AMOUNT | |

---

**Удостоверение:**
Certification:

Получена сумма (прописью):     Eight hundred USD
RECEIVED IN FULL THE AMOUNT OF:

Подпись
SIGNATURE:

---

**Подготовлено:**
PREPARED BY:

**Одобрено:**
APPROVED BY:

EXHIBIT
DORCUS 63
11·27·01

CP4193

# Каунтерпарт Консорциум/Counterpart Consortium
## Расходный ордер Алматинского офиса
### ALMATY OFFICE EXPENSE VOUCHER

Номер ордера/Voucher number: **04/06/65**      Дата/ Date: **06/30/04**

Выдано кому: **Michael Kunz**

Paid to/Deposit from:

Назначение платежа/ Депозит/ Поправка:     Personal deposit M.Kunz

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMEN

cash $14840,10; bank fee 1% (v.4/6/13; 4/6/46)

| Фонд № Fund # | Местонах-е LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | Описание NARRATIVE | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|
| | | | 2004 | 4 | 900 | Other | 14990,00 |
| 452 | 21 | 25 | 5000 | 4 | 000 | Bank Fee | -149,90 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed)**

Общая сумма
TOTAL AMOUNT      14840,10

Удостоверение:
Certification:
   Получена сумма (прописью):
   RECEIVED IN FULL THE AMOUNT OF: _____

Подпись _____
SIGNATURE:

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

CP4194

COURTEPART International, inc. 

| DATE | TYPE JOURNAL | BATCH CONTROL NUMBER | Posting Line Items |
|---|---|---|---|
| 07/31/04 | GJ | 87161 | 134130 |

Attach Documentation
**Description:** Reason for Posting/Adjustment
CAR III Almaty, Kazakstan - July 2004

Posting Trace No.

| FUND | LOC | PROJ | OBJECT | OBJ | SUB OBJ | DEBITS | CREDITS | NOTES/COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 950 | 21 | 00 | 1001 | 4 | 201 | 165,500.00 | | |
| 950 | 21 | 00 | 1001 | 4 | 201 | | 230,349.22 | |
| 950 | 01 | 00 | 1127 | 1 | 029 | | | Dep from ICNL DC |
| 452 | 21 | 25 | 5000 | 4 | 000 | | | Bank Fee |
| 950 | 21 | 00 | 3335 | 6 | 452 | | 144,500.00 | Xfer from HQ |
| 950 | 21 | 00 | 3335 | 6 | 452 | | 21,000.00 | Xfer from HQ |
| 950 | 21 | 00 | 3011 | 4 | 000 | | 1.42 | Gain/ Loss On Exch |
| 444 | 06 | 25 | 5000 | 4 | 000 | 0.31 | | |
| 444 | 06 | 25 | 5014 | 4 | 000 | 31.27 | | |
| 448 | 06 | 25 | 5000 | 4 | 000 | 0.31 | | |
| 448 | 06 | 25 | 5014 | 4 | 000 | 31.27 | | |
| 449 | 05 | 25 | 4100 | 4 | 000 | 3,655.00 | | |
| 449 | 05 | 25 | 4150 | 4 | 000 | 689.58 | | |
| 449 | 05 | 25 | 4151 | 4 | 000 | 296.49 | | |
| 449 | 05 | 25 | 4152 | 4 | 000 | 1,110.00 | | |
| 449 | 05 | 25 | 4161 | 4 | 000 | 340.35 | | |
| 449 | 05 | 25 | 4404 | 4 | 000 | 216.89 | | |
| 449 | 05 | 25 | 4231 | 4 | 000 | 152.25 | | |
| 449 | 05 | 25 | 4700 | 4 | 000 | 450.00 | | |
| 449 | 05 | 25 | 5001 | 4 | 000 | 140.00 | | |
| 449 | 05 | 25 | 5000 | 4 | 000 | 142.84 | | |
| 449 | 05 | 25 | 5005 | 4 | 000 | 244.77 | | |
| 449 | 05 | 25 | 5045 | 4 | 000 | 66.66 | | |
| 449 | 05 | 25 | 5014 | 4 | 000 | 289.78 | | |
| 449 | 05 | 25 | 5039 | 4 | 000 | 225.00 | | |
| 449 | 05 | 25 | 5042 | 4 | 000 | 315.00 | | |
| 449 | 06 | 25 | 5000 | 4 | 000 | 1.53 | | |
| 449 | 06 | 25 | 5005 | 4 | 000 | 151.15 | | |
| 449 | 06 | 25 | 5014 | 4 | 000 | 62.55 | | |
| 449 | 21 | 25 | 4100 | 4 | 000 | 2,001.00 | | |
| 449 | 21 | 25 | 4150 | 4 | 000 | 497.41 | | |
| 449 | 21 | 25 | 4151 | 4 | 000 | 191.28 | | |
| 449 | 21 | 25 | 4230 | 4 | 000 | 5,382.47 | | |
| 449 | 21 | 25 | 4231 | 4 | 000 | 121.80 | | |
| 449 | 21 | 25 | 4403 | 4 | 000 | 591.35 | | |
| 449 | 21 | 25 | 5000 | 4 | 000 | 138.77 | | |
| 449 | 21 | 25 | 5005 | 4 | 000 | 86.03 | | |
| 449 | 21 | 25 | 5014 | 4 | 000 | 231.82 | | |
| 449 | 21 | 25 | 5039 | 4 | 000 | 60.00 | | |
| 449 | 21 | 25 | 5042 | 4 | 000 | 252.00 | | |
| 449 | 21 | 25 | 5045 | 4 | 000 | 53.32 | | |
| 449 | 21 | 25 | 5506 | 4 | 000 | 8,400.00 | | |
| 452 | 06 | 25 | 4401 | 4 | 000 | 944.14 | | |
| 452 | 06 | 25 | 5000 | 4 | 000 | 11.78 | | |
| 452 | 06 | 25 | 5005 | 4 | 000 | 155.72 | | |
| 452 | 06 | 25 | 5014 | 4 | 000 | 140.73 | | |
| 452 | 05 | 25 | 4100 | 4 | 000 | 2,475.00 | | |
| 452 | 05 | 25 | 4150 | 4 | 000 | 666.09 | | |
| 452 | 05 | 25 | 4151 | 4 | 000 | 468.66 | | |
| 452 | 05 | 25 | 4152 | 4 | 000 | 3,017.60 | | |
| 452 | 05 | 25 | 4157 | 4 | 000 | 100.00 | | |
| 452 | 05 | 25 | 4161 | 4 | 000 | 1,021.00 | | |
| 452 | 05 | 25 | 4231 | 4 | 000 | 402.25 | | |
| 452 | 05 | 25 | 5001 | 4 | 000 | 2,597.39 | | |
| 452 | 05 | 25 | 4300 | 4 | 000 | 126.00 | | |
| 452 | 05 | 25 | 4700 | 4 | 000 | 450.00 | | |
| 452 | 05 | 25 | 4302 | 4 | 000 | 134.81 | | |
| 452 | 05 | 25 | 4403 | 4 | 000 | 10.33 | | |
| 452 | 05 | 25 | 4404 | 4 | 000 | 2,820.46 | | |
| 452 | 05 | 25 | 5037 | 4 | 000 | 94.78 | | |
| 452 | 05 | 25 | 5010 | 4 | 000 | 8.86 | | |
| 452 | 05 | 25 | 5000 | 4 | 000 | 200.41 | | |
| 452 | 05 | 25 | 5005 | 4 | 000 | 607.26 | | |
| 452 | 05 | 25 | 5014 | 4 | 000 | 305.94 | | |
| 452 | 05 | 25 | 5039 | 4 | 000 | 75.00 | | |
| 452 | 05 | 25 | 5042 | 4 | 000 | 323.04 | | |
| 452 | 05 | 25 | 5045 | 4 | 000 | 110.94 | | |
| 452 | 21 | 25 | 4100 | 4 | 000 | 4,259.00 | | |
| 452 | 21 | 25 | 4150 | 4 | 000 | 1,053.12 | | |
| 452 | 21 | 25 | 4151 | 4 | 000 | 1,162.07 | | |
| 452 | 21 | 25 | 4300 | 4 | 000 | 422.69 | | |
| 452 | 21 | 25 | 4231 | 4 | 000 | 1,794.59 | | |
| 452 | 21 | 25 | 4301 | 4 | 000 | 370.00 | | |
| 452 | 21 | 25 | 4302 | 4 | 000 | 9.52 | | |
| 452 | 21 | 25 | 4303 | 4 | 000 | 402.58 | | |



EXHIBIT

Dorcus 64

1/27-06

CP4208

## Расходный ордер Алматинского офиса
## ALMATY OFFICE EXPENSE VOUCHER

| Номер ордера/Voucher number: | **04/07/01** | Дата/ Date: | **07/01/04** |
|---|---|---|---|

| Выдано кому | **Bob Abma** |
|---|---|

Paid to:

| Назначение платежа/ Депозит/ Поправка: | Berlin & Washington travel expenses report |
|---|---|

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMENT:

Exchange rate 136,60 kzt/usd; 166,17 kzt/euro

| Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed) | | | | | | Описание | | Сумма дебита или кредита |
|---|---|---|---|---|---|---|---|---|
| Фонд № | Местонах-е | № проекта | Таблица счетов | Орг | Подсчет | NARRATIVE | | Debit or credit amount |
| Fund # | LOC | #PROJ | Chart of acct | ORG | SUB - ACCT | | | |
| 452 | 05 | 25 | 4404 | 4 | 000 | Inter-Country Travel | FO | 538,25 |
| 449 | 05 | 25 | 4404 | 4 | 000 | Inter-Country Travel | FO | 179,41 |
| 452 | 05 | 25 | 4161 | 4 | 000 | R&R - Consultation | BA | 1021,00 |
| 449 | 05 | 25 | 4161 | 4 | 000 | R&R - Consultation | BA | 340,35 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | Общая сумма TOTAL AMOUNT | 2079,01 |
|---|---|---|

Удостоверение:
Certification:

Получена сумма (прописью):
RECEIVED IN FULL THE AMOUNT OF:

Подпись
SIGNATURE:

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

CP4214

**Расходный ордер Алматинского офиса**
ALMATY OFFICE EXPENSE VOUCHER

| Номер ордера/Voucher number: | **04/07/66** | Дата/ Date: | **07/22/04** |
|---|---|---|---|

| Выдано кому /Получено от | **Igor Krayev** |
|---|---|

Paid to/Deposit from:

| Назначение платежа/ Депозит/ Поправка: | apartment lease Bob Abma Jul 1 - Sept 30, 2004 |
|---|---|

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMENT:

**Таблица кодов**/Chart of accounts number
(Должно быть заполнено/Must be completed)

| Фонд № Fund # | Местонах-е LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | Описание NARRATIVE | | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|---|
| 452 | 05 | 25 | 4152 | 4 | 000 | Housing | BA | 1665,00 |
| 449 | 05 | 25 | 4152 | 4 | 000 | Housing | BA | 1110,00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | Общая сумма TOTAL AMOUNT | 2775,00 |
|---|---|---|

**Удостоверение:**
Certification:

**Получена сумма (прописью):** _____
RECEIVED IN FULL THE AMOUNT OF:

**Подпись** _____
SIGNATURE:

**Подготовлено:** _____
PREPARED BY:

**Одобрено:** _____
APPROVED BY:

CP4266

# LEASE AGREEMENT

1. This lease is entered into the 1st of August 2004, to 30th of June 2005 by Igor Krayev, LANDLORD, and Counterpart, presented by Bob Abma, TENANT.

2. The LANDLORD hereby leases to the TENANT the following described property, together with certain furnishing and equipment, listed in Appendix A.

3. The term of this lease will be till 30th of June 2005.

4. The TENANT shall pay the LANDLORD for the premises rented the following rate and terms: $950 per month. The first payment for the period till 09/30/04 is made on the date of agreement signing, the second payment is made on 10/05/04, third payment is made on 01/05/05 for three months and the last payment is done on 04/04/05 till the end of the agreement.

5. The LANDLORD warrants that he is the sole and lawful owner of the premises and that he is duly authorized and able to enter into this lease agreement and perform its obligations. The LANDLORD also warrants that the TENANT shall and may enjoy peaceable possession of the premises for the lease term.

6. For the purpose of maintaining the premises, the LANDLORD reserves the right to enter the premises to inspect and make necessary repairs, so long as such entry is at prearranged times, with the consent of the TENANT.

7. The LANDLORD or his appointee shall be responsible for paying for making repairs of damage caused by normal daily wear and tear on premises or by faulty equipment or materials. The LANDLORD shall also pay for repair of appliances that break down during the course of lease.

8. The LANDLORD shall furnish or otherwise provide to the TENANT during the lease term the following: heat, water, gas, power, sewage disposal, and telephone service. The TENANT will pay for long -distance telephone charges and power.

9. In the event that the LANDLORD fails to fulfill any of his obligations under this lease, the TENANT is entitled to terminate her lease and shall be entitled to reimbursement of rent of remaining months in lease. In the event that the building in which premises are located suffers any major changes, that make habitation in the premises untenable, the TENANT is entitled to terminate her lease and receive reimbursement of remaining months rent.

10. The LANDLORD accepts full responsibility for all fees, taxes and other charges of a public nature which are or may be assessed against the premises, and shall pay charges when due.

IN WITNESS whereof, the parties have affixed their signatures this day of July 19  2004.

LANDLORD:
Igor Yevgenievich Krayev, born on 10/18/64
passport 1780776
Issued on 9/29/1997 by MIA RoK
29 Basenova str., apt. 32 Almaty, 480000,
tel. _74-16-87_
_8-300-3500031_
Signature _____

TENANT:
Bob Abma
Regional Financial Director

Zhandosova, str.36 Almaty, 480091
tel. 501950; Fax.501949

Signature _____

CP4268

## Расходный ордер Алматинского офиса
### ALMATY OFFICE EXPENSE VOUCHER

| Номер ордера/Voucher number: | **04/09/53** | Дата/ Date: | **09/23/04** |
|---|---|---|---|

**Выдано кому:**                                    L. Kondik

Paid to/Deposit from:

| Назначение платежа/ Депозит/ Поправка: | Bob Abma Russian lessons Sep'04 |
|---|---|

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMEN

### Таблица кодов/Chart of accounts number
### (Должно быть заполнено/Must be completed)

| Фонд № Fund # | Местонах-е LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | Описание NARRATIVE | | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|---|
| 452 | 05 | 25 | 4152 | 4 | 000 | Housing Allowance | BA | 50,00 |
| 449 | 05 | 25 | 4152 | 4 | 000 | Housing Allowance | BA | 50,00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | Общая сумма TOTAL AMOUNT | 100,00 |
|---|---|---|

**Удостоверение:**
Certification:

Получена сумма (прописью): _____
RECEIVED IN FULL THE AMOUNT OF:

Подпись
SIGNATURE:

Подготовлено: _____
PREPARED BY:

Одобрено: _____
APPROVED BY:

EXHIBIT
Dorcus 65
11-27-0?

CP4321

4/52 BA   50% C-R  50% H-R

## Каунтерпарт Консорциум , Алматинский офис
### Counterpart Consortium, Almaty office
## Расходный кассовый ордер
### RECEIPT FOR CASH PAYMENT

Дата: 09/23/04
Date:

Я, _L. Koundik_         от                                    получил(а) сумму $100.00
I,    (имя, фамилия)    of                                    received
      (name of person)        (Название организация)
                              (name of organization/company)

(курс обмена            на доллар США) от Каунтерпарт Консорциума для
(exchange rate          per USD) from the Counterpart Consortium for

_Bob Abma Russian lessons Sep '04_

                        описание товаров и/или услуг
                        (description of goods and / or services rendered)

на период от _____ до _____
for the period of         to

                        Получено : _Koundik._
                        Received by :        подпись/signature

**Фамилия и подпись представителя Консорциума, ответственного за оплату:**
Name and Signature of Consortium Representative Making Payment:

                        **Прикрепить к оригиналу счета-фактуры**
                        [Must attach original invoice]

CP4322

Расходный ордер Алматинского офиса
ALMATY OFFICE EXPENSE VOUCHER

| | | | |
|---|---|---|---|
| Номер ордера/Voucher number: | **04/09/61** | Дата/ Date: | **09/24/04** |

Выдано кому / Получено от     **Igor Krayev**

Paid to/Deposit from:

Назначение платежа/ Депозит/ Поправка:     apartment lease Bob Abma Oct'1 - Dec'30, 2004

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMENT:

| Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed) | | | | | | Описание NARRATIVE | | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|---|
| Фонд № Fund # | Местонах LOC | № проект #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | | | |
| .452 | 05 | 25 | 4152 | 4 | 000 | Housing | BA | 2137,50 |
| 449 | 05 | 25 | 4152 | 4 | 000 | Housing | BA | 712,50 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | Общая сумма TOTAL AMOUNT | | 2850,00 |

Удостоверение:
Certification:
    Получена сумма (прописью):     _____
    RECEIVED IN FULL THE AMOUNT OF:

                          Подпись
                          SIGNATURE:

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

EXHIBIT
DORCUS 66
11·27·06

CP4324

75% / 25%

**Каунтерпарт Консорциум , Алматинский офис**
Counterpart Consortium, Almaty office
**Расходный кассовый ордер**
RECEIPT FOR CASH PAYMENT

Дата: _09/24/04_
Date:
Я, _Igor Krayen_                от _____        получил(а) сумму $2850.00
I,    (имя, фамилия)         of      (Название организации)        received
        (name of person)              (name of organization/company)

(курс обмена _____ на доллар США) от Каунтерпарт Консорциума для
  (exchange rate           per USD) from the Counterpart Consortium for

_rent apt  Bob Abma  Oct 1 – Dec 31 '04 · $950 x 3 mnt_
                        описание товаров и/или услуг
                    (description of goods and / or services rendered)

на период от _____ до _____
for the period of                to

                        Получено : _____
                        Received by :      подпись/signature

Фамилия и подпись представителя Консорциума, ответственного за оплату:
Name and Signature of Consortium Representative Making Payment:

            Прикрепить к оригиналу счета-фактуры
            [Must attach original invoice]

CP4325

LEASE AGREEMENT

1. This lease is entered into the 1st of August 2004, to 30th of June 2005 by Igor Krayev, LANDLORD, and Counterpart, presented by Bob Abma, TENANT.

2. The LANDLORD hereby leases to the TENANT the following described property, together with certain furnishing and equipment, listed in Appendix A.

3. The term of this lease will be till 30th of June 2005.

4. The TENANT shall pay the LANDLORD for the premises rented the following rate and terms: $950 per month. The first payment for the period till 09/30/04 is made on the date of agreement signing, the second payment is made on 10/05/04, third payment is made on 01/05/05 for three months and the last payment is done on 04/04/05 till the end of the agreement.

5. The LANDLORD warrants that he is the sole and lawful owner of the premises and that he is duly authorized and able to enter into this lease agreement and perform its obligations. The LANDLORD also warrants that the TENANT shall and may enjoy peaceable possession of the premises for the lease term.

6. For the purpose of maintaining the premises, the LANDLORD reserves the right to enter the premises to inspect and make necessary repairs, so long as such entry is at prearranged times, with the consent of the TENANT.

7. The LANDLORD or his appointee shall be responsible for paying for making repairs of damage caused by normal daily wear and tear on premises or by faulty equipment or materials. The LANDLORD shall also pay for repair of appliances that break down during the course of lease.

8. The LANDLORD shall furnish or otherwise provide to the TENANT during the lease term the following: heat, water, gas, power, sewage disposal, and telephone service. The TENANT will pay for long -distance telephone charges and power.

9. In the event that the LANDLORD fails to fulfill any of his obligations under this lease, the TENANT is entitled to terminate her lease and shall be entitled to reimbursement of rent of remaining months in lease. In the event that the building in which premises are located suffers any major changes, that make habitation in the premises untenable, the TENANT is entitled to terminate her lease and receive reimbursement of remaining months rent.

10. The LANDLORD accepts full responsibility for all fees, taxes and other charges of a public nature which are or may be assessed against the premises, and shall pay charges when due.

IN WITNESS whereof, the parties have affixed their signatures this day of July 19 2004.

LANDLORD:
Igor Yevgenievich Krayev, born on 10/18/64
passport 1780776
Issued on 9/29/1997 by MIA RoK
29 Basenova str., apt. 32 Almaty, 480000,
tel. 74-16-81
8-500-3500031
Signature _____

TENANT:
Bob Abma
Regional Financial Director

Zhandosova, str.36 Almaty, 480091
tel. 501950; Fax 501949

Signature _____

## Расходный ордер Алматинского офиса
### ALMATY OFFICE EXPENSE VOUCHER

**Номер ордера**/Voucher number: **04/10/67**    Дата/ Date: **10/21/04**

**Выдано кому:**    **L. Kondik**

Paid to/Deposit from:

**Назначение платежа/ Депозит/ Поправка:**    Bob Abma Russian lessons October'04

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMEN

| Фонд № | Местонах-е | № проекта | Таблица счетов | Орг | Подсчет | Описание | | Сумма дебита или кредита |
|--------|------------|-----------|----------------|-----|---------|----------|--|--------------------------|
| Fund # | LOC | #PROJ | Chart of acct | ORG | SUB - ACCT | NARRATIVE | | Debit or credit amount |
| 452 | 05 | 25 | 4152 | 4 | 000 | Housing Allowance | BA | 25,00 |
| 449 | 05 | 25 | 4152 | 4 | 000 | Housing Allowance | BA | 25,00 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Общая сумма**    50,00
TOTAL AMOUNT

**Удостоверение:**
Certification:

**Получена сумма (прописью):** _____
RECEIVED IN FULL THE AMOUNT OF:

**Подпись** _____
SIGNATURE:

**Подготовлено:**
PREPARED BY:

**Одобрено:**
APPROVED BY:



CP3661

C - R - 50%
R - R - 50%

## Каунтерпарт Консорциум , Алматинский офис
Counterpart Consortium, Almaty office
### Расходный кассовый ордер
RECEIPT FOR CASH PAYMENT

Дата: 10/21/4
Date:

Я, _L. Kondik_ от _____ получил(а) сумму $50.00
I,      (имя, фамилия)      of      (Название организации)      received
        (name of person)              (name of organization/company)

(курс обмена _____ на доллар США) от Каунтерпарт Консорциума для
(exchange rate            per USD) from the Counterpart Consortium for

_Russian lessons Bob Abma Oct 104_
описание товаров и/или услуг
(description of goods and / or services rendered)

на период от _____ до _____
for the period of            to

Получено : _Marine_
Received by :      подпись/signature

Фамилия и подпись представителя Консорциума, ответственного за оплату:
Name and Signature of Consortium Representative Making Payment:

### Прикрепить к оригиналу счета-фактуры
[Must attach original invoice]

CP3663

**CASH ADVANCE LIQUIDATION / REIMBURSEMENT REQUEST**

Subm _____  Storozhenko Igor _____  Date : _____

Amount of Received   Tenge _____   Grant Total :  $1,525.27
         Exchange Rate   132.47                                              (date)

Attached please find receipts for the following expenses (except taxis less than $10):

| ITEM # | DATE | DESCRIPTION | | | TENGE | Ex. Rate | DOLLARS |
|---|---|---|---|---|---|---|---|
| | | | | | | **AMOUNT** | |
| 1 | 6-Oct-04 | FedEx for Fin Department | PRAGMA | 3335 | 5,966.00T | 132.47 | $45.04 |
| 2 | 11-Oct-04 | Lunch for Amanova GMeeting | C-K | 4302 | 10,790.00T | 132.47 | $81.45 |
| 3 | 12-Oct-04 | Taxi:   Zharikova | C-K | 4403 | 1,000.00T | 132.47 | $7.56 |
| 4 | 12-Oct-04 | Taxi:   Sklyarov | C-K | 4403 | 400.00T | 132.47 | $3.02 |
| 5 | 13-Oct-04 | Cleaning things for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 2,220.00T | 132.47 | $16.76 |
| 6 | 14-Oct-04 | Taxi:   Bakhmutov | C-K | 4403 | 400.00T | 132.47 | $3.02 |
| 7 | 14-Oct-04 | Food ;cleaning things for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 15,136.00T | 132.47 | $114.26 |
| 8 | 15-Oct-04 | Temporary work for Kazakova translator Zhaksyberger | CWU-K | 4231 | | 132.47 | $10.00 |
| 9 | 18-Oct-04 | Turkish visa for Bob Abma | IRAQ CAP-FO | 4404 | | 132.47 | $65.00 |
| 10 | 18-Oct-04 | Electrician Nyrkov  temporary work for Jay Cooper ⚓ | C-R-JC | 4152 | | 132.47 | $100.00 |
| 11 | 18-Oct-04 | Cable for Regional office | C-R | 5014 | 8,364.00T | 132.47 | $63.14 |
| 12 | 18-Oct-04 | Print-Cartidge for Xerox | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 37,240.00T | 132.47 | $281.12 |
| 13 | 18-Oct-04 | Driver Erport  for CC staff | C-Kyr 9,1% H-R 36,4% ICNL 54,5% | 4403/2004 | | 132.47 | $33.00 |
| 14 | 19-Oct-04 | Xerox paper for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 16,950.00T | 132.47 | $127.95 |
| 15 | 20-Oct-04 | Visa for Kazakhstan for Wegerich Kai | CWU-R | 4234 | | 132.47 | $70.00 |
| 16 | 20-Oct-04 | Taxi: Asanova | C-K | 4403 | 250.00T | 132.47 | $1.89 |
| 17 | 22-Oct-04 | Armenia visa for Bob Abma | Armenia CASP-FO | 4404 | | 132.47 | $65.00 |
| 18 | 22-Oct-04 | Hotel "Kazzhol" for Kasybekov | C-KYRGYZSTAN | 4404 | 5,900.00T | 132.47 | $44.54 |
| 19 | 22-Oct-04 | Stationery for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 3,365.00T | 132.47 | $25.40 |
| 20 | 22-Oct-04 | Railtickets for Wegerich ;Tanekenov | CWU-R | 4234 | 9,622.00T | 132.47 | $72.64 |
| 21 | 26-Oct-04 | Extention cord for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 | 6,660.00T | 132.47 | $50.28 |
| 22 | 26-Oct-04 | Computer supplies& battery for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5037 | 4,400.00T | 132.47 | $33.22 |
| 23 | 26-Oct-04 | Tea,coffe, sugar ,glasses for: office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5014 4302 | (8468) 5691,00T 2777,00T | 132.47 | 42.89T |
| 23 | 26-Oct-04 | Tea,coffe, sugar ,glasses for: training | C-K | 5014 4302 | (8468) 5691,00T 2777,00T | 132.47 | 20.92T |
| 25 | 26-Oct-04 | Postage for Amanova | C-K | 5003 | 500.00T | 132.47 | $3.77 |
| 26 | 26-Oct-04 | Kcell for Storozhenko Nov | H-R | 5005 | 4,000.00T | 132.47 | $30.20 |
| 27 | 27-Oct-04 | Computer supplies for office | C-R 25%/ C-K 20%/ H-R 25%/ H-K 20%/ UM 10% | 5037 | 10,966.00T | 132.47 | $82.78 |

                                                                    $1,514.82

gned : _____                        Less Advance Rec'd              $1,525.27

Supervisor's Approval / Date                  Amount due Counterpart or (due employee) _____  $10.45

_____ / _____

DCOP  Approval / Date

_____ / _____

--------------------------------
TOO "Фирма AK-НИЕТ"
Обя.вал.PC25009/2/189
Бостандык .Р-н
--------------------------------

10/28/4

TOO"ОБМЕННЫЙ ПУНКТ АЛТАИ
ОБМЕН ВАЛЮТ
АУЭЗОВСКИЙ Р-Н
РЕГ N46476
      РНН   0060030050750I
      Кассир 1   АА00480783НМ
N 0001Ф   9: 01   22.10.04
      Покупка (001)
$ _____  курс:_____  132.40   1
   Код-во:        1.000.0
   Итого:      132.400,00

300Х          @132.70
$ ПОКУПКА   =39810.00
ИТОГ        =39810.00
НАЛ         =39810.00
КАССИР 1    № 000029
¥ 10:19 ¥        0000
ДАТА  16.10.'04  СБ



EXHIBIT
Dorcas 68
11.27.06

CP3667

**Каунтерпарт Консорциум , Алматинский офис**
Counterpart Consortium, Almaty office *for Michael .*
**Расходный кассовый ордер**
RECEIPT FOR CASH PAYMENT

Дата: *10/21/4*
Date:
Я, *Koleshichenko M.*     от     *Landlord - M. kunz*     получил(а) сумму *$3,6*
I,     (имя, фамилия)     of     (Название организации)     received
*Michael kunz*     (name of person)     (name of organization/company)
(курс обмена     на доллар США) от Каунтерпарт Консорциума для
(exchange rate     per USD) from the Counterpart Consortium for

*rent payment $1,800 × 2mnth   Nov 21'04 – Jan 21'05*
описание товаров и/или услуг
(description of goods and / or services rendered)

на период от _____ до _____
for the period of     to

Получено :
Received by :     подпись/signature

Фамилия и подпись представителя Консорциума, ответственного за оплату:
Name and Signature of Consortium Representative Making Payment:

Прикрепить к оригиналу счета-фактуры
[Must attach original invoice]

EXHIBIT
*Dorcus 69*
*11·27·06*

CP3677

**COUNTERPART International, Inc.**

| DATE | TYPE JOURNAL | BATCH CONTROL NUMBER | Posting Line Items |
|---|---|---|---|
| 11/30/2004 | GJ | 11/36 | *337* |
| | | | 289 |

Attach Documentation
Description: Reason for Posting/Adjustment
Almaty, Kazakhstan

Posting Trace No.

| FUND | LOC | PROJ | OBJECT | ORG | SUB OBJ | DEBITS | CREDITS | NOTES/COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 452 | 21 | 00 | 1030 | 4 | 000 | 201,482.89 | | |
| 452 | 21 | 00 | 1030 | 4 | 000 | | 132,224.99 | |
| 452 | 21 | 10 | 1040 | 6 | 000 | | 172,990.00 | Transfer From HQ |
| 452 | 21 | 00 | 1040 | 6 | 000 | | 19,010.00 | Transfer From HQ |
| 668 | 21 | 00 | 1040 | 4 | 000 | | 9,497.89 | Partner Loan from Chap |
| 452 | 21 | 00 | 1040 | 4 | 000 | 5,365.00 | | Transfer to Pragma |
| 452 | 21 | 00 | 1040 | 4 | 000 | 1,579.93 | | Transfer to Pragma TIP |
| 452 | 01 | 00 | 1127 | 4 | 001 | 5,795.71 | | Transfer To ICNL |
| 452 | 21 | 00 | 2004 | 4 | 000 | | | Transfer of Funds |
| 452 | 21 | 00 | 3250 | 4 | 000 | | 0.00 | Gain/Loss On Exch |
| 452 | 21 | 10 | 5014 | 4 | 000 | 15.00 | | Gain/Loss On Exch |
| | | | | | | | | |
| 444 | 06 | 10 | 5000 | 4 | 000 | 24.93 | | Telephone |
| 444 | 06 | 10 | 5001 | 4 | 000 | 14.99 | | Other Supplies |
| 444 | 06 | 10 | 5010 | 4 | 000 | 0.88 | | Bank service Charge |
| 444 | 06 | 10 | 4706 | 4 | 000 | 47.69 | | Renovation |
| | | | | | | | | 88.49 |
| 449 | 21 | 10 | 4110 | 4 | 000 | 2,238.50 | | Salary |
| 449 | 21 | 10 | 4140 | 4 | 000 | 568.63 | | Payroll Taxes |
| 449 | 21 | 10 | 4141 | 4 | 000 | 491.32 | | Fringe Benefits Medical |
| 449 | 21 | 10 | 4142 | 4 | 000 | 56.35 | | Vacation Leave |
| 449 | 21 | 10 | 4204 | 4 | 000 | 45.60 | | Sub Contract Other Field |
| 449 | 21 | 10 | 4428 | 4 | 000 | 651.11 | | Local Travel |
| 449 | 21 | 10 | 4438 | 4 | 000 | 120.69 | | Foreign Travel |
| 449 | 21 | 10 | 4706 | 4 | 000 | 537.04 | | Renovation |
| 449 | 21 | 10 | 5000 | 4 | 000 | 446.39 | | Telephones |
| 449 | 21 | 10 | 5001 | 4 | 000 | 222.85 | | Office Supplies |
| 449 | 21 | 10 | 5010 | 4 | 000 | 62.04 | | Bank Service Charge |
| 449 | 21 | 10 | 5012 | 4 | 000 | 2.32 | | Legal Fee |
| 449 | 21 | 10 | 5022 | 4 | 000 | 11.89 | | Staff Development |
| 449 | 21 | 10 | 5031 | 4 | 000 | 30.00 | | Repair & Maintenance |
| 449 | 21 | 10 | 5520 | 4 | 000 | 951.02 | | Small Grants |
| | | | | | | | | 6,435.75 |
| 449 | 23 | 10 | 5010 | 4 | 000 | 0.18 | | Bank service Charge |
| 449 | 23 | 10 | 4318 | 4 | 000 | 18.00 | | Training Travel Per Diem |
| | | | | | | | | 18.18 |
| 449 | 05 | 10 | 4110 | 4 | 000 | 3,460.00 | | Salary |
| 449 | 05 | 10 | 4140 | 4 | 000 | 658.03 | | Salary Payroll taxes |
| 449 | 05 | 10 | 4141 | 4 | 000 | 851.03 | | Fringe Medical Insurance |
| 449 | 05 | 10 | 4204 | 4 | 000 | 182.40 | | Subcontractor Other |
| 449 | 05 | 10 | 4302 | 4 | 000 | 39.85 | | Training Supplies & Services |
| 449 | 05 | 10 | 4318 | 4 | 000 | 135.00 | | Training Travel & Per Diem |
| | 05 | 10 | 4438 | 4 | 000 | 1,712.19 | | Foreign Fields Staff |
| | 05 | 10 | 4505 | 4 | 000 | 947.42 | | Furniture and Equipment < $1000 |
| | 05 | 10 | 4706 | 4 | 000 | 1,765.63 | | Renovation |
| | 05 | 10 | 5000 | 4 | 000 | 601.96 | | Telephone |
| | 05 | 10 | 5001 | 4 | 000 | 1,078.72 | | Other Supplies |
| | 05 | 10 | 5010 | 4 | 000 | 131.85 | | Bank Service Charge |
| | 05 | 10 | 5012 | 4 | 000 | 9.25 | | Legal Service |
| | 05 | 10 | 5022 | 4 | 000 | 143.25 | | Staff Development |

CP4340



EXHIBIT

**Расходный ордер Алматинского офиса**
ALMATY OFFICE EXPENSE VOUCHER

| VOUCHER NUMBER: | **04/11/19** | Дата/ Date: | **11/05/04** |
|---|---|---|---|

PAID TO:                    **Bob Abma**

---

EXPLANATION OF PAYMENT

**Bob Abma - Salary Advance**          **for November 2004**

**Cash: $800**

**Bank Fee: 1%**

---

| Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed) | | | | | | Описание NARRATIVE | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|
| Фонд № Fund # | Местонах-е LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | | |
| | | | 4184 | 4 | | Bob Abma - Salary Advance | 808.00 |
| 452 | 21 | 10 | 5010 | 4 | 000 | Bank Charges | -8.00 |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |
| | | | | 4 | 000 | | |

| | Общая сумма TOTAL AMOUNT | 800.00 |
|---|---|---|

---

Удостоверение:
Certification:

**Получена сумма (прописью):**          Eight hundred USD
RECEIVED IN FULL THE AMOUNT OF:

**Подпись.**
SIGNATURE

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

CP4352

Расходный ордер Алматинского офиса
ALMATY OFFICE EXPENSE VOUCHER

| VOUCHER NUMBER: | **04/11/65** | Дата/ Date: | **11/17/04** |
|---|---|---|---|

PAID TO: **Michael Kunz**

---

**EXPLANATION OF PAYMENT**

**Michael Kunz - Salary Advance**     **for November 2004**

**Cash: $1400**

**Bank Fee:**

---

| Фонд № | Местонах-е | № проекта | Таблица счетов | Орг | Подсчет | Описание | Сумма |
|---|---|---|---|---|---|---|---|
| Fund # | LOC | #PROJ | Chart of acct | ORG | SUB - ACCT | NARRATIVE | дебита или кредита<br>Debit or credit amount |
| | | | 4184 | 4 | | Michael Kunz - Salary Advance | 1400.00 |
| 452 | - 06 | 10 | 5010 | | | Bank Charges | 14.00 |
| 452 | 21 | 10 | 5010 | 4 | 000 | Bank Charges | ~~14.00~~ |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Таблица кодов/Chart of accounts number
(Должно быть заполнено/Must be completed)

| | | Общая сумма | 1400.00 |
|---|---|---|---|
| | | TOTAL AMOUNT | |

**Удостоверение:**
Certification:

Получена сумма (прописью):    One thousand four hundred USD
RECEIVED IN FULL THE AMOUNT OF:

Подпись
SIGNATURE:

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

CP4365

EXHIBIT

Dorcus 71
11-27-06

**COUNTERPART International, Inc.**

Posting Line Items

| DATE | TYPE JOURNAL | BATCH CONTROL NUMBER | |
|------|------|------|------|
| 12/31/2004 | GJ | 12/18 | 401 |

Posting Trace No.

Attach Documentation
Description: Reason for Posting/Adjustment
Almaty, Kazakhstan

| FUND | LOC | PROJ | OBJECT | ORG | SUB OBJ | DEBITS | CREDITS | NOTES/COMMENTS |
|------|-----|------|--------|-----|---------|--------|---------|----------------|
| 452 | 21 | 00 | 1030 | 4 | 000 | 122,130.06 | | |
| 452 | 21 | 00 | 1030 | 4 | 000 | | 117,801.71 | 8382.03 |
| 452 | 21 | 10 | 1040 | 6 | 000 | | 93,000.00 | Transfer From HQ |
| 452 | 21 | 00 | 1040 | 6 | 000 | | 22,000.00 | Transfer From HQ |
| 452 | 01 | 00 | 1127 | 4 | 001 | | 7,130.06 | Transfer To ICNL 21-12 |
| 452 | 21 | 10 | 5014 | 4 | 000 | 15.00 | | Gain/Loss On Exch |
| 444 | 06 | 10 | 5000 | 4 | 000 | 68.53 | | Telephone |
| 444 | 06 | 10 | 5010 | 4 | 000 | 0.97 | | Bank service Charge |
| 444 | 06 | 10 | 5001 | 4 | 000 | 36.35 | | Other Supplies |
| | | | | | | | | 105.85 |
| 449 | 21 | 10 | 4110 | 4 | 000 | 2,320.76 | | Salary |
| 449 | 21 | 10 | 4140 | 4 | 000 | 1,021.17 | | Payroll Taxes |
| 449 | 21 | 10 | 4200 | 4 | 000 | 2,891.97 | | Sub Contract Project Funding |
| 449 | 21 | 10 | 4202 | 4 | 000 | 3.80 | | Sub Contract Interpreters Field |
| 449 | 21 | 10 | 4428 | 4 | 000 | 755.90 | | Local Travel |
| 449 | 21 | 10 | 4650 | 4 | 000 | 7,123.03 | | Small Projects |
| 449 | 21 | 10 | 5000 | 4 | 000 | 173.66 | | Telephones |
| 449 | 21 | 10 | 5002 | 4 | 000 | 154.61 | | Conference & Meeting |
| 449 | 21 | 10 | 5010 | 4 | 000 | 124.69 | | Bank Service Charge |
| 449 | 21 | 10 | 5022 | 4 | 000 | 30.00 | | Staff Development |
| 449 | 21 | 10 | 5042 | 4 | 000 | 552.12 | | Marketing & Advertisement |
| 449 | 21 | 10 | 5520 | 4 | 000 | | 951.02 | Small Grants CI CAG |
| | | | | | | | | 14,200.69 |
| | | | | | | | | 0.00 |
| 449 | 05 | 10 | 4110 | 4 | 000 | 6,298.71 | | Salary |
| 449 | 05 | 10 | 4140 | 4 | 000 | 1,600.90 | | Salary Payroll taxes |
| 449 | 05 | 10 | 4202 | 4 | 000 | 15.20 | | Subcontractor Interpreter |
| 449 | 05 | 10 | 4428 | 4 | 000 | 18.34 | | Local Travel Staff |
| 449 | 05 | 10 | 4438 | 4 | 000 | 1,325.81 | | Foreign Fields Staff |
| 449 | 05 | 10 | 4505 | 4 | 000 | 28.46 | | Furniture and Equipment < $1000 |
| 449 | 05 | 10 | 5000 | 4 | 000 | 650.83 | | Telephone |
| 449 | 05 | 10 | 5001 | 4 | 000 | 959.33 | | Other Supplies |
| 449 | 05 | 10 | 5010 | 4 | 000 | 133.99 | | Bank Service Charge |
| 449 | 05 | 10 | 5022 | 4 | 000 | 136.00 | | Staff Development |
| 449 | 05 | 10 | 5031 | 4 | 000 | 450.00 | | Repair & Maintenance |
| | | | | | | | | 11,617.57 |
| 449 | 06 | 10 | 4418 | 4 | 000 | 692.14 | | Foreign HQ Staff |
| 449 | 06 | 10 | 5000 | 4 | 000 | 274.17 | | Telephone |
| 449 | 06 | 10 | 5001 | 4 | 000 | 145.41 | | Office supplies |
| 449 | 06 | 10 | 5010 | 4 | 000 | 10.81 | | Bank Service Charge |
| | | | | | | | | 1,122.53 |
| 452 | 05 | 13 | 4110 | 4 | 000 | 1,105.00 | | Salary |
| 452 | 05 | 13 | 4140 | 4 | 000 | 188.43 | | Payroll Taxes |
| 452 | 05 | 13 | 4201 | 4 | 000 | 46.76 | | Sub Contract Consultant Field |
| 452 | 05 | 13 | 4204 | 4 | 000 | 25.04 | | Sub Contract Other Field |
| 452 | 05 | 13 | 4302 | 4 | 000 | 294.72 | | Training Supplies & Services |
| 452 | 05 | 13 | 4458 | 4 | 000 | 2,346.12 | | Foreign Consultant |
| 452 | 05 | 13 | 5000 | 4 | 000 | 9.27 | | Telephones |
| 452 | 05 | 13 | 5010 | 4 | 000 | 62.90 | | Bank Service Charge |

CP4373

Расходный ордер Алматинского офиса
ALMATY OFFICE EXPENSE VOUCHER

| Номер ордера/Voucher number: | **04/12/88** | Дата/ Date: | **12/23/04** |
|---|---|---|---|

| Выдано кому: | **Michael Kunz** |
|---|---|

Paid to/Deposit from:

| Назначение платежа/ Депозит/ Поправка: | Travel CAR, Armenia, business lunchs |
|---|---|

EXPLANATION OF PAYMENT / DEPOSIT / ADJUSTMEN

| Таблица кодов/Chart of accounts number (Должно быть заполнено/Must be completed) | | | | | | Описание NARRATIVE | | Сумма дебита или кредита Debit or credit amount |
|---|---|---|---|---|---|---|---|---|
| Фонд № Fund # | Местонах-е LOC | № проекта #PROJ | Таблица счетов Chart of acct | Орг ORG | Подсчет SUB - ACCT | | | |
| | | | | | | TX from Advance to Cash on Hand | | -7600,00 |
| | | | | | | TX to Cash on Hand from Advance | | 7600,00 |
| 460 | 41 | 10 | 4418 | 4 | 000 | Foreign-HQ Staff | | 4096,42 |
| 460 | 41 | 10 | 5021 | 4 | 000 | Employe Morale | | 338,78 |
| 961 | 06 | 50 | 5002 | 4 | 000 | Conferences & Meetings | RF | 372,10 |
| 449 | 06 | 10 | 4418 | 4 | 000 | Foreign-HQ Staff | | 150,00 |
| 452 | 06 | 10 | 4418 | 4 | 000 | Foreign-HQ Staff | | 150,00 |
| 452 | 06 | 10 | 5031 | 4 | 000 | Maint.Agreem/Vihicle F/Mat. | | 19,08 |
| 452 | 06 | 10 | 5045 | 4 | 000 | Postage | | 1,07 |
| | | | | | | **Общая сумма** TOTAL AMOUNT | | 5127,45 |

Удостоверение:
Certification:

Получена сумма (прописью):
RECEIVED IN FULL THE AMOUNT OF:

Подпись
SIGNATURE:

Подготовлено:
PREPARED BY:

Одобрено:
APPROVED BY:

CP4391

**Counterpart Consortium, Almaty office**
**CASH ADVANCE LIQUIDATION / REIMBURSEMENT REQUEST**

Employee Name : Michael Kunz
Date : 23-Dec-04
Purpose of expenses : Travel CAR, Armenia, business lunchs

Date of Received Advance : November 2004
Amount of Received Advance : $7,600.00
Type of Local Currency : Kazakhstan Tenge

| # | Date | Description | Amount Local Currency | Exch. Rate | Amount USD | Project | Acc# |
|---|------|-------------|----------------------|-----------|-----------|---------|------|
| 1 | 10/18/2004 | SIM card for business purposes | 63,022 | 502.00 | 125.54 | 460-41-10 | 4418 |
| 2 | 10/18/2004 | SIM card for business purposes | 63,022 | 502.00 | 125.54 | 460-41-10 | 4418 |
| 3 | 10/25/2004 | SIM card for business purposes | 96,900 | 502.50 | 192.84 | 460-41-10 | 4418 |
| 4 | 10/12/2004 | Airport Hotel in Istanbul | 237,211,953 | 1455000.00 | 163.03 | 460-41-10 | 4418 |
| 5 | 10/28/2004 | Mariott Hotel in Yerevan | 658,013 | 504.89 | 1,303.28 | 460-41-10 | 4418 |
| 6 | 08/12/2004 | Representative funds | 890 | 131.00 | 6.79 | 961-06-50 | 5002 |
| 7 | 09/24/2004 | Representative funds | 2,992 | 131.00 | 22.84 | 961-06-50 | 5002 |
| 8 | 09/27/2004 | Representative funds | 4,319 | 131.00 | 32.97 | 961-06-50 | 5002 |
| 9 | 10/27/2004 | Lunch with staff | 93,825 | 504.89 | 185.83 | 460-41-10 | 5021 |
| 10 | 09/29/2004 | Lunch with staff | 77,220 | 504.89 | 152.94 | 460-41-10 | 5021 |
| 11 | 11/03/2004 | Postage to USA | 140 | 131.00 | 1.07 | 452-06-10 | 5045 |
| 12 | 11/06/2004 | Representative funds | 7,194 | 131.00 | 54.92 | 961-06-50 | 5002 |
| 13 | 11/07/2004 | Mobile phone repair | 2,500 | 131.00 | 19.08 | 452-06-10 | 5031 |
| 14 | 11/16/2004 | Representative funds | 4,488 | 131.00 | 34.26 | 961-06-50 | 5002 |
| 15 | 10/25/2004 | Armenia perdiems Oct 12 - 28 total 16 days 54 US$/Day | | | 864.00 | 460-41-10 | 4418 |
| 16 | 10/25/2004 | Istanbul perdiems Oct 11, Oct 29 total 2 days 76 US$/Day | | | 152.00 | 460-41-10 | 4418 |
| 17 | 11/26/04 | Hotel in Istanbul | 184,785,000 | 1455000.00 | 127.00 | 460-41-10 | 4418 |
| 18 | 11/24/04 | Tickets to Istanbul from Yerevan | 160,133 | 502.00 | 318.99 | 460-41-10 | 4418 |
| 19 | 11/18/04 | Lost Tickets replacement Istanbul Almaty | 73,000,000 | 1455184.00 | 50.17 | 460-41-10 | 4418 |
| 20 | 11/18/04 | Turkish visa | | | 20.00 | 460-41-10 | 4418 |
| 21 | 11/18/04 | Lost Tickets replacement Yerevan Istanbul Yerevan | | | 31.00 | 460-41-10 | 4418 |
| 22 | 11/18/04 | Hotel in Istanbul | 90,250,858 | 1455000.00 | 62.03 | 460-41-10 | 4418 |
| 23 | 11/25/04 | Air Passenger Exit Duty | 10,000 | 500.00 | 20.00 | 460-41-10 | 4418 |
| 24 | 11/19/04 | Representative funds | | | 152.00 | 961-06-50 | 5002 |
| 25 | 11/23/04 | Representative funds | 4,300 | 500.00 | 8.60 | 961-06-50 | 5002 |
| 26 | 11/26/04 | Turkish visa | | | 20.00 | 460-41-10 | 4418 |
| 27 | 12/02/04 | Armenia perdiems Nov 19-25 total 7 days 54 US$/Day | | | 350.00 | 460-41-10 | 4418 |
| 28 | 12/02/04 | Turkey perdiems Nov 18: 6AM-Nov 19: 2AM, Nov 26: 0AM-Nov 27: 6AM 2.25@76 | | | 171.00 | 460-41-10 | 4418 |
| 29 | 12/13/04 | Representation for World Bank  (Bishkek) | 1,000 | 40.50 | 24.69 | 961-06-50 | 5002 |
| 30 | 12/10/04 | Representative funds | | | 18.62 | 961-06-50 | 4418  5002 |
| 31 | 12/14/04 | Turkmenistan perdiems Dec 6-8, Total 3 days 50 US$/Day | | | 150.00 | 452-06-10 75% / 449-06-10 25% | 4418 |
| 32 | 12/14/04 | Kyrgyzstan perdiems Dec 13 total  1 day 50 US$/Day | | | 50.00 | 452-06-10 75% / 449-06-10 25% | 4418 |
| 33 | 12/14/04 | Uzbekistan perdiems Dec 9-10 Total 2 days 50 US$/day | | | 100.00 | 449-06-10 | 4418 |
| 34 | 12/02/04 | Representative funds | 2,134 | 130.00 | 16.42 | 961-06-50 | 5002 |

TOTAL EXPENSES : _____ **$5,127.45**

Less Advance : _____ **$7,600.00**

Amount due Company (due employee) : _____ **$2,472.55**

Amount Due Received by :
Employee Signature : _____

Company Signature : _____ 12/23/4
J. anichshenko

APPROVED :

Supervisor Approval / Date

Financial Manager Approval / Date
_____ 12/23/4
Bob Abma

**Memorandum**

| TO: | **All Employees** |
|-----|-------------------|
| FROM: | **Harry Dorcus, CFO** |
| RE: | **Policy Change** |
| DATE: | **May 16, 2003** |

We have decided to discontinue our Grievance Procedure as set forth at Section 6.20 of the Employee Handbook effective immediately. The sole purpose of the procedure was to enhance employee-management communications, but experience has indicated that the procedure was ineffective.

As a result, we have decided to eliminate Section 6.20 from the Employee Handbook, but at the same time, we want to reaffirm our commitment to listen, hear and respond to employee questions, suggestions and concerns. Counterpart has always maintained an "open-door" policy, and it continues to do so. This means that if you ever have any questions, suggestions or concerns about any aspect of your employment, you should feel free to raise those issues with your supervisor, or with any other member of management who you believe can be helpful.

On behalf of Counterpart, and all of its managers, I want to assure you that your views will be heard and given serious consideration. We value your point of view and your contributions to our organization.



DEPOSITION EXHIBIT
Dreus 78
4.27.06

CP3006

## STATEMENT OF GRIEVANCE

**DATE:**   4/7/2003

**TO:**   ARLENE LEAR, SENIOR VICE-PRESIDENT

**CC:**   KATE GOTTSCHALL, HUMAN RESOURCE DIRECTOR

ARTHUR LOVELACE, ADMINISTRATIVE DIRECTOR

**FROM:**   AARON M. CHASSY

**RE:**   MANAGEMENT/SUPERVISION BY ARLENE LEAR

---

As per the Counterpart International, Inc. Domestic Employees Manual (March, 2001) instructions on page 22, I am submitting this memorandum as a statement of grievance. I am submitting it 6 days after Ms. Kate Gottschall informed me of Ms. Lear's intent to terminate me with an opportunity to negotiate a separation agreement on the morning of Wednesday, April 2, 2003 during a meeting in Ms. Gottschall's office.

**Clear Description of The Events and Circumstances:**

Soon after beginning and thereafter throughout my tenure at Counterpart International I have been subjected to unprofessional treatment from Ms. Arlene Lear, Senior Vice President for the Civil Society Division. Specifically, in violation of the Counterpart International, Inc. Domestic Employees Manual Code of Conduct (6.19), page 20, Ms. Lear has exhibited behavior that included "Angry or vulgar language, including swearing name calling and shouting" as well as "harassment or intimidation by words, gesture, body language or any other menacing behavior."

When I began my tenure with Counterpart, Ms. Lear assigned me the responsibility of managing the proposal development process for the Central Asian Civil Society Support Initiative, a fully and openly competed $17 million cooperative agreement to be awarded by the U.S. Agency for International Development. Ms. Lear had helped to win the initial grant with USAID in 1994 and had been the individual in Counterpart Headquarters who was ultimately responsible for ensuring its successful implementation for the ensuing 8 ½ years. Despite many personal reservations on her part and counsel to the contrary from other Counterpart colleagues, such as Program Development Director David Cohen, she chose to send me alone to Central Asia. I appreciated her willingness to assign me this major responsibility and took it on, believing that she would provide me with every means of support to enable me to produce a winning proposal. My ensuing experience quickly disabused me of this assumption.

Specifically, while undertaking this assignment, Ms. Lear repeatedly questioned my capacity to perform work tasks in a tone that I would describe as contemptuous. She did so both in person, both before, during and after my trip to Central Asia, when she threatened to take away the proposal management responsibilities she had assigned to

DEPOSITION EXHIBIT 79
DORCUS
11·27·06

CP3174

## Arthur Lovelace

| | |
|---|---|
| **From:** | Arlene Lear |
| **Sent:** | Tuesday, April 08, 2003 6:33 PM |
| **To:** | Lelei LeLaulu; Harry Dorcus; Arthur Lovelace; Kerry Richard |
| **Subject:** | FW: Comp Time Confirmation |
| **Importance:** | High |

more.....


### *Arlene Lear*

Senior Vice President
Counterpart International, Inc.
1200 18th Street, N.W.
Suite 1100
Washington, D.C. 20036

Tel.   (202) 721-1520
Fax.  (202) 296-9679
www  counterpart.org

-----Original Message-----
**From:** Aaron Chassy
**Sent:** Wednesday, March 12, 2003 12:30 PM
**To:** Arlene Lear
**Subject:** Comp Time Confirmation
**Importance:** High

Arlene,

I wanted to confirm whether or not I could plan to take the week of March 24th off, assuming the proposal has been submitted and delivered.

Our babysitter will be on sick leave for about 4 weeks around that time. We are trying to plan for the best way to get "coverage" in her absence. If I could plan on taking that week off and be at home with the children,  then my wife and I can better schedule my mother-in-law's visit to help us with childcare needs.

I would greatly appreciate a response at your soonest convenience.

Many thanks, Aaron

     -----Original Message-----
     **From:** Arlene Lear
     **Sent:** Tuesday, March 11, 2003 11:51 AM
     **To:** Aaron Chassy
     **Subject:** RE: Friday Absence

     I was planning on giving you a week off.....Aaron, you need to trust me.....I wouldn't put you through this stress without being sensitive to your need to decompress and re-group with your family.



CP3196

My main interest is coming up with the best product....if we can win this bid, both of our lives will be less stressful and we can then concentrate on developing interesting projects in other parts of the world feeling more financially secure and able to take some calculated risks.

This has been the nature of my life over the past decade -- basically carrying the ball on proposal development and writing......it's stressful, but the pay off is great -- seeing people and institutions evolve as real players in building their societies and addressing critical human needs.....and generating revenue to keep CPI going.....and my staff employed.

There are several reasons I want to win the CAR bid:  1) to finish the job we started, 2) to keep our local staff employed, 3) to give our division some security, and 4) to give me the satisfaction of having made a demonstrable difference in people's lives through capacity building and improved access to resources over the longer term.

Don't be stressed over the first draft.....somehow we will get the substantive information we need to make this proposal reflect years of on-the-ground experience.....we can always get numbers....also, the Phase II and Phase III proposals may have some good language....no one on the current review committee, with the possible exception of Sean Roberts, is aware of what we've written previously.....

Also, the NGO expand and CRD proposals should give good background on Tajikistan.....What I'm seeing from these country grids is that not a hell a lot has changed related to the context.....what has changed over the years are our own achievements in the areas of community mobilization, advocacy, social partnership, institutional strengthening and our lessons learned in each of these areas......

My strong recommendation to you, even for the first draft:  keep it simple....easy to grasp......straightforward......logical.......and point out the gaps in bold.

Thanks for being a trouper....and let me know what help you need from me.

arlene


*Arlene Lear*

Senior Vice President
Counterpart International, Inc.
1200 18th Street, N.W.
Suite 1100
Washington, D.C. 20036


Tel.  (202) 721-1520
Fax.  (202) 296-9679
www  counterpart.org

-----Original Message-----
**From:** Aaron Chassy
**Sent:** Monday, March 10, 2003 8:07 PM
**To:** Arlene Lear
**Subject:** RE: Friday Absence

I'll work on the weekend or evenings or whenever I have to to get the job done. But I am going to ask you for a few comp days after we put this proposal to bed so that I don't burn out.

CP3197

11/1/2005

**ATTACHMENT B**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAY W. COOPER | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:05-cv-01598-RMC |
| | ) | |
| COUNTERPART INTERNATIONAL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S REQUEST FOR ADMISSIONS**

Defendant Counterpart International ("Counterpart") responds to plaintiff's request for admissions as follows:

**General Objections and Responses**

1.      Counterpart has made good faith efforts to respond to plaintiff's requests for admissions.  Counterpart reserves the right to supplement these responses.

2.      Counterpart objects to plaintiff's requests for admissions to the extent they seek the disclosure of information and communications protected by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

3.      Counterpart objects to plaintiff's requests for admissions to the extent they seek private, privileged and confidential commercial and/or proprietary business information.

4.      Counterpart objects to the instructions and definitions contained in plaintiff's requests for admissions to the extent they impose obligations greater than those

required by the Federal Rules or the Local Rules of the U.S. District Court for the District of Columbia.

<div align="center">**<u>Specific Objections and Responses</u>**</div>

**REQUEST NO. 1:** Documents bearing Bates stamp numbers CP0001 through CP1073, CP1346 through CP2466 and CIC1470 through CIC1524 are true, accurate and complete photographic copies of records created or maintained by Counterpart in the course of its regularly conducted business activity within the meaning of Rule 803(6) of the Federal Rules of Evidence.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 2:** Documents bearing Bates stamp numbers CP1074 through CP1345 are incomplete financial records of Counterpart, which Counterpart has agreed to replace with true, accurate and complete records as created or maintained by Counterpart in the course of its regularly conducted business activity within the meaning of Rule 803(6) of the Federal Rules of Evidence.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that documents bearing Bates stamp numbers CP1074 through CP1345 are Counterpart financial records maintained by Counterpart in the course of its regularly conducted business activity within the meaning of Rule 803(6) of the Federal Rule of Evidence, a portion of which were inadvertently cut off in the copying process. Counterpart further admits it has agreed to produce complete copies of said financial

records including the portions that were inadvertently cut off in the copying process.
Counterpart denies the remainder of Request No. 2.

**REQUEST NO. 3:** Documents bearing Bates stamp numbers 49-61, 64-98, 108,
112-15, 221-260, 266-86, 295-98 and 3457 are true, accurate and complete photographic
copies of records created or maintained by Counterpart in the course of its regularly
conducted business activity within the meaning of Rule 803(6) of the Federal Rules of
Evidence.

**RESPONSE:** Subject to the general objections and responses stated above,
Counterpart responds as follows:

Counterpart admits documents bearing Bates stamp numbers 49-61, 65-68, 75-76,
78-89, 92, 96-98, 221-223, 225-227, 229, 231-233, 241-243, 247-248, 251-260 and 284-
286 are true, accurate and complete photographic copies of records created or maintained
by Counterpart in the course of its regularly conducted business activity within the
meaning of Rule 803(6) of the Federal Rules of Evidence.  Counterpart denies the
remainder of the allegations in Request No. 3.

**REQUEST NO. 4:** Documents bearing Bates stamp numbers CP1490 through
CP2466 are true, accurate and complete photographic copies of the files that Kelli Boyer
found in Jay Cooper's office after his termination that she characterized as "secret files"
at pages 93-103 of her deposition.

**RESPONSE:**  Counterpart objects to Request No. 4 on the grounds that it seeks
information which is not relevant to the subject matter of this litigation and not
reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remaining allegations in Request No. 4.

**REQUEST NO. 5:** The "secret files" are comprised of files on fourteen individuals and one file labeled "computer consultants" concerning a local firm.

**RESPONSE:**  Counterpart objects to Request No. 5 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits that documents Kelli Boyer characterized as "secret files" during her deposition are comprised of files on fourteen individuals and one file labeled "computer contractors" (not "computer consultants").

**REQUEST NO. 6:** Jay Cooper at one time or another was charged with the supervision of each of the fourteen individuals for whom a "secret file" was found, with the exception of Michael Kunz.

**RESPONSE:** Counterpart objects to Request No. 6 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 6, except that Counterpart is still in the process of confirming if Jay Cooper was ever charged with the supervision of Natalia (Natasha) Bougaets.

**REQUEST NO. 7:** With the exception of the file on Michael Kunz, the "secret files" are comprised of the sort of documents routinely kept by a manager about the people he supervises, such as contracts of employment or consulting agreements, job descriptions or documents setting of the scope of work of consultants, resumes, performance evaluations and self-evaluations, periodic progress reports against objectives, and routine emails asking for and sharing information.

**RESPONSE:** Counterpart objects to the term "the sort of documents routinely kept by a manager" as vague and ambiguous.  Counterpart further objects to Request No. 7 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 7.

**REQUEST NO. 8:** The "secret files" on nine of these fourteen individuals (Anika Ayrapetyants, Yazgylych Charyev, Natalia (Natasha) Bougaets, Gavin Helf, Rosalie Yasquez-Yetter, Roberta Talmage, Bob Abma, Ara Nazinyan and Erkin Kasybekov) and the computer consultants file contain employment or consultancy agreements.

**RESPONSE:**  Counterpart objects to Request No. 8 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."    Counterpart admits the remainder of the allegations in Request No. 8.

**REQUEST NO. 9:** The "secret files" on nine of these fourteen individuals (Kim Alter, Soroush Javadi-Matlagh, Yazgylych Charyev, Natalia (Natasha) Bougaets, Gavin Helf, Roberta Talmage, Bob Abma, Ara Nazinyan and Erkin Kasybekov) contain job descriptions and/or documents setting out the Scope of Work expected in connection with a consultant arrangement.

**RESPONSE:** Counterpart objects to Request No. 9 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the remainder of the allegations in Request No. 9.

**REQUEST NO. 10:** The "secret files" on six of these individuals contain job performance appraisals completed by Jay Cooper and/or self appraisals by that individual.

**RESPONSE:** Counterpart objects to Request No. 10 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the remainder of the allegations in Request No. 10.

**REQUEST NO. 11:** The "secret files" on two of these individuals (Randall Olson and Rosalie Vasquez-Yetter) contain emails and memos concerning the

employment failings of these two individuals and various options to improve that performance or terminate their employment.

**RESPONSE:** Counterpart objects to Request No. 11 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the terms "employment failings" and "various options to improve" as vague and ambiguous. Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the remainder of the allegations in Request No. 11.

**REQUEST NO. 12:** Jay Cooper terminated Rosalie Vasquez-Yetter from her position as Country Director of Turkmenistan in the Fall of 2001 upon instructions from Arlene and Lelei Lelaulu after her husband created a public scene offensive to a US government official based in that country.

**RESPONSE:** Counterpart objects to Request No. 12 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Jay Cooper terminated Rosalie Vasquez-Yetter from her position as Country Director of Turkmenistan in the Fall of 2001 upon instructions from Arlene Lear. Counterpart denies the remainder of the allegations in Request No. 12.

**REQUEST NO. 13:** Jay Cooper demoted Randall Olson from his position as Country Director of Tajikistan due to poor performance with the concurrence of Arlene Lear. That poor performance is documented in emails, memos, notes, comments on monthly reports and the performance reviews contained in the file on him.

**RESPONSE:** Counterpart objects to Request No. 13 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 14:** The "secret file" on Kim Alter contains lengthy memoranda by Kim Alter concerning her goals and objectives and progress, the ownership of her work product, and her discontent with attempts to supervise her work.

**RESPONSE:** Counterpart objects to Request No. 14 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term "lengthy memoranda" as vague and ambiguous. Subject to these objections and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 14.

**REQUEST NO. 15:** Kim Alter resigned from employment with Counterpart in 2004.

**RESPONSE:**  Counterpart objects to Request No. 15 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 16:** Counterpart was dissatisfied with Kim Alter's relationships with her supervisors by the time she resigned.

**RESPONSE:** Counterpart objects to Request No. 16 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 17:** In 2003, Cooper, as Chief of Party for CSSI and HNCBI, had responsibility for Counterpart's office in Uzbekistan during a period when that operation acted as a sub-contractor to an organization named CHF International in the

running of a program known as CAIP (Community Action Investment Program).  During that period, Michael Kunz served as the Deputy Chief of Party working for Counterpart, while the Director of the CAIP project worked for CHF.  Kunz was based in the CHF office in Tashkent.  During the CAIP project, Counterpart's Uzbekistan staff sent several written complaints (and also complained orally) to Cooper about Kunz' behavior.

**RESPONSE:**  Counterpart objects to Request No. 17 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart denies that during the CAIP project, Counterpart's Uzbekistan staff sent "several" written complaints to Cooper about Kunz' behavior.  Counterpart lacks sufficient information to either admit or deny Counterpart's Uzbekistan staff "complained orally" to Cooper about Kunz' behavior.  Counterpart admits the remaining allegations in Request No. 17.

**REQUEST NO. 18:** Documents bearing Bates stamp numbers CP1889-1893 and CP1898-1905 (contained in the "secret file" for Michael Kunz) are examples of the written complaints Jay Cooper received from his staff in Uzbekistan.

**RESPONSE:**  Counterpart objects to Request No. 18 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart is unable to deny or admit the remaining allegations in Request No. 18 because it has no way of knowing whether the documents referenced in Request No. 18 constitute "examples of the written complaints Jay Cooper received from his staff in Uzbekistan."

**REQUEST NO. 19:** The documents referred to in the preceding paragraph (with different Bates stamp numbers) were marked as Exhibit 33 (bearing Bates stamp number 49-51) and Exhibit 34 (bearing Bates stamp number 52-60) to the Lear deposition.

**RESPONSE:** Counterpart objects to Request No. 19 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.  The documents referred to in the proceeding paragraph, though similar to those marked as Exhibits 33 and 34 to the Lear deposition, also include unidentified handwritten notations.

**REQUEST NO. 20:** Cooper sent the document bearing Bates stamp number 251 to Arlene Lear on April 8, 2003, with a copy of the document now marked as Exhibit 34 to the Lear deposition.

**RESPONSE:** Counterpart objects to Request No. 20 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 21:** The "secret file" on Michael Kunz also contains documents bearing Bates stamp numbers CP1895-96 (concerning a traffic accident in Uzbekistan), CP1897 (concerning the accident and Kunz' complaints about a Counterpart employee named Azam), and CP1906-07 (Cooper's handwritten notes of a conversation with Azam in which Azam complains about Kunz).

**RESPONSE:** Counterpart objects to Request No. 21 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the remaining allegations in Request No. 21.

**REQUEST NO. 22:** There are no other documents in the "secret file" on Michael Kunz other than those described in paragraphs 18 and 21.

**RESPONSE:** Counterpart objects to Request No. 22 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remaining allegations in Request No. 22.

**REQUEST NO. 23:** Of the 15 employees and consultants about whom a "secret file" was found, only eight (Michael Kunz, Randall Olson, Gavin Helf, Rosalie Vasquez-Yetter, Roberta Talmage, Bob Abma, Maura Corkery and Kim Alter) were ex-pats (Americans living abroad).

**RESPONSE:**  Counterpart objects to Request No. 23 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 23, except Counterpart is still in the process of confirming the status of Natalia (Natasha) Bougaets.

**REQUEST NO. 24:** No "secret file" on Arlene Lear was discovered among the other "secret files" found by Kelli Boyer in Jay Cooper's office after his termination.

**RESPONSE:**  Counterpart objects to Request No. 24 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 24.

**REQUEST NO. 25:** Only two of the "secret files" (Rosalie Vasquez-Yetter and Randall Olson) contain any handwritten memos of conversations between Jay and whatever person's file it was in.

**RESPONSE:**  Counterpart objects to Request No. 25 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term Counterpart objects to the term "whatever person's file it was in" as vague and ambiguous.  Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 25.

**REQUEST NO. 26:** Only one of the "secret files" (Randall Olson) contain any non-handwritten memos of conversations between Jay and whatever person's file it was in.

**RESPONSE:**  Counterpart objects to Request No. 26 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term Counterpart objects to the term "whatever person's file it was in" as vague and ambiguous.  Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remaining allegations in Request No. 26.

**REQUEST NO. 27:** The "secret files" concerning two individuals (Anika Ayrapetyants and Roberta Talmage) contain only materials relevant to brief projects for which they were hired as consultants.

**RESPONSE:**  Counterpart objects to Request No. 27 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term Counterpart objects to the term "materials relevant to brief projects for which they were hired" as vague and ambiguous.  Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 27.

**REQUEST NO. 28:** The "secret file" of Maura Corkery contains only one sheet of paper, a memo from her asking about time sheets.

**RESPONSE:**  Counterpart objects to Request No. 28 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remaining allegations in Request No. 28.

**REQUEST NO. 29:** Maura Corkery was retained briefly on a consulting basis to serve as an advisor to the Country Director in Tajikistan.

**RESPONSE:** Counterpart objects to Request No. 29 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 30:** The "secret file" on Anika Ayrapetyants contains only a consulting agreement.

**RESPONSE:** Counterpart objects to Request No. 30 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the remaining allegations in Request No. 30.

**REQUEST NO. 31:** The "secret file" on Yazgylych Charyev contains a lengthy report by a management consultant brought in by Cooper to improve Charyev's performance. Charyev remained as Counterpart's Country Director in Uzbekistan at the time of Cooper's termination.

**RESPONSE:** Counterpart objects to Request No. 31 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term Counterpart objects to the term "lengthy report" as vague and ambiguous. Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it

characterizes, or has ever characterized, said documents as "secret files."  Counterpart admits the remainder of the allegations in Request No. 31.

**REQUEST NO. 32:** Erkin Kasybekov remained as Counterpart's Country Director in Krygyzstan at the time of Cooper's termination.

**RESPONSE:**  Counterpart objects to Request No. 32 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 33:** The "secret file" labeled "computer consultants" contains a contract with a local firm to supply consulting services, a list of overtime hours for which the consultants sought reimbursement and an analysis by one of the accountants of documentation.

**RESPONSE:**  Counterpart objects to Request No. 33 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files."  Counterpart

admits the remaining allegations pertaining to the file labeled "computer contractors" (not "computer consultants") in Request No. 33.

**REQUEST NO. 34:** With only the possible exception of the file on Michael Kunz, none of the documents contained in any of the "secret files" can fairly be construed to "maybe harm the person maybe at a later date."

**RESPONSE:** Counterpart objects to Request No. 34 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the phrase "can be fairly construed" as vague and ambiguous. Subject to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits that during her deposition Kelli Boyer testified that she believed the documents she identified as "secret files" were "designed to maybe harm the person maybe at a later date." Counterpart denies the remaining allegations in Request No. 34.

**REQUEST NO. 35:** Arlene Lear prepared and signed the Performance Review bearing Bates stamp numbers CP82-90 which is Exhibit 9 to the Lear deposition on or before March 19, 2002.

**RESPONSE:** Counterpart objects to Request No. 35 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 36:** Arlene Lear sent the Performance Review bearing Bates stamp numbers CP82-90 which is Exhibit 9 to the Lear deposition to Counterpart's Human Resources Department on March 19, 2002.

**RESPONSE:** Counterpart objects to Request No. 36 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 37:** The document bearing Bates stamp numbers CIC 1470-73 is a true and correct photographic copy of the document referred to by Arlene Lear at her deposition on page 53-56.

**RESPONSE:** Counterpart objects to Request No. 37 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 38:** Arlene Lear received and reviewed the document bearing Bates stamp numbers CIC1470-73 before preparing the Performance Review that bears Bates stamp numbers CP82-90 and is Exhibit 9 to the Lear deposition.

**RESPONSE:**  Counterpart objects to Request No. 38 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Arlene Lear received and reviewed the document bearing Bates stamp numbers CIC1470-73.  Counterpart denies the remaining allegations in Request No. 38.

**REQUEST NO. 39:** The document bearing Bates stamp numbers CIC1474-1524 is a true and correct photographic copy of the document referred to by Arlene Lear at her deposition on page 81-83.

**RESPONSE:**  Counterpart objects to Request No. 39 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 40:** Arlene Lear received and reviewed the document bearing Bates stamp numbers CIC1474-1524 before preparing the Performance Review that bears Bates stamp numbers CP82-90 and is Exhibit 9 to the Lear deposition.

**RESPONSE:** Counterpart objects to Request No. 40 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Arlene Lear received and reviewed the document bearing Bates stamp numbers CIC1470-73. Counterpart denies the remaining allegations in Request No. 40.

**REQUEST NO. 41:** The document bearing Bates stamp numbers 91-92 and is marked as Exhibit 14 to the Lear deposition is a true, correct and complete photographic copy of a document prepared by Cooper and sent to Arlene Lear in March of 2002.

**RESPONSE:** Counterpart objects to Request No. 36 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Cooper prepared, and Arlene Lear received, the document bearing Bates stamp numbers 91-92. Counterpart can neither admit nor deny the remaining allegations in Request 41 because Counterpart does not have any records that indicate, and Arlene Lear does not recall, when Lear received the document.

**REQUEST NO. 42:** Arlene Lear received and reviewed the document referenced in the preceding paragraph before March 18, 2002.

**RESPONSE:** Counterpart objects to Request No. 36 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Arlene Lear received and reviewed the document referenced in the preceding paragraph. Counterpart can neither admit nor deny the remaining allegations in Request 42 because Counterpart does not have any records that indicate, and Arlene Lear does not recall, when Lear received and reviewed the document.

**REQUEST NO. 43:** The document referenced in paragraph 41 was also received in Counterpart's Human Resources Department in March of 2002.

**RESPONSE:** Counterpart objects to Request No. 43 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the HR Department received the document referenced in paragraph 41.  Counterpart can neither admit nor deny the remaining allegations in Request 43 because Counterpart does not have any records that indicate when the HR Department received the document.

**REQUEST NO. 44:** The document bearing Bates stamp numbers CP82-83 that is Exhibit 13 to the Lear deposition is a true and correct photographic copy of a document prepared by Cooper and sent to Arlene Lear in March of 2002.

**RESPONSE:** Counterpart objects to Request No. 44 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 45:** The document referenced in the previous paragraph was attached to an email from Arlene Lear to Kate Gottschal (forwarding an email from Cooper to Arlene Lear) that bears Bates stamp number 81 and is Exhibit 10 to the Lear deposition.

**RESPONSE:** Counterpart objects to Request No. 45 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 46:** Counterpart has published no whistleblower protection policy to its employees at any time after August of 2004.

**RESPONSE:** Counterpart objects to Request No. 46 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 47:** Counterpart has published no whistleblower protection policy to its employees at the time of Jay Cooper's termination on November 12, 2004.

**RESPONSE:** Counterpart objects to Request No. 47 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO 48:** As of the date of these Requests for Admissions, Counterpart has failed to produce any written Counterpart whistleblower protection policy.

**RESPONSE:** Counterpart objects to Request No. 48 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 49:** Kelli Boyer's email on the page that bears the Bates stamp number 230 and is on the first page of Exhibit 37 to the Lear deposition is the first time Counterpart announced to its employees that its Grievance Policy had been rescinded.

**RESPONSE:** Counterpart objects to Request No. 49 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 50:** At a meeting of Counterpart's Senior Management Team held on October 26, 2004, it was announced that two members of Counterpart's Program Management Team were revising the company's Open Door Policy to include greater specificity, which was lost when the Grievance Policy was rescinded.

**RESPONSE:** Counterpart objects to Request No. 50 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that at a meeting of Counterpart's Senior Management Team held on October 26, 2004, it was announced that two members of Counterpart's Program Management Team were revising the company's Open Door Policy.  Counterpart denies the remaining allegations in Request No. 50.

**REQUEST NO. 51:** As of the date of these Requests for Admissions, Counterpart has failed to produce any revision of Counterpart's Open Door Policy that modifies that policy as set forth in Exhibit 7 to the Lear deposition.

**RESPONSE:** Counterpart objects to Request No. 51 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Counterpart further objects to the terms "revision" and "modifies" as vague and ambiguous.  Subject

to these objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart denies it has not produced documentation which rescinds, and therefore revises and modifies, the Open Door Policy set forth in Exhibit 7 to the Lear deposition.

**REQUEST NO. 52:** Jay Cooper hired Gavin Helf as a consultant to provide guidance and management support to Yazgylych Charyev, Counterpart's Country Director for Turkmenistan, on two occasions, once for a three-month period in 2003 and again for a three-week period in 2004.

**RESPONSE:** Counterpart objects to Request No. 52 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 53:** The documents bearing the Bates stamp numbers 2009 and 2010 are contained in the "secret files" on Gavin Helf and are true and correct photographic copies of an exchange of correspondence between Cooper and Mr. Helf concerning the scope of work to be performed by Mr. Helf on his second visit, as well as the reasons why that second consultancy was warranted.

**RESPONSE:** Counterpart objects to Request No. 53 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that during her deposition, Kelli Boyer characterized documents found in Cooper's Almaty office as "secret files" but denies that it characterizes, or has ever characterized, said documents as "secret files." Counterpart admits the document bearing the Bates stamp number 2010 is a true and correct photographic copy of an exchange of correspondence between Cooper and Mr. Helf, concerning the scope of work to be performed by Mr. Helf on his second visit, as well as the reasons why that second consultancy was warranted. Counterpart is unable to admit or deny the remainder of the allegations in Request No. 53 with regarding to the document bearing the Bates stamp number 2009 because there is no indication on the document itself that it is a copy of any exchange of correspondence.

**REQUEST NO. 54:** Arlene Lear approved hiring Mr. Helf for the purposes described in Request No. 52 and in the documents referenced in Request No. 53.

**RESPONSE:** Counterpart objects to Request No. 54 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 55:** Sometime after December 31, 2005, Counterpart prepared and submitted to USAID a Final Program Report on one of the programs Jay Cooper had managed between January 1, 2003 and the date of his termination, the HNCBI, which had

been operated in five countries in Central Asia.  A true and correct photographic copy of that report, minus its attachments, is Exhibit A to these Requests.

**RESPONSE:**  Counterpart objects to Request No. 55 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 56:** In its Final Program Report on the HNCBI, Counterpart concluded:  "Despite challenging operating environments in some of the countries, the program has proved to be resilient and extremely successful in terms of outreach and producing significant health impact at the community level . . . . It has by far exceeded the target indicators under each of the objectives . . . ."

**RESPONSE:**  Counterpart objects to Request No. 56 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the text of the Final Program Report on the HNCBI, attached as Exhibit A to these Requests, speaks for itself and is accurately quoted herein.

**REQUEST NO. 57:** In August of 2004, Don Feil held the position of Vice President (Small Business Development) with Counterpart.

**RESPONSE:** Counterpart objects to Request No. 57 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 58:** In August of 2004, Harry Dorcus held the position of Vice President and Chief Financial Officer with Counterpart.

**RESPONSE:** Counterpart objects to Request No. 58 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 59:** Lelei LeLaulu does not weigh 350 pounds.

**RESPONSE:** Counterpart objects to Request No. 59 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 60:** Arlene Lear does not weigh 350 pounds.

**RESPONSE:** Counterpart objects to Request No. 60 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 61:** Exhibit B is a true, accurate and correct photographic copy of Form 990, Return of Organization Exempt from Income Tax (with attachments) filed with the IRS by Counterpart, covering Counterpart's activities from October 1, 2004 to September 30, 2005.

**RESPONSE:** Counterpart objects to Request No. 61 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO 62:** The document marked as Exhibit 49 to the deposition of Harry Dorcus is a true and correct photographic copy of Form 990, Return of Organization Exempt from Income Tax (with attachments) filed with the IRS by Counterpart, covering Counterpart's activities from October 1, 2003 to September 30, 2004, with the sole exception of a blacked out portion of page 6.

**RESPONSE:** Counterpart objects to Request No. 62 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not

reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document marked as Exhibit 49 to the deposition of Harry Dorcus appears to be a copy of Form 990, Return of Organization Exempt from Income Tax (with attachments) filed with the IRS by Counterpart, covering Counterpart's activities from October 1, 2003 to September 30, 2004, with the sole exception of a blacked out portion of page 6.

**REQUEST NO. 63:** The document bearing Bates stamp numbers CP852 through 972 is a true, accurate and complete copy of a Mid-Term Evaluation Report on CSSI, prepared for Counterpart, dated May 11, 2005 and is the Mid-Term Evaluation Report referred to by Christopher Szscsey in his deposition in this case taken on September 6, 2006.

**RESPONSE:**  Counterpart objects to Request No. 63 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp numbers CP852-CP972 is a true, accurate and complete copy of a Mid-Term Evaluation Report on CSSI, prepared for Counterpart, dated May 11, 2005.  Counterpart can neither admit nor deny the remaining allegations in Request No. 63 because Counterpart's counsel had no way to

verify what documents were being viewed by Christopher Szscsey when he referred to documents he was viewing during his telephone deposition.

**REQUEST NO. 64:** The document bearing Bates stamp numbers 282-83 is a true and correct photographic copy of an email sent by Bob Abma to Michael Kunz and Cooper on September 3, 2004.

**RESPONSE:** Counterpart objects to Request No. 64 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp numbers 282-83 appears to be an email sent by Bob Abma to Michael Kunz and Cooper on September 3, 2004. Counterpart denies the remaining allegations in Request No. 64.

**REQUEST NO. 65:** The reference in the document described in the preceding paragraph to deficits in "HQ" refers to spending of dollars from the CSSI and NHCBI programs as direct program costs by Counterpart employees based in Counterpart's headquarters in Washington, D.C.

**RESPONSE:** Counterpart objects to Request No. 65 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 66:** The reference in the document described in paragraph 64 to deficits in "The Regional Office" refers to spending of dollars from the CSSI and NHCBI programs as direct program costs on items such as the salaries, fringe benefits, and travel of Cooper, Bob Abma, Michael Kunz and several other Almaty-based Counterpart employees.

**RESPONSE:** Counterpart objects to Request No. 66 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 67:** Bob Abma suggests in the document described in paragraph 64 above that funds from the NHCBI project be used for CSSI projects and for other projects in countries where CSSI had no projects.

**RESPONSE:** Counterpart objects to Request No. 67 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 68:** Bob Abma suggests in the document described in paragraph 64 above that NHCBI project funds be used for other projects in the Regional Office.

**RESPONSE:** Counterpart objects to Request No. 68 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 69:** As the document bearing Bates stamp number 3452 indicates, on September 24, 2004, Michael Kunz sent an email to Cooper thanking him for "today's meeting" which he (Kunz) described as "really productive."

**RESPONSE:** Counterpart objects to Request No. 69 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 70:** The document bearing Bates stamp number 3452 is a true and correct photographic copy of an email from Michael Kunz to Cooper dated September 24, 2004.

**RESPONSE:** Counterpart objects to Request No. 70 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 71:** Irina Kolmakova, the HR and Administrative Manager of Counterpart's office in Almaty, Kazakstan, received an email from Michael Kunz on or before October 6, 2004, requesting that Jay Cooper and Bob Abma prepare an agenda of the major topics they would like to cover at the Monday staff meeting by close of business on the previous Thursday and stating that he is not going to participate in those meetings until topics are up for discussion that may be of interest to him.

**RESPONSE:** Counterpart objects to Request No. 71 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits that on October 6, 2004, Kolmakova sent an e-mail to Cooper and Abma that stated "Michael wrote that he is not going to participate in our meetings until we discuss topics that may be of interest for him." Counterpart lacks sufficient information and knowledge to admit or deny the remaining allegations in Request No. 71.

**REQUEST NO. 72:** The document bearing Bates stamp number 3457 is a true and correct photographic copy of an email sent to Jay Cooper and Bob Abma by Irina Kolmakova on October 6, 2004.

**RESPONSE:** Counterpart objects to Request No. 72 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp number 3457 appears to be an email sent to Jay Cooper and Bob Abma by Irina Kolmakova on October 6, 2004. Counterpart denies the remaining allegations in Request No. 72.

**REQUEST NO. 73:** Irina Kolmakova was Counterpart's HR and Administrative Manager in its Almaty office in 2004, with supervisory responsibility for the receptionist, the drivers and the security guards that worked out of that office.

**RESPONSE:**  Counterpart objects to Request No. 73 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 74:** The document bearing Bates stamp number 3453-56 is a true and correct photographic copy of email correspondence between Michael Kunz and Cooper about meetings in October of 2004, attaching other correspondence about the subject of those meetings.

**RESPONSE:**  Counterpart objects to Request No. 74 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Countepart admits the document bearing Bates stamp number 3453-56 appears to be email correspondence between Michael Kunz and Cooper about meetings in October of 2004, attaching other correspondence about the subject of those meetings.  Counterpart denies the remaining allegations in Request No. 74.

**REQUEST NO. 75:**  The document bearing Bates stamp number 284, which is Exhibit 23 to the Lear deposition, is a true and correct photographic copy of an email written by Michael Kunz to Cooper and Yazgylych Charyev on October 6, 2004.

**RESPONSE:**  Counterpart objects to Request No. 75 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 76:**  The document bearing Bates stamp number 230-32, which is Exhibit 32 to the Lear deposition,  is (with the exception of the email forwarding notice from Cooper to Pat Douglass on the top of page 230) a true and correct photographic copy of an email sent to Counterpart's Headquarters Staff from its Human Resources Department on October 6, 2004.

**RESPONSE:**  Counterpart objects to Request No. 76 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart denies the document bearing Bates stamp number 230-32 is Exhibit 32 to the Lear deposition.  Counterpart admits the remaining allegations in Request No. 37.

**REQUEST NO. 77:** The document bearing Bates stamp number 69-73, which is Exhibit 46 to the Dorcus deposition, is a true and correct photographic copy of an email sent from Bob Abma to Cooper and Michael Kunz on October 8, 2004, attaching a spreadsheet.

**RESPONSE:**  Counterpart objects to Request No. 77 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp number 69-73, which is Exhibit 46 to the Dorcus deposition, appears to be an email sent from Bob Abma to Cooper and Michael Kunz on October 8, 2004, attaching a spreadsheet.  Counterpart denies the remaining allegations in Request No. 77.

**REQUEST NO. 78:** The reference to "Eurasia Regional" on the spreadsheet attached to Dorcus Exhibit 46 is to a fund designed to support efforts by Michael Kunz to travel to Armenia and other countries in an attempt to procure new programs for Counterpart, as well as travel by Bob Abma to Iraq, Turkey and perhaps Afghanistan on short-term assignments for Counterpart including training sessions.

**RESPONSE:**  Counterpart objects to Request No. 78 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not

reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

At this time, Counterpart lacks sufficient information to admit or deny the allegations in Request No. 78.  Counterpart is in the process of researching the information to respond to this Request and will supplement its response as soon as possible.

**REQUEST NO. 79:** The document bearing Bates stamp number CP 21-23 that is Exhibit 17 to the Cooper deposition is a true, correct and complete copy of a resume that accurately sets out the responsibilities that Michael Kunz had in his position as Counterpart's Regional Director for Counterpart's Civil Society Division in Eurasia, the Middle East and South East Asia as of September 1, 2004.

**RESPONSE:**  Counterpart objects to Request No. 79 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp number CP21-23 that is Exhibit 17 to the Cooper deposition is a job description for Michael Kunz's position as Regional Director of Counterpart's Civil Society Division in Eurasia, the Middle East and South East Asia as of September 1, 2004.  Counterpart denies the remaining allegations in Request No. 79.

**REQUEST NO. 80:** Exhibit 17 to the Cooper deposition describes Michael Kunz' responsibilities as of September 1, 2004 as overseeing current programs in Armenia, Bulgaria and Vietnam.

**RESPONSE:** Counterpart objects to Request No. 80 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Exhibit 17 to the Cooper deposition describes some of Michael Kunz' responsibilities as of September 1, 2004, including overseeing current programs in Armenia, Bulgaria and Vietnam.

**REQUEST NO. 81:** In the Fall of 2004, Michael Kunz was cultivating new program opportunities in the Central Asia Region, including those in countries in which Counterpart had no existing programs such as Armenia.

**RESPONSE:** Counterpart objects to Request No. 81 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 82:** In October of 2004, Bob Abma held the position of Counterpart's Regional Finance Director for the Central Asian Region, with

responsibility for financial matters in various existing and proposed projects outside the five countries in which the programs managed by Cooper operated.

**RESPONSE:**  Counterpart objects to Request No. 82 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 83:** During 2004, Bob Abma traveled extensively, purportedly on Counterpart business.  Among the countries he visited were Armenia, Iraq and Turkey on training missions; he also traveled to Tajikistan to perform services on a Counterpart agricultural projects.

**RESPONSE:**  Counterpart objects to Request No. 83 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits during 2004, Bob Abma traveled on Counterpart business, including to Armenia and Iraq.  Counterpart denies the remaining allegations in Request No. 83.

**REQUEST NO. 84:** Counterpart's vision for Bob Abma is that he would live in Central Asia but travel all over that part of the world as a consultant to perform services in connection with various Counterpart programs and proposals.

**RESPONSE:** Counterpart objects to Request No. 84 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 85:** Before October 8, 2004, Bob Abma and Michael Kunz proposed a budget that allocated to the CSSI project and the NHCBI project a portion of salary costs for a new assistant to support Michael Kunz in the activities described in the paragraphs 78 through 81.

**RESPONSE:**  Counterpart objects to Request No. 85 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 86:** Cooper expressed to Bob Abma and Michael Kunz  his objections to the use of funds from the CSSI and HNCBI projects to fund the proposed salary described in the previous paragraph as well as the travel by Kunz and Abma designed to develop new programs unrelated to the mission of CSSI and NHCBI.

**RESPONSE:**  Counterpart objects to Request No. 86 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits Jay Cooper stated in an e-mail to Bob Abma and Michael Kunz that he did "not agree to approve funds from CSSI or HNCBI to be used for anything other than those projects." Counterpart denies the remaining allegations in Request No. 86.

**REQUEST NO. 87:** None of the activities described in paragraphs 78 through 84 fell within the program parameters of CSSI or NHCBI.

**RESPONSE:** Counterpart objects to Request No. 87 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 88:** The document bearing Bates stamp number 285 is a true, accurate and complete photographic copy of an email Cooper sent Bob Abma and Michael Kunz in response to Exhibit 46 to the Dorcus deposition.

**RESPONSE:** Counterpart objects to Request No. 88 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp number 285 appears to be an email Cooper sent Bob Abma and Michael Kunz in response to Exhibit 46 to the Dorcus deposition.  Counterpart denies the remaining allegations in Request No. 88.

**REQUEST NO. 89:** The document bearing Bates stamp number 74, which is Exhibit 45 to the Dorcus deposition, was received by Bob Abma, Michael Kunz, Harry Dorcus and Yana Dobronravova on October 21, 2004.

**RESPONSE:** Counterpart objects to Request No. 89 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document bearing Bates stamp number 74 includes what appears to be an e-mail send from Jay Cooper to Bob Abma, Michael Kunz, Harry Dorcus and Yana Dobronravova on October 21, 2004.  Counterpart denies the remaining allegations in Request No. 89.

**REQUEST NO. 90:** Counterpart never assigned the full time financial person to track closely all the costs for the CSSI and NHCBI projects, as had been requested by Cooper in Exhibit 45 to the Dorcus deposition.

**RESPONSE:** Counterpart objects to Request No. 90 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart denies it never assigned a full time financial person to track closely all the costs for the CSSI and NHCBI projects.  Counterpart admits the remaining allegations in Request No. 90.

**REQUEST NO. 91:** At no time before Cooper's termination on November 12, 2004, did Counterpart assign the full time financial person to track closely all the costs for the CSSI and NHCBI projects, as had been requested by Cooper in Exhibit 45 to the Dorcus deposition.

**RESPONSE:** Counterpart objects to Request No. 91 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart denies it never assigned a full time financial person to track closely all the costs for the CSSI and NHCBI projects prior to Cooper's termination on November 12, 2004.  Counterpart admits the remaining allegations in Request No. 91.

**REQUEST NO. 92:** Counterpart entered into an agreement with its former Chief Operating Officer Greg Touma in connection with his resignation from Counterpart's employment under the terms of which he is not allowed to discuss events surrounding his employment with Counterpart or its termination.

**RESPONSE:**  Counterpart objects to Request No. 92 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this

objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 93:** Counterpart has refused to waive the confidentiality provision in its agreement with Greg Touma to allow him to give information or testimony in this case.

**RESPONSE:** Counterpart objects to Request No. 93 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits it refused to waive the confidentiality provision of its agreement with Greg Touma.

**REQUEST NO. 94:** Aaron Chassey was terminated from his position as Director of Counterpart's Civil Society Program in the Spring of 2003. He was not locked out of his office following that termination.

**RESPONSE:** Counterpart objects to Request No. 94 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 95:** Counterpart entered into an agreement with Aaron Chassey, its former Director of Civil Society, in connection with the termination of his Counterpart employment, under the terms of which he is not allowed to discuss events surrounding his employment with Counterpart or its termination.

**RESPONSE:**  Counterpart objects to Request No. 95 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits it entered into an agreement with Aaron Chassey, its former Director of Civil Society, in connection with the termination of his Counterpart employment.  Counterpart denies the remaining allegations in Request No. 95.

**REQUEST NO. 96:** Counterpart has refused to waive the confidentiality provision in its agreement with Aaron Chassey to allow him to give information or testimony in this case.

**RESPONSE:**  Counterpart objects to Request No. 96 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits it has refused to waive the confidentiality provision in its agreement with Aaron Chassey.

**REQUEST NO. 97:** Counterpart used NICRA funds generated from grants from USAID to subsidize losses in its for-profit subsidiary Enviroventure.

**RESPONSE:** Counterpart objects to Request No. 97 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 98:** The document marked as Exhibit 41 to the Dorcus deposition is a true, correct and complete copy of OMB Circular A-122, Cost Principles for Non-Profit Organizations.

**RESPONSE:** Counterpart objects to Request No. 98 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Counterpart admits the document marked as Exhibit 41 to the Dorcus deposition is a true, correct and complete copy of a 75-page document available on the website: http://www.whitehouse.gov/omb/circulars/a122/print/a122html, entitled OMB Circular A-122, Cost Principles for Non-Profit Organizations.

**REQUEST NO. 99:** Counterpart investigated various allegations against Cooper made by Kim Alter and determined that they were without merit.

**RESPONSE:** Counterpart objects to Request No. 99 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term "various allegations" as vague and ambiguous. Subject to these objections and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 100:** Kelli Boyer's explanation for the reason why she found Kim Alter's allegations to be without merit on page 21-23 of her deposition demonstrates her unfamiliarity with basic principles of the law of sexual harassment.

**RESPONSE:** Counterpart objects to Request No. 100 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection and the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 101:** Counterpart did not credit allegations about Cooper made by Aaron Chassey, and such allegations played no role in Counterpart's decision to terminate Cooper.

**RESPONSE:** Counterpart objects to Request No. 101 on the grounds that it seeks information which is not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Counterpart further objects to the term "allegations" as vague and ambiguous. Subject to these

objection and the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 102:** Counterpart has paid no reimbursement to Cooper for the business expenses for which reimbursement was requested in documents bearing Bates stamp numbers 89, 92, 96 and 98.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 103:** Accountants in Counterpart's Almaty office possessed records sufficient to verify the amounts reflected in the documents referenced in the previous paragraph.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

At this time, Counterpart lacks sufficient information to admit or deny the allegations in Request No. 103.  Counterpart is in the process of researching the information to respond to this Request and will supplement its response as soon as possible.

**REQUEST NO. 104:** The documents bearing Bates stamp numbers 100-107 and 111 reflect expenses incurred by Cooper in returning himself and his possessions to his Home of Record from Central Asia after his termination.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Counterpart lacks sufficient knowledge to either admit or deny the allegations in Request No. 104.

**REQUEST NO. 105:** The documents bearing Bates stamp numbers 100-107 and 111 reflect reasonable expenses incurred by Cooper in returning himself and his household and personal effects to his Home of Record from Central Asia after his termination.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 106:** Counterpart has taken no steps to verify the reasonableness of the expenses reflected in the documents referred to in paragraph 104.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Denied.

**REQUEST NO. 107:** Counterpart has paid no reimbursement, in whole or in part, for the travel and shipping expenses reflected in the documents referred to in paragraph 104.

**RESPONSE:** Subject to the general objections and responses stated above, Counterpart responds as follows:

Admitted.

**REQUEST NO. 108:** It is a policy or practice of Counterpart not to reimburse outstanding business expenses or relocation costs for terminated employees unless they release Counterpart from all liabilities associated with the termination.

**RESPONSE:**  Subject to the general objections and responses stated above,

Counterpart responds as follows:

Denied.

Respectfully submitted,

**JACKSON LEWIS LLP**

By: _____
    Tyler A. Brown
      (D.C. Bar No. 480693)
    Kara M. Ariail
      (D.C. Bar No. 46817)
    8614 Westwood Center Drive
    Suite 950
    Vienna, VA 22182
    (703) 821-2189
    **Counsel for Defendant**

October 11, 2006

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 11, 2006, a copy of the foregoing

*Defendant's Response to Plaintiff's Request for Admissions* was served upon the

following via overnight delivery:

        Patricia D. Douglass
        98 Interpromontory Rd.
        Great Falls, VA 222066
        Counsel for Plaintiff


                                    _____
                                      Kara M. Ariail

**PDX-C**

**Counterpart International**

# Mid-Term Evaluation Report

# Civil Society Support Initiative (CSSI) Kazakhstan, Kyrgyzstan and Turkmenistan

Prepared for Counterpart International

Author:

Christopher Carver
Evaluation Team Leader and Program Manager
Social Impact, Inc.

Under Contract No. 115-A-00-03-00020-00

Date:
May 3, 2005

*Social Impact, Inc.*

# Table of Contents

Acronyms ................................................................................................................... iv
Acknowledgements ................................................................................................... v
**Executive Summary** ................................................................................................ vi

**Chapter I:    Introduction** ....................................................................................... 1
CSSI Background and Overview ............................................................................... 1
Mid-Term Evaluation Purpose ................................................................................. 2
Mid-Term Evaluation Objectives ............................................................................ 2
Mid-Term Evaluation Methodology ........................................................................ 3

**Chapter II:    Kazakhstan Evaluation Findings** .................................................... 5
Introduction ............................................................................................................... 5
Evaluation Findings .................................................................................................. 6
    Objective 1 ........................................................................................................... 6
    Objective 2 ........................................................................................................... 13
    Objective 3 ........................................................................................................... 14
    Objective 4 ........................................................................................................... 16
    Objective 5 ........................................................................................................... 17
    Objective 6 ........................................................................................................... 18
Recommendations .................................................................................................... 18

**Chapter III:   Kyrgyzstan Evaluation Findings** ................................................... 23
Introduction ............................................................................................................... 23
Evaluation Findings .................................................................................................. 24
    Objective 1 ........................................................................................................... 24
    Objective 2 ........................................................................................................... 29
    Objective 3 ........................................................................................................... 30
    Objective 4 ........................................................................................................... 32
    Objective 5 ........................................................................................................... 34
    Objective 6 ........................................................................................................... 35
Recommendations .................................................................................................... 35

**Chapter IV:   Turkmenistan Evaluation Findings** ............................................... 40
Introduction ............................................................................................................... 40
Evaluation Findings .................................................................................................. 42
    Objective 1 ........................................................................................................... 42
    Objective 2 ........................................................................................................... 46
    Objective 3 ........................................................................................................... 48
Recommendations .................................................................................................... 49

**Annexes**
Annex 1: Satellite Offices in Kazakhstan ............................................................... 52
Annex 2: Projects Implemented with other NGOs, government agencies and for-profit
organizations in Kazakhstan .................................................................................... 55

*Social Impact, Inc.*

Annex 3: CSSC's Sources of Income (split by percentage/total) in Kazakhstan ......................... 59
Annex: 4: CSSC's Sources of Income (split by percentage/total) in Kyrgyzstan ...................... 62
Annex 5: Kyrgyzstan Sources of Income of CSSC and Association........................................... 70
Annex 6: Kyrgyzstan Organizations with Branch Offices ............................................................ 80
Annex 7: CSSC's Sources of Income (split by percentage/total) in Kyrgyzstan ...................... 81
Annex 8: Summary of Grants in Kyrgyzstan................................................................................. 85
Annex 9: Law on Public Associations-Turkmenistan .................................................................. 89
Annex 10: Work Cycle of Facilitators/Consultants ..................................................................... 93
Annex 11: Client Satisfaction Survey, Results Summary ........................................................... 95
Annex 12: Evaluation Work Plan ................................................................................................ 101
Annex 13: Pre-certification Framework ...................................................................................... 110

*Social Impact, Inc.*

## Acronyms

| | |
|---|---|
| ACSSC | Association of Civil Society Support Centers |
| AI | Appreciative Inquiry |
| ARGO | Civil Society Development Association |
| CAG | Community Action Grant |
| CAP | Community Action Planning |
| CBOs | Community-Based Organizations |
| CDT | Capacity Development Team |
| CPI | Counterpart International |
| CSOs | Civil Society Organizations |
| CSSC | Civil Society Support Centers |
| CSSI | Civil Society Support Initiative |
| CTO | Cognizant Technical Officer |
| ICNL | International Center for Not-for-Profit Law |
| M&E | Monitoring and Evaluation |
| OSCE | Organization for Security and Cooperation in Europe |
| PCA | Participatory Community Appraisal |
| PMU | Program Management Unit |
| UI | Urban Institute |
| SE | Social Enterprise |
| SI | Social Impact |
| SIAP | Service Improvement Action Plans |
| SMT | Senior Management Team |
| UI | Urban Institute |

*Social Impact, Inc.*

## Acknowledgements

On behalf of the Evaluation Team, I gratefully acknowledge the help and assistance of the Counterpart Headquarter, Regional and Country CSSI staff and managers in Kazakhstan, Kyrgyzstan and Turkmenistan.  The team is especially indebted to the invaluable support of Michael Kunz, Counterpart Regional Director and Chief of Party, Marat Aitmagambetov, Counterpart Kazakhstan Country Director, Erkin Kasybekov, Counterpart Kyrgyzstan Country Director and Yazgylych Charyev, Counterpart Turkmenistan Country Director and their staff— both in terms of facilitating the Mid-Term Evaluation and for actively participating in the evaluation.

I also would like to extend thanks to the Executive Directors of the Association of Civil Society Support Centers in Kazakhstan and Kyrgyzstan, Jamila Asanova and Erkina Ubysheva, who provided invaluable information regarding the development of the Associations.

This report benefited from the input of many persons beyond the author. Local Evaluation Team member, Vladimir Kosarev, Altynai Kussainova, Cholpon Akmatova and Julia Belosludtseva played key roles in data collection and data analysis.  I would also like to extend my gratitude to Anika Ayrapetyants and Altinay Kuchukeeva, Counterpart Headquarter Civil Society Division staff and Evaluation Team Members, with whom I developed the assessment design, carried-out the data collection activities, analyzed the findings and grounded the recommendations.  I also owe an immense debt of gratitude to Christopher Szecsey, Social Impact Senior Associate, for his invaluable insights into CSSI, his creative blending of Appreciative Inquiry Evaluation Workshops with more traditional evaluation methodologies, and for his personal and professional support during the evaluation.

Lastly, this report could not have been written without the continued and ongoing support of Rolf Sartorius, Social Impact's President.  Rolf Sartorius' ongoing technical assistance and penchant for creative design methodology proved both invaluable and inspiring.

*Social Impact, Inc.*

# Executive Summary

## Evaluation Purposes and Methods

Counterpart International's Civil Society Support Initiative (CSSI) program focuses on the establishment and localization of Associations of independent and intermediary support organizations (Civil Society Support Centers or CSSCs) in Kazakhstan and Kyrgyzstan. The Associations are to serve as the primary vehicles to deliver civil society services and to mobilize civic organizations and citizens in order to form constituencies for reform. The Counterpart program in Turkmenistan focuses on providing support to groups, organizations and citizens associated with civil society in order to keep them functioning until legal and political conditions are improved. Mobilizing civic organizations and citizens to form constituencies for reform aims to promote a more democratic culture.

The purpose of the CSSI Mid-Term Evaluation in Kazakhstan, Kyrgyzstan and Turkmenistan was to improve the performance of CSSI in meeting stated project goals during the final phase of project implementation. This report thus evaluates all CSSI Project Objectives but focuses primarily on assessing the Association's capacity to independently contract with the US Agency for International Development (USAID). To assess this capacity, this report examines a breadth of issues, ranging from financial sustainability to governance structures, and to relationships among the Association members. In each area, this report seeks to identify areas of strengths and weakness of CSSI and to propose grounded recommendations.

The evaluation team, consisting of eight people including Social Impact expatriates, Counterpart expatriates and Counterpart local staff, developed an evaluation strategy that included a mix of qualitative and quantitative data collection approaches. Relevant documents were reviewed for an understanding of the dynamics of the CSSI in each country, individual interviews and focus groups were conduct to capture a qualitative sense of the CSSI program, Appreciative Inquiry Evaluation Workshops were carried-out to ensure stakeholder participation, and a formal Client Satisfaction Survey was administered to a sample of CSSI end users to rigorously collect data that could be analyzed quantitatively. These techniques were selected as the best available means to gather sufficient data to provide an assessment "snapshot" of CSSI.

## Findings

Evaluators found that CSSI in each country is making significant progress toward the development and mobilization of civil society. Below are some of the most salient findings regarding the Associations broken down by individual country. Following these "snapshots", common findings that apply to all three countries are presented

### CSSI in Kazakhstan

The Association in Kazakhstan has many strengths and challenges. On the one hand, there is evidence of some CSSC buy-in to the Association model, some transfer from a CSSC-centric identity to an Association identity, continued board development and the development of a strategic plan. On the other hand, Association members lack the resources to implement the strategic plan and they do not agree all agree on the next steps to board development. Also, there

appear to be fewer direct connections between the Association and outside donors, government personnel and local businesses than the Association in Kyrgyzstan.

*CSSI in Kyrgyzstan*
In many respects the Association in Kyrgyzstan is the most developed.  Within the Association, there is strong alignment of CSSC interests with Association interests, a strong and well-developed and independent Association Executive body and agreement on board development plans.  The Association also enjoys relatively strong programmatic connections between the Association and outside donors, government personnel and local businesses.  At the same time, due to miscommunication between the Urban Institute, Counterpart and the Association, the links to local government are not as strong as they perhaps could be.  In addition, the Association has yet to agree on a future Association financing strategy (that does not compete with member NGOs).

*CSSI in Turkmenistan*
Due to the extremely onerous and rapidly changing operational environment in Turkmenistan, CSSI activities had to be frequently revised and reoriented.  While there is no Association development in Turkmenistan, there is some evidence of CSSCs actively working together.  As with any group, this interaction could be increased in frequency and improved in substance.  However, CSSCs continue to carry-out services similar to CSSI in Kyrgyzstan and Kazakhstan though reduced in scope. Due in large part to Turkmenistan's operational environment, there are virtually no connections with local businesses or government and no connection with outside donors.

*Common Themes*
Despite the many differences between CSSI in each country there are some striking similarities. First and foremost there is strong evidence of high quality and demand-driven CSSC services in each of the three countries.  In addition, in each country, end users found the "Project Design" and "NGO and Community" training module the most useful.

In addition, each country program is challenged by similar ways.  First, CSSI in each country has yet to begin formal preparations to contract with USAID as of July 1, 2006.  Second, financial sustainability is still defined as Social Enterprise and thus continues to have a limited impact. Third, CSSI in each country is underutilizing ICNL to provide guidance on how to adapt the program to the changing political environment.  Fourth, there is still insufficient attention and resources dedicated to the development of sub-networks and regional networks.  Fifth, advocacy is still misunderstood and should be repackaged to have a broader impact.

## Country-by-Country Recommendations

The evaluators hope that these recommendations will prove useful to key stakeholders in Counterpart, the CSSCs, and the Associations.

*Topic: Association Strength in Kazakhstan*
<u>Recommendations</u>

- Capitalize on the development of the Association's strategic plan and the progress made toward the development of a common vision for the Association, develop and provide the necessary resources to implement a step-by-step action plan.
- Ensure a majority of external members on the ARGO's Board by July 1, 2006.

*Topic: Association Strength in Kyrgyzstan*
<u>Recommendations</u>
- Ensure a majority of external members on the Association's Board by July 1, 2006.
- Association should decide on a future financing strategy.

*Topic: Transition from Counterpart to the Association Executive Body in Kazakhstan*
<u>Recommendations</u>
- Develop and implement a detailed phase-over plan that describes the shifting roles and responsibilities from Counterpart to the Association.
- Increase communication between senior managers and staff.

*Topic: Transition from Counterpart to the Association Executive Body in Kyrgyzstan*
<u>Recommendations</u>
- Develop and implement a detailed phase-over plan that describes the shifting roles and responsibilities from Counterpart to the Association.

*Topic: Long-Term sustainability of CSSI Turkmenistan*
<u>Recommendations</u>
- Enlist the assistance of the U.S. Ambassador or the USAID Mission Director to facilitate the government's approval of key program activities.
- Develop scenario-based strategies for dealing with abrupt and potentially unforeseen changes in the political environment.

**Common Recommendations**

*Topic: Contracting with USAID*
<u>Recommendations (Kazakhstan and Kyrgyzstan)</u>
- Negotiate and agree upon a set of contracting criteria with USAID.
- Secure transitional funding from USAID for the Association as of July 1, 2006.

<u>Recommendations (Turkmenistan)</u>
- Decide on a clear strategy for the current CSSI contract with USAID.

*Topic: Quality and Scope of Demand-Driven Services*
<u>Recommendations</u>
- Develop uniform CSSC quality service standards and a uniform quality feedback system to better and compare services across CSSCs and to systematically improve the quality of services CSSC.
- "Repackage" CSSC services for the next annual year to ensure that they remain relevant to end-users.

*Social Impact, Inc.*

*Topic: Financial Sustainability*
<u>Recommendation</u>
- Implement "process-oriented" financial sustainability development.

*Topic: Operational/Work Environment*
<u>Recommendation</u>
- Work more closely with ICNL to monitor the political environment.

*Topic: Sub-networks and Regional Networks*
<u>Recommendations</u>
- Provide funding to continue the development of sub-networks and leverage Counterpart's regional and global perspective by sharing best practices.

*Topic: Advocacy*
<u>Recommendation</u>
- Amend CSSI's advocacy approach to promote a better understanding of its uses.

# Chapter I:    Introduction

## CSSI Background and Overview

The Civil Society Support Initiative (CSSI) focuses on the establishment and localization of Associations of independent and intermediary support organizations (Civil Society Support Centers or CSSCs) in Kazakhstan and Kyrgyzstan.  The Associations are to serve as the primary vehicle to deliver the civil society services and to mobilize civic organizations and citizens in order to form constituencies for reform.  The Counterpart program in Turkmenistan focuses on providing support to groups, organizations and citizens associated with civil society in order to keep them functioning until legal and political conditions are improved.  Mobilizing civic organizations and citizens to form constituencies for reform will promote a more democratic culture and aligns with USAID/CAR's Strategic Objective 2.1— "Strengthened Democratic Culture among Citizens and Targeted Institutions" as outlined in USAID's Assistance Strategy for Central Asia, 2001-2005.

Implementation of CSSI in Kazakhstan focuses on creating and supporting a positive image of civil society and NGOs among the population, business and state.  The CSSI strategy in Kyrgyzstan focuses on deepening and strengthening democratic changes in the country.  As mentioned above, the Counterpart program in Turkmenistan provides support to those associated with civil society until the legal and political conditions improve for CSSC network development.  CSSI includes Association development and grant programs with an overarching goal to build capacity in areas of financial sustainability, advocacy and legal reform that will leave behind strong Associations and individual institutions, a democratic legislative framework, models of partnership and cross-sector collaboration.  In Kazakhstan and Kyrgyzstan, Counterpart International country offices will evolve into national coordination and management bodies for the Associations while the Associations assumes more responsibility and control of activities progressively over the life of the project.

CSSI developed a number of methods and inputs to build the capacity of individuals, organizations and the association to be organizationally and financially sustainable.  Association Development includes capacity building in four key areas:   1) financial sustainability development; 2) demand-driven services provision; 3) democratic governance establishment; and 4) the creation of the Association management structure.  CSSI also provides a number of grant programs to support capacity development, institutional strengthening and community action aimed at CSSCs networks, leading NGOs and communities.  CSSI also introduces and develops

*Social Impact, Inc.*

an advocacy element of CSSI through the Community Action Grant (CAG) activity. All CAGs include an element of advocacy in their activity in communities. CAGs thus assist community members in increasing their awareness and in building skills in formulating, communicating and effecting of agenda for reform, whether it aims at local government service delivery or national policy.

The implementing partners include the International Center for Not-for-Profit Law (ICNL), Social Impact (SI) and the Urban Institute (UI).

## Mid-Term Evaluation Purpose

The purpose of the Civil Society Support Initiative (CSSI) Mid-Term Evaluation was to improve the performance of CSSI in meeting stated project goals during the final phase of project implementation. As part of Social Impact's (SI) subcontract with Counterpart International (CPI), SI conducted a "formative evaluation" of CSSI to measure the progress made toward the creation and development of an Association of Civil Society Support Centers (CSSCs) in Kazakhstan, Kyrgyzstan and Turkmenistan. The mid-term evaluation covers all Project Objectives as delineated in the Annual Work Plan Narrative (1 July 2004 to 30 June 2005) for Kazakhstan, Kyrgyzstan and Turkmenistan. As per the SI's Scope of Work, this evaluation report focuses on assessing the Association's capacity to independently contract with USAID. To assess this capacity, the evaluation examined a breadth of issues, ranging from financial sustainability to governance structures, and to relationships among the Association members.

The evaluation report has also sought to identify areas of strength and weakness in CSSI and has proposed future programmatic directions to improve, to strengthen and to ensure the Associations' sustainability by the end of the project. Key users of the Mid-Term Evaluation will be those who support the design and implementation of CSSI in Kazakhstan, Kyrgyzstan and Turkmenistan—the Chief of Party/Regional Director, Country Directors, the Executive Directors of the Associations in Kyrgyzstan and Kazakhstan, Counterpart's Senior Vice President, Counterpart's Civil Society Division Manager, Counterpart's Civil Society Division Program Officer, USAID's Chief Technical Officer, USAID's Country Representatives, as well as implementing partners and consultants.

## Mid-Term Evaluation Objectives

As per the Evaluation Scope of Work (4 February 2005), the mid-term evaluation covers all Project Objectives as delineated in the Annual Work Plan Narrative (1 July 2004 to 30 June 2005) for Kazakhstan, Kyrgyzstan and Turkmenistan.[1] Through joint discussions with Counterpart International staff in Washington, DC, the Counterpart Regional Director and Country Directors, the evaluation also focused on the following key questions:

---

[1] For a complete listing of Project Objectives from the Annual Workplan Narrative (1 July 2004 to 30 June 2005) for Kazakhstan, Kyrgyzstan and Turkmenistan, please see Annex 12.

*Social Impact, Inc.*

1. What is the level of capacity of the network associations to contract with USAID (based on USAID criteria)?
2. What, if any, capacity building assistance is needed to get network associations ready for USAID contracting?
3. What are the specific criteria for readiness in contracting with USAID and other donors?
4. What is the ability of the network to contract with other donors?
5. To determine the extent to which there is common programmatic vision among network members?
6. To what extent to which individual CSSCs are "buying-in" to the network (e.g., *not* competing between themselves)?
7. To what extent is the initiative is evolving a governance structure and executive structure that is supportive and congruent with the planned future direction of the association?

The aforementioned seven questions (many of which directly respond to Annual Workplan Project Objectives) received an in-depth treatment from the evaluation team. In addition, the evaluation team responded to evaluation questions that received a lighter level of treatment.[2]

## Mid-Term Evaluation Methodology

The evaluation team was comprised of eight people including the following: two expatriate evaluation specialists from Social Impact, who were responsible for the overall design and management of the project evaluation; one Counterpart Civil Society Division Manager from Headquarters; one Counterpart Civil Society Program Officer from Headquarters; one Regional M&E Specialist based in Almaty, Kazakhstan; and three M&E Coordinators (one person from Kazakhstan, one from Kyrgyzstan and one from Turkmenistan).

The scope of the evaluation work called for a mixed-method approach combining qualitative and quantitative research methodologies.[3] Qualitative data drew from the following sources: organizational documents; programmatic documents; and key informant interviews and focus group interviews with Counterpart regional and country staff, Association staff (in Kazakhstan and Kyrgyzstan only), CSSC managers and CSSC end-users; and Appreciative Inquiry (AI)[4] Evaluation Workshops. As the team had two days per country to gather data (and 1.5 days to process and present preliminary findings), these rapid appraisal techniques were selected as the best available means to gather sufficient data to provide an assessment "snapshot" of CSSI. In addition to the qualitative data, quantitative research methods were also employed, via a Client Satisfaction Survey to measure the nature and quality of the CSSC's services.

Stakeholder participation was central to SI's evaluation design. In the AI evaluation workshops, stakeholders themselves delineated the strengths, challenges and recommendations for CSSI. In

---

[2] For a complete listing of all Key Evaluation Questions for Kazakhstan, Kyrgyzstan and Turkmenistan, please see Annex 12.
[3] The Evaluation Team's field work consisted entirely of qualitative research methods.
[4] Appreciative Inquiry (AI) is process that searches for what is best in people and organizations. It is a participative, collaborative, and systematic approach to inquiry that seeds what is right in an organization in order to create a desired future. For evaluation purposes, AI is especially useful in situations in which change needs to be accelerated and when dialogue is critical to moving an organization forward.

*Social Impact, Inc.*

addition, by combining AI with more traditional evaluation methods, the Evaluation Team triangulated the results thereby ensuring their validity.  The evaluation design also called for the drafting of Aide-Mémoires, 5-page papers delivered to the Regional Director, the Country Directors and the Association Executive Director (where applicable) before the Evaluation Team departed from each project site.  The findings in the Aide-Mémoires were then discussed with the aforementioned stakeholders to ensure their active participation in data collection and analysis.  Lastly, the methodology called for internal capacity development of Counterpart staff members.  Upon arrival in Kazakhstan, SI conducted an M&E mini training that focused on building the capacity of the team to effectively elicit key program information and insights from a wide variety of stakeholder groups.  SI also conducted a mini introductory workshop on AI Evaluation Workshops.  These interventions not only ensured quality control but also put emphasis on stakeholder participation in the evaluation.

**Schedule**

The activities of this evaluation were carried out over a three-month period from February through April 2005, with three weeks spent in the field.

**Report Organization**

The Evaluation Report that follows in Chapters two through Chapter five presents the findings and recommendations of the CSSI Mid-Term Evaluation.  The findings for each country are delineated according to the project objectives listed in the Annual Workplan Narrative (1 July 2004 to June 2005).  Recommendations are provided on a country-by-country basis within each country chapter.

*Social Impact, Inc.*

## Chapter II:    Kazakhstan Evaluation Findings

## Introduction

Kazakhstan is geographically the largest of the five Central Asian republics.  It is also is rich in natural resources and home to a diversity of ethnic groups.  Kazakhstan currently has a GDP per capita of $1,421 making it the wealthiest of the Central Asian republics.  However, large income and social disparities continue to grow, with over 30% of the population living under the poverty line, according to the government's own statistics. The shadow economy is estimated to account for 20 to 28% of GDP.  The official unemployment rate is near 4%, but the real figure may be as high as 30% according to U.S. government sources.  Furthermore, the historical legacies of authoritarianism and corruption, the inefficient provision of services, and the general disdain for civic action and independent media are still very evident.   The civil society sector suffers from a generally poor image and low levels of public recognition.



Civil society organizations (CSOs) often lack the public relations ability to counter such trends or interact with a disinterested media.  It is in this context that Counterpart International has been implementing the CSSI program.[5]

In Kazakhstan, the CSSI focuses on the goal of creating and developing an independent Association of Civil Society Support Centers (CSSCs).  To achieve this objective, the current Counterpart International country office is scheduled to evolve into a national coordination and management body for the Association while the Association gradually assumes more responsibility and greater control of activities over the life of the project.  To facilitate the transfer, a number of elements have been and are currently being created to build the capacity of staff, CSSCs and the Association to be financially and organizationally sustainable.  Elements include: the development of an effective governance structure; the continued provision of a broad spectrum of demand-driven and quality services by CSSCs for local civil society organizations and community groups; the further strengthening of the Association's management capacity to take responsibility for implementation of the program; and the implementation of a financial sustainability plan.  The Association is expected to have the internal capacity and ability to take full responsibility for the continuation of CSSI on July 1, 2006 when Counterpart's role in CSSI is scheduled to be completed.

---

[5] Background information on Kazakhstan is derived from U.S. Department of State Background Notes.

*Social Impact, Inc.*

## Evaluation Findings

The findings of the Mid-Term Evaluation are broken down below by Project Objectives as per the Scope of Work (February 4, 2005) though some findings overlap and/or have implications for one or more project objectives. Thus, to the extent possible, such overlaps are highlighted where appropriate.

## Objective 1

*To further strengthen and formalize the countryside Civil Society Support Center Networks to provide a full-range of demand-driven services to local Civil Society Organizations and have the ability to contract directly with USAID and other international donors.*

To assess this objective, the evaluation team disaggregated the findings into four distinct areas: Association strengths and challenges; the transition of key roles and responsibilities from Counterpart to the Association Executive Body; the capacity of the CSSC Association to contract with USAID; and the quality and scope of demand-driven CSSC services. Of the four areas, the evaluation team focused primarily on the development of the Association, including the structure and makeup of the Association's governing body, the Board and its composition (internal and external members) and the Association Executive Body's role and capacity in grant management and administration, training implementation and overall reporting.

## Association Strengths and Challenges

The Association of CSSCs or the Civil Society Development Association (ARGO) was formally established in March 2004. As such, it is important that the reader bear in mind that ARGO had only

> "We are now responsible for CSSI."
>
> -Association Executive Staff Member

been operating for 1 year at the time of this evaluation. The evaluation team discovered a number of successes and achievements of the Association that underscore and highlight the success in implementing the CSSI program. Some of these achievements include: the hiring of an independent and professional executive staff; the development of a strategic vision for ARGO development; the discernable shift from CSSC identity to an ARGO identity; the recognition by all ARGO members of each member's unique contribution to the Association; the implementation of an ARGO membership fee (currently at 10,000 Tenge/year or approximately $75/year) and the demand for ARGO services. Taken together, these achievements suggest not only that ARGO's development as an independent institution has progressed rapidly over the past year, but also that the Association members (CSSCs) are beginning to link their individual success together with ARGO's success. Clearly, as the collective strength of the CSSCs continues to undergird the Association, ARGO and the Association Executive Body will continue to develop in a sustainable fashion.

These successes are visible both internally and externally. The transfer of personal (CSSC) interests to common concerns (ARGO), the creation of a professional Association Executive Body and the professionalism and overall responsibility of the Association Board figure are internal achievements. The recognition of ARGO as an entity by corporations and donors, as

*Social Impact, Inc.*

evidenced by its first contract with another donor (UNDP), represent a significant external achievement.

These achievements are further highlighted in a number of internal Association processes that are particularly successful. These include: ARGO's expert training and technical support; ARGO's strong promotion of CSSC services; the transfer of responsibility for the grant making program from Counterpart to the Board and the Executive Staff; the definition of Association policy by Association members; the flexibility of the Association during the transition from Counterpart to ARGO; the ingenuity of Board members to develop and adapt concepts and methodologies to future projects; and the fact that Board members are well-positioned to clearly assess the civil society environment on both local and national levels. ARGO is thus beginning to develop standard operating procedures, systems to carryout work and a unique coordination mechanism to improve communication within the organization. These systems have an embedded flexibility enabling the "young" organization to develop and adapt to an ever-changing environment.

At the same time, the evaluation team also became aware of certain challenges to the further development and transfer of responsibility to the Association. While the development of a strategic plan for the Association is highlighted above as a key achievement, the actual implementation of the plan into concrete actions remains incomplete. One hurdle to the implementation of the strategic plan, as noted by Associations members, is a lack of necessary funding. Association members lack the necessary resources required to meet together on a regular basis to translate the strategic plan into action plans as well as the resources to actually implement the tenants of the action plan. Another challenge sits with one CSSC Manager/Board Member who has repeatedly slowed the process of Board development. This single individual has different ideas regarding the future of the Association which tend to impede the smooth functioning of the Association as well as the ability of the members to reach key agreements on the future makeup of the Board.

This challenge of implementation is also evident with regards to the Association's common vision. Justifiably highlighted in this report as an achievement, the evaluation team found clear evidence of a common vision within ARGO. Indeed, the evaluation team discovered a discernable shift away from a CSSC-centric identity to an ARGO-team identity. There was recognition among the CSSCs that their individual unique qualities and traits contribute to ARGO's uniqueness. Though again, there was less agreement among the disparate CSSCs on how best to implement the common vision and take advantage of the Association's uniqueness. Again, there appears to be common agreement on what the final result should (or should not) be but there is no common agreement on how best to arrive at the result.

Other aspects of Board development also remain incomplete. The Board has yet to implement a system to encourage, motivate or highlight the successes of ARGO members. This challenge is further highlighted by its need for improved public relations capacity. Also, according to the Association members, Counterpart has yet to clearly delegate CSSI responsibilities to the Association. As such, there is no "roadmap" to describe the transfer of key roles and responsibilities from Counterpart to the Board and from the Board to its members.

In terms of the Association's evolving governance and executive structure, Association members were generally satisfied with their ability to support the planned future direction of the Association. At the same time, the term Program Management Unit (PMU) creates confusion and implies a close relationship with and control by Counterpart. The PMU is currently used interchangeably with the Association Executive Body. Counterpart's Cooperative Agreement states that there would be a number of PMUs (one for each grant that would each oversee the different donor grants). However, there are no other donors and there are no plans to create a PMU with each new grant.

In addition, the current governance structure is not clearly defined, lacks adequate checks and balances and it creates an inherent conflict of interest. For example, every CSSC manager is also a Board member. The Association Executive Staff interfaces with both groups and is ultimately charged with directing and ensuring CSSC compliance with decisions made by the Board. However, Board members (in their dual role as Board members and CSSC managers) are at the same time, higher *and* lower in the chain of command vis-à-vis the Association Executive Staff. This makes compliance a challenge, creates a conflict of interest and undermines the ability of the Association Executive Staff to carve-out an indispensable function in CSSI.

**Transition from Counterpart to the Association Executive Body**

Counterpart's cooperative agreement with USAID describes Counterpart's transition or exit strategy. The strategy states that the key to Counterpart's exit is the incremental devolution of decision making authority and management of key inputs—grant making, training and technical assistance—to the formalized Association in Kazakhstan. As such, Counterpart's current country Hub Office is expected to devolve its decision-making authority and management oversight of the CSSC Association to the registered Association and ensure that it has the capacity to carry-out its future responsibilities.

The team discovered many achievements as well as some challenges to the transition process. On a practical level, the devolution of authority and management oversight from Counterpart to the Association presents some difficulties. For example, as USAID contracted with Counterpart to build the Association of CSSCs and to later devolve its authority to the Association, to fulfill these contracting obligations, Counterpart must transfer authority and management of key inputs—grant making, training and technical assistance among others—to the Association. However, by devolving all management and programmatic authority to the Association, it becomes unclear how Counterpart is to fulfill its contractual obligations (e.g., ensure the "proper" implementation of CSSI, report to USAID on CSSI progress, etc.). In such a scenario Counterpart must request that the Association responds to USAID but by making such a demand, Counterpart is essentially usurping the Association's independence thereby undermining the transition process and the clear delineation of roles and responsibilities. It is with this Catch-22 in mind that the reader should assess the transition from Counterpart to the Association Executive Body.

To better analyze this transition process, this report examines the presence (or lack thereof) of clear boundaries between the Association Executive Staff and the Counterpart staff in terms of the separation of staff and decision-making, M&E reporting capacity, and the degree to which

the transition plans are clearly open, transparent and clearly communicated. The separation of staff and of decision-making authority has not yet been completed given that the transition is currently underway. The Association Executive Body remains reliant on Counterpart to carry-out some staff functions. Thus, the internal capacity, in terms of technical skills, key roles/functions and general organizational development of the Association Executive is not sufficient were it to become independent from Counterpart immediately.[6]

*Staff Separation*
In terms of staff separation, the physical separation (within the building) of the Association from the other organizations (Zhalgas, Counterpart Country Office, Counterpart Regional Office, and ICNL) has helped distinguish between the different organizations. However, the physical separation has not been matched by the clear separation or transition of key staff positions to the Association. The Association continues to rely on Counterpart to fulfill a number of key staff responsibilities including: some general administration; capacity development; financial sustainability; and M&E reporting. For example, a person was recently hired into the capacity development role under the auspices of the Counterpart Country Office even though the target of capacity development is the Association and not the Country Office. Similarly, there is no financial sustainability specialist within the Association—these positions are currently Counterpart Country and Regional positions. It is unclear if or when the latter two positions will be transferred to the Association. In addition, the Association shares Counterpart's receptionist, the phone line and Internet access (presumably as cost-savings measures).

*M&E Reporting*
With regards to M&E reporting, the Association is particularly weak, lacking the capacity to meet the demanding task of reporting to large donors like USAID. In addition, the current M&E reporting arrangement with Counterpart is not only overly bureaucratic, but it also creates an unnecessary administrative role for the Counterpart Country Office. At present, the Association reports go to the Counterpart Country Office for editing and then on to the Counterpart Regional Reporting Office. Should questions regarding the report arise, the Regional Reporting Office must direct questions first to the Counterpart Country office which then directs the question to the Association. In addition to this inefficient bureaucratic hurdle, the reporting process actually undermines the ability of the Association Executive Body to become indispensable to the CSSCs. The reporting of CSSC activities is not done by the Association Executive Body at all. Instead the CSSCs report individually and directly to the Counterpart Country Office which then reports to the Counterpart Regional Office. As such, there is a lost strategic opportunity for the Association Executive Body to provide an invaluable service to the CSSCs thereby increasing the Association Executive Body's utility vis-à-vis the CSSCs.

*Internal Communication*
The aforementioned challenges as well as the inherent difficulties in creating an entity (the Association) that is entirely independent but also entirely responsive to Counterpart's needs have been compounded by insufficient communication regarding the transition. As such, there is a high degree of uncertainty, speculation and ambiguity among Association Executive Staff and the Counterpart Country and Regional Office Staff concerning if, how, when, why and who would participate in the eventual transition. Also, information and/or transition decisions made in

---

[6] The complete transition will not occur until July 1, 2006.

*Social Impact, Inc.*

Senior Management Team (SMT)[7] meetings are not communicated to other staff members, something that is undermining potential and necessary staff buy-in to the transition. Apart from regular staff meetings at the Counterpart Country level, there are no other regular staff meetings for other teams in the Almaty office. As a result, there is very limited access to information, high levels of speculation and a sense that there is no transparency in decision-making regarding the impending transition. Lastly, there are no clear phase-over plans or clear job descriptions that delineate how, when and why key staff positions will be transferred over to the Association Executive Body.

**Contracting with USAID**

On July 1, 2006, the ultimate sign of CSSI Kazakhstan success will hinge on one element: whether or not ARGO contracts directly with USAID. At present, however, the criteria for contracting directly with USAID are not clearly defined. USAID has not defined the contracting criteria and Counterpart has not yet negotiated a clear set of contracting criteria. Thus, the evaluation team discovered a wide range of responses from interviewees (Counterpart staff members, Association Executive staff and USAID) when it asked interviewees to describe the criteria for contracting with USAID. In addition, without a clear set of USAID criteria from which to compare ARGO's contracting capacity it was difficult for the evaluation team to accurately judge ARGO's current contracting capacity.

However, it should be pointed out that there was general consensus among responses that the most important capacity areas include: the capacity (financial and managerial) to do the work; the capacity (financial and managerial) to absorb and disburse the funds; and the capacity to report on the activities to USAID. Areas of less importance included the executive structure of the contracting body and other internal management structures. According to the USAID Cognizant Technical Officer (CTO), the key elements include: "the perception of overall programmatic success and impact"; solid grant management; and strong financial management capabilities.

This general agreement on the key criteria for USAID contracting is reflected in Counterpart's newly-developed pre-certification framework. The framework outlines Counterpart's approach to ensuring an Association contract with USAID at the end of the CSSI program.[8] The framework addresses five key functional areas including: governance and strategic management; human and material resources; financial management; financial sustainability; external relations; and products and services. Reflecting the conglomeration of a wide variety of U.S. government documents, standards and contracting requirements, the framework will allow for consistency across organizations, provide a clear system for USAID and serve as a clear diagnostic tool to build the capacity of organizations. Clearly, the proactive development of the pre-certification framework is an achievement of CSSI and should provide a "roadmap" and diagnostic tool for ARGO's development in the last 15 months of CSSI. According to Counterpart staff, Counterpart will also develop training manuals and training modules to increase the capacity of the Association.

---

[8] Please see Annex 13 for more in-depth information on the Pre-Certification Framework.

*Social Impact, Inc.*

The Association's current capacity to contract with USAID (taking into account the caveats noted above) suggests that the Association will need capacity development in most areas presented in Counterpart's pre-certification framework. However, the weakest elements of the Association's capacity are in the areas of financial management, financial sustainability and reporting. Another challenge will be the continued development and definition of the Capacity Development Team (CDT) as well as its scope of work.

### The Quality and Scope of Demand-Driven Services

The provision of quality, demand-driven services is another key element of project success. The evaluation team discovered a number of achievements and successes with regards to services that underscore and highlight the success in implementing the CSSI program. While this particular section focuses on findings for Kazakhstan, the qualitative and quantitative data is virtually identical to that found in Kyrgyzstan and Turkmenistan. As such, the findings below will not be replicated in the Kyrgyzstan and Turkmenistan sections. Instead, those sections will be used to highlight differences.

The primary CSSC services in Kazakhstan include: a CSSC resource center (with computer and Internet Services, telephone and email communication, and information dissemination); legal assistance; Participatory Community Appraisal; Community Action Planning and a variety of training modules. The training modules offered last quarter include: Human Resource Management: Social Partnership; Project Design; Using Internet and Email; Advocacy; Public Hearings; Training Techniques and Methodology; Participatory Community Appraisal; Participatory Monitoring and Evaluation; and Business Planning. CSSC clients include NGOs, CBOs, state employees, business men and women, and private citizens.

CSSC clients are satisfied with the products and services provided by the Centers. Ninety-four percent of respondents ranked their satisfaction as "satisfied" or better (the top three categories in the Client Satisfaction Survey). Please see Chart 2.1 for this breakdown.



Chart 2.1: What is your overall satisfaction with CSSC's products and services?

Satisfied, 19%

Completely Satisfied, 35%

Very Satisfied, 40%

- Completely Satisfied
- Very Satisfied
- Satisfied

This high level of satisfaction is undergirded by the high levels of repeat users taking advantage of the CSSC services: 37% of respondents have been using the CSSC services for 3 years or more. Nearly 85% of respondents have been using the CSSC services for 6 months or more. CSSC clients are also satisfied with the Resource Centers. Eighty-seven percent of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 25% were "completely satisfied", 39% "very satisfied", and 23% "satisfied":

*Social Impact, Inc.*

| *Satisfaction Level with Resource Center* | *Kazakhstan* |
|---|---|
| Completely Satisfied | **25%** |
| Very Satisfied | **39%** |
| Satisfied | **23%** |

Qualitative data, gathered through interviews with CSSC clients, also suggest that quality of instruction at trainings was high to outstanding. This claim is further supported by the quantitative data. Of all the services, the training workshops were the most accessed and over 95% of respondents ranked their satisfaction as "satisfied" or better (the top three categories).

In terms of the quality of instruction in the training workshops, here too CSSC clients were very satisfied. Ninety-four percent of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 47% were "completely satisfied", 30% "very satisfied", and 17% "satisfied". According to the CSSC staff, they believe that all services are driven by client demand and that the dissemination of information, trainings and individual consultations are among the most demanded services. The quantitative data above supports this conclusion. At the same time, there is no established feedback system that allows the tracking client needs/demands in a consistent fashion.



Respondents generally found training workshops to be highly relevant to their need with 87% ranking their satisfaction as "satisfied" or better (see Chart 2.2). These numbers further suggest that the training workshops offered by the CSSCs are demand-driven. Of all the trainings, 21% of respondents clearly ranked "Project Design" as the most popular workshop followed closely by "NGO and Community" in second place with 11% and "Fundraising" in third place with 9%.



In terms of CSSC staff professionalism, respondents also found staff to be quite responsive to their needs suggesting that CSSC products and services take into account the demands of the clientele (see Chart 2.3).

At the same time, the CSSCs face several key challenges as they attempt to become demand-driven enterprises. Some respondents suggested that there is a need to develop more advanced training modules and modules in the Kazakh language. They suggest that there is unmet demand in these two areas. Another issue across CSSCs is that there is no defined quality criteria/standard for services. Similarly, there is no systematic or universal system for tracking the quality of services. As such, the quality of services is gauged through demand for services rather than by actual impact of the service provision. Since there are no established quality standards/indicators, CSSC staff are not able to diagnose a potential issues and create specific steps for improvement in service delivery. This could lead to the provision of generic improvements. This could also decrease the speed and effectiveness with which each CSSC defines its organizational core competency and develops a specialization in a limited number of key areas so as to create a unique placement for itself within the larger CSSC network.


**Objective 2**

***To enhance the accountability, transparency, professionalism and public image of Civil Society Organizations through community action grants, community development initiatives, improved service delivery, and advocating for the rights and interests of their clients and constituents.***

From qualitative interviews, the evaluation team found that the community action grants, community development initiatives, CSSC service delivery and advocacy have improved the transparency, professionalism and public image of CSOs. All respondents suggested that said interventions were positive in nature and have done much for civil society. The interventions thus made a significant difference. However, evaluation of this objective is limited in that it cannot draw a strict causal linkage between the interventions and improved accountability, transparency and the public image of CSOs (since many other factors have an affect as well). At the same time, since all respondents suggested that a link exists between the interventions and the positive outcome, the evaluation team examined the strengths and challenges of the CSSCs (as the implementers of the interventions) with regards to accountability, transparency, professionalism and public image. In so doing a correlation can be drawn between the interventions and the outcomes.

There are other variables that have contributed to this change such as:
- The CSSC model allows for broad outreach to target groups;
- The network model permits (at least in theory) the exchange of experiences;
- The network interaction increases the professionalism of the CSSCs;
- The network model allows for systematic NGO training and capacity development supported by the communities;
- The CSSC regional network models have great potential for improving the public image of CSOs;

*Social Impact, Inc.*

- The organization of national level advocacy campaigns via the network have a greater chance for positive impact;
- CSSCs have become recognized sources of local information and a technical resource not only for NGOs and individual clients but also for government, business and international organizations; and
- The CSSC model allows for a system of internal cooperative learning and training.

Some of the challenges include:

- Relevance of some CSSC objectives for the remaining grant period and/or the means of service delivery is not always relevant and necessary;
- Limited CSSC resources for the support, development and sharing (expertise, experience and best practices) with other CSSC;
- The future of CSSC development remain vague and the place, role and services spectrum of CSSCs for the future are not currently defined;
- The public relations capacity of the CSSCs remains weak;
- CSSC outreach into rural areas remains weak; and
- There are problems in adapting methodologies for advocacy approaches and community development in the operational environment.

> **Textbox 2.1:**
> **Illustrative Quotes**
>
> -"These grants help my community build capacity and important spheres of influence."
>
> -"The government cannot provide grants to NGOs and community groups. It is the only way that NGOs in Kazakhstan can remain intact. Sometimes it is their main source of funding."
>
> -"These grants provide the opportunity to address community needs and it empowers them to address their needs vis-à-vis the government."
>
> -"Many local and rural communities, initiative groups and NGOs gained new knowledge and information through the community grant program and community development initiatives."
>
> -"My support center now believes that it can positively influence the development of civil society."

Taken together, the data are positive in nature. CSSC services appear to positively influence civil society. In addition, the challenges are by no means roadblocks to fulfilling this objective but should be viewed as areas for improvement over the next 15 months of CSSI. Further, many challenges do not suggest failures but rather the need to continuously adapt and improve services as has been the case throughout CSSI.

## Objective 3

***Strengthen the organizational and sustainability of leading (sector) Civil Society Organizations, CSSC network members and local NGOs through tailored institutional and capacity building assistance with an emphasis on self-financing and income generating activities.***

Counterpart's emphasis on financial sustainability is critical for the future of the Association of CSSCs, NGOs and civil society in general. The Social Enterprise (SE) model has largely been

the focus of the program's financial sustainability strategy.[9]   The model is already utilized throughout the region by NGOs through fees for service and small business enterprises.  Under this model, Counterpart builds the capacity of the organizations through specific tailored assistance provided by experts in the fields of social enterprises, organizational development, leadership development, corporate philanthropy, grant management and other specific areas.  The focus on SE also includes an emphasis on SE loans.  Due to this focus on SE, there is not an equal provision of trainings, technical assistance, consultation and promotion of the other components of financial sustainability (see below).

CSSI has emphasized SE at the expense of a more process-oriented and multi-pronged financial sustainability approach.  Citing the need for reorientation, the Counterpart Financial Sustainability Technical Advisors have started drafting a Counterpart Financial Sustainability Certification process.  The certification process was developed in response to the need to teach organizations "business values", the need to overcome legislation policies and the mindset of the population with regards to NGOs and the need to better clarify the terms and conditions of Social Enterprise (SE) loans.  The certification process includes the following components:

- Financial and Strategic Action Planning (FSAP);
- Social Enterprise/Fee for Service;
- Public/Private Partnership (Corporate/State Contracting);
- Grant writing/Strategic Donor Funding; and
- Membership Service Development.

The incorporation of Social Enterprise into the newly developed financial sustainability methodology suggests that it makes up only one of several key components.  Counterpart developed the NGO Financial Sustainability Certification Program to provide one-on-one consultation from expert consultants.  Once certified, CSSI Certified Financial Sustainability organizations then become regional practitioners capable of transferring the financial capabilities long after the CSSI program ends.  This redirection of financial sustainability is certainly a positive move as the benefits of a more broad-based financial sustainability strategy appear likely to have better longer-term benefits than the more limited focus on SE.  At the same time, training modules and training resources have not yet been developed.  In addition, the shift away from SE to a more process-oriented approach to financial sustainability has not yet been shared with the Association Executive Body.  Also, resources do not appear to be available to develop and implement the Financial Sustainability modules.

There are some other barriers to the roll-out of the process-oriented approach.  In terms of the SE loans, this has not been a successful component.  There is virtually no interest in the loan program at the CSSC level due to several reasons: the loan amounts are currently too small for Kazakhstan; the SE loan program has been poorly communicated and as a result is not well understood; there is inadequate capacity (or the perception of inadequate capacity) on the part of the CSSCs; and the current focus of the loan program is on impacts of the loan instead of the

---

[9] Social Enterprise is any NGO revenue-generating business, venture, activity, or project, founded for the dual purpose of earning income and contributing to a social cause.  Definition taken from *Financial Sustainability— Assessment and Strategy* by Kim Alter, a consultant for Counterpart International.

*Social Impact, Inc.*

*process* of taking out a loan.  As a result, only one round of 0% interest loans will be released and paid back before the end of CSSI.

## Objective 4

### *To develop an enabling environment for civil society by improving the legal environment and providing regular legal advice and services to support civil society organizations*

ICNL's objectives include developing an enabling environment for civil society by improving the legal framework and providing legal advice and services to support civil society organizations.  After nearly two years of work in Kazakhstan, ICNL has witnessed continual progress towards a more enabling legal environment.  ICNL works on several levels including legal reform in which it engages in advocacy work at the national level trying to promote civil society friendly legislation. It also works to prevent the government from enacting poor legislation.  ICNL also provides CSSCs with on-site legal consultations. Additionally, in terms of education and improving the knowledge of civil society, ICNL leads training courses on NGO law, and helps Centers to develop their own law courses.  Lastly, ICNL conducts trainings for its network attorneys on local elections law.  These attorneys then provide advice to local NGOs on their prospective activities during an upcoming election.

ICNL's overall emphasis (in CSSI) is on raising awareness of the importance of civil society, educating people on their rights and best practices, and stopping bad trends. Where possible, ICNL prefers to work with government to show successes in civil society and to not force them to do anything that makes them uncomfortable.

> **Textbox 2.2**
> **ICNL Provides "Golden Solution"**
>
> **The Issue**
> The village of Sarzhal in Eastern Kazakhstan is currently home to a gold mining venture that caused considerable environmental damage and negative health impacts.  The Sarzhal village residents were outraged by the mining operation's negative externalities but they had few legal channels through which to pursue legal recourse and exert their legal rights.
>
> **The Intervention**
> Finally, a small group from the village applied to Zhamilya Azylkiyasova, an ICNL legal consultant based in a CSSC.  Azylkiyasova provided numerous consultations about environmental legislation and mechanisms of its implementation and actively represented the interests of the village residents in local state bodies. Azylkiyasova and the CSSC also organized and conducted seminars and roundtables for village residents where the legal consultant provided training on how to advocate, promote and protect their environmental rights.
>
> **Measured Results**
> As the result of seminars and actions taken by ICNL and the village residents, the management of the mining company took the following immediate remedial actions:
> - The director of the mining operation apologized to the community for violating the public trust;
> - The mining company removed all the barrels containing cyanide; and
> - The director signed an agreement granting public access to the mining areas for further community-based evaluations.

In the last quarter, ICNL/CSSI legal environment results include the following:
- Advocacy programs have increased charitable giving from 2% to 3 %;
- Select NGOs, such as those working with children and health, had their NGO fees reduced;
- Stopped bad provision in bills that would have effectively stopped the work of all youth NGOs;
- Hundreds of legal consultations to assist NGOs have been provided;

- The NGO Law Course completed its first semester.  Next year university professors (not ICNL) will teach the course with ICNL providing technical assistance; and
- CSSC Legal Advisors made considerable impacts in their communities by proving quality legal consultations, rendering a total of 164 consultations last quarter in four cities.  In addition, the legal advisors continue to be engaged and meeting community needs through seminars, assistance in advocacy campaigns and by applying their legal skills in program implementation.

Despite the work of ICNL and the importance of it to the success of CSSI, there does not appear to be systematic collaboration between Counterpart and ICNL.  Twenty-five percent of CSSC end-users in Kazakhstan do not use the legal services provided by the Centers.  While the legal environment for civil society in Kazakhstan is moderate (there is no freedom of association but this provision is not enforced) and has improved since CSSI's inception, recent political events in Georgia, Ukraine and Kyrgyzstan are causing concern for the government, and may impact on CSSI efforts.  Such events call for close collaboration with ICNL as closing or deterioration of the operational environment can negatively impact CSSI.  Communication is insufficient between ICNL and ARGO, the Counterpart Country Office and the Counterpart Regional Office.  This trend is underscored by the SMT meetings which do not include representatives from ICNL.

## Objective 5
*To improve cooperation between various Civil Society Organizations by establishing new and strengthening existing regional and sub-regional inter-organizational linkages.*

Counterpart is currently supporting the development of sub-regional networks to enhance CSSI in the regions where it works.  The goal is that CSSCs develop sub-regional networks on the oblast level with each CSSC selecting several NGOs and providing them with training, organizational development and fundraising support.  Then these local sub-regional networks are meant to provide opportunities to organizations in small towns and villages as a means to better access pertinent information.  Counterpart is also interested in developing linkages between the CSSC Associations on the regional level through staff exchanges and conferences.

In terms of sub-regional networks, the evaluation team found that CSSI has successfully established a network of CSSCs (in 8 regions), each with its own sub-network of rural communities, international groups and NGOs.  In addition there are five CSSCs with established satellite offices including Ecocenter in Karaganda, Iris in Semei, Zubr in Ust-Kamenogorsk, ASTRA in Astana and Tan in Atyrau.  Only Ecocenter had concluded a cooperation agreement with its satellite offices. [10]  The others work with the local centers on informal basis.  Thus, the strength and effectiveness of sub-networks varies from region to region in Kazakhstan thereby underscoring the challenge of establishing rural networks.  Large distances between rural villages have hampered the continued development, stability and effectiveness of the rural networks.  Thus there is unmet rural demand for services due to resource constraints.  In addition, CSSCs are unwilling to spend their scarce resources on further sub-network development.

---

[10] Please see Annex 1 regarding the CSSC satellite offices in Kazakhstan for more information.

*Social Impact, Inc.*

At the regional level, there does not appear to be much activity. Counterpart has not placed significant emphasis on regional staff exchanges, joint events or conferences. Similarly, there are few opportunities for Association Board members to participate in information exchanges to share knowledge and best practices and to compare CSSI between countries. Insufficient funding appears to be the primary reason for the lack of activity at the regional level.

**Objective 6**

***To increase the accountability and transparency of local governments and self-governing bodies through issue-based advocacy, social partnership and providing targeted capacity development support to local government officials.***

Local government accountability and transparency is an area that will be targeted over the course of the project. To enhance and facilitate the process, Counterpart has encouraged the creation and development of local Cooperative Councils that include local NGOs, business representatives and government officials. The Cooperative Councils are to play the role of decision-making committee, giving advice to local authorities on socio-economic issues as well as other local community issues.

The operational environment has the potential to greatly impact the degree to which social partnership can occur with government, however. While the external environment (see Objective 4 above) is not entirely favorable to government partnerships, most respondents suggested that there remain some operational maneuverability and partnership opportunities with local government. For example, during the team's visit to Ecocenter, it was noted that local government officials are open to and appreciate the CSSC trainings and education. However, (as was frequently noted by a variety of evaluation respondents) the high turnover rates in local government have severely limited the creation of long-lasting social partnerships.

In terms of advocacy, the CSSC managers noted that the advocacy approach needs to be reevaluated because government at the local and national level remain fearful that the advocacy efforts are directed to harm government, not to improve it. As such, CSSC managers believe that advocacy should be "repackaged" and only used when all other methods to achieve goals are exhausted.

**Recommendations**

Based on the evaluation findings presented in this chapter of the report, the key recommendations are described below and disaggregated by Objective and their sub-components where applicable. Some recommendations apply to more than one objective. In addition, since the Evaluation focused primarily on Objective 1, there are more recommendations for this objective.

**Objective 1:**

**Association Strengths and Challenges**

- *Capitalize on the development of the Association's strategic plan and the progress made toward the development of a common vision for the Association, develop and provide the necessary resources to implement a step-by-step action plan.* Before the development of the CSSI Annual Workplan Narrative (1 July 2005 to 30 June 2006), the CSSC managers should meet in Almaty to formalize the development of an agreed-upon action plan. The process should perhaps be facilitated by an outside and neutral facilitator to reach consensus. Then Counterpart should make funds available to implement the plan. Finally, this action plan should then be referenced in the Workplan Narrative and include key milestones and targets before the completion of CSSI. Counterpart and the Association could then monitor against the key target values and milestones.

- *Support the transition from a CSSC-centric identity to an Association identity by making the Association and its services indispensable to the CSSCs.* Counterpart and the Association Executive Director could collaboratively develop an Association development strategy with milestones and key targets before the finalization of the next annual workplan. Some goals/elements of the strategy could include the following:
  - Ensure that the Association Executive Director attends <u>all</u> meetings with USAID regarding CSSI. This will bolster its role as a broker between CSSI and USAID;
  - Introduce and market the Association to Counterpart's public, private and non-profit contacts in Kazakhstan and the region as a means to identify future partners and funding sources; and
  - To capitalize on the Association's unique attributes, begin development and roll-out of public relations campaign. Preparation for a broad-based public relations campaign should begin immediately with full roll-out starting with this summer (with the finalization of the Workplan). Some elements of the public relations strategy could include brochures and other printed materials that underscore the unique CSSC services and the diverse competencies of the individual CSSCs. Other public relations events could include public events and informational meetings with interested government officials.

- *Ensure a majority of external members on the ARGO's Board by July 1, 2006.* To address the conflicts of interest and the inadequate checks and balances of having Board members govern themselves, Counterpart could help the Association attract and maintain a board made up of external Board members. Counterpart should provide support and/or funding to facilitate continued and ongoing discussions with regards to ARGO's governing Board. As necessary, outside facilitation experts could be contracted to assist in this process. The CSSI Annual Workplan Narrative (1 July 2005 to 30 June 2006) should include these plans and set key milestones.
  - The ARGO Board may also want to address the disruptive behavior of one Board member to facilitate consensus building necessary to follow-through on this recommendation. The continual conflict caused by one Board member is slowing progress toward potentially positive Board developments. Some potential options could include: removal of the Board member (for a limited period of time) until significant results may be achieved by the Board; or give the Board member a new role outside of the Board such as chairing an advisory committee or the

responsibility of establishing the information/analysis unit on behalf of the association.

- ***Eliminate the concept of PMU and focus on the Association as an independent NGO.*** PMU implies a close relationship with and control by Counterpart which created confusion and does not reflect the current situation.

- ***Facilitate creative and Kazakhstan-specific development of ARGO.*** The above recommendations should directly relate to the experience of CSSI in Kazakhstan. The route taken by CSSI in Kyrgyzstan, while useful at times for comparative reasons, may not apply to CSSI in Kazakhstan. For example, one option (that goes against the other recommendations) is to not make the Association independent at all. Instead it could become a governance body. Such changes would need USAID approval.

## Transition from Counterpart to the Association Executive Body

- ***Develop and implement a detailed phase-over plan that describes the shifting roles and responsibilities from Counterpart to the Association.*** Along with Counterpart's submission of the Annual Work Plan narrative (1 July 2005-30 June 2006), Counterpart should submit a written plan including the extensive details of the phase-over. Questions concerning who, what, where, when, why and how of the phase-over should be made publicly available. The phase-over plan should delineate the evolving roles and responsibilities of the Association, the Counterpart Country Office and the Counterpart Regional Office and clearly define future roles and responsibilities. To ensure clarity and transparency, job descriptions of all staff involved (or not) in the transition should be developed. An outside and experienced facilitator could provide assistance with an independent and participatory phase-over plan.

- ***Facilitate ARGO's internal capacity development.*** Ameliorate the Association's M&E reporting capacity by providing technical assistance and training. In addition, the Association should begin to report directly to the Counterpart Regional Reporting Officer and the CSSC should begin to report directly to the Association and not the Counterpart Country Office. This will help bolster ARGO's role. Also, Counterpart should begin to transfer internal capacity development roles and financial sustainability function over to the Association. Such plans should be delineated in the Annual Work Plan narrative.

- ***Increase communication between senior managers and staff.*** There is much uncertainty regarding the impending transition, something that is causing confusion, anxiety and uncertainty among the staff. Management decisions should become more transparent and available to all staff members. Some possibilities include: publishing minutes of SMT meetings, holding regular (weekly or bi-weekly) staff meetings for each individual organizational unit housed in the Almaty office and hold regular building-wide staff meetings on a monthly or as needed basis.

## Contracting with USAID

- ***Negotiate and agree upon a set of contracting criteria with USAID.*** Counterpart and ARGO could develop (with input from USAID) a checklist delineating the criteria for contracting. By submission of the Annual Work Plan narrative, Counterpart, ARGO and USAID should agree upon the checklist. Then, based on the checklist, Counterpart and ARGO could undertake an organizational assessment of ARGO to highlight capacity strengths and challenges. Lastly, weaker capacity areas could then be systematically targeted as a means to ensure ARGO contracts with USAID before the end of CSSI

- ***Secure transitional funding from USAID for ARGO as of July 1, 2006.*** International research suggests that NGO networks take between 3-5 years to stabilize and be "successful". Thus, Counterpart could begin discussions with USAID to underscore the importance of securing 2-3 years of transitional funding (particularly for operational costs) as a means to consolidate and yield sustainable results. As an independent NGO, the Association could possibly accelerate its own organizational and programmatic development by exercising an option to subcontract with other organizations, such as Counterpart to provide specific capacity building services, until it is ready to assume such responsibilities on its own.

**The Quality and Scope of Demand-Driven Services**

- ***Develop uniform CSSC quality service standards and a uniform quality feedback system to better and compare services across CSSCs and to systematically improve the quality of services CSSC.*** Counterpart and ARGO should build on the development and implementation of the Client Satisfaction Survey to regularly monitor client satisfaction with CSSC services. Counterpart and ARGO could provide the CSSCs with technical assistance to implement their own survey and evaluate the results, perhaps reporting the survey results back to ARGO and Counterpart regularly. In addition these uniform feedback systems could assist CSSCs in the development of other services demanded by clients. Also, based on the feedback from the Client Satisfaction Survey, Counterpart and ARGO could develop clear quality standards/targets so that individual CSSC can easily measure their own progress and take effective action. One area for immediate attention includes upgrading training modules to include beginner, intermediate and advanced modules. Another area is to build capacity to implement trainings in local languages.

**Objective 2:**

- ***"Repackage" CSSC services for the next annual year to ensure that they remain relevant to end-users.*** To continually enhance the accountability, transparency, professionalism and public image of CSSCs, it is necessary to evaluate key services and methodologies to proactively address changing operational environments. As such, CSSCs could participate in a facilitated discussion to establish clear methods and program goals in advance of the Annual Work Plan narrative. The discussion could then culminate in an operational CSSC work plan with clear targets and milestones.

- ***Promote the exchange of best practices, expertise and experience among CSSC members.*** Resources could be made available for support, development and sharing among and

between CSSCs.  During CSSI's last year, it will be important for CSSCs to exchange ideas so as to improve services and solidify the CSSC development plan in terms of the place, role and services spectrum of CSSCs for the future.  To achieve this objective, Counterpart could facilitate the development of a formal exchange program between CSSCs managers.

**Objective 3:**

- ***Implement "process-oriented" financial sustainability development.***  Taking the lead from Counterpart's Financial Sustainability Team, develop financial sustainability modules that reflect the broad menu of financial sustainability options.  Develop a clear work plan, schedule and milestones for implementation as well as the gradual transition of the financial sustainability to the Association.  Counterpart and ARGO should also bolster interest in the SE 0% loan program through an examination of the CSSC's financial sustainability plan and by facilitating the creation of project ideas that could potentially add value for the work they are doing.  One potential way to bolster interest in the loan program would be to increase the size of the loan from $5000 to $7000 or $8000.  This may better meet the needs of NGOs operating in Kazakhstan.

**Objective 4:**

- ***Work more closely with ICNL to monitor the political environment.***  In light of recent events in Georgia, the Ukraine and Kyrgyzstan, Counterpart and ARGO should leverage its partnership with ICNL to keep abreast of potential changes for NGOs operating in Kazakhstan.  This would enable CSSI to be more proactive in quickly adapting certain aspects of CSSI to match the legal environment.  One way to leverage the partnership could be to invite ICNL to participate in SMT and provide weekly debriefings.

**Objective 5:**

- ***Provide funding to continue the development of sub-networks and leverage Counterpart's regional and global perspective by sharing best practices.***  Counterpart could respond to CSSC requests for additional funding to further strengthen and development sub-networks.  If funding were to become available, Counterpart and ARGO could then jointly develop an implementation plan with a monitoring component.

**Objective 6:**

- ***Amend CSSI's advocacy approach.***  Currently national/local government and local communities do not fully understand advocacy.  As USAID will begin to focus more on advocacy, Counterpart and ARGO could improve its advocacy campaigns through an examination of the challenges to the advocacy component and by building upon its successes.  Then the advocacy approach could be restructured accordingly to ensure that advocacy is properly communicated to key stakeholders. Counterpart and ARGO could develop an advocacy manual with best practices and case studies that could lead to improved advocacy trainings.

*Social Impact, Inc.*

## Chapter III:  Kyrgyzstan Evaluation Findings

### Introduction

Although small and land-locked with limited natural resources, Kyrgyzstan has been the most open, progressive and cooperative of the Central Asian republics. It is important to stability in the region but weak governance, continuing poverty, potential ethnic tensions, a porous southern border with Tajikistan and an essentially closed border with Uzbekistan are potential sources of conflict that could threaten national and regional stability.



The current political environment remains unsteady at best following the March 24, 2005 "revolution" and the subsequent ouster of President Askar Akayev.[11] Kyrgyzstan is now the third post-Soviet state in the past 15 months to overthrow a corrupt, authoritarian regime through mass protests symbolizing the power of the people, combined with growing political opposition and civic activism.  Its sudden revolution is the culmination of rising popular anger with socio-economic deterioration, widespread corruption and blatant electoral manipulation.  The resultant instability, internal political contest and sense of expectancy in Kyrgyzstan—which will last at least until the presidential election scheduled for July 10—will most likely have regional implications, impelling leaders of the other Central Asian states to step up repression and political control over the media, civil society and opposition groups to avoid a similar scenario. Another and more optimistic option is that the region's governments will extend certain political rights to civil society as a means of avoiding a "revolution".[12]

The data gathered for this Mid-Term Evaluation Report was collected *before* March 24, 2005. Thus, due to the fluidity of the current political situation, it will be important for the reader to bear in mind that the findings, conclusions and recommendations may or may not match the rapidly-evolving situation—this report is a reflection of CSSI's successes and challenges in pre-"revolutionary" Kyrgyzstan.  Despite the "revolution" in Kyrgyzstan, the evaluation team did manage to carryout the majority of the data collection activities as specified in the CSSI Mid-Term Evaluation's Work Plan. The team did lose one-half day of data collection and data processing time, however.

---

[11] The Evaluation Team was in Bishkek, Kyrgyzstan for the "revolution" and chose to leave for Almaty, Kazakhstan thereby losing one-half day of data gathering.
[12] Background information on Kyrgyzstan is derived from U.S. Department of State Background Notes.

Counterpart's CSSI strategy in Kyrgyzstan focuses on deepening and strengthening democratic changes in the country. As such, much emphasis is placed on promoting and supporting local and national level advocacy through local NGOs and their coalitions, by strengthening existing and creating new links between NGOs and communities throughout the county. The locally registered Association of CSSCs continues to be the primary vehicle for capacity development and community outreach support to local NGOs and CBOs. Thus, Association membership development is a centerpiece of CSSI in Kyrgyzstan. Counterpart currently provides capacity building assistance to the Association, its member CSSCs and other leading NGOs in the country. The assistance serves to strengthen their organizational and institutional potential and to help them become financially sustainable and viable for the long term.

**Evaluation Findings**

The preliminary findings of the evaluation team are broken down below by Project Objectives though some findings overlap and/or have implications for one or more project objectives. Thus, to the extent possible, such overlaps are highlighted where appropriate.

**Objective 1**

***To further strengthen and formalize the countrywide Civil Society Support Center Networks to provide a full-range of demand-driven services to local Civil Society Organizations and have the ability to contract directly with USAID and other international donors.***

To assess this objective, the evaluation team disaggregated the findings into four distinct areas: Association strengths and challenges; the transition of key roles and responsibilities from Counterpart to the Association Executive Body; the capacity of the CSSC Association to contract with USAID; and the quality and scope of demand-driven CSSC services. Of the four areas, the evaluation team focused primarily on the development of the Association, including the structure and makeup of the Association's governing body, the Board and its composition (internal and external members) and the Association Executive Body's role and capacity in grant management and administration, training implementation and overall reporting. The Association of Civil Society Support Centers (ACSSC) was created by Counterpart in 2002.

**Association Strengths and Challenges**

With regards to the further development of the Association, the evaluation team discovered a number of achievements and successes that underscore and highlight the success in implementing the CSSI Program.

> "The CSSC common vision is to contribute to the development of an effective, dynamic and sustainable civil society in the Kyrgyz Republic."
>
> -Association Staff

Some of these achievements include: the development of a charter, internal policies/ procedures and regulations for the CSSCs; the continued development of a system of external governance (at present there are three active external board members, one inactive board member and 4 CSSC managers); the successful implementation of four network-wide projects (e.g., with the Soros Foundation to provide

training workshops for authorized representatives of Deputies to Parliament; with the World Bank's Village Investment Project to conduct workshops for local government and communities in pilot villages; and with USAID to provide election grant projects for elections at both the local level and with Parliament); the establishment of the CSSCs Executive Body; ACSSC's Executive Body attracted approximately $2,000 in fees for services to date; the ACSSC become more recognized by its constituency and stakeholders (it now has its own slogan and logo); and the increased profile of the Association.

The evaluation team also discovered several key factors that facilitate the achievement of CSSI objectives by the ACSSC. These include: the development of the ACSSC's new CSSC quality standards/guidelines (to be adopted by the CSSCs); the existence of a common vision and shared goals among Association members and the general agreement on the future vision of the Board and the Association as a whole; the professionalism of the ACSSC staff; the ongoing process of capacity building among Association members and staff; wide geographical reach (there are 11 CSSCs in all 7 regions in Kyrgyzstan); and the establishment of relatively good relationships with local government structures, NGOs, USAID and other donors. In addition, the strong internal working relationships between and among the network members and Association Executive Staff has helped facilitate the positive development of the Association as noted by the following elements: the strong communication among and between CSSC members and the Association Executive Staff; and through the development of mechanisms to settle disputes and misunderstandings. These working relationships are based on the desire to work toward a "democratic society, strong civil society, the absence of human rights abuses and freedom of expression."[13]

There is also evidence that individual CSSCs are "buying-in" to the Association concept. As previously mentioned, the fact that there are four external members (with plans to develop a Board made up entirely of external members by 1 July 2006) on the Board suggests that a system of external governance is viewed in a positive light by the CSSCs. According to CSSC managers, this future development will ensure that there are no conflicts of interest. According to them, this type of structure facilitates "healthy competition" for resources as well as mutual support and cooperation among overlapping CSSCs.

At the same time, the evaluation team also became aware of some challenges for the Association. These challenges can be broken down into internal and external challenges. Internally, the Association has developed a charter and internal working procedures, however the role/position of the Association remains underdeveloped (e.g. is the Association a service NGO or a Civic-oriented and proactive NGO?). Also, while nearly every person interviewed promoted the development of a Board made up of only external board members, the steps to achieve this objective remain unclear.

With regard to the Association vis-à-vis its external environment, the Association has yet to decide on a future financing strategy that will clarify whether or not it will seek in-country financing. As it currently stands, there could be future competition between Association members and/or local NGOs with regards to financing should the Association seek internal financing. In addition, the Association has yet to fully develop a clear understanding of the

---

[13] This quote was taken from an Association Executive Staff member.

*Social Impact, Inc.*

government's structure and how it relates to NGO development.  As such, there is limited contact with the government and a limited understanding of how best to position the Association to contract with the government. Also, according to the Association staff's perception, there continues to be some misunderstanding and misgivings within government, the business community and among the Kyrgyz population vis-à-vis the value of civil society.  This is due, according to the Association staff's perspective, to the fact that the Association has yet to conduct an assessment of the potential positive impacts of civil society development in Kyrgyzstan.

**Transition from Counterpart to the Association Executive Body**

Counterpart's cooperative agreement with USAID states that the key to its' exit strategy is the incremental devolution of decision making authority and management of key inputs—grant making, training and technical assistance—to the formalized Association of Kyrgyzstan.  As such, Counterpart's current country office is expected to devolve its decision-making authority and management oversight of the CSSC Association to the registered Association and ensure that is has the capacity to carry-out its future responsibilities.  The evaluation team discovered both achievements and challenges concerning the transition of roles and responsibilities from Counterpart to the Association Executive Body.

In terms of achievements, most respondents agreed that the Association already is its own entity in terms of its governance structure, financial structure, staff separation, and in terms of decision-making authority.  The transparent hiring process for the Association Executive Director serves to bolster that claim.  In addition, numerous respondents described the "Association's unique organizational culture" thereby highlighting the ACSSC's organizational independence.  Many of these positive changes have been facilitated by relatively good communication between and among Counterpart and Association staff at the Bishkek office.  Most respondents suggested that frequent staff meetings have greatly facilitated the dissemination of transition plans.

At the same time, while most respondents agreed that the transition process has largely been transparent and fairly well communicated to staff members in Counterpart and to the Association Executive Body, there has been no roadmap describing *when* aspects of this transition will occur.  In addition, there are some aspects regarding the division of responsibility that remain unclear.  For example, with regards to grants, both Counterpart and the Association are both charged with administering the same Community Action Grant (CAG) program.[14]  Also, the relationship between the Urban Institute (charged with providing technical assistance to Service Improvement Action Plans or SIAP) and the Association is unclear at this point.  Counterpart has successfully transferred responsibility of administering SIAP to the Association but it is Counterpart's ultimate responsibility to ensure that SIAP is implemented properly.  Several Association Executive Staffers also noted that the transition of responsibility has not been clearly communicated to the Urban Institute.  Such an issue leads to perhaps one of the key challenges for the Association—how to attract international donor funding when the Association no longer bears Counterpart's name and prestige.

**Contracting with USAID**

---

[14] See Annex 8 or more information on the grant program in Kyrgyzstan.

Ensuring that the Association is able to contract directly with USAID by July 1, 2006 is the overarching goal of CSSI. However, USAID has not defined the contracting criteria and Counterpart has not yet negotiated a clear set of contracting criteria from USAID. Thus, the evaluation team discovered a wide range of responses from interviewees (Counterpart staff members and the Association Executive Staff) when asked to describe the criteria for contracting with USAID and the most/least important criteria. In addition, without a clear set of criteria from which to measure contracting capacity with USAID, it was difficult for the evaluation team to measure the Association's contracting capacity against a target value. However, there was general agreement on the key criteria for contracting with USAID. These include: financial and organizational sustainability; financial accountability (vis-à-vis local laws and USAID); and the ability to carryout the work with measured impacts.

Noted here as an achievement, all respondents suggested that the Association would be capable of contracting with USAID following the termination of CSSI. Respondents used the following examples to support that claim: the Association knows and has already worked with USAID; the Association has partners throughout the region who are also familiar with USAID; the Association provides a number of high-quality services that support the USAID strategic objectives in Kyrgyzstan; and the Association has strong M&E capacity.

Thus, in general the capacity of the Association has achieved much in terms of developing the capacity to contract with USAID. However, the evaluation team's preliminary assessment suggests that the Association does not currently possess sufficient financial reporting, and knowledge of USAID contracting rules and regulations to fulfill all obligations of a large USAID contract. Counterpart has already begun to address these deficiencies in Counterpart's newly-developed pre-certification framework that outlines Counterpart's approach to ensuring an Association contract with USAID at the end of the CSSI program. This framework is discussed in Chapter 2 and the complete framework is available in Annex 13. The proactive development of the pre-certification framework is an achievement of CSSI and should provide a "roadmap" and diagnostic tool for the Association's future development in the last 15 months of CSSI. As such, the pre-certification tool will be very useful in diagnosing and ameliorating the capacity of the Association to contract directly with USAID.

The evaluation team's assessment of the Association's current contracting capacity suggests that the weakest areas are in reporting and in USAID-compliant financial management and financial sustainability. According to interviewees, the Association is not yet in full compliance with the international financial system necessary to pass international audits.

**The Quality and Scope of Demand-Driven Services**

As previously alluded to in the Kazakhstan Chapter of this report, the evaluation team discovered a number of achievements and successes with regards to services that underscore and highlight the success in implementing the CSSI program. The findings across the three countries are virtually identical. That is, qualitative and quantitative data from one CSSI country is virtually indistinguishable from the other countries. Thus, the findings will not be replicated here in their entirety but rather summarized. In addition, any differences will be highlighted.

The CSSCs in Kyrgyzstan offer the widest selection of training modules. The training modules offered last quarter include the following: Human Resource Management: Micro-business; Project Design; Advocacy; Participatory Monitoring and Evaluation; Participatory Community Appraisal, Project Design, Training of Trainers; Community Network Development; Strategic Planning; Conscientious Management; Prevention of Traffic in Persons; Taxation of NGOs'; Registration of NGOs; Community Development; The Role of Women in Elections; and Condominium. Similar to Kazakhstan, the Project Design and NGO and Community-related training modules were rated by participants as the most effective (please see Chart 3.1 for a breakdown). Participatory Advocacy ranked third for Kyrgyzstan clients. Lastly, similar to Kazakhstan, CSSC clients in Kyrgyzstan include NGOs, CBOs, state employees, business men and women, and private citizens.

Some of the findings concerning the quality and scope of demand driven services include the following:



- Overall, CSSC end users are satisfied with the products and services provided by the Centers. In Kyrgyzstan, 96% of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 45% were "completely satisfied", 33% "very satisfied", and 18% "satisfied";
- There are high numbers of repeat users taking advantage of the CSSC services;
- CSSC clients are also very satisfied with the Resource Centers;
- Qualitative and quantitative data suggests that quality of instruction at trainings is high to outstanding;
- Training modules are highly relevant to client needs; and
- The CSSC staff is very professional, responsive and accommodating of clients and their needs.

As with CSSI in Kazakhstan, these findings suggest CSSC services are both demand driven and of high quality. However, despite this positive feedback regarding services, CSSCs will face several key challenges as they attempt to become demand-driven enterprises. For example, respondents suggested that many training modules are outdated and will need to be upgraded and updated. Additional training modules, training materials and the training of trainers would have to occur in local languages to ensure broad-based impact. However, there is no established feedback system (computerized or other) to ensure that data is gathered in a systematic and uniform fashion by all CSSCs. In addition, qualitative data suggests that substantial data gathering is occurring but not there are insufficient incentives to analyze the data. Also, even if CSSC feedback improves and is systematized, there is no defined quality criteria/standard for

services across Kyrgyzstan's CSSCs. As such, the quality of services is gauged through demand for services rather than by actual satisfaction with or impact of the service provision.

Despite, such shortcomings, it does the CSSCs appear to be offering a full range of quality services including the trainings and of the consultation services. The trainings have and will continue to result in a more empowered and better educated population.

## Objective 2

***To enhance the accountability, transparency, professionalism and public image of Civil Society Organizations through community action grants, community development initiatives, improved service delivery, and advocating for the rights and interests of their clients and constituents.***

Through key informant interviews, the evaluation team found that community action grants, community development initiatives and CSSC services have all enhanced the accountability, transparency, professionalism and public image of CSOs. The initial perception of civil society organizations was negative in Kyrgyzstan (due in large part to the foreign nature of the interventions) but the image has improved because the "efforts are aimed to sincerely and transparently serve people and work in social partnership with the government."[15] Thus, since all respondents suggested that a link exists between the interventions and the positive outcome, the relationship is plausible. To qualitatively verify this relationship, the Evaluation Team examined the strengths and challenges of the CSSCs (as the implementers of the interventions) with regards to accountability, transparency, professionalism and public image.

These strengths include:
- CSSCs fit the high quality standards of organizational and democratic culture;
- The CSSC's values are supported by the end-user values;
- CSSCs obtain new expertise provided by professional partners and utilize them in practice;
- CSSCs promote the positive change in civil society through advocacy campaigns and take clients as partners in the process;
- CSSCs caused visible results (active civil participation, rise of public awareness and the involvement of target groups);
- CSSCs provide legal service free of charge;
- CSSCs have strong skills in conducting advocacy campaigns
- CSSCs established transparent mechanisms for the disbursement of grants via local grant committees; and
- CSSI promotes positive partnerships with local governance bodies, state structures and makes decisions at the local level.

Some challenges include:
- The public relations capacity of CSSCs and the Association remains weak;
- Financial resources of CSSCs lack broad diversification;

---

[15] This quote was taken from an Association Executive Staff member.

*Social Impact, Inc.*

- There are limited resources available for the CSSCs to learn and jointly strategize, share best practices and expertise;
- There is insufficient training and consistent coaching of lawyers;
- There are low levels of motivation among the CSSCs staff members as reflected in the high level of turnover in the CSSCs; and
- The services and service materials are not provided in the Kyrgyz languages thereby limiting their impact.

Taken as a whole, the data are positive. CSSC appear to positively impact the development of civil society. The aforementioned challenges are areas for improvement over the next 15 months and underscore the need to continuously adapt and improve services as has been the case through CSSI.

Also, while the advocacy component promoted by CAG has been underscored by some CSSC managers as one of the program's strong components (as it has generated positive impacts), it has also been cited as a serious challenge by others. The difficulties cited include:

- An insufficient number of trainings in advocacy offered through the program;
- Inadequate understanding of the advocacy concepts and mechanisms for conducting advocacy with local governments both at CSSC- and end user-level;
- Lack of awareness among the population about their legal and civil rights;
- Frustration with the fact that CAG supports only advocacy projects, which tend to be more difficult to implement and do not necessarily yield tangible results; and
- There are low numbers of advocacy proposals submitted to some CSSCs, and low approval turnout at the National Grant Committee level.

## Objective 3

*Strengthen the organizational and sustainability of leading (sector) Civil Society Organizations, CSSC network members and local NGOs through tailored institutional and capacity building assistance with an emphasis on self-financing and income generating activities.*

Counterpart's emphasis on financial sustainability is critical for the future of the Associations of CSSCs, NGOs and civil society in general. The Social Enterprise (SE) model has largely been the focus of financial sustainability.[16] The model is already utilized throughout the region by NGOs through fees for service and small business enterprises. Under this model, Counterpart builds the capacity of the organizations through specific tailored assistance provided by experts in the fields of social enterprises, organizational development, leadership development, corporate philanthropy, grant management and other specific areas. Over the past 1.5 years, the financial sustainability has focused on the SE model. This includes an emphasis (perhaps an over-emphasis) on SE and SE loans. There is currently not an equal provision of trainings, technical

---

[16] Social Enterprise is any NGO revenue-generating business, venture, activity, or project, founded for the dual purpose of earning income and contributing to a social cause. Definition taken from *Financial Sustainability— Assessment and Strategy* by Kim Alter, a consultant for Counterpart International.

assistance, consultation and promotion of the other components of financial sustainability (see below).

During CSSI the emphasis of financial sustainability referred to SE instead of a more process-oriented financial sustainability approach.[17]  Citing the need for reorientation, the Counterpart Financial Sustainability Technical Advisors have started drafting a Counterpart Financial Sustainability Certification process.  The certification process was developed in response to the need to teach organizations "business values", the need to overcome legislation policies, the mindset of the population with regards to NGOs and the need to better clarify the terms and conditions of Social Enterprise (SE) loans.  The certification process includes the following components:

- Financial and Strategic Action Planning (FSAP);
- Social Enterprise/Fee for Service;
- Public/Private Partnership (Corporate/State Contracting);
- Grant writing/Strategic Donor Funding; and
- Membership Service Development.

The incorporation of Social Enterprise into the newly developed financial sustainability methodology suggests that it makes up one of several key components.  Counterpart developed the NGO Financial Sustainability Certification Program to provide one-on-one consultation from expert consultants.  Once certified, CSSI Certified Financial Sustainability organizations then become regional practitioners capable of transferring the financial capabilities long after the CSSI program ends.  This redirection of financial sustainability is certainly a positive move as the benefits of a more broad-based financial sustainability strategy appear likely to have longer-term benefits than the more limited focus on SE.  At the same time, training modules and training resources have not yet been developed.  In addition, the shift away from SE to a more process-oriented approach to financial sustainability has not yet been shared with the Association Executive Body.  Also there does not appear to be significant available resources to develop and implement the Financial Sustainability modules.

The zero-interest loan program for social development helps NGOs through targeted technical assistance and seed funding to better develop market driven revenue generating members services that are vital to the financial future of the organizations.  In terms of the SE loans, this has been a very successful process.  Eleven NGOs submitted applications and eight were finally

> **Textbox 3.1:**
> **List of NGOs\* that Applied for 0% Interest Loans in Kyrgyzstan**
>
> 1.) Karkol CSSC; Project: Internet World; Requested $3000
> 2.) Kerben CSSC; Project: Animal Husbandry; Requested $3000
> 3.) Kant CSSC; Project: Farming; Requested $3000
> 4.) Talas CSSC; Project: Computer Shop; Requested $3641
> 5.) Naryn CSSC; Project: DVD Hall; Requested $3000
> 6.) Jalalabad CSSC; Project: Internet Center; Requested $2500
> 7.) Nookat CSSC; Project: Animal Husbandry; Requested $2965
> 8.) Insan Leilek; Project: Microcredit for Women; Requested $3000
> 9.) Center for Elderly People (Ymyt Balykchi); Project: Microcredit; Requested $3000
> 10.) ADRA Kyrgyzstan; Project: Greenhouse; Requested $3000
> 11.) Sairon; Project: Expanding Credit Portfolio; Requested $3000
>
> \*11 NGOs in total with 7 CSSCs and 4 NGOs.

---

[17] The process-oriented approach refers to the learning process that occurs when organizations undertake a variety of financial sustainability measures including: Financial Strategic Action Planning (FSAP); Social Enterprise/Fee for Service: Public/Private Partnership (Corporate/State Contracting); grant writing/strategic donor fundraising; and membership service development.

approved to receive a loan with a maximum loan size of $3000 (see textbox 3.1). One of the reasons for the success is the well-designed selection criteria in which all selected organizations must:

- Be a mission driven organization;
- Have qualified staff;
- Have a stable source of financing for next 2 years;
- Have assets for collateral; and
- Have a strong desire to generate income to support all members the organization.

The submission of the business plan supports these criteria. Perhaps the most important success factor for the 0% interest loan program is that the loan amount ($3000) matches the investment needs of end-users and the investment climate in Kyrgyzstan. Thus, it is much easier to achieve the goal of teaching prospective loan recipients to become more financially responsible, to diversity their resource base, to develop clear business plans and clear marketing plans. Once all the loans disburse, the challenge will revolve around how best to monitor and evaluate the actual impact of the loan as a means to prove their usefulness.

## Objective 4

***To develop an enabling environment for civil society by improving the legal environment and providing regular legal advice and services to support civil society organizations***[18]

The overall objective of ICNL in Kyrgyzstan is to develop an enabling environment for civil society by improving the legal framework and providing regular legal advice and services to support civil society.

ICNL provides important support and guidance to CSSI, by working at two levels: directly assisting CSSCs and trying to enact good civil society legislation. As requested, ICNL provides CSSCs with on-site legal consultations, leads training courses on NGO law, and helps centers to develop their own law courses. ICNL also works to reform the legal system engaging in advocacy at the national level, promoting civil society friendly legislation and working to prevent the government from enacting poor legislation. Overall ICNL's emphasis through CSSI is on raising awareness of the importance of civil society, educating people on their rights and best practices, and stopping bad policy trends. Where possible, ICNL prefers to work with government to show successes in civil society and not force the government into taking any policy action that makes them uncomfortable.

At present the legal environment for civil society in Kyrgyzstan can be defined as open. Freedom of association is allowed. However, recent political events in Georgia, Ukraine and within Kyrgyzstan (the revolution) are causing new concerns for the government, and may impact (and continue to impact) the implementation of the CSSI program.

---

[18] Due to the revolution in the Kyrgyz Republic, there remains much uncertainty as to future of the legal environment. As such, the results of the evaluation team's finding reflect the assessment of the environment *before* the revolution.

*Social Impact, Inc.*

However, before the revolution there were some key successes including the following. The legal advisors at the CSSCs reached a milestone in their consultations rendered, going over the 1,000 threshold. 254 consultations were given in the original six cities during the quarter, totaling 1,103 for the life of the project in the last quarter of 2004. These consultations covered a variety of issues and have aided civil society groups to register as legal entities, protect their interests in the tax office and other state bodies, and to deliver their concerns/requests to the Government regarding draft laws relating to NGO activity. In addition, the five new legal advisors funded through a grant by the Eurasia Foundation began their work and rendered a total of 111 consultations to community members and conducted training sessions on a variety of topics.

In addition, the ICNL Kyrgyzstan team finished teaching its NGO law course at the International University of Kyrgyzstan for the first semester of the 2004-2005 academic year. The course syllabus included topics such as: the Legal Status of NGO; NGO registration; Kyrgyzstan's tax system; and international best practices. ICNL staff members taught the course to 60 students this semester and are currently negotiating with the university to have them commit a full time faculty member to teach the course in the fall of 2005.

Also, Legal experts from ICNL worked with both the special commission and a coalition of interested groups to make recommendations to improve the tax environment (regarding a new tax code) for the civil society sector. ICNL has also been monitoring the progress of the Community Based Organizations Draft Law, which does not meet the needs of community based organizations. ICNL has also completed the NGO Registration Manual. The manual describes all the stages of state registration of NGOs, including samples of establishing documents of frequently

---

**Textbox 3.2**
**Consultation for Associations of Water Users**

The International Center for Not-for-Profit Law (ICNL) has been conducting taxation seminars throughout the different regions in Kyrgyzstan for managers and accountants of NGOs. During the trainings, all aspects of NGO taxation in the Kyrgyz Republic were covered in detail to help the organizations plan for, and identify, the different tax issues that they must comply with.

One of the trainings was attended by Sophia Doronina, the accountant of "Torpu", an association of water-users (AWU) in the Issyk-Ata rayon of Chui Oblast. After the training, Ms. Doronina received additional ICNL consultations concerning an issue after the training. Ms. Doronina, acting as a representative on behalf of all 11 AWUs of the Issyk-Ata rayon of Chui Oblast, applied to the State Tax Inspection office to cancel the 4% local tax that the organizations had to pay for rendering public services to the population. Her research indicated that the 4% tax had never been published in a public forum, thus rendering the act unenforceable.

The ICNL legal consultants advised Ms. Doronina to address the tax authorities in writing and helped draft an appeal stating the demands of the AWUs. Following advice from the same ICNL lawyers, Sophia continued to press her issue, sending additional letters and placing several phone inquires. Finally, the tax authorities agreed to meet with Ms. Doronina thus canceling the payment of the tax. In this case, Ms. Doronina managed to overcome the government agency's common ignorance of their rules and regulations.

---

registered organizational forms of NGOs and provides contact information to facilitate the process. The manual will be distributed to all the CSSCs and each of the network lawyers is very familiar with its content and will use this manual as a resource during their consultations.

As ICNL legal advisors are integrated with CSSCs, there are some examples of strong collaboration (via legal consultations for NGOs and individuals). However, this collaboration does not appear to be systematic and significant through CSSI in Kyrgyzstan. Instead, it appears

*Social Impact, Inc.*

as though each organization is working independently toward the same goal and that the common interests collide at the local level as if almost by accident.

## Objective 5

***To improve cooperation between various Civil Society Organizations by establishing new and strengthening existing regional and sub-regional inter-organizational linkages.***

The goal of developing local networks is to unite around common issues of several communities and advocate for their rights. Community networking aims to expand on rayon level initiatives to encourage community networking at the oblast and country level, with a focus on solving common issues through utilization of effective advocacy strategies.

The evaluation team found that the CSSCs in Kyrgyzstan successfully developed numerous rural and community networks (see textbox 3.3 for examples). The organizations and rural communities actively interact within the networks and there is sufficient support for rural community network development. In addition, most CSSCs have one or more informal networks in Kyrgyzstan.

Despite these successes, some key challenges remain. The evaluation team also discovered that there is not enough funding and provision of technical assistance to ensure the long-term stability of these networks. The respondents suggested that there is also limited sharing of best practices and expertise among and between the CSSCs with regards to network development. The same respondents suggested

> **Textbox 3.3**
> **Examples of Network Development in Kyrgyzstan**
>
> Example of successful networking activities:
> - **Talas CSSC**: Network of 37 registered NGOs and a rural community network of more than 100 community based organizations.
> - **Naryn CSSC:** Established an informal network of 7 CBOs. There is some exchange at the oblast level under the auspices of the World Bank's Community Driven Development.
> - **Osh CSSC:** Informal network "Alai Ata Jurt" that coordinates implementation of community projects, members attend some of the trainings offered by the CSSC. Ten local NGOs are interested in creating a formal network.
> - **Jalalabat CSSC:** Three successful rural community networks.
> - **Kant CSSC:** Four established networks: one informal rural social economic development network; one network of youth organizations; one network of women's organizations (20 organizations); and one network of 11 resource centers working with refugee women. Another network of farmer cooperatives is under construction.
> - **Kerben CSSC:** Informal regional network of about 20 communities and NGOs of Alabuka and Chatkal raions.

that this is causing a decrease in the effectiveness of the networks. In addition to supporting the development of sub-regional networks to enhance CSSI, Counterpart is also interested in developing linkages between the CSSC Associations on the regional level through staff exchanges, conferences and through the sharing of best practices. There does not appear to be significant focus on the development of regional linkages due to inadequate funding opportunities.

*Social Impact, Inc.*

## Objective 6

***To increase the accountability and transparency of local governments and self-governing bodies through issue-based advocacy, social partnership and providing targeted capacity development support to local government officials[19]***

CSSCs support local advocacy campaigns addressing the quality of public services rendered at the municipal level.  Such campaigns are expected to result in policy changes on the national level.  One mechanism for increasing the accountability and transparency of local governments and local and self-governing bodies is via the Service Improvement Action Plan (SIAP), a simple template designed by the Urban Institute (UI) to help integrate performance measurement with the actions necessary to improve each service. These plans guide targeted individuals through the process of assessing the critical issues facing their sector in the situation analysis section of the action plan; selecting objectives and key targets; and designing performance indicators. The SIAP can be used at every step of the process—it can be used to create a context for the entire performance management system from the identification of objectives through the selection and collection of indicators, through using the data to carry out service improvements. The SIAP concept promotes the building of partnership between local communities and local governments and aims to increase of transparency and accountability of local governments.

Since March 2004, the SIAP concept was introduced into 8 pilot villages by discussing the concept's advantages, establishing working groups in the communities, conducting initial assessments.  The SIAP concept was originally introduced and implemented in four pilot sites (Jany Nookat and Gulcha—Osh oblast), Akman (Jalalabat oblast) and Karakol small city (Issyk-Kul oblast).  SIAP in Karakol and Jany-Nookat will be evaluated this year to get the intermediate results from this activity.   The communities and local governments selected the following services for the SIAP: roads and transportation (Jany Nookat village, Osh oblast), housing and communal services (Karakol), development of pre-school, school and professional education (Akman village, Jalalabat oblast), social infrastructure development (Gulcha village, Osh oblast). Baseline data collection was collected in all four villages which provided the basis for the development of village action plans.  SIAP has made measured progress in each of these villages including the provision of social services, funding, the establishment of social infrastructure and overall better communication between the community and local government.

At the same time there remain some challenges.  These challenges include: the wide variety of operational environments that makes a "cookie cutter" approach difficult; insufficient communication between SIAP activities and the ACSSC staff; local capacity is not always sufficient to develop questionnaires and SIAP indicators without the assistance of UI; and there has not been adequate monitoring or evaluating of these activities to draw sufficient conclusions as to their impact.

## Recommendations

---

[19] Due to the Revolution in Kyrgyzstan it is uncertain at this point how this objective will be affected.

*Social Impact, Inc.*

---

Based on the evaluation findings presented in this chapter of the report, the key recommendations are described below and disaggregated by Objective and their sub-components where applicable. Some recommendations apply to more than one objective. In addition, since the Evaluation focused primarily on Objective 1, there are more recommendations for this objective.

**Objective 1:**

**Association Strength**

- ***Ensure a majority of external members on the Association's Board by July 1, 2006.*** The Association should undertake two main tasks to meet this recommendation. One, to complete the transition to a majority of external Board members, the Association should continue to ensure a transparent selection process for Board members. The Association should target applicants from sectors that support the ACSSC's mission, values and could attract new funding sources. Two, the Association should continue to clarify roles and responsibilities of the Executive Director and the Board, to ensure that the Executive Director has the relevant authority and that the Board develops into a governance body, *not* a managing body. Another option would be for the Association to develop a Board made up entirely of external Board members with one rotating CSSC member per year or quarter. These strategies should be delineated in the Annual Work Plan Narrative with clear milestones.

- ***Continually add new Association members but no more than a manageable number each year.*** Such a recommendation would require the revision of the current membership requirements. One new requirement could include assurance that new members add some area of expertise to increase the overall strength of the Association. This in turn could be leveraged to enhance the specific expertise of each center as well as to minimize rivalry if members compete for the same niche role. Such strategies should be delineated in the Annual Work Plan Narrative with clear targets and milestones.

- ***Association should decide on a future financing strategy.*** So as not to compete with other local NGOs with regards to in-country financing and out-of-country financing. Before the development of the Annual Work Plan, the Association should develop a financing strategy that works to establish good relationships with local/national government structures, NGOs, USAID as a means to leverage funding for its constituents and to not compete with them.

**Transition from Counterpart to the Association Executive Body**

- ***Develop and implement a detailed phase-over plan that describes the shifting roles and responsibilities from Counterpart to the Association.*** Along with Counterpart's submission of the Annual Work Plan narrative (1 July 2005-30 June 2006), Counterpart should submit a written plan including the extensive details of the phase-over. Questions concerning who, what, where, when, why and how of the phase-over should be made publicly available. The phase-over plan should delineate the evolving roles and responsibilities of the Association, the Counterpart Country Office and the Counterpart Regional Office and clearly define

future roles and responsibilities. To ensure clarity and transparency, job descriptions of all staff involved (or not) in the transition should be developed. For clarity's sake the phase-over plan should also ensure that the Association has its own and independent hiring process. An outside and experienced facilitator could provide assistance with an independent and participatory phase-over plan.

## Contracting with USAID

- *Negotiate and agree upon a set of contracting criteria with USAID.* Counterpart, the Association and USAID should develop and agree upon a checklist delineating the criteria for contracting by the time the Annual Work Plan is submitted. Then, based on the checklist, Counterpart and Association could undertake an organizational assessment of the Association to highlight capacity strengths and challenges. Lastly, weaker capacity areas could then be systematically targeted as a means to ensure that the Association contracts with USAID before the end of CSSI

- *Secure transitional funding from USAID for ACSSC as of July 1, 2006.* Since international research suggests that NGO networks take between 3-5 years to stabilize and be "successful", Counterpart could begin discussions with USAID to underscore the importance of securing 2-3 years of transitional funding (particularly for operational costs). As an independent NGO, the Association could possibly accelerate its own organizational and programmatic development by exercising an option to subcontract with other organizations, such as Counterpart to provide specific capacity building services, until it is ready to assume such responsibilities on its own.

## The Quality and Scope of Demand-Driven Services

- *Develop uniform CSSC quality service standards and a uniform quality feedback system to better and compare services across CSSCs and to systematically improve the quality of services CSSC.* Counterpart and Association should build on the development and implementation of the Client Satisfaction Survey to regularly monitor client satisfaction with CSSC services. Counterpart and the Association could provide the CSSCs with technical assistance to implement their own survey and evaluate the results, perhaps reporting the survey results back to the Association and Counterpart regularly. In addition these uniform feedback systems could assist CSSCs in the development of other services demanded by clients. Also, based on the feedback from the Client Satisfaction Survey, Counterpart and the Association could develop clear quality standards/targets so that individual CSSC can easily measure their own progress and take effective action. One area for immediate attention includes upgrading training modules to include beginner, intermediate and advanced modules. Another area is to build capacity to implement trainings in the Kyrgyz language.

## Objective 2:

- *"Repackage" CSSC services for the next annual year to ensure that they remain salient.* To continually enhance, the accountability, transparency, professionalism and public image

*Social Impact, Inc.*

of CSSCs, it is necessary to evaluate key services and methodologies proactively address changing operational environments. As such, CSSC could participate in a facilitated discussion to establish clear methods and program goals in advance of the Annual Work Plan narrative. The discussion could then culminate in an operational CSSC work plan with clear targets and milestones.

**Objective 3:**

- ***Implement "process-oriented" financial sustainability development.*** Taking the lead from Counterpart's Financial Sustainability Team, develop financial sustainability modules that reflect the broad menu of financial sustainability options. Develop a clear work plan, schedule and milestones for implementation as well as the gradual transition of the financial sustainability to the Association. Consideration should be given to Association efforts aiming to strengthen and maintain financial and human resources sustainability in CSSCs. In undertaking the process-oriented approach it will be important to ensure that key aspects of the program match the realities of the NGOs. Thus, just as the 0% interest loan program matches the needs of NGOs, it will be important to get input from NGOs on the specific of other aspects of financial sustainability.

**Objective 4:**

- ***Work more closely with ICNL to monitor the political environment.*** In light of recent events in Georgia, the Ukraine and within Kyrgyzstan, Counterpart and the Association should leverage its partnership with ICNL to keep abreast of potential changes for NGOs operating in Kyrgyzstan. This would enable CSSI to be more proactive in quickly adapting certain aspects of CSSI to match the legal environment. One way to leverage the partnership could be to invite ICNL to participate in weekly, bi-weekly or monthly debriefings.

**Objective 5:**

- ***Provide funding to continue the development of sub-networks and leverage Counterpart's regional and global perspective by sharing best practices.*** Counterpart could respond to CSSC requests for additional funding to further strengthen and development sub-networks. If funding were to become available, Counterpart and the Association could then jointly develop an implementation plan with a monitoring component.

**Objective 6:**

- ***Empower the Association to take a more active role in SIAP by clarifying role, responsibilities and expectations.*** There remains confusion regarding roles and responsibilities between the Urban Institute (in Washington, DC) and the Association. As such, the Counterpart Country Office could undertake a roles and responsibilities clarification plan to ensure a strong working relationship between the two organizations. This could be achieved through a meeting between relevant Urban Institute and Counterpart Headquarters staff.

*Social Impact, Inc.*

- ***Amend CSSI's advocacy approach.***   Currently national/local government and local communities do not fully understand advocacy.  As USAID will begin to focus more on advocacy, Counterpart and ACSSC could improve its advocacy campaigns through an examination of the challenges to the advocacy component and by building upon its successes. Then the advocacy approach could be restructured accordingly to ensure that advocacy is properly communicated to key stakeholders. Counterpart and ASCCS could develop an advocacy manual with best practices and case studies that could lead to improved advocacy trainings.

*Social Impact, Inc.*

## Chapter IV:  Turkmenistan Evaluation Findings

### Introduction

Of the Central Asian Republics, Turkmenistan remains the most closed and least reformist—essentially a one-man state. The regime is characterized by patronage and corruption, a highly restrictive visa regime, suspicion of civic action and the media, and state-control over and distortion of the economy. Following the end of the Cold War and the breakup of the Soviet Union, Turkmenistan declared its independence on October 27, 1991. Saparmurat Niyazov or "Turkmenbashi" (the father of the Turkmen) became the first president of the new republic and still remains the supreme decision-maker. On December 28, 1999, Niyazov's term was extended indefinitely by the Majlis (parliament), which itself had taken





office only a week earlier in flawed elections that included only candidates hand-picked by President Niyazov. Neither independent political activity nor opposition candidates are allowed in Turkmenistan. The Democratic Party of Turkmenistan (DPT) is the only legal political party. Political gatherings are illegal unless government sanctioned, and the citizens of Turkmenistan do not have the means to change their government democratically.

Following an armed attack on President Niyazov's motorcade on November 25, 2002, the Government of Turkmenistan moved quickly against perceived sources of opposition. There were widespread reports of human rights abuses committed by officials investigating the attack, including torture and punishment of families of the accused. It also instituted new measures to stifle dissent and limit contact with the outside world.

While the constitution provides for freedom of the press, there is virtually no freedom of the press or of association. The government has full control of all media and restricts foreign publications.  Corruption continues to be pervasive. Power is concentrated in the president; the judiciary is wholly subservient to the regime, with all judges appointed for 5-year terms by the president without legislative review. The president routinely dismisses cabinet members and other government officials on charges of corruption and they are subsequently tried in secret trials and frequently imprisoned or sentenced to internal exile.  It is in this context that the Counterpart initiated the CSSI Turkmenistan program in July 2003.[20]

### Political Environment and its Effects on CSSI Turkmenistan

---

[20] Background information on Turkmenistan is derived from U.S. Department of State Background Notes.

*Social Impact, Inc.*

Before delving into an analysis of Counterpart's efforts in Turkmenistan, it is important to contextualize Counterpart's progress to date, its achievements and its challenges within Turkmenistan's socio-political environment described above. Only 3 ½ months after Counterpart initiated CSSI, Turkmenistan adopted the new law on "Public Association" (NGO Law)[21] in Turkmenistan in October 2003 (coming into effect in November 2003). The law requires that all existing NGOs go through a re-registration process and it creates radical sanctions for unregistered activities, including criminal penalties. The law essentially halted the activities of the emerging network of NGOs, which were the major focus of Counterpart Turkmenistan's activities. For Counterpart Turkmenistan, it meant a revision of the project objectives as well as adjustments in strategies and tactics to meet the new challenges of working with civil society in Turkmenistan.

November 2003 also witnessed the closing down of NGOs "Catena" and "Dashoguz Eco Club". The law has also severely curbed NGO registration with only two new NGOs registered to date. Other registered NGOs are so called "GONGOs" (government NGOs). Due to the unfavorable political environment, CSSI was forced to stop its trainings, its grant program and other major activities in December 2003.

To systematically and reorient its strategy and workplan to become effective in the new and challenging environment, Counterpart developed a new annual workplan in February-March 2004 with the help of an outside expert. The workplan was submitted to Counterpart's Regional Office in April-

---

**Textbox 4.1**
**Law On "Public Association" and its Effects on Civil Society in Turkmenistan**

The law of Turkmenistan on Public Associations (PA) came into force on October 21, 2003. From the moment of acceptance of the Law on PA in Turkmenistan practically all activities of PA were suspended. Article 33 of the Law on PA determined that charters and other founding documents of PA, established before the present law came into force, should be brought to conformity with the present Law.

As a result of the law, all earlier registered PA had to pass re-registration, and newly established PA had to collect a package of documents and send them to the Ministry of Adalat of Turkmenistan (similar to the Ministry of Justice in other countries), in accordance with new Law on PA.

The situation has become difficult increasingly because of the requirement on re-registration, which did not establish the procedure for re-registration. In addition, the Ministry of Adalat did not provide consultations or clear explanations on the new law. The rules of registration of PA were approved by the Resolution № 6547 of the President of Turkmenistan only on January 1, 2004, nearly 2.5 months after the introduction of the Law on PA.

However, even after the acceptance of the Resolution there has been a measured decrease in the activity on registration (or re-registration) among initiating groups and registered PA.

ICNL continues to work with government officials, deputies of Parliament and local Ministry of Adalat. Unfortunately, the current situation in Turkmenistan makes any plan regarding legislative changes uncertain at best. INCL will continue to provide information on new laws that affect civil society and technical assistance to the government on such legislative initiatives as is possible.

---

June 2004. The new workplan was approved by USAID in September 2004. That same month, the Community Leaders Forum, a 3-day forum, for 50 participants, was conducted in collaboration with UNDP, Counterpart International and START/AED and facilitated by Social Impact and local staff.

In October 2004 the trainings started anew focusing on local project management of Community Action Grants (CAG) for community representatives, NGO members and local facilitators. The new grant program was also developed (based on strategic advice from USAID and the Ministry

---

[21] See textbox 4.1 for an abbreviated discussion of the new law's implications or Annex 9 for a complete ICNL analysis and implications for civil society development in Turkmenistan.

of Foreign Affairs). As local government objected to providing cash grants to grantees, the program instead provides equipment. Thus, since its inception, CSSI Turkmenistan has been forced to stop altogether, restart, and/or amend its program components due to the rapidly changing operational environment. As such, the reader should remain cognizant of such challenges and limitations placed on civil society when interpreting the evaluation findings presented below.

At the same time, the higher-level objectives of CSSI have remained constant throughout the program: to develop stable, peaceful, prosperous democratic societies by enabling civil society to have an increasingly active role in promoting the adoption of democratic behavior and practices in the pursuit of socio-economic development. That being said, the focus of the Counterpart program is to provide support to groups, organizations and citizens associated with civil society in order to keep them functioning until Turkmenistan's operational environment improves. Components of Counterpart's strategy in Turkmenistan include: the provision of technical assistance to local NGOs, CBOs and community activists; the provision of grants for social partnership and community development activities; and the provision of a wide variety of civil society-specific services via the CSSCs. As noted by Counterpart's Cooperative Agreement with USAID, there is no transition plan.

## Evaluation Findings

The evaluation findings are broken down below by Project Objectives. Some findings overlap and/or have implications for one or more project objectives. Thus, to the extent possible, such overlaps are highlighted where appropriate.

## Objective 1
*To provide a full range of demand driven services to local civil society organizations.*

As mentioned in the Kazakhstan Chapter of this report, the evaluation team discovered a number of achievements and successes with regards to services that underscore and highlight the success in implementing the CSSI program. Surprisingly, the findings across the three countries are virtually identical. That is, qualitative and quantitative data from one CSSI country is virtually indistinguishable from the other countries. At the same time, this section will contain an expansive discussion of CSSC services since this is the primary means by which to assess successes and challenges of CSSI in Turkmenistan.

The existing Counterpart network in Turkmenistan consists of Counterpart's Hub and three branch CSSCs located in Ashgabat, Lebap and Dashoguz. While Turkmenbashi City is not a full-fledged CSSC, its status as a partner enables Counterpart Turkmenistan to deliver services to four of Turkmenistan's five regions. The CSSCs and the partner in Turkmenbashi are charged with providing services to NGOs and community initiative groups, local business, governments and international organizations. These services include computer and Internet service, telephone and email communication, information dissemination and assistance in developing community driven and community-based projects. The Mary region does not currently have a CSSC

*Social Impact, Inc.*

presence.  As noted above, the CSSC's service delivery capacity was often limited due to a hostile external environment.

Turkmenistan's CSSCs offered the following training modules last quarter: Project Design; Local Project Management Part I; Local Project Management Part II; NGOs & Community; and Training Methodology.  CSSC clients include primarily individual community activists, some members of registered NGOs, members of formerly registered NGOs and some lower-level government officials.



The provision of quality demand-driven services is one key element of program success.  CSSC end users are satisfied with the products and services provided by the Centers.  Ninety-one percent of respondents ranked their satisfaction as "satisfied" or better (see Chart 4.1).  CSSC clients are also very satisfied with the Resource Centers.  Eighty-eight percent of respondents ranked their satisfaction as "satisfied" or better (the top three categories).  Of that 39% are "completely satisfied", 39% are "very satisfied", and 10% are "satisfied".  This demand is further illustrated by the high numbers of regular users of CSSC products and services (see Chart 4.2)



As with Kyrgyzstan and Kazakhstan, trainings modules were in high demand.  Qualitative data suggests that quality of instruction at trainings was high to outstanding.  Many respondents enthusiastically praised the high quality, professionalism and applicability of the services.  For example, one CSSC client claimed: "When they conduct trainings, people don't want to leave afterward.  They want to continue talking and learning from the people at the centers."[22]  This is supported by quantitative data.  Of all the products and services, the training workshops were the most accessed.  Ninety-one percent of respondents ranked their satisfaction with the CSSC training workshops as "satisfied" or better (the top three categories).  Of that 49% were "completely satisfied", 32% were "very satisfied" and 10% were "satisfied.

---

[22] Quote taken from CSSC end-user.

In addition, similar to Kazakhstan and Kyrgyzstan, of all the trainings "Project Design" was the most popular followed by "NGO and Community". "Training Techniques and Methodologies" ranked third (see Chart 4.3).

In terms of quality of instruction, here too CSSC clients were satisfied. Ninety-one percent of respondents ranked their satisfaction with the quality of instruction as "satisfied" or better (the top three categories). In addition, the respondents found training workshops to be relevant to their needs with 87% ranking their satisfaction as "satisfied" or better (see Chart 4.4). For example, one respondent claimed that "trainings are tailored to my needs and that helps me carry-on with my work."[23]



Chart 4.3: Which training workshop did you find most effective?

- Project Design, 23%
- NGO and Community, 22%
- Training Techniques and Methodologies, 14%

This quantitative and qualitative data suggests that the CSSC services are demand-driven. Such a conclusion is bolstered by high marks for CSSC staff professionalism and responsiveness. In addition, the clients suggested that the provision of technical assistance was customized to their particular needs.



Chart 4.4: How relevant are the training workshops to your needs?

- Completely Satisfied: 31%
- Very Satisfied: 41%
- Satisfied: 15%

Turkmenistan Respondents

At the same time, the CSSCs face challenges as they attempt to become demand-driven enterprises. Currently, there does not appear to be CSSC-wide quality criteria/standards for service quality for services across CSSCs in Turkmenistan. A number of respondents suggested that the quality of service delivery is almost uniquely defined by the final impact of an activity. However, it is difficult to assess impact across CSSCs if different quality standards are utilized. Other respondents suggested that quality of services is evidenced by the continued demand for services. While certainly true in most environments, Turkmenistan is a different case in which few other services are available. Thus, high demand does not necessarily imply that services are of high quality but rather that they are the only services currently available and therefore in high demand. Another challenge is the issue of providing trainings in the Turkmen language as well as Russian. Turkmen is more widely spoken in Turkmenistan than Kyrgyz and Kazakh are in Kyrgyzstan and Kazakhstan. Currently trainings are delivered primarily in Russian with approximately 2-3

---

[23] Quote taken from CSSC end-user.

trainings delivered in Turkmen. As such, this limits the extent to which trainings can have a broader impact in Turkmenistan.

As CSSCs are the primary providers of the aforementioned services, it is also important to assess the capacity of CSSCs by examining their strengths and challenges. Among the CSSCs there are numerous strengths including the following: CSSCs and Counterpart both understand the specifics of the environment in which they operate and are able to craft creative solutions; the creation of discussion clubs organized and involving trainers, activists and volunteers; the high demand for client services and the high numbers of clients; some strong contract with local authorities through local governors; mobility, flexibility and adaptability of CSSCs in the changing, dynamic environment; and the continued provision of technical support service, registration support services and other support and assistance to NGOs and communities.

> "Whatever issues and ideas that facilitates the community getting together—that is the most important issue."
> -Counterpart Turkmenistan staff member
>
> "Our centers are just about the only link between local communities and the outside world."
> -Counterpart Turkmenistan staff member

These successes were underscored by several internal factors including: the highly professional CSSC staff specialized in civil society development and their focus on CSSC strategy; the Participatory Community Appraisal Process with Appreciative Inquiry (AI); the ability to initiate dialogue with some local authorities via community activists; and the emergence of advocacy when implementing CAG projects. Perhaps the most notable internal factor, however, was the degree to which the CSSC managers agreed on a present/future vision for CSSCs/CSSI. As noted in the AI Evaluation Workshops, CSSC managers underscored that the common elements of the CSSC/CSSI vision will facilitate success. These elements include the desire to: register NGOs (and to one day register the CSSCs themselves); expand on the existing informal and local network of CSSC satellite branches; work on a consistent basis with local, regional and national leaders; achieve sustainability and quick registration of projects; build strengthened, more horizontal relations between CSSCs and the Hub office; revitalize civic education; enhance participatory decision-making and program planning with local authorities; build the capacity of CSSC managers; and continually adapt and fine-tune CSSI's goals and objectives.

Also, while the external environment is very challenging to CSSI, there are certain external factors that do facilitate success. These include: the lack of competition by other organizations; the unique CSSI methodologies and tools; the demand driven services of the program; the strategic partnership with ICNL; and the presence and support of USAID in Turkmenistan.

In addition to the general strengths of CSSI in Turkmenistan, each CSSC has its own niche strengths. Ashgabat Center has good social partnership capacity. The Center builds avenues by which to work with the government (in fact a total of six community leaders have been promoted to government). One of the Ashgabat Center's strengths is that its projects/services strongly reflect the regional needs. The Dashoguz has a strong and strategically-minded manager something that has facilitated strong cooperation with the NGO sector. In particular, this center has strong partnership capabilities with ecological NGOs. One of the strengths of the Lebap Center is its location. The area has great potential for civil society development with an NGO

sector that is still quite active and socio-economic conditions/factors that favor further civil society development.

Indeed, the Lebap Center has great potential for development but has faced very severe challenges making program operation impossible.  For example, the fact that the population is over 90% Uzbek (and that the majority of natural resources are located in this region) has led the government to control all activities and to cancel all training programs.  This has caused program efforts in the region to become stagnant, has limited the CSSC's contact with government and underscored insufficient creativity of the Lebap staff in finding solutions.

As the CSSCs build on their strengths as well as their internal and external factors for achievement and success, they are often confronted by extremely difficult external factors that challenge and often limit success.  These factors include: the general socio-political environment in Turkmenistan (as discussed above); the inherent difficulty in establishing viable and long-term partnerships with government due to the government high turnover rate; the lack of skills and tools to work with civil society on the part of the government; the CSSC's dependency on a single donor organization (the external environment limits their abilities to diversify funding sources); the arduous and arcane task of registering NGOs and their projects; the difficulty of managing two internal accounting policies (the market rate versus the official/bank rate in Turkmenistan); the dearth of accurate CSSI and USAID program information circulating at the top government levels; and the inherent disadvantage of working with government for fear of being co-opted and manipulated.

As previously alluded to in this chapter's introduction, Turkmenistan's external environment greatly influences Counterpart's ability to carry-out CSSI (or internal) objectives and plans.  At present some of these internal challenges to CSSI in Turkmenistan include: insufficient coordination and communication between the Hub and the CSSC related to information sharing and reporting; limited Hub mentoring of the CSSCs; relatively slow reaction time in the development of a strategy to react to the new law on Public Association (see textbox 4.1); insufficient adaptation of CSSI to each of the distinct regional environments; the difficulty in releasing grants due to the dual accounting policies in Turkmenistan; there are no current PCA trainings since they have not been cost effective; and too few CSSC staff positions for the many obligations and responsibilities of the CSSCs.

## Objective 2
*Engage in development activities identified by local communities in Turkmenistan.*

The CSSCs aim to assist in local communities in effectively engaging at the grassroots level as a means to improve linkages between civil society organizations (where they exist), community activists, and the CSSC constituencies.  This enhances their ability to represent communities in promoting issue-based dialogue.   The Participatory Community Appraisal and Community Action Planning (CAP)

> -"We are actually involved in the activities defined by the communities.  The communities come to us asking for help.  Then we conduct activities together but the initiative comes from the communities themselves, we only facilitate."
>
> -CSSC Staff member

modules employ AI approaches to build on what is strong in communities and attempting to building on those assets.

At least in the past, CSSCs engaged with local communities in a variety of informal ways: "The engagement process is somewhat informal—they [communities] conduct activities and the initiatives come directly from them."[24]  In direct response to this trend and the variety of ways in which CSSC's engaged local communities, Counterpart developed the "Work Cycle of Facilitators/Consultants" (see Annex 10).  This plan examines the relationships between the CSSCs, Counterpart, the facilitators/consultants and the community.  It also begins to ensure that CSSCs are utilizing the same systems and processes for engaging in development activities identified by local communities in Turkmenistan.  The Work Cycle guide establishes key roles and responsibilities for the Hub office, the CSSCs and the facilitator/consultants.  The Hub office is charged with providing for overall leadership, implementation of rules, regulations and procedures as well as providing ongoing consultations, monitoring and feedback.  The CSSCs identify potential facilitator candidates and then provide formal training, on-the-job training, consulting and feedback support.  The facilitators/consultants then work directly with the communities employing Counterpart's methodologies.   The facilitator/consultant is thus empowered and trained to undertake his/her tasks and provides direct training to the communities, facilitates the PCA and CAP process and provides ongoing community consultations while the community prepares the project.   They are also credentialed by Counterpart receiving certification to practice after a 6-day workshop.  Currently, there is a cadre of 8 facilitators/consultants in each CSSC.

This newly-developed "Work Cycle for Facilitators/Consultants" aims to ensure that Counterpart engages in development activities that are indeed identified and initiated by communities.[25] Facilitators/consultants are trained to learn of community demands, the community itself (its condition as a community, ethnic/group composition, its institutions, population, etc.) and attempt to fit a potential projects within the general confines of Counterpart's requirements. After this assessment period, the target communities are identified.  Then consultants/facilitators begin their work with the communities.  These activities include: conducting the PCA, writing a PCA report; developing the CAP; developing a project, the project team and the project documents; potential project re-working according the Grant Committees recommendation; project registrations and implementation of the project.

The step-by-step "Work Cycle" aims to ensure that no steps are missed when engaging communities.  In addition it has various embedded mechanisms to guarantee that development activities are undertaken that are identified and needed by communities themselves. Most respondent suggested that, "They [CSSCs] are actually involved in the activities defined by communities because the communities come to the CSSCs and ask for help—they [communities] conduct the activities and the initiatives that come directly from them."[26]   Some challenges to this process remain however.  They include: the delayed provision of grants to the communities (due in part to Turkmenistan's socio-political environment); the CSSC model emphasizes bringing community members to the centers versus an emphasis on staff carrying-out the

---

[24] Quote taken from CSSC staff member.
[25] Please see Annex 10 for the complete "Work Cycle for Facilitators/Consultants".
[26] Quote taken from CSSC staff member.

activities in the targeted community and/or satellite centers; the inherent difficulty in providing grants because of the dual accounting policies (market rate vs. bank/official rate); the misunderstanding of civil society in targeted communities; the stoppage of PCA trainings in Turkmenistan; and the fractured nature of community in Turkmenistan. Taken together, these challenges have been formidable—there are few examples of success (only three local projects have been implemented) with the grant funding. Counterpart has been more successful with the NGO institutional grants, however, having disbursed $143,567.18 as of March 1, 2005 (see Chart 4.5).

**Chart 4.5: NGO Institutional Grants**

| Grant Recipients | Grant Type | Amount Approved | Amount Disbursed as of March 1, 2005 |
|---|---|---|---|
| *Ashgabat CSSC* | CI Institutional | $51,475.00 | $43,448.00 |
| *Dashoguz CSSC* | CI Institutional | $54,677.00 | $42,530.00 |
| *Lebap CSSC* | CI Institutional | $54,468.00 | $38,947.75 |
| *Resource Center "Diller dunyasi"* | CI Institutional | $30,784.00 | $18,641.42 |
| **Subtotal** | | **$191,404.00** | **$143, 567.18** |

## Objective 3

*Support and strengthen the capacity development of NGOs, community-based organizations and community activists in initiating and promoting community initiatives that engage the government in dialogue.*

The Community Action Grant (CAG) Program is one method used to promote network-like activities throughout the country, with an emphasis on rural communities. Multiple linkages between NGOs, CBOs, community initiatives, local associations and activists are meant to assist in the promotion and development of a capable set of registered organizations with competent leadership to lay the foundation for a functional and sustainable localized network. The CAG also aims to build a stronger and more collaborative relationship with the communities and the local authorities facilitates this objective.

At the same time there are important challenges that CSSI faces in attempting to engage the government in dialogue. These challenges include the following: CSSCs have no joint projects with governments and therefore no viable mechanism to facilitate dialogue; community members often lack tools to access government employees; governmental organizations are prohibited from contracting and collaborating with international and/or other organizations; government does not fully understand the work of the CSSI thereby eliminating a potential venue for trust and confidence-building; CSSCs may only make presentations to local authorities if invited; government authorities fear that by associating with representatives from civil society they may lose their jobs; local authorities often block community projects whether or not they are properly informed as to the nature of the project; and high turnover rates in government have further undermined the potential for partnership opportunities. Even if civil society actors are able to

develop relationships with lower level government bureaucrats, these bureaucrats often lack the decision-making power and/or funding necessary to engage in development activities.

Forming a constructive dialogue with the two other entities, NGOs and for profit entities, has also proved challenging. There is no charitable law in Turkmenistan to encourage businesses to donate money. Informal methods ("under-the-table" methods) are the only means to acquire co-sponsorship though there had been little if any success in this area. Concerning NGOs, there are three types: government-backed civil society organizations; other registered civil society organizations; and unregistered civil society organizations. They are all very challenging to work with. Government-backed civil society organizations tend to be difficult to work and/or out of the purview of CSSI (many are sports-related NGOs). In terms of the registered NGOs, there are very few to work with and even if a partnership activity is initiated, the project must be registered with the local government. As the registration process for projects can be arduous, arcane and time-consuming, many projects are not approved. Formerly registered civil society organizations (e.g. NGOs that used to be registered before the Law on "Public Association" but have been unable or unwilling to reregister as NGOs) are easier to work with as they share many of the goals as CSSI but since they are not registered, they often lack capacity or the legitimacy to carry-out projects. Despite some of the inherent difficulty Counterpart has had in collaborating with organizations, Counterpart has had success in working with community activists. CSSC-sponsored "Discussion Clubs" and forums are providing an opportunity for community activist across issue areas and sectors to discuss community issues. It appears that here, CSSI is having the greatest success.

## Recommendations

Based on the evaluation findings presented in this chapter of the report, the key recommendations are described below and disaggregated by Objective. As was the case with findings and analysis above, some information applies to one or more objectives. This is also true for the recommendations below. In addition, this section includes cross-cutting recommendations as some recommendations did not fit neatly within the confines of one particular objective.

## Objective 1

- ***Develop uniform CSSC quality service standards and a uniform quality feedback system to better compare services across CSSCs and to systematically improve the quality of CSSC services.*** Counterpart and CSSCs should build on the development and implementation of the Client Satisfaction Survey to regularly monitor client satisfaction with CSSC services. Counterpart could provide the CSSCs with technical assistance to implement their own survey and evaluate the results, perhaps reporting the survey results back to Counterpart on a regular basis. These uniform feedback systems could assist CSSCs in the development of other services demanded by clients. Also, based on the feedback from the Client Satisfaction Survey, Counterpart could develop clear quality standards/targets so that individual CSSC can easily measure their own progress and take effective action. One area for immediate attention includes upgrading training modules to include beginner, intermediate and advanced modules. Other areas include building internal capacity to

implement trainings in the Turkmen language and the hiring of more Turkmen speaking CSSC Project Coordinators/Community Outreach Coordinators working as community facilitators.

- ***Increase and improve communication channels between the Hub office and the CSSCs.*** The Hub office could increase and facilitate an improved exchange of best practices, lessons learned and other key program information among the CSSCs. Some possibilities could include publishing a bi-weekly or monthly bulletin that highlights success stories and shares best practices among the CSSC and its members. Other options could include regular exchanges among and between the CSSCs. In addition, Counterpart could provide increased levels of encouragement, capacity building and day-to-day mentoring of CSSCs in the areas of management, organizational development and program operations.

- ***"Repackage" Lebap's services for the next annual year to ensure that they remain salient.*** As noted by USAID, Counterpart and the Lebap Center should build on the assets and challenges of its community and its constituents. The area has a large youth population and a relatively high unemployment rate. As such, Counterpart could consider the roll-out of micro-enterprise development services and support to better reflect and address community concerns thereby raising the CSSC's credibility.

## Objective 2

- ***Counterpart should continue to develop a core network of community facilitators/activists in each CSSC to improve and better target CSSC activities.*** In addition to the "Work Cycle of Facilitator/Consultant Model", Counterpart could retrofit the facilitator/consultant cadre model by shifting from a CSSC model in which the CSSC's constituents come to the center for services to a model in which CSSC staff provide services in the centers or via a satellite centers.

## Objective 3

- ***Enlist the assistance of the U.S. Ambassador or the USAID Mission Director to facilitate the government's approval of key program activities.*** The Counterpart Regional Office could work with the U.S. Ambassador and the USAID Mission Director to develop a top-down program roll-out model in which major program events are approved by the highest levels of government. For example, one potential idea could be to implement a forum for dialogue and collaboration among different stakeholder groups in local development planning. This would help building on the successes of the community facilitator forum last October, sponsored by AED and Counterpart. The next step would include holding an Appreciative Inquiry forum of civil society organizations, entrepreneurs/business and government to foster multi-stakeholder communication, confidence building, and mutual planning, based on the strengths, best practices and appropriate role of each stakeholder group. Leveraging and complementing the best of what each party has to offer, the forum could then a support multi-year development planning that encourages participation and seeks opportunities for collaboration among the different stakeholder groups. This type of

forum could then be rolled-out across Turkmenistan eventually culminating in a national dialogue.

## Cross-Cutting Recommendations

- ***Work more closely with ICNL to monitor the political environment.*** In light of recent events in Georgia, the Ukraine and Kyrgyzstan, Counterpart and the Association should leverage its partnership with ICNL to keep abreast of potential changes for NGOs operating in Turkmenistan. One way to leverage the partnership could be to invite ICNL to provide weekly, bi-weekly and weekly political debriefings. In addition, Counterpart should develop a mechanism by which political/legal developments are first closely followed by ICNL and then quickly dispersed to CSSCs and Counterpart to develop rapid programmatic responses.

- ***Develop scenario-based strategies for dealing with abrupt and potentially unforeseen changes in the political environment.*** Should the political/operational become quickly and/or increasing challenging (or dramatically opened), Counterpart could develop standard operating procedures to ensure the quick adaptation of program goals, strategies and objectives. The standard operating procedures could be agreed upon and implanted CSSC if necessary. They could include a certain degree of flexibility for CSSCs to react to situational.

- ***Decide on a clear strategy for the current CSSI contract with USAID.*** Some potential options include:
  - Convert the Ashgabat Center into national coordinating NGO with branch offices (CSSCs) with possibility of converting Ashgabat CSSC into national coordinating NGO;
  - Register all CSSCs as NGOs or have each CSSC subsumed under local or regional NGOs;
  - Seek out a national organization that would be willing to develop a joint venture with CSSI, preferably one that would have a comparative advantage in the Turkmenistan;
  - Pursue discussion with USAID to secure additional funding at the end of project and to extend CSSI given the unfavorable socio-political environment; or
  - Terminate CSSI in Turkmenistan.

*Social Impact, Inc.*

## Annex 1: Satellite Offices in Kazakhstan

Five of ARGO's NGO members have satellite offices in remote areas. These are: Ecocenter in Karaganda, Iris in Semei, Zubr in Ust-Kamenogorsk, ASTRA in Astana and Tan in Atyrau. Only Ecocenter had concluded a cooperation agreement with its satellite offices. The others work with the local centers on informal basis.

### ECOCENTER, Karaganda

The Cooperation agreement with satellite offices was concluded in June 2004. The subject of the agreement is the mutual assistance in implementation of different programs and activities in the regions. All the offices were chosen from among the old partners of the CSSC. The satellite offices help in disseminating information, data collection, training and consulting the clients at the local level. In its turn Ecocenter provides the partners with capacity development consulting, training, and coaching.

| Name | Location | Date Established | Number of staff |
|---|---|---|---|
| Public Union "Ecos" | Saran town | June 23, 2004 | 6 |
| Association of family physicians | Zhezkazgan town | June 23, 2004 | 7 |
| Socially active school "Alians" | Aktogai raion, Shushubai village | June 23, 2004 | 6 |
| Public union "Ecocenter Karkaraly" | Karkaralinsk town | June 23, 2004 | 5 |
| Public union "Otrazheniye" | Temirtau town | June 23, 2004 | 3 |
| Public Union "Committee for self-governance "Enthusiast" | Dubovka village | June 23, 2004 | 3 |

### IRIS, Semei

Iris works with its satellite offices on informal basis. The partnership with the different offices was made in different time. The local centers help in disseminating and collecting the information, consulting on different CSSC's projects and programs. The satellite offices receive training and consultative support from Iris.

| Name | Location | Date Established | Number of staff |
|---|---|---|---|
| Public Union "Asar" | Abaiskiy raion, Sarzhal village | March 1999 | 15 |
| Public Union "Arna" | Beskaragaiskiy raion, Begen village | January 2000 | 4 |
| Initiative group "Birlik" | Beskaragai raion, Semenovka village | 2001 | 2 |
| Public Union "Nadezhda" | Kurchatov town | 1998 | 2 |
| Initiative group "Belukha" | Ramadan village | 2003 | 3 |

**TAN, Atyrau**

Tan works with satellite offices on informal basis as well. All the partners specialize on environmental issues. The initiative group "Zhas kanat" helps Tan to develop voluntarism in the region.

| Name | Location | Date Established | Number of staff |
|---|---|---|---|
| Initiative group | Berezovka village, west-Kazakhstan oblast | 2003 | 19 |
| Initiative group | Ganyushkino village | 2004 | 10 |
| Initiative group of young people "Zhas kanat" | Atyrau city | 2004 | 20 |

**Social corporative Foundation ZUBR, East Kazakhstan oblast**

ZUBR develops networks in the region. One network partner NGOs works since 1998. The other oblast network of social organizers was created in April 2004.

| Name | Location | Time started operating as satellite office | Number of staff |
|---|---|---|---|
| Women supporting center "Nezabudka" | Ridder town | 1998 | 3 |
| Tourist club "Raduga" | Ridder town | 1998 | 2 |
| "Bumerang" | Ridder town | 1998 | 2 |
| Public union "Information cultural center "Leader" | Ridder town | 1998 | 3 |
| Shemonaikha association of raion youth and children organizations | Shemonaikha town | 1998 | 5 |
| Public foundation "Pervomaiskiy charity foundation for uninterrupted education" | Pervomaiskiy village | 1998 | 5 |
| Environmental tourist club TEC | Katon-Karagai village | 1998 | 3 |
| **Social organizers** | | | |
| Social organizer from Public union "Federation of youth and children organizations" | Ridder town | 2004 | Natalie Grigor |
| Social organizer from Public union "Federation of youth and children organizations" | Ridder town | 2004 | Svetlana Ivanova |

*Social Impact, Inc.*

| Social organizer from School named after Astaphiyev | Shemonaikha town | 2004 | Svetlana Zelentsova |
|---|---|---|---|
| Social organizer Shemonaikha association of raion youth and children organizations | Shemonaikha town | 2004 | Julia Leontiyeva |
| Youth union "Together" | Zyryanovsk town | 2004 | Irina Timopheyeva |
| Central city library | Zyryanovsk town | 2004 | Galina Goncharova |
| Village School, vice-director on out-of-school activities | New Bukhtarma village | 2004 | Larisa Polkovnikova |
| Art Center for children | New Bukhtarma village | 2004 | Alena Semenova |
| Public foundation "Pervomaiskiy charity foundation for uninterrupted education" | Pervomaiskiy village | 2004 | Anara Zhakupova |
| Department of ecological information and tourism | Katon-Karagai village | 2004 | Ainagul Nurgaliyeva |
| Women council of Samarskiy rural district | Samarskoye village | 2004 | Valentina Portnova |
| Director of school # 2 | Serebryansk town | 2004 | Margarita Bublikova |

**ASTRA, Astana**

Astra works with satellite offices informally. The local centers help ASTRA in disseminating and collecting information, consulting the clients on different programs and activities. ASTRA in turn assists in developing organizational capacity of the local centers and provides key information.

| Name | Location | Time started operating as satellite office | Number of staff |
|---|---|---|---|
| Public Union "Angel" | Atbasar town | 2001 | 2 |
| Public Union "Zhenskiy luch" | Stepnogorsk town | 2002 | 3 |
| Public Union "Luch Nadezhdy" | Kokshetau city | 2004 | 2 |
| Public Union "Rodnik" | Korgaljino village | 2002 | 4 |

*Social Impact, Inc.*

**Annex 2: Projects Implemented with other NGOs, government agencies and for-profit organizations in Kazakhstan**

| # | Month/ Year | ECOCENTER Karaganda | ASTRA Astana | ZHALGAS Almaty | ZUBR Oskemen | IRIS Semei | SMEDA Aktobe | ANGOKO Kostanai | TAN Atyrau |
|---|---|---|---|---|---|---|---|---|---|
| 1. | June 2003 | 3 Hivos; SPARE; Eurasia Foundation | 2 Eurasia Foundation, World bank | 0 | 1 Paid services for Association of Youth and children organizations | 0 | 2 Ministry of information; Oblast department for business support | 2 World bank; Paid copy services | - |
| 2. | July 2003 | 1 Soros Foundation | 0 | 0 | 2 Soros Foundation; Paid services for Association of Youth and children organizations | 0 | 0 | 1 UNDP | - |
| 3. | August 2003 | 1 Global green grant foundation (USA) | 0 | 0 | 2 Summer school for NGOs paid from charitable contributions; Dutch foundation Cordaid | 0 | 0 | 1 Paid copy services | - |
| 4. | September 2003 | 3 Ministry of information; ISAR; World woman foundation | 0 | 0 | 0 | 0 | 0 | 0 | - |
| 5. | October 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6. | November 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 3 Ministry of information; | 0 |

*Social Impact, Inc.*

| # | Month/ Year | ECOCENTER Karaganda | ASTRA Astana | ZHALGAS Almaty | ZUBR Oskemen | IRIS Semei | SMEDA Aktobe | ANGOKO Kostanai | TAN Atyrau |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Department of inner policy; Paid copy services | |
| 7. | December 2003 | 1 Soros Foundation | 0 | 0 | 0 | 0 | 0 | 1 Ministry of information | 0 |
| 8. | January 2004 | 1 Hivos | 0 | 1 World bank | 0 | 0 | 0 | 0 | 0 |
| 9. | February 2004 | 0 | 1 Soros Foundation | 0 | 0 | 0 | 0 | 1 Paid copy services | 0 |
| 10. | March 2004 | 0 | 0 | 0 | 1 Soros Foundation | 0 | 0 | 1 Paid copy services | 0 |
| 11. | April 2004 | 0 | 1 Eurasia Foundation | 0 | 0 | 2 Soros Foundation; Mushel (Great Britain) | 2 OSCE; Oblast department for business support | 1 Paid copy services | 0 |
| 12. | May 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13. | June 2004 | 2 Department of inner policy; Eurasia foundation | 0 | 1 OSCE | 3 Paid services (for the training); Joint project sponsored by Department of inner policy and Soros foundation; Paid services (financial plan development) | 0 | 3 TACIS; European Union; USAID/ASMED | 0 | 0 |

*Social Impact, Inc.*

| # | Month/ Year | ECOCENTER Karaganda | ASTRA Astana | ZHALGAS Almaty | ZUBR Oskemen | IRIS Semei | SMEDA Aktobe | ANGOKO Kostanai | TAN Atyrau |
|---|---|---|---|---|---|---|---|---|---|
| 14. | July 2004 | 0 | 0 | 0 | 0 | 0 | 1 Oblast department for business support | 0 | 0 |
| 15. | August 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 1 Department of inner policy | 0 |
| 16. | September 2004 | 1 Earth Island institute | 0 | 0 | 0 | 0 | 1 TACIS | 0 | 0 |
| 17. | October 2004 | 0 | 0 | 0 | 1 Soros Foundation | 0 | 0 | 2 Paid services (IT invest); UNDP | 4 Green foundation; Soros Foundation; Agip; Regional education center |
| 18. | November 2004 | 2 Department of inner policy; Soros Foundation | 0 | 0 | 1 Soros Foundation | 0 | 0 | 1 Paid services (IT invest) | 0 |
| 19. | December 2004 | 0 | 1 Soros Foundation | 0 | | 1 AED | 1 Soros Foundation | 5 Soros Foundation; US State department; IT invest; Paid Evaluation services; AED (Internship) | 0 |
| | TOTAL | 15 | 5 | 2 | 11 | 3 | 10 | 20 | 4 |
| | DONORS | Government | International | International | Paid services – | International | Government | Government | Government |

*Social Impact, Inc.*

| # | Month/ Year | ECOCENTER Karaganda | ASTRA Astana | ZHALGAS Almaty | ZUBR Oskemen | IRIS Semei | SMEDA Aktobe | ANGOKO Kostanai | TAN Atyrau |
|---|---|---|---|---|---|---|---|---|---|
| | | agencies - 3 International donors - 12 | donors – 5 | donors – 2 | 4 International donors – 5 Business – 1 Government agencies - 1 | donors – 3 | agencies - 4 International donors - 6 | agencies - 5 Paid services – 10 International donors - 5 | agencies – 1 For-profit organizations – 1 International donors – 2 |

### Annex 3: CSSC's Sources of Income (split by percentage/total) in Kazakhstan

**Please note:** There is a lack of information available for the year 2004. Though the evaluation process has been completed, the reports were not completed as there was no responsible capacity coordinator who could prepare the summary reports.

**IRIS, Semei**

|   | Source of funding | 2001 | 2002 | 2003 Sept | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 0% | 0% | 1% | 0.33% | |
| *II* | *Local fundraising* | 2% | 2% | 1% | 1.60% | |
| *III* | *External Funding* | 93% | 93% | 93% | 93.00% | |
| *IV* | *Other* | 5% | 5% | 5% | 5.00% | |
| | **TOTAL** | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 2% | **2** |

**Association of Non-Governmental Organizations in Kostanai Oblast**

|   | Source of funding | 2001 | 2002 | 2003 Aug | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 0% | 3% | 0% | 1.38% | |
| *II* | *Local fundraising* | 0% | 0% | 0% | 0.00% | |
| *III* | *External Funding* | 100% | 97% | 96% | 97.35% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
| | **TOTAL** | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 1% | **2** |

*Social Impact, Inc.*

**Zhalgas Counterpart, Almaty**

|  | Source of funding | 2001 | 2002 | 2003 Sept | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 63% | 28% | 46% | 45.67% | |
| *II* | *Local fundraising* | 0% | 0% | 0% | 0.00% | |
| *III* | *External Funding* | 37% | 72% | 54% | 54.33% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | **TOTAL** | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 46% | **4** |

**TAN, Atyrau**

|  | Source of funding | 2001 | 2002 | 2003 Sept | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 0% | 0% | 0% | 0.00% | |
| *II* | *Local fundraising* | 0% | 0% | 45% | 15.00% | |
| *III* | *External Funding* | 0% | 0% | 55% | 18.33% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | **TOTAL** | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 15% | **3** |

**Smeda, Aktobe**

|  | Source of funding | 2001 | 2002 | 2003 Sept | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 28% | 7% | 0% | 11.67% | |
| *II* | *Local fundraising* | 0% | 0% | 64% | 21.33% | |
| *III* | *External Funding* | 72% | 93% | 36% | 67.00% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | **TOTAL** | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 33% | **4** |

*Social Impact, Inc.*

**Agency of Social Technologies and Development ASTRA, Astana**

|  | Source of funding | 2001 | 2002 | 2003 Aug | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 0% | 0% | 0% | 0.00% | |
| *II* | *Local fundraising* | 0% | 0% | 0% | 0.00% | |
| *III* | *External Funding* | 100% | 100% | 100% | 100.00% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | TOTAL | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 0% | **1** |

**ZUBR, Ust-Kamenogorsk**

|  | Source of funding | 2001 | 2002 | 2003 Sept | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 2% | 5% | 2% | 3.00% | |
| *II* | *Local fundraising* | 3% | 50% | 18% | 23.67% | |
| *III* | *External Funding* | 95% | 45% | 80% | 73.33% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | TOTAL | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 27% | **2** |

**Ecocenter, Karaganda**

|  | Source of funding | 2001 | 2002 | 2003 July | Average per year | Scoring for Sustainability Ratio |
|---|---|---|---|---|---|---|
| *I* | *Self-financing* | 0% | 0% | 0% | 0.00% | |
| *II* | *Local fundraising* | 0% | 0% | 0% | 0.00% | |
| *III* | *External Funding* | 100% | 100% | 100% | 100.00% | |
| *IV* | *Other* | 0% | 0% | 0% | 0.00% | |
|  | TOTAL | 100% | 100% | 100% | 100% | |
| V | **Sustainability Ratio** *(% Self-financing+ %Local fundraising (I+II))* | | | | 0% | **1** |

*Social Impact, Inc.*

**Annex: 4: CSSC's Sources of Income (split by percentage/total) in Kyrgyzstan**

***Batken CSSC***

| Financial Sources | Baseline 2001-2003 | Performance 2004 | Planned- 2005-2006 |
|---|---|---|---|
| **I. Self financing** | | | |
| Fee-for service | 0.3% | | |
| Membership development | | | |
| Income generation/Social enterprises | | | |
| *Sub-total I* | | | |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |
| Public fundraising | | | |
| Governmental order | | | |
| *Sub-total II* | | | |
| **III. External financing** | | | |
| Long term institutional grants | 99.7% | 100% | 100% |
| Short term institutional grants | | | |
| Others | | | |
| *Sub-Total III* | 99.7% | 100% | 100% |
| **Others** | | | |
| *Subtotal others III* | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | **$167909** | **$130000** |

***Bishkek CSSC***

| Financial Sources | Baseline 2001-2003 | Performance 2004 | Planned- 2005-2006 |
|---|---|---|---|
| **I. Self financing** | | | |
| Fee-for service | | 4% | 0.6% |
| Membership development | | | |
| Income generation/Social enterprises | | | |
| *Sub-total I* | | **4%** | **0.6%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |
| Public fundraising | | | |
| Governmental order | | | |

*Social Impact, Inc.*

| | | | |
|---|---|---|---|
| ***Sub-total II*** | | | |
| **III. External financing** | | | |
| Long term institutional grants | 100% | 96% | 99.94% |
| Short term institutional grants | | | |
| Others | | | |
| ***Sub-Total III*** | **100%** | **96%** | **99.94%** |
| **Others** | | | |
| ***Subtotal others III*** | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | **$161.650** | **$152.500** |

### *Jalal-Abad CSSC*

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
| | **2001-2003** | **2004** | **2005-2006** |
| **I. Self financing** | | | |
| Fee-for service | 0.14% | | 2.6% |
| Membership development | | | |
| Income generation/Social enterprises | | | 21.4% |
| ***Sub-total I*** | **0.14%** | | **24%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |
| Public fundraising | | | |
| Governmental order | | | |
| ***Sub-total II*** | | | |
| **III. External financing** | | | |
| Long term institutional grants | 99.86% | 100% | 76% |
| Short term institutional grants | | | |
| Others | | | |
| ***Sub-Total III*** | **99.86%** | **100%** | **76%** |
| Others | | | |
| ***Subtotal others III*** | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | $55603 | $21320 |

### **Kant CSSC**

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
| | **2001-2003** | **2004** | **2005-2006** |

*Social Impact, Inc.*

| **I. Self financing** | | | |
|---|---|---|---|
| Fee-for service | | 3% | 2.6% |
| Membership development | | | |
| Income generation/Social enterprises | | 2.59% | 21.4% |
| ***Sub-total I*** | | **5.59%** | **24%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |
| Public fundraising | | | |
| Governmental order | 4.8% | | |
| ***Sub-total II*** | **4.8%** | | |
| **III. External financing** | | | |
| Long term institutional grants | 99.86% | 90% | 76% |
| Short term institutional grants | | | |
| Others | | | |
| ***Sub-Total III*** | **83.67%** | **90%** | **76%** |
| ***Others*** | 1.83 | | |
| ***Subtotal others III*** | **1.83** | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | $62524 | |

### *Kara-Balta CSSC*

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
| | **2001-2003** | **2004** | **2005-2006** |
| **I. Self financing** | | | |
| Fee-for service | 0.45% | | 3.43% |
| Membership development | | | 0.3% |
| Income generation/Social enterprises | | | 1.56% |
| ***Sub-total I*** | | | **5.31%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | 0.3% |
| Public fundraising | | | 1.56% |
| Governmental order | | | |
| ***Sub-total II*** | | | **1.87%** |
| **III. External financing** | | | |
| Long term institutional grants | 99.55% | 100% | 92.82% |
| Short term institutional grants | | | |
| Others | | | |
| ***Sub-Total III*** | **99.55%** | **100%** | **92.82%** |

*Social Impact, Inc.*

| **Others** | | | |
|---|---|---|---|
| ***Subtotal others III*** | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | $34400 | $3200 |


### *Karakol CSSC*

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
| | **2001-2003** | **2004** | **2005-2006** |
| **I. Self financing** | | | |
| Fee-for service | 0.87% | | 3.12% |
| Membership development | | | 0.31% |
| Income generation/Social enterprises | 1% | | |
| ***Sub-total I*** | **1.87%** | | **3.43%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | 9.20 | 24.95% | 31.25% |
| Public fundraising | | | 0.31% |
| Governmental order | | | 0.31% |
| ***Sub-total II*** | **9.20%** | **24.95%** | **31.87%** |
| **III. External financing** | | | |
| Long term institutional grants | 88.93% | 100% | 62.5% |
| Short term institutional grants | | | |
| Others | | | |
| ***Sub-Total III*** | **88.93%** | **75.05%** | **62.5%** |
| **Others** | | | |
| ***Subtotal others III*** | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | **$40065** | **$32350** |


### *Kerben CSSC*

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
| | **2001-2003** | **2004** | **2005-2006** |
| **I. Self financing** | | | |
| Fee-for service | 12.25% | | |
| Membership development | | | |
| Income generation/Social enterprises | | | |
| ***Sub-total I*** | **12.25%** | | |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |

*Social Impact, Inc.*

| | | | |
|---|---|---|---|
| Public fundraising | | | |
| Governmental order | | | |
| *Sub-total II* | | | |
| **III. External financing** | | | |
| Long term institutional grants | 87.44% | **100%** | |
| Short term institutional grants | | | |
| Others | | | |
| *Sub-Total III* | **87.44%** | **100%** | |
| **Others** | | | |
| *Subtotal others III* | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | $59094 | $15500 |

### *Naryn CSSC*

| Financial Sources | Baseline 2001-2003 | Performance 2004 | Planned- 2005-2006 |
|---|---|---|---|
| **I. Self financing** | | | |
| Fee-for service | 0.44% | 3.35% | 2.25% |
| Membership development | | 0.30% | 0.21 |
| Income generation/Social enterprises | | 0.15% | 12.88 |
| *Sub-total I* | **0.44%** | **3.5%** | **15.34%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | 1.39% |
| Public fundraising | | | |
| Governmental order | 0.76% | 1.97% | |
| *Sub-total II* | **0.76%** | **1.97%** | **1.39%** |
| **III. External financing** | | | |
| Long term institutional grants | 87.44% | **94.53%** | **83.24%** |
| Short term institutional grants | | | |
| Others | | | |
| *Sub-Total III* | **87.44%** | **100%** | **83.24%** |
| **Others** | | | |
| *Subtotal others III* | | | |
| Total | **100%** | **100%** | **100%** |
| Annual budget | | **$16388** | **$23274** |

### *Nookat CSSC*

| Financial Sources | Baseline | Performance | Planned- |
|---|---|---|---|

*Social Impact, Inc.*

|  | **2001-2003** | **2004** | **2005-2006** |
|---|---|---|---|
| **I. Self financing** |  |  |  |
| Fee-for service |  | 7.22% | 4.5% |
| Membership development | 2% | 2% | 0.81% |
| Income generation/Social enterprises | 12.74% |  | 20.48% |
| *Sub-total I* | **14.74%** | **9.22%** | **25.79%** |
| **II. Local fundraising:** |  |  |  |
| Corporate philanthropy |  |  |  |
| Public fundraising |  |  | 2.04% |
| Governmental order | 15.36% |  |  |
| *Sub-total II* | **15.36%** |  | **2.04%** |
| **III. External financing** |  |  |  |
| Long term institutional grants | 68.75% | **90.77%** | **72.17%** |
| Short term institutional grants |  |  |  |
| Others |  |  |  |
| *Sub-Total III* | **68.75%** | **90.77%** | **72.17%** |
| **Others** |  |  |  |
| *Subtotal others III* |  |  |  |
| Total | **100%** | **100%** | **100%** |
| Annual budget |  | **$36178** | **$24404** |

*Osh CSSC*

| **Financial Sources** | **Baseline** | **Performance** | **Planned-** |
|---|---|---|---|
|  | **2001-2003** | **2004** | **2005-2006** |
| **I. Self financing** |  |  |  |
| Fee-for service |  | 4% | 9.59% |
| Membership development |  |  |  |
| Income generation/Social enterprises |  |  |  |
| *Sub-total I* |  | **4%** | **9.59%** |
| **II. Local fundraising:** |  |  |  |
| Corporate philanthropy |  |  |  |
| Public fundraising |  |  |  |
| Governmental order |  |  |  |
| *Sub-total II* |  |  |  |
| **III. External financing** |  |  |  |
| Long term institutional grants | 100% | 96% | 90.40% |
| Short term institutional grants |  |  |  |
| Others |  |  |  |

*Social Impact, Inc.*

| | | | |
|---|---|---|---|
| *Sub-Total III* | 100% | 96% | 90.40% |
| **Others** | | | |
| *Subtotal others III* | | | |
| Total | 100% | 100% | 100% |
| Annual budget | | $65850 | $16640 |

### *Talas CSSC*

| Financial Sources | Baseline | Performance | Planned- |
|---|---|---|---|
| | 2001-2003 | 2004 | 2005-2006 |
| **I. Self financing** | | | |
| Fee-for service | 0.08% | 5% | 5% |
| Membership development | | 7% | 7% |
| Income generation/Social enterprises | | | 11.76% |
| *Sub-total I* | **0.08%** | **12%** | **23.76%** |
| **II. Local fundraising:** | | | |
| Corporate philanthropy | | | |
| Public fundraising | | 1% | |
| Governmental order | | 3% | |
| *Sub-total II* | | **4%** | |
| **III. External financing** | | | |
| Long term institutional grants | 99.33% | 60% | |
| Short term institutional grants | | 24% | |
| Others | | | |
| *Sub-Total III* | **99.33%** | 84% | 76.24% |
| **Others** | | | |
| *Subtotal others III* | | | |
| Total | **100%** | 100% | 100% |
| Annual budget | | $19650 | $26400 |

### *CSSC Association*

| Financial Sources | Baseline | Performance | Planned- |
|---|---|---|---|
| | 2001-2003 | 2004 | 2005-2006 |
| **I. Self financing** | n/a | | |
| Fee-for service | n/a | 0.25% | 0,4% |
| Membership development | n/a | | 0,07% |
| Income generation/Social enterprises | n/a | | |
| *Sub-total I* | n/a | **0.25%** | **0.47%** |
| **II. Local fundraising:** | n/a | | |

*Social Impact, Inc.*

| | | | |
|---|---|---|---|
| Corporate philanthropy | **n/a** | | |
| Public fundraising | **n/a** | | 1.17% |
| Governmental order | **n/a** | | 1,1% |
| *Sub-total II* | **n/a** | | **2.27%** |
| **III. External financing** | **n/a** | | |
| Long term institutional grants | **n/a** | | 97.26% |
| Short term institutional grants | **n/a** | | |
| Others | **n/a** | | |
| *Sub-Total III* | **n/a** | | **97.26%** |
| **Others** | **n/a** | | |
| *Subtotal others III* | **n/a** | | |
| Total | **n/a** | 100% | 100% |
| Annual budget | | **$211535** | **$737905** |

*Social Impact, Inc.*

## Annex 5: Kyrgyzstan Sources of Income of CSSC and Association

**Batken CSSC**

*Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1 | SDC | RDR | $91979 | 01.06.04.-01.05.04 |
| 2 | Mercycorps | PCI | $12 000 | 01.11.04.-30.04.05. |
| 3 | Hivos | KUP | $50000 | 01.01.04.-31.12.05. |
| 7 | Soros | CSSC | $6050 | November2004-  April 2005 г. |
| 8 | USAID | CSSC | $7015 | 01.01.05-30.12.05 |
| 11 | USAID | "Healthy communities" | $ 865 | 01.11.04-30.04.05 |
| | **Annual budget** | | **$167909** | |

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1 | GTZ | Development of Community Foundations | $50000 | 2004-2005 |
| 2 | OSCE | Delimitation and demarcation of frontier of Kyrgyzstan | $42000 | 2004-2005 |
| 3 | GTZ | Training on conflictology for communities | $20000 | 2005-2006 |
| 7 | OSCE | Women and election | $18000 | 2005-2006 |
| | **Annual budget** | | **$130000** | |

**Bishkek CSSC**

*Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1 | ICCO | Support of NGOs in Kyrgyz Republic and institutional development of the NGO "Interbilim" | $70000 | 01.06.04.-01.05.04 |
| 2 | Counterpart International | Health communities | $850 | 01.11.04.-30.04.05. |

CSSI Mid-Term Evaluation Report

*Social Impact, Inc.*

| 3 | DCA (Denmark) | Fair and transparent elections | € 31.000 ($40800) | 01.01.04.-31.12.05. |
|---|---|---|---|---|
| 7 | Allavida | Trust, Interrelation, Collaboration, ( Volunteer development program) | $ 50.000 | November2004- April 2005 г. |
| | **Annual budget** | | **$161.650** | |

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1 | ▪ Fee-for -services | Fee-for service training for<br>▪ Helvetas<br>▪ TACIS<br>▪ CAMP | $200<br>$600<br>$200 | February - Хельветас March August – TACIS February – March - CAMP |
| 2 | Helvetas | Participatory community appraisal | $1500 | 2005г.-2006 |
| 3 | European Union | Support of NGOs in Kyrgyz Republic and institutional development of the NGO "Interbilim" | $150000 | 2005г-2006 |
| | **Annual budget** | | $152500 | |

## Jalal-Abad CSSC

*Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID | CSSI program | $11369,00 | 1/01/04-31/12/04 |
| 2. | World Bank | Village investment project | $9920,00 | 1/01/04-31/12/04 |
| 3. | Winrock Int. | We are against traffic | $12783,00 | 1/05/04-30/10/04 |
| 4. | Washington University | Internet center | $4800,00 | 24/05/04-31/10/04 |
| 5. | New Zealand Embassy | Internet center | $9986,00 | 1/09/04-1/09/05 |
| 6. | Democracy commission of US Embassy | Internet center | $4500,00 | 1/09/04-1/09/05 |
| 7. | New Zealand Embassy | Internet center | $2245,00 | 1/09/04-1/09/05 |

*Social Impact, Inc.*

| | | | | |
|---|---|---|---|---|
| 8. | **Annual budget** | | $55603 | |

## Planned for 2005-2006

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | Fee-for service for CSSC clients | Fee-for service training | $650 | 2005-2006 |
| 2. | World bank | Village investment project | $2932 | 2005-2006 |
| 3. | Winrock Int. | Trafficking | $10000 | 2005-2006 |
| 4. | Fee- for service of Internet center ( IP tel/ADSL) | Fee-for service | $4098 | 2005 |
| 5. | ICNL | Legal services for NGOs | $2400 | 2005 |
| 6. | NGOs, CBOs | Fee-for services of equipment and rent | $1240 | 2005 |
| 7. | **Annual budget** | | $21320 | |

## Kant CSSC

### Actual for 2004

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | UNHCR | Support to refugees and NGOs | $32122 | 2004 |
| 2. | USAID | CSSI program | $8110 | 2004 |
| 3. | ABA | Legal services for NGO | $3432.97 | 2004 |
| 4. | World Bank | Village investment project | $9538.03 | 2004 |
| 5. | Asian Bank of Development | Participation of local communities | $6977 | 2004 |
| 6. | Fee for service | Training | $2345 | 2004 |
| 7. | **Annual budget** | | $62524 | |

## Kara-Balta CSSC

### Actual for 2004

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|

*Social Impact, Inc.*

| 1 | Counterpart/ UNHCR | Services for refugees | $11000,04 | 2003-2004 |
|---|---|---|---|---|
| 2 | Counterpart | Institutional grant | $ 7 730,00 | 2003-2004 |
| 3 | TASIC | Institutional grant | $7020,00 | 2004-2005 |
| 4 | Soros Foundation | Dialog and partnership | $ 5 187,00 | 2004-2005 |
| 5 | Eurasia Foundation | Legal services for NGOs | $ 3 463,00 | 2004 |
|   | **Annual budget** |  | $34400 |  |

## *Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID | CSSI | $5500 | 2005-2006 |
| 2. | UNHCR | Support to refugees | $5000 | 2005-2006 |
| 3. | Soros Foundation | Partnership in local communities | $10000 | 2005-2006 |
| 4. | Eurasia | Legal services for NGO | $3200 | 2005-2006 |
| 5. | Asian Bank of development/European Union/New Zealand embassy, MCF | Support to rural entrepreneurship | $3000 | 2005-2006 |
| 6. | MOM | Migrants support project | $3000 | 2005-2006 |
| 7. | Membership fees |  | $100 | 2005-2006 |
| 8. | Sponsorship |  | $100 | 2005-2006 |
| 9. | Corporate philanthropy |  | $500 | 2005-2006 |
| 10. | Fee –for -service | Training, | $1000 | 2005-2006 |
| 11. | Representation for donors | Representation | $100 | 2005-2006 |
| 12. | Social enterprise | Real estate business | $500 | 2005-2006 |
| 13. | **Annual budget** |  | $32000 |  |

## **Karakol CSSC**

## *Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1 | Soros Foundation | Support to NGOs | $4000 | 2004-2005 |
| 2 | USAID | CSSI program | $9682 | 2004 |
| 3 | World Bank | Village investment project | $10355 | 2004 |

*Social Impact, Inc.*

| 4 | Democracy commission of US Embassy | Democracy school | $6028 | 2004 |
|---|---|---|---|---|
| 5 | Corporate philanthropy | Kumtor operating company | $10000 | 2004 |
| | **Annual budget** | | $40065 | |

## Planned for 2005-2006

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID | CSSI | $10000 | 2005 |
| 2. | Soros Foundation | Partnership in local communities | $10000 | 2005-2006 |
| 3. | Membership fees | Membership development | $100 | 2005 |
| 4. | Sponsorship | Local corporates | $150 | 2005 |
| 5. | Corporate philanthropy | Kumtor operating company | $10000 | 2005 |
| 6. | Fee –for -service | Training, | $500 | 2005 |
| 7. | Representation for donors | Representation | $500 | 2005 |
| 8. | Social enterprise | Guesthouse | $1000 | 2005 |
| 9. | Government | Training | $100 | 2005 |
| 10. | **Annual budget** | | $32350 | |

## Kerben CSSC

## Actual for 2004

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID | CSSI | $7920 | 2004 |
| 2. | USAID | Healthy communities | $860 | 2004 |
| 3. | TASIC | Participation in local level | $17841 | 2004 |
| 4. | Soros Foundation | Partnership in local communities | $6000 | 2004 |
| 5. | ISNL | Legal services for NGO | $2836,25 | 2004 |
| 6. | World Bank of development | Village investment project | $4883,41 | 2004 |
| 7. | World Bank of development | Village investment project | $9907,77 | 2004 |
| 8. | Eurasia Foundation | Information of population on migration | $8847 | 2004 |
| 9. | **Annual budget** | | $59094 | |

*Social Impact, Inc.*

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | Counterpart | Social Enterprise | $3000 | 2005 |
| 2. | World Bank | Training on VIP ( Village investment Project) | $2500 | 2005 |
| 3. | WINROCK Int. | Traffic prevention | $10000 | 2005 |
| 4. | **Annual budget** | | $15500 | |

## Naryn CSSC

*Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID/Counterpart | CSSI | $ 8140 | 2004 |
| 2. | USAID/Counterpart | Healthy communities | $1890 | 2004 |
| 3. | Soros Foundation | Partnership in local communities | $ 3500 | 2004 |
| 4. | ISNL | Legal services for NGO | $ 1800 | 2004 |
| 5. | USAID | Election | $110 | 2004 |
| 6. | Membership development | | $50 | 2004 |
| 7. | Fee for services, | | $549 | 2004 |
| 8. | Sponsorship | Development of sponsorship | $324 | 2004 |
| 9. | Rent of training room | | $25 | 2004 |
| 10. | **Annual budget** | | $16388 | |

**Planned**

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID/Counterpart | CSSI | $6375 | 2005 |
| 2. | USAID/Counterpart | Healthy communities | $2000 | 2005 |
| 3. | Social enterprise | DVD studio | $3 000 | 2005 |
| 4. | Media Center | Democracy commission | $ 11 000 | 2005 |
| 5. | Membership development | | $50 | 2005 |
| 6. | Fee for services, | | $500 | 2005 |

*Social Impact, Inc.*

| 7. | Sponsorship | Development of sponsorship | $324 | 2005 |
|---|---|---|---|---|
| 8. | Rent of training room | | $25 | 2005 |
| 9. | **Annual budget** | | $23274 | |

## Nookat CSSC

*Actual for 2004*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | UNHCR | Support to refugees and NGOs | $2500 | 2004 |
| 2. | USAID | CSSI project | $8575 | 01/04/01-31/12/03 |
| 3. | TASIC | Rural entrepreneurship | Euro 6330 | 2004 |
| 4. | USAID | Healthy communities | $860 | c 1/07/03- 31/12/03 |
| 5. | World Bank | Village investment project | $8406 | 1/01/04-31/12/04 |
| 6. | Winrock Int. | We are against traffic | $4500 | 1/05/04-30/10/04 |
| 7. | Fee-for -services | Training, survey | $3337 | 2004 |
| 8. | **Annual budget** | | $36178 | |

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | USAID | CSSI project | $9604 | 01/04/01-31/12/03 |
| 2. | TASIC | Rural entrepreneurship | $8000 | 2005 |
| 3. | Social enterprise | Agriculture | $1500 | 2005 |
| 4. | Social enterprise | Cattle breeding | $1500 | 2005 |
| 5. | Social enterprise | Shop | $2000 | 2005 |
| 6. | Membership development | Membership fee | $200 | 2005 |
| 7. | Fee for service | Training, equipment | $1100 | 2005 |
| 8. | Sponsorship | Sponsorship development | $500 | |
| 9. | **Annual budget** | | $24404 | |

## Osh CSSC

*Actual for 2004*

*Social Impact, Inc.*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | Soros Foundation | NGO support program | $6000 | 2004 |
| 2. | USIAD /Counterpart International | Health communities | $850 | 2004 |
| 3. | USIAD /Counterpart International | CSSI program | $9000 | 2004 |
| 4. | Allavida | Trust, Interrelation, Collaboration, ( Volunteer development program) | $ 50.000 | November2004-  April 2005 г. |
| 5. | **Annual budget** | | $65850 | |

*Planned for 2005-2006*

| № | Organizations ( sources of financing) | Project Title | Grant sum | Project Duration |
|---|---|---|---|---|
| 1. | ▪ Fee-for - services | Fee-for  service  training for | $1000 | 2005 |
| 2. | USIAD /Counterpart International | Health communities | $850 | 2004 |
| 3. | USIAD /Counterpart International | CSSI program | $7790 | 2004 |
| 4. | Helvetas | Participatory community appraisal | $500 | 2005г. |
| 5. | Representation | Donors In KG | $500 | 2005г |
| 6. | Counterpart International | Election program | $5000 | 2005 |
| 7. | **Annual budget** | | $16640 | |

**Talas CSSC**

*Actual for 2004*

| № | Organizations ( sources of financing) | Project title | Grant sum | Grant duration |
|---|---|---|---|---|
| 1. | Soros | NGO support program | $5900 | 2004 |

*Social Impact, Inc.*

| № | | Project title | Grant sum | Grant duration |
|---|---|---|---|---|
| | Foundation | | | |
| 2. | USIAD /Counterpart International | Health communities | $850 | 2004 |
| 3. | USIAD /Counterpart International | CSSI program | $5900 | 2004 |
| 4. | Democracy commission | Civic education center | $7000 | 2004 |
| 5. | **Annual budget** | | $19650 | |

**Planned for 2005-2006**

| № | Name of organizations provided financial support and contact information | Project title | Grant sum | Grant duration |
|---|---|---|---|---|
| 1. | Eurasia Foundation | NGO support program | $14000 | 2005-06 |
| 2. | USIAD /Counterpart International | Health communities | $850 | 2005-06 |
| 3. | USIAD /Counterpart International | Social enterprise | $3000 | 2005-06 |
| 4. | Democracy commission | Civic education center | $4000 | 2005-06 |
| 5. | Democracy commission | Stimuli grants | $4500 | 2005-06 |
| 6. | Membership development | Membership fee | $50 | |
| 7. | **Annual budget** | | $26400 | |

## CSSC Association

**Actual for 2004**

| № | Name of organizations provided financial support and contact information | Project title | Grant sum | Grant duration |
|---|---|---|---|---|
| 1. | Eurasia Foundation | Legal Advisors Support Project. | $ 34 800 | Sep 2004 – Sep 2005 |
| | Counterpart International | Institutional Grant | $ 98332 | 2004 |
| 2. | Foundation Soros- | Trainings for | $ 77 867 | Dec 2004 – |

*Social Impact, Inc.*

| | Kyrgyzstan | authorized representatives of candidates to the Deputy of Jogorku Kenesh regarding election procedures. | | March 2005 |
|---|---|---|---|---|
| 3. | Fee-for service | Training, consultation | $536 | 2004 |
| | **Annual budget** | | $211535 | |

**Planned for 2005**

| № | Name of organizations provided financial support and contact information | Project title | Grant sum | Grant duration |
|---|---|---|---|---|
| | Counterpart International | Institutional Grant | $428278 | 2005 |
| | Counterpart International | Election grant | $9000 | 2005 |
| | Counterpart International | Election grant | $150000 | 2005 |
| | Eurasia Foundation | Legal Advisors Support Project. | $ 24 800 | Sep 2004 – Sep 2005 |
| | Foundation Soros-Kyrgyzstan | Trainings for authorized representatives of candidates to the Deputy of Jogorku Kenesh regarding election procedures. | $ 77 827 | Dec 2004 – March 2005 |
| | Democracy commission | Civil society survey | $5000 | 2005 |
| | Mama Cash, New Zealand , Canada Embassies | Organizational Development | $15000 | 2005 |
| | UNDP, DFID, TASIC | PRS | $3000 | 2005 |
| | Counterpart, Soros Foundation | Conception of collaboration of Governmental and civil society | $5000 | |
| | Membership development | | $500 | 2005 |
| | Counterpart Sheriktesh | Sponsorship | $8000 | 2005 |
| | Private contribution | Sponsorship | $500 | 2005 |
| | Fee-for service | Training, consultation | $3000 | 2005 |
| | Governmental order ( Agency on development and investment) | | $8000 | 2005 |
| | **Annual budget** | | **$737905** | |

*Social Impact, Inc.*

**Annex 6: Kyrgyzstan Organizations with Branch Offices**

**I. International Center "Interbilim" Bishkek: Director Asia Sasykbaeva**
1. Kunduz Jenalieva Manager of CSSC
2. Aizada Jakupbekova Health program coordinator

***Osh branch office of Interbilim:***
1. Gulgaky Mamasalieva
2. Ilias Imetov-health program coordinator
3. Gulnur Moldobaeva-legal adviser
4. Jumabai -administrator
5. Chinara Irisova-Soros program coordinator

**II. Nookat CSSC:**
1. Abduvali Khudaiberdiev Director
2. Abdilboki Tolipov, Manager of CSSC
3. Ismatulla Gaparov, Coordinator
4. Maksidova Elmira Refugee Coordinator
5. Safarflieva Gulkhan Accountant

***Aravan branch office of Nookat CSSC***

1. Ramil Nafikov, coordinator of Aravan branch office
2. Maftuna, Assistant of Aravan branch office

*Social Impact, Inc.*

### Annex 7:  CSSC's Sources of Income (split by percentage/total) in Kyrgyzstan

| Country | Type | Organization Name (Location) - Mission | 2004 | |
|---|---|---|---|---|
| | | | 6/30/2004 | 12/31/2004 |
| | | | | |
| **KG** | **CSSC** | **Association of CSSCs for the Kyrgyz Republic (Bishkek) -** Promotion of development of dynamic, effective and sustainable civil society in the Kyrgyz Republic | | |
| | | International Grants / Fundraising: | 99.90% | 94.05% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.09% | 5.93% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 0.00% |
| | | Membership Fees / Dues: | 0.01% | 0.02% |
| | | Total: | 100.00% | 100.00% |
| **KG** | **CSSC** | **Karakol-** Development of civic leadership and capacity of NGOs, CBOs, and initiative groups for building civil society. | | |
| | | International Grants / Fundraising: | 45.3% | 45.0% |
| | | Domestic Grants / Fundraising: | 0.0% | 0.0% |
| | | Social Enterprise / Fee for Service: | 4.5% | 35.5% |
| | | Corporate Social Responsibility: | 45.3% | 18.8% |
| | | State Social Contracting: | 0.5% | 0.0% |
| | | Membership Fees / Dues: | 4.5% | 0.7% |
| | | Total: | 100.0% | 100.0% |
| **KG** | **CSSC** | **Jalalabad -** To assist building civil society through development and support of NGOs, CBOs, communities and refugees in Jalal-Abad and Osh oblast by providing training, consultations, and informational services. | | |

*Social Impact, Inc.*

| | | | | |
|---|---|---|---|---|
| | | International Grants / Fundraising: | 0.00% | 95.69% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.00% | 2.27% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 2.04% |
| | | Membership Fees / Dues: | 0.00% | 0.00% |
| | | Total: | 0.00% | 100.00% |
| **KG** | **CSSC** | **Kant-** Building civil society in Chui valley that would be enable to participate in decision-making process through social mobilization, development of capacity of local communities and NGOs, associations, initiative group, CBOs, farmer unions. | | |
| | | International Grants / Fundraising: | 0.00% | 84.42% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.00% | 15.58% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 0.00% |
| | | Membership Fees / Dues: | 0.00% | 0.00% |
| | | Total: | 0.00% | 100.00% |
| **KG** | **CSSC** | **Talas-** Strengthening capacity of NGO, CBOs and local communities of Talas oblast | | |
| | | International Grants / Fundraising: | 0.00% | 91.22% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.00% | 5.41% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 0.00% |
| | | Membership Fees / Dues: | 0.00% | 3.37% |
| | | Total: | 0.00% | 100.00% |
| **KG** | **CSSC** | **Naryn -** Creation of conditions for NGOs to develop democracy and building civil society through providing services to local NGOs/CBOs and supporting their initiatives. | | |

*Social Impact, Inc.*

| | | | | |
|---|---|---|---|---|
| | | International Grants / Fundraising: | 0.00% | 94.32% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.00% | 3.51% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 0.00% |
| | | Membership Fees / Dues: | 0.00% | 2.17% |
| | | Total: | 0.00% | 100.00% |
| **KG** | **CSSC** | **Karabalta** - To increase public activity of society in Panfilov, Moscow, Jayil rayons in solving of social problems and increasing in decision-making process via services. | | |
| | | International Grants / Fundraising: | 0.00% | 94.38% |
| | | Domestic Grants / Fundraising: | 0.00% | 0.00% |
| | | Social Enterprise / Fee for Service: | 0.00% | 5.62% |
| | | Corporate Social Responsibility: | 0.00% | 0.00% |
| | | State Social Contracting: | 0.00% | 0.00% |
| | | Membership Fees / Dues: | 0.00% | 0.00% |
| | | Total: | 0.00% | 100.00% |
| **KG** | **CSSC** | **Batken-** Increasing capacity of NGOs, CBOs, initiative groups, refugees of Batken oblast through providing information, consultation, technical assistance, strengthening participation of local communities in decision making process in social and economical environment. | | |
| | | International Grants / Fundraising: | 0.0% | 0.0% |
| | | Domestic Grants / Fundraising: | 0.0% | 0.0% |
| | | Social Enterprise / Fee for Service: | 0.0% | 0.0% |
| | | Corporate Social Responsibility: | 0.0% | 0.0% |
| | | State Social Contracting: | 0.0% | 0.0% |
| | | Membership Fees / Dues: | 0.0% | 0.0% |
| | | Total: | 0.0% | 0.0% |
| **KG** | **CSSC** | **Nookat** - To support civic initiatives of NGOs, communities and initiative groups through involving them to educational programs, planning and implementation of | | |

*Social Impact, Inc.*

community projects on the base of social partnership.

| | | |
|---|---|---|
| International Grants / Fundraising: | 0.00% | 83.48% |
| Domestic Grants / Fundraising: | 0.00% | 0.00% |
| Social Enterprise / Fee for Service: | 0.00% | 11.48% |
| Corporate Social Responsibility: | 0.00% | 0.00% |
| State Social Contracting: | 0.00% | 3.38% |
| Membership Fees / Dues / Private donations: | 0.00% | 1.66% |
| Total: | 0.00% | 100.00% |

## Annex 8: Summary of Grants in Kyrgyzstan



**Ассоциация   ЦПГО**

## Summary of Grants

### Election Program
The Program is financed by United States Agency for International development (USAID) through Counterpart Kyrgyzstan and implemented by Association of Civil Society Support Centers.
2004- 2005.
**Goal of the program:** To promote open, non-partisan election-related initiatives on behalf of civil society organizations for increasing transparency and ensuring fair and open elections.

### Local election program grants

**The objectives of Election Grants are to fund election related activities in order to:**
- Involve NGOs, including those in regions, in the election process of non-partisan basis
- Foster civic participation at the pre-election and election stage especially among youth, women, and special interest groups
- Increase public awareness of the election process and voting procedures

**Types of local election program grants**
- Civic Education Grants (up to $10,000)
- Media Grants (up to $10,000)
- First Voters and Women Voters Grants (up to $5,000)
- Local Election Grants (up to $1,000)
- Partnership Grants ( up to $25,000)

**The first Round of the local election program** grants was devoted to pre-election activity of NGOs and Mass media: informational and educational activities, including voter education, promoting legal culture, regarding upcoming local elections. ACSSC received 152 Letters of Interest from NGOs and mass media. 48 Letters of Interest were selected by EGC to fill project application.
**Projects approved:**
- 18 projects
- Amount funded $71,194.38

**The Second Round of the local election program** was devoted to informational and educational activity of Public Associations for conducting observation of voting process, counting of votes, identifying results of voting and identification of election results to the local Kenesh (Councils) and independent mass media activity for providing, objective, complete and

accurate information for population. ACSSC received 93 Letters of Interest from NGOs and mass media. 25 Letters of Interest were selected by EGC to fill project application.

**Projects approved:**
- 10 projects
- Amount funded $31,197.46

During local election grant program the approved amount of two rounds made $ 102, 391.84

**Parliamentary Election Program**

**Grant types**:
- Civic Education Grants (up to $10,000)
- Media Grants (up to $10,000)
- First Voters and Women Voters Grants (up to $5,000)
- Local Election Grants (up to $1,000)
- Partnership Grants ( up to $25,000)

**The first Round of the parliamentary election grant program of ACSSC** was devoted to pre-election activity of NGOs and Mass media: informational and educational activities, including voter education, promoting legal culture, regarding parliamentary elections. ACSSC received 229 Letters of Interest from NGOs and mass media. 66 Letters of Interest were selected by EGC to fill project application. 19 project-proposals were approved by Election Grant Committee on December 21, 2004.

**Projects of the first round approved:**
- 19 projects
- Amount approved : $ 65, 600.5
- Amount funded after revisions of budgets: **$62, 161.1**

The Second Round of the given program was devoted to informational and educational activity of Public Associations for conducting observation of voting process, counting of votes, identifying results of voting and identification of election results to Parliament and independent mass media activity for providing, objective, complete and accurate information for population. ACSSC received 91 Letters of Interest from NGOs and mass media. 24 Letters of Interest were selected by EGC to fill project application. 11 project-proposals were approved by Election Grant Committee on January 14, 2005.

**Projects of the second round approved:**
- **11** projects
- Amount approved:  **$47, 880.**
- **Contracts were signed for 42, 810.**

During two contests of parliamentary election program 30 project-proposals were approved by Election Grant Committee for the sum of US $ 113, 480.5. Contracts were signed for the sum of 104, 971.1.

**During local and parliamentary elections in total the approved amount of grants made 212, 362.94. One grantee refused from grant in $ 5, 000 for conducting monitoring of Election Day.**

**Institutional Grants**

10 Civil Society Support Centers' activity was funded on the basis of Cooperative agreement between Counterpart Kyrgyzstan and USAID. Contracts were signed for $ 78, 165 in frame of program "Civil Society Support Initiative in Central Asia".

The objective of the CSSC activity is provision of services to Kyrgyzstan NGOs and other Civil Society Institutions in a non-biased, non-partisan open transparent and fair manner.

The purpose of Grant program for the CSSCs is that they become a catalyst for democratic and economic reform to ensure the growth and sustainability of civil society throughout Central Asia. CSSCs will evolve into the primary vehicle for delivering quality and demand-driven civil society support services to Civil Society organizations (CSOs) and the communities they serve in urban and rural communities throughout the region.  In order to provide real support for Civil Society in their regions and to catalyze and promote grass-roots advocacy and civic initiatives, CSSCs need to be organizationally strong, financially viable and independent, with the ability to effectively engage citizens and governments in constructive dialogue on issues that affect people's lives.

**Sector Grants**

*Association of Civil Society Support Centers implementing program "Civil Society Support Initiative in Central Asia" within financial support of Counterpart International in the Kyrgyz Republic and USAID announced contest of the institutional grant program for registered NGOs that* concentrate their activity one of the two following sectors:

1. **Labor/Migration Organizations:**  Organizations that work toward addressing social and legal issues of particular importance to economic and other migrants.

2. **Advocacy Organizations:**   Organizations that focus their activities on national level advocacy, engaging the government and the community to address social issues.  Organizations, that advocate for changes in legislation and policy or advocate for the rights and interests of a particular issue-based constituency or professional group.  Organizations may be involved in national campaigns or be focused on specific regional issues but in either case organizations must demonstrate that their mission is focused specifically on supporting the rights and interests of a specific client group or addressing a specific issue.

The goal of the Civil Society Support Initiative is to support civil society development and community initiatives by providing a broad range of resources and training to NGOs active in Kyrgyzstan. The program supports a network of Civil Society Support Centers (CSSCs) with a range of other grant and training resources. The grant is not project-based but is designed to strengthen the organizational capacity and existing program activities of organizations with an established constituency in the given sector and a record of successful mission-based activities.

**Community Action Grants**

*Social Impact, Inc.*

The goal of the community action grant program (CAG) is to support local non-governmental organizations (NGOs), community-based organizations (CBOs) and local initiative groups (IGs) in their efforts to unite communities and stakeholders for advocating community interests and rights. Communities shall take part in the development of community action plans and assessment of the community needs.

ACSSC has been administering 23 CAG project for the approved amount of $ 38, 350.18.
Fifteen of twenty three projects were completed.

ACSSC announced the start of the community action grants program to support local non-governmental organizations, community organizations and local initiative groups in their efforts to unite communities, stakeholders and organizations for promoting and advocating community interests and rights.
The CAG program is aimed at strengthening of communities' role in protection of rights and interest with simultaneous support of social partnership with state and business structures. Planning of community actions, needs assessment should be carried with participation of population or members of the community.

The following project types shall be accepted for consideration:

- Campaigns addressing the problems of a considerable number of community members that are aimed at changing the public policy on the local or national level, and also campaigns strengthening accountability and transparency of the local state authorities and bodies of self-governance.
- Broad educational and informational campaigns aimed at raising the public awareness of social, gender, ecological, youth, legal and other problems for the purpose of building the skills and experience of citizens to affect public policies.
- Other activities promoting growth of civil activity and mobilization of community members to exercise and advocate their rights.

Maximum of grant is not more than USD 3,000 for Community Action Grants, duration is 1 year.

**Annex 9:  Law on Public Associations-Turkmenistan**
(Taken from http://www.icnl.org/PRESS/Articles/2003/20031114.htm)

## SHORT COMMENTARY ON THE NEW

## LAW ON PUBLIC ASSOCIATIONS OF THE REPUBLIC OF TURKMENISTAN

### November 14, 2003

*The International Center for Non-for-profit Law (ICNL) is an international organization providing research, education, and technical assistance to develop and improve legislation concerning the non-commercial sector.  It has worked in more than 80 countries around the world. This experience underlies the present commentary to the <u>law of the Republic of Turkmenistan "On Public Associations" adopted on October 21, 2003</u> (hereinafter the "new law"), which has replaced the old Law on Public Associations (hereinafter referred to as "old law").*

This new law represents a step backward in the legal framework for civil society of Turkmenistan.  In our comments we summarize the negative provisions in this law and their practical effect on civil society.

**Summary of the Main Points**

**(1) No registration procedure**

Under the old law and implementing regulations there was a clear registration procedure, although this procedure was not implemented.  Because of this procedure the Ministry of Justice (MoJ) officials had a hard time justifying to the public its non-registration of public associations. The new law regulates some issues of registration, but does not establish a registration procedure.  Further, although the new law refers to the Civil Code in Article 17, provisions of the Civil Code in regard to registration apply only to the legal forms of public organization and foundation defined therein. "Public associations" as defined in the new law, do not fall in either of these groups (see section #11 of this commentary for a detailed explanation). Without a clarification of the registration procedure there should be no expectation that the registration process will improve under the new law.  The lack of a registration procedure may also provide the MoJ with a "legitimate excuse" to not register public associations.

*Note:  The MoJ is now officially known as the Ministry of Adalat, meaning 'fairness and justice.'*

**(2) Broad reasons for denial of registration**

Article 18 provides for a long list of reasons why the registration of a public association can be denied, leaving it to a MoJ official in charge of registration to decide whether to register an association or not.  For example, the registration may be denied if "the name of the association

offends … the feelings of citizens" or "if one of the founders has been in jail for a serious crime."

### (3) Re-registration in case of changes in by-laws

Article 17 requires organizations to complete the registration procedure each time a fact in the statutory document changes. For a national organization required to have 500 members, this could be a never ending process should any member leave the association. Fees will be assessed for each "registration."

### (4) Obligatory re-registration of all currently existing public associations

According to Article 33 all currently existing associations may have to re-register under the new law, because they should amend their by-laws to bring them into compliance with this law. This puts not only new groups, but established groups in jeopardy of being denied registration.

### (5) Non-registered informal associations are now prohibited

Article 17 specifically prohibits activities of non-registered public associations. This is a change from the previous law and prior practice that allowed non-registered organizations to legally operate. In a country where very few public associations have been registered in the last two years, the ability to legally operate was critical for these informal associations. Such a prohibition directly violates the rights of citizens to freely associate, and contradicts international law and practice.

### (6) Problems with establishment of associations

The new law maintains the territorial divisions of all associations based on the geographic scope of their activities, as follows: international, national and local. According to Article 13 the territory of activity shall be defined in the by-laws of an association. The complexity of the registration procedure depends on the status, the higher the status, the more complex the procedure:

(1)    Local associations are permitted to engage in activities only within a certain geographic area. This can effectively prevent such associations from participation in events outside the borders of a village, town, or administrative region (oblast).

(2)    The new law directly discriminates against international and national public associations by requiring such associations to have five-hundred (500) and fifty (50) members respectively. In comparison, local public associations can be founded by just five (5) individuals.

(3)    It is impossible to establish an international association under the current law, because in order to establish an international association a group needs to demonstrate that it has an office or an affiliate overseas, which, of course, can not be opened unless the association is registered.

*Social Impact, Inc.*

---

**(7) Discrimination against non-citizens**

According to Article 5 only citizens of Turkmenistan are permitted to be founders and members of public associations (with the exception of international associations, which will be problematic to register, see sections #6 and #8).

**(8) Problems for foreign NGOs operating in Turkmenistan**

The new law is the only Turkmen law which addresses activities of foreign NGOs in Turkmenistan. The new law will only increase the previously existing hardships for them. Every foreign NGO, irrelevant the form of incorporation, will have to prove to the Turkmen authorities that they are a "public association" and eligible to register and operate in Turkmenistan. The law does not establish registration procedure for public associations therefore foreign NGOs will continue to have problems with getting registered (see section #1). If a foreign NGO does manage to get registered it will face more problems as the new law is applicable to foreign NGOs without addressing their specifics. For example, under Article 22, all public associations, including foreign, shall notify in advance the government authorities about all events conducted by an organization and allow for the presence of government officials. As the definition of "an event" is not provided, any gathering of two or more members or officials could be considered events. If an association fails to meet the requirement, it can be liquidated by the decision of the MoJ according to Article 28.

Furthermore, Article 21 allows Turkmenistan organizations to cooperate with international organizations and sign contracts only with the participation of the Ministry of Foreign Affairs (MFA) as a third party. As "cooperation" and "communication" are not defined by the law, any communication without engaging the MFA may result in liquidation of a public association.

**(9) Limited rights of public associations**

Article 21 of the law provides an explicit list of rights of public associations. Public associations are prohibited in exercising any rights, unless they are stated in this article or other law.

**(10) Registration of projects and programs of foreign assistance with the Ministry of Adalat**

The law contemplates registration of foreign projects and programs in Article 22. And, on October 22, 2003 the Minister of Adalat (Justice) indicated in an interview on the Altyn Asyr network (state-owned) that the new law would require public associations to register grants and foreign assistance with the State Agency on Foreign Investment, failure to result in confiscation of funds and punishment for the individuals involved. Using Article 22, the state could impose a severely restrictive grants approval system.

*Note: A subsequent decree, the text of which is not yet available, purportedly vests a grant registration function within the MoJ.*

**(11) Contradiction with the civil code**

*Social Impact, Inc.*

There are two forms of NGOs recognized in the civil code, public organizations and foundations. The new law confuses the issue by ignoring the civil code and continuing to use the outdated term "public association", which existed in the old Law on Public Associations. The new law further confuses the issue by including the non-associational form of "foundation" as a public association. The creation of a foundation is based on property, not membership. In addition, the new law creates several barely distinguishable forms of membership or 'participant' based public associations, assuring confusion among officials and citizens.

*Social Impact, Inc.*

## Annex 10: Work Cycle of Facilitators/Consultants



**HUB OFFICE**
Providing leadership, rules and
regulations, and procedures.
Consultations.
Monitoring and feed back.

**CSSC**
Facilitators identification.
Training.
Consulting.
On the job training.
Monitoring.
Feed Back.

**FACILITATORS-CONSULTANTS**
Working with communities using
Counterpart's methodologies
Training for communities.
PCA, CAP facilitation in communities.
Consultation on preparing the project

Development of criteria

Selection of facilitators-consultants

Learning of demands, conditions of communities and Counterpart's requirements

Presenting training modules and concept's materials. Conduct first TOT through the whole cycle «Local Project Management» 1, 2, and 3 parts.

Trainers, Facilitators, community leaders, Farmer Activists, Local Mobalizers

Conduct TOT « Local Project Management». Part 1.

The target communities are identified

Presentation of the format of the memorandum

Conducting interview, signing memorandum of collaboration (letter of interest from the facilitator)

Conduct TOT « Local Project Management». Part 2.

Presentation of Facilitator's Guidelines (supporting projects of local communities, CAG)

Producing the consultants/facilitators work plan

Presentation of the format of the contract
Organizing and administration of Grant Committee
Conduct mini-training on the Grant's financial procedures and procurement issues for CAG grants recipients
Preparation and signing of grant agreement
Signing of contracts with facilitators/consultants
Conduct TOT « Local Project Management». Part 3 and the Session on Procurement issues to approved projects
Project Recommendations at Grant Committee
Payment to
consultant
-
facilitator
Participation in the signing of the grant agreement
Monitoring and evaluation of communities' projects. Work with community' projects' financial and program reports
Working with communities – conducting PCA, writing report on PCA, developing CAP.
Developing of project, preparing documents, calculations for the procurement. Technical expertise of the project (if needed)
Project re-working according to the Grant Committee recommendations
Registering the Project
Implementation of the project (Communities can include in the project's budget the payment of services for the facilitator for consulting on the implementation of the projects)



*Social Impact, Inc.*

## Annex 11: Client Satisfaction Survey, Results Summary

**BACKGROUND INFORMATION**

**1. Country*:***
Of the 518 respondents, 33% were from Kazakhstan, 52.7% from Kyrgyzstan, and 14.3% from Turkmenistan. Looking at the number of CSSC in each country, it is a similar number with 34.8% of the CSSCs in Kazakhstan, 47.8% in Kyrgyzstan, and 17.4% in Turkmenistan.

**2. City*:***
The average number of respondents per center is 21 for Kazakhstan, 25 for Kyrgyzstan, and 19 for Turkmenistan. The number of responses varied per center with the highest number (28) coming from the Batken CSSC to the lowest (15) coming from the Turkmenbashi Center.

**3. Gender:**
Of the total respondents, 60% were women and 38% men (2% did not answer the question). In Kazakhstan the percent of female respondents (74%) far outweighed the number of male respondents (25%). In Kyrgyzstan the mix was more balanced, with 45% male respondents and 53% female respondents. In Turkmenistan the number was closer to the average for the region, with 39% male respondents versus 58% female respondents.

**4. Age:**
In total there was nearly even distribution of respondents across three major age categories: 18-35 (35%), 36-50 (41%) and 51+ (21%). Only 1 respondent was under 18 (from Turkmenistan) and 18 respondents didn't indicate their age. The breakdown by country among the three main age ranges is as follows:

| Age Range | Kazakhstan | Kyrgyzstan | Turkmenistan |
|-----------|-----------|-----------|--------------|
| 18-35 | 39% | 31% | 42% |
| 36-50 | 38% | 43% | 39% |
| 51+ | 20% | 22% | 15% |

**5. Please indicate your affiliation:**
Not surprisingly, the majority of respondents were from the NGO sector. Across the region 65% of respondents were from NGOs, 13% from CBOs, 11% from CIGs, 3% from local governments, and 9% from some other organization. The regional number is skewed slightly by the categorization in Turkmenistan, 27% were from NGOs, 12% from CBOs, 26% from CIGs, 11% from local government and a surprisingly high 23% indicated their affiliation as "other".

**6. How often have you used the products and services of the CSSC?**
The respondents seem to represent the core client base of the CSSCs, with 84% of respondents using services at least every one to two months and only 6% of respondents were first time users. Within the country breakdowns nearly all the respondents fell in the top two categories ("weekly" and "every 1-2 months") – 82% for Kazakhstan, 83% for Kyrgyzstan, and 94% for Turkmenistan.

**7. For how long have you been using the products and services of the CSSC?**

*Social Impact, Inc.*

Again, the respondents seem to represent the core client base of the CSSCs, with 48% of the respondents using services of the CSSCs for more than 3 years and only 11% using them for less than 6 months. To complete the profile, 16% have been clients for 2 to 3 years; 13% have been clients for 1 to 2 years; and 9% have been clients for 6 months to a year. The breakdown by country among the five main categories is as follows:

| Range | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| 3 years + | 37% | 55% | 47% |
| 2-3 years | 22% | 13% | 16% |
| 1-2 years | 16% | 10% | 19% |
| 6 months – 1 year | 9% | 9% | 10% |
| Under 6 months | 14% | 11% | 7% |

**SATISFACTION WITH CSSC SERVICES**

**8. What is your overall satisfaction with CSSC's products and services?**

Clearly CSSC clients are satisfied with the products and services provided by the Centers. 95% of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 40% were "completely satisfied", 37% "very satisfied", and 18% "satisfied". Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 35% | 45% | 30% |
| Very Satisfied | 40% | 33% | 47% |
| Satisfied | 19% | 18% | 14% |

**9. How satisfied are you with the CSSC Resource Center services?**

Again, CSSC clients are satisfied with the Resource Centers. 85% of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 29% were "completely satisfied", 36% "very satisfied", and 21% "satisfied". Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 25% | 31% | 32% |
| Very Satisfied | 39% | 32% | 41% |
| Satisfied | 23% | 20% | 16% |

**10. How satisfied are you with the CSSC's specialized Program Consultations?**

Clearly CSSC clients are satisfied with the consultation services provided by the Centers. 91% of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 39% were "completely satisfied", 35% "very satisfied", and 17% "satisfied". Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 42% | 38% | 39% |
| Very Satisfied | 29% | 37% | 39% |

*Social Impact, Inc.*

| | | | |
|---|---|---|---|
| Satisfied | 19% | 17% | 10% |

**11. How satisfied are you with the overall quality of the CSSC's legal assistance and legal consultation?**
Of all the services represented in this survey, legal services were the least accessed.  Across the region 19% of respondents do not use the legal services provided by the Centers (25% in Kazakhstan, 16% in Kyrgyzstan, and 14% in Turkmenistan).  Looking at the remaining 80% who have used legal services, 72% ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 25% were "completely satisfied", 28% "very satisfied", and 18% "satisfied".

**12.  How satisfied are you with the overall quality of the Participatory Community Appraisal facilitated by the CSSC?**
13% of respondents indicated they have never accessed the PCA services of the Centers.  More interesting is that in Kazakhstan 21% of the respondents indicated they have never accessed the PCA services.  However, of the remaining 87% regionally who utilized PCA services from the Center, 82% ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 32% were "completely satisfied", 30% "very satisfied", and 20% "satisfied".  In Kazakhstan the ranking is similar.

**13.  How satisfied are you with the overall quality of the Community Action Planning facilitated by the CSSC?**
As expected, the rankings for CAPs are similar to PCA in that 16% regionally (25% in Kazakhstan) indicated they have never accessed the CAP services of the Centers.  Of the remaining 84% regionally who utilized CAP services from the Center, 77% ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 24% were "completely satisfied", 32% "very satisfied", and 22% "satisfied".

**14.  How satisfied are you with the CSSC training workshops?**
Of all the services represented in this survey, training workshops were the most accessed (meaning only .8% of total respondents indicated they had never used the service).  95% of respondents ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 49% were "completely satisfied", 34% "very satisfied", and 12% "satisfied".  Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 46% | 52% | 49% |
| Very Satisfied | 34% | 34% | 32% |
| Satisfied | 16% | 11% | 10% |

**15. How satisfied are you with the quality of instruction in the training workshops?**
CSSC clients are satisfied with the quality of instruction provided by the Centers in their training workshops.  95% of respondents ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 45% were "completely satisfied", 36% "very satisfied", and 14% "satisfied".  Looking at these top three categories, the country breakdown is as follows:

*Social Impact, Inc.*

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 47% | 44% | 42% |
| Very Satisfied | 30% | 40% | 39% |
| Satisfied | 17% | 13% | 10% |

**16. How relevant are the training workshops to your needs?**

As to be expected given the high rankings in questions #14 and #15, respondents found training workshops to be relevant to their needs. 90% of respondents ranked their satisfaction as "satisfied" or better (the top three categories). Of that, 39% were "completely satisfied", 33% "very satisfied", and 18% "satisfied". Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|---|---|---|---|
| Completely Satisfied | 33% | 45% | 31% |
| Very Satisfied | 33% | 30% | 41% |
| Satisfied | 21% | 17% | 15% |

**17. How likely are you to attend future CSSC training workshops?**

Given the high level of satisfaction with CSSC trainings, it is not surprising that 98% of respondents indicated that they would be likely to attend future workshops. 68% said they "will attend", 21% said they were "very likely to attend" and 9% said they were "likely to attend". Further, no one in Kyrgyzstan or Turkmenistan said they would not attend with only 2 respondents from Kazakhstan saying they would not attend.

**18. Which training workshops did you find most effective?**

When asked about the three most effective training workshops of the 44 topics presented, "Project Design" was clearly ranked the highest, with 27% of respondents indicating it was the most effective. "NGO and Community" came in second, with 12% of respondents across the region. There was no clear third place training topic, as the other ratings were dispersed across the remaining 42 topics at much lower values. At the country level the top three effective training topics are indicated in the following chart:

| Country | Topic 1 | Topic 2 | Topic 3 |
|---|---|---|---|
| Kazakhstan | Project Design (21%) | NGO and Community (11%) | Fundraising (9%) |
| Kyrgyzstan | Project Design (31%) | NGO and Community (10%) | Participatory Advocacy (7%) |
| Turkmenistan | Project Design (23%) | NGO and Community (22%) | Training Techniques and Methodologies (14%) |

**19. Which training workshops did you find least effective?**

When asked about the three least effective training workshops of the 44 topics presented, 48% of respondents did not indicate a first choice, 52% did not indicate a second choice, and 55% did not indicate a third choice. When asked why they omitted this question, respondents wrote in that they find all the trainings effective and that the question is not relevant as the quality of

*Social Impact, Inc.*

CSSC trainings is high.  Of those respondents who did answer the question, the least effective trainings by country are indicated in the following chart:

| Country | Topic 1 | Topic 2 | Topic 3 |
|---------|---------|---------|---------|
| Kazakhstan | NGO Newsletter Development and Success Story Writing (3.5%) | Association Development Micro-business Basics Volunteer Management Presentation Skills Web Page Development (2.9%) | |
| Kyrgyzstan | NGO Newsletter Development (5.5%) | Web Page Development (4.8%) | Public Hearings (4.4%) |
| Turkmenistan | Coalition Development (9.5%) | Success Stories Writing (6.8%) | Association Development and Organizing Press Conferences 5.4% |

**CSSC STAFF**

**20.  Please rate the professionalism of the CSSC staff:**
As to be expected given the high rankings of service delivery in the previous section, 34% of respondents indicated the level of professionalism was "excellent", 47% ranked staff professionalism as "very good", and 13% rated it "good".  Only 1 respondent, from Turkmenistan, ranked the level of professionalism as "poor".

**21.  How satisfied are you with the staff's responsiveness to your organization's or community's questions/issues/needs:**
As with professionalism above, respondents found staff to be quite responsive to their needs. 93% of respondents ranked their satisfaction as "satisfied" or better (the top three categories).  Of that, 41% were "completely satisfied", 37% "very satisfied", and 15% "satisfied".  Looking at these top three categories, the country breakdown is as follows:

| Satisfaction Level | Kazakhstan | Kyrgyzstan | Turkmenistan |
|--------------------|------------|------------|--------------|
| Completely Satisfied | 42% | 41% | 34% |
| Very Satisfied | 39% | 34% | 43% |
| Satisfied | 13% | 18% | 11% |

**COMMENTS**
Open questions #22 and #23 were not processed (as discussed with IT and Michael) as it was too difficult to classify all open questions from 518 questionnaires for entry into SPSS.

**22. Please use the space below to provide us with some any other comments you may have about service delivery.  We welcome any suggestions for improvement that you may have.**

*Social Impact, Inc.*

23. Please make your suggestions, what other services you need from CSSC but currently not

provided by CSSC:

*Social Impact, Inc.*

# Annex 12: Evaluation Work Plan

**Counterpart International
Mid-Term Evaluation**

**CSSI**

**Kazakhstan, Kyrgyzstan and Turkmenistan**

**Evaluation Work Plan**

**Submitted by:**

**Christopher Carver, Program Manager**

**Social Impact, Inc.**

**Submitted To:**

**Counterpart International**

**Altinay Kuchukeeva**

**Program Officer, Civil Society**

*Social Impact, Inc.*

## 1. PROJECT OVERVIEW

The Civil Society Support Initiative (CSSI) focuses on the goal of creating and developing individual associations of Civil Society Support Centers (CSSC) in Kazakhstan, Kyrgyzstan and Turkmenistan. Mobilizing civic organizations and citizens to form constituencies for reform will promote a more democratic culture and aligns with USAID/CAR's Strategic Objective 2.1—"Strengthened Democratic Culture among Citizens and Targeted Institutions" as outlined in USAID's Assistance Strategy for Central Asia, 2001-2005.

This current initiative will focus on the establishment and localization of networks of independent, intermediary support organizations, which will serve as primary vehicles for the delivery of civil society services.   Counterpart International country offices will evolve into national coordination and management bodies for the association while the association assumes more responsibility and control of activities progressively over the life of the project.  A number of methods and inputs will build the capacity of individuals, organizations and the association to be organizationally and financially sustainable.  Important elements include: strong and effective governance of the association, a broad spectrum of quality services provided by the members of the association for local civil society groups and community groups.

### Purpose

The purpose of the evaluation is to improve the performance of CSSI in meeting stated project goals during its final phase.  As such, the evaluation will measure the progress made toward the goal of creating and developing an association of Civil Society Support Centers in Kazakhstan, Kyrgyzstan and Turkmenistan.  The mid-term evaluation will cover all Project Objectives as delineated in the Annual Workplan Narrative (1 July 2004 to 30 June 2005) for Kazakhstan, Kyrgyzstan and Turkmenistan, but will focus on assessing the Network's capacity to independently contract with USAID.  To asses this capacity, the evaluation will examine a breadth of issues, ranging from financial sustainability to governance structures and relationships among the Network members.

Based on the progress made as of the project's Mid-Term Evaluation, the evaluation report will make key recommendations to improve, strengthen and ensure the networks' sustainability by the end of the project. Key users of the Mid-Term Evaluation will be those who support the design and implementation of the CSSI in Kazakhstan, Kyrgyzstan and Turkmenistan—the CSSI Chief of Party, Country Directors and Hub Offices, executive bodies of the Network Associations, Counterpart's Senior Vice President, CSSI Program Officer, and the USAID CTO as well as implementing partners and consultants.

### Specific Operational Goals of the Evaluation

Through joint discussion with the Counterpart International staff in Washington, DC, the CSSI Chief of Party and Country Directors, the following specific list of goals where identified and agreed upon to be the main references and outcomes of this assessment:

1. To assess the level of capacity of the network associations to contract with USAID (based on USAID criteria).
2. To assess what, if any, capacity building assistance is needed to get network associations ready for USAID contracting.
3. To determine the specific criteria for readiness in contracting with USAID and other donors.
4. To assess the ability of the network to contract with other donors.
5. To determine the extent to which there is a common programmatic vision among network members.

*Social Impact, Inc.*

6. To asses the extent to which individual CSSCs are "buying in" to the network (e.g. *not* competing between themselves).
7. To assess the extent to which the initiative is evolving a governance structure and executive structure that is supportive and congruent with the planned future direction of the association.

The aforementioned goals will receive an in-depth treatment from the evaluation team. In addition, the evaluation will respond evaluation questions (see Annex 1) that will receive a lighter depth of treatment.

## 2. PROJECT WORKPLAN

Nine major tasks will be carried out the CSSI Mid-Term Evaluation. These tasks are discussed below and detailed in the list:

### Task 1: Review of Key Counterpart CSSI Documents

During week 1 and 2 (February 4-February 18, 2005), the Evaluation Team will review key Counterpart CSSI documents. This review will be a critical nexus for determining what activities must be included in the Evaluation Work Plan and what topics and concerns should be addressed within the client satisfaction survey questionnaire and other key informant and/or focus groups protocols. All material and documents will be requested from the various Counterpart offices and gathered by the evaluation team.

### Task 2: Prepare Detailed Evaluation Work Plan

By the end of week 4 February 25, 2005 the Evaluation Team will prepare a detailed Evaluation Work Plan for carrying out an evaluation of the CSSI program in Kazakhstan, Kyrgyzstan, and Turkmenistan. The plan will be delivered for review and modifications. A copy of the plan should also be sent to country offices in Kazakhstan, Kyrgyzstan and Turkmenistan for feedback and for guiding the fieldwork. The work plan constitutes a road map for the three intensive weeks of field work and beyond.

### Task 3: Develop Data Collection Instruments

**Client Satisfaction Survey**
During weeks 2-6 (February 7 through March 11, 2005) Social Impact, Inc. will provide technical assistance to Counterpart International to develop a Client Satisfaction survey to be administered to clients of CSSCs in Kazakhstan, Kyrgyzstan and Turkmenistan. The client satisfaction survey will be translated into local languages and field tested. The field testing should occur in a minimum of two CSSCs per country and to a minimum of 3-5 clients per CSSC. Following the field testing, the survey will be amended as needed and then translated back into English to ensure the survey remains true to the original questions. The survey will then be administered by Counterpart to a statistical sound sampling of CSSC clients.[27]

**Interview Protocols**
Work will commence on the development of the Key Informant Interview Guide (for CSSC staff members and CSSC users) by end of Week 5 (February 28-March 4, 2005) and while awaiting comments on the Work Plan by Counterpart and/or USAID. Once draft instruments are developed, they will be shared with Counterpart staff for review and comment. Changes will be incorporated into the draft instruments. During the Evaluation Team's "Strategy and Team Planning Meeting" in Almaty, Kazakhstan on March 14, 2005, the interview protocols will be further fine tuned. The interview protocols and questionnaires will involve the following five principles:

---

[27] The sample size has not been determined at this time.

*First*, the interview guides content should reflect the central variables of the study as determined in concert with the Counterpart and with Counterpart staff;

*Second,* the interview guides items should only deal with information that is necessary—each item should be justified as part of an integrated analytic plan;

*Third,* the interview guides items should be as clear and simple as possible—the items should be carefully screened for overly complicated sentences and for unnecessary jargon;

*Fourth,* the respondent burden should be carefully considered—close-ended items should be used to the extent possible in order to lessen the response burden and to facilitate analysis though respondents should be free to add additional information or detail whenever possible;

*Fifth,* the interview guides should be reviewed by the entire Evaluation Tem during the "Strategy and Team Planning Meeting" as well as different staff persons possessing varying amounts of knowledge about the program in order to gain different perspectives on the questions; and

**Appreciative Inquiry (AI) Evaluation Workshop Guide**
During week 4-5 (February 28, 2005-March 11, 2005) will commence on the development of the Appreciative Inquiry Interview Guide (to better guide the AI facilitators' data streams). Once draft guides are developed, they will be shared with Counterpart staff for review and comment. Changes will be incorporated into the draft instruments. During the Evaluation Team's "Strategy and Team Planning Meeting" in Almaty, Kazakhstan on March 14, 2005, the AI guides will be further fine tuned.

### Tasks 4: Strategy and Team Planning Meeting

On March 14, 2005 Social Impact will facilitate a Strategy and Team Planning Meeting with the entire Evaluation Team (2 people from Social Impact; 2 people from Counterpart HQ; 1 M&E Local Expert from Kazakhstan, 1 from Kyrgyzstan and 1 from Turkmenistan; and 1 regional M&E expert). The goal of the meeting is to provide a common understanding of evaluation goals, priorities and the workplan as well as to discuss data collection protocols, individual roles and responsibilities and to fine tune the evaluation methodology.

### Task 5:  Informal M&E Training and AI Introductory Training

On March 15, 2005, Social Impact and Counterpart will conduct an informal mini M&E training workshop and a mini introductory workshop for AI Evaluation Workshops. Also, after the arrival of the US Evaluation Team to Almaty, and once the survey instruments have been finalized, basic techniques for conducting the interviews will be developed.  In conducting the survey, the main implementation issues are those of consistency (administering the survey in the same way each time), completion of all survey items, and striving for a reliable response rate during from each participant cohort population. Informal training will also be provided on how to conduct Focus Groups.  Well-managed Focus Groups are an excellent source of qualitative data that will serve to enhance and amplify the quantitative data collected by the survey instrument.

### Task 6: Collect Field Data

**AI Evaluation Workshops**
During Weeks 6, 7, 8 (March 16-March 29, 2005), the AI Facilitator and AI Co-Facilitator will conduct  a 1.5 day AI Evaluation Workshop (one in Almaty, one in Bishkek and one in Ashgabat).  The participants

for the workshop will include one senior-level CSSC manager per CSSC and per country. As previously discussed, the evaluation will cover and evaluate progress toward the achievement of all the Project Objectives from the Annual Workplan of 1 July 2004 to 30 June 2005 (see Annex 1) but will focus on assessing the Network's capacity to independently contract with USAID. Taking an asset-based approach, the AI evaluation workshop will take participants through a 4-step model to answer key evaluation questions.

**Key Informant Interviews**

The Evaluation Team will collect data using qualitative data collection techniques to assess the key evaluation questions. These data will be generated from key informant interviews and perhaps focus groups where appropriate. The potential list of targeted groups and key individuals includes:

- Counterpart Country Staff;
- USAID CTO and USAID Contracting Officer (to determine specific measurable criteria for subcontracting and gather USAID perspective);
- Selected CSSC's staff (site visits);
- CSSC staff (follow-up after AI Evaluation Workshop)
- Selected CSSC customers
- Michael Kunz, Chief of Party;
- Yazgylych Charyev, Country Director Turkmenistan;
- Marat Aitmagambetov, Country Director Kazakhstan; and
- Erkin Kasyvekov, Country Director Kyrgyzstan

The Counterpart field offices will coordinate the various procedures to facilitate the process of data collections. One staff members per country will be identified to assist in coordinating meetings dates, locations and other logistical aspects.

### *Task 7: Debriefing, Team Discussion and the drafting of informal Aide-Mémoires*

Following the AI Evaluation Workshops and the visits to CSSCs, (and before leaving each country) Social Impact and Counterpart team members will convene to review standards and benchmarks which were assessed through the project objectives and key evaluation questions, to synthesize findings (within and across countries and programs where appropriate) and to jointly arrive at key conclusions and recommendations for program improvement. Social Impact will complete an informal Aide-Mémoire (five pages or less) for each country to be delivered to the Counterpart Country Director.

### *Task 8: Collect Completed Client Satisfaction Surveys and Synthesize Results*

Counterpart will collect completed Client Satisfaction Survey and Synthesize Results by April 8, 2005. The results will be included in Social Impact Final Evaluation Report.

### *Task 9: Preparation of the Evaluation Report*

During the first and second week of April, a draft evaluation report will be completed and consist of a short 15-20 page report documenting program strengths, areas for improvements and actionable recommendations for improving network capacity. The evaluation will synthesize the findings and recommendations with separate sections for Kazakhstan, Kyrgyzstan and Turkmenistan.

### **3. WORKPLAN SCHEDULE**

*Social Impact, Inc.*

| Evaluation Activities | Date(s) |
|---|---|
| • Document review; develop interview questions for Counterpart/Washington, DC staff | February 4-February 18, 2005 |
| • Prepare detailed Evaluation Work Plan | February 25, 2005 |
| • Develop Data Collection instruments (Client Satisfaction Survey, Interview Protocols and AI Evaluation Workshop Guide) | February 7-March 11, 2005 |
| • Arrive in Almaty, Kazakhstan | March 13, 2005 |
| • Strategy and Team Planning Meeting (Chris, Christopher, Anika, Altinay and 4 local M&E evaluators).<br>• Finalize design of data collection instruments | March 14, 2005 |
| • Informal M&E Training and AI Introductory course for evaluation team.<br>• Prepare for evaluation work in Kazakhstan | March 15, 2005 |
| • Conduct AI Evaluation Workshop (1.5 days)<br>• Conduct addition follow-up interviews as needed<br>• Conduct interviews of Counterpart Staff | March 16-17, 2005 |
| • Conduct interviews at selected CSSCs (site visits)<br>• Conduct interviews of selected CSSC customers<br>• Interview USAID CTO and USAID Contracting Officer<br>• Interview Michael Kunz, Chief of Party<br>• Interview Marat Aitmagambetov, Country Director Kazakhstan | March 16-17, 2005 |
| • Entire evaluation convenes in Almaty for day-long debriefing.<br>• Social Impact produces Aide-Mémoire for Country Director | March 18, 2005 |
| • Depart for Bishkek<br>• Entire Evaluation Team prepares for evaluation activities | March 19, 2005 |
| • Planning as needed and Holiday | March 20-21, 2005 |
| • Planning and preparation for evaluation activities as needed | March 22, 2005 |
| • Conduct AI Evaluation Workshop (1.5 days)<br>• Conduct addition follow-up interviews as needed<br>• Conduct interviews of Counterpart Staff | March 23-24, 2005 |
| • Conduct interviews at selected CSSCs (site visits)<br>• Conduct interviews of selected CSSC | March 23-24, 2005 |

CSSI Mid-Term Evaluation Report

*Social Impact, Inc.*

| Evaluation Activities | Date(s) |
|---|---|
| customers<br>• Interview Erkin Kasybekov Director Kyrgyzstan | |
| • Travel to Ashgabat | March 25, 2005 |
| • Entire evaluation convenes in Ashgabat for day-long debriefing on evaluation work in Kyrgyzstan.<br>• Social Impact produces Aide-Mémoire for Country Director. | March 26, 2005 |
| • Planning and preparation for evaluation activities as needed | March 27, 2005 |
| • Conduct AI Evaluation Workshop (1.5 days)<br>• Conduct addition follow-up interviews as needed<br>• Conduct interviews of Counterpart Staff | March 28-29, 2005 |
| • Conduct interviews at selected CSSCs (site visits)<br>• Conduct interviews of selected CSSC customers<br>• Interview Yazgylych Charyev, Country Director Turkmenistan | March 28-29, 2005 |
| • Entire evaluation convenes in Ashgabat for day-long debriefing.<br>• Social Impact produces Aide-Mémoire for Country Director.<br>• Christopher Szecsey departs for USA | March 30, 2005 |
| • Entire evaluation convenes in Ashgabat for day-long 3-country debriefing. | March 31, 2005 |
| • Evaluation Team Departs | April 1, 2005 |
| • Counterpart finishes collected and synthesizing Client Satisfaction Survey results and send the information over to Social Impact to be included in the final evaluation report | April 8, 2005 |
| • Social Impact submits final report to Counterpart HQ | April 17, 2005 |

**Annex 1:**
Project Objectives from Annual Workplan Narrative (1 July 2004 to 30 June 2005)
And
Key Evaluation Questions[28]

## Turkmenistan:

*Objective 1:* To provide a full range of quality and demand driven services to local civil society organizations.

*Objective 2:* Engage in development activities identified and initiated by local communities in Turkmenistan.

*Objective3:* Support and strengthen the capacity development of NGOs, community-based organizations and community activists in initiating and promoting community initiatives which engage the government in a dialogue.

## Kyrgyzstan and Kazakhstan:

*Objective 1:* To further strengthen and formalize the countrywide Civil Society Support Center Networks to provide a full range of quality and demand-driven services to local Civil Society Organizations and have the ability to contract directly with USAID and other international donors.

*Objective 2:* To enhance the accountability, transparency, professionalism and public image of Civil Society Organizations through community action grants, community development initiatives, improved service delivery, and advocating for the rights and interests of their clients and constituents.

*Objective 3:* Strengthen the organizational and sustainability of leading (sector) Civil Society organizations, CSSCs network members and local NGOs through tailored institutional and capacity development assistance with an emphasis on self-financing and income generating activities.

*Objective 4:* To develop an enabling environment for civil society by improving the legal framework and providing regular legal advice and services to support civil society organizations.

*Objective 5:* To improve cooperation between various Civil Society Organizations by establishing new and strengthening existing regional and sub-regional inter-organizational linkages.

*Objective 6:* To increase the accountability and transparency of local governments and self-governing bodies through issue-based advocacy, social partnership and providing targeted capacity development support to local government officials.

## Key Evaluation Questions
(Listed by level of treatment in the evaluation)

In-depth treatment:
1. What is the level of capacity of the NGOs to contract with USAID (based on USAID criteria)?
2. What capacity building assistance is needed to get targeted NGOs ready for USAID contracting?

---

[28] Key Evaluation Questions are assigned an evaluation treatment level ranging from "In-depth" to "Medium" to "Light" to underscore focus of the evaluation.

*Social Impact, Inc.*

3. What are the criteria for readiness in contracting?
4. What is the ability of the network to contract with other donors?
5. To what extent is there a common programmatic vision among network members?
6. To what extent are the individual NGOs "buying in" to the network (e.g. *not* competing between themselves)?
7. To what extent is the initiative evolving a governance structure and executive structure that is supportive and congruent with the planned future direction of the association?
8. What is the quality of service delivery and how is it defined?

Medium treatment:

9. Are there clear boundaries between Networks (PMUs in particular) and Counterpart in terms of the governance structure, financial structure and separation of staff?
10. What is the PMU's capacity in training (design, delivery) and grant management?
11. What are the core competencies of each CSSC?
12. How successful has Counterpart been in promoting the creation of rural community networks?

Light treatment:

13. What progress has been made by the Urban Institute's work (Kyrgyzstan)?
14. Do CSSC have any satellite offices in remote areas?
15. What is the CSSC's annual budget and sources of income (split by percentages/totals)?
16. What status does each CSSC have with local government? Any joint projects?
17. What projects are being implemented with other NGOs, government agencies and for-profit organizations?
18. What projects are being implemented in partnership with other NGOs, government agencies, or for-profit organizations?

*Social Impact, Inc.*

### Annex 13: Pre-certification Framework

The framework below outlines Counterpart International's general approach to ensuring the CSSC Network Associations in Kazakhstan and Kyrgyzstan have the necessary systems, policies, procedures and overall capacity to manage projects directly with USAID.

After reviewing numerous resources materials published by USAID and other offices of the U.S. Government[29], Counterpart selected to organize the materials needed in accordance with the functional areas of organizational effectiveness. This structure allows us to build on the organizational development work we have been doing in these two countries. Further, it allows us to present the items need to ensure compliance with USAID pre-certification standards in a format that is consistent with how we have framed organizational management from the beginning. This reinforces the message that we are first building strong organizations; compliance with USAID policies and procedures is one of the things we'll be able to demonstrate in the process, rather than a separate exercise removed from our capacity building process.

The Capacity Development Teams in each country will be responsible for the outputs outlined below using the reference materials to ensure compliance.

| Functional Area/Definition | Outputs/Criteria | USAID and other References |
|---|---|---|
| **Governance and Strategic Management** - How the mission and direction of the organization is planned and approved, with clear roles for staff, organization leaders, and the board. | • NGO Registration<br>• Strategic Financial Plan | Kazak and Kyrgyz Law<br>USAID ADS 591 Appendix A |
| **Human and Material Resources (Administrative Infrastructure) -** What human and material infrastructure is available or needed to implement mission-related activities and how these resources are acquired and maintained. | • Personnel Manual<br>• Office Policies and Procedures Manual | USAID ADS E303.5.9.a<br>OMB A-122<br>USAID ADS 591 Appendix A<br>OMB A-110 |
| **Financial Management** - How the organization manages its resources, plans its resource usage, documents resource usage, analyzes patters of resource usage, identifies potential for additional resources, and tracks the flow of finances in conformity with local laws and regulations as well as donor requirements. | • Accounting Procedures<br>• Grant Management Manual<br>• Financial Management<br>• Property Management Policies | USAID 22CFR 226<br>OMB A-110<br>OMB A-122<br>USAID ADS 591 Appendix A<br>OMB A-133 |
| **Financial Sustainability** - How the organization plans to secure funds or materials to expand or update its administrative infrastructure. | • Proposal Writing Manual<br>• Financial Diversification Toolkit<br>• Donor MIS | USAID ADS 591 Appendix A<br>USAID ADS E303.5.9.a |
| **External Relations** - How the organization manages its relationships with clients and other core constituents to support financial sustainability and product and service delivery. | • PR/Marketing Plan<br>• Communications Plan | OMB A-122 |
| **Products and Services** - What the organization does and how the organization ensures it does it well. | • M&E Plan<br>• Program Management Guidelines<br>• Project MIS | USAID ADS 591 Appendix A<br>USAID 22CFR 226<br>OMB A-110 |

---

[29] These documents include: ADS 303; 22CFR226; ADS 591, including attachments; OMB Circulars A-110, A-122, and A-133; GAO Government Auditing Standards (Yellow Book); Mandatory Standard Provisions for Non-US, NGO Recipients; and Non-US Based Organizations Assessment Guide.

CSSI Mid-Term Evaluation Report

**PDX-D**

## NOTES FROM CC MANAGEMENT TEAM MEETING
### Almaty, Kazakhstan - October 23 and 27, 2000
**Attending:** Arlene Lear, Tom Carmody, Jay Cooper, Bob Abma, Beth Comolli

**Step 1. After clarifying our expectations for the meeting, we brainstormed a list of the strengths and limitations of CC and CI, as follows:**

Brainstorming CC/CI Strengths and Limitations/Areas For Improvement

| Strengths | Limitations/Areas for Improvement |
|---|---|
| • Relationship w/USAID<br>• Motivated staff<br>• Experienced staff<br>• Regional reputation<br>• Hub offices and some SCs established<br>• Commitment of staff to excellence<br>• Management team<br>• KG staff experience<br>• KG Country Director<br>• TM program implementation; motivated staff | • Weak expat recruitment process<br>• Lack of expat resources and skills<br>• Financial info not available to Bob for analysis (system doesn't provide timely info) CA and DC both<br>• Local staff skills and experience<br>• No strategic and business plans in SCs<br>• Lack of resources for oversight<br>• All Counterpart Central Asia programs perceived as CC<br>• Lack of coordination among CI divisions<br>• Lack of clarity about available budget<br>• Lack of coordination between CC & DC; lack of understanding of roles<br>• Not enough $ for hiring technical expertise<br>• Not enough $ for travel<br>• CI self-image as small organization, not an institution<br>• Low visibility – lack of expat-driven public education component (no materials)<br>• KZ staff skills<br>• A lot of new staff people (8+ in KZ and regional office)<br>• Not recognizing and/or tolerating poor performance<br>• No performance management system<br>• No coordinated long-term vision for CI<br>• No permanent UZ Country Director for one year<br>• Lack of focused management in TJ<br>• Lack of time for coaching by Regional Director<br>• Inadequate skills of program articulation<br>• Us vs. them<br>• Lack of expat staff for Community Outreach/Mobilization |

**Step 2. Next, we grouped most of the limitations into five broad categories.**

Grouping Limitations/Areas For Improvement

- Staff skills and recruitment problems
- Performance management
- $, budgeting/financial management
- lack of coordination/information
- lack of expat skills/people

**Step 3. We then brainstormed possible solutions for each of the five categories.**

Brainstorming Possible Solutions To Limitations/Areas For Improvement

### Staff skills and recruitment problems
- Get qualified UZ Country Director
- Use job descriptions for recruitment
- Revise expat recruitment process
  - Provide more information to hiring manager in the field

CIC 1470

**PDX-F**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAY W. COOPER | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:05-cv-01598-RMC |
| | ) | |
| COUNTERPART INTERNATIONAL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## SECOND REQUEST FOR THE PRODUCTION OF DOCUMENTS

Defendant Counterpart International ("Counterpart") responds to plaintiff's

second request for the production of documents as follows:

### General Objections and Responses

1.      Counterpart objects to plaintiff's requests for production to the extent they

seek the disclosure of documents that are protected by the attorney-client privilege, the

attorney work-product doctrine, the common interest/joint defense privilege or any other

applicable privilege or immunity.

2.      Counterpart objects to the instructions contained in plaintiff's requests for

production to the extent they impose obligations beyond those imposed by the Federal

Rules of Civil Procedure and/or Local Rules of the District Court for the District of

Columbia.

3.      Counterpart objects to plaintiff's requests for production to the extent they

seek documents containing proprietary business information, trade secrets or other

confidential or personal information.

4.    Counterpart will produce responsive, non-privileged documents for inspection and copying at a mutually convenient time and location and as they are maintained in the ordinary course of business.

5.    Counterpart has made all good faith efforts to locate documents responsive to plaintiff's requests.  Counterpart reserves the right to supplement its document production if it locates additional documents or, as this action progresses, Counterpart determines that documents which have been located but appear non-responsive are actually responsive to plaintiff's requests.

6.    Counterpart will produce documents only in its possession, custody, or control or in the possession, custody, control of its agents or employees.

## Specific Objections and Responses

**REQUEST NO. 1:**  Please produced all of the "secret files" you discovered in Jay Cooper's office in Almaty after his termination as described by Ms. Kelli Boyer in her deposition on March 28, 2006.

**RESPONSE:**  Subject to the general responses and objections stated above, Defendant responds as follows:  Defendant has not yet been able to locate Jay Cooper's "secret files" as described by Kelli Boyer during her March 28, 2006 deposition.  Defendant will continue to search for the files and will supplement this response if and when such files are located.

**REQUEST NO. 2:**  Please produce all amendments to the March 2001 edition of Counterpart's Manual for Employees in Foreign Areas that was marked as Exhibit 4 to Cooper's Rule 30(b)(6) deposition of Counterpart International that were in force as of Fall 2004, including an amendment concerning whistleblower protection discussed by

## NOTES FROM CC MANAGEMENT TEAM MEETING
### Almaty, Kazakhstan - October 23 and 27, 2000
**Attending:** Arlene Lear, Tom Carmody, Jay Cooper, Bob Abma, Beth Comolli

**Step 1. After clarifying our expectations for the meeting, we brainstormed a list of the strengths and limitations of CC and CI, as follows:**

<u>Brainstorming CC/CI Strengths and Limitations/Areas For Improvement</u>

| Strengths | Limitations/Areas for Improvement |
|---|---|
| • Relationship w/USAID | • Weak expat recruitment process |
| • Motivated staff | • Lack of expat resources and skills |
| • Experienced staff | • Financial info not available to Bob for analysis (system doesn't provide |
| • Regional reputation | timely info) CA and DC both |
| • Hub offices and some SCs | • Local staff skills and experience |
| established | • No strategic and business plans in SCs |
| • Commitment of staff to | • Lack of resources for oversight |
| excellence | • All Counterpart Central Asia programs perceived as CC |
| • Management team | • Lack of coordination among CI divisions |
| • KG staff experience | • Lack of clarity about available budget |
| • KG Country Director | • Lack of coordination between CC & DC; lack of understanding of roles |
| • TM program implementation; | • Not enough $ for hiring technical expertise |
| motivated staff | • Not enough $ for travel |
| | • CI self-image as small organization, not an institution |
| | • Low visibility – lack of expat-driven public education component (no |
| | materials) |
| | • KZ staff skills |
| | • A lot of new staff people (8+ in KZ and regional office) |
| | • Not recognizing and/or tolerating poor performance |
| | • No performance management system |
| | • No coordinated long-term vision for CI |
| | • No permanent UZ Country Director for one year |
| | • Lack of focused management in TJ |
| | • Lack of time for coaching by Regional Director |
| | • Inadequate skills of program articulation |
| | • Us vs. them |
| | • Lack of expat staff for Community Outreach/Mobilization |

**Step 2. Next, we grouped most of the limitations into five broad categories.**

<u>Grouping Limitations/Areas For Improvement</u>

- Staff skills and recruitment problems
- Performance management
- $, budgeting/financial management
- lack of coordination/information
- lack of expat skills/people

**Step 3. We then brainstormed possible solutions for each of the five categories.**

<u>Brainstorming Possible Solutions To Limitations/Areas For Improvement</u>

**Staff skills and recruitment problems**
- Get qualified UZ Country Director
- Use job descriptions for recruitment
- Revise expat recruitment process
  - Provide more information to hiring manager in the field

CIC 1470

**PDX-F**

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No. 1545-0047

**2004**

Open to Public Inspection

**A** For the 2004 calendar year, or tax year beginning **OCT 1, 2004** and ending **SEP 30, 2005**

| B Check if applicable: | | C Name of organization | D Employer identification number |
|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | COUNTERPART INTERNATIONAL, INC. | 13-6183605 |
| ☐ Name change | | Number and street (or P.O. box if mail is not delivered to street address)   Room/suite | E Telephone number |
| ☐ Initial return | | 1200 18TH STREET, N.W.   1100 | 202-296-9676 |
| ☐ Final return | | City or town, state or country, and ZIP + 4 | F Accounting method: ☐ Cash ☒ Accrual |
| ☐ Amended return | | WASHINGTON, DC 20036 | ☐ Other (specify) ▶ |
| ☐ Application pending | | | |

● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).**

**H** and **I** are not applicable to section 527 organizations.

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No

**G** Website: ▶ **WWW.COUNTERPART.ORG**

**H(b)** If "Yes," enter number of affiliates ▶

**J** Organization type (check only one) ▶ ☒ 501(c) ( **3** ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**H(c)** Are all affiliates included? **N/A** ☐ Yes ☐ No (If "No," attach a list.)

**K** Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return.

**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**I** Group Exemption Number ▶

**M** Check ▶ ☒ if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ **114,543,416.**

### Part I   Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| a | Direct public support | 1a | 2,646,053. | |
| b | Indirect public support | 1b | | |
| c | Government contributions (grants) | 1c | 111,660,933. | |
| d | Total (add lines 1a through 1c) (cash $ **28,015,272.** noncash $ **86,291,714.** ) | | | 1d | 114,306,986. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | |
| 3 | Membership dues and assessments | | | 3 | |
| 4 | Interest on savings and temporary cash investments | | | 4 | 15,871. |
| 5 | Dividends and interest from securities | | | 5 | 24,012. |
| 6 a | Gross rents   SEE STATEMENT 1 | 6a | 12,036. | |
| b | Less: rental expenses | 6b | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | 12,036. |
| 7 | Other investment income (describe ▶ ) | | | 7 | |
| 8 a | Gross amount from sales of assets other than inventory | (A) Securities 120,000. | 8a | (B) Other | |
| b | Less: cost or other basis and sales expenses | 102,323. | 8b | | |
| c | Gain or (loss) (attach schedule) | 17,677. | 8c | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B))   STMT 2 | | | 8d | 17,677. |
| 9 | Special events and activities (attach schedule). If any amount is from gaming, check here ▶ ☐ | | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) | 9a | | |
| b | Less: direct expenses other than fundraising expenses | 9b | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | | |
| b | Less: cost of goods sold | 10b | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | | 11 | 64,511. |
| 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 114,441,093. |
| 13 | Program services (from line 44, column (B)) | | | 13 | 113,891,992. |
| 14 | Management and general (from line 44, column (C)) | | | 14 | 45,198. |
| 15 | Fundraising (from line 44, column (D)) | | | 15 | 194,590. |
| 16 | Payments to affiliates (attach schedule) | | | 16 | |
| 17 | Total expenses (add lines 16 and 44, column (A)) | | | 17 | 114,131,780. |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | 309,313. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19 | 611,357. |
| 20 | Other changes in net assets or fund balances (attach explanation)   SEE STATEMENT 3 | | | 20 | 96,768. |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 1,017,438. |

423001
01-13-05

LHA   **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**

Form **990** (2004)

1

COUNTERPART INTERNATIONAL, INC.                    13-6183605

| Part II | Statement of Functional Expenses | All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. | | | Page 2 |
|---|---|---|---|---|---|
| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I. | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
| 22 Grants and allocations (attach schedule) .......... | 22 | | | | |
| (cash $_____ noncash $_____) | | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. .......... | 25 | 817,125. | 341,891. | 475,234. | 0. |
| 26 Other salaries and wages ............................... | 26 | 7,897,919. | 6,336,511. | 1,561,408. | 0. |
| 27 Pension plan contributions .......................... | 27 | 437,375. | 297,415. | 139,960. | |
| 28 Other employee benefits ............................. | 28 | 2,030,038. | 1,375,107. | 654,931. | |
| 29 Payroll taxes ........................................... | 29 | 273,252. | 266,734. | 6,518. | |
| 30 Professional fundraising fees ....................... | 30 | | | | |
| 31 Accounting fees ....................................... | 31 | 74,797. | 74,797. | | |
| 32 Legal fees ............................................. | 32 | 79,489. | 51,508. | 27,981. | |
| 33 Supplies ............................................... | 33 | 358,684. | 329,480. | 29,204. | |
| 34 Telephone ............................................. | 34 | 376,472. | 293,807. | 82,665. | |
| 35 Postage and shipping ................................ | 35 | 23,959. | 19,041. | 4,918. | |
| 36 Occupancy ............................................. | 36 | 1,031,050. | 596,023. | 435,027. | |
| 37 Equipment rental and maintenance ................ | 37 | 158,819. | 144,920. | 13,899. | |
| 38 Printing and publications ............................ | 38 | 93,711. | 56,618. | 37,093. | |
| 39 Travel .................................................. | 39 | 1,607,638. | 1,261,533. | 346,105. | |
| 40 Conferences, conventions, and meetings .......... | 40 | 206,884. | 152,960. | 53,924. | |
| 41 Interest ................................................ | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) ... | 42 | 15,216. | | 15,216. | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a _____ | 43a | | | | |
| b _____ | 43b | | | | |
| c _____ | 43c | | | | |
| d _____ | 43d | | | | |
| e SEE STATEMENT 4 | 43e | 98,649,352. | 102,293,647. | -3,838,885. | 194,590. |
| 44 Total functional expenses (add lines 22 through 43). Organizations completing columns (B)-(D), carry these totals to lines 13-15. | 44 | 114,131,780. | 113,891,992. | 45,198. | 194,590. |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? .............. ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ _____ ; (ii) the amount allocated to Program services $ _____ ;

(iii) the amount allocated to Management and general $ _____ ; and (iv) the amount allocated to Fundraising $ _____

| Part III | Statement of Program Service Accomplishments |
|---|---|

What is the organization's primary exempt purpose? ▶ SEE STATEMENT 5

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

**Program Service Expenses**
(Required for 501(c)(3) and (4) orgs. and 4947(a)(1) trusts; but optional for others.)

a SEE ATTACHED STATEMENT

_____

_____

_____

(Grants and allocations $ ) 113,891,992.

b _____

_____

_____

(Grants and allocations $ )

c _____

_____

_____

(Grants and allocations $ )

d _____

_____

_____

(Grants and allocations $ )

e Other program services (attach schedule)          (Grants and allocations $ )

f Total of Program Service Expenses (should equal line 44, column (B), Program services) ............. ▶ 113,891,992.

423011
01-13-05

2

Form 990 (2004)

Form 990 (2004)    COUNTERPART INTERNATIONAL, INC.    13-6183605    Page 3

## Part IV Balance Sheets

Note: *Where required, attached schedules and amounts within the description column should use end-of-year amounts only.*

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 45 | Cash - non-interest-bearing | 3,893,284. | 45 | 6,720,605. |
| | 46 | Savings and temporary cash investments | 501,141. | 46 | 882,395. |
| | 47 a | Accounts receivable — 47a 510,961. | | | |
| | b | Less: allowance for doubtful accounts — 47b | 342,117. | 47c | 510,961. |
| | 48 a | Pledges receivable — 48a | | | |
| | b | Less: allowance for doubtful accounts — 48b | 15,000. | 48c | |
| | 49 | Grants receivable | 29,263,073. | 49 | 28,046,520. |
| | 50 | Receivables from officers, directors, trustees, and key employees | | 50 | |
| | 51 a | Other notes and loans receivable — 51a | | | |
| | b | Less: allowance for doubtful accounts — 51b | | 51c | |
| | 52 | Inventories for sale or use | | 52 | |
| | 53 | Prepaid expenses and deferred charges | 106,614. | 53 | 181,697. |
| | 54 | Investments - securities STMT 6 ▶ ☐ Cost ☒ FMV | 557,534. | 54 | 681,054. |
| | 55 a | Investments - land, buildings, and equipment: basis — 55a | | | |
| | b | Less: accumulated depreciation — 55b | | 55c | |
| | 56 | Investments - other | | 56 | |
| | 57 a | Land, buildings, and equipment: basis — 57a 274,745. | | | |
| | b | Less: accumulated depreciation STMT 7 — 57b 231,088. | 16,479. | 57c | 43,657. |
| | 58 | Other assets (describe ▶ SECURITY DEPOSITS ) | 30,461. | 58 | 38,661. |
| | 59 | Total assets (add lines 45 through 58) (must equal line 74) | 34,725,703. | 59 | 37,105,550. |
| **Liabilities** | 60 | Accounts payable and accrued expenses | 2,134,963. | 60 | 3,858,644. |
| | 61 | Grants payable | 31,719,383. | 61 | 31,819,135. |
| | 62 | Deferred revenue | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees | | 63 | |
| | 64 a | Tax-exempt bond liabilities | | 64a | |
| | b | Mortgages and other notes payable | | 64b | |
| | 65 | Other liabilities (describe ▶ LINE OF CREDIT ) | 260,000. | 65 | 410,333. |
| | 66 | Total liabilities (add lines 60 through 65) | 34,114,346. | 66 | 36,088,112. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | |
| | 67 | Unrestricted | 611,357. | 67 | 1,017,438. |
| | 68 | Temporarily restricted | | 68 | |
| | 69 | Permanently restricted | | 69 | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | |
| | 70 | Capital stock, trust principal, or current funds | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds | | 72 | |
| | 73 | Total net assets or fund balances (add lines 67 through 69 or lines 70 through 72; column (A) must equal line 19; column (B) must equal line 21) | 611,357. | 73 | 1,017,438. |
| | 74 | Total liabilities and net assets / fund balances (add lines 66 and 73) | 34,725,703. | 74 | 37,105,550. |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

423021
01-13-05

09160619 745960 08565          2004.09000 COUNTERPART INTERNATIONAL,  08565__1

Form 990 (2004)   COUNTERPART INTERNATIONAL, INC.   13-6183605   Page 4

| Part IV-A | Reconciliation of Revenue per Audited Financial Statements with Revenue per Return | | Part IV-B | Reconciliation of Expenses per Audited Financial Statements with Expenses per Return | |
|---|---|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements ▶ | a 116552747. | a | Total expenses and losses per audited financial statements ▶ | a 116146666. |
| b | Amounts included on line a but not on line 12, Form 990: | | b | Amounts included on line a but not on line 17, Form 990: | |
| (1) | Net unrealized gains on investments .....$ 96,768. | | (1) | Donated services and use of facilities ..$ 2,026,922. | |
| (2) | Donated services and use of facilities ..$ 2,026,922. | | (2) | Prior year adjustments reported on line 20, Form 990 .............$ | |
| (3) | Recoveries of prior year grants ..........$ | | (3) | Losses reported on line 20, Form 990 .....$ | |
| (4) | Other (specify): _____ $ _____ | | (4) | Other (specify): _____ $ _____ | |
| | Add amounts on lines (1) through (4).... ▶ | b 2,123,690. | | Add amounts on lines (1) through (4) ..... ▶ | b 2,026,922. |
| c | Line a minus line b ..................... ▶ | c 114429057. | c | Line a minus line b ..................... ▶ | c 114119744. |
| d | Amounts included on line 12, Form 990 but not on line a: | | d | Amounts included on line 17, Form 990 but not on line a: | |
| (1) | Investment expenses not included on line 6b, Form 990 ...$ | | (1) | Investment expenses not included on line 6b, Form 990 ...$ | |
| (2) | Other (specify): STMT 8 _____ $ 12,036. | | (2) | Other (specify): STMT 9 _____ $ 12,036. | |
| | Add amounts on lines (1) and (2) .......... ▶ | d 12,036. | | Add amounts on lines (1) and (2) .......... ▶ | d 12,036. |
| e | Total revenue per line 12, Form 990 (line c plus line d) .......... ▶ | e 114441093. | e | Total expenses per line 17, Form 990 (line c plus line d) .......... ▶ | e 114131780. |

| Part V | List of Officers, Directors, Trustees, and Key Employees (List each one even if not compensated.) | | | | |
|---|---|---|---|---|---|
| (A) Name and address | | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
| ------------------------------------------------ SEE STATEMENT 10 ------------------------------------------------ | | | 817,125. | 118,923. | 0. |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |
| ------------------------------------------------ ------------------------------------------------ | | | | | |

**75** Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? If "Yes," attach schedule. ▶  ☐ Yes ☒ No

423031 01-13-05                                                                    Form 990 (2004)

09160619 745960 08565        2004.09000 COUNTERPART INTERNATIONAL,    08565__1

Form 990 (2004)    COUNTERPART INTERNATIONAL, INC.                    13-6183605    Page 5

**Part VI | Other Information**

| | | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | 76 | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? | 77 | | X |
| | If "Yes," attach a conformed copy of the changes. | | | |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | 78a | | X |
| b | If "Yes," has it filed a tax return on **Form 990-T** for this year? ............................................ N/A | 78b | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? | 79 | | X |
| | If "Yes," attach a statement | | | |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | 80a | | X |
| b | If "Yes," enter the name of the organization ▶ _____ | | | |
| | _____ and check whether it is ☐ exempt or ☐ nonexempt. | | | |
| 81 a | Enter direct or indirect political expenditures. See line 81 instructions | 81a | 0. | |
| b | Did the organization file **Form 1120-POL** for this year? | 81b | | X |
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | 82a | X | |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) | 82b | 2,026,922. | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | 83b | X | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | 84a | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? ............................................ N/A | 84b | | |
| 85 | **501(c)(4), (5), or (6) organizations.** a Were substantially all dues nondeductible by members? ............ N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? ............ N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| c | Dues, assessments, and similar amounts from members ......... | 85c | N/A | |
| d | Section 162(e) lobbying and political expenditures ......... | 85d | N/A | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices ......... | 85e | N/A | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) ......... | 85f | N/A | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? ............ N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? ............ N/A | 85h | | |
| 86 | **501(c)(7) organizations.** Enter: a Initiation fees and capital contributions included on line 12 ......... | 86a | N/A | |
| b | Gross receipts, included on line 12, for public use of club facilities ......... | 86b | N/A | |
| 87 | **501(c)(12) organizations.** Enter: a Gross income from members or shareholders ......... | 87a | N/A | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) ......... | 87b | N/A | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX | 88 | X | |
| 89 a | **501(c)(3) organizations.** Enter: Amount of tax imposed on the organization during the year under: section 4911▶ 0.; section 4912▶ 0.; section 4955▶ 0. | | | |
| b | **501(c)(3) and 501(c)(4) organizations.** Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ......... ▶ | | 0. | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization ......... ▶ | | 0. | |
| 90 a | List the states with which a copy of this return is filed ▶ **ALL STATES** | | | |
| b | Number of employees employed in the pay period that includes March 12, 2004 | 90b | 82 | |
| 91 | The books are in care of ▶ **THE ORGANIZATION**    Telephone no. ▶ 202-296-9676 | | | |
| | Located at ▶ 1200 18TH STREET NW #1100, WASHINGTON, DC    ZIP+4 ▶ 20036 | | | |
| 92 | *Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of* **Form 1041**- Check here ............................................ ▶ ☐ | | | |
| | and enter the amount of tax-exempt interest received or accrued during the tax year ......... ▶ | 92 | N/A | |

423041
01-18-05

Form 990 (2004)    COUNTERPART INTERNATIONAL, INC.    13-6183605    Page 6

## Part VII   Analysis of Income-Producing Activities (See page 33 of the instructions.)

Note: Enter gross amounts unless otherwise indicated.

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | |
|---|---|---|---|---|---|
| 93 Program service revenue: | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | (E) Related or exempt function income |
| a _____ | | | | | |
| b _____ | | | | | |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 15,871. | |
| 96 Dividends and interest from securities | | | 14 | 24,012. | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | 16 | 12,036. | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | 18 | 17,677. | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a MISCELLANEOUS | | | | | 6,809. |
| b CURRENCY EXCHANGE GAINS | | | | | 57,702. |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 69,596. | 64,511. |
| 105 Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 134,107. |

Note: Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.

## Part VIII   Relationship of Activities to the Accomplishment of Exempt Purposes (See page 34 of the instructions.)

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| 103A | MISCELLANEOUS REVENUE EARNED IN FURTHERANCE OF EXEMPT ACTIVITIES. |
| 103B | REVENUE FROM LOCAL CURRENCIES TRANSLATED INTO U. S. DOLLARS AT YEAR-END EXCHANGE RATE. |

## Part IX   Information Regarding Taxable Subsidiaries and Disregarded Entities (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| ENVIROVENTURE - 1200 18TH ST. NW #1100, WASHINGTON, DC 20036 - 52-2322149 | % % % 100% | CONSULTING | -28,644. | 461,198. |

## Part X   Information Regarding Transfers Associated with Personal Benefit Contracts (See page 34 of the instructions.)

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? ............ ☐ Yes ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? ......................... ☐ Yes ☒ No

Note: If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).

Please Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

Signature of officer _____ _Larry C. Mracu_    Date 6/23/06    Type or print name and title. _HARRY C. HORCUS_

| Paid Preparer's Use Only | Preparer's signature ▶ | Date 6/22/0_ | Check if self-employed ▶ ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP + 4 | GELMAN, ROSENBERG & FREEDMAN 4550 MONTGOMERY AVE., SUITE 650 NORTH BETHESDA, MARYLAND 20814-2930 | EIN ▶ | |
| | | | Phone no. ▶ (301) 951-9090 | |

423161 01-13-05

Form 990 (2004)

6

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or Section 4947(a)(1) Nonexempt Charitable Trust
**Supplementary Information-(See separate instructions.)**
▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No. 1645-0047

**2004**

Name of the organization

COUNTERPART INTERNATIONAL, INC.

Employer identification number

13 6183605

## Part I — Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| MICHAEL KUNZ<br>ALL IN C/O OF THE ORG.'S ADDRESS | CHIEF PARTY<br>40 | 107,838. | 21,338. | 0. |
| RICHARD DROLET | SR. DIRECTOR<br>40 | 107,744. | 13,188. | 0. |
| HUGH OROZCO | CHIEF PARTY<br>40 | 93,940. | 14,537. | 0. |
| BOBBY ABMA | REG. FIN. DIR<br>40 | 92,836. | 15,002. | 0. |
| SIBEL BERZEG | DIR. NEW PROG<br>40 | 92,085. | 13,579. | 0. |

Total number of other employees paid
over $50,000 ........................................▶ | 28 |

## Part II — Compensation of the Five Highest Paid Independent Contractors for Professional Services

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| MARIST FATHERS OF BOSTON<br>723 PALISADES BEACH RD #211, SANTA MONICA, CA 94 | CONSULTING | 60,000. |
| DAVID MANGES<br>4932 MILAM STREET, DALLAS, TX 75206 | CONSULTING | 51,993. |
| EDWARD E. SPENGLER<br>102 GAINEY DRIVE, GOLDSBORO, NC 27530 | CONSULTING | 50,663. |
| | | |
| | | |

Total number of others receiving over
$50,000 for professional services ........▶ | 0 |

423101/11-24-04   LHA   For Paperwork Reduction Act Notice, see the Instructions for Form 990 and Form 990-EZ.    Schedule A (Form 990 or 990-EZ) 2004

Schedule A (Form 990 or 990-EZ) 2004  COUNTERPART INTERNATIONAL, INC.                    13-6183605   Page 2

| **Part III** | **Statements About Activities** (See page 2 of the instructions.) | | Yes | No |
|---|---|---|---|---|
| 1 | During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ _____     $ _____ (Must equal amounts on line 38, Part VI-A, or line 1 of Part VI-B.) | 1 | | X |
| | Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | | | |
| 2 | During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? (If the answer to any question is "Yes," attach a detailed statement explaining the transactions.) | | | |
| a | Sale, exchange, or leasing of property? | 2a | | X |
| b | Lending of money or other extension of credit? | 2b | | X |
| c | Furnishing of goods, services, or facilities? | 2c | | X |
| d | Payment of compensation (or payment or reimbursement of expenses if more than $1,000)?  SEE PART V, FORM 990 | 2d | X | |
| e | Transfer of any part of its income or assets? | 2e | | X |
| 3 a | Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| b | Do you have a section 403(b) annuity plan for your employees? | 3b | X | |
| 4 a | Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4a | | X |
| b | Do you provide credit counseling, debt management, credit repair, or debt negotiation services? | 4b | | X |

| **Part IV** | **Reason for Non-Private Foundation Status** (See pages 3 through 6 of the instructions.) |
|---|---|

The organization is not a private foundation because it is: (Please check only ONE applicable box.)

5  ☐  A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6  ☐  A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7  ☐  A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8  ☐  A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9  ☐  A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). Enter the hospital's name, city, and state ▶

10  ☐  An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a  ☒  An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b  ☐  A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12  ☐  An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13  ☐  An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above; or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See page 5 of the instructions.)

| (a) Name(s) of supported organization(s) | (b) Line number from above |
|---|---|
| | |
| | |
| | |

14  ☐  An organization organized and operated to test for public safety. Section 509(a)(4). (See page 5 of the instructions.)

423111
12-03-04

Schedule A (Form 990 or 990-EZ) 2004

09160619  745960  08565          2004.09000  COUNTERPART INTERNATIONAL,  08565__1

Schedule A (Form 990 or 990-EZ) 2004  COUNTERPART INTERNATIONAL, INC.    13-6183605    Page 3

**Part IV-A** Support Schedule (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting.**
Note: *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting.*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
|---|---|---|---|---|---|
| **15** Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | 106014483. | 124225842. | 118623514. | 111473466. | 460,337,305. |
| **16** Membership fees received | | | | | |
| **17** Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| **18** Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 131,126. | 46,363. | 12,891. | 5,284. | 195,664. |
| **19** Net income from unrelated business activities not included in line 18 | | | | | |
| **20** Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| **21** The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| **22** Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | 356,133. | 110,658. | SEE STATEMENT 11  260,375. | | 727,166. |
| **23** Total of lines 15 through 22 | 106501742. | 124382863. | 118896780. | 111478750. | 461,260,135. |
| **24** Line 23 minus line 17 | 106501742. | 124382863. | 118896780. | 111478750. | 461,260,135. |
| **25** Enter 1% of line 23 | 1,065,017. | 1,243,829. | 1,188,968. | 1,114,788. | |

| | | | |
|---|---|---|---|
| **26** Organizations described on lines 10 or 11:  **a** Enter 2% of amount in column (e), line 24 | ▶ | **26a** | 9,225,203. |
| **b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 2000 through 2003 exceeded the amount shown in line 26a. **Do not file this list with your return.** Enter the total of all these excess amounts | ▶ | **26b** | 0. |
| **c** Total support for section 509(a)(1) test: Enter line 24, column (e) | ▶ | **26c** | 461,260,135. |
| **d** Add: Amounts from column (e) for lines: 18  195,664.  19 _____  22  727,166.  26b _____ | ▶ | **26d** | 922,830. |
| **e** Public support (line 26c minus line 26d total) | ▶ | **26e** | 460,337,305. |
| **f** Public support percentage (line 26e (numerator) divided by line 26c (denominator)) | ▶ | **26f** | 99.7999% |

**27** Organizations described on line 12: **a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." Do not file this list with your return. Enter the sum of such amounts for each year:    N/A

(2003) _____    (2002) _____    (2001) _____    (2000) _____

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger** of (1) the amount on line 25 for the year or (2) $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) Do not file this list with your return. After computing the difference between the amount received and the larger amount described in (1) or (2), enter the sum of these differences (the excess amounts) for each year:    N/A

(2003) _____    (2002) _____    (2001) _____    (2000) _____

| | | | |
|---|---|---|---|
| **c** Add: Amounts from column (e) for lines:  15 _____  16 _____ 17 _____  20 _____  21 _____ | | | |
| **d** Add: Line 27a total ___ and line 27b total ___ | ▶ | **27c** | N/A |
| **e** Public support (line 27c total minus line 27d total) | ▶ | **27d** | N/A |
| **f** Total support for section 509(a)(2) test: Enter amount on line 23, column (e) ▶  **27f**  N/A | ▶ | **27e** | N/A |
| **g** Public support percentage (line 27e (numerator) divided by line 27f (denominator)) | ▶ | **27g** | N/A % |
| **h** Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator)) | ▶ | **27h** | N/A % |

**28 Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 2000 through 2003, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. Do not file this list with your return. Do not include these grants in line 15.

NONE

423121  12-03-04    Schedule A (Form 990 or 990-EZ) 2004

9

Schedule A (Form 990 or 990-EZ) 2004 COUNTERPART INTERNATIONAL, INC.                          13-6183605  Page 4

| | | |
|---|---|---|
| **Part V** | **Private School Questionnaire** (See page 7 of the instructions.) (To be completed ONLY by schools that checked the box on line 6 in Part IV) | N/A |

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | 31 | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | 32d | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | 33h | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? If you answered "Yes" to either 34a or b, please explain using an attached statement. | 34b | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2004

423131
11-24-04

Schedule A (Form 990 or 990-EZ) 2004 COUNTERPART INTERNATIONAL, INC.    13-6183605    Page 5

**Part VI-A** | **Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.)
(To be completed ONLY by an eligible organization that filed Form 5768)

Check ► **a** ☐ if the organization belongs to an affiliated group.    Check ► **b** ☐ if you checked "a" and "limited control" provisions apply.

| | Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | | (a) Affiliated group totals | (b) To be completed for ALL electing organizations |
|---|---|---|---|---|
| | | | N/A | |
| 36 | Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 | Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 | Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 | Other exempt purpose expenditures | 39 | | |
| 40 | Total exempt purpose expenditures (add lines 38 and 39) | 40 | | |
| 41 | Lobbying nontaxable amount. Enter the amount from the following table - | 41 | | |
| 42 | Grassroots nontaxable amount (enter 25% of line 41) | 42 | | |
| 43 | Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 | Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

If the amount on line 40 is -
Not over $500,000 .......................................
Over $500,000 but not over $1,000,000 ..........
Over $1,000,000 but not over $1,500,000 .......
Over $1,500,000 but not over $17,000,000 ......
Over $17,000,000 ......................................

The lobbying nontaxable amount is -
20% of the amount on line 40
$100,000 plus 15% of the excess over $500,000
$175,000 plus 10% of the excess over $1,000,000
$225,000 plus 5% of the excess over $1,500,000
$1,000,000

**Caution:** If there is an amount on either line 43 or line 44, you must file Form 4720.

### 4-Year Averaging Period Under Section 501(h)

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

| Calendar year (or fiscal year beginning in) ► | Lobbying Expenditures During 4-Year Averaging Period | | | | |
|---|---|---|---|---|---|
| | (a) 2004 | (b) 2003 | (c) 2002 | (d) 2001 | (e) Total |
| | | | | | N/A |
| 45 Lobbying nontaxable amount | | | | | |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 0. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | | | | | 0. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 0. |
| 50 Grassroots lobbying expenditures | | | | | 0. |
| | | | | | 0. |

**Part VI-B** | **Lobbying Activity by Nonelecting Public Charities**
(For reporting only by organizations that did not complete Part VI-A) (See page 11 of the instructions.)

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers | | X | |
| b Paid staff or management (Include compensation in expenses reported on lines c through h.) | | X | |
| c Media advertisements | | X | |
| d Mailings to members, legislators, or the public | | X | |
| e Publications, or published or broadcast statements | | X | |
| f Grants to other organizations for lobbying purposes | | X | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body | | X | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | X | |
| i Total lobbying expenditures (Add lines c through h.) | | | 0. |
| If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities. | | | |

423141
11-24-04

Schedule A (Form 990 or 990-EZ) 2004

09160619 745960 08565        2004.09000 COUNTERPART INTERNATIONAL,  08565__1

Schedule A (Form 990 or 990-EZ) 2004  COUNTERPART INTERNATIONAL, INC.                    13-6183605   Page 6

| Part VII | Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations (See page 11 of the instructions.) |

**51** Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

| | | Yes | No |
|---|---|---|---|
| a | Transfers from the reporting organization to a noncharitable exempt organization of: | | |
| | (i) Cash ........................................................................ 51a(i) | | X |
| | (ii) Other assets ............................................................. a(ii) | | X |
| b | Other transactions: | | |
| | (i) Sales or exchanges of assets with a noncharitable exempt organization ........................ b(i) | | X |
| | (ii) Purchases of assets from a noncharitable exempt organization .................................. b(ii) | | X |
| | (iii) Rental of facilities, equipment, or other assets ................................................ b(iii) | | X |
| | (iv) Reimbursement arrangements ..................................................................... b(iv) | | X |
| | (v) Loans or loan guarantees .......................................................................... b(v) | | X |
| | (vi) Performance of services or membership or fundraising solicitations ............................ b(vi) | | X |
| c | Sharing of facilities, equipment, mailing lists, other assets, or paid employees ....................... c | | X |

**d** If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received:         N/A

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**52 a** Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527? .........................................................► ☐ Yes  ☒ No

**b** If "Yes," complete the following schedule:        N/A

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

423151
11-24-04

12

Schedule A (Form 990 or 990-EZ) 2004

09160619 745960 08565                    2004.09000 COUNTERPART INTERNATIONAL,   08565__1

**Depreciation and Amortization Detail** FORM 990 PAGE 2

990

| Asset Number | Date placed in service | Method/ IRC sec. | Life or rate | Line No. | Cost or other basis | Basis reduction | Accumulated depreciation/amortization | Current year deduction |
|---|---|---|---|---|---|---|---|---|
| 1 FURNITURE & FIXTURES | | | | | | | | |
| | VARIES | SL | 5.00 | 16 | 30,890. | | 29,829. | 530. |
| 2 COMPUTER EQUIPMENT | | | | | | | | |
| | VARIES | SL | 5.00 | 16 | 231,261. | | 173,449. | 14,686. |
| 3 DEFERRED LEASING COST | | | | | | | | |
| | VARIES | SL | 3.00 | 16 | 12,594. | | 12,594. | 0. |
| * TOTAL 990 PAGE 2 DEPR | | | | | | | | |
| | | | | | 274,745. | 0. | 215,872. | 15,216. |

416201
05-01-04

# - Current year section 179      (D) - Asset disposed

13

COUNTERPART INTERNATIONAL, INC.

13-6183605

| FORM 990 | RENTAL INCOME | STATEMENT | 1 |

| KIND AND LOCATION OF PROPERTY | ACTIVITY NUMBER | GROSS RENTAL INCOME |
|---|---|---|
| SUB-LEASE RENTAL INCOME | 1 | 12,036. |
| TOTAL TO FORM 990, PART I, LINE 6A | | 12,036. |

| FORM 990 | GAIN (LOSS) FROM PUBLICLY TRADED SECURITIES | STATEMENT | 2 |

| DESCRIPTION | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
|---|---|---|---|---|
| SALE OF INVESTMENTS | 120,000. | 102,323. | 0. | 17,677. |
| TO FORM 990, PART I, LINE 8 | 120,000. | 102,323. | 0. | 17,677. |

| FORM 990 | OTHER CHANGES IN NET ASSETS OR FUND BALANCES | STATEMENT | 3 |

| DESCRIPTION | AMOUNT |
|---|---|
| UNREALIZED GAIN ON INVESTMENTS | 96,768. |
| TOTAL TO FORM 990, PART I, LINE 20 | 96,768. |

| FORM 990 | OTHER EXPENSES | STATEMENT | 4 |

| DESCRIPTION | (A) TOTAL | (B) PROGRAM SERVICES | (C) MANAGEMENT AND GENERAL | (D) FUNDRAISING |
|---|---|---|---|---|
| CONSULTANT | 1,381,972. | 862,249. | 519,723. | |
| EQUIPMENT | 205,285. | 201,842. | 3,443. | |
| FURNITURE AND FIXTURES | 181,419. | 171,547. | 9,872. | |
| INTERNET | 158,673. | 138,867. | 19,806. | |
| COMPUTER SUPPLIES | 47,874. | 35,772. | 12,102. | |
| BANK CHARGE | 75,934. | 70,876. | 5,058. | |
| DUES | 55,122. | 33,885. | 21,237. | |
| SUBSCRIPTIONS | 9,468. | 2,731. | 6,737. | |
| TEMPORARY HELP | 88,998. | 61,978. | 27,020. | |

COUNTERPART INTERNATIONAL, INC.                                    13-6183605

| | | | | |
|---|---|---|---|---|
| TRAININGS | 1,280,972. | 1,249,101. | 31,871. | |
| TRANSPORT & WAREHOUSING | 125,192. | 115,029. | 10,163. | |
| TECHNICAL ASSISTANCE | 25,891. | 25,841. | 50. | |
| INSURANCE | 54,865. | 8,359. | 46,506. | |
| TAXES | 64,933. | 52,461. | 12,472. | |
| PAYROLL SERVICES | 20,026. | 785. | 19,241. | |
| RECRUITMENT | 4,668. | 3,279. | 1,389. | |
| STAFF DEVELOPMENT | 45,887. | 20,823. | 25,064. | |
| LEASE EXPENSES | 46,710. | 25,846. | 20,864. | |
| VIDEO | 5,797. | 3,760. | 2,037. | |
| ADVERTISING | 8,629. | 8,510. | 119. | |
| SHIPPING AND FREIGHT | 31,938. | 25,335. | 6,603. | |
| MEDICAL SUPPLIES | 120,719. | 120,719. | | |
| SMALL GRANTS | 4,979,211. | 4,979,211. | | |
| PROJECT MATERIALS | 234,000. | 234,000. | | |
| SUBCONTRACTS | 563,586. | 563,586. | | |
| VEHICLES | 252,648. | 252,648. | | |
| FOOD | 41,956. | 41,956. | | |
| AGRICULTURE EXPENSES | 328,973. | 328,973. | | |
| SURVEY | 1,250. | 1,250. | | |
| LOANS | 13,980. | 13,980. | | |
| SCHOOL FEEDING | 68,168. | 68,168. | | |
| STORAGE | 161,495. | 161,495. | | |
| HEALTH | 87,646. | 87,646. | | |
| AGRIBUSINESS | 123,577. | 123,577. | | |
| MICROCREDIT | 63,333. | 63,333. | | |
| ENTERPRISE DEVELOPMENT | 5,049. | 5,049. | | |
| FOREST GARDEN | 12,966. | 12,966. | | |
| INDIRECT ALLOCATION | -4,664,262. | | -4,664,262. | |
| RELATED FUNDRAISING EXPENSES | 119,590. | | | 119,590. |
| DONATED EQUIPMENT | 35,532,864. | 35,433,864. | 24,000. | 75,000. |
| DONATED SMALL PROJECTS | 49,440,529. | 49,440,529. | | |
| LOSS ON EXCHANGE | 305,291. | 305,291. | | |
| MISCELLANEOUS | 6,915. | 6,915. | | |
| OTHER DONATED MATERIALS | 6,929,615. | 6,929,615. | | |
| TOTAL TO FM 990, LN 43 | 98,649,352. | 102,293,647. | -3,838,885. | 194,590. |

---

FORM 990    STATEMENT OF ORGANIZATION'S PRIMARY EXEMPT PURPOSE    STATEMENT    5
PART III

EXPLANATION

TO WORK WITH THE PEOPLE OF THE WESTERN EUROPEAN NEWLY INDEPENDENT STATES
(WESTNIS) AND THE PACIFIC BASIN IN PROGRAMS THAT ASSIST HUMAN DEVELOPMENT.

COUNTERPART INTERNATIONAL, INC.

13-6183605

| FORM 990 | NON-GOVERNMENT SECURITIES | STATEMENT | 6 |

| SECURITY DESCRIPTION | COST/FMV | CORPORATE STOCKS | CORPORATE BONDS | OTHER PUBLICLY TRADED SECURITIES | TOTAL NON-GOV'T SECURITIES |
|---|---|---|---|---|---|
| STOCKS | FMV | 115,917. | | | 115,917. |
| MUTUAL FUNDS | FMV | | | 559,770. | 559,770. |
| MONEY FUNDS | FMV | | | 5,367. | 5,367. |
| TO FORM 990, LINE 54, COL B | | 115,917. | | 565,137. | 681,054. |

| FORM 990 | DEPRECIATION OF ASSETS NOT HELD FOR INVESTMENT | STATEMENT | 7 |

| DESCRIPTION | COST OR OTHER BASIS | ACCUMULATED DEPRECIATION | BOOK VALUE |
|---|---|---|---|
| FURNITURE & FIXTURES | 30,890. | 30,359. | 531. |
| COMPUTER EQUIPMENT | 231,261. | 188,135. | 43,126. |
| DEFERRED LEASING COST | 12,594. | 12,594. | 0. |
| TOTAL TO FORM 990, PART IV, LN 57 | 274,745. | 231,088. | 43,657. |

| FORM 990 | OTHER REVENUE INCLUDED ON FORM 990 | STATEMENT | 8 |

| DESCRIPTION | AMOUNT |
|---|---|
| RENTAL INCOME REPORTED ON FORM 990 PART I, LINE 6(A) AND NETTED AGAINST RENTAL EXPENSES ON FINANCIAL STATEMENTS. | 12,036. |
| TOTAL TO FORM 990, PART IV-A | 12,036. |

| FORM 990 | OTHER EXPENSES INCLUDED ON FORM 990 | STATEMENT | 9 |

| DESCRIPTION | AMOUNT |
|---|---|
| RENTAL INCOME NETTED AGAINST RENTAL EXPENSES ON FINANCIAL STATEMENTS AND REPORTED ON FORM 990 PART I, LINE 6 (A). | 12,036. |
| TOTAL TO FORM 990, PART IV-B | 12,036. |

COUNTERPART INTERNATIONAL, INC.

13-6183605

| FORM 990 | PART V - LIST OF OFFICERS, DIRECTORS, TRUSTEES AND KEY EMPLOYEES | | STATEMENT 10 |

| NAME AND ADDRESS | TITLE AND AVRG HRS/WK | COMPEN-SATION | EMPLOYEE BEN PLAN CONTRIB | EXPENSE ACCOUNT |
|---|---|---|---|---|
| LELEI LELAULU ALL IN C/O THE ORGANIZATION'S ADDRESS | PRESIDENT/CEO 40 | 211,842. | 30,702. | 0. |
| ARLENE LEAR | SENIOR VICE PRESIDENT 40 | 152,904. | 20,442. | 0. |
| LILYA WAGNER | VICE PRESIDENT 40 | 61,278. | 9,902. | 0. |
| THORIC CEDERSTROM | VICE PRESIDENT 40 | 112,654. | 20,603. | 0. |
| HARRY C DORCUS | TREASURER/CFO 40 | 165,075. | 20,890. | 0. |
| RAYMOND CHAVEZ | VICE PRESIDENT 40 | 113,372. | 16,384. | 0. |
| STANLEY W HOSIE | CHAIRMAN 1 | 0. | 0. | 0. |
| BRYANT GEORGE | SECRETARY 1 | 0. | 0. | 0. |
| MARCELO DE ANDRADE | DIRECTOR 1 | 0. | 0. | 0. |
| SALLY M. BRUMBAUGH | DIRECTOR 1 | 0. | 0. | 0. |

COUNTERPART INTERNATIONAL, INC.

13-6183605

| | | | | |
|---|---|---|---|---|
| PERRY EATON | DIRECTOR 1 | 0. | 0. | 0. |
| CHARLES EDDY | DIRECTOR 1 | 0. | 0. | 0. |
| JAN HARTKE | DIRECTOR 1 | 0. | 0. | 0. |
| JOHN A. HOYT | DIRECTOR 1 | 0. | 0. | 0. |
| JEFFREY TODD LARICHE | DIRECTOR 1 | 0. | 0. | 0. |
| GAIL MOANEY | DIRECTOR 1 | 0. | 0. | 0. |
| BARABARA PYLE | DIRECTOR 1 | 0. | 0. | 0. |
| BOB REYNOLDS | DIRECTOR 1 | 0. | 0. | 0. |
| MARK SILVERSTEIN | DIRECTOR 1 | 0. | 0. | 0. |
| DAVID SLOAN | DIRECTOR 1 | 0. | 0. | 0. |
| TOTALS INCLUDED ON FORM 990, PART V | | 817,125. | 118,923. | 0. |

COUNTERPART INTERNATIONAL, INC.

13-6183605

| SCHEDULE A | | OTHER INCOME | | STATEMENT 11 |
|---|---|---|---|---|

| DESCRIPTION | 2003 AMOUNT | 2002 AMOUNT | 2001 AMOUNT | 2000 AMOUNT |
|---|---|---|---|---|
| OTHER INCOME | 356,133. | 110,658. | 260,375. | 0. |
| TOTAL TO SCHEDULE A, LINE 22 | 356,133. | 110,658. | 260,375. | 0. |

Form **8868**
(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.

OMB No. 1545-1709

- If you are filing for an Automatic 3-Month Extension, complete only Part I and check this box .................................. ▶ ☒
- If you are filing for an Additional (not automatic) 3-Month Extension, complete only Part II (on page 2 of this form).

**Do not** complete Part II unless you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I** **Automatic 3-Month Extension of Time** - Only submit original (no copies needed)

Form 990-T corporations requesting an automatic 6-month extension - check this box and complete Part I only .................................. ▶ ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs, and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

**Electronic Filing (e-file).** Form 8868 can be filed electronically if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for corporate Form 990-T filers). However, you cannot file it electronically if you want the additional (not automatic) 3-month extension, instead you must submit the fully completed signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs.gov/efile.*

| Type or print | Name of Exempt Organization | Employer identification number |
|---|---|---|
| File by the due date for filing your return. See instructions. | COUNTERPART INTERNATIONAL, INC. | 13-6183605 |
| | Number, street, and room or suite no. If a P.O. box, see instructions. | |
| | 1200 18TH STREET, N.W., NO. 1100 | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. | |
| | WASHINGTON, DC 20036 | |

Check type of return to be filed (file a separate application for each return):

☒ Form 990
☐ Form 990-BL
☐ Form 990-EZ
☐ Form 990-PF

☐ Form 990-T (corporation)
☐ Form 990-T (sec. 401(a) or 408(a) trust)
☐ Form 990-T (trust other than above)
☐ Form 1041-A

☐ Form 4720
☐ Form 5227
☐ Form 6069
☐ Form 8870

- The books are in the care of ▶ THE ORGANIZATION

Telephone No. ▶ (202) 296-9676            FAX No. ▶ _____

- If the organization does not have an office or place of business in the United States, check this box ................................. ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____. If this is for the whole group, check this box ▶ ☐ . If it is for part of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension will cover.

**1**  I request an automatic 3-month (6-months for a Form 990-T corporation) extension of time until   **MAY 15, 2006** .
to file the exempt organization return for the organization named above. The extension is for the organization's return for:
▶ ☐ calendar year _____ or
▶ ☒ tax year beginning   **OCT 1, 2004** , and ending   **SEP 30, 2005** .

**2**  If this tax year is for less than 12 months, check reason:  ☐ Initial return   ☐ Final return   ☐ Change in accounting period

**3a**  If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions ........................................................ $ _____

**b**  If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit ........................... $ _____

**c**  **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions ........................ $      **N/A**

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

LHA   **For Privacy Act and Paperwork Reduction Act Notice, see instructions.**

Form **8868** (Rev. 12-2004)

423831
01-10-05

Form 8868 (Rev. 12-2004)

Page 2

- If you are filing for an **Additional** (not automatic) 3-Month Extension, complete only Part II and check this box .......... ▶ ☒
- **Note:** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

| Part II | Additional (not automatic) 3-Month Extension of Time - Must file Original and One Copy. |

**Type or print.**

**File by the extended due date for filing the return. See instructions.**

Name of Exempt Organization

COUNTERPART INTERNATIONAL, INC.

Number, street, and room or suite no. If a P.O. box, see instructions.

1200 18TH STREET, N.W., NO. 1100

City, town or post office, state, and ZIP code. For a foreign address, see instructions.

WASHINGTON, DC   20036

Employer Identification number

13-6183605

For IRS use only

Check type of return to be filed (File a separate application for each return):

☒ Form 990   ☐ Form 990-EZ   ☐ Form 990-T (sec. 401(a) or 408(a) trust)   ☐ Form 1041-A   ☐ Form 5227   ☐ Form 8870
☐ Form 990-BL   ☐ Form 990-PF   ☐ Form 990-T (trust other than above)   ☐ Form 4720   ☐ Form 6069

**STOP:** Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.

- The books are in the care of ▶ THE ORGANIZATION
  Telephone No. ▶ (202)296-9676    FAX No. ▶
- If the organization does not have an office or place of business in the United States, check this box .................................. ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box ▶ ☐ . If it is for part of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4    I request an additional 3-month extension of time until    AUGUST 15, 2006
5    For calendar year _____ , or other tax year beginning    OCT 1, 2004    and ending    SEP 30, 2005
6    If this tax year is for less than 12 months, check reason:   ☐ Initial return   ☐ Final return   ☐ Change in accounting period
7    State in detail why you need the extension
     ADDITIONAL TIME IS NEEDED FOR PREPARING A COMPLETE AND ACCURATE RETURN.

8a   If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions ........................................................... $

b    If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 ........................................................... $

c    Balance Due. Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions ........... $    N/A

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶    Title ▶ CPA    Date ▶ 4/20/06

**Notice to Applicant - To Be Completed by the IRS**

☐ We have approved this application. Please attach this form to the organization's return.
☐ We have not approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.
☐ We have not approved this application. After considering the reasons stated in item 7, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.
☐ We cannot consider this application because it was filed after the extended due date of the return for which an extension was requested.
☐ Other

EXTENSION APPROVED
JUN 0 1 2006

Director

By:

FIELD DIRECTOR
SUBMISSION PROCESSING, OGDEN

Date

**Alternate Mailing Address** - Enter the address if you want the copy of this application for an additional 3-month extension returned to an address different than the one entered above.

**Type or print**

Name

GELMAN, ROSENBERG & FREEDMAN

Number and street (include suite, room, or apt. no.) or a P.O. box number

4550 MONTGOMERY AVE., SUITE 650 NORTH

City or town, province or state, and country (including postal or ZIP code)

BETHESDA, MARYLAND 20814-2930

RECEIVED
MAY 1 6 2006
OGDEN, UT

Form 8868 (Rev. 12-2004)

423832
01-16-05

21

08010420 745960 08565                2004.09000 COUNTERPART INTERNATIONAL,   08565__1

**PDX-G**

Analysis of Michael Kunz Timesheets – Year 2004
(source of data=X-58)

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V | 444 Bulg. HQ | 448 Civic Advoc. | 460 Armen. CASP | 657 CAIP HQ | 657 V | 660 Food Vietn | 2310 Microe Uzbek | 674 Iraq CAP | 674 V H | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3334 | 1/1-1/15 | 50 | 5 | 0 | 0 | 0 | 0 | 0 | 20 | 2 | 0 | 0 | 0 | 0 | 77 |
| 3336 | 1/16-1/31 | 50 | 5 | 0 | 0 | 0 | 0 | 0 | 20 | 2 | 0 | 0 | 0 | 0 | 77 |
| 3338 | 2/1-2/15 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 70 |
| 3339 | 2/16-2/29 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 70 |
| 3340 | 3/1-3/15 | 46 | 0 | 9 | 0 | 8 | 6 | 0 | 6 | 0 | 2 | 0 | 0 | 0 | 77 |
| 3342 | 3/16-3/31 | 36 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 | 0 | 84 |
| 3343 | 4/1-4/15 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 | 0 | 77 |
| 3344 | 4/16-4/30 | 26 | 0 | 15 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 27 | 0 | 77 |
| 3346 | 5/1-5/15 | 21 | 7 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 18 | 0 | 70 |
| 3348 | 5/16-5/31 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 32 | 0 | 80 |
| 3350 | 6/1-6/15 | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 30 | 0 | 77 |

---

[1] H = holiday; V= vacation; S=sick.

1

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V | 444 Bulg. HQ | 448 Civic Advoc. | 460 Armen. CASP | 657 CAIP HQ | 657 V | 660 Food Vietn | 2310 Microe Uzbek | 674 Iraq CAP | 674 V H | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3352 | 6/16-6/30 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 31 | 0 | 77 |
| 3354 | 7/1-7/15 | 44 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 22 | 0 | 77 |
| 3356 | 7/16-7/31 | 47 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 20 | 0 | 77 |
| 3358 | 8/1-8/15 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 20 | 0 | 70 |
| 3360 | 8/16-8/31 | 29 | 0 | 0 | 0 | 0 | 2 | 0 | 10 | 0 | 0 | 0 | 43 | 0 | 84 |
| 3362 | 9/1-9/15 | 0 | 37 | 0 | 3 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 24 | 77 |
| 3364 | 9/16-30 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 22 | 0 | 80 |
| 4568 | 10/1-10/15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 | 0 | 0 | 77 |
| 3366 | 10/16-10/31 | 30 | 0 | 0 | 0 | 0 | 0 | 10 | 10 | 0 | 0 | 0 | 20 | 0 | 70 |
| 3368 | 11/1-11/15 | 77 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 |
| 3369 | 11/16-11/30 | 9 | 0 | 0 | 0 | 0 | 0 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 77 |
| 3370 | 12/1-12/15 | 77 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 |
| 3371 | 12/16-12/31 | 53 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 |
| TOTAL | | 900 | 75 | 24 | 3 | 8 | 8 | 78 | 237 | 17 | 2 | 77 | 377 | 24 | 1830 |

2

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V | 444 Bulg. HQ | 448 Civic Advoc. | 460 Armen. CASP | 657 CAIP HQ | 657 V | 660 Food Vietn | 2310 Microe Uzbek | 674 Iraq CAP | 674 V H | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL HVS | 0 | 0 | 75 | 0 | 3 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 24 | 119 |
| % TOTAL | | 49.18 | 4.09 | 1.31 | 0.16 | 0.43 | 0.43 | 4.26 | 12.95 | 0.92 | 0.10 | 4.20 | 20.60 | 1.31 | 99.94 |
| % TOTAL HVS | | | 63.02 | | 2.52 | | | | | 14.28 | | | | 20.16 | |

3

**PDX-H**

Analysis of Bobby Abma Timesheets – Year 2004
(source of data=X-57)

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3286 | 1/1-1/15 | 35 | 14 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3288 | 1/16-1/31 | 46 | 4 | 12 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3290 | 2/1-2/15 | 42 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 3 | 70 |
| 3292 | 2/16-2/29 | 44 | 0 | 17 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 7 | 0 | 0 | 70 |
| 3293 | 3/1-3/15 | 21 | 7 | 12 | 0 | 0 | 0 | 0 | 0 | 30 | 0 | 7 | 0 | 0 | 77 |
| 3295 | 3/16-3/31 | 6 | 0 | 4 | 0 | 0 | 0 | 15 | 0 | 56 | 0 | 3 | 0 | 0 | 84 |
| 3296 | 4/1-4/15 | 42 | 0 | 20 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 5 | 0 | 0 | 77 |
| 3298 | 4/16-4/30 | 39 | 5 | 20 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 77 |
| 3300 | 5/1-5/15 | 30 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 7 | 0 | 10 | 70 |
| 3302 | 5/16-5/31 | 12 | 3 | 9 | 2 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 2 | 0 | 77 |
| 3306 | 6/1-6/15 | 8 | 27 | 6 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 70 |

[1] H= holiday, V=vacation, S= sick leave.

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3308-9 | 6/16-6/30 | 18 | 27 | 8 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 77 |
| 33010-11 | 7/1-7/15 | 17 | 24 | 15 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 3 | 0 | 75 |
| 3312-13 | 7/16-7/31 | 24 | 10 | 21 | 7 | 0 | 0 | 7 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3314 | 8/1-8/15 | 33 | 14 | 12 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 7 | 0 | 0 | 70 |
| 3316-17 | 8/16-8/31 | 25 | 4 | 28 | 0 | 0 | 0 | 4 | 0 | 15 | 0 | 8 | 0 | 0 | 84 |
| 3318-19 | 9/1-9/15 | 24 | 0 | 24 | 0 | 0 | 0 | 7 | 0 | 14 | 0 | 8 | 0 | 0 | 77 |
| 3320-21 | 9/16-30 | 4 | 19 | 29 | 0 | 0 | 0 | 8 | 0 | 11 | 0 | 6 | 0 | 0 | 77 |
| 3322-23 | 10/1-10/15 | 21 | 0 | 21 | 0 | 0 | 0 | 8 | 0 | 12 | 0 | 5 | 0 | 0 | 67 |
| 3324 | 10/16-10/31 | 11 | 0 | 5 | 0 | 33 | 0 | 9 | 0 | 12 | 0 | 0 | 0 | 0 | 70 |
| 3326-27 | 11/1-11/15 | 19 | 0 | 29 | 0 | 8 | 0 | 11 | 0 | 10 | 0 | 0 | 0 | 0 | 77 |
| 3328-29 | 11/16-11/30 | 21 | 15 | 11 | 18 | 2 | 6 | 3 | 5 | 4 | 5 | 0 | 0 | 0 | 90 |
| 3330-31 | 12/1-12/15 | 13 | 8 | 19 | 9 | 6 | 4 | 7 | 0 | 11 | 0 | 0 | 0 | 0 | 77 |
| 3332-33 | 12/16-12/31 | 26 | 4 | 23 | 3 | 9 | 0 | 8 | 0 | 11 | 0 | 0 | 0 | 0 | 84 |

2

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | 581 | 185 | 398 | 92 | 58 | 10 | 103 | 5 | 243 | 5 | 115 | 20 | 13 | 1828 |
| TOTAL HVS | | 0 | 185 | 0 | 92 | 0 | 10 | 0 | 5 | 0 | 5 | 0 | 20 | 0 | 317 |
| % TOTAL | | 31.78 | 10.12 | 21.77 | 5.03 | 3.17 | 0.54 | 5.63 | 0.27 | 13.29 | 0.27 | 6.29 | 1.09 | 0.71 | 99.96 |
| % TOTAL HVS | | | 58.35 | | 29.02 | | 3.15 | | 1.57 | | 1.57 | | 6.30 | | |

3

**PDX-I**

Analysis of Bobby Abma Timesheets – Year 2004
(source of data=X-57)

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3286 | 1/1-1/15 | 35 | 14 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3288 | 1/16-1/31 | 46 | 4 | 12 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3290 | 2/1-2/15 | 42 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 3 | 70 |
| 3292 | 2/16-2/29 | 44 | 0 | 17 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 7 | 0 | 0 | 70 |
| 3293 | 3/1-3/15 | 21 | 7 | 12 | 0 | 0 | 0 | 0 | 0 | 30 | 0 | 7 | 0 | 0 | 77 |
| 3295 | 3/16-3/31 | 6 | 0 | 4 | 0 | 0 | 0 | 15 | 0 | 56 | 0 | 3 | 0 | 0 | 84 |
| 3296 | 4/1-4/15 | 42 | 0 | 20 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 5 | 0 | 0 | 77 |
| 3298 | 4/16-4/30 | 39 | 5 | 20 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 77 |
| 3300 | 5/1-5/15 | 30 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 7 | 0 | 10 | 70 |
| 3302 | 5/16-5/31 | 12 | 3 | 9 | 2 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 2 | 0 | 77 |
| 3306 | 6/1-6/15 | 8 | 27 | 6 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 70 |

[1] H= holiday, V=vacation, S= sick leave.

1

| CP Bates # | Dates | 452 CSSI | 452 H[1] V S | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3308-9 | 6/16-6/30 | 18 | 27 | 8 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 77 |
| 33010-11 | 7/1-7/15 | 17 | 24 | 15 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 3 | 0 | 75 |
| 3312-13 | 7/16-7/31 | 24 | 10 | 21 | 7 | 0 | 0 | 7 | 0 | 0 | 0 | 8 | 0 | 0 | 77 |
| 3314 | 8/1-8/15 | 33 | 14 | 12 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 7 | 0 | 0 | 70 |
| 3316-17 | 8/16-8/31 | 25 | 4 | 28 | 0 | 0 | 0 | 4 | 0 | 15 | 0 | 8 | 0 | 0 | 84 |
| 3318-19 | 9/1-9/15 | 24 | 0 | 24 | 0 | 0 | 0 | 7 | 0 | 14 | 0 | 8 | 0 | 0 | 77 |
| 3320-21 | 9/16-30 | 4 | 19 | 29 | 0 | 0 | 0 | 8 | 0 | 11 | 0 | 6 | 0 | 0 | 77 |
| 3322-23 | 10/1-10/15 | 21 | 0 | 21 | 0 | 0 | 0 | 8 | 0 | 12 | 0 | 5 | 0 | 0 | 67 |
| 3324 | 10/16-10/31 | 11 | 0 | 5 | 0 | 33 | 0 | 9 | 0 | 12 | 0 | 0 | 0 | 0 | 70 |
| 3326-27 | 11/1-11/15 | 19 | 0 | 29 | 0 | 8 | 0 | 11 | 0 | 10 | 0 | 0 | 0 | 0 | 77 |
| 3328-29 | 11/16-11/30 | 21 | 15 | 11 | 18 | 2 | 6 | 3 | 5 | 4 | 5 | 0 | 0 | 0 | 90 |
| 3330-31 | 12/1-12/15 | 13 | 8 | 19 | 9 | 6 | 4 | 7 | 0 | 11 | 0 | 0 | 0 | 0 | 77 |
| 3332-33 | 12/16-12/31 | 26 | 4 | 23 | 3 | 9 | 0 | 8 | 0 | 11 | 0 | 0 | 0 | 0 | 84 |

| CP Bates # | Dates | 452 CSSI | 452 H V S[1] | 449 Healthy Comm. | 449 H V S | 460 Armen. CASP | 460 V | 669 Food Tajik | 669 V | 674 Iraq CAP | 674 V H | 761 WB Women | 761 V S | 955 Prog. Devel | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | 581 | 185 | 398 | 92 | 58 | 10 | 103 | 5 | 243 | 5 | 115 | 20 | 13 | 1828 |
| TOTAL HVS | | 0 | 185 | 0 | 92 | 0 | 10 | 0 | 5 | 0 | 5 | 0 | 20 | 0 | 317 |
| % TOTAL | | 31.78 | 10.12 | 21.77 | 5.03 | 3.17 | 0.54 | 5.63 | 0.27 | 13.29 | 0.27 | 6.29 | 1.09 | 0.71 | 99.96 |
| % TOTAL HVS | | | 58.35 | | 29.02 | | 3.15 | | 1.57 | | 1.57 | | 6.30 | | | |