## Declaration of Lawrence J. Held

I, Lawrence Held depose and swear as follows based on my personal knowledge for use in the case of Cooper v. Counterpart pending in the United States District Court for the District of Columbia.

1. I am currently the Academy for Educational Development (AED) Regional Director for Central Asia (2002-Present) based in Almaty, Kazakhstan. Previously, I was AED director in Azerbaijan from 1999-2002 and the International Executive Service Corps (IESC) Representative for Central Asia from 1998-1999. From 1995-1996, I was AED's Representative in Turkmenistan. I also served as a U.S. Peace Corps Volunteer in Kyrgyzstan from 1993-1995.

2. I first met Mr. Cooper when I served as a Peace Corps Volunteer in Kyrgyzstan. Mr. Cooper was our group's training director. It was during this time that we became friends. Subsequently, in my post-Peace Corps work positions in Central Asia, we remained friends and also became close collaborators on USAID projects to promote civil society in the Central Asia region. My various positions with AED as well as my work with IESC often required me to work in partnership with Counterpart Consortium's Civil Society Support project and I worked closely with Mr. Cooper in designing and implementing numerous training programs for local NGOs in all five of the Central Asia republics.

3. I came to know Mr. Cooper's work in Central Asia through our joint collaboration in designing and implementing USAID training programs for local NGOs in the region. In particular, during the period from 2002-2004, Counterpart and AED worked in partnership through USAID's Regional Training Program (implemented by AED) to deliver training courses to the NGOs that Counterpart was supporting in the region. During this time period, AED and Counterpart jointly implemented at least 15 training courses in partnership. Though I collaborated with Mr. Cooper in other capacities from 1998-2004, it was during the period from 2002-2004 that I worked most closely with Mr. Cooper on these training programs as we were both regional directors of USAID projects based in Almaty, Kazakhstan. I would say that on average, we communicated directly at least once a month, numerous times per month as our respective staffs collaborated on these training programs. AED implemented an average of 2-3 training programs per month in partnership with Counterpart region-wide throughout the period from 2002-2004. I also saw Mr. Cooper an average of at least once a week socially or at more general USAID meetings and functions in the Almaty community or during business trips to other Central Asia republics.

4. In my view, Mr. Cooper's work performance was exemplary. When I needed to contact him at his office to discuss a program-related issue, I could always count on him being there both before and after normal business hours. I would describe him as a "workaholic". He was dedicated to his work and invariably provided quality input and

creative ideas into the training programs we implemented with his staff. I also respected his commitment to developing the skills of his local staff and he constantly sought to give them as much responsibility as they could handle in working with us to design training programs. In addition to our direct working relationship with Mr. Cooper and Counterpart, AED also worked with the NGOs in the region outside of our partnership with Counterpart. NGO leaders often praised Mr. Cooper's work and gave him much credit for the support he provided them over the years. Mr. Cooper is very well known throughout the NGO community in Central Asia and in my experience, stakeholders in the development community uniformly have a tremendous amount of respect for Mr. Cooper's body of work in the region.

5. Mr. Cooper's professional reputation in the development community in Central Asia was very strong. USAID officers as well as staff of other technical assistance projects have pointed out to me on at least 5 occasions that I can recall (shortly after the mid-March 2005 overthrow of the government in Kyrgyzstan) that Mr. Cooper's work in Kyrgyzstan in particular helped lay the groundwork for NGOs in Kyrgyzstan to respond positively during the March 2005 civil unrest in the country. For example, one USAID officer mentioned to me at this time that "if it had not been for Jay's work over the years in supporting the Kyrgyz NGOs, they never would have had the capacity to help calm the situation". Another USAID officer once remarked of Mr. Cooper's work in Turkmenistan that, "Jay's training of local Counterpart staff in Turkmenistan has enabled them to carry on work with or without an expatriate director". Arlene Lear of Counterpart has praised Mr. Cooper's work to me on at least 3 occasions. Once during an interview I had with Counterpart for a position in Uzbekistan in 1998 during a conference in Washington, DC, a second time during a social event in Ashgabat, Turkmenistan in approximately 1999 and a third time during a USAID partner's forum in Almaty in approximately 2003. I never heard a professional colleague express any doubt as to the quality of his work or his enthusiasm for the goals of his projects.

6. The only exception to the above is that on one occasion I was told by a member of the staff of USAID that he overheard from other USAID staff members that George Deikun, USAID/CAR Mission Director, expressed concerns about Jay's personal style sometime in the Spring of 2004. This same staff member went on to praise Mr. Cooper's work and expressed regret that the Mission Director based his opinion of Mr. Cooper on his at times awkward presentation skills rather than on any substantive issue with his body of work. Thereafter I never heard anything but praise for Jay's work from anyone at USAID.

7. I have been told by Mr. Cooper's counsel that some people have reported that Jay was overly controlling and intimidating to staff, even abusive at times and that he is not devoted to professional development of staff. In my work and contact with Mr. Cooper, I observed quite the opposite behavior. When AED staff met with Counterpart, at least 3

times per month over a period of 3 years between 2002 and 2004, Mr. Cooper always brought key local staff with him to meetings with me. With other expatriate implementers, often times, they do not bother to invite local staff to attend meetings with expatriate counterparts. Mr. Cooper went out of his way to give his local staff responsibility and invariably treated both his staff and my own staff with the utmost respect.

8. I have also been told by Mr. Cooper's counsel that some people have reported that it was Mr. Cooper's practice to yell at his staff and have temper tantrums and fits of anger that he unloaded on staff. I was in a position to observe Mr. Cooper in his office (at least twice a month from 2002-2003), in the AED office at least once a month during the same period and during at least one social event per month and never observed the kind of behavior Mr. Cooper's counsel refers to. On the contrary, Mr. Cooper went out of his way to feature his staff in both professional and social settings.

9. I have also been told by Mr. Cooper's counsel that some people have reported that it was Mr. Cooper's practice to make negative comments about Bob Abma's sexual orientation. I never heard any such comments from Mr. Cooper.

10. I first learned of Mr. Cooper's dismissal by Counterpart through a mobile phone call that Mr. Cooper made to me the day it happened. The tone of the phone call was one of utter surprise, humiliation and shock over what had happened after 10 years of outstanding service to the NGO community in Central Asia. Mr. Cooper also described the situation about how he had been locked out of his office and how his office and personal effects had been collected while he was in Bishkek on a business trip. Mr. Cooper was a pillar and highly respected member of the development community in Central Asia and word of how Mr. Cooper had been treated by the organization he had served for so long and so well made its way around the development community rapidly, especially among the other Democracy projects such as ABA, IFES, Internews and the Soros Foundation as well as the Urban Institute. Staff from these organizations uniformly expressed regret and surprise that Mr. Cooper had been treated this way. Staff from the organizations described above had also heard by word of mouth about the "lockout" situation described above. In particular USAID Democracy staff conveyed to me that they felt terrible about the way Mr. Cooper had been treated and that he did not deserve this treatment after 10 years of loyal service to Counterpart.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 10, 2006

_____
Lawrence J. Held