UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAY W. COOPER,                        )
                                      )
    Plaintiff,                        )
                                      )
    v.                                )  Civil Action No. 05-1598 (RMC-JMF)
                                      )
COUNTERPART INTERNATIONAL,            )
                                      )
    Defendant.                        )

## DECLARATION OF ARA NAZINYAN

I, Ara Nazinyan, depose and declare as follows, based on my personal knowledge, for use in the captioned case.

1. I am currently working as a Country Director Armenia, Eurasia Foundation. I am managing all activities of the Foundation office in Yerevan, Armenia including grant making and operating programs, finance, personnel and administration. From September 1997 to June 2003, I was employed by Counterpart International in a series of positions based in Central Asia. My final position with Counterpart was as Deputy Regional Director for Central Asia, Civil Society Support Program, where I reported directly to Jay Cooper from July 2002. I resigned that position to take my present position which permitted me to return to my family in Armenia.

2. I first met Jay Cooper in September 1997 in Tashkent. I was traveling to my post in Dushanbe, Tajikistan. Jay was traveling from Khujand, Tajikistan together with the World Bank Mission. At that time, I just joined Counterpart as Management Adviser to TASIF (Tajik Social Investment Fund), the World Bank. Jay welcomed me cordially to Counterpart and I felt from our first meeting a deep respect and trust

toward him. Since that, we were meeting with Jay many times during regular regional staff meetings in Almaty and other cities of Central Asia. It was always a pleasure working with Jay and learning from him about specifics of managing different development programs. Since September 2000, I had an opportunity to work more directly with Jay, when he asked me to join Counterpart Uzbekistan Mahalla Initiative Program (MIP) as a Program Advisor. Together with Jay Cooper and Uzbekistan staff, we worked hard to improve the program which had had not such a good start. In less than a year the program became one of the flagships of Counterpart in Uzbekistan and received an extension and new funding from USAID Mission. Jay was providing leadership and support to Uzbek and other country offices, dealing with multiple difficult and sensitive issues in a highly professional manner, taking into account local circumstances and respecting local traditions. He was always consulting with local staff and was enjoying full trust and respect from all country offices.

3. Jay always impressed me with his style of "intuitive management". He was the one who developed and marketed Counterpart's Civil Society Training Program in Central Asia. This was one of the greatest achievements of the organization in the region, which actually made a strong name and reputation for Counterpart. Jay always liked trusting staff and delegating responsibilities. He was the initiator and motivator of transferring large training program to local trainers-contractors (he made a huge effort to support development and creating of such important human capacity in the region). He was also motivating staff for supporting creation of local Civil Society Support Centers (CSSC), the idea which laid a foundation for successful localization

of Counterpart's Civil Society Program. Jay was very effective managing relationships with multiple stakeholders at USAID mission and offices throughout the region. Thanks to his personal contacts and efforts, Counterpart was able to secure support for Civil Society/NGO program as well as for other programs, such as Health Initiative and other activities. Jay Cooper was always promoting team work and delegating decision making to the key personnel. For example, he fully delegated OD program (one of the largest components of CSSP) to Beth Commolli, who was making all program related decisions. I was in charge of other program components, and was fully trusted the supervision and management over that components. Same can be said about other managers, including expatriate and local Country Directors, Program Managers, and Coordinators. Jay was always supportive of idea of promoting local staff, giving them more role and empowering for decision making. It was became obvious while implementing Healthy Community Projects, when a local staff was hired to manage the large program (with a minimum support and supervision from the regional office), and also during the localization of Civil Society program in Kyrgyzstan, Kazakhstan and Uzbekistan. Jay was able to introduce such a visionary approach for creating local institutions and transferring this vision throughout the programs and staff.

4. I have been told by Jay's attorney that persons in this case have testified that several people on Jay's staff have complained that Jay was overly controlling, abusive and intimidating to the staff, and that he was not supportive of staff members developing in their careers. My personal experience suggests the opposite. Jay was always promoting his staff. Thanks to Counterpart's management support (including Jay) I

was able to combine my work and learning at External Program of London University. Many former Counterpart staff received personal support from Jay for participation into Muskie Fellowship and other education programs. Of course, there were several complaints and conversations about some of the decisions made by Jay, but this is a regular situation in a large office and program. I cannot say, that he made any serious decisions, which had had a negative impact on program.

5. I was also told that some people have been reporting that Jay was inaccessible to staff and worked behind closed doors. I think that Jay was always open and accessible for the staff. The only times when his office door was closed were when there was a meeting or when he was having regular phone conversations with DC office.

6. I also came to know Bob Abma, Counterpart's Regional Finance Director. At the beginning my impression with Bob was quite positive. However, it changed over period of time. It was hard for me to understand his comments, sometimes very cynical, about people and about other things. When we were discussing new programs, projects or extension of old ones, the only concern for him was "adding my 5%", meaning 5% of any project total budget to support his, Bob Abma's position. Bob was always trying to charge expenses to the programs which had nothing to do with them. For example, trips, rent of "guest houses", etc. I tried to bring some of these issues to his and then to Jay's attention. Which caused rather tense conversation between Bob and myself and then between Bob and Jay.

7. Since Jay Cooper's promotion as a Regional Director, in different circumstances Bob Abma was making negative comments about Jay's role as a Regional Director. Although relationships between Jay and Bob were not the best ones, Jay was always

involving Bob in all decision making regarding finance and program management. Jay was always taking Bob's advice with regard of financial issues. I never heard Jay make any comments about anyone's sexual preferences.

8. I became acquainted with Michael Kunz when he joined Counterpart for Community Infrastructure Program in Uzbekistan. I did not have opportunities to work directly with Michael Kunz. However, I was informed by our local colleagues from Uzbekistan office that Michael was putting quite a pressure to the local office, asking for extra services and "attention". He ones had a strong argument with local Deputy Director Azam who tried to explain to Michael that his style and behavior is not entirely appropriate in the office. Same complaints about his personal "unethical and impolite" style of management I heard from other people in Uzbekistan, in particular from several local trainers who worked for Michael in his program. I believe these issues were reported by local staff to Jay and he had conversations with Arlene Lear and Mike about these cases. I was not involved in these discussions.

9. When I learned about firing Jay Cooper, my first reaction was not to believe to that news. From what I observed and what I did know about Jay's contribution to overall success of the organization in the region and to the particular program, I could not believe that such things were possible. I heard many different rumors from former colleagues in Central Asia. Although there were different interpretations, almost all of them were telling how upset they were with the process. For all of them, locking out the Regional Director, not allowing him to interact with the staff, and other "preventive" measures were outrageous and not justifiable. Many people viewed as a personal "revenge" of Bob Abma and Michael Kunz. This process had negative

impact on both local staff and also Counterpart reputation with USAID mission and other organizations.

10. Arlene Lear had always held Jay Cooper in high regard. For many years, Arlene was relying on Jay, especially in difficult times. Arlene was speaking highly of Jay in many instances, promoting him as a manager and giving him increasing role in the regional activities. I had a chance to talk with Arlene Lear after Jay's dismissal. I expressed my surprise with the fact. She told me that there were issues regarding Jay's performance. However, I felt that this conversation is difficult for Arlene personally and we did not talk at length on the issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  Feb. 09, 2007
                    Date

At  Yerevan
         Place

_____
Ara Nazinyan