0001
1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3  * * * * * * * * * * * * * * * *
4  JAY W. COOPER,              :
5            Plaintiff,        :
6    -vs-                : CASE NO.:
7  COUNTERPART INTERNATIONAL,    : 1:05cv1598(RMC)
8            Defendant.        :
9  * * * * * * * * * * * * * * * *
10    Corporate Deposition of Counterpart International
11            by and through
12            ARLENE LEAR
13          Vienna, Virginia
14       Friday, January 13, 2006
15            9:36 a.m.
16
17
18
19
20  Job No.:  1 - 70575
21  Pages:  1 - 269
22  Reported by:  Paula M. Flint, Notary Public
0002
1        Deposition of COUNTERPART INTERNATIONAL,
2  by and through ARLENE LEAR, held at the law offices
3  of:
4
5        JACKSON LEWIS, LLP.
6      8614 Westwood Center Drive
7          Suite 950
8       Vienna, Virginia  22182
9         (703) 821-2189
10
11
12
13
14        Pursuant to agreement, before Paula M.
15  Flint, Notary Public of the Commonwealth of
16  Virginia.
17
18

19
20
21
22

0003

1           A P P E A R A N C E S
2
3    On behalf of the Plaintiff:
4         PATRICIA D. DOUGLASS, ESQUIRE
5         Law Office of Patricia D. Douglass
6         98 Interpromontory Road
7         Great Falls, Virginia  22066-3219
8         (703) 759-3674
9
10    On behalf of the Defendant:
11      BY:  KARA M. ARIAIL, ESQUIRE
12        Jackson Lewis, LLP.
13        8614 Westwood Center Drive
14        Suite 950
15        Vienna, Virginia  22182
16        (703) 821-2189
17
18
19
20
21
22

0004

1           C O N T E N T S
2    EXAMINATION OF ARLENE LEAR            PAGE:
3     Ms. Douglass                7, 266
4     Ms. Ariail                  264
5           E X H I B I T S
6    LEAR DEPOSITION EXHIBIT NO.            PAGE:
7       (Exhibits subsequently
8        attached to the Deposition.)

9    1    Employment Contract        13
10   2    Employment Contract        15
11   3    Notice of Deposition        7
12   4    Employment Contract        17
13   5    E-mail                20
14   6    E-mail                25
15   7    Employee Manual        28

| 16 | 8 | Employment Contract | 21 |
| 17 | 9 | Employee Performance Review | 30 |
| 18 | 10 | E-mail | 33 |
| 19 | 11 | Job Description | 109 |
| 20 | 12 | E-mails | 132 |
| 21 | 13 | Employee Self-Appraisal | 41 |
| 22 | 14 | Employee Self-Appraisal | 42 |

0005

| 1 | 15 | E-mail | 217 |
| 2 | 16 | Resume | 11 |
| 3 | 17 | Employee Performance Appraisal Form | 46 |
| 4 | 18 | Report | 260 |
| 5 | 19 | E-mail | 57 |
| 6 | 20 | E-mail | 61 |
| 7 | 21 | E-mail | 63 |
| 8 | 22 | E-mail | 66 |
| 9 | 23 | E-mail | 70 |
| 10 | 24 | E-mail | 71 |
| 11 | 25 | E-mail | 75 |
| 12 | 26 | E-mail | 77 |
| 13 | 27 | E-mail | 84 |
| 14 | 28 | Midterm Evaluation | 95 |
| 15 | 29 | Second Supplemental Response | 111 |
| 16 | 30 | Email | 155 |
| 17 | 31 | Memo | 179 |
| 18 | 32 | Plaintiff's Responses | 180 |
| 19 | 33 | Memo | 202 |
| 20 | 34 | Memo | 204 |
| 21 | 35 | E-mails | 207 |
| 22 | 36 | E-mail with Attachments | 229 |

0006

| 1 | 37 | E-mail | 239 |
| 2 | 38 | Draft Minutes | 242 |
| 3 | 39 | E-mail | 251 |
| 4 | 40 | Detailed List of Comments | 256 |

5        *    *    *

6

7

8

9

10

11

12

13
14
15
16
17
18
19
20
21
22

0007

1    Thereupon,
2                    ARLENE LEAR,
3    was called for examination by Counsel and, after
4    having been duly sworn by the Notary, was examined
5                and testified as follows:
6        EXAMINATION BY COUNSEL FOR PLAINTIFF
7    BY MS. DOUGLASS:
8        Q.    Could you state your name for the record,
9    please.
10        A.    Arlene Lear.
11        Q.    And are you appearing today as the
12    corporate representative of Counterpart
13    International?
14        A.    Yes.
15        Q.    And are you appearing pursuant to a Notice
16    of Deposition served on your company?
17        A.    Yes.
18            MS. DOUGLASS:  I'd like to have marked as
19    the first exhibit in order what I believe to be that
20    notice.
21            (Document referred to marked Deposition
22    Exhibit Number 3 for identification and subsequently
                            0008
1    attached to the deposition.)
2    BY MS. DOUGLASS:
3        Q.    Now, Ms. Lear, I've shown you what's
4    been --
5            MS. ARIAIL:  I'm just going to stop you
6    for a minute.  She hasn't had a chance to look at
7    it.
8            MS. DOUGLASS:  Okay, go ahead.
9        A.    Okay.  We'll be able to go down one level

10    at a time?
11         Q.   Yes.  I'm just going to ask you now if the
12    notice that I've just handed you that's been marked
13    Plaintiff's Exhibit 3 is something that you've
14    reviewed before this deposition.
15         A.   Yes.
16         Q.   Now, do you understand that you are
17    appearing here as a representative of the
18    corporation Counterpart International?
19         A.   Yes.
20         Q.   If at any time you make a statement, I'm
21    free to align that statement as the position of
22    Counterpart International.  Is that your
                              0009
1     understanding?
2          A.   Yes.
3          Q.   If for any reason in response to any given
4     question you want to comment on whether or not your
5     statement is representative of Counterpart
6     International, I will allow you to do that if you
7     ask me.
8          A.   Okay.
9          Q.   We want to make the record very clear what
10    you're answering in your personal capacity versus
11    your corporate capacity.
12         A.   Okay.
13         Q.   I'm intending to ask all my questions to
14    elicit your response in your corporate capacity.
15    All right?
16         A.   Uh-huh.
17         Q.   Now, if there's any question that's
18    unclear to you that I ask, please ask me to clarify,
19    because it's extremely important that we're
20    communicating.  And if you need to take a break, you
21    can do that.  If you want to confer with Ms. Ariail,
22    you can do that as long as there's not a question
                              0010
1     pending.  And if there's any other problem that
2     comes up, simply ask me if we can go off the record
3     and we'll discuss it.  All right?
4          A.   Uh-huh.
5          Q.   Okay.  Now, let's turn to subject number
6     one in Attachment A to Exhibit 3.  In that subject

7    you're asked to speak for the corporation with
8    respect to the following subject matter.  Quote,
9    "Jay Cooper's career at Counterpart, including the
10   positions he's held, his responsibilities at those
11   positions, the salaries, raises and bonuses he's
12   received at these positions and the work evaluations
13   he's received at these positions," correct?
14      A.   Yes.
15      Q.   Now, have you produced with you today any
16   documents that have not previously been produced
17   that are called for by subject number one?
18      A.   Not that I'm aware of, no.
19      Q.   You have to speak up.
20      A.   No.
21         MS. ARIAIL:  You have to speak loudly.
22         THE WITNESS:  No.
                            0011
1          MS. DOUGLASS:  Fine.
2          THE WITNESS:  Sorry.
3          MS. ARIAIL:  That's okay.
4    BY MS. DOUGLASS:
5       Q.   Now, did you hire Jay Cooper for
6    Counterpart?
7       A.   Yes.
8       Q.   This is you personally?
9       A.   Yes.
10      Q.   And I would like to show you what's been
11   previously marked in Mr. Cooper's deposition as
12   Defendant's Exhibit 16 and have it marked in this
13   deposition as Plaintiff's Exhibit 16 and ask you if
14   you can identify it for us.
15      A.   Uh-huh.
16         (Document referred to marked Deposition
17   Exhibit Number 16 for identification and
18   subsequently attached to the deposition.)
19   BY MS. DOUGLASS:
20      Q.   I will represent to you that Mr. Cooper
21   has testified that this is a resume that was
22   prepared at about 2003 in connection with a proposal
                            0012
1    to USAID for a project for Counterpart.  If you have
2    any reason to doubt that, I would like you to tell
3    me.

4      A.   I don't recall the reason why this was
5    prepared.
6      Q.   Is it -- does it appear to be a resume of
7    Jay Cooper?
8      A.   Yes.
9      Q.   My question is, at the time you hired
10   Mr. Cooper, do the qualifications set forth in
11   Plaintiff's Exhibit 3, from the middle of the page
12   marked 000047 on, appear to accurately reflect what
13   you understood his qualifications to be at the time
14   you hired him?
15     A.   000047.  Everything on this page?
16     Q.   From the phrase that starts "Director and
17   co-founder of Center Interbilim."
18     A.   Okay.  I do not recall much of this.  This
19   was 1994 when he was hired.  I frankly do not recall
20   much of this.
21     Q.   Presumably you considered him qualified
22   for the job at the time you hired him.  Is that
                          0013
1    right?
2           MS. ARIAIL:  Objection, form.  You can
3    answer when I object.
4           THE WITNESS:  Okay.
5           MS. ARIAIL:  After I object.
6      A.   He was hired as a training coordinator,
7    and I thought that he was sufficiently qualified,
8    yes.
9      Q.   Now, I'd like to mark as Plaintiff's
10   Exhibit 1 what's previously been marked Defendant's
11   Exhibit 1 and ask you if this is the first contract
12   that you entered into with Jay Cooper.
13          (Document referred to marked Deposition
14   Exhibit Number 1 for identification and subsequently
15   attached to the deposition.)
16     A.   As I recall, yes, this is the first
17   contract.
18     Q.   All right.  Now, using Plaintiff's
19   Exhibit 1, if you need to use it to refresh your
20   recollection, am I correct that Mr. Cooper was hired
21   as the Kyrgyzstan country director and regional
22   training director under this contract to serve in
                          0014

1    that position between October of 1994 and June 30,
2    1997? I refer you to paragraph four for that date.
3        A.   Uh-huh.
4        Q.   No.  The paragraph with a "4" in front of
5    it.
6        A.   Oh, sorry.  Yes.
7        Q.   And was Mr. Cooper given a salary for that
8    period in the amount of $46,800 per year?
9        A.   To my best knowledge, yes.
10       Q.   Was he, in fact, paid that amount during
11   that period of time?
12       A.   I can assume so, yes.
13       Q.   Did he receive any bonuses during that
14   period?
15       A.   I frankly don't recall.
16       Q.   What is, if anything, Counterpart's policy
17   on bonuses?
18       A.   In those earlier years we had no policy on
19   bonuses.
20       Q.   Were bonuses given occasionally as a
21   benefit at the discretion of supervisors?
22       A.   Yes.

                          0015

1        Q.   Were you one of the supervisors that
2    exercised discretion to give or not to give bonuses?
3        A.   Yes.
4        Q.   But you do not recall whether or not you
5    gave one to Mr. Cooper.  Is that correct?
6            MS. ARIAIL:  Objection, asked and
7    answered.
8        A.   Yes.
9            MS. DOUGLASS:  Now, I'd like to mark as
10   Plaintiff's Exhibit 2 a document previously marked
11   Defendant's Exhibit 2, which appears to be an
12   employment contract for employees hired to work in
13   foreign areas.
14           (Document referred to marked Deposition
15   Exhibit Number 2 for identification and subsequently
16   attached to the deposition.)
17   BY MS. DOUGLASS:
18       Q.   Ms. Lear, does Plaintiff's Exhibit 2
19   appear to be a contract between Counterpart and
20   Mr. Cooper which was executed by Counterpart and by

21    Mr. Cooper in February of 1998?
22        A.   Yes.

0016

1        Q.   And does it purport to cover Mr. Cooper's
2    employment by Counterpart for the period of
3    July 1997 till sometime in 2000?
4            MS. ARIAIL:  Objection to form.
5            MS. DOUGLASS:  Excuse me.  Let me withdraw
6    that question and ask a different one.
7            THE WITNESS:  Uh-huh.
8    BY MS. DOUGLASS:
9        Q.   Does it purport to cover Mr. Cooper's
10   employment by Counterpart between the first day of
11   July 1997 and at least 27 months thereafter?
12       A.   Yes.
13            MS. ARIAIL:  Objection, form.
14   BY MS. DOUGLASS:
15       Q.   And did Plaintiff's Exhibit 2, in fact,
16   cover Mr. Cooper's employment by Counterpart through
17   May of 2000?
18       A.   I don't remember.
19       Q.   Was Mr. Cooper offered a subsequent --
20   strike that.
21            Did you enter into a subsequent contract
22   with Mr. Cooper for his employment?

0017

1        A.   Following this contract?
2        Q.   Yes.
3        A.   Yes.
4        Q.   And I'd like to show you what's been
5    previously marked Defendant's Exhibit 4, in which
6    I'd like to have marked in this deposition as
7    Plaintiff's Exhibit 4, which I believe to be the
8    subsequent contract, and ask you if that's true.
9            (Document referred to marked Deposition
10   Exhibit Number 4 for identification and subsequently
11   attached to the deposition.)
12       A.   Yes.
13       Q.   So if you look back at what's been marked
14   Plaintiff's Exhibit 2, it shows that Mr. Cooper was
15   serving in the period of time Plaintiff's Exhibit 2
16   was in effect, in the post of regional deputy
17   director.  Is that correct?

18    A.    Yes.
19    Q.    And by the time Plaintiff's Exhibit 4 came
20    into effect his title had changed and he was serving
21    in a position of regional director for the
22    Counterpart consortium program for civil society and

0018

1    NGO development.  Is that correct?
2    A.    Yes.
3    Q.    And during the period of time Plaintiff's
4    Exhibit 2 was in effect, he was paid $62,000 a year.
5    Is that correct?
6    A.    Uh-huh -- yes.
7    Q.    And when Plaintiff's Exhibit 4 came into
8    effect, he began to be paid at the rate of $82,500 a
9    year.  Is that correct?
10    A.    Yes.
11    Q.    Was there any gap between the time that
12    Plaintiff's Exhibit 2 was in effect and Plaintiff's
13    Exhibit 4 came into effect when Mr. Cooper was not
14    employed by Counterpart?
15    A.    Not that I recall.
16    Q.    So is it fair to say that Plaintiff's
17    Exhibit 2 was effective until the effective date of
18    Plaintiff's Exhibit 4?
19    A.    Yes.
20    Q.    And so the salary of $62,000 a year was
21    paid up until April 1, 2000 to Mr. Cooper?
22    A.    To my best knowledge.

0019

1    Q.    And did he receive any bonuses during the
2    time Plaintiff's Exhibit 2 was in effect?
3    A.    Implicit in the salary of -- for Exhibit 4
4    is acknowledgment of merit.
5    Q.    Correct.  I'm now asking you about
6    Exhibit 2.  During the time Exhibit 2 was in effect,
7    did Mr. Cooper receive any bonuses?
8    A.    He may have.
9    Q.    You don't remember.  Is that the answer?
10    A.    I don't remember.  Actually, at that time
11    we gave Christmas bonuses.
12    Q.    So you believe you did?
13    A.    Yes.
14    Q.    Was the bonus computed on a percentage of

15    salary?
16        A.    As I recall.
17        Q.    Was it discretionary?  Let me rephrase
18    that question.
19        A.    It was discretionary on the part of the
20    company, yes.
21        Q.    Correct.  But everyone got the same
22    percent based on their salary.  That's my question.

                              0020

1        A.    I don't recall.
2        Q.    You don't recall whether or not it was
3    based on merit?
4        A.    I don't.
5            MS. DOUGLASS:  Now, I'd like to have
6    marked as the next available exhibit number what
7    appears to be an e-mail written by you on May 12,
8    2000, bearing the title of "Congratulations to Jay."
9            MS. ARIAIL:  Could you let us know what
10   the number is?
11           THE REPORTER:  Five.
12           (Document referred to marked Deposition
13   Exhibit Number 5 for identification and subsequently
14   attached to the deposition.)
15   BY MS. DOUGLASS:
16       Q.    Did you write Plaintiff's Exhibit 5?
17       A.    Yes.
18       Q.    And does Plaintiff's Exhibit 5 celebrate
19   Mr. Cooper's promotion from being a regional deputy
20   director to being a regional director?
21       A.    Yes.
22       Q.    And at the time you wrote Plaintiff's

                              0021

1    Exhibit 5, did you believe the sentiments there
2    expressed?
3        A.    Yes.
4            MS. DOUGLASS:  I'd like to have marked as
5    Plaintiff's Exhibit 8 a document previously marked
6    Defendant's Exhibit 8 in Mr. Cooper's deposition.
7            (Document referred to marked Deposition
8    Exhibit Number 8 for identification and subsequently
9    attached to the deposition.)
10   BY MS. DOUGLASS:
11       Q.    Do you recognize Plaintiff's Exhibit 8 as

12    the final contract that Counterpart entered into
13    with Mr. Cooper?
14        A.   Yes.
15        Q.   And by its terms, I'm correct, am I not,
16    that Plaintiff's Exhibit 8 covers the period July 1,
17    2003 to June 30, 2006?
18        A.   Yes.
19        Q.   Now, if you go back to Plaintiff's
20    Exhibit 4, the term of that agreement was to end
21    March 31, 2003.  Do you see that?
22        A.   Yes.
                        0022
1         Q.   Was Mr. Cooper employed by Counterpart
2     between March 31, 2003 and July 1, 2003?
3         A.   Yes.
4         Q.   Was he --
5         A.   There was an extension.
6         Q.   Extension?
7         A.   Uh-huh.
8         Q.   So he was acting during those months under
9     the terms of the agreement that's Plaintiff's
10    Exhibit 4.  Is that correct?
11        A.   Yes.
12        Q.   And during the time he was employed under
13    the terms of Plaintiff's Exhibit 4, he was making
14    $82,500 a month.  Is that correct?
15        A.   Yes.
16           MS. ARIAIL:  Objection, misstated the
17    exhibit, the document.
18    BY MS. DOUGLASS:
19        Q.   I don't remember what I said, but during
20    the time -- I'll ask it again.
21        A.   Yeah.
22        Q.   During the time Mr. Cooper was employed
                        0023
1     under the terms of Plaintiff's Exhibit 4 --
2         A.   Yes.
3         Q.   -- he was receiving a salary of 82,500 a
4     month.  Is that correct?
5         A.   Yes.
6            MS. ARIAIL:  Objection to the
7     mischaracterization of the document.  I can just
8     tell you.  It wasn't monthly.  You said monthly

9   twice.
10         MS. DOUGLASS:  I meant annually.
11   BY MS. DOUGLASS:
12      Q.   Did you understand me to mean annually
13   when you said "yes"?
14      A.   Yes.
15         MS. DOUGLASS:  Thank you, Kara.
16         MS. ARIAIL:  Yes.
17   BY MS. DOUGLASS:
18      Q.   Do you remember whether Mr. Cooper
19   received any bonuses during the time he was employed
20   under the terms of Plaintiff's Exhibit 4?
21      A.   I just don't recall.  I just don't recall.
22   It's likely, but I don't recall.
                      0024
1      Q.   Do you remember whether or not at some
2   point in time Counterpart began giving bonuses for
3   special achievements as opposed to across-the-board
4   bonuses based on the percentage of salary?
5      A.   Possibly maybe about two years ago.
6      Q.   So that would have been during the period
7   that Plaintiff's Exhibit 4 was in effect?
8      A.   Two years ago?  No.  No, it would not have
9   been the time that Exhibit 4 was in effect, no.
10      Q.   It would have been the time in which
11   Exhibit 8 was in effect?
12      A.   Actually, implicit in the salary under
13   Exhibit 8 is a bonus as a merit.
14      Q.   And this was a bonus that was awarded
15   Mr. Cooper for superior management performance.  Is
16   that correct?
17      A.   I wouldn't state it as superior.
18      Q.   You wouldn't?
19      A.   No.
20      Q.   Why did Mr. Cooper get a bonus in
21   Plaintiff's Exhibit 8?
22      A.   My issue was with the term "superior," not
                      0025
1   with the fact that he merited a bonus.
2      Q.   So what you're saying is he merited a
3   bonus but not because he was superior.  Is that
4   correct?
5      A.   He merited a bonus because he demonstrated

6      that he performed well.
7         Q.   During the period that Plaintiff's
8      Exhibit 8 was in effect, Mr. Cooper was compensated
9      on an annual salary exclusive of bonus, of
10     $97,323.60 annually.  Is that correct?
11        A.   Yes.
12           MS. DOUGLASS:  I'd like to have marked as
13     the next available exhibit number a document which
14     appears to be an e-mail from Arlene Lear to Kelli
15     Boyer, dated November 16, 2003.
16           (Document referred to marked Deposition
17     Exhibit Number 6 for identification and subsequently
18     attached to the deposition.)
19     BY MS. DOUGLASS:
20        Q.   Have you had a chance to look at
21     Plaintiff's Exhibit 6?
22        A.   Yes.
                         0026
1         Q.   Do you recognize the top half of the first
2      page of Plaintiff's Exhibit 6 as an e-mail you wrote
3      to Kelli Boyer on November 16, 2003?
4         A.   Yes.
5         Q.   And in that e-mail you tell Ms. Boyer that
6      you'd like to give Mr. Cooper a merit bonus, quote,
7      "for being the COP of two multi-million-dollar,
8      multi-country initiatives."  Is that right?
9         A.   Uh-huh.
10           MS. ARIAIL:  I'm sorry.  Say "yes" or "no"
11     when you answer.
12           THE WITNESS:  Yes.
13     BY MS. DOUGLASS:
14        Q.   And that decision was yours to make, was
15     it not?
16        A.   Yes.
17        Q.   You're simply asking Ms. Boyer to
18     effectuate what you want to have done, correct?
19        A.   Yes.
20        Q.   Now, did you mean what you wrote in the
21     section of Plaintiff's Exhibit 6 that constitutes
22     the e-mail to Kelli Boyer of November 16 at the time
                         0027
1      you wrote it?
2         A.   Yes.

3       Q.   Was it Counterpart's policy to give
4  performance evaluations to one's subordinates?
5       A.   Yes.
6       Q.   And was this a policy that was broadly
7  effectuated in the company?
8            MS. DOUGLASS:  Let me withdraw that
9  question.  That's not an easy question.  I
10  apologize.
11  BY MS. DOUGLASS:
12       Q.   Were performance evaluations routinely
13  done at Counterpart?
14       A.   Informal and formal, yes.
15       Q.   Now, was an annual performance evaluation
16  required of every supervisor?
17       A.   It was recommended.
18       Q.   And in what form was it recommended?
19       A.   There were two forms.  There was a
20  self-evaluation and a supervisor's evaluation.
21            MS. DOUGLASS:  I'd like to have marked as
22  the next exhibit in order a multi-page document
                              0028
1  bearing the Bates stamps CP572 through 607, the
2  cover page of which reads, "Counterpart
3  International, Inc. Manual for Employees in Foreign
4  Areas."
5            (Document referred to marked Deposition
6  Exhibit Number 7 for identification and subsequently
7  attached to the deposition.)
8  BY MS. DOUGLASS:
9       Q.   What is Plaintiff's Exhibit 7 please,
10  Ms. Lear?
11       A.   Manual for employees in foreign areas.
12       Q.   Is it a manual that was in effect at
13  Counterpart in 2001?
14       A.   Yes.
15       Q.   Has it been superseded since March 2001?
16       A.   There have been modifications.
17       Q.   Would you look on page five of Plaintiff's
18  Exhibit 7, please.  Does section 3.4 of Plaintiff's
19  Exhibit 7 state that performance review is conducted
20  annually or more frequently?
21       A.   Yes.
22       Q.   And that was the policy of Counterpart --

0029

1    A.   Uh-huh.
2    Q.   -- at the time this manual was in effect,
3  correct?
4    A.   Yes.
5    Q.   Has that section of Plaintiff's Exhibit 7
6  been modified between March of 2001 and November 12,
7  2004?
8    A.   Not to my knowledge.
9    Q.   Is it the policy of Counterpart that the
10  performance evaluation process should be an
11  opportunity to communicate frankly and openly about
12  issues concerning a particular individual's
13  performance?
14    A.   Yes.
15    Q.   Did you in your position as senior vice
16  president communicate frankly and openly with
17  employees who reported to you during the performance
18  evaluation process?
19    A.   Yes.
20    Q.   Now, did you expect your employees to
21  communicate openly and frankly with you during the
22  performance evaluation process?

0030

1    A.   Yes.
2    Q.   Did you think less highly of employees who
3  frankly stated criticisms of your performance during
4  your evaluation of their performance?
5      MS. ARIAIL:  Objection, relevance.
6    A.   No, I did not think less highly of those
7  employees.
8    Q.   Okay, good.
9      MS. DOUGLASS:  Now, I'd like to have
10  marked as the next exhibit in order a multi-page
11  document bearing Bates stamps 000333 through 40, the
12  first page of which is headed "Counterpart
13  International Employee Performance Review."
14      (Document referred to marked Deposition
15  Exhibit Number 9 for identification and subsequently
16  attached to the deposition.)
17  BY MS. DOUGLASS:
18    Q.   Before you look at that, Ms. Lear, I would
19  just like to state, for the record, that this

20    document was produced in discovery by Mr. Cooper.
21    And your company, Counterpart, produced an identical
22    document but one that was missing the first page.

0031

1    And I have a copy of what was produced there if your
2    counsel would like to look at it to verify that it's
3    the same document.
4        MS. ARIAIL:  I would just add that
5    Exhibit 9 has two additional pages, page seven and
6    page eight, but it otherwise appears to be
7    identical.
8    BY MS. DOUGLASS:
9        Q.   If you look at page seven and eight of
10   Exhibit 9, Ms. Lear, are those pages a blank form
11   that an employee is supposed to fill out in an
12   effort to appraise his or her own performance?
13       A.   Yes.
14       Q.   And is it Counterpart policy to have the
15   employee fill out pages like page seven and eight of
16   Plaintiff's Exhibit 9 and submit it to his or her
17   supervisor before the supervisor fills out a form
18   such as the first six pages of Plaintiff's
19   Exhibit 9?
20       A.   I don't think there's a sequence.
21       Q.   So it's your understanding, however, that
22   pages like pages seven and eight of Plaintiff's

0032

1    Exhibit 9 are to be filled out by an employee,
2    correct?
3        A.   Yes.
4        MS. ARIAIL:  Objection, asked and
5    answered.
6    BY MS. DOUGLASS:
7        Q.   And the first six pages of Plaintiff's
8    Exhibit 9 is on a standard form that supervisors are
9    to use to rate a performance of their employees that
10   report to them.  Is that correct?
11       A.   Yes.
12       Q.   And is Plaintiff's Exhibit 9, pages one
13   through six, a performance review that you completed
14   assessing the performance of Jay Cooper?
15       A.   Yes.
16       Q.   Can you tell me the date that Plaintiff's

17      Exhibit 9 was completed by you?
18          A.   No, I don't recall.
19          Q.   Is there any other occasion on which you
20      have completed a form, such as Plaintiff's
21      Exhibit 9, to evaluate the performance of Jay
22      Cooper?

0033

1           A.   As I recall, there were two performance
2       reviews.  One of Jay Cooper, as I recall.
3           Q.   In other words, there is another
4       performance review aside from Plaintiff's Exhibit 9
5       that you filled out on Jay Cooper.  Is that what you
6       said?
7           A.   Is this the 2000 -- is this approximately
8       2003 for 2002 performance?
9               MS. ARIAIL:  You're not asking the
10      questions.
11              THE WITNESS:  Sorry.
12              MS. DOUGLASS:  I'll give you a piece of
13      paper that might help you with this question.
14              THE WITNESS:  Yeah, I really don't know.
15              MS. DOUGLASS:  I'd like to have marked as
16      the next available exhibit an e-mail from Arlene
17      Lear to Kate Gottschall, dated March 19, 2002.
18              (Document referred to marked Deposition
19      Exhibit Number 10 for identification and
20      subsequently attached to the deposition.)
21      BY MS. DOUGLASS:
22          Q.   Is Plaintiff's Exhibit 10 an e-mail you

0034

1       wrote to Kate Gottschall in March of 2002?
2           A.   Yes.
3           Q.   Is it -- does review of Plaintiff's
4       Exhibit 10 refresh your recollection that
5       Plaintiff's Exhibit 9 was prepared on or about March
6       of 2002?
7           A.   Let me review this.  What I can
8       acknowledge is I did this evaluation.
9           Q.   You're talking about Plaintiff's
10      Exhibit 9?
11          A.   Yes.  What I can acknowledge is that there
12      was an evaluation done in 2002.  Since there is no
13      date on this, it's difficult for me to recall that

14    this is the same evaluation.  Sorry.
15        Q.    But your best memory now is that there was
16    one other evaluation of Jay Cooper prepared by you?
17            MS. ARIAIL:  Objection,
18    mischaracterization of testimony.
19            MS. DOUGLASS:  Let me rephrase it.
20    BY MS. DOUGLASS:
21        Q.    Is it your testimony now that you prepared
22    another evaluation of Jay Cooper's performance at
                            0035
1    some time during the time you supervised him?
2        A.    I'm now looking at seven years.  This is
3    the evaluation.
4        Q.    So your --
5        A.    Yes.
6        Q.    Just to clarify --
7        A.    Yes.
8        Q.    -- what you've just said, when you said
9    this is the evaluation, is that Plaintiff's Exhibit
10    9 is the evaluation that was attached to Plaintiff's
11    Exhibit 10 and was therefore prepared in March of
12    2002.  Is that correct?
13        A.    It appears so.
14        Q.    Now, if you look at Plaintiff's
15    Exhibit 10, there are various ratings that are
16    permissible for various aspects of performance.  Is
17    that correct?
18        A.    Yes.
19        Q.    In other words, a particular --
20            MS. ARIAIL:  I want to cut in.  You
21    misstated the exhibit number.
22            MS. DOUGLASS:  All right.  Then I'll start
                            0036
1    over again.
2    BY MS. DOUGLASS:
3        Q.    Would you look at Plaintiff's Exhibit 9,
4    please?
5        A.    Yes.
6        Q.    On the form that you filled out on
7    Plaintiff's Exhibit 9, you were permitted to rate
8    various aspects of performance under several
9    different ratings.  Is that correct?
10        A.    Yes.

11    Q.    And the available categories of ratings
12    were: one, exceptional; two, commendable; three,
13    meets minimum standards; four, needs improvements;
14    and five, unacceptable.  Is that correct?
15    A.    Yes.
16    Q.    Now, it is correct, is it not, that in
17    March of 2002, you rated Mr. Cooper's performance
18    exceptional in all except five categories out of 25.
19    Is that correct?
20    A.    Shall I count?
21    Q.    If you want to.
22        MS. ARIAIL:  You're not asking the

0037

1    questions.
2    A.    Six.
3    Q.    All right.  And is it true that in the six
4    categories that you did not rate exceptional, you
5    rated Mr. Cooper's performance as commendable?
6    A.    Yes.  In that -- I correct that again.
7    It's seven.  I saw on page five.  It's seven.
8    Q.    Well, on several occasions you seemed to
9    have rated his performance on the line between --
10    A.    Yes.
11    Q.    -- exceptional and commendable.  Is that
12    right?
13    A.    Absolutely, yes.
14    Q.    And that's true on item 13 --
15    A.    Uh-huh.
16    Q.    -- and on item 18 --
17    A.    Uh-huh.
18    Q.    -- and on item 22?
19    A.    No.
20        MS. ARIAIL:  Arlene, please answer "yes"
21    or "no" instead of uh-huh.
22    BY MS. DOUGLASS:

0038

1    Q.    Yes?
2    A.    On item 18 it was commendable.  On item 19
3    it was commendable.  On item 22 it was commendable.
4    On item 23 it's commendable.
5    Q.    Okay, thank you.  Now, did the views
6    expressed in Plaintiff's Exhibit 9 accurately
7    reflect your opinion of Mr. Cooper's work

8    performance as of March 2002?
9        A.   Yes.
10       Q.   Now, in your view what is the purpose that
11   Counterpart intends to serve by requiring its
12   employees to make a self-appraisal?
13           MS. ARIAIL:  Objection, outside the scope
14   of the deposition.
15           MS. DOUGLASS:  Okay.
16           MS. ARIAIL:  I'm actually going to
17   instruct her not to answer on anything outside the
18   scope of the deposition.  She'll be deposed as an
19   individual, and that will be the opportunity to
20   explore her views about Counterpart's practices and
21   policies.
22           MS. DOUGLASS:  Okay.  But I'm going to
                          0039
1    avail myself the opportunity to determine whether or
2    not something's in or outside the scope of the
3    deposition.
4    BY MS. DOUGLASS:
5        Q.   Is the self-appraisal requirement part of
6    the job evaluation process at Counterpart?
7        A.   Yes.
8        Q.   And what function does it serve as part of
9    the job evaluation process?
10       A.   It provides the employee an opportunity to
11   share with the supervisor his or her self-assessment
12   of performance.
13       Q.   And how does this help the supervisor
14   assess the employee's performance, if at all?
15       A.   I don't see the relationship.
16       Q.   Is it part of the open and frank
17   communication that is the stated policy behind the
18   self-evaluation of the work-evaluation process?
19       A.   Yes.
20       Q.   Now, Mr. Cooper in March of 2002 sent you
21   two separate self-evaluations, did he not?
22       A.   Two separate?
                          0040
1        Q.   Yes.
2        A.   I'm sorry.  I don't recall two separate
3    self-evaluations.
4        Q.   Would you look at Plaintiff's Exhibit 10,

5    please.  The first line of your memo to
6    Ms. Gottschall says, "Here's Jay's revised and final
7    self-evaluation."
8         Do you remember that Mr. Cooper revised
9    his self-evaluation?
10        A.   No, I do not.  If he did, it must have
11   been self-generated.
12        Q.   Do you deny that you objected to the
13   original self-evaluation that he submitted to you?
14        A.   I don't deny or affirm.  I don't recall.
15        Q.   Do you recall crying and cursing at
16   Mr. Cooper when you received his first
17   self-evaluation in March of 2002?
18        A.   No.
19        Q.   Do you believe that did not happen?
20        A.   Yes.
21        MS. DOUGLASS:  I'd like to have marked as
22   the next exhibit number a document bearing Bates
                            0041
1    stamps CPOO82 and 83, bearing the title Counterpart
2    International Employee Performance Review, Employee
3    Self-Appraisal.
4         (Document referred to marked Deposition
5    Exhibit Number 13 for identification and
6    subsequently attached to the deposition.)
7    BY MS. DOUGLASS:
8         Q.   Have you had a chance --
9         A.   Time-out.
10        Q.   Sure.
11        MS. ARIAIL:  I actually have to go to the
12   ladies' room anyway.
13        MS. DOUGLASS:  Okay.  Why don't we take a
14   break.
15        (A recess was taken.)
16   BY MS. DOUGLASS:
17        Q.   Do you recognize Plaintiff's Exhibit 13 as
18   the self-appraisal prepared by Jay Cooper that you
19   forwarded on to Kate Gottschall as an attachment to
20   Plaintiff's Exhibit 10?
21        A.   I don't recall.
22        Q.   Have you seen Plaintiff's Exhibit 13
                            0042
1    before?

2    A.    I don't recall.

3    Q.    Was it your practice to read

4    self-appraisals at the time you prepared an employee

5    appraisal?

6    A.    Absolutely, but this was 2002.

7    Q.    Does Plaintiff's Exhibit 13 from its

8    content appear to be written by Jay Cooper?

9    A.    Yes.

10    MS. DOUGLASS:  I'd like to have marked as

11    the next exhibit a two-page document bearing Bates

12    stamps CPO091 and 92.

13    (Document referred to marked Deposition

14    Exhibit Number 14 for identification and

15    subsequently attached to the deposition.)

16    BY MS. DOUGLASS:

17    Q.    Do you recognize Plaintiff's Exhibit 14?

18    A.    It's similar to 13.

19    Q.    Have you ever seen Plaintiff's Exhibit 14

20    before?

21    A.    I don't recall.

22    Q.    Does Plaintiff's Exhibit 14 appear from

0043

1    its content to have been written by Jay Cooper?

2    A.    Yes.

3    Q.    Does reviewing Plaintiff's Exhibit 14

4    refresh your recollection about Mr. Cooper having

5    submitted an employee self-appraisal that you

6    requested be redone?

7    A.    No.

8    Q.    In the March 2003 time frame, do you

9    recall Mr. Cooper expressing to you that he felt a

10    lack of understanding and trust when he brought

11    personnel issues to you?

12    A.    No.

13    Q.    Is there anything about Plaintiff's

14    Exhibit 14 that you think is inappropriate as a --

15    let me rephrase that.  Sorry.

16    Is there anything about the substance of

17    Plaintiff's Exhibit 14 that you think is

18    inappropriate content for an employee's

19    self-appraisal?

20    A.    No.

21    Q.    Now, did Counterpart have the policy that

22      in order for a contract to be entered into or
                          0044
1      renewed there had to be a current employee
2      evaluation on file?
3          A.   No.
4          Q.   Was there a point at which when you were
5      negotiating what we've marked previously as
6      Plaintiff's Exhibit 8, that you were told by someone
7      that you could not proceed without an employee
8      evaluation on file for Mr. Cooper?
9          A.   No.
10         Q.   When you negotiated Plaintiff's Exhibit 8,
11     you gave Mr. Cooper a raise over what he had been
12     receiving under Plaintiff's Exhibit 4.  Is that
13     correct?
14         A.   Yes.
15         Q.   And was that raise something that you had
16     the authority to set?
17         A.   Yes.
18         Q.   In Plaintiff's Exhibit 10, you stated to
19     Ms. Gottschall that you recommended a 7 percent
20     retroactive to his anniversary date.  Is that
21     correct?
22         A.   I'm not quite sure we're talking about the
                          0045
1      same time frame here.  I don't know whether that
2      memo is directly related to the terms of the -- of
3      this agreement.
4          Q.   Let's look at Exhibit 8 for a minute.
5          A.   Okay.
6          Q.   It's dated --
7          A.   The dates are different.
8          Q.   -- in December of 2003, correct?
9          A.   Pardon me?
10         Q.   Plaintiff's Exhibit 8 is dated
11     December 18, 2003.
12         A.   Exhibit 8 is dated December 21, 2003.
13         Q.   My Exhibit 8 is dated December 18, 2003.
14     Oh, I see.  You're talking about the time it was
15     executed?
16         A.   Yeah.
17         Q.   That's fine.
18             MS. DOUGLASS:  I'd like to have marked as

19    the next exhibit in order a document bearing Bates
20    stamp CP00751.  Both pages of the document have the
21    same Bates stamp number, 00751.  And the title is
22    employee performance appraisal form.

                         0046

1          (Document referred to marked Deposition
2    Exhibit Number 17 for identification and
3    subsequently attached to the deposition.)
4    BY MS. DOUGLASS:
5          Q.    Have you had a chance to look at
6    Plaintiff's Exhibit 17?
7          A.    May I look at it a little bit more
8    closely?
9          Q.    Sure.  Have you ever seen Plaintiff's
10   Exhibit 17 before?
11         A.    I don't recall.
12         Q.    If you look at the format of Plaintiff's
13   Exhibit 17, it's different from the format of
14   Plaintiff's Exhibit 13 and 14, is it not?
15         A.    Yes.
16         Q.    Have you ever seen the format that is
17   Plaintiff's Exhibit 17 filled out by any employee?
18         A.    No.
19         Q.    From reading Plaintiff's Exhibit 17, does
20   it appear to have been made out, if you can tell, by
21   Jay Cooper?
22         A.    It appears so.

                         0047

1          Q.    Do you see underneath the box with the
2    name Jay Cooper at the top of Plaintiff's Exhibit
3    17, it says the following.  "The employee's" --
4    quote, "The employee's perspective on his/her
5    performance and relevant goals is critical to
6    thorough and accurate performance review," close
7    quote.
8          Is that statement an accurate statement of
9    Counterpart's policy?
10         A.    May I repeat the question?
11         Q.    Certainly.
12         A.    It's my understanding you want to know
13   whether the self-appraisal is an integral part of
14   the performance review?
15         Q.    Yes.

16    A.    Yes.
17    Q.    And that was Counterpart policy, as you
18    understood it, correct?
19    A.    Not always Counterpart policy.
20    Q.    In August of 2003, was it Counterpart
21    policy?
22    A.    I believe so.

0048

1    Q.    Earlier in 2003 was it Counterpart policy?
2    A.    I don't recall.
3    Q.    Did you prepare an appraisal of Jay
4    Cooper's performance any time after August 19, 2003?
5    A.    I thought I had.
6    Q.    Do I interpret your answer to mean that
7    you haven't been able to find something you thought
8    you prepared?
9         MS. ARIAIL:  Objection.
10    BY MS. DOUGLASS:
11    Q.    I can represent to you, Ms. Lear, that no
12    such appraisal has been produced to me.  So my
13    question is, do you remember preparing one?
14    A.    I remember preparing a document that had
15    '03 on it, and it -- I don't know whether it was for
16    '03 or '02.
17    Q.    And was the document you remember
18    preparing in the format of Plaintiff's Exhibit 9?
19    A.    Yes.
20    Q.    But it was not what we've marked as
21    Plaintiff's Exhibit 9, the one that you remember?
22    A.    It may be only Exhibit 9.

0049

1    Q.    Do I understand you correctly that you're
2    thinking Plaintiff's Exhibit 9 may have been
3    prepared after you received Plaintiff's Exhibit 17?
4    A.    No, I think that Exhibit 14 and Exhibit 9
5    correspond.
6    Q.    So if I've understood you correctly, you
7    believe that there is a missing appraisal, but
8    you're not sure what year it was done in?
9         MS. ARIAIL:  Objection,
10    mischaracterization of testimony.
11    A.    What's confusing me is that none of these
12    are dated.  So I can honestly say I just don't

13  recall.
14      Q.   But you do recall there being more than
15  simply Plaintiff's Exhibit 9?
16      A.   No.
17      Q.   You don't?
18      A.   No.
19      Q.   So you're not sure?
20      A.   I'm not sure, yes.
21          MS. DOUGLASS:  I'd ask Ms. Ariail that
22  every effort be made to find any additional employee
                    0050
1   appraisals of Jay Cooper's performance.
2           MS. ARIAIL:  For the record, all documents
3   responsive to discovery requests and the deposition
4   notice that are not objectionable have been sought
5   and have been produced as of this time.
6   BY MS. DOUGLASS:
7       Q.   Let's move on to subject number two.  If
8   you could go back to Plaintiff's Exhibit 3, which is
9   the notice of deposition.
10      A.   Uh-huh.
11      Q.   In your position as Jay Cooper's
12  supervisor and as senior vice president, did you
13  have occasion to praise or honor Jay Cooper on any
14  occasion for his performance of his
15  responsibilities?
16      A.   Yes.
17      Q.   And can you give me some examples of
18  occasions when you did that?
19      A.   Yes.  When he was promoted to be the
20  regional director for the civil society support
21  initiative.
22      Q.   Are you referring to what we've discussed
                    0051
1   previously as --
2       A.   Yes.
3       Q.   -- Plaintiff's Exhibit --
4           MS. ARIAIL:  Wait until she finishes the
5   question.
6   BY MS. DOUGLASS:
7       Q.   Plaintiff's Exhibit 5?
8       A.   Yes.
9       Q.   Can you think of any other instance when

10    you did that?
11        A.    Jay Cooper and I made -- had phone
12    conversations on a weekly basis.  I gave him
13    immediate feedback and assessment.  We call it
14    formative evaluation.  I'm sure during those weekly
15    calls, or they might even be more frequently than
16    just once a week, when Jay performed to satisfaction
17    I would provide him with positive feedback.
18        Q.    And would you say that that event happened
19    once a month at least during the time that he
20    reported to you?
21        A.    I don't understand the question.
22        Q.    You've described a process of weekly or
                                  0052
1    more frequent telephone conversations.
2        A.    Right.
3        Q.    My question is, would you say that those
4    telephone conversations included positive feedback
5    at least once a month during the time that he
6    reported to you?
7        A.    Possibly.
8        Q.    Possibly?
9        A.    Yeah.
10        Q.    Likely?
11        A.    Possibly.
12        Q.    Mr. Cooper was a valued employee, was he
13    not?
14        A.    Yes.
15        Q.    And he performed to your satisfaction for
16    years, did he not?
17        A.    Yes.
18        Q.    Have you today produced any documents
19    responsive to my request in subject number two?  If
20    you look at subject number two, I request, well,
21    among other things, a letter from you to an
22    Elizabeth Kamoli that was later read at a banquet.
                                  0053
1    Have you produced that?
2        A.    I don't ever recall.
3            MS. ARIAIL:  As I've stated previously,
4    and I just want to get on the record one more time,
5    plaintiff's counsel is in possession of all
6    non-objectionable documents that Counterpart and

7    Ms. Lear have provided to us.
8        A.   I don't recall that letter.
9        Q.   You have no memory of such a letter?
10       A.   (Indicating.)
11       Q.   Did you attempt to find such a letter
12   previous to your appearance here today?
13       A.   I attempted to look at all correspondence
14   that was relevant.
15       Q.   Do you know who Elizabeth Kamoli is?
16       A.   Yes.
17       Q.   Who is she?
18       A.   Elizabeth Kamoli was the -- she was our OD
19   specialist and then became our deputy regional
20   director under Phase III of the project, and she was
21   supervised by Jay Cooper.
22       Q.   Did you ever praise Jay Cooper's
                        0054
1    performance to Ms. Kamoli orally?
2        A.   Not that I recall.
3        Q.   Were you pleased with Jay Cooper's
4    performance with respect to the project on which
5    Ms. Kamoli worked?
6        A.   I had issues with some aspects of his
7    performance.
8        Q.   What issues were those?
9        A.   Beth Kamoli brought to my attention that
10   Jay was not effective in laying out the vision for
11   the project.  She also pointed out to me that he was
12   indecisive, and consequently decisions that needed
13   to be made in a timely manner were not.
14            And I recall, this was in the first year
15   of that project, that there was an intervention.
16   Meaning that I went over to central Asia with Tom
17   Carmody, who at that time was the director within
18   the civil society division, to sit down with Jay
19   Cooper and Beth Kamoli, to look at the goals and
20   objectives of the program, the existing resources,
21   the areas that were -- were being implemented in an
22   inefficient way or insufficient way.  And we came up
                        0055
1    with a plan of action to address those issues, which
2    included hiring some new staff.
3        Q.   Now, what --

4      A.   And --
5      Q.   Excuse me.  Go ahead.
6      A.   That's okay.
7      Q.   When was this?
8      A.   I think this was within the first year of
9   Phase III.
10     Q.   Which would have been what year?
11     A.   Let's see.  Phase III began in 2000.
12   Maybe about 2002.
13     Q.   And so your intervention that you've
14   described occurred before the performance evaluation
15   that we've marked previously --
16     A.   I don't know.
17     Q.   Hold on.  Let me finish.
18        MS. ARIAIL:  Let her finish the question.
19        THE WITNESS:  Sorry.
20   BY MS. DOUGLASS:
21     Q.   Before the performance evaluation we've
22   marked as Plaintiff's Exhibit 9?
                         0056
1      A.   I think that intervention might have taken
2   place after.
3      Q.   Would you look at Plaintiff's Exhibit 9,
4   please, and tell me whether or not your issues or
5   concerns about Mr. Cooper's performance with respect
6   to Ms. Kamoli's project are reflected anywhere in
7   your comments on Plaintiff's Exhibit 9.
8      A.   No, because I think that meeting took
9   place after this evaluation had been done.  But
10   since this evaluation is not dated, it's really
11   difficult for me to answer that question.
12     Q.   Have you ever seen anything in your files
13   written by you expressing your issues or
14   reservations with respect to Mr. Cooper's
15   performance on the project in which Ms. Kamoli was
16   involved?
17     A.   There was a summary of that meeting.
18     Q.   A written summary?
19     A.   Yes.
20        MS. DOUGLASS:  I request that that be
21   produced, Ms. Ariail.
22        MS. ARIAIL:  I'd like to take a break.
                         0057

1      (A recess was taken.)
2   BY MS. DOUGLASS:
3      Q.   Is there anything you'd like to add to
4   your answer given the brief break?
5      A.   No.
6      Q.   I'm going to, Ms. Lear, show you a series
7   of documents that I believe demonstrate approval of
8   Mr. Cooper's performance and ask you to identify
9   them and if my perception is correct.  All right?
10     MS. DOUGLASS:  I would like to have marked
11  as the next exhibit a two-page document bearing
12  Bates stamp numbers 253 through 254, which appears
13  to be an e-mail from Arlene Lear to Jay Cooper and
14  Ara Nazinyan, dated August 19, 2002.
15     (Document referred to marked Deposition
16  Exhibit Number 19 for identification and
17  subsequently attached to the deposition.)
18  BY MS. DOUGLASS:
19     Q.   In the e-mail that's at the top of
20  page 253 of Plaintiff's Exhibit 19, did you tell Jay
21  Cooper and Ara Nazinyan that they should be very
22  proud of the success in working with Michael Kunz on

                        0058

1   a project in Uzbekistan?
2      A.   No, I don't think that's what this memo is
3   about.
4      Q.   Did Michael Kunz work on a training
5   project in Tashkent in mid-2002?
6      A.   What kind of project?
7      Q.   Training project.
8      A.   He worked as the deputy chief of party on
9   a project in Tashkent.
10     Q.   And the name of the project was CAIP?
11     A.   Yes.  Community Action Investment
12  Programs, CAIP.
13     Q.   And was it your view in August of 2002
14  that the Counterpart consortium had worked
15  effectively with Mr. Kunz on that project?
16     A.   Yes.  In my perception there was good
17  collaboration.
18     Q.   In August of 2002, did you invite
19  Mr. Cooper and Mr. Nazinyan to advise you as to
20  their perceptions of the project and the role of

21      Michael Kunz in that -- as training and TA
22      coordinator?

0059

1          A.    There were two reasons for them to --
2      there were two issues that I wanted them to take a
3      look at.
4          Q.    And those were?
5          A.    One was the approach community
6      mobilization that was being implemented by Michael.
7      I thought we could learn from that and that they
8      could learn from us.  Because Ara Nazinyan was
9      implementing the community mobilization component of
10     our project.
11              In addition to that, I also wanted them to
12     take a look at Michael's role as training and TA
13     coordinator as -- well, in his larger role of deputy
14     chief of the project.
15         Q.    The last line of your e-mail indicates
16     that you thought that Mr. Cooper and Mr. Nazinyan
17     should be proud of the collaboration that had
18     happened thus far.  Is that correct?
19         A.    No.  I wanted them to be proud of what we
20     had produced within the context of Phase III.  It
21     didn't refer to collaboration, it referred to the
22     Phase III project.

0060

1          Q.    Now, would you look at page two of
2      Plaintiff's Exhibit 19, which is I believe, and
3      correct me if I'm wrong, an e-mail from Michael Kunz
4      to you on the CAIP Karshi 017 project.
5          A.    Uh-huh.
6          Q.    In that e-mail Mr. Kunz is laudatory of
7      the Counterpart consortium in paragraph three on
8      page two, is he not?
9          A.    Counterpart consortium in Tashkent only.
10     He only worked with the Counterpart consortium based
11     in Uzbekistan.  Tashkent being the hub office.  He
12     did not work with the regional office.
13         Q.    But Mr. Cooper, at the time Plaintiff's
14     Exhibit 19 was written, was the director of the
15     Counterpart consortium in central Asia, was he not?
16         A.    Regional.
17         Q.    Regional director?

18    A.   Yeah.  Based in Almaty, Kazakhstan.
19    Q.   So he had supervisory authority over the
20  Counterpart consortium in Tashkent, did he not, in
21  Uzbekistan?
22    A.   Yes.

                          0061
1    Q.   Let's look at an e-mail dated January 7,
2  2003, on a document bearing the Bates stamp 000237,
3  which appears to be to you from Jay Cooper.
4         MS. ARIAIL:  For the record, Pat, could
5  you clarify if you're asking a question right now.
6         MS. DOUGLASS:  No, I'm simply announcing
7  what the document was.
8         MS. ARIAIL:  Because Arlene has been
9  responding with "yes," and I'm assume you're just
10  asking her to review the document.
11         MS. DOUGLASS:  I'll try to be clearer.  I
12  didn't mean to be -- mislead anyone.
13         (Document referred to marked Deposition
14  Exhibit Number 20 for identification and
15  subsequently attached to the deposition.)
16  BY MS. DOUGLASS:
17    Q.   Have you had a chance to review
18  Plaintiff's Exhibit 20?
19    A.   Yes.
20    Q.   In the e-mail that's at the top of
21  Plaintiff's Exhibit 20, are you responding to Jay
22  Cooper and praising his Web-based searchable impact

                          0062
1  stories on a democracy project he was reading in
2  early 2003?
3    A.   I'm praising the fact that he put them on
4  the Web.
5    Q.   In what you considered an effective way,
6  correct?
7    A.   Pardon me?
8    Q.   In what you considered an effective way?
9    A.   No.
10    Q.   Didn't you say "what a great gift" in
11  Plaintiff's Exhibit 20?
12    A.   Right.  But the last part of the sentence
13  says, "I'm assuming that you are taking the impacts
14  edited by Washington for the quarterly reports,

15    yes." And also, much -- we presented impact
16    documents in multiple ways. Yes, I praised him for
17    having put it on the Web.
18        Q.    Thank you. Now, did Counterpart receive a
19    new award in 2003 for a regional healthy communities
20    project?
21        A.    It was not an award.
22        Q.    Was it an extension of an existing award?

                           0063
1     A.    Yes.
2         Q.    Was that still a benefit to Counterpart,
3     to have that award extended?
4         A.    Yes.
5            MS. DOUGLASS: I would like to mark as the
6     next exhibit an e-mail -- what appears to be an
7     e-mail from Arlene Lear to Bob Abma and Harry
8     Dorcus, dated January 8, 2003, bearing the Bate
9     stamps 000242 and 243.
10           (Document referred to marked Deposition
11    Exhibit Number 21 for identification and
12    subsequently attached to the deposition.)
13    BY MS. DOUGLASS:
14        Q.    Have you had a chance to look at
15    Plaintiff's Exhibit 21?
16        A.    Yes.
17        Q.    In the e-mail which is at the top of that
18    exhibit, did you thank Jay for his hard work and
19    commitment to developing the project?
20        A.    Yes.
21        Q.    And did you express the view that this was
22    a great way to begin the new year?

                           0064
1     A.    Yes.
2         Q.    In the lower part of the page 242, did
3     Mr. Abma in his e-mail to you indicate that the
4     project was a new cooperative agreement, not an
5     extension of the old one?
6         A.    That's a funding issue, a funding
7     instrument. In other words, it is an extension of
8     the old project which I had developed, but the donor
9     chose to create a new cooperative agreement as the
10    funding instrument. It builds upon an extension of
11    the previous project.

12    Q.    Does that distinction have significance to
13    Counterpart?
14    A.    No.
15    Q.    Do you know someone by the name of
16    Yazgylych Charyev?
17    A.    Yes.
18    Q.    Who is he?
19    A.    Up until about a week or two ago he was
20    our country director for Turkmenistan.
21    Q.    So when Mr. Cooper was working under your
22    supervision, Mr. Charyev would have been working for
                        0065
1    Mr. Cooper, correct?
2    A.    At some point, yes.
3    Q.    What is a work plan?
4    A.    A work plan lays out the implementation
5    strategy.  It's usually done on an annual basis and
6    it gives the details, the how of how we're going to
7    implement different components of the program over a
8    year's time.
9    Q.    Is a work plan periodically submitted to
10    USAID for approval?
11    A.    Yes.
12    Q.    Is that a requirement of your agreements
13    with USAID?
14    A.    Yes.
15    Q.    At some point during 2004, did Yaz develop
16    a work plan for submission to the USAID for his
17    project in Turkmenistan?
18    A.    He would have developed it with -- in
19    2004, Michael Kunz assisted him in the development
20    of that work plan, as did Jay Cooper.
21    Q.    Do you know whether or not USAID was
22    receptive to the plan that was developed and
                        0066
1    submitted?
2    A.    It's an interactive process.  So that they
3    don't necessarily -- you submit the first draft and
4    they come back with comments and then you do
5    revisions.  And this happens -- this happens in all
6    the phases in all of the years.  Very rarely do we
7    not get comments back.
8    Q.    And to your best memory in the summer of

9    2004, you got some positive comments and some
10    negative comments on the Turkmenistan work plan?
11        A.    I would assume so.
12            MS. DOUGLASS:  I would like to mark as the
13    next exhibit a one-page e-mail from Yazgylych
14    Charyev to a number of people, dated July 30, 2004,
15    bearing Bates stamp number 000241.
16            (Document referred to marked Deposition
17    Exhibit Number 22 for identification and
18    subsequently attached to the deposition.)
19    BY MS. DOUGLASS:
20        Q.    Have you seen Exhibit 22 before?
21        A.    Yes.
22        Q.    Did it come to you at the time it was

                        0067

1    written?
2        A.    Did this come to me at the time it was
3    written?  Yes.  I recall, yes.  Yes.  Yes, as a
4    matter of fact, it came from Jay Cooper.
5        Q.    If you look at -- Mr. Cooper forwarded to
6    you an e-mail from Yaz, correct?
7        A.    Right.
8        Q.    It's unclear to me if Yaz sent it to you.
9    That's my question.
10        A.    Right.  I'm not on the distribution.
11        Q.    Is it fair to say that in Exhibit 22, Yaz
12    is thanking Jay Cooper for spending a week on the
13    Turkmenistan work plan in the summer of 2004?
14            MS. ARIAIL:  Objection.  You can answer to
15    the extent you understood that question.
16        A.    He is thanking Jay for spending a week.
17        Q.    Did you become aware in the summer of 2004
18    that Jay was spending a week in Turkmenistan working
19    on the work plan?
20        A.    Yes.
21        Q.    Did you ever hear that Michael Kunz at any
22    time expressed another view of Jay's work on the

                        0068

1    Turkmenistan work plan?
2        A.    Yes.
3        Q.    And in what context did you hear that?
4        A.    They had a disagreement on some key pieces
5    of the work plan.  I also --

6       THE WITNESS:  May I make a comment?
7       MS. ARIAIL:  You can do whatever you want
8  to answer the question.
9       A.   I also note that in the same memo, Yaz
10  thanks Altynai and Michael for their heavy input
11  into the development of the work plan.
12      Q.   Who's Altynai?
13      A.   She works for me in my office.
14      Q.   So it was a group project?
15      A.   Yes.
16      Q.   And from your perspective the group worked
17  together productively to produce a work plan that
18  was acceptable to USAID?
19      MS. ARIAIL:  Objection to characterization
20  of testimony.
21      A.   The job got done.
22      Q.   Was it your perception that the

                            0069
1  individuals mentioned in Plaintiff's Exhibit 22
2  worked together productively to create a work plan
3  that was acceptable for USAID?
4       A.   I find the question leading.
5       Q.   It is.  Unfortunately that's not a
6  problem.
7       A.   Okay.  What I know is that the work plan
8  was accepted.  So that the final product was a good
9  product.  That's what pleased me, yeah.
10      Q.   Now, apparently it pleased Yaz, as he says
11  in Plaintiff's Exhibit 22?
12      A.   Yes, absolutely.
13      Q.   Now, did you ever know Michael Kunz to
14  praise Jay Cooper's contributions in the summer and
15  fall of 2004?
16      A.   The summer and fall of 2004.  At the
17  meeting on August 18, Michael Kunz praised Jay, Jay
18  praised Michael Kunz, and I praised both of them.
19  Because it was a facilitated meeting and that was
20  the nature of it, to start out in a very positive
21  way and look at all the positives that resided in
22  each of the participants.
                            0070
1       Q.   Did you come to the conclusion that the
2  statements made at the August 18 meeting were not

3    sincere?
4         MS. ARIAIL:  Objection.  You can answer.
5         A.   I came to the conclusion that what was
6    said at the August 18 meeting was sincere by all
7    parties.  Positive intent.  I concurred it was
8    positive intent on all sides.
9         Q.   And truthfulness on all sides?
10        A.   Yes.
11        Q.   I'd like to show you what's been -- a
12    document bearing Bates stamp number 284, which
13    appears to be an e-mail from Michael Kunz to Jay
14    Cooper, dated October 6, 2004.
15             (Document referred to marked Deposition
16    Exhibit Number 23 for identification and
17    subsequently attached to the deposition.)
18    BY MS. DOUGLASS:
19        Q.   Have you seen Exhibit 23 before?
20        A.   No.
21        Q.   Did you ever hear Michael Kunz express
22    appreciation to Jay or about Jay's contributions to
                          0071
1    a successful conference in Turkmenistan in October
2    of 2004?
3         A.   Not that I recall.
4         Q.   Was there a conference in Turkmenistan in
5    October of 2004?
6         A.   Yes.
7         Q.   Was it successful?
8         A.   Yes.
9         Q.   Did Jay contribute to its success?
10        A.   I don't know.
11            MS. DOUGLASS:  I'd like to mark as the
12    next exhibit -- sorry.  We'll withdraw that.
13            I'd like to have marked as Plaintiff's
14    Exhibit 20 to this deposition a document previously
15    marked Defense Exhibit 20 to the deposition of Jay
16    Cooper, which appears to be an e-mail from Arlene
17    Lear to Worldwide CPI staff, dated November 16,
18    2004.
19            (Document referred to marked Deposition
20    Exhibit Number 24 for identification and
21    subsequently attached to the deposition.)
22            MS. DOUGLASS:  For the record, we already

0072

1    had Exhibit 20 so I asked the reporter to mark the
2    e-mail dated November 16, 2004 as Plaintiff's
3    Exhibit 24 on this record.
4    BY MS. DOUGLASS:
5        Q.   Ms. Lear, have you had an opportunity to
6    look at Plaintiff's Exhibit 24?
7        A.   Yes.
8        Q.   Did you write it?
9        A.   Yes.
10       Q.   Did you distribute it to Worldwide CPI
11   staff?
12       A.   Yes.
13       Q.   Would that be every employee of
14   Counterpart International?
15       A.   Yes.  Every employee on the mailing list.
16       Q.   Professionals and nonprofessionals?
17       A.   I just don't know who was on that list.
18   It's very comprehensive.
19       Q.   In Plaintiff's Exhibit 24 you say, quote,
20   "Jay has made an immeasurable contribution to the
21   development and management of Counterpart's
22   region-wide civil society support initiative over

0073

1    the past decade," close quote.
2           Did you believe that at the time you wrote
3    Plaintiff's Exhibit 24?
4        A.   I believe that he absolutely made an
5    immeasurable contribution, yes.
6        Q.   So you --
7        A.   During the life of a decade-long
8    participation -- during the decade-long
9    participation, yes.  I believe this.  I believed
10   everything I said.
11       Q.   Everything you said in Exhibit 24?
12       A.   Uh-huh.
13       Q.   And in the end of the second paragraph of
14   Plaintiff's Exhibit 24, you describe his evolution
15   through various positions he held with Counterpart.
16   Is that correct?
17       A.   Yes.
18       Q.   And you said that series of appointments
19   is, quote, "a reflection of our mutual trust and

20    commitment over the years," close quote?
21    A.    Yes.
22    Q.    At the end of Plaintiff's Exhibit 24 you

0074

1    stated that you sincerely hoped that "we will work
2    together again in the future."
3    A.    Yes.
4    Q.    By "we," did you mean Counterpart and Jay
5    Cooper?
6    A.    I meant both.
7    Q.    In other words --
8    A.    Myself and Counterpart, yes.
9    Q.    And Jay Cooper?
10    A.    Uh-huh.
11    Q.    Now, in November of 2004, had you
12    discussed with Michael Kunz your respect for Jay
13    Cooper?
14    A.    In November?
15    Q.    Uh-huh.  Let me withdraw the question.
16    Let me ask it differently.
17         By November of 2004, had you expressed to
18    Michael Kunz your respect for Jay Cooper and your
19    recognition of his contribution to Counterpart and
20    the central Asian region?
21    A.    I really don't understand that question.
22    By November?  In other words, is Michael Kunz on

0075

1    this mailing list?  I'm not quite sure.  I don't
2    understand the question.
3    Q.    I'll withdraw it then.  Thank you.
4    A.    Yeah.
5         MS. DOUGLASS:  I'd like to have marked as
6    the next exhibit in order an e-mail from Michael
7    Kunz to Arlene Lear, dated Tuesday, November 16
8    2004, bearing Bates stamp CP00735.
9         (Document referred to marked Deposition
10    Exhibit Number 25 for identification and
11    subsequently attached to the deposition.)
12    BY MS. DOUGLASS:
13    Q.    I hand you what's been marked Plaintiff's
14    Exhibit 25 and ask you to review it, please.
15    A.    (Reviewing.)  Yes.
16    Q.    Did you receive Plaintiff's Exhibit 25

17    shortly after having sent out Plaintiff's
18    Exhibit 24?
19        A.    Yes.
20        Q.    And Plaintiff's Exhibit 25 is a message to
21    you from Michael Kunz.  Is that right?
22        A.    Yes.

0076

1        Q.    And he is stating, is he not, that
2    Plaintiff's Exhibit 24 demonstrates your respect for
3    Jay Cooper.  Is that correct?
4        A.    Uh-huh.
5        Q.    And your recognition of Jay Cooper's
6    contribution to Counterpart in the central Asian
7    region?
8        A.    Yes.
9        Q.    So is it fair to say that you shared your
10    respect and your recognition of Jay Cooper with
11    Michael Kunz before November 16, 2004?
12        A.    I shared it in a message.  He's responding
13    to this message.
14        Q.    Had you shared it with Michael Kunz in any
15    way aside from the message which is Plaintiff's
16    Exhibit 24?
17        A.    I'm sure I have, yes.
18        Q.    Now, did you receive any other responses,
19    such as Plaintiff's Exhibit 25, to your e-mail,
20    which is Plaintiff's Exhibit 24?
21            MS. ARIAIL:  Objection to form.
22            MS. DOUGLASS:  That's a fair objection.

0077

1    Let me restate it.
2            THE WITNESS:  Okay.
3    BY MS. DOUGLASS:
4        Q.    Did you receive any responses to
5    Plaintiff's Exhibit 24?
6        A.    Not that I recall.  I'm almost sure this
7    is the only one.
8        Q.    Okay.  Who is Hugh Orozco?
9        A.    Hugh is our chief of party on our Bulgaria
10    project for the development of community foundations
11    and social enterprises.
12        Q.    If you'll help me out with geography, is
13    Bulgaria considered part of central Asia?

14    A.    No.  Bulgaria is central and eastern
15    Europe.
16        MS. DOUGLASS:  I'd like to have marked a
17    two-page document bearing Bates stamps CP0839 and
18    40, which appears to be an e-mail from Hugh Orozco
19    to a number of people, dated November 17, 2004.
20        (Document referred to marked Deposition
21    Exhibit Number 26 for identification and
22    subsequently attached to the deposition.)
                            0078
1    BY MS. DOUGLASS:
2        Q.    Have you had an opportunity to look at
3    Plaintiff's Exhibit 26?
4        A.    So that was the second response.  I --
5        MS. ARIAIL:  Well --
6        MS. DOUGLASS:  That's all right.
7    BY MS. DOUGLASS:
8        Q.    Did you receive Plaintiff's Exhibit 26 at
9    some time around November of 2004?
10        A.    I'm copied, yes.
11        Q.    Does reviewing Plaintiff's Exhibit 26
12    remind you that there might have been other
13    responses to your Plaintiff's Exhibit 24?
14        A.    It reminds me that Hugh Orozco gave a
15    response.
16        Q.    Do you construe Mr. Orozco's response as a
17    recognition of the central role Jay Cooper had in
18    Counterpart's central Asian programming and success?
19        A.    It suggests to me Hugh Orozco's generosity
20    of spirit.
21        Q.    You think Hugh Orozco was not being
22    genuine when he expressed the thoughts set out in
                            0079
1    Plaintiff's Exhibit 26?
2        A.    No, I'm sure he was being genuine.
3        Q.    Did you ever express some appreciation to
4    Jay Cooper for any support that he developed for the
5    projects in which he was involved that went beyond
6    the duties expected of him?
7        A.    That's very possible, very possible.
8        Q.    Does the word -- does the name Roberta
9    Talmidge mean anything to you?
10        A.    Yes.

11    Q.    Who is Roberta Talmidge?

12    A.    I think she provided some pro bono

13    assistance to our project.

14    Q.    Did she participate in or lead a

15    conference called the societal partnership

16    conference?

17    A.    I don't recall.

18    Q.    Did she conduct some training that's

19    termed performance based management for Jay's

20    project?

21    A.    That I remember.

22    Q.    Was that an effective training mechanism?

                        0080

1    A.    The only one who could assess that was

2    Jay.

3    Q.    Were you pleased that he arranged for her

4    to perform that service?

5    A.    Yes.

6    Q.    And you expressed that to him?

7    A.    Yes.

8    Q.    Now, it was a practice at Counterpart, was

9    it not, to commission independent evaluations of the

10    projects that it performed under contract with

11    USAID?

12    A.    Yes.

13    Q.    And that was something that Counterpart

14    was required to do under the terms of its agreements

15    with USAID?

16    A.    Not necessarily a requirement, something

17    that we felt would be a good idea.

18    Q.    And Counterpart hired independent persons

19    to do those assessments?

20    A.    Yes.

21    Q.    And the assessments were directed project

22    by project.  Is that fair to say?

                        0081

1    A.    Yes.

2    Q.    And can you recall any instance in which

3    one of these assessments assessed negatively the

4    management performance of Jay Cooper?

5    A.    I recall assessments that required us to

6    make corrections, address issues that were

7    identified.

8      Q.   Were they issues that were the
9  responsibility of Jay Cooper?
10      A.   As the regional director, yes.
11      Q.   Can you give me some specifics as to
12  particular issues that involved Mr. Cooper's
13  management responsibilities that were criticized by
14  independent evaluations of the project?
15      A.   Yes.  I remember that Jane Yudelman
16  evaluated our mahala project in Uzbekistan.
17      Q.   And what --
18      A.   And --
19      Q.   -- criticisms did she have in that
20  evaluation?
21      A.   I think -- as I recall, there might have
22  been some issues related to the implementation of
                         0082
1  the grant component, but that's only as I recall.
2      Q.   Have you finished your answer?
3      A.   (Indicating.)
4      Q.   What does implementation of the grant
5  component mean?
6      A.   During that project we managed a small
7  grant pool that we provided to NGOs that were
8  working in collaboration with these mahalas.  And a
9  mahala is like a neighborhood of three to 12,000
10  individuals.  And so the point of this project was
11  to build the capacity of these mahalas to better
12  represent the community members.  And we were trying
13  to create a relationship between NGOs and mahalas to
14  link NGOs to communities.
15          And so management of the grant mechanism
16  is really -- it's -- there's a solicitation
17  component to grant making, there's monitoring
18  evaluation of grantees.  There's the size of the
19  grants that are determined, et cetera.
20          So, as I recall, there might have been
21  some recommendations for refinement.  That's all.
22      Q.   And the purpose of such an evaluation is
                         0083
1  what you've -- you might call a collaborative one.
2  In other words, to improve the product?
3      A.   Yes.
4      Q.   And that's the reason why USAID welcomes

5   these kinds of evaluations?
6       A.   Absolutely.
7       Q.   And was Jay Cooper, in your memory,
8   responsive to the recommendations in the evaluation
9   you've just described?
10      A.   I assume so.
11      Q.   Did you ever hold a view that he wasn't?
12      A.   No.
13      Q.   Now, there was a midterm evaluation of --
14   the CSSI project was scheduled to be performed after
15   Jay Cooper left the employment of Counterpart.  Is
16   that correct?
17      A.   Yes.
18      Q.   But you received a preliminary evaluation
19   summary before he was fired.  Is that right?
20      A.   Not that I recall.
21      Q.   Do you recall being told that Anika
22   Ayrapetyants met with Igor Tupitsin and talked about
                    0084
1   the evaluation and USAID's -- a previous evaluation
2   of the CSSI project?
3       A.   I'm aware of the fact that Anika met with
4   Igor Tupitsin.
5       Q.   And she reported to you the preliminary
6   evaluation that USAID had made of the project?
7       A.   I'm not aware of any preliminary
8   evaluation that USAID made other than maybe a visit.
9   I'm not aware of any.
10          MS. DOUGLASS:  Let's have marked as the
11   next exhibit what appears to be a document bearing
12   the Bates stamp 000078 and 79, apparently an e-mail
13   from Anika Ayrapetyants to Arlene Lear, and a
14   response from Arlene Lear to Anika, both dated
15   November 9, 2004.
16          (Document referred to marked Deposition
17   Exhibit Number 27 for identification and
18   subsequently attached to the deposition.)
19   BY MS. DOUGLASS:
20      Q.   Have you had a chance to review
21   Plaintiff's Exhibit 27?
22      A.   Yes.
                    0085
1       Q.   Isn't Anika telling you that she learned

2    about USAID's summer evaluation of CSSI?
3        A.   It's prospective, it's not past.  It's
4    after our evaluation they were going to do another
5    of their own assessment.  It's not -- they didn't
6    do -- first we did ours, then they did their own.
7        Q.   All right.
8        A.   And actually we determined that it would
9    be a good idea to do our own internal one first to
10    make any kind of necessary corrections prior to
11    USAID's, yes.
12        Q.   Now, about six or seven lines up from the
13    bottom of 788 of Plaintiff's Exhibit 27, the
14    following is written.  Quote, "Overall the program
15    is going very well in Kazakhstan and Kyrgyzstan;
16    legal environment in Turkmenistan makes the program
17    there different," close quote.
18            Was your reading of Anika's e-mail to you
19    that that statement was her opinion or that it was
20    USAID's opinion or something else?
21        A.   Her opinion.
22        Q.   Her opinion?
                        0086
1        A.   Yeah.
2        Q.   And your response to Anika, which is at
3    the top of page 78 of Plaintiff's Exhibit 27, you
4    ask her whose assessment that is made by?
5        A.   Right.
6        Q.   Was there an answer from Anika to you to
7    your e-mail of November 8, 2004?
8        A.   There wasn't anything in writing.
9        Q.   Was there something oral?
10        A.   When she came back she said that -- when
11    she came back from her trip, she said that she had a
12    good meeting.
13        Q.   Is it fair for me to conclude from our
14    discussion of Plaintiff's Exhibit 27, that in
15    November of 2004, USAID had no problems with how the
16    CSSI program was going?
17            MS. ARIAIL:  Objection to form.
18        A.   No, that's not correct.
19        Q.   What objections do you know that USAID had
20    to how the CSSI program was going as of November 9,
21    2004?

22        A.    For the first time ever, I received

0087

1    criticism of Jay Cooper from George Deikun, who was
2    at that time the regional director for USAID in
3    central Asia.  This was in the spring of 2004.  I
4    was traveling on an airplane.  He was sitting across
5    from me.  And he raised the issue with me that he
6    was disappointed and surprised that Jay Cooper
7    didn't take a more -- didn't deal with the crisis in
8    Turkmenistan in a more timely fashion.
9          He indicated to me he too was a regional
10    director and that he traveled all the time.  And I
11    during that conversation tried to defend Jay Cooper
12    by saying although that we had sent a consultant
13    over and that Jay I'm sure was in daily contact or
14    weekly contact or periodic -- regular contact,
15    regular contact with Yaz.
16          When I arrived in Kazakhstan, I met with
17    Jay Cooper and gave him feedback and expressed my
18    concerns.  Because what was being communicated to me
19    was that he was not on top of it.
20          We had a meeting.  I had -- I organized a
21    meeting, scheduled a meeting with George Deikun to
22    include Jay Cooper and Michael Kunz and myself,

0088

1    because I wanted to reverse that perception of Jay.
2          I prepped Jay.  I said, you know, what
3    George Deikun wants to know is not what the
4    consultant did in March but what you did yourself to
5    address what they perceived as a crisis.
6          We had the meeting with George Deikun.  I
7    gave Jay Cooper the floor.  He started the meeting
8    making a reference to the consultant's visit in
9    March and talked about the recommendations of the
10    consultant.  I was not happy because we had prepped
11    Jay and Jay just did not have focus in that meeting
12    to be able to do -- to recover, basically.
13          I knew enough about what had happened.
14    Michael came in.  And so I felt on balance.
15    Counterpart's -- the perception of Counterpart's
16    ability to act in a timely manner was made more
17    positive.
18          When we exited from that meeting, Jay

19    Cooper exited first.  It just so happened that he
20    left the room first.  George Deikun turned to
21    Michael Kunz and said, "I'm so happy you're here.
22    Come and see me any time."  This whole experience
                          0089
1    was a red flag for me.
2        Q.    Are you finished with your answer?
3        A.    Finished.
4        Q.    I have a number of questions about what
5    you said.  How do you spell George Deikun?
6        A.    George.
7        Q.    Right.
8        A.    You have that one.  D-E-I-K-U-N.  I think
9    it's "U-N" at the end.
10        Q.    And his position is what?
11        A.    He was the regional mission director for
12    central Asia, and he's now the mission director for
13    India.
14        Q.    Am I correct in assuming that's a fairly
15    high-up position within USAID?
16        A.    Yes.  In central Asia it was the highest.
17        Q.    You made reference to Jay Cooper not
18    dealing with the crisis in Turkmenistan.  What was
19    the crisis in Turkmenistan?
20        A.    There were some issues related to -- I
21    don't remember the specifics.  I really don't.  It
22    was a crisis as defined by the U.S. government.  I'm
                          0090
1    not defining it as a crisis.
2        Q.    Was it a political crisis?
3        A.    Yeah, a political, but it had an impact on
4    the way we were going to manage our program, a
5    serious impact.  It had to do with the enabling
6    environment being -- or the legal framework being
7    changed for nongovernmental organizations.  And we
8    had to understand those implications because it
9    really was going to force us to restructure our
10    programming significantly.
11        Q.    And this political crisis took place in
12    March of 2004, more or less?
13        A.    Probably prior.
14        Q.    Prior?
15        A.    Prior to March, uh-huh.

16    Q.    Now, you mentioned a consultant that had
17    been sent in.  Who was the consultant?
18    A.    Gavin Helf.
19    Q.    How do you spell it?  H-E-L-F?
20    A.    H-E-L-F.
21    Q.    And who was he?
22    A.    The consultant.

0091

1    Q.    Consultant on what subject?
2    A.    He was a management consultant and he knew
3    a lot about the region and he was there to help us
4    determine a strategy for moving forward.
5    Q.    Who chose him to be the consultant?
6    A.    Gavin had worked as a management
7    consultant to Yaz prior to that for several months
8    and so we thought he knew the context best, and so
9    it was a joint decision.
10    Q.    Joint of Yaz and you?
11    A.    No.  Jay and myself.
12    Q.    All of you?
13    A.    Yeah, that's right.
14    Q.    Now, you spoke about arriving in
15    Kazakhstan and meeting with Jay Cooper and giving
16    him feedback about your meeting with George on the
17    plane?
18    A.    Absolutely.
19    Q.    When was that?  Was this the summer of
20    2004?
21    A.    No, this was the spring of 2004.
22    Q.    So it was right after you got off the

0092

1    plane meeting with George, whenever that was?
2    A.    Whenever I got back to the office.  My
3    first encounter with Jay, yeah.
4    Q.    So we're talking --
5    A.    In Jay's office.  We're talking about the
6    spring of 2004.
7    Q.    Now, you said Jay had took the floor and
8    made reference to the consultant's visit and what
9    the consultant had done.  What had the consultant
10    done?
11    A.    The consultant had developed
12    recommendations for moving forward.

13    Q.  Did George disagree with the

14  recommendations?

15    A.  He made no comment.

16    Q.  Why was it that you wanted Jay not to talk

17  about what the consultant had done?

18    A.  Oh, no, it was not wanting him to make

19  reference, it was just to demonstrate what Jay had

20  done.  The idea was, Jay, don't start with the

21  consultant.  I mean, say what you have done, you

22  personally have done to rectify, to deal with the

                0093

1  situation, what did you do, so that George can see

2  that you acted in a timely manner and were on top of

3  it.

4    Q.  Now, after you had this meeting in which

5  Jay talked about the consultant in contrary to your

6  request that he not do that --

7    A.  I didn't say don't talk about the

8  consultant, but demonstrate that what you have done

9  following the consultant's involvement.  All right?

10    Q.  And Jay did not do that at the meeting?

11    A.  That's right.  He was very fuzzy,

12  unfocused.

13    Q.  Now, in what capacity was Michael Kunz

14  present at the meeting you've described with George

15  and Jay?

16    A.  Uh-huh.  In his capacity as the overall

17  regional director for central Asia, the NIS, Middle

18  East.

19    Q.  Before August of 2004, Michael Kunz had

20  what title?

21    A.  That was the title.

22    Q.  I think we know it someplace.

                0094

1    A.  It's there in his -- you actually --

2    Q.  There was a resume in there?

3    A.  It was a job description that was -- my

4  attorney has it.

5    Q.  I think I know where -- all right.

6        But among his oversight responsibilities

7  was Turkmenistan?

8    A.  Was central Asia and whatever we were

9  doing in the former Soviet Union and what we hoped

10  to be doing in the Middle East.
11      Q.   Now, this meeting raised a red flag for
12  you?
13      A.   Yes.
14          MS. DOUGLASS:  Well, Ms. Ariail, I'm
15  afraid we may be going beyond subject number two.  I
16  wanted to ask her what she did when the red flag was
17  raised, but do you have an objection to that?
18          MS. ARIAIL:  I do.
19          MS. DOUGLASS:  All right, then we won't.
20  See how honorable I am?  One more thing to do and
21  then we're going on to another subject.
22          I'd like to have marked as the next
                            0095
1   exhibit a multi-page document bearing Bates stamps
2   CP0973 through 1042, entitled Midterm Evaluation of
3   Counterpart's Health NGOs Capacity Building
4   Initiative, Phase I and II.
5          (Document referred to marked Deposition
6   Exhibit Number 28 for identification and
7   subsequently attached to the deposition.)
8   BY MS. DOUGLASS:
9       Q.   Before you read the whole thing, Ms. Lear,
10  I have only one question, whether or not Plaintiff's
11  Exhibit 28 is the evaluation by Jane Yudelman that
12  you spoke about earlier?
13      A.   Yes.
14      Q.   And that was delivered --
15      A.   No, this is not the same evaluation I
16  spoke of earlier.
17      Q.   Okay.
18      A.   This is an evaluation by Jane Yudelman.
19  She did a prior evaluation of the mahala project.
20      Q.   And this is not Exhibit 28?
21      A.   Right.
22      Q.   Is the mahala project, which I have no
                            0096
1   idea how to pronounce, something over which Jay
2   Cooper had supervisory responsibility?
3       A.   Yes, and Ara Nazinyan as well.
4          MS. DOUGLASS:  Ms. Ariail, then I request
5   a production of the other Jane Yudelman evaluation
6   that she was describing earlier.

7    BY MS. DOUGLASS:

8        Q.    Have you ever reviewed what's Plaintiff's

9    Exhibit 28, in the past?

10        A.    Yes, I have.

11        Q.    As you sit here now, do you remember any

12    particular criticisms of the management of Jay

13    Cooper contained in Plaintiff's Exhibit 28?

14        A.    Of the specific -- may I answer the

15    question with a question?

16        Q.    Go ahead.

17        A.    For clarification, does it refer

18    specifically to Jay Cooper or are there findings

19    that needed to be addressed?  Which is the question?

20        Q.    Findings that needed to be addressed that

21    reflect badly on the management Jay Cooper applied

22    to the project.

                        0097

1        A.    Well, Jay Cooper had overall

2    responsibility for the project.  There were issues

3    identified, that was the point of this evaluation,

4    and to be addressed.

5        Q.    Like any evaluation?

6        A.    Uh-huh.

7        Q.    Correct?

8        A.    Correct.

9        Q.    So when you received Plaintiff's

10    Exhibit 28, you did not immediately conclude that

11    Jay Cooper had mismanaged the health NGO capacity

12    building initiative project, did you?

13        A.    I don't recall the details of this

14    evaluation.  So I'd have to review the evaluation

15    and then respond.

16        Q.    All right.  Did you receive Plaintiff's

17    Exhibit 28 soon after December 3, 2003?

18        A.    I received it before for review as a

19    draft.

20        Q.    So you received it and reviewed it before

21    you entered into the contract with Jay Cooper, which

22    is Plaintiff's Exhibit 8?

                        0098

1        A.    Yes.

2        Q.    Now, I want to go on to subject three.

3            You were -- am I correct in assuming that

4    you have found no additional documents reflecting
5    the events of August 18, 2004?
6       A.   Correct.
7       Q.   Is it your habit to take notes at
8    meetings?
9       A.   Sometimes.
10      Q.   Did you take any notes of a meeting
11   convened on August 18, 2004 concerning Jay Cooper
12   and Michael Kunz?
13      A.   No.
14      Q.   Did you notice anyone else taking notes of
15   that meeting?
16      A.   Yes.
17      Q.   Would that be Barbara Sloan?
18      A.   Yes.
19      Q.   Anyone else?
20      A.   Not that I'm aware of.  It's possible Jay
21   took some notes.  It's possible Michael took some.
22   But not that I'm aware of.

                    0099

1       Q.   Now, who called the meeting on August 18,
2    2004?
3       A.   I did.
4       Q.   And how, in what form did you call that
5    meeting?
6       A.   I spoke to Jay.  I spoke to Michael
7    individually.  We determined -- we set the date.
8    Jay was in the U.S., as I recall, doing renovations
9    on his house in Oregon.
10      Q.   Was Jay in Oregon a scheduled vacation
11   or -- why was he in Oregon?
12      A.   He said he had renovations to do on his
13   house.  As I recall, that was the time.
14      Q.   And he wasn't absconding from his duties
15   by being in Oregon, was he?
16      A.   No.  He got permission to.  No.
17      Q.   Now, what did you tell Jay about the
18   purpose of the meeting on August 18, 2004?
19      A.   Barbara Sloan talked to Jay about the
20   purpose of the meeting.
21      Q.   Did you say anything to Jay about the
22   purpose of the meeting?

                    0100

1    A.    Well, I said, "We'll get together.
2    Michael's here.  You're here.  We'll talk about
3    issues."
4          I know that Jay was not happy about having
5    to report to Michael.  Michael -- yes.
6          And so there were some outstanding --
7    there were issues, management -- related to his
8    acceptance of the new management structure that I
9    had put into place.  He had his issues.  So it was
10   an opportunity for all parties to sit down in a safe
11   place with a third-party objective person,
12   professional facilitator and executive coach to help
13   us talk through those issues that Jay had, that
14   Michael had about the new management structure in
15   which Jay was reporting directly to Michael.
16         And when Barbara Sloan spoke to Jay, she
17   heard from Jay -- she said it was her habit to speak
18   to each individual separately that was going to
19   participate in such a meeting to get their views,
20   tell them about what she felt was the purpose of the
21   meeting or what she was told was the purpose of the
22   meeting, to get their views, their individual views.

                    0101

1    It was, again, an opportunity for them to speak
2    privately to the facilitator so that she would be
3    sure that all views came out.
4    Q.    Am I correct in assuming from your answer
5    to the last question that you had made a decision to
6    change the management structure so that Jay Cooper
7    would report to Michael Kunz before the meeting of
8    August 18, 2004?
9    A.    Yes.
10   Q.    And that you had announced that decision
11   to Jay Cooper and Michael Kunz before that meeting?
12   A.    Yes.
13   Q.    Now, how much before that meeting had you
14   announced that?
15   A.    I don't recall.
16   Q.    Do you remember in what form you announced
17   that change in management structure to Jay Cooper?
18   A.    On the telephone.
19   Q.    What do you remember --
20   A.    It was something I wanted to -- I didn't

21    want to be overly bureaucratic about it.  I wanted
22    to talk to him.

                                    0102

1        Q.    So sometime before August 18, you had a
2    telephone call with Jay Cooper, correct?
3        A.    Uh-huh.
4        Q.    And you also had a similar call with
5    Michael Kunz, presumably?
6        A.    Yes.  More than -- I would say more than a
7    month.
8        Q.    More than a month?
9        A.    That's my recall.  My recall.
10       Q.    With both of them?
11       A.    Uh-huh.
12       Q.    Had the change in management structure
13    been announced to other persons in Counterpart
14    before August 18?
15       A.    I don't know.  I don't recall.
16       Q.    Now, from your description of the role of
17    Barbara Sloan, am I correct in an assumption that
18    you knew before August 18, 2004 that there would be
19    some issues in making this management change?
20           MS. ARIAIL:  Objection to form.
21           MS. DOUGLASS:  Strike it.  I'll start
22    again.

                                    0103

1    BY MS. DOUGLASS:
2        Q.    Am I correct that you knew before
3    August 18, 2004, that the management change which
4    you had made might result in some problems?
5        A.    Yes.
6        Q.    And is it Counterpart's policy to engage
7    professional facilitators and executive coaches when
8    management changes are made?
9        A.    It's our policy to use facilitators to
10    facilitate resolution of issues of whatever manner.
11    We've had facilitators to help us at the senior
12    management team level talk about allocation of
13    resources across divisions.  We've used facilitators
14    to facilitate meetings that could be potentially
15    contentious.
16       Q.    Did you have reason to think that the
17    change of management could be potentially

18    contentious in the case of Jay Cooper and Michael
19    Kunz?
20       A.   Yes.
21       Q.   What was that concern based on?
22       A.   Jay Cooper had indicated to me that he had

                              0104

1    issues with Michael Kunz.  Michael Kunz had
2    indicated to me that he had issues with the way Jay
3    Cooper was managing the project.
4       Q.   Was this information imparted to you
5    during these telephone calls you testified about?
6       A.   Prior, during, yeah.
7       Q.   So what was your intention of calling the
8    August 18 meeting?
9       A.   The intention was to look at the
10    management structure, get agreement on some changes,
11    which one of the big changes was to have Jay Cooper
12    report -- no.  One of the big changes was to have
13    Bob Abma take on the admin function.  He was already
14    director of finance.  And Michael felt that based on
15    his perception of how things were being managed,
16    that finance and admin needed to be pulled together.
17    Because Jay Cooper had taken -- previously taken Bob
18    off the admin function and took it upon himself the
19    admin function, which had him report -- more than
20    10 people, possibly 12 individuals reporting to him,
21    many of them performing admin functions.  And the
22    perception was that it was distracting him from

                              0105

1    focusing on the substance of the program.
2       Q.   When you said the perception was, you mean
3    Mr. Kunz's perception was?
4       A.   And mine.
5       Q.   And yours?
6       A.   Yeah.  Remember, I had visited in the
7    spring of 2004.
8       Q.   In the spring of 2004, you drew the
9    conclusion you've just said, that the administrative
10    function was distracting Jay Cooper from his other
11    responsibilities?
12       A.   No.
13       Q.   When did you first come to the conclusion
14    that the administrative functions were distracting

15    Jay Cooper?
16        A.   I came to the conclusion that Jay Cooper
17    was distracted in the spring of 2004.  I came to the
18    conclusion that things were just not moving along in
19    the way that I had hoped.
20        Q.   In the spring of 2004?
21        A.   That's right.
22        Q.   Did you at any point in time come to the
                          0106
1    conclusion that the fact that Jay Cooper had some of
2    the administrative functions, which had previously
3    rested with Bob Abma, was contributing to what you
4    perceived as his distractions?
5        MS. ARIAIL:  Objection, asked and
6    answered.
7        MS. DOUGLASS:  I don't believe so,
8    actually.
9        A.   I came to the conclusions that it was
10    inappropriate for the chief of party to have the
11    receptionists, the drivers and other admin functions
12    reporting directly to the chief of party.  It didn't
13    make sense.  It was not the way we had structured
14    the program in the past.  And I did come to that
15    conclusion, yes.
16        Q.   When?
17        A.   I came to -- when did I come to the
18    conclusion?  I came to the conclusion that we needed
19    to revisit the structure and to have a conversation
20    with Jay Cooper about the pros and cons of having
21    him hold on to the administrative functions or
22    letting go the administrative functions and having
                          0107
1    them put back under Bob Abma.
2        So during the course of the August 18
3    meeting, that was part of the dialog.  So the actual
4    decision was made in the August 18 meeting.
5        Q.   So let me see if I've got this right.  The
6    decision to have Michael Kunz supervise Jay Cooper
7    was made before the August 18 meeting?
8        A.   That's right.
9        Q.   But the question of whether or not the
10    admin function should be given back to Bob Abma was
11    not made until the August 18 meeting?

12      A.   That's right.
13      Q.   And was Jay Cooper and Michael Kunz
14  informed that the division -- that the supervision
15  of the admin functions was going to be one of the
16  subjects discussed at the August 18 meeting before
17  the meeting happened?
18      A.   I think the broader topic of the
19  management structure was brought to his attention by
20  Barbara Sloan.
21      Q.   Now, did Barbara Sloan report to you
22  before the meeting what she had been told by Jay
                         0108
1   Cooper and Michael Kunz in her conversations with
2   them before the meeting?
3       A.   I don't recall.
4       Q.   Now, you said, I believe, previously that
5   you knew that Jay Cooper had indicated he had issues
6   that you expected to arise if he were placed under
7   the supervision of Michael Kunz.  Is that right?
8       A.   Jay Cooper wanted to report to me.  That's
9   it.
10      Q.   And you knew that Jay Cooper had had
11  issues with some actions of Michael Kunz in the
12  past, correct?
13      A.   Yes.
14      Q.   And you knew that apparently Michael Kunz
15  had some objections to Jay Cooper's management in
16  the past, correct?
17      A.   In the past?
18      Q.   Before the August 18 meeting.
19      A.   Yes.
20      Q.   So now we're up to the August 18 meeting.
21  I think we have everybody's expectations on the
22  table.  So now we're going to discuss what happened.
                         0109
1          MS. ARIAIL:  Unless you have a question
2   pending, can we take a break before we do this?
3          MS. DOUGLASS:  Sure.
4          (A lunch recess was taken.)
5   BY MS. DOUGLASS:
6       Q.   We're back from lunch now and we were
7   talking about subject number three, the August 18,
8   2004 meeting.

9       A.    Yes.
10      Q.    Did you ask Jay Cooper to prepare a job
11   description before that meeting?
12      A.    Yes.
13      Q.    Did he do so?
14      A.    Yes.
15      Q.    Did he bring it with him?
16      A.    Yes.
17          MS. DOUGLASS:  I'd like to have marked as
18   Plaintiff's Exhibit 11 what was previously marked
19   Exhibit 11 to the Cooper deposition for the
20   defendants.  It is a document bearing Bates stamps
21   000065 and 66.
22          (Document referred to marked Deposition
                        0110
1    Exhibit Number 11 for identification and
2    subsequently attached to the deposition.)
3    BY MS. DOUGLASS:
4       Q.    Would you please look at what's been
5    marked Plaintiff's Exhibit 11.  And my question is,
6    is it the job description he propounded to you
7    before the August 18, 2004 meeting?
8       A.    He brought it to the meeting.
9       Q.    He brought it to the meeting?
10      A.    Yes.
11      Q.    At the time did you review it?
12      A.    Yes.
13      Q.    Did it appear to you to be an accurate
14   description of his job functions?
15      A.    At that time, yes.
16      Q.    This is before the change in management,
17   correct?
18      A.    This is before -- yes.
19      Q.    And did you have Mr. Kunz prepare a job
20   description also?
21      A.    I don't recall.
22      Q.    Now, I want you to turn your attention to
                        0111
1    the actual meeting itself.
2          MS. DOUGLASS:  And I'm going to have
3    marked as the next exhibit number, your -- I hope I
4    have enough copies -- second supplemental response
5    to plaintiff's first set of interrogatories.

6          (Document referred to marked Deposition
7     Exhibit Number 29 for identification and
8     subsequently attached to the deposition.)
9     BY MS. DOUGLASS:
10          Q.   I'm showing you what's been marked
11     Plaintiff's Exhibit 29.  Have you seen Plaintiff's
12     Exhibit 29 before?
13          A.   Yes.
14          Q.   And did you recently execute a
15     verification with respect to the answers set forth
16     in Plaintiff's Exhibit 29?
17          A.   Yes.
18          Q.   Would you please turn to the answer to
19     Interrogatory number two, paragraph one.
20          A.   Yes.
21          Q.   I want to ask you specific questions about
22     some of it.

0112

1          A.   Yes.
2          Q.   You say --
3          MS. ARIAIL:  I'm sorry.  I don't -- she's
4     not looking at the same document I'm looking at.
5          MS. DOUGLASS:  (Indicating.)
6          MS. ARIAIL:  She is not looking at that
7     document.  You gave her the responses to the request
8     for production.
9          MS. DOUGLASS:  Sorry about that.  Can we
10     substitute for Exhibit 29 -- thank you for saying
11     that -- a different document?
12          (Deposition Exhibit Number 29 was
13     remarked.)
14     BY MS. DOUGLASS:
15          Q.   I'm sorry about that, Ms. Lear.
16          A.   Okay.
17          Q.   Please look on page four of Plaintiff's
18     Exhibit 29, answer -- response to Interrogatory
19     number two, paragraph one.
20          A.   Uh-huh.
21          Q.   You say in the first sentence of response
22     to Interrogatory number two, paragraph one, that on

0113

1     August 18, 2004, you held a meeting with plaintiff,
2     Michael Kunz and Barbara Sloan, quote, "to discuss

3    Cooper's performance problems," close quote.
4         Was that one of the purposes of the
5    August 18 meeting?
6       A.   Yes.
7       Q.   What performance problems of Cooper's were
8    discussed at that meeting?
9       A.   One of the issues was the -- the
10   distraction on admin functions taking him away from
11   more substantive areas of responsibility.  The other
12   was not accepting a revised management structure
13   which would allow for Bob Abma, rather than Jay
14   Cooper, to oversee the admin functions.
15      Q.   Anything else?
16      A.   The focus of that meeting.  That was --
17      Q.   Those two?
18      A.   -- the primary focus.  And then other
19   issues arose.
20      Q.   I'm going to ask you about the rest of the
21   sentence, but right now I'm just asking what
22   performance problems by Jay Cooper were discussed,
                        0114
1    and you've identified two, correct?
2       A.   Uh-huh.
3       Q.   All right.
4       A.   And in relationship to this, not meeting
5    the objectives of the program.
6       Q.   In relationship to what?
7       A.   The focus on the admin functions.
8       Q.   In other words, being distracted from the
9    objectives by the admin functions?
10      A.   Right.
11      Q.   Now, during the August 18 meeting, did
12   Mr. Cooper admit that he had been distracted by the
13   administrative functions so that he could not focus
14   on the objectives of the program?
15      A.   No.
16      Q.   Did he deny that?
17      A.   Yes.
18      Q.   He did?
19      A.   Yes.  He felt that he was -- he could do
20   both.
21      Q.   What facts were brought to his attention
22   to convince him that he did have a problem in that

0115

1   area?
2       A.   As I recall, there was -- I don't know
3   whether I'm recalling what happened at that meeting
4   or prior to that meeting with Michael Kunz.
5       Q.   Well, what do you recall, whichever place
6   it happened?
7       A.   That the vision of the program was not
8   well understood by some key staff and, therefore,
9   their ability to implement was undermined.
10      Q.   And you were told that by someone or you
11  concluded that from something?
12      A.   I concluded that from my visit in the
13  spring and it was corroborated by others.
14      Q.   I'd like to parse that through for a
15  minute, if I could.
16           Which members of the key staff did not
17  appreciate the vision of the program?
18      A.   Country directors.  In particular those in
19  Kazakhstan and Kyrgyzstan.
20      Q.   And how did you determine that they did
21  not appreciate the vision of the program?
22      A.   Conversations that Michael Kunz had had

0116

1   with those individuals.
2       Q.   Did you have conversations with those
3   individuals personally to verify or determine that
4   fact?
5       A.   At what point in time?
6       Q.   At any time before August 18.
7       A.   Yes.
8       Q.   With whom and when?
9       A.   Marat Kazibeko.
10      Q.   And his position is what?
11      A.   At that time he was country director.
12      Q.   Of Kazakhstan?
13      A.   Uh-huh.
14      Q.   And when did you speak to him about his
15  vision of the program?
16      A.   I didn't say his revision for the program.
17  I gathered from my conversations with him that he
18  didn't have a clear vision.
19      Q.   And in what respects did his vision appear

20    faulty to you, from your conversations with him?
21        A.    I don't think he -- he did not appear to
22    understand how the devolution of authority, how

0117

1    authority was going to devolve from the Kazakhstan
2    country office through the associations that we were
3    principally targeting as our legacy in those two
4    countries.
5        Q.    Was there a work plan in place to permit
6    that process to happen, in Kazakhstan?
7        A.    Some of the work plan was not being
8    executed.
9        Q.    By Marat?
10        A.    By Marat.
11        Q.    And others?
12        A.    And his direct supervisor, Jay Cooper.
13        Q.    In what respect was Jay Cooper not
14    executing the work plan?
15        A.    Capacity was not being built, sufficient
16    capacity was not being transferred to the
17    associations to take on the role that they needed to
18    take on prior to the end of the program.
19        Q.    You got that impression from a direct
20    conversation with Marat.  You also had a direct
21    conversation --
22        A.    No.

0118

1        Q.    Am I wrong?
2        A.    (Indicating.)
3        Q.    How am I wrong?
4        A.    You asked -- that was not -- that did not
5    relate to a direct conversation with Marat.
6        Q.    It was your conclusion after a
7    conversation with Marat.  Is that correct?
8        A.    We did not discuss the work plan with
9    Marat.
10        Q.    After your conversation with Marat, you
11    drew the conclusion that the work plan was not --
12    the vision of the program was not adequately
13    understood by him.  Is that correct?
14        A.    Yes.
15        Q.    Did you also have a conversation on that
16    subject with the country director from Kyrgyzstan?

17      A.   I don't recall.
18      Q.   Did you hear from Michael Kunz something
19  that made you think that the vision of the program
20  was not adequately understood by the country
21  director from Kyrgyzstan?
22          MS. ARIAIL:  Objection to form.
                    0119
1       A.   Yes.
2       Q.   When did Michael Kunz tell you something
3   that made you draw that conclusion?
4       A.   For months prior.
5       Q.   Now, in the August 18 meeting, were your
6   doubts about whether or not the country directors
7   had a well-understood vision of the program
8   expressed and Jay Cooper's responsibility for that
9   discussed?
10          MS. ARIAIL:  Objection,
11  mischaracterization of testimony.
12  BY MS. DOUGLASS:
13      Q.   Did I mischaracterize something you said?
14      A.   Would you repeat that?  I'm sorry.
15      Q.   All right.  Let's back up.
16          You say in your Interrogatory answer that
17  one of the things that was discussed on August 18
18  was Jay Cooper's performance problems.
19      A.   That's right.
20      Q.   And I've asked you what the performance
21  problems were, and we've discussed two of them
22  having to do with the administrative function
                    0120
1   distracting him from larger goals.  Am I right so
2   far?
3       A.   Uh-huh.
4       Q.   Then we -- then you said that this
5   distraction had led to your conclusion that the
6   vision of the program was not being adequately
7   understood by the country directors of two
8   countries?
9       A.   No.  I didn't mean to draw that kind of a
10  relationship.  Sorry.
11          MS. ARIAIL:  You don't have to apologize
12  for anything.
13          THE WITNESS:  All right.

14    BY MS. DOUGLASS:
15       Q.   What do I have wrong in my understanding
16    of what you said?
17          MS. ARIAIL:  Objection, form.
18    BY MS. DOUGLASS:
19       Q.   What did I misunderstand, please,
20    Ms. Lear?
21       A.   They're two separate issues here.  The
22    vision piece was my concern in the spring of 2004.
                        0121
1     It was also Michael Kunz's concern.  It was a joint
2     concern.  During my visit in the spring of 2004, I
3     had the opportunity to speak to staff, to Marat
4     and -- I don't remember whether I went to
5     Kyrgyzstan.  I don't.
6        Q.   Now --
7        A.   The work plan was not discussed.
8        Q.   Was not discussed in the spring or was not
9     discussed in the August meeting?
10       A.   It wasn't discussed at all.
11       Q.   At all?
12       A.   No.
13       Q.   Now, what you've called the vision part,
14    we're communicating about that, was that discussed
15    at the August 18 meeting as an aspect of Cooper's
16    performance problems?
17       A.   I don't recall.
18       Q.   Now, on answer to Interrogatory number
19    two, paragraph one, you also say that during the
20    meeting on October 18, you sought to, quote,
21    "identify and implement an effective management and
22    leadership structure."
                        0122
1          MS. ARIAIL:  Objection.  I think you meant
2     August.
3          MS. DOUGLASS:  What did I say?
4          MS. ARIAIL:  October.
5          MS. DOUGLASS:  Strike it, please.  Thank
6     you.
7     BY MS. DOUGLASS:
8        Q.   Was the meeting on August 18 also to
9     identify and implement an effective management and
10    leadership structure?

11    A.    Yes.

12    Q.    We've already talked about the fact that

13    before the meeting Mr. Kunz had already been brought

14    in to supervise Mr. Cooper, correct?

15    A.    Yes.

16    Q.    So what that refers to, in your answer to

17    Interrogatory number two, is the structure for

18    moving the administrative functions to Mr. Abma.  Is

19    that right?

20        MS. ARIAIL:  Objection.

21        MS. DOUGLASS:  What's the objection?

22        MS. ARIAIL:  The objection is that that's

                    0123

1    not what she's testified and that's not what this

2    states.  If you have a question, ask her; don't put

3    words in her mouth that you have no basis for coming

4    up with.

5    BY MS. DOUGLASS:

6    Q.    The management structure, to the extent

7    that it involved adding Mr. Michael Kunz as a

8    supervisor of Jay Cooper, was already in place

9    before the meeting, correct?

10    A.    Yes.

11    Q.    Given that, what did you mean in your

12    answer to Interrogatory number two, paragraph one,

13    when you said that you held a meeting on August 18

14    to, quote, "identify and implement an effective

15    management and leadership structure for the CSSI and

16    Healthy Communities project," close quote?

17    A.    Yeah.  We wanted to do just that, to

18    identify and create a leadership structure that we

19    felt would enable us to move forward to meeting the

20    objectives of the program -- or to better meet the

21    objectives of the program.

22    Q.    What did that encompass aside from --

                    0124

1    A.    It encompassed having --

2        MS. ARIAIL:  I was just going to say, let

3    her finish her question.

4    BY MS. DOUGLASS:

5    Q.    What did that encompass aside from moving

6    the administrative functions from Jay Cooper to Bob

7    Abma?

8      A.    It encompassed having a -- it encompassed
9    improving the working relationship between Jay
10   Cooper and Michael Kunz.
11      Q.    Good.
12      A.    Yeah.
13      Q.    And that was one of the purposes of the
14   meeting, was to try to air out whatever issues there
15   may or may not be between them, and we've talked
16   about that previously, right?
17      A.    Absolutely, yes.
18      Q.    Now, did you or anyone else during the
19   August 18 meeting state that Jay Cooper had had
20   difficulty with filling vacant project positions?
21      A.    Yes.
22      Q.    Did Jay Cooper have a response to that?

                              0125

1      A.    I don't recall.
2      Q.    What did Jay Cooper say about making
3    decisions being painful for him?
4      A.    It's exactly what he said.
5      Q.    For the context in which it was said, did
6    you understand what he meant?
7      A.    Yes.
8      Q.    What decisions were painful for Jay
9    Cooper, as you understood it?
10      A.    All decisions.
11      Q.    Did you draw a conclusion that any
12   particular decisions which were painful for him were
13   hindering his ability to perform his duties?
14      A.    Yes.
15      Q.    Which decisions were doing that?
16      A.    Recruitment of staff, one.  In particular,
17   making decisions on people who were available.
18      Q.    Choosing among candidates, is that what
19   you mean?
20      A.    Yes.  Identification of a problem and then
21   addressing the problem in a timely fashion.
22   Addressing it in a timely fashion is the issue.

                              0126

1      Q.    Was that subject discussed at the
2    August 18 meeting?
3      A.    In the context of positions.  In the
4    context of not being able to make a decision as to

5    whether he wanted to stay with Counterpart or
6    depart.
7        Q.    Was it your belief on August 18 that
8    Mr. Cooper wanted to depart Counterpart?
9        MS. ARIAIL:  Objection, outside the scope
10    of the deposition.
11        MS. DOUGLASS:  Excuse me.  I'll withdraw
12    the question.
13    BY MS. DOUGLASS:
14        Q.    Was anything said at the August 18 meeting
15    about whether or not Mr. Cooper wanted to remain
16    with Counterpart?
17        A.    Mr. Cooper sought to leave the room twice,
18    stating that he didn't think he wanted to remain.
19        Q.    You mean remain in the room or remain at
20    Counterpart?
21        A.    Both.
22        Q.    Do you remember what happened during the
                            0127
1    meeting just before Mr. Cooper twice sought to leave
2    the room?
3        A.    I don't remember exactly what happened,
4    but -- may I think about that meeting?
5        Q.    Sure.
6        A.    Can you ask the question one more time?  I
7    apologize.
8        Q.    I believe you testified that two times
9    Mr. Cooper sought to leave the room, saying that he
10    didn't want to remain.  And then I asked you, remain
11    in the room or remain with Counterpart, and you said
12    both.
13        A.    Uh-huh.
14        Q.    And then I said, do you remember from a
15    context what had happened in those meetings just
16    before he did that.
17        A.    Yes, yes.  What I remember is this.  That
18    I said to Jay -- we encouraged him to sit down and
19    he sat.  We said, is it an issue -- I said, my
20    sense, is this an issue of control and pride.  And
21    this is the transferring of the admin function over
22    to Bob Abma.  And Jay thought for a while and
                            0128
1    concurred that that was probably the case.  Loss of

2      control and loss of pride.
3          Q.    And at that point he sought to leave the
4      room.  Is that correct?
5          A.    No, not at that point.  I think it was
6      after we encouraged him to sit down and we were
7      trying to figure out what it was that was upsetting
8      him so.
9          Q.    And each of the two times it was the same
10     context in which he took that issue, or not?
11         A.    I don't know.  I'm not -- I know he got up
12     twice to go.  I know he was encouraged to sit down
13     twice.  I don't know what the catalyst was.  I can't
14     remember the catalyst.  But I'm trying to respond to
15     your question.
16         Q.    Fine.  Did Jay Cooper during the August 18
17     meeting bring up reservations he had about Michael
18     Kunz's temperament?
19         A.    Yes.
20         Q.    What did he say about that?
21         A.    He indicated that Michael had yelled at
22     him.

                          0129

1          Q.    And?
2              MS. ARIAIL:  Objection.
3      BY MS. DOUGLASS:
4          Q.    Is that all he said?
5          A.    What's your question?
6          Q.    What did Jay Cooper say about Michael Kunz
7      having yelled at him?
8          A.    He yelled at him.  That's what he said.
9      "Michael Kunz yelled at me."  He must have expressed
10     the fact that it upset him.
11         Q.    Did he say anything about the context in
12     which Michael Kunz had yelled at him?
13         A.    I'm not -- it may have had something to do
14     with -- I remember two things.  One, where he had
15     said to Michael Kunz that he was keeping a file on
16     Michael Kunz.  I thought it might be in that
17     context.  I'm just not clear about the context.  I
18     don't recall the other context.  I just don't recall
19     the other context.
20         Q.    Did Jay Cooper express that during the
21     August 18 meeting, that Michael Kunz had yelled at

22    him for a half hour on the subject of changes Jay

0130

1    Cooper had made to the Turkmenistan work plan?

2        A.    Oh, that's possible.

3        Q.    Did Barbara Sloan indicate during the

4    August 18 meeting that emotional outbursts such of

5    that of Michael Kunz were inappropriate?

6        A.    I don't recall.

7        Q.    Do you recall Barbara Sloan saying that it

8    would be assumed going forward that there would be

9    no such further outbursts by Michael Kunz?

10        A.    Or anybody.

11        Q.    Did she say that?

12        A.    I can't corroborate whether she said one

13    or the other, I just don't remember.

14        Q.    Was there a discussion about emotional

15    outbursts by somebody at the August 18 meeting?

16        A.    It was something that Jay brought up.  We

17    all -- I can't ask you a question.  Sorry.

18            MS. ARIAIL:  Can we take a break, please?

19            MS. DOUGLASS:  Sure.

20            MS. ARIAIL:  Are you done with your

21    question?

22            THE WITNESS:  Yeah.

0131

1        (A recess was taken.)

2    BY MS. DOUGLASS:

3        Q.    So is there anything that you'd like to

4    change about your answer based on the lapse of

5    timing?

6        A.    (Indicating.)

7            MS. ARIAIL:  I'm sorry.  Please answer

8    "yes" or "no."

9            THE WITNESS:  No.  I'm sorry.

10            MS. ARIAIL:  Just for the court reporter.

11            THE WITNESS:  No.

12    BY MS. DOUGLASS:

13        Q.    Now, on page three of Plaintiff's

14    Exhibit 29, which is your Interrogatory answer, you

15    make the following statement.  Quote, "Cooper

16    expressed his belief that Kunz and Abma were

17    conspiring against him," close quote.

18            You heard Jay Cooper make that statement?

19    A.    Yes.
20    Q.    Was he asked the basis for that belief?
21    A.    I'm sure he was asked to clarify.
22    Q.    Do you remember what he said to clarify

0132

1    that belief?
2    A.    I think he -- no, I just don't remember.
3    I don't remember.
4    Q.    Do you remember whether Mr. Kunz responded
5    in any way when Mr. Cooper expressed that belief?
6    A.    No.  In the context of August 18, no.
7    Q.    Yes, in the context of the August 18
8    meeting.
9    A.    Uh-uh.
10    Q.    I'd like to show you what's been
11    previously marked Defendant's Exhibit 12 in the
12    Cooper deposition and have it marked as Plaintiff's
13    Exhibit 12 in this deposition.  It's a multi-page
14    set of e-mails, the top one being from Barbara Sloan
15    to Jay Cooper and others, dated August 24, 2004,
16    bearing Bates stamps CP00740 through 744.
17        (Document referred to marked Deposition
18    Exhibit Number 12 for identification and
19    subsequently attached to the deposition.)
20    BY MS. DOUGLASS:
21    Q.    Have you seen Plaintiff's Exhibit 12
22    before, Ms. Lear?

0133

1    A.    Yes.
2    Q.    Is it an e-mail you received on or about
3    August 24?
4    A.    Yes.
5    Q.    2004?
6    A.    Yes.
7    Q.    Whose handwriting is it at the top of the
8    document, if you know?
9    A.    It looks like mine.
10    Q.    Do you remember making that notation?
11    A.    No.
12    Q.    Did you believe that the proposal set
13    forth in the first page of Plaintiff's Exhibit 12 is
14    a, quote, "thoughtful process for resolving
15    management issues or seeking reparation," close

16  quote?
17        MS. ARIAIL:  Objection.
18        THE WITNESS:  May I ask a question?
19        MS. ARIAIL:  No.  I mean, I can't stop
20  you.  Go ahead.  You can ask the question.
21        THE WITNESS:  I can?
22        MS. ARIAIL:  Yeah.
                        0134
1      A.    I thought it was a thoughtful process for
2   seeking to resolve the management issues, yes.
3      Q.    What does seeking reparation mean in that
4   note?
5      A.    I don't know.
6        MS. ARIAIL:  Objection.
7        MS. DOUGLASS:  What objection?
8        MS. ARIAIL:  I don't think it says
9   reparation.  I think it says separation.
10        THE WITNESS:  Separation, right.  It is
11  separation.  That's my "S."
12        MS. ARIAIL:  It's pretty clear.
13        MS. DOUGLASS:  It's pretty clear?
14        MS. ARIAIL:  To me.  That's why I
15  objected.
16        THE WITNESS:  It is.
17        MS. DOUGLASS:  You could have said why you
18  objected and we would have saved about 10 minutes.
19  BY MS. DOUGLASS:
20      Q.    Separation?
21      A.    Absolutely, right.  Then I agree with the
22  full sentence, "A thoughtful process for resolving
                        0135
1   management issues or seeking separation."
2      Q.    Is that maybe a "C" at the beginning of
3   the word separation?  It doesn't look like an "S" to
4   me.
5      A.    It's an S.  It's my handwriting.  It's
6   better than usual.
7      Q.    Now, let's move on to subject four.  At
8   some point there was arranged a conference telephone
9   call on August 25, correct?
10      A.    Yes.
11      Q.    2004, correct?
12      A.    Yes.

13    Q.   Now, is it true that Mr. Cooper was not
14    told that this call was going to happen when it
15    happened?
16    A.   Not true.
17    Q.   Did you hear Mr. Cooper's testimony on the
18    subject the other day?
19    A.   Yes, but I -- yes.
20    Q.   And your belief is that his testimony was
21    erroneous?
22    A.   Can you remind me of his testimony?

                              0136
1    Q.   Well, he says he had no idea that this
2    call was scheduled for that day, and indeed there's
3    an e-mail someplace that says that.  But your memory
4    is that everyone who participated in the August 25
5    call was aware of the call and what its subject was
6    to be.  Is that correct?
7    A.   Yes.
8    Q.   Now, if you'd go back to Plaintiff's
9    Exhibit --
10    A.   In fact, the memo attached says Altynai
11    corroborates the fact that she called Jay Cooper to
12    tell him about the call tomorrow.
13    Q.   Doesn't it say, looking at page 741 of
14    Plaintiff's Exhibit 12, that Jay hadn't been told
15    about the call previous to Altynai informing him?
16    A.   We agreed on August 18 that we would
17    follow-up with a phone call.  Okay?
18    Q.   Yes, I understand.
19    A.   Altynai and I, who is my assistant or
20    program officer in the division, called him to
21    remind him of the phone call scheduled for the 25th.
22    That he didn't remember doesn't necessarily mean

                              0137
1    that we didn't agree on the time of the phone call.
2    Q.   So you're saying that the date of
3    August 25 was set on August 18?
4         MS. ARIAIL:  Objection, mischaracterizing
5    her testimony.
6    BY MS. DOUGLASS:
7    Q.   I'm asking you, Ms. Lear, is it your
8    testimony that the date of August 25 for the
9    follow-up phone call was set at the meeting on

10      August 18?
11          A.    I don't recall if the date was set on
12      August 18.
13          Q.    Do you recall when the date was set?
14          A.    I recall that we talked about having a
15      follow-up phone call --
16          Q.    Okay.
17          A.    -- to reach closure and agree on the
18      conclusions and the steps for going forward.
19          Q.    Do you remember when it was determined
20      that that phone call would happen on August 25?
21          A.    No.
22          Q.    Would you look back at Plaintiff's
                          0138
1       Exhibit 29, please, and paragraph two of your
2       answers to Interrogatory number two.
3           A.    Okay.
4           Q.    Now, you say in that answer, second
5       sentence, quote, "At that time the call participants
6       agreed both Cooper and Counterpart would assess
7       whether or not Cooper should remain with Counterpart
8       after a four-month transition period with a new
9       management structure in place."
10              Is that your understanding of one of the
11      agreements that was reached in the August 25 call?
12          A.    Yes.  But what was determined was that
13      either party, either Jay Cooper or Michael Kunz
14      would be in a position to determine whether we
15      should go forward or not, that Jay Cooper was going
16      to be given -- there was going to be a go or no-go
17      decision by Jay by month four.
18          Q.    And it's your testimony that Jay Cooper
19      agreed to those terms on the phone call on
20      August 25?
21          A.    Yes.
22          Q.    Now, if you look back at Plaintiff's
                          0139
1       Exhibit 12, please, on page 743, which is the fourth
2       page of the document --
3           A.    Yes.
4           Q.    -- under key decisions --
5           A.    Yes.
6           Q.    -- look down at the sixth bullet point,

7    starting "at the latest."
8        A.    Yes.
9        Q.    Now, this is a summary of the phone call
10   written by Barbara Sloan.  Is that correct?
11       A.    Yes.
12       Q.    Barbara Sloan writes that either Jay or
13   Michael -- "If either Jay or Michael feel strongly
14   that it will not work before the four-month period,
15   they will say so and plans will begin for a
16   thoroughly managed separation."
17       A.    Thoughtfully.
18       Q.    "Thoughtfully managed separation."
19             Is it your testimony that that agreement
20   was reached during the August 25 call?
21       A.    Yes.
22       Q.    Later in that paragraph is the following
                              0140
1    sentence.  Quote, "Should it become evident that
2    this effort is not working, she will consider to go
3    with Jay and Michael, how to best use his time."
4             Do you understand the "she" in that
5    sentence to be you?
6        A.    Yes.
7        Q.    Do you agree that it was agreed during the
8    August 25 call that should it become evident that
9    this effort is not working, that she would consider,
10   together with Jay and Michael, how best to use the
11   four-month time?
12       A.    Yeah.
13       Q.    Did you live up to that agreement?
14       A.    It became irrelevant.
15       Q.    It became irrelevant so there was no need
16   to live up to the agreement?  What did you mean by
17   it became irrelevant?
18       A.    Jay Cooper did not live up to his part of
19   the agreement.
20       Q.    Right now we're on subject three so I
21   can't go into that, but I will in a minute.
22             MS. ARIAIL:  Pat, just to clarify, you
                              0141
1    said we were on subject four, I thought, August --
2             MS. DOUGLASS:  We're on subject four.
3    BY MS. DOUGLASS:

4    Q.    In your -- again on Plaintiff's
5    Exhibit 29, page five, paragraph two, which concerns
6    the August 25, 2004 phone call, you saying the
7    following.  Quote, "Lear and Cooper agreed, if
8    necessary, Cooper could be transitioned out of
9    Counterpart prior to the end of the four-month
10   period," close quote.
11        Is that sentence based on the agreement
12   that's described in Ms. Sloan's memo, which is the
13   page numbered CP00743 of Plaintiff's Exhibit 12, the
14   sixth bullet point under key decisions?
15   A.    "Cooper could be transitioned out of
16   Counterpart prior to the end of the four-month
17   period," that's your question?
18   Q.    Yes.  Is that the same --
19   A.    It corresponds.
20   Q.    All right, thank you.  The answer's yes,
21   correct?
22   A.    Yes.

0142

1    Q.    Now, according to Ms. Sloan's e-mail,
2    which is page 743 of Plaintiff's Exhibit 12, you
3    agreed to participate in monthly check-in sessions
4    with Michael and Jay.  Is that right?  I'm looking
5    at bullet point five on page 743.
6        MS. ARIAIL:  Objection, misstates what the
7    document says.
8    BY MS. DOUGLASS:
9    Q.    Does bullet point five on page 743 of
10   Plaintiff's Exhibit 12 say, under key decisions,
11   quote, "Monthly check-in sessions with Arlene,
12   Michael and Jay"?
13   A.    Yes.
14   Q.    Does that reflect the fact that you agreed
15   during the August 25 call to participate in monthly
16   check-in sessions with Michael and Jay?
17   A.    If needed, yes.
18   Q.    Who was, in your understanding, to
19   determine whether or not such sessions were needed?
20   A.    I would think Michael and Jay.
21   Q.    So in your understanding of what you
22   agreed to, they were supposed to ask you for a

0143

1   monthly check-in session if they wanted one?
2       A.   That was my understanding, yes.
3       Q.   And that was discussed during the
4   August 25 phone call?
5           MS. ARIAIL:  Objection.
6           MS. DOUGLASS:  Objection what?
7           MS. ARIAIL:  You can't ask if her
8   understanding of something was discussed after it's
9   based on what you're asking her about now.
10      BY MS. DOUGLASS:
11      Q.   There was a discussion about whether there
12  would be monthly check-in sessions with you and
13  Michael and Jay, correct?
14      A.   Yes.
15      Q.   Was anything stated during the August 25
16  phone call about whether or not it would be your
17  responsibility to initiate such discussions or the
18  responsibility of someone else?
19      A.   No.
20      Q.   So what you testified to previously was
21  simply an assumption on your part rather than
22  something that was said in the phone call, correct?
                    0144
1       A.   Yes.
2       Q.   Was anything said about bullet point four
3   on page 743 of Plaintiff's Exhibit 12 during the
4   August 25 phone call?
5       A.   Yes.
6       Q.   What was said about the subject of weekly
7   check-in sessions between Michael and Jay?
8       A.   Item number eight says, "Agree on check-in
9   points."
10      Q.   I'm looking on page 743.  Are you?
11      A.   You asked its relationship to the
12  agreements made on -- in the conference call.
13      Q.   Yeah.
14      A.   So point number eight, summarizing the
15  agreements made in the conference call, indicates
16  that we agree on check-in points.
17      Q.   Well, I interpret -- I didn't write this.
18  Page 740 of Plaintiff's Exhibit 12 appears to be
19  Ms. Sloan's, A, summary of the meeting on August 18,
20  and, B, proposals for an agenda for the phone call

21    that turned out to happen on August 25.
22        A.   I don't understand the question.  You
                        0145
1     asked --
2         Q.   I'm looking at page 743, which appears to
3     postdate the phone call on August 25.  Am I right
4     about that?
5         A.   Sorry.  Yeah.
6         Q.    And there's some confusion, because the
7     heading of page 743 talks about a phone call on
8     8/24, and we believe it happened on 8/25.  Okay?
9         A.   Yes.
10        Q.    But with that wiggle aside, isn't
11    Ms. Sloan, on page 743 of Exhibit 12, summarizing
12    what happened in the August 25 phone call?
13        A.   Yes.
14        Q.    And one of the things that she considers a
15    key decision is bullet point four, which talks about
16    Michael and Jay agree to weekly check-in sessions,
17    correct?
18        A.   Yes.
19        Q.    Do you remember such an agreement being
20    made during the phone call on August 25?
21        A.   Yes.
22        Q.    And do you remember whether anything was
                        0146
1     said about --
2             MS. ARIAIL:  I'm sorry.  I just want to
3     make sure she lets you finish your question.
4     BY MS. DOUGLASS:
5         Q.    Do you remember whether anything was said
6     during the August 25 phone call about whose
7     responsibility it would be to initiate such
8     sessions?
9         A.   I do not.
10            MS. ARIAIL:  Arlene, can you speak up a
11    little?
12            THE WITNESS:  Yes.
13    BY MS. DOUGLASS:
14        Q.    Now, we're now on subject five.
15            Did Jay Cooper come to you after the
16    August 25 phone call and say that he believed that
17    the arrangement which was in place would not work?

18    A.    After our phone call?
19    Q.    Yes.
20    A.    No.
21    Q.    Did Michael Kunz come to you after your
22    phone call of August 25 and say that he believed

                          0147

1    that the arrangement that was in place would not
2    work?
3    A.    No.
4    Q.    Did you conclude from -- based on
5    something else that the arrangement was not working
6    after August 25?
7    A.    Yes.
8    Q.    What caused you to draw that conclusion?
9    A.    New positions were still -- you mean the
10    decisions made just here, the decisions made on the
11    25th, yeah?
12    Q.    No.  I'm asking something different now.
13    If there's something you want to say that you
14    thought I asked, go ahead.
15    A.    No.
16    Q.    There was a phone call on the 25th of
17    August, and we've talked about what decisions were
18    made then --
19    A.    Yes.
20    Q.    -- and what the understandings were?
21    A.    Uh-huh.
22    Q.    One of the possibilities was either that

                          0148

1    Jay Cooper or Michael Kunz come to you and say it's
2    not working.  And I just asked you about that.  And
3    I believe you said neither one of them did, correct?
4    A.    I thought you said immediately -- repeat
5    the question.  I'm sorry.
6    Q.    Was it -- was one of the options that was
7    talked about in the August 25 phone call, that
8    either Michael Kunz or Jay Cooper could come to you
9    within the four-month window of time and say, I
10    think this is not working?
11    A.    Uh-huh.
12    Q.    Did either Jay Cooper or Michael Kunz do
13    that?
14    A.    Yes.

15    Q.    Which one of them?

16    A.    Michael.

17    Q.    When did that happen and what did he say?

18    A.    During --

19          MS. ARIAIL:  Objection, compound question.

20    BY MS. DOUGLASS:

21    Q.    When did that happen?

22    A.    During the week that Kelli Boyer was in

                              0149

1    central Asia.

2    Q.    And what did Michael Kunz say to you on

3    that subject during that week?

4    A.    "Jay Cooper refuses to meet with me."

5    Q.    Did you question him about the

6    circumstances under which that happened?

7    A.    Yes.

8    Q.    And what did he say in response to your

9    questions?

10    A.    That there was one occasion where Kelli

11    had organized a meeting between Bob Abma and Jay

12    Cooper to discuss their issues.  And she organized

13    it to take place in Michael Kunz's office.  It was

14    her request as our HR director.  She felt she wanted

15    Jay's supervisor to be present.  Jay refused to meet

16    with Michael in Michael's office and refused to meet

17    with Michael.  And thereafter refused to meet with

18    Michael for any purpose.

19    Q.    Now, can I ask you some specifics about

20    that?  Did Michael say that Jay refused to meet in

21    Michael's office or that he refused to meet with

22    Michael, or both?

                              0150

1    A.    Refused to meet in his office for that

2    particular, but refused to meet with Michael.

3    Q.    For any purpose?

4    A.    Right.

5    Q.    And did that refusal happen in one

6    conversation or did it happen in multiple

7    conversations, if you know?

8    A.    As I recall, it was in one -- certainly in

9    one conversation, possibly in two.

10    Q.    And so did you interpret Michael's

11    reporting this to you as being his invocation of the

12  agreement that he could come forward and say this is
13  not working?
14      MS. ARIAIL:  Objection, beyond the scope
15  of the deposition.
16  BY MS. DOUGLASS:
17    Q.   It's not, so please answer the question.
18    A.   Can you --
19      MS. ARIAIL:  I'll instruct you not to
20  answer.  Counterpart can't interpret anything.
21  Ms. Lear's going to be deposed or has the option to
22  be deposed at a later time when she can be

0151

1  questioned about her individual interpretations,
2  feelings and opinions.  That's not the purpose of
3  today's deposition.
4  BY MS. DOUGLASS:
5    Q.   What did you do when Michael Kunz called
6  you and reported what you've just described?
7    A.   I discussed it with our COO.  I discussed
8  it with Kelli.
9    Q.   Did you take any action?
10   A.   No, not at that time, no.
11   Q.   Now, if you look back on Plaintiff's
12  Exhibit 12, page 743, bullet point six under key
13  decisions, did you take any steps to discuss with
14  Jay Cooper the fact that in Michael Kunz's view the
15  arrangement was not working?
16   A.   The fact that Michael Kunz said to me that
17  Jay would not report to him did not lead to his
18  saying to me explicitly at that moment this is not
19  working.  He merely reported that he was not willing
20  to meet with him.
21   Q.   He simply gave you a fact, he did not make
22  that report that this was not working?

0152

1    A.   That's right.
2    Q.   Now, I'm focusing now on subject number
3  five.  So I'm asking about the substance of all
4  communications, written or oral.
5      Following the August 25 phone call, did
6  you have any such communications with anyone on the
7  subject of whether or not Cooper was performing his
8  Counterpart duties appropriately?

9      A.    I might have, in the weekly phone
10    conversations with Michael Kunz, said "how are
11    things going."
12      Q.    So after August 25, you had weekly phone
13    conversations with Michael Kunz.  Is that correct?
14      A.    And that's pro forma.
15      Q.    Pro forma?
16      A.    As I did with Jay.
17      Q.    You had weekly conversations with him
18    also?
19      A.    When he reported to me.
20      Q.    But after Michael Kunz was put in to the
21    management structure, you no longer had phone
22    conversations with Jay Cooper.  Is that correct?
                              0153
1      A.    Right, that's correct.
2      Q.    And you might have said, how are things
3    going.  And what do you remember Mr. Kunz reporting
4    back to you?
5      A.    He said that he had met with Jay
6    periodically, had elicited from him, are things
7    going all right, had gotten the response yes.  And
8    it was too early to assess whether improvements had
9    been made, in terms of meeting the program
10    objectives.
11      Q.    And the statement you've just made is one
12    made to you by Michael Kunz in a phone call,
13    correct?
14      A.    It could have been a series of phone
15    calls.  Just, in other words, this is, you know --
16    yeah.
17      Q.    I understand.  Would you give me the time
18    frame of the series of phone calls?
19      A.    I would say in our weekly phone calls we
20    would.
21      Q.    So we're talking between August 25 and
22    Kelli Boyer's visit to the region?
                              0154
1      A.    Yeah -- yes.  Yes.
2      Q.    Was there anything more negative said
3    about how it was working out with Jay Cooper during
4    that period than what you've said?
5      A.    Well, Jay was staying behind closed doors

6    and that there wasn't a lot of communication
7    initiated by him.  I seem to recall him saying he
8    wasn't around a lot.
9        Q.    Jay wasn't around a lot?
10       A.    Yeah.  I don't know whether it had to do
11   with his traveling to Bishkek.
12       Q.    Did you or Michael Kunz express in these
13   phone calls any questions about whether Jay was
14   inappropriately out of the office?
15       A.    I don't recall that specific topic, no.
16       Q.    You don't remember a concern about him
17   being AWOL from his job?
18       A.    What I -- I don't recall.
19       Q.    Now, did you learn at some point in time
20   from Jay Cooper that he was being excluded from
21   information flow on certain subjects during the
22   period between the August 25 phone call and Kelli
                    0155
1    Boyer's visit to Almaty?
2        A.    No.
3            MS. DOUGLASS:  I want to have marked as
4    the next exhibit a two-page document bearing Bates
5    stamp 000234 through 35.  Apparently an e-mail from
6    Jay Cooper to Arlene Lear, dated August 3, 2004.
7            (Document referred to marked Deposition
8    Exhibit Number 30 for identification and
9    subsequently attached to the deposition.)
10   BY MS. DOUGLASS:
11       Q.    Have you seen Plaintiff's Exhibit 30
12   before?
13       A.    Yes.
14       Q.    What is it?
15       A.    Well, it's a -- there was a
16   precertification -- a meeting on precertification
17   that Bob had and -- I thought it was maybe Bob.  Let
18   me see.  Yeah, we had to precertify the associations
19   that we're seeking to localize.  And Bob had
20   indicated to Jay, I think previously, that he was --
21   they were going to have a meeting with USAID.
22           Jay was out of town I think at the time of
                    0156
1    this meeting, if I'm not mistaken.  And they had a
2    meeting.  It was just a preliminary meeting with

3    the -- just to get a sense of what you see his
4    expectations were for precertification.  It was
5    almost like an administrative thing.  Decisions
6    weren't made.  It was just an information-gathering
7    meeting.
8        Q.    Who is Altynai?
9        A.    She works for me.  She's the program
10   officer.  Oh, a different Altynai.  This Altynai I
11   think -- well, worked for Jay.
12       Q.    So he's asking that this Altynai person be
13   included in future meetings?
14       A.    Right.
15       Q.    Did you think there was -- that Jay was
16   being excluded from meetings purposely by Bob --
17       A.    No.
18           MS. ARIAIL:  Objection.
19   BY MS. DOUGLASS:
20       Q.    "No" is the answer?
21       A.    Yes.
22           MS. ARIAIL:  Objection, beyond the scope
                          0157
1    of the deposition.  I'd like to take a break.
2            MS. DOUGLASS:  Okay, but we're trying to
3    get done.  So, sure, let's go.
4            MS. ARIAIL:  I'll keep track of how long
5    we are so you get your seven hours.
6            (A recess was taken.)
7    BY MS. DOUGLASS:
8        Q.    We're still on communications, oral or
9    written, following the August 25 phone call, which
10   is the subject of subject number five.  And I'm
11   going to ask you a number of subjects.  I'm going to
12   ask you whether or not you had any communication
13   with anyone on those subjects.  And the time frame
14   I'm pointing to is October 25 through your
15   decision -- the corporation's decision to terminate
16   Mr. Cooper.
17           Did you have any discussions, aside from
18   the ones you've talked about, about Mr. Cooper being
19   accessible to employees under his supervision?
20       A.    Yes.
21       Q.    With whom and when?
22           MS. ARIAIL:  Objection, compound.  You can

0158

1    answer.
2        A.    Kelli Boyer.
3        Q.    Excuse me?  Kelli Boyer?
4        A.    Uh-huh.
5        Q.    What did Kelli Boyer tell you about that
6    subject?
7        A.    That -- repeat the question.  This is
8    about accessibility?
9        Q.    That Cooper was often inaccessible to
10   those employees under his supervision.
11       A.    Yes, he was behind closed doors a lot of
12   the time.
13       Q.    Kelli Boyer told you that?
14       A.    She perceived that.  Michael Kunz
15   perceived that.  Bob perceived that, but he didn't
16   talk to me directly about it.
17       Q.    Do you know whether Kelli Boyer
18   interviewed staff members at the Almaty office to
19   draw that conclusion?
20       A.    She interviewed staff.
21       Q.    Did you have any conversations about
22   whether or not Cooper was controlling and

0159

1    intimidating?
2        A.    I'm trying to remember.  Yes.
3        Q.    Who told you that?
4        A.    Kelli.
5        Q.    Do you know what her basis for drawing
6    that conclusion was?
7        A.    Conversation with Marat.  The term was not
8    empowered.
9        Q.    Not empowering?
10       A.    Not empowering.  Not feeling empowered.
11   That was the term.
12       Q.    Did anyone have a conversation with you
13   about whether Jay Cooper neglected opportunities to
14   enhance the productivity and well-being of existing
15   staff?
16       A.    During that time frame?
17       Q.    Yes.
18       A.    Would you repeat that?
19       Q.    Did you have any conversations with anyone

20  who reported to you that Jay Cooper neglected
21  opportunities to enhance the productivity and
22  well-being of existing staff?  If it will help you,

                            0160

1   Ms. Lear, I'm reading from Plaintiff's Exhibit 29,
2   page six, which are the Interrogatory answers.
3       A.   What page is that again?
4       Q.   Page six.
5       A.   And the question?
6       Q.   Did anyone discuss with you the fact that
7   Cooper neglected opportunities to enhance the
8   productivity and well-being of existing staff?
9       A.   I don't understand this as phrased.
10      Q.   Do you have any evidence that Jay Cooper
11  between August 25 and the date of his termination,
12  quote, neglected opportunities to enhance the
13  productivity and well-being of existing staff?
14      A.   The capacity building that should have
15  been going on with our associations, the transfer of
16  not only responsibility but, you know, the putting
17  in place the capacity for their taking on additional
18  authority for the implementation of program
19  objectives was not moving forward at the pace it
20  should have, according to the project proposal.
21      Q.   With whom did you have a discussion on
22  that subject?

                            0161

1       A.   This was a continuum and this was not
2   specific to that time frame alone.
3       Q.   In fact, there was a midterm assessment of
4   the CSSI program that was completed by a Mr. Carver
5   after Jay was fired.  Is that correct?
6       A.   Long after.
7       Q.   Well, in the spring --
8       A.   In the spring.
9       Q.   -- of 2005?
10      A.   Substantial time had passed.  A lot of
11  things had been put in place.  New people had been
12  hired.  And there was more movement forward in the
13  right direction.
14      Q.   As a matter of fact, Mr. Carver drew the
15  conclusion that except with respect to Turkmenistan,
16  that the associations were being encouraged and

17    fostered to take on that additional responsibility
18    that was going to be passed on to them after the end
19    of the project.  Is that right?
20        A.   It cannot be attributed to Jay Cooper.
21        Q.   Not at all?
22        A.   Not -- no, it cannot be attributed to Jay

                          0162
1    Cooper.
2        Q.   How long had the CSSI project been going
3    on at the time Jay Cooper was fired?
4        A.   About a year.  It started in 2003.
5        Q.   And you think --
6        A.   July 1.
7        Q.   And you think none of the results
8    reflected in Mr. Carver's evaluation could be
9    attributed to Jay Cooper?
10        A.   I didn't say none.  But that particular
11    result, the associations having a deeper
12    understanding of their role did not happen at the
13    time -- at the time that Jay was fired, no.
14        Q.    Now, I'd like to move on to subject number
15    six.
16             Who decided that Kelli Boyer should travel
17    to central Asia in October of 2004?
18        A.    That was a decision made between Kelli and
19    her supervisor --
20        Q.    Who was Kelli's supervisor?
21        A.    -- or COO or a combination of all three.
22    And I was part of that decision.

                          0163
1        Q.    Who was Kelli's supervisor?
2        A.    Her direct supervisor was Arthur Lovelace,
3    and -- who in turn reported to Harry Dorcus, but
4    there were often many meetings that were held
5    together among the three.
6        Q.    There were many meetings discussing --
7        A.    No, no.  I don't know exactly who was in
8    the room with Kelli when that decision was made.  We
9    discussed her going to central Asia to follow-up for
10    two purposes.
11             The one purpose, my interest, was
12    following up with Jay Cooper in response to his
13    e-mail requesting information about separation.  The

14    larger issue was an HR issue.  We periodically send
15    the HR director or the director for finance -- or
16    director for administration to countries to do an HR
17    audit.
18          So these two things came together.
19    Follow-up with Jay Cooper, that was my interest.
20    And the larger institutional interest was doing an
21    HR audit, giving her an opportunity to look at the
22    policies, the procedures, talk to staff, both senior

                          0164

1     staff, mid-level staff and junior staff.
2        Q.    Is it your understanding that when
3     Ms. Boyer went to central Asia, she did both of
4     those tasks?
5        A.    Yes.
6        Q.    And she reported back to you after doing
7     that?
8        A.    No.  I'm not her supervisor.  She reported
9     back to me on conversations with Jay Cooper.  But
10    I -- and on -- yes.
11       Q.    Have you seen some handwritten notes that
12    have been produced by Counterpart in this case a
13    couple days ago?
14       A.    No.
15       Q.    Have you ever seen any handwritten notes
16    that appear to be written by Kelli Boyer about her
17    trip to central Asia?
18       A.    No.
19       Q.    To your knowledge, was Jay Cooper informed
20    about Kelli Boyer's coming to central Asia before
21    she came?
22       A.    Not that I know.  That's all I know.

                          0165

1        Q.    Do you know whether anyone else was told
2     about Kelli Boyer's coming to central Asia before
3     she came?
4        A.    I can only assume so since Kelli Boyer had
5     to receive an invitation, which is processed through
6     Jay's office, an official invitation that comes from
7     the government -- comes from us, but it's for visa
8     preparation.  And also she was picked up at the
9     airport by our staff.  Hotel reservations were made.
10    So I can only make the assumption that there were

11   people in that office who knew that she was
12   arriving.
13      Q.   Was Jay Cooper told to stay in the region
14   and put off plans to leave Almaty during her visit?
15      A.   That I don't know.  That's something that
16   I can't answer.
17      Q.   Do you know who Kelli interviewed during
18   her visit to central Asia?
19      A.   I know that she interviewed Marat.  I know
20   that she interviewed Michael and Bob.  I think -- I
21   know that she interviewed the HR person.  And that's
22   what I know.  But maybe her notes will give you a

                          0166

1   fuller picture.
2      Q.   Did she make any formal report to you as a
3   result of those interviews?  By formal, I mean in
4   writing.
5      A.   No, we had phone conversations on several
6   occasions.
7      Q.   What did she tell you that Marat had told
8   her?
9      A.   This is not verbatim.
10      Q.   The best you can do.
11      A.   The best I can do, okay.
12      Q.   Uh-huh.
13      A.   That he did not feel -- working close to
14   Jay Cooper in an office, he didn't feel as empowered
15   as the other country directors.  And he was treated
16   more like staff rather than as a country director.
17   That's what I remember.
18      Q.   What about what she reported that Michael
19   told her?
20      A.   We didn't talk about what Michael told
21   her.
22      Q.   Did she report about what Bob Abma told

                          0167

1   her?
2      A.   No.
3      Q.   Did she report about what the HR person
4   had told her?
5      A.   No.  She reported on what Jay told her.
6      Q.   I'll get to that in a minute.
7      A.   Sorry.  I should have mentioned Jay in

8      that list.
9         Q.    Is the HR person a person named Irina?
10        A.    Yeah.
11        Q.    Is Irina still with Counterpart?
12        A.    I don't think so.
13        Q.    Did she report anything that Irina had
14     told her?
15        A.    I don't remember that at all.
16        Q.    What did she report about what Jay had
17     told her?
18        A.    She reported that -- as I recall, that Jay
19     talked about the fact that he had been in the region
20     for 10 years, was tired.  She said that they on
21     several occasions talked about separation.  I think
22     she may have said that Jay spoke to her about some

                              0168

1      of his issues, but not -- I didn't get into the
2      specifics.  I remember -- what I was focusing in on
3      was his discussion about separation.
4         Q.    Did she mention --
5         A.    And --
6         Q.    Sorry.  Go head, I didn't mean to
7      interrupt you.
8         A.    She reported back to me -- what was the
9      question?  I just want to make sure that I'm
10     answering your question.
11        Q.    I think the question was -- we can ask her
12     to read it back, but I think the question was, what
13     did Kelli report to you that Jay had said during her
14     meeting with him in Almaty.
15        A.    She said to me in one of the conversations
16     that Jay had said that -- he vacillated on
17     separation; no, I'm going to stay and do the bare
18     minimum.  She said that, as she reported to me, the
19     minimum is not acceptable.
20        Q.    She said --
21        A.    She also indicated to me that at one point
22     in their conversation, one of their conversations,

                              0169

1      she even suggested he might want a sabbatical.  Now,
2      I wasn't too thrilled about it.  Anyway, might want
3      a sabbatical.  She gave me an indication that she
4      was trying hard to figure out what Jay Cooper

5     wanted. Because he was not -- apparently not
6     satisfied. He did not share this with Michael.
7         Q.    Is that the end of your answer?
8         A.    (Indicating.)
9         Q.    He did not share what with Michael?
10        A.    The kind of conversations about separation
11    that were discussed with Kelli. She shared with me
12    that he asked her to stay on for an additional
13    period of time. They made an arrangement. She
14    asked if that was okay. She wanted to make sure
15    that was okay. I said yes. She made arrangements
16    to meet him on a Monday. And she said when she
17    showed up for the meeting he was not there. He had
18    already left for Bishkek.
19        Q.    Is that the end of what you remember about
20    Kelli telling you about what Jay said to her?
21        A.    Yes.
22        Q.    Did you take any steps to hear from Jay
                        0170
1     whether or not what was being reported to you was
2     accurate about what he had said?
3         A.    No.
4         Q.    Do you know how much in advance Kelli's
5     trip to Almaty was planned before it took place?
6         A.    Two weeks. One week, two weeks. The
7     invitation, it takes awhile to be -- within a
8     two-week time frame, I would think. I'm assuming.
9         Q.    Let's move on to subject seven. I'd like
10    you to look on Plaintiff's Exhibit 29, answer to
11    Interrogatory number four.
12        A.    What page is that?
13        Q.    That's page number eight.
14        A.    Okay.
15        Q.    Is it Counterpart's position that locking
16    Jay Cooper out of his office was simply a matter of
17    Counterpart following its standard operating
18    procedure?
19        A.    The office was locked to secure his
20    possessions, to keep them safe.
21        Q.    And his being instructed not to come into
22    any Counterpart office was for what purpose?
                        0171
1         A.    Jay's parting words -- the conversation

2    that we had on November 12, he was going to get a
3    lawyer.  And so consequently there was a
4    self-protection motive.
5        Q.   I don't quite follow the reason.
6        A.    There was no reason for Jay to be going to
7    the other offices.  There was reason for Jay to come
8    to retrieve his belongings in the office.
9        Q.    So he was told to stay out of the other
10   offices because he had said he wanted to get a
11   lawyer.  Is that your testimony?
12             MS. ARIAIL:  Objection,
13   mischaracterization.
14       A.    No.  I'm not drawing that -- I'm just
15   saying that we made that request at our attorney's
16   recommendation or advice.
17       Q.   Is it --
18       A.    And you would maybe understand that better
19   than I.
20       Q.    Is there any written procedure at
21   Counterpart concerning what procedures are to be
22   followed with respect to offices and entry to
                        0172
1    offices and personal property, et cetera, upon the
2    involuntary termination of an employee?
3        A.    It's precedent.
4        Q.    By precedent, you mean a consistent
5    practice?
6        A.    Yes.
7        Q.    And what was the consistent practice?
8        A.    The precedent is -- or the consistent
9    practice is that upon termination the employee
10   leave, be asked to leave the office, return the
11   keys.  The computer is -- I don't know what the term
12   is, whatever you do with a computer, lock it up.
13   And that the employee may return to the office in
14   the presence of someone designated to accompany the
15   employee to pick up personal belongings and to do
16   whatever else is agreed upon, mutually agreed upon.
17       Q.    And has that practice been consistently
18   followed by Counterpart in termination of other
19   employees?
20       A.    Quite consistently.
21       Q.    Now, in your response to Interrogatory

22    number four, I asked you about people who had been

0173

1    locked out of their office and you have come up with
2    two individuals, Mr. Propp and Mr. Touma.  Is that
3    correct?
4        A.   Yes.  And there was -- and now I recall
5    there was another one, Brian Black.  I think that
6    was what his name was.
7        Q.   When was Mr. Black terminated?
8        A.   This was during Greg Touma's tenure, and I
9    don't remember the years.
10        Q.   Within the last five years?
11        A.   I think so.
12        Q.   What was his position?
13        A.   He was director for fundraising.  That was
14    the title.
15        Q.   And it's your testimony that he was also
16    locked out of his office?
17        A.   He was accompanied out of the office, and
18    then he was able to come back in the presence of
19    someone designated to accompany him.
20        Q.   Was Mr. Cooper allowed to come back in the
21    office in the presence of someone designated to
22    accompany him?

0174

1        A.   Yes.
2        Q.   Who was that?
3        A.   The person designated, as I understand it,
4    was Marat.  The original person designated was
5    Kelli.  And she stayed on for that express purpose
6    until it became evident that Mr. Cooper was not
7    going to be returning to the office prior to her
8    departure to the United States.
9        Q.   At what steps does Counterpart take to
10    keep its practices concerning these manners
11    consistent?
12        A.   Arthur Lovelace oversees the consistent
13    application, but whenever someone is terminated we
14    confer with legal counsel.  I don't remember a time
15    when we fired a senior person that we did not
16    consult with legal counsel and did not take the
17    advice of legal counsel.
18        Q.   Do you know a man named Don Feil?

19    A.   Yes.
20    Q.   Was he involuntarily terminated?
21    A.   No.  Don Feil resigned.
22    Q.   Did he resign in lieu of termination?

0175

1    A.   No.
2    Q.   Do you know an Aaron Chassey?
3    A.   Yes.
4    Q.   Was he terminated involuntarily?
5    A.   Yes.
6    Q.   Was he locked out of his office?
7    A.   He left and never came back to his office.
8    Q.   So you don't know whether he was locked
9  out?
10    A.   All I remember is there was no lock on
11  Aaron Chassey's office.
12    Q.   What about Blair Sheridan?
13    A.   Blair?
14    Q.   Yes.
15    A.   That was -- Blair Sheridan was terminated
16  prior to the precedent being set.
17    Q.   Was there any particular event that caused
18  the precedent to be set?
19    A.   Yes.  The termination of Brian Black, as I
20  remember it.  And the precedent was established by
21  Greg Touma.
22    Q.   Was there --

0176

1    A.   In consultation with legal counsel.
2    Q.   Was there some reason to suspect that
3  Brian Black was dishonest?
4       MS. ARIAIL:  Objection, irrelevant.  You
5  can answer.
6    A.   No.  It's just the first time that this
7  particular lead counsel had -- was giving the
8  advice.  And that was her approach.  And Greg
9  Touma --
10       MS. ARIAIL:  I'm going to stop you from
11  divulging any client-attorney conversations.
12       THE WITNESS:  Oh, sorry.  All right.
13       MS. DOUGLASS:  I don't have any objection
14  to that objection.
15  BY MS. DOUGLASS:

16    Q.    What about Rosalie Vaquez and Scott Eider?

17    A.    Yes.

18    Q.    Were they involuntarily terminated?

19    A.    Yes.

20    Q.    Were they locked out of their office?

21    A.    There was no precedent established at that

22    time.

0177

1    Q.    What is the source of your information

2    that Brian Propp was locked out of his office?

3    A.    I escorted Brian Propp out of the

4    building.  I left the building with him.

5    Q.    And he was not allowed to return?

6    A.    He was allowed to return to pick up his

7    belongings and in the company of someone designated

8    to accompany him.

9    Q.    He was not allowed to use his office for

10    several weeks after he was terminated?

11    A.    Right.

12    Q.    Is that correct?

13    A.    Yes.  That's correct about Greg Touma,

14    that's correct about Brian Black.

15    Q.    Neither one of them were allowed to use

16    their office for any period of time?

17    A.    Not within the presence -- that's what I

18    know.  That's the best of my recollection.

19    Q.    And in answering these Interrogatories,

20    you made reasonable inquiry about this, I assume?

21    A.    Pardon me?

22    Q.    In answering the Interrogatories, you made

0178

1    inquiry of the people at the corporation of the

2    people most likely to have knowledge on the subject,

3    did you not?

4    A.    Yes.  I have knowledge on the subject.

5    Q.    Is it Counterpart policy to have personal

6    effects in an office boxed up by the human resources

7    department?

8    A.    It's Counterpart policy to take legal

9    advice seriously when it comes to termination.  This

10    was the -- that's what our policy is, to defer to

11    our legal counsel on these kinds of issues, and

12    that's what was done.

13    Q.    In Mr. Cooper's case?
14    A.    Absolutely.
15    Q.    And in everybody's case?
16    A.    In everybody's case, absolutely.
17    Q.    I know you won't believe --
18         MS. DOUGLASS:  Excuse me for a minute.
19    Off the record.
20         (Discussion off the record.)
21         MS. DOUGLASS:  I'd like to have marked as
22    Plaintiff's Exhibit 19 a document previously marked
                          0179
1    in the deposition of Jay Cooper as Defendant's
2    Exhibit 19, which appears to be a memo to Jay from
3    Kelli Boyer dated 12, November, 2004.
4         (Document referred to marked Deposition
5    Exhibit Number 31 for identification and
6    subsequently attached to the deposition.)
7    BY MS. DOUGLASS:
8    Q.    I'd like to show you what's been marked as
9    Plaintiff's Exhibit 31, Ms. Lear.  Have you seen it
10    before?
11    A.    Yes.
12    Q.    Did you participate in its drafting?
13    A.    No.
14    Q.    Was Exhibit 31 given to Jay Cooper on 12,
15    November, or soon thereafter, 2004?
16    A.    I assume so.
17    Q.    And it accurately sets out what you
18    understand to be the procedures that were followed
19    at the time of his termination?
20    A.    Yes.
21    Q.    Would you turn to the Interrogatory
22    answers of -- never mind.
                          0180
1         I'd like to show and have marked
2    plaintiff's responses to defendant's first set of
3    interrogatories, which I'll have marked as the next
4    exhibit.
5         (Document referred to marked Deposition
6    Exhibit Number 32 for identification and
7    subsequently attached to the deposition.)
8    BY MS. DOUGLASS:
9    Q.    I'm showing you Plaintiff's Exhibit 32,

10    Ms. Lear.  And these are Interrogatory answers that
11    Jay Cooper gave to your counsel's questions.  I'd
12    like you to specifically turn to Interrogatory
13    number 14, which is on page 15.
14          MS. ARIAIL:  Just for clarification, are
15    we moving on to --
16          MS. DOUGLASS:  We are.  We're moving on to
17    subject eight.
18          MS. ARIAIL:  Page 15.
19    BY MS. DOUGLASS:
20      Q.    I'm going to ask you about subjects one
21    through seven.
22      A.    Of Interrogatory 14?

                        0181

1       Q.    You just have this in front of you so I
2     can ask the questions briefly and you can look at
3     it.
4       A.    All right.
5       Q.    Did you ever become aware of the fact that
6     Bob Abma purchased an apartment for himself and his
7     companion in his companion's name or possibly in his
8     companion's mother's name?
9       A.    No.
10      Q.    Did you ever learn that Bob Abma collected
11    money from the project to be paid as rent?
12      A.    No.
13      Q.    Do you know whether anyone at Counterpart
14    ever learned either of those facts?
15      A.    Are we making the assumption these are
16    facts?
17      Q.    I'm asking whether or not Counterpart ever
18    heard these matters.  We will discuss whether they
19    are fact in some other situation.
20      A.    I don't know.  I really can't talk to
21    that.
22      Q.    Do you know whether those two subjects I

                        0182

1     just quoted were discussed with Bob Abma?  Excuse
2     me.  With Harry Dorcus?
3       A.    That's a possibility.
4       Q.    Have you discussed with Harry Dorcus
5     whether or not he discussed those matters with Bob
6     Abma?

7    A.   No.
8    Q.   Do you know whether Counterpart has done
9  anything to investigate the propriety of the actions
10  set forth in plaintiff's answer to Interrogatory
11  number 14?
12    A.   You mean number one?
13    Q.   Yes.  Subparagraph number one of answer
14  number 14.
15    A.   The propriety of what?  I don't understand
16  the question.
17    Q.   Let's try again.
18    A.   There are a lot of facts indicated here,
19  and if we disagree on whether they're facts, then --
20    Q.   Good.  I like your answer.  Let's start
21  that way.
22      Do you know whether anyone at Counterpart
                    0183
1  investigated whether any of the matters set out in
2  paragraph one of answer to Interrogatory number 14
3  on page 15 of Plaintiff's Exhibit 32, were in fact
4  true?
5    A.   Someone would have had to tell us that it
6  was an issue before we could investigate whether it
7  was true.  I don't remember it being brought to my
8  attention.
9    Q.   Do you know --
10    A.   That's my issue here.
11    Q.   Do you know whether Harry Dorcus had it
12  brought to his attention?
13    A.   I really don't know.  As stated, I really
14  don't know.
15      MS. DOUGLASS:  Then I'm requesting a new
16  witness on the subject of this particular subpart of
17  subject number eight.
18      MS. ARIAIL:  Can we go off the record for
19  a moment?
20      MS. DOUGLASS:  Sure.
21      (Discussion off the record.)
22  BY MS. DOUGLASS:
                    0184
1    Q.   I'm going back to my questions on subject
2  number eight right now.  And again, pointing you to
3  plaintiff's answers to Interrogatory number 14 of

4    Plaintiff's Exhibit 32.  And that answer in a number
5    of subparts sets out a number of financial
6    irregularities, right?
7        A.   Uh-huh.
8        Q.   I'm going to ask you, A, whether or not
9    Counterpart was informed of these matters at some
10    time during the time Jay Cooper worked for them.
11        A.   Okay.
12        Q.   And I'm going to ask you, B, what, if
13    anything, Counterpart did in response.
14        A.   Okay.
15        Q.   And if your answer is, I don't know the
16    answer because I didn't check with whoever might
17    know, that's a different answer.
18        A.   But now we're talking about the time frame
19    during his employment?
20        Q.   Yes.
21        A.   Did I know or anyone that --
22        Q.   Did the corporation -- you're the

                            0185

1    corporation for the purposes of this questioning.
2        A.   Got it.
3        Q.   Did the corporation ever learn any of the
4    facts alleged in paragraph one of the answer to
5    Interrogatory number 14?
6        A.   I think the corporation may have known
7    that he purchased an apartment, period.  That's all
8    I know.
9        Q.   That's all you knew?
10        A.   (Indicating.)
11        Q.   Do you know whether Harry Dorcus knew more
12    at the time Jay Cooper was employed?
13        A.   Pardon me?  Let me correct this.  I didn't
14    know for whom he purchased the apartment.  It could
15    have been for his companion.  I wasn't focused on
16    it.  Harry Dorcus might know more.  That's what you
17    asked us, yes.
18        Q.   Did you at any time approve him renting an
19    apartment and charging the rent to USAID or one of
20    the projects funded by USAID?
21        A.   No, I didn't -- it wasn't on my radar.
22        Q.   Do you know whether the corporation
                            0186

1    approved Bob Abma taking those steps?
2        A.   I think Harry Dorcus is the one that
3    needs --
4        Q.    So the answer is we need a new witness on
5    that subject?
6        A.   Yeah.
7            MS. ARIAIL:  Can we take a break?
8            MS. DOUGLASS:  Sure.
9            MS. ARIAIL:  I'm just concerned my witness
10   doesn't understand.
11           (A recess was taken.)
12   BY MS. DOUGLASS:
13       Q.    We're going to try again on subject number
14   eight.  And the subject of number eight is each of
15   the matters alleged in answer number 14 of
16   Plaintiff's responses to Defendant's
17   interrogatories, in which are listed a number of
18   matters that Jay Cooper thinks are irregularities.
19           And I am going to ask you as to each one
20   whether or not that was learned about by Counterpart
21   at the time Cooper was employed.  And if so, what
22   Counterpart did about it and whether it was proper
                          0187
1    or not under Counterpart's policies, right?
2        A.   Right.
3        Q.    And if the answer is that you don't know,
4    then we'll deal with it in another way.  Okay?
5        A.   Got it.
6        Q.    Now, first, as to paragraph one of the
7    answer to Interrogatory number 14, you can see it
8    involves an apartment purchased by Bob Abma.
9            Did anyone at Counterpart learn about that
10   at the time Cooper was employed by Counterpart?
11       A.    According to Bob Abma, Harry Dorcus.
12       Q.    Learned about it?
13       A.    Uh-huh.
14       Q.    Is that right?
15       A.    Purchased the apartment, yes.
16       Q.    And was Harry Dorcus told that it was in
17   his -- Abma's companion's name or his companion's
18   mother's name?
19       A.    I don't know.
20       Q.    And did Dorcus learn that Abma collected

21    money from the project to be paid as rent?
22        A.    That I don't know either.  Harry Dorcus is
                        0188
1    on leave.
2        Q.    So you weren't able to ask him before you
3    testified?
4        A.    That's why, right.
5        Q.    Now, do you know whether or not Dorcus or
6    anyone else at Counterpart learned that Abma's
7    mother was paid to clean the apartment out of funds
8    provided for the project by USAID?
9        A.    No.
10        Q.    Let's turn to paragraph two of the answer
11    to Interrogatory number 14 on Plaintiff's
12    Exhibit 32.
13        A.    All right.
14        Q.    Now, is there something called NICA?
15        A.    NICA.
16        Q.    What is that?
17        A.    Negotiated indirect costs agreement.
18        Q.    Is that an agreement between Counterpart
19    and USAID that governs what percentage of --
20        A.    Overhead is applied.
21        Q.    -- what sort of things can be applied to
22    overhead out of the project funds?  Is that a fair
                        0189
1    summary of NICA?
2        A.    NICA, number one, identifies the rate that
3    you can charge as overhead.  Number two, it
4    indicates, in our case, that we can apply it against
5    total operational costs with the exception of
6    indirect.  We can't charge indirect against
7    indirect, and equipment as I understand it, and
8    small grants up to 25,000, if I understand that too.
9        Q.    Did Counterpart ever learn at the period
10    of time that Cooper was working for them that
11    Counterpart used project funds for purposes that
12    violated their NICA agreement with USAID?
13        A.    We have never used project funds for
14    purposes that violated a NICA agreement.  We receive
15    an A133 audit that demonstrates compliance with
16    USAID on an annual basis.
17            We also have gone through several audits,

18     one by USAID Mission in central Asia.  We provide to
19     the Office of Financial Management an accounting of
20     expenditures, both in terms of cash flow as well as
21     expenditures against budget.  We are totally open,
22     transparent on how we spend money against what's

                                 0190

1     been approved.
2              In our cooperative agreements there are
3     five major line items that -- for the budget.  We
4     have budget breakdowns.  When we first submit a
5     budget breakdown to USAID to provide the rationale
6     for costs, they look at the full budget breakdown.
7     And then they combine all the detail into these
8     broad line-item categories.  Maybe about five of
9     them.  Salaries, travel, consultants, whatever.
10             And so within those very broad categories
11     we have 100 percent line-item flexibility.  We can
12     move from headquarters to field and vice versa.
13             Between those broad categories there are
14     some limitations.  We've never exceeded what the
15     regulation has called for, nor has any audit
16     disclosed that we have.
17             So Jay Cooper may not have liked our
18     spending more at HQ, but in terms of the legal
19     liability to USAID, nothing was breached.  We were
20     totally compliant.
21      Q.   When you talk about 100-percent
22     flexibility --

                                 0191

1      A.   Within a line item.  Like, for example,
2     salary line item.  Within that category.
3      Q.   Where is that 100-percent liability
4     spelled out?
5      A.   22CFR226.
6      Q.   Just what I wanted to know.  22CFR --
7      A.   226.
8      Q.   226?
9      A.   Yeah.
10      Q.   Now, the flexibility within broad
11     categories, I think I understood what you said.
12     There's also purposes for which money should not be
13     spent.  In other words, things that are not indirect
14     costs, are there not?

15      A.   No, most of the costs are direct costs.
16   Salary is a direct cost, travel is a direct cost,
17   operations, all project operations.  Indirect is our
18   overhead, and every organization has a different
19   formula for calculating overhead.
20      Q.   And that formula is set out in your
21   agreement with USAID?
22      A.   Absolutely, right.

                         0192
1      Q.   And that's also audited?
2      A.   It's reviewed on an annual basis.  You're
3   given a provisional rate and then -- and Harry
4   Dorcus was a USAID controller for 20 years.  So he's
5   very cognizant of compliance issues.
6      Q.   Now, at what role does the budget that's
7   sent by Counterpart to USAID at the beginning of a
8   project and as amended during a project, what is the
9   relationship between that and the NICA limitations?
10      A.   I don't see any relationship.  We charge
11   the NICA that we are authorized to charge by USAID.
12   And the NICA fluctuates during the life of a
13   project.  And we have an agreement that that NICA
14   should not exceed a certain amount.  But there's
15   fluctuations, annual fluctuations.
16      Q.   And --
17      A.   Because your overhead is not constant.
18      Q.   And so that's one of the reasons why the
19   budget gets amended over the course of a contract?
20      A.   No.  There's no -- it's our budget.  It's
21   a cooperative agreement, it's not a contract.  Under
22   a cooperative agreement, think ownership.  We own

                         0193
1   the project, and this is an G1946assistance
2   instrument to us.  So that there's more flexibility
3   under a cooperative agreement then there would be
4   under a contract, a direct contract with USAID.
5          A direct contract with USAID, they own the
6   project.  And every single line item they really
7   scrutinize.  It's their project.  You're servicing
8   them.  Through a cooperative agreement, once they
9   have determined that what you've presented them is
10   rational -- you know, rational, articulation of how
11    you would spend money on certain line items, you

12    meet your program objectives, then there's much more
13    flexibility in moving those line items around, yeah.
14        Q.    Now, item number three on page 16 of
15    Plaintiff's Exhibit 32 talks about the M&IE rate as
16    applied to headquarter's staff as opposed to staff
17    in the field.
18        A.    Right.
19        Q.    Was that subject discussed with you
20    personally, Ms. Lear, by Jay Cooper?
21        A.    Yes.
22        Q.    And did you agree with his objections?

                            0194
1         A.    No.
2         Q.    Did you look into whether or not the
3    disparity between those rates was appropriate with
4    your contract with USAID?
5         A.    It is.  And do you want --
6         Q.    No.  I just asked if you looked into it.
7         A.    It's absolutely justified, because the
8    policy had been set at the field level by David
9    Smith, who at that time was the chief of party.  Jay
10    Cooper was deputy chief of party at that time.  The
11    policy was set in the field.  And this is very
12    common in most organizations, set a policy in the
13    field for M&IE or the whole per diem.  Because
14    there's so much travel at the field level for
15    trainings and what have you across countries, that
16    it would be exorbitant if the field charged the full
17    amount allowable.
18         So that was discussed.  The policy was set
19    in the field.  That was the field-set policy.  So
20    therefore it was out of my control.  No one at HQ
21    said set the policy, you are to get less than what,
22    you know, HQ does.

                            0195
1         As a matter of fact, most of my staff do
2    not charge the full M&IE and most often they stay in
3    apartments.
4         Q.    Please look at paragraph four of the
5    answer to number 14 on Plaintiff's Exhibit 32.  Was
6    it Counterpart practice to use project staff to
7    develop new proposals?
8         A.    We have used project staff not to -- not

9      to develop full proposals?

10        Q.   New proposals.

11        A.   New proposals.  We've had -- project staff

12     have input into the development of new proposals.

13     The majority of new proposals are developed by the

14     HQ staff with input.  The people on the ground have

15     a better idea of, you know, the local operating

16     conditions, the costs of things for budgeting.  They

17     also have very good ideas often about what is --

18     makes up a good design.  And so we take their input,

19     but the responsibility for the most part for new

20     proposals is done by HQ with exception.  With

21     exception.

22        Q.   Did Jay Cooper express concerns about that

                              0196

1      to you at any time during his employment?

2         A.   Actually, it was -- USAID wrote a letter

3      at one point.  They had determined that some of our

4      staff were working on a proposal.

5         Q.   So at one point USAID objected.  Did Jay

6      Cooper, based on that objection, express his

7      reservations about the practice to you?

8         A.   It's interesting that you ask that

9      question since Jay Cooper often was upset that there

10     wasn't sufficient opportunity for the field to do

11     the writing on these proposals.  Jay Cooper -- we

12     discussed it, absolutely discussed it, yeah.

13        Q.   And did you, based on your discussion with

14     Jay Cooper, change any practices?

15        A.   Yes, yes, absolutely.  We now have a

16     program development council at headquarters.  And

17     then a program development council memo is

18     established to determine, number one -- to

19     articulate what the project is about and then to

20     identify the costs that are going to be needed to

21     implement the program.  And those costs include

22     consultants' costs or whatever and costs incurred by

                              0197

1      some of the HQ staff.

2         Q.   And in your view that ameliorates the

3      problem that was raised by --

4         A.   Significantly ameliorates the problem.

5         Q.   Please look at paragraph five of answer to

6      Interrogatory number 14 on Plaintiff's Exhibit 32.
7            Did it ever come to Counterpart's
8      attention during the time that Jay Cooper was
9      employed there, that he objected to the allocation
10      of expenses associated with personnel that worked on
11      his project on a part-time basis, but had all their
12      salaried expenses billed to his project?
13      A.   I don't know whether Jay explicitly stated
14      it in this way.  We were very careful.  We had to
15      achieve economies of scale.  We have different
16      people allocated, time allocated to different
17      projects, you know.
18            Michael Kunz and Bob Abma had -- Bob Abma
19      provided a lot of service to CSSI.  At one time he
20      was almost 100 percent to the project in its various
21      phases.
22            Bob Abma we have a formula for allocating
                        0198
1      these costs.  He's spread out among multiple
2      projects.  And he doesn't have -- CSSI is our
3      largest project in central Asia.  So the larger
4      percentage of his time is allocated to that project.
5            It was at one time a five-country program,
6      in the beginning -- in phase three, and then it
7      became a three-country program, but Healthy
8      Communities is a five-country program.  So that's a
9      lot for someone -- for a finance director to oversee
10      with accountants in each one of those countries that
11      are reporting directly to Bob.  So -- in addition to
12      the Abma functions that he historically had and then
13      were taken away at one point and then returned.
14            So I think Jay and I disagreed on this
15      issue, yeah.  I feel people were appropriately
16      charged.  And we have -- we had time sheets that,
17      you know, document time allocated.  It's not a
18      science.
19      Q.   Does Counterpart pay settlements to
20      terminated employees out of program funds?
21      A.    You know, I know that it's either --
22      either out of overhead or out of the fringe line
                        0199
1      item in a program.  And I just don't know the --
2      Q.   But either way it comes out of the program

3    funds?
4        A.    No.  Out of our overhead, our
5    institutional overhead.  It can be out of our
6    institutional overhead or it could -- that's
7    something that I can't answer.
8        Q.    You don't know?
9        A.    Yeah, I really don't know.  We have a -- a
10    line item in a budget has a place for legal.  So it
11    could be under legal.  It could be under the fringe
12    line item.  And if there's not room in either, then
13    it probably comes out of our overhead.  That's my
14    understanding.  And it depends upon the employee.
15    If the employee is covered only under overhead, then
16    it could come out of overhead.  But I may not be --
17    I'm answering this question to the best of my
18    ability.
19        Q.    Would you look at paragraph seven of the
20    answer to Interrogatory number 14 on page 18 of
21    Plaintiff's Exhibit 32.  It describes a situation
22    where board members of Counterpart used Turkmenistan

0200

1    staff to purchase and ship carpets.  Did anyone at
2    Counterpart, aside from the particular people
3    involved, ever become aware of that?
4        A.    I became aware after the fact.  I also
5    became aware of the fact that the board member paid
6    for the services rendered.  I still wasn't pleased
7    that time had been spent at all, but the board
8    member used -- paid for those services, paid for the
9    transportation costs, et cetera.  And that is
10    unlikely to ever happen again.  It will not happen
11    again, actually.
12        Q.    The board member paid because you called
13    him on it.  Is that right?
14        A.    No, the board member paid.
15        Q.    Just voluntarily?
16        A.    Absolutely, yeah.
17        Q.    Let's go on to paragraph -- subject number
18    nine.
19        A.    What page are we on?
20        Q.    We're on subject number nine.  We're not
21    on the interrogatories anymore.  We're on --
22            MS. ARIAIL:  If I could just right now, so

0201

1  I don't have to do it after every question, just
2  make an objection to cover all questions asked
3  pertaining to subject number nine as irrelevant.
4      And if you wouldn't mind just letting us
5  know when you're done with subject number nine, I
6  won't object in the middle and disrupt the flow
7  unless you want me to.
8      MS. DOUGLASS:  Your objection is
9  irrelevant?
10      MS. ARIAIL:  Yes.
11      MS. DOUGLASS:  Well, as you know, that
12  doesn't need to be made in a deposition because it's
13  a discovery deposition and it's not designed to
14  decide whether things are admissible.  So I don't
15  mind if you object to it as irrelevant.  You're not
16  going to produce documents anyway.  We're going to
17  have to go to the judge on it, but I just want to
18  find out what she had to say to see whether it's
19  worth it.
20      MS. ARIAIL:  I'm not going to stop you,
21  I'm just stating my objection.
22      MS. DOUGLASS:  All right.

0202

1  BY MS. DOUGLASS:
2      Q.  Ms. Lear, did you -- you received certain
3  information from Jay Cooper about problems Michael
4  Kunz was having with certain staff members in the
5  field, did you not?
6      A.  Yes.
7      Q.  And I'm going to show you a few documents
8  and just ask if you received them and what you did
9  about them, if anything.
10      MS. DOUGLASS:  First I'd like to have
11  marked as the next exhibit in order, a three-page
12  memo bearing the Bates stamp numbers 000049 through
13  51, on Counterpart Program of Civil Society
14  Development in the Central Asian Region letterhead,
15  dated February 25, 2003.
16      (Document referred to marked Deposition
17  Exhibit Number 33 for identification and
18  subsequently attached to the deposition.)
19  BY MS. DOUGLASS:

20    Q.   Have you seen Exhibit 33 before, Ms. Lear?
21    A.   I'm reminding myself of this.  Do I have
22    time to read this in detail?

0203

1    Q.   How about if I tell you what I'm going to
2    ask you and then you can decide whether you want to.
3    You're certainly free to read it.
4    A.   All right.
5    Q.   Did Jay Cooper send you what's been marked
6    Plaintiff's Exhibit 33 at some time during 2003?
7    A.   Yes.
8    Q.   And at that time, tell me if it's true
9    that Jay Cooper was the regional director and
10    Michael Kunz was working in a project in Uzbekistan
11    for which Counterpart was a subgrantee.
12    A.   Through another organization, that's
13    right.  So he had no -- therefore, Jay Cooper had no
14    supervisory relationship with Michael Kunz or any
15    authority over him, right.
16    Q.   But you did, correct?
17    A.   Yes, I did.
18    Q.   And Jay Cooper sent this and other
19    documents to you in order to ask you to intervene to
20    protect the Counterpart staff in Uzbekistan from
21    Michael Kunz's behavior.  Is that right?
22    A.   No, he wanted me to be aware of it.  He

0204

1    didn't ask me to -- he wanted me to be aware of it.
2    Q.   Now, I'd like to show you another
3    document, which I'll have marked next, and ask you
4    if it's another example of the same kind of report
5    to you from Jay Cooper.
6        MS. DOUGLASS:  I'm asking to be marked a
7    multi-page document beginning with Bates stamp
8    000052 to Dina Muhamadieva from Shakhnoza Muminova,
9    February 25, 2003.
10        (Document referred to marked Deposition
11    Exhibit Number 34 for identification and
12    subsequently attached to the deposition.)
13    BY MS. DOUGLASS:
14    Q.   Have you seen Plaintiff's Exhibit 34
15    before?
16    A.   Yes.

17    Q.    Was it also sent to you by Jay Cooper?

18    A.    Yes.

19    Q.    And did you take any steps in response to

20    the subject matter of Plaintiff's Exhibit 34?

21    A.    Number one, I asked for an explanation of

22    Michael Kunz.

0205

1    Q.    You asked Michael Kunz for an explanation?

2    A.    Yes.

3    Q.    Okay.

4    A.    Number two, I recognize that this was a

5    document that was presented, and I think sent

6    directly -- it was presented by Shakhnoza,

7    disgruntled employee.  She had been in a car

8    accident.  She'd hired the driver, who was a friend,

9    it was an old car, and he died.  And she was

10    seriously injured.  She was seeking damages.

11         And so she was creating -- she was

12    deflecting responsibility from herself and she was

13    creating a rationale why Michael Kunz was somehow

14    implicated.  We did a thorough investigation of the

15    accident, the causes of the accident, et cetera.

16         Because as a subgrantee to CHF, we are

17    both -- both organizations were -- felt legally

18    liable.  We had a local attorney.  There was a very

19    serious investigation done.  We conferred with USAID

20    on this, and we were found not liable.

21         We offered her -- yeah.  So I don't

22    understand what the -- yes, an investigation was

0206

1    done.

2    Q.    I'm talking the investigation into Michael

3    Kunz in a deranged state, drunk in the house of

4    the -- the party with the ambassador.  Did you make

5    an investigation into that?

6    A.    Michael Kunz was well regarded by the U.S.

7    Embassy and by USAID.  If there were any reality to

8    this, then the USAID or the embassy would have come

9    to us.

10    Q.    Did you ask anybody at the embassy or

11    USAID whether, in fact, this had happened?  This

12    incident that's reflected in Plaintiff's Exhibit 34.

13    A.    No.

14    Q.    Had you asked Michael Kunz whether or not
15    this had happened?
16    A.    Yes.
17    Q.    And he said?
18    A.    No.
19        MS. DOUGLASS:  Now, I'd like to mark as
20    the next exhibit in order a multi-page set of
21    e-mails bearing Bates stamps 000255 through 260.
22    I'm starting with one from Jay Cooper to Arlene
                        0207
1    Lear, dated April 8, 2003.
2        (Document referred to marked Deposition
3    Exhibit Number 35 for identification and
4    subsequently attached to the deposition.)
5    BY MS. DOUGLASS:
6    Q.    Have you had a chance to review
7    Plaintiff's Exhibit 35?
8    A.    No.  I'm not seeing a relationship why --
9    what's the supporting documentation and Jay's
10    getting angry, frustrated and sick.  Maybe I'm not
11    reading this.  Maybe you can --
12    Q.    Have you reviewed the comments in Michael
13    Kunz's e-mail to staff that are attached to
14    Mr. Cooper's e-mail to you?
15    A.    Pardon me?
16    Q.    Have you reviewed the tone of Mr. Kunz's
17    e-mail messages to staff that are part of this
18    exhibit?
19        MS. ARIAIL:  I have a separate objection
20    from the one for all of mine, that an e-mail can't
21    possibly show tone.  So the question doesn't make
22    sense.  I'm sorry, that's my objection.  Objection.
                        0208
1        MS. DOUGLASS:  I'll change the question.
2    BY MS. DOUGLASS:
3    Q.    Have you reviewed the comments -- the
4    substance of the comments made by Mr. Kunz to staff
5    people that are contained in Plaintiff's Exhibit 35?
6    A.    What's the problem?
7    Q.    You don't see a problem in any of those
8    messages by Mr. Kunz?
9    A.    Michael is saying to his staff this is
10    Counterpart's responsibility.  That's what he's

11    saying.  Stay out of it, it's Counterpart's
12    responsibility.  This is what we've charged them to
13    do.  I don't see --
14        Q.    You don't see a problem?
15        A.    The angry, frustrated and sick, that's a
16    big reaction to this.  Annoyed from Jay's
17    perspective possibly, but I don't get the angry,
18    frustrated and sick.
19        Q.    Did you take any actions when you received
20    Mr. Cooper's e-mail of April 8, 2003, which is the
21    first one listed on Plaintiff's Exhibit 35?
22        A.    I'm sorry.

0209

1        Q.    Did you take any action in response to
2    Mr. Cooper's e-mail to you of April 8, 2003?
3        A.    No.
4        Q.    Now, did you receive any -- aside from the
5    ones that we've gone through today, did you receive
6    any other criticisms of the temperament or
7    management style of Michael Kunz from any other
8    person, either within or without Counterpart?
9        A.    No.
10        Q.    Never?
11        A.    Not that I recall, no, only from Jay.
12        Q.    Well --
13        A.    In other words, anything that I received
14    about Michael was through Jay.
15        Q.    Well, the ones we've just gone through
16    didn't -- weren't initiated by Jay, they were passed
17    on by Jay, correct?  Is that what you mean?
18        A.    Uh-huh, right.
19        Q.    Let's move on to subject number 10.
20    Please look at Plaintiff's Exhibit Number 29, which
21    is Counterpart's --
22        A.    Just repeat the last question.  I want to

0210

1    make sure that I answered fully.
2        Q.    I think the last question was, did you
3    receive any complaints from anyone in or outside of
4    Counterpart about Mr. Kunz's management style or
5    temperament.
6        A.    No.
7        Q.    And you answered "no"?

8      A.   Yeah.
9      Q.   Is that right?
10     A.   That's correct.
11     Q.   Would you look at Plaintiff's Exhibit 29,
12  which is your Interrogatory answers.
13         On page two in answer to Interrogatory
14  number one, you identify Kelli Boyer as someone who
15  played a role in Cooper's termination.  And you say
16  the following.  "Kelli Boyer, dot, dot, dot, has
17  recently transitioned to a consultant's role for
18  Counterpart," close quote.
19         What do you understand about the
20  circumstances of that transition?
21     A.   What I understand is that Kelli Boyer
22  approached Harry Dorcus and said that she was
                          0211
1   burned.  And he suggested, well, maybe she would
2   like to remain on a consulting basis for a
3   transition, and she agreed.  That's what I
4   understand.
5      Q.   By "burned" --
6      A.   There's a lot of work.
7      Q.   Burned out.  Is that what you mean by
8   "burned"?
9      A.   Yeah.
10     Q.   Not angry, but tired?
11     A.   Yeah.  Her mother had just died.  She was
12  very, very close to her mother.  And it was very
13  sudden.  Yeah, I think she was looking maybe for
14  something -- a smaller organization.
15     Q.   When did that happen?
16     A.   Sometime in the fall or December.
17  Something like -- I think it was December.
18     Q.   Of 2005?
19     A.   Uh-huh.  November or December of 2005.  I
20  think it was -- because I had gone to central Asia
21  in November and I got back about the third week of
22  November, and I got back into the office maybe
                          0212
1   around the 27th or 28th.  I think it was something
2   like that, yeah.  I mean, I don't know the exact
3   date, but I came back and I was told that by Kelli.
4   Or soon after.  Frankly, you know, it wasn't like --

5    yeah.
6        Q.    You, as a corporation, have no knowledge
7    that Kelli's change in circumstances had anything to
8    do with her handling of the Jay Cooper matter, do
9    you?
10       A.    Oh, not at all.  Not at all.  I think we
11   were very satisfied with her handling of the Jay
12   Cooper matter.
13       Q.    Let's move on to -- we've already touched
14   on the subject of subject 11.  Would you look at the
15   text of subject 11 there and see whether or not
16   subject 11 on -- whether you have any information to
17   add as to the source of any of those allegations in
18   your Interrogatory answer.
19       A.    If we could take the time frame away.
20   Last time you asked me within a specific time frame.
21   Do you want to take the time frame away?
22       Q.    Sure.  I mean, your question is whoever
                        0213
1    said this to you at any time.  Is that what you're
2    asking me?
3        A.    What is the question?
4        Q.    The question is, who told you at any time
5    that Cooper was inaccessible to the employees under
6    his supervision?
7        A.    Erkin Kasybekov indicated he wasn't
8    answering e-mails for extended periods of time.
9        Q.    Have you finished your answer?
10       A.    This is in addition to the other people
11   mentioned?
12       Q.    Yes.  Could you tell me when Erkin made
13   that comment to you?
14       A.    It might have been during a trip that I
15   made to central Asia.
16       Q.    In what year?
17       A.    It was either '04, '05.
18       Q.    And Erkin is the country director for
19   Kyrgyzstan, correct?
20       A.    Uh-huh.
21       Q.    Has anyone, other than Kelli Boyer who you
22   described previously, mentioned to you that
                        0214
1    Mr. Cooper remained in his office with the door

2    closed much of the time?
3        A.    Bob Abma had said it to me on many
4    occasions.  Michael.
5        Q.    What time frame were those comments made?
6        A.    Prior to the 18th and subsequent to the
7    25th.  I have witnessed Jay to be controlling and
8    intimidating.
9        Q.    I'm just doing one.  We're going to go bit
10   by bit.
11       A.    I'm really sorry.
12       Q.    Have you finished with everybody who said
13   anything about his door closed?
14       A.    This is just about the door closed.  I am
15   sorry.  About the door closing, the door closing,
16   Michael, Bob, Kelli.
17       Q.    Kelli as we've already described?
18       A.    That's right.  Three people, as I remember
19   about the door closing.
20       Q.    Who was the source of information coming
21   to you that Cooper was controlling and intimidating
22   to his staff?

                            0215
1        A.    Myself.  It was an observation of mine.
2    When I visited in the spring of 2004 -- Jay and I
3    have talked about this.  This has been an ongoing
4    issue.
5        Q.    Anything else?
6        A.    Subsequent -- strike that.  Are you able
7    to strike something?
8        Q.    Yeah.
9        A.    Strike "subsequent."  Jay is legendarily
10   controlling.
11       Q.    That's your own observation?
12       A.    It's been an issue for a long time, yes.
13       Q.    As far as you know, no one else has told
14   you that?
15       A.    Interviews with Kelli reveals or
16   corroborated it.
17       Q.    Go ahead.
18       A.    Bob.  I think I mentioned Bob.
19       Q.    You mentioned Bob in connection with
20   something else.  Bob also said he was controlling
21   and intimidating?

22    A.    Yes.  Yana has said that to me.

0216

1    Q.    Yana, Y-A-N-A?

2    A.    Yeah.  Ina, who was his M&E and reporting

3    person, indicated that he had the habit of going

4    around and looking at what people were doing at

5    their computer in their e-mail to determine whether

6    they were doing personal communications or whether

7    it was work related.  That to me is intimidating.

8    Q.    Not to say likely to uncover many games of

9    Solitaire.

10    A.    There's also a sign-in policy that

11    apparently at one point I think Jay may have ended

12    it, but it was ongoing for a long time, which is

13    signing -- not only signing in and signing out in

14    the morning and evening, but signing in and out

15    every time one left the office.  And I felt that

16    that was conveying a wrong -- a wrong message to the

17    local staff in a developing country we were trying

18    to assist.  So that's what I remember right now.

19    Q.    Did anyone ever relay to you that Cooper

20    had difficulty fulfilling his leadership

21    responsibilities?

22    A.    Yes.  Michael, in my own perceptions.

0217

1    Beth Kamoli.  Ara Nazinyan after he left Phase --

2    upon his departure from the program we had an exit

3    interview, and he was a person very loyal to Jay.

4        I'm thinking of who else.  Well, George

5    Deikun alluded to that fact, that aired in

6    conversation.  That's all I can recall at this time.

7    Do I have the option to amend later on, either

8    correct or amplify or whatever?  Are we given that

9    option?

10    Q.    You'll have to discuss that with your

11    counsel.

12    A.    Okay.

13    Q.    As far as I'm concerned, if you think of

14    something while it's going on so I can ask a

15    follow-up question, sure.

16        MS. DOUGLASS:  I'd like to have marked as

17    the next exhibit what was previously marked

18    Exhibit 15 to Mr. Cooper's deposition as a defense

19    exhibit and have it marked Plaintiff's Exhibit 15.
20         (Document referred to marked Deposition
21    Exhibit Number 15 for identification and
22    subsequently attached to the deposition.)

                          0218

1    BY MS. DOUGLASS:
2         Q.   Would you like to add something to your
3    answer?
4         A.   Kim Alter.
5         Q.   As to leadership?
6         A.   (Indicating.)
7         Q.   What did she say about that?
8         A.   She said that he wasn't.
9         Q.   He wasn't a leader?
10        A.   Was not an effective leader.
11        Q.   Could you look, please, at what's been
12    marked Plaintiff's Exhibit 15.  Am I correct that
13    Plaintiff's Exhibit 15 is your script for your
14    termination phone call with Jay Cooper?
15        A.   Yep.
16             MS. ARIAIL:  Please say "yes" or "no."
17             THE WITNESS:  Yes.  Sorry.
18    BY MS. DOUGLASS:
19        Q.   I would like to know, and we're still on
20    subject number 11, who, if anyone, told you that
21    your staff expressed fear of -- that Cooper's staff
22    expressed fear of him and feelings of

                          0219

1    disempowerment?
2         A.   Kelli.
3         Q.   Anyone else?
4         A.   Prior to her visit, historically other
5    people have said that, but I'm referring here to her
6    corroboration.
7         Q.   Do you remember who historically had said
8    that?
9         A.   Yes.  Marat, Bob.  This is the same
10    question I just answered about controlling and
11    intimidating.  So is there another --
12        Q.   I thought fear maybe was different, but if
13    you consider it the same, that's fine with me.
14        A.   Yeah, I think so.
15        Q.   Fear to me indicates some kind of physical

16  threat.
17      A.    No.
18      Q.    That's not what you meant by fear in
19  Exhibit 15?
20      A.    No.
21      Q.    Now, who, if anybody, was the source of
22  your statement in Plaintiff's Exhibit 15 that Jay

                        0220

1  was exhibiting erratic behavior?
2      A.    Michael and Kelli.
3      Q.    What was the erratic behavior that Michael
4  reported?
5      A.    The indecisiveness about separation, no
6  separation, and I'll meet you.  You know, stay,
7  please stay.  She stays.  It's a big deal for her to
8  stay.  And then he takes off for another country.
9  She follows him at my request and it just was a very
10  dysfunctional environment during that week.
11      Q.    Did anyone besides Kelli report to you the
12  fact that Michael -- that Jay had taken off to
13  Bishkek without informing Kelli that he was doing
14  that?
15      A.    Michael mentioned it to me.
16      Q.    What was Michael's source of knowledge of
17  that?
18      A.    Kelli.
19      Q.    You never learned that Michael had
20  overheard any conversations between Jay and Kelli
21  about whether or not he was going the next week to
22  Kyrgyzstan?

                        0221

1      A.    I don't remember him saying that.
2      Q.    Let's move on to subject 12 then.  Did you
3  have any conversations with anyone at USAID -- and
4  here I mean not only you, but you the corporation --
5  concerning the reasons for Mr. Cooper's termination?
6      A.    Yes.
7      Q.    And would you tell me when these
8  conversations were?
9      A.    Soon after -- maybe -- number one, I
10  didn't know -- not having heard from Mr. Cooper,
11  gotten any response to the request for the --
12  Kelly's letter about separation, separation

13    agreement, I felt obligated to inform the head --
14    Susan Fritz, who is the head of the democracy media
15    office that oversees that project, that he was no
16    longer with us.
17        Q.    Could I interrupt for a minute?
18        A.    (Indicating.)
19        Q.    He was not going to be with you any longer
20    whether or not he accepted the separation agreement
21    offered by Kelli Boyer, correct?
22        A.    I wanted to give Jay an opportunity to

0222

1    work out with us how we were going to share this
2    with the donor, frankly.
3        Q.    Did you tell Jay that?
4        A.    I told him in this meeting that I was
5    hoping that we could work out a win-win solution,
6    have a win-win outcome in that, you know, he
7    could -- could live and leave in a way that left a
8    good taste in both of our mouths.  Basically I
9    didn't say that exactly in this.  But I did say,
10    number one, we were prepared to honor the agreement
11    of August 24.  And moving forward from that date,
12    carrying the six-month period forward from the
13    date -- from the 18th, we were prepared to write up
14    the retainer agreement, provide him with legitimacy
15    regarding his visa status as long as it takes to
16    finalize the divorce proceedings.  Give him positive
17    references, work out some agreement whereby we hold
18    each other blameless.  And even hold out the promise
19    or hope -- hope, that there could potentially be
20    further consulting work with us.
21            And in the -- in the meeting of the
22    18th -- which I perceived as the first phase of a

0223

1    process, of a grievance process really, to allow Jay
2    Cooper to articulate what his issues were -- I
3    explicitly stated that if we were to separate, I
4    wanted it to be done in a way that would enable him
5    to have a -- enable -- done in a way that was
6    mutually beneficial.
7            He would have a place out of which to
8    operate for several months while looking for
9    something new, if that's what he wanted.  We would

10    together come up with a statement to the donor.  And
11    I promised him that from that point in time during
12    this trial period, even if he should at the end of
13    two months or three months or four months decide to
14    separate, he would be guaranteed at least six months
15    worth of remuneration, which included not only his
16    salary but allowances for two children.
17        Q.    What you just said, is that something you
18    said to Jay Cooper on August 18?
19        A.    Yes.
20        Q.    All of what you just said?
21        A.    Yes.
22            MS. ARIAIL:  I'd like to take a break

                        0224

1    before we continue.
2            MS. DOUGLASS:  Sure.
3            (A recess was taken.)
4            MS. DOUGLASS:  We're back on.
5        A.    I want to make a correction to my
6    statement.  Not at the advice of counsel, but I used
7    a term, promise.  That was an inadvertent term.  I
8    said that it was my desire.
9        Q.    What was your desire?
10        A.    To have a mutually beneficial separation.
11        Q.    Now, I believe you testified to a number
12    of things you said about that subject on August 18,
13    correct, just now before you took your break?
14        A.    Uh-huh.
15        Q.    Is it your testimony that that offer or
16    that desire was still on the table on November 12,
17    2004, when you read the script, which is Plaintiff's
18    Exhibit 15, to Mr. Cooper?
19        A.    I think it was too late for that desire to
20    be on the table.
21        Q.    So your references to win-win in
22    Plaintiff's Exhibit 15 don't really have any

                        0225

1    substance, do they, because it was too late for a
2    win-win?
3        A.    What I meant -- thank you.  That was what
4    I meant for a win-win.  That we could work out
5    something whereby the departure was to the benefit
6    of both parties, yes.  But he said he was getting a

7    lawyer and the conversation stopped.
8        Q.    But you waited -- we started this
9    conversation about your conversations with USAID.
10   But I believe --
11       A.    Oh, USAID, yeah.
12       Q.    I believe you said you waited for a while
13   because you were hopeful after the conversation
14   that's reflected in Plaintiff's Exhibit 15, that
15   somehow this would still be resolved on a win-win
16   basis?
17       A.    That we could have a separation agreement
18   and in that separation agreement we could agree on
19   how we would present the case or the issue or the
20   separation to the donor, yeah.
21       Q.    Was that ever said to Mr. Cooper, that you
22   hoped that you would be able to work out an

                              0226

1    agreement as to what would be said publicly and to
2    the donor?
3        A.    Well, we said it on the 18th, and I talked
4    about win-win.  And Mr. Cooper never said, what do
5    you mean by win-win, what do you mean?  How will
6    that benefit me?  He never had that -- we were never
7    able to have that conversation.
8        Q.    Didn't Mr. Cooper call and e-mail Kelli
9    Boyer attempting to find out what was meant by the
10   meeting and the telephone conversation in August?
11       A.    What do you mean what was meant by it?
12       Q.    Aren't there e-mails in the record and
13   didn't Mr. Cooper testify about how he kept
14   approaching Kelli Boyer because he didn't know what
15   was meant by what was said in the August meeting and
16   telephone conversation, he didn't know what his
17   options were and he kept asking her to help him
18   figure that out.  Do you remember that testimony?
19       A.    Kelli Boyer went into the field to
20   follow-up on his e-mail about the process for
21   separation.  And it's my understanding that they had
22   that conversation in the field when she was there.

                              0227

1        Q.    And Mr. Cooper said that it was working
2    out fine with Mr. Kunz and he wanted to stay and
3    finish the project, did he not?

4      A.    He didn't say that when Kelli was there.
5      Q.    That's what he says he said when Kelli was
6    there.  So maybe we have a disconnect.
7           MS. ARIAIL:  Objection to form.
8    BY MS. DOUGLASS:
9      Q.    So you think that but for Mr. Cooper's
10   failure to ask what win-win was, what you considered
11   a favorable disposition was aborted?
12           MS. ARIAIL:  Objection,
13   mischaracterization of testimony.
14     A.    It is a mischaracterization.
15     Q.    Mr. Cooper's failure to ask what a win-win
16   was had what result?
17     A.    If Mr. Cooper wanted a win-win, he would
18   have made contact with us to discuss a win-win.
19     Q.    Do you know a lawyer by the name of Kerry
20   Richards?
21     A.    Yes.
22     Q.    Do you know whether Mr. Cooper spent the
                              0228
1    better part of a year trying to negotiate something
2    with Kerry Richards?
3           MS. ARIAIL:  Objection.  It goes to
4    attorney-client privilege.  Don't answer that.
5    BY MS. DOUGLASS:
6      Q.    Let's go back to your conversation with
7    USAID.
8      A.    Yeah.
9      Q.    You decided you had to notify Susan Fritz,
10   I believe you said, of the change in situation?
11     A.    Yes.
12     Q.    And how did you do that and what did you
13   say?
14     A.    I called her on the phone.
15     Q.    And what did you say?
16     A.    And I indicated that there was a
17   separation and I was not at liberty to go into the
18   details.
19     Q.    Did she ask for the details?
20     A.    No, she was respectful.  But to know that
21   it was a sad thing, Jay had made a contribution that
22   was very valuable.  She asked for a proposed
                              0229

1  management structure in a letter, and that was
2  submitted to her.
3      Q.   Who made the comment that Jay had made a
4  contribution that was very valuable?  Was that your
5  comment or her comment?
6      A.   I made the comment.
7      Q.   Was there ever any inquiry from anyone at
8  USAID of the facts behind the separation of
9  Counterpart and Jay Cooper?
10     A.   No, not that I'm aware of.
11          MS. DOUGLASS:  I would like to have marked
12  as the next exhibit in order a multi-page document
13  bearing Bates stamps CP0841 through 0848, the first
14  page of which is an e-mail from Arlene Lear to Sue
15  Fritz, and it begins, "Dear Susan and Igor."
16          (Document referred to marked Deposition
17  Exhibit Number 36 for identification and
18  subsequently attached to the deposition.)
19  BY MS. DOUGLASS:
20     Q.   Is Plaintiff's Exhibit 36 the revised
21  management structure that you submitted at the
22  request of USAID?

                              0230

1      A.   Yes.
2      Q.   Is it, in fact, the revised management
3  structure that went into effect after Mr. Cooper's
4  termination?
5      A.   No.
6      Q.   Would you look at --
7      A.   When I say "no," I mean not in whole, no.
8      Q.   Something changed from this proposed
9  management structure.  Was it the identity of some
10  person or --
11     A.   Yes.  That's it.  The only thing.
12     Q.   I don't think there's any reason I need to
13  know that.  If you think I do, you can tell me that.
14     A.   No.
15     Q.   Could we look at --
16          MS. DOUGLASS:  Is that my phone?
17          MS. ARIAIL:  It's not mine.
18  BY MS. DOUGLASS:
19     Q.   I'd like to look at Plaintiff's Exhibit 29
20  for a minute, answer to Interrogatory number five,

21    paragraph six on page ten.  And this is
22    Interrogatories about -- communications about
                              0231
1     Mr. Cooper's termination.  And you mention that you
2     spoke with Mark Hannifin at USAID regarding an
3     e-mail Mark had sent to a Counterpart employee about
4     Cooper's termination.
5          A.   Yes.
6          Q.   What is that e-mail?
7          A.   The e-mail was sent by Mark Hannifin to
8     David Smith.
9          Q.   What was the subject matter?
10         A.   I don't have a copy of it.  The substance
11    was this.  He said we're all reeling from the
12    precipitous firing of Jay Cooper; poor guy, he's in
13    a lot of pain.  That's what it said.
14         Q.   Mark Hannifin said that?
15         A.   That's exactly right.  And that was my
16    first indication that Jay was talking to USAID.
17         Q.   And you said you spoke with Mark Hannifin
18    about the subject in June of 2005.  Was the e-mail
19    in June of 2005?
20         A.   Uh-uh.  The e-mail was right -- soon after
21    the firing.
22         Q.   And what was -- did you say anything else
                              0232
1     to Mr. Hannifin aside from the two sentences that
2     are listed on paragraph six on page 10 of
3     Plaintiff's Exhibit 29?
4          A.   I articulated the process a little bit.
5          Q.   What process is that?
6          A.   It was our hope that we could have
7     established an amicable separation if a separation
8     was to be had at all.
9          Q.   Did Mr. Hannifin ask any questions?
10         A.   No.
11         Q.   Let's go on to subject number 13.
12              Now, for some period of time Counterpart
13    had a grievance procedure.  Is that right?
14         A.   Yes.
15         Q.   And the grievance procedure was spelled
16    out in the manual that we marked previously?
17         A.   Yes.

18      Q.   If you could look at Plaintiff's
19   Exhibit -- it's in that pile for you.
20          MS. ARIAIL:  28.
21          MS. DOUGLASS:  7.  Mine is Exhibit 7.
22          THE WITNESS:  It's Exhibit 7?
                        0233
1           MS. DOUGLASS:  Yeah.  28?
2           MS. ARIAIL:  I'm sorry.  Sorry about that.
3    BY MS. DOUGLASS:
4       Q.   Now, how long prior to the fall of 2004
5    had Counterpart had a grievance procedure in its
6    manual, if you know?
7       A.   Prior to 2004.  It was put in by Kate
8    Gottschall when she was the HR director, and so
9    that's the time frame.  And I don't remember the
10   time.
11      Q.   How long was she HR director?
12      A.   Maybe a couple years, at least.
13      Q.   Was the grievance procedure used by
14   employees, do you know?
15      A.   Yes.
16      Q.   In what situations?
17      A.   Grievance procedure prior to termination
18   or post termination?
19      Q.   Whenever.  I don't know.
20      A.   What's the question?
21      Q.   I want to know whether or not the
22   grievance procedure was used by Counterpart
                        0234
1    employees who were eligible to use it.
2       A.   I'm assuming so.
3       Q.   But you don't know.  Have you ever heard
4    of anyone filing a grievance?
5       A.   Yes.
6       Q.   Is it a common thing at Counterpart?
7       A.   It certainly hasn't been common in my
8    experience.
9       Q.   What kind of situations do you know of
10   when it's been used?
11      A.   I know one situation where it was used --
12   one situation it was used.
13      Q.   What was that?
14      A.   After termination.

15    Q.    After termination?

16    A.    Uh-huh.

17    Q.    Now, did it work well in that situation?

18    A.    How do we define "work well"?

19    Q.    Well, let's look at the manual, page 23,

20    please.  This is Plaintiff's Exhibit 7.

21    A.    What page are we looking at?

22    Q.    Page 23.  It's the page with the stamp

0235

1    597.  If you'd look under B, Counterpart procedure

2    for employee grievances, the second full paragraph,

3    the last sentence, it says, quote, "The remedies

4    sought by an aggrieved employee are limited to

5    actions which may be taken to correct the factual

6    situation which forms the basis of the grievance."

7           So my question is, in your one experience

8    with a grievance, did it work well to correct the

9    factual situation which forms the basis of the

10    grievance?

11    A.    Actually, I had two experiences with

12    grievance.  I felt that the meeting on August 18 was

13    the beginning of the grievance process for Jay

14    Cooper.  It was giving him an opportunity to

15    articulate in front of me, in front of Michael Kunz

16    and a third objective party all of the issues that

17    he had related to the management structure.

18    Q.    What were --

19    A.    So I felt that that was --

20    Q.    Did you inform Mr. Cooper that he was in

21    the middle of a grievance procedure?

22    A.    He was grieving.  He was presenting his

0236

1    grievances.  He did not formally articulate it as

2    such.

3    Q.    That's what I want to know.

4           What was the other grievance situation

5    that you were --

6    A.    Aaron Chassey.

7    Q.    He filed a grievance about you, right?

8           MS. ARIAIL:  Objection to the entire line

9    of questioning regarding the grievance against --

10    the grievance by Aaron Chassey against Arlene Lear.

11           MS. DOUGLASS:  And the objection is?

12          MS. ARIAIL:  Relevance.

13          You can still answer.

14     A.    Uh-huh.

15     Q.    Yes, okay.  I may get to that later, but

16   right now I want to talk about the procedure.

17     A.    Uh-huh.

18     Q.    Did it work well in -- aside from the

19   question of Mr. Chassey, because that's for a later

20   discussion, do you think, to the extent that the

21   meetings in August with Jay Cooper, that what you

22   considered a grievance but was not formally called

                           0237

1    that, worked well to correct the factual situation

2    which forms the basis of the grievance?

3      A.    I thought the process -- I thought that

4    the meeting of August 18 and the subsequent phone

5    conversation of the 25th worked well to what, in my

6    mind, was a good -- it was positive intent for

7    resolving issues between Jay and Michael Kunz, which

8    I think could potentially further undermine the

9    successful implementation of the project.

10          And so I felt satisfied that we had done

11   everything during that eight-hour session to give

12   all sides an opportunity to articulate issues that

13   were the most pressing issues.  And it was really --

14   it was kind of like Jay's opportunity to share all

15   the things that were of concern to him, and he did.

16     Q.    But it didn't work, did it, to solve

17   factual disputes, such as whether he told Kelli

18   Boyer he was going to have a meeting with her on

19   Monday and then he took off to Bishkek instead?

20          MS. ARIAIL:  Objection.

21     A.    I don't see the -- I really don't

22   understand that question.

                           0238

1      Q.    The grievance procedure stated in the

2    Counterpart manual talks about it being useful to

3    correct the factual situation which forms the basis

4    of a grievance.  And there were, in the case of Jay

5    Cooper's termination, quite a number of factual

6    disputes, were there not?

7          MS. ARIAIL:  Objection.

8      A.    I don't -- factual disputes?

9    Q.    Well, you listened to Mr. Cooper's
10   testimony, did you not?
11    A.    Yes.
12    Q.    You listened to his version of his
13   dealings with Kelli Boyer, did you not?
14    A.    Uh-huh.
15        MS. ARIAIL:  Objection, at the time any
16   grievance procedure could possibly have been
17   instituted relating to this.  Ms. Lear had not sat
18   in on Mr. Cooper's deposition testimony and
19   therefore this line of questioning makes absolutely
20   no sense.
21        MS. DOUGLASS:  Well, that's part of my
22   point, Ms. Ariail.

                0239

1   BY MS. DOUGLASS:
2    Q.    At some point in the fall of 2004
3   Counterpart chose to abolish its grievance
4   procedure, did it not?
5    A.    No.
6    Q.    No?
7    A.    No.
8    Q.    Okay.
9        MS. DOUGLASS:  I'd like to mark as the
10   next exhibit in order an e-mail from Kelli Boyer to
11   headquarters staff, carbon copied a lot of people,
12   dated October 6, 2004; subject, rescind policy,
13   grievance procedure.
14        (Document referred to marked Deposition
15   Exhibit Number 37 for identification and
16   subsequently attached to the deposition.)
17   BY MS. DOUGLASS:
18    Q.    Have you seen Plaintiff's Exhibit 37
19   before?
20    A.    I don't remember seeing it.
21    Q.    No?
22    A.    I don't remember it.

                0240

1    Q.    Does it appear to be an e-mail from Kelli
2   Boyer to the headquarters staff?
3    A.    Uh-huh.
4    Q.    And carbon copy a number of people.  And
5   the subject is rescind policy, grievance procedure?

6      A.   Yes.
7      Q.   And is Kelli asking everyone to remove the
8    grievance procedure from their handbook because it's
9    redundant?
10      A.   Yes.
11      Q.   Now, what is Counterpart's open-door
12    policy that Ms. Boyer is saying makes the grievance
13    procedure redundant?
14      A.   At any given time an employee gets access
15    to not only the supervisor but the supervisor's
16    supervisor.
17      Q.   And would you look at page four of
18    Plaintiff's Exhibit 7, please.  That's the manual.
19    Do you have the manual in front of you, open-door
20    policy?
21      A.   I have this in front of me.
22      Q.   Look at Plaintiff's Exhibit 7, please,
                              0241
1    which is the manual, the big fat thing that's right
2    in front of you, on page four.  Now, that describes
3    the open-door policy in much the same way as you
4    just have.  Is that correct?
5      A.   Right.
6      Q.   You were unaware that this change had been
7    made.  Is that correct?
8      A.   Yeah.
9      Q.   Do you know of an organization within
10    Counterpart called the senior management team?
11      A.   I'm part of it.
12      Q.   Do you remember a discussion at a meeting
13    of the senior management team on October 9 of 2004
14    about the decision to remove the grievance policy
15    from the manual?
16      A.   I might not have been present at that
17    meeting.
18      Q.   I'm going to show you what's been produced
19    as a multi-page document bearing Bates stamp numbers
20    000272 dash 78.  It's entitled -- it's an e-mail
21    from Lelei LeLaulu to worldwide CPI staff, dated
22    October 19, 2004.
                              0242
1         (Document referred to marked Deposition
2    Exhibit Number 38 for identification and

3    subsequently attached to the deposition.)
4    BY MS. DOUGLASS:
5        Q.    Does Plaintiff's Exhibit 38 appear to be
6    draft minutes of a meeting of the senior management
7    team for a meeting on October 19, 2004, at which you
8    were not present?
9        A.    I was not present.
10       Q.    Would you look, please, on -- the draft
11   minutes, by the way, are circulated to everybody,
12   whether they're present or not.  Is that correct?
13       A.    They're circulated around, yes.
14       Q.    Even to people not members of the senior
15   management team?
16       A.    Yes.
17       Q.    Would you look on page 275.  Under
18   grievance policy the document reads, "A recent
19   policy change which replaced the grievance policy
20   with the open-door policy left PMT concerned with a
21   potential oversight of stating rights of employees."
22       A.    Yes.

0243

1        Q.    Who is "PMT"?
2        A.    The program management team is made up of
3    the program officers.  And subsequent to this
4    issuance of this e-mail, they met and subsequently
5    came up with a grievance policy that was -- I think
6    subsequently came up with a grievance policy that
7    would be incorporated into our new personnel manual
8    under -- currently under -- currently being
9    finalized now.
10       Q.    Do you know who -- so in other words,
11   sometime in the future there will now be a grievance
12   procedure?
13       A.    That's my understanding.
14       Q.    But it seemed to have lapsed between
15   October 6th and sometime in the future, in favor of
16   the open-door policy, correct?
17       A.    That's my understanding.
18       Q.    Who made that decision to have the open --
19   the open-door policy replace the grievance policy
20   for some period of time?
21       A.    That was an HR decision.  My sense is that
22   it also -- it could have been made with legal

0244

1   counsel.  I'm assuming that Harry Dorcus was

2   involved and that Arthur Lovelace was involved and

3   that Kelli was involved.  So it could have been

4   legal counsel and those three staff.

5       Q.    Did you ever participate in or hear about

6   any discussion about whether the grievance policy

7   should be abolished?

8       A.    No.

9       Q.    Did you ever hear any discussion about the

10  grievance policy at any meeting of the senior

11  management team?

12      A.    I knew it was on the table to be

13  revisited.  They were exploring.  They were looking

14  at -- we belong to Interaction, which is an umbrella

15  organization for U.S. nongovernmental organizations

16  doing international development, and Lelei wanted us

17  to be in compliance with many of their policies and

18  procedures, to reassure that we comply with the

19  ethical standards of the organization.

20      Q.    And does Interaction have as one of its

21  standards a grievance procedure for employees in

22  organizations that are its members?

0245

1       A.    I think so, yes.

2       Q.    Was there any discussion of the pending

3   situation with Jay Cooper at the time that

4   Counterpart decided to abolish the grievance

5   procedure?

6       A.    Not at all.

7       Q.    It just happened to happen a month before

8   he was fired?

9       A.    Absolutely.

10          MS. ARIAIL:  I would like to note for the

11  record that plaintiff's counsel is using sarcasm.

12  BY MS. DOUGLASS:

13      Q.    You consider that a coincidence?

14      A.    Absolutely.  Yes.

15      Q.    No one ever --

16      A.    There was no anticipation -- I'm sorry.

17      Q.    Go ahead.

18      A.    There was no anticipation of firing Jay

19  Cooper.  So why would that be relevant?

20      Q.   There was no anticipation of firing Jay
21   Cooper after the meetings in August and the multiple
22   discussions about whether he'd have six months?
                          0246
1           MS. ARIAIL:  For the record, I would
2    like --
3      A.   Firing him, no.
4           MS. ARIAIL:  -- that Arlene Lear is not
5    deposing plaintiff's counsel, she's being deposed.
6           THE WITNESS:  Right.
7           MS. ARIAIL:  You don't have to answer
8    questions for her, is what I'm saying.
9           MS. DOUGLASS:  Don't worry, I can take
10   care of myself.
11     A.   Can you go back to your original question?
12   I want to make sure that the answer is correct on
13   the record.
14     Q.   I don't know what the original question
15   was.  Question about what?  I'd be glad to repeat
16   any --
17     A.   I want to make sure the answer was
18   recorded correctly.  Is that possible?
19          MS. DOUGLASS:  Do you want to read back
20   the last few questions and answers, please?
21          THE WITNESS:  Yeah.
22          (Reporter read from the record.)
                          0247
1    BY MS. DOUGLASS:
2      Q.   Now, let's go on to subject number 14.
3           What is Counterpart's policy about the
4    protection of whistle blowers?
5      A.   We have a document.
6      Q.   Excuse me?
7      A.   We have a policy that is currently going
8    to be incorporated into the new personnel manual.
9      Q.   Was there a policy in place as of the fall
10   of 2004?
11     A.   If it's not reflected in here, I don't
12   think so.
13     Q.   I'm not aware of it being in the manual,
14   but if you'd like to look and guarantee for yourself
15   that it isn't, you can do that.
16     A.   Thank you.

17     Q.    As a matter of fact, I would like you to
18   look at the manual on page 15, please.
19          MS. ARIAIL:  I'm sorry.  Are you going to
20   let her finish looking through it first?
21          MS. DOUGLASS:  Yeah, sure.  She can take
22   as long as she wants.

                           0248

1     A.    I don't see it in the manual.
2     Q.     Would you look on page 15 under policy
3   relating to ethics at the bottom of the page.  The
4   third sentence says, quote, "Any employee who has
5   reason to question the integrity of any transaction
6   or to believe misconduct and/or a prohibited act has
7   occurred, is obligated to report it to the
8   appropriate department supervisor and the VP for
9   F and A," close quote.
10     A.    Yes.
11     Q.     So it was Counterpart's policy, was it
12   not, that its employees report any questionable
13   activities?
14     A.    Yes.
15     Q.     Now, was there any protection in place for
16   employees who did that in the fall of 2004?
17     A.    I'm not aware of any time when there was
18   any demonstration of lack of protection for such
19   activities.  I'm just not aware of it at all.
20     Q.     Were you ever aware of the fact that Jay
21   Cooper objected to certain accounting practices
22   suggested by Bob Abma right before he was fired?

                           0249

1     A.    No.
2     Q.    You've never heard about that?
3     A.    No.
4     Q.    You've never read it in our complaint?
5     A.    I read it in your complaint.
6     Q.    But at the time you never heard about it?
7     A.    No.
8     Q.    Did you ever speak with Mr. Dorcus about
9   whether he heard about it at the time?
10     A.    In the complaint we're talking about the
11   budget.
12     Q.    Yes.
13     A.    And I did discuss that with Harry Dorcus.

14    And we both came to the same conclusion, which I
15    articulated in my response, that there was no --
16    that we were in full compliance with whatever the
17    USAID or U.S. government regulations were, in terms
18    of expenditures, yes.
19        Q.    So the fact that Mr. Cooper complained
20    both to Bob Abma and to Harry Dorcus about what he
21    considered an accounting irregularity --
22            MS. ARIAIL:  Objection, assumes facts not

                            0250

1    in evidence.
2    BY MS. DOUGLASS:
3        Q.    Didn't you just testify that Mr. Dorcus
4    knew about Mr. Cooper's complaint about the
5    accounting?
6        A.    From your --
7        Q.    Oh, you didn't know about it at the time?
8        A.    No, no.  I only knew about it from what
9    your --
10        Q.    I'm not saying you knew about it, I'm now
11    asking about Mr. Dorcus.
12        A.    Harry.
13        Q.    Did you ever learn whether or not Jay
14    Cooper reported his complaint about Mr. Abma's
15    accounting practices to Mr. Dorcus before he was
16    fired?
17        A.    I'm absolutely not aware of that nor did
18    Mr. Dorcus ever share that with me.
19        Q.    Now, let's look at another document, which
20    is -- what is Bates stamp numbers 266 through 271,
21    and appears to be an e-mail from Lelei LeLaulu to
22    worldwide CPI staff, subject, draft notes, dated

                            0251

1    October 12, 2004.
2            (Document referred to marked Deposition
3    Exhibit Number 39 for identification and
4    subsequently attached to the deposition.)
5    BY MS. DOUGLASS:
6        Q.    Ms. Lear, does Plaintiff's Exhibit 39
7    appear to be draft notes of a meeting of the senior
8    management team on October 12, 2004, at which you
9    were present?
10        A.    Yes.

11        Q.    Would you look at page 268, which is the
12    third page of the exhibit, the paragraph called
13    clarification of whistle-blower policy.
14            MS. ARIAIL:  The one in your hand.
15    BY MS. DOUGLASS:
16        Q.    The third page of this one --
17        A.    Oh, 268.
18        Q.    -- of Plaintiff's Exhibit 39.
19            Now, who is Lelei LeLaulu, whose name I'm
20    probably butchering?
21        A.    Lelei LeLaulu, he's our CEO.
22        Q.    Under clarification of whistle-blower
                            0252
1    policy, it says, quote, "Lelei said the
2    whistle-blower policy will be strengthening to
3    include the option of going directly to the board
4    for support in a claim against an employee," close
5    quote.
6            Do you remember that statement being made
7    at a meeting of the senior management team on
8    October 12, 2004?
9        A.    I don't recall.
10        Q.    The language I've just read includes the
11    word clarification of whistle-blower policy, and the
12    term strengthening to apply to that policy, which
13    suggests that there is a policy.  Do you understand
14    why those terms are used?
15        A.    No.
16        Q.    Now, at the meeting on October 12, 2004,
17    was there any discussion about the situation -- if
18    you want to amend it, go ahead.
19        A.    He may be referring to the draft policy,
20    the draft.
21        Q.    It was in existence in 2004?
22        A.    Oh, this is 2004.  No, then I just don't
                            0253
1    know.
2        Q.    This is a month before Jay Cooper was
3    fired.
4        A.    No, I really don't know.
5        Q.    Was the situation with Jay Cooper
6    discussed at the senior management team meeting on
7    October 12, 2004?

8      A.    Was the situation with Jay Cooper
9   discussed?
10     Q.    Yes.
11     A.    No.
12     Q.    Are there periodic retreats for vice
13  presidents at Counterpart?
14     A.    Yes.
15     Q.    How often are those held?
16     A.    Maybe twice a year.
17     Q.    Was the whistle-blower policy ever
18  discussed during those retreats?
19     A.    No.
20     Q.    Was the --
21     A.    Because the retreats are very issue
22  oriented.  It was not a topic.
                         0254
1      Q.    Was the temporary abolition of the
2   grievance procedure discussed at any of those
3   retreats?
4      A.    No.
5      Q.    Was Jay Cooper discussed at any of those
6   retreats?
7      A.    No.
8      Q.    Have you read the draft whistle-blower
9   policy that you referenced?
10     A.    I did the other day, yeah.  Don't ask me
11  to repeat it.
12     Q.    Does it provide that a whistle-blower has
13  the option of going to the board for support?
14     A.    I don't recall.
15     Q.    Does it apply to a whistle-blower that's
16  been fired?
17     A.    I don't recall.
18     Q.    On to subject 15.  Did you at some point
19  receive a memo from a Kim Alter?
20     A.    Yes.
21     Q.    And who is Kim alter.
22     A.    Kim Alter was a financial sustainability
                         0255
1   advisor for the Civil Society Support Initiatives,
2   CSSI, and she reported directly to Jay Cooper in the
3   field.
4      Q.    And when was she hired?

5       A.    I think it was maybe 2003.  I think it was
6    2003, but I can't be absolutely certain.
7       Q.    Does January 2004 sound right?
8       A.    Yes.  Yes, I knew it was January.  Yes, it
9    does.
10       Q.    And was Ms. Alter pregnant at the time she
11    was hired?
12       A.    No.
13       Q.    How did you receive a memo prepared by
14    Ms. Alter?
15       A.    In the e-mail.
16       Q.    E-mail?
17       A.    Yeah.
18       Q.    From her directly?
19       A.    Uh-huh.
20         MS. DOUGLASS:  I would like to have marked
21    an exhibit bearing Bates stamps CP00752 and 753.  On
22    the top line it says submitted by Kim alter on
                              0256
1    April 30, 2004.
2         (Document referred to marked Deposition
3    Exhibit Number 40 for identification and
4    subsequently attached to the deposition.)
5    BY MS. DOUGLASS:
6       Q.    What did you do when you received
7    Plaintiff's Exhibit 40?
8       A.    We had an investigation.
9       Q.    Who conducted the investigation?
10       A.    Kelli.
11       Q.    What was the results of Kelli's
12    investigation?
13       A.    There was no evidence, proof of these
14    allegations.  It was determined that the allegations
15    were false -- or uncorroborated.  Uncorroborated.
16       Q.    Did Kelli Alter [sic] subsequently leave
17    the employee of Counterpart?
18       A.    No.
19       Q.    She did not?
20       A.    Did she subsequently leave?
21       Q.    Yes.
22       A.    No.  We're talking about a year or so.
                              0257
1    This was '03.  We're now talking about '05.  Kelli

2    left in '05.  You said Kelli, did Kelli subsequently
3    leave.
4        Q.   I'm sorry.  I'm really not trying to trap
5    anybody.  I'm getting tired.  Let me start again.
6        Did Ms. Alter subsequently leave the
7    employ of Counterpart?
8        A.   Yes, she did.
9        Q.   When was that?
10       A.   Let me see.  I think it was the spring
11   or -- I think it was the spring -- the late spring
12   of that year, but I'm not absolutely sure.
13       Q.   Did any allegation by Ms. Alter, either
14   contained in Plaintiff's Exhibit 40 or otherwise,
15   convey to you, play any role in your decision to
16   terminate Jay Cooper?
17       A.   No.
18       Q.   Is it fair to say that you believed -- did
19   you ask Jay Cooper about the allegations Ms. Alter
20   made?
21       A.   I talked -- Jay Cooper received a previous
22   e-mail from Kim Alter articulating -- indicating
                        0258
1    there was sexual harassment and denigration of
2    women.  And then I asked for some detail to
3    corroborate that statement.  And he received a copy
4    of that from one of our vice presidents, Don Feil,
5    who received that as well.  And I thought -- and Jay
6    was upset about it and I asked for corroboration.
7    We did an investigation.  End of story.
8        Q.   So Jay's version of events was accepted by
9    the company?
10       A.   Yes, yes.
11       Q.   Thank you.  On to subject, last and not
12   least, 16.
13       Who was Aaron Chassey?
14       A.   He was -- he was a former director for
15   civil society programs in the civil society
16   division.
17       Q.   Is that position equal in rank to Jay's
18   position as chief of party and regional director?
19       A.   I think I would say it's somewhat
20   parallel.
21       Q.   And Aaron Chassey reported directly to

22    you?

0259

1    A.    Yes.
2    Q.    At some point he was sent into the central
3    Asian region, correct?
4    A.    Yes, to design a proposal and work with
5    the field.
6    Q.    And was he supposed to relieve you of some
7    of your oversight responsibilities?
8    A.    Yes, that was part of his function.
9    Q.    Was it part of the oversight
10    responsibility over Jay Cooper that he was supposed
11    to be working on?
12    A.    Over anyone on the field that was funded
13    by -- that was working on projects related to the
14    civil society division.
15    Q.    Was it his job to report to you his
16    observations of Mr. Cooper and Mr. Abma and everyone
17    else in Almaty and other offices in central Asia?
18    A.    Absolutely, right.
19    Q.    Did he prepare a report for that purpose
20    on or about March of 2003?
21    A.    Yes.
22    Q.    How long had he been employed at the time

0260

1    he prepared that report?
2    A.    Months.
3    Q.    Several months?
4    A.    Yeah.
5        MS. DOUGLASS:  I'd like to have marked as
6    the final exhibit, I believe, a multi-page document
7    that was Exhibit 18.
8    A.    Excuse me.  It could have been maybe two
9    months.  Several is three or more.
10    Q.    You meant two months.
11        MS. DOUGLASS:  This was Exhibit 18 to the
12    deposition of Mr. Cooper.  Do we still have 18
13    available?  This is now Plaintiff's Exhibit 18.
14        (Document referred to marked Deposition
15    Exhibit Number 18 for identification and
16    subsequently attached to the deposition.)
17    BY MS. DOUGLASS:
18    Q.    Is Plaintiff's Exhibit 18 the report

19    Mr. Chassey submitted to you on March 5, 2003?
20       A.    Yes.
21       Q.    There's some handwriting on Plaintiff's
22    Exhibit 18 and some underlining.  Is that your
                                  0261
1    writing?
2       A.    I guess so.  I think so.  You know, I'm
3    really not sure, really not sure.  Correct --
4    correction.  Only I could have done this
5    underlining.  I must have been on the way to sleep.
6    It's just, you'll notice, the handwriting has
7    changed a little bit.  Yes, probably.  Most likely
8    it was my handwriting.
9       Q.    Is there anything in Plaintiff's
10   Exhibit 18 or anything otherwise reported to you by
11   Mr. Chassey that played a role in your decision to
12   fire Jay Cooper?
13      A.    No.  As a matter of fact, I subsequently
14   brought Jay Cooper on as the chief of party of
15   Phase IV.  So this did not play a role in my
16   decision making at all.
17      Q.    Is it fair to say you disagreed with many
18   of the observations in Plaintiff's Exhibit 18?
19      A.    It's fair to say that I wasn't wholly
20   confident of the judgment of Mr. Chassey, so that I
21   erred on the side of wanting to have my own opinion.
22      Q.    Was Mr. Chassey ultimately relieved of his
                                  0262
1    responsibilities?
2       A.    Yes.
3       Q.    Was that an involuntary separation?
4       A.    Yes.
5       Q.    And Mr. Chassey at some point filed a
6    grievance against you.  Is that right?
7           MS. ARIAIL:  I'll just restate my general
8    objection to the category number --
9           MS. DOUGLASS:  16.
10          MS. ARIAIL:  Yeah -- no.  I'm sorry.
11   Actually, 13 is when I stated it originally, to the
12   extent that it relates to the grievance of Aaron
13   Chassey against Arlene Lear.
14          MS. DOUGLASS:  Okay.
15   BY MS. DOUGLASS:

16    Q.    Did he file a grievance against you?
17    A.    Yes.
18    Q.    Did --
19    A.    Following termination, yes.
20    Q.    Following the termination?
21    A.    Yes.
22    Q.    Was that grievance upheld by anyone?
                          0263
1     A.    It was investigated.
2     Q.    It was investigated?
3     A.    Uh-huh.
4     Q.    By the HR department?
5     A.    Yes.
6     Q.    And someone listened to Mr. Chassey's view
7    of events?
8     A.    Not only by the HR department but also by
9    our legal counsel.
10    Q.    And were you questioned about your view of
11   events of whatever he was alleging?
12    A.    Yes.
13    Q.    And what was the resolution of the matter?
14    A.    The resolution was that there was no --
15   that the grievance was unfounded.
16    MS. DOUGLASS:  Thank you very much,
17   Ms. Lear.  You've been a stalworth here.
18    I would like to reserve the 30(b)(6)
19   deposition because I have to add probably only one
20   more subject based on documents that were served on
21   me at nine o'clock on Wednesday night, and I haven't
22   had a chance to formulate a subject or address them.
                          0264
1    And also subject to a resolution of some of your
2    objections that we have not resolved, specifically
3    about the documents involving Michael Kunz and
4    complaints about him.
5     MS. ARIAIL:  Of course.
6     MS. DOUGLASS:  But subject to those
7    reservations, I'm closing the deposition.  Thank you
8    very much.
9     THE WITNESS:  Thank you.
10    MS. ARIAIL:  I just have a few questions,
11   literally just a few questions.
12    EXAMINATION BY COUNSEL FOR DEFENDANT

13    BY MS. ARIAIL:
14        Q.    Arlene, could you please locate Exhibit 12
15    that you looked at today.
16            Can you please tell me, yes or no, if any
17    statement contained in Exhibit 12 is a contract?
18        A.    No.
19        Q.    I would like to direct you to Exhibit
20    Number 8.  Do you recognize this as the last
21    employment contract between Jay Cooper and
22    Counterpart?
                            0265
1        A.    As I remember, yes.
2        Q.    Is there any statement set forth anywhere
3    in Exhibit 12 that in any way supersedes the
4    provisions of the contract in Exhibit 8?
5            MS. DOUGLASS:  You're asking her for a
6    legal conclusion?
7            MS. ARIAIL:  I'm not asking her for a
8    legal conclusion.  I can restate that.
9    BY MS. ARIAIL:
10        Q.    Do any of the statements contained in
11    Exhibit 12 change the agreement set forth in
12    Exhibit 8?
13        A.    Not that I --
14            MS. DOUGLASS:  Same objection, but go
15    ahead and answer.
16        A.    No.
17        Q.    Do you have the authority to evaluate the
18    performance of Jay Cooper?
19        A.    Yes.
20        Q.    At the time you terminated Jay Cooper, had
21    you concluded, on behalf of Counterpart, that Jay
22    Cooper was not performing to your satisfaction,
                            0266
1    being Counterpart's satisfaction?
2        A.    Yes.
3            MS. ARIAIL:  That's all I have.
4            MS. DOUGLASS:  Well, that has prompted
5    something.
6            MS. ARIAIL:  Uh-huh.
7        EXAMINATION BY COUNSEL FOR PLAINTIFF
8    BY MS. DOUGLASS:
9        Q.    Would you please look at Plaintiff's

10    Exhibit 8.  No, I reserve -- I changed my mind.
11          MS. DOUGLASS:  Question withdrawn before
12    asked.
13          THE REPORTER:  Reading and signing?
14          MS. ARIAIL:  Oh, absolutely.  I'm sorry.
15          (Deposition concluded at 5:21 p.m.)
16               *    *    *
17
18
19
20
21
22
                              0267
1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, ARLENE LEAR, do hereby acknowledge
4    that I have read and examined the foregoing
5    testimony, and the same is a true, correct and
6    complete transcription of the testimony given by me,
7    and any corrections appear on the attached errata
8    sheet signed by me.
9
10
11
12
13    _____    _____
14    (Date)              (Signature)
15
16
17
18
19
20
21
22
                              0268
1          E R R A T A   S H E E T
2    IN RE:  JAY W. COOPER vs. COUNTERPART INTERNATIONAL
3    RETURN BY:  _____
4    PAGE/LINE  REASON
5    _____    _____
6    _____    _____

| | |
|---|---|
| 7 | _____ _____ |
| 8 | _____ _____ |
| 9 | _____ _____ |
| 10 | _____ _____ |
| 11 | _____ _____ |
| 12 | _____ _____ |
| 13 | _____ _____ |
| 14 | _____ _____ |
| 15 | _____ _____ |
| 16 | _____ _____ |
| 17 | _____ _____ |
| 18 | _____ _____ |
| 19 | _____ _____ |
| 20 | _____ _____ |
| 21 | _____ _____ |

22   DATE              SIGNATURE

0269

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2

3       I, Paula Flint, Court Reporter, the officer

4   before whom the foregoing proceedings wee taken, do

5   hereby certify that the foregoing transcript is a

6   true and correct record of the proceedings; that

7   said proceedings were taken by me stenographically

8   and thereafter reduced to typewriting under my

9   supervision; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set me hand

14   and affixed by notarial seal this 25th day of

15   January, 2006

16

17

18   _____

19   Notary Public in and for the

20   Commonwealth of Virginia

21   My Commission Expires January 31, 2007

22