0001
1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3
4   -------------------------------X
5   JAY W. COOPER,              :
6              Plaintiff :
7          v.            : No. 1:05cv1598 (RMC)
8   COUNTERPART INTERNATIONAL,     :
9              Defendant :
10  -------------------------------X
11
12
13          Deposition of HARRY DORCUS
14             Vienna, Virginia
15          Tuesday, August 29, 2006
16                9:40 a.m.
17
18
19
20  Job No.:  1-84616
21  Pages 1 - 246
22  Reported by:  Nancy Bond Rowland

0002

1        Deposition of HARRY DORCUS, held at the

2   offices of:

3

4        Jackson Lewis, LLP

5        8614 Westwood Center Drive

6        Suite 950

7        Vienna, Virginia

8

9        Pursuant to agreement, before Nancy Bond

10   Rowland, Registered Professional Reporter and Notary

11   Public in and for the Commonwealth of Virginia.

12

13

14

15

16

17

18

19

20

21

22

0003

1            A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF:
3        PATRICIA D. DOUGLASS, ESQUIRE
4        LAW OFFICES OF PATRICIA D. DOUGLASS
5        98 Interpromontory Road
6        Great Falls, VA  22066-3219
7        (703) 759-3586
8
9    ON BEHALF OF DEFENDANT:
10        KARA M. ARIAIL, ESQUIRE
11        JACKSON LEWIS, LLP
12        8614 Westwood Center Drive, Suite 950
13        Vienna, VA  22182
14        (703) 821-2189
15
16
17
18
19
20
21
22

0004

```
 1          C O N T E N T S
 2   EXAMINATION OF HARRY DORCUS                    PAGE
 3      By Ms. Douglass                   6
 4
 5
 6          E X H I B I T S
 7      (Attached to the Transcript)
 8   DEPOSITION EXHIBIT                   PAGE
 9   41 - Circular No. A-122.                 12
10   42 - Audit Report for the year ended 9/30/04.    105
11      Bates no. CP 1396 - 1423
12   43 - CSSI Program Budget.                128
13      Bates no. CP 1045 - 1061
14   44 - Health NGO Capacity Building Initiative    145
15      Extension budget.
16      Bates no. CP 1062 - 1070
17   45 - E-mail dated 10/21/04.              157
18      Bates no. 000074
19   46 - E-mail dated 10/8/04.               158
20      Bates no. 000069 - 000073
21   47 - Ledger Report Summary - Run Date 12/02/2005.  179
22      Bates no. CP 1138 - 1272
```

0005

1  DEPOSITION EXHIBIT                        PAGE
2  48 - Ledger Report Summary - Run Date 12/02/2005.  182
3     Bates no. CP 1315 - 1345
4  49 - Form 990.                         183
5  50 - Resolution of Alter Employment Related to     207
6     Pregnancy dated June 17, 2004.
7     Bates no. CP 1725 - 1733
8  51 - InterAction PVO Standards.           230
9  52 - E-mail dated 11/24/04.             238
10     Bates no. 000145 - 000147
11
12
13
14
15
16
17
18
19
20
21
22

0006

1          P R O C E E D I N G S
2               HARRY DORCUS
3      having been duly sworn, testified as follows:
4          EXAMINATION BY COUNSEL FOR PLAINTIFF
5  BY MS. DOUGLASS:
6      Q   Good morning, Mr. Dorcus.  I am Pat Douglass.
7  I represent Jay Cooper in a suit against Counterpart
8  International, and I'm going to be asking you some
9  questions relevant to that.
10          If there's any reason why you don't
11  understand a question, please just ask me what I meant
12  by it, and I'll clarify it.  The point of this exercise
13  today is to have you understanding me and me
14  understanding you, and if we don't proceed that way, it
15  gets in trouble later.
16          There are no tricks.  Everything is right off
17  the top of the deck here.  If you don't know something
18  or if there's any other reason why you don't want to
19  answer something, just say why you don't want to
20  answer.  All right.
21          First, have you ever been deposed before?
22      A   No.  This is the first time.

0007

1    Q   Did you do anything to prepare for the
2   deposition today?
3    A   I met with my attorney.
4    Q   Did you talk with anyone else besides your
5   attorney about the deposition today?
6    A   I talked with my secretary who told me to
7   come here.
8    Q   Did you talk with Arlene Lear about it?
9    A   No.
10    Q   Did you talk with Arlene Lear about her
11   deposition?
12    A   No.
13    Q   Did you read Arlene Lear's deposition?
14    A   No.
15    Q   Did you read Kelli Boyer's deposition?
16    A   No.
17    Q   Did you read any documents in preparing for
18   the deposition today?
19    A   Documents?  I thought about documents.  I
20   thought about the contract.
21    Q   But you didn't look at it?
22    A   No.

0008

1      Q   Okay.  Now, did you read the deposition by
2  Jay Cooper in this case?
3      A   Did I read the deposition by Jay Cooper?  I
4  think I just answered that.  No.
5      Q   No.  I asked you about Lear, and I asked you
6  about Boyer.
7      A   No Cooper.
8      Q   Nobody?
9      A   Nobody.
10     Q   All right.  Good.  Have you read the
11  complaint in the case?
12     A   Complaint?  Yes.  Months ago.
13     Q   Okay.  Now, what is your current position
14  with Counterpart?
15     A   I'm the chief operating officer and acting
16  CFO.
17     Q   Acting CFO, all right.  How long have you
18  been the chief operating officer?
19     A   19 months.
20     Q   And how long have you been the acting CFO?
21     A   19 months.
22     Q   All right.  What are the duties of a chief

0009

1  operating officer briefly?
2      A   All vice-presidents report to me.  I report
3  to the CEO.
4      Q   Do you participate in the hiring of new
5  staff?
6      A   Almost all.
7      Q   Do you participate in setting salaries of
8  staff?
9      A   Almost all.
10     Q   What was your previous position before you
11  were made chief operating officer?
12     A   CFO.
13     Q   So is it fair to say you've continued the
14  duties that you had before once you became the chief
15  operating officer as well as taking on new duties?
16     A   Yes.
17     Q   Now, what are the duties of a CFO at
18  Counterpart?
19     A   The duties of the CFO were to give guidance
20  on financial procedures, to be responsible for the
21  books, to make sure that all funds of Counterpart are
22  appropriately accounted for and reported on.

0010

1    Q   Are you familiar with the regulations that
2  govern accounting of government contracts?
3    A   Yes, ma'am.
4    Q   And have you had experience in the past of
5  working under those guidelines?
6    A   Yes, ma'am.
7    Q   And what was your experience?
8    A   23 years as a USAID controller.
9    Q   What does a USAID controller do?  That's
10  USAID, correct?
11    A   Yes.
12    Q   What does a USAID controller do?
13    A   The USAID controller is the guy on the other
14  side of the table who pays the money and accounts for
15  the government funds.  So currently I sit on the
16  recipient side of the table.  Previously I sat on the
17  paying side of the table.  So I was responsible for the
18  accounting of the U.S. government funds and how they
19  were used.
20    Q   All right.  Am I correct that the standards
21  for accounting for government contracts with USAID are
22  governed by a document called Circular A-122?

0011

1    A  Yes, ma'am.
2    Q  And that was issued by the Office of
3  Management and Budget?
4    A  It would be the cost standards.
5    Q  Excuse me?
6    A  Cost standards.
7    Q  Cost standards.  All right.  And that
8  document has various sections including one called
9  General Principles, one called Selected Items of Cost,
10  and one called Nonprofit Organizations Not Subject To
11  This Circular, correct?
12    A  Yes.
13    Q  Is it your testimony that Counterpart
14  operates in accordance with the standards in --
15    A  Yes, ma'am.
16    Q  -- this circular?
17    A  Yes.
18      MS. ARIAIL:  Let her finish her question.
19  BY MS. DOUGLASS:
20    Q  We should have said at the beginning it's
21  important that we not interrupt each other because the
22  court reporter can't take down both, and I'll try not

0012

1    to interrupt you.
2          I'd like to have marked as the first exhibit
3    a multi-page document that I pulled off the Internet,
4    and the question to you is do you identify this as
5    Circular Number A-122 put out by the Office of
6    Management and Budget that we've just discussed?
7          (Deposition Exhibit 41 was marked for
8    identification and was attached to the transcript.)
9          MS. ARIAIL:  This hasn't been produced yet,
10   so I'd ask Harry to take the time and review the entire
11   document because we've never seen it before.
12         THE WITNESS:  Okay.
13         MS. ARIAIL:  This can be off the record.
14         (Discussion off the record)
15         MS. ARIAIL:  I'd just object to this document
16   on the grounds that there's been no opportunity to
17   verify it is what it says it is, but I'm going to let
18   the witness answer questions regarding it to the extent
19   he can.
20   BY MS. DOUGLASS:
21      Q   Is what's been marked as Exhibit 41 a copy of
22   the Office of Management and Budget Circular Number

0013

1  A-122 that we discussed previously?
2      A  It appears to be.
3      Q  If at any time I ask you a question and you
4  refer to Exhibit 41 and you believe that what you're
5  referring to is not the accurate text of the circular,
6  would you inform me, and we'll verify it at a later
7  time?
8      A  Okay.
9      Q  All right.  Now, before you were COO I
10  noticed in some documents that you apparently signed
11  employment agreements on behalf of Counterpart, is that
12  correct?
13      A  Yes, ma'am.
14      Q  For example, you signed the employment
15  agreement under which Jay Cooper was operating at the
16  time he was fired, is that right?
17      A  I would sign the contracts.  Yes, ma'am.
18      Q  Did you review them or negotiate them or just
19  sign them?
20      A  I reviewed them and signed them.
21      Q  Who negotiates an employment contract at
22  Counterpart?

0014

1      A   In the case of Jay Cooper, it was Arlene.

2      Q   Is it usually a vice-president for whom an

3   employee works that negotiates an employment contract

4   at Counterpart?

5      A   At the time of Jay Cooper, yes.

6      Q   All right.  Who sets the salary which is

7   offered to an employee at Counterpart when a proposed

8   contract is offered to that person?

9      A   It's done with HR in conjunction with the

10   vice-president and the CFO.

11      Q   Do you have to approve any increase in salary

12   between one contract and another?

13      A   I don't understand that one.

14      Q   All right.  If you have an employee who is

15   under contract and his contract is expiring and you

16   propose a new contract with the individual, who sets

17   any raise that occurs in the salary level between the

18   first contract and the second contract?

19      A   The vice-president recommends and the CFO

20   concurs if indeed that kind of situation were to

21   happen.

22      Q   Are there any limitations on increases in

0015

 1  salary that can be given to an individual who stays in
 2  the same position with Counterpart?
 3      A   Is there any limitation?  Okay.  If the job
 4  description does not change, generally other than
 5  5 percent per year, a step increase in other words,
 6  there would be no reason.
 7      Q   There would be no reason for you to review
 8  it, is that what you're saying?
 9      A   No.  There would be no reason to give the
10  increase.
11      Q   All right.  So do I hear you correctly to say
12  that it's Counterpart's policy to increase salaries at
13  5 percent a year for all employees?
14          MS. ARIAIL:  Objection to the form.
15      A   Based on performance.
16      Q   What is Counterpart's policy with respect to
17  increases in compensation?
18      A   Annually based on performance.
19      Q   And is it true that each employee is reviewed
20  annually for that purpose?
21      A   Each employee should be reviewed annually.
22      Q   Is that review in connection with the

0016

1  performance evaluation by his or her supervisor?

2    A  Yes, ma'am.

3    Q  If there is no performance evaluation

4  performed, is it Counterpart's policy that an

5  individual can have a contract renewal?

6    A  Yes.

7    Q  Is it Counterpart's policy that if no

8  performance --

9    A  Can you repeat that last question please?

10    Q  Sure.  If there has been no annual

11  performance review by an employee's supervisor, is it

12  Counterpart's policy that that employee can --

13    A  We don't have a policy.

14      MS. ARIAIL:  Harry, make sure you let her

15  finish the question.

16      THE WITNESS:  Okay.

17  BY MS. DOUGLASS:

18    Q  Let me just finish the question to see if you

19  were answering what I thought I was asking.

20    A  Okay.

21    Q  You don't have a policy about whether or not

22  a contract can be renewed absent a performance

1   evaluation, is that right?
2       A   That's correct.  We don't have a policy for
3   that.
4       Q   Do you have a policy about whether or not an
5   increase in compensation can occur without a
6   performance evaluation?
7       A   No.
8       Q   Without a policy, who makes the decision on
9   those two subjects?
10      A   The vice-president.
11      Q   In your position as COO, do you have review
12  over that decision?
13      A   I do now.
14      Q   Are you required to approve it?
15      A   Yes.
16      Q   Since when have you had that --
17      A   The last 18 months.
18      Q   When you were CFO, did you have a role --
19      A   No.  Complete the question.
20      Q   -- a role in the review of either a contract
21  renewal or an increase in compensation?
22      A   Not always.

0018

1    Q   In what instances did you not?

2    A   I don't recall.

3    Q   In the case of Jay Cooper, did you have a

4    review function with respect to the renewal of his

5    contract?

6    A   I don't remember.

7    Q   With respect to Jay Cooper, did you have a

8    review function with respect to increases in his

9    compensation?

10    A   No.

11    Q   You mentioned earlier the figure 5 percent.

12    Is that a common increase given to a Counterpart

13    employee who has good performance?

14    A   With no change in job description, yes.

15    Q   Okay.  Did you have any review function in

16    the compensation offered to Bob Abma in the last couple

17    of years?

18    A   In the last 18 months, yes.

19    Q   Did Mr. Abma receive a compensation increase

20    in the last 18 months?

21    A   Yes.

22    Q   What was the percentage or the amount of

0019

1  that?
2      A  I don't recall.
3      Q  What was the reason for the increase?
4      A  Annual.
5      Q  What does annual mean?
6      A  Annual review.  Annual increase.
7      Q  And you agreed with that increase?
8      A  Yes, ma'am.
9      Q  Now, in general Counterpart has a budget for
10  the various programs that it operates under funding
11  from USAID, is that correct?
12      A  Yes, ma'am.
13      Q  And that budget sets out, among other things,
14  the salaries to be paid to the various persons working
15  on projects under the contract, is that correct?
16      A  Yes, ma'am.
17      Q  When I'm using the word contract, I mean to
18  include a cooperation agreement.  Is that acceptable to
19  you?
20      A  Cooperative agreement.
21      Q  Cooperative agreement, correct?
22      A  Yes.

0020

1     Q   And that's what USAID usually gives
2   Counterpart, correct?
3     A   Yes, ma'am.
4     Q   And there are some distinctions between those
5   two terms, so if I say something that invokes a
6   distinction, please let me know.  All right.
7       Now, as far as you know there is no
8   regulation of USAID which restricts the amount of
9   compensation that can be awarded an individual working
10  under a contract which has been the subject of a budget
11  before the contract was entered into?
12      MS. ARIAIL:  Objection to form.  You can
13  answer.
14     A   Repeat the question.
15     Q   Okay.  Let's assume we have a budget for a
16  project, and the budget is approved by USAID.  All
17  right.
18      MS. ARIAIL:  Objection to form.  You're
19  assuming.
20  BY MS. DOUGLASS:
21     Q   Are you willing to answer a question based on
22  that assumption?

0021

1     A   Based on?
2     Q   The assumption that there is a contract with
3   USAID that has a budget attached to it.
4       MS. ARIAIL:  Objection.  You can answer all
5   these questions.  I'm objecting just for the record.
6     A   Okay.  So go ahead.  I'll answer.
7     Q   All right.  And usually these budgets have
8   line items for salary for staff, do they not?
9     A   Yes.
10      Q   And when an individual is assigned the role
11   of a staff position in connection with a project, is
12   there any limitation to increases in his compensation
13   during the life of the project that is imposed by USAID
14   or any regulation?
15      A   There's a cap limitation, a maximum beyond
16   which we can't pay, but the amount per year to year is
17   based on Counterpart policy.  So we aren't limited.  I
18   mean, there's no regulation that I know of that says
19   Counterpart can't change a person's salary different
20   than the U.S. government GS or FS pay scale.
21      Q   All right.  What's the cap limitation you
22   referenced?

0022

1     A  FS-1 step 10.
2     Q  Is that a federal pay level?
3     A  Yes, ma'am.
4     Q  All right.  Do you mean to say that that is
5  the top pay level that can be paid to someone who's
6  working under a USAID contract?
7         MS. ARIAIL:  Objection to form.
8     A  What I'm saying is the U.S. government will
9  not reimburse you.  You can pay more.
10     Q  All right.  Now, are you required to inform
11  the U.S. government of pay increases of staff
12  members --
13     A  No, ma'am.
14     Q  Let me finish.  -- operating under a contract
15  with USAID?
16     A  No, ma'am.
17     Q  Now, just briefly about your background, you
18  said you had worked 23 years for USAID.  Was that as a
19  foreign service officer?
20     A  Yes, ma'am.
21     Q  But you were restricted, am I correct in
22  understanding, to a financial function rather than an

0023

1  other function?
2      A  I did both program functions and financial
3  functions.  I was sort of a rare duck.
4      Q  A rare duck.  All right.  And you were also
5  the COO of another development oriented organization
6  called International Republican Institute, is that
7  right?
8      A  Yes, ma'am.
9      Q  All right.  At some point did you learn that
10  Jay Cooper had concerns about various budget changes
11  proposed by Bob Abma in Counterpart's program in
12  central Asia?
13      A  I don't know that they -- At some point I
14  remember discussing budget changes along the course of
15  implementation of the project, but I don't know if it
16  was Bob Abma, Arlene or who introduced those.  It could
17  have been Jay himself.
18      Q  All right.  And what budget changes do you
19  remember?
20      A  I vaguely remember discussing procurement
21  regulations and the amount of budget change which was
22  authorized.

0024

1     Q   Was this in the middle of one of Jay's
2   programs?
3     A   It would have been during my first time at
4   Counterpart, so yes.
5     Q   In what year would that be approximately?
6     A   Between '02 and '03.  Between August of '02
7   and August of '03.
8     Q   Okay.  Did you at any point in time become
9   aware that Jay Cooper had concerns about the management
10  style of Michael Kunz?
11    A   No.
12    Q   Did you ever receive any documentation from
13  Jay Cooper concerning some complaints about the actions
14  of Michael Kunz in Uzbekistan?
15    A   I may have received an e-mail discussing
16  Michael Kunz.  I'm not sure.
17    Q   Was that an e-mail from Jay?
18    A   Yes.
19    Q   And what did the e-mail say?
20    A   I don't recall.
21    Q   Do you remember discussing having received
22  that e-mail with anyone?

0025

1      A   No.
2      Q   Do you remember discussing it with Jay?
3      A   No.
4      Q   Do you remember what it said about Michael
5  Kunz?
6      A   No.
7      Q   Do you remember ever hearing from any source
8  that there was concern about the management style of
9  Michael Kunz?
10     A   No.
11     Q   I'd like to show you what's been previously
12  marked Exhibits 33, 34 --
13         MS. ARIAIL:  Let's do them one at a time.
14         MS. DOUGLASS:  All right.
15  BY MS. DOUGLASS:
16     Q   What's previously been marked 33 in a
17  previous deposition in this case.  My question to you
18  is have you ever seen it before?
19     A   No, I've never seen this before.
20     Q   Okay.  I assume you would say you did not
21  receive this from Jay Cooper?
22     A   No.

0026

1    Q   Thank you.  I'd like to show you what's been
2  marked previously as Exhibit 34 in an earlier
3  deposition in this case.
4    A  I don't recall seeing this one either.
5    Q   And I assume that means you did not receive a
6  copy of it from Jay Cooper, correct?
7    A  I don't think so.
8    Q   Did you ever discuss the substance of what's
9  been shown to you as previously marked Exhibits 33 and
10  34 with anyone at Counterpart?
11    A  No.
12    Q   Did anyone at Counterpart ever bring up to
13  your attention any of the subjects discussed in those
14  two documents?
15    A  I don't think so.
16    Q   I'd like to show you what's been marked in a
17  previous deposition as Exhibit 35.
18    A  Repeat the question again.
19    Q   Have you ever seen what's been previously
20  marked in another deposition as Exhibit 35?
21    A  I don't think so.
22    Q   Did you ever discuss the subject matter of

0027

1  what's been marked in a previous deposition as Exhibit
2  35 with anyone?
3      A   No.
4      Q   Does the subject matter of Exhibits 33
5  through 35 that you've just examined come as a surprise
6  to you today?
7      A   No.
8      Q   Why is that?
9      A   Issues with local employees occur from time
10  to time overseas, and to me this is part of overseas
11  work.  The fact -- Yes.
12      Q   You find nothing about the reports of Michael
13  Kunz's behavior in the three documents that were marked
14  33 through 35 that give you any pause?
15      A   I had no knowledge of this behavior before.
16  I was commenting on the source of the e-mails from the
17  local employees, and I don't know that these
18  allegations are true because overseas employees have
19  different motives for criticizing Americans.
20      Q   All right.  Do you think that the three
21  documents, Exhibits 33 through 35, would give a manager
22  pause about Michael Kunz and prompt some investigation

0028

 1  into the matters set forth in those documents?

 2        MS. ARIAIL:  Objection.  Hypothetical.

 3        THE WITNESS:  Do I answer?

 4        MS. ARIAIL:  You can if you can answer a

 5  hypothetical question.

 6    A   If 100 percent true, yes.

 7    Q   If you had gotten the three documents that

 8  have been previously marked Exhibits 33 through 35,

 9  what would you have done?

10    A   That's a hypothetical.  I don't know what I

11  would have done.

12    Q   Would you have investigated?

13        MS. ARIAIL:  Objection.  Asked and answered.

14  He doesn't know what he would have done.

15        MS. DOUGLASS:  Let him testify, Miss Ariail.

16        MS. ARIAIL:  He did already.

17  BY MS. DOUGLASS:

18    Q   What would you have done?

19    A   I don't know.

20    Q   Did you come to learn at some time that there

21  was consideration being given to a management change in

22  Counterpart's operation in central Asia?

0029

1     A   Yes, ma'am.
2     Q   And when was that?
3     A   That would have been the summer before Jay
4   left Counterpart.
5     Q   Would that be the summer of 2004?
6     A   Yes, ma'am.  He left at the end of 2004.
7     Q   When in that summer do you remember first
8   hearing about that subject?
9     A   Arlene held a retreat, and I remember talking
10   with Arlene about the results of the retreat.
11     Q   Do you remember the date of the retreat?
12     A   No, ma'am.
13     Q   What was the subject of the retreat?
14     A   I don't remember exactly what the purpose
15   was.  I know they were discussing management changes
16   and ways to incur change in our central Asia programs,
17   the management of our central Asia programs.
18     Q   Were you present at the retreat?
19     A   No, ma'am.
20     Q   Do you know who was present at the retreat?
21     A   I don't know all those who were present at
22   the retreat.

0030

1    Q   Do you know some of those who were present at
2    the retreat?
3        A   I know Jay was present.  I know Arlene was
4    present.  And I know Barbara Sloan was present.  And
5    beyond that, I have no knowledge of it.
6        Q   All right.  But you did discuss this retreat,
7    as you call it, with Arlene after it happened, correct?
8        A   Arlene discussed it with me, yes.
9        Q   All right.  Tell me what she said.
10       A   She said they had decided to send Jay back
11   out to the field to his position in Almaty, and they
12   had tried to -- I'm not sure this is 100 percent
13   accurate.  They had tried to get him to take some time
14   off or change his job description, but he had refused
15   or it had not worked out.  I'm not sure which one of
16   those.
17       Q   Did she --
18       A   And the purpose of the discussion was to
19   enable Jay to be a better employee for Counterpart.
20       Q   Did she tell you that she had announced
21   before this retreat, at least a month, that Michael
22   Kunz would be brought in as Jay's supervisor in central

0031

1  Asia?
2      A  No.
3      Q  Did you subsequently learn that fact?
4      A  Yes.
5      Q  Did you learn that had been announced at
6  least a month before the retreat?
7      A  No.
8      Q  Had it been announced to you before the
9  retreat?
10      A  I don't recall.
11      Q  Did --
12      A  I know I was told.  But before the retreat,
13  after the retreat, I don't recall.
14      Q  Did Arlene Lear say anything to you about Jay
15  Cooper having an objection to Michael Kunz being
16  brought to central Asia as a manager?
17      A  No, ma'am.
18      Q  Did Arlene Lear tell you that Jay Cooper had
19  reported to her that Michael Kunz had been verbally
20  abusive to him in connection with a discussion of a
21  work plan for Turkmenistan?
22      A  No, ma'am.

0032

1     Q   Did Arlene Lear ask your permission to assign
2   Michael Kunz to the position in central Asia that she
3   decided to assign?
4     A   No, ma'am.
5     Q   There was no requirement that she ask your
6   permission, is that correct?
7     A   That's correct.
8     Q   Where had Michael Kunz been working before
9   this assignment was given?
10     A   In Uzbekistan.
11     Q   So there was no need to get your approval of
12   his leaving that position in Uzbekistan?
13     A   I'm not sure exactly what procedure she used
14   to fill that position.  I know she was looking to make
15   change, and she made the decision to bring Michael
16   over.
17     Q   Was the retreat that you reference in
18   Counterpart's offices in Washington, D.C.?
19     A   I'm not sure whether it was in the office or
20   at a hotel.
21     Q   Do you know Jay Cooper?
22     A   I met Jay Cooper at least three times.

0033

1    Q   On what occasions have you met him?

2    A   I think two visits to Washington and one

3  visit I made to Almaty.  He made two trips to the U.S.

4  during the time he was still employed with Counterpart,

5  and then I made a trip to Almaty, and various e-mails,

6  phone calls, that sort of thing.

7    Q   Was one of the times you met him during the

8  period in which this retreat was held?

9    A   Yes, ma'am.

10    Q   Did you have a discussion with him at that

11  time?

12    A   No, ma'am.  My knowledge of the results came

13  from what Arlene told me.

14    Q   Did you say to Jay Cooper at the time he was

15  in Washington for the retreat that you had determined

16  that there was a power play in central Asia about to

17  happen?

18    A   I had no idea of a power play.

19    Q   Did you say that to Jay Cooper?

20    A   No, ma'am.

21    Q   What does a power play mean to you?

22    A   It means moving someone with an unfair

0034

1   advantage or without discussion in this context.
2      Q   Did you have any discussion with Jay Cooper
3   about moving Michael Kunz to central Asia?
4      A   No, ma'am.
5      Q   Did you ever see any notes or memoranda
6   prepared after the retreat you've discussed?
7      A   I don't recall.  I may have seen some sort of
8   write-up by Barbara Sloan.
9      Q   Do you think you did or do you think you
10  didn't?
11     A   I think I didn't.
12     Q   How do you know there was a write-up by
13  Barbara Sloan?
14     A   As the CFO, her purchase orders generally
15  require report.  And so in the context of making
16  payment, I'll make sure that she does produce some sort
17  of product before she gets paid.
18     Q   Now, tell me -- Go ahead.
19     A   So the issue is whether I read it or not.
20     Q   So if you received any report by Barbara
21  Sloan, it was in connection with paying her, not in any
22  other connection?

0035

1      A   Correct.
2      Q   All right.  Tell me what the relationship
3   between Barbara Sloan and Counterpart was in the summer
4   of 2004.
5      A   As a contractor.
6      Q   And what was her -- For what duties were her
7   services contracted?
8      A   Retreat facilitation.
9      Q   Was she an employee of any company at the
10  time?
11     A   I believe she had her own company.
12     Q   Did you ever know Barbara Sloan to be
13  associated with a company called Social Impact?
14     A   Yes, ma'am.
15     Q   Was it your understanding that she was
16  associated with that company at the time of the
17  retreat?
18     A   I believe she was.  There was some confusion
19  over that fact during that time period, and I'm not
20  sure exactly when she left Impact and when she went on
21  her own.
22     Q   Okay.  So after the retreat did you at some

0036

1  time learn that Michael Kunz had in fact been
2  dispatched to central Asia to serve in the civil
3  society projects?
4      A  I learned Michael Kunz was returning to
5  central Asia.
6      Q  In a different capacity than he had been when
7  he had been serving in Uzbekistan, is that correct?
8      A  For Michael Kunz, no, I was not aware that he
9  was returning with a different capacity.
10      Q  At some point in time did you learn that he
11  was returning in a different capacity?
12      A  At some point I did learn that he was
13  returning in a different capacity and moving to
14  Kazakhstan.
15      Q  When do you think that point of time was?
16      A  Sometime in the fall I imagine.
17      Q  Did you come to learn at some point in time
18  that he was to become Jay Cooper's supervisor?
19      A  Yes.
20      Q  And did you learn that from Arlene Lear?
21      A  Yes.
22      Q  And what did she tell you about that subject?

0037

 1      A   She told me they did everything they could,
 2   and this was the only alternative she had remaining.
 3      Q   They did everything they could for what?
 4      A   For Jay.
 5      Q   What did you understand that to mean?
 6      A   That they'd offered Jay different options,
 7   and Jay had refused, and that this was the last -- She
 8   was not excited about this, but this was an option that
 9   she was being forced into because Jay refused to
10   change.
11      Q   Did she tell you what options she had offered
12   to Jay?
13      A   No, ma'am.
14      Q   Did you ask?
15      A   No.
16      Q   Now, do you know a woman by the name of Kelli
17   Boyer?
18      A   Yes, ma'am.
19      Q   Did you hire her for Counterpart?
20      A   I participated in the hiring of Kelli Boyer.
21   Lelei was the ultimate decision maker on Kelli Boyer.
22      Q   And what was your participation in the hiring

0038

1  of Kelli Boyer?
2      A   Arlene and I and Lelei sat on a panel
3  together with Arthur Lovelace.
4      Q   By sat on a panel, do you mean that the panel
5  interviewed her?
6      A   Yes, ma'am.
7      Q   Reviewed her credentials presumably?
8      A   (Witness nods).
9      Q   Was it a unanimous decision of Arlene and you
10  and Lelei and Arthur Lovelace to hire Kelli Boyer?
11      A   At the end of the day, yes.
12      Q   Was there initially some --
13      A   Initially there was discussion.
14      Q   What was Kelli Boyer's background at the time
15  you interviewed her?
16      A   She had extensive HR experience for I believe
17  a firm called Mantech.
18      Q   What kind of a firm is Mantech?
19      A   It's a local supplier of personnel to I
20  believe the defense industry in this area.
21      Q   Did you check her references for Mantech?
22      A   Yes, ma'am.

0039

1    Q  Were they positive?

2    A  Yes, ma'am.

3    Q  What was her function at Mantech if you

4  remember?

5    A  HR manager, HR supervisor, something to that

6  ilk.

7    Q  Do you know whether or not she had any

8  experience while at Mantech running an investigation?

9    A  No, I do not.

10    Q  What was the position description for which

11  you were interviewing her at Counterpart?

12    A  HR manager.

13    Q  And what were the duties of an HR manager at

14  the time you interviewed her?

15    A  Basically the duties were to handle all

16  HR-related activities at Counterpart.  And if she

17  couldn't do it herself, to supervise those who could.

18    Q  Did she have subordinates as an HR manager?

19    A  We brought in temps from time to time.

20    Q  What was the reservation of some member or

21  members of your committee to her hire initially?

22        MS. ARIAIL:  Objection.  Mischaracterizes the

0040

1  testimony.
2      A  There was another applicant who had more
3  years of experience with a higher salary.
4      Q  So am I correct in concluding that some
5  members of the committee preferred the other applicant?
6          MS. ARIAIL:  Objection to form.
7      A  There was discussion.
8      Q  Was there any inquiry into whether or not
9  Kelli Boyer had the skills in which to investigate an
10  employment situation?
11     A  No, ma'am.
12     Q  How did Kelli Boyer work out at Counterpart?
13     A  Kelli Boyer resigned.  She was there I
14  believe two years, maybe a little more, and she was an
15  excellent employee working with people and with HR
16  issues, and we had some issues on the paperwork side of
17  her job.
18     Q  What issues were those?
19     A  Getting filing done, getting forms filled
20  out, that sort of thing.
21     Q  Was she asked to resign?
22     A  No, ma'am.

0041

1    Q  Is it fair to say that the management of
2  Counterpart was glad when she resigned?
3        MS. ARIAIL:  Objection to form.
4    A  No.
5    Q  If someone said that, they'd be lying, right?
6        MS. ARIAIL:  Objection to form.  You can
7  answer.
8    A  It's like any other employee.  Some people
9  would say they were happy, and some people would say
10  otherwise.
11    Q  What was your reaction when she resigned?
12    A  Good luck.
13    Q  Who prepared Kelli Boyer's work evaluations?
14    A  I did.
15    Q  Did you do that twice in the period she was
16  there?
17    A  I believe so, yes.
18    Q  Were her work evaluations positive?
19    A  For the most part.
20    Q  Did you in your work evaluations comment on
21  the work she had done in connection with Jay Cooper's
22  termination?

0042

 1    A  No, ma'am.
 2    Q  Is there any reason for that?
 3    A  No, ma'am.
 4    Q  How many times was Kelli Boyer during the two
 5  years she was there involved in a situation where a
 6  senior employee was terminated?
 7    A  Once I think.  Once.
 8    Q  Did you say once?
 9       MS. ARIAIL:  Yes, twice.
10  BY MS. DOUGLASS:
11    Q  Oh, I thought you said months.  I'm sorry.  I
12  misheard you.  And that's in the case of Jay Cooper?
13    A  You meant other than Jay Cooper or Jay
14  Cooper.
15    Q  I meant in all.  That's why we're clarifying
16  it.  You mean once other than Jay Cooper?
17    A  Yes, ma'am.
18    Q  Okay.  And whose termination was that?
19    A  Brian Propp.
20    Q  Did you comment on her performance in
21  connection with Brian Propp's termination --
22    A  No, ma'am.

0043

1      MS. ARIAIL:  Let her finish.
2    A   Go ahead.
3    Q   -- in your performance evaluation?
4    A   No.
5    Q   Was there any particular reason why you left
6  out the two situations involving the termination from
7  your work evaluation?
8      A   No particular reason.  In each of these cases
9  Counterpart moved in accordance with advice of counsel.
10  Kelli acted as a conduit and many times she was there,
11  as I was there, discussing the advice of counsel.
12     Q   Well, in the case of Jay Cooper, Kelli was
13  bringing information to Counterpart based on which
14  Counterpart made a termination decision, is that
15  correct?
16     A   Kelli was sent to Uzbekistan to discuss with
17  local employees HR issues, with other American
18  employees HR issues, and she was not sent there
19  specifically for Jay Cooper.  This was a visit to
20  basically touch base on how Counterpart's policies and
21  HR procedures are working in that particular country.
22  So the fact that she came across Jay Cooper

0044

1  information, she was not sent there specifically as an
2  investigation as you call it.
3      Q  Okay.  But to ask my question again, she
4  actually was a conveyer of information that she thought
5  she had obtained in central Asia to management of
6  Counterpart in Washington, correct?
7      A  Yes, ma'am.  She came back with information.
8      Q  And that was the information on which you
9  based your termination decision, correct?
10     A  I would not say it was based on that.  I
11  would say that was a part of the decision.
12     Q  Can you spell out for me -- Let me ask a
13  preliminary question.
14         Were you involved in the decision to
15  terminate Jay Cooper?
16     A  No.  Arlene -- Define involved.
17     Q  Have any role in whatsoever.
18     A  Arlene made that decision in conjunction -- I
19  was in the room when Arlene and Lelei discussed it.
20  Was I involved?  No.  I didn't have any positive or
21  negative impact on the decision.
22     Q  Okay.  But you were in a room when Arlene and

0045

1   Lelei discussed whether or not to terminate Jay Cooper?

2       A   Sure.

3       Q   All right.  When was that discussion?

4       A   After Kelli's trip and before we notified

5   him.

6       Q   Okay.  What was said by Arlene during that

7   discussion?

8       A   I'm paraphrasing.  Basically we've tried

9   everything, and this is not working out, and based on

10  some of the information that Kelli brought back and

11  other information that Arlene had, she felt that this

12  situation could no longer be tolerated.

13      Q   Did she say what information she had other

14  than what Kelli brought back to which she was

15  referring?

16      A   There were a litany of events that took place

17  from the retreat to phone calls, and by phone calls I'm

18  referring to phone calls from the field to her, and I

19  don't know who those calls were from, but basically it

20  was Kelli, the retreat, and phone calls from third

21  parties from overseas, and I don't recall who.

22      Q   She never told you who was calling her from

0046

1   overseas that would have given her information?
2       A   She may have told me, but there were so many
3   things going on, I don't recall who at the time she was
4   talking to.  I assume it was someone in Almaty, but it
5   could have been Kyrgyzstan or Uzbekistan.
6       Q   Did she ever mention Michael Kunz giving her
7   any information that influenced her decision?
8       A   No, ma'am, not to me.
9       Q   Did she ever mention Bob Abma as someone who
10  gave her information that influenced her decision?
11      A   Bob Abma spoke to me, but I'm not sure he
12  spoke with Arlene.
13      Q   Bob Abma spoke to you when about what?
14      A   When I was in Almaty, Bob and I talked about
15  Jay.
16      Q   All right.  Let's start with when were you in
17  Almaty?
18      A   It was while Jay was still employed, so I
19  assume it was the summer before -- the spring before
20  the retreat.
21      Q   What was the purpose of your trip to Almaty?
22      A   Familiarization with central Asia programs.

0047

1    Q   And did you seek out Bob Abma for this
2 conversation?
3    A   No.  In the course of reviewing procedures
4 and internal controls, we would have discussions on the
5 general work atmosphere there in Almaty, and he
6 informed me that Jay was not a collaborative
7 supervisor.
8    Q   Did you ask him what he meant by that?
9    A   Yes.  Bob would not be invited to staff
10 meetings.  Bob would not -- Basically there was a
11 contentious relationship between the two.
12    Q   Did you discuss Bob's concerns with Jay?
13    A   Bob's concerns with Jay?  I did talk with
14 Jay, and Jay had a style of management that he was
15 using out there at the time whereby he thought that
16 sort of treatment was normal.
17    Q   What sort of treatment?
18    A   Not inviting important parts of your American
19 staff to staff meetings, and sitting in the office all
20 day and not relating to the staff.  Those are the two
21 things I remember.
22    Q   And this was from Bob Abma?

0048

1      A   Yes, ma'am.

2      Q   And when he spoke about inviting important

3   parts of your staff to staff meetings, he was referring

4   to himself?

5      A   Yes.

6      Q   Okay.  Did he say that other people were

7   excluded?

8      A   I don't recall.  I don't recall.

9      Q   Now, sitting in his office all day and not

10  relating to staff, that was also from Abma?

11     A   Yes, ma'am.

12     Q   Okay.  Did you talk with Jay about either of

13  those subjects?

14     A   Not about the sitting in the office all day

15  because when I was there, he didn't spend one minute in

16  his office.

17     Q   Did you ever see him in his office with his

18  door closed?

19     A   I would get there in the morning, and he

20  would be in the office with his door closed.  And as

21  soon as I got there, I would walk in.

22     Q   Into his office?

0049

1    A   Yes, ma'am.  I mean, I didn't think it was
2  unusual.  However, he did have his door closed, and
3  then we proceeded with our activities for the rest of
4  the day.
5      Q   And you didn't see his door closed
6  thereafter?
7      A   No, because I was with him.
8      Q   Now, did you talk to him about the first part
9  of Mr. Abma's complaint about not inviting staff people
10  to important meetings?
11     A   I don't remember discussing it with him
12  per se, no.
13     Q   Why not?
14     A   That's a good question.  I don't know why
15  not.  I don't recall at this time why.  I hadn't been
16  with Counterpart that long, and it could have been
17  because I wanted to get more information from Bob Abma.
18  I'm not sure at this time.
19     Q   Did you take steps to get more information
20  from Bob Abma?
21     A   No, because it was shortly thereafter that
22  Jay was in town in Washington, D.C., and I really had

0050

1  no -- The financial situation there seemed well in
2  hand, and so Jay was in town, and Arlene said that
3  there were other issues that she was taking care of,
4  and so I let the issue drop.
5      Q   Okay.  You said you hadn't been with
6  Counterpart that long.
7      A   About a year.
8      Q   Okay.  And you were at that point CFO?
9      A   Yes, ma'am.
10     Q   So am I correct that your role in visiting
11 Almaty was really one to oversee the financial aspects
12 of the business?
13     A   Yes, ma'am.
14     Q   Now, did you take steps to oversee the
15 financial aspects of the Almaty operation?
16     A   I kept the relationship with Bob Abma.  I
17 made sure that his job was to oversee all the financial
18 activities in central Asia.  He was the regional
19 financial person hired specifically for that.
20     Q   And did you take steps to satisfy yourself
21 that he was performing those functions --
22     A   Yes, ma'am.

0051

1    Q  Excuse me.  -- in accordance with the
2  regulation that we've had marked as Exhibit 41?
3    A  Yes, ma'am.
4    Q  What steps did you take?
5    A  We reviewed documentation.  We reviewed
6  financial statements.  We talked about procedures.  We
7  documented some procedures.  We did cash counts.
8  Reviewed bank reconciliations.  We reviewed the last
9  auditor's visit, the report.  That's all I recall.
10    Q  All right.  When you said the last auditor's
11  visit, what is that in reference to?
12    A  Often in overseas offices both AID and your
13  own commercial auditors will make visits to the post
14  and review the operations, your procedures, your books,
15  testing.  So in the case of Almaty we reviewed whatever
16  the last audit, the last visit, whomever it was, I
17  don't recall whether it was a commercial auditor
18  because we send commercial auditors and we have visits
19  from Kazak government auditors, AID auditors, KGB
20  auditors.
21    Q  KGB?
22    A  Yes, ma'am.

0052

1      Q   Okay.  Isn't the KGB an arm of the old Soviet
2  Union?
3      A   Yes, ma'am.  They don't call them KGB
4  anymore, but it's the same staff, and it's the same
5  purpose to check on the local population, and tax
6  auditors will turn issues over to the internal police.
7      Q   All right.  Do you remember whatever audit it
8  was that you were reviewing with Mr. Abma, how long it
9  had been before your visit that that audit had taken
10 place?
11     A   I don't recall.
12     Q   Do you remember what that audit had found?
13     A   No.
14     Q   Do you remember if that audit had found any
15 problems that you thought needed to be addressed?
16     A   No.
17     Q   No, you don't remember or no, it hadn't found
18 any?
19     A   No, I don't remember.
20     Q   Okay.  If there had been any problems, you
21 would have addressed them, would you have not?
22     A   That was the purpose of the trip.  Yes,

0053

1  ma'am.

2      Q   Okay.  Now, have you ever heard Arlene Lear

3  make any comment about Kelli Boyer?

4          MS. ARIAIL:  Objection.  Extremely broad.

5      A   I don't know how to react.  Comment?  Of

6  course.

7      Q   Okay.  Have you ever heard Arlene Lear

8  denigrate Kelli Boyer's competence?

9      A   There were issues which Arlene I'm sure would

10  denigrate anyone's competence, my own included.

11     Q   What do you remember Arlene saying about

12  Kelli Boyer's competence?

13     A   I don't remember specifically, but I know of

14  course she would with respect -- One issue I can think

15  of was on recruiting, that Kelli would not be active

16  enough in recruiting.  However, we had to remind Arlene

17  that recruiting was only as successful as the program

18  people would make it by bringing in the HR person early

19  on in a design or an implementation phase.  HR could

20  only be as successful as the information they had, and

21  so Kelli Boyer was not a mind reader.

22     Q   So if I understood what you just said

0054

1  correctly, you or some other persons tried to correct

2  Arlene's or modify Arlene's initial complaints about

3  Kelli Boyer on this subject?

4      A  We would add information to try to make her

5  understand that the issue with recruiting was not all

6  Kelli Boyer's fault.

7      Q  What about other functions that Kelli Boyer

8  fulfilled, did you ever hear Arlene be critical of her

9  in those functions?

10     A  No, ma'am.

11     Q  Was Kelli Boyer assigned the task of updating

12  Counterpart's manual for employees?

13     A  Yes, ma'am.

14     Q  Did she do that in a timely fashion?

15     A  What's timely?

16     Q  In your view did she do it in a timely

17  fashion?

18     A  Miss Boyer was not given a deadline on the

19  manual, and there were many exchanges with counsel on

20  the manual which made the process drag out.

21     Q  You personally as her supervisor were not

22  critical of her handling of the updating of the manual,

0055

1  is that correct?
2      A  I may have been critical.
3      Q  Were you critical?
4      A  To her.
5      Q  In your performance review?
6      A  I don't recall if I put it in the performance
7  review.
8      Q  Did you ever hear Arlene Lear express a
9  critical comment about Kelli's handling of the
10  performance review -- sorry -- the employee manual
11  update?
12      A  I don't recall.
13      Q  Did you ever hear anyone say at Counterpart
14  that Kelli Boyer could not be fired because it would be
15  difficult to fire a black woman?
16      A  No, ma'am.
17      Q  Did you ever hear any sentiment expressed
18  along those lines at all?
19      A  No, ma'am.
20      Q  Was ever anyone at Counterpart to your
21  knowledge in favor of firing Kelli Boyer?
22      A  Kelli Boyer would enforce the dress code.

0056

1  Many of the young females did not like Kelli Boyer
2  because of this.
3      Q   And they complained to you?
4      A   The complaints -- Counterpart has a procedure
5  whereby the junior employees are given an hour to two
6  hours once a week to meet to do training and to
7  exchange ideas on how to be more efficient and to talk
8  about how their organization can improve, and this
9  issue came out of one of it's called the PMT, program
10  management team, came out of the reports.  However, I
11  would also see young females leaving on the elevator
12  very upset when Kelli would tell them to go home and
13  change their shirt.
14      Q   What is the Counterpart dress code that was
15  at issue?
16      A   Exposed midriffs.
17      Q   All right.  Aside from the objections to her
18  from the PMT meetings and its members of the PMT, did
19  you ever hear anyone else express the view that Kelli
20  Boyer should be fired?
21      A   No.
22      Q   Do you know a David Cohen?

0057

1    A   Yes.
2    Q   Did you ever hear him express any views at
3  all about Kelli Boyer?
4    A   No.
5    Q   At some point Kelli Boyer I believe it was in
6  the end of 2005 changed her supervisor from Arthur
7  Lovelace to you, is that correct?
8    A   Yes.
9    Q   And what was the reason for that change?
10    A   Arthur was not able -- Arthur could not
11  implement the changes that we had agreed upon to
12  improve Kelli's performance and the handling of
13  paperwork and the files, that sort of thing.  So I said
14  okay, Kelli will report directly to me.
15    Q   Why could he not implement them?
16    A   He had tried.  He and Kelli didn't always see
17  eye to eye on how to do things.  We had gone through
18  one year and was unsuccessful, and so rather than go
19  through three years, I said let's make a change.
20    Q   So you volunteered to be the supervisor?
21    A   So I volunteered.
22    Q   And you were at that point still the CFO,

0058

1  correct?
2      A  I'm not sure because I don't remember dates.
3  If it was after January of '05, I would have been the
4  COO.
5      Q  Now, Kelli Boyer testified that she spoke
6  frankly, she spoke up frankly, and that that event
7  caused a change in her supervisor and a change in her
8  responsibilities.  Can you explain that to me?
9      A  Some people don't like to hear frank
10  comments, and Arthur Lovelace evidently -- not
11  evidently -- Arthur Lovelace and she had a
12  communication issue.
13      Q  Do you know what frank comment she made to
14  Arthur Lovelace?
15      A  I don't recall.
16      Q  Did you know at one point in time?
17      A  Yes.
18      Q  Did Arthur Lovelace ever complete a
19  performance evaluation of Kelli Boyer?
20      A  I would write them.  He would edit.
21      Q  Is this even in the first year of her
22  employment?

0059

1    A   I don't recall if I wrote and he edited or he

2   wrote and I edited.

3    Q   Did you ever hear Arthur Lovelace express the

4   view that Kelli Boyer should be fired?

5    A   No.

6       MS. ARIAIL:  Would this be a good time to

7   take a break?

8       MS. DOUGLASS:  That's fine.

9       (Recess)

10  BY MS. DOUGLASS:

11    Q   Did Miss Boyer's job description change after

12   the time you became her supervisor as opposed to Mr.

13  Lovelace?

14    A   No, ma'am.

15    Q   Did she lose any duties that she previously

16  had had?

17    A   No.

18    Q   All right.  Is there a person at Counterpart

19  by the name of Thoric Cederstrom?

20    A   Yes, ma'am.

21    Q   Did you ever hear him express any views about

22  whether Kelli Boyer should be fired?

0060

1    A  No, ma'am.
2    Q  Was there any discussion of whether Kelli
3  Boyer should be fired at the vice-presidential level of
4  which you're aware?
5    A  I don't remember on that one.
6    Q  My question was not terribly clear.  What I
7  really meant was at a formal meeting at the
8  vice-presidential level.
9    A  Be fired?  No.  I never heard anything from a
10  vice-president at a formal meeting that Kelli should be
11  fired.
12    Q  Did you ever hear anything from a
13  vice-president at a formal meeting that Kelli Boyer
14  should be eased out of employment with Counterpart?
15    A  No.
16    Q  There are vice-presidential retreats that in
17  recent years have been held about four times a year, is
18  that correct?
19    A  There are vice-presidential retreats always
20  in May for budget purposes and then as needed.
21    Q  Has Kelli Boyer's situation ever come up at a
22  vice-presidential retreat?

0061

1    A  Not that I recall.

2    Q  Has Jay Cooper's situation ever come up at a
3  vice-presidential retreat?

4    A  Not that I recall.

5    Q  Are minutes kept of the events that occur at
6  vice-presidential retreats?

7    A  Summaries.

8    Q  Are those summaries kept by Barbara Sloan or
9  some person in her capacity?

10    A  They are produced by Barbara Sloan.

11    Q  Is there a separate vice-presidential retreat
12  having to do with budget purposes as opposed to the
13  vice-presidential retreat having to do with goals in
14  programs?

15    A  Up until '06 they were together.  Barbara
16  Sloan was the facilitator.  In '06 we stepped out on
17  our own without a facilitation.

18    Q  Does Barbara Sloan still provide services to
19  Counterpart?

20    A  Not at the moment.

21    Q  Was there some dissatisfaction with her
22  services?

0062

1     A   No.
2     Q   Was there some decision that she wasn't
3   necessary?
4     A   Consultants are expensive.  It was strictly
5   financial.
6     Q   Now, let's go back to Kelli's trip to central
7   Asia in the fall of '04.  Okay.  I believe you said
8   that -- Well, who decided to send Kelli Boyer to
9   central Asia?
10    A   Who decided?  That would have been me.
11    Q   Okay.  And why did you decide to send her?
12    A   As I stated earlier, we sent Kelli to
13   numerous countries to check on HR practices and
14   employee morale and to get Kelli oriented as to what
15   Counterpart did and their HR needs.
16    Q   She hadn't been to very many countries, had
17   she?
18    A   No.  She may have been out once previously.
19    Q   Was that to Senegal?
20    A   I know she went to Senegal.  I don't remember
21   if it was before or after.
22    Q   On the trip where she went to Senegal, was

0063

1  there a manager or an assistant manager whose conduct
2  was under scrutiny?
3      A   There was a local employee whose conduct was
4  under scrutiny.
5      Q   What was the concern about the local
6  employee?
7      A   When she went, it was performance based.  And
8  in the course of her trip there, she and Arthur
9  Lovelace determined that he was improperly using
10  assets.
11      Q   And he was terminated, correct?
12      A   Yes, ma'am.
13      Q   What was his name?
14      A   I don't remember.
15      Q   He was a Senegalese native?
16      A   Yes, ma'am.
17      Q   How did Kelli determine that he was
18  improperly using assets?
19      A   She and Arthur Lovelace talked to employees
20  there who had knowledge, and then they would review
21  vehicle logs and that sort of thing, usage.  They
22  reviewed documentation to substantiate the claim.

0064

1    Q   Does it violent Counterpart policy to use
2   Counterpart vehicles for personal use?
3    A   It is not Counterpart's policy to use
4   vehicles for personal use.
5    Q   If you discover that that has occurred, is it
6   Counterpart's policy to investigate it and take
7   appropriate disciplinary action?
8    A   It is Counterpart's policy to determine what
9   the situation is, and if the situation is just a bill
10   that was not issued or was not reported, we will ask
11   for a bill to be issued for mileage to be reimbursed.
12    Q   Do you know whether or not that kind of
13   inquiry was ever made in the case of Michael Kunz?
14    A   No, ma'am.
15    Q   Do you know that it wasn't made?
16    A   I have -- I don't remember.  I don't know if
17   it was made or not.
18    Q   Okay.  All right.  Now, you made the decision
19   to send her.  Did you consult anyone in making that
20   decision?
21    A   Yes, ma'am.
22    Q   Who?

0065

1    A  Arlene because it was her program that would
2  have funded the trip.
3    Q  Did she tell you she wanted Kelli to look
4  into any other matter besides the HR issues you've
5  described?
6    A  Did she -- Repeat the question.
7    Q  Did Arlene Lear tell you that she wanted
8  Kelli to look into other matters other than the HR
9  procedures that you were sending her to look into?
10    A  Yes.
11    Q  What did Arlene say?
12    A  She stated that there was an issue with Bob,
13  and that if in the course of her interviews if she got
14  any information, to let us know.
15    Q  And the issues with Bob you referenced --
16    A  I mean Jay.
17    Q  Okay.  Issues with Jay.  What did she say
18  about issues with Jay?
19    A  Jay's relationship with the staff and Michael
20  Kunz.
21    Q  What did she say about Jay's relationship
22  with the staff and Michael Kunz?

0066

1    A  That's as specific as I can get.

2    Q  You do not remember as I understand it that
3  she told you anything about the matters that we have
4  looked at in Exhibits 33 through 35?

5    A  No, ma'am.

6    Q  All right.  Did Arlene say anything about
7  wanting Kelli to look into the quality of Jay's
8  management performance?

9    A  No.

10    Q  When was the trip planned?

11    A  The trip would have been planned sometime
12  before she left, and I don't recall.  It was I believe
13  before the retreat and before he left Counterpart.
14  However, I can't say when it was planned.  It may have
15  been after the retreat.  I'm not sure.

16    Q  Do you know whether or not Jay Cooper was
17  informed of the purposes for Kelli's trip?

18    A  Jay Cooper would have had to know because an
19  American could not enter into Kazakhstan without
20  Counterpart issuing an invitation letter through a
21  government ministry.  So basically you have to -- To
22  get the Visa for Kelli to come, Counterpart would have

0067

1  had to request an invitation.
2     Q   Could that request have been done through Bob
3  Abma?
4     A   It could have been done through a local
5  employee.
6     Q   Do you know how it was done?
7     A   No.
8     Q   Okay.  You have no knowledge -- knowledge
9  rather than assumption -- that Jay Cooper was told
10  about the trip and its purposes?
11     A   I do not have knowledge that Jay Cooper
12  signed the letter that went to the ministry that
13  requested the visa for Kelli Boyer to come to
14  Kazakhstan.
15     Q   How long was the trip supposed to be in the
16  original plan?
17     A   The number of days I do not know.
18     Q   When did you first hear anything from Kelli?
19        MS. ARIAIL:  Objection.  Overbroad.
20        MS. DOUGLASS:  You're right.
21  BY MS. DOUGLASS:
22     Q   Did Kelli at some point report back to you

0068

1  during her trip?

2      A   Yes.

3      Q   And when was that vis-a-vis the beginning of

4  the trip, the middle of the trip, the end of the trip?

5      A   I would say about two-thirds through the

6  course of the trip.

7      Q   All right.  What did she say?

8      A   It's an unusual situation, and this is

9  paraphrasing.  I do not remember her exact words, but

10  it is an unusual situation here.  Jay informed me that

11  he's going to do exactly what's in his job description

12  and nothing more.  And that's as much detail as I can

13  remember, but this business about Jay refusing to do

14  only -- to work only from 9:00 to 5:00 and do only

15  what's in his job description, that was a Kelli Boyer

16  quote.

17      Q   Okay.  Now, at this point you are not Kelli

18  Boyer's supervisor, correct?

19      A   No, ma'am.

20      Q   Lovelace is.  Does she report this to

21  Lovelace and you or just to you?

22      A   I don't know if Arthur was in the room on a

0069

1  conference call.  I don't know if he's the one who told
2  me.  I know I got the information.
3      Q   When you got the information, did you give
4  Kelli any instructions?
5      A   No.  Continue.
6      Q   Continue with what you went to do?
7      A   Yes.  Continue with what we sent you out
8  there to do.
9      Q   All right.  Did there come a point in time
10  when you heard again from Kelli?
11      A   There was a decision point on whether she
12  should stay some extra days in order to talk with Jay
13  or discuss her findings with Jay, and she tried to set
14  up a meeting with Jay, and as I understand it she never
15  did or for some reason they didn't meet.  Jay refused
16  to meet with her, did not return to Almaty from
17  Kyrgyzstan, I'm not sure what the situation exactly
18  was, but there was a situation where Kelli wanted to
19  out-brief or discuss what she had found with Jay, and
20  Jay did not come to the meeting.  That's all I
21  remember.
22      Q   And your source for this was Kelli?

0070

1    A   Yes, ma'am.
2    Q   Did you attempt to verify that by contacting
3  Jay?
4    A   No.  I left that to Arlene.
5    Q   Do you know whether Arlene attempted to
6  verify that by contacting Jay?
7    A   I do not know.
8    Q   Do you think it would have been important for
9  someone to verify it by contacting Jay?
10    A   Could have been.
11    Q   Would it be usual in counterpart's conduct of
12  its business to contact an employee who has been
13  accused of certain conduct to find out their point of
14  view on it?
15    A   Absolutely.
16    Q   How often did you speak to her during the
17  trip?
18    A   I don't remember.  I can remember one time.
19    Q   Is that the time that she said what you first
20  testified to?
21    A   I don't know if that was a conference call
22  with Arthur.  I don't know if it was via Arthur.  There

0071

1  was communication at one point during the trip that I
2  remember.
3      Q   Okay.  Did you have discussions with Arlene
4  Lear during the period that Kelli was in central Asia?
5      A   No.
6      Q   When did you first discuss what Kelli was
7  finding in central Asia with Arlene Lear?
8      A   Upon her return.
9      Q   Were you asked to give permission for Kelli
10  to stay longer than the trip had been originally
11  planned for?
12      A   Yes.
13      Q   Did you give permission for her to move from
14  Kazakhstan to Kyrgyzstan?
15      A   Yes.
16      Q   And was this at Kelli's request or Arlene
17  Lear's request?
18      A   I don't recall.
19      Q   Do you remember what was given as the reason
20  why Kelli should stay longer?
21      A   To meet with Jay.
22      Q   Do you remember what was given as a reason

0072

 1   why Kelli should move from Kazakhstan to Kyrgyzstan?
 2       A   No.
 3       Q   Now, at some point Kelli returns from central
 4   Asia, correct?
 5       A   Yes, ma'am.
 6       Q   Did she report to you anything about what she
 7   found?
 8       A   She reported to myself, Arthur, and Arlene,
 9   and I don't recall if Lelei was there or not.
10       Q   In one meeting?  I'm sorry.  What I meant to
11   ask was did she report to the three of you together on
12   the same time and place?
13       A   I don't know if Lelei was there.  I know
14   Arlene was there.
15       Q   Was Arthur there at the time Kelli reported?
16       A   I'm not sure.
17       Q   Okay.  So there was an occasion when Kelli
18   came to report, and you were there and Arlene was there
19   and maybe Lelei and Arthur, correct?
20       A   Correct.
21       Q   All right.  Tell me what Kelli said.
22       A   All right.  Kelli said -- I'm paraphrasing.

0073

1  Kelli said the situation there was such that Jay would
2  only do the bare minimum of work because of his
3  relationship with Arlene and Michael Kunz, and that Jay
4  refused to meet with her.  That the way she was treated
5  while she was there was antagonistic.  Jay was
6  antagonistic and refused to meet with her, and the
7  other staff had substantiated that in many ways he was
8  antagonistic towards them.  And then she went on to say
9  she had talked to Abma and numerous local employees and
10  substantiated these findings.
11      Q  Anything else?
12      A  No.
13      Q  Did she say anything about Jay reporting that
14  he wanted to leave the employ of Counterpart?
15      A  No.
16      Q  Did anybody suggest that either you or Arlene
17  Lear or anyone else should call Jay and find out Jay's
18  point of view on these events?
19      A  No.
20      Q  Why didn't you suggest it?
21      A  Arlene calls the field at least twice a week.
22  I am certain that she talked to Jay and Michael twice a

0074

 1  week.  Even today Arlene spends a lot of time on the
 2  phone with the overseas staff.  So it was assumed that
 3  Arlene was in communications with Jay and Michael.
 4      Q   Do you have any knowledge that Arlene in fact
 5  talked to Jay at any time after the retreat until the
 6  day he was fired?
 7      A   I don't have knowledge of it.
 8      Q   But you assume it must have happened?
 9      A   I know that there were phone calls that we
10  paid for to Almaty from Arlene's phone.
11      Q   How many?
12      A   At least two per week, often more.
13      Q   Do you know if she spoke to anyone besides
14  Michael Kunz?
15      A   I don't know.
16      Q   If you had learned that Arlene in fact had
17  not spoken to Jay Cooper since the retreat, would that
18  have given you pause in connection with his
19  termination?
20      A   No.
21      Q   And why is that?
22      A   Based on the course of events, all the

0075

1  information that we learned about Jay's attitude and
2  the opportunities Jay had been given for changing his
3  situation in Almaty, I felt as if he had been treated
4  fairly.
5      Q   Now, the information you had about his
6  attitude came from Kelli Lear and Bob Abma, correct?
7      A   Kelli, Arlene, Abma, correct, because all my
8  knowledge from the retreat came from Arlene.
9      Q   And what did Arlene tell you about Jay's
10 attitude as a result of the retreat?
11     A   Jay was reluctant to accept Michael Kunz.  He
12 was reluctant to change his situation in Counterpart.
13 That she had offered numerous, numerous alternatives to
14 the situation there, and Jay would only accept Almaty
15 under his terms.
16     Q   All right.  Did you inquire or did she tell
17 you any reasons why Jay was reluctant to accept Michael
18 Kunz?
19     A   No.
20     Q   Why didn't you inquire?
21     A   I thought that Jay wanted to maintain control
22 of the programs in which he had been implementing for

0076

1  numerous years, and I thought that it was an ego issue,
2  that Arlene was making a change, and Jay was reluctant
3  to accept.
4      Q   And where did you get the impression that it
5  was an ego issue?
6      A   By the fact that he had been in charge of the
7  program for numerous years, and now Arlene was putting
8  someone in on top of him, but he had been given months
9  of warning, months of discussion.
10     Q   When had he been given months of discussion?
11     A   The entire period -- As I understand the
12  purpose or one of the purposes of the retreat was to
13  discuss this very issue, and Jay refused to accept even
14  doing a facilitated retreat.
15     Q   Who told you that he refused to accept?
16     A   Arlene.
17     Q   And so you based your decision to agree with
18  his termination on that representation?
19     A   Yes, ma'am.
20         MS. ARIAIL:  Objection.  Mischaracterization
21  of the testimony.
22  BY MS. DOUGLASS:

0077

1    Q   You relied on Arlene to have reported that
2  retreat accurately, correct?
3    A   Yes.
4    Q   Now, you said that he had been offered
5  various not possibilities but options to change his
6  situation.  I'm not using the word you used.  What word
7  was it you used?
8    A   Alternatives.
9    Q   Alternatives.  What alternatives had he been
10  offered?
11    A   It seems to me Arlene had talked about
12  possibilities in other countries, proposals that we
13  were writing at the time, and Jay expressed that he was
14  not interested in leaving Almaty for personal reasons.
15    Q   All right.  What's your source for that
16  information?
17    A   Arlene.
18    Q   Do you have any other source?
19    A   No, ma'am, not on that issue.
20    Q   Not on that issue.  Okay.  Is it your
21  understanding that these other possibilities were
22  offered to him during the retreat or at some previous

0078

 1  time?
 2      A  I was not told when they were offered.  I
 3  know they were communicated to Jay, and the
 4  relationship with the staff and working with Michael
 5  was discussed at the retreat.
 6      Q  Did you ever discuss Jay's situation with
 7  anyone at USAID before he was terminated?
 8      A  No.
 9      Q  Did anyone think it might have been useful to
10  find out how your client viewed his management?
11      A  Based on the events at the time, no one
12  thought that.
13      Q  Have you subsequently spoken to anyone at
14  USAID about the termination of Jay Cooper?
15      A  No.
16      Q  Have you ever heard that anyone from USAID
17  has made any comments to anyone at Counterpart on that
18  subject?
19      A  Repeat the question.
20      Q  Have you ever heard that anyone at USAID has
21  made any comments to anyone at Counterpart on the
22  subject of Jay's termination?

0079

1     A   Arlene mentioned to me that someone may have
2   made a comment to her.  I'm not sure.
3     Q   And what did Arlene tell you?
4     A   That someone from -- That Jay had informed
5   someone of how he was treated by Counterpart I suppose
6   in an effort to gain sympathy, and she had been
7   confronted by that person, and I don't know who that
8   person was.
9     Q   Did Arlene draw the conclusion that Jay had
10  been trying to generate sympathy?
11    A   Yes.
12    Q   That wasn't your conclusion?
13    A   I agreed with her, that if a person -- Jay
14  treated the situation as though he had been fired
15  unjustly, and he was trying to garner sympathy and ill
16  will towards Counterpart.
17    Q   And your knowledge on which that opinion is
18  based is simply based on a comment by Arlene Lear,
19  correct?
20    A   Yes, ma'am.  I have no direct knowledge of
21  that.
22    Q   Okay.  Have you ever seen any performance

0080

1  evaluation prepared of Jay Cooper's performance?

2      A  No.

3      Q  I'm going to show you what's been previously

4  marked Exhibit 9 in a previous deposition to see

5  whether that changes your testimony.  If it doesn't,

6  we'll move right on.

7      A  I still don't recall seeing this.

8      Q  Did you --

9      A  It's not dated.

10      Q  Yes, I know.  There's been testimony about

11  this.  Was there any discussion of Jay's performance in

12  the past for Counterpart at the time it was discussed

13  whether or not he should be terminated?

14      A  Arlene wrestled with this for months.  Arlene

15  discussed it with myself and Lelei and Jay.  So the

16  answer is yes, there was discussion.

17      Q  Okay.  I think we're not communicating for

18  once here.  My question is was there discussion among

19  the people who decided to terminate Jay about his

20  performance evaluations in the past?

21      A  Not his performance evaluations.  His

22  performance.

0081

1    Q   And what was said about Jay's performance
2   other than what Kelli has reported and what Arlene has
3   reported that you've previously testified to?
4    A   Arlene would inform us of her perception of
5   his performance, and we would concur or not.
6    Q   And when did that happen?
7    A   At numerous points during this two or three
8   months before the retreat and, of course, after.
9    Q   Did you ever think to look in the personnel
10  records of Counterpart to see what Arlene had actually
11  written about Jay's performance?
12   A   No.
13   Q   Would you look at what's been previously
14  marked as Plaintiff's Exhibit 9 in another deposition,
15  and tell me if you agree that it's a highly favorable
16  performance evaluation?
17   A   The evaluation, no one signed it.  It's not
18  complete.  I don't know if this was ever actually
19  issued.  On the surface it's favorable.  However, I do
20  not know that this was ever communicated to Jay.  Jay
21  has not signed it.  Jay's comments are not here.
22   Q   Would you say it's highly favorable?

0082

1    A  If it was issued, yes.

2    Q  Who participated in the decision to fire Jay?

3      MS. ARIAIL:  Objection.  Asked and answered.

4  You can answer again.

5  BY MS. DOUGLASS:

6    Q  Well, we've talked about who was present at a

7  meeting, but I want to focus on the decision.  Who made

8  the decision to fire Jay?

9    A  Arlene in conjunction with Lelei, and I

10  was -- Those two made the decision.  I was still CFO,

11  so they didn't -- I mean, they had taken Kelli's

12  information and their own and Arlene in conjunction

13  with Lelei.

14    Q  And as far as you know Arthur Lovelace did

15  not play a role?

16    A  Not in the decision.

17    Q  Okay.  That's what I was focusing on.  All

18  right.  Do you know whether Lelei ever reviewed what's

19  been shown to you as Plaintiff's Exhibit 9 from another

20  deposition?

21    A  I don't know.

22    Q  You were present at discussions with Lelei

0083

1  concerning Jay's termination, were you not?
2      A   Yes.
3      Q   Did you ever hear Jay's previous performance
4  evaluations discussed?
5      A   No.  Arlene did discuss the number of years
6  she had successfully worked with Jay and her
7  disappointment in the course of events.
8      Q   Had you reviewed the course of Jay's career
9  at Counterpart at any point in time?
10     A   No.  He had been there for many years.  I
11  assumed they were successful.  I did not go to the file
12  and review his personnel file.
13     Q   Do you know whether Mr. LeLalu did?
14     A   I do not know whether LeLalu nor Lovelace
15  reviewed his file.
16     Q   At any point was the Board of Directors of
17  Counterpart informed that Jay Cooper had been fired?
18     A   The Board of Directors was to my knowledge
19  not informed officially.  Separate members could have
20  gotten knowledge of this either through Arlene or from
21  Jay.  I do not know.  It was not on the official agenda
22  at a board meeting.

0084

1    Q   Is that consistent with usual practice at
2  Counterpart?
3    A   The board does not normally get involved with
4  personnel issues in the program.  So yes.
5    Q   Okay.  Now, you were a participant in a
6  telephone call in which Jay was informed that he was
7  terminated, is that right?
8    A   Correct.
9    Q   All right.  And what was the reason for your
10  participation?
11    A   To explain to Jay his benefits and his offer
12  for severance.
13    Q   And you were still CFO at that point, right?
14    A   Yes, ma'am.
15    Q   I'd like to show you what's been marked at a
16  previous deposition as Plaintiff's Exhibit 15, and ask
17  you if you've seen that before?
18    A   We reviewed these.  I haven't seen this
19  particular -- Arlene and I did the phone call.  I
20  think, yes, it was just Arlene and I, and we reviewed
21  these issues.
22    Q   Is it possible that you saw what's been

0085

1  marked Plaintiff's Exhibit 15 without the handwritten

2  notations before the phone call?

3     A  I discussed the bullets.  I don't remember

4  reading -- You know, Arlene prepared this, and I don't

5  remember reading this, but I had discussed the issues,

6  the bullet issues here.

7     Q  All right.  Is there anything on page 1 of

8  Exhibit 15 up to and including the first bullet on page

9  2 that Arlene didn't say during the phone call with Jay

10  Cooper?  I'm referring to the typewritten sections of

11  the document.

12     A  I can't recall whether each of these bullets

13  were covered by Arlene during the course of the phone

14  call.

15     Q  Do you remember that Jay Cooper objected to

16  some of the facts that were stated by Arlene during the

17  phone call?

18     A  Yes.

19     Q  Do you remember what he said about that

20  subject?

21     A  Jay was taken aback by the phone call or he

22  reacted surprised.  I don't recall what he said in

0086

1   return to any of these bullet points.  It seems to me
2   he did say something to the effect that Arlene, we have
3   not talked about this before, and she would respond
4   that they had, but I don't remember as to which bullet
5   points that exchange took place.
6       Q   Do you remember that he objected to the
7   statement you refused to meet with Kelli on Monday
8   departing Bishkek in spite of the fact that you had
9   been asked to stay?
10      A   I remember he did say that he would have met
11   with her.  He had an excuse.  I don't recall what that
12   excuse was.
13      Q   Do you remember that he said that Kelli had
14   not asked him to meet with him on Monday?
15      A   I don't remember if it was Kelli had not
16   asked him or he said he would have met with her had she
17   asked him.  It was something to that -- It was
18   something to the effect that it was not his fault that
19   he did not meet with Kelli, that he would have met with
20   Kelli given the opportunity.
21      Q   Did he say anything about the claim that he
22   wouldn't meet with Michael?

0087

1    A   The Michael issue I don't recall.

2    Q   Okay.  Did he say anything about the

3 statement that he was staying until June 2006 applying

4 minimal effort?

5    A   This was talked about during the phone

6 conversation, and he denied.

7    Q   He denied saying it?

8    A   Yes, ma'am.

9    Q   As you were listening to the phone

10 conversation with Arlene Lear for which a script is

11 included in Plaintiff's Exhibit 15, did you think

12 perhaps it might be important to find out what the true

13 facts were?

14    A   From my chair we had sent Kelli Boyer, a

15 noninterested party, to confirm the true facts.  We had

16 had facilitated retreats.  We had separate meetings

17 with Jay Cooper to determine different courses of

18 action that could have been taken with Jay's career at

19 Counterpart.  And at this point I was operating under

20 the assumption that all the information we had was

21 factual and that it was Jay who was mistaken.

22    Q   And did you see no reason whatsoever to look

0088

1  into Jay's point of view on these various contested
2  matters?
3      A   Not after Kelli's trip.
4      Q   Did anybody besides Kelli ask the local staff
5  if they were afraid of Jay?
6      A   You may talk to Bob Abma on that.  I think he
7  will concur or he will substantiate that also.
8      Q   What about that local staff expressed
9  feelings of disempowerment, was there any source of
10  that aside from Kelli Boyer?
11      A   Michael and Bob.
12      Q   What had Michael Kunz communicated to you on
13  that subject?
14      A   He didn't communicate with me.  He
15  communicated with Arlene who communicated with me.
16      Q   What did Arlene say Michael had said on that
17  subject?
18      A   She just substantiated that Michael -- She
19  just confirmed that Michael had substantiated that
20  claim.  So Michael and Bob.  And Kelli spoke with local
21  employees.  So I felt as if that was substantiation.
22      Q   And how much time was Jay given during the

0089

1  phone conversation that's reflected in Exhibit 15 to
2  speak to the various matters raised there?
3      A  We would have stayed on the phone all night
4  if he wanted to speak to the specific issues.  Jay's
5  demeanor during the time of the phone call was denial,
6  and it was best -- I think we concluded it was best to
7  have a cooling off kind of period here and give Jay a
8  chance to rebut or I don't think there was ever a
9  chance for rebuttal.  Our decision was made, and the
10  point was to respond to the offer for the future.
11      Q  So there was no chance for Jay to change your
12  mind on the facts, is that correct?
13      A  He was given plenty of opportunity to discuss
14  during the phone conversation.  However, the extent of
15  the discussion was denial, not alternatives or any of
16  the opportunities that Arlene had offered him up to
17  that point.
18      Q  Well, at the time of the phone conversation
19  he wasn't in a position to call various of his
20  employees to rebut the statements about their attitudes
21  toward him, was he?
22      A  We made the phone call in the middle of the

0090

 1  night our time, so that would have been daytime over
 2  there.  So he would have had, if he so desired, the
 3  opportunity to bring in other employees had he wanted
 4  to.  It was 3:00 a.m. eastern time.
 5      Q   So your position is he could have gone around
 6  the office and said Hey, get on the phone and tell them
 7  that what Kelli Boyer says is not true, --
 8        MS. ARIAIL:  Objection.
 9      Q   -- and you would have listened to that, is
10  that what you mean?
11      A   I don't think it would have been appropriate.
12  He could have done that.
13      Q   And you would have listened to it?
14      A   I don't know.
15      Q   Now, it says on page 2 of Plaintiff's Exhibit
16  16 that Arlene was planning to say Harry, would you
17  please explain our legal obligation per Jay's contract.
18  Did Arlene say that?
19      A   Yes.
20      Q   And did you explain Counterpart's legal
21  obligations?
22      A   I explained that we were legally liable for

0091

1  his accrued annual leave.  We were responsible for
2  bringing he and his family back to his home of record.
3  And that we were responsible for reimbursing him for
4  all those items in the contract which he had incurred
5  costs and had not been reimbursed such as travel, rent,
6  that sort of thing.  That was what was meant by legal
7  obligations.  And then we made the offer for the
8  six-month period, and that was the extent of it.
9     Q   Did you tell Jay Cooper during the phone
10  conversation we've been discussing that Counterpart had
11  no legal obligation to pay him through the end of his
12  contract?
13     A   He was informed that his last day of work was
14  that day, and he could not be reimbursed for the
15  remainder of the contract, absolutely.
16     Q   And did you state the reasons for that?
17     A   Those reasons were given.  This litany of
18  reasons were definitely gone through.  Now, whether we
19  used these exact words, I don't recall, but we went
20  through the bullet points.
21     Q   All right.  And did you come to some legal
22  conclusion that the matters set out on the first page

0092

1  of Plaintiff's Exhibit 15 were sufficient to relieve
2  Counterpart of its obligations to pay out the rest of
3  his contract?
4      A   He was never given the impression that he had
5  the right to the rest of his contract.  Under the terms
6  of his agreement, he could be dismissed at any time,
7  and he signed that contract.  We gave him these
8  reasons, and there was not any discussion that he would
9  be paid through the remainder of the contract.  That
10  came back in writing from him later on.
11      Q   What came back in writing?
12      A   The desire to be paid for the remainder of
13  the contract.
14      Q   Right.  And so in your opinion Counterpart
15  has fulfilled its legal obligations to Jay Cooper in
16  its actions that it took in investigating and
17  determining that he should be fired?
18      A   Yes.
19      Q   In your view Counterpart took those steps in
20  good faith, is that right?
21      A   Yes.
22      Q   And it was obliged to take them in good

0093

1  faith, was it not?

2    A  Obliged to take -- What do you mean?

3    Q  Well, you apparently were in charge of
4  telling Jay what Counterpart's legal obligations were,
5  and I want to find out what your understanding is of
6  what their legal obligations were.

7      MS. ARIAIL:  Objection.  He's explained what
8  that meant in what he said already.

9    A  I thought I had explained it.

10    Q  From your perspective at the time you
11  explained the legal obligations to Jay Cooper, it was
12  your belief that Counterpart had the right to cancel
13  his contract?

14    A  Yes.

15    Q  And that they had taken all the necessary
16  steps to do that in good faith?

17    A  Yes.

18    Q  Let's go back for a minute to the -- Hold on.
19  Did Arlene say on the second page of Plaintiff's
20  Exhibit 15, it says we are prepared to honor the
21  agreement of August 24th.  Do you see that language?

22    A  The commitment I made to you on August 24th.

0094

1  We are prepared to honor the agreement of August 24th.
2  I thought that was the written agreement that we
3  offered him for his severance.
4      Q  My question is much simpler than that.  Do
5  you know what the agreement of August 24th was?
6      A  I know we prepared or counsel prepared an
7  agreement for August 24th.  I think that's what it's
8  referring to.
9      Q  Counsel prepared a document called agreement
10  and waiver, is that correct?
11     A  I think that's what it is.
12     Q  I'll show it to you.  I'll show you what's
13  been previously marked and this was a plaintiff's
14  exhibit in the deposition of Kelli Boyer, Exhibit
15  Number 5, and my question is have you seen this before?
16     A  No.
17     Q  All right.  You knew such a document had been
18  prepared by counsel, is that fair to say?
19     A  Wait a minute.  I need to get straight here
20  exactly what we're talking about, August 24th, and then
21  the dates on the exhibits because I'm confused on what
22  the August 24th --

0095

1          MS. DOUGLASS:  All right.  With your
2    counsel's permission I'll make a representation, which
3    she can correct if it's wrong, about what that refers
4    to.  Is that acceptable?
5          MS. ARIAIL:  Let's make it off the record
6    first.
7          MS. DOUGLASS:  Okay.
8          (Discussion off the record)
9          MS. DOUGLASS: I'm withdrawing the last
10   question, and I'm going to ask another one.
11   BY MS. DOUGLASS:
12       Q   Was it your understanding that an offer was
13   made to Jay Cooper during the phone call in which you
14   participated in which he was fired?
15          MS. ARIAIL:  Objection.  It's broad.
16       A   I did not know about the commitment.  I knew
17   about the agreement/waiver, Exhibit 5.
18       Q   All right.  Now, I believe you said you never
19   saw Exhibit 5 before.
20       A   I did.  I did see Exhibit 5.  I'm sorry.
21       Q   All right.  Fine.  Then you knew that an
22   offer was to be made or was made to Jay Cooper to pay

0096

1  him certain severance amounts in exchange for various
2  releases on his part, is that fair?
3      A   No.  He was offered an agreement, Exhibit 5,
4  and there was never any discussion about releasing
5  anything.
6      Q   All right.  Isn't it your understanding that
7  Exhibit 5 which is entitled Agreement and Waiver
8  contains a release of all liability from him to
9  Counterpart as a condition of receiving anything?  If
10  you'd look on the page that has 000081, paragraph 3,
11  the second page of the document.
12      A   Okay, but there was no discussion.
13      Q   There was no discussion during the phone call
14  of this?
15      A   No.
16      Q   All right.  Was there discussion over the
17  phone call we're going to send you a document for you
18  to consider?
19      A   I believe, yes.
20      Q   All right.  And is it your understanding that
21  what's been marked in another deposition as Boyer
22  Exhibit 5 is what was originally sent to him?

0097

1    A   Yes.
2    Q   Was it your understanding that Jay Cooper was
3  required to release Counterpart from all liability in
4  order to be reimbursed for expenses he had incurred on
5  Counterpart's behalf before his termination?
6    A   He would have been reimbursed for all
7  expenses that he incurred that he was entitled to be
8  reimbursed for, yes.
9    Q   Without releasing Counterpart from any
10  liability?
11    A   Of course.
12    Q   Does Counterpart have a policy of repaying
13  the business expenses of terminated employees?
14    A   Yes.
15    Q   Does it do that on a regular basis?
16    A   Yes.
17    Q   Okay.  There's some reference in, if you look
18  at Exhibit 5, to a consulting status.  It's the top of
19  the second page of the document.  Do you remember any
20  discussion about offering Jay Cooper a consulting
21  status?
22    A   Not during the phone call.

0098

1    Q   At any other time?

2    A   Arlene may have mentioned it to me.  I'm not

3  sure.

4    Q   But you never had a discussion with Jay

5  Cooper about it?

6    A   No.

7    Q   In your discussion which may or may not have

8  occurred with Arlene, do you remember anything about

9  whether or not Jay was expected to actually work for

10 Counterpart?

11   A   No.

12   Q   No, you don't remember it or no, there was no

13 such discussion?

14   A   No, there was no such discussion.

15   Q   I'd like to go back for a minute to the

16 question of employment reviews.  It's Counterpart's

17 policy, isn't it, to have an employee performance

18 review on an annual basis or more frequently?

19   A   Yes.

20   Q   All right.  And I'd like you to look at

21 what's been previously marked as Exhibit 7 to the

22 corporate deposition, and ask you if this is a copy of

0099

1   Counterpart's manual for its employees?
2        A   This is for overseas.
3        Q   And Jay Cooper was considered an overseas
4   employee, correct?
5        A   Yes, ma'am.
6        Q   Now, would you look on page 5, section 3.4.
7        A   Yes, ma'am.
8        Q   That sets forth the policy I've just stated
9   that there should be performance reviews annually or
10  more frequently?
11       A   Yes, ma'am.
12       Q   Who enforces that policy at Counterpart?
13       A   It was done through HR.
14       Q   What's the purpose of the policy?
15       A   To reinforce and to guarantee that
16  individuals get an annual review, and formalized
17  discussion with their supervisor on salary and
18  performance.
19       Q   Isn't one policy that's enforced by that
20  requirement that the employee be given fair notice of
21  any deficiencies that the supervisor observes in his or
22  her performance so that that employee has a chance to

0100

1   correct it?
2       A   I don't see that in the policy.  However,
3   fair is undefined.
4       Q   All right.  Well, the policy as stated in
5   Exhibit 7 on page 5 says performance review is intended
6   to provide open two-way communication of goals and work
7   results.  Do you agree with that?
8       A   Yes, ma'am.
9       Q   All right.  And if an employee had not
10  received open communication of work results, that
11  employee would not be well armed to attempt to change
12  those results, is that fair?
13          MS. ARIAIL:  Objection to form.
14      A   In the case of Cooper, I think the reason if
15  we go back to your prior questions that I did not look
16  back was there were numerous occasions that I had
17  knowledge of where his performance was discussed with
18  Jay, and the retreat and the evenings and the times
19  surrounding the retreat, I was informed that his
20  performance was discussed with him.
21      Q   So the only instance that you're aware of
22  when his performance was discussed with him was this

0101

1  retreat?
2      A   That I'm aware.
3      Q   All right.  So you think that whatever
4  discussion happened at the retreat obviated the need
5  for a formal performance review in order to fulfill the
6  policies behind section 3.4 of Counterpart's manual?
7      A   No.
8      Q   Do you think that an actual written
9  performance review should have been prepared for him on
10  an annual basis?
11      A   It should have been.
12      Q   Do you think that if you had known at the
13  time that you were participating in the decisions about
14  his termination that one had not been done for far
15  longer than a year, that that would have caused you
16  concern?
17      A   I don't want to surmise.  I don't know if it
18  would or wouldn't because I was the CFO at that point,
19  and that was not my function.
20      Q   Okay.  What about job descriptions, is it
21  Counterpart's policy that when a contract is entered
22  into with an employee, that a job description is

0102

1  attached to that contract?

2      A   Yes.

3      Q   And what's the reason for that policy?

4      A   It clarifies for both sides of the

5  transaction exactly what is expected.

6      Q   Do you think that that clarifies a later

7  determination of whether or not an employee has been

8  performing in a satisfactory manner?

9      A   No job description can cover every situation

10  by which a person is judged.  It can generally go over

11  what is required, but there are a lot of specifics that

12  can't be covered or are not covered in job descriptions

13  such as supervisory ability, ability to get along with

14  fellow employees, intangible things that are hard to be

15  objective in job descriptions or to have objective

16  measures that aren't necessarily covered in a job

17  description.  So the answer to your question is no, not

18  everything in the job description is there.

19      Q   But the performance review is designed to

20  cover those intangible things, is it not?

21      A   Yes.

22      Q   And the job description is to set out clearly

0103

1  the expectations of the employer, that is Counterpart,

2  as to what the goals of that person's employment are

3  designed to result in?

4      A   The deliverables, if there are deliverables,

5  and the specific areas of responsibility.  Yes, ma'am.

6      Q   If you had known that Jay Cooper, despite

7  repeated requests, had never received a job description

8  for his latest contract, would that have made you feel

9  that further inquiry was appropriate before he was

10  terminated?

11      A   No.

12      Q   And why not?

13      A   Because of the course of events that led up

14  to the termination, I felt justified in what we did.

15  Because of the information I was given, it seemed like

16  the due diligence was proper.

17      Q   Based on the information you were given?

18      A   Yes, ma'am.

19      Q   And you didn't think it was proper for you to

20  seek out additional information from Jay Cooper?

21      A   Not in that situation.

22      Q   All right.  It is Counterpart policy, is it

0104

1   not, that an employee should report to his or her
2   supervisor or other persons at the company any
3   questionable actions that an employee encounters?
4       A   Of course.
5       Q   And when an employee makes such a report,
6   it's Counterpart policy that the supervisor or other
7   person to whom that is reported should look into the
8   matter?
9       A   Yes.
10      Q   And it's also Counterpart practice that if
11  the employee is correct in reporting questionable
12  actions, that Counterpart will take steps to correct
13  the situation, is that right?
14      A   Correct.
15      Q   All right.  And those policies we just
16  described are set forth in the manual that's Exhibit 7
17  on page 15?
18      A   Exhibit 7 is our manual for employees in
19  foreign areas, and it does not to my knowledge give
20  those words as you've just laid them out.  This gives
21  our equal opportunity policy, number of hours per week
22  you're expected to work, your shipping.  This is more

0105

1  of a nuts and bolts kind of what you're entitled to.

2      Q   Would you look on page 15 please.

3      A   15.  Okay.  Policy relating to ethics.

4      Q   Would you read the third sentence in the

5  paragraph under 7.1, policy relating to ethics?

6      A   Any employee who has reason to question the

7  integrity of any transaction or to believe misconduct

8  and a prohibited act has occurred is obligated to

9  report it to the appropriate department supervisor.  I

10  stand corrected.

11      Q   And the VP for finance and administration,

12  correct?

13      A   That's me.

14      Q   That would be you.  And the language actually

15  says "or to believe misconduct and/or a prohibited act

16  has occurred," correct?

17      A   And/or?  Yes, correct.

18      MS. DOUGLASS:  Now I'd like to have marked

19  this as the next exhibit, I believe it will be 42.

20      (Deposition Exhibit 42 was marked for

21  identification and was attached to the transcript.)

22  BY MS. DOUGLASS:

0106

1    Q   Would you explain please what Exhibit 42 is?

2    A   Exhibit 42 is our annual audit report.  This

3  particular one was completed by Gelman, Rosenberg &

4  Freedman for the year ending September 30th, 2004.

5    Q   All right.  In other words, if I'm correct,

6  if you assume that Jay Cooper was terminated on

7  November 12th, 2004, this audit report covers most of

8  the last year of his employment, is that right?

9    A   Up till September 30th, 2004.

10    Q   Except for the last month and a half?

11    A   Last month and a half.

12    Q   All right.  Thank you.  Is Counterpart

13  considered an organization with one major function or

14  several major functions for purposes of Circular Number

15  A-122?

16    A   A-122, when you say functions --

17    Q   I'm looking on page 11 of regulation A-122.

18    A   Okay.  Our function I believe in that case is

19  development, but we do many activities in the course of

20  performing development.

21    Q   Well, isn't it important that under Circular

22  A-122 that a person under contract with USAID is

0107

 1   determined either to be a multi-function or a
 2   one-function entity?
 3      A   I'm uncertain as to what you're driving at
 4   because A-122 is cost standards.  We are an
 5   organization functioning under a cooperative agreement,
 6   and we adhere to the cost standards of A-122.  This
 7   audit, I'm not sure whether what multi-function or
 8   single function, I don't understand the question.
 9      Q   All right.  Isn't it true that it's important
10   whether or not a contractor with USAID is a
11   one-function or a multiple-function entity for purposes
12   of allocation of indirect costs?
13      A   Absolutely.
14      Q   All right.  So if you'd like to look, you can
15   see the regulation I'm referring to is on page 11.
16      A   Yes.  Okay.  I understand the question now.
17      Q   My question is which is Counterpart, a
18   multi-function or a --
19         MS. ARIAIL:  For the record I want to note
20   that the copy that the witness is looking at and that
21   I'm looking at, the page numbers are cut off.
22         MS. DOUGLASS:  I'm sorry.

0108

1    A   Page 11?
2    Q   Under Schedule A, Section D, Allocation of
3  Indirect Costs.
4    A   Okay.  This OMB circular is written for all
5  types of nonprofit institutions:  hospitals, colleges,
6  everything that the U.S. government funds.  When
7  they're speaking of multi in this situation, allocation
8  of indirect costs and determination of indirect cost
9  rates, where a nonprofit organization has only one
10  major function or where all of its major functions
11  benefit from its indirect costs to approximately the
12  same degree, the allocation of indirect costs and the
13  computation of an indirect cost may be accomplished
14  through simplified allocation procedures.
15      What they're getting at is an organization
16  much larger than Counterpart.  We're talking about a
17  university that has many different research activities
18  going on, and the university will identify the costs
19  specifically to the engineering department versus the
20  chemistry department.  That's what we're talking about
21  multi-function.
22      In Counterpart our functions are the programs

0109

1   themselves, and so the costs are maintained separately
2   by project.  And so in some ways this applies, but in
3   the larger fashion it does not apply because we charge
4   28 percent, our negotiated indirect cost rates, the
5   same across the board for all of our programs.  We
6   don't have a separate cost pool that we have different
7   rates.  So this portion of -- I mean, the fact is that
8   we don't charge a different rate for a project in
9   Almaty than we do for a project in Senegal.
10      Q   All right.  So you basically are relying on
11  simplified allocation procedures as set out in the
12  section we were just talking about?
13      A   Yes, ma'am.
14      Q   All right.  That's what I was asking.  Now,
15  if you'd look back on what you called the audit report
16  which is Plaintiff's Exhibit 42, on the page with the
17  Bates stamped number, by that I'm referring to these
18  little numbers that your counsel has put on down at the
19  right-hand corner.  Do you see what I mean by that?
20  They start out with CP.
21      A   Okay.
22      Q   When I say Bates stamp, that's what I mean.

0110

1  If you'd look at the one with the Bates stamp number
2  1412, would you read the paragraph under 6 which is
3  entitled Allocation of General and Administrative
4  Costs?
5      A  "A portion of total indirect costs is
6  allocated to specific grants based on the allowed
7  percentages included in the grant agreement.  Total
8  costs allocated for the years ended September 30, 2004
9  and 2003 were $4,151,894 and $2,830,662 respectively."
10     Q   All right.  Is that statement that you just
11  read which is a statement of your auditors a correct
12  statement?
13     A  Yes, ma'am.
14     Q  Counterpart does a number of different
15  programs, each one the subject of either an agreement
16  or a cooperative agreement with USAID or another
17  funding entity, right?
18     A  Yes, ma'am.
19     Q  Does each of those separate cooperative
20  agreements or contracts have an allowed percentage?
21     A  28 percent.
22     Q  So they're all the same?

0111

1    A  They're all the same.

2    Q  No matter what agency they're with?

3    A  The only caveat is that where we do a grant

4  pool, and there were a lot of activities in Kazakhstan

5  that had grant pools, in other words a $15 million

6  cooperative agreement could have $10 million grant pool

7  under which we would not draw NICRA.  So we would use

8  all that.  We would give grants to the local people.

9  So $10 million would go to sub grants, and the

10  remaining $5 million would go to salaries and travel

11  and all the things in the budget that you were told.

12    Q  All right.  I'm not sure that I need to know

13  that, but if I do, I may have to come back to that.

14    A  Okay.

15    Q  So the 28 percent you're talking about, is

16  that what's called a NICRA?

17    A  Yes, ma'am.

18    Q  And is NICRA a negotiated indirect cost rate

19  agreement?

20    A  Yes.

21    Q  And it's true, is it not, that Counterpart as

22  a company negotiates its NICRA on a periodic basis with

0112

1  USAID, and it submits various financial information on
2  which that rate is set?
3      A   Every year we send in these audit statements,
4  and Counterpart for competitive reasons freezes its
5  NICRA at 28 percent.  So we run the organization.  The
6  board sets the NICRA rates, and they discuss it every
7  year.  And so in order for me to get 28 cents out of a
8  program dollar, I have to spend a program dollar, and I
9  get 28 cents.  And I take those 28 cents, and I spend
10  it on overhead.
11         The board sets the 28 percent.  AID approves
12  the 28 percent because financially it's a situation
13  where they give you all the room you need to hang
14  yourself because if you have a higher NICRA, you won't
15  get any business.  If you have a lower NICRA, you won't
16  have enough to pay the lights and the accountant and
17  the lawyers.
18      Q   All right.  We're all in favor of paying the
19  lawyers.
20         Now, you said I take the 28 percent, and I
21  spend it on...  When you say I, you're talking about
22  yourself as the chief financial officer?

0113

1    A   Yes.  My staff.

2    Q   You and your staff?

3    A   My staff does the actual calculations.  So if
4  a program spends a dollar, if Jay Cooper spends a
5  dollar in Almaty, I after being told he spent that
6  dollar get 28 cents to pay for the lights, and that's
7  NICRA.  That's overhead.

8    Q   And those lights that you're paying for the
9  lights in the Counterpart headquarters office?

10    A   Yes, ma'am.

11    Q   Are they the lights in Jay's office in
12  Almaty?

13    A   No, ma'am.

14    Q   And that's true of all the various categories
15  of expenses?

16    A   Yes.

17    Q   In other words, the NICRA is simply used for
18  headquarters expenses?

19    A   Headquarters.

20    Q   And headquarters salaries?

21    A   Headquarters salaries, headquarters
22  utilities, headquarters rent, fax machines, xerox

0114

1   machines.  One of the biggest costs is senior exec.
2       Q   Okay.  Now, what's a NICRA budget?
3       A   Okay.  So you see the auditors have reported
4   in '04 and '03 respectively that we spent $4.1 million
5   and $2.8 million.  The budget is how we spent that
6   NICRA.  And what makes this difficult is that this
7   overhead is estimated and driven on what the program
8   spends.  So if the program shut down, I don't get any
9   NICRA.  So we estimate at the beginning of every year
10  how much program we're going to implement, and then
11  it's a simple matter of taking 28 percent of that and
12  budgeting it.
13      Q   All right.  This is all paid out through a
14  line of credit agreement, correct?
15      A   Grants that come through USAID, we get
16  advances from a Health and Human Services letter of
17  credit.  Grants that come from the State Department we
18  do a voucher, and they send us a federal check.
19      Q   Okay.  So for you to get your 28 cents out of
20  the $1 that Jay Cooper spends in Almaty, do you have to
21  submit some kind of voucher?  How do you get your
22  28 cents?

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/dorcus829.txt

0115

1    A  Okay.  We're talking about the cash now,

2  right?  To get the cash, to the State Department I have

3  to submit a voucher.  To the USAID, I have to go on the

4  computer and request it, and then every month I send in

5  a ton of paperwork reconciling it back to the various

6  grants that we have, sort of a bank reconciliation

7  type.

8    Q  And you have to submit that kind of paperwork

9  before you get the 28 cents?

10    A  No, ma'am.  I can get that 28 cents -- The

11  cash for all our activities I can get from AID, the

12  majority I can get in 24 hours over the computer.

13  Cash.  Okay.  When you say the advance, on the books on

14  NICRA I can't get an advance.  Jay Cooper has to spend

15  the dollar, and at the end of the month I can get

16  28 cents, and that's revenue.

17      So we're talking about different accounting

18  things here.  We've got revenue on one side, and we've

19  got cash.  And so the revenue is not earned until Jay

20  spends -- The revenue for the NICRA is not earned until

21  Jay Cooper spends a dollar.  So when he spends that

22  dollar in the field, I can take 28 cents, phone up the

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/dorcus829.txt (115 of 247) [2/13/2007 12:43:46 AM]

0116

 1  Treasury or Health and Human Services and say send me
 2  that cash for 28 cents.  I can't do it until then.
 3      Q   All right.  Now, at the beginning of the year
 4  you make an estimate as to, I think you said this, as
 5  to what programs you're likely to have and how big your
 6  NICRA budget is likely to be?
 7      A   At the beginning of the year we estimate
 8  because everything is estimates because it's hard to
 9  tell in the future how much you're going to spend.
10      Q   Now, you have various vice-presidents in
11  Counterpart who have responsibility each for different
12  kinds of programs, right?
13      A   Yes, ma'am.
14      Q   Some do agricultural programs, some do civil
15  society, et cetera.  Do you allocate to each of those
16  departments a certain percentage of the NICRA budget at
17  the beginning of the year?
18      A   We sit down in May, and we try to forecast
19  for the upcoming October 1st, and it's not a
20  percentage.  What it is is everybody submits his and
21  her request based on business decisions and strategy of
22  what we're trying to achieve with the organization.

0117

1        An example would be if we wanted to improve
2   our competitiveness in the area of civil society, we
3   would take more NICRA and put it to the civil society
4   area.  There's not a -- Let's take the $4.1 million.
5   Arlene doesn't have any right to 10 percent or 20
6   percent or anything like that.  She has to make the
7   case for I want $400,000 of it because I want to pay
8   this salary, and I want to do this proposal.  She has
9   to predict that or try to predict it anyway for the
10  coming year.
11      Q   All right.  Now, here's where I'm having
12  trouble with this.  Jay has a contract to do civil
13  society, CSSI, his biggest contract in Almaty.  Okay.
14  28 percent of the revenue stream is NICRA for you to
15  once you get it, once he spends a dollar, once you get
16  your 28 cents, to use to pay overhead in headquarters.
17  Right so far?
18      A   Uh-huh.
19      Q   Is that money --
20      A   Let me make sure we're communicating.  If we
21  sign a contract from January 1 to December 31st for
22  $100,000 for Jay Cooper, one year, $100,000, for me to

0118

 1  get $28,000, I can get it only as those dollars are
 2  spent.  Not sooner.  And so on the last day on December
 3  31st I will have collected 28 percent which is $28,000.
 4  So if Jay Cooper gets cut early, I don't get 28 percent
 5  because I didn't spend $100,000.
 6      Q  I understand that.  Okay.  Does the
 7  anticipated NICRA coming out of Jay Cooper's CSSI
 8  project which is under Arlene Lear's vice-presidency,
 9  is that somehow assigned to Arlene Lear for her use for
10  overhead, for salaries, proposals, and so on?
11      A  It's all fungible.  Once the NICRA is
12  collected from one program, it can be agriculture, it
13  can be used for civil society.  So you can look through
14  A-122, and there's nothing that says -- Once it becomes
15  NICRA, I can use it for anything that's legal for
16  NICRA.
17      Q  Okay.  Would you please find in A-122 where
18  it says that?
19      A  What you'll find is it won't say anything
20  that says we can't use NICRA from project A to cover
21  program development for program B.  This may take us a
22  while.  Tell me again exactly want you want me to find.

0119

1    Q  I want you to find, just tell me the basis in

2  the regulation for the statement you just made that

3  it's totally fungible, and once you get NICRA you can

4  use it for any program whether or not it's the NICRA

5  generated by any particular program.

6    A  Got it.  Okay.  So we go to indirect costs.

7  Okay.  Indirect costs are those that have been incurred

8  for common or joint objectives and cannot be readily

9  identified with a particular final cost objective.

10    Q  What page are you on?

11    A  I'm on -- I don't know what page I'm on.

12      MS. ARIAIL:  The page numbers are cut off.

13    A  I'm on something of 75.

14    Q  That's unfortunate.

15    A  It's C(1).  It looks like page 10.  I think

16  it's page 10.

17    Q  10 of 75, yes.  All right.

18    A  Okay.  So down there, indirect costs are

19  those that have been incurred for common or joint

20  activities.  Common means all.  Okay.  And cannot be

21  readily identified with a particular final cost

22  objective.

0120

1          Take my salary, for instance.  I work on
2    every program at Counterpart.  And so my work can't be
3    identified with a particular final cost or objective.
4    Say, for instance, my time spent here today will be
5    paid for by Counterpart NICRA that's earned by all its
6    programs.  If this were still an ongoing program, my
7    time here today would be paid for by that.  We don't
8    run down all the cost codes and say 10 minutes to this
9    one and 5 minutes to that one.
10        Q   So as long as we're within the 28 cents out
11   of the dollar, you as headquarters can shift it to any
12   department for any purpose that's a common purpose for
13   the organization?
14        A   That's a common purpose.
15        Q   All right.
16        A   And program development is another example.
17        Q   All right.  Now, is there a limitation on --
18   How do you divide up the pot among your various
19   vice-presidents?
20        A   That is done in May when we sit down and they
21   submit their budgets, and as an organization we all sit
22   in a room that looks something like this one.  They

0121

 1  roll the papers out on the table, and they say I want
 2  three employees under NICRA to work on this, and I want
 3  two employees or I want so much travel or I want so
 4  much for a program development specialist.  And so
 5  that's how it's done.
 6      Q   All right.
 7      A   We take all that detail and put it on a
 8  spreadsheet, and many of the people are joint funded.
 9  So 50 percent of their time will be NICRA related
10  because it can't be identified to a particular cost
11  objective which is generally a program approved by AID
12  or State or one of our other donors.  And so take
13  Arlene Lear, for instance.  I think she charges like 20
14  percent of her time to overhead because she thinks that
15  that's how much time she spends in pointless meetings.
16      Q   And that's at her choice, right?
17      A   That's at her choice.  Well, yes, that's at
18  her choice.  That's right.
19      Q   Is there some mechanism by which the company
20  is obliged to verify the reasonableness of that choice?
21      A   She has programs, and she spends time on
22  those particular programs, and you can prove by

0122

1  monitoring the 80 percent of her time that it's spent
2  on those programs.
3      Q  My question is does somebody monitor the 80
4  percent of her time to determine which programs it's
5  spent on?
6      A  That's her supervisor, and that's me.
7      Q  And what steps do you do to monitor that
8  time?
9      A  We sign her time sheets.
10     Q  All right.  And what do her time sheets look
11  like?
12     A  Her time sheets are computerized time sheets
13  that say program and hours and vacation or work and
14  that sort of thing.
15     Q  So it's not unlike a lawyer writing down his
16  time that says I worked four hours on this in a day,
17  it's to that level of detail?
18     A  It's to that level of detail.
19     Q  And you maintain them, and you --
20     A  These guys, the A -- Okay.  We just went
21  through A-122.  A-133 is the guidance for the auditors.
22  And so the auditors have to do this audit in accordance

0123

1  with A-133 OMB standards, and one of those standards is
2  that you've got to have time sheets to get a U.S.
3  government buck.
4      Q  Let's look at Exhibit 42 which is the
5  auditor's report.  This is written by a CPA hired by
6  Counterpart, correct?
7      A  Yes, ma'am.
8      Q  For this purpose?
9      A  In accordance with generally accepted
10  auditing standards and A-133.
11     Q  Would you look at the letter at the back of
12  the exhibit, on the page with the Bates stamp CP 1421
13  which is like three pages from the back of the exhibit.
14     A  Okay.
15     Q  I'd like to read a sentence which is from the
16  next to the last paragraph.  "However, we noted other
17  matters involving the internal control over financial
18  reporting, which we have reported to management of
19  Counterpart in a separate letter dated December 13,
20  2004."
21         Do you know what are those other matters
22  referenced in that letter?

0124

1      A  Our auditors, I think what they're referring
2  to is the auditors wanted additional oversight on our
3  field operations with respect to a more recurring visit
4  schedule.  The way it was working then is if these
5  auditors were going to Almaty for one client, they'd
6  call us up and say We're going to Almaty, and do you
7  want us to stop into your office and we'd say By all
8  means.  We want you to test our controls.  We want you
9  to look at our books.  We want you to make sure things
10  are going on.  And they say Okay.  Will you give us a
11  day?  Sure, we'll give you a day.  And so we'll pay for
12  a day, and we'd get a pro rata share of the per diem
13  and the airplane ride and all those costs.
14          And so what we're talking about here is a
15  more organized review of all of Counterpart's overseas
16  operations, and what we're doing is hiring a consultant
17  that is going to be on a circuit riding sort of
18  schedule to stop into all our field activities.  Up
19  until this time it was being done only when I had the
20  time or Bob Abma had the time.  The auditors want it on
21  a more recurring organized fashion.
22      Q  Do you have any idea what prompted their

0125

1   concern about this?
2       A   Yes.  They wanted to see the write-ups from
3   the visits, and I said it I'll show you what we've got,
4   but it was only like one-third of our overseas posts,
5   and so they were uncomfortable.
6       Q   Has there been a writeup for your visit to
7   Almaty prepared?
8       A   For my visit to Almaty?
9       Q   Yes.
10      A   No.
11      Q   Has there ever been a writeup to a visit to
12  Bob Abma's financial --
13      A   Yes.
14      Q   -- domain which involves central Asia?
15      A   Yes.  Bob Abma has been audited by USAID, by
16  the local tax authorities in every single country.
17  Gelman has been out to Bob Abma's, and they documented
18  their visit.
19      Q   All right.  When were these visits?
20      A   I don't recall the dates, but both before Jay
21  left and after Jay left.
22      Q   And you're referring to Gelman now?

0126

1       A   I'm referring to Gelman, the Kazak tax
2    authorities, and USAID.
3         MS. ARIAIL:  Pat, can we go off the record
4    for one minute?
5         MS. DOUGLASS:  Sure.
6       (Recess)
7    BY MS. DOUGLASS:
8       Q   I would just like to verify with more
9    specificity what I think we established earlier.  Would
10   you please look at Exhibit 41 which is the OMB circular
11   and turn to page 11, but it says D, Allocation of
12   Indirect Costs and Determination of Indirect Cost
13   Rates.
14      A   Okay.
15      Q   And under D, there are three options that I
16   think might be relevant:  simplified allocation method,
17   multiple allocation base method, and direct allocation
18   method.  If I understood you correctly, Counterpart
19   does none of those three methods?
20      A   We use the simplified.
21      Q   You use the simplified.  So you do allocate
22   indirect costs to particular projects?

0127

1     A   Okay.  We allocate the same amount of our
2   indirect cost rate to each project.  We don't have a
3   separate indirect cost rate for, good example, doing
4   sub grants which I would like to have, but we don't
5   charge a different rate for doing sub grants.  We don't
6   charge any at all.  And so the organization for
7   competitive purposes charges no NICRA on sub grants.
8     Q   All right.  But I thought you told me, and if
9   I'm wrong, I'm wrong, that once something is in NICRA
10  and the company receives the NICRA dollars, it can use
11  it for overhead for any project?
12    A   We don't use overhead on projects.  We use
13  overhead to support the organization.
14    Q   Right.
15    A   The organization uses that money, just like
16  where we read before, for costs that are difficult to
17  assign to any one major function.
18    Q   All right.  So in other words, you do not --
19  I'm looking now on page 12 under simplified allocation
20  method.  You do not distribute indirect costs to
21  individual awards?
22    A   Not to individual awards.  Say, for instance,

0128

1  Jay Cooper's project, it will earn if it's $1 million
2  project and we can take 28 percent, it will earn
3  $280,000, but we don't say we're going to take that
4  $280,000 and put it to activities in Arlene Lear's shop
5  or in Kazakhstan.  They use it to pay me.  They use it
6  to pay Lelei LeLaulu.  They use it to pay the rent on
7  the office building.  So the way it works is you don't
8  take those Kazakhstan-earned NICRA dollars and apply
9  them to a Kazakhstan operation.  Now, you can, but we
10  don't.
11      Q   You don't.  All right.  That's all I wanted
12  to know.  Now, did you have a meeting in the spring of
13  2004 where you adjusted the NICRA budget and told
14  various departments that the NICRA dollars they were
15  expecting to be able to use for their salaries would be
16  allocated differently than had been planned?
17      A   If I did, I don't remember.
18        MS. DOUGLASS:  Okay.  I would like to mark
19  the next exhibit please which I guess would be 43.
20        (Deposition Exhibit 43 was marked for
21  identification and was attached to the transcript.)
22  BY MS. DOUGLASS:

0129

1     Q   Is what's been marked Plaintiff's Exhibit 43

2  the budget for the CSSI program that Counterpart

3  operated with Jay Cooper as its manager?

4     A   I'm not sure.  These figures seem to be

5  those.  So I will have to -- I'm not sure.  I don't

6  know the source of these numbers, where they came from.

7     Q   I'll represent to you, and Miss Ariail can

8  correct me if she wants to, these were produced to us

9  by Counterpart in response to a request for the budget

10  for the CSSI program.

11     A   Okay.

12        MS. ARIAIL:  But that doesn't mean this

13  represents the program Jay Cooper was managing which

14  was your question.  I think that's what you were saying

15  you didn't know.

16     A   See, I don't know.  This is a life of

17  program.  It says Turkmenistan life of program, life of

18  program.  It's hard to tell because of the specificity.

19     Q   All right.  Fine.  Let me just ask you a few

20  questions about it then.  If you can't answer, you'll

21  tell me.

22        Is it the usual procedure when Counterpart is

0130

1  doing a cooperative agreement with USAID that it
2  prepares a budget as part of its proposal to get the
3  grant?
4      A  Yes, ma'am.
5      Q  All right.  And does it present such a budget
6  to USAID, and then USAID approves the project in
7  reliance on the budget?
8      A  Yes, ma'am.
9      Q  All right.  Now why would it say, if we
10 assume that's what this document is, on the page that
11 has the Bates stamp CP 1046, second page of the
12 document, why would it say under overhead 26.34
13 percent?
14     A  That was the rate that Counterpart used I
15 believe up until the end of fiscal year '03.
16     Q  I see.  So has Counterpart's NICRA rate been
17 changing over the years?
18     A  Once we put it at 28 percent, the board has
19 kept it at 28 percent.
20     Q  But you don't know what it was before that?
21     A  It jumped around.  One year I think it was
22 higher than 26, and then it was lower.

0131

1    Q   Okay.  Then I understand that.  Now, if you'd
2  look at the page with the Bates stamp number 1054, am I
3  correct that these salaries under A are a projection of
4  what is likely to be the salaries for the various
5  people listed in year one, two, and three of the
6  project?
7    A   If this is the proposal, yes, these are all
8  projections.
9    Q   And the percentages there where it says
10  percentage year 1, percentage year 2, is a projection
11  of what percentage of that person's time will be spent
12  on this particular project as opposed to other
13  projects?
14    A   Yes, ma'am.
15    Q   Who makes those estimations?
16    A   The headquarters usually in conjunction, if
17  there is a field office, they will do it in conjunction
18  with to get the exact cost because that's how you
19  become more competitive is you use exact cost rather
20  than estimated.  However, in this particular instance
21  I'm not sure whether these were done in conjunction
22  with the field or not.

0132

1    Q   All right.  So let's assume that the grant is
2  awarded for this project to be funded, and it's funded,
3  and it starts.  Does USAID ever come along and see
4  whether or not the spending on, for example, salaries
5  in the region match the salaries that are set out in
6  the budget?
7    A   Every quarter we send AID by regulation a
8  financial report that's set up in conjunction with the
9  major line items which are salaries, fringe, travel,
10  other direct costs, and sub grants, and we show the
11  draw-down versus those general line items.  Now, AID in
12  country, the cognizant technical officer, the person
13  who's our contact point in country, usually it's a
14  local employee of Kazak, will often ask for more
15  detail.  It depends on the country.  But by regulation
16  we only have to give them the draw-down against those
17  general line items.
18    Q   So salary would be one line item?  You
19  wouldn't have the specifics?
20    A   I don't have to give it by country nor by
21  person.
22    Q   All right.  Now, is it permissible for

0133

1   Counterpart under the cooperative agreement in CSSI,
2   for example, to change the salary levels of particular
3   people holding particular posts that are listed in
4   Plaintiff's Exhibit 43?
5       A   We can pay different salaries, and we can pay
6   more or we can pay less.
7       Q   And you can supposedly spend more on legal
8   workshops or consultants or any item, is that right?
9           MS. ARIAIL:  Objection to form.  You can
10  answer.
11      A   Repeat the question.
12      Q   Can you spend different amounts on other
13  items in the budget such as office, rent, Internet
14  access, that are listed in Exhibit 43?
15      A   Okay.  The line item flexibility which is I
16  assume what we're talking about here, up until I think
17  two years ago there was 100 percent line item
18  flexibility, and then the language was changed for
19  cooperative agreements that it was 10 percent without
20  notification of the contracting officer and any amount
21  if you requested the approval of the contracting
22  officer, the person who signed your grant.

0134

1      So basically during the time I think that
2  most of this was taking place, Arlene Lear could change
3  around the line items as long as the project or program
4  was meeting the deliverables.  In other words, all
5  those people, whatever form and function they were
6  doing out there, were meeting the deliverables that the
7  government required for in the program.  Arlene had
8  flexibility within those line items.
9      Q   All right.  Would you find me in Exhibit 41,
10  which is the regulation, where it says --
11      A   That will be in the grant itself.  It won't
12  be in the standards.
13      Q   All right.  And the grant was amended two
14  years ago you say?
15      A   No.  The AID regs that -- Boy, I just had
16  somebody send me those.  The AID regs that make this as
17  standard operating procedure with respect to these line
18  items, that changed about two years ago which it
19  tightened it up.
20      Q   But where is that published, if it's
21  published?
22      A   I'll have to get you that.  I'm not sure.

0135

1  It's an internal AID thing that applies to these
2  cooperative agreements.
3      Q  It's not in the cooperative agreement itself?
4      A  Yes, it is.
5      Q  It is.  Well, the cooperative agreement is
6  entered into at the beginning of the contract, right?
7      A  That's the thing that Counterpart and the
8  contracting officer signed.  That's the legal document
9  that says we're going to give you X, and you're going
10  to do Y in return.
11      Q  All right.  So if something changed two years
12  ago and the contract was under way, was the cooperative
13  agreement amended?
14      A  Not for this.  I don't think it was amended
15  to include this business.
16      Q  Now, I want to read you something that Arlene
17  Lear testified to, and I want you to comment on it.
18  "In our cooperative agreements there are five major
19  line items for the budget.  We have budget breakdowns.
20  When we first submit a budget breakdown to USAID to
21  provide the rationale for costs, they look at the full
22  budget breakdown, and then they combine all the details

0136

 1  into these broad line item categories, maybe five of
 2  them:  salaries, travel, consultants, whatever."
 3  That's on page 190 of her deposition.
 4       MS. ARIAIL:  I'd like to note for the record
 5  that there's no copy provided to us to look at, and I
 6  can't confirm the authenticity of that at this time.
 7  I'm not questioning it.  You can answer the questions.
 8  Go ahead.
 9  BY MS. DOUGLASS:
10       Q   So far Miss Lear is describing something like
11  what is Exhibit 43, correct?
12       A   Correct.
13       Q   All right.  And the line items, for example,
14  on page 1054 would be the A, B, C, D lines?
15       A   Yes, ma'am.
16       Q   And not the sub details, correct?
17       A   Correct.
18       Q   All right.  Now, she goes on.  I'm still
19  reading from 190.  "And so within those very broad
20  categories, we have 100 percent line item flexibility.
21  We can move from headquarters to field and vice versa."
22  What does that mean?

0137

1      A   On this exhibit --
2      Q   43.
3      A   -- we have salaries.  Okay.  You'll see the
4   first salary is chief of party, ex-pat.  That's Jay
5   Cooper.  He's field.  Somewhere in the preparation of
6   this budget there'll be a headquarters person.
7      Q   Yes.  We're going to get to that in a minute.
8   That's the next page.
9      A   And basically what she's saying is you can
10   move this around if you see the need in that these
11   budgets are prepared years in advance of the actual
12   implementation of the program, and that if whoever is
13   in charge of running the program sees that, you know,
14   we really didn't need the deputy regional financial
15   manager at 70 percent, we needed him at 40 percent, and
16   we need a person in the headquarters at 75 percent
17   instead of 65 percent, they have that flexibility.
18      Q   So does the flexibility involve simply
19   cutting somebody's pay or cutting somebody's job and
20   moving it to another person holding another job in
21   headquarters, is that what it means?
22      A   It can.  It can.  It can mean -- Right here

0138

1  we're assuming that all these people are full-time, but
2  these percentages are 70 percent.  Well, you're
3  assuming there's a 30 percent somewhere to fill in the
4  gap, but it doesn't have to.  They can be part-time
5  employees overseas.
6      Q   They can have other projects too?
7      A   They can have other projects.
8      Q   Okay.  I understand that.  My question is
9  does what Miss Lear is calling 100 percent line item
10  flexibility encompass taking the salary that's
11  projected for the regional senior technical adviser on
12  page 1054 of Exhibit 43 and moving it to support a
13  headquarters employee working on another project?
14      A   Yes, it can, and all she has to do on
15  staffing is send a note to AID.  Every time we assign
16  someone overseas, the CTO agrees with it.  Now, if we
17  spend less money overseas than we envisioned when we
18  designed the program, she has the flexibility to say,
19  you know, my original projection was $500,000, and I'm
20  able to do it for $400,000.  I've chosen to use that
21  extra $100,000 in headquarters, and she can do that as
22  long as it's in support of the program.  As long as

0139

1   it's in support of the program.
2       Q   Well, my question to you was to move it to
3   another program.  Can she move that money to support
4   somebody at headquarters working on another program?
5       A   No.  Kazakhstan is for Kazakhstan, and that
6   person in the headquarters works for the Kazakhstan
7   program.
8       Q   So she can move it to headquarters.  It
9   doesn't matter where the person is situated, but the
10   dollars have to be spent on the program that was the
11   source of the cooperative agreement?
12      A   Correct.
13      Q   All right.  Now it seems to be, if you look
14   at Exhibit 43 again, for example, let's take regional
15   financial officer, ex-pat.  The person who actually
16   fulfilled that position was Bob Abma, right?
17      A   Yes, ma'am.
18      Q   Now, the projection shows his salary and his
19   percentage of his time spent on CSSI decreasing over
20   the years 1, 2, and 3 of the project, correct?
21      A   What's the page number again?
22      Q   1054.

0140

1      A  1054.  Okay.

2      Q  Right?

3      A  I'm just getting there.  Regional financial

4  officer, ex-pat.  So it goes from 70 to 70 to 15

5  percent.

6      Q  And the dollars go down --

7      A  Right.

8      Q  -- in accordance with that?

9      A  Right.

10      Q  If the project is going on and in fact Bob

11  Abma is spending more time than 15 percent in year 3

12  and getting paid more than $13,395, does USAID have to

13  approve that?

14      A  USAID, what happens in the course of -- This

15  was designed to be a three-year program and was phasing

16  him out.  Okay.  Let's say, for instance, the deputy

17  regional financial officer below got cut off after year

18  2 and they decided to use all that money to pay for

19  more percentage of Bob Abma, do they have to approve

20  that?  No.  It's all overseas.  It's all within that

21  line item.  And as long as Arlene can pull off the

22  program with Bob Abma all by herself, she has the

0141

1  flexibility.
2       The thing is two or three years before she
3  made the claim that I can do this with this team.  Now,
4  as she's implementing with that team, if she sees that
5  whatever -- The important thing is the product.  The
6  important thing is what the program is supposed to
7  produce.  If she's convinced she can produce it with a
8  different mix, she can make a different mix.  AID
9  doesn't care.
10     Q  All right.  But she's restricted to using
11  those dollars on the CSSI program?
12     A  That's the real hard, you've got to use it on
13  the program in Kazakhstan.  You can't take it out and
14  use it in Turkmenistan.
15     Q  Okay.  Now --
16     A  But this was a regional program.  Okay.  This
17  is one instance here where you have Jay Cooper as the
18  regional adviser, and so there were dollars allowed
19  budgetwise for country to country to country.  Now, if
20  they wanted to take from Turkmenistan and give to
21  Kazakhstan, they go to AID and say okay, we're
22  performing in Turkmenistan and we don't need five

0142

 1  people, we only need four, can we use it in Kazakhstan
 2  where we have a problem, and AID will say yes.
 3    Q   Is that done in writing?
 4    A   Yes, it's in writing.
 5    Q   Now, she goes on, I'm still on page 190 of
 6  her deposition.
 7      MS. ARIAIL:  My same objection for all
 8  testimony read, that we haven't been able to review for
 9  authenticity.
10      MS. DOUGLASS:  I suppose if my question is
11  wrong, it will be struck.
12  BY MS. DOUGLASS:
13    Q   She goes on to say on page 190, "Between
14  those broad categories, there are some limitations.
15  We've never exceeded what the regulation has called for
16  nor has any audit disclosed that we have."
17      Now, do you understand between the broad
18  categories meaning if she shifts the money that was
19  planned for the regional financial officer for the
20  money that was to pay for health insurance, for
21  example?
22    A   I'm not sure what she's driving at there.

0143

1       MS. ARIAIL:  I have another objection in
2  terms of the context.  I mean, you're just reading sort
3  of random passages and then asking him what it means,
4  and he doesn't have the context of what Arlene Lear was
5  talking about during her deposition.  I'm not really
6  sure how he could answer any of this; but again, you
7  can answer to the extent you can.
8  BY MS. DOUGLASS:
9       Q   Is there a regulation that puts limitations
10  on Counterpart's ability to shift project funds from
11  one line item to another?
12       A   Today it is tighter than it was during the
13  implementation of this program.
14       Q   Is it the same regulation you identified
15  earlier that controls it?
16       A   Correct.  Correct.  We're talking about the
17  same thing.
18       Q   And that speaks to between line items as well
19  as within line items?
20       A   It speaks to between line items.  Within line
21  items you can do anything you want to do.  So if it's
22  salaries, if I want to pay five people -- If I have a

0144

1  salary line item of $500,000 and I want to pay one
2  person $500,000 and AID says go ahead, I can do that.
3  Or if I want to pay 50 people $1,000, I can do that.
4      Q   Up until two years ago?
5      A   No.  You're talking within.  I can do that
6  anytime, that hasn't changed, within a line item, the
7  mix.  What they're trying to hang you for is the
8  deliverable, not how much salary you pay Joe and how
9  much you didn't pay Mary.  It's the deliverable that
10  they're after.
11     Q   All right.  And if you'd look again on page
12  1045 on the salaries under regional costs.
13        MS. ARIAIL:  1054?
14        MS. DOUGLASS:  1054.  Did I say something
15  different?  Sorry.
16  BY MS. DOUGLASS:
17     Q   1054 on Exhibit 43.
18     A   I'm there.
19     Q   The salaries are going up even when the
20  percentage stays the same.  So is this a way to budget
21  for some kind of periodic raises?
22     A   Generally we always do that.  We will budget

0145

 1  5 percent.
 2     Q   Okay.  Did anybody ever -- For example, look
 3  at the fringe benefits and travel.  Does the USAID
 4  audit ever compare what's budgeted versus what's
 5  actually spent?
 6     A   The fringe is audited for Americans but not
 7  for local employees.  Local employees is picked up from
 8  local practice.  And so we'll go to other NGOs who have
 9  a history there or we'll get our own numbers and say
10  well, just how much does it cost for us to support an
11  employee.
12     Q   Okay.
13        MS. DOUGLASS:  I'm going to have marked as
14  the next exhibit which I believe will be 44 a document.
15        (Deposition Exhibit 44 was marked for
16  identification and was attached to the transcript.)
17  BY MS. DOUGLASS:
18     Q   My question to you is does this appear to be
19  a budget for the Health NGO Capacity Building
20  Initiative Extension?
21     A   It appears to be.
22     Q   And it's the same kind of estimates that

0146

 1   we've talked about with respect to CSSI that were done
 2   for this separate project, correct?
 3       A   Yes.
 4       Q   All right.  Now, if you'd look back at the
 5   audit.
 6       A   42?
 7       Q   Yes, 42.  On page 1415 there's a schedule of
 8   federal awards held by Counterpart in fiscal year --
 9       A   Yes, ma'am.
10       Q   -- 2003, correct?
11       A   I show 1415 as the year ended September 30th,
12   2004.
13       Q   Isn't that fiscal year 2003?
14       A   No, ma'am.  It's '04.
15       Q   I'm sorry.  Okay.  Correct.  Halfway down
16   under United States AID is Central Asia Civil Society
17   Support Initiative.  You see that?
18       A   Central Asia Civil Society Support
19   Initiative, yes.
20       Q   That is a project that was managed by Jay
21   Cooper, was it not?
22       A   Yes, ma'am.

0147

1    Q   And in fiscal year 2004 that project spent
2    $3,717,486?
3    A   Yes, ma'am.
4    Q   All right.  And that project was by far the
5    highest spending of any project listed in Exhibit 42?
6    A   It was $1.7 million over its closest
7    competitor.  Okay.
8    Q   And if you'd look under Central Asia Health
9    NGO Capacity Building Initiative, about three up, that
10   was also a project managed by Jay Cooper, was it not?
11   A   Yes.
12   Q   And that spent in fiscal year 2004
13   $1,176,782?
14   A   Yes, it did.
15   Q   And so between the two projects that he
16   managed, the spending was close to $5 million?
17   A   Close.
18   Q   And Jay Cooper also managed another project
19   that was commissioned by the World Bank, did he not?
20   A   I'm not sure.
21   Q   What about the Turkmenistan Water Users
22   Project, was that a project that began just about at

0148

1  the time he was fired?

2      A  There again, I don't want to guess.

3      Q  So is it fair to say that Jay Cooper managed

4  a large percentage of the programs in dollar terms that

5  Counterpart had during the fiscal year 2000?

6      A  A large percentage.

7          MS. ARIAIL:  Objection.  I'm sorry.  I don't

8  think you meant to say 2000.

9          MS. DOUGLASS:  I meant to say for 2004.

10  Sorry.

11         MS. ARIAIL:  I just wanted to clarify for the

12  record.

13         MS. DOUGLASS:  Thank you.

14      A  Okay.  I just want to add that these are

15  regional programs, and there were country reps in every

16  one of the programs because it's a regional operation.

17  Of course, he did direct it from Almaty, but he had

18  lots of other good people working for him.  So yes, he

19  did.  If you add the two together, it was a large part

20  of our portfolio.

21      Q  And he had a lot of responsibility in

22  connection with it?

0149

1     A   Sure.
2     Q   Okay.  Now, it is true that aside from NICRA,
3  which we've spent a lot of time discussing, the grant
4  money from a particular cooperative agreement is
5  supposed to be spent only on the program described in
6  the grant, is that right?
7     A   Yes, ma'am.
8     Q   And that precept is --
9     A   But not NICRA.
10    Q   Not NICRA.  That's right.  If you'd look
11  on -- That was my question.  That's what I mean by
12  "That's right."  If you'd look on Exhibit 41 on page 7
13  which would be under Allocable Costs under General
14  Principles, it says "Any cost allocable to a particular
15  award or other cost objective under these principles
16  may not be shifted to other federal awards to overcome
17  funding deficiencies or to avoid restrictions imposed
18  by law or by the terms of the award."
19          MS. ARIAIL:  Where are you?
20          MS. DOUGLASS:  I'm reading from paragraph
21  (b).
22  BY MS. DOUGLASS:

0150

1    Q   You certainly don't disagree with that
2   principle, do you?
3    A   No.  I think that goes with what's been said
4   so far.
5    Q   Okay.  Now, if an expense benefits more than
6   one program, it's supposed to be allocated between the
7   two programs it benefits, is that right?
8    A   Not if it's NICRA.
9    Q   If it's not NICRA?
10    A   If an expense benefits, if you have a single
11   person that's working for two programs, you split that
12   person or 50/50 or whatever the percentage is.  So you
13   share the cost.
14    Q   Another word for share is allocate, right?
15    A   To allocate.
16    Q   All right.  Good.  And you allocate on the
17   previous page now under 4(a), you allocate to a
18   particular cost objective such as a grant or a contract
19   in accord with the relative benefits received, right?
20    A   Correct.
21    Q   Now, who is responsible for making sure that
22   the company does the proper allocation of direct costs?

0151

1      A   In this instance it would have been Abma.
2   I'm responsible, but it's Abma.
3      Q   So he does it in the first instance, and you
4   oversee it, is that fair?
5      A   (Witness nods).
6      Q   And Abma was responsible for all five
7   countries in central Asia:  Kazakhstan, Kyragyzstan,
8   Uzbekistan, Tajikistan, and Turkmenistan?
9      A   Yes, ma'am.
10     Q   Plus Albania and some other places too,
11  right?
12     A   Only on TDY.  Only on short-term consulting
13  kind of things, special assignments to Albania,
14  Armenia.
15     Q   And you said that the USAID comes and does an
16  audit on somewhat of a periodic basis?
17     A   Periodic.  They will come unannounced.
18  Periodic is not the right description.  They will come
19  unannounced or announced depending on the scope of the
20  audit and the type of the audit.
21     Q   Was there an audit in the end of 2004 if you
22  can remember?

0152

 1    A   AID has been in that office.  I don't
 2  remember if it was during Jay Cooper or after Jay
 3  Cooper.
 4    Q   Okay.  Are the USAID audit results public
 5  documents?
 6    A   I'm pretty sure.  Most things unclassified
 7  with U.S. government dollars are public access.
 8    Q   Now, in the central Asian region in the
 9  period we're talking about which is roughly say, for
10  example, 2004, there are a number of people as we show
11  in the budget who have functions that are attributable
12  to more than one project.  I don't mean Turkmenistan
13  versus Kazakhstan.  I mean CSSI versus Health versus
14  whatever.  Am I right about that?
15    A   Yes.
16    Q   Different grants from the USAID they're
17  working on?
18    A   Partial funded.
19    Q   And an example of that is Abma because he
20  works on various grants, Cooper is an example, and
21  Michael Kunz, right?
22    A   Uh-huh.

0153

1     Q   Now, do you calculate the amount of time they
2   spend on each based on time sheets?
3     A   Yes, ma'am.
4     Q   And where do the time sheets reside and how
5   long are they kept?
6     A   The time sheets are electronic.  They reside
7   with us.  They're kept for seven years.
8     Q   All right.  Is a percentage generated off the
9   time sheets that allows you to allocate fringe
10   benefits?
11     A   Yes, ma'am.  So when you summarize them at
12   the bottom by program, the fringe drives at the same
13   rate.
14     Q   Drives with the same percentage.  All right.
15   How often is that fringe percentage modified based on
16   actual time results?
17     A   Every pay period.
18     Q   Oh, really.  All right.
19     A   Yes.
20     Q   And you monitor it?
21     A   My staff does.
22     Q   Now, if one project has more money than

0154

1  another, is it proper to charge the more lucrative
2  project with a heavier share of costs such as fringe
3  benefits and salaries?
4      A   Salaries are charged where the employee says
5  he worked.
6      Q   Okay.  In other words, nobody checks on the
7  accuracy of the time sheets?
8      A   Those are confirmed that a person did -- We
9  check, but Arlene is in Washington.  She makes two or
10  three trips a year.  She confirms then, but every pay
11  period she is not in Almaty.
12     Q   You don't have a time clock, in other words?
13     A   Do you?
14     Q   That was a joke.  All right.  Would it be
15  proper, can you think of an instance where it would be
16  proper to shift the cost of salaries or fringe benefits
17  or other expenses from one project that's hurting for
18  funds to a project that is richer?
19     A   They won't shift.  We never shift the money.
20  They will confirm that they worked the hours under that
21  project.
22     Q   If they confirm it falsely, that's shifting

0155

1  the money, isn't it?

2      MS. ARIAIL:  Objection.  You can answer.

3      A   If they confirm it falsely?  So as I

4  understand the question, if a person lies on his time

5  sheet and charges X when he's really doing Y, that's

6  moving the money.  That's really fraud.  I mean, it's

7  really lying.  Yes.

8      Q   Does Counterpart take any steps to prevent

9  that?

10      A   If we had knowledge, we would.

11      Q   And if that was reported to you as the CFO,

12  you would take steps?

13      A   Yes.

14      Q   And if an employee reported that, that would

15  be considered an appropriate thing to do as an employee

16  of Counterpart?

17      A   Yes.  If we determined the report was

18  accurate, sure.

19      Q   And would the employee be protected by a

20  whistle-blower policy?

21      A   You know, I don't know -- Our whistle-blower

22  policy, we have one.  I assume yes, they would be.

0156

1    Q   What is the whistle-blower policy?

2    A   There's no retribution if you report a

3   finding on your supervisor or something like that.

4    Q   When was that policy put into effect?

5    A   I don't know the exact date.

6    Q   Is it in effect today?

7    A   I believe so, yes.

8    Q   Is it included in the manual today?

9    A   Yes.

10    Q   When was the manual revised?

11    A   That's the date I'm not sure of.

12    Q   Was it before Jay Cooper was fired?

13    A   All this business with the whistle-blower

14   took place during and had no relationship to Jay

15   Cooper.

16    Q   Was the whistle-blower policy in effect at

17   the time Jay Cooper was fired?

18    A   I can't say.

19    Q   Who could say?

20    A   Kelli.

21    Q   Okay.  Now, did it come to your attention in

22   October of 2004 that Jay Cooper had problems with a

0157

1  budget that was being proposed by Bob Abma?

2      A   Did it come to my attention?

3      Q   Yes.

4      A   No.

5          MS. DOUGLASS:  I'd like to have marked as the

6  next exhibit a one-page e-mail from Jay Cooper to Bob

7  Abma and Michael Kunz, carbon copy to Harry Dorcus,

8  dated October 21, 2004.

9          (Deposition Exhibit 45 was marked for

10  identification and was attached to the transcript.)

11  BY MS. DOUGLASS:

12     Q   Have you seen Exhibit 45 before?

13     A   Well, it was sent to me.  I will assume I saw

14  it.  The original e-mail is from Bob Abma on October

15  the 8th to Michael Kunz and Jay Cooper.  Now, we don't

16  have a lot of information here.  We have to assume.

17  Bob says attached is the budget with draft numbers.

18  The partial funding to the Eurasia assistant position

19  was removed as we discussed.  I will work next week to

20  add this to the budget figures for consultants and for

21  the workshops.

22          So this is an e-mail from a person who sits

0158

1  20 feet from the other guy.  Two weeks later, and we
2  don't know what's said in between.  I mean, these guys
3  sit 20 feet from one another.  I'm assuming they talked
4  in this two weeks.  And then Jay Cooper comes back on
5  the 21st of October saying he's thought about it,
6  talking about the field budget.  It seems like there's
7  a lot more going on here than what took place on
8  October the 8th.  And so on the surface it raises a lot
9  of questions.
10    Q   My question is do you remember receiving
11  Exhibit 45?
12    A   No, ma'am.
13    MS. DOUGLASS:  I'd like to have marked as the
14  next exhibit an e-mail from Bob Abma to Jay Cooper
15  dated October 8th with an attached budget.
16    (Deposition Exhibit 46 was marked for
17  identification and was attached to the transcript.)
18    MS. ARIAIL:  I'll just note that there's
19  nothing on this e-mail indicating that there is an
20  attachment other than the statement in the text, and I
21  object on those grounds.
22  BY MS. DOUGLASS:

0159

1     Q   Now that you see Exhibit 46, does that
2   refresh your recollection as to whether you received
3   either Exhibit 45 or Exhibit 46?
4     A   No, ma'am.
5     Q   What is your practice when you receive an
6   e-mail from the field raising a budget irregularity?
7       MS. ARIAIL:  Objection to the form of the
8   question.  You can answer.
9     A   This is -- Okay.  The October 8th, I didn't
10  get a copy.  The October 21st, I did receive a copy.
11    Q   October 21st is attaches and forwards the
12  October 8th e-mail from Abma to Cooper, does it not?
13    A   Uh-huh.
14      MS. ARIAIL:  As far as this exhibit
15  represents.
16    A   I'm uncertain as to the irregularity.
17    Q   All right.  Let's look at Exhibit 46 and just
18  explore that.  Would you look at the budget which is
19  the second page of Exhibit 46.
20    A   Do I have the right one?
21    Q   Yes.
22    A   Okay.  So I've got Health, Finance, Eurasia

0160

 1  Regional, Travel, Total Personnel and Travel, August
 2  1st, '04 to June 30, '06, Allocation of Personnel and
 3  Travel Resources.  So this is some sort of expense
 4  budget that allocates $277,000 among the various
 5  salaries, fringe, and travel.
 6      Q  Right.
 7      A  Okay.
 8      Q  And it has a column for CSSI and Health?
 9      A  Uh-huh.
10      Q  Does that appear to you to be the two major
11  projects that Jay Cooper managed from his office in
12  Almaty?
13          MS. ARIAIL:  Objection.
14      A  Uh-huh.
15      Q  How do you read it, Mr. Dorcus?
16      A  It looks like it's a salary number and a
17  fringe number, and we don't know what the distribution
18  is between the two projects.
19      Q  No.  And then there's a column for Finance
20  and Administration, right?
21      A  Uh-huh.
22      Q  Now, we don't know what project that's being

0161

1  billed to either, do we?
2      A   You can't tell.
3      Q   Can't tell.  You can't tell if it's
4  allocated.  You can't tell if it's indirect or direct
5  cost, can you?
6      A   Normally the field doesn't deal with
7  indirect.  So we have to assume it's direct cost.
8      Q   That's something I wanted to talk to you
9  about.  You can't have a similar item of cost treated
10  as an indirect cost and a direct cost, is that correct?
11     A   Give me a for instance.
12     Q   Well, I'll give you a reg actually.
13     A   You can have a salary.  I can't pay Jay
14  Cooper for the same work from NICRA and from direct
15  cost.  That's for sure.
16     Q   Can you pay for the cost of postage in the
17  office in Almaty and call it an indirect cost or direct
18  cost?  Do you have a choice?
19     A   Sure.
20     Q   And if you've charged the budget for CSSI for
21  postage in headquarters and counted that as an indirect
22  cost under NICRA, can you then call postage in Almaty a

0162

1  direct cost?
2      A   If the headquarters uses postage and charges
3  it as a direct cost, if we can identify a cost in the
4  headquarters, it can be charged to the project as that
5  headquarters portion.  If there's postage in Almaty
6  that's a direct cost, we can charge that to direct
7  cost.  Either of those costs if we elect can be charged
8  to NICRA.
9      Q   But you have to make an election, don't you?
10     A   You have to make an election.
11     Q   And you can't do it inconsistently, right?
12     A   And you can't do it inconsistently.
13     Q   All right.  Now, look at page 2 of Exhibit
14  46.  This proposed budget for two projects that Jay
15  managed, CSSI and Healthy Communities, is proposing a
16  cost of $6,655 for travel for Eurasia Regional.
17     A   $6,656, travel, for finance, right?
18     Q   No.  $6,655 for Eurasia Regional.
19     A   All right.
20     Q   Is that proper to be part of the budget for
21  CSSI and Healthy Communities?
22     A   Eurasia Regional is the third program.  What

0163

1  is Eurasia Regional?
2     Q   I don't know, but it isn't CSSI and it isn't
3  Healthy?
4       MS. ARIAIL:  I want to object because we
5  haven't even established what this is.  He says he
6  doesn't recognize it, and you're asking him to comment
7  on something that he said he's never seen it before and
8  can't comment on what it is.
9       MS. DOUGLASS:  He's the CFO of the
10  corporation, and he's vouching for the controls that
11  are in place in Bob Abma's organization, and this is a
12  document generated by Bob Abma.
13       MS. ARIAIL:  A draft document.
14       MS. DOUGLASS:  Listen to me.  That Jay
15  Cooper --
16       MS. ARIAIL:  Off the record.  Off the record.
17       COURT REPORTER:  You have to both agree to go
18  off the record.
19       MS. DOUGLASS:  We're not going off the
20  record.
21       MS. ARIAIL:  If you yell at me like that one
22  more time, I will stop this deposition, and I will

0164

1  continue it before the court.
2      MS. DOUGLASS:  If you keep testifying, I'll
3  do the same thing.  How about that.  Let's let the
4  witness testify.
5      MS. ARIAIL:  I'm not done.  He has testified
6  that he has never seen this document before.  So every
7  question you asked him is based on the fact that this
8  is a draft document he has never seen before that has
9  not been verified even as an attachment to this e-mail.
10      THE WITNESS:  I'm trying to sort out what
11  Eurasia Regional is.
12      MS. ARIAIL:  If you don't know, you don't
13  know.
14      THE WITNESS:  It's unclear.
15      MS. DOUGLASS:  That's the kind of testimony
16  I'm objecting to, Miss Ariail.  We'll ask the court
17  whether that's proper to make that kind of comment.
18  Let him say he doesn't know.  He's perfectly capable of
19  taking care of himself.
20  BY MS. DOUGLASS:
21      Q   So you don't know what Eurasia Regional
22  refers to, correct?

0165

1      A   I don't know what it refers to.  Of course,
2   it's Almaty which is the Eurasia regional office, but
3   in this context I don't know what they're talking about
4   for $6,655 in travel.  When we go through the detail,
5   it goes down here Eurasia no funding, Eurasia no
6   funding.
7      Q   But the page marked 72, the next to last page
8   of the exhibit, shows all kinds of monies under Eurasia
9   Regional on taxes, does it not?
10     A   Yes.  Over here I see an allocation of
11  $29,000 for -- No.
12     Q   Payroll allocation?
13     A   I'm sorry.  It's Eurasia Regional -- I need a
14  straight edge.  Okay.  When we read across the column,
15  it's zero across the row.
16     Q   Well, look at page 73 if you would, the last
17  page of the exhibit.
18     A   73.  Okay.
19     Q   Doesn't it appear to be allocating a budget
20  for Eurasia Regional travel, 25 percent of the CSSI
21  contract and 25 percent to Healthy Communities?
22     A   Yes.  They're taking this travel budget,

0166

1   these are the numbers we looked at in the summary.
2   Okay.  They're taking that, and they're breaking down a
3   budget of $26,000 by percentages.  And since I don't
4   know precisely what they're getting at here on this
5   Eurasia Regional thing, they took 25 percent and said
6   that's how much the budget is.  Now the source of those
7   funds, it's unclear even reading Jay Cooper's words
8   what the source of those funds are.
9       Q   Doesn't it appear from the last page of
10  Exhibit 46 that 25 percent of the funds were to come
11  from the Healthy Communities budget and 25 percent from
12  the CSSI budget?
13      A   It would appear.
14      Q   And that would be improper unless Eurasia
15  Regional was part of both of those projects?
16      A   That's correct.
17      Q   And it appears in Exhibit 45 that Mr. Cooper
18  is objecting to Mr. Abma's proposed budget that we've
19  just discussed in Exhibit 46, correct?
20      A   Is he objecting.  He's questioning.  He's
21  questioning, and then he says I'm trying to get more
22  money for small grants, and so he's talking about

0167

1  moving line items around it would appear.

2      Q   Doesn't it say in the first sentence of

3  Exhibit 46 "I do not agree to approve funds from CSSI

4  or HNCBI to be used for anything other than those

5  projects"?

6          MS. ARIAIL:  You mean 45.

7          MS. DOUGLASS:  Sorry.  Exhibit 45, first

8  sentence.

9      A   I have given this proposal a lot of thought,

10  and I do not agree to approve funds from two programs

11  to be used for anything other -- Yes, it does, but we

12  still don't know, we assume that Eurasia Regional means

13  it's not.  Eurasia Regional could be in support of just

14  as easily.  I mean, that's a big assumption that we

15  make that Eurasia Regional is not in support of those

16  programs.  Well, those guys down there only had so many

17  things to do, and most of it was in support of those

18  two programs.

19      Q   All right.  But you don't remember receiving

20  45 or 46?

21      A   No, ma'am.

22      Q   And if you had received 45 or 46 or both,

0168

1  what would you have done?

2      A   I would have called Bob Abma and said "What's

3  going on?"

4      Q   Did you do that?

5      A   No, ma'am.

6      Q   Instead, you listened to Bob Abma tell you

7  what a terrible manager Jay Cooper was, right?

8          MS. ARIAIL:  Objection.  Argumentative.

9          MS. DOUGLASS:  Okay.  Let's see where we are.

10         MS. ARIAIL:  I'd like to take a break.

11         MS. DOUGLASS:  Okay.

12         (Recess)

13  BY MS. DOUGLASS:

14     Q   Mr. Dorcus, aside from the NICRA funds, the

15  nonNICRA funds in a particular project, does

16  headquarters have discretion to use those funds to pay

17  expenses at headquarters?

18     A   They can use program funds that can be

19  identified in support of the program or they can use

20  the overhead if they have it in their budget.

21     Q   But the overhead is from NICRA, right?

22     A   Yes, ma'am.

0169

1    Q  I'm not talking about NICRA now.  I'm just
2  talking about program funds.
3    A  If you can identify that you worked precisely
4  or you had a cost related to precisely a program such
5  as a good example was postage that we used before, that
6  can be charged directly to the program.  And I might
7  want to add that many organizations with lower overhead
8  rates do charge much more headquarters cost to program,
9  but they fall into the problems that we're discussing
10  whereby you'll have one program run short and need to
11  do work and the only place you have to turn is another
12  program.  So that's why we elect to go the NICRA route.
13  You have more flexibility.
14    MS. DOUGLASS:  Now I want to discuss the
15  question of Bob Abma's apartment.  I think that's an
16  area where I want him to be the corporate
17  representative.  Okay?
18    MS. ARIAIL:  Just to be clear, I believe this
19  has to do with the response to interrogatory number 14,
20  is that right, the first paragraph?
21    MS. DOUGLASS:  That's right.
22    MS. ARIAIL:  So that will be a corporate

0170

1  designee testimony on that subject.
2  BY MS. DOUGLASS:
3      Q   I'd like to share with you what's been
4  previously marked Plaintiff's Exhibit 32.  It is the
5  Plaintiff's Responses to Defendant's First Set of
6  Interrogatories, and I'm going to direct you to
7  paragraph 1 under interrogatory number 14.
8      A   All right.
9      Q   You've read it?
10     A   Okay.  I've read it.
11     Q   Did Bob Abma discuss with you charging a
12  project funded by USAID for rent when he actually owned
13  the building that he was living in?
14     A   Bob Abma?  Okay.  The discussion was I'm
15  entitled to -- I, Bob Abma, am entitled to a housing
16  allowance.  Yes, you are.  Can I use that housing
17  allowance to support the mortgage?  Yes, you may.  Show
18  us the documents.  And you know that if you get a
19  housing allowance, such as Jay Cooper has, you can pay
20  for utilities and maintenance on top of the rent if you
21  need to.  I understand.  However, I want to use this
22  for a mortgage.  Is that legal?  Yes, it is legal.  The

0171

1  U.S. government will allow you to use grant funds to
2  support a mortgage if you have the documentation to
3  support that you have this in lieu of getting a housing
4  allowance.  It's the same amount of dollars passing
5  across the table.  It's just instead of going to a
6  landlord, it goes to the bank.
7      Q   So he discussed it with you, and you approved
8  it?
9      A   Bob Abma discussed it with me.  I discussed
10  it with Arlene.  We got the documentation together, and
11  we approved it.
12      Q   And what government regulation permits that
13  process?
14      A   Standardized regulations for U.S. government
15  employees working overseas.  If we dig deep, deep into
16  A-122 you'll see that most of the grants in contracts
17  under the cooperative agreements allow for you to use
18  up to the amount or up to the level of the allowance
19  given under the standardized regulations of the foreign
20  service.
21      Q   What are the standardized regulations of the
22  foreign service?

0172

1    A  Those are issued by the State Department, and

2  they govern the allowances given to overseas employees,

3  ambassadors, and everybody underneath.

4    Q  Did Mr. Abma bring you documentation showing

5  who owned the house and who held the mortgage?

6    A  He sent in the documentation as to it was

7  his, it was a mortgage for him, Bob Abma.

8    Q  Okay.  Now, do you know whether or not Jay

9  Cooper had previously been denied permission --

10    A  No, ma'am.

11    Q  -- to do the same thing previously?

12    A  No, ma'am.

13    Q  Have you ever heard of the strict policy in

14  Counterpart against financial support for housing that

15  was owned by the employee?

16    A  I can only say that Arlene did not know about

17  the standardized regulations.

18    Q  That you just described from the State

19  Department?

20    A  Yes, ma'am.

21    Q  So it's possible that Arlene denied him

22  permission because she didn't know?

0173

1    A   She didn't know.

2    Q   Did you discuss this with Arlene?

3    A   I told her about the standardized

4  regulations, yes, and she said "I did not know."

5    Q   Is it Arlene that denied him the permission

6  in previous years?

7    A   I don't know.

8    Q   Did you ever hear that Bob Abma's companion's

9  mother was paid to clean the apartment and collected

10  project funds for that purpose?

11    A   No.

12    Q   Did Abma tell you that?

13    A   Abma did not tell me that he was paying his

14  mother-in-law to clean the apartment.  However, I think

15  that the housing allowance covered the mortgage.  So

16  any money taken out -- Any additional monies taken out

17  would have come from Bob Abma.

18    Q   When you say covered the mortgage, you mean

19  only covered the mortgage?

20    A   I think he was still out-of-pocket.

21    Q   All right.  So as far as you know that's not

22  true?

0174

1    A   As far as I know it could appear that he gets
2  $1,000 a month from the program for his housing
3  allowance, and he pays his grandma or mother-in-law,
4  and so you could draw that conclusion, but I mean the
5  money is fungible.
6    Q   Okay.  That's fine.  Now, this is another
7  subject which is hopefully a corporate deposition, and
8  that is whether or not -- Excuse me.  Paragraph 6 on
9  page 17 of Exhibit 32, same one you were in, just go to
10  page 17.
11       Do you know whether Counterpart pays
12  settlements to terminated employees out of project
13  funds?
14    A   We pay accrued leave, and I'm trying to -- I
15  don't recall paying any settlements, in fact, other
16  than the accrued leave and expenses during my time at
17  Counterpart because in recent years that could be a
18  lot.  In recent years, I mean, I can only think of -- I
19  can't think of that many actually.
20    Q   Well, let me give you a couple of names that
21  have come up.  Arnold Chassey, was he paid a
22  settlement?

0175

1      A   He may have gotten --

2      Q   Aaron.  I'm sorry.  Aaron Chassey.

3      A   I don't think he was paid out of program.

4      Q   What program would it have been if it was?

5      A   He was NICRA.  He worked on program

6   development.

7      Q   Okay.  So was it paid out of NICRA?  It could

8   have been I suppose?

9      A   Most likely.  He was a Washington employee

10   working on program development.

11     Q   All right.  What about Kim Alter?

12     A   Kim Alter, I don't think we paid any kind of

13   settlement to Kim Alter.

14     Q   Okay.  What about the development of new

15   proposals --

16        MS. DOUGLASS:  We're off the 30(b)(6) now.

17        MS. ARIAIL:  Okay.

18   BY MS. DOUGLASS:

19     Q   What about new proposals, were staff paid out

20   of project funds to create new proposals for

21   Counterpart?

22     A   Overseas employees work 40 hours a week.

0176

1  They're paid for 40-hour weeks.  When working on
2  proposals, these are exempt employees, and the policy
3  is you do this on a weekend.  You do it in the
4  evenings.  You don't do it on the program time.
5      Q  Have you issued a policy memo on that point?
6      A  No.
7      Q  Have you instructed people on that point?
8      A  I believe Lear has.
9      Q  In writing?
10     A  I'm not sure.
11     Q  Do you ever do anything to monitor how many
12  hours in a particular pay period they spend writing
13  proposals?
14     A  When you take a year's worth of hours, it
15  can't be more than 1 or 2 percent.
16     Q  Writing a proposal is rather intensive, is it
17  not?
18     A  It's intense for a short period of time, and
19  the majority of the work is done at headquarters.
20     Q  Have you ever seen a time sheet which
21  allocated some time to project proposal writing?
22     A  Sure.  They charge NICRA.  In every division

0177

1  Counterpart has at least one person full-time doing
2  nothing but proposal writing.
3      Q   Have you ever seen an overseas employee
4  allocate some of his time to proposal writing?
5      A  I've not seen it.
6      Q   When Arlene Lear or someone from headquarters
7  travels to the region, central Asia region, does the
8  project pay her travel expenses?
9      A   Yes.
10      Q   And does the project pay her travel expenses
11  at the Washington rate as opposed to the rate for
12  ex-pats and host country nationals that work in the
13  region?
14      A   Different rates.
15      Q   Headquarters is higher, correct?
16      A   Okay.  Per diem rates come out every month
17  from the Department of State based on exchange rates
18  and costs of living in the various countries.  Those
19  rates assume that the person doesn't necessarily know
20  the local culture, speak the local language, or is able
21  to survive on their own, and so generally those rates
22  will put the person up at the nearest local U.S.

0178

1  standard hotel.  Okay.  That's how those rates are
2  derived.
3         In the regional office of Almaty there were
4  always people coming from third countries.  They were
5  coming from Kazakhstan and Turkmenistan and whatever.
6  The office, and even the U.S. government does this, has
7  the flexibility to determine that if they can get it
8  cheaper, if they can put the person up in an acceptable
9  hotel and find that person acceptable meals for less
10  than the established U.S. State Department rate, they
11  can do that as long as they document how those costs
12  were derived.
13         So a good example is you go to a local hotel
14  and say we'll send all of our guys from Turkmenistan
15  here, and we have ten a month coming, and you give us a
16  special rate.  And so you negotiate the rate and the
17  food to boot, and that becomes the per diem.
18         And so what we're talking about here is
19  Arlene Lear didn't speak the local language.  Arlene
20  Lear goes out there every three or four months, and she
21  stayed at the Sheraton, and those costs got reimbursed.
22  And local employees had these deals that Jay Cooper was

0179

1  involved in negotiating, and they had another per diem
2  rate.  Is it right or wrong?  It's just another way of
3  saving money for the program as a whole, and that's how
4  that's determined.
5      Q   All right.  But Miss Lear's particular trip
6  didn't save money for the program as a whole.  As a
7  matter of fact, it cost them more money for the program
8  as a whole.
9      A   I didn't say it cost them more money.  It
10  cost them a different amount of money because it was
11  determined that she would not stay or wasn't going to
12  stay in the other hotel.
13        MS. DOUGLASS:  I'd like to have marked as the
14  next exhibit a multi-page document.  I'll let Mr.
15  Dorcus explain what it is.
16        (Deposition Exhibit 47 was marked for
17  identification and was attached to the transcript.)
18      A   This the detail of our general ledger which
19  the general ledger is everything charged to A452.  It
20  seems as if it's the central Asia program, but because
21  I'm not 100 percent versed in this code, I'm not sure
22  it's all of the central Asia programs or which central

0180

1  Asia.  I think it's the original one.
2     Q  CSSI?
3     A  CSSI.  But I'm not positive.
4     Q  All right.  Exhibit 47 seems to me to cover
5  fiscal year 2004 which began on October 1, 2004, is
6  that right?
7     A  It's 2005, and the date it was run was
8  September 30th -- No.  It ran on December 2nd, 2005 as
9  of September 30th, 2005.
10    Q  So it runs from October 1, 2004 to September
11  30th, 2005, right?
12    A  I believe.
13    Q  And that's considered fiscal year what?
14    A  2005.
15    Q  All right.  I've got that wrong then.  All
16  right.  Now, this document seems to show various
17  entries that correspond to expenses, is that right?
18    A  It should be everything.
19    Q  All expenses.  But there are no dollar
20  amounts on it, right?
21    A  They've been cut off because if you keep
22  reading here, beginning balance, ending balance,

0181

 1  somehow they didn't get printed here.
 2    Q   It is possible to create a similar document
 3  that has the dollar amounts as to each item?
 4    A   Sure.
 5        MS. DOUGLASS:  Miss Ariail, I'll have to ask
 6  for that.  Your e-mail suggested that the company
 7  didn't have that information.
 8        MS. ARIAIL:  I believe my e-mail suggested
 9  that we produced everything we had.  I am sure if the
10  dollars were left off, it wasn't done intentionally
11  with regard to this litigation, and I will explore
12  that.
13        THE WITNESS:  Yes, we didn't mean to do that.
14        MS. DOUGLASS:  Because it doesn't make a lot
15  of sense without the dollars.
16        THE WITNESS:  I don't know what happened here
17  because you can see beginning and ending balance, they
18  should be in there.  So as you read through there it
19  should have a beginning balance, and all these little
20  charges, and then the ending balance
21        MS. ARIAIL:  I'll look into getting you a
22  full copy.

0182

1      MS. DOUGLASS:  Okay.  And here is what I
2  believe to be a similar document for the Healthy
3  Communities project, and I'd like a corrected one of
4  that too.  Let's mark this as the next document.
5      (Deposition Exhibit 48 was marked for
6  identification and was attached to the transcript.)
7      THE WITNESS:  So I don't know if that was a
8  printing problem or we may have sent this
9  electronically, and I don't know what happened here,
10  but it didn't get printed.
11  BY MS. DOUGLASS:
12    Q   Okay.  So are you agreeing with me that
13  Exhibit 48 appears to be the ledger run for the same
14  period but for the Health project?
15    A   Yes, it would appear.
16    Q   Which would be the A449 code?
17    A   Yes.
18    Q   Now, you're obligated by law to keep records
19  of expenditures on various projects, correct?
20    A   Yes, ma'am.
21    Q   And you have to keep them for a substantial
22  amount of time?

0183

1    A  Yes, ma'am.
2       MS. DOUGLASS:  Can I have marked as the next
3    exhibit appears to be a Form 990 for Counterpart for
4    tax year 2003.
5       (Deposition Exhibit 49 was marked for
6    identification and was attached to the transcript.)
7    A  This is '04.
8    Q  For some reason --
9    A  It's confusing.  They give you the period
10   October 1, '03 to '04.  The feds put this date on here,
11   but this is as of the end of fiscal year '04.
12   Q  Okay.  So I've been saying all the questions
13   wrong because I assumed that the --
14   A  Usually a year off.
15   Q  All right.  So even though it's the tax
16   return for year 2003, it's the expenditures for the
17   year 2004?
18   A  Yes.
19   Q  Good.  All right.  That explains a lot of
20   things.  All right.
21      MS. ARIAIL:  I'm sorry.  I want to clarify.
22   We're looking at row A, October 1, 2003 to September

0184

1   30, 2004.
2       THE WITNESS:  Yes.
3       MS. ARIAIL:  Okay.  That was just for my
4   clarification.
5   BY MS. DOUGLASS:
6       Q   So Exhibit 49 covers, except for the last two
7   months or month and a half, the last year of Jay
8   Cooper's term at Counterpart, correct?
9       A   It covers, yes, except for the last two
10  months.  That's right.
11      Q   Now, if you'd look on Schedule A.
12      MS. ARIAIL:  Why doesn't this have Bates
13  stamps?  Did we produce this?
14      MS. DOUGLASS:  No.  These are publicly
15  available documents.
16      MS. ARIAIL:  Okay.  I just want to object to
17  the extent we haven't had a chance to review it as it's
18  just being introduced now.
19      MS. DOUGLASS:  I can't introduce a publicly
20  available document?
21      MS. ARIAIL:  You are introducing it.  I'm
22  just objecting.

0185

1       MS. DOUGLASS:  Okay.

2   BY MS. DOUGLASS:

3       Q   If you see Schedule A which is about five

4   pages in.

5       MS. ARIAIL:  Page numbers would have helped.

6   There are page numbers.  Page 5.  The page numbers are

7   right there.

8       A   Page 5 or 7?

9       Q   7.  I didn't even notice that.  Good.  It

10  shows that aside from the officers and directors, Jay

11  Cooper was the most highly paid Counterpart employee in

12  fiscal year 2004, is that correct?

13      A   It would appear so from this report.

14      Q   And the reason for that is because of the

15  importance of the projects that he managed to the

16  company, is that right?

17      A   That along with his years of experience.

18      Q   And that was because he had more

19  responsibility than any other chief of party at the

20  time he was terminated, is that right?

21      A   More responsibility?  I don't know.

22      Q   Okay.  He certainly had substantial

0186

1   responsibility, is that right?

2      A   He had substantial responsibility.

3      Q   Let's turn to statement 3.

4         MS. ARIAIL:  Pat, before we do that, on page

5   6 can you just say on the record whether you got the

6   document with that part blacked out?

7         MS. DOUGLASS:  I got it that way.  I have no

8   idea why.  These things are electronic.

9         MS. ARIAIL:  I just wanted to make sure.

10  BY MS. DOUGLASS:

11     Q   This was signed by you on page 6, right?

12     A   That's me, of course.  I don't know why --

13  Gelman's preparer signs.  Well, you've got the preparer

14  right there.  I don't know why it's blacked out there.

15     Q   I got it off a web site.  I have no idea

16  either.  But it looks like an accurate copy of the tax

17  return for a nonprofit organization, correct?

18     A   It's a 990.  This is what we send to the IRS.

19     Q   All right.  Let's look at statement 3 which

20  is on 14.  Now, under Other Expenses there are all

21  kinds of descriptions of expenses along the left-hand

22  column and over onto the next page, correct?

0187

1    A  Uh-huh.

2    Q  And then there's a total column which is A, a

3  Program Services column which is B, and a Management

4  and General column which is C, correct?

5    A  Yes.

6    Q  Now, is column C headquarters only?

7    A  Is column C headquarters only?  Yes.  For the

8  most part it's headquarters only.

9    Q  What do you mean by for the most part?

10    A  Well, you see the allocation $4,151,894 at

11  the bottom of 14.

12    Q  That's the NICRA number, isn't it?

13    A  Yes, that's the NICRA number.  Now, you net

14  that out with all these costs, and it nets into

15  $353,158.  So when you say all of it is headquarters, I

16  was trying to determine okay, the $4,151,894 is NICRA,

17  and that's headquarters.  We've determined that.  Okay.

18  Then we net out all these costs, and they net to

19  $353,158.

20      So I was trying to respond to your question

21  with okay, the $353,158 where is that negative number

22  coming from, and where is it being spent.  And so that

0188

1    $353,158 is what we pay out of our own money, and I'm
2    not sure where that is spent at all times.  Some of it
3    may be outside the United States
4        Q    But when you say when we spend out of our own
5    money, do you mean out of project funds?
6        A    No.
7        Q    Out of what fund?
8        A    Counterpart's funds.
9        Q    There is a sharing arrangement within USAID
10   cooperative agreements, right?
11       A    Yes.  A lot of those are in kind
12   contributions, not cash.
13       Q    All right.
14       A    So those in kind things, they're not in here.
15       Q    Is that what you were talking about when you
16   said our own money, the sharing part?
17       A    No.  No.  This is Counterpart's cash.
18   Counterpart spent money of its own.
19       Q    So you don't think that that $353,158 is
20   program funds?
21       A    No, ma'am.
22       Q    All right.

0189

1     A   The program funds were the $4,151,894 of
2   which we spent $353,158 more.
3     Q   Well, for example, let me check some of the
4   line items and see if this clarifies it.  Look at the
5   amount for consultants, if you go down to on page 15?
6     A   $817,000.
7     Q   There's a huge amount of money for
8   consultants.
9        MS. ARIAIL:  Objection to the
10   characterization.
11        MS. DOUGLASS:  Correct.  I withdraw the huge
12   statement.
13   BY MS. DOUGLASS:
14     Q   $5.3 million was spent on consultants for
15   projects, right?
16     A   Yes, ma'am.
17     Q   And then $817,000 was spent on consultants.
18   Could that be consultants for headquarters?
19     A   I don't know how the -- I don't see salaries,
20   say for instance my salary.  I think that's the way our
21   CPA firm categorized it.
22     Q   Well, your salary is up front here.

0190

1      A   Yes, but in these other expenses -- Repeat
2   the question again because I want to make sure we're
3   communicating here.
4      Q   All right.  My big question that we've been
5   sort of fleshing out is whether column C, the expenses
6   listed in column C on pages 14 to 15, are headquarters
7   expenses and whether or not they're paid out of NICRA
8   or out of program funds.  That's what I'm trying to
9   find out.
10        MS. ARIAIL:  Objection to both asked and
11   answered.
12        MS. DOUGLASS:  I don't think it has been
13   answered.  I think we're struggling with it.
14      A   Headquarters can use program funds if they
15   can identify the cost.  So even if they are for program
16   costs, if these can be identified back to that program.
17   Stipends are interns.  We have interns that come in and
18   work only for programs, and they get charged to those
19   programs.  Temporary help, same thing.  Computer
20   supplies, same thing.  Headquarters can use program
21   costs.
22      Q   Okay.  Then if we assume column C is only

0191

1  headquarters, that $353,158 number at the bottom of the
2  column could include both program funds that have been
3  designated to benefit programs and what you called
4  Counterpart's own money, right?
5      A   Could include Counterpart's own money.
6      Q   And program funds that were designated, for
7  example, interns that worked on a particular program.
8      A   Right.
9      Q   All right.  But we really don't know if
10 column C also includes some funds spent for management
11 in the projects overseas.  Am I right about that?
12     A   We can go back, and the first line item will
13 be easy to track back as to what these people did to
14 spend the $60,000.  That would be in support of
15 programs overseas, indirect support.
16     Q   But they could also be doing it overseas?
17     A   Yes.
18     Q   We don't know from this document.
19     A   That's right.
20     Q   All right.  So management in general really
21 adds up to in fiscal year 2005 a combination of
22 $3,429,357 which is the bottom of column C --

0192

1      MS. ARIAIL:  Pat, I'm sorry.  I think you
2  mean fiscal year 2004.
3      MS. DOUGLASS:  You're right.  Thank you.
4  BY MS. DOUGLASS:
5    Q   This is a complicated question, I warn you.
6  Is it true from Exhibit 49 that we can conclude that
7  management and general expenditures in all of
8  Counterpart encompassed both the NICRA amount of
9  $4,151,894 plus the total at the bottom of column C
10  which is another $3.4 million?
11    A   State the question again.
12    Q   Management and general spending in fiscal
13  year 2004 in Counterpart totaled, one, the NICRA amount
14  which is $4,151,894 and, two, the sum of the management
15  and general column C in this Exhibit 49 which is an
16  additional $3.429 million?
17    A   Yes.
18    Q   Now, let's look back at Exhibit 47 which is
19  the CSSI ledger.
20    A   Okay.
21    Q   Look at the date 10/30/2004 on the first page
22  of Exhibit 47.

0193

1     A   Okay.

2     Q   It shows salary to Abma, salary to Alter,

3   salary to Cooper, salary to Kunz all on the same date?

4     A   Yes.

5     Q   Now, that will not be the entire salary that

6   went to those people because there will be an

7   allocation to the other projects, correct?

8     A   Correct.

9     Q   And that allocation should follow the budget

10  for the CSSI program which was Exhibit 43 unless it has

11  been modified by a written agreement with USAID,

12  correct?

13    A   It may or it may not, and it doesn't

14  necessarily have to be approved by AID.

15    Q   So the answer is it may or it may not.  All

16  right.  But there should be some kind of allocation,

17  right?

18    A   There should be an allocation.

19    Q   All right.  And that's also true if you look

20  on page 1145 on Exhibit 47?

21    A   1145.  Fringe?

22    Q   Yes, fringe and pension plan?

0194

1     A   Uh-huh.
2     Q   And 1146, housing allowance?
3     A   Uh-huh.
4     Q   And 1150, travel?
5     A   Okay.
6     Q   That should be allocated too, correct,
7   because those people worked on more than one project?
8     A   Right.
9     Q   Now, if you'd look on 1154 in Exhibit 47,
10   there's a travel item -- two travel items.  This is at
11   the bottom of the page.  On 11/30/2004 and 12/31/2004
12   travel to Bishkent, Kyrgyzstan.
13       A   What page are you on?
14       Q   On page 1154.  On 11/30/2004 it shows an
15   item, we don't know the dollar amount, but for travel
16   to Bishkent, Kyrgyzstan.
17       A   11/30/2004, Bishkent, yes.
18       Q   Would that be the travel by Kelli Boyer?
19       A   Can't tell.
20       Q   Would it be appropriate to charge Kelli
21   Boyer's travel to Kyrgyzstan to the CSSI project or
22   would it be proper to allocate it?

0195

1    A   Kelli Boyer's travel could be charged
2  depending on how she worked when she went.  That's a
3  judgment call.  I mean, she worked on all the programs,
4  so it would be easiest and be less controversial to
5  charge it across all the regional programs there.
6    Q   To allocate it?
7    A   Allocate it.
8    Q   Okay.  For every program Jay Cooper worked
9  on?
10    A   Every program there in Almaty which is where
11  she was working.
12    Q   Do you know whether that was done?
13    A   I don't know.
14    Q   Okay.  And the same sort of allocation should
15  have happened in the ledger for the Health program that
16  we've seen as the next exhibit, correct, 48?  If we had
17  the numbers there, we should be able to tell whether or
18  not it was allocated between CSSI and Health?
19    A   1158?
20    Q   No.  Exhibit 48 is the equivalent for the
21  Health project.
22    A   I'm with you.  Okay.  Over on Health project

0196

 1  for Kelli Boyer's trip, if she was charged we should
 2  find the same thing if that's indeed Kelli Boyer which
 3  we don't know.
 4      Q   Okay.  Now, look at the first page of Exhibit
 5  47 just for a minute.  I find an S. Alter beginning a
 6  salary entry on 10/30/04.  I believe that is Kim Alter
 7  and she has a first name like Syria, is that right?
 8      A   I think you're correct.
 9      Q   All right.  When was she separated from --
10      A   I don't recall the date.
11      Q   But if she's still being paid on 10/30,
12  either she was still working there or she got a
13  severance that went that far?
14      A   Correct.
15      Q   And if she got a severance that --
16      A   Or she had accrued annual leave that brought
17  her into that pay period.
18      Q   Would that be a salary entry?
19      A   It would be back there on fringe.  Annual
20  leave is in the back.  So that should be her last time.
21      Q   So if she wasn't working for Counterpart any
22  time during the pay period ending on 10/30/04 --

0197

1    A   10/30/04 should be the pay period from 10/15.
2  See, they're usually two weeks behind.
3    Q   All right.  So if she wasn't working for
4  Counterpart in October of 2004 at all, then this is
5  evidence that whatever separation was paid to her was
6  paid from project funds?
7    A   I don't know.  I can't say definitively.  It
8  could be.
9    Q   All right.  Did USAID do an assessment of the
10  CSSI project in the summer of 2005?
11    A   I'm not sure.
12    Q   How would one find that out?
13    A   Arlene Lear would have documents in the file.
14    Q   Have you ever seen an assessment of the CSSI
15  project by USAID?
16    A   No.
17    Q   Is that something that would normally cross
18  your desk?
19    A   No.
20    Q   Did Counterpart do an internal assessment of
21  CSSI in 2004 in preparation for the USAID assessments
22  later?

0198

1    A   When programs come to an end, a monitoring
2  and evaluation study is usually always done for the
3  donor.  So I'm assuming that it was coming to an end,
4  and it very well could have been done.
5    Q   By Counterpart?
6    A   By the program.  You pay it out of the
7  program funds.
8    Q   And do they hire a consultant to do it?
9    A   Third party.
10    Q   All right.  But you don't know if that's
11  happened with CSSI?
12    A   I don't recall.
13    Q   Does such an assessment include an audit of
14  the expenditures?
15    A   AID will come in and audit, and they accept
16  our auditor's review of the expenditures.  The
17  evaluation picks up the reports.  Nothing detailed.
18  They pick up the financial reports as they go to
19  management and use them, but it's not an audit.  It's a
20  review of the deliverables, the program deliverables.
21  And so they're reporting on hopefully the important
22  things which is what they started the program to do.

0199

1     Q   Now, Counterpart had a grievance procedure
2  that was part of its manual for overseas employees,
3  correct?
4     A   I don't know on the overseas.  I'd have to
5  check.
6     Q   Let's find Exhibit 7.  It should be on page
7  23.  Have you ever read the grievance procedure set out
8  in Exhibit 7?
9     A   I read the one for the domestic employees.
10  I'm not sure I've read this one.
11     Q   Take your time.
12     A   Okay.
13     Q   Did you come to learn that this grievance
14  procedure was rescinded at some point in 2004?
15     A   I knew we were talking about this, this is
16  the line of questioning I thought from our earlier
17  conversation, but now we're talking about the foreign
18  manual versus the domestic one, and we'll just have to
19  assume we're talking about both at the same time.
20     Q   In other words, in your mind the two are very
21  different or are different in some way?
22     A   No, they're not.  The overseas one has a lot

0200

1  of things pertaining to overseas benefits that the
2  domestic guys it just doesn't apply.  But with respect
3  to grievance, it should be the same if we elect to.
4      Q   Okay.  Miss Lear testified that you were
5  involved in establishing a new grievance procedure
6  after this one was abolished.  Is that accurate?
7      A   This is -- I was involved with Kelli Boyer's
8  work with Miss Richards, our counsel, and that's what
9  she's pertaining to is Kelli was going back and forth
10  with counsel on how to word this, whether to word it.
11      Q   And what time frame was this happening?
12      A   Now, this is -- I'm not sure because it
13  passed a long period of time.
14      Q   Now, the memo that announced to the employees
15  that the grievance procedure was being abolished said
16  that it was considered unnecessary because of the open
17  door policy.  Do you remember hearing that?
18      A   Yes.
19      Q   And did you get any feedback from your
20  employees as to whether the open door policy was
21  sufficient?
22      A   No.  Neither positive nor negative.

0201

1     Q   Now, the open door policy is at page 4 of the
2  manual, if you can look at Exhibit 7, 2.4 at the top of
3  the page.  Do you consider that an adequate policy to
4  meet Counterpart's obligations to its employees?
5        MS. ARIAIL:  Objection on the grounds that
6  it's broad.  You can answer.
7     A   Sure.
8     Q   Were you involved in any discussions before
9  the grievance policy was removed that involved Mr.
10  Cooper?
11     A   Wait a minute.  I don't know that -- I've
12  been talking about Mr. Cooper from almost the first day
13  that I started work at Counterpart, and I don't know
14  the dates in which the grievance talks started.  So I
15  don't know if I had talks along the line involving Mr.
16  Cooper.
17     Q   Did you ever hear anyone say that they
18  expected Mr. Cooper to file a grievance?
19     A   No.
20     Q   Did you ever hear anyone say that if the
21  grievance policy were abolished, it would give Mr.
22  Cooper less leverage in which to press his objections?

0202

1     A   No.
2     Q   Was the grievance policy reinstated at some
3   point?
4     A   I don't believe it was.
5     Q   Why not?
6     A   Advice of counsel.
7     Q   Was there a draft that was circulated?
8     A   Only between counsel and us.
9     Q   What are the circumstances under which Bob
10   Abma left Counterpart?
11     A   The project came to an end.
12     Q   Was he offered another position?
13     A   We have an agreement with Bob Abma to do
14   consulting upon availability of funds.
15     Q   Was he offered a regular employment position?
16     A   No, ma'am.
17     Q   Was there any dissatisfaction with Mr. Abma's
18   performance?
19     A   Was there dissatisfaction?
20     Q   Yes.
21     A   In general, no.
22     Q   In particular?

0203

1     A   In particular there were instances where
2  things would come up that Arlene felt as if he should
3  have handled auditors, but when the details were known,
4  he did handle the auditors just fine.  So no one is
5  perfect.
6     Q   Were any financial irregularities found in
7  areas for which he was responsible after his departure?
8     A   We had a problem in Tajikistan but nothing
9  that he was responsible for.
10     Q   What was the problem in Tajikistan?
11     A   We had some procurement problems.
12     Q   Wasn't Mr. Abma responsible for financial
13  management of Tajikistan projects?
14     A   Precisely the problem was we bought Iranian
15  plastic pipe for an irrigation project because it was
16  cheaper and better, and Bob Abma missed the origin.
17     Q   Was there a problem with buying pipe from
18  Iran?
19     A   You can't buy Iranian pipe nor tractors nor
20  air.
21     Q   And so was there an adverse result as a
22  result of this purchase?

0204

1    A  It's not determined yet.
2    Q  Were there any other problems that arose
3  after or around the time of Mr. Abma's departure?
4    A  No, ma'am.
5    Q  Who is Eric Pacifica?
6    A  He is the gentleman who's handling our
7  activities in Tajikistan until we can get a full-time
8  person.
9    Q  So he's the chief of party or something?
10   A  He's the acting.  He's a consultant there for
11  us.
12   Q  Are there any projects going on in Tajikistan
13  at the moment?
14   A  Food security.
15   Q  Is that all?
16   A  That's plenty.  Food security encompasses
17  AIDS, agriculture, and maternal child health.
18   Q  Has Mr. Pacifica uncovered any financial
19  irregularities?
20   A  He's the person we're talking about the pipe
21  with.
22   Q  Has he found other accounting irregularities?

0205

 1      A   He's brought things up, but we've always
 2   gotten Abma in, and those things were proven to be
 3   misnomers, to be false.  And so he's brought two or
 4   three things forward, and we always come back and Bob
 5   will say did you check this and did you check that, and
 6   Pacifica says no.  And so when he does, it tracks back.
 7      Q   So Bob is being consulted as Mr. Pacifica
 8   finds things?
 9      A   Yes.  Because he's the only one who has the
10   knowledge of a lot of these things that took place, but
11   we do have Yana now.  Yana was out on maternity leave,
12   and she is also quite versed in many of these
13   situations, but she was out on maternity leave for the
14   most part of '06.
15      Q   So Yana is still working for Counterpart?
16      A   Yes, ma'am.
17      Q   Did Mr. Pacifica uncover 400 kilos of
18   chocolate that had been ordered for the office in
19   Tajikistan?
20      A   Say again?
21      Q   You haven't heard about the 400 kilos of
22   chocolate?

0206

1    A   No, ma'am.

2    Q   Okay.  Is there any plan to have Mr. Pacifica

3  work with any of the other offices in the central Asia

4  area?

5    A   We're uncertain as to the future of Mr.

6  Pacifica because his fiancee is an AID direct hire

7  employee, and he'll want to move when that person gets

8  reassigned, and so he can't be definitive with us as

9  far as his commitment in Tajikistan.  So we're looking

10  for a replacement.  We would like to keep Mr. Pacifica.

11  However, because of his personal situation, it's hard

12  to run a program when you have someone who's going to

13  leave or may leave in the next month.

14    Q   Okay.  Let's move on to Kim Alter if we

15  could.  Did you hire Kim Alter?

16    A   Me, no.  I signed her contract, but I did not

17  make the decision to hire her.  She worked for Arlene

18  Lear under that program.

19    Q   All right.  Arlene hired her then?

20    A   Arlene in conjunction with Jay.

21    Q   Was she for some reason to report jointly to

22  Don Feil and Jay?

0207

1      A   She did consulting for Don Feil a number of
2  times, three or four times.
3      Q   Was her work on any particular project or on
4  multiple projects?
5      A   Be more clear, was her work?
6      Q   I'm sorry.  Was her work in support of any
7  particular Counterpart project or projects?
8      A   Her work was in support of the regional
9  program in Almaty that Jay supervised.  For Don Feil
10  she did program development.  She wrote papers.  She
11  wrote project papers.
12      Q   Is it fair to say that Miss Alter didn't take
13  direction terribly well?
14      A   I have no knowledge of her ability to or not
15  to take direction.
16        MS. DOUGLASS:  I'll have marked as the next
17  exhibit a multi-page document entitled Resolution of
18  Alter Employment Related to Pregnancy.
19        (Deposition Exhibit 50 was marked for
20  identification and was attached to the transcript.)
21  BY MS. DOUGLASS:
22      Q   If this helps, I'm only going to ask you

0208

1  about the first two pages.
2     A   Good.
3     Q   This woman has never met a keyboard she
4  doesn't like.
5     A   Okay.
6     Q   Have you ever seen Exhibit 50 before?
7     A   No.
8     Q   Exhibit 50 appears to suggest two different
9  options for resolution of her employment.  My question
10  is do you know which one was followed?
11     A   I was trying to remember that.  I thought she
12  went to Brussels and had her child, and I'm not sure
13  either one of these were followed.
14     Q   Okay.  Your understanding is she ceased being
15  a Counterpart employee though at some point?
16     A   Yes, ma'am.
17     Q   Or a consultant.  Was she a consultant rather
18  than an employee?
19     A   She was an employee.
20     Q   Was Counterpart happy with her services?
21     A   As far as I know her services -- She did
22  not always get along well with her supervisors, but her

0209

1  work was good.
2     Q   Do you know if she was paid a settlement?
3     A   No.
4     Q   No, you don't know?
5     A   No, I don't know.
6     Q   And you don't know what project funds she was
7  paid from?
8     A   The project she worked on.
9     Q   So it would be allocated?
10    A   Yes.
11    Q   Now, is it true that Arlene Lear's division
12 of Counterpart is the most successful division in the
13 company?
14    A   It's a matter of interpretation.  If you look
15 at the numbers, Food Security Division brings in almost
16 as much because Arlene -- It's misleading because if
17 you look at the numbers superficially, her grant level
18 is way over.  If you look at the amount of NICRA earned
19 on Arlene's programs, she gives up a lot when she
20 submits bids in order to win.  And so in other words,
21 she lowballs, and the benefit to Counterpart is the
22 same as what Food Security does with one-half the

0210

1  amount of grants.
2      Q  I thought you told me the NICRA rate is the
3  same on every project?
4      A  Remember the grant pools.
5      Q  Oh, she's a grant pool person.
6      A  So she'll get a $15 million grant, and
7  $10 million of that is a grant pool that we don't draw
8  any overhead off of.  And so it takes an awful lot of
9  accounting with those small little community
10  associations she's setting up all over Kazakhstan
11  giving each one $5,000.  You have to track all those
12  receipts.  That's a lot of work and communication and
13  responsibility.  And so we do that basically for free.
14      Q  Well, aside from a cost perspective, would
15  you say she's successful in promoting the mission of
16  the programs?
17      A  Yes, ma'am.
18      Q  And the goals of Counterpart?
19      A  Yes, ma'am.
20      Q  Has she been rewarded for her success
21  monetarily?
22      A  She gets her salary increase and bonus like

0211

1  everybody else.

2      Q   Does she get large bonuses compared to other

3  people?

4      A   Compared to who?

5      Q   Compared to other vice-presidents.

6      A   Compared to Lelei, no.  Compared to some

7  other vice-presidents, yes.  Not all.

8      Q   And those decisions are made by Lelei,

9  correct?

10     A   By Lelei.

11     Q   And he rewards her for success in her

12  programs?

13     A   (Witness nods).

14     Q   And Jay Cooper was in 2004 the manager of the

15  largest segment of her programs?

16     A   Active programs.

17     Q   Were you at Counterpart when Brian Propp was

18  fired as CFO?

19     A   No.  I was there, but he wasn't the CFO.  I

20  was the CFO.

21     Q   You were the CFO.  He was a vice-president,

22  right?

0212

1    A   Yes, in charge of the CHAP division,
2  Community Humanitarian Assistance Programs.
3    Q   Did you order that locks be put on Mr.
4  Propp's door?
5    A   The door was locked by advice from counsel.
6    Q   That was some weeks after he was told he was
7  terminated, correct?
8    A   There's a story behind that, and I'm not sure
9  exactly what it is, but there was a question whether he
10  was coming in to use the computer, and so we locked the
11  doors.
12    Q   But the doors were not locked at the time he
13  was told he was terminated, correct?
14    A   We were advised by counsel.  I don't know if
15  we did it the same day.  We were told to do that.
16    Q   You were told by counsel to do that?
17    A   (Witness nods).
18    Q   Was there some concern that Mr. Propp was
19  stealing things?
20    A   It was a computer issue.
21    Q   What was he doing with his computer that was
22  questionable?

0213

1     A   Nothing.
2     Q   What were people afraid he was going to do
3  with his computer?
4     A   The computer is Counterpart's asset.  They
5  can control their assets as they see fit.
6     Q   So they didn't want him to use his computer?
7     A   Correct.
8     Q   But he was or was not allowed to do that?
9     A   He was not allowed.
10     Q   Okay.  And your understanding was it was soon
11  after he was fired?
12     A   Soon.
13     Q   Did you see the locks on the doors?
14     A   No.  We replaced the core, you know.
15     Q   So it's a lock on a doorknob kind of thing?
16     A   Yes.  We don't put padlocks on the doors.
17     Q   Okay.  What about Greg Touma, were you there
18  when he was fired?
19     A   No, ma'am.
20     Q   What about Aaron Chassey, were you there when
21  he was fired?
22     A   Yes, ma'am.

0214

1      Q   Where was Aaron Chassey's office when he was
2   fired?
3      A   Where?
4      Q   Yes.
5      A   Next to Arlene I believe.
6      Q   It was in headquarters?
7      A   Yes.
8      Q   Was his office locked?
9      A   When he left?
10     Q   Right.
11     A   I don't believe.
12     Q   Okay.  Was he involuntarily terminated, Aaron
13   Chassey?
14     A   Yes.
15     Q   Was he paid a settlement?
16     A   He was paid his accrued leave and expenses.
17     Q   That's all?
18     A   That's all that I know of.
19     Q   Is he under some kind of a confidentiality
20   agreement?
21     A   Yes.
22     Q   Was that a condition of him getting paid his

0215

1  accrued leave and expenses?
2      A  I don't -- I believe so.  I'm not sure.
3      Q  Who decided to lock Jay out of his office in
4  Almaty?
5      A  That was under the advice of counsel.
6      Q  But who made the decision for the company?
7      A  I did.
8      Q  Did you doubt Jay's honesty?
9      A  It wasn't a matter of honesty.  It was a
10  matter of when you get into a situation such as this
11  with an employee, you have no idea what they're going
12  to do.  And so this is really the safest for all
13  parties concerned to keep as much control as you can
14  over these situations.  So it's not a matter of
15  honesty.  It's a matter of management.
16      Q  Did you have any basis for thinking Mr.
17  Cooper was going to do something irrational?
18      A  No.
19      Q  Do you know what the culture of central
20  Asia's attitude toward people who are terminated is?
21          MS. ARIAIL:  Objection.  Overbroad.  You can
22  answer.

0216

1      A   Jay Cooper is an American.

2      Q   All right.  Arlene testified that the

3   decision to lock him out of his office was because he

4   said he was going to get a lawyer.  Do you agree with

5   that?

6          MS. ARIAIL:  Objection to the extent that I

7   don't recall that, so I'm objecting on the grounds I

8   don't know if that's true.

9      A   You know, whether she said it or she didn't

10  say it, you know.

11     Q   We'll read it to you.

12     A   Okay.

13     Q   This is page 170, 171.  Question:  And his

14  being instructed not to come into any Counterpart

15  office was for what purpose?  Answer:  Jay's parting

16  words, the conversation that we had on November 12th,

17  he was going to get a lawyer, and so consequently there

18  was a self-protection motive.

19         MS. ARIAIL:  I object just on the grounds

20  that we can't see that to verify it.  I'm not

21  questioning that she's reading from the transcript.

22     A   And the question is?

0217

1    Q  Did the fact that Jay said he was going to

2  get a lawyer factor into your decision to lock his

3  office?

4    A  Absolutely not.

5    Q  All right.  You don't think there's anything

6  wrong with Jay having a lawyer, do you?

7    A  No, ma'am.

8    Q  Counterpart had a lawyer that was advising

9  it, correct?

10    A  Yes, ma'am.

11    Q  What is Counterpart's whistle-blower policy?

12    A  What is it today?  What was it?  Because it's

13  been in transition, and this is the third time we've

14  been over the whistle-blower thing.

15    Q  I would like to see the whistle-blower

16  policy.  I have never seen one in writing.  Is there

17  one in writing?

18    A  I believe that we were instructed to use the

19  open door policy in lieu.  So I don't think you'll see

20  a whistle-blower policy per se.

21    Q  I thought the open door policy was in lieu of

22  the grievance procedure?

0218

1     A  I don't -- I'll have to check.
2     Q  I'm not arguing with you.
3     A  I'll have to check.
4     Q  All right.  Just let me get this straight.
5  At the time Jay was fired, was there a written
6  whistle-blower policy to your knowledge?
7     A  I think there was.
8     Q  Okay.  And it was put out --
9     A  Because I'm getting whistle-blower and
10  grievance mixed up also because the whole book, this
11  goes back to the Kelli Boyer thing, both the handbooks
12  were under review, and grievance/whistle-blower were
13  part of what was being kicked around.  And, you know,
14  Jay Cooper, none of that got involved with it.  The
15  lawyer was reading the handbooks and said maybe this is
16  a good idea, maybe this is not a good idea.  There was
17  all this advice going back and forth about what you
18  need and what you don't need.  That's why I'm not sure
19  which was where when.
20     Q  Okay.  But no revision of the handbook, which
21  is Exhibit 7 which is in front of you, has come out
22  yet, is that correct?

0219

1    A  I believe it has.

2    Q  It has.  And when did it come out?

3    A  Just in the last three or four months.

4    Q  Okay.  But before then, no revision of the

5  handbook came out?

6    A  No revision had come out.

7    Q  So if they were kicking it around, it wasn't

8  publicly disseminated to the employees at the time Jay

9  was fired?

10    A  No, ma'am.

11    Q  Okay.  Now, Aaron Chassey wrote a memo which

12  I can show you if you need to see it, and I'll be glad

13  to, that was critical of various things in the central

14  Asia region office including Jay Cooper.  Have you ever

15  seen that memo?

16    A  No, ma'am.

17    Q  Miss Lear has said that it had no bearing on

18  his termination.  Is your understanding that it had any

19  bearing on his termination?

20    A  I don't believe it did.

21    Q  Is that because Arlene Lear didn't believe

22  Aaron Chassey?

0220

1      A   I think his termination had to do with his
2   performance and not what he wrote with respect to
3   what's going on in Almaty or his opinion about what was
4   in Almaty, but what he did when she sent him on to
5   design a program.
6      Q   All right.  She sent him to the central Asia
7   region to design a program, is that right?
8      A   (Witness nods).
9      Q   All right.  So there's nothing that happened
10   between Arlene Lear and Aaron Chassey that made Aaron
11   Chassey's credibility in doubt, is that true?
12      A   His credibility?  I don't know specifics
13   about what took place when she sent him to Almaty, and
14   so I can't answer that question.
15      Q   Do you know that Mr. Chassey apparently filed
16   a grievance against Arlene Lear?
17      A   Yes.
18      Q   Have you ever seen it?
19      A   I did see it.
20      Q   Was it investigated?
21      A   Yes.
22      Q   Who investigated it?

0221

1    A  Mr. Lovelace.

2    Q  Did he write a report?

3    A  I don't recall what took place.

4    Q  Was the investigation completed?

5    A  You know, I don't remember exactly what his

6  findings were on that.  I know that there were

7  discussions held about Chassey and the grievance

8  against Arlene.

9    Q  Did the merits of the grievance have anything

10  to do with Arlene's management style?

11    A  Did the merits of the agreement?

12    Q  Of the grievance.

13    A  Of the grievance.  It had to do with the way

14  she spoke with him, and she brushed up against him or

15  something like that.  So if that's management style, I

16  would guess you could say it is, that she spoke to him

17  in a manner that he didn't appreciate.  So that's all I

18  recall.

19    Q  All right.  The manner he didn't appreciate

20  being harsh?

21    A  Harsh.

22    Q  Was it Mr. Lovelace's conclusion that Mr.

0222

1  Chassey had been lying about that?

2      A   That it was exaggerated.

3      Q   Miss Lear can be a somewhat difficult boss,

4  is that fair to say?

5          MS. ARIAIL:  Objection to the

6  characterization.

7      A   Difficult?  I don't know what that means.

8      Q   Have you ever heard anyone complain about

9  Miss Lear being difficult to get along with?

10     A   Arlene is a thorough individual who demands a

11  lot of her employees.

12     Q   Some people respond to that better than

13  others I assume?

14     A   You've got it.

15     Q   Okay.  The interrogatory answers that your

16  company has made, and I'll show them to you if it's

17  necessary for this question, say that you relied on

18  certain documents in connection with Jay Cooper's

19  termination, and one of them that they identified was

20  the manual for overseas employees.  Can you tell me

21  what in the manual you relied on?

22     A   For his termination?

0223

1     Q   Yes.

2     A   Well, there was something floating around

3   about what he had done with Kim Alter with respect to

4   harassment.  There was -- Let's see.  The performance

5   review issues with respect to the prior six or eight

6   months before the time he was released.  That's all I

7   can recall.

8     Q   Is it your understanding that he got a

9   performance review sometime in the prior six to eight

10   months before he was released?

11     A   It is my understanding that he and Mrs. Lear

12   had numerous discussions with respect to his

13   performance and different options which he could choose

14   with respect to his future with Counterpart, and none

15   of those options included leaving Counterpart.

16     Q   And your source for believing this is simply

17   Miss Lear told you that?

18     A   Mrs. Lear.

19     Q   Okay.

20     A   And Sloan from the retreat.

21     Q   I thought you never talked to Miss Sloan

22   about the retreat?

0224

1    A  I got the report.
2    Q  Oh, you did?
3    A  I've got it somewhere.  I've got an e-mail
4  with what was written up.
5    Q  I thought you testified you had not gotten
6  that, but all right.  You did read the e-mail written
7  by Barbara Sloan?
8    A  I got the report to pay her.
9    Q  But you don't remember if you read her
10  report?
11    A  I don't remember if I read her report, and
12  according to Arlene a lot came out of the retreat that
13  he was offered options, and he could not live with any
14  options.  And so she was bending over backwards to
15  accommodate, and he would not respond.  He had one
16  thing in his mind:  Almaty, Almaty, Almaty.
17    Q  And the thing that was floating around about
18  Kim Alter, did you use something Kim Alter said in your
19  decision to --
20    A  That was Lear again.  And I don't know if I
21  saw -- I don't recall how I got the information with
22  respect to Alter.

0225

1    Q   But you used whatever information was
2  connected with Alter in connection with deciding
3  whether termination was appropriate?
4    A   Yes.
5    Q   You did.  All right.  I thought you told me
6  previously that it was Arlene and Lelei that decided to
7  terminate her?
8    A   But I was there.
9    Q   But you there were, and you brought up the
10  Kim Alter thing?
11    A   No.  She brought up the Kim Alter thing.
12    Q   Oh, she did.  At that meeting with Lelei?
13    A   I don't know.
14    Q   But she brought it up at some point?
15    A   It was brought up in the various discussions
16  as another thing of what's going on, we sent Alter out
17  there and, you know, he has this problem with women.
18    Q   So as far as you know, Arlene Lear was
19  crediting what Kim Alter said about Jay?
20    A   Yes.
21    Q   Was Kelli Boyer crediting what Kim Alter
22  said?

0226

 1    A   I don't know.  She also had knowledge of the
 2  Kim Alter affair.
 3    Q   All right.  Now, Jay Cooper claims he still
 4  has not been reimbursed for minor amounts of money
 5  which were his expenses that he submitted vouchers for.
 6  Are you aware of that problem?
 7    A   No.  He's not communicated with me recently.
 8    Q   Are you familiar with communications between
 9  me and Miss Richards on the subject?
10    A   No.
11    Q   About a year of them.
12    A   No.
13    Q   All right.  Let's show you what's been
14   previously marked Boyer Exhibit 16.
15    A   Did we not do it?
16    Q   You did not.  Does that surprise you?
17    A   Yes.
18    Q   Okay.  You think you can take care of it this
19  week?
20        MS. ARIAIL:  Objection.
21  BY MS. DOUGLASS:
22    Q   Would there be any reason not to pay Mr.

0227

 1  Cooper for amounts that he expended on Counterpart's
 2  behalf?
 3     A   No.  I'll have to pull the documentation out,
 4  but we can do that.
 5     Q   I'd like to show you Exhibit 18 to the Boyer
 6  deposition.
 7        MS. ARIAIL:  I'm going to object to this for
 8  the same reason I objected to it in the Kelli Boyer
 9  deposition which is that it's unclear that this is
10  actually a legitimate authentic e-mail chain based not
11  only on the dates which I understand there's some issue
12  with the time changes, but also the format of the
13  e-mail and the lines that run in between the e-mails
14  which are not in other e-mail chains that have been
15  presented by plaintiff at various times as exhibits.
16  BY MS. DOUGLASS:
17     Q   Did you receive Boyer Exhibit 18 at or around
18  December 2nd?
19     A   So I would have gotten a copy of every one of
20  these.  I'll have to assume I did.
21     Q   All right.  Did you do anything when you
22  received copies of them?

0228

1     A   If I did receive copies of them, which I'm
2   not sure I did, I would have gone to Kelli and said
3   "What's going on with this payment."  So this is why
4   I'm questioning if I did really receive these things
5   because generally on employees who are leaving us, I
6   like to follow through and make sure that they get
7   what's due to them because it's just a stone in their
8   shoe if you don't pay employees off when they're
9   leaving, and so this is not something I would have let
10  hang.
11     Q   Well, could it be that Kelli Boyer didn't
12  follow up?
13     A   It could be.
14     Q   Was this the kind of thing she was deficient
15  in?
16     A   At times.
17     Q   Okay.  Now, what is the American Council for
18  Voluntary International Action?  I believe it's called
19  InterAction for short.
20     A   Oh, InterAction.  Okay.  What is it?
21     Q   Uh-huh.
22     A   It's the NGO's NGO.  It's what represents all

0229

1   the nonprofit development NGOs in this town on common

2   issues, and we pay dues to have them represent us to

3   The Hill and to do studies and to educate the public

4   about what development NGOs do.

5       Q   Counterpart is a member of InterAction,

6   correct?

7       A   Yes, ma'am.

8       Q   I understand Mr. Lelei is perhaps on the

9   board of InterAction?

10      A   He most certainly was.

11      Q   He was.  He's no longer?

12      A   I'm not sure if he still is or not.  I think

13  his term is coming to an end soon.

14      Q   Okay.  Has Counterpart taken steps to try to

15  be a member of good standing in that organization?

16      A   What do you mean steps?  We pay our dues.

17      Q   Aren't there various things called PVO

18  standards that InterAction requires of its members?

19      A   And we meet those standards according to the

20  latest submission that we've made to InterAction.  We

21  have some sort of certificate that we meet those

22  standards.

0230

1    Q   You do.  Okay.

2    A   That was done a couple years, I don't know, I

3   think while Cooper was still with us.

4        MS. DOUGLASS:  I'd like to have marked 51

5   please a document which I'll ask you to identify.

6        MS. ARIAIL:  And I'll just object again on

7   the grounds this is the first time counsel has seen

8   this document, and it can't be verified during this

9   deposition as an authentic document.

10        (Deposition Exhibit 51 was marked for

11   identification and was attached to the transcript.)

12   BY MS. DOUGLASS:

13    Q   Have you seen the PVO standards before?

14    A   I've discussed these with the staff member

15   who was doing the certification work with us.  So I've

16   not seen these.  I've gone through some of the

17   principles with certain staff members who worked on our

18   certification.

19    Q   When was the certification granted?

20    A   I don't recall how many years ago it was.

21   It's one of those things in the last four years that I

22   can't remember if it was the first year or the second

0231

1  year.
2     Q  I'd like you to look at standard 3.2.
3     A  Page?
4     Q  Page 6 of 32.  Would you read 3.2 please?
5     A  "Each organization shall have a written
6  standard of conduct for its directors, employees, and
7  volunteers, which they commit to follow."
8     Q  Is it your understanding that Counterpart
9  abides by that standard?
10    A  A written standard of conduct?  I believe
11 that if we go to our manual, we have policies related
12 to ethics, confidentiality, harassment, work product,
13 personal conduct, and ethics that could be construed as
14 a written standard of conduct.
15    Q  Okay.
16    A  Dress, personal mail, how to use a credit
17 card, code of conduct.
18    Q  So you believe that section 7.0 of Exhibit 7
19 fulfills that responsibility?
20    A  Evidently.
21    Q  And you believe that the whole manual is
22 basically a commitment by the employees and employer to

0232

1  follow certain standards, is that right?

2      A   Certain standards.

3      Q   And you believe you follow them, right?

4      A   To the best of our ability.

5      Q   Okay.  Now, look at 3.3.  Please read that.

6      A   "The organization will have policies to

7  address complaints and prohibit retaliation against

8  whistle-blowers."

9      Q   Do you believe that Counterpart met that

10  standard before the recent amendment to the --

11      A   Yes.

12      Q   Hold on.  Let me finish the question please.

13  -- before the recent amendment to the manual which was

14  about three months ago?

15      A   I think we had something in there that

16  prohibited retaliation against whistle-blowers.  I'm

17  not sure.

18      Q   There's nothing in the manual that shows

19  that, I guarantee you.

20      A   In this manual, but on the domestic manual,

21  we'd have to check.

22          MS. DOUGLASS:  Kara, I'd certainly appreciate

0233

1  if you'd look for me.  I've asked for the
2  whistle-blower policy.  If there is one in the domestic
3  manual, maybe you haven't looked there.
4        MS. ARIAIL:  I'll look into producing
5  whatever is relevant
6        MS. DOUGLASS:  Okay.
7  BY MS. DOUGLASS:
8     Q   What do you have to address complaints now
9  that the grievance procedure has been worked out?
10     A   Once again, I'd have to address the manual on
11  our policy.
12     Q   You're talking about the new manual now?
13     A   Yes.
14     Q   So you don't know if there was any way to
15  address complaints at the time Jay Cooper was fired?
16     A   If Jay Cooper had put in a grievance -- No, I
17  don't know.
18     Q   All right.  Would you look at the open door
19  policy.  Isn't it more difficult to use an open door
20  policy when you're on the other side of the globe from
21  your supervisor?
22     A   People come into Washington every year.  So

0234

1  Jay Cooper was there in Washington.  He can come and
2  talk to Lelei.
3      Q   So if he had come in --
4      A   That's when I met Jay was when he was in
5  Washington the first time.
6      Q   So if he had come into your office concerning
7  Bob Abma's budget that he objected to that we talked
8  about under Exhibits 45 and 46, that would have
9  prompted you to do something about it you think?
10     A   I can't say for sure, but it may have, yes.
11     Q   But the e-mail didn't --
12     A   The e-mail obviously didn't.
13     Q   All right.  Look at please 4.1.  This is on
14 page 7.  Would you read that please?
15     A   "The finances of a member organization shall
16 be conducted in such a way as to assure appropriate use
17 of funds and accountability to donors."
18     Q   Do you believe Counterpart lives up to that?
19     A   Yes.
20     Q   And if program funds were used for a program
21 other than the program that generated the funds, that
22 would violate that, wouldn't it?

0235

1    A   The finances of a member organization shall
2  be conducted in such a way as to assure appropriate use
3  of funds and accountability to donors, and the question
4  is again if we use funds --
5    Q   From one program to subsidize another
6  program, that would violate that standard of conduct,
7  wouldn't it?
8    A   It could.
9    Q   Would you look at 3.7.  Please read that.
10  Never mind.  I take that back.  If you'd look at 4.7
11  please.
12    A   "The organization shall operate a budget
13  approved by the board."  We do.  "It shall account for
14  funds from the moment they are received until they are
15  used in the project or services."  We do.  "It shall
16  exercise adequate internal controls over disbursements
17  to avoid unauthorized payments."  We do.  "The
18  organization shall not have secret funds, and it shall
19  prohibit any unaudited transactions or loans to board
20  members and to staff."
21    Q   I'm sorry.  That wasn't the one I wanted you
22  to read.  I'm sorry.  Read 4.6.

0236

1     A   "The organization's combined fund-raising and
2   administration costs shall be kept to the minimum
3   necessary to meet the agency's needs.  Allocations of
4   expenditures to administration, fund-raising, and
5   program services shall reflect the organization's
6   purposes, actual activities, and generally accepted
7   accounting principles."
8     Q   Do you believe that the administration of
9   Counterpart keeps its costs at a minimum?
10     A   To meet the agency's needs.  Needs are
11   determined by the board and the CEO.
12     Q   First class travel is a minimum necessary to
13   meet the agency's needs?
14     A   Repeat that please.
15     Q   Is first class airplane travel the minimum
16   necessary to meet the agency's needs?
17     A   If the CEO who's 6 foot 5 and weighs 350
18   pounds needs a business class seat, it's in accordance
19   with U.S. government regulations.
20     Q   Is there a regulation about the size --
21     A   You bet.
22     Q   -- the size of the CEO?

0237

1     A   You bet.  If you weigh 350 pounds, you can

2   sit in a business class seat.  The U.S. government will

3   pay for it.

4     Q   That's something I didn't know.  I'll have to

5   gain weight.

6     A   And you're above a certain height.

7     Q   All right.  The organization does have a

8   separate audit committee of the board, doesn't it?

9     A   It has an audit committee.

10     Q   Would you look on page 9 of 32 and read me

11   6.3.3.

12     A   6.3.3.  "The organization's expectations of

13   employees shall be clearly defined and communicated."

14     Q   Do you believe Counterpart lives up to that

15   in respect to Jay Cooper?

16     A   Yes.

17     Q   Okay.  Even though he had no job description?

18     A   Yes.

19     Q   Even though he had no communications from

20   Arlene Lear or Michael Kunz after August of 2004?

21     A   I was told differently from Miss Lear.

22     Q   Even though he had no job evaluations since

0238

1  early 2003?

2    A  I understand there was communication going on

3  at all times.

4    Q  From Miss Lear?

5    A  From Miss Lear.

6    Q  All right.  Would you please read 6.3.1.

7    A  "Such policies shall clearly define and

8  protect the rights of employees, assuring fair

9  treatment in all matters."

10    Q  Did you afford Jay Cooper fair treatment?

11    A  Given the course of events as outlined over

12  the prior six to eight months before Jay left, yes.

13    Q  As told you by Arlene Lear?

14    A  Yes.

15    Q  Did Counterpart do the right thing by Jay

16  Cooper in your view?

17    A  Yes.

18    MS. DOUGLASS:  My final document is an e-mail

19  from Lelei LeLaulu to Jay Cooper dated November 24,

20  2004.

21    (Deposition Exhibit 52 was marked for

22  identification and was attached to the transcript.)

0239

 1  BY MS. DOUGLASS:
 2      Q   Did you receive Exhibit 52 at or about the
 3  time it was written?
 4      A   Well, it says I did, but I don't remember
 5  this.
 6      Q   Do you usually receive e-mails that are
 7  directed to you?
 8      A   Yes, ma'am.
 9      Q   I mean, it looks like Mr. Cooper directed it
10  to you, and then Mr. LeLaulu directed his reply to you,
11  correct?
12      A   Yes, indeed he did according to this which
13  has, you know, separate fonts and -- Anyway, it looks
14  like it came from different sources, but since it
15  starts Harry, thanks for -- Okay.  "I have to tell you,
16  Harry, that Kelli absolutely did not tell the truth
17  about the situation which came out in the
18  teleconference.  I did not ask her to stay in Almaty."
19  I guess this has to do with Kelli.  Okay.
20          I mean, this goes to the crux of many of our
21  disagreements where people have different
22  understandings of what took place, and obviously Kelli

0240

1  and Jay most certainly didn't agree on this.  "She said
2  I am going to stay and work on this or something like
3  that.  I asked her when she made her decision, and her
4  reply was just now.  I said that it is not a bad idea
5  and asked her if she needed to meet with me on the
6  weekend or if she wanted me not to go to Bishkek."
7  This is not what Kelli said.
8      Q   Obviously Mr. Cooper had a different view of
9  what transpired between him and Kelli, is that fair to
10  say?
11      A   Fair to say.
12      Q   And he's setting out his point of view in
13  this e-mail to you with a carbon copy to Lelei LeLaulu,
14  correct?
15      A   Right.
16      Q   You don't answer it.  LeLaulu does, correct?
17      A   He gets back.
18      Q   Right.
19      A   Because Kelli is standing right beside me
20  saying this is all false.
21      Q   So you chose to believe her?
22      A   Yes.

0241

1     Q   And so the decision had bean made by the time
2  Mr. Cooper wrote you this e-mail which is the second
3  one on Exhibit 52?
4     A   And I did not make that decision in a vacuum.
5  There was Lear.  There was the meeting.  There was -- I
6  mean, the information flow was coming from many sources
7  on Cooper.
8     Q   What steps did Counterpart do to try to do
9  the right thing by him as of November 24th?
10     A   Once we got to November 24th, we had done the
11  right thing for the organization.
12     Q   What about the right thing by you which is
13  what Mr. Lelei says?  Was not paying his expenses doing
14  the right thing?
15     A   You know, I didn't know that we did not pay
16  his expenses.  "Separating from colleagues is something
17  we do not well, and frankly, it's something I do not
18  want to be good at.  But I do not like to hear of the
19  pain and anguish you feel.  We will try to do the right
20  thing by you, Jay, and I wish you well.  Lelei."
21       So I mean, in every issue there are two
22  sides, two points of view, and in this one the

0242

1  headquarters came off taking the other point of view.

2    Q   Based on what you've testified to today?

3    A   Yes.

4      MS. DOUGLASS:  Okay.  That's all the

5  questions I have.

6      (Signature having not been waived, the

7  deposition of Harry Dorcus was concluded at 4:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

0243

1      ACKNOWLEDGMENT OF DEPONENT

2          I, Harry Dorcus, do hereby acknowledge that I

3      have read and examined the foregoing testimony, and the

4      same is a true, correct and complete transcription of

5      the testimony given by me and any corrections appear on

6      the attached Errata Sheet signed by me.

7

8      _____  _____

9          (DATE)              (SIGNATURE)

10

11

12

13

14

15

16

17

18

19

20

21

22

0244

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Nancy Bond Rowland, Registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 3rd day of

14   September 2006.

15

16   My commission expires:

17   May 31, 2010

18

19

20   _____

21   NOTARY PUBLIC IN AND FOR THE

22   COMMONWEALTH OF VIRGINIA

0245

1          E R R A T A  S H E E T
2          IN RE:  Cooper v. Counterpart
3    RETURN BY:  _____
4    PAGE  LINE  CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   _____  _____
22      (DATE)              (SIGNATURE)

0246

1    E R R A T A  S H E E T  C O N T I N U E D
2        IN RE:  Cooper v. Counterpart
3  RETURN BY: _____
4  PAGE  LINE  CORRECTION AND REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22      (DATE)              (SIGNATURE)

0247

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - - x

4  JAY W. COOPER,            :

5    Plaintiff            :

6  v.                : No. 1:05cv1598 (RMC)

7  COUNTERPART INTERNATIONAL,   :

8    Defendant          :

9  - - - - - - - - - - - - - - - x

10

11      Deposition of HARRY DORCUS, Volume 2

12          Vienna, Virginia

13        Monday, November 27, 2006

14            9:55 a.m.

15

16

17

18

19

20  Job No.: 1-91688

21  Pages 247 through 432

22  Reported by:  Marilyn Feldman, RPR

0248
1          Deposition of HARRY DORCUS, held at the
2    offices of:
3
4
5          JACKSON LEWIS LLP
6          8614 Westwood Center Drive
7          Suite 950
8          Vienna, VA  22182
9
10
11      Pursuant to agreement, before Marilyn Feldman,
12    Registered Professional Reporter and Notary Public
13    in and for the Commonwealth of Virginia.
14
15
16
17
18
19
20
21
22

0249
```
 1            A P P E A R A N C E S
 2     ON BEHALF OF PLAINTIFF:
 3        PATRICIA D. DOUGLASS, ESQUIRE
 4        LAW OFFICE OF PATRICIA D. DOUGLASS
 5        98 Interpromontory Road
 6        Great Falls, VA  22066-3219
 7        703.759.3586
 8
 9     ON BEHALF OF DEFENDANT:
10        KARA M. ARIAIL, ESQUIRE
11        JACKSON LEWIS LLP
12        8614 Westwood Center Drive
13        Suite 950
14        Vienna, VA  22182
15        703.821.2189
16
17
18
19
20
21
22
```

0250

```
 1              C O N T E N T S
 2  EXAMINATION OF HARRY DORCUS              PAGE
 3    By Ms. Douglass               252
 4
 5              E X H I B I T S
 6          (Attached to the Transcript)
 7  DEPOSITION EXHIBITS              PAGE
 8  53  CP2895-2941              253
 9  54  Project codes 9/15/04        259
10  55  CP3556-597               262
11  56  CP3373-74                280
12  57  CP3286-3333              285
13  58  CP3334-72                290
14  59  CP4034-39                291
15  60  CP4055-56                298
16  61  CP4134-52                301
17  62  CP4172-77                307
18  63  CP4193-96                310
19  64  CP4208-90                311
20  65  CP4321-23                324
21  66  CP4324-28                326
22  67  CP3661-63                328
```

0251

| 1 | DEPOSITION EXHIBITS | PAGE |
|---|---|---|
| 2 | 68  CP3667 | 330 |
| 3 | 69  CP3677 | 332 |
| 4 | 70  CP4340-72 | 336 |
| 5 | 71  CP4373-464 | 346 |
| 6 | 72  CP4657-750 | 354 |
| 7 | 73  CP4633-56 | 365 |
| 8 | 74  CP2947-60 | 369 |
| 9 | 75  Expense report, A. Lear, | |
| 10 | 6/19/03-7/12/03 | 376 |
| 11 | 76  CP3510-19 | 383 |
| 12 | 77  CP3505-09 | 389 |
| 13 | 78  CP3006 | 392 |
| 14 | 79  CP3174-81 | 397 |
| 15 | 80  CP3196-97 | 411 |
| 16 | 81  CP3227 | 414 |
| 17 | 82  CP3236-39 | 416 |
| 18 | 83  CP3262-68 | 419 |
| 19 | 84  CP3383-87 | 421 |
| 20 | | |
| 21 | | |
| 22 | | |

0252
 1           P R O C E E D I N G S
 2                HARRY DORCUS
 3   having been duly sworn, testified as follows:
 4         EXAMINATION BY COUNSEL FOR PLAINTIFF
 5   BY MS. DOUGLASS:
 6      Q    Mr. Dorcus, I am Pat Douglass.  We met
 7   before.  This is a continuation of your previous
 8   deposition which was taken in August in the same
 9   case.  The same understandings apply.  If you don't
10   understand a question, just ask me.  If you want a
11   break, ask for it.  And please let's not talk over
12   each other, all right?
13      A    Okay.
14      Q    If you have any desire to change some
15   answer, that's fine; just ask me.
16      A    Okay.
17      Q    I would like to have marked as the first
18   exhibit a multi-page document starting with
19   Counterpart no. 2895 through 2941, and my question
20   to you is, is this the cooperative agreement which
21   governed the Counterpart fulfillment of the CSSI
22   project?

0253
 1          (Dorcus Exhibit no. 53 was marked for
 2    identification and was attached to the transcript.)
 3      A    Yes.
 4      Q    Would you look on page 2901 of exhibit 53,
 5    please.  It appears that USAID requires program
 6    reporting; is that correct?
 7      A    Three copies, um-hmm, program reporting.
 8      Q    That's a periodic document that's reported
 9    to USAID?
10      A    You want me to read aloud?
11      Q    Maybe you could read to yourself after I
12    ask the question.  It appears to me there are
13    periodic reports required by USAID and also a final
14    report as part of Counterpart's fulfillment of this
15    cooperative agreement; is that correct?
16      A    Under final report, it's financial report,
17    and then there's program reporting which says
18    nothing about final report.  So go ahead.
19      Q    All right.  So your understanding is that
20    there's a final report which is financial only?
21      A    Yes, ma'am.
22      Q    What about items such as, and I'm reading

0254

1  from 2901, project impacts, activity highlights and
2  so on, those seem like project, program-related
3  subjects rather than financial ones.
4      A    Correct.
5      Q    Would you like to amend your answer that
6  the final report is broader than simply a financial
7  report?
8      A    I can't tell that from these paragraphs.
9      Q    Okay.  Have you seen a final report on the
10 CSSI project?
11     A    No.
12     Q    Is there one, do you know?
13     A    I have not seen it.
14     Q    When would it ordinarily be prepared in
15 your experience?
16     A    Normally these reports are done in
17 cooperation with the CTO and the implementers, and
18 so they are done in accordance with the work plan if
19 it's not spelled out.
20     Q    Who at Counterpart would know if there had
21 been such a report?
22     A    Jay Cooper and Arlene Lear.

0255

1      Q    Well, Jay Cooper was not employed by
2   Counterpart at the end of the CSSI project; is that
3   right?
4      A   I believe so.
5      Q    So who would know --
6      A   Lear.
7      Q    Lear, okay.  I would like to request that,
8   Kara.
9          MS. ARIAIL:  We have already provided our
10   answer and that came directly from Arlene Lear.
11   There is none, I told you that.
12          MS. DOUGLASS:  If there is one, will you
13   provide it?
14          MS. ARIAIL:  Can we go off the record?
15          MS. DOUGLASS:  Sure.
16          (Discussion off the record.)
17          MS. DOUGLASS:  We will make a stipulated
18   fact on the record right now that there is -- I'll
19   let Ms. Ariail describe it.
20          MS. ARIAIL:  As reported by my client,
21   Counterpart, there is no final report on the CSSI
22   project.  We have already informed Mr. Cooper's

0256
1   counsel of this.  Apparently, according to my
2   client, Counterpart's client did not request a final
3   report and it was not budgeted for and therefore it
4   was not performed.
5   BY MS. DOUGLASS:
6       Q    Do you know, Mr. Dorcus, if there have
7   been interim reports prepared?
8       A    I have not seen them.  I do not know.
9       Q    Thank you.  The bottom of 2901 provides
10  for an overhead rate of 26.34 percent.  That's the
11  matter we talked about in your last deposition,
12  correct?
13      A    The negotiated provisional rate is 26.34,
14  provisional rate.
15      Q    What is the significance of the word
16  provisional?
17      A    Provisional means that after your audit
18  you can go back to your contracting officer and you
19  can charge the actual overhead rate.
20      Q    Has that happened with respect to the CSSI
21  project?
22      A    Our current overhead rate is 28 percent.

0257
1  Yes.
2      Q    So someone has gone back to the
3  contracting officer?
4      A    Yes, ma'am.
5      Q    Is there a document that's created in that
6  process?
7      A    Every year, if you look at our audit, our
8  audit will have the 28 percent number and we have a
9  letter to the contracting officer.
10     Q    And the contracting officer has approved
11  that request?
12     A    Yes, ma'am.
13     Q    Okay.  If you look on page 2929, under
14  financial management director, the last sentence of
15  the paragraph under that heading says, "the finance
16  director is expected to spend 25 to 30 percent of
17  his time in the country offices assuring quality and
18  control of program finances and reporting."  Did
19  that happen in the case of the CSSI program?
20     A    I don't know.
21     Q    Would the finance director be Mr. Abma?
22     A    Yes.

0258

1      Q     On page 2938, on the last paragraph which
2    starts with a D --
3      A     2938, okay.
4      Q     -- there's reference to a written indirect
5    cost rate agreement signed by both parties.  Is that
6    the indirect cost rate agreement that reflects an
7    overhead rate of 26.34?
8      A     Where are you?  D, at the bottom of the
9    page?
10     Q     Yes.  The paragraph starts "the results."
11     A     Yes.  26.34 was the rate at the beginning
12    of the fiscal year -- this was signed in '03, so in
13    '02 that was the rate, and then when our experience
14    from '03 came through we used 28 percent.
15     Q     Does the indirect cost rate agreement
16    that's referenced on page 2938 also itemize or
17    describe items that will be treated as direct costs?
18     A     No.  You send them your audit report and
19    the request and they review the audit report and
20    that's all it is.
21     Q     Okay.
22     A     It gives total.

0259

1    Q    It doesn't itemize this or --
2    A    No.  It's just the audit report and I
3  believe you have that.
4    Q    I do.  I just have never seen any piece of
5  paper that spells out the items that will be treated
6  as direct costs in the CSSI program.
7         MS. ARIAIL:  Is that a question?
8  BY MS. DOUGLASS:
9    Q    Is there such a document?
10   A    No.
11        MS. DOUGLASS:  I would like to mark as
12  exhibit 54 a one-page document headed "Project
13  Codes."
14        (Dorcus Exhibit no. 54 was marked for
15  identification and was attached to the transcript.)
16  BY MS. DOUGLASS:
17   Q    Does exhibit 54 appear to list certain
18  codes that are used in Counterpart to account for
19  various activities and expenditures?
20   A    Yes, ma'am.
21   Q    There seem to be some that are not on
22  here.  Have you brought a piece of paper that will

0260
1   help us fill in the blanks?
2       A    Yes, ma'am.
3       Q    There seem to be three segments in each
4   project code separated by hyphens.  Do you see what
5   I'm asking?
6       A    Yes, ma'am.
7       Q    What does the first three-digit letter
8   signify?
9       A    The first three represents the donor and
10  the number that we give each cooperative agreement.
11  So, for instance, you'll see on this 4 means USAID
12  and 48 will be the 48th grant that we have gotten
13  from USAID.
14      Q    What is the second two-letter digit in
15  each code?
16      A    Those mean the location I think.  I think
17  that will be explained here somewhere but it's the
18  country, or if it's regional, in the case of CSSI, I
19  think it's like one of those digits, 06, 05 means
20  region -- 06 means headquarters obviously.
21      Q    What is the final two-digit part of the
22  code?

0261
1     A     Now that currently means the division,
2  like Arlene Lear's division.
3     Q     Did it mean something different at some
4  earlier point in time?
5     A     Yes, before October 1st, 2004, it meant
6  the attribute which was Civil Society or something
7  like that, but we had some problems -- you know they
8  weren't problems.  We wanted to be more -- we wanted
9  to assign the activities to the managers that were
10  managing them so we changed these codes.  Instead of
11  just saying Civil Society, they went Civil Society
12  Division because we had different divisions in
13  Counterpart implementing different programs.
14     Q     Each division would be headed by a vice
15  president, right?
16     A     Not any more.
17     Q     That would be too simple.  But Arlene
18  Lear's --
19     A     Arlene Lear's is the largest division and
20  yes, she is a vice president.
21     Q     What number is attached to --
22     A     I believe it's 05, but it should be in

0262
 1  here somewhere.
 2          MS. DOUGLASS:  I would like to mark the
 3  next exhibit a set of documents produced by
 4  Counterpart bearing numbers CP 3556 through 3597 and
 5  ask you what they are.
 6          (Dorcus Exhibit no. 55 was marked for
 7  identification and was attached to the transcript.)
 8          THE WITNESS:  These appear to be time
 9  sheets for Arlene Lear.
10  BY MS. DOUGLASS:
11      Q    Do they appear to cover from January 1,
12  2004 through the end of that calendar year?
13      A    They appear to start with January, yes,
14  January 1, and go to December 31, 2004.
15      Q    Is the form used in exhibit 55 the usual
16  form used to report time within Counterpart?
17      A    This is a copy of the electronic time
18  system that we use at Counterpart.
19      Q    Is every employee required to report time
20  on such a form?
21      A    Yes, ma'am.
22      Q    Now to whom do these forms go once they

0263
1  are filled out?
2      A    There's a schematic -- at this time they
3  went to Leilei LeLaulu for Arlene Lear for approval.
4      Q    Do they go someplace different now?
5      A    Now they go to me.
6      Q    That's at the time you became COO that
7  change happened?
8      A    Yes.
9      Q    What do you do when you get them?
10     A    You review them and you approve them or
11  disapprove them.
12     Q    Sometimes on the bottom there's an
13  indication of that fact.  If you would look for
14  example at page 3560, it says Maria Stoneham did
15  something to Arlene Lear's time sheet.
16         MS. ARIAIL:  Objection, misstated.
17  BY MS. DOUGLASS:
18     Q    Who is Maria Stoneham?
19     A    Payroll clerk.
20     Q    So they did something with respect to
21  Arlene Lear's time sheet for 2/1/2004 to 2/15/2004?
22     A    Yes.

0264

1    Q    What did she do?

2    A    She processed it.

3    Q    That's not the same thing as approval?

4    A    This particular copy doesn't denote

5    approval.

6    Q    For example, if you look at the next page,

7    3561, does the notation at the bottom of that sheet

8    indicate that Leilei did something with respect to

9    Arlene Lear's time sheet with from 2/1 to 2/16/2004?

10    A    It would appear that they did something,

11    yes.

12    Q    It says "completed."

13    A    Yes.

14    Q    Does that mean approved?

15    A    You know I can't tell that he did

16    something, yes, from this.  I would have to go back

17    and review the system.

18    Q    Is there an electronic place where

19    approval is supposed to be noted?

20    A    Yes.

21    Q    In your earlier testimony you indicated

22    that it's the procedure at Counterpart to bill the

0265
1  time you spend during the day to one project or
2  another or to an overhead task; is that correct?
3     A    Yes.
4     Q    Is that what the purpose of these time
5  sheets is for?
6     A    Yes.
7     Q    Who makes the determination whether that
8  allocation has been done appropriately by the
9  employee?
10    A    The employee and his or her supervisor.
11    Q    In Ms. Lear's case at that time it would
12  be Mr. LeLaulu?
13    A    Yes.
14    Q    What is the scope of the inquiry that is
15  generally made at Counterpart?
16        MS. ARIAIL:  Objection, vague.
17        MS. DOUGLASS:  I'll re-ask it.
18  BY MS. DOUGLASS:
19    Q    Does Counterpart have a policy with
20  respect to that reviewing function?
21    A    The policy is that they must be approved,
22  they must be reviewed and approved.  As to what that

0266
1  entails, no.
2      Q    So is it fair to say it could differ
3  depending on who the supervisor is as to a
4  particular employee?
5      A    Generally -- could it differ?  No, it
6  shouldn't differ.  It should be in accordance with
7  -- when you charge something to a federal grant,
8  it's supposed to be in accordance with the rules of
9  U.S. government.
10     Q    Have you ever known in your period of time
11 as CFO and acting CFO and COO of Counterpart anyone
12 to challenge the accuracy of any allocation of time
13 by an employee?
14     A    Yes.
15     Q    How often has that happened?
16     A    I'm not sure.
17     Q    Can you remember three instances that that
18 has happened?
19     A    Yes, I have challenged three times since
20 then.
21     Q    Have you ever challenged Ms. Lear?
22     A    No, I have never challenged Ms. Lear.

0267

1    Q    Have you ever challenged Mr. Kunz?
2    A    No, I have never challenged Mr. Kunz.
3    Q    Have you ever challenged Mr. Abma?
4    A    No.
5    Q    Have you ever challenged Mr. Cooper?
6    A    No.
7    Q    Can you generalize as to what sort of
8    situation has led you to challenge someone?
9    A    When I felt people were charging time to
10   an area where there was no budget.
11   Q    Now let's look at the page 3556 of exhibit
12   55.  There is --
13   A    3 --
14   Q    Very first page of exhibit 55.
15   A    Okay.
16   Q    There is a column called "labor class."
17   A    Yes.
18   Q    Do the numbers in the column for labor
19   class correspond to the first three digits of the
20   codes that we discussed earlier?
21   A    Yes.
22   Q    So in other words, it corresponds to a

0268
1  particular cooperative agreement?
2      A    Um-hmm.
3          MS. ARIAIL:  Harry, try to answer yes or
4  no.
5          THE WITNESS:  Sorry.  Yes.
6  BY MS. DOUGLASS:
7      Q    The next column is called "cost center."
8  What is a cost center?  What does that mean?
9      A    This is a commercial time sheet package
10 that Counterpart procures, and the 06, as we spoke
11 before, it's the next two digits in our coding
12 system, which I think 06 means regional and 25 means
13 Civil Society.
14     Q    So even though there's no hyphen --
15     A    That's just a continuation of what we
16 spoke about before.
17     Q    Let's look at the first entry on 3556,
18 please.  Am I reading this correctly that on January
19 2nd, 2004, Ms. Lear spent 4 hours working on project
20 452 and 2 hours working on project 449, and one hour
21 working on project 448, correct?
22     A    Yes, ma'am.

0269

1    Q    452 is CSSI; is that correct?

2    A    I believe, yes.

3    Q    0625 means she did that at headquarters

4  and she did it under her own vice presidency?

5    A    Now I think 06 may mean Washington, I'm

6  not sure whether it means regional program, or done

7  in Washington, D.C.  You know I'd have to check

8  this.

9        MS. ARIAIL:  Could you just go ahead and

10  look up what you don't know?

11        THE WITNESS:  Okay.  Location, 06,

12  Washington.  And the next one, 25, it says

13  institutional development here.  Okay, so Washington

14  institutional development.

15  BY MS. DOUGLASS:

16    Q    What is institutional development?

17    A    That's the general area that Civil Society

18  had identified itself at that time.  Then we changed

19  that to Civil Society Division.

20    Q    Am I correct that one is expected to

21  account for 7 hours of time in a workday?

22    A    It's Counterpart's policy for domestic

0270

1  employees, their handbook says they work a 7-hour
2  day.
3      Q    Suppose they work longer than a 7-hour
4  day.  Are they asked to note that in any way?
5      A    She's an exempt employee and so if you
6  work more than that, you don't get overtime.
7      Q    Let's go down some of these categories if
8  we could.  452 is CSSI, correct?
9      A    Yes, ma'am.
10     Q    449 is Healthy Communities, is it not?
11     A    Yes, regional health initiative, Healthy
12 Communities.
13     Q    And it's also a project that was managed
14 by Jay Cooper?
15     A    I believe.
16     Q    448, the next item --
17     A    Civic Advocacy.
18     Q    What is Civic Advocacy?
19     A    It was a program we had in Uzbekistan.
20     Q    Is it part of CSSI?
21     A    No.
22     Q    Is it an offshoot of CSSI?

0271

1     A     No, nothing to do with CSSI.

2     Q     Nothing to do with CSSI, okay.  If you

3  look on the fourth row down, you'll notice that I

4  believe on January 1, in other words, New Year's

5  Day, she allocated time for her holiday because it

6  was a national holiday and she allocated the holiday

7  time between the same three programs; is that

8  correct?

9     A     Yes, she did.  However, charging a

10  holiday -- I'd have to check but I believe that's an

11  adjustment that we make during the year.  I'm not

12  sure.

13     Q     Presumably she gets paid for a holiday

14  like anyone else does?

15     A     Yes, ma'am.

16     Q     So would the charge for that pay go --

17     A     Goes to the program.  It's just how it

18  happens, so I'd have to check on it.

19     Q     There is some theory into which the

20  allocation is made?

21     A     It ultimately goes to those programs.

22     Q     Presumably and roughly the same proportion

0272
1  as what she spends?
2      A     Presumably, yes.
3      Q     Over what period of time would the
4  proportions be set up?  Let me re-ask that.  Does
5  each employee make an allocation of something like
6  holiday time based on what percentage of time he or
7  she has been working on particular projects over
8  some period of time?
9      A     For holiday time, yes.
10      Q     How often is that adjusted?
11      A     That is adjusted when new programs come
12  into their portfolio.
13      Q     Is the allocation that they are using
14  written down somewhere?
15      A     No.  It's budgeted.  The only writing down
16  is the budgets in the programs.  We don't know what
17  the future brings.
18      Q     So if a new program comes into
19  Counterpart, does it say Arlene Lear is expected to
20  spend 10 percent of her time on this?
21      A     It says Arlene Lear may charge 10 percent
22  of her time to that program.

0273

1      Q    So presumably then her holiday time and
2  other things --
3      A    Her holiday time may be charged.
4      Q    But it's very clear that holiday time is a
5  permissible charge under a cooperative agreement
6  between Counterpart and USAID?
7      A    Yes.
8      Q    I am going to ask about some more codes.
9  If you look on January 8, there is a charge to 444.
10     A    January 8, 444.
11     Q    What is that?
12     A    The program?
13     Q    Yes.
14     A    Bulgaria.
15     Q    What kind of a program does Counterpart
16  have in Bulgaria?
17     A    Some type of Civil Society activity.
18     Q    Let's look at March 30th on page 3565.
19     A    Okay.
20     Q    The code is 657.
21     A    Yes, ma'am.
22     Q    What is that?  Would that be CAIP?

0274

 1    A    Yes.

 2    Q    What is CAIP?

 3    A    What is the acronym for CAIP, C-A-I-P?

 4  It's a new program that Arlene had just gotten.  I

 5  think it's for that area.

 6    Q    Is that the program that Michael Kunz was

 7  working on in Uzbekistan?

 8    A    No.  Michael Kunz's Uzbekistan program was

 9  the one we mentioned before.

10    Q    Which one was that?

11    A    Civic Advocacy, 448.

12    Q    If I have documents that show that Michael

13  Kunz was working on CAIP in Uzbekistan, that would

14  be wrong?

15    A    I don't know.

16    Q    You don't know what CAIP is really?

17    A    I know it's one of our programs.  Now who

18  was working on that program -- I know it's an Arlene

19  Lear program, but I cannot tell you if Michael Kunz

20  should or should not be working on that program.

21    Q    Okay.  Let's go down to April 23rd on page

22  3567.

0275

1     A     Okay.

2     Q     There's a code 674.

3     A     674, I don't have that on my list.

4     Q     If you will look on what has been marked

5     54, it shows Iraq CAP.

6     A     That's correct.

7     Q     But it has a different follow-up code,

8     5225.

9     A     Where are you here?

10     Q     I'm on 674.

11     A     I got 679 -- 674, all right, CAP Iraq.

12     Okay, CAP gets a 6 because it's U.S. government,

13     okay. 74, it's the 74th program. 52 is another

14     type of activity. It's Iraq.

15     Q     It's a location for Iraq?

16     A     Yes.

17     Q     Because Ms. Lear was not in Iraq on April

18     23rd, it shows 0625 on page 3567 of exhibit 55?

19     A     Correct, yes, ma'am.

20     Q     I'm getting there. Would you look at June

21     15 which is on page 3571?

22     A     3571, okay.

0276

1    Q    There is a reference to a code 761.  Could
2  you tell me what that is?
3    A    World Bank Kyrgyzstan Empowering Women.
4    Q    That is a program which Jay Cooper
5  supervised, right?
6    A    I don't know.  I believe he supervised it.
7  I'm not sure.
8    Q    August 23rd on page 3581, there is a
9  reference to code 673.  Could you tell me what that
10  is, please?
11    A    That's a new number, I don't have it here
12  on this list.  Mine chops off at 664.
13    Q    Okay, you don't know.
14    A    I don't know.
15    Q    Could you look at October 25, please, on
16  page 3588?
17    A    Okay.
18    Q    Code 460, it's on here as Armenia task.
19    A    Yes.
20    Q    Is that correct?
21    A    Yes.
22    Q    Armenia was not under Jay Cooper's

0277
1  supervision, correct?
2      A    No, ma'am.
3      Q    Would you look on December 24, please,
4  page 3596?
5      A    December --
6      Q    24, the number is 534.
7      A    534 --
8      Q    Which is not on exhibit 54.
9      A    I don't have that one either.
10      Q    Could it be just a mistake, do you think?
11      A    No.  What it is, the gal who does my chart
12  of accounts, I think she has given out some new
13  codes and the update I have is not the most recent.
14  I can find out, that's for sure.
15      Q    All right.  The next one, 453 --
16      A    Mine stops at 452.  This doesn't have it
17  either.
18          MS. DOUGLASS:  Ms. Ariail, would you be
19  willing if I sent you a letter to get answers to the
20  ones he doesn't know?
21          MS. ARIAIL:  If you send me a letter, I'll
22  respond to it.

0278

1        MS. DOUGLASS:  Thank you.

2    BY MS. DOUGLASS:

3        Q    We have an entire year of the time charges

4    by Arlene Lear in exhibit 55, correct?

5        A    Yes.

6        Q    If you added up all the charges, say for

7    example to code 452, which is CSSI, you would find

8    what percentage of Ms. Lear's time was charged

9    against that program, correct?

10       A    You would find the amount of time on this

11   time sheet, yes.

12       Q    And that would be a direct charge to that

13   program, correct?

14       A    Yes.

15       Q    A direct cost?

16       A    Yes.

17       Q    And that would presumably match the

18   financial records of the dollar amounts that are

19   charged in your accounting records to 452?

20       A    Presumably.

21       Q    If not, it would be an error, right?

22       A    If not, the auditors would pick it up.

0279

1      Q     That number, I haven't done the math, but

2   let's assume we did a percentage, X percent, all

3   right?

4      A    Yes.

5          MS. ARIAIL:  Objection to form, but you

6   can answer, Harry.

7      Q     That X percent would also determine where

8   fringe benefits going to Ms. Lear would be paid

9   from, correct?

10     A    Fringe benefits are charged on actual

11  budgeted estimates.  So the fringe benefits are what

12  the actual costs are, her health insurance, life

13  insurance, annual leave, those things are actual

14  costs.  So you budget at a percentage but you charge

15  on actuals.

16     Q     But say her health care was $5,000 a

17  year --

18     A    The charge should be in there, in that

19  program as the percentage.

20     Q     Of 5,000?

21     A    Yes.

22     Q     That's what I am asking.  Ms. Lear got

0280
1  bonuses in 2003 and 2004, correct?
2      A    Yes, ma'am.
3          (Dorcus Exhibit no. 56 was marked for
4  identification and was attached to the transcript.)
5  BY MS. DOUGLASS:
6      Q    This is a two-page document bearing Bates
7  stamp 3373 and 3374.
8      A    Yes, ma'am.
9      Q    Do those pages indicates that Ms. Lear
10 received a bonus of $16,000 for the year ending
11 September 30, 2003?
12     A    It says she got a letter from Leilei that
13 she got a bonus, yes.
14     Q    Will that bonus be allocated and paid for
15 by programs under the same percentage we were
16 talking about as the fringe benefits?
17     A    Doesn't have to be.  If there's no budget
18 in a certain program, we will not take the money
19 from that program.  So what we do at bonus time is
20 we take the majority of it from overhead and then in
21 the instance of Arlene Lear, if we have budget in
22 some of our programs, we will take it from there

0281
 1  also.  But it's sort of we look at the individual,
 2  we look at where there's money available, and that's
 3  where the bonus comes from.
 4      Q    It would be improper to take a bonus from
 5  any project --
 6      A    No, ma'am.
 7      Q    Let me finish the question, please -- in
 8  excess of the percentage of the person's time that
 9  was spent working on that project; is that not
10  right?
11      A    It would be improper to take a bonus from
12  the program.  I'm just repeating the question.  I
13  have never been asked this question before.  No.
14      Q    It would not be improper?
15      A    It would not necessarily be improper.
16      Q    Why would that be?
17      A    The budgets in these programs are
18  estimates.  The time we spend on these programs are
19  actuals.  The bonuses can be charged in accordance
20  with the recipient's own policies.  So the U.S.
21  government says -- you can pay a bonus just like the
22  federal government pays bonuses to its employees,

0282

1  the federal government says you can pay a bonus.  If
2  you have salary available in that program, there's
3  nothing that says we couldn't take it all from one
4  program.  I mean I know of no regulation that says
5  that.
6         I mean your logic is in line but I know of
7  nothing from any OMB circular or anything like that
8  that says that if it's your company's policy to pay
9  bonuses, some do, some don't, where those bonuses
10  come from must be taken at the same proportion as
11  the pay.  I don't know of any wording like that in
12  any OMB circular.
13     Q    So as far as you know, aside from whatever
14  the circulars show, it's Counterpart's policy not
15  necessarily to allocate a bonus from a person's
16  programs?
17     A    It is Counterpart's policy to take it
18  overhead first and then if the bonus exceeds what we
19  have available in overhead, then we go to the
20  program.
21     Q    Well, the overhead, as we discussed
22  previously, is NICRA funds, correct?

0283
1    A    Yes, ma'am.
2    Q    And NICRA funds are supposed to be spent
3  with respect to the programs that generated these
4  funds, correct?
5    A    Repeat the question.
6    Q    NICRA funds are expected to be spent on
7  overhead costs of the programs that generated the
8  NICRA funds?
9    A    To be spent on the overhead of the
10  organization, not necessarily the program, but the
11  organization that implements the programs.
12    Q    So then is it Counterpart's position you
13  could spend NICRA funds generated from a civil
14  advocacy program completely, and exhaust Ms. Lear's
15  bonus with those funds, if there was overhead in
16  that program?
17    A    Your logic with respect to tying overhead
18  to programs is incorrect.  Overhead is generated by
19  programs and once it's generated, it's used for the
20  organization.  The logic of tying overhead expenses
21  to specific programs, it goes to the organization,
22  it goes to the president's salary, it goes all over

0284
1   the organization once it becomes overhead.  There's
2   no direct correlation between a Bulgaria program
3   generated overhead and that program itself.
4       Q    I think we discussed that last time and I
5   don't wish to repeat, but to make sure I am clear,
6   if you wanted to pay Ms. Lear $16,000 sometime at
7   the end of 2003, you would first see if there were
8   NICRA funds available for that and only if there
9   were not would you go to particular programs; is
10  that your testimony?
11      A    If she had a bonus to begin with, if she
12  had warranted a bonus, yes.
13      Q    Does exhibit 56 indicate that she was
14  warranting a bonus in 2003?
15      A    Yes.
16      Q    Of 16,000?
17      A    Yes.
18      Q    Doesn't the second page of exhibit 56 show
19  that she warranted a bonus of 25,000 in 2004?
20      A    Yes.
21      Q    Your answer would be the same as to how
22  those funds would be generated first from NICRA

0285
1  funds and then if those were exhausted, from program
2  funds?
3     A    We are doing it right now, yes, ma'am.
4     Q    What do you mean you are doing it right
5  now?
6     A    What I mean is I am going through the
7  process of determining the pool in NICRA that's
8  available for bonuses, not who gets what bonus but
9  how much out of overhead I have to pay for bonuses.
10    Q    That's the year end for bonuses, September
11  30 --
12    A    September 30, '06.
13        MS. DOUGLASS:  We will have marked as the
14  next exhibit what I believe to be time sheets for
15  Bobby Abma bearing Counterpart numbers 3286 through
16  3333.
17        (Dorcus Exhibit no. 57 was marked for
18  identification and was attached to the transcript.)
19  BY MS. DOUGLASS:
20    Q    Am I correct that what has been marked as
21  exhibit 57 are time sheets for Bobbie Abma for all
22  pay periods in 2004?

0286
1    A    January 1, December 31, it would appear,
2  yes.
3    Q    There are a couple more codes I need your
4  help with in this document.  Do you have a code 955?
5    A    955 is Program Development.
6    Q    What is Program Development?
7    A    Overhead.
8    Q    So it's paid out of NICRA?
9    A    Yes, ma'am.
10    Q    How about 669?
11    A    669?
12    Q    You can see it on February 23rd, page
13  3292.
14    A    Okay.  3292?
15    Q    Yes.
16    A    That's not Iraq or Afghanistan?  What did
17  you say the number was?
18    Q    669.
19    A    669 is Food Security.
20    Q    So that is not a program administered by
21  Jay Cooper?
22    A    No, ma'am.

0287

1    Q    If you look at the cost center codes, it
2  says 2727.  Does 27 signify a particular location?
3    A    It's probably Tajikistan because he would
4  run over to Tajikistan.  It's probably a country in
5  that area.  27 is Tajikistan.
6    Q    If you could go back to 955 again.  Which
7  is on page 3290, the cost center codes there are 06
8  which means headquarters, right?  And 47 --
9    A    47 is Proposal Writing.
10    Q    Now it says 06, that doesn't mean that Mr.
11  Abma had to be physically present in headquarters?
12    A    No.  It means somebody in headquarters
13  told him to report on the proposal.
14    Q    What location code is 05?
15    A    Regional.
16    Q    Does that mean that it's dispensed against
17  the budget for the regional program?
18    A    Right.
19    Q    That's all five CAR countries?
20    A    Yes.
21    Q    The location code of 52 is what?
22    A    Afghanistan.

0288

1    Q    And the location code of 27 is what?
2    A    Tajikistan.
3    Q    And the location code of 21 is what?
4    A    Kazakhstan.
5    Q    And the final code, which I'm still
6  confused on what you call it -- what do you call the
7  last two numbers, the activity code?  Would that be
8  fair to call it that?
9    A    Activity, yes.  Right now it's the
10  division code, it's the division in which --
11    Q    Since we are working in 2004, let me call
12  it the activity code just so we can communicate.
13    A    It's where we attribute the cost.
14    Q    And we know 25 is Arlene Lear.  What is
15  19?
16    A    19?  I believe it's Business Enterprise.
17    Q    What about 12?
18    A    Agriculture.
19    Q    What about 10?
20    A    Micro Enterprise.
21    Q    How is that distinguished from Enterprise?
22    A    Micro Enterprise is probably under a Food

0289

1  Security activity where we have different distinct
2  programs.
3      Q    How about 61 for an activity code?
4      A    It's a regional environmental activity,
5  but I'm not sure on that.
6      Q    Like Arlene Lear, if we went through and
7  added up the time spent on various of these
8  activities, we would come up to a percentage which
9  should set an allocation of where Mr. Abma's salary
10  is paid from, correct?
11     A    If you add these all up by program, you
12  can make percentages, yes, ma'am.
13     Q    And that would determine both his salary
14  and his fringe benefits as we discussed last time?
15     A    Yes, ma'am.
16     Q    Did Mr. Abma get any bonuses for the
17  period 2003 and 2004?
18     A    I don't recall.
19     Q    Was he paid a relocation, do you know?
20     A    If he submitted his request.
21     Q    That would also be allocated in accordance
22  with the percentages we are talking about which

0290

1  might change over time?

2      A    Correct.

3          MS. ARIAIL:  Can we take a quick break?

4          MS. DOUGLASS:  Sure, absolutely.

5          (Off the record 10:52-10:57 a.m.)

6          (Dorcus Exhibit no. 58 was marked for

7  identification and was attached to the transcript.)

8  BY MS. DOUGLASS:

9      Q    Is what has been marked exhibit 58 similar

10  time sheets to those we have been looking at

11  previously but this time for Michael Kunz?

12      A    Yes, ma'am.

13      Q    Once again I need to ask you a couple of

14  codes.  What is code 660?

15      A    Food for Progress Vietnam.

16      Q    That's not a Jay Cooper project, right?

17      A    No, ma'am.

18      Q    How about on the cost center code, what is

19  location code 23?

20      A    Uzbekistan.

21      Q    And location code 41?

22      A    Armenia.

0291

1    Q    And location code 66?

2    A    66 has to do with environment.

3    Q    Sorry, I'm wrong about that.  I misread my

4  handwriting.  Forget that question, please.  I think

5  we want to know activity code 01.

6    A    I think that's a Chevron.

7    Q    Is that a division of the company?

8    A    No.  That's some activity we did for

9  Chevron Oil Company.

10    Q    Once again, if I added these up, I could

11  determine what percentage of Michael Kunz's salary

12  should be paid for example by the CSSI program; is

13  that right?

14    A    Yes, ma'am.

15    Q    And also his fringe benefits in the same

16  percentage?

17    A    Yes, ma'am, same percentage.

18        MS. DOUGLASS:  I would like to have marked

19  as the next exhibit a multi-page document produced

20  bearing Counterpart Bates stamps 4034 to 4039.

21        (Dorcus Exhibit no. 59 was marked for

22  identification and was attached to the transcript.)

0292
 1  BY MS. DOUGLASS:
 2     Q    First, what kind of a document is exhibit
 3  59?
 4     A    The front is a general voucher that the
 5  accountants use to post financial activity, so it's
 6  a posting medium used by the accountants.
 7     Q    For example, the left-hand column on the
 8  first page will tell you which project a certain
 9  dollar amount goes in, correct?
10     A    Goes in and comes out.
11     Q    The second column is the location we have
12  been talking about, correct, the two-digit location
13  code?
14     A    Yes.
15     Q    The third is what we have been calling the
16  activity code, right?
17     A    Right.
18     Q    What does "object" mean?
19     A    The object is the salary or equipment or
20  that sort of thing.
21     Q    And you have a different set of numbers
22  for that, right?

0293

1    A    Yes.

2    Q    What does O-R-G mean?

3    A    I believe that means the donor.

4    Q    Would 4 be the USAID?

5    A    Correct.

6    Q    And sub/object would be what?

7    A    Sub/object is another level of information

8  on the object.  So if you -- part-time salaries,

9  full-time salaries, that sort of thing.

10    Q    Would you look on page 4036?

11    A    Yes.

12    Q    I came equipped in trying to read these

13  things if anybody needs this (indicating magnifying

14  glass).  What kind of a document is page 4036?

15    A    This is a print-out in some formality that

16  we used to reconcile all of our postings, everything

17  that goes in.

18    Q    So it's repetitious, that same data comes

19  out in other forms, does it not?

20    A    Sure.

21    Q    We'll try to avoid that one unless we have

22  to look at it.

0294

1    A    Go ahead.
2    Q    The same information should be in other
3  formats, correct?
4    A    Yes, ma'am.
5    Q    Look on page 4037, please.  Now this is a
6  common form that I have seen a lot.  Is it fair to
7  just call it an expense voucher?
8    A    It's what's used overseas, yes, ma'am.
9  This is a Dushanbe expense voucher.
10    Q    What is Dushanbe?
11    A    Tajikistan.
12    Q    Can you tell from this form who took the
13  trip to Tajikistan that's referenced?
14    A    Well, it says payment some expenses during
15  the trip to Tajikistan, Bob Abma.
16    Q    So he charged --
17    A    We don't know that.
18    Q    We don't know that he did it?
19    A    No, ma'am.
20    Q    Why would it say that if he didn't do it?
21    A    His signature is not here.  What this
22  could be is mileage or overtime or taxi fare.  I

0295
 1  have no idea exactly.  This is travel expense for
 2  Bob Abma on a trip, but he did not prepare this.  An
 3  accountant evidently prepared this and it was
 4  approved by someone else.  So these are incidental
 5  costs related to his travel that the office over
 6  there charged while he was there, it would appear.
 7      Q     Who is the "approved by" signature at the
 8  bottom of page?
 9      A     Looks like Andrea Brunetski, Andrea B, but
10  I'm not sure.
11      Q     Who is that person?
12      A     She was our chief of party there in
13  Tajikistan I believe during that time.
14      Q     It looks as if somebody has changed the
15  code from 434 to 449.
16      A     Yes, ma'am.
17      Q     What is code 434?  What does that mean?
18      A     CAR extension no. 3.
19      Q     What is CAR, do you know?
20      A     Central Asia Republics.  Don't know
21  exactly what that program was.  It's an old one.
22      Q     But it's not anything administered by Jay

0296
1  Cooper, correct?
2      A    I don't know.
3      Q    And 449 is Healthy Communities, correct?
4      A    Healthy Communities, correct.
5      Q    Location 27 being Tajikistan?
6      A    Correct.
7      Q    If we look back on Bob Abma's time sheets,
8  which is exhibit 57, from March 28 to April 4,
9  presumably we will find out what he was doing in
10  Tajikistan.  Would that be a fair assumption?
11      A    Presumably we will find out where he
12  charged his time while in Tajikistan.
13      Q    I believe it's page 3295 of exhibit 57.
14      A    Okay, I see March, March 28th is a Sunday.
15      Q    Am I correct that on March 30th he charged
16  5 hours to 669, which I believe is --
17      A    Food Security.
18      Q    And on the same day he charged 2 hours to
19  761, which I believe is World Bank Women Tajikistan.
20      A    On the 30th, I see.
21      Q    And some time to the same two projects on
22  the 31st.

0297
1    A    Okay, Tajikistan women and --
2    Q    Food Security.
3    A    -- Food Security, okay.
4    Q    Does Food Security have a project in
5  Tajikistan?
6    A    Yes, ma'am.
7    Q    So that's why it says 27,27?
8    A    Yes, ma'am.
9    Q    So as far as we know, both of those
10  charges were accurate, in other words, the travel
11  was charged to the same thing he was doing, except
12  that --
13    A    So as far as we know, it looks like he was
14  in Tajikistan during those days, yes, ma'am.
15    Q    During those two projects?
16    A    Yes.
17    Q    And it was charged to 449, which is
18  Healthy Communities?
19    A    449, Healthy Communities, yes.
20    Q    So that's the same?
21    A    I don't know.  There's no regulation that
22  says he can't talk on the phone for an hour about

0298

1   Healthy Communities from Tajikistan.  I don't know

2   what he did while -- in other words, I cannot sit

3   here and say yes or no that was a mistake without

4   having a lot more information.

5          (Dorcus Exhibit no. 60 was marked for

6   identification and was attached to the transcript.)

7   BY MS. DOUGLASS:

8      Q    Exhibit 60 is a two-page document bearing

9   Bates stamp numbers 4055 and 4056.  Is exhibit 60 an

10   expense voucher for Bob Abma for per diem charges

11   while in Ashgabad between May 1 and 8, 2004?

12      A    Per diem, yes, ma'am.

13      Q    And he has charged it to fund 452; is that

14   right?

15      A    Yes, ma'am.

16      Q    And 452 is CSSI?

17      A    Yes, ma'am.

18      Q    And he said location 32, and location 32

19   is what?

20      A    I assume it's Turkmenistan, that's

21   Ashgabad.  Yes, Turkmenistan.

22      Q    Now if you look on exhibit 57, on page

0299
 1   3300, you'll see that between May 1 and 8, 2004 --
 2      A     Sorry, could you repeat that?
 3      Q     Sure.  Please look at exhibit 57, the Abma
 4   time sheets.
 5      A     All right.
 6      Q     On page 3300.
 7      A     Okay.
 8      Q     You will see that during May 1 and 8,
 9   2004, he worked on three different projects.
10      A     Yes, ma'am.
11      Q     On 452, which is the same as the project
12   to which he charged his per diem, correct, in
13   exhibit 60?
14      A     Yes.
15      Q     As well as 449, which is Healthy
16   Communities and 761 which is World Bank Women?
17      A     Correct.
18      Q     That's incorrect, the charging of a
19   nonallocation of per diem, is it not?
20      A     Once again, the accountant who prepared
21   this voucher, he took -- receipt for cash, so he
22   took $50 a day in per diem.  So this is per diem

0300
1    while he was in Ashgabad.  The accountant that
2    prepared this, it would appear on this particular
3    document that the cost did not get distributed.
4    However, we don't know that they did not get
5    adjusted later on.  That per diem was charged to
6    this particular account by the accountant and
7    there's -- Bob Abma's signature is not here.  The
8    only thing it says is he took a $50 advance for his
9    per diem while he was in Ashgabad, and as far as
10   this accountant knew, the only account that he was
11   working on was 452.
12       Q     So what you are saying is there was a
13   miscommunication between Mr. Abma and the
14   accountant?
15       A     It could appear to be that, yes.
16       Q     Could you look back on exhibit 59, please,
17   and look on page 4036 -- and feel free to use the
18   magnifying glass -- and tell me whether you can tell
19   whether or not that per diem has been reallocated.
20       A     Okay, what's the date?  Even if I could
21   find it on here, which I'm looking for per diem trip
22   to -- trip, trip, trip, there's a lot of trips here.

0301

1  I can't even find it, no. 1, and so I'm not sure

2  when that posted.  So I can't tell.

3      Q    Okay, you can't tell.  I would like to

4  have marked as the next exhibit a multi-page exhibit

5  bearing Bates stamped 4134 through 4152.

6          (Dorcus Exhibit no. 61 was marked for

7  identification and was attached to the transcript.)

8  BY MS. DOUGLASS:

9      Q    How would you describe the set of

10  documents that's exhibit 61?

11      A    These seem to be charges to petty cash

12  made at the office during May and June of '04.

13      Q    And they include travel vouchers, do they

14  not, for trips to Berlin for Ms. Lear and Mr. Kunz?

15      A    I see visas all over the place.

16      Q    Airline tickets, excuse me, I meant

17  airline tickets.

18      A    I see in the front here the big charge for

19  intercountry travel HQ staff Washington.  So is

20  there a ticket for Arlene Lear here somewhere?

21      Q    There appears to be a ticket for Arlene

22  Lear to --

0302

1     A     I see Michael Kunz.
2     Q     -- from Almaty to that place that you
3  pronounce Dushanbe on 4138, 39?
4     A     Right.
5     Q     There appears to be a ticket on 4143 from
6  Michael Kunz to go to Germany?
7     A     Michael Kunz goes to Frankfort, then to
8  Berlin.  Lear's ticket is which page?  I see.  It's
9  on 4139?
10     Q     Yes.
11     A     So she went down to Dushanbe, okay.
12     Q     And on 4150, Michael Kunz went to
13  Tashkent?
14     A     4150, Michael Kunz, airline ticket,
15  Almaty, Tashkent.  Okay.
16     Q     If you look on the big items on the first
17  page, you will see they are intercountry travel for
18  headquarters staff?
19     A     Yes, ma'am.
20     Q     And both items in the amount of 1367.28
21  and the amount of 422 are charged to account no.
22  452?

0303
1    A    Yes, ma'am.
2    Q    That's a CSSI program, correct?
3    A    Yes, ma'am.
4    Q    Did someone check to see that that travel
5    was for the purposes of that program?
6    A    Other than Arlene Lear and Jay Cooper, no.
7    Q    Look on page 4135, there is a charge for
8    tickets from Michael Kunz to Frankfort in the amount
9    of $834.18.
10   A    Yes, air tickets, 834.18, Kunz.
11   Q    Now it doesn't give a code, if I'm reading
12   it correctly, unless 4404 is a code.
13   A    I don't know where it was charged.
14   Q    What does it mean when it says regional
15   MK?  See in the middle column there are a number of
16   charges to regional MK.
17   A    That's a local something they are using.
18   I'm not sure what they mean by regional MK.
19   Q    Do you know what the number 4404 to the
20   right means?
21   A    No, ma'am.
22   Q    If you look at the line above the regional

0304
1   MK line there, above the line that says $834.10,
2   there is an item for tea, sugar, coffee for office.
3   Do you see that line?
4       A    Yes.
5       Q    And the amount charged is $36.59.  It
6   looks like there has been very careful allocation of
7   the tea, coffee, sugar among the various projects.
8           MS. ARIAIL:  Is that a question?
9           MS. DOUGLASS:  I'm asking if that's what
10  that shows.
11          THE WITNESS:  It could, yes, ma'am.
12  BY MS. DOUGLASS:
13      Q    And that happens a number of times on page
14  4137 in that they allocate percentage-wise the
15  various projects that are in the office in Almaty;
16  is that right?
17      A    Yes, ma'am.
18      Q    Do you have any explanation why airfare in
19  the amount of $834 wasn't allocated in a similar
20  way?
21      A    The airfare was for Kunz and -- let's
22  see --

0305
1    Q    To Frankfort, Germany.
2    A    -- to Frankfort.  Not offhand, no.
3    Q    There was a conference in Berlin in June
4  of 2004, was there not?
5    A    Yes, ma'am.
6    Q    What was the purpose of that conference?
7    A    It was a regional -- not a regional, it
8  was a worldwide Counterpart training.  Every couple
9  of years Counterpart will bring people together for
10  training, for familiarization, administrative.
11    Q    And a number of people were invited?
12    A    Yes.
13    Q    To what account should travel and related
14  expenses have been charged?
15    A    There's two different ways to do it.  If
16  the person -- where should they be charged?  It
17  appears that Mr. Kunz's travel was charged to this
18  particular program and I can't say on the surface
19  whether that was proper or improper for him to --
20    Q    By that you mean 452?
21        MS. ARIAIL:  Let him finish what he is
22  saying.

0306

 1    A    I can't tell where it was charged.  It
 2  appears -- I mean on the front sheet it doesn't say
 3  who it was.  It says intercountry travel HQ 1367.  I
 4  don't know if that's a number of travels from the
 5  second page, but the fact that if Kunz's travel was
 6  indeed charged to the program, you can take
 7  individuals who have direct charges to those
 8  programs and take them out for training and charge
 9  it to the programs.  So the fact that we charged
10  Kunz to the program, it doesn't necessarily mean it
11  was wrong.  It means we took Kunz out for this
12  training, we brought people from all over the world
13  to go to this training meeting -- we do it every
14  couple of years -- and that again is -- there are
15  training line items in the programs, in many of
16  them, and so it's a judgment call.  It's not right,
17  it's not wrong; it's a judgment call.
18    Q    Should it in the case of for example Mr.
19  Kunz have been allocated against a number of
20  programs he worked on based on his time sheets?
21    A    Not necessarily on training.
22    Q    Training is different why?

0307

1    A    Because every project may not have had a
2  training budget.
3    Q    And so if every project does not have a
4  training budget, then you pay them out of the
5  projects that do?
6    A    You go to the one that does because in
7  some the donor will give you a lot of different
8  budgets and in others the donor will give you
9  nothing.  I wish it were simple.
10        MS. DOUGLASS:  The next document is
11  exhibit 62, a multi-page document bearing Bates
12  stamp numbers 4172 through 77.
13        (Dorcus Exhibit no. 62 was marked for
14  identification and was attached to the transcript.)
15  BY MS. DOUGLASS:
16    Q    Am I correct that the first two pages of
17  exhibit 62 show that Ms. Lear stayed in the Hotel
18  Hyatt in Almaty and spent $642.64, which was all
19  charged to program 452?
20    A    This is from the top page?
21    Q    First two pages, you really have to read
22  the first two -- three pages actually.

0308

 1     A     Hotel Hyatt for Lear, $642.  It appears as
 2  if the program paid for her hotel direct.
 3     Q     That's 452, correct?
 4     A     It appears.
 5     Q     If you look on page 4173, the same item is
 6  on that page about a third of the way down but the
 7  code says C-W.
 8     A     That's an internal code they use for where
 9  to charge the cost.  I don't know what that --
10  that's something there in Almaty they were using,
11  C-W, H-R, am not sure what it means.
12     Q     But the item directly above that which is
13  7 June 04, cartridge for the Xerox machine, is very
14  carefully allocated among various programs, and for
15  some reason it wasn't done with Arlene's hotel bill
16  which is much, much larger in dollars.  Do you know
17  why?
18     A     Once again it could have to do with
19  budgets.  So without having all the programs, don't
20  know why.
21     Q     The item for $25.70 for office supplies
22  which is listed on page 4172 of exhibit 62 appears

0309
 1  to be for an adapter for Michael Kunz, if you look
 2  on page 4176.
 3      A    This is a converter of some sort.
 4      Q    At any rate, it was charged to 452, right?
 5      A    $25.70, it would appear it was charged to
 6  452.
 7      Q    Would you look on page 4177 for a minute.
 8  Do you have any idea what that is?
 9      A    Perhaps a local employee -- something to
10  do with a local employee, but I don't know what
11  Newstar --
12      Q    Well, since it cost 3500 units of the
13  local currency, it apparently relates to the adapter
14  which is exactly that price.
15          MS. ARIAIL:  Objection.
16  BY MS. DOUGLASS:
17      Q    I am just asking why you --
18          MS. ARIAIL:  I object to Ms. Douglass
19  testifying about what it is when she just asked the
20  witness what it was.
21  BY MS. DOUGLASS:
22      Q    Do you know what it is?

0310
1     A    You want me to guess?
2     Q    No.  I just want to know why they took the
3   man's picture.
4     A    I don't want to guess.  I don't know.
5         MS. DOUGLASS:  I would like to have marked
6   as exhibit 63 a document bearing Bates stamp 4193
7   through 4196.
8         (Dorcus Exhibit no. 63 was marked for
9   identification and was attached to the transcript.)
10  BY MS. DOUGLASS:
11    Q    Does exhibit 63 appear to show that bank
12  fees are charged to project 452 when Mr. Abma or Mr.
13  Kunz took an advance?
14    A    Okay, the advances were related -- I think
15  Kunz was related to his move.  So in the instance
16  where -- in this instance, we charged the bank fees
17  to the program, it would appear.
18    Q    What about Mr. Abma's bank fees?
19    A    Same thing.
20    Q    He didn't move, did he, in June of --
21    A    I don't recall why they gave him a salary
22  advance.  I think it's because he bought a house.

0311

1      Q    Have you ever come to know that there was
2   a routine practice of taking salary advances by Mr.
3   Abma and Mr. Kunz and Mr. Cooper?
4      A    No.
5      Q    Did you authorize that all bank charges in
6   the Almaty office be billed to account no. 452?
7      A    No, no.
8    Q    Would that have been proper?
9      A    It may have been proper.
10     Q    Under what theory would it have been
11  proper?
12     A    If that was the only program in that
13  particular office that had budget for bank fees.
14         MS. DOUGLASS:  I would like to have marked
15  as exhibit 64 a multi-page exhibit beginning with CP
16  no. 4208 through 4290.
17         (Dorcus Exhibit no. 64 was marked for
18  identification and was attached to the transcript.)
19  BY MS. DOUGLASS:
20     Q    Can you tell me what exhibit 64 is, Mr.
21  Dorcus?
22     A    This again is a journal voucher, the

0312

1   posting medium that Counterpart uses to post these
2   attachments to our books.
3       Q    Included in the exhibit, after you get
4   through the journal entries, are various receipts
5   for expenses for the Almaty office?
6       A    Yes, they should correlate to what has
7   been posted, yes.
8       Q    Presumably all these relate to the month
9   of July 2004?
10      A    May or may not.
11      Q    May have been posted during that month,
12  correct?
13      A    Correct.
14      Q    Would you look at page 4214, please, and I
15  believe the next page has the same information as
16  well.  Does this indicate that Mr. Abma in June of
17  2004 took a trip to Berlin and also R&R to
18  Washington?
19      A    It would appear that he went on R&R after
20  the trip to Berlin, yes.
21      Q    R&R is allowable under what grant or
22  project?

0313
1     A     AID and the Department of State -- when
2  Americans are assigned to countries overseas, the
3  State Department makes a designation as to whether
4  it's a healthy or unhealthy post that warrants R&R,
5  and if it is a post where R&R is warranted, the
6  donor will fund trips in accordance with the State
7  Department's guidance.  Almaty is, I think it's
8  8,000, 10,000 -- I don't know, it's between 8,000
9  and 10,000 feet and the State Department has made a
10  determination that people who live there get annual
11  R&R.
12     Q     Is it Counterpart's policy to allocate the
13  costs of R&R to all the projects on which an
14  individual works under the allocation based on the
15  amount of time he or she spends on each of the
16  various projects?
17     A     To those projects which have R&R travel
18  authorized travel in the budgets.  Let's say for
19  instance he worked on -- take Bob Abma, he worked on
20  many programs, on Food Security, on many, many,
21  many.  However, there may not have been R&Rs for the
22  regional accounting in those other grants, and so

0314

1   while he did work on -- while there was evidently
2   R&R on these two programs authorized for his
3   position, there may not have been R&R in other
4   programs on which he worked.
5       Q    So it's proper in your view under the
6   appropriate regulations to charge the programs that
7   have the money for that purpose?
8       A    Yes, ma'am.
9       Q    If you look on page 4214, there is BA and
10  FO.  Does FO stand for financial officer and BA for
11  Bob Abma?
12      A    I don't know (laughing).
13      Q    You don't know either, okay.  So both 452
14  and 459 are programs that Jay Cooper managed,
15  correct?
16      A    Yes, Jay Cooper, yes, 452 and 459.
17      Q    Look on page 4215.  There appear to be
18  allocations between for example hotel in Washington,
19  between C-R and H-R?
20      A    Right.
21      Q    Do you know what those are?
22      A    Those are local codes evidently that they

0315
1  used out there in Almaty that refer to their
2  programs, but I don't know which is which.
3      Q    The following pages appear to be various
4  pieces of paper submitted by Mr. Abma to support his
5  request for reimbursement.  Is that what you see?
6      A    Which page?
7        MS. ARIAIL:  Objection.
8      Q    Say 10, 15 pages after the pages we have
9  been looking at.
10     A    Repeat the question.
11     Q    Are the pages following page 4214 and 15
12  materials submitted by Bob Abma to support his
13  request for reimbursement?
14     A    16, 17, 18 --
15     Q    I believe all the way through 4231.
16     A    It would appear, yes.
17     Q    On page 4219, under Berlin is written, "no
18  per diem allowable per e-mail from Harry Dorcus of
19  6/5/04."
20     A    Yes, ma'am.
21     Q    Did you tell Mr. Abma he couldn't have per
22  diem in Berlin, and if so why?

0316
1      A     The deal was, as I recall, we negotiated
2    with the hotel a one-price-fits-all kind of deal, so
3    50 employees for X number of dollars.  And so when
4    we do that, when I pay for three meals a day plus
5    lodging, I don't pay for per diem.  And so we
6    instructed the employees when you reach Berlin, when
7    your feet are in Berlin, you don't get per diem.
8    Now if you come via five other countries to get
9    there, you can claim per diem for those countries.
10   However, once you get to Berlin, I have your costs
11   covered, because we negotiated a conference facility
12   that included meals and so we saw no reason to pay
13   per diem.
14     Q     Did you attend the proceedings in Berlin?
15     A     Yes, ma'am.
16     Q     Did Mr. Abma bring a friend with him?
17     A     I think so.
18     Q     If you look on page 4217, he deducted his
19   friend's lodging from the amount he asked for?  This
20   is in the R&R part of the deal.
21     A     4217?
22     Q     Yes.

0317
1       A    I can't tell.
2       Q    It says second person is base rate times
3    $15 a day --
4            MS. ARIAIL:  Where are you looking?
5            MS. DOUGLASS:  4217.
6            THE WITNESS:  It says two days at 129,
7    second person is base rate at $15 a day.  I'm not
8    sure on that without going all through this, but it
9    would appear yes.  I can't tell.
10   BY MS. DOUGLASS:
11      Q    But that would be an appropriate way of
12   doing it, right?
13      A    I think he was well aware that we weren't
14   paying for his friend, if his friend was there.
15      Q    Let's look at 4247 in exhibit 64.
16      A    4247, okay, Hyatt for Lear May 29.
17      Q    Is that the same charge that we saw
18   earlier on exhibit 62?
19      A    No idea.
20      Q    Appears that the dates are different.  I
21   wonder if you knew.
22      A    The arrival day is April 20 on the first

0318

1    one.  The arrival date on this one is January 30.

2        Q    So they are different?

3        A    Yes, ma'am.

4        Q    Can you tell from anything that is

5    available to you as to what program Ms. Lear's hotel

6    bill, which is in exhibit 64 at pages 4247 and

7    following, was billed?

8        A    I would assume it was exactly as was done

9    in the prior exhibit.  However, that's an

10    assumption.  There are many charges on this voucher.

11        Q    Can you tell from the one on the first

12    four or five pages of exhibit 64 how her hotel bill

13    was charged?

14        A    I can't find the correlating dollar amount

15    that was charged for the hotel bill.  I have the pro

16    forma, the estimate, but I don't know which exchange

17    rate they used so I don't see the dollar charge.  So

18    the answer to your question is I can't tell.

19        Q    But you assume it was probably handled the

20    same way as the last one?

21        A    Yes, ma'am.

22        Q    Would you look at 4266, please.

0319
1    A    4266?
2    Q    Yes.  Am I correct that on page 4266 of
3    exhibit 64 it indicates that Bob Abma's housing was
4    allocated between project 452 which is CSSI and 449
5    which is Healthy Communities?
6    A    Yes, ma'am.
7    Q    Do you know how that allocation was made?
8    A    No, ma'am.
9    Q    Do you know why none of it was allocated
10   to the other projects on which he worked?
11    A    I am assuming they didn't budget for
12   housing costs.  The accounts were budgeted just for
13   those two programs in his costs.
14    Q    Does USAID know when it permits its funds
15   in the Healthy Communities in the CSSI projects to
16   be used for Mr. Abma's housing that he is not
17   spending all his time on those two projects?
18    A    Do they know.  It's easy for them to tell.
19   Yes, they know.
20    Q    Do they approve that it be handled that
21   way?
22    A    Yes, ma'am.

0320
1     Q     How do they make that approval?
2     A     They have audits, the CTO knows what's
3  going on with respect to the programs.
4     Q     The CTO sees the time sheets that we
5  looked at earlier?
6     A     If he wants.
7     Q     Have you ever known one to look at them?
8     A     Yes.
9     Q     In connection with the Almaty program?
10     A     No.
11     Q     Let's look at pages 4267 and 68 of exhibit
12  64.
13     A     67 and 68?
14     Q     Right.  That's the lease of Mr. Abma's
15  housing, correct?
16     A     Yes, ma'am.
17     Q     And the next two-pages are the same thing
18  in Russian?
19     A     Mine is in English.  The next page is
20  English.
21     Q     4269 and 70 are the same thing in Russian?
22     A     I don't speak Russian, I have no idea.

0321

 1      Q    Mr. Abma's landlord is named Igor Krayev;
 2  is that correct?
 3      A    Igor Krayev.
 4      Q    Igor Yevgenievich Krayev?
 5      A    Yes, Krayev.
 6      Q    Is he a romantic partner of Mr. Abma?
 7      A    I don't know if that's him or not.  I know
 8  Igor, but I don't know if that's the same Igor.
 9      Q    I believe you testified previously you
10  came to know and approved Mr. Abma renting from a
11  romantic partner; is that right?
12          MS. ARIAIL:  Objection,
13  mischaracterization of testimony.
14  BY MS. DOUGLASS:
15      Q    Did you ever approve Mr. Abma renting his
16  housing from a romantic partner?
17      A    No, I don't recall approving him renting
18  from his romantic partner.
19      Q    Did you ever have a discussion with Mr.
20  Abma about his housing arrangements?
21      A    No -- I do recall having a discussion with
22  Abma about his arrangements when the purchase was

0322
 1  going to take place.
 2      Q    What do you remember about those
 3  discussions?
 4      A    I think we talked about that, but
 5  basically he wanted to know if it could cover a
 6  mortgage and I said yes, AID will cover a mortgage
 7  if it doesn't exceed the amount of the housing
 8  allowance.
 9      Q    Was it your understanding that Mr. Abma
10  personally was going to buy the property?
11      A    I don't recall.  It was his mortgage, yes,
12  that he was going to purchase the property.
13      Q    You never heard that his romantic partner
14  was involved?
15      A    He told me that it was in conjunction
16  with, yes, because it had to do with something that
17  you had to have a local person going in with you on
18  the purchase, that Americans buying property in
19  Kazakhstan couldn't be done on your own, you had to
20  have a partner, a local partner.
21      Q    Is there any problem with a Counterpart
22  employee operating under a grant from USAID paying

0323
1  rent to someone with whom he is personally involved?
2     A    If it's an arm's length transaction, no.
3     Q    Did you ever approve the terms of this
4  lease?
5     A    No.
6     Q    Were you ever asked to?
7     A    No.
8     Q    Do you know whether anyone else ever did?
9     A    I don't know if Arlene did or not, or Jay
10  Cooper.
11    Q    Did you approve the allocation of the
12  housing to the two projects, Healthy Communities and
13  CSSI?
14    A    No.
15    Q    Did you know whether anyone else did?
16    A    No.
17        MS. ARIAIL:  Can we stop for one second?
18        (Discussion off the record.)
19        (Lunch recess 12 noon-1:00 p.m.)
20        MS. DOUGLASS:  I would like to have marked
21  as exhibit 65 a three-page document starting with
22  Counterpart no. 4321.

0324

1          (Dorcus Exhibit no. 65 was marked for
2     identification and was attached to the transcript.)
3     BY MS. DOUGLASS:
4          Q     Does exhibit 65 appear to be a voucher put
5     in by Mr. Abma for Russian lessons?
6          A     I don't see his signature on here.  It
7     appears to be a payment to L. Kondik for Bob Abma
8     lessons, and this says housing allowance on mine.
9          Q     Sorry.
10         A     That's what's strange because over on the
11    top -- are you with me?
12         Q     Yes.
13         A     -- it says Russian lessons, but down in
14    the body of the voucher it says housing allowance.
15    Now due to the amount, it seems to me to be Russian
16    lessons paid to L. Kondik, it says 100 in local
17    currency or maybe it's 100 dollars.  I don't know.
18         Q     100 dollars with a dollar sign?
19         A     Yes.
20         Q     The next page, 4323, is also lessons from
21    a Mr. Kondik, right?
22         A     Yes, ma'am.

0325

1     Q     Did you authorize Russian lessons for Bob
2  Abma?
3     A     No, ma'am.
4     Q     Do you know if it's a proper training
5  cost?
6     A     Yes.
7     Q     You do?
8     A     A training cost is most certainly a proper
9  cost if it will allow Mr. Abma to do his duties
10  better.  There is no difference between this and
11  sending him off to Berlin.  It's a training class
12  for him to do his job better.
13     Q     Does Counterpart have any programs in
14  countries that speak Russian?
15     A     All of the Stans.
16     Q     All of the Stans are Russian speaking?
17     A     Kazakhstan, Tajikistan, Turkmenistan, they
18  don't like to admit they speak Russian but that's
19  the lingua franca, that's the business language.  So
20  Kazakhstan, Kurdistan, Tajikistan, Turkmenistan.  It
21  gets you shot faster but it also gets you down the
22  street because it's the language that everybody was

0326

1  educated in formally.  They were educated formally
2  but of course they are tribal languages.  Having
3  Russian for Mr. Abma allows him to do his job
4  better.  All the government officials speak Russian.
5      Q    Would it be proper to have him allocate
6  the cost of Russian language lessons over all the
7  contracts that he works on in proportion to the
8  number of hours he spends on each?
9      A    Yes, not necessary.
10     Q    Your answer was yes, it was not necessary?
11     A    Repeat the question.
12     Q    Would it have been proper to allocate the
13  cost of the Russian language over all the contracts
14  he works on, all the projects he works on in
15  proportion to the number of hours he spends on each?
16     A    Only to those projects which had training
17  costs in the project allowed.
18     Q    The same answer as before?
19     A    The same answer as before.
20         (Dorcus Exhibit no. 66 was marked for
21  identification and was attached to the transcript.)
22  BY MS. DOUGLASS:

0327

1      Q     The next document is a multi-page document
2   starting with CP 4324.  Mr. Abma's romantic partner
3   is Russian, right?
4      A     He's probably Kazak.
5      Q     Would you look at exhibit 66, please, on
6   page 4326.
7      A     Bob entered the lease.  Do you want me to
8   read the lease?
9      Q     No.  I want to ask you about Igor
10  Yevgenievich Krayev and ask you if that's a Russian
11  name.
12     A     Yes, ma'am.
13     Q     Mr. Krayev is Mr. Abma's landlord,
14  correct?
15           MS. ARIAIL:  Objection, asked and
16  answered.  You can answer.
17     A     I mean that person signed.
18     Q     And exhibit 66 is an expense voucher for
19  Mr. Abma's rent which is paid to Igor Krayev, right?
20     A     Yes, ma'am, this goes direct to Krayev and
21  the payment is made direct for apartment lease of
22  Bob Abma from October through December of '04.

0328

1    Q    Right.  And the cost of Mr. Abma's housing
2  is split between 452 and 449?
3    A    Yes, ma'am.
4    Q    And somebody has made an allocation
5  between those two numbers?
6    A    Yes, ma'am.
7    Q    Do you believe that that allocation
8  reflects the number of hours Mr. Abma spent on the
9  two projects?
10    A    No, ma'am, I don't think it has anything
11  to do with hours.  I think it has to do with whether
12  or not those projects had support cost budget in
13  them.
14        (Dorcus Exhibit no. 67 was marked for
15  identification and was attached to the transcript.)
16  BY MS. DOUGLASS:
17    Q    The next exhibit is a multi-page document
18  beginning with CP 3661.
19    A    This looks like 65, right?
20    Q    It's the same?
21        MS. ARIAIL:  It's the same Bates stamp
22  number.

0329
1          MS. DOUGLASS:  This is a different date.
2   This is 10/21/04, the other one is 9/03.
3          THE WITNESS:  65 is for September and the
4   other is for October.
5   BY MS. DOUGLASS:
6      Q     So Mr. Abma apparently continued his
7   Russian lessons, correct?
8      A     Correct.
9      Q     Once more it is coded as housing allowance
10  to 452 and 449, correct?
11     A     Without looking to know what chart of
12  accounts 4152 means, I can't say that was charged as
13  housing allowance.  This could be a Xerox copying
14  error because they took his housing allowance
15  voucher and just word-processed it and left that on
16  there.  However, the payee is different and it says
17  the purpose -- the explanation of the payment up at
18  the top says it's for Russian lessons and the
19  apartment would indicate it's for Russian lessons
20  and I can't tell -- the answer for 65 is the same as
21  for 67.
22     Q     Did we have a location -- 41 was Armenia

0330
1    you told me previously for location code?
2        A    Yes, but this is local, this 4152.  I
3    don't know if this is something that's done here.
4    452 is correct.  Location 05.
5        Q    That would be regional?
6        A    Regional.
7        Q    And 25 would be Arlene?
8        A    Arlene, okay.  Okay, 4152 is a function
9    cost.  We haven't gotten that deep into it yet.
10    Yes, you are right, looks like they charge it to
11    housing.
12        Q    4152 is a housing code?
13        A    Um-hmm, yes.
14            (Dorcus Exhibit no. 68 was marked for
15    identification and was attached to the transcript.)
16    BY MS. DOUGLASS:
17        Q    The next document is a one-page document
18    bearing Bates stamp 3667.  Mr. Dorcus, this is an
19    example of a reimbursement request list where some
20    things are obviously allocated and other ones are
21    not.
22        A    Um-hmm.

0331
 1     Q    Can you explain to me again why that's
 2  done that way?
 3        MS. ARIAIL:  Objection, asked and
 4  answered.  You can answer.
 5  BY MS. DOUGLASS:
 6     Q    Well, if this document helps you explain
 7  it.  If not, we'll just leave the testimony the way
 8  it is.
 9     A    Your question is why a Turkish visa for
10  Bob Abma to go to Iraq is capped?
11     Q    That one is obvious but look at cable for
12  the regional office is C-R.  Taxi for Asanova is
13  C-K.  Tea, coffee, sugar, glasses for training is
14  C-K.  K cell for Storozhenko is evidently a cell
15  phone and another is H-R.
16        MS. ARIAIL:  Is there a question here?
17  BY MS. DOUGLASS:
18     Q    Do you know why it's done here and what
19  those codes mean?
20        MS. ARIAIL:  Objection, asked and
21  answered.
22     A    No, ma'am.

0332

1    Q    But as to some of the entries, it is
2  probably allocated as far as you can tell?
3    A    Yes, ma'am.
4        (Dorcus Exhibit no. 69 was marked for
5  identification and was attached to the transcript.)
6  BY MS. DOUGLASS:
7    Q    The next exhibit a one-page document
8  bearing Counterpart number 3667.  Now is exhibit 69
9  a receipt for Mr. Kunz's payment of his rent?
10    A    It looks like his landlord received $3600
11  for November 21 to January 21 for Michael Kunz.
12    Q    So it's $1800 a month, right.  Can you
13  tell from anything you have seen to what project
14  that was booked?
15    A    I can't tell.
16    Q    What would have been proper in your view?
17        MS. ARIAIL:  Objection.  You can answer.
18  BY MS. DOUGLASS:
19    Q    Do you know what would have been proper?
20    A    It would have been proper to bill his rent
21  to those programs that had a rental budget in the
22  grant for his particular position.

0333

1     Q     Assuming that he worked for them for at

2   least some part of his time?

3     A     Assuming that he worked there, yes, ma'am.

4   If he works in other programs, these programs accrue

5   the benefit.

6     Q     The other programs accrue the benefit?

7     A     No.  For salary, when a person goes into

8   other programs and bills his salary, the larger

9   programs that have his full salary already budgeted

10   for benefit and the people who are managing those

11   programs accrue those benefits.  In other words,

12   they can take that salary and use it for a

13   consultant or use for whatever.

14     Q     But in fact the program doesn't benefit in

15   the other sense of the word benefit -- (phone

16   rings) -- in that the larger program has lost the

17   sum of the individual's time working on its project?

18     A     That's correct, but that's a conscious

19   decision made by all those that post at the time,

20   including Bob Abma -- I mean Jay Cooper.

21     Q     That's assuming that they know about it,

22   correct?

0334
1      A    You have the time sheets -- they approved
2  the time sheets.
3      Q    You think Jay Cooper approved the time
4  sheets that allocated Mr. Kunz's rent allocation to
5  wherever it was allocated?
6      A    I don't know, but I assume there would
7  have been an expense voucher and I would assume he
8  had seen all the expenses going through all these
9  programs.
10      Q    Didn't Mr. Cooper object to the fact that
11  Mr. Kunz's and Mr. Abma's expenses were being billed
12  solely to his programs?
13      A    I don't know.
14      Q    You never heard that?
15      A    No.
16      Q    He never told you that?
17      A    He never told me that.  I was out there
18  once talking to Jay Cooper and I remember him
19  talking about Abma, I don't remember him talking
20  about Kunz.  I don't think Kunz was there when I was
21  there.
22      Q    When you were talking about Abma, he was

0335
 1   talking about all of his expenses were being
 2   billed --
 3        A    He had never seen anything having to do
 4   with this business having to do with a mortgage.  He
 5   thought that had never been done before and I say
 6   no, Jay, this has been done before.  All the U.S.
 7   government cares about is you don't exceed the
 8   allowance, and if you want to buy property in the
 9   country in which you are assigned, it's okay, go buy
10   property if it's legal.  It's still a housing
11   allowance.  You still get X number of dollars going
12   toward housing, whether it's purchased or leased,
13   they don't care.
14        Q    Did you tell him it didn't matter that the
15   rent was being paid to his romantic partner?
16        A    There was a lease.  He didn't talk to me
17   about the lease with this other guy.  I never saw
18   the lease.  We talked about the mortgage purchase.
19        Q    Do you believe that Jay Cooper knew that
20   Bob Abma was taking Russian lessons that were being
21   billed to his project?
22        A    Don't have a clue.

0336

1    Q    Is there any reason why he would have
2  given his position as chief of party?
3    A    Why he would have approved it?
4    Q    Why he would have known about it.
5    A    Shouldn't he have known?
6    Q    I don't know, I'm asking you.
7    A    Yes.
8        (Dorcus Exhibit no. 70 was marked for
9  identification and was attached to the transcript.)
10  BY MS. DOUGLASS:
11    Q    A multi-page document beginning with CP
12  4340, exhibit 70.  What is exhibit 70, please?
13    A    This is a journal that accountants use to
14  post costs sent in from Almaty, Kazakhstan.
15    Q    I would like you to look at exhibit 70 and
16  tell me if you can to what projects Mr. Kunz's rent
17  was charged.
18    A    I must have skipped over it.  Is rent on
19  here?  I can't find rent.  Is there a receipt in
20  here for rent?  Receipt for cash payment, postage.
21    Q    I'll speculate, if you don't mind.  I
22  think it must be --

0337
1          MS. ARIAIL:  Objection.
2          MS. DOUGLASS:  Fine.  I won't.
3          THE WITNESS:  I can't find it.
4    BY MS. DOUGLASS:
5     Q     Have you looked in the pages 4345 through
6    9?
7     A     No, ma'am.
8     Q     That's where I think it is.
9     A     Other than salary advance, I can't find
10   anything else for Michael Kunz.
11    Q     Okay.  Did you have enough time to look?
12    A     Yes.
13    Q     Would you look on the first page of
14   exhibit 70?
15    A     First page, 4340?
16    Q     Yes.
17    A     Yes.
18    Q     It shows several credits, including two
19   transfers from headquarters from project 452; is
20   that correct?
21    A     Correct.
22    Q     In the amount of 172,990 and 19,010.  Do

0338
 1  you see the item above that for 132,000?
 2      A    Yes.
 3      Q    What is the source of that money?
 4      A    Those are most likely the advances we sent
 5  out there.  It looks like they are all advances that
 6  we sent to the field from the debit column.
 7      Q    Aside from the loan to CHAP which is
 8  $9,497, all the money coming into Almaty in November
 9  2004 is from 452 source?
10      A    The cash, yes, it looks as if.
11      Q    If we look at page 4358 for a minute --
12      A    Can I explain cash management on here?
13      Q    Sure.
14      A    The cash that we send to the field, this
15  gets reconciled back to the needs at the end of the
16  month and so she'll put -- Fidel, who sends us cash,
17  she makes it show like all the cash comes from 452
18  but then we reconcile at the end of the month for
19  the actuals.  And so these are estimates.  The field
20  will make estimates and so we will go to our letter
21  of credit and pull down to it and tell the donor
22  that we have used cash for 452 and the next one we

0339
1  use 4949 and at the end of the month they reconcile
2  it.
3      Q    What is 668, CHAP?
4      A    CHAP.
5      Q    What is CHAP?
6      A    Community Humanitarian Assistance, another
7  program that runs in Almaty.
8      Q    That's not under Jay, is it?
9      A    No.
10     Q    But this report that's in exhibit 70 shows
11 expenditures tied or accredited against a number of
12 different programs, right?  Where it says fund, that
13 whole column says fund, it starts out with a lot of
14 452s but it goes on to other charges?
15     A    Correct.
16     Q    For example, 750, what is charge 750?  Is
17 that University of Michigan?
18     A    Yes.
19     Q    I don't see any money that's coming in
20 from a University of Michigan grant.
21     A    That's right.
22     Q    Is that what you were just explaining?

0340

1    A    That's what I was just explaining.
2    Q    So 452 is used as sort of the banker,
3  correct?
4         MS. ARIAIL:  Objection.
5    A    No indeed.
6    Q    No indeed?
7    A    No indeed.  That's what I was trying to
8  explain, that we have a Federal Reserve letter of
9  credit, that every time we sign one of these exhibit
10  no. 53s, this letter of credit gets increased, okay.
11  And so what you can do then is you go on the
12  computer and you can draw down for your cash needs
13  on that letter of credit.  So the U.S. Treasury
14  gives you the authority to draw down all of these
15  grants.
16         Let's say for instance in Almaty we
17  needed, what is it, 309,000 for this particular
18  month -- if you add up the debits and the credits,
19  Almaty needed 334,000 that month to pay those bills
20  and those are estimates that they make one month
21  before, okay.  So 30 days before, Almaty will say
22  headquarters, send me 334,000.  Well, usually it

0341
1   comes in, they say we need 350,000.  So the 350,000
2   will be coded because we have to tell the federal
3   government, we have to give them a number.  We won't
4   know exactly where they are going to spend the
5   350,000 but we have to give the federal government a
6   number, so we use 452 for instance to draw down on
7   the letter of credit.  Nothing is charged, it's just
8   an advance until the charges come in.
9          And so it's a misnomer when you say you
10  borrowed the money or you charged the money.  This
11  is an advance against the letter of credit, and we
12  don't know exactly which one of these programs is
13  going to use it, whether it's University of Michigan
14  or whoever.
15         Then at the end of the month when the
16  charges come back in, we allocate them
17  appropriately, because from an accounting
18  standpoint, if we have to say okay, this little
19  project is going to need so much advance and this
20  program is going to need this much advance, it would
21  drive the accountants -- they would go bonkers.
22    Q    So when I asked the question is 452 a

0342

1  bank, I think that's what I meant, it's used as the
2  source of funds but it's later repaid after the
3  accounting is finished?
4      A    In 30 days.
5      Q    It's repaid based on these kind of
6  documents we have been looking at for the last
7  couple of hours?
8      A    That's right.
9      Q    Okay, good.  Let's look at 4358 in exhibit
10  70.
11      A    Supplies.
12      Q    Now this is a voucher for Xerox paper for
13  the office in Almaty, correct?
14      A    It's a payment to Copy Limited for Xerox
15  paper for office.
16      Q    For use by Michael Kunz?
17      A    Supplies for Michael Kunz, that's what it
18  says, yes.
19      Q    Now the whole total of this bill is $129
20  and they have taken the steps to allocate it to five
21  different grants, right?
22      A    Yes.

0343

1     Q     Why isn't that done with every charge is
2  my question.  Why are we finding that this does not
3  happen for every charge?
4     A     The answer is if we go to 444, which is
5  Bulgaria, there is no -- don't ask me why they
6  charged Bulgaria for 6.46 but he must have done
7  something for Bulgaria for 6.46, but there's no
8  housing, R&R, or salary in there for Michael Kunz.
9     Q     Okay.  It just strikes me when we were
10  talking about NICRA, that Xerox paper could be
11  something that was not allocated and simply paid out
12  of NICRA, but apparently that is not done.
13     A     It's done at headquarters.
14     Q     For the headquarters' Xerox paper?
15     A     Yes.
16     Q     But it's not done overseas?
17     A     Because the overseas runs solely under
18  programs.
19     Q     But there are plenty of expenses that we
20  see that could be allocated that way even though
21  they --
22     A     Yes, there was budget available.

0344

1    Q    Let's look at 4365.  Now this shows again
2  that Michael Kunz's bank charge on his salary is
3  billed to 452.
4    A    Yes, ma'am.
5    Q    Now that too could be allocated?
6    A    Could have been.
7    Q    And that's because you are saying there
8  was no budget item for it?
9    A    Don't have a clue on that one.
10   Q    Now 4360 to 63 in exhibit 70 --
11   A    4360?
12   Q    Yes.  I believe these are documents
13 concerning the trip Bob Abma took to Frankfort and
14 it was charged to a project in Armenia; is that
15 correct?
16   A    I think you are right, I think it is
17 Armenia.
18   Q    Do you know what relationship a trip to
19 Frankfort had with a project in Armenia?
20   A    No, unless he did some work for them.  I
21 don't know.
22   Q    Is Yerevan a place in Armenia?

0345

1    A    Yes, ma'am, it's the capital.

2    Q    So it's possible he went on to Armenia

3  even though it doesn't show that?

4    A    It's possible he went on to Armenia.  We

5  sent Abma -- at this time we could have been opening

6  our office in Armenia and one of Abma's functions,

7  because he had been with Counterpart for 10 years,

8  was to go set up the accounting shops in new

9  countries, and so he would train the accountants,

10  install the software.  So we would take Abma out of

11  Central Asia and fly him around.  That's why you

12  will see him charged to Iraq and other places

13  because we did fly him in from time to time to train

14  the new accountants.

15    Q    And that would be charged to the project

16  that he was going to?

17    A    Yes.

18    Q    4366, once again this is an extensive

19  allocation of I believe cell phone payments, is that

20  right, for Michael Kunz and Marat Aitmagambetov?

21    A    This appears to be cell phone, yes.  It

22  says telexes but I don't know if they still use

0346
1    telexes.
2       Q    Your testimony is that all the projects
3    listed on the left-hand side have got funding for
4    cell phone calls?
5           MS. ARIAIL:  Objection, characterization.
6       A    I don't know that it is.  I mean if telex
7    is cell phone, then it could be fax, could be phone.
8    I don't know exactly what this is.  It's some kind
9    of telecommunications charge, and the answer to your
10   question is yes, they must have budgets for
11   telecommunications charges.
12          (Dorcus Exhibit no. 71 was marked for
13   identification and was attached to the transcript.)
14   BY MS. DOUGLASS:
15      Q    The next page is a multi-page document
16   beginning with Counterpart 4373.  Before we get to
17   that, I forgot to ask a question about the last
18   exhibit.  Kelli Boyer made a trip to Almaty in
19   November that resulted in Jay Cooper's termination.
20   Would her expenses be run through the Almaty office?
21      A    Part of her -- it's not entirely proper to
22   characterize the trip as to dismiss Jay Cooper.  She

0347

1  was out there for other reasons so some of her costs
2  may be charged to that.
3      Q    Is that evident on exhibit 70 anywhere?
4  I'll tell you I didn't find it, but that doesn't
5  mean I didn't miss it.
6      A    I didn't see any receipts in here for
7  Kelli Boyer.  I see Bob Abma, Michael Kunz, Irena.
8  No.
9      Q    So it wouldn't be surprising to you if
10 none of it were charged to the program?
11     A    We could have charged her to overhead.  I
12 don't recall.
13     Q    On to exhibit 71, please, 4373.  On page
14 4388, I believe it shows that Michael Kunz's R&R
15 leave in the amount of 2800 was charged to program
16 452; is that right?
17     A    It looks as though Michael Kunz -- yes.
18     Q    That was because the 452 program provided
19 a budget item for that?
20     A    It was budgeted for his R&R for he and his
21 family.  All right, there's his wife, okay.
22     Q    R&R includes your family, doesn't it?

0348

 1    A    Yes, ma'am.

 2    Q    4391.

 3    A    Travel, business lunch.

 4    Q    It lists 460 as one program, that's

 5  Armenia task, right?

 6    A    Yes, ma'am.

 7    Q    I don't know what 961 is.

 8    A    That's overhead, Armenia's overhead

 9  account.

10    Q    And we know 449 and 452 are health and

11  CSSI?

12    A    Right.

13    Q    This is an example of travel being

14  allocated among several programs?

15    A    Yes, ma'am.

16    Q    Now the next page, 4392, I believe is

17  detail supporting the previous page.

18    A    Supposedly, yes, ma'am.

19    Q    And it shows that Michael Kunz was

20  traveling in Armenia, in Turkey and Turkmenistan and

21  Kyrgyzstan and Uzbekistan and Istanbul and Armenia,

22  in November and December 2004, correct?

0349

1    A    October, November --
2    Q    October, November, December.
3    A    Yes, August, September, October, November,
4  December, yes.
5    Q    Extensive traveling by Mr. Kunz?
6         MS. ARIAIL:  Objection.
7         MS. DOUGLASS:  Objection to what?
8         MS. ARIAIL:  To volunteering testimony for
9  no apparent reason.
10  BY MS. DOUGLASS:
11    Q    Does it show extensive travel by Mr. Kunz
12  in those countries?
13    A    Well, I said those months because it shows
14  in October he bought a SIM card.  I don't know that
15  he traveled in October.  In September it shows
16  representation funds using Counterpart's overhead
17  but we don't know that he traveled in September.
18  Here it shows there's lunch with the staff.  Now
19  here there's obvious travel in October, he went to
20  Armenia.  Then evidently in October and November he
21  traveled, and in December, early December, he did
22  some travel.  So October, November, and December he

0350
1  did some travel.
2      Q    4406, please.  This shows travel to
3  Armenia in October, correct, by Mr. Kunz?
4      A    It shows arrival on the 18th day of
5  October 2004.
6      Q    4420 shows Mr. Kunz was in --
7      A    Istanbul.
8      Q    Thank you -- Istanbul on November 18,
9  2004?
10     A    That's correct.
11     Q    4425 --
12     A    There was some conference.
13     Q    -- shows an itinerary to Istanbul in
14  November of 2004, correct, by Mr. Kunz?
15     A    This is for Armenia -- this is Yerevan,
16  not Istanbul.
17     Q    Oh, sorry.  Well, it goes to Istanbul for
18  some reason.
19     A    Yes.  This says arrive on Friday and then
20  goes to Istanbul at 45 minutes after midnight and
21  leaves at 8:00 that night.  So that was for transit,
22  he was transiting Turkey to get back to Almaty,

0351

1    according to this.

2      Q    From Armenia, correct?

3      A    Correct.

4      Q    Will you look at 4427, please?  Now here

5    is Mr. Abma's travel to Dushanbe.  What does foreign

6    field staff mean to you?

7      A    I don't know what this means unless once

8    again it's for excess -- if he comes in in the

9    middle of the night and a local employee is sent to

10   pick him up, sometimes it's overtime or something

11   like that.  That's the only thing I can surmise as a

12   result of Bob Abma's travel.  But why are they

13   paying Bob Abma?  I don't know.  Maybe the answer is

14   on the next page.  What that says is he is claiming

15   $39 a day per diem charging to the different

16   programs.  So this is just per diem and I don't know

17   why this is listed down here as foreign field staff.

18     Q    And the three projects are not based in

19   Tajikistan, right?

20     A    669 most certainly is, yes.

21     Q    Food Security?

22     A    Food Security, big program there.

0352

 1      Q    My mistake, sorry.  449 is Healthy
 2  Communities and the location code for that is
 3  regional, correct?
 4      A    Correct, 05.
 5      Q    And 761 is World Bank Women with location
 6  code of Tajikistan, all right.  4429, please?
 7      A    Michael Kunz, 4429, gets paid for travel
 8  to Armenia.  This is the one we looked at before,
 9  part of the one.
10      Q    And he bills --
11      A    Overhead.
12      Q    951 is overhead?
13      A    Yes.
14      Q    He bills for Healthy Communities, he bills
15  CSSI, and he bills Armenia task.  Do you have any
16  idea how that was allocated?
17      A    No, ma'am.
18      Q    You don't know of any work that CSSI does
19  in Armenia, do you?
20      A    Looks as if he bought a cell phone card
21  for Kelli Boyer to use and don't ask me what she was
22  working on.

0353

1    Q    What page are you on, 4432?

2    A    Yes, ma'am.  So that was part of it.

3    Q    Can you tell if that was billed to 452?

4    A    That got split up in the total.  I don't

5  know where -- you see he has got it on his voucher

6  here, on the 12616, and then in some fashion he

7  splits his 12616 up, but I can't find exactly a

8  correlation except for the $30 how he distributes.

9  1992, Armenia airport tax.  Oh, there it is.  For

10  airport tax he charges to 449.

11    Q    Which is Healthy Communities, which

12  doesn't have any business in Armenia, does it?

13    A    460.  I don't know why he did that.  There

14  is tax on traveler leaving Yerevan airport.  Don't

15  know why.

16    Q    What does the word "representation" mean

17  when it's used on an expense voucher?

18    A    Representation means you take the local

19  employees out to dinner.

20        MS. DOUGLASS:  I would like to have marked

21  as the next exhibit a multi-page document bearing

22  the number 4657.

0354

1            (Dorcus Exhibit no. 72 was marked for
2    identification and was attached to the transcript.)
3    BY MS. DOUGLASS:
4        Q    Would you look, please, at page 4658?
5        A    Yes, ma'am.
6        Q    What does the entry GJNLA mean, which
7    shows up repeatedly?
8        A    General journal, it's a code when we make
9    a journal entry, when the accountants charge
10   someone's salary.  In other words, it's general
11   journal -- I don't know what -- I'll have to check
12   on that.  I think it's the computer actually doing
13   it, and when you don't see that, it's when a human
14   is doing it.  Okay, go ahead.
15       Q    On page 4658, under salaries, it seems to
16   me that this part of the exhibit reflects -- tell me
17   if I'm wrong -- the salaries of the ex-pats working
18   on project 452 in Almaty in the period between the
19   1st of October 2003 through 9/30/2004.
20       A    Where we see Abma and Cooper listed there?
21       Q    Yes.
22       A    Yes.

0355

 1    Q    This is only the portion of their salaries
 2  that has been attributed to 452, correct?
 3    A    Yes, ma'am.
 4    Q    One thing I noticed, and I would like you
 5  to tell me why, is the amounts differ.  If you look
 6  for example at Bob Abma, you see a different amount
 7  next to his name virtually every time.  Is this
 8  because the allocation of salary between projects is
 9  being adjusted on a biweekly basis?
10    A    Every week.
11    Q    Who is doing that function?
12    A    Bob Abma.
13    Q    Based on the time sheets we have
14  identified?
15    A    Yes, ma'am.
16    Q    Does he report those allocation schedules
17  to you?
18    A    He does his time sheet.
19    Q    He does his time sheet but he calculates
20  it off the time sheet?
21    A    No.  These charges are driven by time.  We
22  went through the time approval system to the time

0356

1   sheets, but you were correct, the reason these jump
2   around is that people work on different programs in
3   different weeks.
4       Q    But all these people supposedly worked on
5   452 at sometime during this year?
6       A    Yes, ma'am.
7       Q    It shows Michael Kunz beginning on 10/31
8   spending what looks like a major part of his --
9       A    10/31?
10      Q    2003.
11      A    Yes, ma'am, Michael Kunz.
12      Q    Is it fair to say that a fairly large
13  percentage of his compensation during this time
14  period is being charged to 452?
15      A    It's fair to say he has charged more than
16  the others.
17      Q    A larger percentage at least?
18      A    Yes.
19      Q    We don't know what his base salary is.
20      A    Base salary.
21      Q    Do you know what Michael Kunz was doing in
22  the fall of 2003 for the CSSI project?

0357

1     A     No, I don't.

2     Q     Didn't you tell me earlier you thought he

3   was working on Civic Advocacy?

4     A     I don't know the exact dates when he

5   changed over so I don't know when he moved.  I don't

6   know.

7     Q     But this indicates that he --

8     A     What that indicates is during those dates

9   he worked on that program.  Now if he was in

10  Uzbekistan, that could have been, he could have come

11  to Almaty and done something.  That's an Arlene Lear

12  thing.  But basically he says he did work for that

13  program during that period.

14    Q     If I take the time sheets which we marked

15  earlier on in the deposition, which we only have

16  from the beginning of 2004 on, the allocation of

17  hours on the time sheets should match up with these

18  as to project 452 of the amount of the salaries?

19    A     Yes.

20    Q     In other words, the hours should go up at

21  the same time the numbers go up?

22    A     Yes, ma'am, should track.

0358

1    Q    Let's look at 4663.

2    A    4663, okay.

3    Q    Here is the housing allowance for Michael

4  Kunz in the bottom half of the page.

5    A    Bottom half, Michael Kunz.

6    Q    It shows he gets $1200 a month from 452,

7  correct?

8    A    That's what it shows.

9    Q    And we saw in an earlier document that his

10  housing allowance is slightly more than that,

11  correct?  We saw whatever we saw.

12    A    It seems to me 18 was the number we saw.

13    Q    Let's look at 4664.  These are amounts

14  paid out for vacation pay and pension for the

15  various ex-pats in Almaty charged to project 452,

16  correct?

17    A    These are the days they took vacation,

18  yes.

19    Q    I see, these are the days.

20    A    When they accrue vacation.

21    Q    When they accrue vacation?

22    A    Right.  They accrue vacation, we set that

0359

1  money aside.

2     Q     They didn't necessarily take it?

3     A     We can't tell.

4     Q     Anyway, it is allocated the same way, the

5  pension is allocated the same way on the time

6  sheets?

7     A     Yes.

8     Q     4676, please.  Now the bottom half of 4676

9  on exhibit 72 appears to be amounts of salaries of

10  persons working in headquarters at Counterpart in

11  Washington that is charged to project 452; is that

12  right?

13     A     4676, at the bottom it shows -- these are

14  people who worked on this particular program, yes.

15     Q     And their time sheets would match these

16  numbers presumably?

17     A     Yes, ma'am.

18     Q     So if I track Arlene Lear's time sheets

19  that we have, I should notice these numbers going up

20  when her time goes up attributed to --

21     A     Sure.  She might have made a trip during

22  that period.

0360

1    Q    Who is A. Kuchuke?

2    A    She is a Kazak gal that works for Arlene.

3    Q    There is a huge charge, a large charge in

4  September 2004 by A. Lovelace to 452.

5         MS. ARIAIL:  Where are you?

6         MS. DOUGLASS:  Page 4678.

7         MS. ARIAIL:  Objection to the

8  mischaracterization.

9  BY MS. DOUGLASS:

10   Q    There is a 3,281.26 charge for the

11  services of A. Lovelace.

12   A    Yes, ma'am.

13   Q    Do you have any idea what that refers to?

14   A    Could be the time that he spent working on

15  that program for some reason or another.

16   Q    Do you know what he did for CSSI?

17   A    I don't recall what he did for CSSI.

18   Q    4706, please.

19   A    Okay.

20   Q    Near the top of the page, can you tell me

21  why the postage for the Bulgaria Pilot Fund was

22  charged to 452?

0361

1     A     No, I can't.

2     Q     Does that seem appropriate to you?

3     A     Not without pulling it out.  I don't know

4  what they were doing.  So there's as much chance

5  that it's proper as it's improper just on -- from

6  just on the surface, it looks improper.  However, we

7  really can't tell.

8     Q     4712, please.

9     A     4712.

10     Q     Now this document, before I ask the next

11  question, appears to repeat its categories and I

12  want to know why.  Here is a category on 4712 other

13  direct costs, and below that indirect costs

14  recoverable.  Do you see?

15     A     4712?

16     Q     Yes.  The same categories show up on 4721

17  and 4748.

18     A     What I think is indirect costs recoverable

19  is where we are pulling out our 28 percents.  So

20  month by month you will see that's where we pull out

21  the money from the program to get the NICRA.

22  Evidently on this particular program there was the

0362
1   subcontract, ICNL, that we run NICRA on.
2        Q    I don't mean to be repeating what we did
3   last time, but my understanding of how NICRA works
4   is when you get a dollar, you really get a 1.28.
5        A    That's one way of looking at it.
6        Q    Why do you have to pull it out?  Don't you
7   get it directly into your computer?
8        A    Starting at the beginning.  When they give
9   us this, we spend a dollar out of it, we charge the
10  dollar, then the 28 cents are being shown here in
11  these accounts and the 28 cents are being allocated
12  to the dollars.  ICNL is the legal NGO, that's our
13  subcontract.  So month by month these are the costs
14  that -- the dollars that we pay to ICNL out of this
15  grant.  These are the 28 cents that we are charging
16  to the program.
17       Q    So it shows up on this accounting
18  document.  Does it get transferred back to
19  headquarters?  What happens to the money?
20       A    No.  No.  The guys in the field never see
21  this.
22       Q    So it's just a ledger entry?

0363

1    A    Yes.  They have nothing to do with 28
2  cents except when they want to spend some.  But the
3  earning of it -- their job is to spend the dollars.
4  We do the 28 cents part here back in the states.
5    Q    So this 32581 on page 4712 never went to
6  Almaty?
7    A    No, not never went to Almaty.  That is 28
8  cents that's recovered from the grant as a result of
9  grant expenses that could have taken place in
10  Almaty, could have taken place by Arlene Lear
11  spending you know program costs.
12    Q    Okay.  Look on page 4721 for a minute.
13  Here is another category called indirect costs
14  recovered.  It covers the same dates and it has
15  different numbers.
16    A    Right.  What it's showing you is these are
17  different -- it is showing that NICRA generated --
18  see the last five digits 453006 and the others --
19    Q    Same number.
20    A    No.  The other numbers, if we go back to
21  4712, you go to 452139, and so the location code is
22  different.

0364

1    Q    I see that.  Now on 21, the location was
2    21.  I don't think I know 21.
3    A    Kazakhstan.
4    Q    And the other one was the 22, and 22 is --
5    A    Kyrgyzstan.
6    Q    So you recovered some of the costs based
7    on the spending in the programs?
8    A    Yes, ma'am.
9    Q    4748, I think we found another one, that's
10   location 32, activity code 39.
11   A    Yes.
12   Q    Where is that?
13   A    32, Turkmenistan.
14   Q    What is activity 39?
15   A    ICNL subcontracts in those areas.
16   Q    What was your explanation of what other
17   direct costs category is?  There's one on 4712 for
18   example.
19   A    Other direct costs?
20   Q    These have something to do with ICNL?
21   A    Yes.
22   Q    We don't know what those are, but if we go

0365

1   back to the general ledger --
2      A    If we go back to the backup, yes, we can
3   see why we charged other direct costs.  I assume
4   it's like phone or something like that in support of
5   phone -- phone and copying in support of ICNL
6   because I think ICNL shared an office with them so
7   they were living in common space and so they
8   probably kept track of the costs.
9         MS. DOUGLASS:  I would like to have marked
10   as the next exhibit a multi-page exhibit bearing no.
11   4643 on the first page.
12        (Dorcus Exhibit no. 73 was marked for
13   identification and was attached to the transcript.)
14   BY MS. DOUGLASS:
15      Q    This is a similar document to the last one
16   except it only covers one month, October 2004,
17   correct?
18      A    Yes, ma'am, for one program.
19      Q    For 452?
20      A    Yes.
21      Q    Could you look on page 4636, please?
22      A    Yes.

0366

1       Q    The third entry down, am I correct that
2    that shows a housing allowance for Michael Kunz of
3    $1200 a month billed to 452?
4       A    Yes.
5       Q    Look at 4650, please.  Roughly at the
6    beginning of the page there is local travel for
7    Bulgaria Pilot Community?
8       A    Yes.
9       Q    Is that the same thing we saw --
10      A    That's the same thing we saw before.  I
11   mean on the surface it looks strange, but without
12   the detail we really can't tell.
13      Q    What is activity 10?  That's on page 4650,
14   the activity code is 452, 22.
15      A    10?
16      Q    10.
17      A    This says it's Fiji.  It's not Fiji.  I
18   don't know what has happened there, 2210.  Hold on.
19   It's Micro Enterprise activity, 10.
20      Q    So we don't know much more than we did
21   before, right?
22      A    No.

0367

1      Q    In your earlier deposition you talked
2  about knowing that Arlene had many telephone
3  conversations with Jay Cooper about his inadequacies
4  and offering him various alternatives, and you
5  testified that you knew this because you approved
6  the telephone vouchers for those expenses.  Do you
7  remember that?
8          MS. ARIAIL:  Objection, mischaracterization
9  of testimony.
10     A    I don't remember specifically, no.
11     Q    Do you remember testifying that you had
12  reason to believe that there had been many telephone
13  conversations between Ms. Lear and Mr. Cooper?
14     A    I remember talking about the telephone.
15     Q    We have asked for the records to show that
16  and we have been told that the office doesn't break
17  down records and telephone conversations by
18  particular extension or office.  Is that true?
19     A    Yes, that's correct.
20     Q    So there is no way that you could have
21  approved in a written form telephone conversations
22  that you knew were between Ms. Lear and Mr. Cooper;

0368
1  is that right?
2      A    Or by myself, unless I heard myself.
3      Q    But you wouldn't have --
4      A    Documentation.
5      Q    As far as you know, there is no way to
6  find documentation on that from the office in --
7      A    Not definitive.
8      Q    What could you find definitive?
9      A    No, ma'am.
10     Q    Nothing?
11     A    We would find lists of phone numbers made
12 from our general number, (202) 226-9676.  You will
13 find phone calls to Almaty but I don't know if she
14 made the calls or if I made the calls.
15     Q    There is no way to search those numbers
16 electronically?  In other words, could you put it in
17 a computer and have it spit out every one that was
18 to a particular number?
19     A    I mean we could see all the calls to
20 Almaty but we would still come out the same.
21     Q    What about particular numbers in Almaty?
22     A    I mean those are listed, every number is

0369
1  listed.
2    Q    Could you get a print-out -- I assume your
3  log would have thousands of phone calls?
4    A    They do have thousands of phone calls and
5  so the phone bills are like this (indicating).
6        MS. ARIAIL:  Can we go off the record so I
7  can clarify something?
8        MS. DOUGLASS:  Sure.
9        (Discussion off the record.)
10        THE WITNESS:  Arlene makes a ton of phone
11  calls from her house and she doesn't claim half of
12  them.
13        MS. DOUGLASS:  I know that.  Thank you.  I
14  would like to have marked as the next document a
15  multi-page document with Bates CP 2947 as the first
16  page.
17        (Dorcus Exhibit no. 74 was marked for
18  identification and was attached to the transcript.)
19  BY MS. DOUGLASS:
20    Q    Is exhibit 74 a modification that was made
21  to the cooperative agreement that is exhibit 53?
22    A    This is modification no. 4.  Yes.

0370

1    Q    Is a modification made when more funding
2    is needed on a cooperative agreement grant?
3    A    The United States government will modify
4    these things for funding, for regulation change, for
5    communications, many reasons, including funding.
6    Q    Well, it says on page 2947, one of the
7    purposes is to incrementally fund the cooperative
8    agreement.
9    A    That's what --
10    Q    That's one of its reasons, correct?
11    A    One of its reasons.
12    Q    Now was that at the request of Counterpart
13    or was that sua sponte from the agency?
14    A    We will -- the CTOs will read our
15    financial reports and if they see a strong down,
16    they will augment our grant.
17    Q    I assume as part of a dialogue with people
18    on the ground?
19    A    Um-hmm.
20    Q    At the time of modification no. 4, which
21    is exhibit 74, you still hadn't used up your $10
22    million, correct?

0371
1      A     We couldn't have because they had only
2   given us 4 million -- well, at that point we only
3   had 3-1/2 million.
4      Q     Right, as you can see, in section 10 of
5   page 2947, right?
6      A     Yes, ma'am.
7      Q     I would like to turn to page 2951 and the
8   following pages in this document all the way through
9   2960.  You use some nomenclature I would like to ask
10  you about.  Year 1 is one column and LOP is another
11  column.  Is LOP life of the program?
12     A     Yes, ma'am.
13     Q     So in every case here, year 1 and LOP are
14  identical.  Why is that?
15     A     I assume that this program started back in
16  '02 sometime and so they didn't have any follow-on
17  budget.  I don't know why -- at the time they did
18  this, I would venture to say that the original one
19  was signed in late -- yes, effective date of the
20  award was 6/27/03.  Okay, and so this is June --
21     Q     A year later.
22     A     This is one year later.  So basically

0372
 1   these guys hadn't done another year's project by
 2   this time.
 3        Q     So on pages 2951 through 2960, in exhibit
 4   74, is year 1 column actual or budget?
 5        A     Budget.  None of these things is actual.
 6        Q     Was there any requirement that you report
 7   to USAID in any way any variance from the budget?
 8        A     You are allowed to vary from these budgets
 9   and so I can't -- right now I don't know if I
10   reported something in variance to these budgets.  I
11   could have, I couldn't have.
12        Q     Was it a normal practice of yours to do
13   that?
14        A     If Arlene Lear runs the program in that
15   direction and the grant allows it, you could.
16        Q     Well, let's look at a couple of examples.
17   In the middle of page 2951, under consultants, both
18   numbers in both columns is zero.  We know that CSSI
19   used several consultants during the course of this
20   case.  So was that something you had to get special
21   permission from?
22        A     So that's Central Asia, and we go on to

0373

1   Kazakhstan -- that's the summary you are reading
2   from, Central Asia.  Summaries, all countries.  So
3   in the first year they didn't have any consulting
4   money.  However, over the life of the project, if we
5   go on and look at the total, this is a $10 million
6   program, and if we go all the way to the end,
7   wherever the end may be -- do we have an end?  This
8   is only the 599 budget.  So this is the budget just
9   for one year but they are adding on.  So they really
10  mislead you here with this activity budget.  Do you
11  see what they have done?  They have given you a
12  budget for 599 --
13      Q    Which page are you referring to now?
14      A    I am referring to page 2951.  So the total
15  of these budgets was 599,768, which is --
16      Q    Which is the new grant?
17      A    Yes, which is the new grant.  There is a
18  typographical error you will see also here.  So
19  basically you can't tell from this particular
20  amendment what the 10,655,000 budget is, all you can
21  tell is for this elections grant budget which is
22  some kind of activity they agreed to do with AID

0374
1  election grants, they have 599,000 and no
2  consultants.
3      Q    So for example on page 2960 when it says
4  it gets zero for international travel for
5  headquarters cost, that doesn't mean there is zero
6  money for Arlene Lear to travel, it just means she
7  can't travel in support of election grants?
8      A    Out of the 599 she can't travel, but out
9  of the 4 million 159 that AID has given us already,
10  there should be some travel money somewhere.
11     Q    Is she supposed to be careful not to use
12  it for the purpose of these election grants, or does
13  somebody watch what --
14     A    At work they don't watch.  Where you
15  charge they watch.  And so if she wants to go out
16  and work on this, she may have gone out to see hey,
17  how's the election grant going.  I can't tell you.
18     Q    So this is not a terribly informative
19  document; is that what you are saying?
20     A    No, ma'am.  These are illustrative at
21  best.  What we are tip-toeing around here is what is
22  the difference between cooperative agreements and

0375
1  contracts, because contracts are real finite where
2  you can't go to the contracting officer and say
3  please may I move the day and this is how much it's
4  going to cost, everything is real finite.
5          These cooperative agreements are -- one of
6  the reasons the government does it is because they
7  are not supposed to have substantial involvement
8  because the U.S. government says to Counterpart, you
9  are qualified and you are an expert in this area and
10  we grant you this amount of money to achieve 1, 2,
11  3, 4, 5, 6, 7 things, and what they really care
12  about is the 7 things.
13          And so this business of contract,
14  cooperative agreement, and these budget items, it's
15  much softer in these cooperative agreements because
16  if we tell the donor, hey, we can't pull off this
17  election day budget grants things without 300,000
18  more dollars, they will say go over and get it from
19  the other one, you all have the authority to do it.
20          It's not like a contract where it says you
21  have to produce a fighter plane and if you go one
22  dollar over budget, you eat it.  You know we are

0376
 1  supposed to produce some kind of result and we have
 2  within the total -- the line items aren't that
 3  sacrosanct, all we have to do is go back to our
 4  contracting officer and inform them of one way of
 5  busting their budgets, and in most cases -- not in
 6  most cases -- I have never seen a case where we were
 7  denied if we were within the total.
 8      Q     But the OMB circular that we discussed at
 9  length last time still applies, does it not?
10      A     Yes, ma'am, still applies.
11          MS. ARIAIL:  Can we take a quick break?
12          MS. DOUGLASS:  Sure.
13          (Off the record 2:35-2:46 p.m.)
14          MS. DOUGLASS:  I would like to have marked
15  a multi-page document starting with no. CP 3537
16  through 3541.
17          (Dorcus Exhibit no. 75 was marked for
18  identification and was attached to the transcript.)
19  BY MS. DOUGLASS:
20      Q     Does this appear to be an expense report
21  for various travel charges submitted by Arlene Lear
22  for travel between June 19th and July 12th, 2003?

0377

1    A    Yes, ma'am.

2    Q    I believe that Ms. Lear traveled from D.C.

3  to Atlanta and Atlanta to Paris; is that correct?

4    A    Yes, ma'am.

5    Q    Stayed in Paris about 24 hours and then

6  flew from Paris to Frankfort.  Am I right so far?

7    A    Looks like 24 hours, yes.

8    Q    And from Frankfort to Almaty.  Beginning

9  on 6/19, which is the day she lays, she bills her

10  time to apparently 434.  Is that right?

11    A    That's what it looks like, yes, ma'am,

12  434.

13    Q    What is 434?

14    A    CAR extension no. 3.

15    Q    Is that a part of CSSI?

16    A    I don't think so.  I think that was the

17  one that was before.

18    Q    She puts her airfare on her American

19  Express card, her meals and her lodging on American

20  Express, correct?

21    A    That's what it says.  I can't tell from

22  here.  Yes, it says she put her lodging on Amex, her

0378
1  phone on Amex, right.
2      Q    And she takes a little bit off because she
3  went over on her M&IE on the bottom line; is that
4  right?  She takes off $10.83.
5      A    Okay, that's what it looks like.
6      Q    From Almaty -- she goes to Almaty on the
7  21st of June, leaves for Bishkek on the 23rd, leaves
8  Bishkek on the 25th for Dushanbe, leaves Dushanbe on
9  the 27th for Almaty.  Correct so far?
10      A    27th for Almaty, okay.
11      Q    And that whole period from June 22nd
12  through June 28th she's billing her time to 434,
13  correct?
14      A    Yes, ma'am, looks like that.
15      Q    That's CAR extension no. 3, correct?
16      A    Yes.
17      Q    She charges her meals and so forth to
18  Amex.  Beginning June 30, she flies from Almaty to
19  Tashkent, stays in Tashkent until the 5th of July
20  when she goes to Samarkand, and then directly back
21  to Tashkent.  She stays over part of a day in
22  Samarkand.

0379

1    A    Okay.
2    Q    Am I right so far?
3    A    Yes.
4    Q    She bills her time --
5    A    To Uzbekistan, 448.  So when she gets up
6  into Tashkent and Samarkand, she --
7    Q    Switches over to 448.
8    A    That's correct.
9    Q    448 is Civic Advocacy, Uzbekistan.
10    A    Yes.
11    Q    Tashkent and Samarkand are both in
12  Uzbekistan?
13    A    Yes, ma'am.
14    Q    Then she flies on the 6th from Tashkent to
15  Almaty, on the 9th from Almaty to Frankfort --
16    A    Wait a minute.  On the 6th, Tashkent to
17  Almaty.  Okay.
18    Q    On the 9th Almaty to Frankfort.
19    A    Okay.
20    Q    Quickly goes from Frankfort to Paris.
21    A    All right.
22    Q    She stays in Paris for three days.

0380

1    A    Yes.

2    Q    And then goes on to Boston on the 12th of

3  July and goes quickly from Boston to D.C.?

4    A    Changes planes and comes home.

5    Q    She begins on 7/6 charging to 452, so the

6  whole end of this trip, right?

7    A    She begins on what date?

8    Q    July 6th.

9    A    July 6th, okay.

10    Q    So the total cost of the whole trip is

11  $2137; is that right?

12    A    2137, yes.

13    Q    And I believe that does not include the

14  amounts on Amex?

15    A    That should not include any Amex account.

16    Q    So it was an expensive trip?

17        MS. ARIAIL:  Objection to the

18  characterization.  Are you asking a question?

19        MS. DOUGLASS:  Yes, I'm always asking a

20  question.

21  BY MS. DOUGLASS:

22    Q    It was a long trip and an expensive trip

0381
 1  because she went a lot of places, correct?
 2      A    It was a long trip and it was not
 3  necessarily an expensive trip.
 4      Q    Okay.  My question is, the detour to Paris
 5  and the four days in Paris --
 6      A    Yes, ma'am.
 7      Q    -- was that paid for by program 452?
 8      A    It seems to me, as I look at the dates,
 9  that Frankfort to Paris starts on the 9th at 7:25
10  a.m. and gets to Paris at 8:35 a.m., and she got a
11  portion of that day's MI&E, $46, that she charged to
12  452.  Then on the 10th she didn't charge anything.
13  On the 11th she didn't charge anything.  On the 12th
14  she came home and charged taxi fare to get home.
15      Q    Well, presumably she charged her airfare
16  ticket to Paris and from Paris to Boston on her Amex
17  card?
18      A    I'm sorry.  I think we went through this
19  before.  But if it's the same price, she can stop 10
20  times, we don't care as long as -- so let's say for
21  instance, just because she flew from Almaty to
22  Frankfort, and there are direct flights from

0382

1  Frankfort to New York or Frankfort to Washington,
2  D.C., if for the same price she can find an airline
3  that takes her Frankfort-Paris-U.S., we don't stop
4  her from stopping in Paris.
5     Q     Did someone scrutinize whether the price
6  was the same?
7     A     Sorry?
8     Q     Does someone scrutinize whether the price
9  is the same?
10    A     Yes, yes.
11    Q     Is she billing time on the 9th, 10th,
12  11th, and 12th while she is in Paris to the 452?
13    A     Her time while she's in Paris hopefully is
14  vacation and so she will have vacation accrued
15  accordingly.
16    Q     We don't know that from this document
17  though, do we?
18    A     We can't tell that from this document.
19    Q     You are the one who would scrutinize
20  whether or not the price on the airline ticket was
21  the same?
22    A     The airline fare, yes, that would be me.

0383

1    Q    Do you remember having done this on this
2  occasion?
3    A    No, ma'am.
4        MS. DOUGLASS:  I would like to mark the
5  next document a multi-page document starting with CP
6  3510 through 3919.
7        (Dorcus Exhibit no. 76 was marked for
8  identification and was attached to the transcript.)
9        THE WITNESS:  There is no travel advance.
10  BY MS. DOUGLASS:
11    Q    The rest of the document describes some
12  travel I want to ask you about.
13    A    All right.
14    Q    The trip that's the subject of exhibit 76
15  is 15 days in various Central Asian countries; is
16  that right?
17    A    It goes Central Asia and Berlin, yes,
18  Kazakhstan, Kyrgyzstan, Tajikistan, Turkmenistan,
19  Uzbekistan, Germany.
20    Q    The trip, both the per diem and the
21  airfare, was charged to three different projects, 50
22  percent to 452, 25 percent to 449, which is Healthy

0384

1  Communities, and 25 percent to 448, which is Civic
2  Advocacy, right?
3      A   Yes, ma'am.
4      Q   And you approved that, correct?
5      A   Yes, ma'am.
6      Q   The first leg of the flight is from Dulles
7  Airport to Paris, business class?
8          MS. ARIAIL:  Are you looking at 3513?
9          MS. DOUGLASS:  3513.
10  BY MS. DOUGLASS:
11     Q   Is that right?
12     A   Yes, ma'am -- well, it says here coach.
13     Q   Well, I have looked at this several times.
14  There seem to be two planes listed and in my vast
15  experience, that sometimes happens when one airline
16  is flying under two numbers.  But make of it what
17  you do.
18     A   Mine says she rode in an Air France
19  airplane.
20     Q   That's fine.
21     A   But it's a Delta ticket.
22     Q   She arrived in Paris on the 30th of May --

0385

1     A     31st she goes to --
2     Q     Frankfort.
3     A     -- Frankfort.
4     Q     On June 16th she goes to Almaty, so she
5  spends some substantial amount of time in Germany,
6  right?
7     A     I don't know whether she spent time in
8  Almaty or she went to another program, I can't tell.
9     Q     I mean before that, before she went to
10  Almaty, there is a two-week period between May 31st
11  and June 16th when she must be in Berlin.
12     A     She must be somewhere in Europe, but I
13  can't answer.
14     Q     All right, she goes to Almaty on June 16th
15  and then does a short hop to Berlin, which
16  apparently allows you to go on to Paris, correct?
17     A     Yes.
18     Q     So she is in Paris from the 23rd of June
19  until she -- until we don't know what happens to
20  her.
21          MS. ARIAIL:  Objection.
22  BY MS. DOUGLASS:

0386

1    Q   Do we know what happens to her after the

2  23rd of June?

3    A   We have to look at her travel itinerary --

4  I mean we can't tell what happened, we have to look

5  at her I mean her travel voucher.  Can't tell what

6  happened.

7    Q   The cost for airfare for this jaunt was

8  3,944.80?

9       MS. ARIAIL:  Objection, characterization.

10  BY MS. DOUGLASS:

11    Q   Is that correct?

12    A   It was for -- we authorized 5364 for this

13  trip, yes.

14    Q   So it included --

15    A   That's for 25 days through June 24th.  So

16  after June 24th, I don't know -- she comes back to

17  Washington, D.C. on June 23rd, 7:05 p.m.

18    Q   7:35.  So she doesn't spend any time in

19  Paris at all?

20    A   From June 20 --

21    Q   To the 23rd, three days going one way and

22  one day going out, right?

0387
1    A    Yes, ma'am.
2    Q    Was that leg of the flight paid for by
3    those programs for 52, 448 and 449?
4    A    Because she had to go to Berlin and the
5    stop in Paris is generally thrown in by the
6    airlines, of course it's paid for by those programs.
7    Q    If we look at her time sheets, we will
8    find that on May 30th, exhibit 55 --
9    A    55?
10    Q    Yes.
11    A    Got it.  It appears I don't have May in my
12    exhibit.  Maybe you do.  Maybe it's a xeroxing
13    mistake.
14        MS. ARIAIL:  I don't have May in my
15    exhibit.  Our numbers indicate that you received
16    May.
17        MS. DOUGLASS:  All right, maybe it's a
18    copying mistake.
19    BY MS. DOUGLASS:
20    Q    So let's go to June 1.
21    A    Which page?
22    Q    3571.

0388

1      A     Okay.

2      Q     She arrived in Almaty on May 31st and she

3  left for Frankfort on June 16th.  So between May 31

4  and June 16, she's in Almaty or someplace near

5  there?

6      A     Yes, ma'am.

7      Q     On June 15th is the first time we see any

8  charges other than the ones we talked about and

9  that's a charge for 650, 7, and 761.  What are

10  those?

11          MS. ARIAIL:  What page are we on?

12          MS. DOUGLASS:  3571.

13  BY MS. DOUGLASS:

14      Q     761 is World Bank Women, right?

15      A     Yes.  657 is CAIP.

16      Q     So she did something else, those two

17  things, CAIP and World Bank Women, on June 15?

18      A     Yes.

19      Q     Same thing on June 30th.  Oh, she's

20  already back.  So aside from that day that she did

21  CAIP and World Bank Women, she was actually

22  assigning her time to the --

0389

1      A     Three programs.

2      Q     -- the three programs that are listed on

3   the voucher, okay.  Good.  Now let's look at one

4   more document, Bates stamp numbers 3505 through

5   3509.

6           (Dorcus Exhibit no. 77 was marked for

7   identification and was attached to the transcript.)

8   BY MS. DOUGLASS:

9      Q     These documents refer, do they not, to a

10   trip Arlene Lear made between April 15 and May 9 of

11   2005?

12      A     Yes, ma'am.

13      Q     And she charged all of this to 452; is

14   that right?

15      A     3506 says she intended to charge it to 452

16   and 448, and this is -- I can't tell from this

17   document where the airfare was charged.  It looks

18   like she intended to charge to 452.  448, because

19   she's going to -- see, the itinerary, this travel

20   advance request shows one day in Tashkent, that's in

21   Uzbekistan, so that's why she is charging it to CAP,

22   4848.  However, from these documents -- these

0390

 1   documents indicate she was given a travel advance
 2   for $1500 and that she started out on this trip to
 3   all these places.  However, she must have driven or
 4   gotten local flights because this ticket itinerary
 5   does not show the itinerary shown on the travel
 6   advance.  So there are things going on in this
 7   travel that -- other things.
 8       Q     Well, see if I have this right.  My notes
 9   show she left Ashgabad --
10       A     The capital of Kazakhstan.
11       Q     -- for Frankfort on the 2nd of May.
12   That's the third item down.
13       A     On the 2nd of May, okay.  She arrives in
14   Almaty on the 19th.  Now how does she get from
15   Almaty to Ashgabad?  It doesn't show that trip.
16   That's a long way.  So then we don't know where
17   she's flying between the 19th of April and the 2nd
18   of May.
19       Q     Okay.
20       A     Then all of a sudden she leaves Ashgabad
21   and flies off to Frankfort.
22       Q     Right.  Then on to Paris.

0391

 1     A     Then she gets out of Frankfort as fast as
 2  possible and goes on to Paris --
 3     Q     Stays in Paris from the 2nd to --
 4     A     -- and stays six days.
 5           MS. ARIAIL:  Objection.  Can you let him
 6  finish his answer and not talk over him?
 7           MS. DOUGLASS:  Sure.
 8           THE WITNESS:  So this looks like from the
 9  2nd to the 8th of May she spends in Paris.
10  BY MS. DOUGLASS:
11     Q     Then she goes, am I correct, to Sophia
12  where she stays until the 12th of May?  Now unless I
13  am incorrect in my geography, Sophia is in Bulgaria.
14     A     Yes, ma'am.
15     Q     What projects did 452 or 448 have in
16  Bulgaria?
17     A     Those two didn't have any, but Counterpart
18  had projects there.  And so we don't know from this
19  document whether or not they were charged for that
20  trip or not.
21     Q     Doesn't the document 3507 indicate that --
22  that's part of exhibit 77 -- that airfare and the

0392

1    1500 dollars per diem advance was all charged to
2    452?
3        A    It would appear that that was the budgeted
4    amount and where she planned to budget those funds
5    from.
6        Q    We don't know whether she took vacation
7    for her period in Paris, six days in Paris?
8        A    I can't tell from this, no.
9        Q    Was that an appropriate use of the funds
10   from those programs to fly to Paris?
11       A    Yes, ma'am.
12       Q    Ms. Lear has a husband in Paris, does she
13   not?
14       A    Yes, ma'am.
15           MS. DOUGLASS:  I would like to show you a
16   one-page document that's bearing CP no. 3006.
17           (Dorcus Exhibit no. 78 was marked for
18   identification and was attached to the transcript.)
19   BY MS. DOUGLASS:
20       Q    Did you write exhibit 78, Mr. Dorcus?
21       A    The attorney wrote it.
22       Q    Is that Ms. Richard?

0393

1     A     Yes, ma'am.

2     Q     Did you send out exhibit 78 to all

3  employees of Counterpart?

4     A     Did I send it out?  It was somehow sent

5  out.

6     Q     By whom?

7     A     I'm not sure exactly how it was sent out.

8  I don't know whether it was Kelli or Arthur or

9  exactly how this was disseminated.

10     Q     Do you know that it was disseminated?

11     A     I was told that it was disseminated.

12     Q     Who told you?

13     A     Arthur and Kelli.

14     Q     It references the employee handbook.  I

15  would like to show you what has been previously

16  marked in this deposition as exhibit 7 and ask you

17  to verify that it's not talking about the employee

18  handbook that is exhibit 7.

19     A     What is the question?

20     Q     Is exhibit 78 talking about amending the

21  employee handbook which is exhibit 7 marked in

22  previous depositions in this case?

0394
1      A      When we write to employee handbook,
2   generally it will mean both domestic -- if it
3   applies, it will mean domestic and foreign.
4      Q      Would you look at what has previously been
5   marked in exhibit 7 at section 6.20 and tell me
6   whether it refers to a grievance procedure.
7      A      I can't find it.  Is it in here?
8      Q      Yes.
9      A      6.20.  It only goes up to 6.5 on page 14.
10     Q      Can you find a grievance procedure section
11  of exhibit 7?
12     A      7.17.
13     Q      So it's true, is it not, that exhibit 78
14  is not referring to the handbook that's exhibit 7?
15     A      True, that this is not referring -- hold
16  on.  6.20 doesn't reference back to this handbook.
17     Q      So exhibit 7 was referring to some other
18  employee handbook of Counterpart, correct?
19     A      Well, there is domestic and international.
20     Q      Exhibit 7 is entitled Manual For Employees
21  in Foreign Areas; is that right?
22     A      That's correct.

0395

1    Q    Isn't it true that the employee handbook
2  for the domestic or otherwise was under revision for
3  several years at Counterpart?
4    A    Domestic.
5    Q    The domestic one was under revision?
6    A    Yes.
7    Q    Do you believe exhibit 78 was part of that
8  process?
9    A    Exhibit 78 was part of that process?  No.
10  This was -- we have from time to time -- the
11  attorney was reviewing the handbook and said that
12  she advised --
13        MS. ARIAIL:  I would like to stop my
14  client from saying anything that violates the
15  attorney-client privilege.  Please don't share what
16  your attorney told you.
17        THE WITNESS:  Well, we decided to do this
18  at this time and I think we were doing this with our
19  domestic handbook.
20  BY MS. DOUGLASS:
21    Q    So you were told by somebody that this
22  procedure was sent out over your name?

0396
1      A    Yes, ma'am.
2      Q    Had you ever sent out a memorandum to all
3   employees before?
4      A    By e-mail.
5      Q    In fact, usually a memorandum to all
6   employees at Counterpart goes out over the name of
7   Mr. LeLaulu; is that not true?
8      A    Right now definitely it goes out in my
9   name.  At this time, in May 2003 -- that was less
10  than a year that I had been there -- I don't know.
11     Q    Doesn't it seem strange to you that they
12  would choose to send out a memorandum to all
13  employees under your name when you were CFO?
14     A    No.
15     Q    It doesn't really relate to a financial
16  function, does it?
17     A    Admin and HR report to me.
18     Q    As CFO?
19     A    Yes, ma'am.
20     Q    Well, what experience had indicated to you
21  that the grievance procedure was ineffective?
22     A    What experience?

0397
1    Q    Yes.
2    A    There were no individual experiences.  It
3  was a review of our documentation pointed to a need
4  for change.
5    Q    What was the need for change about?
6    A    In order to protect both the employee and
7  the employer.
8    Q    From what?
9    A    From nothing, just to have a more just
10  policy.
11    Q    How many experiences had Counterpart had
12  as of May 16, 2003, with the grievance procedure?
13    A    At that time I had been with Counterpart
14  10 months.  None to my knowledge.
15    Q    As of May 16, 2003, you had never heard of
16  a grievance against anyone at Counterpart?
17    A    I don't believe so, no.
18        MS. DOUGLASS:  I would like to have marked
19  as the next exhibit a multi-page document bearing
20  numbers CP 3174 through 3197.
21        (Dorcus Exhibit no. 79 was marked for
22  identification and was attached to the transcript.)

0398
1   BY MS. DOUGLASS:
2       Q    Is exhibit 79 a copy of a grievance filed
3   against Arlene Lear by Aaron Chassy?
4       A    Yes, ma'am.
5       Q    Is it dated April 7, 2003?
6       A    Yes.
7       Q    Is that about five weeks before exhibit
8   78?
9       A    Yes.  I didn't recall that it was before.
10  I thought it took place after.
11      Q    You know about Mr. Chassy's grievance
12  because you told me about it in your deposition last
13  time, right?
14      A    I remember it took place.  I didn't
15  remember the exact date.
16      Q    Did Counterpart's experience with Mr.
17  Chassy's grievance lead it to conclude that the
18  grievance procedure was ineffective?
19      A    No, I don't recall that.  This again is
20  something where we turn these matters over to an
21  attorney.
22      Q    Did you ever discuss Mr. Chassy's

0399
1    grievance with Arlene Lear?
2        A    No.
3        Q    Did you ever hear Arlene Lear voice an
4    opinion on whether the grievance procedure should be
5    abolished?
6        A    Did I ever hear Arlene Lear voice that it
7    should be -- no.
8        Q    Did you ever hear Arlene Lear discuss the
9    grievance procedure in any way?
10       A    No.
11       Q    Is it true that Aaron Chassy was the third
12   Civil Society director hired in the four years
13   before he was hired?
14       A    That took place before I came to
15   Counterpart.
16       Q    Did you ever hear anything about that,
17   that the company had gone through quite a number of
18   Civil Society directors?
19       A    Did I ever hear?  I heard rumors.
20       Q    Who did you hear the rumors from?
21       A    I don't recall.
22       Q    Had you heard rumors that the previous two

0400

1    Civil Society directors resigned because they had
2    unsatisfactory experiences in the job?
3        A    No.
4        Q    What did you hear about why the previous
5    Civil Society directors resigned?
6        A    I heard that they didn't get along with
7    Arlene.
8        Q    Do you know why?
9        A    No.
10       Q    Did you ever hear about what they thought
11   were the reasons for that?
12       A    No.
13       Q    Did you ever hear anyone say that the
14   previous Civil Society program directors had found
15   Ms. Lear's management style so intolerable and
16   abusive that they resigned?
17       A    No.
18       Q    That's basically not getting along with
19   Arlene Lear, isn't it?
20       A    Could be.
21       Q    Now were you aware of this grievance by
22   Mr. Chassy at the time it was filed?

0401

1       A     Not immediately.  This came maybe to me
2   two or three days later.
3       Q     Do you know whether there ever was a
4   grievance procedure instigated at Mr. Chassy's
5   request?
6           MS. ARIAIL:  Objection.  You can answer if
7   you understand the question.
8   BY MS. DOUGLASS:
9       Q     Let me accept that and rephrase.  What
10  happened after Mr. Chassy filed this grievance, to
11  your knowledge?
12      A     He resigned.
13      Q     Was there ever any investigation of his
14  allegations in the document that's exhibit 79?
15      A     Investigation by Lelei?  Investigation
16  into what, into her management style?
17      Q     Into anything that he alleged in exhibit
18  79.
19      A     No.
20      Q     So no one did anything in response to his
21  piece of paper that's exhibit 79?
22      A     The allegations were not something that we

0402
1   felt warranted investigation.  The allegations are
2   about style and the way he was talked to and her
3   venomous litany of accusations.  I don't know that
4   these are -- that how a person talks, I don't know
5   is grievable.  What she says is grievable.  How she
6   says it, I don't know.
7       Q     All right, that's your opinion, that it's
8   not grievable.  Do you mean in the legal sense?
9       A    No.
10      Q     What do you mean by grievable?
11      A     What I mean is basically are there items
12  in here -- I didn't see -- I read it quickly, and I
13  haven't read it for a long time, and I didn't see
14  what would warrant a grievance.
15      Q     Would you agree that Mr. Chassy in exhibit
16  79 has concerns about an aspect of his employment?
17      A     He has concerns.  However, we don't deal
18  with Ms. Lear's concerns about his performance
19  anywhere in this grievance.  So we are looking at
20  this situation from one side of the issue, which is
21  only Mr. Chassy's.  So a lot of this we felt was
22  unfounded.

0403

1     Q     So somebody did look into the facts and
2   determine it was unfounded?
3     A     Define look into the facts.  Lelei talked
4   to Arlene.  If that's looking into the facts, yes.
5     Q     What came out of that discussion?
6     A     I don't know.
7     Q     But according to your memo that's exhibit
8   78, the grievance procedure has been found to be
9   ineffective; is that correct?
10    A     Okay.
11    Q     In your experience, was the grievance
12  procedure ineffective in the case of Mr. Chassy's
13  memo?
14    A     On May 16th, after obviously I knew
15  something of Aaron Chassy on May 16, 2003, it did
16  not seem to be ineffective with respect to this
17  situation.
18    Q     But there was some other situation --
19    A     No, there was no situation.  It was just
20  the way this was worded, we worded it this way, that
21  this procedure was ineffective.
22    Q     When in fact there was really no instance

0404
1  in which it has --
2      A    There was no instance in which it had ever
3  been used.  However, I cannot speak before the cases
4  you mentioned because I was not there.
5      Q    So you had no problem signing a memo that
6  was going out to all employees saying experience has
7  indicated that the procedure was ineffective?
8      A    No.
9      Q    And you had no hesitation writing a memo
10 suggesting that any employee with any concerns about
11 any aspect of their employment should feel free to
12 raise those issues?
13     A    Well, that's what a grievance procedure
14 is, right?
15     Q    According to your memo, that's what an
16 open door policy is, correct?
17     A    Correct.
18     Q    So wouldn't you say exhibit 79 is Mr.
19 Chassy raising his concerns about an aspect of his
20 employment?
21     A    He is raising his concerns that Ms. Lear
22 was angry and shouted at him, used vulgar language.

0405
1    Q    That didn't give you any pause?
2    A    Knowing Aaron Chassy, no.
3    Q    So you are telling me and you are swearing
4    under oath that there is no relationship between Mr.
5    Chassy's grievance and your issuance of exhibit 79?
6         MS. ARIAIL:  Objection, total
7    mischaracterization of testimony.
8    A    Repeat the question.
9    Q    Is it your testimony that there is no
10   relationship between Mr. Chassy's memorandum of
11   grievance, which is exhibit 79, and your memo that
12   you said was written by the lawyers, which is
13   exhibit 78, five weeks later?
14   A    To the best of my knowledge, I don't know
15   that they were connected.
16   Q    Do you know that they weren't connected?
17   A    I know they weren't connected.  To the
18   best of my knowledge, no one even thought of this as
19   a grievance and so -- no, they were not connected.
20   Q    Does the first sentence of exhibit 79 not
21   say, "as per the Counterpart International Inc.'s
22   Domestic Employees Manual instructions on page 22, I

0406
 1  am submitting this memorandum as a statement of
 2  grievance"?
 3      A    Right, it does say that.
 4      Q    But would that not clue someone that this
 5  was a grievance?
 6      A    It says that exactly.  However, we have
 7  not talked about the performance nor the actions of
 8  Mr. Chassy with respect to Ms. Lear and his
 9  activities in the field which mitigated this memo,
10  and so there is nothing in the file by Ms. Lear --
11  I'm sure she has something but we don't have it
12  here -- which is the other side of the story.
13      Q    Well, wouldn't that come out in a
14  grievance procedure if there was a procedure
15  actually instigated?
16      A    I think it did, I think there are things
17  in writing.  They are not here.  And we are talking
18  about over three years ago.  I think those things
19  are in the file but I'm not sure.  I know Arlene
20  writes everything down.
21      Q    So it's your understanding that someone
22  actually did listen to both sides in the Chassy case

0407

1  and make a judgment?

2      A    Lelei most certainly did.

3      Q    So in effect, Mr. Chassy's memo of

4  grievance was treated as a grievance?

5      A    This is where I would have to read.  I

6  don't have Domestic Employee Manual, page 20, 6.19,

7  in front of me to know if Counterpart treated this

8  exactly like a grievance.

9      Q    Fair enough.  Has the Domestic Employees

10  Manual been formally amended since March 2001?

11      A    It has been amended many times.

12      Q    And there was a fairly recent amendment;

13  is that right?

14      A    We worked with Kelli a long time to get it

15  amended.

16      Q    Does the Domestic Employees Manual in fact

17  omit the section 6.20 on grievances?

18      A    I believe it does.

19      Q    You believe it does and you believe it did

20  contemporaneously with your memo which is exhibit

21  78?

22      A    I'm not sure on that.

0408
1      Q      Would you look at exhibit 79 for a minute
2  again.
3      A    Yes.
4      Q    If you look on page 3180, under paragraph
5  F, under fairness, is it true that the CSSI project
6  is the one project that sustains much of Counterpart
7  International's operations?
8      A      "For the one project that sustains much of
9  Counterpart" -- the year before Chassy got there,
10  Arlene got zero business and the next year she did
11  much better, '04, and so it sustains Counterpart's
12  business in Central Asia.  As an organization,
13  that's a mischaracterization, but for Central Asia,
14  most certainly.  You know enough about it now to
15  know that Arlene Lear spends a lot of time in all
16  the Stans and so that program was key for our
17  activities and to Arlene that's the whole world.
18      Q    In your last deposition, didn't we
19  establish that it was the biggest grant that
20  Counterpart had ever gotten in any part of the
21  world?
22      A    That new one, it was one of the largest

0409
1  grants, yes.
2      Q    The largest, right?
3      A    Yes.  But if you take our Food Security
4  activities, they make up another large portion.  And
5  so yes, it is the largest single at that time, most
6  certainly.
7      Q    I find it strange when you said Arlene
8  Lear hadn't gotten any business in the year before
9  because didn't we show earlier she got a $16,000
10  bonus for what she did in 2003?
11     A    That was 2002.  The year I got there,
12  Arlene got zero.  So for '03, '04 she got the bonus,
13  not '02.
14     Q    '03 and '04 are the two dates she got the
15  bonus?
16     A    Yes.
17     Q    Are you telling me that was for the year
18  '02?
19     A    '02 was the bad year.
20     Q    She got 16,000 in '03 and 25,000 for '04.
21     A    Yes.
22     Q    So where was the bad year in there?

0410

1     A     '02.

2     Q     '02, okay.  Now is there a way, back to

3  exhibit 78, to verify that this was sent out to all

4  employees?

5     A     Not that I'm aware of.

6     Q     How is something sent out to all employees

7  physically at Counterpart, by e-mail?

8     A     Generally.

9     Q     Is there some sort of a group e-mail that

10  you can just push one button and it goes to

11  everybody?

12     A     There is -- at that time I don't know if

13  there was one or not.  Today, yes.

14     Q     So there would be no record of it if it

15  was not done that way?

16     A     I'd have to talk to Lovelace.

17     Q     Who caused it to be sent out, do you know?

18     A     The HR people.

19     Q     Lovelace?

20     A     Yes.

21     Q     Lovelace and Kelli?

22     A     Yes.

0411

1          MS. DOUGLASS:  I would like to have marked
2     as the next exhibit a two-page document bearing the
3     no. 3196 and 97.
4          (Dorcus Exhibit no. 80 was marked for
5     identification and was attached to the transcript.)
6          MS. ARIAIL:  I would just like to state
7     for the record that in answering any questions about
8     this document, Counterpart is not waiving the
9     attorney-client privilege.
10          MS. DOUGLASS:  Fine.
11     BY MS. DOUGLASS:
12     Q     My question is about Ms. Lear's e-mail of
13     March 11, 2003, to Aaron Chassy that starts at the
14     bottom of page 3196.
15     A     Um-hmm.
16     Q     In the third paragraph on page 3197, she
17     states that there are several reasons why she wants
18     to get the CAR bid.  Is that the proposal that Aaron
19     Chassy was working on?
20     A     I believe.
21     Q     Is that renewal of CSSI or something
22     different?

0412

1      A    I think that's the renewal.  Well, it was
2   the big proposal to replace the one that was coming
3   to an end.
4      Q    Doesn't she say that one reason she wants
5   to limit it is too quote "give our division some
6   security" close quote?
7      A    For that part of the world, most certainly
8   because you have local employees for that region
9   many, many who need jobs.  This is more about the
10  local employees than it is about the Americans.
11     Q    And it also brings in a very large part of
12  Counterpart's NICRA; is that right?
13     A    It brings in NICRA.  However, her division
14  is the worst at percentage of NICRA versus
15  percentage of grants.  So if you look at this grant,
16  this 15 million dollar one we talked about, you
17  would think you would be able to take 28 percent and
18  that would be our NICRA.
19         If we make a million dollars on this --
20  now make is not the right perception.  If
21  Counterpart generates a million dollars of NICRA on
22  the 15th, I'd be surprised because Arlene competes

0413

1  financially to get these programs in Central Asia
2  and so you don't -- on subgrants, which on a 15
3  million dollar program it's about 5 to 6 million
4  dollars go to subgrants, we don't make a nickel, we
5  don't generate one cent of NICRA on the subgrants
6  because she does not to compete with other
7  nonprofits who have large constituencies.
8      Q    I thought we just saw in the financial
9  documents that you had recouped NICRA from the ICNL
10  subgrantee --
11      A    Yes, in that particular case we got it on
12  ICNL, which is a subgrant, but I'm talking about
13  subgrants to Kazak organizations, okay.  ICNL is
14  maybe 750,000.  The large amount of money in these
15  grants goes in $25,000 tranches to little NGOs
16  spread all over Kazakhstan.  Counterpart doesn't
17  generate a penny of NICRA.  Arlene does that
18  consciously to win the proposal.
19      Q    It's also consistent with the point of the
20  program, isn't it, to empower the local
21  organizations?
22      A    Yes, but it's also consistent with trying

0414
1   to break the organization because I have to juggle
2   all these things to keep it going and I don't earn
3   the kind of NICRA that a lot of other organizations
4   do.  So it's a very competitive business because we
5   make that 28 percent decision based on what our
6   competitors do.  We live within that 28 percent.  So
7   it's not like we've got 15 million dollars, ergo
8   there's 2 million or 3 million of NICRA.  No, it's
9   much less than that because of the way it is
10  designed.  You have to pare back the onion and see
11  the way those accountants make those 28 percent
12  entries do it only on specific cost items.
13      Q    That's one motivation for charging as much
14  as you can as direct costs to the program, is it
15  not?
16      A    It's a motivation, sure.
17          MS. DOUGLASS:  I would like to have marked
18  as the next exhibit a one-page document bearing
19  Bates stamp no. 3227.
20          (Dorcus Exhibit no. 81 was marked for
21  identification and was attached to the transcript.)
22  BY MS. DOUGLASS:

0415

1    Q    Have you seen exhibit 81 before?
2    A    I think so.  I don't recall exactly, but
3  obviously I have a copy here.
4    Q    Mr. Gottschall is the predecessor of Kelli
5  Boyer; is that right?
6    A    Correct.
7    Q    Do you know why the grievance procedure
8  was determined not to apply to his letter?
9    A    No, ma'am.
10    Q    Did you ever hear any discussion of that
11  subject?
12    A    No, ma'am.
13    Q    Was your lawyer involved in that decision,
14  if you know?  I'm not asking you what he or she
15  said, I just want to know whether the lawyer was
16  involved in the decision reflected in exhibit 81.
17    A    In 81?
18    Q    Yes.
19    A    I don't know.
20        MS. DOUGLASS:  I would like to mark as the
21  next exhibit a multi-page document starting with
22  3236 through 3239.

0416

1          (Dorcus Exhibit no. 82 was marked for
2   identification and was attached to the transcript.)
3   BY MS. DOUGLASS:
4       Q     Have you seen exhibit 82 before?
5       A     Yes, ma'am.
6       Q     Is that the agreement that was sent to Mr.
7   Chassy together with exhibit 81?
8       A     I don't know if it was sent with 81 or
9   not.  It has different dates.
10      Q     You signed it on behalf of Counterpart,
11  right?
12      A     Yes, ma'am.
13      Q     Mr. Chassy had worked for Counterpart
14  approximately three months at the time of his
15  termination; is that right?
16      A     Yes, ma'am.
17      Q     He was given a severance of three months
18  or a period basically equal to the amount of time he
19  had already spent at Counterpart, right?
20      A     Counterpart shall issue a final paycheck
21  on -- let's go through the dates.
22      Q     I believe it's paragraph 2 B.

0417

 1     A     To answer your question, I don't know his
 2  exact start dates and -- I don't know the date that
 3  he actually started so I don't know if he did three
 4  months or -- see, this is on the 25th of April.  I
 5  don't know if he started on the 25th of February.
 6     Q     Was it approximately three months that he
 7  had been employed?
 8     A     I'd say approximately.
 9     Q     In addition to three months' severance, he
10  was given a consulting status for a period of 6
11  months?  That's paragraph 2 E.
12     A     Yes, ma'am.
13     Q     And he was to be paid at $41.25 an hour
14  for any work he did during that period?
15     A     If he did work.
16     Q     If he did work.  And you required Aaron
17  Chassy to agree to cooperate with Counterpart to
18  facilitate a smooth transition?  That's in paragraph
19  4.
20     A     Smooth transition of his former
21  responsibilities, yes.
22     Q     In paragraph 7 you agreed to allow Aaron

0418
1  to personally come to the office to retrieve all
2  personal items on a certain date in April of 2003?
3      A    Yes, between the hours of 7:00 and 8:00
4  a.m.
5      Q    You required Aaron to agree not to
6  disclose directly or indirectly any information
7  regarding his employment or termination of
8  employment with Counterpart; is that right?  I'm
9  looking at paragraph 8 C.
10     A    Yes.
11          MS. ARIAIL:  Objection, misstates the
12 document.
13     Q    Did you require that Mr. Chassy keep the
14 facts surrounding his employment and termination in
15 confidence?
16     A    I am trying to find that part.  Aaron and
17 Counterpart agree not to disclose either directly or
18 indirectly any information regarding Aaron's
19 employment.  So the answer seems to be yes.
20     Q    And that confidentiality requirement was
21 enforceable under paragraph 9 of the agreement,
22 correct?

0419
1      A    Yes.
2      Q    I would like to now ask you about the
3  termination of Gregory Touma and I would like to
4  mark as the next exhibit a multi-page document
5  bearing the numbers CP 3262 through 3268.
6          MS. ARIAIL:  Can we take a break before
7  you begin your questioning?
8          MS. DOUGLASS:  Sure.
9          (Dorcus Exhibit no. 83 was marked for
10  identification and was attached to the transcript.)
11          (Off the record 4:00-4:15 p.m.)
12  BY MS. DOUGLASS:
13      Q    You were not around when Mr. Touma left,
14  right?
15      A    Don't know the name.
16      Q    I just have one question since you are the
17  only witness I have left.  The interrogatory answers
18  in this case stated that Mr. Touma was asked to
19  resign on December 14, 2000, and in fact his
20  employment ended on December 21, 2000, and you will
21  see these are reflected in this document.  My
22  question is, do you know which date Counterpart is

0420
1  claiming that he was locked out of his office?
2      A    No.
3      Q    You don't know?
4      A    No.
5      Q    You have no idea?
6      A    No.
7      Q    You have never heard anything about
8  Mr. Touma being locked out of his office?
9      A    No.
10     Q    Can you identify exhibit 83 as Mr. Touma's
11  resignation letter, his last paycheck, and an
12  agreement waiver that he signed with Counterpart?
13     A    I have here a resignation from Greg Touma
14  dated December 21st, there is a check dated New
15  Year's Day 2001, and there is an agreement signed
16  and dated by Greg Touma December 15.
17         MS. DOUGLASS:  Are you willing to
18  stipulate, Ms. Ariail, that these are accurate
19  records of Counterpart and do in fact reflect what
20  Mr. Dorcus just said?
21         MS. ARIAIL:  Doesn't need to be
22  stipulated.  We made that representation when we

0421
1   produced them as part of discovery.
2        MS. DOUGLASS:  We have certainly had a lot
3   of people reflect opposite positions, but if you
4   will take that position, that's fine.
5   BY MS. DOUGLASS:
6      Q    You testified at the previous deposition
7   that you gave two performance evaluations to Kelli
8   Boyer.  Do you remember that?
9      A    Yes, ma'am.
10     Q    We have had some documents provided which
11  I think are part of one and I want to ask you what
12  happened to the other one and if this is one of
13  them, okay?
14     A    Okay.
15       MS. DOUGLASS:  Let's mark the next
16  document, this is starting with 3383 through 3387.
17       (Dorcus Exhibit no. 84 was marked for
18  identification and was attached to the transcript.)
19  BY MS. DOUGLASS:
20     Q    It looks to me that the last page is
21  really the first page but I am giving it to you the
22  way I got it.

0422
1      A    Page 2, 3, 4, 5, 1, okay.
2      Q    Is that a performance evaluation you wrote
3   of Kelli Boyer?
4      A    I can't tell because on the second one --
5   first of all, there is not a name here, and when we
6   did the second one, and I believe this is the second
7   one since I know on the first one I made lots of
8   comments and this one has no comments, she left
9   right around this time.  So I don't know if I
10  have -- in other words, this may be the draft of the
11  one that we did to get the process started right
12  around the time she left.  I don't know whether it
13  is or -- I'm not sure because there is no name on
14  here.  Your question was is this Kelli Boyer's
15  sufficiency report.  I can't tell because there is
16  no name on here and if it is, it's the one we did
17  when she left.
18     Q    What do you mean by get the process
19  started?
20     A    Usually the employee does his own
21  self-evaluation and in this case I think Arthur did
22  this and then he and I would sit down and go over

0423

1   it, and that was the time she left.  So we never
2   filed a full evaluation in her file.  I think that
3   was the problem, that we didn't complete it when she
4   left.
5       Q    Do you know what has happened to the first
6   evaluation you did of her?
7       A    Should be in the file.
8          MS. DOUGLASS:  Do you know where that is?
9          MS. ARIAIL:  We produced everything we
10  could find that was responsive, so we don't have it.
11         MS. DOUGLASS:  Would you be willing to
12  look again or have someone look again?
13         MS. ARIAIL:  No.  We looked thoroughly.
14  The court made very clear that we need to produce
15  the documents you requested.  We spent a great deal
16  of time working to comply with that order.  We have
17  thoroughly investigated it.
18         MS. DOUGLASS:  Just so you know, I am
19  going to argue a negative inference from the fact it
20  was not produced.  So if I were you, I'd go try to
21  find it.
22  BY MS. DOUGLASS:

0424

 1     Q    Do you have a memory of whether or not the
 2  first evaluation you did was more or less favorable
 3  than exhibit 84?
 4     A    It was more favorable than this.
 5     Q    It was?
 6     A    Yes.
 7     Q    In your view, could you characterize
 8  exhibit 84 as favorable, unfavorable, mixed, or
 9  whatever?
10     A    Well, if we use an objective measure, it's
11  commendable.
12     Q    So you consider this a commendable
13  evaluation?
14     A    Under Counterpart's system, it's a
15  commendable evaluation.
16     Q    It's your testimony I believe that Ms.
17  Boyer was not fired.
18     A    No.
19     Q    Is it your testimony she was not nudged
20  out the door?
21     A    No, she was not nudged out the door.
22  However, she and I were having issues and she had an

0425

1  unfavorable -- I mean her evaluation that's not here
2  stated different things that she could do to improve
3  and she and I both knew that not all those things
4  were followed up on very well.
5      Q    Counterpart entered into a separation
6  agreement with her, did it not?
7      A    No, ma'am.
8      Q    It did not?
9      A    No, ma'am.  She resigned.  She drafted
10  something and it's floating around somewhere, but it
11  was never signed.
12      Q    She drafted the separation agreement?
13      A    Yes, ma'am.
14      Q    And it called for a severance pay and all
15  that?
16      A    Yes.
17      Q    And severance pay was never given?
18      A    No.
19      Q    Did she ask that it be given?
20      A    No.
21      Q    The severance agreement, as I remember it,
22  also called for a retroactive raise back to the

0426
1  middle of the summer.
2      A    We left with a handshake and a smile and
3  she was paid in accordance with Counterpart's
4  procedures with her annual leave and that was the
5  end.
6      Q    Did she present the agreement to someone
7  to be signed?
8      A    She never presented it to me.  She may
9  have talked about it to Arthur.
10      Q    And she did serve as a consultant for
11  Counterpart for some period of time, right?
12      A    She did some consulting, yes.  We have a
13  lot of things involved with different cases.
14      Q    After she resigned?
15      A    Yes.
16      Q    Was she paid for work she did consulting?
17      A    Yes, ma'am.
18      Q    On an hourly basis?
19      A    Hourly basis.
20      Q    Was she paid for her time spent being a
21  deponent in this proceeding?
22      A    I don't know.

0427

1      Q      So there was no confidentiality agreement
2    with Ms. Boyer?
3      A      No, never signed.
4      Q      Did Ms. Boyer apply for unemployment, do
5    you know?
6      A      I don't know.  Arthur deals with
7    unemployment and I don't know if she applied or not.
8    I know she's working down the street now in a
9    foreign international organization, but that's all I
10   know.
11     Q      Was she angry when she left about
12   something?
13     A      She claimed we had too much work for her
14   to do, so we got her two assistants, part-time, to
15   see how it worked out and we had as many problems
16   when we had the temps as we had when she didn't have
17   them.  So she had a production problem when she was
18   by herself and she had a supervisory problem and the
19   temps were never good enough.
20           To answer your question were there
21   problems, well, yes, there were problems, but it was
22   between she and I and her performance.  There are

0428

1  many things about Kelli's work, and I think this

2  bears it out, that were exceptional.  It just didn't

3  work out.

4      Q    Did you write a letter of recommendation

5  for her?

6      A    Counterpart did, Arthur did.

7      Q    Did you ever see it?

8      A    No, ma'am.

9      Q    Were you contacted by her new employer?

10     A    I was not.

11     Q    Do you know whether anyone at Counterpart

12  was?

13     A    I don't know.

14         MS. DOUGLASS:  That's all I have.  Thank

15  you very much.

16         THE WITNESS:  Thank you.

17         (Signature not having been waived, the

18  deposition of HARRY DORCUS was concluded at 4:25

19  p.m.)

20              * * *

21

22

0429

1          ACKNOWLEDGMENT OF DEPONENT
2          I, HARRY DORCUS, do hereby acknowledge I have
3   read and examined the foregoing testimony, and the
4   same is a true, correct and complete transcription
5   of the testimony given by me, and any corrections
6   appear in the attached errata sheet signed by me.
7
8   _____    _____
9   Date                HARRY DORCUS
10
11
12
13
14
15
16
17
18
19
20
21
22

0430

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Marilyn Feldman, Registered Professional
3   Reporter, the officer before whom the foregoing
4   proceedings were taken, do hereby certify that the
5   foregoing transcript is a true and correct record of
6   the proceedings; that said proceedings were taken by
7   me stenographically and thereafter reduced to
8   computerized transcription under my supervision; and
9   that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and have
11  no interest, financial or otherwise, in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set my hand
13  and affixed my notarial seal this 1st day of
14  December 2006.
15  My commission expires:
16  September 30, 2009
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE COMMONWEALTH OF VIRGINIA
22

0431
1          E R R A T A   S H E E T
2     IN RE:  Cooper v. Counterpart International
3  RETURN BY:  _____
4  PAGE    LINE     CORRECTION AND REASON
5   ____    ____    _____
6   ____    ____    _____
7   ____    ____    _____
8   ____    ____    _____
9   ____    ____    _____
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19  ____    ____    _____
20  ____    ____    _____
21  _____    _____
22     (DATE)          (SIGNATURE)

0432

1     E R R A T A   S H E E T   C O N T I N U E D
2     IN RE:  Cooper v. Counterpart International
3   RETURN BY:  _____
4   PAGE    LINE     CORRECTION AND REASON
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  _____   _____
22    (DATE)              (SIGNATURE)