0001
1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLUMBIA
3      --------------------------X
4    JAY W. COOPER,              )
5          Plaintiff,        )
6          -vs-            ) No 1:05cv1598 (RMC)
7    COUNTERPART INTERNATIONAL,  )
8          Defendant.        )
9      --------------------------X
10              Deposition of Kelli Boyer
11                McLean, Virginia
12              Tuesday, March 28, 2006
13                  9:57 a.m.
14   Job No.: 1-74535
15   Pages 1 - 216
16   Reported by:  T. R. Hollister
17
18
19
20
21
22

0002

1          Deposition of Kelli Boyer, held at the office
2   of:
3
4          JACKSON LEWIS, LLP
5          8614 Westwood Center Drive
6          Suite 950
7          Vienna, Virginia  22182
8          (703) 821-2189
9
10          Pursuant to notice, before T. R. Hollister,
11   Reporter and Notary Public for the Commonwealth of
12   Virginia.
13
14
15
16
17
18
19
20
21
22

0003

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3        PATRICIA D. DOUGLASS, ESQUIRE
 4        LAW OFFICE OF PATRICIA D. DOUGLASS
 5        98 Interpromontory Road
 6        Great Falls, Virginia  22066
 7        (703) 759-3586
 8
 9    ON BEHALF OF DEFENDANT:
10        KARA M. ARIAIL, ESQUIRE
11        JACKSON LEWIS, LLP
12        8614 Westwood Center Drive
13        Suite 950
14        Vienna, Virginia  22182
15        (703) 821-2189
16
17
18
19
20
21
22
```

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/BOYER.txt

0004

1                    C O N T E N T S
2    EXAMINATION OF Kelli Boyer                    PAGE
3       By Ms. Douglass                  5
4                    E X H I B I T S
5          (Attached to the Transcript)
6    BOYER DEPOSITION EXHIBITS                    PAGE

7    1   Subpoena                       5
8    2   12/2003 e-mails                     50
9    10  12/17/03 e-mail from Arlene Lear to Jay Cooper    53
10   3   12/19/03 e-mail exchange               54
11   9   12/15/03 letter from Jay Cooper to Arlene      55
12   4   Kelli Boyer Handwritten notes            107
13   13  E-mail exchange                  126
14   5   Agreement/Waiver                   188
15   16  11/24/04 e-mail from Harry Dorcus to Jay Cooper   201
16   17  E-mail exchange                  203
17   18  E-mail exchange                  206
18   19  E-mail exchange                  209
19
20
21
22

0005

```
 1         P R O C E E D I N G S
 2              Kelli Boyer
 3  having been duly sworn, testified as follows:
 4         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 5  BY MS. DOUGLASS:
 6      Q   Could you state your name please.
 7      A   Kelli, Boyer, B-O-Y-E-R.
 8      Q   Ms. Boyer, I'm Pat Douglass.  I represent Jay
 9  Cooper in the case against Counterpart International.
10  I've served you with a subpoena.  Are you here today in
11  response to that subpoena I served on you?
12      A   Yes.
13      Q   I'd like you to look at this -- of course we
14  have to have the court reporter mark it -- and tell me is
15  this the subpoena you are responding to.
16      A   Yes.
17         (Boyer Deposition Exhibit Number 1 was marked
18  for identification and attached to the transcript.)
19  BY MS. DOUGLASS:
20      Q   I'm going to ask you a series of questions
21  that are designed to bring out your knowledge concerning
22  the dispute here.  It is very important that you
```

0006

1   understand every question.  So if there is something
2   unclear about a question that I ask please ask me to
3   restate it or explain it or whatever just to make sure
4   we're communicating.  Okay?
5        A    Sure.
6        Q    Only one of us can speak at a time so we have
7   to not talk over each other so the court reporter can get
8   it down.  Your counsel may have an objection.  If she has
9   an objection, stop talking and let us fight our lawyers
10  battles.  Okay?
11       A    Head nod.
12       Q    The main theme here is to get your full
13  knowledge on all these subjects.  I do not intend to
14  mislead you in any way or to stop you from saying
15  anything you want to say on any of the subjects.  So if
16  you feel you've been cut off and want to add to your
17  testimony let me know.
18       A    Okay.
19       Q    If you want a break for any reason, let me
20  know and we'll do that.  Okay?
21       A    Yes.
22       Q    Now what is your present employment?

0007

1    A    Human resources director.
2    Q    For what company?
3    A    International Executive Service Corp.
4    Q    Where is that located?
5    A    Washington, D.C.
6    Q    How long have you worked there?
7    A    Since February 6th.
8    Q    Of 2006?
9    A    Correct.
10   Q    Now, for some period of time you worked for
11   Counterpart International, correct?
12   A    Correct.
13   Q    What period of time was that?
14   A    June of 2003 until December of 2005.
15   Q    What was your title or titles at the time you
16   worked for Counterpart International?
17   A    Human resources manager.
18   Q    And to whom did you report in that position?
19   A    Harry Dorcus.
20   Q    What is his title?
21   A    Chief operating officer.
22   Q    What were your responsibilities as human

0008

1  resources manager for Counterpart International?
2      A    All personnel-related issues involving the
3  organization and its employees.
4      Q    Did you have persons that reported to you in
5  your position as human resources manager?
6      A    Yes.
7      Q    How many?
8      A    One.
9      Q    What was that person's role?
10     A    Receptionist.
11     Q    So is it fair to say that your human
12  resources department was a one-man shop?
13     A    Yes.
14     Q    I've seen the name of a Mrs. Gottschalk.  Is
15  that name familiar to you?
16     A    Yes.
17     Q    Was she your predecessor?
18     A    Yes.
19     Q    Did she and your period of employment overlap
20  in any way?
21     A    No.
22     Q    You were hired to replace her basically?

0009

1     A   Correct.
2     Q   When you say personnel-related issues, does
3   that include hiring of personnel?
4     A   Yes.
5     Q   Does it include firing of personnel?
6     A   No.
7     Q   Does it include conducting investigations of
8   issues that come up?
9     A   Yes.
10     Q   Does it include having an input into policies
11   of Counterpart International that affect its employees?
12     A   Yes.
13     Q   Does it include playing a role in the
14   development of written policies for that purpose?
15     A   Yes.
16     Q   Have you had any input into the development
17   of Counterpart's employee manual?
18     A   Yes.
19     Q   At the time you came to counterpart, was
20   there an employee manual in place?
21     A   Yes.
22     Q   Was it amended in various respects during the

0010

1  time you were there?

2      A    Yes.

3      Q    Do you remember off the top of your head in

4  what respects it was amended?

5      A    Various policies were added.

6      Q    I'm going to show you --

7          MS. DOUGLASS:  What I'd like to do here,

8  Ms. Ariail, is use the same exhibit numbers that we used

9  in previous depositions.  That will make it easier for us

10  later writing briefs.

11  BY MS. DOUGLASS:

12      Q    So I'm going to show you what has been marked

13  in the corporate deposition in this case as Plaintiff's

14  Exhibit 7 and ask you if you recognize it as a copy of

15  the manual for employees in foreign areas of Counterpart

16  International that was in effect in 2004?

17      A    Appears to be, yes.

18      Q    The first page of Exhibit 7 bearing a Bates

19  stamp number -- by that which I mean those little numbers

20  starting with "CP" at the bottom of the page.  Do you see

21  that number?

22      A    Yes.

0011

1      Q    Bearing number CP0572 giving the date for
2   this document as March 2001.  In reviewing Exhibit 7 as
3   you just did, do you believe that the document accurately
4   reflects any changes that were in effect as of 2004?
5      A    Yes.
6      Q    At some point in time the grievance procedure
7   that had been part of Exhibit 7 was changed during the
8   fall of 2004; is that correct?
9      A    I'm not sure of the date but, yes, it was
10  changed.
11     Q    And you issued a memorandum informing the
12  staff that the grievance procedure as contained in
13  Exhibit 7 was no longer in effect?
14     A    Correct.
15     Q    Do you remember what occasioned you to take
16  that step?
17     A    No.
18     Q    Do you remember any conversations you had
19  with anybody concerning the reasons why that step should
20  be taken?
21     A    Yes.
22     Q    Tell me what you remember about that.

0012

1        A    That the grievance policy as in the handbook
2    was no longer needed because it was covered under the
3    open-door policy.
4        Q    What is the open-door policy?
5        A    Where an employee can come to a member of
6    management at any time with any concerns that they need
7    addressed.
8        Q    I'd like you to look at Exhibit 7, page 22 of
9    33, which is the page with a Bates stamp number 596.
10   Section 7.17 beginning on that page is the grievance
11   procedure we've been discussing, correct?
12       A    Yes.
13       Q    Am I correct that paragraph "A" which begins
14   on Bates stamp numbered page 596 is in fact the open-door
15   policy to which you are referring?
16       A    No.
17       Q    All right.  Where in Exhibit 7 is the
18   open-door policy?
19       A    Page 433.
20       Q    And you're talking about paragraph 2.4 on
21   that page?
22       A    Correct.

0013

1      Q    How long had section 2.4 of Exhibit 7 been in
2   existence as of 2004 if you know?
3      A    I don't know.
4      Q    Was it in existence when you joined the
5   company in June of 2003?
6      A    Yes.
7      Q    So if the open-door policy was sufficient to
8   handle issues that might otherwise arise under the
9   grievance policy, it had been sufficient since at least
10   June of 2003 for that purpose, right?
11      A    Yes.
12      Q    So who decided that the grievance procedure
13   which is section 7.17 beginning on Bates page 596 of
14   Exhibit 7 was redundant?
15      A    Our corporate attorney.
16      Q    Corporate attorney.  Who is your corporate
17   attorney?
18      A    Kerry Richard.
19      Q    Were you involved in any discussions with her
20   on that subject?
21      A    Yes.
22      Q    I'm going to ask you some questions which are

0014

```
 1  not designed to elicit any communications between you and
 2  Kerry Richard because I don't want to infringe on any
 3  privilege.  All right?
 4      A   (Witness nodding head.)
 5      Q   So if any question I ask would reflect that
 6  you just tell me I can't tell you that, okay?
 7      A   (Witness nodding head.)
 8      Q   In your discussions with Kerry Richard on
 9  this subject, was anyone else present besides you and
10  Ms. Richard?
11          MS. ARIAIL:  Objection.  I'm going to object
12  to the whole line of questioning about any conversations
13  the witness had with Counterpart's attorney and instruct
14  her not to answer.
15          MS. DOUGLASS:  I have a right to inquire
16  whether or not privilege existed and it depends on who
17  was present during the conversation as you know.
18          MS. ARIAIL:  I'm not going to have her answer
19  it.  You can take it up with the court.
20          MS. DOUGLASS:  You're not going to let her
21  answer who was present during these conversations even if
22  whoever was present might have resulted in the waiver of
```

0015

1  the privilege.
2       MS. ARIAIL:  There would be no waiver of the
3  privilege because she was serving in a capacity as HR
4  manager.  And any communications she had with
5  Counterpart's attorney is privileged.  If you want to ask
6  if she had any personal outside communications with the
7  attorney not related to Counterpart business, I will
8  allow her to answer that.  But nothing can overcome the
9  privilege when she was speaking in her capacity as the HR
10  manager with Counterpart's attorney.
11       MS. DOUGLASS:  Well, as you know that is not
12  true if an outsider was present during the conversations,
13  which would constitute a waiver of the privilege.  And
14  all I'm asking is whether or not such a person was
15  present.  I'm not asking for the substance of the
16  conversation until we determine whether or not such a
17  person was present.
18       MS. ARIAIL:  If your question is was there
19  anyone not employed by Counterpart present at any of the
20  conversations I will allow her to answer that question.
21  You asked who was present.  I don't want my client to
22  answer what discussions she had with Counterpart

0016

1  executives and their attorneys.
2  BY MS. DOUGLASS:
3      Q   Let me ask another question then.  Were
4  conversations you had with Ms. Richard concerning the
5  cancellation of the grievance procedure in the presence
6  of anyone who was not an employee of Counterpart?
7      A   No.
8      Q   Do you recall any conversations between you
9  and other employees of Counterpart not involving
10  Ms. Richard concerning whether or not the grievance
11  procedure should be abolished?
12      A   No.
13      Q   Do you recall any conversations concerning
14  the relationship of the grievance procedure to Jay Cooper
15  at any time?
16      A   No.
17      Q   When you worked at Counterpart, were you the
18  recipient of minutes of a group of executives called SMT?
19      A   Yes.
20      Q   Did you ever receive a set of minutes of SMT
21  that discussed whether or not the grievance procedure
22  should be abolished?

0017

1      A   Possibly.
2      Q   I'd like to show you what has been marked
3  during the corporate deposition as Plaintiff's Exhibit
4  Number 38 and ask you if that is a set of minutes that
5  you received at the time you were worked at Counterpart?
6      A   Looks familiar.
7      Q   All right.  Would you look at -- what's
8  previously been marked as Exhibit 38 appears to be
9  minutes sent out by Lelei Lelaulu to Worldwide CPI staff;
10  is that correct?
11      A   Yes.
12      Q   And you would be included in Worldwide CPI
13  staff?
14      A   Yes.
15      Q   Then Lelei Lelaulu is the CEO of Counterpart,
16  is he not?
17      A   Right.
18      Q   What does SMT refer to?
19      A   Senior management team.
20      Q   Would you be a member of the senior
21  management team?
22      A   Yes.

0018

1      Q   If you look on the page that has Bates stamp
2   number 275 on Exhibit 38, there's a paragraph above
3   grievance policy, correct?
4      A   Yes.
5      Q   Would you read that paragraph and tell me
6   whether I'm correct in interpreting it to say that a
7   group called PMT was concerned that the recent decision
8   to abolish the grievance procedure left Counterpart
9   employees with inadequate rights?
10         MS. ARIAIL:  Objection to form.  The witness
11   can't speak to your interpretation of this.  You can
12   still answer.
13         THE WITNESS:  I don't think I understand your
14   question.
15   BY MS. DOUGLASS:
16      Q   Okay.  Have you read the section of Exhibit
17   38 entitled "Grievance Policy"?
18      A   Right.
19      Q   It appears to say that a group called PMT has
20   concerns about the fact that the grievance policy was
21   changed; is that fair?
22      A   Yes.

0019

1    Q    Who is PMT?
2    A    Program management team.
3    Q    Who are they?
4    A    Junior staff.
5    Q    Would you be a member of PMT?
6    A    No, I would not.
7    Q    How junior is junior?
8    A    Below the level of manager.
9    Q    Is that roughly the equivalent to a union in
10   another kind of corporation?
11       A    No.
12       Q    It is simply a committee made up of junior
13   members of the team; is that fair?
14       A    Correct.
15       Q    Is membership in PMT voluntary or does it
16   come with your job?
17       A    Voluntary.
18       Q    What percentage of the employees of
19   Counterpart who are eligible to be members of PMT were in
20   the fall of 2004?
21       A    I don't know.
22       Q    Is it a big group, do you remember?

0020

 1      A   I don't know.
 2      Q   Now, it says on page 275 of Exhibit 38 both
 3  SMT -- that's the group you are a member of -- and PMT,
 4  quote, agree that it is important to draft necessary
 5  language to protect particular rights, closed quote.
 6          Do you remember at that meeting that such an
 7  agreement was reached?
 8      A   Possibly.
 9      Q   Was there language drafted to protect
10  particular rights as set fort in Exhibit 38?
11      A   Yes.
12      Q   What language was that?
13      A   A revised grievance policy issued.
14      Q   When was that?
15      A   Either fall of '04 or early '05.
16      Q   All right.  Was that after Jay Cooper's
17  termination from Counterpart?
18      A   I don't remember.
19      Q   In your experience as the human resources
20  manager, was the previous grievance procedure that was
21  abolished in the fall of 2004 used very often?
22      A   No.

0021

1      Q    In the period of time you were there from
2  June of '03 until it was abolished, how many times can
3  you recall it being used?
4      A    Once.
5      Q    Was that in the case of a person named Aaron
6  Chassey?
7      A    I was not there when Aaron Chassey was
8  employed.
9      Q    What is the instance you remember it being
10  used?
11      A    A different employee.
12      Q    What was the issue with the different
13  employee?
14      A    Discrimination and degradation of women.
15      Q    Would that be a woman by the name of Kim
16  Alter?
17      A    Yes.
18      Q    So Kim Alter filed a grievance at the time
19  you were a human resources manager?
20      A    Yes.
21      Q    And part of her allegations had to do with
22  Jay Cooper, did they not?

0022

1    A    Yes.

2    Q    As I understand you were in charge of

3  investigating her allegations under the grievance

4  procedure?

5    A    Yes.

6    Q    And you did so?

7    A    Yes.

8    Q    Did you determine whether or not her

9  allegations had merit?

10    A    Yes.

11    Q    What did you determine?

12    A    They did not.

13    Q    What was your explanation for the reasons she

14  had brought such charges?

15    A    Explanation for the reason?

16    Q    Yes.  Did you come to any conclusion about

17  her motivation in filing the grievance?

18    A    Certain statements made to her by Jay Cooper

19  made her feel uncomfortable.

20    Q    Did you determine whether or not Jay Cooper

21  had in fact made the statements about which she was

22  complaining?

0023

1      A    Yes.

2      Q    Had he?

3      A    Yes.

4      Q    But you determined there was no basis for the

5  grievance?

6      A    Yes.

7           MS. ARIAIL:  Objection.  Asked and answered.

8  BY MS. DOUGLASS:

9      Q    If certain statements were made to Ms. Alter

10 by Mr. Cooper, what led you to conclude that no basis

11 existed for Ms. Alter's grievance?

12     A    Because Mr. Cooper made the same type of

13 statements to everyone, not just women.

14     Q    I'd like to show you what has been marked in

15 the corporate deposition as Plaintiff's Exhibit 37 and

16 ask if you can identify it please?

17     A    It is familiar, yes.

18     Q    Is this a memo you sent out to headquarters

19 staff announcing the abolition of the grievance

20 procedure?

21     A    Yes.

22     Q    If you look on the second page of Exhibit 37,

0024

1   you'll see an inquiry about it from a David Smith.

2       A    Yes.

3       Q    Did you receive that inquiry?

4       A    Yes.

5       Q    Did you answer it, which I believe is the

6   next page?

7       A    Yes.

8       Q    Did you receive any other inquiries besides

9   the one from David Smith in response to your e-mail which

10  is Plaintiff's Exhibit 37?

11      A    Probably.

12      Q    Do you remember whether they were critical of

13  the removal or not?

14      A    They must have been because there's

15  documentation of it in the SMT records.

16      Q    Where is that?

17      A    From what you showed me on the grievance

18  policy, this came after this.

19      Q    Right.

20      A    That the PMT was concerned.

21      Q    Let me just clarify for the record.  What you

22  are saying is that Exhibit 38 came after Exhibit 37,

0025

1   correct?
2       A    No -- yes.  38 came after 37, correct.
3       Q    So you think that the reference in Exhibit 38
4   on page 275 refers to not only Mr. Smith's comments but
5   other peoples comments?
6           MS. ARIAIL:  Objection.  Mischaracterization
7   of testimony.
8   BY MS. DOUGLASS:
9       Q    Well, Mr. Smith, all by himself, is not the
10  PMT, correct?
11      A    Mr. Smith was not a member of PMT.
12      Q    So what about the paragraph on Exhibit 38
13  makes you think that other comments were received?
14      A    Because it was brought up for discussion
15  during the SMT meeting.
16      Q    How many comments do you think you received?
17      A    I don't know.
18      Q    More than ten?
19      A    I don't know.
20      Q    Was it a hotly debated issue at the time?
21      A    Yes.
22      Q    Now, the purpose of having a grievance policy

0026

1    that existed before your action reflected in Plaintiff's
2    Exhibit 37 was to provide an avenue for an employee to
3    solve a work-related problem; is that right?
4        A    Yes.
5        Q    Under its terms it could provide an employee
6    with a way to bring his or her view of certain facts to
7    the attention of a decision-maker who would take into
8    account his view of facts and decide whether or not
9    management action was appropriate; is that true?
10       A    Yes.
11       Q    Now, did you ever hear anybody say that they
12   were concerned that Jay Cooper would file a grievance?
13       A    No.
14       Q    Did you ever discuss Jay Cooper -- the
15   possibility that Jay Cooper might file a grievance with
16   Arlene Lear?
17       A    No.
18       Q    Did you ever discuss that subject with Harry
19   Dorcus?
20       A    No.
21       Q    Did you ever discuss that subject with
22   Michael Kunz?

0027

1       A    No.
2       Q    Did you ever discuss that subject with your
3   immediate supervisor?
4       A    No.
5       Q    Did you have a supervisor by the name of
6   Lovelace?
7       A    Yes.
8       Q    I believe you've already told me that you
9   reported to Dorcus, correct?
10      A    Correct.
11      Q    What was Lovelace's role?
12      A    Director of administration.
13      Q    Was he subordinate to Dorcus?
14      A    Yes.
15      Q    Did you report to Dorcus directly or through
16  him?
17      A    Initially through him.  At the end of my
18  employment, directly.
19      Q    Which reporting relationship was in effect in
20  the fall of 2004?
21      A    Directly to Mr. Lovelace.
22      Q    Directly to Mr. Lovelace and he reported to

0028

1   Mr. Dorcus?
2        A   Correct.
3        Q   Did you ever discuss whether or not it was
4   likely that Jay Cooper would file a grievance with
5   Mr. Lovelace?
6        A   No.
7        Q   Now, what did you do, if anything, to prepare
8   for this deposition today?
9        A   I met with my attorney.
10        Q   Is Ms. Ariail your attorney?
11        A   Yes.
12        Q   You have retained her?
13        A   No.
14        Q   She's a volunteer attorney?
15        A   No.
16        Q   She's representing Counterpart; is that
17   correct?
18        A   Correct.
19        Q   And you're no longer an employee of
20   Counterpart?
21        A   Correct.
22        Q   My question is have you established an

0029

1  independent attorney/client relationship with Ms. Ariail?
2      A    No.
3      Q    But you did come and discuss with her your
4  testimony today?
5      A    Correct.
6      Q    Did you review any documents in the course of
7  your discussion with her or otherwise?
8      A    Yes.
9      Q    What documents?
10      A    The documents relating to the case where
11  there were questions submitted and Counterpart had to
12  respond.
13      Q    Interrogatories?
14      A    Yes, interrogatories.  Thank you.
15      Q    So what you're saying is Counterpart's
16  answers to interrogatories posed by Mr. Cooper?
17      A    Correct.
18      Q    Anything else?
19      A    No.
20      Q    Did you review the complaint in this case?
21      A    Yes.
22      Q    What about the testimony that's been

0030

1  previously given by Mr. Cooper or Ms. Lear?

2      A   No -- well, I'm not sure if that was part of

3  the interrogatories or --

4      Q   No, it wouldn't be.  It would be a question

5  and answer transcript.

6      A   Then, yes.  Yes.

7      Q   You did you review them?

8      A   Yes.

9      Q   All right.  Which one?  The one of Ms. Lear?

10     A   No.

11     Q   Mr. Cooper?

12     A   Yes.

13     Q   Did you review the whole thing?  It was

14  several hundred pages.

15     A   No.

16     Q   Selected parts?

17     A   Yes.

18     Q   Parts that Ms. Ariail selected for you or you

19  selected yourself?

20     A   She selected for me.

21        MS. ARIAIL:  I would like to state for the

22  record that some of this review occurred while she was

0031

 1  employed with Counterpart and some occurred afterwards.
 2  She has not distinguished that.
 3         MS. DOUGLASS:  Fair enough.
 4  BY MS. DOUGLASS:
 5     Q   I don't want you to tell me anything -- any
 6  communication you had with Ms. Ariail while you were an
 7  employee of Counterpart.  Okay?
 8     A   Yes.
 9     Q   If I ask a question that asks for that, just
10  say I'm not telling you.
11     A   Okay.
12     Q   Do you have any documents that relate to work
13  you did for Counterpart with respect to Jay Cooper?
14     A   No.
15     Q   So anything you had in that regard you left
16  at your office when you resigned?
17     A   Yes.
18     Q   What was your practice in taking notes of
19  conversations you had with people?
20     A   I used a spiral notebook and would date the
21  pages, who I spoke to and just make general notes to
22  myself.

0032

1      Q    And then you put those away presumably in a
2   file when a particular issue was over?
3      A    I actually just left everything in the
4   notebook.
5      Q    And your notebooks contained information
6   about various projects you were working on in the same
7   notebook?
8      A    Yes.
9      Q    When during your employ with Counterpart did
10  you first hear of Jay Cooper?
11     A    I don't think I understand your question.
12     Q    Did you at some point come to know there was
13  a Counterpart employee by the name of Jay Cooper?
14     A    Yes.
15     Q    When did you first learn of his name?
16     A    Probably early on in my employment when I was
17  learning all of the employees.
18     Q    How many employees are there of Counterpart
19  International?
20     A    Approximately 350 when I was there.
21     Q    Aside from a trip to central Asia in the fall
22  of 2004 that I'm going to ask you about, were you always

0033

1   based in Counterpart's Washington, D.C. headquarters?
2       A   Yes.
3       Q   Did you take any other foreign trips?
4       A   Yes.
5       Q   How many?
6       A   Three.
7       Q   Briefly, where were those trips?
8       A   Senegal, Saint Lucia and Berlin, Germany.
9       Q   Those were all on Counterpart's business?
10      A   Correct.
11      Q   I am correct, am I not, that a substantial
12  number of Counterpart employees reside in foreign areas?
13      A   Correct.
14      Q   So presumably you got to know those people
15  when they visited the Washington office?
16      A   Yes.
17      Q   Or when you went on one of these trips?
18      A   Yes.
19      Q   So Mr. Cooper was a resident during the
20  relevant time that we're going to talk about in
21  Kazakhstan, right?
22      A   Yes.

0034

1    Q    So when was the first time you encountered
2  him?
3    A    In Washington, D.C.
4    Q    What was the occasion?
5    A    He was on a business trip to the D.C. office.
6    Q    Do you remember the first instance in which
7  you were called upon to perform human resources-related
8  functions with respect to Jay Cooper?
9    A    Probably summer of '04.
10   Q    It's true, is it not, that most executive
11  employees of Counterpart working overseas work pursuant
12  to employment contracts; is that right?
13   A    Yes.
14   Q    Is it Counterpart policy that there should be
15  an employment contract in effect for each of those
16  executive employees who are posted overseas?
17   A    Contract or agreement?
18   Q    What is the difference between contract and
19  agreement?
20   A    More just terminology.
21   Q    So, for example, a letter agreement would be
22  what you meant when you say agreement?

0035

1    A   Yes.
2    Q   Do you remember that Jay Cooper's contract
3  was up for renegotiation in the fall of 2003?
4    A   Yes.
5    Q   Is that something that you would ordinarily
6  have had a role in?
7    A   Yes.
8    Q   In your capacity as human resources director,
9  was it among your duties to negotiate renewal of a
10  contract or extension of a contract?
11    A   Negotiate, no.
12    Q   Was it among your duties to write an
13  agreement that reflected a set of oral agreements between
14  whoever negotiates for the company and the employee?
15    A   Yes.
16    Q   Did you do that with respect to an extension
17  of Jay Cooper's contract that took effect in December of
18  2003?
19    A   I'm not sure of the date, but, yes.
20    Q   I'm going to show you the contract just so
21  we're clear.
22        I'd like to show you what has previously been

0036

1  marked in the corporate deposition Plaintiff's Exhibit
2  31 -- oops, that's not it.  Nevermind.
3          I'd like to show you what's previously been
4  marked Plaintiff's Exhibit 8 in the corporate deposition
5  and ask you if this is an extension of Jay Cooper's
6  employment contract with Counterpart in which you
7  participated?
8      A   Yes.
9      Q   Now, is it true that Ms. Lear personally
10 negotiated the financial aspects of Plaintiff's Exhibit
11 8?
12     A   Yes.
13     Q   Did several drafts of this agreement pass
14 back and forth between Ms. Lear and Mr. Cooper?
15     A   Yes.
16     Q   You notice that Exhibit 8 calls for a -- I'm
17 looking at the second page of the exhibit bearing Bates
18 stamp 32 -- calls for a position description which should
19 be provided under separate cover at Exhibit 1.
20         MS. ARIAIL:  No question pending.
21 BY MS. DOUGLASS:
22     Q   Do you see that language on page 32?

0037

1    A   Yes.
2    Q   Was it your responsibility to see that a
3  position description was developed for Mr. Cooper and
4  sent to him and labeled as Exhibit 1 to Plaintiff's
5  Exhibit 8?
6    A   No.
7    Q   Whose responsibility was it?
8    A   The supervisor's.
9    Q   That would be Ms. Lear?
10   A   Correct.
11   Q   Now, did you at any time promise Mr. Cooper
12 that the position description would be forthcoming?
13   A   I don't remember.
14   Q   Was it standard in Counterpart's agreements
15 with its overseas executive employees that a job
16 description be included as an exhibit to their employment
17 agreement?
18   A   Yes.
19   Q   And presumably that was so there was no
20 ambiguity about what they were hired to do?
21   A   Correct.
22   Q   Was it Counterpart policy that there had to

0038

1  be an employment agreement in effect at every point in
2  time, in other words, if one agreement lapsed an employee
3  could not be paid until another agreement was in effect?
4      A   No.
5      Q   That was not the policy?
6      A   No.
7      Q   Were agreements sometimes backdated to cover
8  months that had elapsed between the time they were
9  entered into and the termination of the previous
10  agreement?
11     A   Backdated?  No.
12     Q   I don't mean backdated, but I mean dated to
13  cover a period of time before the date of the agreement?
14     A   Yes.
15     Q   That was the standard procedure?
16     A   Standard, no.
17     Q   It did happen?
18     A   Yes.
19     Q   It didn't violate any particular policy of
20  Counterpart to do that?
21     A   No.
22     Q   Now, is it true that it was Counterpart's

0039

1  policy in 2003 and 2004 that each employee was to be
2  evaluated by his or her superior on a written evaluation
3  formed on an annual basis?
4       A   Yes.
5       Q   And that, in fact, is -- if you look at
6  Exhibit 7 which you had in front of you previously --
7  called for by section 3.4 of the manual on the page
8  bearing Bates stamp 579.
9       A   Would you repeat the question please?
10      Q   All right.  If you look at Exhibit 7 on page
11  579 under paragraph 3.4, it says, does it not, that
12  performance review is conducted annually or more
13  frequently as appropriate?
14      A   Yes.
15      Q   And that was, in fact, Counterpart's policy,
16  was it not?
17      A   Yes.
18      Q   And its practice also?
19      A   Yes.
20      Q   Was it Counterpart's policy that an
21  employee's contract could not be extended if there was
22  not a timely performance review in place?

0040

1    A    No.

2    Q    So there was no need -- what enforced, if

3  anything, the requirement that annual performance or

4  evaluations be performed by supervisors?

5    A    What enforced?  I don't understand.

6    Q    Was there any policy which made it necessary

7  for supervisors to abide by section 3.4 of Exhibit 7?

8    A    Yes.  This is the policy.

9    Q    If they did not abide by that policy, did

10  anything happen?

11    A    No.

12    Q    Now, see if I have this correct in terms of

13  performance evaluations, the procedure was that first

14  each employee would write a self-evaluation, correct?

15    A    Correct.

16    Q    And he would send that self-evaluation to the

17  supervisor?

18    A    Correct.

19    Q    And the supervisor would take that into

20  account and write a performance evaluation?

21    A    They were done simultaneously.

22    Q    Well, did the supervisor wait until he or she

0041

1  had the self-appraisal before writing a --
2      A    Some did.
3      Q    Some did, some didn't?
4      A    Right.
5      Q    Was the human resources director kept
6  apprised of that process?
7      A    Yes.
8      Q    So copies of both the self-appraisals and
9  performance evaluations went to you?
10     A    Yes.
11     Q    Did you routinely review them?
12     A    Yes.
13         MS. ARIAIL:  I'd just like to clarify, you've
14  twice referred to her as the HR director.  And I'm not
15  sure it makes any difference, but I just want to clarify
16  that her title is HR manager.
17         MS. DOUGLASS:  Oh, I'm sorry.
18  BY MS. DOUGLASS:
19     Q    Have you understood my questions to be
20  directed to you as HR manager?
21     A    Yes.
22     Q    I will try to do better.

0042

1         Now, have you ever seen a performance
2   evaluation of Jay Cooper prepared by Arlene Lear?
3       A   Yes.
4       Q   Did you receive it at about the time it was
5   written?
6       A   Yes.
7       Q   I'd like you to look at what has previously
8   been marked as Plaintiff's Exhibit 9 in the corporate
9   deposition and ask you if that's the performance
10  evaluation of Jay Cooper by Arlene Lear that you saw?
11      A   I'm not sure.
12      Q   All right.  How many performance evaluations
13  of Jay Cooper by Arlene Lear have you ever seen?
14      A   I can't recall.
15      Q   Would you look at Plaintiff's Exhibit 9 and
16  using your experience as a human resources manager at
17  Counterpart, tell me whether or not you consider this an
18  exceptionally favorable evaluation.
19      A   Yes.
20      Q   You notice the Exhibit 9 has -- there's X's
21  in various columns under various of the aspects of
22  performance.

0043

1       A    Yes.
2       Q    Is that fair to say?
3       A    Yes.
4       Q    Sometimes the X kind of wanders and gets on
5    the line.  For example, if you look under productivity
6    and judgment on page Bates 34 you see that the X is on
7    the line between two categories.
8       A    Yes.
9       Q    Is that common in your experience?
10      A    Yes.
11      Q    Is that the equivalent of like a B-plus or an
12   A-minus?  Is that what that means?
13      A    Yes.
14      Q    How are these filled out?  This form is a
15   preexisting form for placing these comments; is that
16   right?
17      A    Correct.
18      Q    Does it show up on the screen of the
19   supervisor's computer --
20      A    Yes.
21      Q    -- to fill in these blanks?
22          MS. ARIAIL:  Let her finish the question.

0044

1  BY MS. DOUGLASS:
2      Q   So in other words you don't have to take a
3  blank form and put it in a typewriter to do this; you can
4  do it on a computer screen?
5      A   Correct.
6      Q   So if you want to put an X in the box, it is
7  not particularly hard to put an X in the box?
8      A   No.
9      Q   I'd like to show you what has been previously
10 marked as Exhibit 14 in the plaintiff's corporate
11 deposition and ask you if you've seen this before?
12     A   This does not look familiar.
13     Q   But it was your usual practice to receive
14 similar types of documents from other employees?
15     A   Yes.
16     Q   I'd like to show you what has been previously
17 marked Plaintiff's Exhibit 13 in the corporate deposition
18 and ask you if you've seen this before?
19     A   Looks very similar to the first document.
20     Q   By that you mean Exhibit --
21     A   14.
22     Q   -- 14?  Yes.  There are some differences I

0045

1  could point out to you in --
2        MS. ARIAIL:  I'm sorry.  She didn't answer
3  the initial question.
4        MS. DOUGLASS:  Well, the question is have you
5  seen it before.
6        MS. ARIAIL:  Yes.
7        MS. DOUGLASS:  She said it looks similar to
8  the last one.  And I'm going to point out the differences
9  in the last one and see if you've ever seen the document
10  before.
11  BY MS. DOUGLASS:
12      Q    One example is if you look on page 1 of
13  Exhibit 14 under paragraph 3, "Identifying any special
14  circumstances."  Do you see that?  Exhibit 14 has a
15  longer entry than Exhibit 13.
16      A    Okay.
17      Q    Okay.  Does looking at that refresh your
18  recollection as to which, if any, if either, of these
19  documents you've seen before?
20      A    No.
21      Q    Now, the manual of Counterpart International
22  encourages both employees and supervisors to speak

0046

1   frankly in the performance evaluation documents, does it
2   not?
3       A   Yes.
4       Q   Both in terms of the self-evaluation and in
5   the performance evaluation by the supervisor?
6       A   Yes.
7       Q   And it is a stated policy and it's designed
8   to head off any surprises in the employment relationship?
9       A   I'm sorry?  Could you repeat that question?
10      Q   Is that policy, which is by the way on
11  Exhibit 7, Bates number 579 the very last paragraph, is
12  that policy designed to head off any surprises in the
13  employment relationship?
14      A   Yes.
15      Q   Have you ever heard of any supervisor
16  objecting to an employee's frankness in filling out a
17  self-evaluation?
18      A   Yes.
19      Q   In what instance?
20      A   I guess I don't understand.
21      Q   My first question -- maybe you didn't
22  understand it -- was have you ever heard of any

0047

 1  supervisor objecting to an employee's frankness in
 2  filling out the self-evaluation.  You said yes.
 3       A    Yes.
 4       Q    And I asked you what instance did that
 5  happen?
 6       A    My own.
 7       Q    Oh, your own?
 8       A    Yes.
 9       Q    Okay.  You said something to your supervisor
10  that was franker than your supervisor wanted to hear?
11       A    Yes.
12       Q    What was the result of that, if any?
13       A    A changed job description and a changed
14  supervisor.
15       Q    So your statement was taken seriously by
16  whoever reviewed it; is that right?
17       A    Yes.
18       Q    And that was the way the system was designed
19  to work, correct?
20       A    Correct.
21       Q    And that was a change in the supervisor from
22  Mr. Lovelace to Mr. Dorcus?

0048

1    A   Correct.
2    Q   And that happened sometime before the fall of
3  2004?
4    A   After.
5    Q   After?
6    A   Yes.
7    Q   After the beginning of 2005?
8    A   Around that time frame, yes.
9    Q   I have another document I'd like to show you
10 which was marked previously in the corporate deposition
11 as Plaintiff's Exhibit 17 and ask if you've ever seen
12 that before?
13        MS. DOUGLASS:  Off the record.
14        (Discussion held off the record.)
15        THE WITNESS:  No.
16 BY MS. DOUGLASS:
17    Q   You've never seen it before?
18    A   No.
19    Q   It is on a form that is different than the
20 forms that were Exhibit 13 and 14, is it not?
21    A   Yes.
22    Q   Have you ever seen that form used before?

0049

```
 1    A   This form?
 2    Q   Yes.
 3    A   No.
 4    Q   Any explanation as to when this might have
 5  been filled out?
 6    A   No.
 7        MS. ARIAIL:  Can we take a quick break for
 8  the ladies room?
 9        MS. DOUGLASS:  Sure.
10        (A break was taken.)
11  BY MS. DOUGLASS:
12    Q   I'd like to show you another document that
13  was marked as Plaintiff's Exhibit 6 in the corporate
14  deposition.  I'd like you to read over all three e-mails
15  that are contained in that exhibit.
16    A   Okay.
17    Q   Ms. Lear wrote you on November 12 in an
18  e-mail which is the last one in the exhibit that she was
19  behind on her performance review for Jay Cooper among
20  other people; is that right?
21    A   Yes.
22    Q   Had you been pushing her or reminding her
```

0050

1  about her obligations for that review?

2      A    Yes.

3      Q    Was that your usual practice to do that?

4      A    Yes.

5      Q    But if I understood you previously to say

6  that had no hindrance on your ability to enter into a new

7  contract with Jay Cooper?

8      A    Correct.

9      Q    It didn't matter whether she had done it or

10  not for that purpose, correct?

11     A    Correct.

12     Q    Did you ever learn that Jay Cooper was

13  requesting that he have a copy of his job description

14  before he signed his renewal of this contract?

15     A    No.

16     Q    You never were told that by anybody?

17     A    It is not familiar.

18     Q    Okay.  I'd like to mark next a new document

19  which bears the Bates stamps 3462 through 3464 and

20  consists of a number of e-mails.

21          (Boyer Deposition Exhibit Number 2 was marked

22  for identification and attached to the transcript.)

0051

1          THE WITNESS:  Okay.
2    BY MS. DOUGLASS:
3          Q    What's been marked Boyer Exhibit 2 appears to
4    be an accurate copy of the set of e-mails between you and
5    Jay Cooper in December of 2003.
6          A    Yes.
7          Q    Did you tell Jay Cooper on December 11th,
8    this is on page 3463, that Counterpart would no longer be
9    able to pay him after December 15th without a signed
10   contract?
11         A    It appears so.
12         Q    Do you know what policy you were relying on
13   in making that statement?
14         A    No policy.
15         Q    You just said that?
16         A    Yes.
17         Q    To get him to do it?
18         A    Yes.
19         Q    I notice the same frankness you were alluding
20   to earlier.
21              And he responded as the exhibit shows,
22   correct?

0052

1    A    Yes.

2    Q    Now, what was your understanding of the
3    reasons for the delay in the finalization of his contract
4    in December of 2003?

5    A    I don't know.  I had asked for ideas of what
6    was keeping him from signing it and he said he needed to
7    discuss that with Arlene as in a dialogue.

8    Q    And eventually he did discuss it with Arlene
9    as far as you know, correct?

10    A    I would assume so.

11    Q    Now, I'd like to show you what has previously
12    been marked Exhibit 10 in the deposition of Mr. Cooper
13    not Ms. Arlene Lear.

14    MS. ARIAIL:  I would ask that this one be
15    marked individually since it was an exhibit for the other
16    side and any reference to it would need to distinguish
17    between it being an exhibit for Cooper and an exhibit for
18    Counterpart.

19    MS. DOUGLASS:  All the rest of them so far
20    have been exhibits for Lear.  Fine.  Let's remark what
21    was previously deposition Exhibit 10 in the Jay Cooper
22    deposition as Exhibit 10 in the Boyer deposition.

0053

1          (Boyer Deposition Exhibit Number 10 was

2    marked for identification and attached to the

3    transcript.)

4    BY MS. DOUGLASS:

5          Q    Now, is what is marked Boyer Exhibit 10 a

6    copy of an e-mail to Jay Cooper from Arlene Lear dated

7    December 17, 2003, which was forwarded to you on the same

8    date by Arlene Lear?

9          A    Yes.

10          Q    There's some handwriting on the page.  Is

11    that your handwriting?

12          A    Yes.

13          Q    Now, on item one on her e-mail to Mr. Cooper

14    which is included in Boyer Exhibit 10 it says, "Job

15    description.  This will be updated by close of business

16    tomorrow and sent to you for review."

17          Did you understand that this was a

18    responsibility that Ms. Lear was taking on or was she

19    asking you to do that by sending you a copy of her

20    December 17th e-mail?

21          A    This was her responsibility.

22          Q    Her responsibility.  Okay.

0054

1          MS. DOUGLASS:  I'd like to have marked as the

2    next exhibit in order here a document bearing Bates stamp

3    number 061.

4          (Boyer Deposition Exhibit Number 3 was marked

5    for identification and attached to the transcript.)

6    BY MS. DOUGLASS:

7          Q    Okay.  Is it true that Boyer Exhibit 3 is an

8    accurate copy of e-mail exchanges between you and Jay

9    Cooper on the 19th of December 2003?

10         A    Yes.

11         Q    On that date you told Mr. Cooper that his

12   revised job description is forthcoming, correct?

13         A    Yes.

14         Q    Did you have a reason to think that was true?

15         A    Yes.

16         Q    Ms. Lear told you it was true?

17         A    Based on e-mails of the previous day, yes.

18         Q    So you were relying on her earlier e-mails?

19         A    Correct.

20         Q    You weren't promising yourself to provide it?

21         A    No.

22         Q    I'd like to show you what has previously been

0055

1  marked Exhibit 9 to the Cooper deposition which I will
2  have marked Exhibit 9 to this deposition.
3          (Boyer Deposition Exhibit Number 9 was marked
4  for identification and attached to the transcript.)
5  BY MS. DOUGLASS:
6      Q    Have you had a chance to look at Boyer
7  Exhibit 9?
8      A    Yes.
9      Q    Have you ever seen it before?
10     A    Yes.
11     Q    Is that your handwriting on the left-hand
12  column?
13     A    Yes.
14     Q    Does it appear to you in Boyer Exhibit 10
15  which you have in front of you Ms. Boyer [sic] was
16  responding one by one to the points in Boyer Exhibit 9?
17     A    Yes.
18     Q    And did you see Boyer Exhibit 9 at the time
19  that the contract was being renegotiated in December of
20  2003?
21     A    Yes.
22     Q    You see number 1, Mr. Cooper says that he

0056

1  wants to see his revised job description before he signs
2  the contract?
3      A   Yes.
4      Q   Does that refresh your recollection that you
5  at some time learned that he was asking to see that
6  before the contract was signed?
7      A   Yes.
8      Q   Did you ever take any steps to determine
9  whether or not he had received a job description at the
10  time you told him that you wouldn't pay him until he
11  signed the contract?
12     A   I don't recall.
13     Q   Now, at some time in the summer of 2004 did
14  you learn from any source at all that there was a
15  reorganization about to take place in the management of
16  Counterpart's projects in central Asia?
17     A   No.
18     Q   Did you at any time learn who Michael Kunz
19  was?
20     A   In the summer of 2004?
21     Q   Uh-huh.
22     A   Prior to that.

0057

1    Q    Prior to that?

2    A    Yes.

3    Q    When did you know who Michael Kunz was?

4    A    When I first started at Counterpart when I

5    was learning who all the other employees were.

6    Q    What was your understanding of what

7    Mr. Kunz's position was?

8    A    I don't recall what his position was at the

9    time I learned of him.

10    Q    Did you ever learn that there had been some

11    complaints about his treatment of his subordinates?

12    A    His?

13    Q    Treatment of his subordinates.

14    A    I'm sorry, which "his"?

15    Q    Mr. Kunz, sorry.

16    A    No.

17    Q    Did you ever hear that there had been some

18    complaints about his actions involving alcohol?

19    A    No.

20    Q    At some point in time were you advised by

21    anybody that Mr. Kunz was going to be placed over

22    Mr. Cooper as a supervisor in central Asia?

0058

1      A    Yes.
2      Q    When did you learn about that?
3      A    Probably early fall of '04.
4      Q    And who did you hear it from?
5      A    Ms. Lear.
6      Q    In what context?
7      A    In the reorganization of the Civil Society
8  Division.
9      Q    What did she tell you about the
10  reorganization of the Civil Society Division?
11     A    I believe I was presented with a new work
12  chart of the division with everybody's names and titles
13  or revised titles.
14     Q    Was that in the form of a thing with boxes
15  and reporting relationships spelled out with arrows?
16     A    No.
17     Q    What form was it in?
18     A    Probably memo form I would think.
19     Q    And at the time you saw that memo, had the
20  reorganization that it reflected already taken place?
21     A    Yes.
22     Q    Did you become aware at some point that a

0059

1   Barbara Sloan had been employed by Counterpart with
2   respect to issues in the central Asian Civil Society
3   Division?  Maybe I'm mangling that, but did you ever
4   learn that Barbara Sloan had been employed to perform
5   certain services with respect to the management of
6   Counterpart's interest in central Asia?
7           A   Yes.
8           Q   When did you learn that?
9           A   Fall of '04.
10          Q   Who was Barbara Sloan?
11          A   Barbara Sloan is a consultant with a group
12  called Social Action.  She is a facilitator.
13          Q   Had you worked with Barbara Sloan in any
14  other situation?
15          A   Yes.
16          Q   In how many instances?
17          A   One.
18          Q   What is her expertise?
19          A   I assume group facilitation.
20          Q   What is your understanding of what services
21  she performed for Counterpart with respect to Mr. Cooper?
22          A   Mediation and group facilitation of the Civil

0060

1  Society Division reorganization.
2      Q   Did you ever discuss her services in that
3  regard with her?
4      A   Yes.
5      Q   In what situation?
6      A   During my trip to central Asia.
7      Q   She was in central Asia with you?
8      A   No.
9      Q   You discussed it on the phone while you were
10  in central Asia with her?
11      A   Yes.
12      Q   Were you ever shown any memoranda concerning
13  meetings or telephone calls that took place in August of
14  2004 concerning that reorganization?
15      A   No.
16      Q   Let me show you what was previously marked in
17  the corporate deposition as Exhibit 12 and ask you if you
18  have seen any of the pages in this document before?
19      A   Yes.
20      Q   Which of them have you seen and when did you
21  see them?
22          MS. ARIAIL:  Objection.  Compound question.

0061

1   BY MS. DOUGLASS:
2       Q   Did you see Exhibit 12 in the form it is now
3   with the pages attached or some other way?
4       A   Some other way.
5       Q   Tell me whether or not you saw pages 740 to
6   742 attached to each other in a single document.
7       A   No.
8       Q   Did you see the first page 740 independently
9   not attached to anything?
10      A   No.
11      Q   Tell me how you saw any part of this
12  document.
13      A   From Jay Cooper.
14      Q   From Jay Cooper?
15      A   Yes.
16      Q   How much of it did you see from Jay Cooper?
17      A   Pages 743 and 744.
18      Q   And you have never to this day ever seen 740,
19  742?
20      A   No.
21      Q   Okay.  Good.  Now, that was during the time
22  that you were in central Asia that you saw pages 743 and

0062

1   744 of Plaintiff's Exhibit 12?
2       A   Yes.
3       Q   He had that with him in a discussion with him
4   and gave it to you?
5       A   Yes.
6       Q   At some point you travelled to central Asia
7   in the fall of 2004, correct?
8       A   Yes.
9       Q   How did that come to happen?
10      A   Through a series of discussions with Arlene
11  Lear and senior management that it was time for me to
12  make a visit on the Civil Society Division for an HR
13  audit.
14      Q   Is the Civil Society Division something that
15  exists other places in the world other than central Asia?
16      A   No.
17      Q   Okay.  So --
18      A   I don't think so.
19      Q   That's not a trick question.  I just don't
20  know.
21      A   I'm trying to remember the countries.
22      Q   So if you were going to do an HR audit of the

0063

1  Civil Society Division that would encompass going to
2  various countries in central Asia?
3       A   Correct.
4       Q   You said senior management.  Who did you mean
5  by that?
6       A   The SMT would be my supervisor Harry Dorcus
7  and Arlene Lear and other vice presidents.
8       Q   I believe we've established that up until the
9  beginning of 2005 you were still reporting to
10  Mr. Lovelace?
11       A   Correct.
12       Q   Was he involved with that, too?
13       A   Yes.
14       Q   Other vice presidents, who would those be?
15       A   At the time Thor Cederstrom and Don Field.
16       Q   How do you spell the first man's name?
17       A   C-E-D-E-R-S-T-R-O-M.
18       Q   All right.  Now, did you participate in a
19  discussion on why an HR audit was appropriate for that
20  division at that time?
21       A   Yes.
22       Q   With the individuals you just identified?

0064

1    A    Yes.
2    Q    What was given by whom as the reasons why
3  this was appropriate?
4    A    By whom I don't recall.  But I've made other
5  visits to other divisions in other regions.
6    Q    Okay.  That's something I want to explore.
7  Does Counterpart International have a particular policy
8  about when or how often or where HR audits should be --
9    A    No.
10    Q    Let me put a verb at the end of
11  it -- conducted?
12    A    No.
13    Q    Okay.  Is it fair to say the decision whether
14  to do an HR audit is on a case-by-case basis?
15    A    Correct.
16    Q    What are the usual considerations, not in
17  this particular case, but the usual considerations which
18  make any audit appropriate in your experience?
19    A    Size of programs, the growth of programs as
20  far as the number of programs they would have plus the
21  number of people.
22    Q    Okay.

0065

1      A    And sometimes maybe if there were some type
2   of maybe tension in the offices among employees.  Morale
3   issues is probably a better way to put it.
4      Q    Is the purpose of an HR audit in your
5   experience at Counterpart International to diffuse
6   tensions in the office and to improve morale among
7   employees?
8      A    Yes.
9      Q    So is it fair to say than an HR audit is not
10  a punitive function but is designed to be a positive
11  effort to improve Counterpart's business?
12     A    Yes.
13     Q    During the discussion you had with the people
14  you've identified at which it was decided to have an HR
15  audit of the Civil Society Division in central Asia, was
16  tension in the office or morale issues in that division
17  discussed?
18     A    Yes.
19     Q    What morale issues?
20     A    Staff morale within the Almaty office versus
21  the office in Bishkek.
22     Q    Anything else?

0066

1    A    No.

2    Q    When you say versus, do you mean there was a

3  difference in the staff morale between those two offices?

4    A    Yes.

5    Q    Which of the offices had a more positive

6  staff morale?

7    A    Bishkek.

8    Q    And one reason to have an HR audit would be

9  to determine the reasons for that?

10    A    Yes.

11    Q    Were any other issues of staff morale or

12  tension discussed during the time it was decided to have

13  an HR audit?

14    A    No.

15    Q    Was the mediation or other services provided

16  by Barbara Sloan discussed in that context?

17    A    No.

18    Q    Was any tension or potential problems

19  concerning the relationship between Jay Cooper and

20  Michael Kunz discussed in that context?

21    A    No.

22    Q    Was Jay Cooper's management skill discussed?

0067

1      A    No.
2      Q    How would it come to the attention of
3  yourself and/or the other people you've identified that
4  there was a difference in staff morale between the
5  Bishkek office and the Almaty office?
6      A    How did it come to me?
7      Q    How did it come to any of you discussing the
8  subject if you know?
9          MS. ARIAIL:  Objection.
10  BY MS. DOUGLASS:
11     Q    Do you know how --
12     A    I don't know.
13     Q    Did anybody say, we've been told by somebody
14  or other that there is a staff morale problem in Almaty?
15     A    I don't know.
16     Q    It was just presented as a fact to the
17  meeting that you attended?
18     A    Yes.
19     Q    Was Ms. Lear in favor of the HR audit?
20     A    Yes.
21     Q    Was Mr. Dorcus?
22     A    Yes.

0068

```
 1     Q    Was Mr. Feil?
 2     A    Yes.
 3     Q    Was Mr. Lovelace?
 4     A    Yes.
 5     Q    Unanimous decision?
 6     A    Yes.
 7     Q    How many other times have you done an HR
 8  audit?
 9     A    Once.
10     Q    In what office?
11     A    Senegal.
12     Q    And when was that?
13     A    May of '04.
14     Q    Were there any management changes made to the
15  Senegal office as a result of your HR audit?
16     A    Yes.
17     Q    What changes were made?
18     A    The assistant director was terminated.
19     Q    So termination decisions can flow from the
20  results of an HR audit; is that right?
21     A    Yes.
22     Q    Does Counterpart have any procedures that it
```

0069

1   mandates in the case of an HR audit?
2       A   No.
3       Q   It is up to you to devise your own
4   procedures?
5       A   Yes.
6       Q   Is there any attempt to make sure that you,
7   in performing an HR audit, have the benefit of various
8   points of view?
9       A   Yes.
10      Q   What is that?
11      A   The various points of view such as?
12      Q   Well, for example, as to whether or not there
13  was a need to have a termination of the assistant
14  director of Senegal.  Presumably people had different
15  opinions on that.  Did you solicit the various opinions?
16      A   Yes.
17      Q   And that is standard operating procedure in
18  an HR audit to solicit the viewpoints of various people
19  on whatever you're investigating, correct?
20      A   Correct.
21      Q   Was there any other assignment you had with
22  respect to your trip to central Asia?

0070

```
 1      A   No.
 2      Q   At the time you went to central Asia, you
 3   knew that the Civil Society Division had been reorganized
 4   in the summer; is that correct?
 5      A   Yes.
 6      Q   Recently?
 7      A   Yes.
 8      Q   Were you told anything about any reaction
 9   that Jay Cooper had to the reorganization?
10      A   Yes.
11      Q   What were you told?
12      A   He was not pleased.
13      Q   Who told you that?
14      A   Arlene Lear.
15      Q   That was before you went?
16      A   Yes.
17      Q   Were you asked to do anything about that?
18      A   No.
19      Q   It was just given you as a matter of
20   information?
21      A   Yes.
22      Q   Were you told of any other particular facts
```

0071

1  about the Civil Society Division such as that or anything
2  else that might help you in your job?
3          A   Yes.
4          Q   What were you told?
5          A   There was tension between Bob and Jay Cooper.
6          Q   Were you told what kind of tension it was?
7          A   That they didn't like each other.
8          Q   And that was told you by Arlene Lear?
9          A   Yes.
10         Q   Before you went?
11         A   Yes.
12         Q   Did Arlene Lear tell you where she got that
13  information?
14         A   Yes.
15         Q   What did she tell you?
16         A   From both parties.
17         Q   "Both" being Kunz and Abma?
18             MS. ARIAIL:  Objection.
19             THE WITNESS:  No.
20  BY MS. DOUGLASS:
21         Q   "Both" being -- you mean all three people?
22         A   Cooper and Abma.

0072

1      Q   Cooper and Abma had the latter tension and
2  presumably Cooper and Kunz on the previous tension?
3           MS. ARIAIL:  Objection.  It was never brought
4  into testimony.
5  BY MS. DOUGLASS:
6      Q   All right.  My notes are faulty.  She told
7  you she had heard about tension between Abma and Cooper
8  from both of those people, correct?
9      A   Yes.
10     Q   Did she tell who she had heard that Jay was
11 not pleased about Kunz's supervision?
12     A   Yes.
13     Q   Who did she tell you she heard that from?
14     A   Cooper.
15     Q   From Cooper.  Okay.
16          Now, part of your job as a human resources
17 manager is to provide support to employees who experience
18 difficulty in the workplace; isn't that right?
19     A   Yes.
20     Q   And that is actually spelled out in the
21 manual, is it not, if you look on what has been marked as
22 Exhibit 7?

0073

1          MS. ARIAIL:  Where?

2          MS. DOUGLASS:  Paragraph 7.17A, "Counseling."

3          MS. ARIAIL: I don't see a paragraph 7 -- oh,

4  right.

5          MS. DOUGLASS: 7.17.  It is under

6  "Grievance."

7          MS. ARIAIL:  Objection.  Nothing in the

8  paragraph states your statement.

9          THE WITNESS:  I'm not sure where we were.

10  BY MS. DOUGLASS:

11      Q    Look at Exhibit 7 that you have.  Look at the

12  page with Bates number 596 and paragraph 7.17, which is

13  under "Grievance Procedure," subparagraph "A" talks about

14  counseling.  And my question to you is if you read the

15  description of counseling on the next page whether or not

16  you considered it as part of your job as a human resource

17  manager to provide counseling assistance to employees?

18      A    Yes.

19      Q    And that responsibility is in fact

20  independent of whether it is a formal grievance

21  procedure; is that right?

22      A    Correct.

0074

1      Q    And that counseling support is designed to be
2  confidential when there's no reason to make it otherwise;
3  is that correct?
4      A    Correct.
5      Q    And the purpose for that confidentiality
6  requirement is that it makes employees feel freer to
7  share with you whatever difficulties they are having; is
8  that fair?
9      A    Yes.
10     Q    Now, how was the fact that you were coming to
11  Almaty or Almaty and Bishkek -- strike that.
12         How was your trip to central Asia in the fall
13  of 2004 announced if you know?
14     A    I don't know.
15     Q    How did you set up your trip?
16     A    I don't --
17     Q    How did you decide where to go?
18     A    Based on the main location of the HR
19  documents and the I guess what you would consider
20  headquarters for that division in central Asia.
21     Q    Was in Almaty, Kazakhstan?
22     A    Correct.

0075

1      Q    And there was in fact an HR person there by
2   the name of Irina; is that right?
3      A    Correct.
4      Q    Was she the only HR person in central Asia
5   operating for Counterpart?
6      A    Yes.
7      Q    Was she someone that you were in normal
8   contact with in the course of your job?
9      A    No.
10     Q    Had you ever met her before?
11     A    No.
12     Q    She operated in independent shops more or
13  less?
14     A    Yes.
15     Q    Did you contact her when you were going to
16  make your trip to tell her you were coming?
17     A    Yes.
18     Q    Did you contact anyone else?
19     A    Yes.
20     Q    Who?
21     A    Bob Abma.
22     Q    Why Bob Abma?

0076

1       A    Part of his job function are office
2    administration and he helped with travel arrangements and
3    visa preparations.
4       Q    Did you tell him the purpose of your trip?
5       A    Yes.
6       Q    Did he express to you he was glad you were
7    coming?
8       A    Yes.
9       Q    But you don't know what was announced to
10   anyone else at the office besides Mr. Abma and Irina that
11   you talked to yourself?
12          MS. ARIAIL:  Objection.  Asked and answered.
13   BY MS. DOUGLASS:
14      Q    Who met you at the airport?
15      A    Igor.
16      Q    What was Igor's responsibilities?
17      A    Driver.
18      Q    Was anybody assigned to act as your host, so
19   to speak, to take you around and show you the country?
20      A    No.
21      Q    Were you provided with arrangements for
22   housing?

0077

1    A   Yes.
2    Q   And were you provided with an interpreter if
3   you needed one?
4    A   No.
5    Q   Did you ever speak to anyone that didn't
6   speak English?
7    A   No.
8    Q   Did all the staff at the Counterpart offices
9   speak English?
10    A   No.
11    Q   Did you ever feel the need to speak to
12   someone that didn't speak English?
13    A   No.
14    Q   Irina -- I believe her name is Kolmoskava
15   (phonetic.)  Irina.  You know who I'm talking about?
16    A   Yes.
17    Q   The HR director there, did she speak English?
18    A   Yes.
19    Q   Do you know the name Anika Ayrapetyants?
20    A   Yes.
21    Q   What is her position?
22    A   Manager of the Civil Society Division.

0078

1     Q   Does that make her a superior executive to
2  Michael Kunz?
3     A   No.
4     Q   Does that make her a superior executive to
5  Arlene Lear?
6     A   No.
7     Q   Does she work for Arlene Lear?
8     A   Yes.
9     Q   But she does not -- but the office in
10  Kazakhstan does not report to her?
11     A   No.
12     Q   What is her job with respect to that office?
13     A   Liaison I would say.
14     Q   Is she a liaison with civil society projects
15  other places in the world also?
16     A   Yes.
17     Q   Got it.  Now, Anika traveled to Kazakhstan at
18  the same time you did; is that right?
19     A   Yes.
20     Q   But on a different plane?
21     A   Yes.
22     Q   But arrived the same day?

0079

1     A    I'm not sure what day she arrived.

2     Q    But she was more or less there at the same

3  time you were?

4     A    Yes.

5     Q    What was she doing there?

6     A    I don't know.

7     Q    Did you have any interaction with her during

8  the time you were there?

9     A    Yes.

10    Q    Anything beyond social interaction?

11    A    No.

12    Q    Did you ever discuss any of the things you

13  were investigating with Anika?

14    A    No.

15    Q    Did you ever discuss whatever she was doing

16  with Anika?

17    A    No.

18    Q    Now, you arrived -- let's focus on the first

19  week that you were in Almaty.

20    A    Okay.

21    Q    Presumably you set yourself up in a hotel,

22  right?

0080

1    A   Yes.
2    Q   And then you visited the Counterpart offices?
3    A   Yes.
4    Q   What did you do in those visits?
5    A   I spent most of my time with Irina going
6  through the HR files, how they were set up, how their
7  policy manuals were set up and meeting staff.
8    Q   Presumably those are the staff members that
9  could speak English?
10    A   Correct.
11    Q   Was there a vacancy problem in the Almaty
12  office, in other words, were there staff positions that
13  had not been filled?
14    A   Yes.
15    Q   Did you determine or take any steps to
16  determine the causes for that?
17    A   No.
18    Q   Did you discuss the vacancies with Irina or
19  with anyone else?
20    A   Yes.
21    Q   What were you told, if anything, about the
22  reasons for the vacancies?

0081

```
 1      A   They were recruiting.
 2      Q   Was it Irina's job to be recruiting?
 3      A   Partly.
 4      Q   Did she tell you that they had a problem in
 5  recruiting because the salaries they were offering were
 6  too low for Almaty?
 7      A   Yes.
 8      Q   Did you have any reason to doubt that?
 9      A   No.
10      Q   Did you take that fact back to anyone in
11  Washington and report that?
12      A   Yes.
13      Q   Was anything done to raise the salary level
14  in the office in Almaty?
15      A   I don't know.
16      Q   Did you recommend that the salary level for
17  the office in Almaty be raised?
18      A   Yes.
19      Q   Now, you spoke with Irina.  You spoke with
20  various staff members who spoke English.  With whom did
21  you spend your evenings?
22      A   Various staff members.
```

0082

1    Q    Could you give me a list?

2    A    Bob Abma, Michael Kunz, Irina.  That's it.

3    Q    Is it fair to say that you had dinner with

4  one or the other of these people every night your first

5  week there?

6    A    No.

7    Q    How many times did you have dinner with them?

8    A    Twice.

9    Q    What did you do for evenings the other times?

10    A    Went to the hotel.

11    Q    By yourself?

12    A    Yes.

13    Q    Did you have dinner on any occasion with Jay

14  Cooper?

15    A    No.

16    Q    Was there any particular reason for that?

17    A    No.

18    Q    Did he invite you?

19    A    No.

20    Q    Was there ever any effort made to have a

21  dinner which you and Michael Kunz and Bob Abma and Jay

22  Cooper would all eat together?

0083

1      A   No.
2      Q   Is that sort of a dinner common in a
3   situation of an HR audit in a foreign country?
4      A   It happens.
5      Q   Okay.  Now, did you see any evidence, when
6   you were discussing with Irina looking at the HR files,
7   any evidence that Jay Cooper was not actively recruiting
8   for the staff vacancies?
9      A   I didn't see any evidence of recruiting at
10   all.
11      Q   I thought you said earlier that they were
12   recruiting?
13      A   They said they were.
14      Q   But there was no evidence of it?
15      A   Not that I recall seeing.
16      Q   Okay.  What is the procedure in a central
17   Asian country like Almaty to recruit?
18      A   I don't know.  The local office handles their
19   own recruiting so that would not have gone back through
20   me.  So I don't know their procedure.
21      Q   You don't know if whatever they did generated
22   a paper trail that would be obvious to you?

0084

```
 1      A   I don't know.
 2      Q   Now, did you draw any conclusions about the
 3  reasons why the morale in the Almaty office was lower
 4  than the morale -- was -- in other words, at some point
 5  you were told that there was a difference between the
 6  Bishkek office and Almaty office before you went,
 7  correct?
 8      A   Yes.
 9      Q   In morale.  Now, when you first went for the
10  first week in Almaty you couldn't make a comparison
11  because you hadn't been to Bishkek; is that right?
12      A   Correct.
13      Q   Now, what did you find about the morale in
14  the Almaty office in that first week?
15      A   It was very low, very tense environment.
16      Q   Would you tell me the basis on which you drew
17  that conclusion?
18      A   Based on discussions with the staff.
19      Q   I'd like you to tell me in as much detail as
20  you can who told you what about that, the particulars of
21  that?
22      A   Most of the staff I spoke to -- I'm sorry I
```

0085

1  don't remember all their names.  But definitely Moratt
2  and Irina and Bob and Michael, Igor, both Igor's.  There
3  are two Igor's.  And the other staff members.  I don't
4  remember their names.  The receptionist I'm sorry I don't
5  remember her name.
6      Q    Was that Yana?
7      A    No.  She's an accountant.
8      Q    Did you talk to her?
9      A    Yes.  Yana and Julia are both accountants.
10     Q    Did you talk to both of them?
11     A    Yes.
12     Q    And the receptionist's name you don't know.
13  All right.  Now I want to go through them one by one and
14  have you tell me what you remember about what they said
15  that led you to that conclusion.  Okay?
16     A    Uh-huh.
17     Q    Moratt, what did Moratt say?
18     A    That as a director in the office he wasn't
19  allowed to lead.  He did not have any real power.
20     Q    Did he have anyone that he blamed for that
21  situation?
22     A    Yes.

0086

1    Q    Who was that?

2    A    Jay Cooper.

3    Q    Why did he blame Cooper?

4    A    Because they were physically located in the

5  same office.  And he let it be known that -- Mr. Cooper

6  let it be known that he is really the one in charge and

7  Moratt reports to him.  So even though Moratt was a

8  director, he did not have any real power.

9    Q    And Moratt's equivalent position in other

10  countries such as Kyrgyzstan, Turkmenistan, Uzbekistan

11  who reported directly to Cooper didn't have Cooper in the

12  same office; is that true?

13    A    Correct.

14    Q    So in some senses it may be attributable to

15  the fact that Moratt had Cooper in the same office as

16  him; is that fair?

17        MS. ARIAIL:  Objection to form.

18        You can still answer.

19        THE WITNESS:  Possibly.

20  BY MS. DOUGLASS:

21    Q    Did Moratt draw any conclusion along that

22  line?

0087

 1      A    Yes.
 2      Q    Is there anything else that Moratt said that
 3  reflected on his view of the morale at the office?
 4      A    The staff salaries were low.
 5      Q    And we've already talked about that.  You
 6  made a recommendation about that subject, correct?
 7      A    Yes.
 8      Q    Is there anything else you can think of that
 9  Moratt said that is relevant?
10      A    Not that I can recall.
11      Q    All right.  Let's do Irina.  What do you
12  remember Irina saying?
13      A    Mostly about the salaries being low.
14      Q    Uh-huh.
15      A    And the management style of Jay Cooper.
16      Q    What did she say about that?
17      A    He basically used her to do all his dirty
18  work with the staff.  So she wasn't well-received by the
19  staff.
20      Q    Did she dislike being put in that position?
21      A    Yes.
22      Q    Okay.

0088

1      A   That there had been a reorganization in the
2  Almaty office and now she was a direct report to Bob Abma
3  and she was much happier.
4      Q   So that looked like the morale is going up?
5          MS. ARIAIL:  Objection.  Mischaracterization
6  of testimony.
7  BY MS. DOUGLASS:
8      Q   Did that lead you to the conclusion that her
9  morale was going up?
10      A   For her, yes.
11      Q   Anything else that she said?
12      A   I don't recall without seeing my notes.
13      Q   I'll show you the notes in a minute, but I
14  just want to get it in general.  And if you don't
15  remember until you see the notes, we'll look at the
16  notes.
17          Anything specific she said about Jay Cooper?
18      A   Just about his management style, not very
19  positive, very rough towards the staff.
20      Q   Rough.  By that do you mean bullying?
21      A   Yes.
22      Q   Is that what you mean?

0089

1    A   Yes.
2    Q   And she experienced him being bullying toward
3  her or toward other people?
4    A   I don't know what she experienced.
5    Q   Did she say he was bullying toward her or did
6  she say other people were complaining about him being
7  bullying toward them?
8    A   Both.
9    Q   Both.  Okay.  Did she say that Cooper was
10 inaccessible?
11    A   I don't recall her saying that.
12    Q   Did she talk about him having his doors
13 closed and not being available to staff?
14    A   I don't recall her saying that.
15    Q   All right.  Anything else you can think of?
16    A   No.
17    Q   What about Bob Abma?
18    A   Bob had a lot to say.  Bob told me that he
19 worked with Jay for about 9 years in some capacity and
20 that he was pretty much a dictator.  But if he were ever
21 put into a crunch time situation, he would work with Jay
22 any time as far as program implementation, starting new

0090

1  programs.
2      Q   Let me see if I understand that part of the
3  comment.  Does that mean that he was he would work with
4  Jay any time because he had respect for Jay's work?  Is
5  that what you meant?
6      A   He had respect for him starting programs, the
7  implementation of new programs, yes.
8      Q   Did he say there were areas for Jay that he
9  didn't have respect for?
10      A   His management style, yes.  And his
11  characterizations of people, very judgmental of people's
12  lifestyles.
13      Q   Okay.  Did he give particulars on that?
14      A   Openly judgmental about Bob and his partner
15  ans Bob's sexual orientation.
16      Q   Okay.  By that you mean that Bob was gay?
17      A   Correct.
18      Q   And Bob felt discriminated against somehow by
19  Jay?
20          MS. ARIAIL:  Objection.  Mischaracterization
21  of testimony.
22          MS. DOUGLASS:  I'm asking.

0091

1        THE WITNESS:  Discriminated?  No.
2    BY MS. DOUGLASS:
3        Q   Okay.  He just felt judged?
4        A   Harshly judged.
5        Q   Harshly judged.  Okay.  Anything else that
6    Bob Abma said?
7        A   Not without my notes.  I can't remember.
8        Q   Did he allude in any way to Jay's objections
9    to certain financial arrangements that Bob was engaged
10   in?
11       A   No.
12       Q   There was no discussion of budgets or Jay's
13   objections to Bob's budgets?
14       A   Just the way he managed the budgets.
15       Q   The way he managed the budgets meaning people
16   or dollars or what?
17       A   Both.
18       Q   What did Abma object to about the way he
19   managed the budgets?
20       A   More so that Jay just wanted to control
21   everything and not let other people do their jobs.  He
22   had to have control of everything.

0092

1    Q    Okay.  Anything else?
2    A    No, not that I recall.
3    Q    Did Abma say that Jay was inaccessible?
4    A    Yes.
5    Q    That he kept his door closed?
6    A    Yes.
7    Q    How many days were you actually in the Almaty
8  office?
9    A    Eight.
10    Q    Eight working days?
11    A    Eight working days.
12    Q    None of those days were weekends?
13    A    No.
14    Q    How many of those 8 working days was Jay
15  Cooper there?
16    A    Five.
17    Q    Did you see Jay Cooper with his door closed?
18    A    Yes.
19    Q    On how many occasions?
20    A    I don't recall.
21    Q    Was his door closed that you observed for
22  long periods of time?

0093

1    A    Yes.
2    Q    Can you estimate what percentage of a working
3  day you would see his door closed?
4    A    Maybe half.
5    Q    Did Abma say anything about Cooper's
6  leadership ability?
7    A    Yes.
8    Q    What did he say?
9    A    Very poor.
10    Q    What specificity on that?
11    A    The high rate of turnover and the high rate
12  of turnover expense staff and that Jay had a secret file
13  on everyone.
14    Q    Did you ask him what he meant by that?
15    A    No.
16    Q    Did you ever find out whether or not Jay did
17  have a secret file on everyone?
18    A    Yes.
19    Q    What did you find out?
20    A    That he did.
21    Q    He did?
22    A    Yes.

0094

1    Q    How did you find that out?

2    A    Jay Cooper actually told me.

3    Q    What did Jay Cooper tell you now?

4    A    During one discussion he talked about all the

5  notes that he kept on everyone and that he had a file on

6  everyone including Arlene Lear.

7    Q    After Jay was fired, you participated in a

8  search of Jay's office and boxing up various of his

9  effects; is that correct?

10    A    Search, no.

11    Q    Did you enter Jay's office and box up certain

12  of his effects?

13    A    Yes.

14    Q    Did that include boxing up materials that

15  were in his desk?

16    A    Yes.

17    Q    And that were in his file cabinets?

18    A    Yes.

19    Q    Did you find the files on everyone when you

20  did that process?

21    A    Yes.

22    Q    What happened to those files?

0095

1        A    They were boxed up and put in a locked
2    cabinet in the office in Almaty.
3        Q    And put in a locked cabinet.  All right.  Do
4    you know what happened to them thereafter?
5        A    I do not.
6        Q    Do you remember finding a file specifically
7    on Arlene Lear?
8        A    Yes.
9        Q    On who else?
10       A    Every ex-pat that ever worked in that office
11   with Jay Cooper.
12       Q    And what kinds of materials were in these
13   files?
14       A    All negative things that -- mostly
15   handwritten memos that Jay had written with negative
16   information that Jay had written about everybody.
17       Q    Did you read the substance of these memos?
18       A    I scanned them, yes.
19       Q    Who else at the office did you discuss the
20   fact that there were these files in Jay's office?
21       A    Arlene Lear and Michael Kunz.
22       Q    Did you discuss the possibility that Jay had

0096

1  such files with Arlene Lear and/or Michael Kunz before
2  Jay was fired?
3      A   No.
4      Q   Did you discuss them before you went into the
5  office and found the files?
6      A   No.
7      Q   So it was after you found the files that you
8  discussed them with Lear and Kunz, right?
9      A   Yes.
10     Q   Did you discuss them with Lear separately
11  from Kunz or together?
12     A   Separately.
13     Q   Tell me about your discussion with Lear on
14  this subject.
15     A   From what I recall I just let her know that
16  while I was packing the office I did find files on all of
17  the ex-pats that had worked in the central Asia office
18  and that there was one on her also.  And that previously
19  Jay had told me he had a secret file on everyone.
20     Q   Do you know what happened to those documents?
21     A   I do not.
22     Q   Have you ever heard any discussion of what

0097

1  should be done with them?
2      A   No.
3      Q   Did Arlene Lear ask to get a copy of whatever
4  was on file about her?
5      A   No.
6      Q   Not to you anyway?
7      A   No.
8      Q   Tell me about your discussion with Michael
9  Kunz about those files.
10     A   We were discuss -- after I had packed up the
11  office, we were discussing just the termination in
12  general.  He mentioned that he heard Jay had secret files
13  on everyone.  And I told him that is correct.
14     Q   Did he ask if there were secret files on him?
15     A   Yes -- well, he told me that there was a
16  secret file on him.  Jay had told him he had a file on
17  him.
18     Q   Did Michael Kunz ask to see the file that was
19  on him?
20     A   No.
21     Q   When you say "ex-pat," let me just make sure
22  I understand what you're talking about.  You're talking

0098

1    about U.S. citizens that are working overseas?

2        A    Correct.

3        Q    Do you know why, from any source, Jay would

4    have kept files only on ex-pats as opposed to everyone

5    working for him?

6        A    No.

7        Q    Did you ever discuss the secret files that

8    you found with Bob Abma?

9        A    No.

10       Q    Now, Bob Abma was present when you were going

11   through Jay's office, correct?

12       A    Correct.

13       Q    Was he there when you found the secret files?

14       A    Yes.

15       Q    And you didn't mention to him that you found

16   the secret files?

17       A    No.  He was identifying what belonged to

18   Counterpart and what belonged to Jay while I boxed up the

19   items.

20       Q    And the secret files you determined belonged

21   to Counterpart?

22       A    Correct.

0099

1    Q    What standard did you use to decide -- did
2  you and Bob together or did Bob to your knowledge -- use
3  to decide what belonged to Counterpart and what belonged
4  to Jay?
5        A    Both of us decided.
6        Q    Both of you decided?
7        A    Yes.
8        Q    But what standard did you use?
9        A    Looking at the documents, what would be
10  considered office material, what would be considered
11  personal material.
12       Q    And in some cases it was fairly obvious, I
13  assume, I mean pictures of his children and whatever
14  would be personal.
15       A    Correct.
16       Q    And memos about Counterpart would be
17  business.  Were there any close cases?
18       A    No.
19       Q    There was some issue about a computer.  Did
20  you ever determine whether or not certain computers were
21  present in Jay's office, in other words, did you do an
22  inventory of the hardware?

0100

1     A    No.
2     Q    Were some of these materials in locked
3    drawers?
4     A    Yes.
5     Q    The secret files were in locked drawers?
6     A    Yes.
7     Q    In what, a desk or file cabinet or --
8     A    Both.
9     Q    What was the volume of this secret files
10   cache?
11     A    It varied based on each person.
12     Q    How about all of it together, would that be a
13   box or more than a box?
14     A    Probably about a third of a box.
15     Q    On all of them?
16     A    Yes.
17     Q    I mean did this sort of thing -- let me -- it
18   seems to me you could have a file on someone that
19   included something you received in the normal course of
20   business but that referred to the person such as a work
21   evaluation, a performance evaluation.  Would you consider
22   that a secret file?

0101

1            MS. ARIAIL:  Objection to the form of

2    question.

3            Sorry.  You can still answer.

4    BY MS. DOUGLASS:

5        Q    I'm trying to take her objection into account

6    here.  What I'm trying to find out is what you mean by

7    secret file.  Was it secret because it was locked up or

8    was it secret because of the subject matter?

9        A    Because of the subject matter.

10       Q    What was the subject matter that was -- other

11   than for example a performance review which is private in

12   other words, you don't put it on the Internet, but it's

13   not inappropriate for a supervisor to have it.

14       A    Right.

15       Q    I want to know what sort of materials were

16   more secret than that that you found?

17       A    Conversations.  Memos of conversations

18   between Jay and whatever person's file it was in.

19       Q    Handwritten?

20       A    Handwritten, mostly, yes.

21       Q    And were they designed to uncover something

22   that would be embarrassing to the person?

0102

1          MS. ARIAIL:  Objection.  She can't --
2    BY MS. DOUGLASS:
3          Q    If you can characterize it -- well, somehow
4    you decided they were secret.  So I'm trying to find out
5    what was the basis of the judgment that these had been
6    secretly kept.
7          A    I would think so, yes.  Designed to maybe
8    harm the person maybe at a later date.
9          Q    And do you remember finding them at least on
10   the following people -- say yes or no to each of these
11   people:  Arlene Lear?
12         A    Yes.
13         Q    Bob Abma?
14         A    Yes.
15         Q    Michael Kunz?
16         A    Yes.
17         Q    Harry Dorcus?
18         A    No.
19         Q    It had to be people who had worked in the
20   region?
21         A    Correct.
22         Q    All right.  Aaron Chassey?

0103

1    A   I don't recall seeing that one.

2    Q   Kim Alter?

3    A   Yes.

4    Q   Can you remember anybody else?

5    A   I can't off the top of my head.

6    Q   But there were other people?

7    A   Yes.

8    Q   Now, the way we got into the secret file

9  thing we were talking about your conversations with Bob

10  Abma on the question of morale, okay.

11    A   Yes.

12    Q   That's where we started.  So I want to go on

13  to the next person and ask about the conversation you had

14  with the person about morale.  The next person is Michael

15  Kunz.

16    A   My conversations with Michael were more

17  related to the office in general and his management

18  style.  He was new to the office and new to the region.

19  And he was more concerned about how the staff would

20  perceive him and how they should communicate what his

21  role is versus what Jay's role was in the region.  He had

22  found that people were talking to him more and opening up

0104

1  to him and discussing office issues with him, even though
2  technically at that time he wasn't the head person in
3  that office.  They were not direct reports to him.
4        Q   Well, he was Jay Cooper's supervisor at that
5  time, right?
6        A   Yes.
7        Q   So they may not have been direct reports, but
8  he was certainly their supervisor?
9        A   Correct.
10       Q   We're on the same --
11       A   Uh-huh.
12       Q   So this sounds to me like a plus on the
13  morale scale that he felt people were confiding with him
14  and working well with him.
15          MS. ARIAIL:  Objection to form.
16  BY MS. DOUGLASS:
17       Q   Is that what you meant to say?
18       A   No.
19       Q   All right.  Start again.  What did he say
20  about how people were relating to him?
21       A   They were confiding to him problems.
22       Q   What problems were they confiding?

0105

1      A    Problems they had working with Jay.  Problems
2  with the programs.  Problems with the pay levels in the
3  region.
4      Q    Well, problems with pay levels in the region
5  we've already talked about.  You tried to solve that by
6  making a recommendation, correct?
7      A    Correct.
8      Q    What about problems with programs, what did
9  he specifically say about that?
10      A    Some of the programs I want to say -- I don't
11  remember which one exactly, maybe health communities,
12  they were coming to an end.  And problems with more what
13  do we do next?  There aren't any new programs coming in.
14  What's going to happen with the staff?  More program
15  issues.
16      Q    That, it seems to me, is not a concern that
17  is specific to Jay Cooper.  No matter who was managing,
18  the program would come to an end when the contract ran
19  out, correct?
20          MS. ARIAIL:  Objection to form.
21  BY MS. DOUGLASS:
22      Q    Correct?

0106

1     A    True.
2     Q    So these programs are limited by the funds
3  that are available under Counterpart's contract with
4  USAID, correct?
5     A    Correct.
6     Q    And it's going to come to an end in June of
7  2006 no matter who's managing; is that right?
8     A    Not necessarily.
9     Q    The big one is.
10     A    The big money may have been extended.
11     Q    So they wanted to know whether it was going
12  to be extended or what their future held?
13     A    Correct.
14     Q    Now, what did Michael Kunz tell you about
15  problems that people reported to him about working with
16  Jay?
17     A    It is hard for me to recall without seeing my
18  notes.
19     Q    All right.  We'll get to your notes.  Let's
20  do it right now.
21          MS. DOUGLASS:  I'd like to have marked -- we
22  would be on 4, right, as the next number.

0107

1          (Boyer Deposition Exhibit Number 4 was marked
2    for identification and attached to the transcript.)
3    BY MS. DOUGLASS:
4        Q    You can spend all the time you want.  I'd
5    just like as a preliminary matter, is what has been
6    marked as Boyer Exhibit 4 a set of notes you made during
7    the time you were in central Asia?
8        A    Yes.
9            MS. DOUGLASS:  Can I ask you what time it is?
10            MS. ARIAIL:  12:15.
11            MS. DOUGLASS:  What do you want to do about
12    lunch?
13            MS. ARIAIL:  Do you have quite a bit more?
14            MS. DOUGLASS:  I do.  I'd like to take a
15    lunch break.
16            (Lunch break taken from 12:17 to 1:14 p.m.)
17    BY MS. DOUGLASS:
18        Q    I have one thing I want to go back to for a
19    second, Ms. Boyer, the location of these secret files
20    after you found them.  And I wrote down you boxed them
21    and put them in a locked cabinet in Almaty.  Is that what
22    you said?

0108

1      A    Or office.
2      Q    Or a locked office?
3      A    Yes.
4      Q    All right.  Can you give me any more
5    specifics about that?  What else was in the cabinet where
6    they were put?
7      A    The other Counterpart-related documents that
8    were removed from Jay's office.
9      Q    So they were mixed in with other business
10   documents?
11     A    Correct.
12     Q    Were they segregated in a file or a box or a
13   sub box?
14     A    No.
15     Q    Were they in identifiable files?
16     A    Yes.
17     Q    What would you look for if you were looking
18   for them?
19     A    The person's name.
20     Q    Files under a person's name?
21     A    Correct.
22     Q    And they were folders like Manila folders?

0109

1    A    Yes.
2    Q    Where we broke off we were talking about your
3 conversations with Michael Kunz about morale problems.
4 Do you remember that?
5    A    Yes.
6    Q    We went through a whole bunch of people and
7 we were at Michael Kunz.  And you said you wanted to see
8 your notes so I put them in front of you.
9    A    Okay.
10         MS. ARIAIL:  Objection.  She didn't say she
11 wanted to see her notes.
12 BY MS. DOUGLASS:
13    Q    All right.  You said that looking at your
14 notes might help you?
15    A    I said I don't recall.  I might have to look
16 at my notes.
17    Q    All right.  Fine.  Sorry.  I didn't mean to
18 misquote you.  I put your notes in front of you and would
19 you identify them.  They're Exhibit 4.  Feel free to look
20 at them.
21    A    Uh-huh.
22    Q    Tell me what you remember about what Michael

0110

1  Kunz said about morale problems using those notes or not
2  as you see fit.
3      A   My notes don't reflect any meetings with
4  Michael, but I do remember several conversations with
5  him.
6      Q   That's fine.  Just tell me what you remember
7  then.
8      A   Just basically what I already mentioned about
9  our meetings with Michael.  Several over the course of
10  the whole time I was there.  With his new role
11  responsibility.  And how staff interacted with him versus
12  how they interacted with Jay.
13     Q   You said these were several meetings?
14     A   Correct.
15     Q   But they aren't in your notes?
16     A   No.
17     Q   Did he have anything specific to say about
18  Jay, specifically how Jay and he interacted?
19     A   They had not interacted very well.  He
20  actually at one time said he was afraid of Jay.
21     Q   By that sentence do you mean he said it at
22  one point in time or at one point in time he was afraid

0111

1  of Jay?

2      A   He said to me he was afraid of Jay.

3      Q   He didn't say that that was something that
4  happened in the past, he said it at the present time he
5  was talking to you he was afraid of Jay?

6      A   Correct.

7      Q   Did he say why?

8      A   Jay has a temper and can get very nasty with
9  people.

10     Q   This is Michael talking?

11     A   Correct.

12     Q   Did anyone else tell you that?

13     A   Yes.

14     Q   Who?

15     A   Bob Abma told me this.  Irina told me this.
16  Marat told me this.  And I witnessed it.

17     Q   When did you witness it?

18     A   In a meeting I had with Jay.

19     Q   In Almaty?

20     A   Correct.

21     Q   Let's go to that.  Tell me about the meeting
22  with Jay.

0112

1    A   I'd say the first meeting I had with Jay out
2  there we were discussing the e-mails he had sent me prior
3  to my trip going out there about him separating from the
4  company and what was my role and he'd like to ask me some
5  questions.  And I sent him my home and cell phone but he
6  never called me.  So we were discussing him leaving the
7  company.  And he exhibited erratic behavior.  He would
8  get upset and then not.
9          But the meeting I'm specifically referencing
10  is when I offered to try to mediate with him and Bob Abma
11  because it was obvious they had issues.  And I went to
12  his office to let him know that we would be meeting with
13  Michael.  And he screamed at me that he would not meet
14  with Michael.  He was not going to any meeting with
15  Michael.  He refused to go to this meeting.  It was just
16  like an instant personality change.
17    Q   Okay.  Was anyone else present to witness
18  that exchange?
19    A   No.
20    Q   I want to ask you a number of questions about
21  this.  Before you had the meeting with Jay about meeting
22  with Abma, you had already met with Abma and discussed

0113

1  Abma's views about Jay; is that right?

2      A   Yes.  And I had also mentioned --

3      Q   That's what I wanted to ask you.  Had you met

4  with Jay to discuss Abma and his relationship with

5  Abma --

6      A   Yes.

7      Q    -- before this conversation?  Okay.  What

8  happened in that earlier conversation?

9      A   With Bob or with Jay?

10     Q    The earlier conversation with Jay when you

11  discussed his feelings about Abma.

12     A    Let me see if this is referenced in my notes

13  at all.  I have in my notes equal treatment of ex-pat.

14  So I think that's when he was talking -- he felt like

15  ex-pats did not all receive the same benefits or packages

16  or whatever type of treatment.  And he talked about --

17     Q   Hold on a minute.  Could you tell me which

18  page you're looking at?

19     A   I am on CP 1457.

20     Q   All right.  Okay.  So Jay said equal

21  treatment -- ex-pats didn't get equal treatment by who?

22     A    Counterpart.

0114

 1      Q    By Counterpart.  All right.  Did that have
 2   anything to do with Bob Abma?
 3      A    Yes.
 4      Q    What?
 5      A    Bob is an ex-pat, so we were talking about
 6   ex-pats in general.
 7      Q    But isn't Jay an ex-pat, too?
 8      A    Yes.
 9      Q    So he was telling you that he didn't think
10   Bob Abma was being treated fairly; is that right?
11      A    No.
12      Q    He thought he was being treated more
13   favorably?
14      A    Correct.
15      Q    Okay.  And did that mean that Jay thought he
16   himself was being treated more favorably?
17      A    No.
18      Q    So this notation, quote, Equal treatment of
19   ex-pats, closed quote, refers to a statement by Jay that
20   Jay thought that Bob Abma, because he was an ex-pat, was
21   being treated more favorably than the natives?
22          MS. ARIAIL:  Objection.  Mischaracterization

0115

1  of testimony.
2         THE WITNESS:  Not because he was an ex-pat,
3  but that ex-pats were not all given the same treatment.
4  BY MS. DOUGLASS:
5      Q   Oh, I see.  Various ex-pats.
6      A   And Bob happens to be an ex-pat.
7      Q   Various ex-pats, between various ex-pats the
8  treatment was not equal?
9      A   Correct.
10     Q   All right.  Now we understand each other.
11 Presumably his view was Abma was being treated more
12 favorably than some other ex-pats.
13        MS. ARIAIL:  Objection to form.
14 BY MS. DOUGLASS:
15     Q   Was that a view expressed to you by Jay
16 Cooper?
17     A   No.
18     Q   Okay.  Then we aren't communicating.  What
19 did Jay Cooper say about ex-pats vis-a-vis Bob Abma?
20     A   We were talking about the different packages
21 such as the allowances that ex-pats receive.  And Jay
22 kept mentioning that all ex-pats did not receive the same

0116

1  packages.  We were also referencing his contract where he
2  had things that other ex-pats don't have.  So we were
3  talking about the equal treatment of ex-pats.  Then we
4  started talking about Bob Abma.
5          They had worked together for I guess about 9
6  years out in the region together.  And he said they had a
7  lot of problems working together.  They didn't see eye to
8  eye.  They didn't work well together.  And he even
9  referenced Bob's sexual orientation and he didn't agree
10  with it.
11      Q    What precisely did he say about the sexual
12  orientation?
13      A    I don't recall the precise language.
14      Q    What was --
15      A    He did reference Bob living with his partner
16  and the type of lifestyle that they led.
17      Q    Whatever he referenced about it, it had a
18  negative tone in some way?
19      A    Correct.
20      Q    Was it the tone of his speech or some words
21  that he used?
22      A    The tone of his speech.

0117

1      Q    Did Jay say anything else about Bob Abma
2   before this boarded meeting that you had set up?
3      A    He did not like that Bob did not directly
4   report to him.
5      Q    Did he say why?
6      A    In the past he had and with several
7   reorganizations Bob was not split direct report between
8   Harry Dorcus and Arlene Lear.  So he didn't have control
9   over what Bob was doing and Bob handled budgets.
10      Q    Did Jay Cooper express any concern about the
11   budgets particularly?
12      A    Not to me, no.
13      Q    Did he to anyone else that you know of?
14      A    Not that I know of.
15      Q    Is there anything else that Jay said about
16   Bob Abma?
17      A    No.
18      Q    So let's get back to the conversation with
19   the screaming if we could.  To set it up, you've already
20   talked to Bob Abma about Jay Cooper and he has said what
21   you've testified.  Then you talked to Jay Cooper about
22   Bob Abma and he said what you've testified.

0118

1          Now, part of your job as a counselor is to
2    somehow bring these people together so they can work
3    together; is that right?
4          A    Correct.
5          Q    And you took steps to try to do that, right?
6          A    Yes.
7          Q    What steps did you take?
8          A    I asked both of them if they would allow me
9    to mediate a meeting between them to try to clear the air
10   of their differences so they could have a better working
11   relationship.
12         Q    And what was Bob Abma's response?
13         A    He said absolutely although I don't think it
14   will accomplish anything.  Willing to try.
15         Q    Okay.  What was Jay's response?
16         A    Jay's response was, sure, I'll try.
17         Q    So you set up a meeting, correct?
18         A    Yes.
19         Q    Why did you set up the meeting in Michael
20   Kunz's office?
21         A    Neutral office.
22         Q    Was your plan to have Michael Kunz present?

0119

1    A   No.
2    Q   He was not going to be present?
3    A   No.
4    Q   Did you tell Jay Cooper that?
5    A   Didn't get a chance to, no.
6    Q   You didn't get a chance because he was
7  screaming?
8    A   Correct.
9    Q   He screamed he would not meet with Michael,
10  correct?
11    A   Correct.
12    Q   He didn't scream he wouldn't meet with
13  Michael and Bob or he wouldn't meet with Michael in
14  Michael's office, he just said I will not meet with
15  Michael; is that right?
16    A   Correct.
17    Q   What did you do next?
18    A   I said, okay, fine.  Then we won't meet.  And
19  I walked out.
20    Q   Well, if he said I won't meet with Michael,
21  seems to me one thing you might have said was --
22        MS. ARIAIL:  Objection to form.

0120

1    BY MS. DOUGLASS:
2        Q    -- we're not meeting with Michael.  Did you
3    say that?
4        A    Not while a person was screaming at me like
5    that, no.
6        Q    So you just said, okay, fine, we won't meet,
7    right?
8        A    Correct.
9        Q    Now, as far as you know, no one overheard him
10   say that to you?
11       A    Not to my knowledge.
12       Q    Abma wasn't there?
13       A    No.
14       Q    Michael wasn't there?
15       A    No.
16       Q    Was Michael in the office at the time this
17   happened?
18       A    Yes.
19       Q    You had made some arrangement for him to
20   leave his office?
21       A    Yes.
22       Q    Where was he supposed to go?

0121

```
 1      A   I don't know.
 2      Q   So you said, okay, fine, we won't meet.  And
 3  then what did you do?
 4      A   I went back to Michael's office to let him
 5  know the meeting would not be held.  Then I let him know
 6  what had taken place.
 7      Q   What happened next?
 8      A   Michael got a little worked up about it.
 9      Q   What did he do?
10      A   He felt that Jay had really committed
11  insubordination and was very disrespectful and rude.  And
12  he let me know I had just witnessed what the people in
13  that office live with on a regular basis, the type of
14  tirades Jay has.  Management by fear is how I might
15  describe it.
16      Q   But this one particular instant is the only
17  time you ever witnessed it; is that right?
18      A   Yes.
19      Q   You went to Michael.  You discussed this with
20  him.  Do you know what, if any, actions he took?
21      A   I don't know.
22      Q   What actions did you take after telling
```

0122

1   Michael about it?

2       A   I let Bob know that the meeting wouldn't be

3   held.  I went back to Jay's office and I apologized to

4   him.

5       Q   For doing what?

6       A   Trying to mediate a meeting.  I found as an

7   HR person sometimes if I go apologize, even though I

8   don't think I've done anything wrong, it might help

9   diffuse the situation.

10      Q   What was his response?

11      A   Jay also apologized back to me.  And he let

12  me know he didn't mean to scream at me the way he did,

13  but there is a lot going on he didn't think the meeting

14  would work anyway.  Then he invited me to lunch.

15      Q   Did you go to lunch?

16      A   No.

17      Q   Did you ever go to lunch with Jay?

18      A   Yes.

19      Q   Was it before or after this event?

20      A   Before.

21      Q   Would you say in the period that you were in

22  Almaty before you went to Bishkek, so the first week you

0123

1   were in Almaty?

2        A    Correct.

3        Q    How many times do you think you spoke

4   one-on-one with Jay?

5        A    Probably three or four times.

6        Q    And once was at a lunch?

7        A    Twice.

8        Q    Two lunches.  Okay.

9        A    Yes.

10        Q    Then, obviously, one was the event you just

11   talked about?

12        A    Yes.

13        Q    Do you remember what the other one was?

14        A    The first time I went with him on the 4th of

15   November where I went to talk to him about the e-mails he

16   sent me about his separating.

17        Q    Is that the first time you met with him?

18        A    Yes.  Let me double-check.  I believe so,

19   yes.

20        Q    Since I'm a visual person, I brought us a

21   visual aid.  (Handing.)  I got that off the Internet.  Do

22   you have any reason to think that --

0124

1          MS. ARIAIL:  I haven't showed it to her yet.
2  I wanted to make sure I don't object to it.
3          Is this for you?
4          MS. DOUGLASS:  No.  They are two different
5  months I hope.
6          MS. ARIAIL:  Oh, two different -- I didn't
7  notice that.
8          MS. DOUGLASS:  They're just to help you
9  remember what event happened on what day of the week.
10  That's the only purpose of the calendar.
11          MS. ARIAIL:  I will just state for the record
12  that because we have no authentication of this -- I'm
13  assuming it's right -- but there's nothing to indicate it
14  is an actual calendar for 2004 just for the record.
15  BY MS. DOUGLASS:
16     Q   Do you remember coming to Kazakhstan on the
17  31st of October?
18     A   Yes.
19     Q   That's a Sunday, correct?
20     A   Yes.
21     Q   So you do remember the 31st being a Sunday?
22     A   Yes.

0125

1      Q    Now, you just testified about a meeting on
2  the 4th of November, which would be a Thursday?
3      A    Correct.
4      Q    Does that match your memory, too?
5      A    Yes.
6      Q    So you had been in the office the 1st, 2nd
7  and 3rd without meeting with Jay yet?
8      A    Meeting, yes.  Speaking, how are you doing --
9      Q    No.  I mean the substantive one-on-one
10  conversation.
11     A    We may have before that, but I really only
12  have documented notes for the 4th.
13     Q    Okay.  So let's get to the 4th then -- which
14  day did the screaming incident happen?
15     A    On the 5th.
16     Q    The next day, Friday?
17     A    Yes.
18     Q    So you said you had two lunches?
19     A    Yes.
20     Q    Which days would those be?
21     A    Probably either the 1st or 2nd and 3rd or the
22  2nd and 3rd.  Earlier in the week.

0126

1    Q   Earlier in the week.  Okay.  So the two
2  lunches within the 1st, 2nd and 3rd.  And then there's
3  the Thursday meeting we talked about and then there's the
4  screaming incident on Friday.
5    A   Correct.
6    Q   All right.  Now I'm going to show you what I
7  hope is a relevant document.  I'll show you what has been
8  previously marked in the Cooper deposition, Exhibit 13.
9         MS. DOUGLASS:  So I want it marked in the
10  Boyer deposition Exhibit 13, please.
11         (Boyer Deposition Exhibit Number 13 was
12  marked for identification and attached to the
13  transcript.)
14  BY MS. DOUGLASS:
15    Q   Now, is what's been marked Boyer Exhibit 13
16  an exchange of e-mails between you and Jay Cooper to
17  which you were referring to earlier?
18    A   Yes.
19    Q   And your testimony is that he did not return
20  your call in response to your e-mails of October 6, 2004
21  giving you various phone numbers; is that right?
22    A   Correct.

0127

1      Q    So when you met with him on the 4th of
2  November, you discussed this subject?
3      A    Yes.
4      Q    Tell me what the discussion was.
5      A    We talked about him leaving the organization.
6  He let me know that Arlene had offered him 6 months of
7  salary.  And he needed clarification on when that 6
8  months started, would it be from the day he left or the
9  day they discussed it.  And I let him know I didn't know
10  they had discussed any type of package.  That's when he
11  showed me the meeting minutes from August when he was in
12  D.C. with Arlene and Barbara Sloan and Michael Kunz.
13      Q    I'm going to show you that just so the record
14  is clear what we're talking about here.  I'm showing you
15  what is in your pile what's marked Plaintiff's Exhibit 12
16  and you identified that as pages 743 and 744 of
17  Plaintiff's Exhibit 12.
18      A    Correct.
19      Q    He had this with him, this section of Exhibit
20  12?
21      A    It was in his e-mails.  He pulled it up from
22  his e-mails.

0128

1      Q   Okay.  What did he say about it?

2      A   He talked about being torn leaving

3  Counterpart, but he felt it was time to move on and that

4  he could not work with the current organizational

5  structure that had been put in place.

6      Q   Did you understand that to be a reference to

7  Mr. Kunz and Mr. Abma?

8      A   Mr. Kunz.

9      Q   All right.

10     A   And I talked to him about staying on, working

11  as a consultant.  He had been with us so many years.  He

12  told me that as long as Michael would be his supervisor,

13  he would not consider becoming a consultant.

14     Q   Did he tell you that he had decided that he

15  wanted to move on?

16     A   Yes.

17     Q   And he was asking what his rights were or

18  what his compensation would be?

19     A   He was asking clarification on the 6 months.

20  Apparently from the notes here they had talked about 6

21  months of salary.  And he needed clarification on when

22  did that start.  And I told him I would check with

0129

```
 1   Arlene.  But from reading the notes that he handed me, it
 2   started back in August.  And he said that was not his
 3   understanding.  So I would check with Arlene to see when
 4   it did start.  It was the first I'd heard about it, so --
 5        Q   Did you check with Arlene?
 6        A   Yes, I did.
 7        Q   You see that reference on page 1457 of Boyer
 8   Exhibit 4 that's circled and says, "No just salary,"
 9   right there?
10        A   That's in reference to the allowances.  That
11   would happen with severance, housing allowance and
12   education allowance.
13        Q   Is "No just salary," something you wrote
14   after talking to Arlene?
15        A   Yes.
16        Q   So you didn't know the answer to that at the
17   time?
18        A   No.
19        Q   Okay.  Did you go and ask Arlene right away
20   right after having this conversation with Jay?
21        A   Yes.
22        Q   Was there anything else said in the meeting
```

0130

1  of October 4th -- November 4th aside from what we've
2  talked about?
3      A    Prior to my conversation with Arlene with the
4  clarification?
5      Q    Before you went to talk to Arlene.  You just
6  had a conversation.  We've discussed what that was.
7      A    Right.
8      Q    Was there anything else in that conversation
9  you haven't told me about?
10     A    Yes.
11     Q    What?
12     A    After I talked with Arlene and got the
13  clarification on the 6 months, Jay was telling me that
14  wasn't his understanding.  And if the 6 months didn't
15  start from the time he decided to leave, then he would
16  just sit and do the basic minimum through the end of his
17  contract and just not do anything because he had a
18  contract and he would stay there to the end of his
19  contract.
20     Q    I want you to be as precise as you can on the
21  words that he used, okay.  Did the words "basic minimum"
22  come from Jay?

0131

```
 1      A   Yes.
 2      Q   This whole thing was premised on if it didn't
 3  start when he decided to leave?
 4      A   Correct.
 5      Q   That was the dependent clause at the
 6  beginning of the statement?
 7      A   Yes.
 8      Q   If it didn't start -- if the 6 months didn't
 9  start when he decided to leave, he was to -- and then
10  tell me exactly what the words were.
11      A   Sit here and do the basic minimum through the
12  end of my contract.  I have an agreement with Counterpart
13  and I'm just going to sit here.
14      Q   What did you say in response to that?
15      A   I let him know that he couldn't just sit and
16  do nothing.  And he said, yes, I can.  I have a contract.
17      Q   Okay.  Is that the end of the conversation?
18      A   Yes.
19      Q   What did you do next?  Here we are on Friday
20  the 4th of November, right?
21          MS. ARIAIL:  Objection.
22  BY MS. DOUGLASS:
```

0132

1      Q    Friday the 5th of November -- sorry.
2    Thursday the 4th of November, correct?  Then what
3    happened?
4      A    I recall going back to Michael and getting
5    Arlene on the phone and letting them know what was
6    transpiring and that Jay was telling me he wasn't going
7    to do anything.  He was just going to sit through the end
8    of his contract and that he would do nothing.  Just do
9    the basic minimum until the end of the contract.
10     Q    What did they say?
11     A    Arlene was saying this was unacceptable.
12     Q    What did Jay say?
13     A    Jay was not present.
14     Q    I thought you said it went back to Michael?
15     A    I went back to Michael.
16     Q    Then you went separately to Arlene?
17     A    Michael and Arlene.  And Kelli had gone.
18          MS. ARIAIL:  You said "Jay" before.
19          MS. DOUGLASS:  Oh, sorry.  I'm tired.
20   BY MS. DOUGLASS:
21     Q    So you went and met with Michael physically
22   with Arlene on the phone and the three of you discussed

0133

1  this, correct?

2      A    Correct.

3      Q    And Arlene said it was unacceptable.  And

4  then what happened next?

5      A    She was asking me should she call Jay, did I

6  think she should call Jay and talk to him directly?  And

7  I told her, no, that's what he wanted her to do.  He did

8  not like having a level of supervision between him and

9  Arlene.

10      Q    So you thought that what Jay wanted was

11  direct conversation with Arlene?

12      A    Correct.

13      Q    And you told her not to play that game

14  basically?

15      A    Correct.

16      Q    So what was decided to be done?  Did she take

17  your advice on that?

18      A    Yes.

19      Q    So she didn't call him.  What happened next?

20      A    I went back to Jay and tried to smooth things

21  over to see if he was really serious about just sitting

22  and not doing anything.  He pretty much made it clear to

0134

 1  me that he was not going to do anything.  If Counterpart
 2  wanted him to leave, Counterpart could fire him.
 3      Q   "Pretty much made it clear to me."  What did
 4  he say that pretty much made it clear to you?
 5      A   He again repeated that he had a contract and
 6  he would just sit in his office through the end of the
 7  contract.
 8      Q   He said that in those words?
 9      A   Yes.
10      Q   Did anybody witness that?
11      A   No.
12      Q   So did you report on that conversation to
13  anyone?
14      A   Arlene Lear and Michael Kunz, yes.
15      Q   Then what happened?
16      A   Arlene was still trying to say maybe I will
17  call him, that is what he wants me to do, I can try to
18  smooth things over.  And then she would change her mind
19  and say, but, no, you're right, that's what's going on.
20  He wants direct contact with me because he knows if he
21  talks to me I'll give in to him.  So she decided not to
22  call him.  And I went back to Jay's office -- I actually

0135

 1  went back and forth between the two offices -- to talk to
 2  him again.
 3         And I told him I felt bad because I was
 4  scheduled to leave on Saturday.  And I felt bad about the
 5  way things were going.  I had talked to Arlene.  And he's
 6  like, well, I'm going to call her.  And I'm like well,
 7  no, you have to go through your chain of supervision and
 8  talk to Michael.  I refuse to talk to Michael.  I'm not
 9  talking to Michael.  So he became heated again.
10     Q   This is still on the 4th?
11     A   Still on the 4th, yes.
12     Q   Okay.
13     A   I went back to Michael's office to let him
14  know that Jay is still heated.  He doesn't want to talk
15  to you.  He wants to talk directly to Arlene.  Then
16  Michael also became heated saying, well, it's a problem
17  if you can't talk to your direct supervisor, he refuses
18  to deal with me.  I went back to Jay's office and Jay was
19  gone.
20     Q   Okay.  And then you did what?
21     A   The next day was Friday.
22     Q   Hopefully you went out to have a drink or

0136

1  something.
2      A   Fortunately, I don't drink.
3      Q   Cranberry juice.  So the next day was Friday.
4      A   Next day was Friday.
5      Q   You were still hopeful of solving the Bob
6  Abma/Jay problem on Friday?
7      A   No.
8      Q   No?
9      A   No.  I'd given up on that.  I didn't see how
10 that was going to happen with Jay refusing to have any
11 type of meeting.
12     Q   Maybe I've got this wrong, but I thought we
13 decided that the screaming conversation happened on
14 Friday the 5th.
15     A   It happened on the 4th, Thursday.
16     Q   The screaming conversation about he and Bob
17 Abma was the same day we were talking about?
18     A   Possibly.  It was either Thursday or Friday.
19     Q   I think earlier --
20     A   Did I say Friday?  Okay.
21     Q   But it seems to me there are two possible
22 screaming events.  One having to do with when the 6

0137

1  months is and one having to do with Bob Abma.  Were they
2  intertwined or were they separate events?
3      A    They were separate events.  The clarification
4  was on the 4th.  So the Bob Abma meeting might have been
5  on the 5th.  It also might have also been on the 4th.
6  They are in that same time frame.
7      Q    All right.  But at the end of the 4th after
8  the whole business about the 6 months, you went back and
9  Jay was gone?
10      A    Correct.
11      Q    What is the next thing you remember
12  happening?
13      A    I remember talking to Jay -- and this had to
14  be that Friday because I was scheduled to leave on
15  Saturday -- telling him I felt bad that I wasn't able to
16  mediate between him and Bob.  I felt bad about the way I
17  was leaving things out in Kazakhstan and I wished there
18  was a way that I could work things out between them.
19  That's when he said I wish you could.  I wish there was a
20  way you could stay and we could work this out.  And I let
21  him know that I could call back and get permission from
22  Harry and Arlene to stay if that's what he really wanted.

0138

```
 1      Q   Uh-huh.
 2      A   And he said he did.  I went and called
 3  Arlene, discussed everything with her.  She said
 4  absolutely stay if you need to stay.  If you think it
 5  will help, stay.  We got Harry on the phone, let him know
 6  that I was going to continue out there a little longer.
 7  He said if it is okay with Arlene it is okay with me.
 8      Q   All right.  Now, you were supposedly doing an
 9  HR audit of both the Almaty office and the Bishkek
10  office, right?
11      A   No, just the Almaty office.
12      Q   So you weren't planning to go to Bishkek?
13      A   No.
14      Q   It was a one-week trip that you had planned?
15      A   Yes.
16      Q   Had you been told that Jay had a series of
17  meetings set up in Bishkek the following week?
18      A   Yes.
19      Q   And Michael knew that too, didn't he?
20      A   Yes.
21      Q   Did you ask him to cancel those?
22      A   No.
```

0139

1    Q    Did Michael ask him to cancel those?

2    A    I don't know.

3    Q    Arlene didn't talk to him, right?

4    A    No, she did not.

5    Q    So nobody knew what had been done about these

6    meetings.  Did you assume they had been cancelled?

7    A    No.

8    Q    All right.  What happened next?

9    A    I talked to Bob since he had helped plan my

10   travel.  And he had Igor and Andre extend my plane

11   tickets and extend my hotel reservations so that I could

12   stay a few more days.  I let Jay know that I was going to

13   stay on.  He said, great, can we meet Monday morning?

14   Q    When was this conversation?

15   A    I said absolutely.  This was on Friday.

16   Q    And he said great --

17   A    Yes.

18   Q    -- when can we meet?

19   A    No.  He said let's meet Monday morning.

20   Q    Is anybody present during that comment?

21   A    No.

22   Q    What did you do over the weekend?

0140

1      A   I spent one day with Kuralai sightseeing,
2   Michael Kunz's wife.  And the next day Bob and his
3   partner Igor took me sightseeing and to lunch.
4      Q   You should give her the spelling of Michael
5   Kunz's wife because it's not a name I know.
6      A   K-U-R-A-L-A-I.
7      Q   Did you give any consideration to spending
8   some time with Jay Cooper?
9      A   No.
10     Q   Did you make any inquiry about whether Jay
11   Cooper was around?
12     A   No.
13     Q   I gather Jay Cooper wasn't your favorite
14   person at the moment?
15          MS. ARIAIL:  Objection to form.
16          THE WITNESS:  No feeling whatsoever.
17   BY MS. DOUGLASS:
18     Q   You weren't angry with him for having yelled
19   at you?
20     A   No.
21     Q   You felt as supportive of Jay Cooper as you
22   did of Bob and Michael at this point in time?

0141

1    A   Yes.

2    Q   All right.  What happens next?

3    A   I spent the week in Almaty.  Talked several

4  times to Arlene over the weekend who called just to make

5  sure I was okay in Almaty over the weekend.  Make sure,

6  you know, I wasn't holed up in my hotel room I guess.

7         Monday morning I come into the office and

8  talked to the staff for a while and realized Jay hasn't

9  come in yet.  And so I start asking where he is and

10  nobody knew where he was.

11    Q   Nobody on his staff knew that he had all

12  these meetings in Bishkek?

13    A   The meetings were scheduled for Tuesday and

14  Wednesday.

15    Q   Do I remember from someplace that Monday was

16  a holiday in Bishkek?

17         MS. ARIAIL:  Objection to form.

18  BY MS. DOUGLASS:

19    Q   Did you ever learn that?

20    A   I do recall hearing that I think Monday was a

21  holiday in Bishkek.

22    Q   Did you look into that when you couldn't find

0142

1  him, where he was or someone told you that?
2      A   No.
3      Q   Somehow you knew that or thought you knew
4  that?
5      A   No, I remember it coming up in conversation
6  because we were all in Almaty.
7      Q   It wasn't a holiday in Almaty?
8      A   No.
9      Q   So nobody knew where he was.  How was that
10  resolved?
11      A   I don't remember who was able to track him
12  down and found out that he had already gone to Bishkek.
13  I don't remember from who that he went to Bishkek over
14  the weekend.
15      Q   What happened next?
16      A   I called Arlene to let her know that I was
17  there in the office that Monday and Jay had already gone
18  over to Bishkek.  She said I thought you all had a
19  meeting scheduled for Monday.  I'm like I did, too.  She
20  said, well, then follow him to Bishkek.  "Follow him,"
21  were her words.
22           And I said, well, I don't have a visa for

0143

1   Kyrgyzstan.  And she said, tell them to get you one.  Go
2   to Bishkek.  So that Tuesday or the rest of Monday and I
3   think part of Tuesday was spent getting the travel
4   documents so I could travel over to Bishkek.
5        Q   Did you fly?
6        A   Drove.
7        Q   What happened when you arrived in Bishkek?
8        A   There was a meeting going on of the Civil
9   Society Division.  So Irina and I walked around, met the
10  staff.  And I decided to take the time while they were
11  meeting to perform the same type of audit on the files
12  that I had done on the Almaty office.
13       Q   Is any of that -- interviews with the staff
14  in Bishkek in your notes?
15       A   No.
16       Q   Irina went with you to Bishkek in the car?
17       A   Yes.
18       Q   Did she drive?
19       A   No.
20       Q   Why did she go with you?
21       A   She was the HR person for that region.
22       Q   So she was going to help you do whatever you

0144

1  were going to do with Jay and Michael?  Was she involved

2  in your attempts to mediate the Jay/Michael/Bob Abma

3  thing?

4          MS. ARIAIL:  Objection to form and objection

5  to two questions at once.

6  BY MS. DOUGLASS:

7      Q    Why was she along?

8      A    As the HR person for the central Asia region,

9  she accompanied me over to another office in the region.

10     Q    Had she been involved in the events we've

11  spent the last hour or so discussing of the previous

12  week --

13     A    No.

14     Q    -- where your attempts to feel out Michael

15  about Jay and Jay about Michael and Bob about Michael

16  about Bob about Jay and everybody about everybody in

17  order to try to help the situation?  Was she involved at

18  all?

19          MS. ARIAIL:  Objection to form.

20          THE WITNESS:  No.

21  BY MS. DOUGLASS:

22     Q    Okay.  Thank you.  Did you discuss with her

0145

1  what events had taken place?

2      A    No.

3      Q    So the only persons you discussed it with

4  were Arlene Lear and Michael Kunz, right?

5      A    Correct.

6      Q    What's the next thing that happened in

7  Bishkek?

8      A    I had a chance to go through the employee

9  files in Bishkek and the salary information.  I did

10  discover there were discrepancies between the salary

11  levels of the two offices.  Talked with some of the

12  staff.  Got a different sense of the atmosphere and the

13  environment and morale of the staff.  I was able to

14  confirm that it was a much happier environment in the

15  Bishkek office.  I met with Jay later in the day.

16      Q    Are we now on Tuesday the 9th of November?

17      A    Either Tuesday or -- no.  No, no.

18          MS. ARIAIL:  Objection.

19          MS. DOUGLASS:  What's the objection?

20          MS. ARIAIL:  You said the 9th and I think you

21  meant to say the 2nd.  Am I wrong?

22          MS. DOUGLASS:  No.  This week she was in

 1  Almaty.  She went to Bishkek here.  That was a holiday.
 2  BY MS. DOUGLASS:
 3      Q  Isn't that where we are?
 4      A  Yes.  Either -- it was the 9th, yes.
 5      Q  So the 9th of November you meet with Jay,
 6  right?
 7      A  Yes.
 8      Q  Tell me what happened.
 9      A  I asked him why, you know, I thought we were
10  meeting but you went to Bishkek early.  So maybe I was
11  confused.  He never addressed that.  And I let him know
12  that I had talked with Arlene about his separation
13  package and was he really serious about just sitting
14  around and not doing anything.  And he said absolutely.
15  And if Counterpart has a problem with it, they can fire
16  me.  And I stressed to him, please, don't let it come to
17  that.
18      Q  How long was this conversation?
19      A  Maybe about half an hour.
20      Q  Where did it take place?
21      A  In Erkin's office.
22      Q  Was Erkin present?

0147

1    A    No.

2    Q    Was anybody else present?

3    A    No.

4    Q    You said, I hope it doesn't come to that?

5    A    Yes.

6    Q    Then what happened?

7    A    He said he didn't care.  He had put in a lot

8    of years with Counterpart and he wasn't going to be

9    pushed out.  And he would again sit around and just do

10   the basic minimum until the end of his contract.

11    Q    He used the words "basic minimum" again?

12    A    Yes.

13    Q    How many times in all these conversations did

14   he use the words basic minimum?

15    A    Several.

16    Q    Several times?

17    A    Yes.

18    Q    The same phrase?

19    A    Yes.

20    Q    Okay.  So then what happened next?

21    A    Went back to my hotel.  Called Arlene.  Let

22   her know about the conversation.  She said let her talk

0148

1  to Harry and she would give me a call back because she
2  asked me did I feel like the situation could be salvaged
3  and I told her I did not think so.
4      Q    What is the next thing that happened?
5      A    I think the next thing we were in the Bishkek
6  office about half a day.  I met with Jay again.
7      Q    We're on the 10th of November?
8      A    We're on the 10th of November, yes.
9      Q    You met with Jay again on the 10th.  What
10 happened in that meeting?
11     A    Again I was trying to get him to reconsider
12 his decision.  And he said, no, he wasn't going to do
13 anything.  Let Counterpart fire him.  They're going to
14 have to fire me.
15     Q    Did he use the phrase "bare minimum" again?
16     A    No.
17     Q    Did anybody overhear that conversation?
18     A    No.
19     Q    What's the next thing that happened?
20     A    Irina and I went back to Almaty.  I talked to
21 Arlene that night I believe.  Also talked with Michael on
22 the way back.  They were going --

0149

1    Q    In the car?

2    A    In the car, yes.  I had a cell phone.

3    Q    Cell phone?

4    A    Yes.

5    Q    What was your conversation with Arlene?

6    A    Just letting her know that I didn't think the

7  situation could be salvaged.  That it had gone too far

8  for them to say -- for Jay to stay a part of Counterpart.

9    Q    Okay.  You talked to Michael on the way back

10  on the cell phone.  What was that conversation?

11    A    He was letting me know he was waiting for me

12  in the office so, that, you know, I could brief him on

13  what happened.  I remember telling him no, go home,

14  because I didn't want him to wait for me.  It was his

15  son's first birthday.  I wanted him to go home and be

16  with his family.  I would talk with him in the office the

17  next day.  And I think Arlene and Harry and I spoke on

18  the phone that night I believe.  I'm not sure about the

19  date.

20    Q    The 10th?

21    A    I believe so.  I believe.  I'm not totally

22  sure.  Just again to recap what had happened over the

0150

1  past day or two.
2        On the 11th, there was a conference call set
3  up.  But we weren't aware of it because the network was
4  down in Almaty.  So Jay and I did not receive the message
5  in central Asia that we needed to be on conference call.
6      Q    What was the subject of the conference call
7  if you know?
8      A    That was the conference call where they were
9  going to terminate Jay.
10      Q    Who told you that?
11      A    That they were going to terminate or that
12  there was a conference call?
13      Q    Both.
14      A    I received a phone call in the Almaty office
15  that they had been waiting on Jay and I to join the
16  conference call.
17      Q    And this is the 11th?
18      A    I believe this was the 11th, yes.  And I
19  said, I don't know what you're talking about.  The
20  network has been down.  We can't access e-mail.  We had
21  sent you an e-mail with the dial-in information.  I
22  hadn't received it because the network was down.

0151

1    Q    And Jay was in Bishkek?

2    A    I don't know where Jay was.

3    Q    But he wasn't with you?

4    A    He was not with me.  I did not see Jay again

5 after the 10th.

6    Q    Okay.  So we're going to get to what happened

7 next, but just let me -- you gave your recommendation

8 that the situation could not be salvaged, right?

9    A    Yes.

10    Q    Somebody decided terminating Jay was the

11 right thing to do, correct?

12    A    Somebody did.

13    Q    Do you know who that was?

14    A    I don't.

15    Q    You weren't involved in any discussion about

16 whether that was right to do anymore than what we've

17 talked about, correct?

18    A    No.

19    Q    No, it's not correct?

20    A    No, I was not involved in any other

21 conversations.

22    Q    Okay.  So that's all you know about it.

0152

1   Okay.
2           Now, I want to go back.  The next thing that
3   happens is that there is a meeting announcing Jay's
4   termination and Jay is terminated on the phone; is that
5   right?
6       A   A meeting, no.
7       Q   Isn't there a meeting in the office at Almaty
8   to announce that Jay is gone?
9       A   A meeting with?
10      Q   The staff at Almaty?
11      A   Not while I was in Almaty, no.
12      Q   You never were present in the office in
13  Almaty at 9:15 in the morning on the 12th of November?
14      A   I was in the Almaty office on the 12th of
15  November.  I can't recall the time.
16      Q   But in the morning?
17      A   Yes.
18      Q   You were present on the conference call in
19  which Jay was terminated, correct?
20      A   Yes.
21      Q   What time of day was that?
22      A   It was mid-morning.

0153

1    Q    Were you present in the office for some
2    period of time before the conference call?
3    A    Yes.
4    Q    Did you hear an announcement by Michael Kunz
5    about Jay no longer being with the company?
6    A    No.
7    Q    Where were you present in the office?
8    A    I was set up at one of the work stations with
9    my computer.
10    Q    Was that an open office?
11    A    Yes.
12    Q    So far as far you know no meeting went on?
13    A    No.
14        MS. ARIAIL:  Objection.  Asked and answered.
15    She has answered the question.
16    BY MS. DOUGLASS:
17    Q    So you were in open office area and the whole
18    rest of the staff were around you, correct?
19    A    Yes.
20    Q    And no meeting took place.  Now --
21        MS. ARIAIL:  Pat, how many times does she
22    have to say --

0154

1          MS. DOUGLASS:  Just stop.  Will you just
2  stop.
3          MS. ARIAIL:  It's harassment.
4          MS. DOUGLASS:  It is not harassment.
5  BY MS. DOUGLASS:
6      Q    How did the staff in Almaty know that Jay was
7  fired, if you know?
8      A    There was a meeting held, an announcement
9  made.
10     Q    When was that?
11     A    Either the 15th or 16th.
12     Q    That would be the Monday or Tuesday of the
13  next week?
14     A    Correct.
15     Q    Were you present for those?
16     A    No.
17     Q    How do you know that there was a meeting held
18  or an announcement made?
19     A    I don't.
20     Q    Someone told you that?
21     A    Yes.
22     Q    Who told you that?

0155

1      A    Probably Michael Kunz.
2      Q    What time do you think you got to the office
3  in Almaty on the morning of the 12th of November?
4      A    Probably around 8:30 a.m.
5      Q    And you were not absent any period of time
6  between then and noon?
7      A    No.
8      Q    Did you speak with anybody from the company
9  during that time?
10     A    Several people in the office, yes.
11     Q    Who did you speak with?
12     A    Just the general staff in the office.
13     Q    Michael Kunz?
14     A    Yes.
15     Q    Abma?
16     A    Yes.
17     Q    Irina?
18     A    Yes.
19     Q    I'm going to go back a little bit when we
20  launched off on our -- we were talking about various
21  people in the Almaty office that told you about morale
22  problems tied to Jay Cooper.  And we got through Marat,

0156

1  Irina, Bob and Michael previously all right.  I'd like to

2  go back to morale and ask you to tell me -- and this is

3  in your first week in Almaty -- what Igor -- Dupitson

4  (phonetic)?

5      A    Possibly.  I'm not sure of the last names.

6      Q    Give me a job title of one of the Igors.

7      A    Driver.

8      Q    Okay.  Igor driver.  What did Igor driver

9  tell you about the morale problems and Jay Cooper?

10     A    Not a whole lot.  It was more so that he

11  liked better working for Michael.

12     Q    Did he say why?

13     A    No.

14     Q    Did he say anything about Jay?

15     A    Not much.  His English wasn't very good.

16     Q    Who was the other Igor?  What does he do?

17     A    I do not recall his position.

18     Q    All right.  We can call him the non-driver

19  Igor.  Will you know who I'm talking about?

20     A    I'm sorry his name is not Igor.  It is Andre.

21  Andre not Igor.

22     Q    What is his position?

0157

1      A   He was the backup driver and I almost want to
2  say office administrator if I had to give it a title.
3      Q   What did he have to say about morale in the
4  office and Jay Cooper?
5      A   He did sort of complain to me that he did a
6  lot of personal errands for Jay such as paying his phone
7  bill and supervising work at Jay's house.
8      Q   And he objected to that?
9      A   Yes.
10     Q   Anything else that he said that was relevant
11 to this?
12     A   Not that I recall.
13     Q   You mentioned the receptionist?
14     A   I don't remember her name.
15     Q   That's all right.  We'll call her the
16 receptionist.  We can probably figure it out.  What did
17 she say about Jay and about morale?
18     A   That he was difficult to work with and she
19 really enjoyed having Michael around.
20     Q   Did she say difficult in what way?
21     A   No.  Her English wasn't very good either.
22     Q   Yana?

0158

1    A    Yes.

2    Q    Yana, what did Yana say about morale?

3    A    I'm looking at CP 1459.

4    Q    And that is just for the record Boyer Exhibit

5  4.

6        A    She talked about how the salaries were low in

7  Almaty.  She said Jay's management style made her better

8  because of his forcefulness.  I'm trying to read my own

9  handwriting.  And structure made her try to improve her

10  language, her English language skills.  That's what I

11  have in parentheses.  He has more problem with program

12  styles.  He needs a deputy to explain the program issues.

13  So she was saying he doesn't really communicate well what

14  he wants.

15        And she was talking about how when he

16  approached the accountants about the program budgets and

17  everything he would pretty much yell at them.  And that

18  Michael -- when we referenced that -- that Michael was a

19  nice person.  He doesn't push or he's not too demanding.

20  So we were talking about the difference in the management

21  styles.

22        That was all I had written that I really

0159

```
 1   recall.  But she said she'd been there for 7 years and
 2   she liked it better.  They were direct -- Yana and Julia
 3   were now direct reports to Bob and she really enjoyed
 4   working with Bob more.
 5        Q   Do you see on page 1459 of Boyer Exhibit 4
 6   there at the bottom it says, "Lance - very helpful"?
 7        A   Yes.
 8        Q   Who is Lance?
 9        A   Lance was the senior staff accountant in the
10   Washington, D.C. office.
11        Q   Did you know him?
12        A   Yes.
13        Q   Does he still work for Counterpart, do you
14   know?
15        A   No.
16        Q   When did he leave?
17        A   It might have been early fall of '04.
18        Q   What is his last name?
19        A   Brenner.
20        Q   Do you know where he went?
21        A   I do not know.
22        Q   Did he leave under favorable circumstances?
```

0160

1    A    Yes.

2    Q    Resigned?

3    A    Yes.

4    Q    All right.  Now, the other person we had was

5  Julia.

6    A    Julia.

7    Q    Did she say anything different?

8    A    Not really.  Just that she really liked

9  working under Bob more than she did under Jay.  Didn't

10  have a real in depth conversation with Julia.

11    Q    These conversations about morale and people's

12  various criticisms of Jay we've talked about, these all

13  were collected in the week starting that first of

14  November when you were in Almaty, right?

15    A    Not all of them.

16    Q    Did some of them happen after you got back

17  from Bishkek?

18    A    Some of them might have happened on the 8th

19  yes.  But none really after I got back from Bishkek.

20    Q    The 8th you were already in Bishkek, right?

21    A    No.  I was in Almaty on the 8th.

22    Q    That's right.  Okay.  So you might have had

0161

1  some on the 8th, but none happened after you came back
2  from Bishkek, right?
3      A   No.
4      Q   All right.  Now, we talked about in your
5  conversations with the staff we talked about morale.
6  Now, how many people and who made the comment that Jay
7  was inaccessible?
8          MS. ARIAIL:  Objection.  Compound question.
9  BY MS. DOUGLASS:
10     Q   Did anyone on the staff comment to you that
11  Jay was inaccessible and kept his door closed?
12     A   Yes.
13     Q   Who?
14     A   I'm not exactly sure who said that, but it
15  was said to me.
16     Q   Okay.  And you witnessed the door being
17  closed about half the time you were there, right?
18     A   Yes.
19     Q   And you reported that fact to Arlene Lear?
20     A   Yes.
21     Q   Who told you that Jay's management style was
22  controlling?

0162

1       A    I don't recall exactly who told me that.
2       Q    But you reported that to Arlene Lear,
3  correct?
4       A    Yes.
5       Q    Who told you that Jay intimidated the staff?
6       A    Irina and Marat.
7       Q    I believe we've already had discussions on
8  the substance of those comments?
9       A    Yes.
10      Q    Who told you that Jay did not support his
11  staff in developing their goals to better themselves?
12      A    I don't recall saying that.
13      Q    Nobody, okay.  Who told you that Jay lacked
14  leadership ability?
15      A    Several employees.
16      Q    Who?
17      A    Bob Abma, Marat.  Julia might have mentioned
18  it.
19      Q    And you reported that back to Arlene Lear,
20  correct?
21      A    Correct.
22      Q    During the times that you met with Jay

0163

1  Cooper, I believe two lunches and two other instances
2  that we discussed, what, if anything, did he say about
3  his problems with working with Michael Kunz?
4        A    That he didn't like Michael's management
5  style and he didn't feel Michael was the right person to
6  lead them in that region.
7        Q    Did he say why?
8        A    Because he'd been in the region for ten years
9  and he had better established relationships.
10       Q    Anything else?
11       A    Not that I recall.
12       Q    Did he speak to you about Michael's temper?
13       A    Yes.
14       Q    What did he say about that?
15       A    He said what he did have a temper.
16       Q    Did he give you any examples?
17       A    No.
18       Q    Did he say anything about Michael's treatment
19  of the staff?
20       A    No.
21       Q    What did Jay say about Bob Abma?
22       A    In what context?

0164

1      Q    In any of the meetings you had with him, did
2    he express any difficulties he had with Bob Abma?
3      A    Several times.
4      Q    What did he say about it?
5      A    They had different management styles.  He
6    didn't like not having control over Bob.  He wasn't sure
7    what he was always doing.  And more often wanted to
8    reference Bob's sexual orientation.
9      Q    Did he discuss problems he had with various
10   budget adjustments Bob was proposing to make?
11     A    No.
12     Q    Did he ever tell you that he objected to
13   various transfers that Bob was making of funds from the
14   project that Jay managed into other uses?
15     A    No.
16     Q    Did he show you documents in which he
17   objected to such budget transfers?
18     A    No.
19     Q    Did that subject ever come up in your
20   discussions with Abma or Michael Kunz?
21     A    Not to my knowledge, no.
22     Q    Did Jay make any reference to financial

0165

1  irregularities and accounting issues at the office during
2  these discussions with you?
3       A   He mentioned to me that I think some
4  headquarters people charged his programs in the field.
5  But that was pretty much about it.
6       Q   Did you look into that?
7       A   No.
8       Q   Why?
9       A   I don't do budgets and accounts.
10      Q   When somebody leaves the employment of
11 Counterpart and is given a settlement separation
12 agreement, are you involved in that process?
13      A   Yes.
14      Q   Do you know whether or not those settlement
15 dollars are charged to particular programs?
16      A   I don't know where they are charged.
17      Q   Who does know that?
18      A   Probably the best person to ask would be
19 Harry Dorcus.
20      Q   Are there any other financial irregularities
21 that you remember Jay bringing up to you?
22      A   Not that I remember, no.

0166

1      Q   Do you remember him asking you what
2  protection he would have if he brought financial
3  irregularities to the attention of the inspector general
4  of the department of USAID?
5      A   No.
6      Q   Do you know what Counterpart's policy as to
7  whistle blower protection is?
8      A   Yes.
9      Q   What is it?
10     A   We have a whistle blower policy.
11     Q   What is it?
12     A   That protects any person who makes any type
13  of report of any allegations or improprieties, financial
14  or any other reason, that they are protected and their
15  statements can be kept confidential and they will not be
16  retaliated against.
17     Q   Is that protection included in the manual?
18     A   It was an amendment added to the manual.
19     Q   When was it added?
20     A   Either I want to say spring or summer of '04
21  maybe. I'm not sure of the exact date.
22     Q   I would like to show you what has been

0167

1    previously marked Plaintiff's Exhibit 39 to the
2    deposition of the corporation.
3        A    Okay.
4        Q    Tell me what Exhibit 39 is please.
5        A    SMT notes of October 12, 2004.
6        Q    Is this a document you received at about the
7    time it was written?
8        A    Possibly.
9        Q    Were you on the SMT as of October 12, 2004?
10       A    Yes.
11       Q    Do you remember attending the meeting that is
12   referenced in these minutes?
13       A    I'm not listed as an attendee, so it is
14   possible I was not there.
15       Q    If you were not there, would you have still
16   been sent the minutes?
17       A    Yes.
18       Q    Would you look on page 268, please.
19   "Clarification of whistle blower policy."
20       A    Uh-huh.
21       Q    It talks about strengthening the whistle
22   blower policy.  Was the whistle blower policy, whatever

0168

1  it was, strengthened after October 14, 2004?

2      A   Yes.

3      Q   How soon thereafter?

4      A   I'm not sure of the exact time frame.

5      Q   Was it strengthened to include the ability of

6  an employee to go to the board?

7      A   In the event that there was a whistle blower

8  claim against the CEO or the HR manager, yes.

9      Q   So am I correct that as of October 14, 2004

10 there was some whistle blower policy in place?

11     A   Yes.

12     Q   Can you find that in Exhibit 7, which is in

13 front of you?

14     A   It is not going to be in this document.  It

15 was added as an amendment.

16     Q   And you believe it was added before

17 October --

18     A   Yes.

19     Q   -- of 2004.  Okay.

20     A   Excuse me.  Can we take a bathroom break?

21     Q   Absolutely.

22         (A break was taken.)

0169

1  BY MS. DOUGLASS:

2      Q   Ms. Boyer, at some point in time were you

3  asked to draft a letter to Jay Cooper terminating his

4  employment?

5      A   Yes.

6      Q   When were you asked to do that?

7      A   After the conference call.

8      Q   So the conference call preceded the letter,

9  right?

10     A   Correct.

11     Q   Okay.  Now, I'd like you to look at your

12  notes which are Exhibit 4 on page 1461.  Are those notes

13  of a phone call with Arlene Lear?

14     A   No.

15     Q   Are 1 and 2 some -- what are they?

16     A   These are the notes that I made basically to

17  myself saying what needed to be done after the

18  termination, so the steps that we would need to follow

19  after we informed Jay that he was terminated.

20     Q   And you wrote that before the phone call that

21  terminated him?

22     A   I might have written it during the phone

0170

1  call.
2      Q   Who is Joseph Lute?
3      A   Joseph Luke --
4      Q   Luke.
5      A   -- was an employee within the Chap division
6  who worked out of the Almaty office.  We had several
7  divisions in one office at one point.  He was the final
8  employee there.  His contract or all his programs had
9  ended.  So he was still in the region.  He is married.
10  His family is there.  So he is still in the region.  And
11  there was consideration of maybe being able to bring him
12  back in into some type of role.
13     Q   Was he brought in, do you know?
14     A   No, he was not.
15     Q   All right.  About three-quarters of the way
16  down the page I believe it says, "Letter from Harry
17  Dorcus."  Does that say Numatt?
18     A   Marat.
19     Q   "Marat and Bob only"?
20     A   Uh-huh.
21     Q   "Request to remove Jay Cooper."  What does
22  that mean?

0171

```
1      A    Bank accounts.
2      Q    From the bank account signature?
3      A    Correct.
4      Q    All right.  There's reference right above
5   that to a message to the Almaty office regarding Jay
6   Cooper.  What does what mean?
7      A    What would we say to the office in Almaty to
8   explain his departure.
9      Q    Were you given the job of determining that?
10     A    No.
11     Q    Who was?
12     A    I believe that was handled between Arlene and
13  Michael.
14     Q    Now, you were asked to be on the telephone
15  conference call when Jay was terminated; is that right?
16     A    Yes.
17     Q    Who asked you to?
18     A    We received a memo, so I believe it was
19  either Arlene or Harry.  Probably both.
20     Q    What did the memo say?
21     A    Announcing that there was a conference call.
22     Q    Was that an e-mail?
```

0172

1        A    It was an e-mail.  The server was down, so we
2    really didn't get it.  So we received a call from the
3    office saying we're waiting for you to join our
4    conference call.
5        Q    And this was on Friday morning November 12th?
6        A    It might have been Thursday or Friday.
7        Q    But the call was on Friday, correct?
8        A    Actually, no.  The call was on Thursday.  I
9    do believe the call was on Thursday.
10        Q    What's your basis for being so sure about
11    that?
12            MS. ARIAIL:  Objection.  You can answer.
13            THE WITNESS:  I remember spending the very
14    next business day trying to contact Jay to ask him to
15    come by the office and he will collect his personal
16    items.
17    BY MS. DOUGLASS:
18        Q    What were the results of those efforts?
19        A    I was never able to reach him.  I left
20    messages on his cell phone, his apartment in Bishkek and
21    his home in Almaty.  And Jay did not call me back.
22        Q    When was Jay's office locked?

0173

1    A    I believe the 13th.
2    Q    Who ordered the office locked?
3    A    Arlene.
4    Q    Did you make a recommendation about that?
5    A    Yes.
6    Q    What was your recommendation?
7    A    That because I was not able to contact Jay to
8    come pick up his personal belongings that we lock the
9    office so no one else could have access to that office
10   until he was able to come in and get his items.
11   Q    Was the office simply locked or was the lock
12   changed?
13   A    The lock was added.
14   Q    And when was the lock added?
15   A    I believe the 13th.
16   Q    Was the office closed while this happened?
17   A    No.
18   Q    The staff was able to come into the office
19   that weekend, the 13th, 14th?
20   A    The staff did not come in.  The servers were
21   down so they would not have been able to do any work.
22   The office was also under renovation so all of the

0174

1  contractors were in over the weekend.
2      Q    What were the renovations that were taking
3  place?
4      A    I assume they were making upgrades to the
5  whole office complex.  It had been under renovation the
6  whole time I was there, changing the floor structure,
7  putting walls up, taking cubicles down.  So there was a
8  lot of renovation and construction the whole time I was
9  there.
10     Q    The whole two weeks you were there?
11     A    Yes.
12     Q    So the construction was a physical
13  construction of the office space, not anything having to
14  do with the IT system?
15     A    No.  Physical.
16     Q    Physical space?
17     A    Physical space.
18     Q    Why did the construction cause the IT system
19  to go down?
20     A    I believe it was something with moving the
21  offices.  They had to actually take the network down to
22  move the IT department because of all the construction.

0175

1  Everybody was switching to a new location.
2      Q    Who told you about this?
3      A    I believe it was Bob Abma.
4      Q    There's been some statements by Counterpart
5  that it was Counterpart's policy to lock out senior
6  executives who were terminated from their offices and
7  that that policy was applied to certain other people.
8  Are you aware of other people who were locked out of
9  their office after termination?
10     A    Was that policy?
11     Q    Yes.
12     A    No.
13     Q    Was not policy?
14     A    No.
15     Q    Are you aware of anyone else who was locked
16  out of his office after termination?
17     A    Yes.
18     Q    Who?
19     A    Brian Propp.
20     Q    Why was he locked out of his office?
21     A    To make sure that when he is there cleaning
22  out his office there is another person present.

0176

1    Q    And the reason for that is what?
2    A    To make sure the only items that are being
3    removed are personal items.
4    Q    Wasn't Brian Propp allowed to work in his
5    office for a substantial period of time?
6    A    No.
7    Q    Not true?
8    A    No.
9    Q    If he says that he is lying?
10   A    Correct.
11   Q    Who else do you know that was treated in a
12   similar way?
13   A    Can you restate the question?
14   Q    Sure.  I wasn't trying to --
15   A    I had two different things in my head.
16   Q    Do you know anybody else who was locked out
17   of their office after termination?
18   A    Physical office or electronic office?
19   Q    Let's take physical office.
20   A    No.
21   Q    What about Greg Touma?
22   A    I was not employed by Counterpart when Greg

0177

1   was there.
2        Q    Did you have anything to do with Brian
3   Propp's termination?
4        A    Yes.
5        Q    An interrogatory answer here says that one of
6   the reasons he was terminated was for violation of
7   Counterpart's code of conduct.  Do you know what that
8   refers to?
9        A    No.
10       Q    Do you know why he was terminated?
11       A    Yes.
12       Q    Why?
13       A    Several reasons.
14       Q    Including?
15       A    Performance-related reasons.
16       Q    But nothing to do with the code of conduct?
17       A    No.
18       Q    Was there any suggestion that Brian Propp was
19   dishonest?
20       A    Yes.
21       Q    What was the suggestion?
22       A    That he was dishonest.

0178

1     Q    Sorry.  Was there any fear that Brian Propp
2  would abscond with Counterpart property?
3     A    Yes.
4     Q    What kind of property was the focus of the
5  fear?
6     A    Any Counterpart files, program-related files.
7     Q    So you were worried about not him stealing
8  paintings off the wall but somehow information that
9  belonged to Counterpart; is that fair?
10     A    Counterpart proprietary information.
11     Q    Proprietary information.  What was the basis
12  of that fear, do you know?
13     A    I have that fear with all employees.
14     Q    Did you have that fear with Jay Cooper?
15     A    Yes.
16     Q    What were you afraid he would steal?
17     A    Any Counterpart proprietary information.
18     Q    So is that one of the reasons why you say
19  that Counterpart has a policy of locking offices?
20          MS. ARIAIL:  Objection.  Mischaracterization
21  of testimony.
22          THE WITNESS:  We don't have a policy.

0179

1  BY MS. DOUGLASS:
2      Q    You don't have a policy.  I'm sorry you did
3  say that.  Sorry.  Is that one of the reasons why on
4  occasion, as you've testified, Counterpart does, in fact,
5  lock offices when people are terminated?
6          MS. ARIAIL:  Objection.  Mischaracterizes
7  testimony.
8  BY MS. DOUGLASS:
9      Q    Isn't that what you said?
10     A    Yes.
11     Q    Yes, they have on occasion locked offices,
12  correct?
13     A    Yes.
14     Q    And that's because of what you just said,
15  your fear of somebody taking proprietary information?
16     A    Correct.
17     Q    How do you decide which employees are likely
18  to do that and which are not?
19     A    It varies based on the termination.
20     Q    Based on the circumstances that gave rise to
21  the termination maybe?
22     A    Correct.

0180

1      Q    What circumstances that gave rise to Jay
2  Cooper's termination would lend you to think that he
3  might abscond with Counterpart's proprietary information?
4      A    The fact that we were not able to terminate
5  him in person and that he had physical access to the
6  building after hours when no one else would be present.
7      Q    Why would being able to terminate him in
8  person be relevant?
9      A    Because we could escort him out of the
10  facility if we needed to or if a Counterpart
11  representative could be present while he packed up his
12  belongings.
13      Q    So since you couldn't reach him that first
14  day, you changed the -- let's see if I've got this
15  right -- you changed the locks.  Then the next day you
16  and Mr. Abma went in and packed up the personal
17  belongings and separated them from the Counterpart
18  belongings, correct?
19      A    No.
20      Q    I thought that's what you said.
21      A    The same day.
22      Q    The same day.

0181

1     A    The locks were changed and the office was
2  packed on the same day.
3     Q    The 13th?
4     A    Correct.
5     Q    Did your interest in finding out whether or
6  not Mr. Cooper, in fact, had secret files play a role in
7  deciding how you would handle his possessions?
8     A    I wasn't interested in finding out if he had
9  secret files.
10     Q    Was anyone else interested in that?
11     A    I don't know.
12     Q    Was it ever expressed to you that Mr. Kunz
13  was interested in that?
14     A    No.
15     Q    Let's have you look at what has previously
16  been marked as Plaintiff's Exhibit 15 in the corporate
17  deposition.
18     A    Okay.
19     Q    Have you seen Exhibit 15 before?
20     A    Yes.
21     Q    When did you see it?
22     A    During document collection for this process.

0182

1      Q    Do I assume correctly that you had not seen
2  it at the time Mr. Cooper was fired?
3      A    That is correct.
4          MS. ARIAIL:  Objection to form.
5  BY MS. DOUGLASS:
6      Q    Does it appear to you that everything written
7  on Exhibit 15 was, in fact, said during that telephone
8  conversation at which Mr. Cooper was fired?
9      A    As much as I can recall, yes.
10     Q    Do you remember Mr. Cooper objecting to any
11  of the facts that are contained in any of the statements
12  in Plaintiff's Exhibit 15?
13     A    Yes.
14     Q    What did he object to?
15     A    All of it.
16     Q    How long did this telephone conversation take
17  place?
18     A    About 45 minutes maybe.
19     Q    And you were on the line.  Let's see if I've
20  got the attendees correct.  Ms. Lear from Washington,
21  correct?
22     A    Correct.

0183

1     Q   Mr. Dorcus from Washington?
2     A   Correct.
3     Q   You from Almaty?
4     A   Yes.
5     Q   Barbara Sloan from someplace in the United
6  States?
7     A   Yes.
8     Q   Anybody else -- Jay?
9     A   Jay.
10     Q   From Bishkek?
11     A   I'm assuming that's where he was, yes.
12     Q   Anybody else?
13     A   No.
14     Q   Were most of the things in Exhibit 15 said by
15  Ms. Lear?
16     A   Yes.
17     Q   Can you pick out anything that's on Exhibit
18  15 that was said by someone other than Ms. Lear?
19     A   Yes.  The part about the legal obligations,
20  what was explained.
21     Q   So we're talking about page 739?
22     A   Where it says, "Harry would you please

0184

1  explain our legal obligations."

2      Q    So Harry said everything from there to the

3  end?

4      A    No.  Harry just explained our legal

5  obligations.  Maybe I misunderstood the question.

6      Q    That's all right.  Would that go from "Harry

7  would you please" down through "potential disruption,"

8  the part that Mr. Dorcus said?

9      A    I'm sorry I don't see it.

10      Q    Number 3 paragraph number 3.

11      A    No.  That was said by Ms. Lear.  I'm sorry.

12  Nothing written on this was said by anyone other than

13  Ms. Lear.

14      Q    So Harry said something about the legal

15  obligations which is not included in Exhibit 15?

16      A    Correct.

17      Q    All right.  And what did he say about that?

18      A    Just explained what was in Jay's contract,

19  the termination clauses.  And then Ms. Lear continued on

20  with what was the rest of this document.

21      Q    Did you say anything during the call?

22      A    No.

0185

1     Q   Did Ms. Sloan say anything during the call?

2     A   No.

3     Q   So the only people speaking were Mr. Dorcus,

4  Ms. Lear and Mr. Cooper?

5     A   Correct.

6     Q   And you said Mr. Cooper objected to

7  practically everything in there?

8     A   Yes.

9     Q   Can you tell me with specificity the

10 particular things he objected to?

11    A   Uh-huh.  Page 00738, the first clear bullet,

12 the refusal to meet with me on Monday.  He stated that he

13 never asked me to stay.  The next bullet he said that he

14 never talked to me at all about separation.  He said that

15 nobody there was afraid of him.  And I remember him

16 saying that he, before he ended the call, that he was

17 going to contact an attorney.

18    Q   Did Ms. Lear say anything about a win/win

19 situation during this call?

20    A   Possibly.  I don't recall her exact words.

21    Q   So after this call did you prepare the

22 document I am showing you which has been previously

0186

 1    marked Plaintiff's Exhibit 31?

 2         A    Yes.

 3         Q    Did you prepare it the date that is on it,

 4    the 12th of November?

 5         A    Yes.

 6         Q    This announces a termination effective

 7    November 12th.  But you testified that the phone call

 8    terminating was November 11th.  Is there any reason why

 9    this is a difference?

10         A    I think I testified that it was either the

11    11th or the 12th.  But, yes, they are pretty much in the

12    same time frame.

13         Q    So if Mr. Cooper believes that the

14    termination call was on the 12th, would you challenge

15    that?

16         A    No.

17         Q    All right.  You say on page 87 of Exhibit 31

18    I have packed your personal belongings.  And you hadn't,

19    correct?

20         A    No, I had not.

21         Q    Why did you say that you had?

22         A    At the time this letter was going to get to

0187

1  him it would have been -- they would have been packed by
2  that time.
3      Q   How was the letter going to get to him?
4      A   By messenger.
5      Q   What was anticipated to be the time frame to
6  have that happen?
7      A   If he had not contacted anyone or called
8  anyone back probably within a two to three day time
9  period.  I can't be one hundred percent sure.
10     Q   Well --
11     A   Because the 12th was a Friday, so...
12     Q   And you planned to pack it on the 13th,
13 correct?
14     A   Yes.
15     Q   Now, Exhibit 31, provides that outstanding
16 expense reports are to be submitted to you in Washington,
17 correct?
18     A   Correct.
19     Q   You were assigned the job of being sure that
20 Mr. Cooper was paid his outstanding expenses?
21     A   Yes.
22     Q   And that it is Counterpart's policy to pay

0188

1  such outstanding expenses in the event of a termination,

2  correct?

3      A    Correct.

4      Q    Were you also assigned the job of drafting a

5  settlement agreement to be sent along with Exhibit 31?

6      A    No.

7      Q    Was a settlement agreement/waiver sent along

8  with Exhibit 31?

9      A    Yes.

10     Q    Did you send it personally?

11     A    I believe it was sent along with this letter.

12  So I did attach -- there were two I believe.

13     Q    There were two different agreements?

14     A    I believe so, yes.  I'm sorry.  There were

15  two copies of the agreement.

16         (Boyer Deposition Exhibit Number 5 was marked

17  for identification and attached to the transcript.)

18  BY MS. DOUGLASS:

19     Q    I have marked as Exhibit 5 a multi-page

20  document bearing Bates stamp 80 to 85 entitled,

21  "Agreement/Waiver" and ask if you can identify that.

22     A    This looks familiar, yes.

0189

1      Q    Did you have what's -- it looks familiar as
2  the attachment to your Exhibit 31 that you sent to
3  Mr. Cooper?
4      A    Yes.
5      Q    Did you have Boyer Exhibit 5 in hand when you
6  drafted Plaintiff's Exhibit 31?
7      A    Yes.
8      Q    Because the dates here match the dates in
9  Exhibit 5, correct?
10     A    I don't recall what was Exhibit 5.
11     Q    Exhibit 5 is the agreement.
12     A    Okay.  Yes.
13     Q    Who decided, if you know, when, assuming
14  Mr. Cooper signed Exhibit 5, when his salary payments
15  would extend to?
16     A    Ms. Lear.
17     Q    Do you know what considerations went into the
18  date that she picked?
19     A    The 6-month period from the meeting they had
20  back in August.
21     Q    It is your understanding, is it not, that his
22  payment of extended salary for the 6-month period would

0190

1   only be provided to Mr. Cooper if he signed the agreement
2   waiver which is Boyer Exhibit 5, correct?
3       A   Yes.
4       Q   So his getting that payment was made
5   conditional on a number of things that are set forth in
6   Exhibit 5, correct?
7       A   Correct.
8       Q   I'd like you to look on Boyer Exhibit 4 for a
9   minute which is your notes and specifically pages 1466 to
10  the end of the exhibit.  Are these pages in your
11  handwriting?
12      A   No.
13      Q   Whose handwriting is it?
14      A   Bob Abma's.
15      Q   Do you know what these calculations are?
16      A   These are calculations of salary plus
17  allowances that Jay would get based on however he
18  decided, you know, he decided would be the termination
19  day.
20      Q   Okay.  So put another way, these are
21  basically scenarios that you were considering between or
22  someone was?

0191

1    A    Yes.
2    Q    Was this prepared for Ms. Lear as far as you
3  know?
4    A    I don't recall.
5    Q    So in effect this really shouldn't be
6  attached to your notes because it is not yours?
7    A    Right, these are not my notes.
8    Q    So I made a bad exhibit.
9        MS. ARIAIL:  That was all produced to us as
10  one document.
11        MS. DOUGLASS:  Okay.  I just want it to be
12  clear.
13  BY MS. DOUGLASS:
14    Q    Let's clarify what Exhibit 4 is.  Exhibit 4
15  pages 1452 through 1465 are your notes?
16    A    Correct.
17    Q    And the rest of it is not.  Okay.  Have you
18  ever seen the remaining pages of what's been marked
19  Exhibit 4, 1466 through 69 before you became involved in
20  discovery in this case?
21    A    Yes.
22    Q    You had seen it --

0192

1      A    Before discovery.

2      Q    Before we became involved.  In other words at

3    the time of the termination, did you see these pages?

4      A    Yes.

5      Q    So they were circulated for people to think

6    about?

7           MS. ARIAIL:  Objection.

8    BY MS. DOUGLASS:

9      Q    Were they circulated for people to think

10   about?

11     A    Prepared.

12     Q    Prepared.  They were prepared and they went

13   to some people, including you?

14     A    Yes.

15     Q    Which of the scenarios set forth in 1466 to

16   1469 is the one that was actually offered to Mr. Cooper

17   if he would waive his rights to everything?

18          MS. ARIAIL:  Objection.  Assuming facts not

19   in evidence.

20   BY MS. DOUGLASS:

21     Q    Let me amend that question.  Which of the

22   scenarios on page 1466 to 1469 were offered to Mr. Cooper

0193

1   if he would sign Plaintiff's Exhibit 5 and waive the
2   matters waived therein?
3           MS. ARIAIL:  Objection.  Assuming facts not
4   in evidence.
5           THE WITNESS:  I'm sorry, am I answering the
6   question?
7   BY MS. DOUGLASS:
8       Q    Yes.
9       A    None of them.
10      Q    None of them.  All right.  If you look on
11  Boyer Exhibit 5 for a minute, up at the top of page 81 it
12  talks about consulting status.  Were you involved in any
13  discussion or consideration of offering Mr. Cooper a
14  consulting arrangement with Counterpart?
15      A    Yes.
16      Q    With whom did you discuss that subject?
17      A    With Mr. Cooper as well as Ms. Lear and
18  Mr. Dorcus.
19      Q    When did you discuss it with Mr. Cooper?
20      A    November 4th.
21      Q    Is that reflected on your notes for that
22  date?

0194

1    A   Yes.
2    Q   Page 1457 of Boyer Exhibit 4 appears to say,
3  "Consulting not option with Michael as supervisor."
4        Is that what it says?
5    A   Correct.
6    Q   So you discussed whether -- does this mean
7  that you discussed with Mr. Cooper whether he wanted to
8  be a consultant and he said, no, as long as Michael was
9  going to be the supervisor?
10   A   Correct.
11   Q   Then given that he had said that to you, how
12  does the reference to consulting status appear in Boyer
13  Exhibit 5?
14   A   Because at the time we knew Mr. Cooper was
15  going through a divorce and a custody hearing.  To allow
16  him to be able to stay in the country and not be employed
17  by us, we would draft up a consulting agreement that said
18  he was still working with us so he could still remain in
19  the country.
20   Q   Was this done after a conversation with him
21  where he agreed with that?
22   A   No.

0195

1      Q    This was somebody's idea of a way to help
2  him?
3      A    Yes.
4      Q    Whose idea was it?
5      A    Ms. Lear's.
6      Q    Was it contemplated at the time that Boyer
7  Exhibit 5 was prepared that Mr. Cooper would actually be
8  used as an consultant?
9      A    No.
10     Q    Boyer Exhibit 5 also talks about on page 80
11  in paragraph 2(a)(3), "CPI, Counterpart, may provide
12  Mr. Cooper with an internet/e-mail access and a voice
13  mailbox." Were those facilities in fact provided?
14     A    No.
15     Q    In fact, wasn't Mr. Cooper's e-mail shut off
16  on the 12th of November?
17     A    Yes.
18     Q    And based on Boyer Exhibit 5 and Plaintiff's
19  Exhibit 31 wasn't he given until December 6th, 2004 to
20  decide whether or not to accept the terms of Boyer
21  Exhibit 5?
22     A    Yes.

0196

1    Q    But in the meantime he was to have no e-mail?

2    A    Correct.

3    Q    Is that a Counterpart policy with respect to

4  employees that are terminated?

5    A    Yes.  It is a practice, not a policy.

6    Q    Was there any discussion in which you were

7  part with Ms. Lear, Mr. Dorcus, Mr. Kunz or anyone else

8  concerning what should be said to persons within and

9  without the company concerning the reasons for

10  Mr. Cooper's departure?

11    A    Yes.

12    Q    Tell me what you can about that, please.

13    A    I think I have notes about that.  Yes, I was

14  involved in a conversation about what type of message we

15  would put out to the office, who should send out a

16  message saying that Jay was no longer with us.  And it

17  was decided that that should come from Arlene Lear.

18    Q    Who made that decision?

19    A    Harry Dorcus I believe.

20    Q    Did Ms. Lear subsequently put out an

21  announcement?

22    A    Yes, she did.

0197

1      Q   Is that the first anyone knew that Mr. Cooper
2  was no longer with Counterpart?
3           MS. ARIAIL:  Objection.  You can answer if
4  you know.
5           THE WITNESS:  Anyone other than the people
6  involved in the termination?
7  BY MS. DOUGLASS:
8      Q   Yes.
9      A   Other than the Almaty office, yes.
10     Q   What was decided about -- we've seen an
11  e-mail that came out from Ms. Lear.  Are you familiar
12  with what I'm talking about?
13     A   Yes.
14     Q   Is that what you are talking about was the
15  announcement from her?
16     A   Yes.
17     Q   What was told to the people in the Almaty
18  office to your understanding?
19     A   I was not there when they were told.  But it
20  was my understanding that they were just told that Jay
21  was no longer with us.  I don't know if a reason was
22  given.

0198

```
 1    Q    Who told you that that's what was said?
 2    A    I believe Michael Kunz.
 3    Q    Did he say that he made that announcement?
 4    A    I believe so, yes.
 5    Q    Did you ever hear from any source at all that
 6  it was announced that Jay had made some mistakes?
 7    A    No.
 8    Q    Did you ever hear from any source that it was
 9  announced that if anyone wanted to know the particulars
10  they should meet privately with Michael Kunz?
11    A    No.
12    Q    Was it ever told to you that the members of
13  the Almaty staff as well as the staff of other
14  Counterpart offices in central Asia were told that
15  Mr. Cooper was not allowed to enter the office?
16    A    Yes.
17    Q    Who told you that that was said?
18    A    Possibly Michael Kunz.
19    Q    Was there a letter written that translated
20  into Russian given to everyone in the office at Almaty
21  about Mr. Cooper's status?
22    A    I don't know.
```

0199

1     Q   You've never been told that?
2     A   No.
3     Q   Now, you mentioned earlier this morning I
4  believe that you had a conversation with Barbara Sloan
5  during the time that you were in Almaty about Mr. Cooper.
6     A   Yes.
7     Q   Can you remember that now?
8     A   Yes.
9     Q   Would you tell us what about that
10 conversation, the circumstances under which it occurred
11 and the substance of that conversation.
12     A   It was over the weekend I believe after the
13 termination had occurred.  And she was concerned about
14 maybe personal liability because she had facilitated the
15 meeting.
16     Q   Concerned with personal liability for what?
17     A   Jay was talking about getting a lawyer and
18 suing everyone and she was concerned that possibly she
19 could be sued separately from Counterpart acting as a
20 facilitator of the meeting in August.
21     Q   Did she say why she was bringing this to your
22 attention?

0200

1        A   I think she just wanted to get a feel for

2    maybe what I thought or if he had said anything that

3    directly mentioned her.

4        Q   What did you tell her?

5        A   I told her that she had not really been

6    mentioned at any meeting and that he only mentioned her

7    as the facilitator for the meeting that had happened back

8    in August.  And that possibly we should call her to get

9    clarification on that 6-month issue when it first came up

10   my first week out there.

11       Q   Did Jay suggest you might call her?

12       A   Not that I might call her.  That maybe

13   someone should call Barbara.

14       Q   Do you know whether anybody did?

15       A   I don't know.  I believe Ms. Lear did.

16       Q   Do you have any idea why Barbara Sloan was

17   included on the conference call in which Jay was

18   terminated?

19       A   I believe because she had been the

20   facilitator of the original meeting where they decided

21   that he would leave if they found that Jay and Michael

22   could not work together.  And also I believe it was more

0201

1  for support for Ms. Lear.
2      Q    Why did Ms. Lear need support?
3      A    She was very emotional about the decision.
4      Q    Do you know why?
5      A    She had a 10-year working relationship as
6  well as what she felt to be I guess a personal
7  relationship with Jay.  And she was very emotional about
8  having to let him go.
9      Q    Now, we've talked about the fact that you
10  were deputized to deal with Jay's attempts to be
11  reimbursed for his expenses, correct?
12      A    I don't know if I'd use the phrase deputized.
13      Q    Okay.  Assigned the task of?
14      A    Yes.
15          MS. DOUGLASS:  I'd like to have marked -- I
16  don't think we can use 6.  So let's got to 16.
17          (Boyer Deposition Exhibit Number 16 was
18  marked for identification and attached to the
19  transcript.)
20  BY MS. DOUGLASS:
21      Q    Can you tell me what Exhibit 16 is, please?
22      A    It appears to be e-mail traffic.  Original

0202

 1   message from Jay to me copy to Harry and a reply from
 2   Harry to Jay.
 3        Q    The original message is dated November 24th,
 4   correct?
 5        A    Yes.
 6        Q    And he asks for reimbursement of an
 7   expenditure to account for the fare for Yazgylych to
 8   attend a conference in Bulgaria for $200.86, correct?
 9        A    That's what it appears, yes.
10        Q    And also his travel to Bishkek starting
11   Sunday, October 31st to Saturday November 6th, correct?
12        A    Would that be for him or Yazgylych?
13        Q    I believe that was for him.
14        A    Because he was in the Almaty office with me
15   during those days.
16        Q    Well, I don't know.  That's a good question.
17   I don't know the answer to that.  Did you look at this
18   request for reimbursement?
19        A    Possibly.  But this doesn't look like an
20   original e-mail to me.
21        Q    A lot of these are not -- have been forwarded
22   and sanitized.  Because, for example, they were sent to

0203

1  lawyers for use in the deposition process.  I have no
2  reason that the substance of this is not accurate.  But
3  it looks strange to you?
4      A   It looks very strange, yes.
5      Q   You do not remember getting that request for
6  reimbursement?
7      A   I do remember getting this and I remember
8  replying to this.
9      Q   All right.  Well, I'm going to show you
10  everything I have that constitutes having to do with
11  this, okay.  But what we see at the top half of Exhibit
12  16 is a response to Jay from Harry Dorcus saying that
13  they are going to pay it, correct?
14      A   That's what it appears to me.
15      Q   Do you know whether this was ever paid?
16      A   I do not know.
17      Q   I'd like you to look at another exhibit which
18  would be 17.
19          (Boyer Deposition Exhibit Number 17 was
20  marked for identification and attached to the
21  transcript.)
22          MS. ARIAIL:  Can you clarify what the Bates

0204

1  stamp numbers are on those?  My copy isn't clear.  It

2  looks like 3148 and 3149.

3          MS. DOUGLASS:  That's what it looks like.  Do

4  you have that envelope that I gave you?

5          MS. ARIAIL:  Back in my office.

6          MS. DOUGLASS:  I believe this original is in

7  there.  I will look to see what I have at home.  If you

8  want to remind me of that I'll find out.  I think it is

9  3448.  It's really bad.

10          MS. ARIAIL:  So for the record I'd just like

11  to say this is the first time counsel has seen this

12  document prior to this morning.

13          MS. DOUGLASS:  That's right.  I think that's

14  one of the few that I sent.

15          MS. ARIAIL:  All right.

16  BY MS. DOUGLASS:

17      Q   Ms. Boyer, have you seen what's been marked

18  Exhibit 17?  And it appears to be three e-mails; is that

19  correct?

20      A   Yes.

21      Q   The bottom one is the same as the bottom

22  e-mail as Exhibit 16, correct?

0205

 1     A   Yes.
 2     Q   The middle one dated December 1, 2004 is a
 3  response to Jay from you to his November 24 e-mail; is
 4  that right?
 5     A   Yes.
 6     Q   Saying that you were going to -- asking to
 7  submit his receipt and saying you were going to inquire?
 8     A   Yes.
 9         MS. ARIAIL:  Can we go off the record for a
10  second?
11         (Discussion held off the record.)
12         MS. ARIAIL:  For the record I want to state
13  that Boyer Exhibit 17 which appears to be an e-mail chain
14  which is presented as an e-mail chain containing three
15  e-mails includes e-mails that are chronologically out of
16  date suggesting in fact that it has been cut and pasted
17  and it is not a chain.  Plaintiff's counsel indicates she
18  doesn't know if that is the case, but I just want that on
19  the record.
20  BY MS. DOUGLASS:
21     Q   Do you remember sending Mr. Cooper an answer
22  to an e-mail he wrote on November 24 requesting

0206

1  reimbursement?

2      A   Yes.

3      Q   Does the text in the middle of Boyer Exhibit

4  17 appear to be what you wrote to him?

5      A   Yes.

6      Q   Do you remember receiving an e-mail at any

7  time from Mr. Cooper that contains the substance of the

8  text of the e-mail at the top of page 3448 of Boyer

9  Exhibit 17?

10      A   Yes.

11      Q   Let's look at another document.

12          MS. ARIAIL:  Can we go off the record again?

13          (Discussion held off the record.)

14          MS. DOUGLASS:  I'd like to mark as Exhibit 18

15  another set of three e-mails.

16          (Boyer Deposition Exhibit Number 18 was

17  marked for identification and attached to the

18  transcript.)

19  BY MS. DOUGLASS:

20      Q   Have you had a chance to look at Boyer

21  Exhibit 18?

22      A   Yes.

0207

1      Q    The first e-mail is one we haven't seen
2  before, correct?
3      A    I've seen this before.
4      Q    I mean in this deposition.  The second two
5  e-mails are the same as has appeared in the last two
6  documents, in other words, Jay's request for
7  reimbursement and your answer, correct?
8      A    Correct.
9      Q    Linked in the same chain is an e-mail from
10  Jay to you dated December 2nd asking for payment that was
11  due before termination.  Did you receive that e-mail from
12  Jay Cooper?
13      A    It looks familiar, yes.
14      Q    Do you remember ever replying?
15      A    It looks like my reply from Exhibit 17 is the
16  reply to that e-mail, which makes me feel that this is a
17  doctored document.
18          MS. ARIAIL:  I'm going to state another
19  objection that there is nothing establishing that this is
20  an e-mail chain.  In fact the text of the document
21  suggests, in fact, that it is not a chain and that it was
22  put together.  Any additional exhibits that come in

0208

1  raising these questions I will instruct my client not to
2  answer regarding the document.
3       MS. DOUGLASS:  What makes you think it was
4  not an e-mail chain?  This one it seems to me is.
5       MS. ARIAIL:  Pat, it is her testimony.  She
6  just testified she thinks the e-mail is from another
7  supposed chain in response not to one here.
8       MS. DOUGLASS:  I'm going to ask her about
9  that.
10 BY MS. DOUGLASS:
11      Q    Look at Exhibit 17, Ms. Boyer.  Your answer,
12  which is in the middle of the first page of Exhibit 17 is
13  dated December 1.
14      A    Uh-huh.
15      Q    How could that be an answer to his e-mail of
16  December 2?
17      A    Because my response is that I have not
18  received information regarding outstanding payments nor
19  monthly draws.  He is asking me about money that was owed
20  to him before his termination.
21      Q    Right.
22      A    So those would have been outstanding

0209

1  payments.
2     Q   Right.
3     A   And I knew at that time Bob was on vacation I
4  would inquire with Yana.  He's referencing Julia, but I
5  think Yana was handling everything in Bob's absence.  So
6  it looks like the answer I gave him on the 1st would have
7  applied to that, which makes me leery of these documents,
8  the dates on these documents.  Because he asked for an
9  accounting and I responded from this e-mail I don't have
10  any information from it.  I hadn't received anything.
11     Q   All right.
12        (Boyer Deposition Exhibit Number 19 was
13  marked for identification and attached to the
14  transcript.)
15  BY MS. DOUGLASS:
16     Q   Do you remember receiving the e-mail that is
17  at top of the page of Boyer Exhibit 19 dated December
18  2nd?
19     A   I don't actually remember ever seeing this
20  one.
21     Q   You don't remember this one.  All right.  Do
22  you know whether or not any payments were ever made to

0210

1   Mr. Cooper to reimburse him for expenses that he covered
2   before his termination?
3        A    I don't know.
4        Q    Who was in charge of that?
5        A    I was in charge of getting -- facilitating
6   all the paperwork coming in and turning it over to
7   accounting which I never received.
8        Q    You never received the paperwork back from
9   accounting?
10       A    From Jay.
11       Q    From Jay?
12       A    Correct.
13       Q    Did you ever make inquiry at the office --
14  obviously, you said you made inquiry of the office in
15  Almaty.  Did you ever get an answer from them?
16       A    Yes, I did.
17       Q    What was the answer you got?
18       A    That there were outstanding payments that
19  they felt were owed to him from trips he had taken.
20       Q    There were.  Okay.  And do you know if that
21  money was ever transferred to him?
22       A    I do not know.

0211

1      Q   Who would have had the authority to decide to
2  do that?
3      A   If all the receipts and expense reports had
4  been turned in, I could have done it or Bob could have
5  done it or Harry could have authorized the payment.
6      Q   But is it your understanding that the
7  receipts hadn't been turned in?
8      A   That is my understanding, yes.
9      Q   He is saying that he turned in receipts
10  before he was fired that were never paid.  Is that not
11  true in your opinion?
12      A   I don't know if he did or not.
13      Q   Did the Almaty accounting office tell you
14  whether he had or not?
15      A   They said he had not because they would have
16  forwarded everything to me for payment.
17      Q   So they claim they had no receipts?
18      A   Correct.
19      Q   And that would be Julia?
20      A   Julia.  Looks like Julia on paper, yes.
21      Q   Tell me the circumstances under which you
22  left the employ of Counterpart.

0212

1    A    I resigned.

2    Q    What were the reasons for that?

3    A    Mainly personal reasons.

4    Q    Did it have anything to do with Jay Cooper?

5    A    No.

6    Q    Was it an amicable resignation?

7    A    Absolutely, yes.

8    Q    You weren't locked out of any office?

9    A    No.

10    Q    That's all I have.  Thank you very much.

11         MS. ARIAIL:  I don't have anything.

12         (The deposition was concluded at 3:34 p.m.

13  and signature was reserved.)

14

15

16

17

18

19

20

21

22

0213

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4
5          I, Kelli Boyer, do hereby acknowledge that I
6  have read and examined the foregoing testimony, and the
7  same is a true, correct and complete transcription of the
8  testimony given by me and any corrections appear on the
9  attached Errata sheet signed by me.
10
11
12
13  DATE                SIGNATURE
14
15
16
17
18
19
20
21
22

0214

1      CERTIFICATE OF NOTARY PUBLIC

2

3          I, T. R. Hollister, the officer before whom the

4   foregoing deposition was taken, do hereby certify that

5   the witness whose testimony appears in the foregoing

6   deposition was duly sworn by me; that the testimony of

7   said witness was taken by me in stenotype and thereafter

8   reduced to typewriting under my direction; that said

9   deposition is a true record of the testimony given by

10  said witness; that I am neither counsel for, related to,

11  nor employed by any of the parties to the action in which

12  this deposition was taken; and, further, that I am not a

13  relative or employee of any attorney or counsel employed

14  by the parties hereto, nor financially or otherwise

15  interested in the outcome of the action.

16

17      _____

18          Notary Public in and for

19          the Commonwealth of Virginia

20          My Commission Expires: August 31, 2007

21

22

0215

```
 1          E R R A T A  S H E E T
 2    IN RE: JAY W. COOPER versus COUNTERPART INTERNATIONAL
 3    RETURN BY: _____
 4    PAGE/LINE      CHANGE      CORRECTION AND REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20
21
22    SIGNATURE OF WITNESS          Date
```

0216

```
1            E R R A T A  S H E E T
2  IN RE: JAY W. COOPER versus COUNTERPART INTERNATIONAL
3  RETURN BY: _____
4  PAGE/LINE     CHANGE     CORRECTION AND REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20
21
22  SIGNATURE OF WITNESS          Date
```