1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - x

4    JAY W. COOPER,              :

5       Plaintiff              :

6    v.                 : No. 1:05cv1598 (RMC)

7    COUNTERPART INTERNATIONAL,   :

8       Defendant              :

9    - - - - - - - - - - - - - - x

10

11        Telephone Deposition of BRIAN PROPP

12               Washington, D.C.

13            Wednesday, September 6, 2006

14                 4:00 p.m.

15

16

17

18

19

20   Job No.: 2-84620

21   Pages 1 through 36

22   Reported by:  Marilyn Feldman, RPR

2

1          Telephone deposition of BRIAN PROPP, held at

2    the offices of:

3

4

5          L.A.D. REPORTING COMPANY, INC.

6          Suite 850

7          1100 Connecticut Avenue, NW

8          Washington, D.C. 20036

9          (202) 861-3410

10

11

12       Pursuant to agreement, before Marilyn Feldman,

13    Registered Professional Reporter and Notary Public

14    in and for the District of Columbia.

15

16

17

18

19

20

21

22

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3       PATRICIA D. DOUGLASS, ESQUIRE
 4       LAW OFFICE OF PATRICIA D. DOUGLASS
 5       98 Interpromontory Road
 6       Great Falls, VA  22066-3219
 7       703.759.3586
 8
 9    ON BEHALF OF DEFENDANT:
10       KARA M. ARIAIL, ESQUIRE
11       JACKSON LEWIS LLP
12       8614 Westwood Center Drive
13       Suite 950
14       Vienna, VA  22182
15       703.821.2189
16
17
18
19
20
21
22
```

4

1               C O N T E N T S
2   EXAMINATION OF BRIAN PROPP               PAGE
3     By Ms. Douglass              5
4
5
6   No exhibits marked.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

5

1          P R O C E E D I N G S
2          MS. DOUGLASS:  This is Pat Douglass, I'm
3    representing Jay Cooper in the matter of Cooper
4    versus Counterpart.  This deposition is being
5    conducted by telephone.  The witness, Brian Propp,
6    is located in Colorado and I would like to have an
7    understanding that the court reporter who will swear
8    him in is in the District of Columbia, and I believe
9    we agreed the deposition may proceed on that basis,
10   having understood that the court reporter and Mr.
11   Propp are not in the same location.
12          MS. ARIAIL:  Yes, we stipulate to that,
13   and again I'll just issue the objection I issued
14   last time on the ground of federal rule civil
15   procedure 30(b)(7).
16          MS. DOUGLASS:  Please swear in the
17   witness.
18                  BRIAN PROPP
19   having been duly sworn, testified as follows:
20          EXAMINATION BY COUNSEL FOR PLAINTIFF
21   BY MS. DOUGLASS:
22      Q    Would you please give your complete name

6

1  with its spelling.

2      A    Brian Propp, Brian Richard Propp, and I

3  spelled it already before we started.

4      Q    All right.  P-r-o-p-p, correct?

5      A    Yes.

6      Q    Were you once employed by Counterpart

7  International?

8      A    Yes, I was.

9      Q    For how long were you so employed?

10     A    Approximately three months short of 10

11  years.

12     Q    What was your final position that you held

13  there?

14     A    Vice president and general director of the

15  Community and Humanitarian Assistance Division.

16     Q    Had you been employed before your

17  employment with Counterpart in development work?

18     A    No.  I had been in the telecommunications

19  industry and in the transportation industry.  My

20  specialization was logistics.

21     Q    How long had you held the position of vice

22  president and general director of the Community

1    Humanitarian Division?
2        A    I was general director for four years and
3    vice president for three years.
4        Q    In that position, where was your office
5    within Counterpart?
6        A    During the last four years I was there, my
7    office was in the northeast corner of the
8    headquarters building on the 11th floor.  That was
9    at 18th and M in Washington, D.C.
10       Q    Do you know who had been in that office
11   before you were assigned it?
12       A    Yes.  That was Greg Touma's office, the
13   person I replaced.
14       Q    When you assumed the position of vice
15   president and general director of the Community and
16   Humanitarian Division, had Mr. Touma been gone for
17   long?
18       A    No.  He had just left the organization the
19   previous month.
20       Q    Do you know whether anyone occupied the
21   office that you later occupied between Mr. Touma's
22   presence there and yours?

1     A     Nobody did.

2     Q     How do you know that?

3     A     Because I was there.  He left at the end

4  of December and I started there the first of

5  January.

6     Q     What year is that, please?

7     A     Let me see.  I hired on January 1, 1995

8  and spent six years in the field.  So that would

9  be -- it would have been January 1, 2001.

10     Q     At the time you took over the office that

11  had previously been Mr. Touma's, was there a lock on

12  the door?

13     A     No, there was not.

14     Q     Was there the ability to lock the office

15  by way of a keyhole in the doorknob?

16     A     No, there was not.  The door handles were

17  the angular type but not a knob, a handle type.

18  There were no locks or keyholes in those handles at

19  all.

20     Q     Were there any signs that there had been a

21  deadbolt or other kind of lock attached to the door

22  at sometime in the past?

1     A     No, never, no sign of that.

2     Q     Did you ever discuss with Mr. Touma the

3  circumstances surrounding his termination of

4  employment with Counterpart?

5     A     Yes, I did.

6     Q     Did you discuss with him whether or not he

7  was locked out of his office at the time he was

8  terminated?

9     A     No, I did not, but I know that he wasn't.

10     Q     How do you know that?

11     A     Because he was offered the ability to use

12  the office after his termination to do job seeking

13  and he came and went for I think a period of one to

14  two weeks after he was terminated.

15     Q     Who told you that?

16     A     He did.

17     Q     When was this conversation in which he

18  told you that?

19     A     Greg Touma himself told me that.

20     Q     When did he tell you that?

21     A     We had discussions just about every day

22  leading up to him being -- leading up to him leaving

10

1    the organization and also in the first couple of

2    weeks after I assumed his position.

3        Q    Did you see him around the Counterpart

4    office once you assumed your position?

5        A    Not after January 1, no, but in the last

6    two weeks of December he called me from there a few

7    times.

8        Q    How do you know he was calling from there?

9        A    Caller ID.  He told me he was in the

10   office.  He knew that I was selected to replace him

11   and we were talking about program issues and

12   personal issues.

13       Q    Now at sometime your employment with

14   Counterpart ended; is that correct?

15       A    Yes.

16       Q    What were the circumstances under which it

17   ended?

18       A    On October 12, 2004, just less than three

19   months from my 10-year anniversary, I was asked to

20   resign.  I refused to resign.  And I was promised a

21   consulting --

22       Q    Sorry, you were promised a what?

1    A    Consulting agreement and then was
2  dismissed from my responsibilities as leading CHAP.
3  I was told that I would be responsible for
4  Counterpart communities and special programs under a
5  new consulting agreement but that I would no longer
6  be vice president and would no longer be general
7  director of CHAP.
8    Q    What does CHAP stand for?
9    A    The Community and Humanitarian Assistance
10  Program.
11    Q    Did you accept the new role that was
12  offered you?
13    A    I was not happy about it but I accepted.
14    Q    How long did you hold the new role?
15    A    A consulting agreement was subsequently
16  never offered and so I waited and waited for much
17  time hoping that that would transpire, it never did,
18  and after one year I sued the organization.
19    Q    Were you given a reason why you were
20  relieved of your responsibilities as vice president
21  and general director?
22    A    No, I was not.  I asked several times and

12

1   I was never given a reason.

2       Q    What age were you at the time that event

3   happened?

4       A    Let's see, 51.

5       Q    What was your salary approximately at the

6   time?

7       A    $120,000 per year plus bonuses.

8       Q    Is it fair to say that you were the third

9   highest paid employee of Counterpart at the time?

10      A    Yes.

11      Q    That's behind the president and CEO, Lelei

12  Lelaulu, and the senior vice president, Arlene Lear;

13  is that correct?

14      A    Yes, I believe so.

15      Q    Did you consider filing a grievance with

16  Counterpart at the time you were terminated?

17      A    Yes, but they revoked their grievance

18  procedure, just about a week before I was dismissed

19  the grievance procedure was revoked.  So I talked to

20  two members of the board of directors, Jan Hartke

21  and Brian George.  Both were shocked by my dismissal

22  and were not in favor of it.

13

1    Q    Did you have any complaints about
2  financial irregularities at the time you were
3  dismissed from Counterpart?
4    A    Yes.  I had been complaining for more than
5  a year about how NICRA money was being used.  NICRA
6  is N-I-C-R-A.  It stands for Negotiated Indirect
7  Cost Rate Agreement.
8    Q    What were your agreements about how NICRA
9  was being used?
10    A    It was being used -- first, money for
11  NICRA was being generated by Arlene's division and
12  by Mike's division but it was being spent by other
13  divisions and not spent wisely.
14    Q    When you say wisely, what do you mean?
15    A    It wasn't spent in areas that would help
16  the organization generate more revenue.  And in
17  addition it seemed to me that it was being -- that
18  part of the money was being used to cover losses of
19  their nonprofit subsidiary -- sorry, I misspoke,
20  their for profit subsidiary.
21    Q    Let me ask you a question about that.  It
22  was being used to cover losses by what division?

14

1    A    The for profit subsidiary of Counterpart
2 called Enviro Ventures.  They called it EVI, Enviro
3 Ventures Incorporated.
4    Q    Do you have understanding of the
5 regulations under which costs should be allocated in
6 the case of a contract or a cooperative agreement
7 between USAID and Counterpart?
8    A    Absolutely.  I administered more than a
9 dozen contracts during my tenure at Counterpart.
10    Q    What is your understanding about whether
11 NICRA funds can be used in projects other than the
12 project that generates those funds?
13    A    The NICRA generated for a particular
14 project is supposed to be used to cover indirect
15 expenses associated with that project.  Indirect
16 expenses are expenses that it is impossible or
17 inconvenient to account for as direct expenses.  In
18 other words, an example might be a portion of the
19 CEO's salary.  The CEO would spend some of his time
20 on every project but not really be able to track
21 minutes or hours spent on each project directly.
22        Another example might be the receptionist

15

1  who answers phones.  As the receptionist answers
2  phone calls, she wouldn't be keeping track of which
3  projects those phone calls are relating to.  Her
4  salary would be generated by NICRA.
5          Some of it might be or should be covered
6  also by revenues derived from independent sources,
7  nongovernmental sources.  For example, if employees
8  or other people donated money to the organization,
9  that's not considered NICRA, and that money can be
10  used for whatever purpose the organization wants or
11  for whatever purpose the donor stipulates.
12      Q    You said I believe that you had been
13  complaining for about a year about misuse of NICRA
14  funds; is that correct?
15      A    Yes.
16      Q    To whom had you been complaining?
17      A    Harry Dorcus, Lelei Lelaulu, and the other
18  vice presidents.
19      Q    What response did you receive from those
20  to whom you complained?
21      A    Most of the other vice presidents agreed
22  with me.  Arlene agreed, Don Feil agreed, Thoric

16

1  Cederstrom agreed to a great extent.  Most of the
2  money however was being spent by Raymond Chavez and
3  Lelei Lelaulu, and of course from them I really did
4  not receive any support.
5     Q    Was anything ever done in response to your
6  complaints.
7     A    No.  I mean some was reallocated but only
8  to cover excessive expenditures by Lelei Lelaulu and
9  Raymond.
10    Q    They were reallocated you say?
11    A    Yes.  They took more money away from
12  Arlene and I.
13    Q    How did they do that?
14    A    In March of 2004, at a vice presidential
15  retreat, Harry provided us with new budgets that
16  took more of our NICRA away to cover excessive
17  expenditures of Lelei and Raymond.
18    Q    In your opinion was that an illegal
19  accounting move?
20    A    Yes.  I think had NICRA been aware of it,
21  they would have definitely objected because the
22  money was being used for executive travel and

17

1    speculation, speculative projects, unrelated to the

2    projects that generated NICRA.

3        Q    How do you know what the money that was

4    moved into Lelei's and Raymond Chavez's budget was

5    used for?

6        A    Because I had access to the accounting

7    report.

8        Q    Was that an internal accounting report?

9        A    Yes, and all the vice presidents had

10    access to those and were being copied with that at

11    the vice presidential retreat.

12        Q    What was the travel that was funded by

13    NICRA?

14        A    Trip to South America and Central America,

15    trip to the Caribbean, trips to western Europe.

16        Q    Did Counterpart have programs in those

17    areas?

18        A    No, not at this time.

19        Q    Was Counterpart endeavoring to get

20    contracts for programs in those areas?

21        A    Yes, they were.

22        Q    Is it an appropriate use of NICRA funds to

1  generate new business?

2      A    If the new business is directly related to

3  the programs that generate the NICRA, yes.

4      Q    In this case do you believe that to be

5  true?

6      A    No, I did not.

7      Q    Why not?

8      A    The programs that generated NICRA were

9  humanitarian assistance civil society programs.  The

10  programs being sought were sustainable tourism and

11  environmental programs.

12      Q    Does the term 100 percent line item

13  flexibility mean anything to you?

14      A    Yes, it does.

15      Q    What does it mean?

16      A    It means that if you have a budget that is

17  administered by the funding organization, for

18  example USAID, if you have 100 percent line item

19  flexibility, it means that the various line items

20  such as personnel expenses, travel expenses, office

21  expenses, other types of expenses are flexible, you

22  don't have to spend exactly the amounts listed in

19

1  each of those line item categories specifically for

2  those categories.

3      Q    Was it your understanding that in

4  Counterpart's programs, the administrator of those

5  programs had 100 percent line item flexibility?

6      A    No, that would be very unusual.  Typically

7  15 percent line item flexibility is the rule.  In

8  order to achieve 100 percent line item flexibility,

9  you have to have an amendment signed by the

10  contracting officer at the funding organization and

11  it's very unusual to have.

12          In all programs I ever administered, which

13  is more than a dozen, I had 100 percent line item

14  flexibility only on one program.

15      Q    Were the programs you administered those

16  under what's called cooperative agreements?

17      A    Yes, some were cooperative agreements.

18  Most of them, yes, were cooperative agreements.

19      Q    So there is nothing about the fact that a

20  cooperative agreement is involved that takes the

21  standard you have just spoken about about line item

22  flexibility away, correct?

1    A    Correct.

2    Q    What was the last time you think you

3  complained about misuse of NICRA before you were

4  terminated?

5    A    In September 2004.

6    Q    To whom did you complain at that time?

7    A    Terry Dorcus.

8    Q    What was his response?

9    A    He seemed to agree but he also -- there

10  was nothing he could do about it.

11    Q    Why is that?

12    A    At that point in time he was not chief

13  operating officer, he was CFO, and he did not have

14  control of the other vice presidents or Lelei

15  Lelaulu or what they did or how they spent money.

16    Q    Did he say that to you?

17    A    No.  That's just a fact.  He was CFO at

18  that time, not COO.  I mean he didn't have control

19  or responsibility over those people.

20    Q    Did he admit to you that the circumstances

21  you have described were improper?

22    A    He didn't use the word improper but he

1  definitely did not like the fact that people were

2  overspending.

3      Q    Did anything happen between that instance

4  when you complained to him in September in 2004 and

5  your termination on October 12, 2004 besides the

6  grievance procedure being revoked?

7          MS. ARIAIL:  Objection, overly broad.

8          MS. DOUGLASS:  That's fair.  I'll withdraw

9  the question.

10 BY MS. DOUGLASS:

11     Q    Was the grievance procedure revoked

12 between the time you complained to Mr. Dorcus in

13 September 2004 and the time you were terminated on

14 October 12, 2004?

15     A    Yes, it was.

16     Q    Was any step taken that you learned about

17 to respond to your complaints during that period?

18     A    No.

19     Q    After you were terminated, were you locked

20 out of your office?

21     A    No, I was not.  I terminated on October 12

22 and I continued for the rest of that day working in

1  my office.  I came back the following day and the
2  day after that and I was going through drawers
3  cleaning out 10 years' worth of accumulation and
4  using my office telephone, and then I continued that
5  throughout the month of October.  And at some time,
6  I believe it was in early November, at one point
7  when I was at the office I was asked to sign in at
8  the front desk and I was told that any time I was at
9  the office I'd have to have someone escort me to my
10  office, but that I could work in my office.
11        So I signed in at the front desk and the
12  log-in sheets kept at the front desk should be
13  available that show me signing in and out each time
14  I visited the office from that time on.
15        That first time I was asked to sign in, I
16  went to -- I think it was Kelli Boyer who escorted
17  me to my office and she retrieved a key and she said
18  that a new lock had been installed and I saw the
19  lock and I asked why, and she said we know you have
20  personal belongings in there -- I had a lot of
21  pictures on the wall, souvenirs that I had been
22  given over the years -- and we didn't want anything

23

1  to be stolen or missing from your office, any of
2  your personal items.
3       So they opened the office for me and
4  walked away and I was allowed to use the office, to
5  use the bathroom, to use the kitchen, to talk to
6  other people.  And then at the end of the day when I
7  was finished, I would ask them to lock it back up
8  and they did and I would sign out and then come back
9  another day.
10     Q    At the time that they put the lock on your
11  office door, had you heard anything about Jay
12  Cooper's situation in Central Asia and his possible
13  termination?
14     A    No, I did not.  I found out he had been
15  terminated approximately two weeks after he had been
16  terminated.
17     Q    When you found out he had been terminated,
18  was the lock on your door?
19     A    Yes, it was.
20     Q    How long approximately had it been on your
21  door at the time you found out he had been
22  terminated?

24

1    A    I would think log-in sheets would be able
2  to determine the exact date that I encountered the
3  lock on my door, but I'm sure it was sometime in
4  November, and there was probably a bill for a
5  locksmith to install it because there had to have
6  been about a 2 inch hole drilled in the door, 2-1/2
7  inch hole, to accommodate the lock which had not
8  previously been there.
9    Q    You mentioned Kelli Boyer.  Did you ever
10  hear any complaints from your fellow vice presidents
11  with respect to Kelli Boyer's competence?
12    A    Many times, yes.
13    Q    What did you hear and from whom?
14    A    Thoric Cederstrom complained several times
15  because he had asked her to draw up documents to
16  either hire or make changes in personnel and she
17  wouldn't do it on time or wouldn't do it at all.
18  Arlene complained several times.  Don Feil
19  complained about her.  So yes, there were many
20  complaints.
21    Q    Was there ever during the time you were
22  there an effort to terminate Ms. Boyer's employment?

25

1    A    To terminate or discipline Kelli?
2    Q    Yes.
3    A    No, not that I'm aware of.
4    Q    Have you had any discussions recently
5    about Kelli Boyer with anyone from Counterpart?
6    A    Yes.  About in the last two months I
7    visited Washington, D.C. to do a deposition in my
8    own lawsuit against Counterpart and I happened to
9    run into Thoric Cederstrom on the Metro and I told
10   him I had heard that Kelli had left the organization
11   and he said yes, thank God, and proceeded to
12   complain about her laziness and inability to get
13   things accomplished.
14   Q    Was there anyone else who you discussed
15   Kelli Boyer with?
16   A    After the day of my deposition, after my
17   deposition I talked to Terry Dorcus, who witnessed
18   my deposition, and he mentioned that Kelli had moved
19   on and I asked him if it was voluntary or if she was
20   asked to leave, and he said well, it was mutual, we
21   were glad to see her go and she seemed happy to be
22   leaving.  He said also they had put her on a

26

1  consulting agreement for a period of time.

2      Q    Did he say why?

3      A    Did he say why?

4      Q    Yes, why he had put her on a consulting

5  agreement.

6      A    No, not directly, but the implication was

7  that it accompanied her departure.

8      Q    Have you ever heard of a Counterpart

9  employee by the name of Brion Black?

10     A    Yes.

11     Q    Do you know anything about the

12  circumstances under which his employment was

13  terminated?

14     A    Yes.  By the way the spelling of his name

15  is B-r-i-o-n.

16     Q    What is B-r-i-o-n?

17     A    B-r-i-o-n, unusual spelling for the name

18  Brian.

19     Q    Okay.  Do you remember my question?

20     A    Please repeat it.

21     Q    What do you know about the circumstances

22  of his termination?

27

 1      A    It was pretty violent, as I recall.  At
 2  the time I was working in Eastern Europe and so I
 3  did not witness the events, but I heard about the
 4  events from many people at the office including Greg
 5  Touma.
 6      Q    What did you hear?
 7      A    That he was asked to leave by Stan Hosie,
 8  who was the president -- sorry, who was the CEO at
 9  the time, that Stan Hosie asked him to leave and
10  that it erupted into a shouting match.  Apparently
11  Stan had purchased a suit for Mr. Black while he was
12  on a trip with him and Mr. Black disrobed in the
13  hallway and threw the suit in Stan Hosie's face.
14      Q    Do you know if Mr. Black was locked out of
15  his office at the time he was terminated?
16      A    I don't know because I wasn't there.  I
17  never heard that happening.  I do remember Greg
18  telling me that Brian continued to hang around the
19  office for two or three days after he was fired, so
20  it doesn't sound to me like he was locked out.  I
21  think perhaps you could interview other people who
22  were there at the time including Mr. Touma.

28

1    Q    Do you have a legal case now pending
2  against Counterpart?
3    A    Yes.
4    Q    What are the claims that you are making?
5    A    Discrimination by gender and race, also
6  retaliation.  Once I hired a lawyer, the promises of
7  a consulting agreement never were brought up again.
8  And then we have added a claim of violation of the
9  False Claim Act.  I mean I'm not a lawyer but I
10  think my case probably should be covered under the
11  Sarbanes-Oxley Act and the whistleblower policy.  It
12  seems to me that perhaps I knew too much about
13  Counterpart's financial dealings.  I have a master's
14  degree in business administration and have been a
15  CFO in the past, and when I call into question
16  financial improprieties, perhaps their action
17  against me was a violation of the Whistleblower Act.
18    Q    Have you made that claim?
19    A    Just recently, yes, in discussion with
20  opposing counsel.
21    Q    Do you have any information as to why
22  Counterpart fired Jay Cooper?

1    A    No, I don't.

2    Q    Did you ever hear any discussion of
3  whether or not Jay Cooper should be fired from
4  Counterpart?

5    A    No.  There were times when Arlene would
6  mention that he's difficult, she would use the word
7  "difficult," but she never made any mention of him
8  doing anything wrong or violating any Counterpart
9  policies or procedures.

10    Q    Was it Counterpart's policy to have
11  discussions about the termination of senior people
12  among the vice presidents or the senior management
13  team?

14    A    Yes, it happens quite often in SMT
15  meetings, senior management team meetings, and other
16  meetings such as the vice presidential retreats that
17  we would have.

18    Q    But not about Jay Cooper, as you remember
19  it?

20    A    That's right.  We discussed terminating
21  Darshana Vyas, who was country director.  We
22  discussed terminating -- what was her name in Iraq?

1  But whoever the country director was in Iraq, we
2  discussed terminating her.  It was discussed by all
3  the VPs and Terry Dorcus and LeLei.  We discussed
4  terminating Ellie Brown, who was Raymond Chavez's
5  predecessor.
6      Q    What was the first name that you mentioned
7  before you went to the director in Iraq?
8      A    D-a-r-s-h-a-n-a V-y-a-s.
9      Q    Is that a female?
10     A    Yes.  She's Asian Indian.
11     Q    What was her position?
12     A    Director of health programs.
13     Q    The other woman was a county director in
14 Iraq?
15     A    Country director for Iraq.
16     Q    And Ellie Brown had the same position as
17 Raymond Chavez, correct?
18     A    Yes, vice president of the Division of
19 Environment and Natural Resources.
20     Q    Now you said I believe that after your
21 termination you complained to two board members,
22 correct?

1    A    Yes.

2    Q    That was Mr. George and Mr. Van

3 something --

4    A    Hartke.  Jan, J-a-n, Hartke.

5    Q    Was anything ever done in response to

6 those complaints?

7    A    Mr. Hartke called Lelei Lelaulu with no

8 result.  And in addition, Mr. Bryant George walked

9 into Lelei's office and complained with no result.

10    Q    Were you promptly paid your outstanding

11 business expenses when you were terminated?

12    A    Yes.  Sorry, could you repeat that?

13    Q    Were you promptly paid your outstanding

14 business expenses when you were terminated?

15    A    I eventually was but not until a year and

16 a half later after I complained about not receiving

17 reimbursements.

18        MS. DOUGLASS:  Thank you, Mr. Propp.

19 That's all the questions I have.  Now it's Ms.

20 Ariail's turn.

21        MS. ARIAIL:  I would like to take a few

22 minutes to go over my notes.

32

1        MS. DOUGLASS:  Can we take a 5-minute
2    break, is that all right with you?
3        THE WITNESS:  Fine.
4        (Off the record 4:45-4:50 p.m.)
5        MS. ARIAIL:  Sorry to keep you waiting.  I
6    don't have any follow-up questions.
7        THE WITNESS:  I remembered the name of the
8    country director for Iraq.  Her name was
9    G-a-l-a-w-e-z-h, last name was B-a-y-i-z, Galawezh
10    Bayiz.
11        MS. DOUGLASS:  Mr. Propp, the court
12    reporter will give you the option to read your
13    deposition and correct any mistranscriptions or
14    whatever before you sign it.  Do you want to avail
15    yourself of that right?
16        THE WITNESS:  Yes, I do.  I would like you
17    to send it to me electronically.  My e-mail address
18    is brpropp@aol.com.
19        (Signature not having been waived, the
20    deposition of BRIAN PROPP was concluded at 4:50
21    p.m.)
22                    *  *  *

33

1        ACKNOWLEDGMENT OF DEPONENT
2        I, BRIAN PROPP, do hereby acknowledge I have
3   read and examined the foregoing testimony, and the
4   same is a true, correct and complete transcription
5   of the testimony given by me, and any corrections
6   appear in the attached errata sheet signed by me.
7
8   _____    _____
9   Date                BRIAN PROPP
10
11
12
13
14
15
16
17
18
19
20
21
22

34

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Marilyn Feldman, Registered Professional

3    Reporter, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by

7    me stenographically and thereafter reduced to

8    computerized transcription under my supervision; and

9    that I am neither counsel for, related to, nor

10    employed by any of the parties to this case and have

11    no interest, financial or otherwise, in its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13    and affixed my notarial seal this 15th day of

14    September 2006.

15    My commission expires:

16    December 14, 2006

17

18

19    _____

20    NOTARY PUBLIC IN AND FOR

21    THE DISTRICT OF COLUMBIA

22

35

1        E R R A T A   S H E E T

2     IN RE:  Cooper v. Counterpart

3  RETURN BY:  _____

4  PAGE     LINE     CORRECTION AND REASON

5   ____    ____     _____

6   ____    ____     _____

7   ____    ____     _____

8   ____    ____     _____

9   ____    ____     _____

10  ____    ____     _____

11  ____    ____     _____

12  ____    ____     _____

13  ____    ____     _____

14  ____    ____     _____

15  ____    ____     _____

16  ____    ____     _____

17  ____    ____     _____

18  ____    ____     _____

19  ____    ____     _____

20  ____    ____     _____

21  _____     _____

22    (DATE)              (SIGNATURE)

36

```
1    E R R A T A   S H E E T   C O N T I N U E D
2       IN RE:  Cooper v. Counterpart
3    RETURN BY:  _____
4    PAGE    LINE    CORRECTION AND REASON
5    _____   _____   _____
6    _____   _____   _____
7    _____   _____   _____
8    _____   _____   _____
9    _____   _____   _____
10   _____   _____   _____
11   _____   _____   _____
12   _____   _____   _____
13   _____   _____   _____
14   _____   _____   _____
15   _____   _____   _____
16   _____   _____   _____
17   _____   _____   _____
18   _____   _____   _____
19   _____   _____   _____
20   _____   _____   _____
21   _____   _____
22      (DATE)            (SIGNATURE)
```