1

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3   - - - - - - - - - - - - - - - x
4   JAY W. COOPER,             :
5      Plaintiff             :
6   v.                  : No. 1:05cv1598 (RMC)
7   COUNTERPART INTERNATIONAL,   :
8      Defendant             :
9   - - - - - - - - - - - - - - - x
10
11      Telephone Deposition of CHRISTOPHER SZECSEY
12              Washington, D.C.
13          Wednesday, September 6, 2006
14               12:05 p.m.
15
16
17
18
19
20   Job No.: 2-84620
21   Pages 1 through 67
22   Reported by:  Marilyn Feldman, RPR

2

1        Telephone deposition of CHRISTOPHER SZECSEY,
2    held at the offices of:
3
4
5        L.A.D. REPORTING COMPANY, INC.
6        Suite 850
7        1100 Connecticut Avenue, NW
8        Washington, D.C. 20036
9        (202) 861-3410
10
11
12       Pursuant to agreement, before Marilyn Feldman,
13    Registered Professional Reporter and Notary Public
14    in and for the District of Columbia.
15
16
17
18
19
20
21
22

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3       PATRICIA D. DOUGLASS, ESQUIRE
 4       LAW OFFICE OF PATRICIA D. DOUGLASS
 5       98 Interpromontory Road
 6       Great Falls, VA  22066-3219
 7       703.759.3586
 8
 9    ON BEHALF OF DEFENDANT:
10       KARA M. ARIAIL, ESQUIRE
11       JACKSON LEWIS LLP
12       8614 Westwood Center Drive
13       Suite 950
14       Vienna, VA  22182
15       703.821.2189
16
17
18
19
20
21
22
```

4

1           C O N T E N T S

2   EXAMINATION OF CHRISTOPHER SZECSEY            PAGE
3     By Ms. Douglass              6, 63
4     By Ms. Ariail                56

5

6

7   No exhibits marked.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1          P R O C E E D I N G S

2          MS. DOUGLASS:  We are on the record.  This

3    deposition is being taken in the case of Cooper

4    versus Counterpart.  I am Patricia Douglass, counsel

5    for plaintiff, Jay Cooper.  Present in the

6    deposition room is Kara Ariail, counsel for

7    Counterpart, and the court reporter who is also a

8    notary.

9          I would like the court reporter to swear

10   in the witness at this time and I would like to have

11   acknowledgment from Ms. Ariail that she does not

12   object to a procedure wherein the notary is at a

13   separate space from the witness.

14          MS. ARIAIL:  I do not object to the fact

15   that the notary is in a separate physical location

16   than the witness.  I would like to state my

17   objection on the record pursuant to federal civil

18   procedure rule 30(b)(7) that plaintiff failed to

19   follow proper procedures in noticing the deposition

20   by telephone, and that defendants thereby oppose the

21   entire deposition and will be moving to either

22   strike the deposition or file a motion in limine at

1  the proper time.

2      MS. DOUGLASS:  In response to that I'd

3  like to say that counsel for defendant has had the

4  notice for several weeks and has made no inquiry

5  about the subject nor any motion to oppose the

6  procedures that were followed, and so any such

7  objection is waived.

8      MS. ARIAIL:  You can't waive my objection,

9  I'm sorry.

10      MS. DOUGLASS:  Would you please swear the

11  witness.

12          CHRISTOPHER SZECSEY

13  having been duly sworn, testified as follows:

14      EXAMINATION BY COUNSEL FOR PLAINTIFF

15  BY MS. DOUGLASS:

16      Q    Mr. Szecsey, I am going to give you some

17  instructions now, some of them are common to every

18  deposition and some are focused on the fact that we

19  are doing this by telephone.  You are in California

20  now; is that correct?

21      A    That is correct.

22      Q    Now I would like you to listen to each

1  question and before you give an answer, pause
2  briefly.  That will give Ms. Ariail a chance to make
3  an objection if she wishes to do so.  If she does,
4  just remain quiet while the lawyers duke it out here
5  and then you can answer the question or not, as the
6  situation resolves itself.
7          Also we need not to talk over each other
8  so it's always a good idea if you have paused in an
9  answer and you want to continue, make sure that no
10  one is talking at the time you do, just simply ask
11  if you can continue your answer.  Okay?
12      A   Yes.
13      Q   At any time you can take a break if you
14  need to, or if you do not understand a question,
15  it's entirely appropriate for you to ask to have it
16  clarified.  It's very important that we understand
17  each other and that you are answering the question
18  that I think I'm asking.  All right?
19      A   Yes.  If I could just request that you all
20  speak slowly because it's not 100 percent clear
21  because I don't have your faces in front of me.
22      Q   I will try to do that and if I speak too

1    quickly, please chastise me for it.
2              Mr. Szecsey, could you give your full
3    name, please?
4        A    Christopher Szecsey.
5        Q    What is your current employment situation?
6        A    Independent consultant.
7        Q    Do you perform that function for more than
8    one company?
9        A    Yes.
10       Q    Is one of the companies Social Impact?
11       A    Yes.
12       Q    What fields do you consult in?
13       A    International humanitarian development
14   efforts.
15       Q    How long have you done that?
16       A    12 years.
17       Q    Can you tell me what Social Impact is?
18       A    Social Impact is a mall consulting firm
19   that bids on various pieces of work in collaboration
20   with larger international organizations.
21       Q    Have you done work for Social Impact
22   involving Counterpart International?

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/090606cs.txt

9

1    A    Yes.
2    Q    How many times have you performed those
3 functions?
4    A    Three times.
5    Q    When were those times?
6    A    The first time was December 6 to December
7 20, 2003.  Second time was May 2 to May 31, 2004.
8 Third time, September 17th to the 24th -- sorry,
9 September 17th to October 17th, 2004.  The last time
10 was March 10th to March 30th, 2005.  So four times.
11    Q    In each of those cases, was your
12 consulting work in connection with certain projects
13 in Central Asia?
14    A    Yes.
15    Q    Have you ever done any other consulting
16 work for Counterpart International on any other
17 project?
18    A    No -- well, I don't know where one draws
19 the line.  I was a consultant to a major project in
20 Russia in the mid '90s and although the consultancy
21 was through the prime contractor, which was Save the
22 Children, one of the partners of that project was

10

1    Counterpart and I did work closely with Counterpart
2    and the other contractors that were part of that
3    contract for Save the Children.  This was working
4    directly with Counterpart on that business.
5        Q    In connection with all the various
6    consulting projects you have worked on over the
7    years, do you have experience in assessing the
8    progress of projects in connection with goals and
9    objectives set by the contracts or agreements under
10   which those projects are run?
11       A    Yes, I do have experience and I'm often
12   asked to do that, and as an outsider coming in it's
13   either directly or indirectly part of my scope of
14   work.
15       Q    Do you know Jay Cooper?
16       A    Yes.
17       Q    When did you first meet Jay Cooper?
18       A    That would have been during the very first
19   visit of December 6 through 20, 2003.
20       Q    What was the purpose of your very first
21   visit?
22       A    First of all, we are talking about one of

1  two projects of Counterpart that I worked with in
2  Central Asia called CSSI, Civil Societies Support
3  Initiative, and on the very first visit I was asked
4  to begin to build what is known as the association
5  of support centers that were emerging networks at a
6  higher level than the project had taken the
7  nonprofit sector up until that point.  So I was
8  asked to assess the status of the work at that point
9  and carry forward a training, a workshop, with
10  representatives of the different society support
11  centers and begin to build a civil society support
12  network.  When I say network, it was evolving into
13  its own nonprofit or NGO, nongovernment,
14  organization.
15      Q    Was your second visit during May of 2004
16  for the same purpose vis-a-vis CSSI?
17      A    Yes.
18      Q    What about your third --
19      A    We continued that process of building
20  those associations, those emerging NGOs, what we
21  call intermediary organizations, in support of the
22  goals and objectives of the CSSI project.

12

1    Q    Was your third visit in September and
2  October 2004 for the same purpose vis-a-vis CSSI?
3    A    That was a little different in the sense
4  that by that point the emerging associations had
5  become already registered NGOs so it was no longer
6  an emerging idea, it was a fact, and a board of
7  directors had already been selected, executive
8  director and staffing were in place around those
9  associations, and my job was to do board
10  development, clarify roles and responsibilities
11  between the executive director and the boards,
12  clarify the overall strategic direction with the
13  board and the staff, lead them through a number of
14  pieces of work to again incrementally move to the
15  next step forward of where they are going.  That was
16  my CSSI work.  I also did work on another
17  Counterpart project.
18    Q    Is the other Counterpart project in which
19  you worked the health initiative?
20    A    Yes.
21    Q    On which of your visits did you do any
22  work on the health initiative project?

13

1    A    On that third visit, September to October
2  visit 2004.
3    Q    Can you tell me what you did for the
4  health project on that visit?
5    A    I had introduced a new methodology called
6  appreciative inquiry on an earlier visit in the May
7  2004 visit, and there was a lot of positive
8  response, people asked me to come back and lead them
9  in a deeper understanding of that process and how it
10  could be used for different applications, and
11  Counterpart asked me to introduce to their Healthy
12  Communities project how they could use it for
13  community mobilization for health.  At the same time
14  I was introduced to the CSSI project.
15    Q    I would like to ask you about certain
16  subjects and I am pointing in these questions to the
17  three visits you have just described when you
18  visited Jay Cooper's projects in Central Asia, and
19  if there's a difference in your answer from one
20  visit to the next, please tell me, but I'm going to
21  proceed on the assumption that there is not.  Okay?
22    A    Okay.

14

1         MS. ARIAIL:  Objection.  You can continue.
2     Q    Did you during your visits to Central Asia
3  that you have just described have the chance to
4  observe the management style of Jay Cooper?
5     A    Could you clarify that further?
6     Q    Yes.  Did you see Jay Cooper interacting
7  with his staff during your visits that you have
8  described to Central Asia?
9     A    Yes.  In fact, on the very first visit,
10  probably as is always the case with a consultant
11  coming for the first time, Jay as project director
12  actually accompanied me on the entire three-week
13  visit to all three of the Central Asian countries
14  and sat in each of the three workshops that I led,
15  and we spent time in the workshops and out of the
16  workshops in other conversations with the staff.
17         In the subsequent visit of May, a similar
18  situation.  And lastly in September, in that visit
19  he was only in one of the three country workshops,
20  the one in Kazakhstan.  He sent me on my own for the
21  other one.
22     Q    Did you observe any interaction between

15

1  Jay and members of his staff in any of these visits
2  that would lead you to think that Jay managed by
3  intimidation?
4      A    No, I didn't observe anything that would
5  lead me to believe that.  In fact, one of the things
6  that I was impressed about Jay as someone like
7  myself who has worked in international relations for
8  a long time, also as someone who is a director of an
9  international NGO who oversees his own staff in
10  other countries, I was impressed with Jay's
11  cross-cultural sensitivity and how he appropriately,
12  relevantly interacted with the local staff.  What I
13  mean by that is an ability to give support,
14  understanding for nationals that were growing in
15  their position, giving them more and more
16  responsibility to take over, but at the same time
17  being firm about what his expectations were in the
18  work.
19      Q    When you say being firm about his
20  expectations, did you ever see him be overly firm in
21  dealing with any staff member?
22      A    I never saw personally, but I did have

16

1  conversations with two staff members who told me in
2  private conversations that they had received letters
3  from Jay clarifying the work that Jay wanted done
4  and clarifying in more specific terms than informal
5  conversations that Jay was having with them about
6  what was expected in the work.  The reason I'm
7  mentioning that is that in both cases I was working
8  with these national staff in the project and the
9  nature of the work they were supposed to do had a
10  direct bearing on the work that I was doing.  They
11  were clarifying that Jay was clarifying with them as
12  well as what I was trying to clarify about the work
13  they were trying to do and accomplish.
14      Q    Was there anything in your view that was
15  inappropriate in the written instructions or
16  clarifications that Jay gave to these individuals?
17      A    Like I say, I never saw those written
18  letters.  It was the two national staff reported to
19  me they had received communications from Jay.  But
20  in terms of Jay's interactions with staff,
21  everything seemed appropriate, what he said.  I
22  didn't see anything that led me to be concerned

17

1  about his management style with the national staff.

2      Q    What were the names of those two

3  individuals?

4      A    Ainura and Vladmere -- not Vladmere --

5  Vaslat.

6      Q    Which country were they operating in?

7      A    Ainura was based in Kazakhstan and was

8  supporting CSSI across three countries.  And Vaslat

9  was also based in the regional office in Kazakhstan

10  overseeing the health community.

11      Q    Did either of those individuals complain

12  to you that Jay had intimidated them by the written

13  instructions he gave?

14      A    No.

15      Q    There has been some comment in this case

16  that Jay was unavailable to his staff and had a

17  closed door policy in his office.  Did you ever

18  observe anything relevant to that issue?

19      A    No, I did not.  All the times I was in the

20  office, you know, his door was always open.  I never

21  saw his door closed on any occasion.

22      Q    Did you meet with the various country

18

1  directors on your first three trips that you have
2  described?
3      A    Yes.
4      Q    Did you discuss with these three country
5  directors the circumstances under which they were
6  carrying out their responsibilities?
7      A    On the first trip I did not have private
8  individual conversations with them because Jay and I
9  were together on the first visit for all
10  conversations with the country director.  So it was
11  not until the May 2004 trip that I started having
12  individual conversations with those three country
13  directors, and of course on the September visits
14  when I was on my own.
15      Q    Did any of the three country directors
16  complain to you about Jay's management style?
17      A    No.  In fact, in all three cases they
18  appreciated Jay's support, understanding of the
19  challenges they were facing mostly related to the
20  management of a complex project that had a number of
21  pieces of work, and then of course the interface
22  across all three countries.

19

1        Then on the other side I would say,
2    besides appreciating his support and his
3    understanding, and I would say this was more
4    particularly true with Marat in Kazakhstan, was the
5    need for individual one-on-one conversations, and
6    they felt Jay was responsive to them in needing
7    specific help, things they didn't want to discuss in
8    public with other staff but that they were
9    struggling with.
10       Q    I need you to clarify that last answer.
11   Are you clarifying something that Marat said to you?
12       A    Marat in particular -- we are talking
13   about the Kazakhstan country director -- he
14   struggled directly more than Kyrgyzstan with the
15   association, the association support centers, and
16   it's not comfortable to discuss some of his
17   limitations or shortcomings in public in staff
18   meetings.  But I know that Jay and him were
19   discussing on a one-on-one basis, and Marat confided
20   to me that he was seeking out advice from Jay about
21   how to address some of the challenges he was feeling
22   in that project.

20

1    Q    Did Marat express to you that Jay was
2  helping him?
3    A    Yes.
4    Q    I would like to turn if I could to your
5  third visit, September to October of 2004.
6    A    Okay.
7    Q    Did you have any discussions with Jay
8  about management changes that had been made in the
9  Central Asian region of Counterpart?
10    A    Can you clarify which aspect of management
11  changes?  There were always changes going on.
12    Q    Were you aware that Michael Kunz had been
13  added to Counterpart's Asian operation by the time
14  of that visit?
15    A    Yes, I met Michael during that visit.
16    Q    Did you have any conversations with Jay
17  Cooper about Michael Kunz's coming to the position
18  he held at that time?
19    A    Yes, we did.
20    Q    Could you tell me about those
21  conversations?
22    A    My recollection is Jay was concerned that

1  Michael had been put in that position, in a regional
2  position, and was unclear why Michael was in that
3  position.  There was lack of clarity about roles and
4  responsibility between Michael and Jay, Jay having
5  been the kind of de facto regional director for
6  Counterpart beyond his project director for a number
7  of years.  So it was unclear the difference in their
8  responsibilities.  It was particularly unclear
9  exactly how Michael would interface with Jay around
10  the management of those two particular projects,
11  CSSI and Healthy Communities, since up until
12  Michael's arrival, clearly they were stated as
13  projects under Jay's direction.
14        So there was confusion and lack of clarity
15  about roles and responsibilities between the two of
16  them and Jay was really not clear about the purpose
17  of Michael being there.
18    Q    Did Jay say anything to you about Michael
19  Kunz's background?
20    A    He did.  He told me that previously
21  Michael had been a subordinate to Jay in Uzbekistan
22  and that there had been some issues about his

22

1  performance as a manager of that project in
2  Uzbekistan.
3      Q    Did Jay express anything about Michael
4  Kunz's preparedness for the role he was assuming?
5      A    Well, again it was unclear again exactly
6  what his role was to be.  To the extent that it was
7  perceived to be something around fundraising and
8  strengthening Counterpart's public relations,
9  representation, and fundraising across Central Asia,
10  Jay felt it was something that possibly could work
11  out.  But to the extent his role might be to manage
12  Jay and the actual -- those two projects in Central
13  Asia, Jay had more concern about that because of his
14  lack of experience with management on that scale
15  since he has only worked on small projects in
16  Uzbekistan previous to that, and because of the
17  performance issue around how he interacted with
18  national staff in Uzbekistan.  Jay was concerned
19  about how he might be interacting with the nationals
20  in the three countries of CSSI.
21      Q    On your third visit, September through
22  October 2004, did Jay Cooper ever express to you

23

1  that he wanted to leave the employment of

2  Counterpart?

3      A    No.

4      Q    Was that subject ever discussed at all?

5      A    No, he never said anything about he wanted

6  to leave.

7      Q    Did Jay appear to be working actively on

8  Counterpart's behalf when you were present during

9  the September-October 2004 period?

10     A    Yes.  I mean I think everybody knows that

11  Jay had worked for Counterpart for 10 years in

12  Central Asia and was well known across all three of

13  those countries as the point person for Counterpart.

14  And wherever I went across those three countries, I

15  would meet with USAID people at different times in

16  those three countries and in all cases they just had

17  tremendous respect and support for what he was

18  trying to accomplish in those two projects.

19          So he had been loyal to Counterpart for

20  that period of time and everybody understood that he

21  was the person representing Counterpart.

22     Q    I would like to now turn to your fourth

24

1  visit to Central Asia which I think you identified
2  as March 10 to 30, 2005.  Do I have those dates
3  right?
4      A    Yes, you do.
5      Q    What was the purpose for your trip during
6  that period?
7      A    To carry out the midterm project
8  evaluation of CSSI, and while I was there I had a
9  little bit of work to do around the Healthy
10  Communities project.
11      Q    What is a midterm project evaluation?
12      A    What does that mean?
13      Q    Yes.
14      A    Okay.  Well, I don't know how familiar
15  both of you are with USAID, but USAID is the U.S.
16  government foreign aid agency and it requires in its
17  funding of international organizations like
18  Counterpart in receipt of funds that usually halfway
19  through a three- or four-year project that an
20  evaluation be carried out to measure the progress of
21  the project and of course make any midterm course
22  corrections for the remaining half period of the

1   project to ensure that goals and objectives are met
2   as originally stated and/or that the original goals
3   and objectives of the project would be modified at
4   the midterm point to reflect what needs to happen in
5   the remaining half of the project.
6       Q    Were you hired as an independent
7   consultant, or was Social Impact hired for this
8   purpose?
9       A    Well, I guess I should clarify.  I am an
10  independent consultant, I work for different
11  consulting firms but I was under contract with
12  Social Impact for all of my work in Central Asia, so
13  it includes this evaluation.  I always came as a
14  Social Impact consultant.
15      Q    Through the three previous trips we have
16  discussed?
17      A    Yes, through all four of these trips.
18      Q    Who participated in the midterm project
19  evaluation you have described?
20      A    Well, there was some discussion about how
21  that would be done because there's always an option
22  for these things, whether it's done internally or

26

1  externally, meaning whether some completely
2  independent body of those outside in the project,
3  and through discussions of Counterpart and USAID it
4  was agreed that it would be more of what we call an
5  internal evaluation, meaning that parties involved
6  in the project would work together to evaluate.
7          So Counterpart and Social Impact together,
8  because Social Impact was a subcontractor to
9  Counterpart on this whole three-year project, were
10  asked together to come up with an evaluation for
11  this project, and so conversations were carried out
12  between Counterpart and Social Impact.
13          A design was made and then an evaluation
14  team was put together that included people from
15  Counterpart headquarters, Washington, D.C. staff out
16  there in the field, in the three countries of
17  Counterpart, and then two of us from Social Impact,
18  Chris Carver and myself.  So it was a pretty diverse
19  group of people.
20     Q    Do you know who at Counterpart designed
21  this team or designed the proposal under which the
22  evaluation was carried out?

27

1    A    Well, the initial draft of the design was
2    developed by Social Impact and then it was sent over
3    to Arlene as the point person for the Counterpart
4    side and of course CSSI in general, and then Arlene
5    has staff that work with her and they made some
6    comments, gave feedback to Social Impact, and
7    through some period of a few weeks a final version
8    of that was put together.  Then it was sent to USAID
9    for its review and approval and then we proceeded
10   from there.
11       Q    Could you tell me who the representatives
12   on the evaluation team from Counterpart's
13   headquarters in Washington were?
14       A    Anikaay Rapetyants and Altinay Kuchukeeva.
15   Sorry for my pronunciation of the last names.  Those
16   are the two point people in Washington, D.C. that
17   worked under Arlene who joined us from headquarters
18   on the evaluation team.
19       Q    I'd like to read what I believe to be the
20   spelling of these people's names, and could you
21   confirm that that's who you are referring to?
22       A    Okay.

28

1    Q    The first one being A-n-i-k-a-a-y

2 R-a-p-e-t-y-a-n-t-s?

3    A    Correct.

4    Q    The second one being A-l-t-i-n-a-y

5 K-u-c-h u-k-e-e-v-a?

6    A    Correct.

7    Q    Tell me if you can, not in tremendous

8 detail, what the evaluation team did in order to

9 carry out its responsibilities.

10    A    Whenever you carry out an evaluation, you

11 obviously want to be clear you are getting objective

12 information, and in order to get objective

13 information you have to triangulate the information

14 across a number of sources.  And so we designed a

15 customer satisfaction survey as one piece of

16 quantitative data collection that was sent out to a

17 wide range of local organizations involved in the

18 CSSI project.  Now these are local organizations

19 that work with civil society support centers to

20 collect data on the services being provided by the

21 support centers.  So that was one general piece of

22 work.

1       Then there was an extensive interview
2   process carried out by the evaluation team which
3   includes people from Counterpart's headquarters,
4   Social Impact, and people in the field that were
5   working with Counterpart, interviewing a number of
6   different people, and this includes USAID people as
7   well as other Counterpart staff in the central level
8   all the way down the ranks of Counterpart to the
9   staff working at the civil societies staff centers,
10  and then a few of the actual organizations that are
11  supported by the support centers.
12      Then separate from that, we conducted some
13  evaluation workshops that brought in key
14  stakeholders from the different support centers in
15  another process which would yield different kinds of
16  data separate from the one-on-one interviews.
17      So there's basically three different
18  methods of data production: the quantitative from
19  the customer satisfaction surveys, the more
20  qualitative from the individual interviews, and from
21  the group interview process that was carried out
22  through key stakeholder workshops.

1    Q    Was the three-step process that you have
2  designed to evaluate the entire course of the
3  project from its inception until the day of your
4  interviews?
5    A    Yes.
6    Q    When were interviews conducted?
7    A    March of 2005, and the customer survey was
8  already starting back in February because we wanted
9  to get that going before we actually arrived out
10  there so we could see the data once we got out
11  there.  So the evaluation started in February 2005.
12    Q    Did you participate personally in the
13  interviews of the country directors that worked on
14  the CSSI project under Jay Cooper?
15    A    Yes.
16    Q    Did any of them have anything critical to
17  say about Jay Cooper's management of them and their
18  section of the project?
19    A    First of all, as you know, Jay had already
20  departed by that point, so no, nobody said anything
21  about Jay in those interviews.
22    Q    Did anyone say anything to the effect that

1  Jay had left the projects in disarray and that the
2  recent management had improved them?
3      A    No.
4      Q    In your interview with USAID staff, did
5  anyone say anything critical of Jay's participation
6  in this project?
7      A    Just to clarify, I only interviewed one
8  USAID person who is the main person for USAID that
9  was overseeing the entire CSSI project, the point
10  person for all Counterpart work there, Igor.  So I
11  only interviewed one person from USAID.  So no, they
12  did not.
13      Q    Would that be Igor Toppitson (ph)?
14      A    Yes.  And no, he did not say anything that
15  would reflect negatively on the project.  In fact,
16  what he had said to me on previous visits was he was
17  very impressed with the progress being made on the
18  project and as a result of the progress he hoped
19  USAID would be able to support these NGO
20  organizations at the conclusions of the CSSI
21  project.
22      Q    Did you ever hear from any source that

1  anyone from USAID was critical of Jay's management
2  of the CSSI project?
3      A    No.  I had other USAID conversations, one
4  in Kyrgyzstan and one in Uzbekistan not related to
5  the actual project evaluation, and in both cases
6  they were very pleased with the progress being made
7  on the project.
8      Q    Did Social Impact and the other team
9  members ultimately produce a report on the result of
10  your evaluation?
11      A    Yes.
12      Q    Is that a multi-page document entitled
13  "Counterpart International Midterm Evaluation
14  Report"?
15      A    Correct.
16      Q    I am going to read the whole title so we
17  make sure we are on the same document.  Do you have
18  the document in front of you?
19      A    Yes, I do.
20          MS. ARIAIL:  Objection to the witness
21  relying on a document that I can't see.
22          MS. DOUGLASS:  That's why I am going to

1   ask some more questions, Ms. Ariail.
2   BY MS. DOUGLASS:
3       Q    Is the report an 111-page document, dated
4   May 11, 2005?
5       A    Correct.
6       Q    The title of which is quote, "Counterpart
7   International Midterm Evaluation Report Civil
8   Society Support Initiative (CSSI) Kazakhstan,
9   Kyrgyzstan and Turkmenistan Prepared for Counterpart
10  International"?
11          MS. ARIAIL:  Objection to any questions
12  from here throughout the rest of the deposition
13  relating to a document that the witness is reviewing
14  that counsel has not had the opportunity to confirm
15  what it is he is reviewing.
16  BY MS. DOUGLASS:
17      Q    Is that the document you have in front of
18  you?
19      A    Yes, it is.
20      Q    Is that the document that your team
21  prepared after your visit in March of 2005?
22      A    Yes.

34

1    Q    Who actually wrote the midterm evaluation
2    report?
3    A    While in country, this evaluation
4    comprised of Counterpart and Social Impact staff, we
5    were collecting the data, doing the interviews,
6    writing up the results of these interviews, the
7    results from the analysis of the data, and drafting
8    portions of this final evaluation report while we
9    were together as a team in country.  And then after
10   being in country and returning back to Washington,
11   D.C., United States in general, then Chris Carver as
12   the team leader from Social Impact, he then
13   consolidated all the information, a draft was sent
14   to the members of the team, which included
15   Counterpart team members, for review before it was
16   finalized and then it was submitted from Counterpart
17   to USAID.
18   Q    Did the members of the Counterpart staff
19   who you have identified have full access to the
20   results of the interviews and what you have called
21   customer satisfaction surveys?
22   A    Yes.

1    Q    And all the other data that was
2  assimilated?
3    A    Yes, the Counterpart staff saw everything
4  while we were in country because we did daily and
5  weekly debriefing sessions where we were sharing the
6  results we got from individual interviews or in the
7  case of the stakeholder workshops, all that
8  interview information was being shared and the data
9  that was coming in from the customer satisfaction
10  surveys was being shared.
11    Q    Can you tell me in reasonably broad terms
12  what you concluded about the state of the Civil
13  Society Support Initiative program at the time you
14  evaluated it in March 2005?  Specifically I'd like
15  to know how it was meeting the goals and objectives
16  that had been set at the beginning of the project in
17  connection with USAID.
18    A    Well, like any evaluation, we spent a lot
19  of time looking at the successes and achievements by
20  that point in the project.  We also took the
21  opportunity to raise issues about challenges that
22  were being faced in the project, and then we gave

1  extensive time to recommendations for strengthening
2  the project over the remaining period of time.  All
3  that is in the document.
4          But from my personal point of view,
5  knowing from previous visits how large and complex
6  this project was, spanning three countries, and a
7  number of goals and objectives to be met in a short
8  period of time, I would say that the project was
9  certainly moving forward like any project that is of
10  this nature.  There are things that were going well,
11  that were ahead of schedule, there were things that
12  were right on target, and there were some things
13  that were moving at a slower pace where it was
14  acknowledged effort needed to be given to strengthen
15  those areas.
16    Q    Are some of the weaker areas connected to
17  the country of Turkmenistan?
18    A    Certainly Turkmenistan of the three was
19  extremely complex and challenging for many political
20  reasons that were beyond the control of Counterpart.
21  I don't know how much detail you want because it's
22  all in the evaluation report here.  Because of

1  external circumstances beyond the control of
2  Counterpart, Counterpart was not able to carry out
3  the project as originally planned and intended in
4  agreement with USAID, and Counterpart and USAID were
5  regularly in contact both in Turkmenistan and in the
6  regional office in Kazakhstan about how to revise
7  the project so that it could keep operating in the
8  country.
9      Q    Arlene Lear has testified in this case
10  that -- well, I'll just read you what she said.
11  It's a little bit long, I am going to read it into
12  the record and I would like you to tell me whether
13  or not you believe this is accurate.  I am going to
14  read question and answer, okay?
15     A    Okay.
16        MS. ARIAIL:  I am going to object on the
17  grounds we haven't been presented with a copy of the
18  deposition transcript to verify its authenticity.
19        MS. DOUGLASS:  I will show it to Ms.
20  Ariail as I read it.
21  BY MS. DOUGLASS:
22     Q    This is page 161 of the deposition of

1   Arlene Lear.  "Question.  In fact, there was a
2   midterm assessment of the CSSI program that was
3   completed by a Mr. Carver after Jay was fired; is
4   that correct?  Answer.  Long after.  Question.
5   Well, in the spring.  Answer.  In the spring.
6   Question.  Of 2005?  Answer.  Substantial time had
7   passed.  A lot of things had been put in place.  New
8   people had been hired and there was more movement
9   forward in the right direction.  Question.  As a
10  matter of fact, Mr. Carver drew the conclusion that
11  except with respect to Turkmenistan that the
12  associations were being encouraged and fostered to
13  take on that additional responsibility that was
14  going to be passed on to them after the end of the
15  project; is that right?  Answer.  It cannot be
16  attributed to Jay Cooper.  Question.  Not at all?
17  Answer.  Not, no, it cannot be attributed to Jay
18  Cooper.  Question.  How long had the CSSI project
19  been going on at the time Jay Cooper was fired?
20  Answer.  About a year.  It started in 2003.
21  Question.  And you think -- Answer.  July 1.
22  Question.  And you think none of the results

1  reflected in Mr. Carver's evaluation could be
2  attributed to Jay Cooper?  Answer.  I didn't say
3  none.  But that particular result, the associations
4  having a deeper understanding of their role did not
5  happen at the time, at the time that Jay was fired,
6  no."  End of quote.
7         Did you hear me on that?
8     A    Yes, I did.
9     Q    Do you agree with Ms. Lear's conclusions?
10    A    No, I don't.
11    Q    Why not?
12    A    For a couple of reasons.  One is that the
13 time period that we are talking about from Jay's
14 departure, which was in November, to carrying out
15 the evaluation which started in February, there's
16 about three months, and anybody who has worked in
17 international development, even in one country let
18 alone working across three countries, knows it would
19 be impossible to turn around a project that large
20 and that complex in only a three-month period.  So
21 that's one thing.
22         A second thing I would not agree with her

1  is I have been there in the previous period of
2  September-October 2004 when the project had already
3  been under way for a year and I already knew what
4  the status of the progress was there and the
5  associations were up and running at that point.  A
6  number of things pointed out in the evaluation three
7  months later were the same things that I experienced
8  and observed during my three-week visit there in
9  September to October, 2004, preceding the
10  evaluation.
11         And if we look at the evaluation more
12  closely, we will see that the data that was
13  collected reflected not the three-month period --
14  just the three-month period from Jay's departure to
15  the evaluation team being in the country.  It
16  reflected as we were instructed through USAID from
17  the beginning of the project to that point which is
18  about a year and a half, and a lot of the data
19  collection if we take just one example, the data
20  collection, the quantitative data collection from
21  end users of the services of the support center,
22  typically we came up with the evaluation covered

1  over 90 percent of support center end users in
2  Kazakhstan, Turkmenistan and Kyrgyzstan are
3  satisfied with the quality of support center
4  products and services, and we -- data collection
5  questions that covered products and services over
6  the entire year plus period of the project, not just
7  the three-month period from the time Jay left until
8  the time the evaluation team arrived.  I mean I
9  could go on, but that's probably some salient
10  points.
11      Q    Did you notice any great difference
12  between what you observed in the September-October
13  time frame and what you observed during the
14  assessment period in February and March of 2005?
15      A    The only thing that I noted, I would say,
16  was a complement to Counterpart's efforts in my
17  visit in the September-October period to March is
18  that trying to figure out how to address the issue
19  of certification of those associations so that they
20  would be in a position to accept direct funding from
21  USAID had not been well thought out.  It was an
22  objective to get them to the point where they could

1  accept that funding and Counterpart had given a lot
2  of effort in that three-month period to figuring out
3  what was required, figuring out an audit of the
4  associations, figuring out where the gaps were, and
5  providing the training, support and guidance to
6  bring them up to the level they needed to be able to
7  receive direct USAID funding.  So that was one piece
8  that was very positive in moving forward.  It's what
9  we call the precertification framework and there's
10  one page in the evaluation which was the initial
11  piece of work that was moving forward on that.
12         Then the other piece was looking at the
13  issue of financial sustainability of support
14  centers, and the association had moved from a place
15  where it kind of stopped because one of the
16  consultants that Counterpart sent in was a social
17  enterprise consultant on sustainability and only
18  looked at it in one narrow way and it needed to be
19  looked at in a broader sense, and it was a broader
20  and more strategic thinking on how to move into this
21  new way of thinking.  We noted that in the
22  evaluation.  But that was also a positive thing that

1  had happened in the preceding three-month period.

2      Q    Are you of the view that some failure by

3  Jay Cooper caused the fact that there had not been

4  sufficient work on the precertification framework

5  before his termination?

6      A    That's a difficult question to answer.

7  Let me hold my yes or no until the end.  Let me put

8  a little more context on that.  Counterpart

9  Washington sent out this consultant, as I said, to

10  look at social enterprise aspects of sustainability.

11  She and Jay did not get along so well in her time

12  out there in the work that she was doing.  There

13  were some different views about what she was

14  actually doing.

15         Counterpart Washington kept insisting she

16  should stay out there and do the work.  Jay had some

17  concerns about the work that she was doing, to what

18  extent it was meeting the needs of the project.  He

19  communicated that, but then there became issues

20  between Jay and Counterpart Washington around this

21  particular consultant.  Eventually that consultant

22  left.

44

1       So I think that Jay was making an effort
2   to address that issue, that shortcoming, that gap in
3   the project, and the consultant that was sent to him
4   was not exactly the right person to do the work that
5   needed to be done and Jay was doing the best he
6   could with the consultant that was sent to him but
7   it didn't work out.  But then when that person left,
8   which was sometime shortly before I arrived in
9   September, so I arrived at the point where that
10  person left and they were kind of back to well, what
11  are we going to do now about this area.
12      Q    Was that person named Kim Alter?
13      A    Yes.
14      Q    On your second point where you said a
15  positive change after Jay's termination was
16  financial sustainability of the associations; is
17  that right?
18      A    Yes.
19      Q    Was there some failure on Jay's part that
20  that work had not progressed previous to his
21  termination?
22      A    I think it's difficult to attribute to one

1  person.  I mean the level of capacity of the
2  association was such that they were not able to
3  address other say income-generating activities
4  beyond their dependence on Counterpart funding
5  because they were so new as organizations.  However,
6  having said that, as the evaluation pointed out,
7  they were already contracting with other
8  organizations and beginning to raise some money.  To
9  what extent that happened in that three-month period
10  versus Jay's departure, I don't actually know the
11  exact dates of the additional funding that came into
12  the association so I'm reluctant to say whether we
13  say it was all Jay's responsibilities or not.
14  Obviously he was the project director and I realize
15  he takes ultimate responsibility, but there were a
16  number of factors there.
17      Q    Do you know a Gavin Helf?
18      A    Yes.  I mean I don't know him well but I
19  met him once.
20      Q    Did you ever know Gavin Helf in a capacity
21  as a consultant to one of Jay's projects or some
22  aspect of Jay's project?

1      A    Yes, he was assigned to help Counterpart's
2  operations in Turkmenistan.  Because of the complex
3  nature of running a project there because of the
4  political situation, external situation, he was
5  asked by Counterpart to come in as a consultant and
6  do two things actually.  One was to do some
7  coaching, mentoring, helping with the country
8  director there, and the other thing was to staff
9  with USAID input trying to figure out how to redo
10  the project.
11      Q    Do you mean redo the project in light of
12  the political situation?
13      A    Yes.  So I had some communication, e-mail
14  communication, with him as I carried on the project
15  from where he left off.
16      Q    Do you know whether or not Jay was
17  instrumental in bringing Gavin Helf on to the
18  project for those purposes?
19      A    I think he was, yes.
20      Q    How common was it in your experience for
21  independent consultants to be brought in to
22  Counterpart projects, if you know?

1    A    Could you repeat that?

2    Q    How common was it for Counterpart to bring

3  independent consultants in to ongoing projects?

4    A    Well, like many international

5  organizations, it was common and it was common in

6  Counterpart.

7    Q    Is that a step that's taken when a project

8  is faltering or in other circumstances as well?

9    A    Well, there's many reasons why consultants

10  are brought in, depending on the project and the

11  organization.  In the case of Counterpart, at least

12  with CSSI, since that's what I know best, it was

13  done as a way to strengthen the project and to help

14  it meet its goals and objectives and to build staff

15  capacity and to provide the kind of specific

16  training and technical assistance that's required in

17  certain areas where there may not be enough of that

18  experience institutionally in the organization, not

19  just in the region but institutionally in

20  Counterpart.

21    Q    Did you consider it a failure of Jay's

22  that he could not supply to the staff in

48

1    Turkmenistan what Mr. Helf was brought in to supply?

2        A    No.

3        Q    Was it any reflection on Jay that Mr. Helf

4    was brought in, in your view?

5        A    A positive reflection.

6        Q    Why would it be positive?

7        A    Well, because there were some particular

8    needs in that program that required somebody sitting

9    on the ground over a number of weeks -- I believe he

10    made two visits there -- who could provide some

11    in-depth training and assistance that was required

12    to work with a very complex thing.  As an example,

13    for a project director like Jay to be taken out of

14    the day-to-day operational management of a project

15    to go sit on the ground for several weeks is not

16    possible in that kind of a project, but it was a

17    judicious use of resources to bring in somebody to

18    give the attention with the expertise to move the

19    project in the right direction while the project

20    director is able to attend to the broader issues,

21    the project responsibilities across three countries

22    as well as other projects he was managing in Central

1  Asia.
2      Q     Would there be any reason that you can
3  think of that Counterpart would want to hide from
4  USAID that Mr. Helf had been brought in for those
5  purposes?
6      A     You want me to speculate?
7      Q     No.  I just want to know if you have any
8  insight into that based on your experience.
9      A     Some international organizations might
10  consider it an uncomfortable situation.  If it was
11  revealed to USAID that they maybe had promoted in
12  the original proposal of doing the project that he
13  had a certain level of expertise to carry out the
14  project, that might be interpreted by the donor that
15  they perhaps didn't really have that expertise, and
16  if it was known to the donor that they were bringing
17  in a consultant to handle some aspects of the
18  project, maybe they would feel somewhat
19  uncomfortable or embarrassed that the donor would
20  know.
21          But in the case of Turkmenistan, I would
22  hope that would not have been the reason with

1  Counterpart because USAID was there and involved
2  with that consultant, and as far as I know they were
3  happy to have had somebody sitting on the ground
4  working with the situation to help leverage how to
5  move forward.
6          I mean that consultant came in, Kim came
7  in -- I was there several times -- I mean most
8  international organizations acknowledge that it's a
9  good use of resources to bring in consultants to
10  help with specific pieces of work if you are going
11  to meet the goals and objectives of the project as
12  stated and on time.
13    Q    Do you have personal knowledge that USAID
14  knew that Mr. Helf was brought into Turkmenistan for
15  the purposes you have described?
16    A    I don't have personal knowledge because
17  that preceded my time and that's something somebody
18  else would have to investigate.  But the kind of
19  agreement that USAID had with Counterpart was called
20  I believe a cooperative agreement.  It's a certain
21  kind of contract between USAID and Counterpart and
22  it has a clause in the agreement that says

51

1    substantial involvement, and part of that is that
2    USAID is regularly monitoring and working with the
3    recipient of the funding around the project
4    management and implementation, and usually it's the
5    case -- and again I can't vouch exactly on this
6    particular point -- but it's usually the case in
7    that kind of an agreement that USAID would have to
8    be advised in advance and in some cases an agreement
9    for any consultant coming in.
10         So if they did actually sign off on the
11   agreement for all of the consultants coming in for
12   Counterpart, they at least would have been advised
13   and reviewed the scope of work of the consultant and
14   would have had an opportunity to say yes or no in
15   advance if they weren't already doing so.
16   Q    I am going to ask a general question now
17   in relation to your conversations with Jay over the
18   four different visits you made to the Central Asia
19   region that you have described, okay?
20   A    Yes.
21   Q    Did you ever have the opinion that Jay did
22   not understand the vision of the projects he was

1  leading?

2      A    No, I never had that impression.

3      Q    Do you understand what vision means in

4  that context?

5      A    Okay, well, first of all, the project

6  doesn't include a vision statement.  It includes

7  very concrete and specific goals and objectives to

8  be achieved.  But it was clear that that particular

9  project, the CSSI project, again putting aside the

10  other project that Jay managed which was Healthy

11  Communities, that at least with CSSI it was clearly

12  understood by Jay, all the staff and everybody, that

13  it was housed within USAID and therefore the U.S.

14  government's strategic priority directions for

15  democracy, participatory society in Central Asia,

16  and it was understood how this project contributed

17  to the larger vision of what the U.S. government was

18  trying to achieve through this funding in Central

19  Asia.

20          So at that level there was a vision around

21  democratic societies in Central Asia to which this

22  project contributed and Jay certainly understood the

53

1  relationship of this project to the vision that
2  USAID had for its funding in Central Asia.
3      Q    Do you believe from your discussions with
4  them that the country directors in all three of the
5  countries you visited understood the vision behind
6  the CSSI project?
7      A    Yes, and the reason for that is that --
8  you know, I think everybody knows this but I guess
9  I'll just repeat it if they don't -- this project
10  was building upon existing work that Counterpart was
11  already doing in Central Asia that was already
12  funded by USAID.  The first round had been the
13  establishment of the NGO/nonprofit sector in these
14  countries.  This was taking the nonprofit sector or
15  civil society to the next level.  So these same
16  country directors, the same staffing Jay had already
17  been engaged in this process already for a number of
18  years and understood clearly how this project was
19  taking it to the next step.  In fact, they helped
20  write the proposal that got the USAID funding to
21  take the work they had already done and because of
22  that to build upon it, and because of the success is

54

1  why USAID again gave them funding to continue that
2  kind of work.
3      Q    What about the Healthy Initiatives
4  project, did you have an opinion as to whether Jay
5  understood the vision of that project?
6      A    Well, I'm less familiar with that project,
7  but from what I -- I mean less familiar with it than
8  certainly CSSI, since my primary focus was CSSI.
9  But in Healthy Initiatives, he I think acknowledged
10  through conversations with his staff that there
11  might be more effective ways to carry out the
12  project than the way that Counterpart had originally
13  proposed in the project, and as the staff and Jay
14  saw that appreciative inquiry, this methodology that
15  I had introduced in CSSI, might be a way to leverage
16  the situation more positively in that project.  I
17  think he correctly said well, let's try using it in
18  Healthy Communities and see if we can move forward
19  more rapidly and with deeper results because in
20  terms of carrying out health work in the
21  communities, I think that everybody acknowledged
22  that it wasn't working as well as it could have been

1  working, and so Jay took the initiative to have me
2  through that project do some work on that project
3  while I was there with this appreciative inquiry,
4  which was eventually received so positively.  And
5  the result of the staff's work there in using it to
6  have better results in the project resulted in
7  Counterpart agreeing to create a manual in Russian
8  on how to use this approach for community health
9  work, and then I understood they have gone now and
10  taken that manual over to their work in Afghanistan.
11          So all of this was a reflection of staff
12  and Jay in making a mid course direction on the
13  Healthy Communities project and that's the kind of
14  responsive management that Jay and the country
15  directors were good at.  I mean they were good at
16  reflecting and analyzing what was happening in these
17  projects and how they needed to change course and
18  what resources they needed to move forward.
19          MS. DOUGLASS:  Thank you very much, Mr.
20  Szecsey.  I have completed my questions.  Now Ms.
21  Ariail has a chance to ask you some.
22          MS. ARIAIL:  I would actually like to take

56

1   5 to 10 minutes just to go over my notes and take a
2   break.
3          (Off the record 1:15-1:20 p.m.)
4          EXAMINATION BY COUNSEL FOR DEFENDANT
5   BY MS. ARIAIL:
6      Q    I just have a few questions.  First of
7   all, how did you learn of Mr. Cooper's lawsuit
8   against Counterpart?
9      A    Let's see, I'll try to remember.  I was
10  contacted by Pat.
11     Q    By Pat Douglass who just questioned you?
12     A    Yes.
13     Q    When was that?
14     A    Maybe two months ago.
15     Q    Was that the first time you had spoken
16  with her?
17     A    Yes.
18     Q    When was the last time you spoke with Mr.
19  Cooper?
20     A    Maybe a week ago.
21     Q    What did you speak about?
22     A    About his new life in Oregon.

57

1    Q    Have you ever spoken with him about his

2  lawsuit against Counterpart?

3    A    Yes.

4    Q    Can you tell me when you spoke with him on

5  that topic?

6    A    Same time, about a week ago.

7    Q    Was that the only time you have ever

8  spoken with him about it?

9    A    I think I got an e-mail from him -- I

10  don't recall, it would be sometime -- could be a

11  year ago, nine months ago, telling me that he was

12  going to pursue or he was in the process or

13  something.

14    Q    Going back to the conversation a week ago,

15  what did he discuss about his lawsuit with you?

16    A    He thought it was under way, that it was

17  something that was important to him in terms of

18  setting -- I don't exactly recall the words but it

19  was something like setting straight really what did

20  happen.

21    Q    Did Ms. Douglass or Mr. Cooper, or anyone

22  else for that matter, ever discuss with you what

1  topics would be covered at this deposition?

2      A    No.

3      Q    Were you ever provided any documents to

4  review by Ms. Douglass or Mr. Cooper in relation to

5  this deposition?

6      A    No.  The only thing that I knew was the

7  evaluation that we referred to earlier that I helped

8  produce, that was the only thing that I was aware of

9  that was something for me -- to be useful for me to

10  be familiar with for this deposition.

11      Q    Did anyone ask you to bring a copy of the

12  evaluation to the deposition?

13      A    No.

14      Q    Do you have any other documents besides

15  the midterm evaluation that you brought with you?

16      A    No, that's all I have.

17      Q    Did you review any other documents on your

18  own in preparation for the deposition?

19      A    No, just this evaluation.

20      Q    Have you provided any documents to Ms.

21  Douglass or to Mr. Cooper in relation to this

22  lawsuit or your deposition?

1     A     No, I haven't provided any documents.

2     Q     In your role as a consultant for

3  Counterpart, did you ever contract to provide any

4  human resources related or personnel type

5  consulting?

6     A     Yes.

7     Q     Can you explain to me exactly what type of

8  consulting you provided along those lines?

9     A     Okay.  Well, what I do in my consulting

10  work is I always give attention to staff

11  development, so in these different trips that I was

12  making out to Central Asia, although I had a purpose

13  of association building, association development,

14  board development, I would also share tools and

15  approaches, techniques, with staff for how they

16  could do this work in between my visits, continue

17  the momentum and of course build their own skills

18  for the work that needed to happen.

19     Q     Did you ever consult with anyone at

20  Counterpart about Jay Cooper's performance?

21     A     The only thing related to that question

22  would be when I had a conversation with Arlene in

60

1  her office in Washington, D.C. -- let's see, that
2  would have been September of 2004 -- and in that
3  conversation we were talking about CSSI, I was about
4  to go out there for that September visit, and she
5  said something to me expressing her concern about
6  Jay or Jay's management or something, and I don't
7  recall the exact wording of it but anyway it was
8  some concern she had about Jay, and I think she said
9  something like well, what's your thoughts about this
10  and that's when I responded something -- again I
11  don't recall my exact words either -- something to
12  the effect that there was good progress being made
13  in the project and the issue of building the
14  associations was moving forward and that I would be
15  happy to have a conversation with Jay about some of
16  the things that needed to move forward in the
17  project if Jay was not already aware of those
18  issues.
19      Q    Anything else you remember from that
20  conversation?
21      A    No.  I mean it was a larger conversation
22  but --

61

1     Q     I understand.  Did you play any role in
2    the decision to terminate Mr. Cooper's contract?

3     A     No.

4     Q     Did anyone ask you your opinion on whether
5    or not his contract should be terminated?

6     A     No.

7     Q     Have you ever seen the contract that was
8    in effect at the time Mr. Cooper was terminated?

9     A     No.

10     Q     Earlier in your deposition you testified
11    that during your fall 2004 visit to Central Asia,
12    you and Jay discussed some of the concerns he had
13    about Michael Kunz assuming a more supervisory
14    position.  Do you recall that testimony?

15     A     Yes.

16     Q     When you spoke to Jay about Kunz and
17    specifically his new role on that project, was it
18    your impression that Mr. Cooper was unhappy about
19    Mr. Kunz's role?

20     A     Yes.

21     Q     Did you ever share the concerns that Jay
22    shared with you about Mr. Kunz to anyone else at

1  Counterpart?

2    A    No.

3    Q    Forgive me if you already answered this.

4  Do you still consult with Social Impact?

5    A    Yes.

6    Q    Does Social Impact still provide

7  consulting services to Counterpart?

8    A    It has not since that contract.

9    Q    Is there any reason why you would not

10  consult for Counterpart again or why you would

11  refuse to consult for Counterpart again?

12    A    No.  I mean it's funny that you ask that

13  question because I tried to with both their

14  Afghanistan project and their Azerbaijan project

15  which with modeled on Central Asia, for both those

16  projects I personally contacted the Counterpart

17  staff and explored with them the possibilities of

18  consulting with them.

19    Q    Why didn't you end up consulting with

20  them, do you know?

21    A    At this point they just said the typical

22  we appreciate your interest and we'll let you know

63

1  if anything comes up where we can use you.

2       MS. ARIAIL:  That's all I have.  Thank

3  you.

4    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

5  BY MS. DOUGLASS:

6    Q   I just have one question.  Could you spell

7  one name for the court reporter, please?  Would you

8  spell Ainura?

9    A   A-i-n-u-r-a.

10    Q   I think that's all.  Thank you very much,

11  Mr. Szecsey.  Make sure you send me the bill for the

12  phone charge.  Do you want to read this transcript

13  and make sure that you were recorded accurately?

14    A   I would love to.

15    Q   We will ask to have him read.

16    A   Do I get to read it?

17    Q   Yes.  There's a certain amount of time you

18  have to correct any mistranscriptions in the

19  transcript and if you don't choose to do that, the

20  transcript stands as is it is transcribed.  Most

21  witnesses want to read it to make sure that they

22  didn't misunderstand something or misspeak.

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/090606cs.txt

64

1    A    I would like to review it.
2  (Signature not having been waived, the deposition of
3  CHRISTOPHER SZECSEY was concluded at 1:30 p.m.)
4                    * * *
5
6
7             ACKNOWLEDGMENT OF DEPONENT
8       I, CHRISTOPHER SZECSEY, do hereby acknowledge
9  I have read and examined the foregoing testimony,
10  and the same is a true, correct and complete
11  transcription of the testimony given by me, and any
12  corrections appear in the attached errata sheet
13  signed by me.
14
15  _____  _____
16  Date                    CHRISTOPHER SZECSEY
17
18
19
20
21
22

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Marilyn Feldman, Registered Professional
3    Reporter, the officer before whom the foregoing
4    proceedings were taken, do hereby certify that the
5    foregoing transcript is a true and correct record of
6    the proceedings; that said proceedings were taken by
7    me stenographically and thereafter reduced to
8    computerized transcription under my supervision; and
9    that I am neither counsel for, related to, nor
10    employed by any of the parties to this case and have
11    no interest, financial or otherwise, in its outcome.
12        IN WITNESS WHEREOF, I have hereunto set my hand
13    and affixed my notarial seal this 15th day of
14    September 2006.
15    My commission expires:
16    December 14, 2006
17
18
19    _____
20    NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA
22

66

1       E R R A T A   S H E E T

2    IN RE:  Cooper v. Counterpart

3 RETURN BY:  _____

4 PAGE    LINE    CORRECTION AND REASON

5 ____    ____    _____

6 ____    ____    _____

7 ____    ____    _____

8 ____    ____    _____

9 ____    ____    _____

10 ____    ____    _____

11 ____    ____    _____

12 ____    ____    _____

13 ____    ____    _____

14 ____    ____    _____

15 ____    ____    _____

16 ____    ____    _____

17 ____    ____    _____

18 ____    ____    _____

19 ____    ____    _____

20 ____    ____    _____

21 _____   _____

22    (DATE)        (SIGNATURE)

67

1    E R R A T A   S H E E T   C O N T I N U E D

2    IN RE:  Cooper v. Counterpart

3  RETURN BY: _____

4  PAGE    LINE    CORRECTION AND REASON

5  ____    ____    _____

6  ____    ____    _____

7  ____    ____    _____

8  ____    ____    _____

9  ____    ____    _____

10  ____    ____    _____

11  ____    ____    _____

12  ____    ____    _____

13  ____    ____    _____

14  ____    ____    _____

15  ____    ____    _____

16  ____    ____    _____

17  ____    ____    _____

18  ____    ____    _____

19  ____    ____    _____

20  ____    ____    _____

21  _____    _____

22    (DATE)            (SIGNATURE)

Case 1:05-cv-01598-RMC     Document 26-13     Filed 02/13/2007     Page 68 of 68