1

```
1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - x

4  JAY W. COOPER,              :

5          Plaintiff,     :

6     -vs-                : CIVIL NO.

7  COUNTERPART INTERNATIONAL,    : 1:05-cv-01598-RMC

8          Defendant.     :

9  - - - - - - - - - - - - - - x

10              Vienna, Virginia

11              Wednesday, January 4, 2006

12  Deposition of:

13          JAY COOPER

14      The plaintiff, called for examination

15  by counsel for the defendant, pursuant to

16  notice, at 8614 Westwood Center Drive, Suite

17  950, Vienna, Virginia, beginning at 9:31 a.m.,

18  before JOSEPH A. INABNET, a Court Reporter and
```

19    Notary Public in and for the Commonwealth of

20    Virginia at Large, when were present on behalf

21    of the respective parties:

22

1  ON BEHALF OF THE PLAINTIFF:

2          PATRICIA D. DOUGLAS, ESQ.

3          98 Interpromontory Road

4          Great Falls, Virginia 22066-3219

5          (703) 759-3586

6

7  ON BEHALF OF THE DEFENDANT:

8          TYLER A. BROWN, ESQ.

9          Jackson Lewis LLP

10          8614 Westwood Center Drive, Suite 950

11          Vienna, Virginia 22182

12          (703) 821-2189

13

14   ALSO PRESENT:  ARLENE LEAR

15

16

17

18

19

20

21

22

1          C O N T E N T S

2  WITNESS:                JAY COOPER

3  EXAMINATION BY MR. BROWN          5

4  EXAMINATION BY MS. DOUGLAS          315

5  FURTHER EXAMINATION BY MR. BROWN     323

6

7

8          E X H I B I T S

9  NUMBER:             MARKED FOR IDENTIFICATION:

10  Deposition Exhibit No. 1        25

11  Deposition Exhibit No. 2        28

12  Deposition Exhibit No. 3        31

13  Deposition Exhibit No. 4        36

14  Deposition Exhibit No. 5        41

15  Deposition Exhibit No. 6        46

16  Deposition Exhibit No. 7        50

17  Deposition Exhibit No. 8        50

18  Deposition Exhibit No. 9        52

19  Deposition Exhibit No. 10          57

20  Deposition Exhibit No. 11          63

21  Deposition Exhibit No. 12          108

22  Deposition Exhibit No. 13          118

4

1   Deposition Exhibit No. 14      145

2   Deposition Exhibit No. 15      146

3   Deposition Exhibit No. 16      254

4   Deposition Exhibit No. 17      256

5   Deposition Exhibit No. 18      258

6   Deposition Exhibit No. 19      264

7   Deposition Exhibit No. 20      265

8   Deposition Exhibit No. 21      267

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1          P R O C E E D I N G S

2    Thereupon,

3              JAY COOPER

4         The plaintiff, called for examination

5    by counsel for the defendant, having been first

6    duly sworn by the notary public, was examined

7    and testified as follows:

8      EXAMINATION BY COUNSEL FOR THE DEFENDANT

9    BY MR. BROWN:

10      Q.   Could you please state your name for

11    the record?

12      A.   Jay Cooper.

13      Q.   Mr. Cooper, my name is Tyler Brown,

14    and we're here today to take your deposition in

15    conjunction with the action that you have filed

16    against Counterpart.

17         Have you ever had a deposition taken

18    before?

19    A.  Yes.

20    Q.  When was that?

21    A.  1990 or '91.

22    Q.  What type of action was that?

1     A.   That was -- I owned a home, and the

2  renter -- I had problems with the rent being

3  paid.  In Jackson County, Oregon.

4     Q.   And did -- so you sued the renter?

5     A.   Well, I -- I filed a complaint and

6  took the renter to court.

7          And the renter was asked -- or was

8  told to leave the house.

9     Q.   Okay.  Was that the one and only time

10  you have --

11    A.   Yes.

12    Q.   -- had a deposition taken?

13    A.   Yes.

14    Q.   Well, it has been a while, so let me

15  go over a few of the basic ground rules to make

16  sure that we understand one another, and make

17  this as easy as possible.

18    A.   Uh-huh.

19     (Interruption at the door.)

20     MR. BROWN:  If we can go off the

21  record?

22     If you would give me a moment.

1    (A discussion was held off the record.)

2        MR. BROWN:  We're back on the record.

3   BY MR. BROWN:

4       Q.   So, Mr. Cooper, I was going to explain

5   to you some of the basic ground rules of the

6   deposition to make sure we understand one

7   another and make this easy for both of us.

8        A deposition is just basically a

9   question and answer session under oath.

10       I'm going to be asking you questions

11   during the course of the day, and it's your job

12   to give me answers to the best of your ability

13   to recall.

14       You have taken an oath to tell the

15   truth.

16       It's the same oath that you would

17   swear to if you were giving testimony in court,

18   even though we're in this informal conference

19   room, and it's enforced by the penalty of

20   perjury.

21         Do you understand that?

22      A.  Yes.

1    Q.   For the court reporter's benefit, it's

2  important we try and do a couple of things.

3        One of them is that you have to answer

4  audibly, saying yes, no, or some other response

5  that we can hear.

6        Shaking your head, nodding your head,

7  saying uh-huh, uh-uh doesn't cut it because it

8  may not lead to a clear record.

9        Fair enough?

10    A.   That's fair.

11    Q.   Okay.  Every witness I have ever

12  deposed, at one time or another during the

13  course of the deposition, slips up and nods or

14  shakes the head.

15        I will just ask you, I'm sorry; is

16  that a yes or is that a no?

17        That's not meant to embarrass you in

18  any way.  It's just meant to make sure we have a

19   clear record.  Okay?

20       A.  Okay.

21       Q.  Great.  It's also important that we

22   speak one at a time.

1        Because in normal conversation, you

2    will sort of anticipate where the question is

3    going, and you will jump in and give me an

4    answer.

5        If I could ask you to refrain from

6    doing that because I will probably keep talking,

7    and the court reporter is trying to figure out

8    who is saying what.

9        It makes his job a living nightmare,

10    so let's not do that to him.

11    A.   Okay.  Understood.

12    Q.   Great.  The -- at any time today,

13    during the course of the deposition, if you

14    would like to take a break, as long as there's

15    not a question pending, we can do that.

16        My habit is usually take a break

17    around every hour or so anyway, but you don't

18    necessarily need to wait for me; okay?

19    A.  Okay.

20    Q.  Great.  If at any time, during the

21  course of the deposition, you do not understand

22  any of my questions, please let me know and I'll

1  be more than happy to rephrase.

2        I want to make sure we understand one

3  another.  Okay?

4     A.  Okay.

5     Q.  Great.  Are you under any medication

6  today that would affect your ability to testify?

7     A.  Actually, I took some cold medicine.

8        I don't think it's going to affect my

9  ability to testify.

10    Q.  Okay.  You're feeling clear headed as

11  you sit here today?

12    A.  Well, pretty clear.

13    Q.  Okay.  In preparation for the

14  deposition, did you review any documents?

15    A.  Yes.

16    Q.  What did you review?

17    A.  I reviewed one document that was a

18  list of talking points that I developed after I

19   was fired.

20          And these were talking points that I

21   prepared to discuss with USAID about my

22   departure and my firing.

1     Q.   I believe I know the document you're

2  talking about, so we will get to that in due

3  course.

4         Anything else?

5     A.   Yes.  I reviewed letters that were --

6  letter -- a letter from Aaron Chassy.

7         I reviewed some documentation about

8  Kim Alter.  I reviewed the interrogatories.

9     Q.   Anything else?

10    A.   That's -- for the most part that's it.

11        Just -- I reviewed -- I think some

12  email traffic.

13    Q.   Do you remember which emails?

14    A.   The emails that -- oh, there was a

15  document about a meeting between Bob Abma,

16  Michael Kunz, and myself.

17        That was the emails that were sent

18  relating to the meeting with Bob Abma and

19  Michael Kunz.

20          And request -- reviewed the budget.

21          This wasn't an email, but I reviewed a

22  budget that was proposed by Bob Abma to Michael

1   Kunz and myself, or proposed by Michael Kunz and

2   Bob Abma to me.

3       Q.   Any other documents that you recall?

4       A.   No, that's about all.

5           That's all that I can recollect right

6   now.

7       Q.   Okay.  The emails regarding the

8   meeting between you and Mr. Abma and Mr. Kunz,

9   what are -- is the approximate date of those

10  emails?

11      A.   October, October 2004.

12      Q.   When was this budget prepared that

13  you're talking about?

14      A.   In October of 2004.

15      Q.   Other than your attorney, have you

16  spoken to anyone in preparation for your

17  deposition today?

18      A.   No.

19    Q.   Where do you currently live?

20    A.   My address is 490 Strawberry Lane,

21   Ashland, Oregon.

22    Q.   Now, I have also seen reference to an

1   address in Medford.

2       A.   That was my address of record, 2431

3   Pinebrook Circle, Medford, Oregon.  That was my

4   address of record for all the years I was

5   working out of the United States.

6           It's an address of friends, and they

7   would take my mail for me and manage my mail.

8       Q.   Okay.  So you did not actually live at

9   the address in Medford?

10      A.   No.

11      Q.   And if I could just wait -- ask you

12  again, just wait until I finish my whole

13  question before you give your answer.

14      A.   Okay, sorry.

15      Q.   No.  That's okay.

16          It's a common issue in depositions.

17          How long have you lived at the

18  Strawberry Lane address in Ashland?

19     A.   From September -- September of this

20   last year, 2005, to the present.

21     Q.   Where were you living immediately

22   prior to the Strawberry Lane address?

14

1      A.   I was living -- I was -- well, I was

2  living in Central Asia, at 162 Coin Covik, in

3  Bishkek, Kyrgyzstan.

4          And there was one month that I was in

5  Arlington, Virginia, in July -- June -- it was

6  July and part of August.

7          I'm trying to remember, into August,

8  yeah.

9          And I was -- that was -- if I remember

10  right, 24 -- 2451, I think, 25th Street in

11  Arlington.

12          I might not have that address correct.

13      Q.   Prior to living in Arlington, were you

14  back at the address in Bishkek that you

15  mentioned?

16      A.   Yes.

17          Before Arlington, yes.

18      Q.   Yes.

19     A.   And after Arlington as well.

20     Q.   Got you.

21          Is that the address in Bishkek that

22   you moved to following your discharge from

1   Counterpart?

2      A.  After I was fired from Counterpart?

3      Q.  Yes.

4      A.  I moved to Kyrgyzstan after -- I

5   stayed in Kazakhstan for several months.

6      Q.  How long?

7      A.  From -- I was fired on November 12.

8          I stayed through the last week of

9   February.

10     Q.  And then moved to Bishkek?

11     A.  Yes.

12     Q.  Did anyone live with you at the

13   address in Bishkek?

14     A.  No.

15     Q.  Or in Arlington?

16     A.  I was staying with a family in

17   Arlington.

18     Q.  Friends?

19    A.  Yes.

20    Q.  And who is that?

21    A.  Twlia, T-W-L-I-A.

22        Fannin, F-A-N-N-I-N.

1    Q.   And do you live with anyone at the

2  address on Strawberry Lane in Ashland?

3    A.   No.  I have a landlord, landlady

4  actually, but not in the same home.

5       It's a cottage that's on the same

6  property, 490 Strawberry Lane.

7    Q.   Sounds like you're renting that

8  property?

9    A.   I'm renting, yes.

10    Q.   And are you currently married?

11    A.   No.

12    Q.   But you have been in the past.

13       Is that correct?

14    A.   Yes.

15    Q.   And when did you divorce?

16    A.   In October of 2004.

17    Q.   That's when the divorce was final?

18    A.   Yes.

19     Q.   You separated from some period of time

20   before that?

21     A.   Yes.

22     Q.   When did you begin the separation?

1      A.  In July -- June, July -- July of 2004.

2      Q.  Do you have any children?

3      A.  Yes.

4      Q.  How many?

5      A.  I have one son, Thomas.

6      Q.  How old is Thomas?

7      A.  Nine.

8      Q.  Where does Thomas reside?

9      A.  Thomas resides at 7939 Deepwell Drive,

10  Bethesda, Maryland.

11      Q.  Is that the address of your former

12  wife?

13      A.  Yes.

14      Q.  And what's her name?

15      A.  Elena, E-L-E-N-A.

16      Q.  Have you ever been convicted of a

17  felony?

18      A.  No.

19     Q.   When did you first begin working at

20   Counterpart?

21     A.   I began officially, January 1, 1995.

22     Q.   In what capacity?

18

1      A.   As the country director for

2   Kyrgyzstan.

3      Q.   What were your duties as country

4   director?

5      A.   Well, we were just beginning the

6   project in Central Asia at that time, and my

7   duties were to set up the program, hire staff.

8         I also had an additional

9   responsibility of coordinating training

10   activities in three countries, besides in the

11   countries of Uzbekistan, Kyrgyzstan, and

12   Kazakhstan.

13        So I had -- my responsibilities were

14   the training program and the -- acting as

15   director of the program in Kyrgyzstan at the

16   time.

17      Q.   Where were you stationed in

18   Kyrgyzstan?

19    A.   In Bishkek.

20    Q.   Who did you report to?

21    A.   I reported to Len Klein.

22    Q.   Is that Len as in L-E-N or L-Y-N-N?

1      A.  L-E-N.

2      Q.  And what was Mr. Klein's position?

3      A.  He was the chief of party for the

4  project.

5      Q.  When you say for the project, what was

6  the project called at that time?

7      A.  The project was the NGO Support

8  Initiative.

9      Q.  And NGO stands for?

10      A.  Nongovernmental Organization.

11      Q.  And I apologize if some of these

12  questions are obvious.  I mean, even though I

13  know some of the answers, too, it makes for a

14  better record if we can -- so somebody down the

15  road can read it later and know what that stands

16  for.

17          How long did you report to Mr. Klein?

18      A.  From January 1, 2000 -- I mean, 1995,

19  until July 1, 1997.

20    Q.  And what happened as of July 1, 1997?

21    A.  The project changed.

22        It was the second phase of this

20

1   project.

2        It was funded -- again, funded by

3   USAID.

4        And there was a new chief of party.

5   Q.  Who was that?

6   A.  David Smith.

7   Q.  Now, Mr. Klein, was he an employee of

8   Counterpart?

9   A.  Yes.

10  Q.  As was Mr. Smith?

11  A.  Yes.

12  Q.  Who did Mr. Klein report to?

13  A.  To Arlene Lear.

14  Q.  Did Mr. Smith also report to Ms. Lear?

15  A.  Yes.

16       You know, I would like to go back and

17  make a, not a correction, but just add to one of

18  my previous responses.

19    Q.  Sure.

20    A.  When I became an employee of

21  Counterpart, I was employed initially as a

22  consultant, and I was working in the capacity

1   that I mentioned.

2        But at the same time, I had some

3   additional responsibilities.  I was working with

4   an organization, Development Alternatives

5   Incorporated, DAI, in Bethesda, Maryland.  That

6   was part-time.

7        And mostly the work was on demand as

8   needed.  And I discussed this with Counterpart

9   when I began.

10        But after, I'm thinking about eight

11   months, they -- I became a full-time employee.

12        It could have been six, seven, eight

13   months in there, I became a full-time employee

14   and moved from that consultant status to a

15   full-time employee.

16    Q.  So when you mentioned a start date of

17   January 1, 1995, that's when you actually

18   started as an employee?

19    A.  Yes.

20    Q.  And six to eight months or so prior to

21  that, you had been working as a consultant?

22    A.  No.  Actually, January 1, 1995, I was

1  hired as a consultant, although, I -- you know,

2  it's -- I just -- I would have to review

3  documentation records to -- I don't know exactly

4  how that classification worked at that time, but

5  consultant and employee status.

6     Q.   Where were you working prior to

7  January 1, 1995?

8     A.   Well, I was working for DAI on a

9  part-time basis, and I had spent about a year

10  establishing an organization called Center

11  Interbilim, I-N-T-E-R-B-I-L-I-M, and

12  volunteering my time.

13        I had some work in Central Asia in

14  the -- so going backwards, that was the year of

15  1994.

16        And in the summer of '94, I was asked

17  to go to Almaty, Kazakhstan from Bishkek,

18  Kyrgyzstan, to take over a position that was

19  vacant, which was a training director for Peace

20  Corps volunteers, for the Kazakhstan Peace Corps

21  training group, which was a couple of months,

22  worked for a couple of months.

1     Q.   Tell me about Center Interbilim.

2          What is that organization?

3     A.   It's an organization that was

4  established to support democratic initiatives,

5  especially nonprofit organizations.

6          We would focus on training and --

7  training the nonprofit organizations, providing

8  information, communications for the nonprofit

9  organizations, which was the -- after the

10  breakup of the Soviet Union, was a new area

11  of -- in the process of developing a democratic

12  society.

13     Q.   And you founded Center Interbilim?

14     A.   With several local people, yes.

15          And with some -- some Americans were

16  founders, though I was the prime force behind

17  the founding.

18     Q.   And as of 1995, January, 1995, did you

19   hold any official position or title with Center

20   Interbilim?

21        A.  I was on the board.

22             I was on the board, although,

1  actually, under Kyrgyz law, there were -- it's a

2  little bit -- it's different than our standard

3  boards that we have here.

4       So based on the Kyrgyzstan law, there

5  were three executive directors or members.  And

6  they were -- you know, had a certain -- they

7  were in a -- they were required, these persons

8  were required for the organization to be legally

9  registered and operated.

10     Q.  Did you continue to serve on the board

11   of Center Interbilim during the course of your

12   employment with Counterpart?

13     A.  I continued -- I was officially on the

14   board.

15       And I don't know when I was removed,

16   but I had no official capacity, and had -- did

17   not -- I was not in any meetings or ...

18     Q.  You said you were removed from the

19  board?

20      A.  Well, at some point yes.

21          You know, they changed their legal

22  registration, and with a series of changes in

1   the registration and laws in Kyrgyzstan, at some

2   point, but I don't know when I was removed from

3   the board.

4           (Thereupon, Deposition Exhibit No. 1

5   was marked for identification.)

6   BY MR. BROWN:

7       Q.   Mr. Cooper, I'm showing you what we

8   have marked as Exhibit 1 to your deposition.

9           This is a seven-page document entitled

10  Employment Contract.

11          It has got a Bates Stamp at the bottom

12  of CP0064 through 70.

13          Is that your signature which appears

14  on the last page of the document?

15      A.   Yes, it is.

16      Q.   And was that -- according to the first

17  paragraph, it says that it's a contract made

18  effective the first day of October, 1994.

19        Is this the first employment contract

20   that you signed with Counterpart?

21        A.   As far as I know, yes.

22        Q.   Now, who did you discuss the terms of

1    this contract with?

2        A.   I'm -- if I remember, I would have

3    discussed it with Len Klein.

4        Q.   And this appears to be a form

5    contract.

6            Was it presented to you in the form

7    that we see here before us as Exhibit 1, and you

8    were simply asked to sign it, or was there any

9    negotiation or any terms and conditions of this

10   contract?

11       A.   It's hard for me to recall that,

12   exactly the details.  I just can't recall.

13           And I'm trying to recollect what

14   actually happened with this contract.

15       Q.   Okay.  But as you sit here today, you

16   don't have any recollection.

17           Is that your testimony?

18       A.   I have some recollection.

19       I remember the fact that as a

20   consultant, I was making quite a bit less than

21   this amount.

22       Q.  This amount being the --

1    A.  Yes.

2    Q.  -- $46,800?

3    A.  Yes.  And I had some discussions with

4  Arlene Lear.

5        And the -- what I was told was that

6  for that -- it was important for me to be a

7  full-time employee with a contract.

8        What's surprising to me right here is

9  that it has the October date on it, and I don't

10  remember why it was dated the first of October.

11        The project began the first of October

12  with USAID, as far as I know.

13        And even though I started in January,

14  I'm sure that if pay records -- payment records

15  were -- were available, it would not -- there

16  would be no record of me making 46,000 starting

17  October 1.

18    Q.  Do you recall discussing with

19   Mr. Klein or with anyone at Counterpart any

20   individual clauses of the employment contract?

21       A.   No.  I don't remember discussing any

22   of these terms with anyone.

28

1          (Thereupon, Deposition Exhibit No. 2

2   was marked for identification.)

3   BY MR. BROWN:

4      Q.   Showing you what we have now marked as

5   Exhibit 2 to your deposition.

6          This is a four-page document, Bates

7   Stamped CP0056 through 59.

8          And is that your signature which

9   appears on the last page?

10     A.   Yes.  That is my signature on the last

11   page.

12     Q.   And are those your initials that

13   appear on the lower right-hand corner of the

14   first three pages?

15     A.   Yes.  Those are my initials.

16     Q.   Is this the second employment contract

17   that you signed with Counterpart?

18     A.   To the best of my knowledge, it's the

19   second.

20      Q.  With whom did you discuss the terms

21   and conditions of this contract?

22         MS. DOUGLAS:  Object to the form.

1        THE WITNESS:  I would have -- I

2   discussed these terms with Arlene Lear.

3   BY MR. BROWN:

4      Q.   And is this a situation where you were

5   presented with Exhibit 2 and simply signed it,

6   or did you negotiate with Ms. Lear over any

7   provisions of this agreement?

8      A.   There was -- I'm sure there was some

9   negotiation.

10     Q.   Over what terms?

11     A.   There was some discussion about

12   housing and special benefits.

13     Q.   Do you recall what the nature of those

14   discussions was?

15     A.   The nature of the discussion was the

16   fact that I purchased an apartment in Bishkek

17   and that I was not eligible to receive a housing

18   allowance because I had purchased this.

19        Even though it was in my future wife's

20    name, the fact was that I purchased it and that

21    I was not eligible for the housing -- any

22    housing allowance.

1        The special benefits were to

2   compensate that housing cost, which is under

3   Point D that is in this contract.

4        Q.  Did you have any discussions or

5   negotiations over the paragraphs under Section

6   3, Employee Obligations?

7        A.  If -- do you have Exhibit 1 to this

8   agreement?

9        Q.  Not with me.

10        A.  If I could see Exhibit 1, then I could

11   comment on discussion.

12        Q.  Meaning what?

13        A.  That I would like to see the job

14   description so I could recall any discussion

15   concerning a job description.

16        Q.  All right.  When we take a break, I

17   will see if I have that.

18            Independent of that, do you have any

19  recollection?

20      A.  I don't have recollection.

21          And I don't have recollection of

22  discussion necessarily under employee

1  obligations.

2       This was, you know, sent to me.  I

3  reviewed it.

4       And, again, if I could see the job

5  description, that might jar the memory a little

6  bit.

7    Q.   Did you have any negotiations or

8  discussions with Ms. Lear regarding paragraph 4,

9  the termination provisions?

10   A.   No.

11       (Thereupon, Deposition Exhibit No. 3

12  was marked for identification.)

13  BY MR. BROWN:

14   Q.   Showing you what we have had marked as

15  Exhibit 3.  This is a three-page document, Bates

16  Stamped CP0051 through 53.  There's a

17  handwritten notation of "draft," at the top of

18  page 1.

19        This is not a signed document.

20        Do you recognize this document?

21    A.  Yes.

22    Q.  Is that --

1    A.  I mean, it's -- it's standard, sort of

2    contract.

3    Q.  Okay.  There's a handwritten notation,

4    as I mentioned, of "draft."

5        Is that your handwriting?

6    A.  Correct.  It looks like it, but I

7    couldn't say for sure.

8        But it does look like my handwriting.

9    Q.  There is also a handwritten -- some

10   numbers next to paragraph 2, on the first page.

11       And it's a little faint, but it

12   appears to be 82,500.

13   A.  Uh-huh.

14   Q.  Is that your writing?

15   A.  I can't say.

16   Q.  Do you recall discussing Exhibit 3

17   with anyone at Counterpart?

18   A.  Well, I -- I'm sure that I would have

19   discussed this with Arlene Lear.

20       Q.   Was Ms. Lear your direct supervisor as

21   of the date of this contract?

22       A.   Yes.

1    Q.   Got to let me finish.

2         It's effective April 1, 2000?

3    A.   Yes.  Ms. Lear was my supervisor as of

4  the date of this contract.

5    Q.   If you compare paragraph 4 of this

6  contract -- "this contract" being the draft that

7  is marked as Exhibit 3 -- and you compare

8  paragraph 4 of the prior exhibit, Exhibit 2, you

9  will note that Exhibit 3 contains a paragraph --

10  paragraph 4C of Exhibit 3.

11        And I'm summarizing, but it talks

12  about termination at Counterpart's sole

13  discretion if the financial situation in

14  Kazakhstan deteriorates to the point that it is

15  no longer practical to operate the program.

16        Do you see that provision?

17    A.   Under -- is this in the ...

18    Q.   Looking at Exhibit 3, paragraph 4(c).

19     A.  Okay.  Is this the exhibit?

20     Q.  That's Exhibit 3 that you have there

21  in front of you, I believe.

22     A.  4(c), yes, I see it.

34

1    Q.  Do you see that version?

2    A.  Uh-huh.

3    Q.  Now, that does not appear, I will

4  represent to you, in Exhibit 2.

5        Do you recall any discussion about

6  that -- the inclusion of that paragraph in

7  Exhibit 3?

8    A.  No.

9    Q.  Was there something different about

10  the financial situation in Kazakhstan as of

11  April of 2000, in terms of the financial

12  situation in Kazakhstan when you signed Exhibit

13  2 in -- it was actually signed in February of

14  1998?

15    A.  Okay.  Now, we're comparing 4(c) with?

16    Q.  With the provisions of paragraph 4 in

17  Exhibit 2.

18    A.  Uh-huh.

19     Q.   And the 4(c) in Exhibit 3 refers to

20   the financial situation in Kazakhstan, paragraph

21   4, and its subparagraphs in Exhibit 2 contain no

22   such provision.

1        I'm just wondering there was any -- if

2    you recall any discussion about the inclusion of

3    the new language in 4(c).

4        A.   I don't recall any discussion about

5    the new provision.

6        Q.   Similarly, paragraph 4(b) of Exhibit 2

7    talks about the conditions under which

8    Counterpart could terminate your employment

9    immediately upon notice.

10        And in Exhibit 2, that language

11    ends -- and I'm looking at paragraph 4(b) of

12    Exhibit 2, ends with the phrase, "or fails to

13    perform his duties satisfactorily."

14        If you look at paragraph 4(b) of

15    Exhibit 3, it's slightly different, and it says

16    "or fails to perform his job duties to

17    Counterpart's satisfaction."

18        Do you recall any discussion with

19   Ms. Lear or anyone at Counterpart regarding that

20   change?

21      A.  I don't recall.

22      Q.  All right.  Do you know if you signed

1    a final version of Exhibit 3?

2        A.  I'm sure that I did.

3        Q.  Well, what makes you sure that you

4    did?

5        A.  Well, because I had a file of

6    contracts in my office, in Almaty, of all my

7    contracts.

8            But this file was taken by Counterpart

9    when they locked my offices and refused to allow

10    me entrance.

11        Q.  The file that you kept in Almaty was a

12    file that contained only signed contracts?

13        A.  I don't recall that -- it could have

14    had any number of contracts with Counterpart,

15    signed, unsigned, drafts, different versions.

16            (Thereupon, Deposition Exhibit No. 4

17    was marked for identification.)

18    BY MR. BROWN:

19    Q.  I'm showing you what we have had

20    marked as Exhibit 4.

21           This is a two-page document in the

22    form of a -- Counterpart stationery in the form

1    of a letter to you, which, although it's in a

2    somewhat different format than the agreements we

3    have been looking at, appears to encompass some

4    of the same terms and conditions of employment.

5        Do you recognize Exhibit 4?

6    A.  Yes.

7        Q.  Did you discuss the terms of Exhibit 4

8    with Ms. Lear?

9    A.  I discussed some parts of this

10   contract.

11       Q.  Which parts?

12   A.  The financial benefits.

13       Q.  Other than your salary, any other

14   financial aspects of Exhibit 4 that you

15   discussed with Ms. Lear?

16   A.  The benefits for education for

17   children.

18       Q.  Anything else?

19     A.   Not that I recall.

20     Q.   What was the nature of the discussion

21   regarding the educational expenses for children?

22     A.   The discussion would have included the

1   costs of school for -- for -- for -- at the

2   international school in Kazakhstan.

3       Q.   And am I correct in assuming that

4   Counterpart was willing to pay you something,

5   and you wanted more than that for the

6   educational benefits?

7       A.   Possibly.  I wanted the total cost of

8   the education.

9       Q.   I'm assuming you weren't asking them

10   to pay you less?

11      A.   Well, are you assuming that there was

12   some -- you mean in the negotiation process?

13      Q.   Yes.

14      A.   It may not have been that I wanted

15   more.

16        It may have just been strictly a

17   discussion, this is what the costs are, and this

18   is what I would expect in my contract.

19     Q.  I'm not as interested in what may have

20   been as what did happen, and either you recall

21   or you don't.

22          Do you recall what you discussed with

1    Ms. Lear regarding the educational benefits?

2        A.   No, I don't recall.

3        Q.   If you look at Exhibit 3 and compare

4    it to Exhibit 4, a couple of things jump out, at

5    least at me.

6            And one is that the two agreements

7    cover the same period of time, that being April

8    1, 2000 to March 31, 2003.

9            Do you have a recollection of how the

10   two agreements came to be and why there's a

11   difference between the two of them covering the

12   same period of time?

13       A.   My only recollection would be that, as

14   this points out, this is a draft --

15       Q.   Uh-huh.

16       A.   -- and that this would have been then

17   developed from this as the draft.

18       Q.   Okay.  And just for the record, so I

19   can clarify what the "this" is, you're saying,

20   the first "this" being the reference to the

21   draft as Exhibit 3, and that the final version,

22   if you will, then would be Exhibit 4.

1    A.  Uh-huh.

2    Q.  Correct?

3    A.  Yes.

4    Q.  Okay.  Thank you.

5        Another change which jumps out at me,

6  which I think lends credence to what you're

7  saying is that in Exhibit 3, the salary is

8  listed as, the typed version, $80,000.

9        There is that handwritten notation of

10  82,500.

11        And then in Exhibit 4, we see that the

12  salary is listed as $82,500.

13        Is it your recollection that you

14  requested from Counterpart, and specifically

15  through Ms. Lear, that your salary be increased

16  from 80,000 to 82,500?

17    A.  Yes, that's my recollection.

18    Q.  And similarly, if you look at special

19   benefits in Exhibit 3, it refers to educational

20   expenses with dependent children not to exceed

21   $10,000 a year, whereas in Exhibit 4, that

22   amount is increased to $11,000 a year.

1        Is it your recollection that you

2   requested an increase in the educational

3   expenses from 10,000 to $11,000 a year?

4      A.  I -- I don't remember the specifics,

5   but I'm sure that's the exact case, that I would

6   have requested 11,000 instead of 10,000.

7      Q.  Okay.  And Counterpart agreed to that

8   request?

9      A.  Yes.

10     Q.   Are there any other provisions of

11   Exhibit 4 that you recall discussing with

12   Ms. Lear or anyone else at Counterpart?

13      A.  No.  There are no other parts that I

14   recall specifically discussing.

15        (Thereupon, Deposition Exhibit No. 5

16   was marked for identification.)

17   BY MR. BROWN:

18     Q.  I'm showing you what we have marked as

19  Exhibit 5.

20          This is a two-page document, Bates

21  Stamped CP0042 and 43.  This is also not signed.

22          It is dated at the top January 26,

42

1  2001.

2          Now, this appears to cover the same

3  period of time that we have been most recently

4  talking about, that being April 1, 2000 to March

5  31, 2003.

6          Do you recall the circumstances which

7  led to the generation of this document?

8      A.  It looks to me from reviewing the two

9  documents, that they're -- and I'm trying to

10  recall.

11     Q.  Let me just interrupt you.

12     A.  Uh-huh.

13     Q.  You're referring to comparing Exhibit

14  4 to Exhibit 5?

15     A.  Exhibit 4 to Exhibit 5, that there's

16  an additional benefit of up to $5,000 for rest

17  and recuperation allowance in Exhibit 5.

18     Q.  Uh-huh.

19     A.   And in Exhibit 4, it's up to a total

20   of 3,000.

21     Q.   What discussions led to the change

22   between Exhibit 4 and Exhibit 5?

1      A.   The discussion would have been that

2   the cost of travel for rest and recuperation

3   is -- would not be covered by $3,000.

4      Q.   Were those discussions that you had

5   with Ms. Lear?

6      A.   Yes.

7      Q.   And as a result of those discussions

8   and your request that the rest and recuperation

9   allowance be increased, that Counterpart agreed

10   to increase that from 3,000 to 5,000?

11     A.   Yes.

12        MS. DOUGLAS:  Objection.  Do we have a

13   signed copy of this?

14        Because the one I have is not signed,

15   so we can't know whether Counterpart agreed to

16   anything.

17        MR. BROWN:  If I had a signed copy,

18   Pat, I would give it to you.

19          MS. DOUGLAS:  All right.

20   BY MR. BROWN:

21          Q.   As you sit here today, sir, your

22   recollection is that Counterpart agreed to your

1  request to increase the rest and recuperation

2  allowance from 3,000 to $5,000?

3      A.  Yes, that's what I recall.

4      Q.  Do you recall discussions with

5  Ms. Lear or anyone at Counterpart regarding any

6  other provisions of Exhibit 5?

7      A.  I don't recall discussing any

8  additional -- any other parts of this Exhibit 5.

9      Q.  Do you recall seeing Exhibit 5 at or

10  about the time it's dated, January 26, 2001?

11      A.  I don't recall seeing them.

12      Q.  Is this the version, if you will, that

13  contains the terms that you eventually did sign,

14  covering the period of April 1, 2000 to March

15  31, 2003?

16      A.  I can't -- I can't -- I can't answer

17  that, whether I -- whether these are the exact

18  conditions, provisions that I signed.

19    Q.  Do you recall signing some other

20  document that covered the terms and conditions

21  of your employment from April 1, 2000 to March

22  31, 2003?

1      A.   I recall signing contracts throughout

2   my employment history with Counterpart.

3          Whether -- which one I signed, I'm not

4   sure.  And, you know, so it's hard for me to say

5   which ones.

6          But even though we often were late and

7   had to sort of pick up from things, we were very

8   busy, there was, from my recollection, always a

9   signed contract with Counterpart throughout my

10  employment history.

11     Q.   All right.  You sort of anticipated my

12  next question, but just to make it clear, even

13  though you may have signed contracts after the

14  period of time that the contract was to be in

15  effect --

16     A.   Uh-huh.

17     Q.   -- at the end of the day, if you will,

18  from the time you began employment with

19   Counterpart to the time when your employment

20   with Counterpart ended --

21     A.   Uh-huh.

22     Q.   -- you also had a signed contract that

1  eventually covered all of that period?

2     A.  Yes.  That's my understanding and

3  recollection.

4     Q.  Okay.  Fair enough.

5        (Thereupon, Deposition Exhibit No. 6

6  was marked for identification.)

7  BY MR. BROWN:

8     Q.  Showing you what we have marked as

9  Exhibit 6.

10       This is a two-page document on

11  Counterpart letterhead, dated September 24,

12  2003, Bates Stamped CP0037 and 38.

13       Do you recognize this document?

14    A.  Yes.

15    Q.  What do you recognize this as?

16    A.  As a contract between myself and

17  Counterpart International.

18    Q.  Now, this contract covers the period

19  July 1, 2003 through June 30, 2006.

20          This version is not signed, although

21  we will eventually get to a version that is.

22          Was this the first version of a

1   contract that you saw that discussed the period

2   of July 1, 2003 through June 30, 2006?

3        A.   I can't answer if that was the

4   first -- if this was -- if Exhibit 6 was the

5   first version that I saw.

6        Q.   Regarding the employment period of

7   July 1, 2003 to June 30, 2006, with whom at

8   Counterpart did you discuss the terms and

9   conditions of your employment for that period of

10  time?

11       A.   With Arlene Lear.

12       Q.   With anyone else other than Ms. Lear?

13       A.   And there may have been discussion

14  with Kelli Boyer, the HR, human resources

15  manager at Counterpart.

16       Q.   What discussions do you recall with

17  Ms. Boyer?

18       A.   The discussions I had with Ms. Boyer,

19   to my -- to my recollection, weren't about this

20   specific contract, but about -- well, let me

21   take that back.

22          There were discussions with her about

1  finalizing the contract, getting it completed.

2  We needed to get a signature.

3       And I would -- I -- in the

4  discussions, I expressed the -- whatever changes

5  or needs in the contract to her.

6       Q.   Over the course of the discussions

7  regarding the contract, which ultimately you

8  signed, covering the period of time July 1, 2003

9  through June 30, 2006, what terms did you

10  discuss with Ms. Boyer?

11      A.   My recollection is that I didn't

12  discuss terms with Ms. Boyer as much as I

13  discussed the need to have a signed contract.

14       And in fact, there was discussion

15  about that if they didn't get a signed contract,

16  I would not be paid.

17       And in this process, as I recollect,

18  there was -- there were communication issues.

19      There were -- things weren't going --

20   I was asking questions and they weren't being

21   responded to.

22      Q.   Of whom were you asking questions?

49

1      A.  With -- well, as I recollect, Kelli

2  Boyer, was the liaison between myself and Arlene

3  Lear, to some extent.

4          And she was trying to get the contract

5  signed.

6      Q.  She being?

7      A.  Kelli Boyer was trying to get the

8  contract signed.

9      Q.  And you were relaying questions to

10  Ms. Lear through Ms. Boyer, and you felt that

11  those questions were not getting answered?

12      A.  Well, I -- it's -- it's difficult for

13  me to exactly recollect the, you know, the

14  specifics of communications between myself and

15  Kelli Boyer and Arlene Lear.

16      Q.  What questions did you have that you

17  were relaying through Ms. Boyer?

18      A.  Well, it would have been the terms of

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/Deposition%20of%20Jay%20Cooper.txt

19   the contract.

20   Q.  Which terms?

21   A.  The financial terms, I'm guessing.

22        They may be more of the benefits --

1  benefits for children.

2     Q.   The last thing I want you to do is to

3  guess.

4        Let me mark a couple of other exhibits

5  here, and it may refresh your recollection.

6     A.   Now, that would be helpful.

7        (Thereupon, Deposition Exhibit No. 7

8  was marked for identification.)

9  BY MR. BROWN:

10    Q.   Showing you what we have marked as

11  Exhibit 7.

12        This is also a two-page document,

13  dated November 25, 2003, also not signed by you,

14  Bates Stamped CP0039 through 40.

15        I think because it was attached to

16  your complaint, the one document I don't have a

17  copy of right handy -- no, I take it back, I do.

18        MR. BROWN:  Let's go ahead and mark

19  this as Exhibit 8.

20          (Thereupon, Deposition Exhibit No. 8

21  was marked for identification.)

22  BY MR. BROWN:

1     Q.   And then I -- you have in front of you

2   Exhibit 8, which is also a two-page document,

3   Bates Stamped CP0031 through 32.  This is dated

4   December 18, 2003.

5        And this one is signed, by both

6   Mr. Dorcus, on behalf of Counterpart, and by

7   yourself as of December 21, 2003.

8        Let me first ask you, is that your

9   signature which appears on Exhibit 8?

10    A.   Yes, that's my signature.

11    Q.   All right.  Now, having Exhibits 6, 7,

12   and 8 in front of you, covering the same period

13   of time, that being July 1, 2003, through June

14   30, 2006, does this refresh your recollection as

15   to the terms and conditions of the contract that

16   you had questions of, that are directly with

17   Ms. Lear or through Ms. Boyer.

18    A.   Could you rephrase your question?

19      Q.  Sure.  We were talking about the

20   questions that you raised during the process of

21   determining whether you would sign the contract

22   covering the period of July 1, 2003 to June 30,

1   2006.

2          And we were trying to determine what

3   questions you had about the terms and conditions

4   of employment.

5          I'm trying -- now that we have got the

6   three contracts or three, I guess, technically

7   two drafts and the final version in front of us,

8   if you -- if that refreshes your recollection as

9   to what questions you had about those terms and

10   conditions?

11      A.   The November 25, which is Exhibit No.

12   7, contract, the contractor agreement, did not

13   include the rest and recuperation allowance for

14   family.

15      Q.   Okay.  I show you a letter which may

16   further refresh your recollection as to some of

17   the issues that were being discussed at this

18   time.

19        (Thereupon, Deposition Exhibit No. 9

20   was marked for identification.)

21   BY MR. BROWN:

22        Q.   Showing you what we have marked as

53

1   Exhibit 9.

2         This is a one-page document, Bates

3   Stamp CP0035, dated December 15, 2003.

4         It begins "Dear Arlene," and ends,

5   "Sincerely, Jay," although it is not signed.

6         Did you prepare Exhibit 9?

7     A.   Yes.

8     Q.   Paragraph 1, the No. 1 of Exhibit 9,

9   refers to a job description that would be

10   provided under a separate cover, and states that

11   you wanted to see that.

12         Did you see a job description before

13   signing Exhibit 8?

14     A.   No.

15     Q.   In Exhibit 9, you state that you would

16   like to see it before signing.

17         What discussions did you have with

18   Ms. Lear or Ms. Boyer or anyone else at

19   Counterpart regarding the job description?

20        A.   I requested a job description, and I

21   don't recall specific discussions, but it's my

22   request here.

1        And I never received it.

2        Q.   And yet you signed Exhibit 8.

3        I'm just wondering, knowing that as of

4    December 15, you wanted to see it before you

5    would sign, as of December 21, you signed

6    without seeing it --

7        A.   Yeah.

8        Q.   -- how that came to be?

9        A.   I was -- I felt pressured to sign this

10   contract.

11        And in fact, I don't -- I could

12   probably find emails where I was threatened with

13   nonpayment if I didn't sign the contract.

14        Q.   You say you could probably find.

15        A.   I would have to look at -- at records,

16   email records.

17        But Kelli Boyer sent me an email

18   threatening me not to pay my salary unless I

19    signed a contract.

20        Q.   Have those emails been produced during

21    the course of discovery, sir?

22        A.   I don't think that they have been

1  produced.

2       I don't -- I just remember

3  specifically, that's something that's -- that

4  really jogs my memory when, you know, I was

5  threatened with nonpayment if I didn't sign a

6  contract.

7       Q.  Uh-huh.  Did you save those emails?

8       A.  Unfortunately, I can't -- I can't say

9  if I have saved the email or not.

10      I would hope that I could find it.  I

11  could try to find it.

12      Q.  Okay.

13      MS. DOUGLAS:  On behalf of Mr. Cooper,

14  we will look, and we will send it to you if we

15  can find it.

16  BY MR. BROWN:

17      Q.  Paragraph No. 2 on Exhibit 9, refers

18  to a clause relating to R&R, I assume that's

19  rest and recuperation, for family members.

20        You requested that that be included in

21  the contract.  And as you have previously

22  identified, that was a change which took place

56

1   between Exhibit 7 and Exhibit 8; correct?

2      A.   Yes.

3      Q.   Paragraph No. 3 refers to carrying

4   over more vacation days than allowed in the

5   manual for persons working in foreign areas.

6          How was that issue resolved?

7      A.   As I recall, Ms. Lear, Arlene Lear,

8   agreed that I could carry over vacation days, as

9   I recall.

10     Q.   And Exhibit 4 refers to ultimately an

11   increase in the M&IE to $50 from the current

12   rate of $30.

13         How was that issue resolved?

14     A.   It was increased from $30 to $50.

15     Q.   Other than the areas reflected in

16   Exhibit 9, do you recall discussing, either

17   directly with Ms. Lear or through Ms. Boyer to

18   Ms. Lear, any other terms and conditions of the

19   agreement that was ultimately signed that is

20   before us as Exhibit 8?

21      A.   I don't recall any other terms or

22   conditions that were discussed.

1      Q.   Did you discuss with anyone at

2    Counterpart the terms concerning the termination

3    of the agreement?

4      A.   No.

5          (Thereupon, Deposition Exhibit No. 10

6    was marked for identification.)

7    BY MR. BROWN:

8      Q.   Showing you what we have marked as

9    Exhibit 10.

10          This is a one-page document, Bates

11    Stamped CP0036, and is an email.

12          At the bottom, from you to -- or I'm

13    sorry, from Ms. Lear to you, dated December 17,

14    2003.

15          Do you recall receiving this email?

16    A.   Yes.

17    Q.   The -- it says that she went over your

18    memo to her with Kelli.

19          I'm assuming that that means the memo

20     we have marked as Exhibit 9 because then we have

21     got four paragraphs which match up with the four

22     paragraphs in your letter to her.

58

1        Is that the way you read this?

2        A.   Would you repeat that, please?

3        Q.   Sure.  The email of Exhibit 10 refers

4    to your memo to me, that being Ms. Lear.

5        I'm assuming that refers to Exhibit 9

6    because it tracks the four numbered paragraphs

7    in Exhibit 9.

8        Is that the way you read that?

9        A.   Yes.

10       Q.   With regard to No. 1, the job

11   description, it says it will be updated by COB

12   tomorrow, I assume that means close of business,

13   and sent to you for review.

14       Is it your testimony that it was not

15   sent to you for review?

16       A.   It is my testimony that it was not

17   sent to me for review.

18       Q.   And then as you had previously

19   testified, Exhibits -- or I'm sorry, paragraph

20   2, 3 and 4 of Exhibit 10 reflects, once you boil

21   them all down, the agreement to include those

22   provisions that you requested.

1        Is that your understanding?

2        A.  Yes.

3        Q.  The last line of the email says:

4   "This protracted negotiation has left me puzzled

5   and annoyed.  I will refrain from venting and

6   stop here."

7        Did you ever have any discussion with

8   Ms. Lear regarding why she felt puzzled and

9   annoyed?

10       A.  As I recall, I responded by sending

11   her copies of emails to Kelli Boyer and pointing

12   out the lack of response on Kelli Boyer's part.

13       Q.  Did you ever have a discussion, either

14   face to face or over the phone, with Ms. Lear

15   regarding the nature of the negotiations,

16   regarding -- of the contract that ultimately

17   ended up being Exhibit 8?

18       In other words, you said you exchanged

19  emails.

20      I'm wondering if the two of you ever

21  actually discussed it?

22      A.   As I recall, there were some

60

1   discussions.

2        There were some discussions especially

3   over the increase of M&IE to $50.

4        Again, I would like to go back to your

5   question, if it's possible, about why did I sign

6   this contract even though I requested a job

7   description.

8        I think if you look at this last line,

9   "This protracted negotiation has left me puzzled

10  and annoyed.  I will refrain from venting and

11  will stop here.  Arlene."

12       That, again, I felt pressured to sign

13  this contract.

14       And another reason why I didn't push

15  on the job description.

16   Q.  Uh-huh.  But ultimately, you did agree

17  to the terms of Exhibit 8?

18   A.  I agreed to the terms.

19        I wanted a job description.  I wanted

20   a clear -- a clear guidance of what my job

21   entailed, and I never received that.

22        Q.  Following your signature of Exhibit 8,

1   did you continue to make requests for the job

2   description?

3      A.  No.

4      Q.  Why not?

5      A.  I gave up.

6      Q.  What was it about your job that you

7   were unclear of as of the time of signing

8   Exhibit 8?

9      A.  I was fairly clear on what my job

10  should be, but it was -- what was unclear to me

11  was what was expected by Counterpart

12  International.

13     Q.  Uh-huh.  And how was that unclear?

14     A.  Because I had nothing in writing.

15     Q.  Well, did you have some reason to

16  believe that what you thought your job was and

17  what Counterpart expected of you did not match

18  up?

19    A.  Not necessarily did I think that we

20  weren't -- that my -- that my job --

21  understanding my job and their expectations did

22  not match up, but I still wanted a job

1   description that was -- I was entitled to have

2   something that could be used in performance

3   reviews, something that was a basis for my work

4   with Counterpart.

5       Q.   Had there been any situations that had

6   come up as of December 21, 2003, where you had

7   either done or not done something and

8   Counterpart had said to you, Hey, wait a minute;

9   that's part of your job, or it's not part of

10   your job?

11        In other words, was there some clash

12   or discussion about differing expectations?

13      A.   Non that I recall.

14      Q.   Were there any after that event?

15        MS. DOUGLAS:  Objection, after --

16   ever, after?

17        MR. BROWN:  After December 21, 2003,

18   yes.

19        THE WITNESS:  Were there --

20   BY MR. BROWN:

21        Q.   Were there any discussions with any --

22   with Counterpart management where differing

1  expectations came to light.

2     A.  Yes.

3     Q.  When did those discussions come about?

4     A.  Those discussions took place in August

5  of 2004.

6     Q.  Okay.  All right.  We will get to

7  those in due course.

8        Was a job description ever provided to

9  you after December 21, 2003?

10     A.  I was asked to write a job description

11  a day or two days before the August meeting,

12  when it was -- that was a request from Ms. Lear.

13        She contacted me and said, We can't

14  find a job description for you anywhere; could

15  you please write one in preparation for the

16  meetings.

17        (Thereupon, Deposition Exhibit No. 11

18  was marked for identification.)

19  BY MR. BROWN:

20      Q.  Showing you what we have marked as

21  Exhibit 11.

22          This is a two-page document, Bates

64

1    Stamped 000065 and 66, entitled Counterpart

2    International Central Asia Position Description.

3         Is this the document that you prepared

4    that you have just referenced?

5        A.   To the best of my recollection, yes,

6    this would have been the document that I

7    prepared.

8        Q.   Okay.

9         MR. BROWN:  With that, we went a

10   little bit longer than I said I usually do, we

11   will take a quick break.

12        MS. DOUGLAS:  Thank you.

13           (A recess was taken.)

14   BY MR. BROWN:

15       Q.   At the time that you discussed the

16   terms and conditions of employment, what

17   ultimately became Exhibit 8, governing the 2003

18   to 2006 time frame, did you have any discussions

19   with Ms. Lear about whether you were burnt out?

20   A.  Yes.

21   Q.  Describe those conversations to me.

22   A.  I would have to think about it.

1        I don't recall the specifics, but

2    there were discussions of the amount of work,

3    the workload, the number of years that I spent

4    in the region, and being tired.

5        Q.   Uh-huh.  In your own thought process

6    of what you wanted to do with your life, were

7    you contemplating at that point not continuing

8    your -- in your role?

9        A.   No.

10       Q.   You felt -- did you personally feel

11    somewhat burnt out?

12       A.   Yes.

13       Q.   But felt that you had enough left, if

14    you will, to keep going?

15       A.   Well, one of the interesting things

16    about working in this field is that we work by

17    project.

18        And it's at a point when a project

19    ends and another project begins that you make

20    the decision to, I'm going to take on this next

21    project and I'm going to see it through, and I'm

22    going to make sure that there are positive

1  results and do it the best I can.

2    Q.  Uh-huh.

3    A.   And if you look back at the projects

4  that Counterpart managed, especially -- there

5  were multiple projects, but there was a main

6  project that was the backbone of all of the work

7  in Central Asia, from -- at least this is my

8  interpretation or my take on it.

9       Len Klein was the first chief of

10  party, and he made it through two and a half

11  years and then he decided to leave.

12       And David Smith came in and he made it

13  through, you know, his project.

14       And I was -- decided to -- that I

15  could go through two projects.  And that was

16  my -- I was determined to do that.

17    Q.  Uh-huh, okay.  When you say to go

18  through two projects, do you mean that you

19   finished one and were going to then start

20   another, or you were going to see two projects

21   through to completion?

22        A.   See two projects through to at

1   least -- and, you know, who knows from there.

2       Q.   And those two projects were?

3       A.   Well, I was chief of party for the

4   project from 2000 to 2003.

5            And then from 2003, with the intention

6   to finish in 2006.

7       Q.   You mentioned a project that was the

8   backbone --

9       A.   Yes.

10      Q.   -- I think was your term.

11      A.   Yes.

12      Q.   And you're talking about -- is that

13  the project you were working on?

14      A.   Yes.

15      Q.   All right.  And what was the name of

16  that project?

17      A.   CSSI.

18      Q.   And what does that stand for?

19    A.  That's the -- I'm at a loss here.

20    Q.  Now, if you don't know, we're really

21  in trouble.

22    A.  The Civil Society Support Initiative.

1        Well, you know, with acronyms, you use

2   them all the time, you forget what they really

3   stand for --

4        Q.   I understand.

5        A.   -- but you know what they are.

6        Q.   I have the same problem myself.

7            And so that was the project that you

8   became chief of party of --

9        A.   Yes.

10       Q.   -- if you will, as of 2000?

11       A.   Yes.

12       Q.   Is that a project which had been

13   ongoing prior to 2000?

14       A.   Well, the initial project began in

15   October, was awarded to be -- and began in

16   October of 1994, and that was, I think, the NGO

17   Support Initiative.

18            Then, there was -- after two and a

19  half years, that was funded, Counterpart was

20  funded again to continue that.

21      And then there was -- in -- I'm trying

22  to recall.  In -- and then it was continued one

1   more time from 2000 to 2003, then it was rebid.

2       Initially, the first phase was in

3   three countries, Kazakhstan, Kyrgyzstan, and

4   Uzbekistan.

5       And it was small in comparison with

6   the next project in terms of the funding.

7       The first one was around 5 million and

8   the second one was closer -- well, I don't have

9   the budgets in front of me, but more than double

10   that.

11   Q.   The second one being -- taking place

12   starting when?

13   A.   July 1997.

14   Q.   Okay.

15   A.   Then the -- the next phase starting

16   in -- actually, there was a transition from

17   April to July, but the -- that third project,

18   that was in -- even though the project didn't

19  begin necessarily until -- it wasn't awarded

20  until after April, it was predated to April 1.

21      Q.  Of what year?

22      A.  Of 2000.

1     Q.   Okay.

2     A.   And that then -- that project went to

3  June 30, 2003.

4         Now, the final -- this fourth project

5  that is ongoing now from July 1, 2003 to June

6  30, 2006, we -- we had to write proposal, and it

7  was rebid by USAID.

8         And so it went to -- we -- the project

9  itself then was divided between two

10  organizations, between Counterpart and IREX.

11        So --

12    Q.   Can you spell IREX for me?

13    A.   I-R-E-X.

14        So we kept three countries, and they

15  were working in two.

16        Although, I was also managing another

17  project.

18    Q.   Which was what?

19     A.  HNCBI.  Healthy Communities NGO

20  Building Initiative, something like that.

21          And that project was in five

22  countries.

1     Q.   And as part of the CSSI project, you

2   were to work with local officials, local

3   authorities on the project.

4         Is that right?

5     A.   Well, that's -- it's very complex.

6     Q.   Yes, it is.  I'm trying to simplify

7   it.

8         If it can't be simplified, I guess you

9   will tell me.

10     A.   The CSSI, in the last element, the

11   last phase, was to -- the direction was to

12   support associations of nonprofit organizations,

13   NGOs, and specific -- these associations which

14   included, depending upon the country, aid to 12

15   organizations in each association.

16         The intent of the project or the

17   purpose of the project is to develop those --

18   the capacity of the association to continue and

19    support the development of civil society through

20    training, through communications, through

21    community out reach, a lot of community out

22    reach.

1      Q.   As part of that, is it the goal to

2   basically, for want of a better term, empower

3   those local organizations so that they can --

4      A.   Absolutely, yes.

5      Q.   Okay.  So that they can start making

6   decisions on their own?

7      A.   Yes.

8      Q.   Okay.

9      A.   Not only just make decision on their

10   own, but develop activities that can fund their

11   work, you know, that they can be independent.

12         That they can contribute to the

13   development of civil society, and at the same

14   time, have a functional organization.

15      Q.   And as part of that, your role then is

16   to develop good working relationships with these

17   local organizations and associations so that you

18   can further that goal of their empowerment.

19        Is that fair to say?

20     A.   Are you talk about me personally?

21     Q.   Yes, in your role.

22     A.   Can we refer to the job description.

1    Q.   If that would help.

2    A.   As you can see, I -- in my role, was

3  more management of the staff that then related

4  to the organizations.

5    Q.   Uh-huh.

6    A.   And we could go through this job

7  description.

8        I don't think we need to do that, but

9  you can see exactly what my role was as I

10  developed this job description.

11    Q.   From June of '03 until the end of your

12  employment, when you say your staff, how many

13  people were on your staff?

14    A.   Well, as the -- as the director for

15  two projects, there were essentially about 400

16  people in these -- in these projects funded -- I

17  mean, throughout the five countries that had a

18  relationship, that had a -- that were working

19   directly.

20       Q.   How many of those 400 were direct

21   reports?

22       A.   Direct reports, about eight.

1        You know, I would have to look at the

2    job -- you know, the organizational chart.

3        And that was revised on -- and

4    depending upon the development of the project,

5    things would change.

6        Again, thinking in terms of the

7    concept of this is a project, it's not an

8    ongoing business.

9    Q.   Uh-huh.

10    A.   You know, it's not -- it's -- you

11    know, it has a different -- there are different

12    aspects to the management of a project compared

13    to an ongoing business.

14    Q.   What are those differences?

15    A.   Well, the difference is that there are

16    specific results that you're trying to achieve.

17        And there's a plan in place, a

18    description, a project description, and then

19   work plans put in place that say at this point

20   or this point or this point this will happen.

21          And it -- there's no reason why it

22   shouldn't happen unless funding was eliminated.

1     Q.   Of those eight direct reports, and I

2   understand it's an approximate number, but how

3   many were local folks?

4     A.   I will do some counting here.

5         MS. DOUGLAS:  Excuse me.  Just for

6   clarification, you mean nonAmericans?

7         MR. BROWN:  NonAmericans.

8         THE WITNESS:  Yeah.  That's how I

9   understood it, as well.

10        MR. BROWN:  Okay.

11        THE WITNESS:  Well, I had more than

12   eight reporting to me, so maybe ten or 12.

13        But all but -- at the last phase,

14   where -- of the project where it was all but one

15   or two, in reality two.

16   BY MR. BROWN:

17     Q.   Who were the two American direct

18   reports?

19      A.   Well, there was the financial director

20   for the region, although actually -- I had

21   forgotten.

22         There's confusion because he was

1   direct reporting -- he reported to me

2   directly -- as the chief financial officer or

3   the financial manager for the two projects, he

4   reported to me directly.

5       But after the August meetings, he then

6   began reporting to Michael Kunz, although, I

7   still signed his time sheets.

8       And so we were in a transition at the

9   end that he would report directly to Michael

10  Kunz.

11      Q.  And his name was?

12      A.  Bob Abma.

13      So at that point, there's the

14  financial sustainability advisor who reported

15  directly to the chief of party.

16      But she had left the organization and

17  they were in the process of identifying who

18  would -- how that would be managed.

19      That was discussions that were going

20   on.

21      Q.  What was her name?

22      A.  Her name was Kim Alter.

1        She reported to me directly.

2        In previous years, there was a number

3    of ex-patriots that reported -- I mean, not --

4    nonlocals or however you want to put it, that

5    reported to me.

6        Over the years, we have continually

7    decreased the number of ex-patriots.

8    Q.  Uh-huh.

9    A.  And that was the intent of the

10    projects, you know, the long-term goal, to sort

11    of localize it.

12    Q.  How would you describe your management

13    style.

14    A.  Well, I -- my management style is on a

15    continuum of a very controlling manager to a

16    very flexible manager.

17        I fit in according to the needs of the

18    organization, of the company, of the -- so if an

19   organization needs a lot of control, I can do

20   that.

21          If the organization is very capable, I

22   can do that as well because you can't just take

1   a management style and go into an organization

2   and say, This is my style; we're going to run

3   this way.

4          You have to look at what are you

5   working with.

6          Who are you working with?  What are

7   their skills?

8          What are their, you know, their

9   pluses, what are their minuses, and how can we,

10   you know, work in this situation.

11     Q.   As of the latter part of 2003 and into

12   2004, what sort of management style was called

13   for as chief of party?

14     A.   It was -- the three countries that I

15   had direct responsibility for, and in each of

16   those countries, the country director, I was

17   very comfortable with those -- with those

18   country directors, and they managed their

19   projects really quite well.

20      Q.   Uh-huh.

21      A.   They hired all their own staff without

22   any question on my part.

1        I didn't ask for approvals of those --

2    their hiring.  I asked them for notification of

3    travel, and which was mostly to comply with

4    USAID regulations.

5        In the office in Almaty, we had the

6    regional staff.  We had regular staff meetings

7    to share information.

8        In previous years, we had a sign-in

9    sheet when people would come to the office, but

10   between six months and a year, before the end of

11   the -- before I was fired, I stopped that.

12        There were some questions about, you

13   know, people needing to sign in and a lack of

14   trust, so to speak.

15        I had always felt that we should have

16   documentation for USAID because these are U.S.

17   government funds, but I -- I ended that

18   requirement.

19          Although, I did notice that some of

20    the local organizations that we worked with that

21    were developing, incorporated that because they

22    felt the need to document the time of staff, and

1   it was a way that they could see -- compare time

2   sheet.

3       I also made the management of the

4   health project.  I -- my -- the person

5   responsible for that project was in the office

6   in Almaty, so I had the opportunity to work more

7   closely with him.

8       Q.  Who is that?

9       A.  Vaslat Achmetov.

10       V-A-S-L-A-T.  A-C-H-M-E-T-O-V.

11       So I was able to work more closely,

12   although, I -- I had a lot of trust in him, and

13   he developed his own travel schedules and took

14   care of -- pretty good care of that project.

15       So does that give you an idea --

16       Q.  Yeah, it does.

17       A.  -- how I see my management style, how

18   I interpret my management style?

19    Q.  It does.

20         With regard to, and I think you

21    touched on it a moment ago, specifically when

22    you referred to Achmetov --

1    A.  Uh-huh.

2    Q.  -- that you allowed him a certain

3  amount of, my term leeway, if you will, was --

4  did you see that as part of your job to -- with

5  regard to the local regional staff that reported

6  to you, to sort of in the same way that you

7  tried to empower the local organizations, that

8  you tried to empower the local staff?

9    A.  Yes.

10    Q.  So that -- and I'm assuming the

11  ultimate goal sort of is that some day you're

12  not going to be there and you want them to be

13  able to run on their own.

14    A.  Well, no, not necessarily.

15      They -- when the project ends, of

16  course, there could be continuing projects, but

17  we would hope that they would be able to go and

18  work for another organization.

19    Q.  Uh-huh.

20        A.  And do -- you know, be able to take

21   their experience from working with our

22   organization and continue along this line of

82

1    work, since they, you know, they had developed a

2    lot of expertise in these areas.

3        Q.   Okay.  So part of your job personally

4    was to develop those skills in these individuals

5    so that they could go to work for these other

6    organizations?

7        A.   Yes.  That was -- that was -- I mean,

8    I -- it was -- it's not in my job description,

9    but I did that all the time.

10       Q.   Okay.  Now, in -- I think you

11   mentioned somewhere along the way that you

12   had -- you had open positions, or you mentioned

13   Ms. Alter left at some point, her position was

14   open.

15          Did you have -- did you have open

16   positions that needed filling in the latter part

17   of 2004?

18       A.   There was an open -- one open position

19   that I recall, which was the capacity building

20   coordinator.

21        Q.  Uh-huh.

22        A.  And in the process, that was one we

1  had a difficult time filling, but I recall a

2  telephone call from Arlene Lear, in fact, I

3  recall it because I was driving between Almaty

4  and Bishkek.

5       I was driving back from Kyrgyzstan to

6  Kazakhstan.  And she caught me on the road.

7       And we discussed filling that position

8  with a person from Washington DC, a Stephanie

9  Sullivan.

10    Q.  Do you remember when that discussion

11  took place?

12    A.  I'm guessing it would have been in

13  September of 2004.

14    Q.  How long --

15    A.  And she asked me -- oh, I'm sorry.

16    Q.  No, go ahead.

17    A.  She just asked me, in that

18  conversation, could we hold off until Stephanie

19   had her baby and was able to come.

20          And I can't recall if I said, you

21   know, it's an interesting idea, it's a good

22   idea, we should think about this, and it's a

1  possibility.

2     Q.  How long was that position open?

3     A.  I don't recall.

4     Q.  How long was Ms. Alter's position

5  open?

6     A.  Actually, Ms. Alter, Kim Alter,

7  discussed all of her contract and negotiations.

8        She was directly hired by Washington.

9  And any discussions for that position was in the

10  hands of Washington DC.

11     Q.  So you weren't responsible for filling

12  that position?

13     A.  I -- I was responsible for providing

14  feedback, discussing possibilities.

15        But she -- she negotiated a -- a close

16  of her contract with Michael Kunz.

17        And, you know, I don't know who else

18  specifically, maybe -- it could have been Don

19  Field because he was, at that point, partially

20  responsible for Kim Alter as well because Don

21  Field was a director of one division in

22  Counterpart, Arlene Lear is a director in

1    another, and Kim Alter was like responsible for

2    both divisions.

3        Q.  Uh-huh.  When did Ms. Alter leave?

4        A.  I think she left in July, or it could

5    have been later because she was pregnant and was

6    going to have a baby sometime in the fall.

7        Q.  As of the time that you left the

8    organization in November, had that position been

9    filled?

10       A.  No, not that I know of.

11           I don't -- absolutely not, it wasn't

12   filled.

13       Q.  Other than Ms. Alter's position and

14   the building --

15       A.  Capacity.

16       Q.  -- capacity building coordinator, any

17   other open positions in the fall of 2004 --

18       A.  Okay.  Open positions.

19     Q.  -- in the fall of 2004?

20     A.  I'm sorry.  In the fall of 2004, there

21   were several positions that I was in the process

22   of filling.

1    Q.  Uh-huh.

2    A.  And in fact, I had -- there was a new

3  project that we were just awarded, which was a

4  civic advocacy support program, CASP, C-A-S-P,

5  for short.

6         There was another project that was

7  awarded to our -- to -- tie into our other

8  projects, which was a water users project.

9         There was staff that needed to be

10  hired for those positions, which I was filling

11  and filled right at about that time.

12         I had two people turn me down.

13         They were ex-patriot positions on the

14  civic advocacy.  And then I invited a British

15  man, Jeremy Gross, to come to visit Kazakhstan,

16  and personally spent the weekend with him to

17  interview him.

18         And then he was hired, although, he

19   didn't arrive until after I was fired, so I have

20   never talked to him since.

21         There was a -- in the water users

22   project, we hired a man named Chi (phonetic),

1   from the Netherlands, who came out and did --

2   worked on the initial assessment of the project,

3   which was part of the project.

4        So he was hired through the University

5   of the Netherlands.

6        Q.  Uh-huh.

7        A.  The reporting officer had left right

8   before I was fired, and our HR person

9   responsible hired a new person within -- so

10   there was carryover in that position.

11        Q.  In the, let's say starting in the

12   June, July time frame of '04, other than the --

13   you mentioned two people had turned you down,

14   did you experience what you considered to be any

15   difficulty in filling any open positions?

16        A.  The difficulty was more in local

17   positions.

18        There were some difficulties really

19   trying to find -- find people.  One of the --

20   one of the situations in Kazakhstan is that it's

21   a -- somewhat of a booming economy in that city,

22   and then it's very competitive on the scale of

1   jobs that we were looking for, for those.

2        I mean, we would get 40, 50 resumes,

3   but there weren't any qualified people.

4      Q.   You have mentioned Michael Kunz.

5        What was his position as of the summer

6   of '04?

7      A.   As of the -- well, do you want as when

8   he came to Almaty or --

9      Q.   When did he come to Almaty?

10     A.   He came to Almaty in, as I recall,

11  December 2003, or January, maybe January of

12  2004, January 2004.

13     Q.   In what capacity?

14     A.   His title was the director of civil

15  society, which is a Washington based position,

16  but he was placed in Kazakhstan.

17        One of the -- I mean, there are

18  several reasons for that, but anyway.

19    Q.  What were those reasons?

20        A.  Well, one is his wife is Kazak, and he

21    wanted to live in Almaty.  There was a need to

22    develop new projects in the region.

1       Projects were -- so his position was

2   director of civil society, as far as I

3   understand, based in Almaty, Kazakhstan, with

4   responsibilities of developing projects.

5       Q.   Uh-huh.

6       A.   Now, when he first -- when Arlene Lear

7   talked to me about Michael Kunz coming to live

8   and work in Kazakhstan, she told me that he

9   would not be my supervisor, and that she really

10   wanted him to have a separate office away from

11   our office so he could focus on his, you know,

12   his own work.

13       And I suggested that I could find

14   space in our office in Almaty, which I did,

15   found an office, and made improvements for him

16   to be in our office in Almaty, Kazakhstan.

17       We had a -- so that was his -- you

18   know, our relationship and his position was

19   information sharing, project development,

20   working together on projects.

21       Q.   Did you know Mr. Kunz prior to him

22   coming to Almaty?

1    A.   Yes.

2    Q.   How long had you known Mr. Kunz?

3    A.   I knew Mr. Kunz from some point in --

4  in 2002 or 2003.

5        It had to be 2002, I'm pretty sure.

6  It was a project in Uzbekistan.

7        This project was the Community Action

8  Investment Program, CAIP, C-A-I-P.  And I was

9  involved actually in developing -- helping to

10  develop a proposal for this project.

11       That was -- the project was awarded to

12  an organization called the CHF, which used to be

13  the Cooperative Housing Foundation, and now

14  it's -- they have changed their, you know, they

15  have kept the acronym, but changed the name to

16  something else, CHF.

17       Counterpart was asked if they would be

18  a subgrantee to this -- to the CAIP project, and

19   Counterpart agreed.

20          The staffing included a chief of party

21   for CAIP, and -- which was employed by CHF.  And

22   Counterpart then had the deputy chief of party

1    for a project that was in two Ovlast of southern

2    Uzbekistan, O-V-L-A-S-T.

3        Q.   Thank you.  How did you get along with

4    Mr. Kunz when you first met him?

5        A.   There were no problems.

6        Q.   At some point during the course of

7    2004, did you have conversations with Ms. Lear

8    in which the subject of Mr. Kunz becoming your

9    supervisor came up?

10       A.   Actually, we had conversations when he

11    was in Uzbekistan, you know, about Mr. Kunz.

12       Q.   Okay.  What were those discussion?

13       A.   Well, she asked me to mentor him.  She

14    asked me to support him.  She asked me to help

15    him and mentor him and give him support.

16           There was a discussion of the some --

17    several incidents and letters of complaint.

18           The -- even though Michael Kunz -- the

19    project he was working on, the CAIP project, was

20    separate and stand alone, they contracted

21    services from the Uzbekistan Counterpart office.

22              And in that phase of the work, I was

1   responsible in 2002 for that office.

2       So my -- I had the relationship to the

3   office in Uzbekistan.  The country director

4   there, at the time, was responsible to me.  And

5   yet, this same office was subcontracting

6   services to the CHF project that was -- Mr. Kunz

7   was the deputy director for.

8    Q.   What was the nature of the letters and

9   complaints about Mr. Kunz in the 2002 time

10  frame?

11   A.   One letter of complaint described an

12  incident where he was drinking at -- and he was

13  in the presence of the ambassador in the hotel

14  and causing a commotion.

15       There were -- there was -- I'm trying

16  to recall, there was another -- or maybe in the

17  same letter -- complaints about his -- his

18  management style, his derogatory comments,

19   swearing at staff, making demands that the staff

20   felt weren't part of their responsibilities.

21        Q.   Were those the same type of criticisms

22   of his management style, derogatory comments,

1   that were later directed at you in a memo from

2   Mr. Chassy, same type of things?

3       A.  I -- I think they're totally

4   different.

5       Q.  Oh, okay.

6       A.  Completely different.

7       Q.  In what way were they different?

8       A.  These complaints about Mr. Kunz were

9   actual swearing, abusive language, just, you

10  know, extreme, very extreme.

11          They should be in the records.  You

12  should have those letters.

13          Whereas as, you know, when Mr. Chassy

14  made some comments about me, he didn't -- well,

15  those comments didn't include that kind of use

16  of language.

17          In fact, there was nothing specific

18  that I saw in those letters.

19     Q.   Well, let's go back to '04, which is

20   what I was trying to get to, which is when in

21   conversations you had with Ms. Lear about

22   Mr. Kunz supervising you?

1     A.   The first recollection I have was

2   either -- either -- it was either -- I can't

3   remember.

4        It was a day or two before the August

5   meeting or during the August meeting.

6     Q.  Uh-huh.

7     A.  But I -- I just don't recall any

8   conversations about -- other than earlier, that

9   he was not going to supervise me.

10    Q.   Well, how did the August meeting come

11   about?

12    A.   I was told it was a meeting to discuss

13   several points and issues.

14        One, is the management information

15   system.

16        I was told it was a -- you know, we

17   have budgeted annual trips to Washington

18   headquarters, and this was a time for us to work

19  on -- on -- the ongoing projects and the

20  upcoming projects that we were being awarded.

21          And it was strictly a business

22  meeting.

1    Q.   Who was in the meeting?

2    A.   Arlene Lear, Michael Kunz, Barbara

3  Sloan, and myself.

4    Q.   And that meeting took place here in

5  Washington?

6    A.   In the headquarters, Counterpart in

7  Washington.

8    Q.   How long did the meeting last?

9    A.   I think we were to start about 2, but

10  there was a delay.

11      I think we started about 2:45, if I

12  recall, but I may be wrong.  And it lasted until

13  about 10 o'clock at night.

14    Q.   Long meeting.

15    A.   Yeah.  But we called in some good

16  lunch, dinner, food.

17    Q.   And this meeting took place on August

18  18?

19     A.  Yes.  Yes.

20     Q.  In the course of that meeting, what

21  was said regarding your performance as chief of

22  party?

1      A.   We had the opportunity to express some

2   of our own -- what we saw -- if I remember

3   right, as we saw some of our -- you know, what's

4   positive about ourselves and what's, you know,

5   what are some of the -- maybe some of the issues

6   that we have.

7          What really comes to me isn't my

8   performance as much as Michael Kunz's

9   performance, that came out at this meeting.

10      Q.   Well, we will talk about that, but I

11   want to know now what it said about your

12   performance.

13      A.   Well, if I could see the notes, then I

14   could -- the notes of the meeting.

15          You have those in the record, don't

16   you?

17      Q.   I have an email, if that's what you're

18   referring to.

19     A.  Yeah.

20     Q.  But I just want to explore with you

21  your recollection.

22        Let me put it this way:  There was

1  criticism of your performance in that meeting,

2  that was discussed; correct?

3     A.  No.

4     Q.  None?

5     A.  There was maybe some discussion --

6     Q.  Okay.

7     A.  -- of performance.

8        There was not criticism that I recall.

9     Q.  All right.  What was the nature of the

10  discussion regarding your performance?

11    A.  Well, that's what I -- I really can't

12  recall right now the discussion of my specific

13  performance.

14       It wasn't a meeting designed to look

15  at my performance.  It wasn't the intention of

16  the meeting at all.

17    Q.  Well, I'm less concerned with the

18  intention as the content.

19     A.  Well, I started to talk about the

20   content, which a lot of it was about Michael

21   Kunz's performance.

22     Q.  All right.  As a result of this

1    meeting, sometime during the course of the

2    meeting, your leaving the organization was

3    discussed; yes?

4       A.  Yes.

5       Q.  How did that come about?

6       A.  When it -- when I was asked if I was

7    comfortable with Michael Kunz being my

8    supervisor.

9       Q.  Uh-huh.

10      A.  I was -- I -- if I remember right, I

11   said that I was not comfortable with that.

12      Q.  And who presented the idea of Mr. Kunz

13   becoming your supervisor?

14      A.  Arlene Lear.

15      Q.  And how was that presented to you?

16         What did she say?

17      A.  I don't remember specifically.

18      Q.  Well, did she tell you we are going to

19   have Michael become your supervisor, we're

20   thinking about Michael becoming your supervisor,

21   what do you think about Michael becoming your

22   supervisor, how?

1    A.  It was presented, there was no choice.

2        I didn't have a choice in the matter.

3    Q.  So she was telling you that Michael

4 was going to become your supervisor?

5    A.  Yes.

6    Q.  Did she tell you why she made that

7 decision?

8    A.  No.

9    Q.  Did you ask?

10   A.  I didn't -- I didn't ask.

11       I didn't have the opportunity to ask.

12   Q.  Why not?

13   A.  Because the meeting was facilitated by

14 Barbara Sloan.

15       And it didn't -- you know, it --

16 actually, I will have to remember now.  I do

17 remember, there were reasons.

18       And one of the reasons is that, as I

19  recall, that Arlene wanted to delegate some of

20  her workload.  And she wanted to share, or not

21  to share, but to relieve herself of some of the

22  daily routine of managing projects and have more

1   time to be a vice president.

2        That it was simply a matter of Michael

3   taking responsibility for all projects in the

4   Central Asia region, in other countries, where

5   Counterpart worked, Armenia.

6        I don't know if the projects were

7   awarded at that time, but he was working on --

8   there was a proposal going on with Armenia that

9   Michael was working on.

10       Even some -- there was some discussion

11  of work in -- in Iraq, if I remember right.

12       So that he was taking the civil

13  society division and being responsible for

14  multiple projects throughout that region of the

15  world.

16   Q.   Uh-huh.  Other than Ms. Lear saying

17  that she wanted to delegate some of her work

18  load, which is why she was going to be making

19  Mr. Kunz your supervisor, any other reasons that

20  she provided or that were provided during the

21  course of the meeting?

22      A.  Not that I remember.

101

1     Q.   Did you say why you felt that you --

2   let me back up.

3        So when this was proposed to you that

4   Mr. Kunz would become your supervisor, what was

5   your statement in response?

6     A.   I was -- I was uncomfortable.

7        I was -- I -- I don't remember the

8   exact words, but I -- I didn't welcome the --

9   this change.

10     Q.   Did you refuse to work under a system

11    where Mr. Kunz would be your supervisor?

12     A.   No, no.

13     Q.   Did you explain why you felt

14   uncomfortable and welcomed the change?

15     A.   Yes.

16     Q.   What did you say?

17     A.   I described a situation in which

18   Mr. Kunz -- what is the word, when Mr. Kunz went

19  on a tirade went on a tirade about some of the

20  work that I had just previously completed, for

21  30 minutes.

22          And the meeting in August spent a lot

1  of time talking about this tirade and how this

2  is not acceptable behavior.

3      And that one of the expectations, and

4  you mentioned expectations earlier, was that --

5  that Mr. Kunz would not explode in this fashion.

6    Q.   Other than describing the situation,

7  did you discuss any other reasons why you were

8  uncomfortable and didn't welcome the change of

9  Mr. Kunz becoming your supervisor?

10    A.   Well, there were several other changes

11  that would take place along with this change.

12      And that was that Bob Abma would

13  report to Mr. Kunz, and that they would -- that

14  Bob Abma would also be responsible for

15  administration in our office in Almaty.

16      And that several staff persons who

17  were working in -- for the projects I managed,

18  would then be under the direct supervision of

19  Mr. Abma.

20       And I was uncomfortable with that as

21  well.

22       Q.  Were you told why that change was

1   going to be made?

2      A.  I was told that Michael Kunz's opinion

3   is that finance and admin needs to be in one

4   department.

5          You can't separate finance and admin.

6          And since Bob Abma is responsible for

7   financial operations, that then admin has to be

8   included under his supervision.

9      Q.  Were you told any other reasons why

10   that change was being made?

11     A.  Not that I recall.

12        Michael Kunz did mention that if this

13   change wouldn't take place, that he would leave

14   Counterpart.

15     Q.  Did you make a similar statement?

16     A.  I think I mentioned that I was --

17   would consider leaving Counterpart, that this

18   was uncomfortable for me.

19        And I questioned whether I should

20   stay.

21        Q.  How was it left?

22        A.  It was left that Michael Kunz would be

1   my supervisor.  Bob Abma would be responsible

2   for finance and administration.  That there

3   would be no behavior that took place in the --

4   as Michael Kunz behavior that he exhibited in

5   the past.

6         That there would be weekly or

7   bi-weekly meetings between Michael Kunz and

8   myself to discuss our relationship in the

9   workplace.  And there would be monthly telephone

10  calls, teleconferences with Arlene Lear.

11        It was left with discussion of what is

12  everyone's opinion about Jay, should he -- does

13  each person want Jay to stay with the

14  organization or not stay with the organization.

15        Arlene Lear said that she really

16  wanted me to stay with the organization and stay

17  in Central Asia.

18        Michael Kunz said that he would like

19   to see me leave Central Asia, but stay with

20   Counterpart.

21           And I said I wanted to stay in Central

22   Asia and stay with the project, and that the

1   project was absolutely my priority.

2          And especially after spending ten

3   years in Central Asia on these projects, even 12

4   years in Central Asia, but ten years building

5   the -- working on the civil society and building

6   the network and the communities that I had

7   worked on, I wanted to see that project through.

8      Q.   Uh-huh.  What was said about the

9   potential for you leaving the company?

10     A.   The only thing that I recall was that

11   Arlene Lear said that she would give me six

12   months.  She would guarantee me six months.

13          But my understanding was that that six

14   months would be a period that at any point, I

15   could say, Well, I'm -- you know, it's time.  I

16   need six months.

17          And that -- and on the other hand, I

18   should give them six months to prepare for --

19   that was my understanding.

20          I asked for clarification about that

21   later and was told it was six months -- from

22   their understanding, was that it was six months

1  from this time.

2       I was guaranteed six months.

3    Q.   So -- just so I'm clear, as of August

4  18, you felt that at any point during the next

5  six months, you could say, This isn't working

6  for me; I don't want to do this, and you would

7  continue to be paid for that six-month period?

8    A.   My understanding was although, I --

9  you know, I didn't really have an intention to

10  leave, so I didn't give it much thought.

11       But my thought was that at some point

12  if I wanted to leave, I could say, Okay, you

13  know, it's time.  And then I would have six

14  months for -- and that would be any time up to

15  like January 1.

16       I could say, Well, it's time, you

17  know, but I'm not -- I wasn't under the

18  impression that I would be paid and not work.

19     Q.  Uh-huh.

20     A.  I was under the impression that I

21  would -- there would be a transition, and it

22  would be -- it would be to benefit the project

1    and benefit everyone.

2        Q.  And, similarly, was it your

3    understanding that during that six-month period

4    of time that Counterpart could come to you and

5    say, From our standpoint, it's not working, and

6    so we're going to end your employment at the end

7    of that six-month period of time?

8        A.  You know, I -- that's a difficult one

9    for me to answer.

10       Q.  Let me ask it another way.

11       A.  Okay.

12       Q.  Was anything said in that meeting

13   about altering the basis under which Counterpart

14   had the right, contractually, to terminate your

15   contract?

16       A.  No.

17           MR. BROWN:  Let's take a break.

18           Let's go off the record.

19          (A recess was taken.)

20   BY MR. BROWN:

21       Q.   Mr. Cooper, let me show you some

22   emails which may help, as we discussed earlier,

1  refresh your recollection about these

2  discussions that we have been most recently

3  talking about.

4         (Thereupon, Deposition Exhibit No. 12

5  was marked for identification.)

6  BY MR. BROWN:

7     Q.   Okay.  Showing you what we have marked

8  as Exhibit 12.

9         This is a number of emails, Bates

10  Stamped CP00742 through 744 -- I'm sorry --

11        MS. DOUGLAS:  Mine starts with 74 --

12        MR. BROWN:  Yeah, no.  I just caught

13  that.  I misspoke.

14  BY MR. BROWN:

15     Q.   Starts with CP00740 and goes through

16  744.

17        If I could first turn your attention

18  to 743 and 744.  Let's see, no, I'm sorry.  I'm

19  sorry.  I'll get this right.

20      The first page of the document, 740,

21  there is a brief summary of the meeting on

22  Wednesday, August 18.  This is an email from

1   Barbara Sloan to you, Ms. Lear, and Mr. Kunz.

2        You see that paragraph I'm referring

3   to, under the heading, Brief Summary of Meeting?

4     A.  Yes.

5     Q.  Have you had an opportunity to review

6   that paragraph?

7     A.  Yes.

8     Q.  Is that an accurate summary of what,

9   to the extent it says here, what transpired at

10  the meeting?

11    A.  Yes.

12     Q.  Is there anything -- obviously you

13  have met for it sounds like nearly eight hours,

14  so not everything could be encompassed in here.

15        Is there anything within this email,

16  within this paragraph, in the brief summary,

17  that you disagree with?

18        MS. DOUGLAS:  Excuse me for a minute.

19        Are you asking if he disagrees with

20   this as an accurate description of the meeting,

21   or if he disagrees with the substance of the

22   paragraph personally?

110

1      That's a different question.

2      MR. BROWN:  Okay.  Okay.

3  BY MR. BROWN:

4      Q.  I'm asking if there's anything in here

5  that you disagree with as an accurate summary of

6  the meeting, first.

7      A.  It's accurate, although there was some

8  confusion about the six months.

9      Q.  Which you have testified about

10  earlier?

11      A.  Yeah.

12      Q.  Okay.  And that confusion was whether

13  the six months would begin from the date that

14  you said, I don't want to work here anymore, or

15  whether it would have been from August?

16      A.  That's right.

17      Q.  All right.  And sometime later, it was

18  clarified for you that Counterpart's intention

19   was that that be August?

20       A.   Yes.

21       Q.   When did that clarification come

22   about?

1    A.  I think that was in some discussions

2  with Kelli Boyer.

3        That was in discussions with Kelli

4  Boyer.

5    Q.  Was it face-to-face discussions?

6    A.  No.  Telephone -- if -- if I recall,

7  that I asked -- I asked Kelli for clarification.

8        And that's -- she clarified that if --

9  she told me that their idea, their impression

10  was that it was from the meeting time period for

11  it.

12    Q.  And what was your reaction to that

13  clarification?

14    A.  Well, I don't remember my exact

15  reaction, but just -- I was confused because I

16  had a different idea.

17    Q.  And do you attribute that to just a

18  miscommunication, if you will, or not

19   understanding what one another said, as opposed

20   to Counterpart saying one thing and then

21   changing what it was saying?

22        A.   Well, you know, my -- I think I

112

1   attribute it to the fact that I really wasn't

2   planning to leave.

3       So the six months was not that

4   significant to me.

5       Q.  So at the meeting on the 18th, you

6   didn't pay that much attention to exactly when

7   Counterpart was talking about that six months

8   starting?

9       A.  Well, it wasn't that I didn't pay that

10  much attention.

11      It could be that I -- I didn't ask for

12  clarification, and I didn't ask for something in

13  writing.

14      It wasn't that significant for me.

15  And in fact -- yeah, just that.

16      Q.  Okay.  Then if I could turn your

17  attention -- I think I have it right this

18  time -- to pages 743 and 744.

19          This reflects the -- you had a

20     follow-up telephone call, I believe, on August

21     24.  Is that right?

22          A.   Or was it on August 25?

113

1    Q.   Well, the only reason I say 24 is

2    because under the subject line on this page, it

3    says "Brief notes from phone call, 8-24-04."

4    A.   It must be on 8-24, then.

5        I don't recall the dates 24 through

6    25.

7    Q.   I will certainly represent to you that

8    I, too, have seen some representation that that

9    call took place on the 25th, but this leads me

10   to believe it's the 24th.

11       In any event, on the 24th or 25th, you

12   had a follow-up phone call with Ms. Sloan,

13   Ms. Lear, and Mr. Kunz.

14       Is that right?

15   A.   Yes.

16   Q.   And what was discussed in that

17   meeting, that telephone call?

18   A.   The fact that I wanted to move ahead,

19   and I was positive about working with Michael

20   Kunz.

21      Q.   So that had changed, if anything,

22   between August 18 and either the 24th or 25th,

1  when you were expressing reservations about

2  working with Mr. Kunz?

3      A.  Just the initial shock was worn off,

4  and I was accepting the new structure.

5      Q.  And under the key decisions area,

6  Ms. Sloan writes a number of bullet points here.

7          And was it your understanding that

8  following this telephone call, the

9  administrative functions would report to

10  Michael, which would, according to Ms. Sloan,

11  allow him to free -- would then free you up to

12  focus on the chief of party role, particularly

13  with the anticipated increase in staff?

14          Is that your understanding?

15      A.  Well, if what the meaning of this --

16  my understanding was that administrative

17  functions would be Bob Abma's responsibility,

18  and ultimately Michael Kunz, if Bob Abma is

19   reporting to Michael Kunz.

20       Q.  Okay.  What was the anticipated

21   increase in staff?

22       What does that refer to?

1      A.   That's referring to the Water Users

2   Association project.

3          It is referring to the CASP, Civic

4   Advocacy Support Project.

5          Those are the two main that additional

6   staff would be coming on line, coming on board.

7          I'm trying to think if there was

8   anything else.

9      Q.   Had you hired for those positions as

10   of August 24th or 25th?

11      A.   Not as of August -- not as of that

12   date, no.

13          They -- actually, though, it's

14   possible that Water Users was hired.  I would

15   have to look at my records.

16          I -- it could have been discussions

17   where I'm going and -- I'm not sure.

18      Q.   The last bullet point under Key

19    Decisions, if you would read that and let me

20    know if that's an accurate understanding of what

21    was discussed on the telephone.

22        A.   "At the latest"?

1    Q.    "At the latest;" correct.

2    A.    Well, my feeling was that -- that you

3    know, I was going to make it work.

4        And whether this, you know, this was

5    that point, may have been what was said.  But

6    you know, my intention was to make this -- this

7    new structure work with Michael.

8    Q.    Well, those are two different things.

9        And I appreciate that, but I'm just

10    trying to clarify that you did understand that

11    what is reflected here in the last bullet point

12    under Key Decisions, beginning with the phrase

13    "At the latest," that that was said on the

14    telephone call on either August 24 or 25,

15    whenever it was.

16    A.    Well, I remember seeing it in this

17    email, but I don't recall it from the phone

18    call.

19     Q.  At the time when you saw this in an

20   email, did you say, Whoa, wait a minute; that's

21   not what we talked about?

22     A.  No.

117

1    Q.  Okay.  So you agree that that's what

2  you talked about?

3    A.  I didn't make any comments to this.

4    Q.  When you read it, did you say to

5  yourself, Yes, that's what we talked about?

6    A.  No.  I didn't say yes, that's what we

7  talked about.

8      I just read it and didn't say, yes,

9  that's what we talked about.

10    Q.  Maybe we're bandying about here, and I

11  don't want to bandy.

12      Was this said on the call or not?

13    A.  I don't recall.

14    Q.  Okay.  Do you recall anything

15  different being said?

16    A.  You know, I don't -- the only thing I

17  remember about the call is the fact that I was

18  using my cell phone.

19          And I was up on the hillside because I

20    couldn't get reception in my house, and it was

21    very difficult to hear.  That's what I recall

22    about that phone call.

1        And the fact that I said, Yes, I'm

2  ready to go ahead.  I really want this to work.

3        And as a result, we have an email that

4  says, Congratulations, good progress.

5    Q.  When you read the comment under, "At

6  the latest," did you take any action to say to

7  anybody, in writing or orally, Hey, wait a

8  minute; we didn't make any decisions about a

9  go/no go decision in four months; this isn't

10  what we discussed?

11        Did you make any attempts to clarify

12  that?

13    A.  I did not.

14        (Thereupon, Deposition Exhibit No. 13

15  was marked for identification.)

16  BY MR. BROWN:

17    Q.  Showing you what we have marked as

18  Exhibit 13.

19          This is a Bates Stamped document,

20    CP0770.

21          At the bottom, it begins with an email

22    from you to Kelli Boyer, dated October 4, 2004.

119

1        Why did you write this email?

2        A.   Because I wanted to talk to Kelli

3   Boyer on the telephone.

4        Q.   About your possible departure from

5   Counterpart?

6        A.   Yes.

7        Q.   What was your -- when you say possible

8   departure, what was your state of mind at that

9   point?

10        What were you thinking?

11        A.   Well, what I wanted to -- I wanted to

12   get answers to those questions that are -- that

13   I have written here.

14        Q.   Well, at the time you wrote this, was

15   it your intention to negotiate your departure

16   from Counterpart?

17        A.   My intention was just to know what

18   my -- what the -- what my opportunities, what my

19  possibilities were.

20        If I was to leave Counterpart, what

21  would -- I asked those questions.

22        Q.  If you were to leave Counterpart, what

120

1    would you be receiving?

2        That's what you wanted to know?

3        A.   These exact questions, yeah.

4        Q.   When you say my possible departure

5    from Counterpart and how you fit into that

6    possibility, what did you mean by that, how you

7    fit into that possibility?

8        A.   What role that Kelli would play.

9        What potential -- just you know, could

10   she provide support in the sense, as the

11   employee's manual states, about providing

12   support for -- the HR manager providing support

13   to -- to employees in terms of, you know,

14   issues.

15       Q.   When you got off the call on August 24

16   or 25, you said that you wanted to make this

17   work, you were positive about trying to make it

18   work.

19        By August 4, were you in a different

20   frame of mind?

21        A.   By October 4?

22        Q.   October 4, I'm sorry, yes.

1     A.   My -- you know, my frame of mind, it's

2   hard for me to recall what my frame of mind, you

3   know, my mood or my feeling.

4     Q.   Well, let me be more specific.

5     A.   Okay.

6     Q.   Did you want to leave the organization

7   as of October 4?

8     A.   No.

9     Q.   Did you -- were you considering it

10   more seriously than you were as of August 25?

11     A.   Well, to me, this whole thing was, you

12   know, a process that started with the transition

13   on August 18, the transition to this new

14   structure.

15        I really wanted to give it a try.

16        And from looking at this email, I was

17   also questioning what kind of -- because that

18   wasn't discussed at the August 18 meeting, over

19  than six months of employment.

20          You know, there was nothing discussed

21  about, you know, other possibilities, you know,

22  so.

1    Q.   What other possibilities?

2    A.   Working with Counterpart in, you know,

3  in another project and doing something else.

4    Q.   Well, as of August 25, you said you

5  wanted to try to make it work.

6        As of October 4, how was it working?

7    A.   Well, you know, we had agreed to have

8  bi-weekly meetings.

9        And we agreed to have monthly phone

10  calls, teleconference calls, and none of that

11  happened.

12    Q.   Actually, I think it was an agreement

13  to meet weekly.

14    A.   Maybe weekly meetings, but there was

15  one meeting that I had with Michael Kunz that we

16  sat down and talked.

17        I asked him to meet with me.  I

18  developed the agenda.  It was all about

19   projects.

20          And at the end of the meeting, he said

21   to me, Oh, and by the way, how are we doing?

22   And I said, Just fine.  And he said, Yeah, I

1    think so, too.

2        Q.   Was something wrong with that?

3        A.   No, that was great.  I thought it was

4    great.

5            The point is -- though, that I'm

6    making is that I think the intention of the

7    follow-up that Barbara Sloan had designed was

8    the weekly meetings, teleconference calls, calls

9    with Arlene, so that this transition could be

10   discussed.

11       Q.   Uh-huh.

12       A.   But, you know, no one had any time.

13   No one took the effort.  No one made the effort.

14       Q.   Including yourself?

15       A.   Including myself, other than I asked

16   Michael to meet with me.

17       Q.   Uh-huh.

18       A.   And you know, that -- that was -- at

19   least on my part, I asked him to meet with me.

20        But I --

21   Q.   What was his response to that?

22   A.   Well, he met with me, and we went

124

1   through the agenda that I had prepared.

2       Q.   Okay.  So you asked to meet with him

3   and he did.

4          When was that meeting?

5       A.   I think it was in October.

6       Q.   Okay.  Was it -- so it was before this

7   email?

8       A.   I'm guessing it was around the middle

9   of October, after this.

10      Q.   Prior to asking him in about the

11  middle of October to meet with you, had you had

12  any meetings with Michael?

13      A.   Well, we would see each other casually

14  in the office.

15      Q.   Uh-huh.

16      A.   And/or we may have had some meetings

17  specifically about some new projects, where we

18  would specifically focus.

19          But we didn't have any meetings that

20    discussed our relationship.

21          I don't know.

22      Q.   And from the August 25 until mid

125

1  October when you did have the meeting where you

2  briefly discussed your relationship, did you

3  ever approach Michael and say, We should have a

4  meeting to discuss our relationship, or words to

5  that effect?

6    A.  Not that I recall.

7    Q.  And did he ever approach you in a

8  similar vein?

9    A.  Not that I recall.

10   Q.  And so then eventually, mid October

11  comes, and you said, Hey, we should sit down and

12  talk, and he agreed?

13   A.  Yes.

14   Q.  Okay.  And you did talk?

15   A.  Yes.

16   Q.  All right.  Was there ever a time when

17  you went to Michael Kunz and said to him, Hey,

18  you know, I think we need to meet and talk about

19   our relationship, and he said, No, we're not

20   going to have that discussion, or words to that

21   effect?

22        A.   No.

1      Q.  Did you ever have a conversation or

2   any communication with Arlene Lear and say, Hey,

3   what about those monthly meetings we were

4   supposed to have?

5      A.  No, I didn't.

6      Q.  Any particular reason?

7      A.  I really felt it was their

8   responsibility.

9      Q.  Uh-huh.  Did you feel the need for a

10  meeting?

11     A.  Well, obviously I felt the need for a

12  meeting.

13       I asked Michael to meet with me.

14     Q.  Okay.  Prior to that, did you feel the

15  need for a meeting?

16     A.  I probably felt -- you know, I don't

17  remember.  I don't recall if I felt the need for

18  a meeting.

19   I just don't recall.

20   Q. When you approached Mr. Kunz in mid

21 October and asked to meet, Why did you not at

22 that same time communicate with Ms. Lear and

1  say, Hey, we need to meet?

2     A.  Again, that, I felt was their

3  responsibility.

4     Q.  Uh-huh.  Did you feel, in mid October,

5  that you needed to have a discussion with

6  Ms. Lear about your relationship with Mr. Kunz?

7     A.  No.  I really felt that the

8  relationship was going pretty well.

9     Q.  Uh-huh.

10     A.  So I didn't really feel -- you know,

11  as I recall, the need -- the important -- the

12  need was really on the program, on the projects

13  because there was a lot of coordination that had

14  to be done for the projects to proceed well.

15        You know, we had to make sure we were

16  on the right track.

17        And in fact, our, you know, everything

18  was going along well, very well.

19    Q.   On the projects?

20    A.   Projects and with Michael Kunz.  There

21   were no issues.

22         And that's probable -- you know, it's

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/Deposition%20of%20Jay%20Cooper.txt

128

1   another reason why these meetings didn't take

2   place.

3        You know, it was -- although I think,

4   you know, looking back, it would have been

5   better to have the meetings.

6   Q.   Why do you say that?

7   A.   Well, I mean, look at the result.

8        I was fired for no reason.

9   Q.   And you think if you had these

10  meetings some reason would become clear to you?

11   A.   No.  I think that there would have

12  been a better understanding and communication.

13        And that, you know, the -- you know,

14  things, you know, would -- you know, I don't

15  know.

16        I still to this day don't know exactly

17  what transpired, and even why I was fired.

18        But -- and it's possible that if we

19    would have had the meetings, he -- if it was his

20    response, that wouldn't have happened, he

21    wouldn't have responded in the same way possibly

22    because he would have a better understanding --

129

1   we would have each had a -- you know, he would

2   have had a better understanding of our

3   relationship then.

4       Q.   Do you know who made the decision to

5   terminate you?

6       A.   No.

7       Q.   Do you know if Mr. Kunz had any input

8   into that decision?

9       A.   I don't know.

10      Q.   So you sent this email to Ms. Boyer,

11   and what happened next in regard to your

12   discussions with her?

13      A.   You know, I don't recall.

14          I don't even know if we had the phone

15   call.

16          I don't remember if we had the phone

17   call to follow up this.

18          I just ...

19    Q.  At some point, in November -- I'm

20  sorry, well, either later in October or when

21  Ms. Boyer came to visit you.

22    A.  Uh-huh.

1     Q.   Do you remember when that was?

2     A.   I think it was October 31, she

3   arrived, I think, and actually came into the

4   office November 1, if I remember right.

5     Q.   In between October 5 or 6th when you

6   were exchanging these emails and when she shows

7   up on October 31, what conversations did you

8   have with Ms. Boyer?

9     A.   I don't recall any conversations.

10     Q.   When she showed up, was it a surprise?

11     A.   Partially a surprise.

12        It was like the few days before we

13   started getting email traffic that, you know,

14   that she's on her way, Anika is on her way, we

15   had to get visas.

16        I probably had to sign some

17   documentation.

18        But it was interesting, about a month

19   before she showed up, about the time of this,

20   Bob Abma asked me, in the hallway one day, he

21   said, Do you know when Kelli is coming?  Have

22   you heard from her?  I haven't heard anything

1   from her.

2        And I didn't even know she was coming.

3        And I said, I didn't even know she was

4   coming.

5        So he had had communication, for

6   whatever reason, with Kelli Boyer about coming

7   to the region.

8     Q.   Was that conversation just referenced

9   before or after your email to Ms. Boyer, of

10   October 4?

11    A.   I don't -- I don't recall.

12        I absolutely don't recall.

13    Q.   So did you have an understanding when

14   she showed up that this was why she was there?

15    A.   My understanding was that she was

16   coming to look -- it was her first trip to

17   Almaty, to Central Asia.

18        And she was coming to -- just to -- in

19   fact, to support and work with our HR person, to

20   meet staff, to get an understanding of the

21   program.

22       Q.  Did you have any understanding that

1  her visit was tied in any way to discussions

2  with you about your potential departure?

3      A.   At that -- at her level, absolutely

4  not.

5      Q.   Once she arrived, did you have

6  discussions with her about potentially departing

7  the company?

8      A.   Not immediately.

9          Later, after her arrival.

10     Q.   When did you have the first such

11  discussion?

12     A.   Actually, I didn't -- I can't say that

13  I had discussed or -- I didn't bring up the fact

14  that I wanted to leave, or I was interested in

15  leaving.

16          I didn't bring that up.

17          Any discussions that I recall had to

18  do with some of the relationships in the office.

19     Q.   What did you bring up about

20   relationships in the office?

21     A.   I don't know if it -- it could have

22   been her, it could have been -- it could have

1  been me, but we -- we discussed the fact that

2  Bob Abma had some issues with me.

3      Q.  What were those issues?

4      A.  You know, I'm still -- I still don't

5  know really what those issues are.

6          He, you know, had -- I had -- I think

7  they had stemmed from years before when I

8  confronted him about overpaying some staff.

9          And he, you know, never let that go.

10          And he, you know, well.

11      Q.  So it was your understanding as the

12  time you're talking to Ms. Boyer, that Mr. Abma

13  did not like you?

14      A.  Yes, that's my understanding.

15      Q.  So the two of you talked about that.

16          At some point, did she bring -- you

17  said you didn't bring up the subject of your

18  departure, did she bring up the subject of your

19  departure?

20      A.  Yes.

21      Q.  What did she say?

22      A.  She said, you know, maybe it's -- it's

1  time for you to leave Counterpart.

2        And I said, I have a contract.  I'm

3  invested in this project.  I don't want to

4  leave.

5     Q.   What was the context in which she made

6  the comment that you just testified to?

7        What were you discussing when she

8  said, Maybe it's time for you to leave?

9     A.   Well, actually, the time that I recall

10  that she brought this up, was -- I was in -- she

11  would -- I -- it was the -- she stayed an extra

12  week, and I was in Kyrgyzstan.  And she came to

13  Kyrgyzstan, and, you know, she just got right to

14  the point, Well, it's time for you to leave.

15        And I said, No, I'm not interested.

16     Q.   You have seen reference, I believe, in

17  documentation that it is Ms. Boyer's

18  understanding that the two of you were to have

19  met.

20          You talked on a Friday, and the two of

21  you were to have met the following Monday, and

22  that you didn't show up.

1        As I understand it, you deny that that

2  took place.

3     A.   That's the most ludicrous thing.

4        I mean, that's absolutely a lie.

5     Q.   That's a bold statement, sir.

6        How do you back that up?

7     A.   Well, I have documentation, a lot of

8  documentation, that I have planned this trip to

9  Kyrgyzstan.

10       Documentation pointing out that I had

11  a training activity, a specific activity, that

12  was planned weeks ahead.

13       And on that Friday, when Kelli

14  announced to me that she was staying -- I didn't

15  ask her to stay, as I have been told I asked her

16  to stay, I did not ask her to stay.

17       She -- I said to her, well, if you're

18  going to stay, that's a good idea, you will get

19  to know the -- you know, do more of what you're

20  doing.

21         And I said, Do you want me to stay in

22  Almaty?

1        And she said, No, you have already got

2   plans; you have already made plans.

3        And I said, Okay, then I'm going --

4   and I said -- I even said to her, Well, this

5   might give you a chance to come to Kyrgyzstan --

6   if I remember right -- this will give you a

7   chance, if you want to come down, you will have

8   some time here, and you can see Bishkek.

9        And then she showed up unannounced,

10  and this is what she told me this, she said, I

11  think that it's time for you to leave

12  Counterpart.

13       I said, I'm sorry, I'm not.

14   Q.   And do you have any documentation that

15  shows these long laid plans to be in Kyrgyzstan?

16   A.   Yes.

17   Q.   Has that been produced during the

18  course of discovery?

19      MS. DOUGLAS:  Yes, it has.

20   BY MS. DOUGLAS:

21      Q.   Of course, plans can change.

22           And how do we know that you didn't

137

1    make your plans and then just decide to change

2    your plans?

3          Is there any way, other than your word

4    against Mr. Boyer's, that we can prove or

5    disprove that you did not say to her, Let's meet

6    on Monday?

7          Any other way?

8     A.   If -- I would have said that we

9    weren't going to meet -- if we were going to

10   meet on Monday, I would have notified the

11   offices in Kyrgyzstan that I wasn't coming.

12          I would have, you know -- I mean, but

13   other than that, no, there's nothing.

14    Q.   Prior to your discharge, did you tell

15   anyone that Ms. Boyer was lying with regard to

16   her statement that the two of you, in her mind,

17   had planned to meet that Monday?

18    A.   I didn't know about it.

19     Q.   Do you know who Ms. Boyer told that,

20   according to her, you were to have met and that

21   meeting did not take place?

22     A.   During the telephone call when I was

138

1   fired, Arlene Lear said that I had been

2   exhibiting erratic behavior, and that I

3   scheduled a meeting with Kelli Boyer and then

4   disappeared.

5        And I told her in that telephone call

6   that's an -- it's -- it's untrue.

7        I had asked Kelli -- first of all, I

8   didn't invite -- and she also mentioned that I

9   invited -- Kelli did say I asked Kelli to stay

10  an extra week.  I did not.

11        And so it was during that telephone

12  call on Friday when I was fired when I was told

13  that I was not allowed in the Counterpart

14  offices, that I was immediately terminated, my

15  contract was terminated.

16        That it was during that phone call

17  that Arlene told me, Arlene Lear told me that

18  Kelli Boyer said, and that was the first time I

19   heard it.

20        Q.   Uh-huh.  Prior to Ms. Boyer showing up

21   in Kyrgyzstan.

22        A.   Kyrgyzstan, yeah.

139

1    Q.   Which would have been that Monday.

2        Is that right?

3    A.   Well, she showed up on Tuesday, I

4  think.

5    Q.   Tuesday, okay.

6        And that was Kyrgyzstan?

7    A.   Yes.

8    Q.   Let me make sure I get my Stans right.

9    A.   Okay.

10   Q.   At any time during her visit, did you

11  say to her that you wanted to leave Counterpart

12  and wanted to discuss how that would work?

13   A.   No.  Prior -- I'm sorry.

14   Q.   Prior to her showing up in Kyrgyzstan

15  on that Tuesday?

16   A.   Did I?

17   Q.   Did you ever say to her, during the

18  course of her visit, I want to leave

19  Counterpart, let's figure out how to make that

20  happen?

21       A.  No.

22       Q.  At any time, prior to her showing up

140

1    in Kyrgyzstan on that Tuesday, did she say to

2    you, Let's talk about how you might exit the

3    company, or words to that effect?

4        A.   I don't recall.

5            I really recall the Tuesday that she

6    talked to me about that.

7            I -- and even thinking, I don't

8    remember -- I really don't think she ever said

9    anything to me about leaving -- that I said to

10   her about leaving before that Tuesday.

11           That Tuesday was the shocker at the

12   time.

13       Q.   So that Tuesday comes, and she tells

14   you that she thinks it's time for you to leave?

15       A.   Yeah.

16       Q.   Was anyone present when you were

17   having this conversation?

18       A.   No.

19    Q.   You replied, No, I have got a

20   contract.

21        Where did the conversation go from

22   there?

141

1      A.  She left.

2      Q.  Did she say anything in response?

3      A.  No.

4      Q.  Other than pleasantries, which I

5  assume you said hello to one another, and

6  probably said good-bye to one another, anything

7  else said in this conversation other than, I

8  think it's time for you to go; no, I have got a

9  contract?

10      A.  Do you want to know about

11   pleasantries, I probably asked her about her

12   trip down, did she like this and that.

13      Q.  No.  Other than pleasantries, anything

14   of substance?

15      A.  Not that I recall.

16      Q.  How long was this conversation?

17      A.  It was very short.

18      Q.  Minutes?

19    A.  Yeah, in minutes, terms of minutes.

20        In fact, I don't even think we sat

21  down.

22        I think we were standing.

1    Q.   Where did it take place?

2    A.   In Erkin Kasybekov's office.

3        E-R-K-I-N.

4        K-A-S-Y-B-E-K-O-V.

5    Q.   Did you say anything to anybody about

6  that comment from her following your

7  conversation with Ms. Boyer?

8    A.   Not that I remember.  Not that I

9  recall.

10   Q.   And when is the next time the subject

11  of your departing the company came up?

12   A.   Friday morning.

13   Q.   How did that come about?

14   A.   I received an email -- well, actually,

15  the mail just said there was going to be a

16  conference call, and I should take the

17  conference call.

18       And I was sitting in an office with

19  people all around me, Can you believe this?

20          Sitting with people all around me, and

21  Arlene is on the phone, and she said, I have

22  Harry on the phone.  I have Kelli, in Almaty, on

1   the phone.  I have Barbara Sloan on the phone.

2   And you have been going on, you have been

3   exhibiting erratic behavior, and it's time for

4   us to end your work, and you're not welcome in

5   any of the offices.

6           And I tried to say, What are you --

7   you know, what's going on here?

8           I -- Kelli did not -- I did not invite

9   Kelli to stay an extra week, and -- what was it,

10   Kelli -- I did not plan a meeting with Kelli at

11   any time.  And I asked her if she wanted me to

12   stay in Almaty.

13           And this was the erratic behavior.

14           And this is how I was presented, with

15   desks of people all around me.

16           I was ridiculed.

17           I was -- I was -- I was just

18   devastated.

19        You know, I had no idea that this was

20   going to happen.

21        Q.  Were you holding a meeting at the

22   time?

144

1    A.  No.

2    Q.  Why were there a bunch of people

3  around?

4    A.  Because they have an open office.

5    Q.  So you weren't all sitting around a

6  conference table?

7    A.  No.

8    Q.  All right.  I had the wrong mental

9  picture in my head.

10    A.  Sorry.

11    Q.  All right.  So you're sitting at a

12  desk, and there are other people in desks --

13    A.  Yes.

14    Q.  -- around you?

15    A.  Yes.

16    Q.  All right.  And they're doing their

17  work, and you're doing whatever you're doing?

18    A.  Well, I'm talking, I'm waiting for a

19    conference call and trying to make sure that

20    they could wire me in because I had to tell

21    people I'm expecting a conference call.

22            It's not something that, you know, is

145

1    done, but there was no private office available.

2         (Thereupon, Deposition Exhibit No. 14

3    was marked for identification.)

4    BY MR. BROWN:

5         Q.   Showing you what has been marked as

6    Exhibit 14.

7         And this is three pages of emails,

8    Bates Stamped 000244 through 246.

9         It's an email chain between you and

10   David Smith, for the first page, page and a half

11   or so, and comments on an email from Michael

12   Kunz.

13        In your email to Mr. Smith of Tuesday,

14   October 5, one day after emailing Ms. Boyer that

15   wanted to talk about your possible departure

16   from Counterpart, you say here, "I'm in the

17   process of looking for a labor attorney in DC

18   you wouldn't have any suggestions, would you?"

19        What was your purpose in writing that?

20        A.   I wanted to know what my rights were.

21        Q.   In the event of what?

22        A.   In the event of I would leave

1   Counterpart, or in the event I would possibly

2   report some financial -- what I found -- I

3   thought irregularities.

4       Q.   So it is fair to say that as of

5   October 5, the thought of leaving Counterpart

6   was at least an option that you were

7   considering?

8       A.   Absolutely.

9       Q.   And the thought of reporting alleged

10   financial irregularities was something you were

11   considering?

12      A.   Yes.

13      Q.   Did Mr. Smith come back with a

14   suggestion for a labor attorney in DC?

15      A.   No.

16          (Thereupon, Deposition Exhibit No. 15

17   was marked for identification.)

18   BY MR. BROWN:

19     Q.   Showing you what we have marked as

20   Exhibit 15.

21          It's Bates Stamped -- a two-page

22   document, CP00738 and 739.

147

1        I believe these to be notes of what

2   was discussed during the course of the telephone

3   call where you were informed of your discharge.

4        Does this document accurately

5   summarize what you were told during the course

6   of that call?

7     A.  No.

8     Q.  In what way does it not?

9     A.  There are a lot of things here that

10  weren't mentioned.

11    Q.  Such as?

12    A.  Well, I -- I don't -- didn't -- don't

13  recall, "We can't just run a company with this

14  sort of dysfunction."

15       And I didn't -- don't recall

16  discussion of any terms of separation.

17    Q.  Other than that, was everything on

18  this document discussed?

19    A.  I don't recall.

20        A lot of it was discussed, but some

21    things I don't -- don't remember in the phone

22    call.

1      Q.   Okay.  Well, let's -- maybe we should

2   just go through it point by point and see what

3   you do recall versus what you're not sure about.

4        Do you recall a statement to the

5   effect -- and I wouldn't expect this was

6   verbatim -- that in spite of our best efforts,

7   best intentions of everyone, et cetera, that

8   first paragraph, was that -- or words to that

9   effect discussed?

10      A.   The first thing I remember is the

11   statement about the difficulty that Arlene was

12   having.

13        And that's what comes to my mind, the

14   first thing that I remember.

15        It may have started with "in spite of

16   our best efforts," but I don't recall.

17      Q.   I'm less concerned because, I mean,

18   certainly a lot of time has passed.  This is the

19   chronological order in which these things might

20   have been said.

21          I don't really expect you -- if you

22   remember that, great, but I don't -- I'm not

149

1   going to hold you to that standard.

2        I'm more concerned just whether these

3   statements were made.

4      A.   The majority of these statements were

5   made, but I can't recall specifically which

6   ones.

7        But there's some -- I mean, I couldn't

8   go through -- by each one and say, yes, I heard

9   this, yes, I heard this, or no, I did not hear

10  this.

11     Q.   Well, maybe you can't, but I can.

12        And you can just tell me if you do or

13  not.  All right?

14     A.   Okay.  Go ahead.

15        I'll let you do it.

16     Q.   Because what I understood you to say

17  was that some you definitely remember, and some

18  you are not sure about, and some you're sure --

19    A.  Yes.

20    Q.  -- weren't said.

21        So those are sort of three categories.

22        I just want to fit each of the

150

1   statements into those categories.

2           So the first bullet point about, in

3   spite of our best efforts, was that said, or

4   words to that effect said?

5       A.   I just said I can't recall

6   specifically if that was the exact thing that

7   was said.

8       Q.   Okay.  I apologize, sir.

9           I deeply apologize.

10          I -- I -- we have been at it a long

11   time, if you said something, and I might have

12   missed it, I apologize.

13      A.   All right.

14      Q.   Okay.

15      A.   You don't need to apologize.

16      Q.   No, I'm sorry.

17      A.   No.

18      Q.   I don't want you to think at any time

19   that I'm misconstruing anything or anything

20   else.

21          So I apologize.

22          I trying to listen --

151

1     A.   You know -- you --

2     Q.   -- but I may miss things.

3     A.   I don't know if you understand the

4   pain that I have gone through after working for

5   ten years for this organization.

6          And to have this kind of response for

7   no reason at all.

8          And to have people come to the region

9   and lie about what I supposedly did for their

10   own interests...

11     Q.   Was it said that you won't even meet

12   with Michael?

13     A.   Yes.

14     Q.   Was it said that based on your erratic

15   behavior, since Kelli has been in the field,

16   it's apparent that the only option left to us is

17   separation?

18     A.   Yes.

19    Q.  The example of refusal to meet with

20  Kelli, departing for Bishkek, that was said?

21    A.  I don't recall.

22    Q.  I thought earlier you had said that

1    that was brought up, and you --

2        A.   What I recall was that she begged me

3    to stay, but not -- I don't recall that it was a

4    meeting scheduled on Monday.

5          I don't recall Arlene Lear saying

6    there was a meeting scheduled on Monday.

7          I recall her saying in spite of the

8    fact that you begged her to stay, that's what I

9    recall.

10      Q.   All right.  Fair enough.

11          The bullet point, writing Kelli

12   requesting information about separation -- maybe

13   we should break it down.

14          Was that part, let's say, just that

15   phrase, writing Kelli, requesting information

16   about separation?

17      A.   I don't recall that.

18      Q.   Did Ms. Lear or anyone else say during

19   the call, you told her, Kelli, innumerable times

20   during the week, that you desired separation?

21        A.   What she said was that I changed my

22   mind several times.

1    Q.   And you deny that that's the case.

2        Is that correct?

3    A.   I continually told Kelli that I wanted

4  to stay with the project.

5    Q.   And at no time said anything to the

6  contrary.

7        Is that right?

8    A.   To?

9    Q.   To Kelli.

10    A.   For example, I mean, what -- what?

11    Q.   Saying that I do want to leave the

12  project, or I do want to leave Counterpart,

13  either one.

14    A.   I don't recall saying that I wanted to

15  leave Counterpart.

16    Q.   Do you deny saying it?

17    A.   Do I deny saying it?

18    Q.   Yes.  There's a difference.

19        One, is I don't remember, which means

20    it may have happened.

21        The other is, you're categorically

22    denying saying that you made that statement.

154

1     A.   I may have discussed terms of

2   separation, which would, in fact, intend that I

3   had an interest.

4        But I was looking out for myself, and

5   what my interests, you know, my own needs in

6   terms of a separation.

7     Q.   All right.  So you did have

8   discussions with Kelli, when she was in Central

9   Asia, about terms of separation?

10     A.   You know, actually, I don't recall.  I

11   really don't recall.

12        That -- I -- I -- no, I didn't.

13        In fact, I'm recalling, you know, for

14   three days, she was in the office, we didn't

15   even talk.

16        And finally I said, Hey, don't you

17   think it's a good idea for us to get together?

18   And she said, yes.

19          And in our first meeting, we -- you

20     know, it was chitchat and over things.  We went

21     to lunch.

22          Everything was pretty good until later

155

1  on in the week.

2       At one point, I said to her, I said,

3  Well, you know, it must be difficult for you

4  because I was opening up some of my frustrations

5  about working with certain people in Washington

6  and other.

7       And she was on some level supportive,

8  and I said to her, You know, it must be

9  difficult for you to take all of these things in

10  and not share them with your -- with the office

11  in Counterpart.

12       Because if you look in the employee's

13  manual, it talks about the support that the HR

14  officer can provide to the employee, and that

15  that's an option to discussion and to -- on

16  grievances, and other issues.

17       And it -- and in the end, she was --

18  everything I was saying -- and I don't recall

19   because we had, you know, meetings and lunches,

20   and mostly was, you know, me sort of venting, I

21   suppose, complaining about, you know, I have

22   been working for so many years, and

1  communication problems, issues, whatever.

2        And her -- she was sharing all of

3  that.

4        And there was no -- no -- you know,

5  the employee manual, it was not -- you know,

6  there was no trust in that at all.

7        And so I started to realize, you know,

8  after a while, wait a minute, this person is not

9  on my side, so to speak, not here to support me.

10        But ...

11     Q.   So I would like to clarify where we

12  ended up because I heard -- I heard two

13  different things.

14        Prior to Ms. Boyer meeting you in

15  Kyrgyzstan, when she was in the office in

16  Almaty, did you ever discuss with her the

17  separation of your employment with Counterpart?

18     A.   No.

19    Q.   So at no time did you indicate that

20   you wanted to leave the company.

21        Is that right?

22        A.   That's right.

1      Q.   And at no time did you discuss with

2   her the conditions under which if you left the

3   company, that you might be compensated or

4   otherwise paid?

5      A.   No.

6      Q.   Do you -- referring back to Exhibit

7   15, in that same bullet point that we left, the

8   statement says, "Saying that you were staying

9   until June 2006, applying minimal effort."

10        Was that said to you during the course

11   of the telephone call during -- in which you

12   were informed of your discharge?

13      A.   I don't recall.

14      Q.   All right.  Did you ever make that

15   statement, or words to that effect to Ms. Boyer,

16   that you would stay, but that you were just

17   going to put in the minimal effort?

18      A.   No.  What I maybe could have been --

19  she may have taken -- my interest was in working

20  on my project, and on the specific projects that

21  I was responsible for.

22          And if I would have said I'm

1  interested in my projects and I'm not going

2  to -- you know, that's my main interest, and

3  that could have been taken as minimal effort or

4  something like that.

5      Q.  Were you told about Kelli's interviews

6  with local staff at all levels, that they were

7  disturbed because they expressed fear of you and

8  feels of disempowerment?

9      A.  No.

10     Q.  Were you told that?

11     A.  In this?

12     Q.  In the call --

13     A.  Yes.

14     Q.  -- were you told that?

15     A.  Yes, I was.

16     Q.  Do you have any reason to believe that

17   that is an untrue statement?

18     A.  Yes.

19    Q.   What's that?

20    A.   After she was there for several days,

21  I was observing the fact that she wasn't meeting

22  with anyone.

1          And I went to her and I said, you

2     know, it would be a good opportunity, while

3     you're here -- she was always doing email or

4     something on a computer.

5          And I said, it would be a really good

6     opportunity for you to meet with somebody.

7          And I asked her, you know, we have the

8     country director from Kazakhstan here in this

9     office, Marat.  Have you met with him, have you

10     made any plans?

11          No, she hadn't.

12          She -- the only person that she seemed

13     to be doing anything with was the HR manager,

14     Irina Kolmakova.

15          K-O-L-M-A-K-O-V-A.

16          And in fact, they were off on several

17     shopping trips, buying souvenirs.

18     Q.   After meeting you in Kyrgyzstan,

19  Ms. Boyer went back to Almaty; correct?

20      A.  I'm assuming, yes.

21      Q.  Do you know if she had any discussions

22  with anyone when she got back?

160

1    A.   Do I know if she had?

2    Q.   Any discussions with staff when she

3   got back?

4    A.   You know, I didn't -- I didn't have

5   any access to any further activities after she

6   return to Almaty because I was in Kyrgyzstan.

7    Q.   Was it said, during the call, that

8   there are few words to express my

9   disappointments, et cetera --

10    A.   Yes.

11    Q.   -- or words to that effect?

12    A.   Yes, yes.

13    Q.   Was it said that we are still hopeful

14   that we can come up with a win, win best

15   outcome?

16    A.   I -- it's possible.

17        I just don't -- that one, I don't

18   recall.

19    Q.  Was it said that what is clear is that

20    we need to take action because minimal effort on

21    your part is not acceptable, nor is the

22    inability or unwillingness to function under the

1  new management structure, or words to that

2  effect?

3      A.  Word to that effect, yes.

4      Q.  Going back towards the beginning, you

5  said Ms. Lear did say that, He won't even meet

6  with Michael.

7          Was that a true statement?

8      A.  No.

9      Q.  Do you know what she was referring to?

10     A.  Yes.

11     Q.  What is she referring to?

12     A.  On Thursday, the first -- that would

13  be about December.

14     Q.  November.

15     A.  Oh, November 6, I think.

16          No, that's not right.

17          It's the fourth, or somewhere in

18  there.

19        Anyway, Thursday, the first week Kelli

20   Boyer was in Almaty.

21        We went to lunch, and she asked -- she

22   said, you know, I know there are some issues

1  between you and Bob, or I brought up that there

2  are some issues between Bob Abma and myself.

3        And she said, Would you be willing to

4  meet with Bob and myself to discuss these.

5        And I said, Yeah, I would welcome it.

6        And later that afternoon, about 4

7  o'clock, 4:10, she came in the office and said,

8  We're going to meet with Bob at 4:30.

9        I said, Fine.

10       I said, Where should we meet, because

11  Bob did not like to come to my office.  He

12  didn't want to sit in my office, for whatever

13  reason.

14       And she said, Oh, I'll find out.

15       She came back at 4:25, and she said,

16  We're going to meet in Michael's office.

17       I said, No, that's not appropriate.  I

18  can't do that.

19          And she turned around and walked out,

20   didn't ask why, and that was it.

21          Later that day, I saw Michael -- well,

22   go ahead.

1    Q.   Why was that inappropriate?

2    A.   Because we had an agreement that Bob

3   and myself and Kelli would meet.

4         And if you go to the employee's

5   manual, there is a part of that manual that

6   talks about the support that an HR person can

7   provide, including bringing conflict to some,

8   you know, some mediation, some conflict

9   mediation or whatever.

10        And this is what I was expecting.

11        I wasn't expecting to then -- to meet

12   in my supervisor's office to discuss the

13   personal issues between Bob Abma and myself.

14        I wanted to get to some -- I really

15   wanted to discuss it, to talk, to get to

16   something.

17        And my immediate reaction was, You're

18   going to meet in Michael's office, was that's

19  not going to work.

20     Q.  Okay.

21     A.  Michael didn't come to me.  No one

22  came to me, said, Hey, what's going on, or, Why

1    didn't you want to meet in my office, or, you

2    know, was -- that was it.

3        Q.   You were starting to say later on you

4    talked to --

5        A.   I -- I saw him --

6        Q.   -- Mr. Kunz about some --

7        A.   -- in the hallway.

8            We said -- passed, said, Hey, how are

9    you doing?

10           He said, Okay, how are you doing?

11   Okay.

12           Nothing was mentioned about what's

13   going on with, you know, why didn't you want to

14   meet, or -- absolutely nothing.

15       Q.   Turning to the second page of Exhibit

16   15.  Was the -- paragraph No. 1 there, we are

17   prepared to honor the agreement, et cetera.

18           Was that said?

19     A.   Where are we?

20     Q.   We're on page 2 of Exhibit 15, the

21   notes of the conversation.

22     A.   Okay.

1     Q.  Referring to --

2     A.  We are prepared to?

3     Q.  Correct, that paragraph.

4     A.  I don't recall that.

5        It may have been said, but I just

6  don't recall.

7     Q.  What about the point No. 2, regarding

8  the divorce proceedings and your visa status?

9     A.  That, I don't recall either.

10    Q.  Was it said that it was requested that

11  you not work out of the office?

12    A.  Yes.

13    Q.  Was it said that, I hope you

14  understand how difficult this is for me

15  personally, that statement?

16    A.  Well, that's the same statement I

17  thought was earlier, but it was said at some

18  point during the discussion.

19    Q.   Okay.  All right.

20         Was it said that as part of the

21    agreement that you will get positive references,

22    and both sides will hold each other blameless

1   when we revert to the terms of your contract?

2       A.  I just don't recall.

3          It probably was said, I just don't

4   recall.

5       Q.  Was something said about future

6   consulting?

7       A.  And, again, I don't recall.

8       Q.  Now, at some point, you were asked to

9   return to the Almaty office to go through your

10   personal effects; correct?

11      A.  I may have received an email about

12   that, yes.

13      Q.  When did you receive that email?

14      A.  The following week, if I recall.

15      Q.  And did you respond to that email?

16      A.  I sent Michael Kunz an email, you

17   know, requesting a time to pick up my things.

18          I wasn't asked to go through my

19   things.  I was asked to pick up my things.

20          Everything was packed in boxes, and I

21   should just pick it up.

22          The first time I tried, I was told

1    that Michael was the only person with access.

2    Then there was another response about two keys

3    and that no one person could have access.

4        Q.  Who was it that told you that only

5    Mr. Kunz had access?

6        A.  Marat Aitmambegov.

7            A-I-T-M-A-M-B-E-T -- B-E-G-O-V.

8        Q.  I'm just going to go with Marat.

9        A.  All right.

10       Q.  Who was Marat?

11       A.  Marat was the country director for

12    Kazakhstan.

13       Q.  And eventually, the box of personal

14    effects was sent to your home address?

15       A.  Boxes.

16       Q.  Boxes, plural.

17       A.  No.  I picked them up.

18       Q.  You picked them up?

19    A.   Yeah, eventually.

20         There was communication with

21    Counterpart in Washington, and some permission

22    given to allow me to pick them up myself.

168

1        I didn't go in my office.  I went just

2   in to pick them up in the lobby kind of thing,

3   front hall.

4     Q.  Okay.

5     A.  But it was after hours, if that makes

6   any difference.

7     Q.  Do you remember when that was?

8     A.  It was several weeks after.

9     Q.  Why wait so long?

10     A.  I was trying --

11        And I -- because Michael was traveling

12   out of the country, and no one could get

13   permission, and ...

14     Q.  Do you have any reason to believe that

15   whoever made the decision to terminate your

16   employment believed that you were performing

17   your duties to the company's satisfaction?

18     A.  Would you repeat that one more time?

19   I want to make sure I have this.

20       Q.   Sure, absolutely.

21           Do you have any reason to believe that

22   whoever made the termination decision actually

169

1  believed that you were performing your duties to

2  the company's satisfaction?

3      A.  Well, I believe I was.

4      Q.  I'm sure that's true.

5      A.  Whether someone else -- do I have a

6  reason, does that mean, do I have documentation

7  or do I have --

8      Q.  Documentation, evidence, anything that

9  would lead you to believe that, in fact, the

10  company did believe that you were performing

11  your job duties to their satisfaction?

12      A.  Yes.

13      Q.  Okay.  What would that be?

14      A.  Well, there were several emails and

15  comments from Michael Kunz, good job, nice going

16  on specific activities.

17          When we had that one meeting and, you

18  know, we went through a whole agenda of

19  project-related issues, but then he said, you

20  know, well, how was our relationship going?

21          And I said, Fine; and he said, I think

22  it's fine.

1          So ...

2     Q.   Other than that, anything?

3     A.   What else could there be?

4          I know I didn't have performance

5   review with Michael.  It was early.

6          I had earlier performance reviews, but

7   of course, they were earlier, so -- there was an

8   email from Anika, that -- after she had met with

9   USAID, saying that USAID really felt that the

10   project was going well, everything -- the

11   projects were going well, project, projects,

12   whichever.

13          And you know, those all give me

14   indication that, you know, things were going --

15   that I was performing my job, which was to

16   manage these projects.

17     Q.   Anything else?

18     A.   Not that I recall.

19          MR. BROWN:  We're a little over an

20   hour, aren't we?  Take five.

21          (A recess was taken.)

22          MR. BROWN:  I don't know that we need

1    to mark this necessarily.

2         It's a copy of the complaint, but I do

3    want to refer to it, so...

4         MS. DOUGLAS:  Okay.

5    BY MR. BROWN:

6         Q.   Mr. Cooper, I want to talk to you

7    about the allegation in the complaint concerning

8    the false light invasion of privacy that you

9    have alleged.

10        In the complaint -- and I understand

11   lawyers write complaints, so I don't hold you to

12   each and every world of this -- but it alleges,

13   in paragraph 24, that "Counterpart took steps

14   knowingly designed publicly to send out the

15   message to Cooper's professional colleagues in

16   and outside the Counterpart organization that

17   Cooper had been guilty of serious misfeasance or

18   dishonesty and was not to be trusted."

19          So what I want to focus on for the

20     next bit here is the steps that Counterpart took

21     to send out this message to the public.

22          Now, the complaint in paragraph 25

1   says:  "Among the steps are the following:"  And

2   then it lists eight subparagraphs of A through H

3   of some of these steps.

4          And then in paragraph 27, it talks

5   about various untrue statements that Counterpart

6   or its employees have been alleged to have said.

7          So let me ask you this.

8          Other than the steps reflected in

9   paragraph 25 and the untrue statements reflected

10   in paragraph 27, are there any other ways in

11   which Counterpart has done something to send out

12   the message that you were guilty of serious

13   misfeasance or dishonesty?

14          And take as much time as you need to

15   read paragraph 25 and 27 or anything else.

16      A.   But you're asking me for something in

17   addition, outside of those two, so I really

18   don't need to read those.

19     Q.   Well, I suggest that only because I

20   don't want you to feel limited in any way in

21   terms of answering my question; okay.

22            And I didn't know how familiar you

1   were with the complaint.

2      A.  I'm very familiar with it.

3      Q.  Okay.

4      A.  I had a conversation with Ruth Pojman,

5   P-O-J-M-A-N, at which time she told me that an

6   employee of Counterpart told her that I deserved

7   what I got.

8          I don't think that's in the complaint.

9      Q.  Okay.  Who is that employee of

10  Counterpart?

11     A.  Altinay Kuchukeena.

12         K-U-C-H-E-E-K-E-K-Y-U-V-A, something

13  like that.

14     Q.  And when did you have this

15  conversation with Ruth Pojman?

16     A.  In -- last summer, July -- July, I

17  think, of 2005.

18     Q.  And who is Ruth Pojman?

19    A.  She works for USAID.

20    Q.  And who is --

21    A.  Altinay Kuchukeena?

22    Q.  Altinay -- okay.

174

1    A.   She is a staff person that works

2    under -- in the division -- civil society

3    division in Washington DC.

4         She is Kyrgyzstany, a woman.

5    Q.   You say she is a staff person.

6         What position does she hold?

7    A.   I don't know the title.

8         It's program assistant, I think, in

9    the division, civil society division.

10   Q.   Does she manage anybody?

11   A.   I can't answer that.

12        I don't know what her work

13   responsibilities are.  I can't answer that

14   question.

15        I don't know what her work

16   responsibilities are.

17   Q.   Okay.  And the statement attributed to

18   Ms. Kuchukeena is that you got what you

19  deserved?

20      A.  Yes.

21      Q.  Did Ms. Pojman tell you what her

22  reaction to hearing that statement was?

1      A.   Not really.

2            She just told me no.

3            I do want to say that I followed up

4   with her, and I said that --

5      Q.   Her being?

6      A.   Ruth Pojman.

7            I followed up with Ruth Pojman, and I

8   asked her, I said, what did that mean.

9            It was on the next day.

10           And she said, Oh, you know, I don't

11   really think that's what she said.

12           So I -- I don't know what was said,

13   but there was obviously some conversation.

14           I was told first, I got what I

15   deserved, then she retracted her statement when

16   I asked for further clarification, which I found

17   interesting.

18           I don't know why.

19    Q.  Do you have any reason to believe that

20    Ms. Pojman talked with Ms. Kuchukeena in between

21    the two conversations?

22    A.  I don't have any reason to believe

1  that.

2     Q.  Did Ms. Pojman talk with anybody

3  else --

4     A.  I don't have any reason to believe

5  that.

6     Q.  Wait until I finish.

7     A.  Oh, sorry.

8     Q.  That's okay.

9        Was Ms. Pojman a friend of yours?

10    A.  A friend, yes.  A colleague over the

11  years.

12       I have known her since probably 1994.

13       She was living in Moscow and working

14  with an organization that I, even before I

15  worked with Counterpart, I had connections with

16  in other USAID funded projects.

17    Q.  Other than the comment that you have

18  just attributed to Ms. Pojman or through her,

19  Ms. Kuchukeena, any other comments that you

20  believe or conduct that has put you in a false

21  light, other than what's reflected in paragraphs

22  25 and 27?

1      A.   None that I -- not that I know of.

2           I really don't know of specific

3    incidents or words or actions, no.

4      Q.   Referring to paragraph 25A of the

5    complaint, it talks about being notified of your

6    termination in a telephone conference call that

7    we have already discussed.

8           In what way does that send out the

9    message that you were guilty of serious

10   misfeasance or dishonesty?

11     A.   A?

12     Q.   Yes.

13     A.   The fact I could not return to my

14   office in Almaty sends a message that I did

15   something.

16          There's got to be a reason for me not

17   allowed back to my own personal office in

18   Kazakhstan.

19      Q.  Has anybody told you that because you

20    were not allowed back that they felt that you

21    must have been guilty of some serious

22    misfeasance or dishonesty or were not to be

1    trusted?

2        A.   I wasn't told directly that I can

3    recall that -- other than, you know, comments

4    like, you know, we really wondered what you did,

5    what's going on, we don't know, where -- this

6    is, you know, so strange.

7            We never heard of anybody else ever

8    having this situation, this -- being locked out

9    of their office, lots and lots of comments like

10    that, you know.

11           And even though they -- I mean, you

12    know, I don't think -- there aren't very many

13    people that would come to me and say what did

14    you do, you know, it's -- well, it's ...

15       Q.   Who are the people you just identified

16    who questioned why it was handled -- why you

17    were not allowed back in your office?

18       A.   I think most of the people that are

19   listed in the, I would say in the

20   interrogatories, yeah.

21          And we have an attached list of people

22   who I have had communications with.

1    Q.   That's about over 50 people.

2    A.   Yeah.

3    Q.   Are you telling me that each and every

4  one of those 50 people commented to you that

5  questioned why you were not allowed back in your

6  office?

7    A.   No.  No, I -- specifically about being

8  allowed in my office, you know, I could go

9  through the list and try to guess.

10        But there has, you know, been a lot

11  of -- with those folks, there has been

12  communication, conversation, and ...

13    Q.   Other than telling you that you could

14  not return to your office, do you know if any

15  steps were taken to publicize that fact in any

16  way, shape or form?

17    A.   Well, by putting -- changing locks on

18  my office is publicizing to me.

19    Q.   Okay.  Well, let's talk about that,

20    that's paragraph B.

21         It says:  "Counterpart immediately

22    changed the locks on Cooper's office in the

180

1  presence of the staff in the office, and kept it

2  locked."

3      Now, how do you know that those locks

4  were changed in the presence of staff?

5    A.  Because my office is right in front of

6  a whole array of desks.

7    Q.  Has anybody told you they watched the

8  locks be changed?

9    A.  Yes.  There were people who have told

10  me that.

11    Q.  Who?

12    A.  Several staff persons.

13    Q.  Give me their names, please?

14    A.  Igor Storozhenko.

15      S-T-O-R-E-Z-H-E-N-K-O.

16    Q.  Anyone else?

17    A.  That's all I can think of right now,

18  that -- specifically that I remember.

19     Q.  So Igor told you, I saw them change

20   the locks?

21     A.  I don't think he said I saw them

22   change the locks.

1          He told me that they, you know, that

2    he knew that they changed the locks on Friday.

3    Q.   Okay.  There's a difference.

4          Because what's alleged here is that

5    they changed the locks in the presence of the

6    staff in that office and kept it locked.

7          One is a public event, doing things

8    out in front of people.  One is a private event.

9          I want to know if you have any

10   testimony, any evidence to show that it was done

11   in a public manner.

12   A.   Well, the only way it could be done is

13   in a public manner, unless they closed the

14   office.

15   Q.   Right.  Okay.

16          Other than your own supposition as to

17   what must have happened, do you have any -- has

18   anybody told you they saw the locks be changed?

19      A.   I can't say that someone specifically

20   told me that they saw the locks being changed.

21      Q.   Okay.  Referring to paragraph C, do

22   you have any facts which would lead you to

1   believe that telling the country directors in

2   Kazakhstan, Kyrgyzstan, and Turkmenistan --

3       A.   No.

4       Q.   -- that you were not allowed in any of

5   the offices in those countries, do you have any

6   reason to believe that that is not standard

7   operating procedure for Counterpart?

8       A.   Well, it's never happened in Central

9   Asia.

10      Q.   When is the last time a chief of party

11  was terminated in Central Asia?

12      A.   I don't know of any chiefs of party

13  being terminated in Central Asia.

14      Q.   So there was no one similarly situated

15  to you, whose termination this could be compared

16  to.

17          MS. DOUGLAS:  Object to the form of

18  the question.

19          MR. BROWN:  Right.

20          MS. DOUGLAS:  That's a legal term, and

21   Mr. Cooper is not competent to answer a question

22   containing a legal term he doesn't know the

1   meaning of.

2   BY MR. BROWN:

3       Q.   You may answer the question.

4       A.   Would you rephrase the question?

5           I don't understand.

6       Q.   Sure.  Well, you have already answered

7   it.

8           But I will ask a different question

9   along the same lines.

10          Other than yourself, did Counterpart

11  ever terminate the employment of any nonnative

12  nonlocal individual in a management capacity?

13      A.   Yes.

14      Q.   Who?

15      A.   Blair Sheridan.

16      Q.   Who is Blair Sheridan?

17      A.   Blair Sheridan was the country

18  director in Uzbekistan.

19          Also, I terminated -- I -- with the

20   coop -- with the advice of Washington DC, I

21   terminated the contracts of Rosalie Vasquez and

22   Scott Yedder (phonetic).

184

1    Q.   Who is Rosalie Vasquez?

2    A.   She was the country director for

3  Turkmenistan, Counterpart in Turkmenistan.

4    Q.   And Scott Yedder?

5    A.   Her husband, who also worked with the

6  project.

7    Q.   When did you -- when was Blair

8  Sheridan discharged?

9    A.   In June 1999.

10   Q.   And did you have any role in informing

11  Mr. Sheridan of that decision?

12   A.   My role was deputy chief of party, and

13  I worked with David Smith on that process, who

14  was chief of party.

15       David Smith was chief of party.

16   Q.   Why was Mr. Sheridan terminated?

17   A.   For performance.

18   Q.   And was he barred from the Uzbekistan

19  office?

20      A.  No.

21      Q.  But he was not a chief of party;

22  right?

1     A.  No.

2     Q.  And Ms. Vasquez, were you involved in

3  her termination?

4     A.  Yes.

5     Q.  And was she barred from the

6  Turkmenistan office?

7     A.  No.

8     Q.  When was she terminated?

9     A.  In October or November -- November

10  2001.

11     Q.  Did you ever take part in any

12  discussions with Counterpart management where

13  the protocol for terminating a chief of party

14  was discussed?

15     A.  No.

16     Q.  Are you aware of any document which

17  spell out what the protocol should be?

18     A.  No.

19    Q.   Other than informing the country

20    directors in Kazakhstan, Kyrgyzstan and

21    Turkmenistan that you were not allowed in any

22    offices of those countries, did you know if

186

1  Counterpart informed anyone else of that ban, if

2  you will?

3      A.  I know that there was a meeting on a

4  Friday morning in the office in Almaty, before I

5  had the conference call, that announced that I

6  was no longer working with Counterpart.

7      Q.  Okay.

8      A.  And I'm not sure the specifics of that

9  meeting, but that meeting took place announcing

10  that I was no longer with Counterpart, even

11  before I knew I was no longer working with

12  Counterpart.

13      Q.  And how do you know that the timing

14  was such that that took place prior to your

15  finding out?

16      A.  Well, because the meeting took place

17  at 9:15 in the morning, and there's an hour

18  difference in time between Kazakhstan and

19  Kyrgyzstan.

20          And the conference call was at 10

21  o'clock, so it would have been 11 o'clock in

22  Almaty when I received the conference call.

1     Q.   And how do you know the meeting take

2   place at 9:15?

3     A.   I was informed.

4     Q.   By whom?

5     A.   By staff members in Kazakhstan.

6     Q.   Can you give me their names, please?

7     A.   Again, Igor Storozhenko.

8     Q.   Anyone else?

9     A.   No, not that I can recall.

10     Q.   Who did Igor tell you conducted the

11   meeting?

12     A.   Michael Kunz and Bob Abma.

13     Q.   And did Igor or has anyone else told

14   you what was said in that meeting?

15     A.   It was an announcement of that I was

16   no longer working.

17         That's all I recall.

18     Q.   And other than that, are you aware of

19   any publication of the fact that you were not

20   allowed in any of the offices of the three

21   countries?

22       A.   I'm not aware of any.

1    Q.   Paragraph D, 25D, refers to shutting

2    down internet access for staff in Almaty on an

3    obvious false pretense of remodeling, thereby

4    making it impossible for Cooper to communicate

5    electronically with anyone at his office.

6         What facts do you have which lead you

7    to state that the remodeling was an obvious

8    false pretense?

9    A.   I discussed the shutdown with the IT

10   manager, the person responsible.

11        He told me that he was told by Michael

12   Kunz to shut down the server and not allow any

13   email traffic.

14        I talked to the director of ICNL,

15   International Center for Not for Profit Law,

16   Steve Larabee, who told me that he was told that

17   email was being shut down because of remodeling.

18        And the IT manager told me that it

19    was -- he was told to shut it down.

20        Q.   Somehow that's contradictory if he was

21    told to shut it down, couldn't it have been he

22    was told to shut it down because of remodeling?

1     A.  No.

2     Q.  Why not?

3        I'm sorry.  I don't understand the

4  disconnect.

5     A.  The system had been -- is totally in

6  place, there wasn't any remodeling going on on

7  the system.

8        The IT manager would know if there was

9  any work being done on the system.

10    Q.  Maybe the work wasn't being done on

11  the system -- let me finish, but the work was

12  being done on the physical plant, something

13  having to do with the office, which would

14  require --

15    A.  Like what, for example?

16    Q.  Oh, I think this highlights the fact

17  that you don't know.

18    A.  Well, I do know.

19     Q.   You were told that the IT director

20   said to you that Mr. Kunz told him to shut down

21   the system; right?

22     A.   Yes.

190

1      Q.   Okay.  Did the IT director tell you

2   there was no remodeling going on in the office?

3      A.   But you don't shut a system down --

4      Q.   Answer my question, please, sir.

5           Did he tell you there was no

6   remodeling going on in the office?

7      A.   He did not tell me there was no

8   remodeling going on in the office.

9      Q.   Do you know for a fact that there was

10   no remodeling going on in the office?

11     A.   I don't know that for a fact.

12     Q.   Okay.

13     A.   But I would like to add.

14     Q.   Sure, go ahead.

15     A.   That if you understand anything about

16   computers and systems, that you don't have to

17   shut the system down for remodeling.

18           When there was no remodeling going on

19   in the server's office, in the IT managers

20   office.

21       Q.   Well, that's your supposition, you're

22   entitled to it, sir.

191

1        And as the former head of the firm's

2   technology committee, I do understand a thing or

3   two about technology.  So I would take exception

4   with your statement, but we're not here to

5   debate that.

6        You're entitled to your opinion.

7        We will move on.

8     A.   And I also would like to add to that,

9   if I could.

10     Q.   Yeah.

11     A.   That the director of ICNL was really

12   quite upset that his communications were shut

13   down under false pretenses.

14        That this is not an office just for

15   Counterpart, but there were other organizations

16   that were working and renting space and

17   cooperating with Counterpart, that worked in

18   other projects and had their email, internet

19   access disconnected.

20       Q.   And what connection was made, speaking

21   of connections, by Counterpart to this shutdown

22   and your lack of employment with Counterpart

1  anymore?

2      What was said in that regard?

3      A.  Please repeat that question.

4      Q.  Sure.  It was pretty awkward.

5      Who said anything to connect the fact

6  that internet access was being shut down with

7  the fact that you were being terminated?

8      A.  No one said that that had anything to

9  do with it, but there's obvious conclusions

10  drawn here, that ...

11      Q.  Did anybody tell you that they

12  connected the shutdown of the internet access

13  with your termination?

14      A.  No.

15      Q.  Who informed you that Counterpart

16  instructed all staff at Almaty to stay away from

17  the office on the weekend of November 13 and 14?

18      A.  Steve Larabee.

19    Q.  Did Mr. Larabee tell you that he was

20  told that the reason that people were told to

21  stay away was because of your termination?

22    A.  No.

1      Q.   Other than the fact that you were

2    terminated and the fact that he was told that,

3    is there any connection between those two

4    events?

5      A.   The fact that everyone in the office

6    was told not to -- that the office was

7    unaccessible, that no one should come to the

8    office on Saturday or Sunday --

9      Q.   Uh-huh.

10      A.   -- I'm trying to rephrase your

11    question.

12         The fact that everyone was told to

13    stay away from the office.

14      Q.   Right.

15      A.   Does it have any relationship to the

16    fact that I was fired?

17      Q.   Yes.

18      A.   Well, the reason that they had told

19   people to stay away was they were -- from what I

20   understand, were packing my bags, my goods.

21        Q.   Was anybody told that, that that was

22   the reason that the office was closing?

194

1     A.  No.  I -- not that I know of.

2     Q.  And how is it you know -- what leads

3   you to believe that the reason that the office

4   was closed was so that someone could pack your

5   office?

6     A.  Well, I know that my office was packed

7   on the weekend.

8     Q.  That's a different question.

9         How do you know that the reason that

10   the office was closed was so that your office

11   could be packed?

12     A.  I don't know that.

13     Q.  Okay.  Paragraph F says that during

14   that weekend, Counterpart employees sorted

15   through everything in your office, and you can

16   read the rest of it.

17     A.  Uh-huh.

18     Q.  First of all, who sorted through your

19   office?

20        A.   Bob Abma and Kelli Boyer.

21        Q.   How do you know that?

22        A.   I was told.

1      Q.   By whom?

2      A.   By the guard who was working that

3   weekend.

4      Q.   Whose name is?

5      A.   Vitaly Shertov.

6      Q.   Did Mr. Shertov tell you that he

7   observed Mr. Abma and Ms. Boyer sort through

8   things in your office?

9      A.   Yes.

10      Q.   And how do you know they broke into

11   locked drawers?

12      A.   Because Mr. Shertov told me.

13          In fact, he told me that he actually

14   broke for -- the drawer open for Bob Abma.

15          Bob Abma asked him -- and Bob Abma

16   told him that if anybody asked, it was Kelli who

17   told him to do it.

18      Q.   When did you have this conversation

19   with Mr. Shertov?

20        A.   In the -- sometime in the, you know,

21   month or so after.

22        Q.   And so it's your understanding that

1   while this search was going through, or sorting

2   through your office was going through, the only

3   people present were Mr. Abma, Ms. Boyer and

4   Mr. Shertov?

5        A.  As far as I know.

6        Q.  And do you know of anyone who was told

7   subsequently about this search?

8        A.  No.

9        Q.  Paragraph G talks about --

10       A.  Yes, actually -- well, no, I can't

11   recall.

12          I don't know who may have known.

13          I know I knew about it, and I told --

14       Q.  Because Mr. Shertov told you?

15       A.  Yeah.

16       Q.  Yes.  All right.

17          And then you decided to share it with

18   people?

19     A.  Yeah, I told a few people.

20     Q.  Okay.  Paragraph G talks about

21  Mr. Kunz instructing the staff not to forward

22  emails or telephone messages or other

1   correspondence to you.

2        How is it you know that?

3        I'm referring to 25G.

4    A.  Uh-huh.

5        From the -- from -- again, from the IT

6  manager.

7    Q.  Do you know if he did that, if

8  Mr. Kunz did that orally, in writing, do you

9  know?

10    A.  I don't know.

11    Q.  Have you ever seen any correspondence

12  or --

13    A.  No.

14    Q.  You have got to wait until I finish.

15        Have you seen any correspondence that

16  reflects this instruction?

17    A.  No.

18    Q.  And has anybody told you that they

19   concluded because emails were not to be

20   forwarded to you or telephone messages or

21   correspondence, that you were guilty of

22   misfeasance or dishonesty, or that you were not

1    a truthful person?

2        A.   No one has told me that directly.

3        Q.   Has anyone told you that indirectly?

4        A.   Well, the comments that I received

5    weren't specifically that, but I received

6    comments.

7            For example, we just don't know what

8    happened, you know.

9            We're so curious.

10           What could you have done?

11           Those kind of comments, you know.

12           And, you know, especially people that

13   I have worked with for ten years.

14       Q.   Basically, what you're describing is

15   that because Counterpart did not publicize the

16   reasons for reaching its termination decision,

17   people were left to their own devices to

18   speculate as to what those reasons might have

19  been.

20        Is that fair to say?

21    A.  Could you rephrase that?

22    Q.  Sure.  You said people come up to you,

1   what happened --

2       A.   Yeah.

3       Q.   -- because they -- obviously, if they

4   knew --

5       A.   Yeah.

6       Q.   -- what happened, they wouldn't have

7   asked you that.

8           So Counterpart did not publicize in

9   any way, that you're aware of, why it made its

10   termination decision.

11          Is that correct?

12      A.   There -- you know, I think what --

13   from my feelings, there were fixed messages.

14          There were messages that I -- I

15   decided to leave Counterpart.

16          There were messages that Counterpart

17   was giving out that, you know, that -- well, at

18   least that I decided, it was my decision, which

19  weren't.

20      Q.  Well, let's back up, and let me be

21  very specific.

22      A.  Uh-huh.

1     Q.   Do you know of any communication from

2   anybody in Counterpart management that said, we

3   terminated Jay Cooper's employment because, and

4   then gave some reasons or a reason?

5     A.   No.

6     Q.   So people coming up to you not having

7   that type of communication, expressed their

8   curiosity, I think was the term you used, as to

9   why this happened because they weren't being

10   told by Counterpart, so they were left to their

11   own devices as to what might have happened.

12        Is that fair to say?

13     A.   It's fair to say there was a lot of

14   gossip going on, a lot of rumors.

15     Q.   Okay.

16     A.   Especially in a network of, you know,

17   hundreds and hundreds of NGOs, and just, you

18   know, in a culture that people talk.

19    Q.   Paragraph 25H says that a Counterpart

20    employee told your professional colleague at

21    USAID that you had left Counterpart, "Not by his

22    own choice."

1    A.   Yeah.

2    Q.   Let's first find out who said what to

3   whom?

4        Who is the Counterpart employee?

5    A.   Michael Kunz.

6    Q.   And he was talking to whom?

7    A.   He was address a meeting at USAID.

8        And I know that Igor Tupitsyn was

9   present, who is our cognizant test technical

10  officer on the project.

11       I think that Susan Fritz was also

12  there.

13       I'm not sure if anybody else was

14  there.

15    Q.   Well, the way the complaint reads.  It

16  says a -- told Cooper's professional colleague,

17  singular.

18       Are you saying that, in fact, it was

19  made --

20     A.  It was --

21     Q.  You have got to let me --

22     A.  It was --

1    Q.   -- got to let me finish my question.

2    A.   Oh, I'm sorry.

3    Q.   Are you saying that he made this

4    comment to both Mr. Tupitsyn and Ms. Fritz?

5    A.   That's -- that was my understanding,

6    but I may not be exactly clear.

7         If I recall right, it was Igor

8    Tupitsyn who told me that's what the statement

9    was.

10    Q.   Now, the statement that you had left

11    Counterpart not by his own -- not by your own

12    choice, that is a true statement; correct?

13    A.   Yes.  Well, wait a minute.

14         That I -- I did not leave by my

15    choice, no.

16    Q.   So it's -- if in fact, Mr. Kunz said,

17    Jay Cooper left Counterpart not by his on

18    choice, that would be a true statement; right?

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/Deposition%20of%20Jay%20Cooper.txt

19    A.  Yes.

20    Q.  Now, let's talk about paragraph 27.

21       Paragraph 27 lists six statements

22  which are alleged to be untrue statements to

1   your professional colleagues, purposely to

2   damage your professional and personal reputation

3   and credibility, or at best, with reckless

4   disregard thereto.

5          So paragraph or statement A says that

6   it was Cooper's decision to leave the employ of

7   Counterpart, and according to your answers to

8   interrogatories, that was made by Ms. Lear to

9   Asiya --

10      A.   Sasykbaeva.

11      Q.   -- like you said, on or about June 25,

12   and to Mark Hannafin.

13          How is it you know that Ms. Lear made

14   these statements?

15      A.   I was told by Ms. Sasykbaeva.

16      Q.   Okay.  When did Ms. Sasykbaeva tell

17   you that?

18      A.   I think it was in June of 2005.

19    Q.  And so at or about the time the

20    statement was made by Ms. Lear.

21    A.  Yes.

22    Q.  And who is Ms. Sasykbaeva?

1      A.   Sasykbaeva?

2           She is the director of Center

3   Interbilim.

4      Q.   I'm sorry?

5      A.   Director of Center Interbilim.

6      Q.   And do you know the context in which

7   that statement was made?

8      A.   All I know is that Arlene Lear

9   requested a meeting at the Center, and went to

10  their offices and met there.

11          In terms of the context, I don't know,

12  some discussion of me.

13     Q.   And how did that statement damage your

14  professional and personal reputation and

15  credibility?

16     A.   It sent a mixed message to the

17  community.

18          And on, you know, the one hand, I'm

19   fired from my position, and on the other hand,

20   someone representing Counterpart saying it was

21   my decision to leave.

22        Q.   But did anybody at Counterpart ever

205

1   say to Ms. Sasykbaeva, or to anyone else in the

2   outside world, that you had been fired?

3       A.   I -- if I didn't leave on my own

4   choice, I was fired.

5          And Mr. Kunz said that I did not leave

6   on my own choice.

7       Q.   Okay.

8       A.   He -- and so Counterpart is making

9   statements to the outside world that I was

10   fired.

11       Q.   Other than Mr. Kunz's statements to

12   Mr. Tupitsyn and possibly Susan Fritz, do you

13   know of any other statements by any member of

14   Counterpart management that said that you had

15   been fired or otherwise involuntarily let go?

16       A.   I don't know the -- what was explained

17   in the meeting on the morning of Friday the

18   12th, in the Almaty office.

19          So I -- I don't know of any other

20   statements.

21          Q.   So do you have any reason to believe

22   that Igor Tupitsyn or Susan Fritz compared notes

1  with Ms. Sasykbaeva, and said, Well, gee,

2  somehow we're getting conflicting stories here?

3      A.   That with -- I don't have any reason

4  to know that they compared notes.

5          But, again, it could have also been

6  from other people of USAID because I know that

7  they shared that information, that I did not

8  leave by my own choice, with other people at

9  USAID.

10     Q.   How do you know they shared that

11  information?

12     A.   I -- I was told.

13     Q.   By whom?

14     A.   Mark Hannafin.

15     Q.   What did Mr. Hannafin tell you?

16     A.   He told me that -- that -- and -- that

17  Igor had discussed that with him, had told him

18  that, the subject of the meeting with Michael

19  Kunz.

20      Q.   All right.  So Mark Hannafin told you

21  that Igor Tupitsyn had told him that Mr. Kunz

22  had said you left not by your own choice?

1     A.   Yes.

2     Q.   Who is Mr. Hannafin?

3     A.   He works for USAID.

4     Q.   And how did you come to learn

5   Mr. Hannafin had been told by Ms. Lear that it

6   was your decision to leave the employ of

7   Counterpart?

8     A.   Mr. Hannafin told me.

9     Q.   And when did he tell you that?

10     A.   After -- at some point, when I -- I'm

11   trying to remember.

12        I saw him in Kyrgyzstan in the summer,

13   some point in the summer, July maybe, of 2005.

14     Q.   When did Mr. Hannafin tell you that

15   Mr. Kunz, through Igor, had made the statement

16   about leaving by your own choice?

17     A.   Probably in November or December of

18   2004.

19    Q.  Then approximately six months later,

20  Mr. Hannafin comes to you and says, Hey, Arlene

21  told me that you left -- that it was your

22  decision to leave Counterpart; right?

1     A.   Yes.

2     Q.   Was there a conversation at that point

3   between you and Mr. Hannafin about the fact that

4   that contradicted, seemingly, what he had heard

5   through Igor that Mr. Kunz had said?

6     A.   It was a conversation that brought

7   that up, the fact that there were mixed messages

8   coming.

9     Q.   And what was the upshot of that

10   conversation?

11       Where did you leave it with

12   Mr. Hannafin?

13       Did you explain to him what had really

14   happened?

15     A.   I don't recall what specifically the

16   upshot was.

17       Just, you know, we were having

18   breakfast in Bishkek, and he told me about the

19   meeting, that short meeting he had with Arlene

20   Lear in Kyrgyzstan.

21       Q.   Did he tell you that he had told

22   anyone about this apparent inconsistency?

1     A.   No.

2     Q.   Other than Mr. Hannafin, have you had

3   any conversations with anyone who has said to

4   you, hey, wait a minute, I heard that you left

5   of your own accord, and I also heard that you

6   left not by your own choice?

7     A.   Well, again, it comes back -- no, I

8   haven't specifically, that on one hand I left on

9   my own terms.

10        But a lot of questions of what

11   happened are getting, you know, confusing, so --

12    Q.   You worked with Ms. Lear as your

13   supervisor for a number of years.

14    A.   Yes.

15    Q.   Okay.  How was your relationship?

16    A.   I thought our relationship was really

17   good.

18    Q.   Do you have any reason to believe that

19  Mr. Lear bore you any ill will?

20      A.  No.

21      Q.  As you sit here today, do you have any

22  reason to believe that she bears you any ill

1 will?

2    A.  Well, I'm sure my feeling is that she

3 feels that I, you know, questions why I'm here.

4    Q.  Well, I don't think anybody likes to

5 have their company be sued.

6       I have yet to meet the client that

7 thanked me for having to defend them.

8       Other than that, do you have any --

9    A.  Have you ever met anyone who worked

10 for ten years for a company and was fired on the

11 spot for no apparent reason?

12    Q.  More than I can count, sir.

13       But I wouldn't say that it was for no

14 apparent reason.

15       But my question is, other than the

16 fact that I'm sure that Ms. Lear is not happy

17 about having her company sued and having to

18 spend the day in this particularly -- this

19  environment, any other reason to believe that

20  she might bear you any ill will, as you sit here

21  today?

22      A.  No.  In fact, I think she was very

1   nieve to what's really going on, and what's

2   going on in the field.

3       Q.   Is it your belief that basically there

4   was a, for want of a better term, conspiracy by

5   Mr. Kunz and Mr. Abma to feed Ms. Lear with

6   false information such that that would lead to

7   your discharge?

8       A.   Looking back, there was definitely --

9   at the time, I didn't feel that at all.

10          But looking back on the situation, not

11   only between Abma and Kunz, but also included in

12   that was Boyer, and the fact that they were

13   having, you know, a lot of private meetings.

14          Ms. Boyer didn't have time for me

15   to -- in the evening for dinner, although she

16   was far away from home, but was with Abma and

17   Kunz.

18          And looking back at that and the

19   progress, yes, I feel that they -- they really

20   were maybe not feeding false information, but

21   not really providing the whole picture, although

22   Ms. Boyer, Kelli Boyer, absolutely provided

1  false information.

2        Absolutely.

3        I can't underline that enough.

4        About what she said about me

5  disappearing, about planning a meeting and then

6  not coming, which I think, if I can say, really

7  was, you know, what Counterpart in Washington

8  took as erratic behavior, which was not erratic

9  behavior at all.

10        I was scheduled to go to this -- to

11  Kyrgyzstan, and I was scheduled to meet.

12     Q.   Would you agree with me that if, in

13  fact, you know, upon hearing, upon it being

14  reported that that's what happened, that if one

15  believed that, that if you, you know, said you

16  were going to be there, weren't there, went off

17  to Kyrgyzstan, if one believed that it unfolded

18  as Ms. Boyer said --

19    A.  Yes.

20    Q.  -- that that would be erratic

21  behavior?

22    A.  I did -- I don't know if I would call

1    it erratic.

2          I would call it unethical or

3    inappropriate behavior.

4          You don't schedule a meeting and not

5    go to it.

6      Q.   Okay, fair enough.

7          What motive would Ms. Boyer have to

8    take part in this conspiracy to get you fired?

9      A.   Well, I think she was -- you know, my

10   feeling is that she was really trying to support

11   Bob Abma, who for whatever reason felt, you

12   know, this ill will you're talking about towards

13   me.

14          And you know, people have a way of

15   taking sides.

16          And she was in a somewhat powerful

17   position, a bit out of her context, coming to

18   Central Asia.

19          And -- and in fact, I don't think

20   she's -- well, that's my opinion.

21     Q.   You don't think she's what?

22     A.   You know, I don't think she's

1   absolutely not a professional.

2         She doesn't, you know, doesn't

3   function effectively or professionally in her

4   role as an HR manager.

5      Q.   Other than the statement concerning

6   whether you were or were not going to have a

7   meeting, in which you have testified that she is

8   flat out lying, have you ever known her to lie

9   about anything else?

10      A.   Not lies that are outright flat-out

11   lies.

12         I mean, there's the issues of, you

13   know, you're going to -- the issue of the job

14   description, and the issue of we're not going to

15   pay you until you sign this contract.

16         Those you know, are -- I mean, they're

17   not lies, but they're -- yeah, I haven't had

18   that much interaction with her, to be honest.

19     Q.  Paragraph 27B says that Counterpart

20  offered you choices other than being terminated,

21  that you rejected.

22         And then that's elaborated on in your

1   interrogatory response, which says that that was

2   a comment made by Arlene Lear to Ms. Sasykbaeva,

3   which I apologize for butchering her name.

4        Was that supposedly made in the same

5   conversation that the comment in paragraph 27A

6   was made?

7      A.  Yes.

8      Q.  And related to you at the same time

9   that the comment in 27A was?

10     A.  Yes.

11         Going back to that, when she -- when

12   Ms. Sasykbaeva told me this, she didn't say, oh,

13   this is what she said, she -- I mean, she said

14   it in a tone that was, you had choices, why

15   didn't you take them?

16         You had, you know, it wasn't -- it was

17   you who -- it was as if she really believed

18   this.

19     Q.   Uh-huh.  And how did that damage your

20    professional or personal reputation and

21    credibility?

22        A.   Well, when someone is accused and even

1  seen as saying one thing to one person and

2  another thing to another purpose, that certainly

3  damages their reputation and credibility.

4     Q.  Well, but did -- the reason that it

5  was -- that Ms. Sasykbaeva was getting

6  conflicting stories would have been because you

7  corrected that perception; right?

8     A.  Well, I originally told her what

9  happened to me.

10     Q.  Okay.  Originally, as in prior to June

11  of 2005?

12     A.  Yes.

13     Q.  And then June 2005, she comes to you

14  and says, now I'm hearing this other stuff?

15     A.  Yes.

16     Q.  And so I'll just ask again.

17        How did that damage your professional

18  and personal reputation?

19      A.   When a person is seen as saying one

20   thing on the one hand and another thing on

21   another hand, there, you know, there's no --

22   there's no -- they're seen as a -- as a dis --

1   you know, as an unethical, unprofessional,

2   dishonest manipulator, or something like that,

3   you know.

4         There just -- it's -- it's -- it just

5   doesn't do anybody any good for their reputation

6   to, you know, to lie and to -- not to tell the

7   truth.

8      Q.  Did Ms. Sasykbaeva tell you that she

9   thought less of you because of what she had

10  heard?

11     A.  No.  She didn't tell me that.

12     Q.  Was she a friend of yours?

13     A.  Yes.

14     Q.  Does she remain a friend of yours

15  today?

16     A.  Yes.

17     Q.  Would you allow for the possibility

18  that assuming Ms. Lear made these statements to

19   Ms. Sasykbaeva --

20      A.   Good job.

21          That was really good.

22      Q.   Thank you.

1          That she was doing it to, in effect,

2    put a positive spin on your leaving the company,

3    as opposed to telling her, hey, he was fired

4    because we didn't like him?

5        A.   I think that was her intent.

6        Q.   27C says that the statement was made

7    that you did not cooperate with Counterpart --

8          Oh, that's the same conversation with

9    Ms. Lear and Ms. Sasykbaeva.

10       A.   Uh-huh.

11       Q.   Okay.  Now, 27D, statement made that

12   you were terminated for performance reasons, was

13   supposedly made to Ara Nazinyan?

14       A.   Nazinyan.

15       Q.   And I have to assume that Mr. Nazinyan

16   told you that?

17       A.   Yes.

18       Q.   At or about the time that the

19   statement was supposedly made to him in March

20   2005?

21       A.   Well, you know, I'm really lost as far

22   as the date of that goes.

1        I think it was around that time, but I

2    really don't remember.

3        All I know is that I had a phone call

4    with him.  He said he had been in Washington DC,

5    my name came up, and all Arlene said were there

6    were some performance issues.

7        And he said there were no details, and

8    that was -- that was it.

9    Q.   And who is Mr. Nazinyan?

10    A.   He is the country director for Eurasia

11    foundation in Armenia.

12    Q.   I'm sorry.  The Eurasian Foundation?

13    A.   Eurasia Foundation in Armenia.

14    Q.   In Armenia.

15    A.   They were based in Washington DC.

16    Q.   The comment -- well, did Mr. Nazinyan

17    tell you that he believed that you were

18    terminated for performance reasons?

19     A.  No.

20     Q.  Did he give you any indication that he

21  thought any less of you for having been told

22  this?

1    A.  No.

2    Q.  Is he a friend of yours?

3    A.  Yes.

4    Q.  Does he remain --

5    A.  A colleague.

6    Q.  Colleague; okay.

7        Does he remain a colleague of yours?

8    A.  Yes.

9    Q.  When was the last time you talked to

10  him?

11   A.  I don't recall.

12       It's been a long time.

13       I would guess six months or something

14  like that.

15   Q.  In paragraph 27E, you allege that a

16  statement was made that you mismanaged your

17  projects, and that this was reportedly made,

18  referring to your answers to interrogatories,

19   from Mr. Kunz to Stephen Larabee, on or about

20   December or January 2004 or 5.

21          And how is it that you learned on this

22   comment?

1     A.   I had a conversation with Steve.

2     Q.   And who does Mr. Larabee work for?

3     A.   For the International Center for Not

4  for Profit Law.

5     Q.   And was that conversation at or about

6  the time that he supposedly had this

7  conversation with Mr. Kunz?

8     A.   Sometime after.

9     Q.   Well --

10    A.   Obvious.

11    Q.   -- obviously it had to be sometimes

12  after, sometime within a month or so?

13    A.   I'm guessing, yeah.

14    Q.   I don't want you to guess, I want your

15  best recollection.

16    A.   Okay.  Yeah, probably within a month.

17    Q.   Did Mr. Larabee tell you the context

18  in which this conversation took place?

19     A.  Just in conversation, discussion, not

20   in a -- it was a casual meeting.

21          They were both in the same office,

22   worked together.

1      Q.   And as far as you understand,

2   Mr. Larabee told you that Mr. Kunz expressed his

3   opinion that you mismanaged your projects?

4      A.   Yes.

5      Q.   Then finally, in terms of the

6   complaint -- well, let me back up.

7          Did Mr. Larabee tell you that he

8   believed that?

9      A.   No.

10     Q.   Did he tell you that, in fact, he did

11   not believe that?

12     A.   He didn't tell me that he did not

13   believe that.

14          He just brought it up, and I, you

15   know, I don't remember him specifically saying I

16   don't believe that you mismanaged.

17          I mean, he worked as a subgrantee to

18   the projects I was managing, and we worked

19  together well.

20         Had a good relationship.

21    Q.  I mean, how did he bring it up?

22         Was it the nature of, gee, you

1  wouldn't believe what Michael Kunz said, or was

2  it, you know, gosh, I'm really concerned, is

3  this true?

4       I mean, how was it brought up?

5     A.   I may have asked him how are things in

6  the office, and he said fine, oh, by the way,

7  Michael stopped by and said, you know, you

8  mismanaged your projects, something like that.

9       I'm just -- that's an example of how

10  it could have happened.

11     Q.   Well, I mean, was there incredulity in

12  his voice, or was there, you know --

13  characterize it for me.

14     A.   I really can't characterize it.

15       It was a telephone conversation.

16  Q.   Oh, okay.

17       Did you continue to talk to

18  Mr. Larabee after that?

19    A.  I have had some contact, but not for a

20  long time.

21    Q.  Is he still back in Central Asia?

22    A.  I'm assuming that he is.

224

1          Someone told me that he recently has a

2     new addition to his family, and that's all I

3     have heard.

4          Q.   Paragraph 27F statement is that your

5     ex-wife, rather than you, deserved custody of

6     your minor child because you were too

7     "controlling."

8          And this comment was supposedly made

9     by Ms. Lear in the presence of Igor Stor --

10         A.   Storozhenko.

11         Q.   Storozhenko.

12         A.   Yes.

13         Q.   And I assume Mr. Storozhenko told you

14   this?

15         A.   Yes.

16         Q.   Shortly after June 2005?

17         A.   Yes.

18         Q.   So basically, Mr. Storozhenko reported

19  to you that Ms. Lear had shared her opinion

20  about your --

21      A.  Yes.

22      Q.  -- child custody situation?

1    A.  Yes.

2    Q.  Did Mr. Storozhenko tell you what his

3  reaction to that was, to hearing that?

4    A.  No.

5    Q.  Is he a friend of yours?

6    A.  Yes.

7    Q.  Does he remain a friend of yours?

8    A.  Yes.

9       It's a little difficult to maintain

10  friendships half way around the would.

11    Q.  I would imagine so, although I'm sure

12  email helps.

13    A.  Well, it's also difficult with

14  language and other things too, but.

15    Q.  I'm sure that's true, too?

16       THE WITNESS:  Can we take two minutes?

17       MR. BROWN:  Yeah, sure.

18       (A recess was taken.)

19  BY MR. BROWN:

20      Q.  Do you know of any statement in a

21  newspaper or magazine or handbill distributed to

22  any number of persons that said anything about

1   your discharge?

2       A.  No.

3       Q.  Do you know of any broadcasts over any

4   radio or any statement to a broad audience about

5   your discharge?

6       A.  No.

7       Q.  You mentioned since we have gone along

8   that you don't really have any reason to believe

9   that Ms. Lear bears you any ill will, other than

10   being involved in this lawsuit.

11          Based on what you're saying, I have a

12   feeling that you would say the exact opposite

13   with regard to Bob Abma.

14          Is that fair to say, or not?

15      A.  Well, I mean, maybe I'm wrong about

16   Arlene Lear and ill will.

17          And in fact -- I mean, the fact that I

18   was fired.  And the fact that she didn't even,

19  you know, call as a -- call me and say, you

20  know, is some -- what's going on, have a

21  discussion before hand, maybe there is some ill

22  will.

227

1        And you know, I would like to think

2   there isn't, but you know, in fact, there may

3   be.

4        And Bob Abma definitely has ill will.

5    Q.   Well, do you have any facts which

6   would lead you to believe that Ms. Lear bears

7   you any ill will?

8    A.   Other than the fact that I was fired

9   from my job, no.

10    Q.   Do you have any facts which lead you

11   to believe that Mr. Abma bears you ill will?

12    A.   Facts.

13        I mean, to my, if somebody wants to

14   bear me ill will, fine.

15        You know, I have a job to do and a

16   project to take care of, and I have a contract.

17        And that's what I'm -- you know, I

18   don't dwell on the ill will somebody may have

19   against me, if you know what I mean.

20        Q.   Sure, but that doesn't really answer

21   my question, which was do you have any facts

22   which would lead you to believe that Mr. Abma

1  bears you ill will?

2      A.  No.

3      Q.  What about Mr. Kunz?

4      A.  No.

5      Q.  What about Barbara Sloan?

6      A.  No.

7      Q.  Mr. Dorcus?

8      A.  No.

9          When you say bears ill will, you mean

10  hold a grudge, have something against me, I

11  mean --

12      Q.  Yes.

13      A.  -- what in your opinion is bearing ill

14  will?

15      Q.  Well, I think you have accurately

16  summarized it just there.

17          It's generally what I'm talking about.

18          As a result of being supposedly held

19   in this false light, what damages have you

20   sustained?

21       A.   Well, I have not been able to find

22   work in Central Asia, so I came back to the U.S.

1       As far as you know, that, yeah, go

2  ahead.

3       Q.   Okay.  And what -- how do you connect

4  the two events of being held in -- supposedly

5  being held in a false light, and not being able

6  to get a job in Central Asia?

7       A.   My reputation was damaged.

8       I was -- I mean, my career was

9  destroyed in Central Asia.

10      And -- and even in other parts of the

11  region, of the world.

12      Q.   Well, what I think I saw in your

13  answers to interrogatories, two jobs that you

14  applied for in Central Asia; right?

15      A.   They weren't in Central Asia.

16      One was in New York, and one was in

17  another -- one was in -- what was the second

18  one, and -- oh, and Bethesda.

19    Q.  Oh, okay.

20    A.  Uh-huh.

21    Q.  Well, you say you -- your career was

22  destroyed, you couldn't find work in Central

230

1  Asia.

2        What work did you try to find in

3  Central Asia?

4     A.  I was continuously networking and

5  talking to people.

6        Talking to as many people as I could,

7  seeing what was available.

8        There's not a lot of jobs just readily

9  available, and they're often focused on specific

10  skills.  So chiefs of party, you know, are

11  limited in the number of jobs.

12        But I was willing to even take, you

13  know, something else, so.

14     Q.  Are there any jobs in Central Asia

15  that you applied for after your discharge?

16     A.  Not that I have applied for, no.

17        I discussed some possible positions.

18     Q.  Did anyone tell you that they had

19  openings that they -- well, let's start with

20  that.

21        Did anyone tell you -- that you talked

22  to tell you that they had job openings?

231

1     A.  No.

2     Q.  How can you say that you have been

3  held in a false light and that's why you

4  couldn't get work in Central Asia?

5     A.  Well, if I wasn't held in a false

6  light, there may have been job openings.

7     Q.  Okay.  How do you know that?

8     A.  Well --

9     Q.  Now, that's a speculation, isn't it,

10  sir?

11     A.  Yeah, it's speculation, but I mean,

12  you know, actually, I had one discussion with a

13  Counterpart consultant from Germany, who wanted

14  me to work on a project.

15        And I said, you know, I really think

16  you need to discuss this with Counterpart

17  Washington because I don't think it would be

18  appropriate for me to work on this project.

19          And she said, well, I can make the

20   decisions.

21          It was a part-time consulting

22   position.

232

1        And in the end, nothing ever

2   transpired from that.

3        Q.   Who was that you were speaking with?

4        A.   Christina Schuirre.

5        Q.   How do you spell that?

6        A.   C-H-R-I-S-T-I-N-A.

7             S-C-H-U-I-R-R-E or I-E-R, something

8   like that.

9             It's on the list.

10       Q.   It's on the list; good.

11            And Ms. Schuirre is with what company?

12       A.   With -- well, she's a consultant, but

13   she has been the sort of liaison for

14   Counterpart.

15            And it's called -- the division is

16   called Counterpart Germany, and she is based in

17   Berlin.

18            And she has developed -- she has

19  developed projects in cooperation with

20  Counterpart, some of the projects.

21        But it's not a full time job or

22  position.

1        She just works as a consultant

2    part-time with the company.

3        Q.   So the part-time position that you

4    were discussing with her would have been with

5    Counterpart Germany?

6        A.   Yes, with -- yes.

7        Q.   Okay.  Do you know why you didn't get

8    that position?

9        A.   Well, no, other than I told her that I

10   think she should discuss any employment, my

11   employment with her, with Counterpart

12   Washington.

13        And that's the last conversation I had

14   with her.

15        Q.   And would it come as a shock to you,

16   assuming that any subsequent conversation took

17   place, they said well, this is a guy that we

18   have let go, so no, you can't hire him?

19      A.   Well, she knew that I was -- she knew

20   that I was let go, but she wanted to hire, me

21   any way.

22          She said you're just an incredible

234

1  resource for working in Kyrgyzstan and Central

2  Asia, and I would love to work with you.

3     Q.  And would it strike you as somehow

4  wrong or inappropriate for a company to say,

5  well, no, you can't hire this person --

6     A.  No.

7     Q.  -- we just let him go?

8     A.  No, it wouldn't strike me as wrong.

9     Q.  Okay.  Have you ever asked the company

10  for a letter of resignation?

11     A.  Asked for a letter of resignation.

12     Q.  Uh-huh.

13        MS. DOUGLAS:  Could we go off the

14  record for a minute.

15        MR. BROWN:  Sure.

16     (A discussion was held off the record.)

17  BY MR. BROWN:

18     Q.  Other than any conversations which may

19   have been had in the context of settlements, and

20   I don't know if there were or not because I just

21   don't know.

22      A.   Okay.

1      Q.   Have you ever asked for -- the company

2   for a letter of resignation?

3      A.   No.

4      Q.   Okay.  Your complaint seeks damages

5   for emotional distress.

6          In what form do you believe you have

7   suffered emotional distress?

8      A.   Just the trauma of losing a job, of

9   being terminated, fired in the fashion that I

10   was fired.

11         It has been really very emotionally

12   disturbing.

13     Q.   Have you seen a doctor or any other

14   healthcare practitioner to discuss the feelings

15   of emotional distress?

16     A.   No.

17     Q.   Have there been any physical

18   manifestations of this emotional distress?

19     A.   Not that I can say was a result of

20   this.

21     Q.   Has this feeling of distress prevented

22   you at any time from seeking employment?

1      A.   It's hard to answer that question.

2          I have continued to seek employment,

3   and now I have employment.

4          And it wasn't easy, especially

5   considering working in the same field because of

6   facing questions, interviews, you know, what

7   happened in your last job, or why did you leave

8   it.

9          And, you know, to look -- facing that,

10  would -- it was something I just didn't want to

11  deal with.

12     Q.   Was there a time after your discharge

13  where you did not seek further employment?

14     A.   I would say the first couple of weeks

15  I didn't seek employment.

16     Q.   After that, you did?

17     A.   I was networking, uh-huh.

18          And also there for -- on international

19   development, there are a lot of positions that

20   come up on the internet, there are some

21   websites.

22        And I have a friend who was sending me

1   potential positions quite often.

2       Q.   How often after your discharge did you

3   surf the internet looking for positions?

4       A.   Well, I'm -- I would say almost daily.

5       Q.   Did you review any publications that

6   talked about jobs?

7       A.   Yes.

8       Q.   What publications?

9       A.   Well, they're on links on my computer,

10  but there's the -- development X, is a website

11  that provides international employment.

12          I can't think of the other names right

13  off the top of my head.

14          But yeah, I was you know, pretty

15  actively looking at some publications.

16      Q.   You volunteered at Center

17  Interbilim --

18      A.   Uh-huh.

19    Q.  -- after you discharge?

20    A.  Uh-huh.

21    Q.  Yes?

22    A.  Yes.

1    Q.  For what period of time?

2    A.  From February through September, with

3  a month off in between.

4    Q.  And why did you do that?

5    A.  For a couple of reasons.

6        One is that that was one organization

7  that I felt a tie, a connection to.  I felt

8  strongly about them, and they were very

9  supportive.

10       I -- it took me sort of back to my

11  roots in Central Asia and Kyrgyzstan, and it

12  felt good.

13       It was healing.

14    Q.  You weren't paid for that?

15    A.  No.

16    Q.  Did you contact any recruiters to try

17  to assist you in finding a job?

18    A.  No.

19    Q.   You said you networked.

20         How many people did you talk to in an

21    effort to try to find subsequent employment?

22    A.   Well, it varied.

1        I mean, a dozen, I guess, maybe

2   overall.

3        Q.  Over the course of approximately nine

4   months or so?

5        A.  Yeah, yes.

6        Q.  How did you eventually get the job at

7   the furniture -- it's a furniture store?

8        A.  Yeah, it's a furniture, appliance --

9   through networking.

10       Q.  How did you hear of it?

11       A.  Well, I was in touch with a friend,

12   who was doing some consulting with the company.

13           And we just started some

14   communication, well, I'm thinking about coming

15   back to Oregon, and I really would like to do

16   this and that.

17           And that's the way it went.

18       Q.  Is the store in Ashland or Medford?

19    A.  Medford.

20    Q.  What is your position there?

21    A.  Officially, I'm the business relations

22  manager.

1    Q.  Unofficially?

2    A.  Well, I do a million things.

3    Q.  And your salary is 70,000 a year?

4    A.  Yes.

5    Q.  Do you get bonus?

6    A.  No.  Actually, I'm even going to make

7  less because I'm taking a leave of absence, now,

8  to be here, and unpaid, so.

9    Q.  You started in September?

10    A.  Yep.

11    Q.  You don't have vacation?

12    A.  Well, this company doesn't have much

13  policy for vacation.

14        It's the real world.

15    Q.  I want to talk to you a bit about

16  these financial irregularities that you have

17  alleged in the complaint.

18        There's about seven of them, it looks

19   like, referring to your answers to

20   interrogatories.

21         Did you ever tell anyone in

22   Counterpart management that if these

1   irregularities in your view were not corrected

2   or addressed, that you were going to complain to

3   somebody in the U.S. government?

4      A.  No.

5      Q.  Did you ever give any kind of a, you

6   know, or else statement of any kind, saying do

7   this or else I'll do something?

8      A.  No.

9      Q.  Do you have any reason to believe that

10   your discussions about the financial

11   irregularities that you have identified have

12   anything to do with your discharge?

13      A.  Yes.

14      Q.  What makes you think that?

15      A.  When I was -- in July of 2004, I came

16   back from Turkmenistan, and I told -- I saw

17   Michael Kunz, and he was -- at this point, he

18   wasn't my supervisor.

19          And I said, you know -- he said, well,

20    we should sit down and talk about what happened

21    in Turkmenistan.

22          And I said, well, okay.

1      And eventually, that day or the next

2  day, I was in his office, and describing what

3  went on.  And there were some changes in the

4  work plans that were made.

5      He became very irate because he had

6  done some work on the work plans, I had invited

7  him to, and ranted for at least 30 minutes,

8  which this discussion came up in the meeting

9  with Barbara Sloan and Arlene Lear.

10     And I said to him, I said, you known

11  now, I know why I have some files about you.

12     And I was referring to letters of

13  complaint I had received.

14     And he went on.

15     Finally, I had a conversation with

16  Arlene Lear after this incident, on the phone.

17  And she said to me, she said, you know, why are

18  you keeping files on Michael?

19          I said, I don't -- I'm not keeping

20    files on Michael.  I have the documents that --

21    letters of complaint that I have sent to you, I

22    have sent to Harry, those are the documents that

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/Deposition%20of%20Jay%20Cooper.txt

243

1   I have.

2        I'm not keeping files.

3        And my feeling is that there was the

4   idea that I was keeping some files on financial

5   irregularities in my office.

6        And the reason that they fired me so

7   quickly and closed my office was so they could

8   look through my files to see what kind of

9   information that I was saving.

10      Q.   Your conversation with Michael Kunz,

11   which he ranted for 30 minutes or so, did that

12   have anything to do with financial

13   irregularities?

14      A.   No.

15      Q.   Okay.  When you had your discussion

16   with Arlene Lear and she asked you if you kept

17   any files, did she say anything about files

18   about financial irregularities?

file:///C|/Documents%20and%20Settings/Pat/My%20Doc...eposition%20trs/Deposition%20of%20Jay%20Cooper.txt (485 of 655) [2/11/2007 5:05:19 PM]

19    A.  No.

20    Q.  So you are --

21    A.  I did mention to Kelli Boyer that

22   that -- right -- the week -- the first week she

244

1   was in Almaty, I mentioned that I was concerned

2   that there were some -- some -- and I quote

3   myself, hanky panky going on with the financial

4   documentation.

5          And I had been asked by Michael Kunz

6   and Bob Abma to approve funding that was

7   underspent from my projects to support some of

8   their travel and some other activities.

9          And eventually, I wrote a memo shortly

10  before I was fired, a couple of weeks before I

11  was fired, saying I do not approve of any monies

12  being used from my projects for expenses outside

13  of these projects.

14     Q.   To whom did you send that memo?

15     A.   We have that on file.

16          To Bob Abma, Michael Kunz, maybe

17  that's all, maybe Harry Dorcus.

18          I would have to look at the memo.

19    Q.  When you mentioned to Ms. Boyer that

20   there was, taking --

21    A.  Go ahead.

22    Q.  -- you used the term "hanky panky."

1      A.   Yeah, I used it.

2      Q.   When you used the term "hanky panky"

3   to Ms. Boyer, what was her response?

4      A.   She said, you mean that you could

5   be -- you could report this to the inspector

6   general?

7          I said possibly, it's possible.

8      Q.   And what did she say then?

9      A.   I don't recall any comment after that.

10     Q.   Following your discharge, did you

11   report any financial irregularities?

12     A.   No.  No, I did not.

13          And in fact, I was asked by the

14   contracting officer, in Almaty, if I suspected

15   there were some financial irregularities, and I

16   told him not that would warrant investigation.

17     Q.   Was that, in fact, your opinion?

18     A.   You know, I just didn't want to start

19   something that I didn't have any real, you

20   know -- that was significant, that I had -- I

21   didn't have any files or proof in a sense.

22          And you know, I just felt that in --

1   unfortunately in reality, all of the

2   organizations that work under USAID, move things

3   and shove things around and take advantage every

4   chance they can.

5       Q.   Somewhere along the way, you have

6   mentioned that you were not afforded an

7   opportunity to grieve the motive for your

8   discharge.

9           To avail yourself of the company's

10  grievance procedure.

11          Are you aware of that allegation?

12      A.   Yes.

13      Q.   Do you recall being told that the

14  grievance procedure was irrelevant in light of

15  the company's open door policy?

16      A.   Yes.  That happened just right before

17  my termination, before I was fired.

18      Q.   So is there -- do you have any reason

19    to believe that the directive that the grievance

20    procedure was irrelevant was somehow related to

21    your discharge?

22        A.   Other than coincidence, no.

1    Q.   Was there anything in the grievance

2  procedure that you felt that if you had been

3  able to avail yourself of, that somehow the

4  outcome of this would all have been different?

5    A.   Yes.

6    Q.   What's that?

7    A.   Well, the fact that I would have had

8  the opportunity -- I would have had the

9  opportunity to have time and discussions about

10  the issues.

11    Q.   Was there anything preventing you from

12  discussing with the company your termination

13  after your termination?

14    A.   Actually, there was a lot of

15  communication and no response, communication

16  requests, communication and no response, and no

17  response, and no response.

18    Q.   From whom?

19    A.   From Kelli Boyer, from -- from the

20  lawyers that were representing Counterpart.

21    Q.   Well, as your counsel has mentioned,

22  off the record, we're not really in a position

248

1  to discussion anything counsel might have

2  discussed.

3      A.  I was -- well, go ahead.

4      Q.  Is there anything that you intended to

5  do in the grievance procedure that you didn't

6  do?

7          In other words, in the grievance

8  procedure, I'm assuming you would have said,

9  hey, this is wrong and here is why.

10         Did you do that?

11     A.  Is there anything that I intended to

12  do in the grievance that I didn't do?

13     Q.  Yeah.

14     A.  Well, looking back, I should have

15  filed a grievance against Michael Kunz for the

16  tirade.

17         And in the interest of trying to keep

18  things working, you know, filing a grievance

19   isn't going to help relationships.

20          Later -- yeah, in fact, not having the

21   opportunity to file a grievance and being, you

22   know, fired immediately, you know, I can't say

file:///C|/Documents%20and%20Settings/Pat/My%20Documents/Cooper/deposition%20trs/Deposition%20of%20Jay%20Cooper.txt

249

1   that -- I mean, I -- my intention was to keep

2   working.

3        So I can't say I was planning to do

4   this or going to do that.

5        My intention was to continue.

6      Q.   Even if the grievances procedure had

7   been in effect at the time of your discharge,

8   you understood that it was not a procedure that

9   had to be followed in every case by the company;

10  correct?

11     A.   I don't really understand the

12  grievance procedure that well, to say that it

13  would have -- you have to follow it or you don't

14  have to follow it.

15        I ...

16     Q.   The conversation that you had with

17  Mr. Kunz, where you said that this hindsight you

18  should have filed a grievance against him.

19    A.   Yeah.

20    Q.   When did that conversation take place?

21    A.   In July of 2004.

22    Q.   So prior to your -- right, it was

250

1   prior to your discussion on August 18 --

2       A.  Yes.

3       Q.  -- because you brought it up at that

4   time?

5       A.  I brought?

6       Q.  You brought up that discussion?

7       A.  Yes.  I brought it up, yes.

8       Q.  Okay.  With regard to the issue of

9   expenses, as you sit here today, have you been

10  reimbursed for all expenses?

11      A.  No.

12      Q.  What expenses have you not been

13  reimbursed for?

14      A.  The vouchers, the expense

15  documentation I provided in -- before I was

16  fired, to the accountant in Almaty.

17          And I didn't even add it up myself, or

18  I don't recall -- I didn't make copies of it.

19      The process was you give it to her,

20   she calculates everything, comes back to, in

21   this case to me, and this is what, you know,

22   this is -- this is -- these are the expenses,

1  and we're reimbursing you for this, and so much

2  for this, and so much for that.

3       And I don't recall how long of a time

4  it was, but for several weeks, at least two

5  weeks and maybe more, I kept getting the answer,

6  oh, we don't have enough cash in the office to

7  pay you.

8       And it was partially for an airplane

9  ticket, the -- well, no, that was paid for

10  previously.

11       It was perdiem.

12       I had miscellaneous incidental

13  expenses, some travel between Kazakhstan and

14  Kyrgyzstan.

15       So those were the expenses that I had

16  requested be refunded to me, travel to

17  Turkmenistan, some perdiem there as well, if I

18  remember right.

19      Q.  And at some point following your

20   discharge, you were told that you had not

21   submitted the appropriate paperwork to support

22   these expenses.

1          Is that right?

2      A.   I submitted the paperwork in Almaty.

3          Kelli Boyer sent me a message saying

4   fill out these forms.

5          I had never filled those forms out

6   before, and they were foreign to me.  And my, if

7   I remember right, my response was, you know,

8   everything has been filed in Almaty.

9          They have all the receipts.

10          I don't even have the receipts to fill

11   out forms, and you know, there was no way I

12   could follow up on that.

13          And there was -- there was no -- after

14   that there was no response.

15      Q.   When was that?

16      A.   This is in like January, February of

17   2005.

18      Q.   So the last communication on the issue

19   of reimburse with the company was your telling

20   Ms. Boyer that you couldn't fill out these

21   forms?

22         A.   I don't even recall if I -- what I --

1   how I responded to it.

2        I just, you know -- my response and

3   the answers I would get, we're going to follow

4   up with Almaty, we're going to follow up with

5   Almaty, we will get so and so, or so and so to

6   help us out with your expenses.

7        And then there were -- eventually

8   there was a memo from Bob Abma -- well,

9   actually, it didn't come from Bob Abma, but I

10  knew from my having working with him for so many

11  years that it came from him, that lined out his,

12  or a sort of balance sheet that I actually owed

13  Counterpart because I didn't turn back two

14  computers.

15       I didn't have two computers.

16       I had one, and then I sent that to the

17  office in Washington DC, shipped it.

18  Q.  So the last communication was that?

19      A.  Yes.

20      Q.  Where is the other computer, what

21   happened to the other computer?

22      A.  It was probably purchased by me and

1    then directed to another staff person in the

2    office.

3         There was some confusion.

4         I asked for some clarification.

5         I didn't get clarification.

6    Q.   And you put the value of these

7    unreimbursed expenses at approximately $1,100.

8         Does that sound right?

9         MS. DOUGLAS:  We have asked for the

10   stuff he submitted to Almaty, in discovery, with

11   an attempt to be more specific on that.

12        And so far, you haven't given us any

13   of it, or what you have given us, I cannot

14   understand it to be that because it's in

15   Russian.

16        But I will give you how we computed

17   that figure, with your indulgence that it's

18   based on his memory and estimates because we

19    don't have the documents.

20          MR. BROWN:  Fair enough.

21          (Thereupon, Deposition Exhibit No. 16

22    was marked for identification.)

1  BY MR. BROWN:

2      Q.   Showing you what we have marked as

3  Exhibit 16.

4          This is a three-page document, Bates

5  Stamped 000046 through 48, appears to be a

6  resume.

7          Is this your resume?

8      A.   Yes.

9      Q.   When was this prepared?

10      A.   You know, I have -- I can't say that,

11  there's no date of preparation on here.

12          It would have to be after, I'm

13  guessing, 2003.

14          It's a guess.

15          I can't do any better than that.

16      Q.   Why was this document prepared?

17      A.   This would have been prepared probably

18  for the last proposal to USAID for the CSSI

19  budget.

20      Q.  If you look at the bottom of the first

21  page, under supervision and management, it lists

22  you as the regional director, et cetera, et

256

1   cetera, July 2003 to present.

2        So that would lead me to think that at

3   a minimum, we're talking about August 2003, and

4   probably beyond that?

5     A.  Uh-huh.

6     Q.  Does that refresh your recollection?

7     A.  No.  I just really can't say.

8        I have a lot of resumes.

9        I have resumes developed for different

10   projects, different -- so I really can't say.

11     Q.  Is all of the information reflected on

12   this resume true and correct?

13     A.  I would hope so, unless somebody else

14   stuck something in there.

15     Q.  No.  I don't play the game that way.

16        That's no fun.

17     A.  Yes.  It all looks true and correct.

18        (Thereupon, Deposition Exhibit No. 17

19  was marked for identification.)

20  BY MR. BROWN:

21      Q.  I'm showing you what we have marked as

22  Exhibit 17.

1        This is a three-page -- oh, I'm sorry,

2   four-page document, Bates Stamped CP0021 through

3   24.

4        Counterpart International Job

5   Description for the Regional Director, dated

6   September 1, 2004.

7        Do you recognize this document?

8      A.   Well, I recognize it as Michael Kunz's

9   job description.

10     Q.   At some point, did you in the course

11   of your meetings or discussions regarding

12   Mr. Kunz and his supervision of you, talk about

13   his job description?

14     A.   We discussed his job description at

15   the August 18 meeting.

16     Q.   In what context?

17     A.   In the context of reviewing my job

18   description, and his job description, and

19   providing feedback on the -- on these job

20   descriptions.

21        Q.   And the job description that was used

22   for you was the one that you prepared?

1    A.  Yes.

2    Q.  That we spoke of earlier?

3    A.  Yes.

4        (Thereupon, Deposition Exhibit No. 18

5    was marked for identification.)

6  BY MR. BROWN:

7    Q.  I'm showing you what we have marked as

8    Exhibit 18, Bates Stamped document CP00754

9    through 758, memorandum to Arlene Lear from

10   Aaron Chassy.

11       Have you seen this document before?

12   A.  Yes, I have.

13   Q.  When did you first see this document?

14   A.  My lawyer provided this to me.

15       It was part of the discovery process.

16   Q.  Now, it's dated March 5, 2003.

17   A.  Yes.

18   Q.  At or about that time, did you have

19   any discussions with Mr. Chassy or Ms. Lear or

20   anyone else, for that matter, regarding the

21   subject matter of this memo?

22      A.  No.

1      Q.   In the paragraph under Roman numeral

2   one, the problem, talks about the complaint from

3   Bob Abma to Mr. Chassy, that he felt you and

4   Mr. Nazinyan treated him unprofessionally,

5   humiliating him and his staff with the use of

6   abusive language, and undermining his authority

7   and ability to manage his operating unit, et

8   cetera, et cetera.

9         Did those complaints from Mr. Abma

10   ever come to you in any way, shape or form?

11      A.   No.

12      Q.   When you saw this memo, did it

13   surprise you?

14      A.   Yes.

15      Q.   Do you deny that you treated Mr. Abma

16   in an unprofessional manner?

17      A.   Yes.

18      Q.   Do you deny that you used abusive

19   language?

20        A.   Yes.

21        Q.   Page 2, paragraph directly above Roman

22   numeral two, states that what is particularly

260

1    disturbing is that several individuals have

2    raised this issue with Jay before, but to date,

3    he has not taken any action, such that Ara has

4    chosen to (try to) modify his behavior.

5        This is, as I said, dated March 5 of

6    '03.

7        Prior to that time, had anyone

8    discussed with you issues such as are outlined

9    here in this memo?

10    A.  No.

11    Q.  Bottom of page 2, it says, "I," I

12    suppose referring to Mr. Chassy, "first spoke

13    with Jay, telling him that I wanted to have the

14    conversation as outlined above, he was extremely

15    defensive, et cetera, et cetera."

16        Did you have a conversation with

17    Mr. Chassy?

18    A.  I had a conversation with Mr. Chassy.

19   Q.   And was it as he describes?

20   A.   Some parts.

21   Q.   Did he discuss with you the complaints

22   that you had treated Mr. Abma unprofessionally?

261

1    A.  No.

2    Q.  Or any abusive behavior on your part?

3    A.  No.

4    Q.  What did he does with you?

5    A.  We discussed -- I'm trying to

6  remember.

7        This is a long time ago.

8        Mostly -- my communication with Aaron

9  Chassy was mostly focused on the project that we

10  were trying to write, the project we were trying

11  to develop.

12        That was his purpose to come to the

13  field, to develop a new proposal.

14        And so a lot of our discussion was --

15  he was the leader, a lot of our discussion was

16  trying to get this thing moving.

17        And discussion about staff or

18  complaints, I don't recall.

19          They -- he may have mentioned

20    something about Bob Abma, but I just -- I mean,

21    I did notice him spending a lot of time with Bob

22    Abma.

1        I did point out, after the proposal

2   was written, that they had put into the budget

3   that Aaron would come every three months to

4   Central Asia, which you know, was not a good use

5   of his time or the project's money.

6        They had obviously struck up quite a

7   relationship.

8        And in fact, Mr. Chassy lasted a few

9   more weeks after he got back to Washington, from

10   what I understand, and was -- his contract was

11   terminated.

12        And he filed a suit against

13   Counterpart, from what I understand.

14   Q.   And do you know how that ended?

15   A.   I think he received a -- some sort of

16   severance and -- after working for two months,

17   or whatever, and walked away.

18   Q.   Did you tell Mr. Chassy that his

19   actions and way of proceeding were undermining

20   you as chief of party --

21        A.   No.

22        Q.   -- as is reflected on page 3?

1      A.   Not that I recall.

2           I may have talked -- I don't think I

3   said undermined.

4           I may have discussed the -- his taking

5   individuals aside and having private

6   discussions.

7           And you know, in terms of there were

8   some sort of -- it wasn't appropriate,

9   inappropriate behavior.

10      Q.   And did you say, as it's reflected

11   further on in this paragraph, referring to page

12   3, first full paragraph, that you were now

13   unsure of your commitment to the current

14   project, and you were uncertain whether or not

15   you could have a good working relationship, or

16   the two of you could have a good working

17   relationship?

18      A.   That's something I just can't remember

19   what, you know, what the exact words of our

20   conversation.

21      Q.   Did he say to you that it was

22   disturbing to him that you were considering

1   resignation as a possible response to his

2   request to address the management issues raised

3   above?

4       A.  I just don't recall.

5       Q.  In your meeting on August 18, did you

6   at any point say that you didn't want to listen

7   to anymore, and say you were going to walk out?

8       A.  I can't recall.

9           I just don't know.

10          (Thereupon, Deposition Exhibit No. 19

11  was marked for identification.)

12  BY MR. BROWN:

13      Q.  Showing you what we have marked as

14  Exhibit 19.

15          It's a two-page document, Bates

16  Stamped 000086 and 87.

17          Did you receive a copy of this letter

18  notifying you that your employment was

19   terminated?

20         A.   Yes.

21         Q.   When did you receive it?

22         A.   Let's see.

1       I would have received it on Tuesday,

2   which would have been the 16th of November.

3       Q.   How did you receive it?

4       A.   By courier.

5          (Thereupon, Deposition Exhibit No. 20

6   was marked for identification.)

7   BY MR. BROWN:

8       Q.   Exhibit 20, which you have in front of

9   you now, is a Bates Stamped, one-page document,

10   CP0571.

11          And it's an email from Ms. Lear to

12   world wide CPI staff.

13          You have seen this document before?

14      A.   Yes.

15      Q.   When did you first see it?

16      A.   It came to me by email, I think.

17      Q.   So as of Tuesday, November 16, anyway,

18   you still had email access?

19     A.  Well, if you notice, it's copied to my

20   new email, my personal email address, not to the

21   Counterpart email address.

22     Q.  Okay.  Didn't know that that was

1  yours.

2       Thank you.

3       How did you feel upon reading this?

4     A.  I was shocked, insulted.

5     Q.  Insulted?

6     A.  Insulted.

7     Q.  And why is that?

8     A.  Because it's -- it's -- it's all about

9  image.

10       It's all about making Counterpart look

11  good.

12       It's all about, you know, trying to

13  cover over some wrong that had been done.

14     Q.  You would have preferred an email that

15  said we're really good Jay Cooper is out of

16  here, and he was a worthless employee that we

17  never should have hired?

18     A.  No.  I would have appreciated the

19   truth.

20       Q.   You would have preferred an email that

21   said we have terminated Jay Cooper and here is

22   why, to be distributed to the entire company?

1     A.   On some levels, yes.

2     Q.   Okay.  So you thought that this email

3   was not genuine?

4     A.   Absolutely not.

5     Q.   It's true what they say, no good deed

6   goes unpunished.

7        MS. DOUGLAS:  Is that a question?

8        MR. BROWN:  In a way, but not of

9   Mr. Cooper.

10        (Thereupon, Deposition Exhibit No. 21

11   was marked for identification.)

12   BY MR. BROWN:

13     Q.   Showing you what we have marked as

14   Exhibit 21.

15        A one-page document, Bates Stamped

16   000220.

17        It's -- first line of the document is

18   points to discuss with USAID, purpose of the

19  meeting.

20        Can you tell me what this document is,

21  please?

22        A.  I prepared this for our closing,

1  closeout meeting that I had with USAID.

2      Q.   You say a closeout meeting, what's

3  that?

4      A.   Purpose of -- point No. 1, to have

5  some closure with USAID.

6      Q.   Who desired this closure?

7      A.   I desired the closure, they desired

8  the closure.

9          They could have refused to meet with

10  me, said you're no longer working.

11          They wanted to hear from me.

12          We had a good working relationship.

13  We mad a sincere working relationship.  It was

14  based on honesty and trust and results.

15      Q.   How did this meeting come about?

16      A.   I contacted them, and I asked them if

17  they would like to meet with me to have a

18  meeting to close my work.

19    Q.  Who did you speak with to set up the

20    meeting?

21    A.  Igor Tupitsyn.

22    Q.  And who did you meet with at the

1  meeting?

2     A.  Igor Tupitsyn, Susan Fritz and John

3  Laurel.

4     Q.  When did the meeting take place?

5     A.  I can't remember.

6        Maybe the week following.

7        The following week, I just can't

8  remember.

9     Q.  Uh-huh.  And did you say or discuss

10  all the things that are reflected here on

11  Exhibit 21?

12     A.  And that, I can't recall either.

13        My intention was, but sometimes

14  that -- I just can't say if I discussed

15  everything.

16     Q.  Did you tell the three folks at USAID

17  that you had not been given a reason, other than

18  during the conversation call on the 12th, that

19   you exhibited erratic behavior?

20        A.  I did state that.

21        Q.  Did you tell the folks that you were

22   meeting with from USAID that you had been

1   discharged?

2      A.   Yes.

3      Q.   The next to last bullet point, last

4   line, says Michael Kunz is now my supervisor and

5   during this process, he did not talk to me one

6   time.

7          Now, that's not an accurate statement,

8   is it?

9      A.   During the firing process, he did not.

10     Q.   Ah, the firing process?

11     A.   Yes.

12     Q.   I see.

13         Did you want to speak to Mr. Kunz?

14     A.   I would have welcomed it.

15     Q.   Yeah, but did you want to?

16     A.   You know, everything -- how could I

17   speak with him.

18         I was banned from the office and

19  banned from communication.

20      Q.  Uh-huh.

21      A.  And it all happened on Friday,

22  November 12, I was in Kyrgyzstan.

1     Q.  Was anything preventing you, at that

2   time, from picking up the telephone and trying

3   to call Mr. Kunz?

4     A.  There was nothing preventing me from

5   calling him.

6     Q.  Was your meeting in person?

7     A.  Yes.

8     Q.  Your meeting at USAID?

9     A.  Yes.

10    Q.  Where was that?

11    A.  At the headquarters of USAID in

12  Almaty, Kazakhstan.

13       It was during this meeting, that I

14  mentioned earlier, that the contracting officer

15  asked me if I had -- if I felt there should be

16  some investigation of financial irregularities,

17  and I said no, I didn't think there should be.

18       MR. BROWN:  We don't need to mark

19   this.  This is Exhibit A, to your attorney's

20   initial disclosures.

21         And if you want, I will just give it

22   to the court reporter.

272

1    MS. DOUGLAS:  Fine.

2    MR. BROWN:  Okay.  So for the record,

3  we're providing to the court reporter Exhibit A

4  to the initial disclosures from plaintiff, which

5  sets forth all of the names that we have been

6  talking about, so that we don't have to spend

7  the next two hours trying to spell all the

8  names.

9    So I will give the court reporter a

10  copy there.

11  BY MR. BROWN:

12    Q.  I will show you a copy, I'm not going

13  to mark a copy as an Exhibit, since we have got

14  so many of these floating around.

15    I think I have this, yeah.

16    And I guess, first off, I would say I

17  applaud your thoroughness, thoroughness of

18  counsel providing so many names.

19          And then tell you that, unfortunately,

20     it means I have to ask about all of them, but we

21     do know some of them.

22          Alexander Shilov.

1    A.  Uh-huh.

2    Q.  And this lists, so you know, those

3  individuals likely have -- likely to have

4  discoverable information.

5       What information does Mr. Shilov have

6  regarding your case?

7    A.  Mr. Shilov is aware of the shutdown of

8  the computer email internet accept in the Almaty

9  office on Friday, November 12.

10   Q.  Who is Mr. Shilov?

11   A.  He is the IT manager.

12   Q.  Oh, okay, we have spoken of him.

13       He's the individual who told you that

14  it had been shut down?

15   A.  Yes.

16   Q.  But did not go into the issue of

17  renovations or anything of that nature; right?

18   A.  Right.  He was the individual that

19   told me that Michael Kunz told him to shut it

20   down.

21       Q.   Right, okay.  You also have written

22   here or it's written here, usage of Counterpart

1   laptops.

2       What does that refer to?

3       A.   The two laptop that is you asked

4   where's the second one.

5       Q.   Uh-huh.

6       A.   He would have records of who has that

7   laptop.

8       Q.   Now, here is Ms. Kuchukeena, and she

9   has testimony regarding your performance in

10  managing the CSSI project in the fall of 2004.

11      What do you mean specifically in that

12  record?

13      A.   I worked directly with her.

14      She would know about the -- my

15  performance.  And at the same time, she also was

16  the person that told Ruth Pojman that I deserved

17  what I got.

18      Q.   Who is Aman Nusupov?

19      A.   Aman Nusupov works in the office in

20   Bishkek.

21          I have worked with him over the last

22   nine years, and he was aware of rumors spreading

1   around.

2       Q.   What rumors has he told you that he

3   has heard?

4       A.   Questions of why I was fired.

5           The fact that my office was locked.

6           And those are a couple of the rumors

7   that -- information that was ...

8       Q.   When -- when you say your office was

9   locked, the -- as you understand it, the lock

10  was changed on your office door; correct?

11      A.   As I understand it, two locks were put

12  on my office door, so that not one person could

13  have access.

14          It would take two people to have

15  access.

16      Q.   And did you ever see this yourself?

17      A.   I was not permitted in the office.

18      Q.   And are we talking padlocks or what?

19     A.  I'm not sure.

20     Q.  Now, who told you there were two

21  locks?

22     A.  Oh, I can't recall.

1    Q.   The next name on the list is Anika,

2  and I'm not even going to take a stab at the

3  last name.

4        Who is that?

5    A.   She works in the office in Washington

6  DC now.

7        Program manager from what I

8  understand.

9        I don't know her exact title.

10        Actually, I recommended her and

11  convinced her to talk to Arlene about getting a

12  job.

13        I have worked closely with her over

14  many years, and she would be able to testify in

15  my performance.

16        She -- excuse me, she was also had

17  lunch with Kelli Boyer and myself when we --

18  when Kelli and Anika arrived at the same time

19    that week of November 5, or whatever it was.

20         First week of November, October 31,

21    November 1.

22         Q.  We have already talked about

1  Mr. Nazinyan, unless -- is there anything else

2  that Mr. Nazinyan could testify to or has some

3  information about?

4      A.  I don't think so.

5          He could testify I suppose about ill

6  will that Bob Abma and some -- he could provide

7  some information about that.

8      Q.  We know who Arlene Lear is.

9          We have talked about Ms. Sasykbaeva.

10         Is there anything other than what you

11  have testified to with regard to information

12  that she has?

13     A.  No.

14     Q.  And who is Azam, whose last name is

15  also very difficult to pronounce?

16     A.  Bobakhodjaev?

17     Q.  Right.

18     A.  He was the deputy director to the

19   office in Uzbekistan in the city of Tashkent.

20          He was -- the intent was that he would

21   take over as director in the localization

22   process that we discussed earlier.

1        And he was in a meeting with Michael

2    Kunz and several other staff persons, in -- when

3    Michael Kunz was the deputy regional or deputy

4    director for the CAIP project.

5        C-A-I-P.

6        And he left a meeting because of

7    Mr. Kunz's temper and tirades.

8        And as a result, Arlene Lear defended

9    Michael Kunz and asked me to -- to discuss this

10   with -- with Azam, to have some type of

11   discussion and possible punishment.

12       And as a result, I investigated the

13   incident and found no fault with Azam.

14       He was justified in walk out of that

15   meeting.

16   Q.   When did this take place?

17   A.   In probably 2002, 2002 when that

18   project was ongoing.

19    Q.   And we have talked about Barbara

20   Sloan.

21        Anything other than her role in the

22   meetings of August?

1      A.   No.  My only comment about Barbara

2   Sloan was the fact that she was a consultant on

3   this particular task and activity.

4           And then not too much longer after

5   that, she, from what I understand, became more

6   of an employee of Counterpart, although she may

7   be working on a consultancy basis.

8           But she's more just devotes all her

9   time to Counterpart.

10      Q.   Is that significant or wrong in some

11   way?

12      A.   I think it's significant because I

13   felt in this whole process, that she was not

14   very objective in the process.

15      Q.   What makes you say that?

16      A.   Just some of the comments, notes, that

17   she was part of the discussion when I was fired,

18   the conference call, and a couple of comments

19   she made.

20          I don't recall exactly what they were,

21   but gave me the indication that she was

22   absolutely on the other side and was not being

1    objective.

2       Q.   Well, we have certainly talked about

3    Mr. Abma.

4          Anything else to add to Mr. Abma,

5    other than what you have already testified to?

6       A.   No.

7       Q.   Who is Chinara Kamarli?

8       A.   She's the -- she works in the office

9    in Bishkek.

10         She is the coordinator for the health

11   project, the -- that's H-N-C-B-I, Health NGO

12   Capacity Building Initiative.

13         And I had a good relationship with her

14   work, and the work in -- of that project in

15   Kyrgyzstan.

16         She could -- she also would be able to

17   talk about the rumors that flew around the

18   region.

19    Q.  Have you discussed with her her

20   knowledge of these rumors?

21    A.  No.

22    Q.  How do you know she has knowledge of

1   rumors?

2       A.  Mr. Nusupov told me that she would

3   have knowledge.

4       Q.  And who is Christopher --

5       A.  Szecsey.

6       Q.  -- Szecsey?

7       A.  He's an American.

8           Anyways, Christopher is a consultant

9   with an organization called Social Impact.

10  Social Impact is a subgrantee to Counterpart on

11  this last initiative.

12          Christopher came to the region several

13  times.  I worked closely with Christopher.  And

14  most recently discussed what had happened to me.

15          And he also was part of an evaluation

16  of the program, of the project a couple of

17  months after I was fired.

18      Q.  Who is Erkin Kasybekov?

19      A.   Kasybekov, he's the country director

20   in Kyrgyzstan.

21        I have worked with him since the

22   beginning of the project, for ten years.

282

1     Q.   Did you discuss with him the way in

2  which rumors were spread?

3     A.   I did discuss some of the issues with

4  him, what -- what happened.

5     Q.   Again, more in the nature of the

6  questions as to what happened?

7     A.   Yes.

8     Q.   We have talked about Mr. Dorcus to

9  some extent.

10     A.   Uh-huh.

11     Q.   Anything you would like to add in

12   terms of what he knows?

13     A.   Not really, not really.

14     Q.   We have spoken of Igor Storozhenko.

15     A.   Yeah.

16     Q.   He's the security guard.

17     A.   No.

18     Q.   No?

19     A.  He's an administrative personnel.

20     Q.  Ah, okay.

21          And what does he know of your files

22  being confiscated and your office ransacked?

283

1    A.  Well, he's the manager of the guards.

2        And so he -- he related the

3    information that the guard told him.  And then I

4    personally went to talk to the guard and asked

5    him what had happened and he told me, in person.

6    Q.  You're speaking of Mr. Abma directing

7    the guard to open the drawer?

8    A.  Yes.  And the fact that Mr. Abma and

9    Ms. Boyer were going through everything.

10        And Mr. Abma was sitting at my desk in

11   my chair and looking through everything and

12   telling the guard that it was the direction of

13   Ms. Boyer.

14   Q.  When Mr. Abma supposedly made the

15   statement about, you know, if anybody asks, it's

16   Ms. Boyer, was Ms. Boyer present?

17   A.  Well, he was speak in Russian because

18   the guard didn't speak English, and Ms. Boyer

19    wouldn't understand.

20       Q.  So she was present?

21       A.  She was present.

22       Q.  Okay.  But he was speaking in Russian?

1     A.  Yes.

2     Q.  Did you take that as Mr. Abma was

3  making a joke?

4     A.  No.  I took it as his, you know, it's

5  typical for him not to want to take any

6  responsibility for something like that, and

7  blaming it on -- putting it on somebody else.

8     Q.  Did you ask the guard if he said it in

9  a joking manner?

10     A.  I didn't ask him if he said it in a

11  joking manner.

12        I never thought of it as a joke.

13     Q.  We have spoken, I believe, of Igor

14  Tupitsyn.

15     A.  Uh-huh.

16     Q.  Anything else that Mr. Tupitsyn knows,

17  other than what you have already testified to?

18     A.  No.

19    Q.   Who is Irina Kolmakova?

20    A.   She was the translator for Kelli

21  Boyer.

22       So she could potentially provide some

1   information, especially about this -- this

2   possible meeting Monday that we were supposed to

3   have.

4        I -- I'm guessing that, you know, that

5   maybe Kelli would have -- could have told her.

6        I'm just -- she also ...

7        She would also have -- actually, now,

8   I remember.

9        It was maybe Irina who told me about

10  the meeting on Friday morning.

11       I think earlier, I mentioned I had

12  mentioned Igor Storozhenko, but I think it was

13  maybe Irina.

14       Now, I recall that it was -- could

15  have been, and maybe even both of them that told

16  me about the meeting on Friday morning, on

17  November 12, before I was officially notified.

18       Q.  And forgive me if I asked you this,

19   but it is late in the day.

20          And I'm not as young as I use to be.

21          Did either of them tell you what was

22   said in that meeting?

1    A.   You know, I don't recall.

2        I just don't recall.

3        I mean, I think it was -- as -- what I

4    can't -- just trying to remember that it wasn't

5    anything significant.

6        Just in other -- I mean, very

7    significant for me, but not any details, very

8    short, you know, Jay is not working with us

9    anymore.

10       And that's my recollection.

11   Q.   And I notice you don't have an address

12   for Ms. Kolmakova.

13       Is that still with the state of

14   affairs --

15   A.   I can get an address easily, of her.

16   Q.   Is she still working with Counterpart?

17   A.   No.

18   Q.   When did she leave?

19     A.   She was basically fired shortly after

20   I left, from what she told me?

21     Q.   Did she tell you why?

22     A.   Restructuring or something.

1    Q.  Who is Jennifer Adams?

2    A.  Jennifer Adams was the director of the

3  health division of USAID, who I worked with

4  closely in the -- in the health projects.

5    Q.  So she would just generally testify

6  about your performance?

7    A.  She, yes, would testify about

8  performance.

9       She could also testify about -- I

10  would guess she could testify about Counterpart

11  International, and so anyway, mostly about my

12  performance.

13    Q.  Who is Jennifer Croft?

14    A.  She's a USAID employee in Kyrgyzstan.

15       And she could also testify about my

16  performance.

17    Q.  It says here how USAID was informed of

18  Mr. Cooper's departure.

19      What's meant by that?

20      A.   Just what they were told.

21      And I don't recall what they were

22   told.

288

1     Q.   Who is Julia Anichshenko?

2     A.   She's the accountant in Almaty that

3  had my receipts, and was holding payment, and

4  told me several times that they didn't have

5  enough cash to pay me, for several weeks before.

6     Q.   Do you have any reason to believe that

7  that's not true?

8     A.   No.

9     Q.   Certainly spoken of Ms. Boyer.

10        Anything to add with regard to

11  Ms. Boyer?

12     A.   At this point no.

13        No, I don't have anything to add.

14     Q.   Who is Lawrence Held?

15     A.   Lawrence Held is the direct of the --

16  director of -- oh, it is getting late in the

17  day, of a training program that A-E -- A-E-D,

18  it's Academy for Educational Development,

19    manages in Central Asia.

20          And I have worked closely with him on

21    a number of training projects.

22          He also could talk about the rumors

1   that resulted because of his -- it was not

2   working with USAID, but as a contractor with the

3   USAID, he worked with all four divisions of

4   USAID.

5       Q.   Have you ever discussed with Mr. Held

6   what rumors were floating around?

7       A.   Some degree, not to a great extent.

8       Q.   Did he tell you anything other than

9   generally there were rumors in the nature of

10   questions as to what happened?

11      A.   Yes.

12      Q.   Anything other than that?

13      A.   Not that I recall.

14      Q.   Mr. LeLaulu?

15      A.   Do you know who that is?

16      Q.   Yes.  I know -- I know who that is.

17      A.   I know who that is.

18      Q.   But for the record, who is that?

19    A.   Mr. LeLaulu is the CEO of Counterpart

20   International.

21    Q.   And we haven't really spoken of him

22   yet, but I did note in your, I think in your

1   answers to interrogatories, you mentioned that

2   you had talked to him about the accounting

3   irregularities.

4        And you had subsequent email

5   correspondence with Mr. LeLaulu about your

6   termination; correct?

7     A.   Yes.  I attempted.

8        There were some attempts, but there

9   was -- the -- from -- there was an attempt to

10   have a discussion, and he told me he would call

11   me, and then he didn't call me.

12     Q.   Who is --

13     A.   Lola.

14     Q.   -- Lola?

15     A.   Lola is a person that works with

16   the -- in Uzbekistan.

17        She worked with Counterpart and with

18   me for years and years, and then moved on to

19   another organization.  And she would have

20   information about Mr. Kunz's performance in

21   Uzbekistan.

22       Q.  We have spoken of Marat.

1     A.  Uh-huh.

2     Q.  Anything other than what you have

3   already testified to?

4     A.  No.

5     Q.  Actually, there's two Marats.

6     A.  Yeah.

7     Q.  The first Marat, is?

8     A.  The one we have discussed.

9     Q.  The one we have discussed.

10        And just summarize for me what that

11   Marat can testify to.

12     A.   That Marat can also testify about the

13   meeting on Friday morning.

14        He could testify about the rumors,

15   about the way it was handled, about the email

16   being disconnected.

17     Q.  Okay.  Now, who is Marat Nusurov?

18     A.  He's the IT manager in the Bishkek

19  office.

20         And he would -- I have worked with him

21  for years, hired him, and continued to support

22  him and worked with him over the years.

1        He could testify about my performance

2  management.

3        Also the -- about the rumors.

4    Q.   Have you discussed with him rumors

5  about your termination?

6    A.   No, I haven't.

7    Q.   We have spoken of Mark Hannafin.

8        Anything you would like to add

9  regarding his knowledge --

10    A.   No.

11    Q.   -- in this case?

12        Okay.  Who is Michael Fritz?

13    A.   He is the -- was the deputy director

14  of USAID in Central Asia.

15        And then he moved on to be the

16  director of USAID Bulgaria.

17        And he was -- over the years, I had a

18  lot of communication with him, discussion, and

19  he would be aware of my performance.

20     Q.  Have you discussed with him your --

21     A.  No.

22     Q.  -- termination?

1    A.  No.

2    Q.  Certainly talked about Michael Kunz.

3        I assume nothing further to add

4  regarding Mr. Kunz?

5    A.  No.

6    Q.  Who is Owen Goldfarb?

7    A.  Owen Goldfarb was a consultant that

8  we -- that worked in the Turkmenistan office for

9  three or four months in 2004.

10       In January through March, I think,

11  three months.

12       And over the -- after I was fired, he

13  was often sending me job information.

14   Q.  For potential new employment?

15   A.  Yes.

16   Q.  Who is Rolf Sartorius?

17   A.  Rolf Sartorius is the director of the

18  Social Impact, which is the subgrantee to

19  Counterpart International on this particular

20  project.

21      Q.  We have talked about Ruth Pojman.

22      A.  Uh-huh.

294

1    Q.   Anything further on her?

2    A.   No.

3    Q.   Who is Sean Roberts?

4    A.   Sean Roberts works for USAID in

5    Almaty, Kazakhstan.

6         And he's in the Division of Democracy.

7         Works closely with Igor Tupitsyn, Mark

8    Hannafin, Susan Fritz, and was CTO on the

9    project when I began in 2000.

10        And then he left, went to -- finished

11   his doctorate.  Went to -- back to Kyrgyzstan,

12   worked for a year, and then moved back to Almaty

13   to work with USAID.

14        And was very aware of all the issues

15   or the, you know, performance and rumors and

16   statements about my departure from there.

17   Q.   And have you spoken to Mr. Roberts

18   about these rumors?

19     A.  No.

20     Q.  I'm sorry?

21     A.  No.

22     Q.  Okay.  So it's just your belief he

1   would know of them?

2       A.   Well, I was told by over people in

3   USAID, Mark Hannafin, that you know, that Sean

4   was very aware and had his opinions.

5       Q.   Okay.  Were you told what those

6   opinions were?

7       A.   He wasn't -- he didn't understand.

8       Q.   Didn't understand why you were let go?

9       A.   Yes.

10      Q.   Who is Shahruh, with the very long

11   last name?

12      A.   Shahruh.

13          He is the -- I was able to manage --

14   or I, through contacts that I have here in the

15   DC area, was able to bring a couple of projects

16   into Counterpart through the World Bank.

17          And I hired him as the manager of

18   those projects.

19      They were funded through the World

20  Bank.

21      And they -- first -- the first --

22  those two projects finished up in June, about

296

1    June of 2004.

2           And then a new one that I wasn't

3    connected to, which was somewhat of a follow up

4    to those projects, began in the fall of 2004.

5        Q.   So he would basically be testifying as

6    to your performance --

7        A.   Yes.

8        Q.   -- on these projects?

9        A.   Uh-huh.

10       Q.   And then it also says here, issues of

11   Mr. Kunz?

12       A.   Yeah.  Because he was from the office

13   in Uzbekistan.

14       Q.   Have you actually spoken to him about

15   his opinions of working with Mr. Kunz?

16       A.   No.  I haven't spoken to him about

17   that.

18       Q.   Who is Shakhnoza Muminova?

19     A.  She was the training coordinator

20     director for the CAIP project, worked directly

21     under Mr. Kunz, and wrote a letter of complaint

22     to me about Mr. Kunz that I passed on to

1   Washington DC.

2       Q.   This, again, is in that 2002 time

3   frame?

4       A.   Yeah.

5       Q.   Who is Sheila O'Dougherty?

6       A.   She was a colleague what was in a

7   chief party position in the health field, with

8   Apt (phonetic) Associates from Bethesda.

9           She -- I have not discussed anything

10  with her since my departure, but we worked for

11  years and had cooperated on health projects in

12  Central Asia.

13      Q.   Who is Soroush Javadi?

14      A.   He was the country director in

15  Uzbekistan.

16          And he is now working with the UNDP in

17  Afghanistan.

18          And he is the one that gave me all the

19   report on Mr. Kunz's behavior while the CAIP

20   program was a subgrantee, or sub -- had a

21   subcontract -- contract with the -- sorry, had a

22   subcontract with Counterpart in Uzbekistan.

1        That was -- sorry about that.

2     Q.   Sure.  We have spoken about Stephen

3   Larabee.

4        Anything that you would like to add?

5     A.   No.

6     Q.   We have spoken about Susan Fritz.

7        Anything you would like to add?

8     A.   No.

9     Q.   Who is Tom Bridle?

10      A.   Tom Bridle was based in Central Asia,

11   and then moved to Bosnia.

12        I was told that after I was fired,

13   that word went -- got to him quickly about this.

14        He had still strong connections to

15   Central Asia, so this was ...

16     Q.   But you have not actually spoken to

17   Mr. Bridle yourself?

18      A.   I haven't spoken to Mr. Bridle.

19   Q.   Who told you that word got to him?

20   A.   I can't recall.

21   Q.   Other than word of your termination

22   getting to him, anything else get to him?

1    A.   Not that I know.

2        I didn't call him and ask him about

3   this.

4        Q.   Who is Ulzhan Kanzhygalina?

5    A.   She worked with me as my -- as the

6   training director in the 2000 to 2003 period.

7        And then she moved to be the director

8   of one of the associations that we supported in

9   the period of time, in the phase of work in

10   which I was fired.

11       She contacted me after I was fired and

12   invited me, a couple of times, to meet with her

13   as friends to support me.

14    Q.   And what did she say about the rumors

15   that spread following your departure?

16    A.   You know, we didn't talk too much

17   about the rumors.

18       She mostly just was disappointed with

19   what happened and the way it was handled.

20          And we tried to avoid that kind of,

21   you know, discussion.

22          Q.   Keep your voice up.

1        I know it's late.

2    A.   That's okay.

3    Q.   Who is Vaslat Achmetov?

4    A.   He is the -- actually, his last

5  position was the director of the health project,

6  the HNCBI.

7        He began working with me in Kyrgyzstan

8  in 1995, and he moved his way up over the years,

9  and was very supportive.

10       Also called me and contacted me, and

11  asked me to meet with him and have something to

12  eat, and was very supportive.

13    Q.   When you say that here, that he had

14  details of the termination of your contract,

15  what are you referring to there?

16    A.   Again, I'm sure -- I -- I don't --

17  it's hard for me to remember, but if he was

18  present at the Friday morning meeting, it's

19   possible that he would have details of that,

20   also of the cutoff of email and ...

21       Q.   We have spoken about Vitaly Shertov.

22       A.   Yeah.

1    Q.  Anything further with regard to him?

2    A.  No.

3    Q.  And I am definitely not going to

4  try --

5    A.  Yazgylych Charyev.

6    Q.  Thank you.

7       Who is that?

8    A.  He's the country director for

9  Turkmenistan.

10      I was in Turkmenistan, and he was

11  trying to figure out how to get to a meeting in,

12  I guess it was in Bulgaria, or was it in -- it

13  was in an eastern block country.

14      And I used my credit card to pay for

15  his reservations so he could get to the meeting,

16  and approved his travel to the meeting.  And

17  that was part of my expense receipt that was

18  never paid.

19    Q.  You supplemented the list with some

20    names in your answers to interrogatories.

21    A.  Uh-huh.

22    Q.  The first name being Brian Propp.

1        What information does Mr. Propp have?

2     A.   Mr. Propp was the vice president for

3  Counterpart International.

4        And one month before I was -- lost my

5  job, he lost his job.

6        I was able to find him, and I asked

7  him about being locked out, at which time he

8  told me that he was not locked out and had full

9  access to his office for about one month.

10        Then it was locked.

11        Then he could ask for the key to go in

12  and out of his office after his termination.

13     Q.   Any other information he has regarding

14  the situation?

15     A.   Yeah.  That he has a potential lawsuit

16  with Counterpart as well.

17     Q.   When did you last speak to Mr. Propp?

18     A.   I think it was November, December, I

19   think, November.

20      Q.   Of 2005?

21      A.   Yeah.

22      Q.   He lives in Westminster, Colorado?

1    A.  Yes.

2    Q.  Who is Christopher Carver?

3    A.  He was a consultant with Christopher

4  Szecsey on the evaluation.

5       I had dinner with Christopher Carver

6  and Christopher Szecsey one evening in Bishkek,

7  after I was terminated, while they were

8  beginning their evaluation process in

9  Kyrgyzstan.

10    Q.  So he would generally testify to your

11  performance?

12    A.  Performance, yes.

13    Q.  David Smith we have spoken of.  I

14  understand he is recently deceased, which is

15  unfortunate.  I guess we don't need to talk

16  about Mr. Smith, unfortunately.

17       Don --

18    A.  Feil?

19    Q.   -- Feil.

20         Who is Mr. Feil?

21    A.   Also a former vice president of

22  Counterpart International, and has moved on, in

304

1  last fall, to the Volkala (phonetic) no, no, no.

2        It's -- formerly was the -- I just

3  can't think of the name of the organization

4  right now.

5        It was VITA, formerly VITA, but now

6  they have combined VITA and the technical

7  institute of some sort that does overseas

8  development work.

9        VITA and Volunteers in Technical

10  Assistance.

11        No, that's VITA.

12        And the other one is -- I'll think of

13  it in a minute.

14        MS. DOUGLAS:  May I show him our

15  interrogatory answers, which has this

16  information?

17        MR. BROWN:  I'm sorry?

18        MS. DOUGLAS:  May I show him our

19   interrogatory answers to speed this up?

20        MR. BROWN:  It's okay.

21        MS. DOUGLAS:  All right.

22   BY MR. BROWN:

1      Q.   My question goes more to what

2   information does Mr. Feil have?

3      A.   Mr. Feil told me when I arrived in

4   Washington DC, before -- the day before the

5   August 18 meetings, that he thought there was a

6   power play in place.

7      Q.   What --

8      A.   Meaning that --

9      Q.   What did you understand that to mean?

10     A.   I understood it to mean that Mr. Kunz

11   was going to have more responsibility in the

12   region, more power.

13     Q.   Did you ask Mr. Feil if that's what he

14   meant?

15     A.   He -- his statement was that it seemed

16   to him that it was this way, that he was unsure

17   but.

18     Q.   And Mr. Feil was a Counterpart vice

19  president at that time?

20      A.  Yes.

21      Q.  Was he a friend of yours?

22      A.  Just a colleague.

1        Actually, Harry Dorcus told me the

2    same thing.

3        Q.   Other than that, Mr. Feil have any

4    information?

5        A.   Not really.

6            We talked about his work and his

7    projects and his new job, when I met with him.

8        Q.   When was that?

9        A.   July of 2005.

10       Q.   Gregory Touma?

11       A.   Yeah.  Gregory Touma was the former

12   COO of Counterpart.

13       Q.   What information does he have?

14       A.   He was -- may have information -- he

15   was fired from his job, from what I understand,

16   years ago and -- quite a few years ago.

17       Q.   From Counterpart?

18       A.   Yeah.

19   Q.   Have you spoken to Mr. Touma?

20   A.   I have spoken to Mr. Touma.

21   Q.   What has he told you that would have

22   any bearing on your case?

1     A.   You know, we didn't really discuss

2   anything that would have bearing on my case.

3         We mostly -- again, when I -- both

4   with Mr. Feil and Mr. Touma, I was networking

5   and interested in potential work.

6         And of course, I knew them because of

7   my work with Counterpart.

8     Q.   Who is John Lord?

9     A.   The contracting officer at USAID in

10   Almaty, or he was at the time that I was fired.

11     Q.   And he has information regarding what?

12     A.   Well, the last thing, the closeout

13   meeting that I had with USAID, he was present.

14         And I told him that there was no

15   reason to do any financial auditing or anything,

16   that I felt, he asked me that question.

17     Q.   Make sure you keep your voice up.

18         Who is Kathleen Kuchnast?

19      A.   She is a consultant that works with

20   the World Bank.

21          I worked with her to -- to incorporate

22   the World Bank projects that started -- well, we

1  worked on -- for years, trying to get them

2  going.

3       Finally, we got them going in 2004,

4  January of 2004.

5     Q.  So she would be basically testifying

6  to your performance?

7     A.  Yes.

8     Q.  Anything else?

9     A.  No.

10    Q.  Who is --

11    A.  Maybe she would know of some rumors.

12       I don't know.

13    Q.  But you have not spoken to her about

14  that?

15    A.  I have not spoken to her about that.

16    Q.  Who is Lance Brenner?

17    A.  Lance Brenner is an accountant at

18  Counterpart International, or was, I don't know

19   if he's still there.

20          But he -- and the only reason I bring

21   him up is the fact that Bob Abma and he had

22   issues all the time.  And Bob was always

1  complaining about Lance.

2      Q.  Who is Sholpan Makhmudoua?

3      A.  Sholpan Makhmudoua was the CTO for the

4  health project in -- at USAID in Almaty.

5          So she would have information about my

6  performance.

7          She sent me a nice note, disappointed

8  about me leaving the project.

9      Q.  Who is Valery Orekov?

10      A.  Valery Orekov was working at

11  Counterpart International.

12          He was originally -- I hired him in

13  Kyrgyzstan in 1995.

14          And then I suggested, in about 1990 --

15  I forget what year, 8, or 9, that he -- I

16  suggested to Lelei that he might be a person

17  that could really take advantage of an

18  internship.

19          He was very bright in computer

20    technologies.

21          And he was then Lelei agreed to bring

22    him over as an intern.  And then he became a

1   full-time employee of Counterpart.

2        And so I have stayed in touch with him

3   for all these years.  And he could testify to my

4   performance and opinion about me.

5     Q.   The last name on this list, Yana

6   Dobronravova?

7     A.   She's the deputy financial director in

8   the office in Almaty.

9        And she could testify about rumors,

10   and also the -- any allegations of abusive

11   language.

12     Q.   Have you spoken to her about

13   whatever --

14     A.   No.

15     Q.   -- knowledge of rumors she has?

16     A.   I have not spoken to her since my

17   termination.

18     Q.   Okay.

19          MR. BROWN:  With that, why don't we

20   take five, and let me talk with my clients.

21          We are probably just about done.

22          (A recess was taken.)

1  BY MR. BROWN:

2     Q.  Mr. Cooper, we have talked at various

3  times today about how you have said that

4  Mr. Kunz exhibited a temper in the office and

5  would be -- would yell and scream, et cetera.

6        You have described all of that.

7        Has anyone ever told you that you

8  exhibited a bad temper in the workplace?

9     A.  Other than maybe Arlene Lear had

10  heard, but in general, no.

11     Q.  Okay.  What did Arlene Lear tell you?

12     A.  She -- we talked about tempers.

13        And she discussed with me how she

14  loses her temper, and that you know, that

15  it's -- you know, it happens sometimes.

16        I really made every effort to be, you

17  know, not to lose temper.  And I don't recall

18  specific incidents other than -- and you know,

19  losing temper has all different levels.

20     Q.  Yes.

21     A.  I mean, you know, you can lose your

22  temper and not say anything, and yet people can

1   read that in body language.

2          So you know, I witnessed Michael Kunz

3   for 30 minutes.

4          I was told about the incident in

5   Tashkent in which Azam walked out.

6      Q.   So are there any times when you have

7   lost you temper such that somebody would, you

8   know, outwardly be able to tell that you that

9   you lost your temper, as opposed to keeping it

10   all inside?

11     A.   It's hard for me to recall specific

12   incidents of losing my temper.

13     Q.   So it may have happened, it may not

14   have happened?

15     A.   Not to -- again, it depends, what's

16   losing temper, you know, what is it?

17          Is it yelling, is it screaming, is it

18   just being angry, is it being frustrated, is

19   it --

20      Q.   Have you ever yelled at any

21   subordinate in the workplace, in an angry

22   manner?

313

1     A.   Not in an angry manner, no.

2     Q.   Have you ever yelled at someone in the

3   workplace?

4     A.   I may have raised my voice -- I may

5   have raised my voice, but ...

6     Q.   But not a frequent occurrence?

7     A.   No, absolutely not.

8     Q.   You mentioned in the course of your

9   job search that you were exploring jobs in

10   Central Asia; correct?

11     A.   Uh-huh.

12     Q.   Yes?

13     A.   Yes.

14     Q.   Okay.  Did you look outside Central

15   Asia?

16     A.   Yes.

17     Q.   Where outside?

18     A.   Well, I was -- I was reviewing

19  positions that were available.

20     Q.  Uh-huh.

21     A.  And -- and in fact, I applied for two

22  positions in the U.S.

1      Q.  Uh-huh.  At the time that -- after

2  your termination, you were going through a

3  divorce proceeding?

4      A.  Yes.

5      Q.  And as part of that, there was a

6  custody battle?

7      A.  Actually, I was divorced before I was

8  terminated.

9         My divorce proceeding was finished,

10  but there was some custody issues, yes.

11     Q.  Okay.  As a result of those custody

12  issues, was it important that you remain in

13  Almaty?

14     A.  No.  I didn't -- I was in Kyrgyzstan.

15     Q.  Was it important that you remain in

16  Kyrgyzstan?

17     A.  It was only -- actually, it wasn't

18  important.

19      I didn't need to stay there for that.

20           It was -- once the initial trial takes

21   place in Kyrgyzstan, the process of filing an

22   appeal can easily be done by lawyers.

1        And I could have gone in at any time

2   for a trial or a hearing.

3      Q.  Okay.

4        MR. BROWN:  All right.  I have nothing

5   further.

6        MS. DOUGLAS:  I have a couple of

7   questions, and I'm going to try to do it as

8   quickly as I can.

9        MR. BROWN:  Okay.

10       EXAMINATION BY COUNSEL FOR THE PLAINTIFF

11   BY MS. DOUGLAS:

12      Q.  Mr. Cooper, you have reviewed, I

13   believe, Exhibit 18, which is a memo by Aaron

14   Chassy?

15      A.  Uh-huh.

16      Q.  And it makes some statements about

17   your behavior in the office and how you treat

18   other people, does it not?

19     A.  Yes.

20     Q.  Did you identify where Mr. Chassy was

21  getting the information that he sets forth in

22  Exhibit 18?

1      A.  I can't identify, over than -- well,

2   actually, he points out that Bob Abma is the

3   source of that information.

4      Q.  And have you reviewed, previously in

5   my office, a memo by a Kim Alter concerning you?

6      A.  Yes.

7      Q.  And did you identify, in reading that

8   document, the source of the information that Kim

9   Alter was including in her memo?

10      A.  Yes.  My -- as I observed, it was from

11   Bob Abma.

12      Q.  Did you realize, at the time you

13   were -- your structure of your office was

14   realigned in August of 2004, that Mr. Abma had

15   been saying things about you such as those

16   included in the memos by Mr. Chassy and

17   Mr. Abma?

18      A.  Was I aware of that in what date?

19    Q.   Until you saw discovery in this case,

20  were your aware what Mr. Abma was making

21  statements about your conduct, such as those

22  reflected --

317

1    A.  No.

2    Q.  -- in Exhibit 18, and in the memo by

3  Kim Alter?

4    A.  Not specifically.

5      I didn't have that kind of written

6  evidenced that he was making these kind of

7  statements.

8    Q.  If you had had that information, would

9  that have given you additional pause in agreeing

10  to continue under the reorganization?

11    A.  Possibly, yes.

12    Q.  And you were asked about whether or

13  not you were aware of any lies by Kelli Boyer.

14      I would like you to look at Exhibit

15  15, please.

16      If Kelli Boyer told Arlene Lear or

17  other persons at Counterpart that during the

18  week she was with you, that you stated

634 of 655

19  innumerable times that you desired a separation,

20  would that be a lie?

21      A.  That would be a lie.

22      Q.  And if Kelli Boyer had told Arlene

318

1   Lear or other persons at Counterpart that you

2   had stated that you had changed your mind and

3   you were staying until June, applying minimal

4   effort, would that have been a lie?

5       A.   That would be a lie.

6       Q.   And if Kelli Boyer reported to anyone

7   at Counterpart that you had a practice of

8   closing your door and being unavailable to your

9   staff, would that be a lie?

10      A.   Absolutely, that would be a lie.

11      Q.   And if Kelli Boyer had reported that

12  you had been -- had been inducing fear of you in

13  persons who reported to you, would that have

14  been a lie, based on your experience of working

15  with your staff?

16      A.   Yes.  That would be a lie.

17      Q.   Was it your practice to infuse the

18  staff with feelings of disempowerment?

19     A.  No.

20     Q.  And if Kelli Boyer reported that,

21  would that be a lie?

22     A.  Yes.

1     Q.   Now, did you have concerns of having

2   your projects continue under the supervision of

3   Michael Kunz in August 2004?

4     A.   Yes.

5     Q.   And what was the basis for that

6   concern?

7     A.   The basis was my experience and

8   observation that he would often come to work,

9   mostly come to work at 10, 11 o'clock in the

10   morning, leave at 4 o'clock.

11         And that he spent a lot of a time

12   talking, and there was mostly delegation and

13   very little production.

14     Q.   And did you have concern that -- about

15   the rearrangement under which Bob Abma would

16   report to Mr. Kunz rather than you, in large

17   measure?

18     A.   The concern came especially after they

19   asked me to approve shifting funds that were

20   unspent from one area of my projects, to staff

21   for Mr. Kunz, and for travel for Mr. Abma and

22   Mr. Kunz.

1     Q.   When you agreed to function under the

2  reorganization that had been proposed, were you

3  given some comfort that the worst events that

4  you were imagining were not going to take place?

5        MR. BROWN:  Objection, vague and

6  ambiguous.

7        MS. DOUGLAS:  No, that's okay, it was

8  a bad question.

9        I'm sorry.  Strike that question.

10  BY MS. DOUGLAS:

11     Q.   You did agree, did you not, to proceed

12  with Mr. Kunz as your supervisor?

13     A.   Yes.

14        MR. BROWN:  Objection, leading.

15  BY MS. DOUGLAS:

16     Q.   And when you took that step, what, if

17  any, reassurances had you received that you

18  could be assured that Mr. Kunz would perform

19    according to the standards expected by

20    Counterpart?

21        A.   I didn't receive any reassurances,

22    other than it was -- in the meeting, August 18,

1  the discussion came up of what is appropriate

2  behavior in the workplace.

3       And the discussion concerning

4  Michael's, Kunz, Mr. Kunz outrage was a -- he

5  was told that this is inappropriate behavior.

6       And that was a reassurance that that

7  wouldn't happen.

8     Q.  And as of November 10 of 2004, did you

9  believe -- what did you believe about how you

10  and Mr. Kunz were working cooperatively?

11    A.  I thought we were working well

12  together.

13       We would have -- it would have been

14  better to meet more, but then there was also

15  travel schedules, which interfered with that.

16       But in fact, I was -- we thought we

17  were working really quite well together.

18    Q.  Did Mr. Kunz, as your supervisor,

19   express any dissatisfaction with your

20   performance?

21        A.   No.

22        Q.   Has any agency through which

1   Counterpart has performed projects, for which

2   Counterpart has performed projects, expressed

3   any dissatisfaction with your management?

4       A.   Not that I'm --

5          MR. BROWN:  Objection, calls for

6   speculation.

7   BY MS. DOUGLAS:

8       Q.   Have you ever heard of any such

9   expression of dissatisfaction?

10      A.   I have not heard of any.

11      Q.   Has Ms.Lear every expressed to you

12   dissatisfaction with your management of your

13   projects?

14      A.   Yes.

15      Q.   And with respect to your performance

16   evaluations, how many performance evaluations

17   have you gotten from Ms. Lear?

18      A.   One.

19     Q.   And what were your ratings on that

20   performance evaluation?

21     A.   They were all -- I don't recall the

22   exact ratings, but they were very high.

323

1    Q.   And how long ago was that performance

2  evaluation?

3    A.   The last one was in 2003?

4    Q.   Have you requested additional -- more

5  recent ones?

6    A.   Well, I have -- the most -- I have,

7  you know, requested my job description, which

8  relates to the performance evaluation.

9    Q.   And you have already testified that it

10  was not forthcoming?

11   A.   Yeah, right.

12      MS. DOUGLAS:  No more questions.

13  FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

14  BY MR. BROWN:

15   Q.   Mr. Cooper, you testified a moment ago

16  that Mr. Chassy based his opinions, in the memo

17  that's reflected in Exhibit 18, solely on

18  Mr. Abma's testimony or statements.

19          Yet, I would direct your attention to,

20   if I could, paragraph -- the next to last

21   paragraph on page 1 of Exhibit 18, which states

22   "Several country advisors, as well as other CPI

1   ex-patriot staff and field, have described to me

2   a similar pattern of abusive behavior of both

3   Jay and Aaron, although particularly on the part

4   of Aaron, most recently."

5       So that's not a true statement on your

6   part, is it sir, that it was based solely on

7   Mr. Abma's statements, is it?

8       A.  Did I say it was solely?

9       Q.  Yes, you did.

10      A.  Did I say it was solely?

11      Q.  Yes.  Well, your attorney put that

12   word in your mouth, and you bought into it.

13       And that's not true, is it sir?

14      A.  Well, it may be true.

15       MS. DOUGLAS:  I believe the question

16   was largely, but the record will show what the

17   question was.

18       THE WITNESS:  It may be true.

19          It may be solely based on

20    Mr. Abma's -- it -- I can't testify that it

21    may -- it's possible that someone else talked to

22    him.

1       But I don't know who what was or --

2   and he doesn't identify the individuals in

3   Mr. Chassy's memo.

4   BY MR. BROWN:

5       Q.   Do you have any reason to believe that

6   anyone in Counterpart management, in Washington,

7   knew -- well, let me back up.

8       You have testified that you believe

9   that Kelli Boyer lied on a number of occasions.

10      Do you have any reason to believe that

11   anyone in Counterpart management, in Washington

12   DC, knew that Ms. Boyer, according to you, was

13   lying?

14      A.   I don't have any reason to believe

15   that anyone else knew that she was lying.

16      And yeah, I just don't have any -- I

17   think that she did this on her own, and that's

18   it.

19    Q.  Thank you.

20        MR. BROWN:  I have nothing further.

21        MS. DOUGLAS:  We want to read, please.

22    (Whereupon, reading and signature not having

1      been waived, the proceedings in the

2   above-captioned matter were concluded at 5:24

3            p.m.)

4

5

6

7            _____

8            JAY COOPER

9

10

11      SUBSCRIBED AND SWORN before and to me

12   this day of _____, 20___.

13

14

15

16

17            _____

18            NOTARY PUBLIC

19

20

21

22   My Commission expires:

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Joseph A. Inabnet, the officer

3     before whom the foregoing deposition was taken,

4     do hereby certify that the witness whose

5     testimony appears in the foregoing deposition

6     was duly sworn by me; that the testimony of said

7     witness was taken by me in Stenotype and

8     thereafter reduced to typewriting under my

9     supervision; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    thereto, nor financially or otherwise interested

17    in the outcome of the action.

18

19          _____

20          Joseph A. Inabnet, Notary Public

21          for the Commonwealth of Virginia

22   My Commission Expires:  July 31, 2007