**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAY W. COOPER,                          )
                                        )
    Plaintiff,                          )
                                        )
    v.                                  )    Civil Action No. 05-1598 (RMC-JMF)
                                        )
COUNTERPART INTERNATIONAL,              )
                                        )
    Defendant.                          )

**PLAINTIFF'S STATEMENT OF GENUINE ISSUES**

      Plaintiff Jay Cooper submits this Statement of Genuine Issues pursuant to LCvR7(h) to demonstrate that material facts in dispute make entry of Summary Judgment for Defendant improper in this case.

      We list below 25 material issues of contested fact, stating Plaintiff's position on each issue and then pointing to Defendant's contrary position, using the signal "**CONTRAST**."  We then set out the record evidence supporting Plaintiff's position.

      Within this Statement of Genuine Issues and the attached Declarations we directly dispute facts in each of the following paragraphs of Defendant's Statement of Material Undisputed Facts In Support of Defendant's Motion for Summary Judgment ("Defendant's Statement"):   11-22, 32, 41-44, 46, 52, 54-55, 61-63, 65, 74-75, 77, 83

      As to the following paragraphs of Defendant's Statement, we do not contest that Boyer reported such matters to Lear but do contest that those matters are accurate or that the reported events in fact were reported to Boyer or occurred, for the reasons set out in Genuine Issues No. 17-20, below and in ¶¶ 36-45 of the Declaration of Jay Cooper:  43-44. 47-50

1

We also dispute that Arlene Lear in good faith believed the matters contained in paragraphs 15-17, 20-22, 27, 30, 42-44, 46-50, 52-54, 57-58 of Defendant's Statement, for the reasons set forth in Genuine Issues Nos. 1-4, 6-21, below, as explained in the Memorandum in Opposition to Defendant's Motion for Summary Judgment.

As to the following paragraphs, with the exception of the allegation that Ms. Lear said she was "disappointed in Cooper's performance," we do not dispute that Lear made the statements referenced, but do dispute that those statements were accurate, for the same reasons:  57-58

We also dispute the inferences drawn from facts in the following paragraphs for the same reasons: 67-69, 70-72, 79-97

We dispute paragraph 51, as an incomplete and therefore misleading quotation of what Mr. Cooper said on pages 157-58 of his deposition, where he said that he told Boyer that he was interested in his projects, that his projects were his main interest and that that statement "could have been taken" by Boyer as "minimal effort or something like that."  See Declaration of Jay Cooper ¶ 39.

We dispute paragraph 78 as unsupported by the testimony cited.

We do not contest paragraph 60 of Defendant's Statement, but assert that Cooper now has such reasons and does now believe that Lear bore him ill will, for the reasons set out at in these Genuine Issues, and as explained in ¶ 51 of Mr. Cooper's Declaration submitted herewith.

These disputes about Genuine Issues are material and require denial of the pending motion.

An index of Genuine Issues is included for the Court's convenience.

**GENUINE ISSUES**

1.     Counterpart has consistently recognized that Jay Cooper at all times fulfilled his job responsibilities in an exemplary fashion, as exemplified by the scope of the responsibilities with which he was entrusted. [**CONTRAST:** Defendant's Statement ¶¶ 11-22 and CPX[1]-L Declaration of Arlene Lear ("Lear decl.")[2] at ¶¶ 8-15, 25-26)]

    a.  Between October 1994 and the date of his termination, Jay Cooper worked for Counterpart in a series of positions of increasing responsibility carrying increased compensation.  The positions, years of appointment and compensation are as follows (see CPX-A, CPX-B; Deposition of Jay Cooper ("Cooper dep.")[3] at 17-22, 22-76; Declaration of Jay Cooper ("Cooper decl.") ¶ 2):

      i.  Kyrgystan Country Director, October 1994, $ 46,800

      ii.  Regional Deputy Director, July 1997, $ 62,000

      iii.  Regional Director/Chief of Party, April 2000,  $ 82,500

      iv.  Regional Director/Chief of Party, December 2003, $ 97,323.60

    b.  As of September 30, 2004, Jay Cooper was the highest paid employee of Counterpart who was not an officer, director or trustee; this was due to the importance of the projects he managed, his years of experience and his

---

[1] References to "CPX-_" are to Exhibits submitted by Counterpart with Defendant's Statement.

[2] References to "Witness decl." are to Declarations by that witness submitted herewith.

[3] References to "Witness dep." are to pages of that witness's deposition transcript submitted herewith.

substantial responsibilities. (X-49[4] at page 6 (Schedule A); Deposition of Harry

Dorcus, Counterpart COO and CFO ("Dorcus dep.") dep. at 185-86)

c. Under the agreement at issue in this case, a letter agreement dated December

18, 2003, Jay Cooper was continued for a three-year term as Regional Director

and Chief of Party responsible for the projects of Counterpart's Civil Society

Division in Central Asia, based in Almaty, Kazakhstan. (CPX-B). As such, he

was in charge of managing two major projects and several smaller ones.

(Cooper dep. at 67-72)

d. The largest project under his management was the Civil Society Support

Initiative ("CSSI"), an 11-million dollar project which was Counterpart's largest

in terms of expenditures in FY 2004.  (X-42 at CP 1415; Dorcus dep. at 146-47)

e. His other primary responsibility was for the Health NGO Capacity Building

Initiative (hereinafter "HNCBI"), also among Counterpart's largest projects with

$ 3.5 million and in excess of $ 1 million available in grants in Phase 2. (X-28 at

CP 0976)

f. Together these two projects spent close to $ 5 million in FY 2004.  Thus

Cooper managed a large percentage in dollar terms of Counterpart's programs

in FY 2004 and had responsibility for, as Harry Dorcus, Counterpart's Chief

Operating Officer and Chief Financial Officer put it, "a large part of our

portfolio."  (Dorcus dep. at 146-49)

2. Counterpart has consistently recognized that Jay Cooper at all times fulfilled his

job responsibilities in an exemplary fashion, as shown by Counterpart's recognition of the

---

[4] References to "X-_" are to Plaintiff's Exhibits identified at deposition, the first page and relevant pages of which are collected in numerical order in Attachment A to the Declaration of Patricia D. Douglass ("Douglass decl.") submitted herewith.

4

success of the programs he managed.  [**CONTRAST**: Defendant's Statement ¶¶ 13, 16 and 17, wherein Counterpart claims that Cooper failed to transmit the vision of his programs, was distracted by minor administrative tasks and unfocused, and that, as a result, the beneficiaries of the programs he managed were not receiving their due.]

    a.  ***The CSSI Project.***  Counterpart and outside consultants engaged to evaluate the CSSI project have recognized that Cooper's management of that program was highly successful.  [**CONTRAST:** Ms. Lear, speaking for Counterpart, trying to deflect the credit for the positive CSSI report by testifying that the CSSI project had been faltering and was only turned around in the few months between Cooper's termination in November of 2004 and the Social Impact evaluation visits in March of 2005 due to the efforts of Michael Kunz. Deposition of Arlene Lear ("Lear dep.") [5] at 161-62)]

    i.  Counterpart engaged a consulting firm by the name of Social Impact to conduct training and perform monitoring and advisory services to Counterpart as part of the CSSI project.  Christopher Szecsey was sent by Social Impact on three occasions during Cooper's tenure to participate in trainings to support CSSI program goals. (Szecsey dep. at 9-3) Szecsey has testified of his admiration for Cooper's management skills and vision based on his observation and discussions with Counterpart's Country Directors on these three visits. (Deposition of Christopher Szecsey ("Szecsey dep.") at 14-18)

---

[5] Arlene Lear, Jay Cooper's immediate supervisor for all but the last three months of his tenure with Counterpart, testified for the corporation Counterpart International in response to a deposition notice under F. R. Civ. P. 30(b)(6).  We cite her testimony as "Lear dep.".

ii.  Szecsey returned to the region in March of 2005 together with others from Social Impact and two evaluators from Counterpart to perform a Mid-term Evaluation Report on the CSSI project.   In the course of that evaluation trip Szecsey and the team surveyed and interviewed local organizations, program recipients, NGO officials, Counterpart's Country Directors and USAID officials overseeing the project. (Szecsey dep. at 25-34)  Upon return to Washington, the team collaborated in preparing a final report that went in draft form to Lear to review.  The Mid-Term Evaluation Report on the CSSI program makes the following finding:  "CSSI in each country is having considerable success and is making significant progress toward the development and mobilization of civil society.  Perhaps most strikingly, the evaluation discovered that over 90% of the CSSC end users in Kazakhstan, Kyrgyzstan and Turkmenistan are satisfied with the quality of CSSC products and services.  This suggests that CSSI is reaching and positively impacting its key target groups."  (Douglass decl. ¶  4 & PDX-C[6] at CP 0858; Defendant's Response to Plaintiff's Request for Admissions ("CPADMISS")[7] at ¶ 63)

iii.  In the course of the evaluation, Szecsey had private conversations with each of Counterpart's Country Directors, all three of which spoke of their appreciation of Cooper's understanding and support.  None complained about Cooper's management style.  (Szecsey dep. at 18-19)

---

[6] References to exhibits attached to the Douglass decl. are labeled "PDX-  ".

[7] Relevant pages of CPADMISS are Attachment B to the Douglass decl.

iv. Szecsey strongly disagreed with Ms. Lear's attributing the project's success to the arrival of Michael Kunz, for three reasons. First, he testified that "it would be impossible to turn around a project that large and that complex in only a three-month period." He also testified that he knew of the program's status from his previous visit in September – October of 2004 when Cooper was its manager and "a number of things pointed out in the evaluation three months later were the same things that I experienced and observed" during that earlier visit. Finally, he noted that the data collected by the evaluation team covered the entire run of the project, not simply the three months since Cooper's departure. (Szecsey dep. at 37-41)

v. Although a monitoring and evaluation study is "usually always" done for the donor when programs come to an end (Dorcus dep. 147-48), and despite the fact that the Cooperative Agreement under which Counterpart was awarded funds for the CSSI project required Counterpart to submit to USAID a final report at the project's end (Dorcus dep. at 253-55 ; X-53 at CP2901), Counterpart produced no such final report to USAID. (Dorcus dep. at 255-56) [**CONTRAST:** Counterpart's explanation for the failure to prepare a final report is that it was not requested by USAID and was not budgeted for. (Dorcus dep. at 255-56)]

b. ***The HNCBI Project.*** Counterpart and consultants engaged by Counterpart to evaluate the program have recognized that Cooper was a highly successful at managing the HNCBI program. [**CONTRAST:** Defendant's Statement at ¶ 19; Lear dep. at 54 asserting that Beth Comolli was critical of Cooper's ability to lay

out the vision for a project and was indecisive, and Lear dep. at 216-17
asserting that Comolli and Ara Nazinyan criticized Cooper's leadership.]

i.   A mid-term evaluation of the HNCBI program prepared for Counterpart by an
     external consultant in conjunction with Counterpart staff in December of 2003
     found the program "by all accounts . . . successful." (X-28 at 0977)  Ms. Lear
     received that report in draft form before she approved the extension of
     Cooper's contract in December of 2003. (Lear dep. at 97)

ii.  Counterpart's official Final Report on that project, discussed the HNCBI
     program's success in the following terms:  "Despite challenging operating
     environments in some of the countries, the program has proved to be
     resilient and extremely successful in terms of outreach and producing
     significant health impact at the community level . . . . It has by far exceeded
     the target indicators under each of the objectives."  (CPADMISS at ¶¶ 55-56;
     Cooper decl. ¶ 68 and JCX- M.[8]

iii. Christopher Szecsey, a consultant to Counterpart who visited and provided
     trainings for and evaluations of Cooper's programs, testified in response to a
     question about Cooper's understanding of the "vision" of the HNCBI project
     that Cooper demonstrated "responsive management" in making a mid course
     correction in the project, permitting introduction of a new methodology that
     would move the project forward more rapidly with deeper results.  Szecsey
     had this to say about Cooper and the Country Directors he supervised: "I
     mean they were good at reflecting and analyzing what was happening in

---

[8] References to "JCX- " are to exhibits attached to the Cooper decl. submitted herewith.

these projects and how they needed to change course and what resources they needed to more forward." (Szecsey dep at 54-55).

iv. Ara Nazinyan, who ran the HNCBI program under Cooper's supervision and has provided a Declaration describing his admiration for Cooper's role in improving the Mahalla Initiative Project to become "one of the flagships of Counterpart in Uzbekistan." (Declaration of Ara Nazinyan ("Nazinyan decl.") at ¶ 2) Nazinyan has nothing but praise for Cooper's "intuitive management," his training programs, and his delegation to, motivation of and trust in his staff,. (*Id.* at ¶ 3) He specifically cites the HNCBI program as an example of Cooper's ability to transfer his vision of the project to local staff and to empower them to become decision-makers. (*Id.*)

v. Ms. Lear's testimony that Comolli told her that Cooper lacked vision and was indecisive had nothing to do with the HNCBI program and, in any event, was not significant to Lear in that it did not merit inclusion in Lear's Performance Review of Cooper.

1. The Comolli comment admittedly concerned a meeting she attended in connection with the Mahalla Initiative Program. (Lear dep. At 53-56, 95-98) Lear testified that the substance of this supposed comment of Ms. Comolli did not appear in her one and only Employee Performance Review of Cooper because the Mahalla meeting occurred after her one Performance Review. (Lear dep. at 53-56)

9

2. Once the memorandum of the meeting about the Mahalla project was produced in discovery, it was seen to have occurred in October of 2000 – well before the Performance Review that Lear has admitted was in March of 2002. (Douglass decl. ¶ 5 & PDX-D; Lear dep. at 32-35)

3. Mr. Nazinyan who worked on the Mahalla Initiative Project describes Cooper's leadership on that project in the following terms: "Jay was providing leadership and support to Uzbek and othr country offices, dealing with multiple difficult and sensitive issues in a highly professional manner, taking into account local circumstances and respecting local traditions. He was always consulting with local staff and was enjoying full trust and respect from all country offices." (Nazinyan decl. ¶ 2)

3. Professionals engaged in international development in Central Asia have consistently recognized Cooper's contributions to that effort, his vision, his expertise and his management skills. [**CONTRAST:** Defendant's Statement ¶¶ 11, 3-22, 52-55; Lear dep. at 86-94, 216-17, testifying that George Deikun of USAID, Ara Nazinyan and Beth Comolli expressed criticism of Cooper.][9]

a. Professionals in the field of the development of civil society in Central Asia hold Jay Cooper's ability to envision the goals of civil society and to turn that vision into effective programs in the highest regard. (Szecsey dep. at 23, 51-55; Declaration of Asiya Sasybaeva ("Sasybaeva decl.") at ¶¶ 5-6; Declaration of

---

[9] Ms. Lear also mentions criticism by a Kim Alter, but has sworn that Ms. Alter's views played no role in her decision to terminate Cooper. (Lear dep. at 257-58)

Lawrence J. Held (:Held decl.") at ¶¶ 4-5; Declaration of Owen Goldfarb ("Goldfarb decl.") at ¶ 3; Declaration of Stephen J. Larabee ("Larabee decl.") ¶¶ 3-5)

b. Ara Nazinyan's Declaration in this case is not consistent in any way with the criticism of Cooper that Lear attributes to him. (Nazinyan decl. at ¶¶ 2-3)

c. The USAID staff with hands-on knowledge of his stewardship of the CSSI program agrees that Jay Cooper was a strong manager. (Declaration of Susan Kosinski Fritz decl. at ¶  4); Szecsey dep. at 23 ("wherever I went across those three countries, I would meet USAID people . . . and in all cases they just had tremendous respect and support for what he was trying to accomplish in those two projects."); see also, Szecsey dep. at 31-32; Held decl. ¶ 6)

d. Susan Fritz of USAID, who supervised the USAID professionals who had hands-on responsibility for the CSSI project, has declared that George Diekun's views on Cooper were based on certain public events and were not shared by the USAID professionals who dealt with Cooper on a daily basis.  (Fritz decl. ¶ 10)

    i. Christopher Szecsey testified that it was a positive reflection on Cooper's management skills and a "judicious use of resources" that Cooper brought in a consultant named Gavin Helf to mentor and coach the Country Director in Turkmenistan who was dealing with a complex fast-evolving political situation.  (Szecsey dep at 45-49)   Szecsey also said that some international organizations consider it an uncomfortable situation to admit that they need the expertise of consultants, and might want to conceal that fact from USAID

if they had represented that they had that consultant's expertise in house. (Szecsey dep. at 49-51) [**CONTRAST:** Lear's criticism of Cooper for stressing to George Deakin of USAID the accomplishments of the consultant Lear and Cooper had brought in to help with the crisis in Turkmenistan. (Lear dep. at 86-88)

ii. Arlene Lear approved the retention of Gavin Helf as a consultant to support the CSSI team in managing events in Turkmenistan.  (CPADMISS ¶¶ 52-54; Lear dep. at 91)

4.     Arlene Lear, as Cooper's direct supervisor at all relevant times until August of 2004, consistently recognized the excellent job Cooper was doing for Counterpart and never communicated to Cooper any dissatisfaction with his job performance, as evidenced by her actions that are wholly inconsistent with her present criticisms, and by the sworn statements of Cooper and those who worked with him. [**CONTRAST:**  Defendant's Statement ¶¶ 12-22, Lear decl. at ¶¶ 8-15]

a. At all relevant times until three months before his termination, Cooper exercised the responsibilities set out above under the direct supervision of Arlene Lear. (Cooper decl. ¶ 2)

b. Arlene Lear delivered a written Employee Performance Review to Jay Cooper in March of 2002 that she admits accurately reflects her opinion of Cooper's job performance as of that date.  (X-9; Lear dep. at 32-39)

c. Both Harry Dorcus, Counterpart's Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"), and Kelli Boyer, Counterpart's Director of Human Resources at the time of Cooper's termination, admit that that Performance

Review was highly favorable. Dorcus called it "highly favorable if it was issued" (dep. at 81-82); Boyer called it an "exceptionally favorable evaluation" (dep at 42) [**CONTRAST:** Arlene Lear, testifying for the corporation, admitted that X-9 was in fact an evaluation she issued but called parts of it merely "commendable" rather than "exceptionable." (Lear dep. at 36-38)]

d. Counterpart was obliged, under its Manual for Employees in Foreign Areas (X-7, hereinafter the "Manual")[10], to communicate to Jay Cooper a frank assessment of his job performance on an annual basis "or more frequently." (X-7 at CP0579; see also Dorcus dep. at 15, 98)

e. Arlene Lear never produced another Employee Performance Review of Jay Cooper before or after the evaluation described above. (Lear dep. at 48-50; Cooper decl. ¶ 3)

f. In connection with the negotiation of his most recent contract in December of 2003, Arlene Lear awarded Cooper a merit bonus of $4,866.18, which she described as being in recognition of "being the COP [Chief of Party] of two multi-million dollar multi-country initiatives. This is not related to revenue generation, but management performance." (X-6 at CP 0850; Counterpart X-B)

g. Ara Nazinyan reports that Arlene Lear spoke highly of Cooper many times. (Nazinyan decl. at ¶ 10)

h. On November 16, 2004, Lear wrote an email to Counterpart's worldwide staff in which she stated that Cooper had "made an immeasurable contribution to the development and management of Counterpart's region-wide civil society

---

[10] The Manual was the Counterpart employee handbook relevant to Cooper's contractual relationship with Counterpart. (CPX-B)

support initiative over the past decade." (X-24)  Lear has testified that he

absolutely made an immeasurable contribution and that she believed

everything she said in X-24.  (Lear dep. at 72-73)

i.  Cooper denies that Lear ever perceived or orally criticized him for any of the

supposed shortcomings she lists in ¶¶ 8-15 of her Declaration filed in this

Court.  (Cooper decl. ¶¶ 4- 6, 18, 33) [**CONTRAST**: Lear Declaration ¶¶ 8 -15,

25; Defendant's Statement ¶¶ 11-22]

i.  During the period that she acted as Cooper's direct supervisor, Arlene Lear

called him from time to time to discuss various aspects of the projects for

which Cooper was responsible.  At times she offered suggestions.  Lear has

testified that these telephone conversations were weekly or more frequent,

and she provided positive feedback to him in these calls, possibly at least

once a month.  (Lear dep. at 51-52)

ii.  Cooper adamantly denies Dorcus' testimony that Lear called Cooper

repeatedly to criticize his performance and to counsel him on corrective

measure he could take to improve it, aside for occasional suggestions that he

learn to "schmooze more," which information Dorcus admits came to him only

because Lear told him that this had occurred. (Cooper decl. ¶¶ 4, 6)

[**CONTRAST**:  Dorcus dep at 73-78, 100-03, 237-38]

j.  On August 18, 2004, Lear convened a meeting in Washington attended by

Lear, Cooper, Kunz and a facilitator at which Lear announced that Michael

Kunz would serve as Cooper's supervisor and that Bob Abma would report to

Kunz rather than to Cooper.  At no time during this meeting did Lear – or any

14

other participant -- express any criticism of Cooper's job performance.  (Cooper

dep. at 94-102)   While Cooper expressed reservations about Kunz'

appointment and Abma's reporting to Kunz ( Cooper dep. at 101-03; Cooper

decl. ¶ 9), Lear admitted that everyone praised everyone at the end of that

meeting.  (Lear dep. at 69)  Lear told Cooper she wanted him to remain with

Counterpart and in the Central Asian region during the August 18, 2004

meeting.  (Cooper dep. at 104)  Both Lear and Kunz praised Cooper, and Lear

has testified that that praise was "sincere by all parties."  (Lear dep. at 69-70)

k.  Cooper does not believe that he ever expressed admiration for Michael Kunz.

(cooper decl. ¶ 9)  [**CONTRAST:**  Lear decl. ¶ 32; Defendant's Statement ¶ 46]

5.  At no time did Arlene Lear or Counterpart offer Cooper "options" other than to return to

Almaty under Kunz' supervision. [**CONTRAST:**  Dorcus' testimony that Lear told him

that she had offered Cooper different options and that she was forced to make the

decision to bring in Kunz and cancel Cooper's responsibility to supervise Abma because

Cooper "refused to change." (Dorcus dep. 36-37)  **CONTRAST ALSO:**  Lear decl. ¶ 23

and Boyer dep. at 128, 193,  stating that Boyer offered Cooper the option to continue to

work for Counterpart as a consultant]

a.  At no time before the August 18, 2004 meeting did Arlene Lear or anyone else

at Counterpart discuss with Cooper or offer to Cooper any "options" of other

arrangements with or positions within the company; it was always assumed, in

every conversation Cooper had with Arlene Lear that he would remain as Chief

of Party and Regional Director until the conclusion of his contract in June of

2006. (Cooper decl. ¶ 8)

15

      b. At the August 18 meeting, Lear offered Cooper no option but to accept the announced reorganization if he wanted to continue his projects in Central Asia. (Cooper decl. ¶ 9)  At that same meeting, Kunz threatened to resign if Abma was not given full responsibility for financial and administrative issues, reporting only to him. (*Id.*; Cooper dep. at 98-99, 102-03)

      c. Cooper denies that Boyer ever offered him a position as a consultant for Counterpart or even discussed that possibility with him.  (Cooper decl. ¶ 8)

      d. Shortly before the meeting of August 18, 2004, two Counterpart Vice Presidents told Cooper that it looked like there was "a power play" in Central Asia.  (Cooper decl. at ¶ 10; Cooper dep. at 305-06; CPADMISS ¶¶ 57-58)

      [**CONTRAST:**  Harry Dorcus denies making that statement.  (dep. at 33-34)]

6. Jay Cooper had sound reasons to be concerned about Counterpart's decision in the summer of 2004 to place Michael Kunz in charge of his projects when Lear announced that change to him on August 18, 2004, and he communicated those concerns and his reasons to Arlene Lear, who unreasonably gave them no weight.  [**CONTRAST**: Defendant's Statement ¶¶ 18-22, 27, reporting that Counterpart had a good faith belief that Kunz' management style and vision were necessary for the success of the programs.  **CONTRAST ALSO**:  Dorcus' denial of receiving communications from staff complaining about Kunz's behavior and temperament, and dismissal of the importance of such reports as "a part of overseas work," possibly arising from motives overseas employees have for criticizing Americans.  (Dorcus dep. at 24-28)]

      a. In 2003, Cooper had received emailed complaints from Counterpart staff in Uzbekistan about Michael Kunz's imperious interactions with Counterpart staff

16

members that were working with him as subcontractors on a project, as well as complaints about an incident when Kunz made a drunken disturbance in the presence of the American ambassador. (X-33, 34, 35; Cooper dep. at 90-92) Kunz' erratic behavior was widely discussed among professionals in Uzbekistan. (Nazinyan decl. at ¶ 8) Cooper was reasonably concerned about how Kunz would interact with the nationals of the three countries where CSSI operated. (Szecsey dep. at 22)

    i. Those staff members sent complaints about Kunz to Cooper because Cooper was their supervisor, and Cooper forwarded them on to Lear who was Kunz' supervisor at the time. (Lear dep. at 203-04)

    ii. Lear discussed the first matter (X-33) with Kunz, discounted the second matter as the product of a disgruntled employee, and assumed that no drunken incident had occurred because she had not heard about it from the embassy, and took no action. (Lear dep. at 203-06)

b. In July of 2004, Cooper had worked with the staff on a work plan for a project in Turkmenistan and made some changes to that plan. Kunz later "went on a tirade," yelling and cursing at Cooper for 30 minutes that Cooper had had no business doing so. Cooper said to Kunz on that occasion that now he (Cooper) understood why he had some files about Kunz, referring to Xs 33-35. Kunz again erupted, asking why Cooper was keeping a file on him. (Cooper dep. at 101-02, 241-242; Cooper decl. ¶ 45d)

c. A few days later in a telephone call Lear asked Cooper why he "was keeping files on Michael." Cooper explained that the only files he had were those

17

related to the incidents in Uzbekistan that he had already sent her.  (Cooper dep. at 24-43; Cooper decl. ¶ 45d)

    d.  Cooper told Lear about the July incident during the August 18 meeting, and the professional facilitator made it clear that outbursts such as the July incident were really unacceptable behavior and should not recur.  (Cooper dep. at 101-02; Cooper decl. ¶ 9)  [**CONTRAST**:  Lear dep. at 129-30, where she denies remembering the facilitator's instructions.]

    e.  Cooper also had reasonable doubts about Kunz' lack of appropriate management experience. (Cooper dep. at 319;  Cooper decl. at ¶ 11; Szecsey dep. at 20-22)

    f.  Cooper was also reasonable in being concerned about what was to be the division of responsibility for the CSSI and HNCBI programs between him and Kunz because, despite his questions about that subject at the August 18 meeting, Lear gave no clear instructions about that subject.  (Cooper decl. ¶ 11; Szecsey dep. at 20-22)

7.    Jay Cooper also had sound reasons to be concerned about Counterpart's decision in the summer of 2004 to remove its Regional Finance Officer Bob Abma from under his supervision and to place Abma under the supervision of Michael Kunz. [**CONTRAST:** Defendant's Statement ¶ 16-17  and Lear decl. ¶¶ 13-14, where Lear claims that the change was necessary because Cooper was too engrossed in "minor administrative tasks" and that those tasks were impacting program objectives. **CONTRAST ALSO:**  CPADMISS ¶¶ 82-83, denying that in October of 2004 Abma had responsibility for

18

financial matters in various existing and proposed projects outside the Central Asia Region and that Counterpart contemplated such a role for Abma]

a. Cooper had been concerned for some time that Abma was assigning costs to the CSSI and Health projects that did not benefit those projects and had expressed those concerns to Counterpart.  (Cooper dep. at 244; X-32, Answ. No. 14, ¶¶ 1, 2, 4 and 5)  Cooper expressed his concern about the issue to Abma many times, as had Cooper's Deputy Ara Nazinyan, leading to tense relations with Abma and no change in Abma's behavior.  (Cooper decl.  ¶ 12; Nazinyan decl. at ¶¶ 6-7)

b. Cooper was specifically concerned about Abma's frequent travels, beyond locales that had any connection to Counterpart's existing CSSI and HNCBI projects. It was Cooper's suspicion that Abma was using his projects' funds to develop budgets for new projects that would permit him to stay in the region because his romantic partner was local.  (Cooper decl. ¶ 13l CPADMISS ¶ 83)

i. Abma had been for some time extending the extent of his participation in the CSSI program beyond the participation that had been budgeted for the CSSI project.  Under the original budget for the CSSI program, as approved by USAID, Bob Abma was to spend 70 % of his time of CSSI in the first two years of the program (7/03 through June 05) and only 15 % in the third year (7/05-6/06). (X-43 at CP 1054)

ii. Cooper spoke to Harry Dorcus about his concerns by telephone in September of 2003, telling him that under the CSSI budget the deputy finance director was scheduled to take over Abma's duties in the third project

year.  Dorcus replied that that plan was still in place, but that Abma would

continue to live in Central Asia and reach out to many projects in the region.

(Cooper decl. ¶ 13)

iii.  Ara Nazinyan has sworn that Abma's sole concern, when discussing new

projects or extensions of new projects, was getting 5% of the project's budget

to support his position.  (Nazinyan decl. at ¶ 6)

8.     After the reorganization of August 2004, Cooper returned to Almaty, Kazakhstan

and worked as usual on his projects. Counterpart found no problem with Jay Cooper's job

performance in the three months he worked under Michael Kunz's supervision until Kelli

Boyer arrived in Almaty.  [**CONTRAST**:  Defendant's Statement ¶¶ 43-44, 46-55,

concerning Counterpart's claim about Lear's perceptions about Cooper, and that Boyer's

reports about Cooper were accurate, that Counterpart reasonably relied thereon, and that

Counterpart terminated Cooper because of dissatisfaction with his job performance, and

that Counterpart acted in good faith in so doing.]

a. By the end of August, Cooper had accepted the new structure, wanted to move

ahead, and was positive about working with Michael Kunz.  (Cooper dep. at

113-18)  After spending ten years in Central Asia working on civil society

projects he wanted to see these projects through.  The projects were absolutely

Cooper's priority.  (Cooper dep. at 104-05; Cooper decl. ¶ 17)

b. Cooper worked as usual on his projects once he returned to Almaty. (Cooper

decl. ¶ 19; Declaration of Irina Kolmakova ("Kolmakova decl.") at ¶ 2;

Declaration of Vaslat Akhmetov ("Akhmetov decl.") at ¶ 7; Declaration of Igor

Storozhenko ("Storozhenko decl.") at ¶ 3).  Although Cooper asked Boyer for

clarification of Arlene Lear's promise of six months of salary made at the August 18 meeting, he did not give it much thought as he was not planning to leave and planned to stay through the end of his contract in June of 2006. (Cooper dep. at 105-06, 111-12; Cooper decl. ¶ 24)

c.  Kunz was not often present at Counterpart's Almaty office during this three month period.  He had many responsibilities on projects other that CSSI and HNCBI, many of which required travel to countries in which those projects did not operate.  (See Cooper decl. ¶ 23 & JCX-B; Dorcus dep. at 348-51; CPADMISS ¶¶ 79-81, discussed *infra* at Genuine Issues No. 11b]  He was also on vacation for two weeks in September (X-58 at CP3362).

d.  Cooper too was often traveling on CSSI or HNCBI business during this period. (Cooper decl. ¶¶ 19)

e.  Cooper did not refuse to meet with Kunz, although regularly scheduled meetings were sometimes cancelled due to travel or at the choice of Michael Kunz.  (Cooper decl. ¶ 26 & JCX-D; CPADMISS ¶¶ 71-72)

f.  On September 24, 2004, Kunz sent Cooper an email thanking him for "today's meeting" which Kunz described as "really productive."  CDADMISS ¶¶ 69-70)

g.  Kunz reported to Lear before Boyer's arrival in Almaty that he had met with Jay periodically.  (Lear dep. at 153)  Irina Kolmakova, the office's HR and Administrative Manager, observed them in normal meetings. (Kolmakova decl. ¶ 2)

h.  One meeting was ultimately scheduled for October 8, 2003.  (Cooper decl. at ¶ 24 & JCX-C).  This was evidently the one meeting Cooper remembered at the

time of his deposition, which he described as in mid-October, at Cooper's request, and about the projects.  (Cooper dep. at 122; CPADMISS ¶ 74)

i.  Cooper and Kunz had a conversation at the end of this meeting about how the new arrangement was working; Cooper testified that he and Kunz agreed that they were doing just fine, and Kunz reported that exchange to Lear.  (Cooper dep. at 122-23, 169; Lear dep. at 153)  Cooper felt that things were going along very well and that there were no issues.  (Cooper decl. ¶ 26; Cooper dep. at 123-27)

j.  As JCX-C shows, Kunz also invited Cooper to attend a budget meeting with him and Abma on that same day, which Cooper did.  (See *infra* at Genuine Issue No. 12)

k.  Michael Kunz communicated no criticism to Cooper about Cooper's performance during the three months he acted as Cooper's supervisor. (Cooper decl. ¶ 31)

l.  On the contrary, Kunz sent Cooper an email on October 6, 2004 congratulating him and the Country Director for CSSI in Turkmenistan on the execution of a successful conference in Turkmenistan.  (X-23;Cooper decl. ¶ 31)

m.  Lear took no steps to have monthly check-in sessions with Cooper and Kunz as she had promised in the telephone call of August 25, 2004 (see CPX-D;[11] Cooper dep. at 104, 122-29).  Despite that promise, Lear testified that it would have been up to Kunz and Cooper to ask her for such sessions if there had been any problems.  (Lear dep. at 142-44)

---

[11]  CPX-D was marked and discussed at depositions in this case as Exhibit 12.

n. Lear has admitted that Kunz made no report of problems with Cooper to Lear until after Kelli Boyer had visited Almaty. (Lear dep. at 142, 146-48)

o. Lear did not communicate with Cooper at all between August 25, 2004 and November 14, 2004 when she called Cooper to announce his termination, although she apparently often spoke with Kunz. (Lear dep. at 152-53; Cooper decl. at ¶¶ 7, 33)[12]

p. She took no steps, directly or indirectly, to inform him of any objections she had to his performance during the three months he reported to Michael Kunz. (Cooper decl. ¶¶ 18, 33)

q. Once Boyer came to Almaty, Boyer and Kunz reported to Lear that Cooper "refused to meet with Michael." (Boyer dep. at 112; Lear dep. at 148-50) Boyer's rendition of that event is contradicted by Cooper. (See Cooper decl. ¶¶ 36-37; Genuine Issues No. 18d, *infra*.)

9. Counterpart abolished its Grievance Procedure in October of 2004 because it planned to terminate Jay Cooper[13] and wanted to prevent him from invoking the Grievance Procedure to challenge the proffered reasons for his termination and expose Counterpart's financial irregularities, and it then tried to cover up that fact by the late production of a highly questionable document. **[CONTRAST:** Both Lear and Dorcus testified that the

---

[12] Plaintiff was unable to verify Cooper's testimony (Cooper decl. ¶¶ 4, 18) that he received only very sporadic telephone calls from Lear in the months before and after August 2004 because Counterpart does not keep records that show from which extension a telephone call is originated or received. (Dorcus dep. at 367-69) The partial records from Ms. Lear's home phone reveal only two brief calls in the period and Cooper has sworn that neither produced a connection or resulted in a conversation. (Cooper decl. ¶ 7)

[13] The abolition may also have been aimed at preventing a Counterpart Vice President named Brian Propp from filing a grievance. Propp, who was fired on October 12, 2004, a few months short of his tenth anniversary with Counterpart, was the third highest-paid employee of Counterpart at the time and had complained about Counterpart's misuse of NICRA funds to cover losses of its for-profit subsidiary. (Propp dep. at 6-21) Propp has sued Counterpart for age and national origin discrimination and retaliation in the Superior Court for the District of Columbia, which action is pending. (Id. at 28) Propp's and Cooper's terminations were the only terminations of a senior person at Counterpart that Kelli Boyer ever worked on. (Dorcus dep. at 42)

abolition of the Grievance Procedure in October of 2004 bore no relationship to Counterpart's decision to terminate Cooper.  (Lear dep. at 245; Dorcus dep. at 201-02); **CONTRAST ALSO:**  Lear denied ever seeing the email that announced the abolition of the Grievance Procedure on October 6, 2004.  (Lear dep. at 239-41)  **CONTRAST ALSO:** Counterpart's later claim, described below, that the Grievance Procedure had been abolished in May of 2003**;  CONTRAST ALSO:** Defendant's Statements *passim* to the effect that Counterpart had a good-faith belief that Cooper's job performance merited termination; CPADMISS ¶ 49]

    a.   As of September of 2004, Counterpart knew that Cooper was complaining about financial irregularities and the use of funds from the programs he administered for other purposes. (X-32, Answ. No. 14; Genuine Issues No. 11, infra)  [**CONTRAST:**  Lear Decl. at ¶¶  33-35]

    b.   On October 6, 2006, Kelli Boyer, Counterpart's Manager of Human Resources emailed an announcement to headquarters staff and copied all overseas managers including Cooper instructing them to remove Counterpart's Grievance Procedure from the Handbook.  Boyer's email explained that this was because the Grievance Policy was redundant in light of Counterpart's Open Door Policy. (X-37).

    c.   Counterpart's Grievance Procedure (X-7 at CP0597-99) had been included in Counterpart's Manual for Employees in Foreign Areas for several years.  (Lear dep. at 233)  It was designed to "ensure that [employees' problems] receive prompt and fair consideration" and "to correct the factual situation, which forms the basis of the grievance."  (X-7 at CP 0596-97)

24

d.  On May 3, 2006, Counterpart revealed in its Response to Plaintiff's Second
    Request for Production of Documents that there were no amendments to the
    March 2001 version of the Manual, but that "The Manual's grievance policy was
    revoked by memorandum dated May 16, 2003.  The Manual is currently in the
    process of being revised for the first time since the March 2001 edition . . . ."
    (Douglass decl. ¶ 6& PDX-F)

e.  Both Lear and Dorcus testified that no revision of the Manual without the old
    Grievance Procedure had been circulated to Counterpart employees until long
    after Cooper's termination. (Lear dep. at  243 (revised grievance procedure
    "currently being finalized now", in deposition on January 13, 2006); Dorcus dep.
    at  199-202, 218-19 (grievance policy not reinstated, upon advice of counsel; a
    revision of the handbook came out in the last three or four months, in
    deposition on August 29, 2006)

f.  Minutes of a meeting of Counterpart's Senior Management Team on October
    19, 2004, reflect management's recognition that replacing the grievance policy
    with the open door policy was a "recent policy change." (X-38 at 000275)

g.  Despite many entreaties by Plaintiff's counsel, Counterpart did not produce that
    May 16, 2003 memorandum until the last day of discovery. (Douglass decl. ¶ 8;
    X-78)

h.  Review of that memorandum reveals that it speaks of the discontinuance of
    "the grievance procedure as set forth in section 6.20 of the Employee
    Handbook" and that "experience has indicated that the procedure was
    ineffective."  (X-78)  The Grievance Procedure is section 7.17 on page 22

through 25 of the Manual for Employees in Foreign Areas, and there is no section 6.20 in that Manual that X-98 could have been meant to amend. (X-7 at CP0596-99) (Dorcus dep. at 392- 97)

i. Once the Court permitted discovery on newly produced documents, Mr. Dorcus' deposition was reopened and he was asked about the memorandum which he supposedly authored.  He testified that he was not the author, that it was authored by Counterpart's counsel and that he does not know if it was disseminated but that he was "told" that it was.  (Dorcus dep. at 392-93)

j. Cooper never saw X-78 until it surfaced in discovery in this case.  (Cooper decl. ¶ 25)  Brian Propp, who was Counterpart's Vice President and General Director of the Community and Humanitarian Assistance Division until October 12, 2004 never saw X-78.  (Propp decl. ¶ 3)  According to both Mr. Propp and Mr. Cooper, Counterpart's CEO Lelei Lelaulu had a policy that memoranda to all employees at Counterpart should be issued only over his signature, and on this basis doubt that X-78 was ever disseminated.  (Propp decl. ¶ 4; Cooper decl. ¶ 25) Mr. Dorcus could not say whether in May of 2003 such a memo would have been sent out over his name.  (Dorcus dep. at 396)

k. Dorcus could point to no experience that indicated that the grievance procedure was ineffective, but described Counterpart's motivation as "just to have a more just policy," and explained the reference to the procedure's being ineffective as "just the way this was worded."  (Dorcus dep. at 396-97)

l. Lear testified for the corporation that the only time she knew of a grievance being filed was when a man named Aaron Chassey filed a grievance against

26

her after his termination. (Lear dep. at 234, 236).  When the Court ordered production of that grievance, which accused Lear of abusive treatment and challenged her basis for terminating Chassey, we learned that it was filed on April 7, 2003.  (X-79; Dorcus dep. at 398)

m. Mr. Dorcus testified that he had never heard of a grievance against anyone at Counterpart as of May 16, 2003, the date on the memorandum that is X-78. (Dorcus dep. at 397)  Dorcus confirmed that "there was no instance in which it had ever been used, contending that Aaron Chassey's complaint against Lear (X-79) was not a grievance.  (Dorcus dep. at 396-97, 403-06)

n. Upon being reminded that Chassey's grievance had been filed approximately five weeks before X-78, Dorcus denied that it was Counterpart's experience with Chassey's grievance that had led Counterpart to conclude that the grievance procedure was "ineffective;" he stated that Counterpart's practice is "to turn these matters over to an attorney."  (Dorcus dep. at 398)

o. Counterpart witnesses differ as to what the company did with Mr. Chassey's grievance.  Lear testified that Chassey's grievance was investigated by Counterpart's HR department and its legal counsel, and the conclusion was that the grievance was unfounded.   (Lear dep. at 262-63)  Dorcus testified that aside from the fact that Counterpart's CEO talked to Lear, no investigation of Chassey's grievance was had, because management considered it "unfounded."  (Dorcus dep. at 401-02)

10. Counterpart's management knew before Cooper's termination that its Open Door policy was inadequate to protect employee rights. [**CONTRAST:**  X-37; CPADMISS ¶ 50;

Defendant's Statement *passim* to the effect that Counterpart had a good faith belief that Cooper's job performance merited termination. **CONTRAST ALSO:**  Harry Dorcus' testimony that he was confident that Cooper had been treated fairly because he had been accorded the August meeting (which he termed a "retreat") and because Lear told him that she had given Cooper months of warning, months of discussions in numerous telephone calls [14] affording him chances to modify his behavior and "options" other than working for Kunz or termination.  (Dorcus dep. at  37, 45, 73-78, 237-38)]

      a.   Minutes of a meeting of Counterpart's Senior Management Team on October 19, 2004, reflect management's recognition that replacing the grievance policy with the open door policy resulted in a "potential oversight" of employees' rights.  (X-38 at 000275)

      b.   Among the employee rights that the Senior Management Team considered it important to protect were the employee's right to confidentiality, detailed guidance as to where to go if an immediate supervisor is not approachable, instructions on how to resolve disputes and an option for written grievances. (X-38 at 000275)

      c.   Counterpart admits that it was announced on October 26, 2004 that two members of its Program Management Team were revising the company's Open Door Policy to include greater specificity, but that no such revision has been produced.  (CPADMISS ¶¶ 50-51)

      d.   Counterpart belonged to an association of non-profit development organizations by the name of The American Council for Voluntary International

---

[14] Plaintiff contends that no such telephone calls took place.  See Cooper decl. ¶¶ 4, 6, 8, 18, 33 and *supra* at Genuine Issues No. 4.

Action ("InterAction") which required its members to have policies to address complaints and prohibit retaliation against whistleblowers. (Dorcus dep. at 228-34) Mr. Dorcus admitted he did not know if there was any way to address complaints at the time Jay Cooper was fired. (Dorcus dep. at 233-34)

e. Despite having no whistleblower policy (see Lear dep. at 247-48; Dorcus dep. at 155-56, 232-33; CPADMISS ¶¶ 42-48), one month before Cooper's termination, Counterpart's senior management expressed the need to "clarify" its whistleblower policy to include the option of going to the Board of Directors for support. (X-39 at 000268) (Dorcus dep at 232-33) [**CONTRAST**: Boyer dep. at 166-68, where she testified that Counterpart did had a whistleblower policy that was added as an addendum to the Manual before October of 2004]

11. Jay Cooper had complained to appropriate officials at Counterpart about financial irregularities he had encountered in Counterpart's offices in the Central Asian Region in 2003-04, and became increasingly concerned after those practices escalated in the Fall of 2004. [**CONTRAST:** Defendant's Statement at ¶¶ 70-77; Lear Decl. at ¶¶ 33-34, denying that she discussed financial irregularities with Cooper or believed Cooper possessed information about financial irregularities. **CONTRAST ALSO:** Dorcus's denial that he knew that Cooper was complaining about all of the housing costs for Kunz and Abma being charged to his projects. (Dorcus dep. at 334)]

a. Cooper had complained about various financial practices that he viewed as improper before the management change on August 2004. (Cooper decl. ¶¶ 12-16;X-32 at Answr. No. 14)

29

i.  Cooper complained to Bob Abma about charging most of the expenses of
Abma and Kunz to the projects Cooper managed, despite the fact that they
spent only a percentage of their time on these projects.  (Cooper decl. ¶ 12;
X-32 at Answr. No 14 at ¶ 5)

    1.  Lear testified that Cooper might not have "explicitly stated it in this
way," but that Counterpart was "very careful" and that Bob Abma
had "a formula for allocating these costs."  (Lear dep. at 198)

    2.  Lear acknowledged that Cooper had discussed the matter with her
as well, testifying that "Jay and I disagreed on this issue" and that
she felt that "people were accurately charged . . . we had time
sheets that . . document time allocated."  (Lear dep. at 197-98)

ii.  He complained to Abma about charging expenses to projects that had
nothing to do with those projects.  (Cooper decl. ¶ 12; Nazinyan decl. at ¶ 6)

iii.  He also complained to Abma about the Washington DC office using project
funds for impermissible purposes and amounts, and Abma often expressed
agreement with that objection.  (Cooper decl. ¶ 16; X-32 at Answr. No. 14 at
¶ 2)

iv.  He had complained to Lear about Headquarters spending project funds
beyond budgeted amounts on many occasions, to be met with Lear's
insistence that she had 100% line item flexibility and could shift project funds
from field to Headquarters and vice versa at will. (Cooper decl. ¶ 16)

    1.  Lear testified as follows on the subject, in effect admitting that
Cooper had complained to her about this subject:  "So Jay Cooper

might not have liked our spending more at HQ, but in terms of the legal liability to USAID, nothing was breached. We were totally compliant." (Lear dep. at 190)

v. He complained to Dorcus about Abma's paying mortgage payments for his romantic partner (X-32 at Answr. No. 14 at ¶ 1; Cooper decl. ¶ 14; Dorcus dep. at 334-35).

vi. He complained to Lear about using staff time and project funds to pay for the development of new projects. (Cooper decl. ¶ 20; X-32 at Answr, No. 14 ¶ 4)

    1. Cooper, as Chief of Party had received a serious letter of concern from the former head of USAID in the Region in 2001 complaining about Counterpart developing projects using staff assigned to implemented award contracts. Cooper discussed this matter with Lear, who was concerned with reducing damage to Counterpart's reputation. (X-32, Answr. No. 14 ¶ 4)

    2. Arlene Lear testified for the corporation that she had discussed that matter with Cooper and that Counterpart had instituted a "program development council" at Headquarters that has responsibility "for the most part" for new proposals. Lear testified that this improvement "significantly ameliorates the problem." (Lear dep. at 195-97)

    3. Yet a review of the time sheets of Lear, Kunz and Abma reveals that during 2004 only thirteen hours were billed by any of the three to proposal writing (code 955); Abma billed three hours to 955 in

31

February (X-57 at CP3290) and ten hours to 955 in May (X-57 at 3300).  (See Douglass decl. ¶¶ 9-11 & PDX-G, H & I.) Dorcus testified that proposal writing (code 955) was charged to NICRA. (Dorcus dep at 286)

4.  Kunz charged a very small percentage of his expenses during a trip to Armenia in December of 2004 to code 961, which Dorcus identified as an Armenia overhead account, with other expenses for that trip charged to CSSI (code 452) and HNCBI (code 449), neither of which operates in Armenia.  (Dorcus dep at 348-49, X-71 at CP 4391-92)

5.  Cooper has said that although a new account had been established for this purpose, its use was not "encouraged." (Cooper decl. at ¶ 16)

vii.  He also complained to Lear that headquarters personnel were permitted to charge higher per diem rates when traveling on his projects than did ex-pats or nationals working on the same projects. (X-32 at Answr.No. 14 ¶ 3) Lear testified that Cooper had indeed complained to her about this and asserted that she had "no control" over the rates because they had been set by Mr. Cooper's predecessor as Chief of Party.  (Lear dep. at 193-94)

viii.  He also complained to Dorcus about Abma's extending his stay on the CSSI and HNCBI projects while spending time developing budget for new projects for headquarters, but Dorcus reassured Cooper that they were securing new funding for that work. (Cooper decl. at ¶ 13)

b.  Michael Kunz' role and job responsibilities in Almaty after August 18, 2004 were
far broader than simply to supervise Cooper's and Abma's work on the CSSI
and HNCBI programs.  Arlene Lear made it clear, in circulating Kunz' 10-page
job description to managers in many countries on October 13, 2004, that Kunz'
role as Regional Director for Eurasia, Middle East, and South East Asia was to
encompass all the geographic areas referenced in his job title, and involve
"cross border exchanges of . . . staff among Counterpart projects covering
these geographic areas . . . ." She made it clear that his efforts should include
projects in Armenia, Bulgaria and Viet Nam in addition to the countries served
by the CSSI and HNCBI projects, and that he should oversee new program
startup/implementation there.  (Cooper decl. ¶ 23 & JCX-B; see also
CPADMISS ¶¶ 79-80, referencing the first 3 pages of JCX-B)

c.  Cooper became increasingly concerned about the improper charging of travel
expenses to the CSSI and HNCBI programs in the Fall of 2004, as Kunz and
Abma began to be out of the Almaty office on travel more and more often
attempting to develop new projects for Counterpart.  (CPADMISS at ¶ ¶ 81-83;
Cooper decl. at ¶ 23; Dorcus dep. at 348=51)

  i.  Analysis of the timesheets filed by Michael Kunz reveals that between
September 1 and November 15, 2004, Kunz charged time on four projects
other than CSSI and HNCBI, including 10 hours on a project in Armenia, 77
hours on a Microeconomic project in Uzbekistan and 42 hours on a project in
Iraq.  (Douglass decl. ¶ 9 & PDX-G)

ii. Analysis of the timesheets filed by Bob Abma reveals that between September 1 and November 15, 2004, Abma charged time on four projects other than CSSI and HNCBI, including 41 hours on a project in Armenia, 43 hours of a food security in Tajikistan and 59 hours on a project in Iraq. (Douglass decl. ¶ 10 & PDX-H)

iii. Analysis of the financial records of Counterpart for the same period reveal that Abma's salary and fringe benefits were being paid only from funds from the CSSI project (75%) and the HNCBI (25%).

d. On September 3, 2004, Abma sent an email to Kunz and Cooper reviewing the spending for the CSSI and HNCBI spending against budget. In that email, Abma concluded that the HNCBI program was "under spent" and recommended that these funds be reallocated to make up for 1) significant projected deficits in the Regional Office, for 2) small deficits on the CSSI projects in three countries and for 3) "other projects" in two countries not covered by CSSI. (Cooper decl. ¶¶ 20-22 & JCX-A; CPADMISS ¶ 64 [**CONTRAST:** CPADMISS ¶¶ 6568, where Counterpart denies that JCX-A says that.]

e. Abma found that the deficits in the Regional Office were due to "spending in salaries, benefits and travel" for "expats. (JCX-A) The term "expat" refers to American or other non-residents of the host country. (Boyer dep. at 97-98) Kunz, Abma and Cooper were "expats" employed by Counterpart's Regional Office. [**CONTRAST:** CPADMISS ¶ 66, where Counterpart denies that JCX-A refers to spending of dollars for the CSSI and NHCBI programs as direct

34

program costs on items such as the salaries, fringe benefits and travel of

Cooper, Abma, Kunz and other Almaty-based Counterpart employees.]

12.   Within weeks of his termination, Cooper refused to approve a budget created by Bob

Abma and supported by Michael Kunz that would have permitted charging costs associated

with an unrelated project to the programs Cooper managed. [**CONTRAST:**  Dorcus' attempt to

suggest that an allocation for "Eurasia Regional travel" in X-46 might be for the benefit of the

CSSI and HNCBI projects because "those guys down there only had so many things to do, and

most of it was in support of those two programs." (Dorcus dep. at 167)  **CONTRAST ALSO:**

CPADMISS ¶¶ 85-87, denying that Abma and Kunz proposed using CSSI and HNCBI funds

for an assistant or that Cooper objected to that proposal, and denying that the CSSI and

HNCBI program parameters did not include activities associated with the Eurasian assistant or

Eurasian travel.]

    a.  Kunz asked Cooper to meet with him and Abma on budget issues on October

8, 2004.  (See *supra* at Genuine Issues No. 8e & JCX-C)  Abma presented a

spreadsheet that showed unused funds in the CSSI and HNCBI programs and

suggested that these funds be used to hire a person to serve as Eurasia

Assistant to support Kunz and for Abma and for travel for both of them in the

Eurasia region.  Cooper knew that Kunz' job included developing new projects

for Counterpart in the Middle East and elsewhere, because he had been given

Kunz' job description at the August 18 meeting and had received Lear's email

(JCX-B) referenced in Genuine Issues No.11b, *supra*.  Cooper objected to

having an assistant hired out of his projects' funds for this purpose and

expressed that objection to Kunz and Abma.  (Cooper decl. ¶¶ 27-28)

b. Later on October 8, 2004, Abma sent Cooper an email attaching a spreadsheet

Comment [PD1]: Okay?

that he termed the Budget Allocation process. While Abma had not included

funds for the salary of an Eurasian assistant, that budget proposed charging the

CSSI and the HNCBI each for 25 % of the amounts to be spent for travel for the

"Eurasia Regional" project. (X-46 at 000073; CPADMISS ¶ 77)

c. The reference to "Eurasia Regional" on the spreadsheet attached to X-46 is a

fund designed to support efforts by Kunz and Abma to travel to Armenia and

other countries in an attempt to procure new programs for Counterpart. (Cooper

decl. ¶ 28) **[CONTRAST**: CPADMISS ¶ 78, where Counterpart declines to

admit or deny that statement.]

d. By email dated October 21, 2004, Cooper replied to Abma by email, refusing

"to approve funds from CSSI or HNCBI to be used for anything other than those

projects." (X-45; Cooper decl. ¶ 27) Cooper also suggested in that reply email

that a full time financial person was needed to track closely all costs for those

projects, since "Bob will be spending a great deal of time away from the

CSSI/HNCBI projects" because he "will be working in the Eurasia Regional

Office." (X-45; Cooper decl. ¶ 29)

e. Cooper sent a copy of his October 21, 2004 email to Harry Dorcus,

Counterpart's Chief Financial Officer, who would have to approve hiring the

Comment [pdd2]: Is this correct?

new financial person. (X-45; Cooper dep. at 244-45; Cooper decl. ¶ 29)

**[CONTRAST:** CPADMISS ¶ 89, where Counterpart appears to deny that X-45

was received by its addressees]

f. Dorcus admitted that he assumes he saw X-45 because it was sent to him, but
it never came to his attention and he did nothing in response. (Dorcus dep. at
156-59; Cooper decl. ¶ 30)

13. Counterpart was obliged to abide by OMB Circular No. A-122, Cost Principles
for Non-Profit Organizations, made applicable by virtue of 22 C.F.R. 226, in connection with
its performance of projects under Cooperative Agreements with the United States Agency
for International Development ("USAID") ("the USAID Cost Standards") [**CONTRAST**:
Harry Dorcus testified that in the case of a cooperative agreement, as opposed to a grant,
USAID mainly focuses on whether the grantee achieves the objectives (deliverables) of the
program, and swore that the U.S. government is "much softer" in the case of cooperative
agreements. (Dorcus dep. at 374-76) Arlene Lear similarly testified that "there's more
flexibility under a cooperative agreement than there would we under a contract, a direct
contract with USAID." She claimed that once you "meet your program objectives, then
there is much more flexibility in moving those line items around." (Lear dep. at 192-93)
**CONTRAST ALSO**: Dorcus' repeated testimony that the USAID Cost Standards permit
Counterpart to treat NICRA funds as fungible and to use them for any purpose
management deems to be in the interest of the corporation. (Dorcus dep. at 113, 118-20)]

a. The USAID Cost Standards explicitly state that they apply to Cooperative
Agreements. (X-41, Attachment A at 1, ¶ 3a)

b. The Cooperative Agreement under which the CSSI project was awarded to
Counterpart explicitly requires Counterpart to abide by 22 C.F.R. Part 226. (X-
53 at CP2931)

c. Mr. Dorcus, Counterpart's COO and CFO, repeatedly testified, despite his sworn statement quoted above, that the USAID Cost Standards govern in the case of cooperative agreements and that Counterpart adheres to those Cost Statements.  (Dorcus dep. at 10-11, 107, 374-76)

d. The USAID Cost Standards describe what costs are "allocable" to a particular project funded by USAID as follows, in relevant part:  "a. A cost is allocable to a particular cost objective, such as a grant, contract, project, service or other activity, in accordance with the relative benefits received.  A cost is allocable to a Federal award . . . if it (1) Is incurred specifically for the award. (2)  Benefits both the award and other work and can be distributed in reasonable proportion to the benefits received. . . . b. Any cost allocable to a particular award or other cost objective under these principles may not be shifted to other Federal awards to overcome funding deficiencies . . . "   (X-41, Attachment A at 6-7, ¶ A4)

e. It was the responsibility of Bob Abma, under the supervision of Harry Dorcus, to make the allocations of direct costs among the programs Counterpart ran in Central Asian region, as well as -- on a short-term consulting basis -- among projects in other nearby countries.  (Dorcus dep. at 149-51, 161)  Dorcus himself, in conjunction with the Counterpart Vice Presidents, took on responsibility for dividing NICRA funds expected to be received from USAID to compensate Counterpart for indirect costs, mainly the expenses of the company's Washington headquarters.  (Dorcus dep. at 113-21)