14.     Counterpart routinely disregarded its obligations to allocate direct costs among the programs that benefited from those costs as required by the USAID Cost Standards, as Counterpart spent funds generated by the CSSI and HNCBI projects for purposes other than the benefit of those projects, including salaries, fringe benefits, housing allowances, travel expenses and miscellaneous matters benefitting other Counterpart programs and new program development.  [**CONTRAST:** Dorcus dep. at 152-55,  157-62, defending Counterpart's allocation policies for direct costs, Abma's budget proposals and various particular expenses]

      a.  Salary and fringes.  Dorcus admitted that salary, fringe benefits and holidays should be charged as direct costs to each program an employee works on in proportion to the time that employee spends working on the project as evidenced by his timesheets.  (Dorcus dep. at 271-73, 279, 289, 291)  Attached as exhibits to the Douglass decl. are charts summarizing the time sheets for calendar year 2004 of Michael Kunz (PDX-G), Bobby Abma (PDX-H) and Arlene Lear (PDX-I).[15]

         i.  ***Lear and CSSI:***  JCX-E attached to the Cooper decl. contains a spreadsheet labeled "Lear CSSI" summarizing payments from the CSSI account to Arlene Lear in FY 2004.  Lear CSSI shows that Arlene Lear was paid by the CSSI program salary and benefits[16] totaling at least $ 83,229.32 during FY 2004.

            1.  Lear's total compensation for FY 2004 was $ 149,001, and that number included a bonus of $ 16,000 for FY 2003 at least $ 3,802

---

[15]  Douglass decl. ¶¶ 9-11 explain how those charts were prepared using X-58, X-57 and X-55, respectively.

[16]  Beginning in February of 2004, Counterpart stopped accounting for medical benefits to employees on an individual basis. Accordingly, the amounts listed in this and successive paragraphs understate total payments of salary and benefits paid from CSSI and HNCBI program funds to Lear, Kunz and Abma.  (Cooper decl. at ¶ 52)

of which was paid by the CSSI program. (X-49 at Statement 9; CPADMISS ¶ 62; X-56; Cooper decl. at ¶ 51 & JCX-F)

2. Thus at least 55.8 % of Lear's compensation and benefits for FY 2004 were charged as direct costs to the CSSI program.

3. PDX-I attached to the Douglass decl. demonstrates that Arlene Lear's timesheets for calendar year 2004 show that she spent only 39.02% of her hours during that year working on the CSSI project.

4. PDX-I also shows that Lear charged 46% of her holiday and vacation time to the CSSI program in calendar year 2004.

5. The CSSI budget reveals that at the beginning of the CSSI program Lear was scheduled to spend only 10% of her time on the CSSI project in 2004. (X-43 at CP1055)

ii. *Lear and HNCBI*.  JCX-E attached to the Cooper decl. contains a spreadsheet labeled "Lear HNCBI" summarizing payments from the HNCBI account to Arlene Lear in FY 2004.[17]  Lear HNCBI shows that Arlene Lear was paid salary and benefits[18] totaling at least $ 30,674.12 from funds for the HNCBI program in FY 2004.

1. Lear's total compensation for FY 2004 was $ 149,001.

2. Thus at least 20.5 % of Lear's total compensation and benefits was charged as a direct cost to the HNCBI program in FY 2004.

---

[17]  Cooper decl. ¶ 53 explains how that spreadsheet was prepared using financial records produced by Counterpart.

[18] See note 17, *supra.*

3.  PDX-I attached to the Douglass decl. demonstrates that Arlene Lear's timesheets for calendar year 2004 show that she spent only 14 % of her hours during that year working on the HNCBI project.

4.  PDX-I also shows that Lear charged 21.33 % of her holiday and vacation time to the HNCBI program in calendar year 2004.

5.  The CSSI budget reveals that at the beginning of the HNCBI program Lear was scheduled to spend only 5% of her time on the CSSI project in 2004. (X-44 at CP 1070)

iii.  ***Kunz and CSSI:***  JCX-E to the Cooper decl. contains a spreadsheet labeled "Kunz CSSI" summarizing payments from the CSSI account to Michael Kunz.[19]  Kunz CSSI shows that Michael Kunz was paid by funds from the CSSI program salary and benefits[20] totaling at least $ 59, 188.78 in FY 2004.

1.  Kunz's total compensation for FY 2004 is unknown to Plaintiff, but was in any event less than $ 92,083, as he is not listed as one of the highest paid employees other than officers, directors and trustees on Counterpart's Form 990, and $ 92,083 is the lowest salary listed there.  (See X-49 at Schedule A.)

2.  Thus assuming Kunz's compensation for FY 2004 was as high as $ 90,000, at least 65 % of Kunz's total compensation and benefits were charged as direct costs to the CSSI program in FY 2004.

---

[19] Cooper decl. ¶ 59 explains how that spreadsheet was prepared using financial records produced by Counterpart.

[20]  See note 17, *supra.*

3.  PDX-G attached to the Douglass decl. demonstrates that Kunz's timesheets for calendar year 2004 reveal that he spent only 49.18 % of his hours during that year working on the CSSI project.

4.  PDX-G also shows that Kunz charged 63.02 % of his holiday and vacation time and sick leave to the CSSI program in calendar year 2004.

5.  Counterpart paid Kunz a housing allowance of $ 1,800 per month. (X-69; Dorcus dep. at 332-33)  Of that, $ 1,200 per month (or 66.6%) was paid by CSSI (Dorcus dep. at 365-66; X-72 at CP4663-64; X-73 at CP3636) ( Dorcus dep. at 366) ]

    [**CONTRAST**:  Dorcus testified that a proper allocation would be "to bill his rent to those programs that had a rental budget in the grant for his particular position."  (Dorcus dep. at 332)]

iv.  ***Kunz and HNCBI***.  PDX-K attached to the Douglass decl. shows that Kunz's timesheets for calendar year 2004 show that he spent only 1.31 % of his hours during that year working on the HNCBI project.

1.  PDX-K  also shows that Kunz charged 2.52 % of his holiday and vacation time to the HNCBI program in calendar year 2004.

v.  ***Abma and CSSI.***  A spreadsheet in JCX-E labeled "Abma CSSI" is a spreadsheet summarizing payments from the CSSI account to Bobby Abma in FY 2004.[21]   Abma CSSI shows that Abma was paid by the CSSI program salary and benefits[22] totaling at least $ 47,392.66 for FY 2004.

---

[21] Cooper decl. at ¶ 56 explains how that spreadsheet was prepared using financial records produced in discovery by Counterpart.

1. Abma's total compensation for FY 2004 is estimated at $ 78,000. (Cooper decl. ¶ 58)[23]

2. Thus at least 60.75 % of Abma's total compensation and benefits were charged as direct costs to the CSSI program in FY 2004.

3. PDX-H attached to the Douglass decl. shows that Abma's timesheets for calendar year 2004 show that he spent only 31.78% of his hours during that year working on the CSSI project.

4. PDX-H also shows that Abma charged 58.35 % of his holiday and vacation time and sick leave to the CSSI program in calendar year 2004.

5. X-64 at CP4266 shows that Abma charged his apartment lease expenses for July-Sept. 2004 60% to CSSI (and nothing to any program other than CSSI and HNCBI).  X-66 shows that Abma charged lease expenses for Oct. – Dec. 2004 75% to CSSI (and nothing to any program other than CSSI and HNCBI).

   [**CONTRAST:**  Dorcus assumes this is because the other projects had no budget for housing costs and that USAID knew of or approved this because it had the right to inspect Counterpart records, including timesheets, although he has never known them to do so in the case of the Almaty program.  (Dorcus dep. 319)]

---

[22] See note 17, *supra.*

[23] Documents sufficient to show Abma's actual total compensation for FY 2004 will be subpoenaed for trial.

43

a.  Analysis of X-57 (Abma's timesheets) does not show an increase in time charged to CSSI as opposed to HNCBI in the Sept.-Oct. period as opposed to the July-Sept. period. (See PDX-H)

b.  In X-64 are documents that show that Abma leased an apartment from an Igor Yevgenievich Krayev (X-64 at CP 4268).

c.  In X-66 are documents that show that Counterpart charged Abma's lease payments to Krayev to CSSI.

d.  While Dorcus claimed not to know (Dorcus dep. at 121), Igor Krayev is Abma's romantic partner. (Cooper decl. at ¶ 13)

e.  Dorcus admitted he had approved Abma using his housing allowance to pay the mortgage on living quarters that Abma was purchasing.  Dorcus never approved Abma's leasing from his romantic partner; he never heard about a lease, only a mortgage.  (Dorcus dep. at 323, 335).

   i.  Counterpart's Manual states that Counterpart does not pay for or otherwise subsidize housing owned by the employee or the employee's family.  (X-7 at CP0581)

f.  Lear did not approve Abma renting an apartment and charging the rent to USAID.  (Lear dep. at 185)

44

vi. ***Abma and HNCBI***.  In JCX-E is a spreadsheet labeled "Abma HNCBI" which summarizes payments from the HNCBI program to Bobby Abma in FY 2004.[24]  Abma HNCBI shows that Abma was paid by the HNCBI program salary and benefits[25] totaling at least $ 23,726.77 in that year.

1.  Abma's total compensation for FY 2004 is estimated at $ 78,000. Thus at least 30.4 % of Abma's total compensation and benefits were charged as direct costs to the HNCBI program in FY 2004.

2.  PDX-H attached to the Douglass decl. demonstrates that Abma's timesheets for calendar year 2004 reveal that he spent only 21.77 % of his hours during that year working on the HNCBI project.

3.  PDX-H also reveals that Abma charged 29.02 % of his holiday and vacation time and sick leave to the HNCBI program in calendar year 2004.

4.  X-64 at CP4266 shows that Abma charged 40% of his apartment lease expenses to the HNCBI program between July and September of 2004 and nothing to any program other than CSSI and HNCBI.  [**CONTRAST**:  Dorcus's assumption is that no other project had housing allowance in its budget and that USAID knew of or approved this charging. (Dorcus dep. at 319)

b.  Travel expenses.  Travel expenses were not always allocated among the programs that benefited from them.

---

[24] Cooper decl. ¶ 56 explains how that spreadsheet was prepared using financial records produced by Counterpart.

[25] See note 17, *supra*.

i. X-59 contains (at CP4037) an expense voucher for incidental expenses incurred during a trip Bob Abma took to Tajikistan between March 28 and April 4, 2004.

    1. The expenses were charged to the HNCBI program (code 449).

    2. Abma's timesheets for those days (X-57 at CP3295-96) show he charged most of his time to other projects (20 hours to Food Security (code 669), 4 hours to World Bank Women Tajikistan (code 761), 2 hours to CSSI (code 452), totaling 26 hours), and only charged 2 hours to HNCBI (code 449).

ii. X-60 is an expense voucher for Abma's per diem expenses during travel to Ashgabad, Turkmenistan between May 1 and 8, 2004.

    1. The expenses were charged to CSSI (code 452).

    2. Abma's timesheets for those days (X-57 at CP3300) show he charged 35 hours of time during that trip, only 20 of which he charged to CSSI (code 452). [**CONTRAST:** Dorcus attributes this to a possible miscommunication between Abma and the accountant. (Dorcus dep. at 299-301)]

iii. X-62 contains a hotel bill for Arlene Lear's stay in Almaty between May 31 and June 3, 2004.

    1. The total cost was charged to CSSI (code 452).  Dorcus dep. at 307-08)

    2. Lear's timesheets for those four days (X-55 at  CP3570-71) show that Lear charged her time to four different programs (9 hours to

46

HNCBI (code 449), 4 hours to Civic Advocacy (code 448), 1 hour
to Bulgaria HQ (code 444) and 14 hours to CSSI (code 452)

[**CONTRAST:**  Dorcus testified that charging all this to CSSI "could
have to do with budgets." (Dorcus dep. at 308)

3. Dorcus assumes that another hotel bill for Lear in Almaty was
handled the same way.  (Dorcus dep. at 317-18)

iv. Bob Abma took an R&R trip to Washington and his travel was charged wholly
to CSSI and HNCBI (X-64 at 4214).  Kunz charged airplane tickets and a
hotel to CSSI for an R&R trip he took to Washington in December of 2004.

[**CONTRAST:**  Dorcus considered it proper to charge only "those projects
which have R&R travel in the budgets, despite the fact that Abma worked on
many other projects that may not have had R&R in the grants."  He testified
that is was proper under the USAID Cost Standards to simply charge the
programs that have the money for that purpose.  (Dorcus dep. at 313-14)
Dorcus explained the Kunz trip the same way: it was proper because "the
program was budgeted for his R&R." (Dorcus dep. at 347)]

v. Travel costs for the field staff for the Bulgarian Pilot Community under
Counterpart's Micro Enterprise Division were billed to CSSI on October 31,
2004.  (Dorcus dep. at 366)

vi. Lear charged CSSI for airfare and a travel advance for a trip to Central Asia
followed by four days in Sophia, Bulgaria in May of 2005, although CSSI
does not run a project in that country.  The trip also included six days in Paris
where Lear's husband lives.  (Dorcus dep. at 391-92)

47

c.   Training-related expenses (including travel for training) were also allocated only to projects that had a budget for training.

   i.   X-61 contains vouchers for Kunz and Lear to travel to Berlin. (Dorcus dep. at 301-03)

   ii.   Lear's tickets were charged to CSSI (code 452), but Dorcus cannot tell to what account Kunz's tickets were charged because the accounting records only record the notation "Regional MK." (X-61 at  CP4135, CP4143; Dorcus dep. at 303)

   iii.   The Berlin trip was between June 16 and 20, 2004. (X-61 at CP4143)  Kunz charged his time in this period to three different projects, CAP Iraq (9 hours, code 674), CAIP HQ (6 hours, code 657) and CSSI (6 hours, code 452).  (X-58 at CP 3352).

   iv.   Abma's travel expenses for the same Berlin trip were charged 75% to CSSI and 25% to HNCBI.  (X-64 at CP4214)

   v.   Dorcus described the trip as one to a conference for worldwide Counterpart training, and testified that it was proper not to allocate the expense among the various programs Kunz worked on "because every project might not have had a training budget" and when that happens "you go to the ones that do because in some the donor will give you a lost of different budgets and in others the donor will give you nothing." (Dorcus dep. at 302-07)

   vi.   X-72 at CP4729 reveals that $1,081 of a bill for Harry Dorcus at a hotel in Berlin was charged to the CSSI project.

**Comment [PD3]:** Jay – look what I found!

48

      vii. X-65 and X-67 show payment to an L. Kondik for Russian lessons for Abma, charged as "housing allowance" to the CSSI program (code 452) and the HNCBI program (code 449). [**CONTRAST:**  Dorcus considers these "most certainly a proper cost if it will allow Mr. Abma to do his duties better." Dorcus considers it a "training class" and thus proper to charge only to those projects "which had training costs in the projects allowed."  Alternatively, Dorcus claims X-67 may be a "Xerox copying error."  (Dorcus dep. at 329-30)]

   d.  Miscellaneous expenses were charged billed only to CSSI and not allocated, or billed in part to CSSI and HNCBI while having no connection to those projects..

     i.  A computer adapter for Michael Kunz was charged to CSSI (X-62 at CP4173, 4176; Dorcus dep. at 308-09)

     ii.  Bank charges for salary advances for Abma and Kunz are charged only to CSSI (see, e.g., X-63 at CP4193-94, X-70 at CP4352, CP4365).

     [**CONTRAST:**  Dorcus explained that it might have been proper to bill all bank charges in the Almaty office to the CSSI program "if that was the only program in that particular office that had budget for bank fees."  (Dorcus dep. at 311)]

     iii.  Postage for the Bulgarian Pilot fund was charged to CSSI on September 30, 2004.  (Dorcus dep. at 360-61)

     iv.  Michael Kunz billed HNCBI for an airport tax in Yerevan, Armenia, and various other expenses during a trip there and to Istanbul to CSSI and

49

HNCBI although CSSI and HNCBI do no business in Armenia. (Dorcus dep. at 348-53; X-71 at CP4391-92)[26]

    e.  Counterpart knew how to allocate expenses when it chose to do so.  For example,

        i.  The expense of a cartridge for the office Xerox machine was allocated on June 4, 2004 (X-62 at CP4173)

        ii.  The cost of an extension cord for the office and other minor expenses were allocated on October 26, 2004 (X-68; dorcus dep. at 330-32)

        iii.  The expenses for tea, sugar and coffee for the office were allocated on X-61 at CP4135.

15.  Counterpart improperly failed to allocate NICRA funds to uses for the individual awards which generated those funds, in violation of the USAID Cost Standards.  [**CONTRAST:** Ms. Lear's testimony the "we never used project funds for purposes that violated a NICA [NICRA] agreement."  (Lear dep. at 189) **CONTRAST ALSO:**  Both Lear and Dorcus testified that NICRA funds could be spent on any operational cost not tied to a specific program.  (Lear dep. at 188; Dorcus dep. at 118-20)]

    a.  The USAID Cost Standards require that indirect costs, as well as direct costs, be allocated.  (X-41, Attachment A at 12, ¶ D2)  Dorcus has testified that Counterpart uses the simplified allocation method to allocate indirect costs, and that this process has resulted in a negotiated indirect cost rate (NICRA) agreement applicable to all Counterpart programs of 28%.  This means that for

---

[26] Only a small portion of these expenses was charged to "Armenia overhead" (code 961). (Dorcus dep. at 348)

each dollar spent on an USAID program, Counterpart receives $ 0.28 of NICRA funds to spend on indirect costs. (Dorcus dep. at 110-16)

i.  The USAID Cost Standards require, however, that under the Simplified Allocation Method[27] the indirect costs are to be "distributed to individual awards" and such distribution must be "equitable."  (X-41 at 12-13, ¶ D2) [**CONTRAST:**  Dorcus interpreted the language of ¶ D2 to be inapplicable because all Counterpart projects receive the same NICRA rate of 28%, despite the referenced language in the Cost Standards about the allocation of indirect costs to individual awards.  (Dorcus dep. at 110, 126-28)]

ii.  Counterpart allocates the same amount of our individual cost rate to each project, says Dorcus.  (Dorcus dep. at 127)

iii.  Yet Dorcus testified that Counterpart used NICRA funds for headquarters expenses, and on an annual basis divided NICRA funds that were expected to be obtained in the coming year up between Counterpart's various Divisions based on judgments as to how the company wanted to support various programs.  Mr. Dorcus testified that all NICRA funds are fungible, and that he can use NICRA once it is received for anything that is legal for NICRA. He was unable to find a justification for this opinion in the USAID Cost Standards.  (Dorcus dep. at 116-18).

iv.  Counterpart's internal audit does not examine whether Counterpart properly allocates the NICRA it receives as a result of particular programs to individual awards and thus does not establish Counterpart's compliance with the

---

[27] Mr. Dorcus has testified that Counterpart uses the Simplified Allocation Method under the USAID Cost Standards. (Dorcus dep. at 108-09, 126)

Simplified Method.  [**CONTRAST:**  Counterpart contends that it has always been found in compliance with the USAID Cost Standards because it undergoes an annual audit that has always found it to be in compliance. (Lear dep. at 189)]

1.  Counterpart's audit for FY 2004 prepared by its accountants shows that total indirect costs for FY 2004 were $ 4,151,894.  (X-42 at CP1412)

2.  The Counterpart audit (X-42) represents that "a portion of total indirect costs is allocated to specific grants based on the allowed percentages included in the grant agreement."  (X-42 at CP 1412 (note 6))  Mr. Dorcus agreed that that was an accurate statement. (Dorcus dep. at 110)

   a.  Yet the allocation of indirect costs in that audit does not break out the $ 4.1 million of indirect costs between grants, simply assigning that sum to broad categories of 'program services" such as "relief," "institution building," business development," health and nutrition," etc. (X-42 at CP1403-04)

   b.  Although the CSSI program may be included within the umbrella of "institution building" and the HNCBI program may be included within the category of "health and nutrition," there is no indication in X-42 that an audit has reviewed and

approved allocation between individual awards (such as

CSSI and HNCBI) within those categories.

v. Brian Propp, former Counterpart Vice President who was terminated a month

before Cooper (see note 13, *supra*) and who had administered more than a

dozen agreements with USAID during his almost ten years at Counterpart

(including mostly cooperative agreements), testified that indirect expenses

are ones that it is impossible or inconvenient to account for as direct

expenses and that NICRA funds generated by a particular project are

supposed to be used to cover indirect expenses associated with that project.

(Propp dep. at 14)

vi. Propp also testified that in March of 2004, at a Counterpart Vice Presidents'

retreat, Dorcus presented budgets that shifted NICRA funds away from some

Divisions, including the Civil Society Division (Lear's Division) and

Humanitarian Assistance (Propp's Division) to pay for executive travel

designed to develop speculative tourism and environmental projects in other

Divisions unrelated to the projects that generated the NICRA as well as to

cover losses in a for-profit Counterpart subsidiary, and that those diversions

were an improper use of NICRA funds. (Propp dep. at 14-18)

vii. Propp testified that he and also "most of the other vice presidents," including

Arlene Lear, objected to this diversion. (Id. at 15-16)

viii. Harry Dorcus testified that Arlene Lear's Civil Society Division generated less

NICRA than other Divisions given the size of the projects she ran because

she bid for projects using grant pools that do not earn NICRA.  (Dorcus dep.

at 209-10, 412-14)  He conceded that this situation could provide a motive for

charging as many headquarters expenses as possible as direct project costs.

(*Id.* At 414)

16.  Counterpart, through Arlene Lear, routinely overspent project funds as direct costs at

Headquarters in excess of amounts set out for those purposes in project budgets

approved by USAID in improper reliance on the notion of "100% line item flexibility."

[**CONTRAST:**  Lear's testimony about 100% line item flexibility and that Counterpart

was "totally compliant." (Lear dep. at 190)]

    a.  Arlene Lear testified for the corporation that she had 100 % line item flexibility

       to move project funds from field to Headquarters or back.  (Lear dep. at 188-90)

    b.  Brian Propp (see *supra* at note 13 and Genuine Issues No. 15aiv) testified that

       15% line item flexibility is the rule, and that to have 100 % line item flexibility

       "you have to have an amendment signed by the contracting officer at the

       funding organization" which he termed "very unusual to have." (Propp dep. at

       18-20)

    c.  Harry Dorcus, Counterpart's CFO and COO, contradicted Lear when he

       testified that a couple of years ago the rules were changed and now you only

       have 10% line item flexibility without written approval from the USAID

       Cognizant Technical Officer in charge of monitoring the project.  (Dorcus dep.

       at  133-34)

    d.  As set out at Genuine Issues No. 14ai & ii, supra, Lear charged much more of

       her time to CSSI and HNCBI than had been budgeted, including $ 83,229.32 in

       salary to CSSI and $ 30,674.12 in salary to HNCBI in FY 2004.

    i. As set out in Cooper decl. ¶ 54, other headquarters personnel billed their salaries in FY 2004 to CSSI and HNCBI, further increasing pressure on the field budgets, despite budget limitations.

    ii. The total budgeted amount for CSSI and HNCBI Headquarters salaries for the second year of the project[28] totaled approximately $ 95,498 (X-43 at CP1050) for CSSI and $ 19,583 for HNCBI (X-44 at CP1070)

  e. As noted in Bob Abma's email to Cooper and Kunz of September 3, 2004, JCX-A, discussed *supra* at Genuine Issues No. 11e, Headquarters' spending of project funds from the CSSI project had created a "large projected deficit." Abma also projected a deficit for Headquarters spending for the HNCBI program, stating that a little more that 50% of the way through the project, HQ had spent 80% of it s LoP (life of program) budget. (JCX-A). [**CONTRAST:** CPADMISS ¶ 65, where Counterpart denies that deficits in "HQ" refers to spending of dollars from the CSSI and NHCBI programs as direct program costs by Counterpart employees based in Counterpart's headquarters in Washington, D.C.]

17. Counterpart sent its Human Resources Manager Kelli Boyer to Kazakhstan at least in part to develop facts about Jay Cooper that would justify his termination.

[**CONTRAST:** Arlene Lear testified for the corporation that Boyer was sent to Almaty to follow up on an email from Cooper about separation and also to conduct an HR audit. (Lear dep. at 162-64)]

  a. Counterpart has given conflicting testimony as to the purpose of Boyer's trip.

---

[28] This analysis is merely an approximation, because a project year runs from July through June while Counterpart's fiscal year runs from October through September.

i.  Kelli Boyer testified that she was sent because senior management of
Counterpart, including Arthur Lovelace, Arlene Lear, Harry Dorcus and two
other Vice Presidents, decided it was time for her to make a visit to the Civil
Society Division for an HR audit. (Boyer dep. at 62-64)  Boyer said she had
"made other visits to other divisions in other regions."  (dep. at 64)  According
to Boyer, the purpose of an HR audit is to diffuse tensions in the office and to
improve morale among employees.  It is not intended to be punitive. (*Id.* at
65)  She was told there was a difference in staff morale between the office in
Almaty, Kazakhstan and the office in Bishkek, Krygystan.  She was not told
of any tension or potential problems between Cooper and Kunz or anything
relating to Cooper's management skills. (dep. at 65-66)

ii.  Dorcus first testified that Boyer was sent to discuss general HR issues, and
was not sent specifically to investigate Cooper, but simply "came across"
information about Cooper.  (Dorcus dep. at 43-44)  Dorcus also swore that
"we sent Kelli to numerous countries to check on HR practices and employee
morale and to get Kelli oriented as to what Counterpart did and their HR
needs."  (dep. at 62)  Dorcus later testified that it was he who made the
decision to send Boyer to Central Asia and that Lear asked that Boyer also
look into issues with Cooper's relationship with the staff and with Kunz.  (dep.
at 62, 65-66)

iii.  Arlene Lear testified for the corporation that the decision, made by herself,
Harry Dorcus and Arthur Lovelace, was to follow up with Cooper about an
email he had sent requesting information about separation, as well as to do a

56

HR Audit "as part of a program where "we periodically sent the HR Director" to give her "an opportunity to look at the policies, the procedures, talk to staff . . . ." (Lear dep. at 162-64)

iv.  Arlene Lear's Declaration states that she became aware of an email Cooper had sent to Boyer to discuss a possible departure from Counterpart, and that she "agreed" that Boyer would address Cooper's "request" on a trip Boyer "was planning to take."  (Lear decl. ¶ 20)

b.  Counterpart's testimony that the trip was in the usual course of sending the HR Director abroad and was designed to acquaint Boyer with the various Counterpart foreign offices and staff is belied by other evidence.

i.  Counterpart had operations in at least 20 countries in the Fall of 2004. (Cooper decl. at ¶ 71)

ii.  Boyer had been with Counterpart since June of 2003.  (Boyer dep. at 7)

iii.  Boyer had only once before been sent abroad to perform an HR audit, and in that instance, in Senegal, she was sent to scrutinize an employee and, after her investigation that employee was terminated.  (Dorcus dep. at 62-63; Boyer dep. at 68)

iv.  Boyer admits that Lear told her before her trip to Almaty that there had been a reorganization in that office and that Jay Cooper was not pleased, and that there was tension between Bob Abma and Cooper who did not like each other. (Boyer dep. at 70-72)

18.  False information provided by Kelli Boyer formed the basis of Lear's stated reasons for her decision to terminate Cooper, and that information is disputed in this Court.

57

[**CONTRAST:** Defendant's Statement ¶¶ 11, 13-22, 52, 54-55 and Arlene Lear's

Declaration ¶¶ 8-13, wherein she claims that she based her termination decision largely on

her personal observations and discussions about Cooper with disinterested third parties.]

     a. CPX-F is the script that Arlene Lear used during her telephone call when she

       told Cooper he was fired. (Lear dep. at 218)

     b. CPX-F shows that Arlene Lear relied on "Kelly's [sic] interviews with local staff

       at all levels" who expressed fear of Cooper.

       i. Boyer testified that she was told that the staff felt fear of and intimidation from

         Cooper by Michael Kunz, Bob Abma, Irina and Marat.  (Boyer dep. at 110-

         11)

       ii. Boyer also testified she herself experienced fear when Cooper had an instant

         personality change and screamed at her.  (Boyer dep. at 112)

       iii. Local staff serving under Cooper and others in a position to observe

         Cooper's management style refute Lear's claim that the staff was afraid of or

         intimidated by Cooper, or that he was too controlling. (See Storozhenko decl.

         ¶ 6; Kolmakova decl. ¶ 5-6; Held decl. ¶¶ 7-8; Akhmetov decl. ¶ 4; Nusupov

         decl. ¶ 4(last on page 1); Goldfarb decl. ¶ 7; Nazinyan decl. ¶ 4; Larrabee

         decl. ¶ 7; Szecsey dep. at 14-17)   [**CONTRAST:**  Lear Declaration ¶¶ 12;

         Defendant's Statement ¶¶ 18, 21]

       iv. Irina Kolmakova has explicitly denied that she ever told Boyer that Cooper's

         staff was afraid of or intimidated by Cooper.  (Kolmakova decl. ¶ 5)

       v.   Cooper denied that allegation on November 12 and Cooper's testimony

about his management style challenges Boyer's report on the subject.

(Boyer dep. at 185; Cooper dep. at 77-78, 318; Cooper decl. at ¶¶ 5, 42. 45c)

c.   CPX-F shows that Arlene Lear relied on Kelli's "interviews with local staff at all

levels" who reported that they felt disempowerment when working with Cooper.

    i.   Boyer testified that she was told by Marat [Aitmambegetov] that he "wasn't

allowed to lead" and "did not have any real power" and that he blames

Cooper for that because Cooper let him know that he was the one in charge.

(Boyer dep. at 85-86)  She gave no other report of a similar complaint.

   ii.   Lear testified that she heard that from Kelli.  (Lear dep. at 166)

  iii.   Dorcus testified that Lear told him that Kunz and Abma had "substantiated"

the local staff's complaint of disempowerment. (Dorcus dep. at 87-88)

  iv.   Marat Aitmambegetov himself expressed contrary views to Christopher

Szecsey, who was working for a consultant to Counterpart (see *supra* at

Genuine Issues No. 2). Szecsey talked to all of Counterpart's Country

Directors on his second and third trips to Central Asia.  All the Country

Directors told Szecsey that they appreciated Jay's support and

understanding of the challenges they were facing.  Marat in particular

confided to Szecsey that he was seeking out advice from Jay about how to

address some challenges he was facing and that Jay was helping him.

(Szecsey dep. at 18-19)

   v.   Various persons who worked with Cooper also refute the notion that Cooper

did not empower and support the professional development of those who

worked for him. (Nazinyan decl. ¶¶ 3-4; Held decl. ¶ 4; Sasykbaeva decl. ¶ 7; Nusupov decl. ¶ 3 ("From the very beginning"); Akhmetov decl. ¶ 3; Goldfarb decl. ¶¶ 5, 8; Held decl. ¶¶ 4, 5, 7; Larrabee decl. ¶ 7)

    vi.  Cooper has denied that he failed to empower his staff.  (Cooper dep. at 318; Cooper decl. at ¶¶ 5, 42-43, 54b)

d.  CPX-F shows that Arlene Lear relied on Kelli's report that Cooper refused to meet with his supervisor Michael Kunz.

    i.  Boyer testified that she had set up a mediation meeting for Cooper and Abma in Kunz' office because it was a neutral place and she had no plans for Kunz to be present.  She testified that she "didn't get a chance" to tell Cooper that because he screamed at her that he would not meet with Michael. (Boyer dep. at 112, 118-20)

    ii.  Boyer testified that she relayed that information to Kunz.  (Boyer dep. at 121)

    iii.  Lear testified that she heard that story from Kunz, who told her that Cooper had refused to meet with him for any purpose.  (Lear dep. at  149-50)

    iv.  Cooper denies both Boyer's rendition and Kunz' rendition, saying that the objection he expressed was not to meeting with Kunz, but to have what he reasonably expected to be a mediated conversation with Bob Abma, with whom he had long had a tense relationship, take place in Kunz' presence. (Cooper dep. at 161-64; Cooper decl. at ¶¶  36-37)

    v.  Cooper has testified to his practice of freely meeting with Kunz after Kunz became his supervisor, and that meeting cancellations were due to travel by

Kunz or Cooper.  (See *supra* at  Genuine Issues No. 8; Cooper decl. at ¶¶
26-27)

    vi.  One document that has surfaced suggests that it was Kunz, not Cooper, who
readily dispensed with meetings.  (JCX-D and Cooper decl. at ¶ 24)

e.  CPX-F shows that Arlene Lear relied on Kelli's report that Cooper arranged to
meet with Boyer on a Monday and departed for Bishkek, despite having begged
Kelli to stay in Almaty longer to meet with him.

    i.  Boyer testified that on a Friday Cooper had asked her to stay in Almaty and
meet with him on Monday, and then went instead to Bishkek, Kyrgyzstan.
(Boyer dep. at 137-42)

    ii.  Boyer testified that she relayed that information to Lear, who told her to
"follow him."  (Boyer dep. at 142)

    iii.  Lear testified that she heard that story from Kelli.  (Lear dep. at 169)

    iv.  Cooper denied that any such event occurred at the time of his termination
and to this Court. (Cooper decl. ¶ 38; Cooper dep. at 134-38, 142-43; Dorcus
dep. at 86)

    v.  Boyer admitted that she had known about a long-planned set of meetings in
Bishkek that Cooper was scheduled to attend.  (Boyer dep. 138-39; see also
Kolmakova decl. at ¶ 10)  Cooper has testified that he asked Boyer if she
wanted him to cancel this trip to Bishkek and she said no.  (Cooper dep. at
135-36)  She admits she did not ask him to do so.  (Boyer dep. at 138)

f.  CPX-F shows that Arlene Lear relied on Kelli's report that Cooper told Boyer
that he was staying until June 2006 and was applying minimal effort.

    i.   Boyer testified that Jay made a statement to her on two separate occasions that he had a contract and he would just stay and do the basic minimum through the end of his contract. (Boyer dep. at 130-31, 146)

    ii.   Boyer testified that she relayed that information to Lear.  (Boyer dep. at 132)

    iii.   Lear testified that she heard that from Kelli.  (Lear dep. at 168)

    iv.   Lear repeats that allegation in her Declaration (¶¶ 24-25)

    v.   Cooper denied ever making such a statement during his termination phone call and denies it emphatically today and calls Boyer's testimony a lie. (Boyer dep. at 185; Cooper decl. at ¶ 39; Cooper dep. at 318; Dorcus dep. at 87)

g.   CPX-F shows that Arlene Lear relied on Kelli's report that Cooper told Boyer "innumerable times during the week that you desired separation, and then changing your mind" and considered that an indication of "erratic behavior."

    i.   Boyer testified that Cooper exhibited erratic behavior when they were discussing his leaving the company.  (Boyer dep. at 112)

    ii.   Lear testified that she heard that from Kelli. (Lear dep. at 168-69)

    iii.   Lear repeats that allegation in her Declaration (¶ 22).

    iv.   Cooper rejected that allegation on November 12 and has described that statement by Kelli as a lie. (Boyer dep. at 185; Cooper dep. at 317; Cooper decl. at ¶¶ 39-40) He admits to sending Kelli an email before her trip to Almaty asking for information about what his rights would be in the event that he decided to leave Counterpart. (X-13)  He never connected with her to get an answer, and Boyer told Lear about the email, which prompted Boyer's trip. While Cooper may have discussed terms of separation with Boyer while she

62

was in Almaty, he absolutely denies that he ever told her he wanted to leave

Counterpart or kept erratically changing his mind on that subject.  What he

told her was that he wanted to stay until the end of his projects, which were

the center of his interest.  (Cooper dep. at 152-58; Cooper decl. at ¶¶ 39-40)

h.  CPX-F shows that Arlene Lear apparently concluded based on Kelli's report

that Cooper was unable or unwilling "to function under the new management

structure."

i.  Cooper continued to work on his projects as usual after Kunz became his

supervisor.  (Kolmakova decl. ¶ 2; Storozhenko decl. ¶ 3; Cooper decl. at ¶

19)   He met with Kunz when requested, and Kunz expressed satisfaction

with how things were going between them. (See Genuine Issues No. 8,

*supra.*)

i.  CPX-F shows that at the time of Cooper's termination Arlene Lear did not place

any weight on many of the reasons advanced in this Court in terminating

Cooper.

i.  CPX-F says nothing about Cooper's supposed lack of vision or inability to

transmit the vision to key project staff. [**CONTRAST:** Lear decl. ¶ 9]

ii.  CPX-F says nothing about Cooper's lack of effectiveness as a leader.

[**CONTRAST:**  Lear decl. ¶ 8]

iii.  CPX-F says nothing about Cooper's being too engrossed in minor

administrative tasks which distracted him from his leadership responsibilities.

[**CONTRAST:**  Lear decl. ¶¶ 13-14]

63

j. Dorcus conceded that Counterpart's decision to terminate Cooper was based, at least in part, on "information" provided by Boyer. (Dorcus dep. at 43-44, 72-73)

19.   Boyer fed Arlene Lear other erroneous information that undoubtedly contributed to the stated reasons for Lear's termination decision. [**CONTRAST:** Counterpart's position that the termination decision rested largely on Lear's personal observations and discussions and discussions with disinterested third parties. Defendant's Statement ¶¶ 11, 13-22, 52, 54-55; Lear decl. ¶¶ 8-13]

a. Boyer testified at deposition that Bob Abma complained to her that Cooper was openly judgmental about Bob's sexual orientation.  She said that Abma reported to her that he felt "harshly judged" by Jay.  (Boyer dep. at 90-91)

i. Boyer testified that in his conversation with her Cooper "referenced Bob's sexual orientation and didn't agree with it."  She could not remember Cooper's words, but testified to a negative tone to his speech.  (Boyer dep. at 116, 164)

ii. That allegation is undercut by Cooper's denial and by the contrary observations of a number of Cooper's professional colleagues.  (Cooper decl.  ¶ 45a; Akhmetov decl. ¶ 6; Nusupov decl. ¶ 4 (" I worked with Jay"); Held decl. ¶ 9; Kolmakova decl. ¶ 15; Storozhenko decl. ¶ 10;  Nazinyan decl. ¶ 7)

b. Boyer testified that she was told by Irina, the local HR representative in Almaty, that staff morale was low and the environment in the office was tense. (Boyer dep. at 84  (Lear mirrors that observation in ¶ 10 of her declaration.)  Ms.

64

Kolmomov, the HR and Administrative Manager of that office, disputes that the morale was low, calling it "rather high," and denies that she told Boyer that it was low, and denies a number of other comments attributed to her by Boyer. (Kolmakova decl. at ¶¶ 9, 5, 6, 7)

c.  Ms. Boyer also testified that Cooper was inaccessible to his staff and stayed behind closed doors, and attributes that information to Bob Abma, other persons that she cannot identify and her own observations. (Boyer dep. at 92-93, 161)  Yet members of the local staff who worked with Cooper deny that they had little interaction with him, or that they felt withdrawn, or that Cooper stayed behind closed doors. (Akhmetov decl. ¶ 5; Kolmakova decl. ¶¶ 8-9; Storozhenko decl. ¶ 7; Nazinyan decl. ¶ 5; Sasybaeva decl. at ¶7; Larrabee decl. ¶ 3;  Szecsey dep. at 17-20)  [**CONTRAST:**  Lear Declaration ¶¶ 10-11; Defendant's Statement ¶¶ 14-15]

d.  One reason Boyer said she was given for low morale was low staff salaries. She made a recommendation that they be raised.  (Boyer dep. at 81, 87, 104-05)   Staff salaries were raised at the Almaty office after Cooper's termination, as were the salaries of Kunz and Abma.  (Kolmakova decl. at ¶ 16)

e.  Boyer testified that she went through Cooper's office after his termination along with Bob Abma found "secret files" in locked desk drawers and file cabinets in Cooper's office; she testified that she told Lear about it.  (Boyer dep. at 93-96) [**CONTRAST:**  Boyer dep. at 181, stating that she was not interested in finding out if Cooper had secret files.]

65

    i.   Lear had previously questioned Cooper as to why he was keeping files on Michael Kunz after Cooper made a comment to Kunz about having a file on him.  (See *supra* at ¶ 6b and c; Cooper decl. at ¶ 45d.)

   ii.   Bob Abma complained to Boyer that Cooper "had a secret file on everybody, including Arlene Lear."  (Boyer dep. at 94)

  iii.   Michael Kunz also mentioned to Boyer that he had heard that Jay had secret files on everyone.  (Boyer dep. at 97)

  iv.   Boyer testified that Jay Cooper told her that he had notes he kept on everyone and that he had a file on everyone including Arlene Lear.  (Boyer dep. at 94)

   v.   Boyer testified that after the termination she found in Cooper's office a file on every expat that ever worked in that office, and that these files contained "all negative things – mostly handwritten memos that Jay had written with negative information about everybody."  (Boyer dep. at 95)

        1.   Boyer testified that these files were only on expats. (Boyer dep. at 95, 98)

        2.   Boyer testified that she found a secret file on Arlene Lear.  (Boyer dep. at 95)

        3.   Boyer testified that the handwritten memos she found in the "secret files" were "designed to maybe harm the person maybe at a later date."  (Boyer dep. at 102)

  vi.   Counterpart turned over the files taken from Cooper's office by Boyer and Abma in discovery in this case.

66

1. 7 of the 15 files did not concern expats. (CPADMISS ¶ 23)

2. There was no file on Arlene Lear. (CPADMISS ¶ 24)

3. There were only two handwritten memos by Jay and only once non-handwritten memo of a conversation with a staff member. (CPADMISS ¶ 25)

4. With the exception of certain documents concerning complaints Cooper had been sent about the behavior of Michael Kunz (see the discussion of Xs-33-35, Genuine Issues No. 6, *supra*), all the so-called "secret files" are the kinds of employment records routinely kept by a manager, including employment contracts, performance appraisals and job descriptions.  (Cooper decl. ¶ 45d, e; CPADMISS ¶¶ 4-22, 27-33l) [**CONTRAST:**  Counterpart's refusal to admit that, with the exception of Kunz, none of the "secret files" can fairly be construed to "maybe harm the person at a later date."  (CPAdmiss ¶ 34)]

20.    Because Boyer had a troubled employment history at Counterpart, Arlene Lear had good reason not to trust her reporting  and not to rely on events that she reported in deciding to terminate Cooper, a ten-year employee with a stellar record. [**CONTRAST:** Lear Declaration ¶  21, saying that she believed that Boyer did a good job handling personnel issues and trusted her ability to investigate employee performance issues and report back accurately.  **CONTRAST ALSO:**  Dorcus' description of Boyer as a good employee with paperwork issues and other attempts to minimize criticisms of Boyer by Counterpart executives.  (Dorcus dep. at  40-43, 53-60)]

67

a. Boyer was the subject of much criticism at the hands of Counterpart's Vice Presidents, including Arlene Lear. (Propp dep. at 24-26)

   i. Dorcus testified that Lear had criticized Boyer for not being active enough in recruiting, but that others had tried to convince Lear that the problems she was complaining about were not all Boyer's fault. (Dorcus dep. at 53-54)

   ii. Dorcus admitted he "may have been critical" of Boyer's handling of the update of the Manual. (Dorcus dep. at 54-55)

   iii. Boyer's manager at the time Cooper was terminated, Arthur Lovelace, was unable to work with Boyer in such a way as to effectively get her to improve areas of weakness. Dorcus testified that Lovelace and Boyer "didn't always see eye to eye on how to do things. We had done through one year and was unsuccessful," and so Harry Dorcus, Counterpart's Chief Operating Officer and Chief Financial Officer, took over supervising Boyer shortly after Cooper was terminated. (Dorcus dep. at 57-59)

      1. Boyer described this change of supervisors as a result of her speaking up frankly, causing a change in her supervisor and her job description. (Boyer dep. at 47)

      2. Dorcus's comment on that testimony is the "Some people don't like to hear frank comments, and . . . Arthur Lovelace and she had a communication issue." (Dorcus dep. at 58)

      3. Dorcus testified that Boyer's duties did not change once she reported to Dorcus. (Dorcus dep. at 59)

68

iv. Dorcus testified that he and Lovelace together prepared two Performance reviews on Boyer.  (Dorcus dep. at 421-23)

    1. Counterpart has been unable to locate the first evaluation, but Dorcus testified that he made lost of comments on it.  (Dorcus dep. at 422

    2. Counterpart produced one documents (X-84) that Dorcus could not positively identify but testified might be an incomplete Review of Boyer's performance prepared by Arthur Lovelace that was never completed.  (Dorcus dep. at 422-23)

v. Boyer was less than candid in her description of these events, describing her departure from Counterpart as a resignation for mainly personal reasons that was absolutely amicable. (Boyer dep. at 211-12)

vi. Although Counterpart claims that Boyer voluntarily resigned from Counterpart (Dorcus dep. at 40), events surrounding that separation suggest that Boyer was forced out of the company.

    1. Defendant stated in an interrogatory answer in this case dated November 29, 2005  that Boyer was at that time serving as a consultant to Counterpart.  (Douglass decl at ¶ 13; X-29, Answ. No. 1)

    2. Boyer stated in her deposition that she left Counterpart in December of 2005 and was working for another company by February 6, 2006.  (Boyer dep. at  7)

69

3. Boyer drafted a separation agreement in connection with her
separation from the company that has been produced by
Counterpart. Dorcus concedes that "it's floating around
somewhere," but it was never signed, and that Boyer just shook
hands and walked away from her job. (Dorcus dep. at 425-26)

4. Dorcus admitted to Brian Propp that "we were glad to see her go."
(Propp dep. at 25-26)

21.    Cooper's termination was not handled in accordance with Counterpart's standard
operating procedures and was carried out in such a way as to send out a message that
Counterpart had found Cooper to be dishonest and to facilitate a search for the "secret
files." [**CONTRAST:** Counterpart asserts that Cooper was terminated in good faith (Mem.
*passim*) and that the termination was handled in accordance with certain standard
operating procedures consistently followed by Counterpart. (X-29 at Answr. No. 4; Lear
dep. at 170-80; Defendant's Statement at ¶¶ 61-63, 65; Lear Decl. ¶¶ 31-32) **CONTRAST
ALSO:** Boyer dep. at 181, testifying that she wasn't interested in finding out if Cooper had
"secret files."]

a. Cooper, on a business trip to Bishkek, Krygstan, was told in a telephone call
while sitting in an open area in the Bishkek office of Counterpart that he was
terminated effective immediately and that he was barred from entering any
Counterpart office. (Cooper dep. at 142-45)

b. It was communicated to the staff at all the Counterpart offices in Central Asia
that Cooper was not permitted to enter any such office. (Boyer dep. at 198;
CPX-H)

70

    c.  Cooper's email was cut off on November 12, 2004.  (Boyer dep. at 195-96)

    d.  At the end of the day on Friday Nov. 12, Kolmakova was told by email that no one was allowed in the office until Monday except Kunz, Abma, Boyer and guards who were to rotate shifts.  She was asked to translate that memo into Russian for the benefit of the Russian-speaking guards. [**CONTRAST:**  Boyer's deposition where she testified that they were making physical upgrades to the whole office complex and the contractors were in over the weekend and the office was not closed.]

    e.  Bob Abma or Michael Kunz told the staff in Counterpart's Almaty office that they could not come in over the weekend. (Cooper dep at 192-94; Kolmakova decl. at ¶ 13; Storozhenko decl. ¶ 11; Akhmetov decl. at ¶ 8; Larrabee decl. ¶ 8)

    f.  Vaslat Akhmetov remembers that the reason given for being kept out of the office was that the office was being renovated and that construction would be going on and that they wanted to avoid people stealing.  (Akhmetov decl. ¶ 8)

    g.  When Steve Larrabee questioned the instruction, Bob Abma or Michael Kunz told him that Cooper had been relieved of his duties and that they did not want anyone in the office in case Cooper decided to come into the office, in which event they thought maybe there could be "problems."  (Larrabee decl. ¶ 8)

    h.  On Friday the locks on the three out side entrance to the Almaty office were also changed.  (Kolmakova decl. ¶ 12)  Bob Abma told Irina Kolmakova that this was done because someone lost his keys.  (*Id.*)

71

i. On Saturday morning a lock was put on Cooper's office door on Lear's instruction.  (Boyer dep. at 172-73; Storozhenko ¶ 11)

    i. Arlene Lear testified that Cooper's office was locked to keep Cooper's possession safe. (Lear dep. at 170)   Boyer said that she recommended it because she was unable to reach Jay to get him to retrieve his possessions despite multiple attempts to reach him and leaving messages on his home phone in Almaty, at his home in Bishkek and on his cell phone on Friday. (Boyer dep. at 172) [**CONTRAST:**  Cooper denies receiving any messages from Boyer on any of those phones, all of which had the ability to take messages.  (Cooper decl. ¶ 62)

j. Cooper's office was never locked on the many occasions he was away on travel.  (Storozhenko decl. ¶ 11; Cooper decl. ¶ 62) There never had been a lock on his door before. (Storozhenko decl. ¶ 11

k. Email access was cut off for all staff in Counterpart's Almaty office.  This was at the order of Michael Kunz and not due to construction in the Almaty office which was very minor in nature.  (Cooper dep. at 188-91; Cooper decl. at ¶ 63) Kolmakova confirms that email had been working on late Friday afternoon.  . (Kolmakova decl. ¶ 13) [how long, by whom, how much ev do we have? If we do, amplify declaration] [**CONTRAST**:  Boyer dep. at 173-75, where she testified that the whole office was under renovation the whole time she was there, changing the floor structure, putting up walls, and that Abma told her they had to take the network down to move the IT department because of all the

> **Comment [PD4]:** When?

> **Comment [PD5]:** Jay – do you know?

construction.  **CONTRAST ALSO:**  Defendant's Statement ¶ 80, claiming Cooper did not know the status of remodeling in the Almaty office.]

l.  On Saturday November 13, Bob Abma and Kelli Boyer, in the presence of a security guard in the empty Almaty office, went through everything in Cooper's office, including having the guard force open the locks on locked file cabinets and desk drawers.  (Cooper dep. at 194-96; Boyer dep. at 94-103)

   i.  One guard who was present told Igor Storzhenko that Abma and Boyer were obviously looking for something and were disappointed with they did not find whatever it was.  (Storzhenko decl. ¶ 12; see also Cooper dep. at 194-96)

   ii.  Kelli Boyer testified that they found "secret files" that contained incriminating information on all ex-pats that had worked under Cooper.  (Genuine Issue No. 19e)

m.  Michael Kunz told the staff at the Almaty office at a meeting on November 15, 2004, that Jay was no longer working at Counterpart, that he (Kunz) was the new acting Chief of Party, that the staff should not communicate with Jay about Counterpart business activities, and that Jay was not allowed to enter any Counterpart office.  (Kolmakova decl. at ¶ 14)

n.  Counterpart's explanations for locking out Cooper have evolved over time, although Counterpart has consistently said that locking Cooper out of his office was done "consistent with Counterpart's standard operating procedure."  (See X-28, Answr 4)

   i.  The one exception to this generalization is the testimony of Kelli Boyer, was was Counterpart's HR Director who testified that there was no standard

73

policy, and that whether or not to lock out an employee depended on the circumstances. (Boyer dep. at 178-79)

ii. **Who else was locked out under that "standard operating procedure? "**

1. Counterpart's original answer to Plaintiff's Interrogatory No. 4, dated November 29, 2005, cited Brian Propp as the one example of other ex-employees Counterpart could identify whose employment was involuntarily terminated and who was locked out of his office at the time of termination. (X-29, Answ. No. 4; Douglass decl. ¶ 13)

2. In its Second Supplemental Response to Plaintiff's first Set of Interrogatories, bearing the date of January 11, 2006 (X-29), Counterpart added Gregory Touma, Counterpart's former Chief Operating Officer, as a person who had been locked out.

3. Arlene Lear, testifying for the corporation on January 13, 2006, again identified these two individuals and another man identified as Brian Black as the only persons who had been locked out of their offices. She was explicit that both Propp and Touma were not allowed to use their offices for any period of time after their terminations and stated that she had knowledge on the subject. (Lear dep. at 177-81)

4. Dorcus testified that Aaron Chassey was involuntarily terminated and his office was not locked. (Dorcus dep. at 214)

74

5. Arlene Lear in her Declaration for the first time mentions an exception to the standard operating procedure when "Counterpart terminates employees as part of a reorganization or loss of position due to a lack of available grant funds." (Lear decl. ¶ 31)

### iii.   Why were terminated employees locked out?

1. Counterpart has sworn that it locked out both Mr. Propp and Mr. Touma "for the purpose of securing the office until a decision was made regarding what to do with any files, office equipment and other Counterpart property located in the office." (X-29, Answer No. 4)

2. Boyer testified that Propp's office was locked to make sure that the only items he could remove were his personal possessions.  She denied that Propp was permitted to work in his office after termination, and said that she feared that Propp would abscond with Counterpart proprietary information.  Boyer has that fear with all employees, including Cooper  (Boyer dep. at 175)

3. Dorcus testified that in Propp's case the office was locked so Propp couldn't use Counterpart's computer and that it was a question of asset control.  (Dorcus dep. at 212-13)  In Cooper's case, said Dorcus, the office was locked because you have no idea what the person is going to do and it's safest for all to keep as much control as you can. (Dorcus dep. at 215)

75

4.  Arlene Lear, testifying for the corporation on January 13, 2006, testified that that Cooper's office was locked "to secure **his** possessions, to keep them safe."  (Lear dep. at 170, emphasis added)

5.  Cooper's office had never been locked during long periods of travel.  (Cooper decl. ¶ 65; Storozhenko decl. ¶ 11)

iv. **The "standard operating procedure" was not to install a lock on an office door, to change the locks on all entrances to the outside, and notifying all staff that the terminated employee is barred from all Counterpart offices.**

1.  Lear said it was Counterpart's "consistent practice" to ask a terminated employee to leave the office, return the keys and to return only in the presence of someone designated to accompany him to pick up personal belongings and do whatever else is mutually agreed upon.  (Lear dep. at 172; Lear decl, ¶ 31))

2.  She testified that first Boyer and then Marat had been designated to accompany Cooper when he returned to claim his possessions. (dep. at 174)

Comment [PD6]: Jay – what happened about this – I frankly can't remember

3.  Boyer testified that Arlene Lear ordered Cooper's office locked upon her recommendation because she was not able to contact Jay to come pick up his personal belongings, although she tried to call him at his home in Bishkek and his home in Almaty and his

76

cell phone and left messages and  "Jay did not call me back."

(Boyer dep. at 172)

4.  Cooper has denied  receiving any calls or messages from Boyer

about his possessions.  (Cooper decl. ¶ 62)

o.  Lear also testified that the purpose for Cooper's being instructed not to come

into any Counterpart office was a self-protection motive because Cooper had

said on November 12 after being fired that he was going to get a lawyer.  (dep.

at 170-71)

i.  CPX-F, Lear's script for the termination telephone call, obviously prepared in

advance of that call, states the following: "As of today we are requesting that

you not work out of the office from today forward to avoid further tension and

potential disruption."

ii.  CPX-H, dated November 12, 2004, states that "we ask that you do not report

to any of the offices, including those located in Kazakhstan, Krygyzstan or

Turkmenistan."

p.  Brian Propp was fired on October 12, 2004.  He denies that he was locked out

of his office for several weeks after he was fired and that he was free to clean

out his office and use the telephone there. (Propp dep. at 21-24)

i.  A lock was eventually installed on Propp's office in November of 2004,

although he was still free to use it if he signed in. (Propp dep. at 22-24)

ii.  The excuse given him by Boyer for the lock was that it was to protect **his**

personal belongings. (Propp dep. at 22-23)  Boyer testified, as we've seen

above, that it was locked because she feared he would steal Counterpart's

property. (Boyer dep. at 175) Dorcus testified that it was because

Counterpart didn't want Propp to use Counterpart's computer and it was a

question of asset control.  (Dorcus dep. at 212-13)

    iii.  Propp did not find out that Cooper had been fired on November 12 until two

weeks after if happened.  At that time his door was locked. (Propp dep. at 23)

He drew the conclusion that Counterpart had locked his office so they could

say that Cooper was not the only terminated employee locked out of his

office.  (Propp decl. ¶ 5)

    iv.  Propp denies that Touma was locked out of his office and explains why he

was in a position to know that fact.  (Propp dep. at 7-10)

    v.  A member of Gregory Touma's staff denies that Touma was locked out of his

office.  (Declaration of Marilyn McKenzie)[29]

22.    Evidence of record reasonably supports the inference that Lear learned that there

was a danger that Cooper would complain to USAID about irregularities in Counterpart's

use of program funds before she terminated Cooper, and Lear caused Cooper to be

locked out of his office to permit a search for the secret files.  [**CONTRAST:**

Defendant's Statement Nos. 67-72, 74-77; Lear decl. ¶¶ 34-35]

    a.  Cooper complained to Kelli Boyer of Counterpart's Human Resources

Department about his concerns about financial "hanky panky" in the Almaty

office during her visit to Almaty in November of 2004, and they discussed

whether Cooper would lodge a complaint with the Inspector General.  (Cooper

---

[29]  Plaintiff does not have direct testimony from Touma on this subject because Touma, as a condition of receiving a separation payment from Counterpart, was required to agree not to discuss events surrounding his termination.  Counterpart declined to release Touma from this obligation to permit him to give information for use in this case.  (CPADMISS ¶¶ 92-93) Touma will be subpoenaed to testify at trial.

78

dep. at 243-45; Cooper decl. ¶ 46)  **[CONTRAST:**  Boyer's denial that any such

conversation took place (Boyer dep. at 117, 164-65**)]**

b. Despite her general denial, Boyer did admit that Jay told her that Headquarters

people charged his programs in the field but said she didn't do anything to look

into it because "I don't do budgets and accounts."  (Boyer dep. at 165)

c. Lear, Kunz and Abma were all concerned with "secret files" that they believed

Cooper was keeping in his office. (See Genuine Issue No. 19ei –iv)

d. When he was fired, Cooper was locked out of his Almaty office and barred from

all Counterpart offices, which was not the usual procedure upon the termination

of an executive at Counterpart.  (See Genuine Issues No. 21b & 21m, *supra*.)

e. Kunz and Abma barred all employees from the Almaty office on the weekend

immediately following the Friday that Cooper was fired, changed the locks on

three doors to the outside and gave false and conflicting reasons for those

actions. (See Genuine Issues No. 21d-h) **[CONTRAST:**  Defendant's Statement

¶¶ 80-82)

f. Boyer and Abma went through everything in Cooper's office after his

termination, and Boyer collected what she described as "secret files" from there

that turned out to be innocuous. (Genuine Issue Nos. 19e, 21k)

g. A guard who was present at the search of Cooper's office has said that Boyer

and Abma were obviously looking for something and seemed disappointed not

to find it.  (Storozhenko decl. ¶ 12)[30]

h. Boyer found In Cooper's office at the time he was fired was a binder containing

paper copies of PowerPoint slides he had received at a workshop conducted by

---

[30]  We will attempt to locate and take a trial deposition of this guard before trial.

79

the USAID Inspector General's Office in 2003 upon which Cooper had
highlighted passages concerning the troubling charges to he projects he was
noticing. (Cooper decl. ¶ 45f; sign-in sheets evidencing his attendance at that
workshop are PDX-M )

i.  Counterpart did not return the workbook to Cooper with his personal effects.
    (*Id.*)

j.  Boyer reported what she "learned" in Almaty to Lear. (Lear decl. ¶¶ 22-24, 26)

k.  Cooper had previously complained about financial irregularities that he had
    found to Lear, to Dorcus, to Abma and to Kunz. (Genuine Issues Nos. 7, 11)

l.  Lear was dependent on the smooth continuation of the operation in Almaty to
    give her Civil Society Division some security, as she said in an email to a
    staffer. (X-80 at CP3197)

    i.  Because Lear did not generate and had been deprived of her expected
        NICRA funds in 2004, she was dependent on her ability to charge
        Headquarters expenses, including her own salary, to projects run out of the
        Almaty office. (Genuine Issue Nos. 15, 16)

    ii. Direct charges to the CSSI and HNCBI projects collectively paid at least 75%
        percent of Lear's salary in FY 2004. (Genuine Issues No. 14ai & ii)

    iii. Lear's Headquarters charges to CSSI and HNCBI were in violation of the
         percentages allocated to Headquarters in the budgets for those projects.
         (Genuine Issue No. 16)

80

  iv.  Lear knew that she did not in fact have "100 % line item flexibility" so that she was in danger if her practices were to be challenged. (Genuine Issue No. 16a-c)

m.  Dorcus was involved in many discussions with Lear on the question of what to do about Cooper.

  i.  He had discussed Cooper with Lear "at numerous times during the two or three months" before the August 18 meeting, and also thereafter.  (Dorcus dep. at  37, 44-45, 73-78, 100-03, 237-38)

  ii.  Abma had complained to Dorcus about Cooper.  (Dorcus dep. at 46-48)

  iii.  Dorcus as Chief Financial Officer of Counterpart and with a 23-year career behind him as a USAID Controller (Dorcus dep. at 10-11) was in a position to know about all the matters included in Genuine Issues Nos. 11-15)

  iv.  Dorcus knew that Lear charged 80 % of her time as direct costs to projects and described that as "her choice" to make.  (Dorcus dep. at 121)

n.  Lear also discussed terminating Cooper with Kunz and Abma before making the termination decision.

  i.  Lear relied on information from phone calls from parties overseas in deciding to terminate Cooper.  (Dorcus dep. 45-46)

  ii.  Lear called Kunz on multiple occasions. (Cooper decl. ¶ 7)

  iii.  Kunz and Abma knew about the mischarging described in Genuine Issue Nos. 11-16 from their participation in those activities and from Cooper's complaints about them.

81

       iv.  Boyer spent much of her time while in Almaty with Abma and Kunz and

testified to many complaints they had about Cooper. (Boyer dep. at 81-82,

89-93, 98-100, 111, 140 (as to Abma) and 81-82, 96-97, 103-06, 109-11,

121, 132-35 (as to Kunz))

23.     Cooper suffered mental distress as a result of Counterpart's actions.

[**CONTRAST**: Counterpart's Memorandum at 20-21,]

    a.  Cooper was deprived of his position as Counterpart's Chief of Party in Central

Asia and lost the opportunity to complete his programs, to which he had

passionately devoted his professional skills for many years.  (Cooper decl. ¶¶

17, 65-66, 68)

    b.  Cooper was devastated by the abrupt reversal of the respect that Counterpart's

Arlene Lear had always shown him. (Held decl. at ¶ 10; Sasybaeva decl. at ¶

12; Goldfarb decl. at ¶ 12; Fritz decl. at ¶ 6; Lear dep. at 231)

    c.  He was in a state of shock initially, and rushed around trying to explain to his

friends and professional colleagues what had happened to him.  He could not

give a coherent story, because what he had been told of the reason for his

termination  -- based on Boyer's falsities – made no sense.  (Cooper decl. ¶ 66)

    d.  Rumors were rampant among the professional development community. The

story of an esteemed colleague being locked out of his office was too juicy not

to become the topic of widespread speculation.  Everyone with whom Cooper

had worked and the staffs of all the democracy programs in Central Asia were

wondering and speculating why Cooper was no longer with Counterpart.

(Nusupov decl. at ¶ 5 (page 2); Kolmakova decl. at ¶ 14; Sasybaeva decl. at ¶¶ 8-11; Akhmetov decl. at ¶ 8; Fritz decl. at ¶    )

e.  Counterpart made the situation worse by giving out conflicting stories.  See, e.g., Sasykbaeva decl. ¶¶ 8-11, as a long-time colleague of both Cooper and Lear tries to make sense out of Arlene Lear's comment that Cooper left by his own choice.  It was also worse because Counterpart has promoted itself as an organization promoting justice and equality.  If such an organization was so cruel to one of its own he must be a bad man indeed, was some of the feelings Cooper encountered.  (Sasykbaeva decl. ¶ 10

f.  He was subjected to the doubts of many professional colleagues and friends who were at a loss to understand how this could have happened to Cooper at the hands of an organization that promotes social justice and which he had served so loyally for so many years, unless Cooper had done something terribly dishonest.  (Cooper decl. at ¶ 67; Sasykbaeva decl. )

g.  Cooper was put in the painful and awkward position of having to explain to professional colleagues why he was no longer with Counterpart.  His attempts to explain what had happened met with awkward silences, as it was inherently incredible to those who were Cooper's friends and admirers of his professional integrity that Counterpart would fire him and lock him out of his office without giving him a chance to explain that what had been reported to management was wrong.  (Cooper decl. at ¶¶ 63-64; Sasybaeve decl. at ¶ 11; Held decl. at ¶ 10)

83

h.  Cooper felt like he had become a pariah and that people seemed uncomfortable with him in his despair.  (Cooper decl. ¶ 66)

i.  The tradition in Central Asia is that when a valued employee leaves a job there is a party and everyone gets to say goodbye in a festive way.  (Cooper decl. ¶ 67; Sayskbaeva decl. ¶ 10)  The perception in that part of the world when this does not happen and when one is locked out is that the person is a very dishonest, mistrusted man, and Cooper felt a cooling of his relationships with Central Asians who had been his good friends. A locked door is a powerful symbol in the part of the world which has long been dominated by Soviet culture and Communist Party politics.  (Cooper decl. ¶ 65)

j.  Cooper was unable to secure another position in Central Asia or in the development field.  He has said that he was never sure that any of his professional friends actually went out of their way to push for him  He felt hw was tainted by Counterpart's judgment and treatment of him.(Cooper decl. ¶ 66)

k.  Counterpart did not pay Cooper his expenses to relocate to his Home of Record (neither transportation of self or of goods) despite the fact that those payments are required by the Counterpart Manual.  (X-7 at CP0580-81)  Being stranded in Central Asia without a salary was not conducive to quick healing of emotional wounds.

l.  He now works in a furniture store in Oregon, for less money than he was making at Counterpart.  (Cooper decl. at ¶¶ 67)

84

    m. He has been required to spend tens of thousands of dollars in legal fees in

        order to maintain this action.  (PDX-I)

24. Counterpart had a general policy of giving each employee an annual increase in salary

    of five percent per year assuming good performance.  (Dorcus dep. 15, 18)  A raise of

    five percent per year for Cooper was built into the budget for the CSSI and HNCBI

    budgets.  (X- 43 at 1054, X-44 at 1066) [**CONTRAST:**  Counterpart's statement that the

    raise is only exemplified by an unenforceable oral contract.  (Memorandum at 20-21)]

25. The evidence of suggests that Counterpart rewarded Lear, Kunz, Abma and some

    members of the staff of the Almaty office for having disposed of the threat that Cooper

    posed.

        a. Lear was awarded a bonus of $ 25,000 on December 30, 2004.  (X-56 at

            CP3374s)

        b. Counterpart's Form 990 for FY 2005 indicates that Counterpart increased the

            compensation to Kunz, Abma and the staff of its Almaty office after Cooper's

            termination. (Douglass ¶ 14 & PDX-F)

        c. Arlene Lear made $ 152,904 in FY 2005 (Statement 10)

        d.  Michael Kunz made $ 107,838 in FY 2005 (Schedule A)

        e. Bobby Abma made $ 92,836 in FY 2005 (Schedule A).

        f. Staff salaries were raised for some persons in Counterpart's Almaty office after

            Cooper's termination.  (Kolmakova decl. at ¶ 16)

85