UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAY W. COOPER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1598 (RMC-JMF)** |
| | ) | |
| **COUNTERPART INTERNATIONAL,** | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAY COOPER**

Jay Cooper, being duly sworn, declares as follows:

1.       I submit this Declaration in support of my Opposition to the motion of

Counterpart International ("Counterpart") for summary judgment in this case.  It is based

on my personal knowledge and my review of documents received in discovery in this

case from Counterpart International ("Counterpart").

2.       I worked for Counterpart International for close to 10 years from January 1995

to November 2004. I worked closely with Arlene Lear over the years although I did not

report to her directly until 2000 when I became the Regional Director and Chief of Party

for several major projects in the Central Asia Region (CAR), which included Kazakhstan,

Kyrgyzstan, Uzbekistan, Tajikistan and Turkmenistan.  Counterpart International works

mostly with funds from the United States Agency for International Development

(USAID) and due to Counterpart's non-profit status usually the funding mechanism is a

Cooperative Agreement.  Most of Counterpart's projects have been linked to the support

and development of non-profit organizations or NGOs.  Counterpart prides itself on building the capacity of NGOs to work both effectively and independently in their regions or countries.   At the time of my termination, I was responsible for two major projects in Central Asia, the Civil Society Support Initiative (CSSI) and the Health NGO Capacity Building Initiative (HNCBI).  I had responsibility for a number of smaller projects in the region including an activity funded by the World Bank which had just completed and other small initiatives funded by USAID.   CSSI was scheduled to complete in June 2006 and HNCBI was finishing at the end of 2005.  The two main projects that I managed were Counterpart's largest of their USAID-funded projects at that time.

3.      I understand that Counterpart is taking the position that I was fired because my job performance was unacceptable to Counterpart in specific respects enumerated in the Declaration of Arlene Lear.  I only received one Performance Review from Arlene Lear, the document that has been marked as X-9 in this case.  That evaluation was presented to me in March of 2002.  While it does not paint me as perfect, it contains none of the devastating criticisms now launched in Ms. Lear's Declaration.  Nor did Lear ever include in any of the many emails I received from her over the years – or in any other writing – the deficiencies she now describes in her Declaration to this Court.

4.      Arlene Lear and I would confer by telephone over the years I worked under her supervision in Central Asia. While she has testified that she and I had such calls on a weekly basis, I disagree.  The frequency of the calls was directly related to whether or not

Counterpart was bidding on new projects.  When a project was being competed by

USAID we talked by phone several times a day, but during normal project

implementation we would talk only every few weeks unless she felt there was a particular

issue, in which case we would discuss the progress of the various civil society projects.

She would often congratulate me for the progress we were making. She would at time

offer suggestions.  I absolutely deny that she ever criticized me in any phone

conversation I ever had with her in any respect that was remotely like the supposed

deficiencies she writes about in paragraphs 8 through 15 of her Declaration.  The only

suggestion or comment I can remember that she made that might be construed as a

criticism is the suggestion (made more than once) that I learn how to "schmooze" more.

     5.     In her Declaration, Arlene Lear states that she made certain personal

observations while visiting the Central Asia Region.  I challenge those statements for a

number of reasons.  First, Arlene was always on a whirlwind tour spending a few days in

each of the five countries where I managed projects.  Her priorities were meetings with

USAID and other donors.  Her interaction with local staff was limited to driving in a car

to visit USAID or perhaps an NGO, and she needed an interpreter to talk to all but a few

staff members with whom she had direct contact.  Arlene did not have an opportunity to

observe my interactions with or management of staff during those visits since the

principal task at hand was to manage her travel and take care of her needs during her

visits.  Her comment about the general tone of the Almaty office as "flat"  and the staff

withdrawn (paragraph 10) is an especially curious and mistaken reading of the culture of

Central Asia, where the abrupt arrival of a Western supervisory official is treated with caution. Limited time and cultural challenges simply did not allow Lear to get an accurate feel for the staff. She also states that field staff told her that my office door was often closed and that I was inaccessible (paragraph 11). I do not believe that anyone on the staff ever told her that, as the only time my office door was ever closed was while I was traveling in the five country region. I did not like to close my door even during meetings. I was always available to staff, who could come into my office freely to discuss whatever issue was of concern to them, whether professional or personal. I considered myself a personal friend of most of those working for Counterpart in the Region. In paragraph 12 Arlene says that she observed me being controlling and intimidating. I absolutely deny that charge. If anything I am too permissive. (See paragraph 42, below.) I spent many hours mentoring and encouraging the Country Directors to master new disciplines and expand their responsibilities. For example, I gave the Country Directors great autonomy in managing their country programs and offices with little to no interference from me. (On the other hand Kunz who was my successor almost immediately sent a memo to COPs and local Country Directors that he and Abma would review the candidates for all positions and new hires would be approved by them.)

6.     I know that Mr. Dorcus has testified in this case that Ms. Lear told him that she called me on multiple occasions during the months prior to August 18 to criticize my performance, to describe alternative behaviors she expected from me and to offer me

alternatives to my dismissal from Counterpart.  If Ms. Lear told Mr. Dorcus that she was

absolutely misrepresenting the situation.  I have already described the tone and frequency

of our telephone contact.  No discussions about my performance needing improvement

were had.  We never had a single discussion about my considering a different position or

different responsibilities at Counterpart.  No "options" were offered or even mentioned in

passing. Ms. Lear's announcement at the meeting in Washington that I was to begin

reporting to Michael Kunz and that Bob Abma was no longer to report to me came as a

tremendous shock to me.

7.     In an effort to rebut Mr. Dorcus' testimony about what Arlene Lear told him,

my counsel attempted to discover phone records that would have demonstrated that she

called me only infrequently and briefly prior to August 18, 2004, and never thereafter.

The only records we were given were partial records of calls from Ms. Lear's home

telephone.  I have reviewed those records.  The month of October is missing. The only

calls in the months from May to November of 2004 from Arlene Lear's home phone that

I found that could possibly be to me are the following:  one call in August for 8 minutes

and one call in September for 2 minutes.  I remember the call in August since I was on

the way from Bishkek to Almaty.  That call concerned Lear's proposal to send Stephanie

Sullivan to Central Asia to work in capacity building.   I am quite sure the September call

never went through and I never talked to her.  (Dropped calls are frequent from the US to

Almaty and usually show up as 1 or 2 minute charges.) Those same records of Lear's

calls from her home telephone show that she called Michael Kunz' cell phone 21 times

between May and September of 2004.  Twenty calls were made to the office in Almaty, Kazakhstan during this period none of which were directly to me other than to ask of Michael Kunz' whereabouts.  There is a 12 or 13 hour time difference between Almaty and Washington DC; therefore if Lear were to call from the Counterpart office during normal working hours in DC the office in Almaty would be closed. I have included as JCX-G and JC-H charts of those calls to Kunz's cell phone and to the office in Almaty.

8.     Mr. Dorcus also testified that Ms. Lear told him that I was offered "options" at the meeting in Washington on August 18, 2004.  If Ms. Lear told Mr. Dorcus that, again she was seriously misrepresenting the situation. I was never, ever at any time during the eight months before my termination offered any alternative position or role in Counterpart.   That possibility was never discussed or even casually mentioned.  Kelli Boyer never offered me a position as a consultant to Counterpart or even discussed that option with me.

9.     I was not told in advance of the August 18, 2004 meeting that the meeting was to announce the appointment of Michael Kunz as my supervisor and the transfer of supervisory authority over Bob Abma to him.  I had no inkling that Ms. Lear had already decided on major changes to the Almaty operations.  I had been told the meeting was going to be about strategy for the future.  I certainly was never told that I was engaged in a grievance session.  As I testified at my deposition, the substance of that meeting was definitely not about anyone criticizing the job I was performing for Counterpart.  No one at that meeting said anything about the matters Ms. Lear has described in paragraphs  8-

15 of her Declaration.  Ms. Lear simply announced that Kunz was to be my supervisor as a fait accomplit.  I was, however, allowed time to express my reservations about the changes.  I told the story about Mr. Kunz' 30-minute rampage at me about the Turkmenistan workplan in July (see paragraph 44d, below), and the meeting facilitator made it clear that that kind of behavior was unacceptable in the future.  Nothing I could have said would have made any difference.  The decision was made. We then discussed whether Bob Abma should report to Michael Kunz rather than to me.  I expressed my concern that I not have control over the budgets and spending for the projects for which I was responsible.  In response to that comment, Michael Kunz threatened to quit Counterpart if he was not given supervisory responsibility for Bob Abma because, he believed, Administration and Finance should always be together.  It was very clear that Kunz' quitting was not acceptable to Arlene Lear, although it seemed to me from the tone of that meeting that if we did not work something out my quitting would not be so devastating to her.   I was offered no options except to accept the new arrangement if I wanted to stay employed at Counterpart and continue with the projects that were very dear to me.  It was clearly a take-it-or-leave-it proposition. We ended the meeting with mutual expressions of positive thoughts and hope for the future, although I do not believe I have ever expressed admiration for Michael Kunz on any occasion.

10.    At some time during breaks from the August 18 meeting I encountered on separate occasions two of Counterpart's Vice Presidents, Harry Dorcus and Don Feil.  Each of those men, separately and out of the presence of the other, made the same remark

to me that day, in similar words.  Both said that it looked as if there was a power play or struggle going on in the Almaty office.

11.     I left the meeting of August 18, 2004 with doubts about how the new arrangement would work.  Nothing specific had been said about the division of responsibility for my projects between Kunz and myself.  I was concerned about Kunz' lack of managerial experience.  To my knowledge he had only served as the Deputy Chief of Party on a small project in Uzbekistan in two sparsely populated Oblasts (regions) in the South of the country.  Management of Counterpart's ongoing civil society projects in Central Asia was a complex task, requiring knowledge of the region and over 400 persons working in various offices and NGOs in the five countries. The political climate in each country was different.  I would have been pleased to share my knowledge, but the experience I had with his tirade in July about changing workplans for Turkmenistan indicated his lack of respect for my knowledge and experience for the project and the region. (He had encouraged the use of an activity that was copied from Uzbekistan and the staff in Turkmenistan pointed out to me issues that would arise with its use there.)    I cannot believe that I ever expressed admiration for Michael Kunz, as Ms. Lear has claimed.

12.     I was also concerned about Abma's potential for abuse of project funds and what appeared to be the removal of any hope I might have had to control that potential abuse with Abma no longer reporting to me.  Every time Abma laid out his spending estimates through the end of the projects, I had tried to tactfully start a discussion to

remind him of what I was sure he knew --the need to use project funds only on the projects for which they had been awarded. Since the CSSI project was by far the most heavily funded one being run out of Almaty, it seemed to me that that Abma frequently turned his head when permitting the CSSI project to be charged for expenses that were for the benefit of other projects, potential projects or general Regional office expenses. The most obvious example is the case of Abma's salary, housing and fringes, which were disproportionately charged to the CSSI project. Another example is when I questioned Abma about the use of consultants to manage the computer network in the Almaty office when I was the Deputy Regional Director. The consultants were not available full time and were charging time to come to the office on weekends to do virus checks. I knew that this could be done automatically and the charges to the program were often over $1500 per month. Only after I became the Regional Director was I able to hire one full time person at half the cost. Abma was irate about this.

13. I had also for some time been concerned about Abma's obvious attempts to extend his stay in the Region. His role in the CSSI project was designed to be reduced to 15% by the third project year (beginning in July of 2005). The Cooperative Agreement that Counterpart had with USAID for the CSSI program included an element of localization. In other words, the host country nationals were to be trained so that they could manage much of the project. This was spelled out in the description of the project and in the budget in the case of Bob Abma. Abma had an assistant who had been working with Counterpart in the Region for many years who was identified to take over

9

the financial responsibilities for the CSSI project.  To protect his position in Almaty, Abma would include a small percentage for his time as he developed budgets for additional funding for our present projects or for new projects for Counterpart.  He told me one day in the Spring of 2004 that he was close to being fully funded to the end of the project.  I suspected that his motivation for these efforts was to remain in the Region with his romantic partner, Igor Yevgenievich Krayev, who was a Russian-born Kazakhstan citizen. At this point I contacted Harry Dorcus and asked him if it was Counterpart's intent for Abma to stay with the project until its completion.  I raised with Dorcus that this would violate that concept of the CSSI project, which was to develop local capacity and replace ex-pats as the local staff built their skills. Dorcus told me that Abma was needed to develop budgets for new projects in the Regions and that they were hoping to find enough funding for Abma to stay in the Region.

14.    I had also been concerned about Abma's purchase of an apartment for himself and reimbursement of his mortgage costs with USAID project funds earmarked for a housing allowance.  I brought this up to Dorcus during a trip he took to the Region in 2003, and he told me that Abma had provided information about the purchase and his mortgage to him and Lear.  Dorcus told me they both felt that it was not an issue since the apartment was not directly purchased in Abma's name.  Several local staff persons complained to me that Abma was paying his partner's mother to clean the apartment with the use of USG funding.

15.    When I was Abma's supervisor I had tried to question and gently challenge these practices, which led to no little friction between Abma and myself.  Abma, although in many ways a talented financial manager, was a strong-willed and prickly individual who hated being second-guessed, questioned or even supervised at all.  He and I had had a tense relationship for some time and I was aware that he resented and disliked me.  I had no doubt that he had intervened with Kunz to engineer the changes in his reporting relationship to be free of what he considered my meddling in his running of the finances in Counterpart's CAR office.

16.    There was one accounting subject on which Abma and I saw eye to eye, however – the drain on resources available for the Regional Office and the country field offices caused by excessive spending of project funds by Counterpart's Washington Headquarters staff.   Each project was approved by USAID with a budget that allocated funds among the field and Regional offices, and also provided for a certain level of spending at Counterpart's Washington Headquarters.  Lear would routinely spend more at Headquarters than was budgeted for that purpose, leaving the field and Regional offices in a position short of funds.  Abma and I shared our dismay on that subject on a number of occasions.  Although I have learned through my analysis of discovery in this case that most of the program funds spent as direct costs at Headquarters were spent on Lear's salary (see ¶ 51, *infra*), my unease at the time was slightly different.  I had learned in connection with Counterpart's effort to obtain an extension of the HNCBI program that Lear (with the approval of Dorcus) insisted on a "backstopping" program person at

Headquarters for each project and that person would charge 25-50% of his or her time as a direct cost to the program.  Although this seemed highly wasteful of project resources to me, Lear described it as "our policy" and justified it (in response to a query on the subject from USAID) as reducing Counterpart's spending of NICRA funds and as potentially cutting Counterpart's NICRA rate.  During Lear's trips to the Region, during my visits to DC, and occasionally by phone I questioned Lear about these and other expenses that were being spend from project funds at Headquarters.  Ms. Lear's defense was always the same.  She cavalierly dismissed my concerns, stating that she had "100 % line item flexibility" and could use project funds, even funds budgeted for use in the Region, as she wished at headquarters.  I had also complained to her about using project funds for the development of new projects, especially after Counterpart received a letter from USAID (Glenn Anders former Mission Director for USAID) that it was inappropriate to use personnel working in a USAID project for new project development. She told me that CI had created a specific account that was paid by indirect costs for project development (950).  This was true, but charges to the account were not encouraged.

17.    After the meeting on August 18, I thought about the matter a great deal and decided to focus on the importance of the projects to me personally.  I had organized and founded an NGO in Kyrgyzstan over 10 years earlier with the purpose of building civil society in Central Asia.  That organization was not funded through our projects but it was an important institution in Kyrgyzstan. I was completely dedicated to my work with the

non-for-profit sector and, despite the difficulties with Counterpart, I was determined to stay and work under the conditions laid out.

18.     After the meeting in Washington on August 18, 2004 and a follow-up telephone call a week or so later, I never heard from Ms. Lear again, until she called to fire me on November 12.   Arlene Lear did not communicate with me in any fashion – in person, in writing or by telephone call – or express in any way any dissatisfaction with me or with my work in the period between August and my termination.  I understand from Mr. Dorcus' testimony that she told him that she had been in regular communication with me and that I had been offered alternatives to termination.  That is totally untrue. After the August 18 meeting my communication with Lear came to a halt.

19.     Upon return to Almaty on September 5, 2004, I continued to work much as I had before.  That period of time was extremely busy, and included much time outside the Almaty office, including the following:  From September 12th to the15th I traveled to Bishkek, Kyrgyzstan for meetings with USAID and the US Embassy and travel to an outlying region (Kant) to meet with a Civil Society Support Center.  From September 24 to October 1 I traveled to Turkmenistan for a major seminar/training event that was facilitated by an American consultant, Christopher Szecsey of Social Impact.  Board development activities took place on October 2-5 in Almaty and a Capacity Development meeting followed on the 6th and 7th.  Mr. Szecsey and I traveled to Kyrgyzstan for Association training and an HNCBI activity before returning to Almaty on the 16th of October.

20.    My anxiety about the potential for increasing mis-use of funds from my projects was stoked by my receipt on or about September 3, within weeks after Abma had been removed from my supervision, of a copy of an email that is attached to this Declaration as JCX-A.  As I interpret JCX-A, Abma was suggesting that excess funds from the HNCBI project be used to make up shortfalls in available funds for the expenses of the Regional Office, which was exceeding its budgeted amounts largely due to expat salaries and benefits.  Under the budget for CSSI the Regional Financial Officer (Bob Abma) was budgeted for 70% of his time through CSSI, but Kunz (as the new Regional Director for Eurasia, Middle East and South East Asia for Counterpart's Civil Society Division) was not budgeted to live and work in Central Asia.  While there were a number of people budgeted to work in the Counterpart office in Washington DC, those funds were not sufficient to pay Kunz to live and work in the Central Asia Region. It was my understanding that a large percentage if not all of the salaries and benefits including the housing allowance for Abma and perhaps also for Kunz were being paid out of CSSI and HNCBI funds, although both men worked on other projects.  The increasing focus on new project development in places such as Armenia and Iraq that came along with Michael Kunz's new position was bound to make the situation worse.   I felt that my ability to stop this drain on the funds available for my projects was minimal without support from Counterpart Headquarters.

14

21.    JCX-A, as I read it, also suggests using HNCBI funds to make up shortfalls in certain other projects in the five Central Asia countries in which our programs operated. It was my understanding that this use was improper under USAID regulations.

22.    JCX-A also reveals what Abma and I had been commiserating about for some time – the fact that persons in Counterpart's Headquarters were so liberal in charging expenses to the CSSI project that they had a "large projected deficit" from exceeding the budgeted amounts for HQ expenses, which were set at the start of the program.  When in the past I had complained about this problem to Arlene Lear, she had replied on several that she had '100% line item flexibility" by which I understood her to mean that she had complete discretion over how to charge the CSSI program for expenses incurred at Headquarters.  I had heard from Altinay Kuchekayev that it was Ms. Lear's practice to instruct the staff to "just charge it to 452" when asked to which project to charge an expense.   I now saw in JCX-A that the situation was much worse than I had previously understood and that the financial needs of my projects might be in jeopardy.  It was also my understanding that my ability to monitor how project funds were accounted for was likely to be non-existent under Lear's recent reorganization.

23.    Michael Kunz did not return to the office in Almaty until the middle of September and even thereafter he and Abma were often traveling to work on projects in other countries.  I knew from Kunz' resume that had been circulated at the August meeting that Kunz had broader responsibilities than simply to monitor the projects I was managing, and on or about October 13, 2004 I received the email from Arlene Lear that is

attached as JCX-B.  JCX-B confirmed that Kunz had substantial responsibilities reaching

as far as the Middle East and Southeast Asia.  Abma was helping him set up new projects

and took every opportunity to travel.  This concerned me because I thought it wrong that

my projects should pay for Abma's housing and local expenses when he was traveling to

develop projects in Eastern Europe and the Middle East.  But with the reorganization

Lear had announced in August, the matter was out of my hands.

     24.    On October 4, 2004, I sent an email to Kelli Boyer that is in included in CPX-

E, inquiring about what my options would be if I decided to leave Counterpart.  While

Arlene Lear had promised me at the August 18 meeting that if I decided to leave or if

Kunz and Lear decided that they felt strongly that the new arrangement was not working

out, I would be guaranteed six months of salary.  I sought to clarify when that six months

would start.  I wrote these questions to Boyer not because I was planning to leave or

wanted to leave, but because I was aware that Counterpart might decide that it was in its

interest that I do so – especially if my failure to go along with the shifting of project

funds that Abma was advocating became too annoying to him and to Kunz.  I also

thought that perhaps the situation in Almaty might become untenable. I simply wanted to

know what my rights were in either event. As I testified in my deposition, my focus was

on the projects and I fully intended to stay if I was permitted to do so.   I wrote to Boyer

on the understanding that my questions would remain confidential between us, as the

Counterpart Manual provides they should.  I now know that Kelli promptly reported the

fact that I had asked these questions to Arlene Lear, causing Lear to dispatch Boyer to

Almaty.  Boyer never called me to discuss those matters as I had requested, and I never

got an answer to my questions until Boyer showed up in Almaty.

25.    I never saw the document that is X-78, purporting to be a memorandum from

Harry Dorcus to "All Employees" dated May 16, 2003 regarding the discontinuation of

the Counterpart grievance policy.  I do not believe I ever received it.  In my experience,

all memoranda from Counterpart headquarters in that time period came from

Counterpart's CEO Lelei Lelaulu.  I did receive X-37, a memorandum from Kelli Boyer

dated October 6, 2004 announcing Counterpart's decision to abolish its Grievance

Procedure. The likelihood that the earlier memorandum (X-78) was never sent to foreign

staff was reinforced by the email from David Smith, attached to X-36, Chief of Party in

Uzbekistan for the CASP project (Counterpart and USAID) who asked Ms. Boyer to

explain what the "open door policy" was.

26.    I understand that it has been asserted in this case that I refused to meet with

Michael Kunz.  In fact, I met with Kunz whenever our schedules would permit it in the

period from September until my termination.  On no occasion did Kunz request my

attendance at a meeting that I failed to attend.  Attached as JCX-C is an email exchange

between me and Michael Kunz to set up a meeting concerning program issues.  That

document indicates that Michael Kunz and I had scheduled regular meetings on Friday

mornings.  Although I can only remember one of these meetings, I have no reason to

think we did not meet on a regular basis when Kunz was in town to discuss the status of

ongoing projects.  I believe that JCX-C refers to the meeting I discussed in my

17

deposition, at the end of which Kunz and I agreed that we were working together well and there were no problems in our working relationship.  I also attach as JCX-D an email I received from our office manager that indicates that Mr. Kunz was not so keen on routine meetings with me in this period, which may account for the fact that I cannot remember more than one meeting.

27.    In JCX-C, Michael Kunz told me that we needed to meet with Abma to discuss some budget issues on October 8, 2004.  We did so after our program meeting in the morning.  I remember that meeting well.  Abma discussed the two main projects that I was managing and described several budget line items that had unused funding.  He also described the need for Kunz and him to travel because of the work that they were doing on multiple projects under Kunz' new broad responsibilities.  He described the need for someone to help both Kunz and him with travel and secretarial needs, bearing the tentative title of "Eurasian assistant."  Abma then suggested the use of funds from projects for which I was responsible for both these purposes.  Kunz expressed his support for Abma's plan.  I told them I thought use of my projects' funds to support new and different projects -- particularly the creation of a new Eurasian assistant position – was improper.  Abma agreed to take out some of the planned changes and I thanked them for their openness and told them that I would have to think more about this.

28.    Later on October 8, I received the email from Bob Abma attaching a spreadsheet that is X-46 in this case.  (I have noticed that the spreadsheet attached to the email is dated October 10, while the email is dated October 8.  The name of the file is

Regional Resources CSSI HC 10-8 which refers to the date October 8, although it looks as if the author of the file, Bob Abma, inserted the date October 10, 2004 on line 4 of the document,  In any event, I am sure that I received an email from Abma with the text of X- 46 attaching a spreadsheet that contained a provision to pay for "Eurasia regional" travel expenses, which I understood to be travel in pursuit of new projects for Counterpart in countries such as Iraq and Armenia that I understood Kunz and Abma were actively pursuing at the time.  I took a few days to decide what to do about Abma's budget which I knew that my supervisor Michael Kunz supported.

29.     I ultimately decided to write the email that is X-45 in this case.  In X-45 I refused to approve use of funds from the CSSI and HNCBI projects to pay for the travel of Kunz and Abma to develop new projects in Eurasia.  I also asked that a new staff person be brought on board to monitor the spending from the CSSI and HNCBI programs.  I did this because I was becoming increasingly concerned that funds from those projects  were to become more widely used to make up for deficits in other less-endowed programs or to support Kunz' (and Abma's) broader new project development goals.  My fear was that with Abma now reporting to Kunz rather than to me, I would become powerless to stop that from happening without the support of Headquarters.  For this reason I copied Counterpart's Chief Financial Officer Harry Dorcus on my email that is X-45, in hopes that he would see what was happening and approve the appointment of a new staff position to monitor for financial abuse in my projects.

30.     I never received a reply from Harry Dorcus to X-45.

31.     At no time during the period he was my supervisor did Michael Kunz communicate to me, whether orally or in writing, that he was in any way displeased with my job performance.  I had no conversation whatsoever with Kunz about any of the issues that were discussed by Arlene Lear during the telephone call when she fired me on November 12, 2004, nor about any of the matters raised in Arlene Lear's Declaration in this case about supposed deficiencies in my performance.

32.     On the contrary, on October 6, 2004, I received the congratulatory email from Michael Kunz (X-23).  The note praised my efforts to complete a seminar in Turkmenistan, a country with an oppressive government, which was possible only through my intervention working with the United Nations Development Program.

33.     I was informed by Igor Storokhenko on many occasions that Arlene Lear had called the office asking to speak with Michael Kunz during the period between September 1 and November 12, 2004.  At no time did she ask to speak with me or ask me how my new reporting relationship was going.  At no time did she hold a "check-in session" with me and Kunz as she had promised to do on August 18, 2004.  I did not ask her to do so because from my perspective my relationship with Michael Kunz was going well.  I was concerned with the budget issues discussed above, but thought I had done the proper thing about those by sending X-45 to Counterpart's CFO.

34.     I was surprised to learn that Kelli Boyer was coming to Almaty a few days before her arrival.  I had lunch with her and Anika Arapatyents the first time.  Other meetings were short and casual and even initiated by me suggesting that she talk to some

of the local staff.  I invited her to dinner but she refused.   I saw her spending most of her

time at a computer and by Wednesday I asked her if she had been meeting with local staff

and suggested that she talk to Marat Aitmambegetov who was the Country Director for

Kazakhstan. She was spending time with Irina Komakova who was the HR Manager for

the office in Almaty shopping for local souvenirs.  I noticed that she spent a great deal of

time with Abma and Kunz, in closed door sessions in their offices.  I saw her talking with

only a few other staff members, and those only briefly.  I am sure she only spoke to staff

members who spoke English, as she declined an interpreter.

35.     During the telephone call in which I was fired, Arlene Lear cited a number of

"facts" that had been reported to her by Kelli Boyer.  Lear's script for the call (CPX-F) is

an accurate listing of what she said on that occasion.  Most of those "facts" were total

fabrications.

36.     First, I never refused to meet with Michael Kunz.  It was my understanding

from Counterpart's Manual that Kelli Boyer, as Counterpart's Director of Human

Resources, was supposed to support employees and intervene to mediate personality

differences between employees.  I also believed from what the Manual said that matters I

bought to Boyer's attention would remain in confidence.  While Kelli was in Almaty I

confided to her my personality differences with Bob Abma and my doubts about financial

"hanky panky" that I believed Abma was engaged in.  I took this step in hopes that Boyer

could mediate the differences between Abma and myself and thereby help us to continue

to work together fruitfully for the remainder of the projects.  Kelli listened to my

complaints about Abma and told me that she had listened to his about me.  She offered a

meeting where we could discuss these issues with a view to reducing tensions.  I agreed.

I thought it was a great idea.  It was the plan for this meeting that became twisted around

so that Kelli Boyer falsely reported to Arlene Lear that I refused to meet with my

supervisor Michael Kunz.

37.    Events unfolded as follows:  Kelli Boyer came to my office to announce that

we would be meeting at 4:30.  I asked her where we would meet since I knew that Abma

did not like to meet in my office and I was determined to have a productive meeting that

should be on neutral ground.   When she told me that the meeting would be held in

Kunz's office I assumed that Kelli meant that Kunz was to be present for our meeting,

which I had been led to believe was a mediated session between Abma and myself

designed to repair our strained relations.   I told her that would not work because we had

an agreement for just the three of us to meet.   She walked out and did not come back.

She never said anything to the effect that she had not planned for Kunz to be present,

which I understand she testified to in her deposition.  I never refused to meet with

Michael Kunz on that occasion.  I certainly never refused to meet with Michael Kunz for

any purpose, as Lear stated in her deposition.  I saw Kunz later in the hall and we

exchanged greetings.  He did not ask me any questions or make any comments.  He never

asked me to attend a meeting with him, which I certainly would have been willing to do.

Many, many details in Boyer's recitation of this event in her deposition are out-and-out

lies:  I was not erratic in any way, nor did I beg her to stay in Almaty.  Boyer stated that

after the botched meeting on Thursday the 4th of November she came to my office and we exchanged some kind words.  She never came to my office or talked to me after that meeting until the next day when she told me that she was staying for another week.  I never made a comment to Boyer about Abma's sexual preferences or his partner.

38.    I never refused to meet with Kelli on a Monday and took off for Bishkek after begging her to stay over to meet with me on that day.  Ms. Boyer told me on Friday the 5th of November that she was planning to stay an additional week in Central Asia.  I told her that I thought that was a good idea so that she could get to know the staff and the Region better.  I asked her if she wanted me to stay in Almaty since (as she knew) I was traveling to Bishkek over the weekend for long-planned meetings and training on the following Tuesday.  She told me that I should not change my schedule since the meetings and training were of a programmatic nature planned well in advance.

39.    I never told Kelli Boyer that I was going to stay in my job until June of 2006 and do the bare minimum or apply minimal effort.  What actually occurred was the following:  Kelli Boyer came to Bishkek on Tuesday the 9th of November with Irina Kolmakova and in a private meeting with me told me that she felt it was time for me to leave my position.  I replied that I had no intention of leaving my position because I had a contract and I was committed to the projects for which I had responsibility.  I made the point that these two projects took all of my time and I was not going to abandon them and that they were my main interest.  In my deposition I was trying to come up with some way in which Boyer might have misconstrued my comments.  I absolutely deny that I

23

ever said I planned to do the "bare minimum" or apply "minimal effort" or anything that would imply that. In my deposition I simply tried to come up with a way that Boyer might have misunderstood my statements.

40.    I never told Kelli Boyer innumerable times during the week that she was in Almaty that I wanted to leave Counterpart. I did email her in mid October to try to schedule a time to talk about some questions I had. (That email exchange is CPX-E and is discussed above.) We had never connected or had any conversation about this subject before her arrival in Almaty, when she asked me about it and started discussing the subject as if I had decided I wanted to leave Counterpart. During that discussion, I simply told her that I wanted to stay until June of 2006 and see the projects through. I had spent 10 years with Counterpart and several years before that, since 1993, engaged in civil society work in the Central Asia Region. While I had certainly considered the option of leaving Counterpart and had asked her in the email I sent her in October about the options if I did so, and she asked me about that email while she was in Almaty, I had decided not to leave. I thought I had made an admirable adjustment to working with the new staff structure in Almaty, specifically Kunz and Abma. While I was not going to support violating USAID regulations to approve the use of funds for purposes outside of the projects I managed, I gave Kunz and Abma my response in an appropriate manner.

41.    Lear's description of my behavior as "erratic" – obviously based on Kelli's reports -- is just plain wrong. I was scheduled to go to Kyrgyzstan the week of the 8th of November and Boyer knew that this was planned well in advance. She reported to Lear

that I scheduled a meeting with her on Monday which was not true.  I told her

consistently that I was planning to stay with Counterpart to see the project through.  This

is not erratic behavior.

42.     Arlene Lear said on November 12 that my staff was afraid of me.  I find that

ludicrous.  If anything, I am too gentle as a manager.  My style of management is very

flexible.  I get to know the people I work with and evaluate the amount of guidance and

control needed to accomplish the goals and objectives of our work.  In foreign countries

this is very important since the projects are time sensitive and result oriented, and there

are various cultural sensitivities that need to be taken into account.  I also made every

attempt to find opportunities for the people I worked with in terms of training and

support.  I can cite numerous examples including Valery Orechov who I recommended to

come to Counterpart in Washington DC and work with Counterpart's technical

department. He stayed for many years and moved to higher positions.  I suggested to

Anika Arapatyents that she approach Arlene Lear and after several attempts she landed a

temporary position and then a full time job as a right hand to Ms. Lear.  I helped people

with applications for education and training opportunities all the time.  I also asked that

people working in my projects make every effort to be responsible and honest in their

work environment.

43.     Arlene Lear said on November 12 that my staff felt disempowerment.  I find it

incredible that anyone would or could report that.  The examples listed above rebut that

charge.  Moreover, I have always gone out of my way to allow the Country Directors to

make their own decisions and participate fully in management activities. Lear told me several times that Marat Aitmambegetov should be fired from his position as Country Director for Kazakhstan. I disagreed and told her that she did not understand his strengths and the consequences if he was fired. Interestingly he was hired by Counterpart to work in Afghanistan after I lost my job. I always had my door open and welcomed the staff to enter and talk at any time. I helped them with their work and encouraged them to make decisions which empowered them.

44.     When Arlene Lear accused me of the above matters on November 12, I objected. Although in shock, I tried to tell my side of these events and clarify what I had said and done. Although I was allowed to do so, neither Arlene Lear nor Harry Dorcus said anything to indicate that it mattered. It was clear that the decision had been made to fire me supposedly based on information reported by Kelli Boyer, and the matter was not going to be revisited simply because what she reported was viciously wrong and simply because my version of events had not been taken into consideration in the decision.

45.     Kelli Boyer has testified that she reported to Arlene Lear various other facts about me. The following "facts" are also simply wrong, and maliciously wrong and undoubtedly designed to support and justify the termination decision:

      a.  I have never, by word or gesture, made any disparaging remark about Bob Abma's sexual orientation.

      b.  It has never been my practice to keep my office door closed and be inaccessible to my staff. When I was in my office my door was always open

even during meetings for the most part. I encouraged my staff to spend time with me and a small table and chairs made it possible for me to sit with staff and not be stuck behind a desk.

c.  I never screamed at Kelli Boyer and could not understand why she took such a stand against me. I had lunch with her twice during the week she was in Almaty and asked her to go out for dinner which is a standard practice among foreigners when colleagues are in town. She declined several offers and I was told of the time she was spending with Kunz and Abma. It would have been helpful to have included me in her socializing if her intent was to understand and even support the staffing structure in Almaty.

d.  I never kept "secret files" in my office, although Boyer at Abma's behest searched for them. In retrospect I think that a search for these files – which Lear and Kunz and Abma feared would uncover evidence of improper allocation of project funds – is what motivated my dismissal. My basis for that belief is as follows:  In July of 2004, I returned from a trip to Turkmenistan and made the effort to go to Michael Kunz's office to update him on the activities that took place during the week I was gone. (This was before the changes were made to the staffing structure in Almaty, before I was reporting to Kunz.)  I was finalizing workplans for USAID and had spent several days working with the entire program staff in Turkmenistan to complete that task. I had been asked by Arlene Lear to include Michael Kunz

in activities when possible and it was a good opportunity to have him work with the Turkmenistan Country Director and regional staff on drafting workplans.  The previous week a Regional meeting had taken place that included all Country Directors and Regional staff.  I asked Kunz if he could work with the Country Director from Turkmenistan and several Regional staff persons at which time preliminary work was done on the plans.  The draft Kunz helped develop was changed quite a bit during the meetings I had just had in Turkmenistan. When I reported that fact to Kunz he erupted in a tirade of anger and yelling.  I sat quietly and after being told that I was making unilateral decisions to change plans and listening to him continue ranting on this subject, I told him that I now knew why I had a file on him in my office. He then screamed at me about having personnel files in my office. Within a few days I was contacted by Lear who asked me why I was keeping a file on Michael Kunz.  I told her it was nothing more than the collection of letters of complaint that I had sent her the year before when Kunz had created problems with the staff in Counterpart's office in Uzbekistan which was under my management.   Fear of what might be in these files was, I now believe, the reason why I was fired and locked out of my office.

e.   These so-called "secret files" have now been produced in discovery by Counterpart.  They are nothing more than the sort of normal files kept by any

manager with contracts, agreements, job descriptions, performance reviews and other information about employees and management issues.

    f.   One other document was in my office that is of significance, however. I had in 2003 attended a workshop put on by the office of the USAID Inspector General about cost accounting principles and fraud awareness in programs sponsored by that agency. I had brought back a looseleaf binder with copies of powerpoint slides that had been presented during the workshop and had kept it in my office and had highlighted various passages as I was debating what I could do to stop the looting of my projects' funds in the Fall of 2004. That binder was undoubtedly found in my office when Abma and Boyer searched it. Counterpart did not return the workbook to me with my personal effects.

46.   One important subject that I did discuss with Boyer was never mentioned in the November 12 telephone call or in Lear's script for that call. I told Kelli Boyer during her visit to Almaty that there was financial "hanky panky" going on in the office there. She asked me if I was going to report anything to the U S Inspector General's Office. I said it was possible. She said nothing further. I did not go on further about the IG since I was not collecting information, but of course I was very aware of the use of funds by different projects, i.e. co-mingling of USAID project monies. I was also aware of the over use of project funds in the Counterpart office in Washington DC. Again, I was not planning to leave my position nor did I intend to cause any problems for Counterpart.

47.     Kelli Boyer identified as a source for some of the "information" she reported back to Lear an "Andre" who is a driver for the office who did not speak English and who Boyer refers to in places as the "other Igor."  Boyer does not speak one word of any language spoken in Central Asia.

48.     Kelli Boyer has testified that Bob Abma was the source of much of her derogatory information about me.  That does not surprise me.  Kelli spent a great deal of time during her visit to Almaty in the company of Abma and Kunz.  I have always had a somewhat troubled relationship with Abma, as discussed above.  I have learned during discovery in this case that he has gone out of his way to say negative things about me to Aaron Chassey and Harry Dorcus.  I have worked together with Abma on various projects for many years, and despite our personality differences we have managed to work cooperatively for the good of the projects. That changed when Michael Kunz came to work in Almaty as Director of Civil Society in the Spring of 2004.  Abma began to resent my questions about accounting allocations and other questions, as described above. I'm sure Abma learned that in the August meeting in Washington I had objected to having him report directly to Kunz, and the situation between Abma and me became more strained when I returned to Almaty.  When I questioned his budget proposal in October, our relationship deteriorated further.  Abma had a lot to lose if Harry Dorcus had intervened as I had requested and appointed a new staff person to monitor spending from the CSSI and HNBCI projects.  His ability to shift and allocate funds to support his travel would be ended.   His ability to stay in the CAR with his partner would be

threatened. His failure to abide by the USAID Cost Standards would be investigated.  I believe Abma decided he had to get the thorn in his side that I had become out of Counterpart, and I believe that Kunz supported him in that effort so that he would have free use of funds.

49.    At some point in this case I was accused of believing that Kunz, Abma and Boyer were conspiring against me.  By the time Boyer arrived in Almaty and began conferring with Abma and Kunz and suggesting that I wanted to leave Counterpart, it indeed looked like that was what was afoot.  When I found out on November 12, 2004 of the falsities that Boyer had reported to Lear I suspected that much of that information came from Abma.  Deposition testimony of Boyer and Lear has proved that suspicion to be true.

50.    On the telephone call on November 12, 2004, I was told that I was fired effective immediately and that I could not enter any Counterpart office.  While I stammered out my objections to what was being said, I was not allowed to present facts to counter what Kelli had reported.  If the grievance procedure had been in place could have confronted Kelli with contrary statements by members of my staff, and brought up all the financial motives of Abma and Kunz.

51.    I said in my deposition that I was not sure that Arlene Lear bore me any ill will and that she had simply been naïve and been fooled by Kunz and Abma, although I found that the fact that she never bothered to call me and listen to my side of the events of Boyer's visit called that assumption into question.   My deposition was held on January 4,

2006 well before we were given the Counterpart financial documents that we have been

able to analyze in this case after the Court's order in October of 2006.  What we have

seen makes it clear that Arlene Lear was not an innocent in this course of events and she

undoubtedly knew that her Division was at risk if the scope of misallocation of project

funds about which I had begun to make serious complaints were uncovered.  She

certainly knew that her 100% line item flexibility rationale for funding her Headquarters

operation was erroneous and that she was greatly exceeding the amounts budgeted for

spending at Headquarters that would be charged as direct costs to my projects.  She

certainly knew that she was overcharging her salary as direct costs to my projects because

NICRA funds were low on her projects and had been shifted to other areas of the

company. After analyzing many of the General Ledger documents I now realize that the

substantial deficit that was being reported by the DC office was largely a result of Lear

using project funds for her own salary.  My concerns and questions about the use of funds

must have been a major factor in Lear's decision to fire me.

52.   I have reviewed the General Ledgers produced by Counterpart for the CSSI

project (documents produced by Counterpart bearing Bates Stamp numbers CP4657-

4750) and the HNCBI project (documents produced by Counterpart bearing Bates Stamp

numbers CP4465-4524) for fiscal year 2004, and produced spreadsheets based on those

records (JCX-E).  The spreadsheet labeled "Lear CSSI" in JCX-E shows $ 83,229.32 in

salaries and other compensation going to Arlene Lear from the CSSI program in FY

2004, even though the project budget stated that Lear would not take more than 10% of

her salary from project funds. Beginning in February of 2004, Counterpart apparently

ceased accounting for medical benefits on an individual basis.  Thus this figure for the

total compensation for Lear from CSSI funds, as well as the total compensation figures

from CSSI and HNCBI for Kunz and Abma discussed below, are somewhat understated.

53.    The spreadsheet labeled "Lear HNCBI" in JCX-E to this Declaration shows

$30,674.12 in salaries and other compensation going to Arlene Lear from the HNCBI

program in FY 2004, despite the fact that the budget for this project provided that only

5% of Lear's salary would be charged to the HNCBI project.

54.    I prepared the spreadsheet labeled "HQ Expenses Not Including Lear" and

attach it as JCX-I based on the same records.   It shows $ 85,739 in salaries and other

compensation paid to other HQ staff other that Lear and charged as direct costs to the

CSSI program.

55.    Arlene Lear has described in her Declaration what she claims are her personal

observations about my failings.  From the fact that she never shared any of these doubts

with me or suggested improvements (whether in her many emails or in any telephone call

with me) I draw the conclusion that they are fabricated to support the supposed "good

faith" of my termination without the need to vouch for the credibility of Kelli Boyer.

Whatever, the motivation, I contest that she ever observed anything that would support

these conclusions.  I have already described in paragraph 5 above why she was not in a

position to make many of her observations.  In addition, the following particulars of that

Declaration are false.

a.  In paragraph 8 of her Declaration, Lear states that she discussed with me my ineffectiveness as a leader and my defensiveness regarding other employees.  I have never had such a discussion with Lear.  Lear promoted me to my positions with increasing levels of responsibility during my 10 years with Counterpart and we worked closely together designing and developing projects for Counterpart over that period.

b.  In paragraph 9 Lear says she perceived that I failed to transmit to key staff the vision of the program and that I was distracted and unfocused.  My management of the staff for two projects (CSSI and HNCBI) was based on a participatory and empowering process that utilized the skills of the Regional staff based in Almaty as well as the Country Directors in each country in which we had projects.  The Regional staff in Almaty reported to me and supported all of the three countries in the CSSI project.  The Regional staff also included a project manager for the HNCBI project, Ara Nazinyan, who reported directly to me.  It was through the Regional staff that I was able to pursue the project vision and objectives.  I also worked with the Country Directors from each country to develop the annual workplans that were reviewed by USAID and were ultimately finalized in conjunction with USAID input to arrive at the goals, objectives and specific directions that each project was to follow in each country.  The Country Directors had the full responsibility of managing their country programs in accordance with the

workplans I fashioned in this consultative process.  In a multi-million dollar endeavor such as Counterpart's projects in Central Asia, management and vision could only be maintained through the participatory management style that I employed.  It worked well, as the success of the projects attests.

c.  In paragraphs 10 and 11, she reports that my staff was flat and withdrawn and that I was inaccessible behind closed doors.  I've already described in paragraph 5, above, why Lear was not in a position accurately to assess those matters and why her conclusions are wrong.  If she had in fact had those perceptions on her visits, discussions with me would have been welcomed at the time. None took place.

d.  In paragraphs 13 and 14 Lear claims that I was too engrossed in minor administrative matters over which I kept direct supervision.  That is simply wrong as a factual matter.  I put an office manager (Irina Kolmakova) in place to handle the majority of administrative tasks such as hiring and human resources,  Igor Storozhenko was in place as an Administrative Manager to oversee the drivers and guard.  I had managers in place in the Regional Staff and the Country Directors to oversee the details of projects and country programs, as described above. The projects were well organized and resources were in place to complete tasks at hand to meet our objectives with USAID in two major projects.  At the same time I personally brought in to Lear's Division at Counterpart for the Central Asia Region a World Bank project that

35

I was responsible for and which led to another larger WB project about the time I was fired. There was $10,000 in the budget for my management of that project, of which, of course, I did not see a penny in a bonus, although we learned in discovery that Lear received a $25,000 bonus in the month after I left.

56.   I have also prepared spreadsheets that demonstrate that Bob Abma too had a lot to lose personally if inquires were made into his personal allocations of project funds. The spreadsheet in JCX-E to this Declaration labeled "Abma CSSI" is a spreadsheet I created from Counterpart's General Ledger for CSSI Expenses (Counterpart Bates Stamp Nos. CP4657-4750) showing that Bob Abma received $ 47,392.66 in salary and other compensation from the CSSI program in FY 2004.

57.   I prepared a spreadsheet labeled "Abma HNCBI" in JCX-E from the Counterpart's General Ledger for expenses charged to the HNCBI program (Counterpart Bates Stamp Nos. CP4465-4524) for FY 2004 for salaries and other compensation paid to Bob Abma for that year.   It shows that Abma was paid $ 23,728.77 from the HNCBI program during that year.

58.   In addition, Abma's housing costs for FY 2004 were paid solely by the CSSI and HNCBI funds.

59.   I estimate that Bob Abma's total compensation for FY 2004 must be slightly under $ 78,000 per annum.  I base this estimate on the fact that I know from a document

36

produced in the "secret files" (see *supra* at paragraph 45d) that he was making $ 70,620 in FY 2003, and the fact that Counterpart routinely gave raises of 5 percent per year.

60.    I have also prepared spreadsheets that demonstrate that Michael Kunz too had a lot to lose personally if inquiries were made into his personal receipt of project funds. I prepared the spreadsheet in JCX-E labeled "Kunz CSSI" from Counterpart's ledger of expenses from the CSSI program for FY 2004 (Counterpart Bates Stamp Nos. CP4657-4750). "Kunz CSSI" shows that Kunz received $ 59,188.78 in compensation from the CSSI program that year. A spreadsheet in JCX-E labeled "Kunz Housing," which I prepared from the same source, shows that Kunz received $ 13,800 in housing allowance from the CSSI project in FY 2004.

61.    I returned to Almaty from Bishkek on the Monday following the Friday of Ms. Lear's telephone call terminating my employment. By Tuesday I had received a letter from Kelli Boyer that reiterated the termination (CPX- H) and attached a draft settlement agreement stating that I had left Counterpart by my own decision and that I was to get three and a half months of pay and the relocation benefits guaranteed me by my contract and the Counterpart Manual, all of which was conditional on my releasing and waiving all rights against Counterpart and a requirement that I say nothing about anything relating to my employment with Counterpart or its termination. In retrospect I see that this was designed to prevent me from conveying my doubts about Counterpart's mischarging of project funds to anyone, including USAID.

62.    I never received any messages from Kelli Boyer asking me to meet her to retrieve my belongings from my office in Almaty, although my home phones and my cell phone all have the capability of taking messages.  Boyer's testimony to the contrary is one more lie by her.

63.    I communicated with several people including Steve Larrabee of ICNL who shared offices with Counterpart in Almaty and several members of the local staff including the guard who worked at Counterpart during the weekend of the 13th of November.  I was told they had been told that the office was locked down over the weekend due to construction work going on there and that access to the Internet was also shut down for the same reason.  I contacted Alexander Shilov who was responsible for computer and technical matters in the office who told me that the shutdown of the Internet was ordered by Michael Kunz and that it had nothing to do with the construction. Marat Nusurov of the Counterpart Bishkek office later confirmed to me that Shilov told him the same thing.  The construction in the office in Almaty in mid-November of 2004 consisted of some minor repairs for the purpose of shifting some office personnel. Internet access and employee access need not have been affected by this minor construction.  This was the first time in the years of Counterpart's presence in Central Asia that an office was shut down or Internet access was denied supposedly due to remodeling.

64.    I communicated with Boyer and Dorcus in an effort to be paid monies owed to me for my business expenses incurred before the termination. (I had submitted

documents to the Almaty office in the month before I was fired and was told by the office

accountant that cash was not available.)  I had paid the advance costs for the Country

Director in Turkmenistan to attend a conference in Europe since a credit card was

required.  I still to this day have not received the reimbursement for those expenses even

though I have submitted my credit card statements several times. I was sent a special

form that was used by Counterpart International for reimbursement of expenses at one

point which was harassment in my point of view since I had submitted all expense forms

and did not have copies of most of the receipts.  Boyer knew that this was the case.  I sent

a letter to Lelalu and Dorcus and was told that an accountant in Almaty would check

into this.  Nothing was forthcoming.   My lawyer spent the better part of a year in a series

of letters trying to convince Counterpart's counsel (not the counsel in this court) to remit

those funds, without success. I have included the amounts owing on a schedule of my

damages submitted by my counsel, along with a quantification of my other benefits –

including housing allowance and medical and retirement benefits and relocation benefits

– that I have lost.

65.    While working at Counterpart, I often traveled out of Counterpart's Almaty

office to the other countries in which the projects I managed operated.  During these

absences, my office was never locked.  There was no way to lock my office door, as there

was no lock on it.  No one ever expressed to me that they were concerned that my

property in that office would be stolen if the office were not locked.  I did not keep

anything in my office other than normal decorations and artwork and of course my work

files.  The fact that Counterpart ordered my door locked sent a message of serious

dishonesty or wrongdoing on my part to the staff in Almaty, especially coming from a US

organization working in areas that the local staff understood but questioned at times.  The

effects of many years of Soviet culture and Communist Party politics were and still are

deep-seated in the minds of the people of Central Asia.  I don't dismiss the dedication of

some of the staff, but for the most part salaries were the reason people were working for

Counterpart.  The most critical targets in the work of the projects that I managed were the

NGOs and their constituents.  My style of openness and even not locking my door was

another way to show local people that as an American I was not hiding information or

conducting clandestine activity.  Counterpart's locking my office door sent a powerful

cultural signal in the Central Asia.

66.    For a while after my termination I was in a state of shock.  I went rushing

around contacting everyone I knew trying to explain what had happened to my job.  I

think in many ways I was simply trying to make sense of it in my own mind, but I was

also frantically networking trying to find another position in the field I loved in the part

of the world in which I had spent so many years.  People were kind and supportive, but

no one could come up with a solid suggestion for an opening that fit my experience.  No

one actually said to me that they had concluded that I must have stolen money or

defrauded Counterpart in some way to have received such harsh treatment, but there were

many awkward pauses and uncomfortable conversations with people who had at one time

acted as if they held me in the highest regard.  And no jobs or even job openings were

offered.  While there were not a lot of companies competing with Counterpart in Central Asia, I was surprised that no place could be found for me given the breadth of my experience in this part of the world.  I was never sure that any of my professional friends actually went out of their way to push for me.  I felt that I was tainted by Counterpart's judgment and treatment of me.  I had become a pariah and people seemed uncomfortable with me in my state of despair. After several months in Almaty I moved to Bishkek, Kyrgyzstan, hiring two small trucks to take my furniture and possessions.  After staying in Bishkek for 6 months and doing volunteer work for Center Interbilim, an organization that I had started many years before.  I finally realized the need to move back to the US and start over since things were not working out for me.

67.     I miss the people and the camaraderie that I experienced in Almaty.  Whenever a staff person left our employ we always had an event, usually at a restaurant or at our office, where we could mark the departure in a celebratory way that was healthy and understood by the local culture.  I was denied this and even the chance to say goodbye to so many people with whom I had worked for years.  I miss them to this day.  I still do not understand how an organization like Counterpart that espouses concern for humans and their conditions can be so cold and destructive to a person who was dedicated to its goals for 10 years. How could it be that persons I knew and trusted could not even call me to ask for my view or explanation when I was being accused of things so different from anything my professional history would suggest I would do?

68.    I contacted USAID within a week or so after my firing and had a meeting there that included Susan Fritz, Igor Tupitsyn and John Lord.  I took this step not to gain some kind of revenge on Counterpart, which is apparently Arlene Lear's take on this meeting. I was simply trying to clear my good name with and say goodbye to persons with whom I had long worked, whom I respected and whose respect for me I cherished.  I was asked at that meeting if I thought that a financial investigation of Counterpart should be conducted.  I said no because I imagined an investigation as something large and damaging to the programs with which I had worked for years.  The hanky panky with funds that I described to Boyer was just that, small and correctible, at least that is what I thought at the time.  After seeing Counterpart's use of funds through financial records produced in this case I realize that Counterpart was blatantly misusing funds that were intended for and granted for specific projects in Central Asia.  Now I realize that Counterpart's mismanagement of funds went way out of bounds when part of a USG funded project.

69.    I am now the General Manager of a local retail store in Oregon, something that has its benefits but it does not even begin to compare with the satisfaction of managing multiple projects in a 5-country region of the former Soviet Union.  I am again considering looking for work in the field of international development and civil society, although I am sure that (as small as that world is) I will have a hard time finding employment.

70. In 2000 while trying to locate a witness I did an internet search and came across the document that is attached to this Declaration as JCX-F.  It is a Final Report that Counterpart had prepared at the conclusion of the HNCBI program that I had managed. The evaluators found the program successful on all objectives.

71. In 2004, Counterpart had projects underway in at least 20 countries around the world.


I declare under penalty of perjury that the foregoing is true and correct.

_____

Jay Cooper

Executed on _____2/12/07_____

                 Date

At _____Medford, Oregon_____

          Place

43