Index to Genuine Issues

| | | |
|---|---|---|
| 1 | 3 | Counterpart has consistently recognized that Jay Cooper at all times fulfilled his job responsibilities in an exemplary fashion, as exemplified by the scope of the responsibilities with which he was entrusted. |
| 2 | 4 | Counterpart has consistently recognized that Jay Cooper at all times fulfilled his job responsibilities in an exemplary fashion, as shown by counterpart's recognition of the success of the programs he managed. |
| 3 | 10 | Professionals engaged in international development in Central Asia have consistently recognized Cooper's contributions to that effort, his vision, his expertise and his management skills. |
| 4 | 12 | Arlene Lear, as Cooper's direct supervisor at all relevant times until August of 2004, consistently recognized the excellent job Cooper was doing for Counterpart and never communicated to Cooper any dissatisfaction with his job performance, as evidenced by her actions that are wholly inconsistent with her present criticisms, and by the sworn statements of Cooper and those who worked with him. |
| 5 | 15 | At no time did Arlene Lear or Counterpart offer Cooper "options" other than to return to Almaty under Kunz' supervision. [**CONTRAST:** Dorcus' testimony that Lear told him that she had offered Cooper different options and that she was forced to make the decision to bring in Kunz and cancel Cooper's responsibility to supervise Abma because Cooper "refused to change." |
| 6 | 16 | Jay Cooper had sound reasons to be concerned about Counterpart's decision in the summer of 2004 to place Michael Kunz in charge of his projects when Lear announced that change to him on August 18, 2004, and he communicated those concerns and his reasons to Arlene Lear, who unreasonably gave them no weight. |
| 7 | 18 | Jay Cooper also had sound reasons to be concerned about Counterpart's decision in the summer of 2004 to remove its Regional Finance Officer Bob Abma from under his supervision and to place Abma under the supervision of Michael Kunz. |
| 8 | 20 | After the reorganization of August 2004, Cooper returned to Almaty, Kazakstan and worked as usual on his projects. Counterpart found no problem with Jay Cooper's job performance in the three months he worked under Michael Kunz' supervision until Kelli Boyer arrived in Almaty. |
| 9 | 23 | Counterpart abolished its Grievance Procedure in October of 2004 because it planned to terminate Jay Cooper and wanted to prevent him from invoking the Grievance Procedure to challenge the proffered reasons for his termination and expose Counterpart's financial irregularities, and it then tried to cover up that fact by the late production of a highly questionable document. |
| 10 | 27 | Counterpart's management knew before Cooper's termination that its Open Door policy was inadequate to protect employee rights. |

| 11 | 29 | Jay Cooper had complained to appropriate officials at Counterpart about financial irregularities he had encountered in Counterpart's offices in the Central Asian Region in 2003-04, and became increasingly concerned after these practices escalated in the Fall of 2004. |
|---|---|---|
| 12 | 35 | Within weeks of his termination, Cooper refused to approve a Budget created by Bob Abma and supported by Michael Kunz that would have permitted charging costs associated with an unrelated project to the programs Cooper managed. |
| 13 | 37 | Counterpart was obliged to abide by OMB Circular No. A-122, Subject: Cost Principles for Non-Profit Organizations, made applicable by virtue of 22 C.F.R. 226, in connection with its performance of projects under Cooperative Agreements with the United States Agency for International Development ("USAID") ("the USAID Cost Standards") |
| 14 | 39 | Counterpart routinely disregarded its obligations to allocate direct costs among the programs that benefited from those costs as required by the USAID Cost Standards. |
| 15 | 50 | Counterpart improperly failed to allocate NICRA to uses for the individual awards which generated those funds, in violation of the USAID Cost Standards. |
| 16 | 54 | Counterpart, through Arlene Lear, routinely overspent project funds as direct costs at Headquarters in improper reliance on the notion of "100% line item flexibility." |
| 17 | 55 | Counterpart sent its Human Resources Manager Kelli Boyer to Kazakhstan at least in part to develop facts about Jay Cooper that would justify his termination. |
| 18 | 57 | False information provided by Kelli Boyer formed the basis of Lear's decision to terminate Cooper, and that information is disputed in this Court. |
| 19 | 64 | Boyer fed Arlene Lear other erroneous information that Lear admits receiving that undoubtedly contributed to the termination decision. |
| 20 | 67 | Cooper complained to Kelli Boyer of Counterpart's Human Resources Department about his concerns about financial irregularities in the Almaty office during her visit to Almaty in November of 2004, and they discussed whether Cooper could lodge a complaint with the Inspector General. |
| 21 | 70 | Cooper's termination was not handled in accordance with Counterpart's standard operating procedures and was carried out in such a way as to send out a message that Counterpart had found Cooper to be dishonest and to facilitate a search for the "secret files." |
| 22 | 78 | Evidence of record reasonably supports the inference that Lear learned that there was a danger that Cooper would complain to USAID about irregularities in Counterpart's use of program funds before she terminated Cooper, and Lear caused Cooper to be locked out of his office to permit a search for the secret files. |
| 23 | 82 | Cooper suffered mental distress as a result of Counterpart's actions. |
| 24 | 85 | Counterpart has a general policy of giving each employee an increase in |

|    |    | salary of five percent per year assuming good performance.. |
|----|----|---|
| 25 | 85 | The evidence suggests that Counterpart rewarded Lear, Kunz, Abma and some members of the staff of the Almaty office for having disposed of the threat that Cooper posed. |