# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAY W. COOPER, ) | |
| Plaintiff ) | |
| v. ) | Civil No. 1:05-cv-01598-RMC |
| COUNTERPART INTERNATIONAL ) | |
| Defendant. ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

**A.  Cooper's Claim For Breach Of Contract**

Plaintiff Jay Cooper's ("Cooper" or "Plaintiff") Opposition to Defendant's Motion for Summary Judgment asks this Court to interpret Plaintiff's employment contract in a manner that is inconsistent with the plain meaning of the contract. The contract provides that Counterpart has the right to terminate Plaintiff's employment if he fails to perform his job duties to Counterpart's satisfaction. Counterpart's moving papers demonstrate why the organization was not satisfied. Those reasons are sufficient under the law for this Court to enforce the contract and grant summary judgment.

Plaintiff essentially argues that Counterpart's satisfaction must be subject to an additional requirement not present in the contract, i.e., that Plaintiff must agree that Counterpart's reasons for its dissatisfaction are valid. Because he and others believe he was performing satisfactorily, he asserts that summary judgment is not appropriate. However, the law does not give weight to Cooper's subjective disagreements (or the

feelings of his friends and supporters). Rather, this Court should enforce the unambiguous contract terms which render his employer's satisfaction as the only determining factor governing the right to terminate the contract. To rule otherwise would be to hold that the agreement at issue is not a satisfaction contract (which it is), but instead a contract requiring mutual consent to terminate. Cooper's contract simply cannot be read in that manner.

Similarly, Cooper's argument that he was really fired for fear that he would report financial irregularities must fail. The illogic of his argument is inescapable. Cooper argues that Counterpart discharged him to stop him from whistle-blowing. Yet, after he was fired he was faced with the perfect opportunity to complain of any financial wrongdoings and decided there was nothing worth mentioning. If Cooper, the self-appointed financial watchdog for the organization, did not see fit to complain, it is impossible to conclude that Company officials who had always believed that they were in compliance with the rules would feel it necessary to fire him just to ensure his silence. Moreover, the alleged "irregularities" he relies upon are a creation of the discovery process and only an after-thought. They were not reported or known to Counterpart during his tenure.

Thus, there is no evidence on the record showing that Counterpart acted unlawfully, in bad faith, or in contravention to the express and implied terms of Cooper's employment contract. Accordingly, summary judgment on Cooper's breach of contract claim should be granted.

> B.  **Cooper's Claim For False Light Invasion Of Privacy**

Cooper's arguments in support of his false light claim are woefully inadequate. His Opposition Brief proves the points raised in Counterpart's opening brief: Plaintiff cannot establish that Counterpart made false statements to the public at large that would be highly offensive to a reasonable person. Indeed, Cooper fails to meet any single portion of the *prima facie* case for false light invasion of privacy.

The most egregious act that Cooper attributes to Counterpart is changing the locks on his office and barring him from the office. Yet, these are not false statements, nor were they generally made known to the public by Counterpart. To the extent anyone talked about these acts, it was only gossip, rumor and innuendo furthered by Cooper and his supporters. Cooper cannot manufacture his own false light claim by spreading rumors about his departure. The other statements on which he relies were either true, not offensive, not publicized, or some combination of all three factors.

For all these reasons, and those more fully described below, summary judgment in Counterpart's favor on all counts, including his false light claim, is appropriate.

## II.  ARGUMENT

> A.  **Plaintiff's Interpretation of his Employment Contract is Wrong and his Arguments Premised on that Interpretation Should be Given no Credence**
>
>> 1.  **The Only Relevant Inquiry is Whether Counterpart was Satisfied with Cooper's Performance**

Cooper does not believe that Lear really believed his performance was poor. He does not believe that the reasons Lear has provided for her termination decision are the "real reasons." And, lastly, he does not believe that he performed poorly. These are Cooper's arguments for why summary judgment should not be granted.

With all due respect to Cooper's subjective beliefs, they are nothing more than speculation and wishful thinking that duck the central issue in this case: the contract that Cooper negotiated and signed allowed Counterpart to terminate the contract if <u>Counterpart</u> was dissatisfied with Cooper's performance.  Like it or not, that is the bargain that Cooper struck.  If he did not want to put his professional future in Counterpart's hands, he should have negotiated a different deal.  But he did not, and he may not come before this Court well after the fact and argue that Lear's undisputed reasons for terminating him are not sufficient.  "It is an elementary principle of contract interpretation that the plain and unambiguous meaning of a written agreement is controlling, in the absence of some clear evidence indicating a contrary intention." *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land*, 670 F.2d 289, 292 (D.C. Cir. 1981) (quoting *Vogel v. Tenneco Oil Company*, 465 F.2d 563, 565 (D.C.Cir.1972) (affirming summary judgment for defendant on breach of contract claim)).

The contract does <u>not</u> say that in order to terminate his contract Cooper must agree that Counterpart actually believed he was performing poorly.  The contract does <u>not</u> say that Cooper must agree that the stated reasons were the real reason for his discharge.  And, finally, the contract does <u>not</u> say that Cooper must agree he was not performing to Counterpart's satisfaction.  To follow Cooper's arguments would be directly contrary to the "plain and unambiguous" meaning of his employment contract.  Accordingly, summary judgment should be granted.

> **2.      Cooper does not Raise Issues of Fact with Regard to Lear's Reasons for Termination**

Even if it were legally relevant to this Court's inquiry (which it is not), Cooper's alleged evidence that Lear did not really believe his performance was unsatisfactory is

insubstantial and unpersuasive. He claims that Lear wrote a favorable performance review more than two and a half years before the termination decision. This is irrelevant. Is Cooper really suggesting that a supervisor cannot change her mind over a two-year period? This stale review proves nothing and does not undermine the bona fide nature of Lear's sworn testimony as to her reasons for terminating Cooper's employment.

Cooper claims that Lear's stated reasons for her termination decision were not completely spelled out in the telephone call with Cooper informing him of her decision and that her reasons are not listed on the "script" she used for that call. This does not raise any issues of fact. There is no principle of law and no contractual requirement which says that an employee must be told every reason he is being fired. Moreover, there was nothing inconsistent with the "script" and Lear's stated reasons in her declaration. In short, this argument does not even tend to show that Lear's reasons are to be disbelieved or cast in a suspicious light.

Cooper introduces the testimony of several co-workers and subordinates who thought he was doing a great job. Again, these declarations are irrelevant because the contract does not state that Cooper's performance was subject to a vote. It is always the prerogative of management to make independent decisions that do not always jibe with the feelings of other employees. This is not uncommon and it does not raise issues of disputed fact. If it did, employment contracts would be rendered unenforceable; it is virtually impossible that every termination decision will be met with universal support and agreement.

On the contrary, courts understand that it is the decision-maker's subjective viewpoint that controls satisfaction contracts and should control here. *See*,

RESTATEMENT (SECOND) OF CONTRACTS § 228 (1981), Illustration 5 (where the contract is for the performance of services, it is inappropriate to use an objective standard to determine satisfaction of performance); *see also, Ferris v. Polansky,* 59 A.2d 74, 752 (Md. 1948) ("It is not necessary that there exist grounds deemed adequate by the trier of facts for the employer's dissatisfaction. He [the employer] is the judge as to whether the services are satisfactory.")

### 3. Cooper has no Evidence that Boyer Lied to Lear, or that Lear had any Reason to Believe Boyer Lied

Cooper does not believe that Boyer's impressions of his performance, as related to Lear, were true. This is irrelevant. There is no dispute, and Cooper cannot contest, that Boyer told Lear certain things which bolstered Lear's own concerns about Cooper's performance. Even if Cooper could show that Boyer was lying (which he cannot), he would have to also show that Lear knew Boyer was lying before he could claim that Lear was making up the reasons for his discharge. Cooper has no such evidence. There is nothing sinister, inappropriate or suspicious about Lear choosing to believe Boyer's account of her visit to Almaty.

Cooper's argument that Boyer and Lear plotted to trump up evidence against him is the product of a fanciful imagination. He claims, without a single supporting fact, that Boyer was basically dispatched to Central Asia on a mission with the express purpose of digging up -- or making up -- dirt on him. He claims, again without any support whatsoever, that Lear "must have known" Boyer's information was false. Plaintiff's wild speculation is not sufficient to raise a triable issue of fact to defeat summary judgment.

What is particularly ridiculous about Cooper's conspiracy theory is that he also goes to great lengths to call into question Boyer's professional competence. Therefore,

on one hand, he argues that Boyer should not have been trusted because she was not good at her job. On the other hand, he says that despite her incompetence, and despite everyone supposedly knowing of her incompetence, Lear entrusted her with this "secret mission" to gather evidence against Cooper. Cooper cannot have it both ways. He cannot say that Boyer was incompetent when it suits his purposes to undermine her testimony, and yet also say that she was competent enough to take part in this elaborate plot.

Moreover, Cooper's imagined theory overlooks the undisputed fact that Cooper admits he asked Boyer about leaving Counterpart and about his termination options. Defendant's Undisputed Fact, ¶40. Thus, it makes no sense that Lear would dispatch Boyer to gather evidence against Cooper when there was every reason to believe that Cooper was going to quit.

In short, Cooper's Opposition Brief does not raise a single material issue of fact that would preclude summary judgment. His arguments run directly contrary to the plain meaning of his employment contract and should be disregarded by this Court.

### B. Alleged Financial Improprieties had Nothing to do with Counterpart's Discharge Decision and Plaintiff has no Evidence to the Contrary

Cooper claims that Counterpart terminated his employment to prevent him from reporting misuse of program funds. This is nothing more than a post-termination red herring created by Cooper in a desperate attempt to defeat summary judgment. His argument cannot withstand the harsh light of his own testimony that he did not believe there was anything worth reporting. In addition, Cooper never explains how terminating him would <u>prevent</u> him from reporting. On the contrary, one would think that

terminating an employee is precisely the type of action that makes someone angry enough to report improprieties, whether or not they exist. Yet, even spurred on by his feelings about being terminated unjustly, Cooper still to this day has never raised an issue of perceived financial irregularities with any government authority. To borrow Cooper's own phrase, this "puts the lie" to his claim.

Cooper has now prepared spreadsheets which purportedly show improper billing. One of the many flaws in Cooper's case, however, is that none of this evidence was known by Counterpart during Cooper's employment. By his own admission, he never told anyone that he felt any billing issues were so severe that he was going to file a report with the government. Defendant's Undisputed Facts, ¶ 67. Indeed, his declaration states that the "hanky panky with funds that I described to Boyer was just that, small and correctible, as least that is what I thought at the time." Cooper Decl., ¶68.

Cooper relies almost exclusively on his off-hand "mention" to Boyer about "small and correctible" "hanky panky." Yet, other than speculation, he cannot even remotely link that remark to Lear. The proposition that Lear somehow knew about Cooper's comments because he happened to speak privately to Boyer is complete fantasy. Cooper has no proof that he made such comments to Lear. He has no proof that Lear was aware of his comments. He has no proof that Boyer told Lear about his comments. Neither Lear nor Boyer testified that they had any discussions about an allegation of "hanky panky."

Lear unequivocally testified that she did not know of any financial irregularities by Counterpart and that the actual conversation she had with Cooper, which Cooper referenced in his testimony as the basis for his claim, was about "files" on Michael Kunz

which Cooper said to Lear were letters of complaint, not evidence of perceived financial irregularities.[1] Cooper offers no evidence that he or Boyer ever communicated to Lear so much as a notion about reporting financial irregularities, and Cooper himself saw no reason to do so.

Moreover, the fact that one <u>could</u> report perceived financial irregularities to the Inspector General, as Cooper describes in his brief, is not the same as actually reporting them, or conveying to others an intent to do so. Cooper does not testify he intended to report his concerns to the Inspector General or that he actually reported them, only that, as a general matter of procedure, it was possible to do so. On the contrary, when contracting officers in Almaty asked Cooper if he suspected there were financial irregularities Cooper unequivocally testified, "I told him not that would warrant investigation." This is a far cry from his present claim that he possibly was going to report his concerns to the Inspector General. Such a direct negation in the testimony demonstrates that Cooper is merely concocting a post hoc reason for his termination that, in reality, was never there.

Without even attempting to pin down when any such conversations took place, Cooper alleges that he had conversations with Lear about alleged financial improprieties. His only evidence is contained in paragraph 16 of his declaration. There, he describes conversations with Lear over a period of years where he raised some questions. Nowhere in that testimony does he allege that he complained Counterpart was engaged in illegal activities. There is a vast difference between complaining that projects were over budget

---

[1] Counterpart showed in its opening brief, pages 11-12, that to the extent there was any knowledge of "secret files", they concerned complaints by Cooper about Kunz. It was old news that the two of them did not work well together and those files certainly provide no basis for concern about alleged financial irregularities.

and a whistleblower claim that Counterpart was violating federal law. What Cooper is now choosing to describe as "financial irregularities" is really nothing more than a personal turf war about whose budget was being charged with what expense. This is consistent with his belief at the time of his discharge that any issues were "small and correctible." If it were anything more than that, Cooper would not have replied as he did after his termination when directly asked if there were in any financial irregularities worth investigating; he replied in the negative. It is nothing more than self-serving revisionist history to come before this Court and claim otherwise.

Nor does he demonstrate beyond his own conclusory allegation that Lear ever believed Counterpart acted improperly, much less illegally, in managing its discretionary funds, let alone that Cooper intended to report Counterpart's book-keeping to government authorities. Cooper's argument is particularly specious considering that it is based solely on evidence obtained in discovery and not on any contemporaneous belief he held at the time of his termination. As a result, Cooper never could have posed a "threat" to Lear, ir anyone else at Counterpart, during his employment.

In addition, if Lear were so motivated to get rid of Cooper because she saw him as a "threat", why did she go through what would then have been an elaborate charade to bring in an outside mediator to discuss the differences between Kunz and Cooper and to try to get them to work together? That step only makes sense if Lear felt that Cooper had potential value to the organization, not if he were a threat. "Actions speak louder than words." This is a time-honored truism and speaks volumes in this case. It was only after this August meeting, and after Boyer reported her concerns to Lear, including that

Cooper had left her with the impression that he was only going to give minimal effort in the future, that Lear reached the termination decision.[2]

Plaintiff's allegations regarding alleged financial improprieties simply do not raise any material issues of triable fact and do not defeat summary judgment.

### C. Plaintiff's Termination did not Violate the Implied Covenant of Good Faith and Fair Dealing

In the context of arguing that Counterpart breached the implied covenant of good faith and fair dealing, Cooper's Opposition Brief reiterates the allegation that he was discharged to prevent him from complaining to "the authorities" about corporate wrongdoing. Again, he fails to explain how Counterpart could achieve this supposedly nefarious objective by terminating him. Indeed, Cooper had the perfect opportunity to "blow the whistle" on Counterpart <u>after</u> his discharge and passed up the opportunity. Why? The answer is simple: he knew then, just as assuredly as he is taking the contrary position now, that there was no corporate wrongdoing taking place. Plaintiff's argument is completely unsupported and raises no triable issues about Counterpart's good faith.

Plaintiff's Opposition Brief also engages in a lengthy screed about the instances of bad faith in which Counterpart allegedly engaged. However, Plaintiff's attempt at mudslinging misses the target. It is of no relevance if, at various times in Cooper's employment, he feels as if he was mistreated. The issue before this Court is whether

---

[2] Plaintiff now "disputes" his own testimony about telling Boyer that has only going to give "minimal effort." Cooper states in ¶ 39 of his declaration, that he was simply attempting to figure out how Boyer might have misconstrued him, and denies ever saying "bare minimum" or "minimal effort." Thus, Cooper is deliberately creating a dispute of fact. This really is no dispute at all, however. Defendant's undisputed facts state explicitly that Cooper admits Boyer "could have" taken his conversation with her to mean minimal effort, which is precisely what he said in his testimony. Nothing is taken out of context; Cooper is simply trying to negate the inference that he, in fact, told Boyer he intended to exert minimal effort. Whether or not Cooper believes he said bare minimum/minimum effort to Boyer is irrelevant; the fact is undisputed that Boyer could have taken his comments that way and conveyed that perception to Lear.

Counterpart breached Cooper's employment contract by terminating him, not whether he received a job description, was lied to with regard to the signing of his contract, did not receive a performance review on time, whether the Company does or does not have a whistle-blowing policy, whether the Company responded to complaints about Kunz, whether the Company responded about Cooper's concerns about expenses, whether Boyer breached Cooper's confidence, whether the grievance procedure was eliminated, whether Dorcus saw a copy of Cooper's 2002 performance review, whether Cooper was given a chance to rebut the reasons for his discharge, whether Cooper was presented with options before being discharged, whether he was locked out of his office, and whether certain individuals received raises in 2005. According to Plaintiff, these are all the allegedly "bad faith" actions taken by Counterpart; yet, not a single one of them has anything do with the only question relevant to Counterpart's motion for summary judgment: did the Company have the right to terminate Plaintiff's employment contract? The answer to that question is unquestionably in the affirmative.

In addition to the foregoing facts being irrelevant to the issue of Counterpart's good faith because they do not concern his termination, the vast majority of them have nothing to do with Lear's state of mind. It is only Lear's actions that are relevant to the question of whether Counterpart breached the implied covenant of good faith and fair dealing, because Lear was the unquestioned decision-maker. Therefore, whether Dorcus or Boyer failed to meet Cooper's standards of appropriate behavior has nothing to do with the question before this Court. Accordingly, judgment should be entered for Counterpart on the contract cause of action.

### D. Plaintiff Cannot Prevail on his Claim for False Light Invasion of Privacy

#### 1. Cooper Cannot Show Sufficient Publicity to Prove his False Light Claim

There are four ways Cooper claims that Counterpart engaged in false light invasion of privacy: (1) Lear's message that Cooper had left the organization; (2) individual conversations with a variety of people; (3) the actions taken to keep Cooper out of the Almaty office; and (4) rumors surrounding his discharge. Each of these alleged bases is insufficient to defeat Counterpart's motion for summary judgment because alone and in combination, the foregoing assertions do not comprise even a *prima facie* case.

Lear's email is the most widely distributed communication that Cooper relies upon. Yet, even that email was only distributed to Counterpart employees. The publicity element of a false light claim requires much more widespread publication. *See, e.g., Childs v. Williams*, 825 S.W. 2d 4, 8-9 (Mo. App. 1992) ("It is of no consequence that private facts are communicated, even to a large group of persons, if by that communication the private facts are not made public. The critical aspect of the publication requirement is public disclosure – communications that are available to the general public, communications that have a likelihood of becoming public knowledge."); *Steinbuch v. Cutler*, 463 F. Supp. 2d 1, 5-6 (D.D.C. 2006) ("Publicity … means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.")

Counterpart is not a large company. It only had about 300 employees in 2004. Supplemental Declaration of Arlene Lear, ¶ 2. Therefore, although Cooper tries to make Lear's email sound like it would reach a large public audience, the reality is quite different. Based on both *Childs* and *Steinbuch*, it is clear that a broader distribution to the mass public would be required in order to state a cause of action for false light invasion of privacy.

The next most widespread information about Cooper concerns the decision to ban him from his office and changing the locks on doors. Engaging in gross hyperbole, Cooper speculates that the people of Central Asia equate these acts to something perpetrated by the KGB.[3] Even assuming, arguendo, that such actions rise to the level of putting Cooper in a false light, and assuming that Cooper is in any position to speak for all of Central Asia, there is absolutely no evidence that Counterpart did anything to let the public know it was taking these steps. The only thing that Cooper's host of declarations shows is that there might have been gossip in the Central Asian development community, much of it furthered by Cooper himself. Because Counterpart was not the party disseminating this information, it cannot be held liable under a false light theory.

In *Stewart v. The Pantry, Inc.*, 715 F.Supp. 1361 (W.D. KY. 1988), the court explained that simply terminating an employee is not enough to subject the employer to a false light claim. Instead, the court held:

> the false public image must result from an unreasonable publicity by the defendant. "Publicity", in the false-light context, requires

---

[3] Plaintiff claims that because other ex-employees dispute Counterpart's contention that changing the locks was standard procedure, that this means there is a question of fact. This is not true. Whether Counterpart had a standard procedure, and whether Counterpart followed it is not the relevant inquiry. To raise a question of fact that mattered, Cooper would need to show that the public knew it was Counterpart's policy <u>not</u> to change locks and that because the Company did so here, that Cooper was placed in a false light. Of course, Cooper has no such evidence and, therefore, this alleged disputed fact is of no consequence.

> more than the mere act of firing plaintiffs under circumstances which may result in gossip. … Rather, it requires the communication of the false impression that plaintiffs were dishonest employees, with knowing or reckless disregard for the falsity of the publicized matter. *McCall* at 888. For that to occur in the present case, plaintiffs must be able to show that The Pantry communicated *the reasons* for plaintiffs' termination to members of the public. There is no evidence to sustain such a contention. Moreover, even if there were evidence that The Pantry communicated such information outside the corporate hierarchy, given that plaintiffs also told others of the reason for their termination, any false light created is not attributable to any conduct on the part of The Pantry.
>
> Most importantly, plaintiffs entire false-light claim rests upon The Pantry's alleged "policy" of terminating employees "under circumstances where widespread publication . . . can be expected, and is in fact desired and intended. . . ." Beyond these contentions, plaintiffs have neither pleaded nor proved any "publicity" by The Pantry, other than the overt act of firing plaintiffs. If the act itself can give rise to a cause of action for false light, then any time an employer discharges an employee, the employer runs the risk that the accompanying stigma will result in a false-light law-suit. That risk may be exacerbated where the events occur in a small town, where plaintiffs may be well known and news spreads quickly. False-light liability must be limited only to those cases in which the employer unreasonably communicates to the public false reasons for a dismissal, not the mere fact of dismissal. [Emphasis in original.]

Here, Cooper's small "community" of Central Asian development workers is akin to the small town in *Stewart*. And, just as in *Stewart*, the dissemination of information by parties other than the employer does not subject the employer to liability.

Cooper attaches a number of declarations from his friends which contain individual accounts of things that the declarant heard. Most of these accounts are based on one-on-one conversations that the declarant had with some other person. Again, this is not evidence of the type of publicity necessary for a false light claim. *See Stonum v.*

15

*U.S. Airways Inc.*, 83 F. Supp. 2d 894, 905 (S.D. Ohio 1999) ("Disclosure … to one person … does not constitute invasion of privacy.")

### 2.  Cooper Admits Counterpart did not Spread False Information About his Discharge

Cooper admitted in his deposition that Counterpart did not do anything to spread the reasons for his termination. Defendant's Undisputed Facts, ¶78. Now, of course, he disputes his own testimony and the "inferences" that Counterpart draws from it. There are no "inferences" involved here. His testimony was clear. To attempt to confuse the issue, Cooper asserts a whirlwind of contradictory conclusions about what constituted false light. First, he accuses Counterpart of placing him in a false light when it remained silent as to the reasons for his termination. Next, Cooper accuses Counterpart of placing him in a false light when it spoke tactfully about his termination (as in the "regretful" announcement to staff or stating Cooper is "no longer with the organization"). Eventually, Cooper accuses Counterpart of placing him in a false light when it explained to officials to whom it had a contractual obligation to inform about changes in staff (such as USAID) that Cooper was terminated from employment, blaming Counterpart of sending out mixed messages after he admitted contacting "everyone I knew trying to explain what happened to my job." Cooper Decl. ¶ 66.

That is not what the cause of action for false light is about. It is not about blaming Counterpart for busy-body gossip promulgated by Cooper's friends and acquaintances; it is not about the unprompted talk of others about why Cooper was terminated; and it is not about holding Counterpart responsible for mixed messages impliedly caused by Cooper when he frantically contacted everyone he knew to tell them why he believed he was fired. The cause of action for false light protects a person from

highly offensive statements deliberately made by an actor with intent to grossly misrepresent the character of that person. By terminating Cooper's employment and attempting to be tactful and respectful about it, hardly capable of controlling the private perceptions of each of Cooper's friends and colleagues, Counterpart did no such thing.

### 3. Reviewing False Light Cases Shows That Cooper's Allegations do not State a Cause of Action

A review of cases in which false light was found is instructive and vividly demonstrates the difference between those situations and the actions Counterpart is accused of in this case. False light has been found:

-- when a police organization letters disseminated letters for purposes of drug investigation that implied an officer who was a candidate for high position in the organization used an illegal drug and engaged in bribery. *White v. Fraternal Order of Police, et. al.*, 909 F.2d 512 (D.C. Cir. 1990);

-- when one party disseminated in nationwide online newsletter information falsely linking plaintiff to murder of police chief. *Mazur v. Szporer*, 2004 U.S. Dist. Lexis 13176 (D. D.C. 2004);

-- when it was reported in a national newspaper false facts about journalist's sexual relationships and that journalist used job to obtain romantic relationships with "power players." *Benz v. The Washington Newspaper Publishing Company LLC et. al.,* 2006 U.S. Dist. Lexis 71827 (D. D.C. 2006);

-- when an article was published in a newspaper suggesting plaintiff was a felon. *Howard v. Antilla*, 160 F. Supp. 2d 169 (D. N.H. 2001);

-- when a legal action was commenced in the name of the plaintiff without plaintiff's knowledge or consent. *Steding v. Battistoni*, 208 A.2d 559 (Conn. 1964);

17

-- when the name and likeness of senator was used to headline state political party without senator's consent.  *State ex rel. La Follette v. Hinkle*, 229 P. 317 (Wash. 1924);

-- when tabloid newspaper published photograph of elderly woman with salacious caption indicating woman became pregnant by millionaire without her knowledge or consent.  *Peoples Bank & Trust Company of Mountain Home, conservator of the estate of Nellie Mitchell v. Globe International, Inc.*, 786 F. Supp. 791 (W.D. Ark. 1992).

Plaintiff's allegations are the answer to the question: which of these sets of facts is different than all the others?  Counterpart did not put any ads in papers or on-line. Counterpart did not impugn Cooper's character by making the true statement that he was no longer with the organization.  Instead, Cooper cites to statements made to individuals, who then decided to spread rumors, many of which he fanned himself by contacting everyone he knew to talk about his termination.  Plaintiff cannot create his own false light claim in this manner and then blame it on Counterpart.

**4.    Counterpart did not Make any "Highly Offensive" Statements**

Even though it was not the subject of mass publicity, Cooper claims that being shut out of his office meets the "highly offensive" prong of the false light test.  As the foregoing cases demonstrate, this part of the test is met when a serious crime is implied or when someone is subjected to "salacious" rumors.  Changing the locks on someone's office does not even come close to this standard.  This is not an uncommon experience and broadening the tort of false light invasion of privacy in this manner would open the floodgates to a host of unwarranted claims.  Plaintiff cannot meet the test of "highly offensive" statements.

### 5. True Statements and Opinions are not Actionable on a Claim for False Light

Cooper's Opposition Brief cites to true statements or opinions which cannot form the basis for a false light claim. For example, he claims that an announcement that was no longer employed by Counterpart and not allowed in Counterpart offices is the foundation for a false light claim. Neither of those statements is false and, therefore, cannot be held against Defendant. Similarly, he argues that Lear's expression of "deep regret" is false. How can he possibly know whether Lear, in fact, feels no regret? Obviously, he cannot and he should not be entitled to mischaracterize her statement to manufacture a dispute of fact. To the extent that Cooper relies on any of these statements in support of his claim, summary judgment must be granted.

### III. CONCLUSION

For the foregoing reasons, Counterpart asks the Court to grant its motion for summary judgment, enter judgment in Counterpart's favor on all counts, and dismiss this case with prejudice.

Respectfully submitted,

**JACKSON LEWIS LLP**

February 26, 2007

By: /s/
Tyler A. Brown (D.C. Bar No. 480693)
8614 Westwood Center Drive, Suite 950
Vienna, VA 22182
(703) 821-2189

**Attorneys for Defendant Counterpart International**