## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAY W. COOPER | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 1:05-cv-01598-RMC |
| | ) | |
| COUNTERPART INTERNATIONAL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### JOINT PRETRIAL STATEMENT

In accordance with the Court's June 3, 2008 Order and Local Rule 16.5(b), Plaintiff Jay

W. Cooper and Defendant Counterpart International, through counsel, hereby file this joint

pretrial statement.

### I.       STATEMENT OF THE CASE

####        A.       Plaintiff's Statement of the Case

In November of 2004, Plaintiff Jay Cooper had been employed by Counterpart

International for almost ten years in a series of increasingly responsible positions. Counterpart is

an international development firm that, as of 2004, ran programs in some twenty countries

throughout the world. Cooper was Regional Director in Counterpart's Civil Society Division

based in Almaty, Kazkhstan. He was also Chief of Party and managed four programs that ran in

five countries in Central Asia. Two of those programs were of substantial size. The Civil

Society Support Initiative ("CSSI") program, running in three countries, was the largest one in

Counterpart's portfolio spending $ 3.7 million in FY 2004, and the largest one in the Division

run by Cooper's supervisor, a Vice President named Arlene Lear. The Health NGOs Capacity

Building Initiative ("HNCBI") program, also in Lear's Division, ran in five countries and spent $ 1.17 million in FY 2004.

Both these program were funded under cooperative agreements with the US Agency for International Development ("USAID"), Counterpart's primary funding source. Counterpart was obliged to account for its spending in all USAID-funded programs under OMB regulations that required that funds awarded for a given program be spent for the benefit of that program.

Cooper began to notice various steps taken by Lear to siphon off monies that had been granted for CSSI and HNCBI for use by Headquarters in excess of the amounts that the USAID-approved budget for those programs had anticipated. He began to notice that a disproportionate amount of the expenses of Counterpart's Regional Financial Director Bob Abma were being charged against these two programs, when much of Abma's time was being devoted to developing proposal for new programs for Counterpart. He started to complain, but was blown off by Lear and Abma. He began to watch Abma more closely.

Suddenly in the summer of 2004, Lear summoned Cooper to Washington and announced that a Michael Kunz was being brought in to the Almaty office and was to become the supervisor of both Cooper and Abma. (Before this event, Kunz and Lear had discussed their fear that Cooper was developing "secret files" on them and on financial irregularities.)

Cooper realized he would no longer have any control over Abma's financial activities because Abma would no longer report to him. He was also leery of Kunz, having received staff complaints of (and having personally witnessed) Kunz exhibit abusive and other erratic behaviors. Although not happy with the new arrangement, Cooper returned to his post in Almaty to continue running his programs.

Almost immediately the effect of the changes became evident, as Abma, with Kunz's backing, proposed moving funds out of CSSI and HCNBI to make up shortfalls elsewhere and to fund Kunz's attempts to develop new proposals for Counterpart in Eurasia.  Cooper refused to approve these moves, and sent copies of relevant correspondence to Counterpart's CFO, Harry Dorcus.  Dorcus made no reply.

Counterpart responded quickly.  Lear sent the HR Manager, Boyer, to Almaty to develop evidence to support Cooper's termination.  Boyer consulted with Abma and Kunz and reported all manner of false and fanciful information about Cooper to Lear, who fired Cooper on November 12, 2004, despite a contract that extended through June of 2006.   Lear's termination call relied heavily on Boyer's false reports.  Cooper was given no opportunity to rebut the lies presented by Boyer.

Lear has concocted various false scenarios to support her action.  To distance herself from Boyer, she has falsely claimed that she had serious problems with Cooper's job performance and that she had on many occasions communicated her criticisms to Cooper.  There is no document that shows any such thing and Cooper denies verbal criticism.  Lear's one written performance review of Cooper is admittedly highly favorable and we have many writings by Lear praising Cooper. Lear also claims she offered Cooper various alternatives to termination, which Cooper denies and of which there is no evidence.

We have many other indicia of Counterpart's bad faith toward Cooper including refusal to give him a job description, lying to him about a fictitious Counterpart policy permitting the withholding of his pay when he asked for such, and abolishing Counterpart's long-standing Grievance Procedure shortly before Cooper's termination to prevent him and another executive

who was also complaining about illegal accounting practices from filing a grievance that would have exposed the true motivation for the firings.

Finally, Counterpart fired Cooper in a manner deliberately designed to send out the message that he was untrustworthy and dishonest, publicly locking him out of and banning him from all Counterpart offices, searching his office in search of the "secret files" and making starkly contradictory statements about why he was gone.  Counterpart witnesses have falsely attempted to pass off these actions as "standard operating procedures."

###### B.     Defendant's Statement of the Case

Defendant disputes plaintiff's statement of the case and substitutes its statement of the case, as follows:

Counterpart is a nonprofit development organization that manages development projects around the world.  Counterpart is organized into several divisions, including the Civil Society Division which has developed and overseen all civil society support projects in the Central Asian Republics since 1994. In January 1995, Counterpart hired Jay Cooper ("Cooper") to work on its projects in Central Asia.

On December 21, 2003, Cooper and Counterpart entered into an employment contract to continue Cooper's employment as Chief of Party for the Civil Society Support Initiative, the Healthy Communities Program, and similar projects.   Cooper's position was based in Counterpart's Almaty, Kazakhstan office.    The contract specified the term of Cooper's employment "shall be thirty-six (36) months, and shall begin on July 1, 2003 and end June 30, 2006, unless terminated earlier as provided below." Paragraph 7 of the contract specified the circumstances for early termination:

4

> This Agreement may be terminated without liability to either party in the
> following circumstances: 1) by Counterpart, upon fourteen (14) days
> notice, if funding for the Position or Program is lost, 2) by Counterpart,
> immediately upon notice, if you fail to fulfill your obligations under this
> Agreement or fail to perform your job duties to Counterpart's satisfaction,
> 3) by either party upon thirty (30) days written notice, for any lawful
> reason; or 4) by mutual agreement of the parties at any time.

Counterpart's Senior Vice President, Arlene Lear ("Lear") has final authority to decide all personnel matters in the Civil Society Division, including employee performance evaluations and terminations. In 2004, Cooper served under Lear. She had final authority to decide if Cooper was performing to the satisfaction of Counterpart

On August 18, 2004, Lear met with Cooper in Washington D.C. Regional Director Michael Kunz ("Kunz"), and Barbara Sloan ("Sloan"), an independent management consultant retained by Counterpart, also attended the meeting. Lear told Cooper she was reorganizing the leadership structure in the Almaty office. Lear told Cooper: 1) he would report directly to Kunz instead of her; 2) Counterpart's Director of Finance Bob Abma ("Abma") would report to Kunz instead of Cooper; 3) some of Cooper's administrative duties would be shifted to Abma. Cooper admitted during his deposition that he told Lear he did not like reorganization and would consider leaving his employment with Counterpart because he was not comfortable with the changes. Lear agreed to give Cooper some time to think about whether he wanted to continue his position at Counterpart. On August 24, Sloan summarized the August 18 meeting in an e-mail to the meeting participants.

On or around August 25, 2004, Lear conducted a conference call with Sloan, Cooper and Kunz. During the meeting Cooper agreed both he and Counterpart would spend the next four months evaluating whether Cooper wanted to remain in the Almaty office under the new leadership structure. Cooper also agreed that if either he or Counterpart decided prior to the end

of the four month period that things were not working out, they would work toward a thoughtfully managed separation of Cooper's employment. On August 25, Sloan summarized the conference call in an e-mail to the meeting participants.

Cooper admitted during his deposition there was nothing said at the August 18th meeting or at any time thereafter which altered the basis under which Counterpart had the right to terminate his employment contract.

On October 4, 2004, Cooper emailed then-Human Resources Manager Kelli Boyer ("Boyer") to inquire about his options for terminating his employment. Boyer consulted with Lear and they agreed Boyer would address Cooper's inquiry in person during her upcoming trip to the Almaty office.

In early November 2004, Boyer traveled to the Almaty office. She met with Cooper several times. While in Almaty, Boyer reported several problems with Cooper's performance to Lear. Cooper disputes the truth of many of Boyer's reports but Cooper admits:

- he sought Boyer's assistance in resolving work-related problems with Abma, but refused to participate in mediation because it was scheduled to take place in Kunz's office;

- Boyer could have interpreted certain statements made by Cooper to mean he intended to put in minimal effort until the expiration of his contract.

Lear believed Boyer did a good job handling personnel issues and trusted Boyer's ability to investigate employee performance issues and report accurately to her. Boyer's reports confirmed Lear's concerns about Cooper's performance and led her to conclude Cooper was no longer a good fit for Counterpart. On November 12, 2004, Lear terminated Cooper's employment. Lear told Cooper he was not performing to Counterpart's satisfaction.

Specifically, it is undisputed that during the termination phone call, Lear told Cooper minimal effort on the job was unacceptable and his inability or unwillingness to function under the new management structure was unacceptable.

Lear communicated her decision to Cooper by telephone from her Washington D.C. office. Boyer and Dorcus were also on the call. Cooper was on a business mission to Counterpart's office in Bishkek, Kyrgystan at the time.

### A. Cooper's Breach of Contract Claim

The Amended Complaint alleges Counterpart terminated Cooper to "avoid the questions Cooper had raised" about financial irregularities and "to prevent Cooper from commencing a grievance procedure" to challenge his termination. However, Cooper admits he has no direct evidence Counterpart terminated him for these reasons. Cooper admits he never had any evidence of any financial irregularities while he was employed and that it was standard industry practice for organizations to allocate USAID funds from one project to another. Cooper admits shortly after he was terminated he told a USAID official that Counterpart had not engaged in any financial practices that would warrant a government investigation. In addition, even though Counterpart had abolished its formal grievance procedure shortly before Cooper's termination, it is undisputed Cooper corresponded freely with Dorcus and Counterpart President Lelei LeLaulu ("LeLaulu") to complain about his termination after the fact and never raised concerns about financial irregularities.

### B. Cooper's False Light Invasion of Privacy Claim

Cooper's false light claim is based on the following evidence and alleged evidence that occurred after Cooper's November 12, 2004 termination:

- Counterpart changed the locks on his office door and left it locked for the Counterpart Almaty staff to see. Cooper admits he does not know who saw the locks being changed;

- Boyer and Abma sorted through Cooper's office in the presence of once security guard;

- Lear instructed Cooper not to return to the Almaty office during the termination conference call;

- Kunz allegedly told Igor Tupitsyn and Susan Fritz that Cooper left Counterpart "not by his own choice." Cooper admits he left Counterpart not by his own choice;

- Counterpart communicated to three Counterpart Country Directors and one professional colleague that Cooper was no longer with Counterpart and was not allowed in any offices in those countries;

- Kunz told the Almaty office IT Director not to forward e-mails or telephone messages or other correspondence to Cooper.

- Altinay Kucheekekyuva's allegedly spoke with Ruth Pojman about Cooper's termination from Counterpart;

- Lear spoke with Ara Nazinyan about Cooper's termination from Counterpart;

- Lear spoke with Asiya Sasykbaeva about Cooper's termination from Counterpart;

- Kunz allegedly told Stephen Larabee that Cooper mismanaged projects;

- Lear allegedly told Igor Storozhenko that Cooper's ex-wife deserved custody of their child.

Counterpart maintains each and every communication made by Counterpart and relied on by Cooper in support of his false light claim, was communicated only to one person or a small

group of persons and was either true, a matter of opinion and/or not highly offensive to a reasonable person.

## II.    STATEMENT OF PLAINTIFF'S CLAIMS

1.    Counterpart breached its written agreement with Cooper by exercising its power to terminate the contract in bad faith in violation of the duty of good faith and fair dealing.

2.    Counterpart breached its oral modification of its written agreement with Cooper by failing to permit him to perform under the new arrangement in bad faith in violation of the duty of good faith and fair dealing.

3.    Counterpart dealt with Cooper in connection with his employment in such bad faith that contract damages are insufficient to hold Counterpart accountable or make Cooper whole, so as to entitle Cooper to compensatory and punitive damages in tort from Counterpart.

4.    Counterpart wrongfully discharged Cooper to prevent him from reporting unlawful accounting problems to the government, which motive is counter to public policy as expressed in the regulations governing cost principles for non-profit organizations promulgated by the US Office of Management and Budget and therefore gives rise to a tort claim for wrongful discharge.

5.    Counterpart terminated Cooper because of his lawful acts in furtherance of an action under the Civil False Claims Act, 31 U.S.C. 3730(h), and is for this reason entitled to additional relief including two times the amount of back pay, interest on the back pay, litigation costs and reasonable attorneys' fees.

6.    Counterpart, in its actions and statements in connection with Cooper's termination, held Cooper up to a false light, with reckless disregard for the truthfulness of the

message it was sending out or of the effect such message would have on a reasonable man in Cooper's position, thereby committing the tort of invasion of privacy.

## III.    STATEMENT OF DEFENDANT'S DEFENSES

### A.    Defendant's Affirmative Defenses

Counterpart denies all the allegations in Cooper's Amended Complaint not expressly admitted.  Counterpart denies any wrongdoing or unlawful conduct and has asserted relevant affirmative defenses as follows:

1.    The Amended Complaint fails to state a claim upon which relief can be granted as a matter of fact and/or law.

2.    At all times relevant hereto, defendant has acted in good faith and has not violated any rights which may be secured to Cooper under any federal, state, or local law, rule, regulation or guideline.

3.    All or a portion of Cooper's claims for damages are barred or reduced by his mitigation of alleged damages or by his failure to mitigate.

4.    Cooper's claims based on an alleged oral employment contract are barred by the Statute of Frauds.

5.    Cooper's claims based on the alleged oral employment contract are barred because the alleged contract did not contain sufficient terms, the contract was vague, the contract lacked consideration, and Counterpart had no intention on, and never assented to, entering into such a contract with Cooper.

### B.    Additional Defenses to Plaintiff's Breach of Contract Claim

1.    Cooper cannot prove Counterpart was satisfied with his performance.

2.     Cooper cannot prove Counterpart terminated Cooper to avoid his financial questions or to prevent him from filing an internal grievance.

3.     Cooper cannot prove Counterpart terminated him for a non-job related reason.

4.     Any claims that were not pled in the Amended Complaint must be rejected. Specifically, Cooper has no viable claim for breach of the duty of good faith and fair dealing, wrongful discharge, retaliation in violation of the False Claims Act, breach of an oral and/or modified contract, or for tort-type punitive damages.

5.     Cooper can only recover maximum contract damages of 30 days under the terms of the December 2003 employment contract.

6.     Cooper has not alleged and/or cannot prove any basis in fact or law for compensatory or punitive damages for his breach of contract claim.

7.     Damages under the False Claims Act are not available for a breach of contract claim.

C.     **Additional Defenses to Plaintiff's False Light Invasion of Privacy Claim**

1.     Cooper cannot prove Counterpart gave publicity to any statement or message about Cooper.

2.     Cooper cannot prove Counterpart's alleged statements or messages were false or made with reckless disregard for the truth.

3.     Cooper cannot prove Counterpart's alleged statements or messages would be highly offensive to a reasonable person.

4.     Cooper cannot prove he suffered compensable damages for emotional distress as because of Counterpart's alleged statements or messages.

5.     Cooper's Amended Complaint does not contain a claim for punitive damages.

IV.    **SCHEDULE OF WITNESSES**

Plaintiff's Witness List is attached to this Joint Pretrial Statement as Attachment 1. Defendant's Expected Witness List is attached to this Joint Pretrial Statement as Attachment 2. Plaintiff has no objections to Defendant's Witness List.

Defendant objects to any proposed testimony by any witness as to any matter where evidence is insufficient that the witness has personal knowledge of the matter.    Defendant reserves the right to object to the introduction of witness testimony on relevance grounds.

Defendant objects to Plaintiff's proposed witness, Irina Kolmakova, because Plaintiff failed to provide Defendant with accurate contact information for Kolmakova.    Under FRCP 26(a) and (e), a party is required to provide the name and any known addresses and telephone number of each individual likely to have discoverable information.    In February 2008, counsel for Counterpart made four separate unsuccessful attempts to reach Kolmakova at the e-mail address and telephone numbers provided in Cooper's initial disclosure.    On February 25, 2008, only at Defendant's request, Plaintiff's counsel provided a Counterpart's counsel with a new phone number for Kolmakova.    Counterpart's counsel was also unable to reach anyone at that number. Cooper and his counsel have maintained sufficient contact with Kolmakova to designate her as one of seven trial witnesses out of more than 40 potential witnesses identified in Plaintiff's initial disclosures.    Under FRCP 37(c)(1), Plaintiff's failure to disclose accurate contact information for Kolmakova prohibits her from testifying on Cooper's behalf at trial.

Defendant also objects to Kolmakova's appearance via video conferencing because Plaintiff has not even *attempted* to demonstrate good cause in compelling circumstances or appropriate safeguards, as required by FRCP 43.

Defendant objects to Plaintiff's proposed witness, Azam Bobakhodjaev, because Plaintiff also failed to provide Defendant with accurate contact information for Bobakhodjaev. In February 2008, counsel for Counterpart made three separate unsuccessful attempts to reach Kolmakova at the e-mail address and telephone number provided in Cooper's initial disclosure. Counterpart's counsel requested confirmation of Bobakhodjaev's contact information from Cooper's counsel. On May 23, 2008, Plaintiff's counsel by e-mail: "I know nothing different about the contact information for any of the people you listed than has been previously given to you." This is not true since Cooper and his counsel have maintained sufficient contact with Bobakhodjaev to designate him as one of seven trial witnesses out of more than 40 potential witnesses identified in Plaintiff's initial disclosures. Under FRCP 37(c)(1), Plaintiff's failure to disclose accurate contact information for Bobakhodjaev prohibits him from testifying on Cooper's behalf at trial.

## V.      LIST OF EXHIBITS

Plaintiff's List of Exhibits is attached to this Joint Pretrial Statement as Attachment 3. Defendant's List of Exhibits is attached to this Joint Pretrial Statement as Attachment 4. Objections will be filed in accordance with Local Rule 16.5(e).

## VI.     DESIGNATION OF DEPOSITION TRANSCRIPTS

### A.      For Plaintiff

Plaintiff's Designation of Deposition Transcripts is attached to this Joint Pretrial Statement as Attachment 5.a – 5.e. Defendant objects to Plaintiff reading into the record any prior sworn testimony of witnesses who are available to testify in person. Defendant's specific objections to Plaintiff's Designation of Deposition Transcripts will be filed in accordance with Local Rule 16.5(e).

13

**B.      For Defendant**

Other than for impeachment purposes, Defendant does not anticipate presenting testimony by deposition.  However, if a witness becomes unavailable, Defendant reserves the right to present testimony by deposition.  Defendant reserves the right to use for impeachment purposes all transcripts of depositions taken in this case, all pleadings previously filed and all discovery responses previously served on or received from opposing counsel.

**VII.    ITEMIZATION OF PLAINTIFF'S DAMAGES**

Plaintiff's itemization of damages is attached to this Joint Pretrial Statement as Attachment 6.

**VIII.   REQUEST FOR OTHER RELIEF**

Plaintiff seeks the relief set out in Attachment 6.

**IX.     PROPOSED *VOIR DIRE* QUESTIONS**

The parties proposed *voir dire* questions and any objections thereto are attached to this Joint Pretrial Statement as Attachment 7.

**X.      PROPOSED JURY INSTRUCTIONS**

The parties proposed jury instructions are any objections thereto are attached to this Joint Pretrial Statement as Attachment 8.

**XI.     MOTIONS IN LIMINE**

Plaintiff has no motions in limine.

*Defendant's Motion in Limine to Exclude Evidence and Testimony Regarding Defendant's Compliance with USAID Regulations*, Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 9.a – 9.c.

14

*Defendant's Motion in Limine to Exclude Evidence and Testimony of Counterpart's Non-Public Communications About Cooper's Performance or Termination,* Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 10.a -10.c.

*Defendant's Motion in Limine to Exclude Evidence and Testimony About Propp's Lawsuit,* Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 11.a – 11.c.

*Defendant's Motion in Limine to Exclude Evidence and Testimony About Chassey's Grievance,* Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 12.a – 12.c.

*Defendant's Motion in Limine to Exclude Evidence and Testimony About the Reasons for Boyer's Separation,* Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 13.a – 13.c.

*Defendant's Motion in Limine to Evidence and Testimony About Plaintiff's Alleged Damages Incurred After December 12, 2004,* Plaintiff's corresponding opposition and Defendant's reply brief are attached to this Joint Pretrial Statement as Attachment 14.a – 14c.

*Plaintiff's Motion in Limine Re Admissions,* and Defendant's corresponding opposition are attached to this Joint Pretrial Statement as Attachment 15.a – 15.c.

## XII.  **STIPULATIONS**

The parties' signed stipulations of fact and/or law are attached to this Joint Pretrial Statement as Attachment 16.

## XIII.  PROPOSED VERDICT FORM

Plaintiff's Proposed Verdict Form is attached to this Joint Pretrial Statement as Attachment 17.  Defendant's Proposed Verdict form is attached to this Joint Pretrial Statement as Attachment 18.

Respectfully submitted,

**JACKSON LEWIS LLP**

July 14, 2008

By: _____
     Michael N. Petkovich (D.C. Bar No. 456010)
     Kara M. Ariail (D.C. Bar No. 478718)
     8614 Westwood Center Drive, Suite 950
     Vienna, Virginia 22182
     (703) 821-2189
     (703) 821-2267 (fax)

**Attorneys for Defendant Counterpart International**

By: _____
     Patricia D. Douglass, Esq. (D.C. Bar No. 214916)
     98 Interpromontory Rd.
     Great Falls, VA 22066

**Attorney for Plaintiff Jay W. Cooper**

16