Attachment 12.b to Joint Pretrial Statement

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAY W. COOPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1598 (RMC-JMF) |
| | ) |
| COUNTERPART INTERNATIONAL, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EVIDENCE AND TESTIMONY ABOUT CHASSY'S GRIEVANCE**

Defendant seeks to bar any testimony about a grievance filed by a former Counterpart employee named Aaron Chassy against Arlene Lear, whom Defendant characterizes as "the same decision maker who terminated Cooper's employment." Plaintiff does not intend to call Chassy as a witness. Plaintiff does not intend to go into the merits of the grounds of Chassy's grievance or the specifics of his problems with Lear.

Nonetheless, as we show below, the fact that Chassy filed a grievance, the date he did so, Counterpart's handling of that grievance and its subsequent abolishment of its longstanding grievance procedures are relevant to 1) Cooper's claim that Counterpart failed to treat him with the good faith required by their contractual relationship, and 2) the credibility of Counterpart's major witnesses.

1. **Relevant facts surrounding Chassy's grievance.**

Cooper hopes to bring out the following facts.

- Counterpart's Grievance Procedure (Exhibit 7 at CP0596-99, attached at Tab A) had been in Counterpart's Manual for Employees in Foreign Areas for several years. By its very terms it was designed to "ensure that [employees' problems] receive prompt and fair consideration," to "provide an orderly and systematic method for the equitable resolution of . . . disputes," and to "correct the factual situation, which forms the basis of the grievance." (Tab A at CP0596-97)

- Chassy wrote and circulated a memorandum "re: Management Supervision by Arlene Lear" on April 7, 2003 (see Exhibit 79, attached at Tab B.) The document was titled "Statement of Grievance." It accused Lear of abusive practices.

- On April 23, 2003, Counterpart's Human Resources Manager wrote Chassy "in accordance with Counterpart's grievance policy" that the grievance procedure should not apply to his complaint, but that Counterpart had voluntarily reviewed the substance of his concerns. (See Exhibit 81, attached at Tab C.)

- On April 25, 2003, Counterpart and Chassy entered into an Agreement terminating his position with Counterpart. (See Exhibit 82, attached at Tab D.)

- We have ample evidence that as of September of 2004, Counterpart knew that Cooper was complaining about financial irregularities and the use of funds from the programs he administered for other purposes.

- Brian Propp, Counterpart's Vice President and General Director of the Community and Humanitarian Assistance Division, had been complaining for a year about Counterpart's misuse of NICRA funds. In September of 2004 he took

his complaint directly to Harry Dorcus, Counterpart's CFO. (Propp dep. at 6-21.)[1]

- On October 6, 2004, Counterpart's new Human Resources Manager sent out a Memorandum rescinding Counterpart's Grievance Procedure. The reason stated for this decision was that the Grievance Procedure was "redundant." (See Exhibit 37, attached at Tab E.)[2]

- Counterpart fired Brian Propp, on October 12, 2004.

- Counterpart fired Plaintiff Cooper on November 14, 2004.

- On the last day of discovery in this case, Counterpart produced a Memorandum dated May 16, 2003 that it claimed proved that the Grievance Procedure had in fact been discontinued as of that earlier date. That May 16 Memorandum purports to "discontinue our Grievance Procedure as set forth at Section 6.20 of the Employee handbook, effective immediately. (See Exhibit 78, attached at Tab F.)

### 2. Relevancy No. 1: Lack of Good Faith and Fair Dealing.

We will ask the jury to conclude that this history evidences a lack of good faith and fair dealing, and that Counterpart abolished its grievance procedure to be sure that neither Cooper nor Propp, whom it planned to terminate, could use that procedure to challenge the factual "basis" for Counterpart's decision to terminate them. Evidence will show that as to Cooper the "evidence" cited by Lear at the time of his termination was based on the

---

[1] The transcript of Propp's deposition has been filed in connection with Plaintiff's Opposition to Defendant's Motion for Summary Judgment (R. 26(11).

[2] It was supposedly redundant because Counterpart had a robust "open door policy." On the contrary, we will show that Mr. Dorcus, the company's CFO, took no steps to advise Cooper when Cooper came to him with concerns about diverting funds from the programs he managed to other Counterpart uses.

reporting of Ms. Boyer of the Human Resources department and was largely simply fiction that could have been easily shown to be such. Propp has testified that he was given no reason for his termination. (Propp dep. at 11-12.) It is an easy inference to draw that Counterpart -- and especially Arlene Lear -- did not want a grievance proceeding launched by either of these men.

Counterpart's management seemed to realize that abolishing the grievance procedure left its employees without meaningful redress. Minutes of a meeting of Counterpart's Senior Management Team on October 19, 2004, reflect management's recognition that replacing the grievance policy with the open door policy resulted in a "potential oversight" of employees' rights, including instructions on how to resolve disputes and an option for written grievances. On October 26, 2004 two members of the company's Program Management Team were revising the open door policy to include greater specificity, but no such revision had issued until long after Cooper's departure. Counterpart had no whistleblower policy during Cooper's tenure, despite management recognition of its value and the fact that Counterpart belongs to an organization of non-profits in the development field that requires its members to have such a policy. (For citation to record evidence re management's recognition of the inadequacy of its procedures once the Grievance Procedure was abolished, see Plaintiff's Statement of Genuine Issues (R. 27(1)), Issue No. 10.

### 3. Relevancy No. 2: Credibility of Counterpart and its Executives.

There are a number of reasons to suspect that Exhibit 78 (the May 16, 2003 Memorandum) is a later-invented document created to try to temporally separate the abolishment of the grievance procedure from Cooper's termination. Minutes of a

meeting of Counterpart's Senior Management team on October 19, 2004 refer to replacing the grievance procedure with the open door policy as a "recent policy change." The Memorandum that is at Tab F does not even refer to the Grievance Procedure in the only Employee Manual in evidence (the one in force when Cooper and Propp were fired). That Manual (at Tab A) has its Grievance Procedure in section 7.17 on page 22, not section 6.20 as Exhibit 78 states. Mr. Dorcus, the supposed author of Exhibit 78 testified that he was not the author, that the memo was authored by Counterpart's counsel and that he does not know if it was disseminated but that he was "told" that it was. (Dorcus dep. at 392-93)[3]  Cooper will testify that he never saw Exhibit 78. Propp has sworn that he never saw it.[4]  Both Propp and Cooper have said that it was Counterpart policy at the time to have such a memorandum issued over the signature of the company's president, not Dorcus. Dorcus himself could not say whether a memo to all employees would have been sent out over his name in May of 2003 (Dorcus dep. at 396).

In short, the sudden arrival of Exhibit 78 is, in Plaintiff's view, a red flag as to the sensitivity of the issue of the abolishment of the Grievance Policy. We will ask the jury to conclude that Arlene Lear was simply determined not to go through another such unpleasant process.

Testimony about these events from those who participated in Cooper's termination -- Lear, Dorcus and Boyer -- was inconsistent and less than candid. For example, Counterpart witnesses differ as to what was done with Chassy's grievance. Lear testified

---

[3]  The transcript of the Dorcus deposition was filed in its entirety on February 13, 2007, as support for Plaintiff's Opposition for Defendant's Motion for Summary Judgment (R. 26(6)), as were other deposition transcripts and declarations supporting these oppositions to Defendant's motions in limine. The precise citations to record evidence about the abolishment of the grievance procedure can be found in Plaintiff's Statement of Genuine Issues, Genuine Issue No. 9 (R 27(1). The deposition evidence cited in these Oppositions will be read into the record in Plaintiff's case at trial.

[4]  Declaration of Brian Propp (R. 26(1).

that Chassey's grievance was investigated by Counterpart's HR department and its legal counsel, who determined that the grievance was unfounded. (Lear dep. at 262-63)[5] Dorcus, on the other hand, testified that aside from the fact that Counterpart's CEO talked to Lear, no investigation of Chassy's grievance was had because management considered it unfounded. (Dorcus dep. at 401-02)  Dorcus went so far as to contend that Chassy's memorandum, Exhibit 79, was not a grievance at all, despite its being captioned "Statement of Grievance." When confronted with the fact that the May 23, 2003 Memorandum that is Exhibit 78 was dated approximately five weeks after Chassy's grievance, Dorcus denied that it was Chassy's grievance (which was, of course, in his view apparently a non-grievance) that led Counterpart to conclude, as Exhibit 78 states, that the grievance procedure was "ineffective." (Dorcus dep at 398.) But Dorcus had never heard of any other grievance being filed at Counterpart before the date of Exhibit 78 and was unable to explain what evidence there could have been that the procedure was, as "his" memorandum stated, "ineffective. (Dorcus dep. at 396-97.)  Lear too knew of no other grievance ever filed at Counterpart other than Chassy's. Boyer, the HR Manager, contradicts her, saying she processed a grievance brought by another employee, which she found without merit. (Boyer dep. at 22.) That grievance is in evidence as Exhibit 40 and is dated April 30, 2004, making it unlikely that the grievance procedure had been abolished in May of 2003. Finally, Boyer simply cannot remember what occasioned her to issue Exhibit 78,

    In the face of this evidence, we will ask the jury to disbelieve Lear and Dorcus when they testified (Lear dep. at 245, Dorcus dep. at 201-02) that the abolishment of the grievance procedure had nothing to do with Cooper's termination. Evidence that goes to

---

[5] The transcript of Lear's deposition can be found at R.26 (8).

credibility of two persons who made the decision to fire Cooper[6] is vitally relevant here. The abolishment of the grievance procedure is one reason Plaintiff has requested the "Falsus in uno, falsus in omnia" instruction to the jury.

## Conclusion

Because the Chassy grievance is relevant to the central issue in this case – whether Counterpart met its obligation to Cooper to exercise its contractual power in accord with the implied covenant of good faith and fair dealing – and because the testimony on the subject is so suspect, Defendant's motion in limine to exclude evidence and testimony about Chassy's grievance should be denied.

Respectfully submitted,

*/s/ Patricia D. Douglass*
Patricia D. Douglass
DC Bar 214916
98 Interpromontory Road
Great Falls, VA 22066-3219
703 759-3586
Counsel for Plaintiff Jay Cooper

July 7, 2008

---

[6] While Lear was the person most responsible for Cooper's termination, she consulted with others, including Dorcus, in making that decision. The evidence as to Dorcus's role is set out at Plaintiff's Statement of Genuine Issues, Issue 22m.