**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAY W. COOPER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 05-1598 (RMC-JMF)** |
| | ) |
| **COUNTERPART INTERNATIONAL,** | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S SUPPLEMENT TO JOINT
PRETRIAL STATEMENT AND PLAINTIFF'S SUPPLEMENTAL COMMENTS
ON SEVERAL MATTERS AT ISSUE**

Plaintiff responds to the Supplement filed by Defendant yesterday. This response

will track the sections of Defendant's submission. Additional matters are discussed in

Sections 7-9, below.

**1.      Defendant's attempt to reargue the relevance of the 30 Days Notice
         Provision should fail to sway the Court.**

Defendant is attempting at the last minute to rely on a contractual provision that was

never used in Cooper's case. Cooper was not given a 30 days notice. Cooper was

summarily expelled from Counterpart. If Cooper had relied on that same provision of his

letter agreement with Counterpart to summarily desert his job, Counterpart would have a

claim against him for breach of contract, as the 30 days was obviously designed to permit

the parties to sever their employment relationship without disruption of Counterpart's

business, to permit an orderly and civilized separation, and to give Cooper an opportunity

to question the reasons for the separation through the company's grievance procedure.

At the pretrial conference on July 29, Defendant's counsel repeatedly described the

30 days notice provision as a "cap" on damages to which the parties had agreed.  The

language of the letter agreement does not support that characterization.  The 30 day

notice provision is an alternative to the "Counterpart's satisfaction" grounds for

termination, with its own time constraints.  Its language says nothing about it modifying

the "satisfaction" provision.

Defendant also conveniently ignores the fact that the 30 days notice provision must

be exercised in accord with the implied covenant of good faith and fair dealing, just as

does the provision concerning Counterpart's satisfaction with Cooper's job performance.

See, for example, *Sadowski v. Dell Computer Corp*., 268 F. Supp.2d 129, 137 (D. Conn.

2003) (apparently unbridled discretion given by contract to one party to cancel must be

exercised in good faith, and whether or not it has been is a jury question);

*Communications Transmissions, Inc. v. Tristar Communications, Inc.,* 798 F. Supp. 406

(W.D. Tex 1992) (party with a unilateral right to decide the nature and extent of the other

party's performance under a contract must exercise that power in good faith); Perritt, H.,

Employee Dismissal Law & Practice § 6.29 (4th ed. ).  *Compare*, *Fortune v. National

Cash Register Co.*, 364 N.E. 2d 1251 (Mass 1977) (employer's decision to terminate a

long-standing employee must be exercised in good faith even though the employment is

at will).

Defendant has unilaterally decided that the agreement's reference to "illegal reason"

connotes only a statutory tort or crime.  If in fact Counterpart terminated Cooper's

contract to prevent the exposure of its failures to abide by government regulations

governing the accounting for costs in government-funded programs, that kind of

retaliatory termination is in fact an illegal retaliatory discharge.  See 31 U.S.C. § 3730(h).

It is also a tort under District of Columbia law.   See, e.g., *Liberatore v. Melville Corp.*,

168 F.3d 1326 (D.C. Cir. 1999) (wrongful termination claim survives a Rule 12(b)(6)

motion when the termination was because of the employee's threat to lodge a complaint

about the employer's violation of federal and state law governing the storage of drugs).[1]

The Fourth Circuit decision offered by Defendant does not change these reasons to

deny Defendant's in Limine motion.  In *Strategic Outsourcing, Inc. v. Continental*

*Casualty Company*, 2008 U.S. App. LEXIS 8191 (4th Cir. 2008), a contract of insurance

provided that the insurer could reevaluate the premium level if additional exposures

represented significant changes from the circumstances contemplated by the parties when

the premium rate was set.  When the insurer invoked this "re-rating clause" and the

insured refused to accept the increased rate that was asked, the insurer invoked a

cancellation clause that permitted either party to terminate the agreement with 90 days

notice.  The jury found for the insured that the insurer had breached the terms of the re-

rating clause, and the insurer argued that the 90-days notice should limit its damages,

much as Defendant does here.  The District Court refused to apply the limit, but the

Circuit reversed as a matter of law.  The appellate court did so on reasoning particularly

apt here.

Despite the jury's verdict that the insurer had breached the contract by failing to meet

the terms of the re-rating clause, the Fourth Circuit found that the insurer had properly

invoked the cancellation clause when the insured rejected the higher rates even assuming

that the covenant of good faith and fair dealing limited the insurer's choices under the

---

[1]   Four other D. C. cases that allow the tort action are cited in Plaintiff's "Support" for Plaintiff's Proposed
Jury Instruction No. 31 (Wrongful Discharge).

cancellation clause: "Nothing in this record even suggests that CNA chose to terminate its relationship with SOI with the intent to wrongfully deprive [SOI] of . . . benefits to which [it was] entitled or for any other wrongful or unconscionable purpose." *Strategic Outsourcing, supra,* 2008 U. S. App. LEXIS 8191 at *12-13, quoting *Dull v. Mut. of Omaha Ins. Co.,* 354 S.E.2d 752, 757 (N.C. App. 1987). Instead, the Circuit Court found that the insurer's motive was to terminate the contract to get a more profitable rate, a motive that it concluded was "neither wrongful nor unconscionable. . . . Therefore, even if an implied duty of good faith limited the parties' exercise of their cancellation rights under the contract, CNA could invoke the cancellation clause without breaching this duty." *Id.* at *13. Thus this case provides no support whatsoever for Counterpart's contention that a party can enforce a notice provision as a "cap" on damages if it is found to have exercised that notice provision in violation of the duty of good faith and fair dealing.

In Cooper's case the exercise of either clause to terminate Cooper must be reviewed for breach of the standards of good faith and fair dealing. Both clauses in Cooper's case deal with termination, as opposed to the *Strategic Outsourcing* situation where one clause can be seen to have been elected under a separate motivation untainted by CNA's breach of the other clause. Cooper is prepared to show that Counterpart, as opposed to the insurer, was not motivated by reasons that were "neither wrongful nor unconscionable" and that even if Counterpart had relied on the 30 days notice provision,[2] it did so to rid itself of the danger Cooper posed to the company, a motivation at odds with the covenant of good faith and fair dealing.

---

[2]   Of course Counterpart did not comply with the clause, did not give 30 days notice and its counsel did not raise a whisper about that clause until its in Limine motion of July 14, 2008, in a case that has been pending since the fall of 2005.

The *Strategic Outsourcing* opinion is distinguishable for other reasons as well.

- The notice provision in that case was actually employed by the insurer, who gave timely notice, and that notice was accompanied by a period during which the insurer kept the policy in force and engaged in the negotiation contemplated by that clause.  In contrast, Cooper was dismissed on the spot.

- The 90 day notice at issue in the *Strategic Outsourcing* case did not explicitly ban its operation in a case where the termination was for an unlawful reason.  Cooper, of course, claims Counterpart's motivation made his termination retaliatory and thus unlawful.

- The opinion relies on North Carolina case law for its conclusions about what the parties might reasonably have expected.  Here, of course, Cooper reasonably expected when entering into his letter agreement with Counterpart that if Counterpart were to invoke the 30 days notice provision he would be given 30 days to invoke the company's grievance procedure to explore the motivation behind the termination decision and/or take that time to leave his position in a dignified fashion.

- Finally, the insured apparently consented to the insurer's invocation of the 90 day notice as a defense in its Pretrial Statement and at trial.  *Id.* at *10.  Here, Plaintiff Cooper objects to any reliance on, or even mention of, that clause in this trial.

2.    **Defendant distorts Plaintiff's false light claim to attempt to exclude relevant evidence**.

Counterpart seeks to bar additional items of evidence that contributed to the creation of a false light about Plaintiff on the grounds that such evidence is either true or is opinion.  In so doing, Defendant ignores Plaintiff's position, previously set our in our Opposition of July 14, that it is irrelevant that certain snippets of the message were literally true.  It was such evidence in the aggregate that constituted the false message that Counterpart sent out to the community about Cooper—that Counterpart had concluded that Cooper was unworthy of trust, that Cooper must be prevaricating about the circumstances of his termination because of conflicting stories disseminating from Counterpart and circulating through the community, and that Cooper must have done something very bad to be so mistrusted and feared by an organization dedicated to the promotion of "civil" society.

These bits of information, in the aggregate, create a false light about Cooper.  They create a picture of a man with characteristics, character or conduct that are so false so as to paint a major misrepresentation of his character, history and activities and that it is foreseeable that a reasonable man in his position would take serious offense and be aggrieved by the publicity generated by Counterpart, which publicity it could have easily foreseen.  RESTATEMENT (SECOND) TORTS § 652e & cmts b & e;  *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C. 1999); *Vassiliades v. Garfinkle's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 587 (D.C. 1985);  *Weyrich v. New Republic, Inc.*, 235 F. 3d 617, 627 (D.C. Cir. 2001).

As to Defendant's position that expressions of opinion have no place in a case of false light, the "it's only an opinion" defense has been substantially weakened by the Supreme Court in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19-20 (1990).  In that defamation

case, the Court said the following, referring to an earlier case which had been relied on

for the proposition that expressions of "opinions" could not create liability for

defamation:

> . . .[W]e do not think this passage from *Gertz* was intended to create a wholesale
> defamation exemption for anything that might be labeled "opinion." . . . Not only
> would such an interpretation be contrary to the tenor and context of the passage, but it
> would also ignore the fact that expressions of "opinion" may often imply an assertion
> of objective fact.
>
>    If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth. Even if the speaker
> states the facts upon which he bases his opinion, if those facts are either incorrect or
> incomplete, or if his assessment of them is erroneous, the statement may still imply a
> false assertion of fact. Simply couching such statements in terms of opinion does not
> dispel these implications; and the statement, "In my opinion Jones is a liar," can cause
> as much damage to reputation as the statement, "Jones is a liar."

As for Defendant's repeated contentions that many of the actions taken by

Counterpart are "common business practices," we will have deposition testimony of Mr.

Propp and live testimony of Mr. Touma as to the contrasting ways their terminations

were handled by Counterpart.  (Both men were cited in Defendant's Interrogatory

Answers as proof that Mr. Cooper's termination was handled in accord with

Counterpart's standard operating procedures.)  In addition, Counterpart has shifted

ground wildly on the reasons why Mr. Cooper's office was locked.  See Genuine Issues,

filed February 13, 2007 (D. 27 (2)) at Genuine Issue No. 21.  Plaintiff will offer

testimony that the motive for the locking and the search was Counterpart's desperate hunt

for the "secret files."

    **3.**    **Defendant's position as to Plaintiff's Proposed Jury Instructions on the
implied duty of good faith and fair dealing (Nos. 15 and 30) is not
supported by the authorities it cited and misstates the law of the District
of Columbia.**

Defendant postulates about Plaintiff's motive in asking that its Proposed Jury Instruction No. 15 be given, seeking to prevent the jury from hearing about the implied contractual duty of good faith and fair dealing. To avoid such an Instruction, Defendant suggests that D.C. law permits no separate claim for violation of that duty, citing the same two cases that appear multiple times as support for Defendant's proposed jury instructions, as the basis for objections to those instructions sought by Plaintiff and in Defendant's Reply Memorandum supporting Defendant's Motion in Limine to Exclude Evidence and Testimony Regarding Defendant's Compliance with USAID Regulations.

First, whether or not the jury is asked to decide whether Cooper is entitled to tort damages for violation of the duty of good faith and fair dealing, Plaintiff is entitled to an instruction that defines the implied duty so that the jury can decide whether the contract was breached because of violation of that implied contractual duty. Thus, Plaintiff's Instruction No. 15 should be given.

Second, Defendant misreads those cases which it claims preclude a separate claim for violation of the implied duty of good faith and fair dealing when there is no other claim in the case that overlaps with and provides the remedies available for violation of the duty of good faith and fair dealing.

The first case cited by Defendant is *WMATA v. Quik Serve Foods*, 2006 U.S. Dist. LEXIS 24510 (D. D. C. 2006). There, Counterclaim Plaintiff Quik Serv sued, *inter alia*, for breach of contract, tortious interference with prospective business advantage and breach of the implied covenant of good faith and fair dealing. WMATA moved to dismiss the breach of the covenant of good faith claim because it was not an independent

cause of action since other counts incorporated that claim. The court began its discussion

with the following observation:

> "The District of Columbia recognizes an independent cause of action for a breach
> of the implied covenant of good faith. *Allworth. V. Howard University*, 890 A.2d
> 194, 210 (D.C. 2006). A party may bring suit for breach of the implied covenant
> when other party to the contract 'evades the spirit of the contract, willfully renders
> imperfect performance, or interferes with performance by the other party.' *Id.*
> However, the implied covenant may not override the express provisions of the
> contract. . . . [B]reach of the implied covenant is not an independent cause of
> action when the allegations are identical to other claims for relief under
> established causes of action."

2006 U. S. Dist. LEXIS 24510 at *14-15.[3]  The Court did not rest its holding on the fact

that there was an overlap in claims. It dismissed the count for breach of the implied

covenant because 1) Quik Serv's actions were expressly permitted by the lease between

the parties, and 2) WMATA's conduct did not rise to the level of bad faith because the

implied covenant could not override the provisions of the lease.

Defendant next cites *Jacobsen v. Oliver,* 201 F. Supp. 2d 93 (D.D.C. 1996),

which invoked the same dicta language employed in *WMATA* about a claim under the

implied covenant not being an independent cause of action when the allegations are

identical to other claims for relief under established causes of action. In *Jacobsen,* the

"other claim for relief" was for the tort of attorney malpractice. In footnote 2, the Court

said that the claim for breach of the implied covenant was identical to the malpractice

claim. It is significant that both causes of action were torts, potentially giving rise to tort-

type damages. [4]

---

[3]  This case provides one example of why Defendant errs in asserting that "tortious breach of the duty of
good faith and fair dealing has never been recognized as an independent tort under District of Columbia
Law." (Defendant's Supplement to Joint Pretrial Statement at 9.)

[4] The Jacobsen court rested its decision on a Third Circuit case, *Northview Motors, Inc. v. Chrysler Motors
Corp.*, 227 F. 3d 78 (3d Cir. 2000), which was based on a specific provision of the Pennsylvania version of

Here, the Court has indicated that has yet to decide whether to permit the jury to consider tort-type damages, including attorney's fees, for breach of contract if the breach arises from breach of the duty of good faith and fair dealing.[5]    The Court has asked Defendant's counsel to provide cites for its contention that the instruction Plaintiff has requested (Plaintiff's Proposed Jury Instruction No. 30) is "not available under District of Columbia contract law."    (See Defendant's Objection to Plaintiff's Proposed Instruction No. 30.)  There is indeed authority for permitting the jury to consider such relief.  See the "Support" for Plaintiff's Proposed Instruction No. 30.  As set out above, the cites Defendant has now provided do not in any way preclude permitting the jury to consider a claim based on failure to deal with Cooper in good faith that gives rise to the possibility of tort damages.  Only tort-type damages can place Cooper in the position Cooper would have been in had Counterpart not terminated him.

4.    **Plaintiff's Proposed Instruction No. 38 correctly describes the damages available in a claim for false light.**

Defendant claims that it is improper to instruct the jury that damages for the tort of false light can include damages for injury to Plaintiff's "good name and reputation" and for "any economic or monetary loss that the Plaintiff suffered as a result."

---

the Uniform Commercial Code, which reference a duty to act in good faith in contract performance.  A comment attached to the provision was  to the effect that the provision under which the claim was brought was intended to be merely a guide for contract interpretation rather than a separate duty of duty of fairness and reasonableness that could be independently breached.  This interpretation of Pennsylvania UCC law is not binding in this case because the courts of the District of Columbia permit an independent action for breach of the implied covenant.  See *Allworth, supra*.

[5]   The Court has indicated it will likely not give an instruction on punitive damages in Cooper's case. Plaintiff suggests the Court revisit this decision after hearing the evidence in the case, when it will become apparent whether Plaintiff's proof has "merged with and assumed the character of a willful tort."  Plaintiff respectfully submits that this is not the case of a "standard breach of contract claim,"  as asserted in Defendant's Supplement to Joint Pretrial Statement at 9.

The case of *Vassiliades v. Garfinkle's*, 492 A. 2d 580 (D.C. 1985) answers that question:

> "A plaintiff whose private life is given publicity may recover damages for the harm to her reputation or interest in privacy resulting from the publicity and also for the "emotional distress or personal humiliation . . . if it is of a kind that normally results from such an invasion and it is normal and reasonable in its extent." RESTATEMENT [(SECOND) TORTS], § 652h comment b.  Actual harm need not be based on pecuniary loss, and emotional distress may be shown simply by the plaintiff's testimony.  Id., comment a.  Proof of special damages is not required."

In Cooper's case the testimony will be that the events surrounding Cooper's termination caused him such humiliation and shame that he was essentially paralyzed for some period of time and embarrassed to ask for help from his colleagues in finding a new position in his field due to the rumors that were rampantly spreading in his community.  That claim is one for emotional distress, and also for the harm to Cooper's reputation and self-esteem that was caused by the actions of Counterpart.

**5.     Defendant's amended Jury Instruction No. 7 is incomplete.**

Plaintiff's Proposed Jury Instructions Nos. 26-28 are more complete that the barebones approach of Defendant's amended Jury Instruction No. 7.  Plaintiff's proposed instructions will provide more guidance to the jury, while still emphasizing that the burden of proof as to damages and amount of damage remains with Plaintiff.

**6.     Defendant's Jury Instruction No. 14 is designed to confuse the jury.**

Defendant seeks to justify the use of the term "actual damages" by reference to language in the RESTATEMENT about actually suffering damages.  Defendant is confusing an adverb with an adjective.  The obvious intent of Defendant's instruction No. 14, which uses the adjective "actual" to modify the word "damages" three times, is to

cause the jury to debate whether the emotional damage that is compensable under the tort of false light is "real" or simply "in Cooper's head."  The language from the *Vassiliades* case quoted above makes it clear that emotional distress and personal humiliation is a type of damage for which the tort was conceived.  There can be no serious doubt that Plaintiff's burden of proof to prove damages, clearly stated in the damages instructions requested by Plaintiff, is sufficient to signal to the jury that to be awarded damages Mr. Cooper must have actually suffered some damage.

7.    **Plaintiff's evidence concerning Ms. Boyer**.

Despite its denial of Defendant's Motion In Limine to Exclude Evidence and Testimony About the Reasons for Boyer's Termination, the Court has expressed some concern about the strength of Plaintiff's proof as to the incompetence of Kelli Boyer, Counterpart's former Human Resources Manager.  In response, Plaintiff notifies the Court that Counterpart, ordered by the Court on October 19, 2006 to produce its performance reviews of Ms. Boyer, has produced only one partial review that could not be positively identified as pertaining to Ms. Boyer.  While Mr. Dorcus testified that he participated in preparing two performance reviews of Ms. Boyer, neither has been forthcoming.  He also testified, without irony, that he actually remembers that the review that is missing is more favorable to Boyer than the partial one that was produced, which may or may not even be of Ms. Boyer!  (Dorcus dep. at 421-24)  Plaintiff has requested Joint Instruction No. 20 and Plaintiff's Proposed Jury Instruction No.7 to permit the jury to draw the inference that these missing performance reviews were unfavorable to Ms. Boyer and thus unfavorable to Defendant's position in this case.

8.    **Plaintiff seeks leave to add Counterpart's General Ledger for the HNCBI project to its exhibit list to form the evidentiary basis for Plaintiff's Exhibits 117 and 120**.

Plaintiff's Exhibits 117 and 120 are charts prepared by Mr. Cooper from a general ledger produced by Counterpart that reflects spending from the HNCBI program during FY 2004.  Plaintiff's counsel has just discovered that this general ledger (Counterpart Bates stamp Nos. 4465-4524) has been inadvertently omitted from Plaintiff's revised Exhibit List.  Mr. Cooper wishes to use the charts as an aid to assist him to explain his conclusions about excessive allocation of funds from the HCBI program to benefit Ms. Lear and Mr. Abma. In order for a chart or summary to be presented to the jury, the underlying documents from which the chart was created must be in evidence in the case. See Joint Jury Instruction No. 22.  Plaintiff requests leave to add this General Ledger to his Exhibit List as Plaintiff's Exhibit 142.

9.    **Plaintiff submits Plaintiff's Exhibit 41A in response to the Court's Order of July 29, 2008.**

The Court has stated that it does not intend to allow Plaintiff to offer or the jury to see Plaintiff's Exhibit 41, the 75-page regulation governing the accounting for costs in government awards, because of the possibility of jury confusion and distraction.  In response to those concerns, Plaintiff herewith offers Plaintiff's Exhibit 41A, consisting of relevant excerpts from Exhibit 41, for review by the Court and Defendant.  Plaintiff requests a decision as to whether this exhibit will be accepted into evidence in this case. Plaintiff also requests that the Court agree to state to the jury that it has taken judicial notice that Plaintiff's exhibit 41A consists of portions of a government regulation that applied to Counterpart's accounting for funds it received for use in the projects managed by Cooper.

Respectfully submitted,

/s/

_____
Patricia D. Douglass
DC Bar 214916
98 Interpromontory Road
Great Falls, VA 22066
(703) 759-3586

COUNSEL FOR PLAINTIFF JAY COOPER

August 5, 2008